**Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.**
**Jamie T. Bird on 03/15/2022**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION


CASE NO.:   7:21CV62 (WLS)


JAMIE T. BIRD,

          Plaintiff,
vs.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA
d/b/a VALDOSTA STATE UNIVERSITY,

          Defendant.
_____/


DEPOSITION OF

JAMIE T. BIRD


Tuesday, March 15, 2022
10:03 a.m. - 2:00 p.m.



Valdosta State University
1500 North Patterson Street
Valdosta, Georgia 31698


Stenographically reported by:
KAIRISA J. MAGEE, RPR, GCCR (Georgia), FLORIDA
NOTARY



Job No. : 387138

APPEARANCES:


On behalf of Plaintiff:

        LAWSON, BECK, & SANDLIN, LLC
        1125 Commerce Drive
        Suite 300
        Peachtree City, Georgia 30269
        (770) 486-8949
        BY:  HOLLY MAESTAS, ESQ.
        holly@lawsonandbeck.com


On behalf of Defendant:

        BROWN, READDICK, BUMGARTNER, CARTER,
        STRICKLAND & WATKINS
        5 Glynn Avenue
        Brunswick, GA 31520
        (912) 264-8544
        BY:  G. TODD CARTER, ESQ.
        tcarter@brbcsw.com

                              I N D E X

Proceedings                                              Page

THE TESTIMONY OF MS. JAMIE T. BIRD:

Direct Examination By Mr. Carter                           4
Cross-Examination By Ms. Maestas                         152
Redirect Examination By Mr. Carter                       166


Certificate of Oath                                      174
Certificate of Reporter                                  175
Errata Sheet                                             176


                          E X H I B I T S

No.                                                     Page

Defendant's Marked Exhibits

41        February 26th, 2019, Email from          71
          Jamie Bird to high school
          counselors

24        Roundtable Bullet Points Discussion  124
          document

Proceedings began at 10:03 a.m.:

MR. CARTER:  This will be the deposition of Jamie Bird, taken pursuant to notice and agreement of counsel.  We'll reserve objections except to the form of the question and responsiveness of the answer.  That's about it.

Anything else, Holly?

MS. MAESTAS:  I don't think so.

THE COURT REPORTER:  All right.  Ma'am, when you're ready, you can raise your right hand.

Do you solemnly swear or affirm that the testimony you're about to give in this cause will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE COURT REPORTER:  Thank you.

Thereupon:

JAMIE BIRD,

a witness named in the notice heretofore filed, being of lawful age and having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MR. CARTER:

**Q    All Right.  Ms. Bird, we've met before.**

My name is Todd Carter.  I represent the Board of Regents of Valdosta State in this lawsuit you've filed.  You've been here for several depositions. So you kind of know how they go.  I'll be asking you questions, and you'll be answering them.  Sometimes I ask a very long question, as I think it through. So if you don't understand something, tell me, and I'll repeat it; okay?

And as you've probably heard us say, don't say "uh-huh" (affirmative) or "uh-uh" (negative) because it's hard for the court reporter to get down.  And hopefully this won't take too long, and we'll get you out of here.

Give me your full name, please, ma'am.

A    Jamie Bird.

Q    Okay.  And what's your current address?

A    435 Northwest 18th Place, Jennings, Florida 32053.

Q    And that was Northwest 18th --

A    18th Place, uh-huh (affirmative).

Q    And the name of the town?

A    Jennings, Florida.

Q    J-e-n-n-i-n-g-s?

A    Yes, sir.

Q    How long have you lived there?

A   We moved there in 1996, and we lived there -- we still live there.  We took about five years and moved to a home here in Valdosta when our children were going to school.

Q   Okay.

A   And then when they got ready to go to college, the eldest, we moved back down.  The address is rather misleading.  It's really not in Jennings, Florida.  It's -- half of the house used to be in Georgia, and the other half used to be in Florida.  So --

Q   Okay.

A   My husband was an airline pilot, and we live -- we chose to live in Florida.  So it's really right past Lake -- it's actually Lake Park, Georgia.

Q   Got you.

And you kept that house when you moved here to Valdosta for those five years?

A   Uh-huh (affirmative).

Q   Is that a yes?

A   Yes, it is.

Q   We didn't get too far before you did it.

Who lives there with you?

A   Currently, my husband and myself.

Q   And what's your husband's name?

A    Frank Bird, III.

Q    Is he still an airline pilot?

A    He is retired.

Q    What airline did he fly for?

A    Piedmont/USAir.

Q    And how long did he do that?

A    Twenty years, approximately.

Q    Got you.

Was he in the military before that?

A    No, sir.

Q    And how long have you and Frank been married?

A    Thirty-eight years.

Q    Okay.  And I know I'm not supposed to ask women this, but how old are you?

A    I'm 61.

Q    Sixty-one.  So you were born in '61 or '62?

A    I was born in '60.

Q    '60.  Okay.  Two years older than me.

What's your date of birth?

A    October the 13th, 1960.

Q    And your Social Security number?

A    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.

Q    And have you ever been married before

Frank?

A   No, sir.

Q   All right.  Are you -- do you have any family here in south Georgia?

A   My mother.

Q   What's her name?

A   Martha Tootle, T-o-o-t-l-e.

Q   Okay.  Where does she live?

A   She lives at Langdale Place, which is an assisted living place here in Valdosta.

Q   Okay.  And has she always lived here in Lowndes County?

A   No, sir.  She -- we moved to Valdosta when I was 3.  So prior to that, she and my father lived in Macon, Georgia.

Q   Okay.

A   And she's from a town called Alamo, Georgia.

Q   Did you happen to -- or did your mother happen to be kin to the Tootles that run the bakery in Baxley, Georgia, by chance?

A   Not that I'm aware of.  My dad -- they have to be related, though.  I mean, my dad was from Glennville and --

Q   Yeah.

A    -- Baxley, they -- but not to my knowledge.

Q    Okay.  And how old is your mother?

A    My mom's 92.

Q    And your father has passed?

A    Yes, sir.

Q    Other than your mother, do you have any other relatives in south Georgia in the Valdosta area?

A    I have no -- I'm an only child.  So I have no siblings.

Q    Cousins?

A    I do have cousins.  I have my cousin CM Jenkins.  He lives in Douglas --

Q    Okay.

A    -- Georgia.

Q    Are any Tootles left, cousins?

A    Yes, sir.  My cousin Renee Tootle Griffin.

Q    And where does she live?

A    She lives here in Valdosta.

Q    Okay.

A    And her sister, also my first cousin, Melanie Tootle Carter.  They live in Valdosta.

Q    Okay.  She's a Carter?

A    Yes, sir.  My -- her parents, Mr. and

Mrs. Wayne Tootle, they live in Cairo.

          MR. ARRINGTON:  Did you say Wayne,
     W-a-y-n-e?

          THE WITNESS:  Yes.

BY MR. CARTER:

     Q    Okay.  Any other relatives?  You're
thinking.

     A    Paul Jenkins.  He -- not in south Georgia.
You're asking me just south Georgia?

     Q    Right.

     A    I'm sorry.

          Now, my second cousin, Sam's daughter, and
her husband live here in Valdosta.  Her name is
Joanna Tanner.

     Q    Okay.  Any others that you can think of?

     A    No, sir.

     Q    And do you have children?  You said you
have children.  How many children do you have?

     A    I have three.

     Q    What are their names and ages?

     A    Frank Bird, the IV.  He's 25.

     Q    Where does he live?

     A    Albany, Georgia.

     Q    Okay.

     A    And then James Rutledge Bird and Maggie

Martha Helen Bird.  Maggie lives here in Valdosta.
Jack lives in Oxford, Mississippi.  And they are
23.  They are twins.

Q    Okay.  And Maggie is the one that lives in
Valdosta, you said?

A    Yes, sir.

Q    What does she do?

A    She's a legal assistant.

Q    Okay.  For who?  For a law firm here
locally?

A    Yes, sir.

Q    What firm?

A    Hoffman and Thagard and Young.

Q    Okay.  Are you a member of -- let me ask
it this way.  You said Lake Park, Georgia, and
Jennings, Florida, are essentially where your house
is; right?

A    Well --

Q    Right on the line?

A    Jennings, Florida, is actually down
further.  But there's a little bit of Florida that
comes up into Georgia, and that's where we are.  And
it's --

Q    Above the line?

A    -- right there -- yes, sir.

It's right there with Lake Park.  So long time ago, people would do their GPS, they would end up down here.

Q    Got you.

But I guess Jennings is the closest town to --

A    No, sir.  Actually, Madison, Florida, is closest to my home.

Q    Uh-huh (affirmative), all right.  Sounds like a geographic nightmare.

A    It really is.  Try to get a Sears person to come to your home.

Q    Oh, I'm sure.

Do -- do y'all file taxes in Georgia or do you consider Georgia for taxes?

A    No, sir.  We're Florida residents.

Q    Florida residents.  Okay.

Do you have a church that you regularly attend?

A    Yes, sir, I do.  Park Avenue United Methodist.

Q    Park Avenue United Methodist.  And is that in Lake Park?

A    It's in Valdosta.

Q    In Valdosta.

How far are you from Valdosta where you live?

A    About 25 minutes.

Q    So is Valdosta where you do most of your shopping, socializing, eating out, that kind of thing?

A    Yes, sir.  And Lake Park, also.

Q    Okay.  And is Park Avenue United Methodist in Valdosta?

A    Yes.

Q    And you regularly attend church there?

A    Yes.

Q    How long have you been a member there?

A    Probably 12 years, approximately.

Q    Okay.  Are you a member of any organizations, civic clubs, anything like that?

A    Do you want me to tell you the ones that I've -- you're talking about currently, that I work with currently?

Q    Yeah.  Tell me the ones currently, and then tell me any in the past ten years, let's say, that you've been associated with or worked with.

A    Okay.  I was in the Valdosta Service League, Valdosta Cotillion Club, and Mystery Ball Club.

Q    Mystery Mall [sic] Club?

A    Uh-huh (affirmative).

Q    Okay.  What's the Valdosta Service League?
What do they do?

A    It was just an organization -- it still is -- that works in our area, service volunteer work to help the community.

Q    Any specific volunteer work or just --

A    Any --

Q    -- what's needed?

A    What's needed, any and everything.

Q    All right.  And Cotillion Club, is that for young ladies?

A    Yes, sir.

Q    And how -- are you still a member of that?

A    No, sir.

Q    Okay.  What about the Service League?

A    No, sir.

Q    When did you -- I guess, when were you associated with the Service League, roughly?

A    I think I was 24, 25.  So we would say 1985, '86, somewhere in there, and I served for 10 years.

Q    So through '95, '96, roughly?

A    Actually, my son was born in '96, and that

was the end of my term.  So '85 to '96, yes.

Q    Okay.  What about the Cotillion Club?

A    Roughly around the same period of time.

Q    And did you leave both of those because of the birth of your son?

A    No, sir.  Actually, in the Service League, you do a ten-year commitment, and so my time was up. And it was basically the same for the Cotillion.

Q    Okay.  And what's the Mystery Mall Club?

A    It's Ball.

Q    Ball.

A    It does nothing but promote a dance every year since 1923.

Q    For --

A    It's just a social club.

Q    Okay.  Is it for any particular organization?  Just have a dance?

A    Uh-huh (affirmative).

Q    Okay.  And when were you with that club?

A    I am currently, and this is my 20th year, I believe.

Q    All right.  Any other organizations in the last 10 years?

A    No, sir.

Q    Have you ever been in the military?

A     No, sir.

Q     Are you currently employed anywhere?

A     No, I am not.

Q     Have you been employed since November 16th, 2020?

A     No, sir.

Q     Okay.  Have you tried to gain employment?

A     Yes, I have.

Q     I know from other depositions you had an application here for, I believe, an administrative assistant position?

A     No, sir.  It was for assistant director of admissions.

Q     What other jobs did you apply for?  Have you applied for a lot?

A     Yes, sir, approximately seven.

Q     Since there's seven, can you just tell me which ones and where?

A     Well, I believe we sent you the exact list.  So I'm just going to go on what my memory.

I applied with Valdosta City Schools.  I believe they had two positions.  I applied with Lowndes County Schools.  They had one.  I applied with the State.  I believe it was two positions. And I applied with Piedmont College for one

position, and Valdosta State, one position.

And like I said, those are written down somewhere specifically with the dates and everything.

Q    That's fine.

And did you interview for any of those positions?

A    I was interviewed for two.  I was given an interview for two.

Q    Which ones?

A    Piedmont College and Valdosta State.

Q    And what position did you apply for at Piedmont?

A    A recruiter.  They were looking for a south Georgia area recruiter.

Q    And where is Piedmont College?

A    North Georgia, to the best of my recollection.

Q    Do you remember where?

A    It was near Gainesville, Georgia.

Q    All right.  And were you offered any job as a result of any of these applications?

A    No, sir, I was not.

Q    Were you given any reason as to why you were not selected for any of those applications?

A    Not officially, no.  As far as the Valdosta State job went, Mrs. Jeanine Boddie-LaVan mentioned in her deposition that while it had nothing to do with me not getting the job, I had evidently -- had been emailing the head of the hiring committee, and that was brought to her attention and the committee's attention.

But I certainly feel that -- and that was inaccurate.

Q    You have not emailed the head of the hiring committee?

A    No, sir, I did not.

Q    Do you know who the head of the hiring committee was?

A    Dr. Chu.

Q    Okay.  And as far -- outside of the Valdosta State job, do you know why you were not selected for any of the other jobs?

A    Well, unofficially, I was told that I was too old for one and that they hired a younger person.

Q    Okay.  Which one was that?

A    Lowndes County job.

Q    Okay.  What kind of -- what was the position for Lowndes County that you were --

A    It was director of public relations.

Q    All right.  And the other ones, you don't have any idea why you were not selected?

A    No, sir, I do not.

Q    Do you know whether any of the jobs you applied for spoke with anyone at Valdosta State about your work here?

A    My references included people from Valdosta State and in this area, but as far as my direct knowledge if they, in fact, spoke with them, I do not know.

Q    Okay.  You never spoke with any of the references here that you put down as to whether they did or did not speak with any of the applicants -- or jobs that you applied for?

A    No, sir.

Q    Okay.  You ever been arrested for anything?

A    No, sir.

Q    Huh?

A    No, sir.

Q    Ever filed for bankruptcy?

A    No, sir.

Q    Okay.  Give me -- if you would, give me your educational background and just your employment

history, starting after you finished your education and bring me forward to where we are today, if you can.

A    After I graduated college here at Valdosta State College, I started teaching school here in Valdosta City Schools.  And I taught kindergarten through 4th grade for approximately 13, 14 years.

Q    And that was with the city schools, Valdosta City Schools?

A    Yes, sir.

Q    And 13, 14 years.  So that would have been, what, '80 through '93?  Something like that?

A    Well, it was '83 to 1996.

Q    Okay.

A    So -- because the reason that I stopped was because I had my child, my first.  So that's how I know that.

Q    And what was your degree in here at Valdosta State?

A    Bachelor of Early Childhood Education, and I got my master's degree two years later from Valdosta State as well.

So I remained home for a couple of years, and then I went to work as an adjunct faculty for Valdosta State, the Dewar College of Education.  In

that position, I was a university supervisor and would go out into the elementary schools and supervise the student teachers in our College of Education.

Q    Okay.  And that would have been from '98? '99?  Don't know for sure?

A    I would -- I remember my oldest.  I had not -- I did not have my other two.  So it would have had to have been around that period of time, I do believe.

Q    All right.  And how long did you do that?

A    I did that for quite a while.  I don't know.  I've -- I've got -- y'all have got my vitae, and I've got all the dates exact.  I'm not really sure if I'm giving you exact dates.

Q    And I'm not -- that's fine.

A    But I -- I did that maybe seven, eight years, until I was approached about coming to work full-time.

Q    All right.  And who approached you about coming to work full-time?

A    Well, there was another adjunct faculty member here.  Dr. Julie Reffel was her name.  She and I went to church together, and she told me that they were looking at expanding their student

teaching program and that I should apply for this job.  And it was -- the job was the director of student teaching.  I believe that was the name in HR.

Q    Okay.  And you applied and got that position?

A    Yes, I did.

Q    And, roughly, do you remember what year that would have been?

A    2000 -- I'm not really sure but --

Q    Probably early 2000 --

A    -- probably 2000 -- yes.

Q    And how long did you do -- hold that job?

A    I was in that position for roughly five years and developed that office.  And it became -- it changed through the year.  It -- I mean, the five years.  I believe it was director of student teaching and field placements is what the final position ended up being.

Q    All right.  And why did you leave that position?

A    I was a -- I was approached by our provost at the time, Dr. Brian Gerber, and this would have been approximately 2015.  Dual enrollment in the state had changed, and Dr. Cecil Staton here at VSU

wanted to expand the program.  And Dr. Gerber asked me if I would be willing to move to the Office of Admissions and assume that responsibility.

Q   Okay.  You said dual enrollment had changed.  How had it changed?

A   Well, prior to that, it was not free --

Q   Okay.

A   -- so ...

Q   So you were having to look for the -- to the students for money before that, and then it changed where the State reimbursed the student?

A   I believe that is correct, yes.

Q   All right.  And so you served as the dual enrollment -- as dual-enrollment director?  Is that position -- is that what the position was called in 2015?

A   Well, Mr. Carter, that was my understanding because when Dr. Gerber asked me to assume that position, of course I asked if there was any additional money.

Q   Right.

A   And he said, no, it's strictly a lateral move, and you have to go to the Office of Admissions to do it.  And I said okay.  So I assumed that I was the dual-enrollment director.  Yes, sir.

Q    Okay.  Did you have -- was there, like, a job description that said that or how did you -- I'm just trying to figure out how you assumed --

A    Well, because I was the director.  That was the level that I was at when I was in the College of Ed, and he said it was a lateral move --

Q    All right.

A    -- and there was no pay being increased or decreased, that my pay would remain the same.  So I was thinking that -- and Dr. Gerber as well, that's what he intended for me to be was the dual-enrollment director.

Q    Okay.  Did that change?

A    Well, a lot of -- at VSU at that time, a lot of people, what they were coded in HR was not necessarily their working title.  So I was called the dual credit director.  I was called the dual-enrollment director, coordinator.  I didn't really look at what I was being called.  I just knew that my pay was still the exact same that it had been.

Q    Okay.

A    In November of 2019 is when I received the CVIOG report.  And the two comparisons were dual-enrollment coordinator, and now it just had

manager.  So that's when I noticed a discrepancy in the working title not being the same as HR.

Q    Okay.  What was the CVIOG?  What is it? Do you know?

A    It was a salary --

Q    Review?

A    Exactly.

Q    Was it system-wide or just for Valdosta State?

A    I believe they were doing it at other institutions.  I don't think it was being done all at the same time, but it was my understanding that they were getting around to getting to all of the other institutions.

Q    What does CVIOG stand for, if you know?

A    No, sir, I don't.

Q    All right.  But you think it was being -- they were trying to do it system-wide?  Is that your understanding?

A    That was my belief, yes.

Q    All right.  And what was the purpose?  To make sure everyone was classified the same in all of the institutions?

A    And, I guess, to make sure that people were being paid accordingly with their positions

consistently around the campus, yes.

Q   Okay.  And that was in November of 2019 when that --

A   When I received notice that my position had, in fact -- that the names -- I noticed the names were different.  They weren't comparing director to -- they didn't have the right information on that form.

Q   And when you say "they didn't have the right information" --

A   Well, I would have thought they -- because on that CVIOG report, which is also in my information, it has the old title and then it had the new title.  Now your title would be this.  Well, my old title was not my old title.

Q   Okay.  What was the old title on the form -- that it had on the form?

A   I believe it had dual-enrollment coordinator, I believe is what it had.  Again, I've provided that information.  I'm -- that's -- I think that's what it was.

Q   All right.

A   But then the second thing, it had just manager.

Q   Okay.

A    Or it may -- Mr. Carter, it may have said dual-enrollment manager.  I -- I'm not sure, but it didn't say director is my point.

Q    Got you.

Who prepared the CVIOG?  Do you know?

A    I have no idea.

Q    Do you know whether it was VSU or the board members -- or not members, but board employees?

A    I know that we had a meeting, and Dr. Michael Black came to that meeting.  And we were all under the impression that we were going to meet again because he came and met with -- I remember it was a lot of people in admissions.

Q    Okay.

A    So that really wasn't the place to get into the specifics of your job, what you do and what you don't do.  Mr. Hogan did the majority of the talking at the meeting.  And we were under the impression that we would be meeting again specifically, and then the next thing I know, we've gotten the CVIOG report that states that.

Q    Okay.  And who was Dr. Black?

A    He's our -- I'm really not sure what his title is.  Institutional research, that might be

Barry. I'm not --

Q    Okay. That's fine.

A    He's the one that we call for all SACS accreditation.

Q    Okay. Were there other people in the admissions office that felt like their jobs were misclassified because of the CVIOG or changed in --

A    I'm really not sure. I never had a discussion with people about that. Because pay was involved, people weren't really willing to --

Q    Discuss it?

A    -- discuss it. And some people got pretty high bumps in pay, and then while some didn't -- and so it was just not something that you felt comfortable talking with people about.

Q    Got you.

Do you think your -- the CVIOG improperly changed your title?

A    Absolutely.

Q    Okay.

A    Well, let -- no, let me say this. There was a whole different team of HR when that happened. So on that CVIOG report, it said if there is a discrepancy or if you don't agree with this, see Jeanine Boddie-LaVan. So that's what I did. I

called and made an appointment with her to discuss that.  In that meeting she provided documentation to me where my position had been reclassified in 2015.

Q    Okay.

A    I did not know that.  I did not get that notice.  Dr. Gerber did not get that notice, and Mr. Tee Mitchell, who was my supervisor at the time, did not get that notice, at any point in time did that come over to him in my paperwork.

She showed me a copy of it, and it's also provided in my documentation for you.  And the reason that I know that I did not get it is because it starts out, Congratulations, your reclassification has been approved.  You are getting a $5,000 pay increase, which was not true.

I mean, I would have noticed that.  I mean, I would have gone down and said, I thought you said I wasn't getting a pay -- so that's -- at that time now in that meeting, Mrs. Boddie-LaVan is telling me, Jamie, there's nothing I can do.  This happened before I got here, but here are some suggestions that you can do to rectify this.

And so she gave me suggestions.

Q    All right.  And did you follow through with --

A    I certainly did.

Q    **Did you get it rectified?**

A    No, sir.

Q    **Okay.  Was your -- as a result of the CVIOG, was your salary changed, when you were reclassified from director to manager?**

A    I believe that there was possibly a little bump in pay.  Like, mine was -- again, I don't have that piece of paper --

Q    **That's fine.**

A    -- in front of me, but I think it was $900.

Q    **Okay.  But there was no decrease?**

A    Mine -- no one had any decreases.

Q    **All right.**

A    It was -- I don't know that a hundred percent.  That's what people were -- that's what they were saying when they presented this, No one will have a pay decrease.  Some of you will be getting pay increases, but no one will lose money.

Q    **Okay.  And did you understand the purpose of it was to, I guess, make all of the job classifications uniform across the system?**

A    That's my understanding.  Like I said, we only had one brief meeting about it and then the

paperwork came out.

Q    Okay.

All right.  And so from 2015, when you became dual enrollment whatever, director or manager, whatever the position was, through November 16th of 2020, did you serve as -- in that same position until you were terminated?  Or because of the reduction in force --

A    Yes, I did.

Q    Okay.  And between November of 2019, when the CVIOG came out, and November 16th of 2020, there was no decrease in your salary?

A    I believe my merit pay was lowered, which decreased my salary.

Q    Okay.  And what's --

A    Again, I'm not a hundred percent sure on the years of that, but I know that once Rodney Carr came, my merit pay had gone down.

Q    When did Rodney come to Valdosta?

A    2017, I believe.

Q    Okay.  And you believe from 2017 through when you -- you were subject to the RIF that you may have had some merit pay decreases?

A    I'm not saying every one of those years, but I know the last couple of years, yes.

Q    What's the merit pay?  What's that based on?

A    I really don't have any idea, to be truthful.

Q    Okay.  I'm just trying to find out what you know, and I'm trying to get you to educate me, too --

A    I understand.

Q    -- as much as you can.  All right.

Okay.  Is this the only lawsuit you've ever filed?

A    Yes, it is.

Q    Have you ever had a suit filed against you?

A    No, I have not.

Q    All right.  Now, you've been doing dual enrollment since 2015; is that right?

A    Correct.

Q    I want you to educate me on dual enrollment because I'm a novice.  Just explain to me, if you could, what dual enrollment is and what its purpose is.

A    Well, dual enrollment -- and, again, I'm speaking from 2015, when it was then started being called Move on When Ready.

Q    Was this when it applied to all --

A    The tuition was being waived.

Q    Okay.  And it applied to 9th, 10th, and 11th?

A    Yes, sir.

Q    Okay.  All right.

A    And it was designed for highly motivated and talented students within the state of Georgia to get a jump start on their college career.

Q    Okay.  Is that it?

A    Uh-huh (affirmative).

Q    And did that -- when did that change so that it went back to where it was just juniors and seniors?

A    Well, in 2015, when I came on board and was told to increase the program, the State had waived the tuition.

Q    Right.

A    So it was very attractive to students to want to participate.  And at that time, we had a lot of students that started coming to participate in dual enrollment.

At that time, students could go to as many institutions that they wanted to.  They could take as many hours as they wanted to.  They could take

courses as -- any course that they wanted, as long as that course had been approved as a dual-enrollment course.

As the director of that program, it was my responsibility to look at the courses that we had on the VSU campus that would align with the courses that the high school students needed to graduate and go through a process with the Georgia Student Finance Commission to have those programs aligned and accepted as dual-enrollment programs.

So those were the only courses that the students could take that were funded.

Q    Okay.

A    That was an ongoing process because we started -- basically, we just had the minimal courses, because Mrs. Long did this position before I did at VSU, and they typically had 25 to, like, 34 students when I came.  Once the State made it attractive financially, then we had an influx of students.

Q    Okay.

A    So at the very beginning of the program, there were no limitations on the students, and students were just going any- and everywhere taking as many courses that they could.

Q   And the courses that they take -- a dual-enrollment course is good for both college credit and high school credit; is that correct, or am I misunderstanding that?

A   That is correct, if they make a C or better.

Q   Right.  So if I'm a high school junior and I have to have an English and I come to VSU and need English to, you know, fulfill my high school requirements and I come to you and say, I've got English I need and maybe a history, then you've got potentially English 101 -- or whatever it's called now, it used to be 101 when I was in school -- and History 101 that you could say, Okay, these two will satisfy both your high school and college credit?

A   Correct.

Q   All right.  And so I could take that one class here and then I'd have whatever number credits for college and also it would apply to my high school to help me graduate?

A   Correct.  As long as that course was funded.

Q   Right.  Okay.

A   I mean, approved.

Q   Approved.  Okay.

Now, can -- are there any dual-enrollment courses that go beyond the core curriculum at a college?

A    Yes, sir.

Q    Okay.

A    And --

Q    So -- go ahead.

A    No.  You go ahead.

Q    Okay.  So if I -- I can take English 1101, maybe 1102, whatever it's called now, and they would satisfy both high school and college credits; right? I could be on course to graduate, and I'd have two credits for college?

A    Yes, sir.  That was the beauty of the program.

Q    Right.

And then -- and then if I had a -- if I wanted to pursue a higher English, could I do that? I mean, was there anything above that, like literature or something?

A    Absolutely.

Q    And would that credit both satisfy a high school requirement and a college requirement?

A    Yes, sir.

Q    All right.  Is there an equivalent in dual

enrollment for AP classes?  In other words --

A    For what now?

Q    AP classes.

If I'm in high school and I say, Okay, I'm going to try to get into the University of Georgia, which looks at AP more, is that something that I could come to you and say, Okay, I want to take AP History or whatever, and you could find a course, get it approved, and I could take it and have both high school and college credit?

A    Typically, in the USG system, when we first started, that was not an option.

Q    Okay.

A    However, our TCSG partners had courses that were aligned, and students were getting credit for AP classes.

Q    All right.

A    So about my second year in the program -- I mean, I'm an old-school teacher.  I have teachers that taught AP.  And that's -- to me, the dual enrollment program is competing with AP.

However, a long time ago, that's how AP classes were developed.  The College Board went into universities, got those lower-level classes, and got them approved as AP classes so that they could be

taught in the high schools.

Q    Okay.

A    So, now -- exactly where you were going with that -- I then, at VSU -- and I spoke with Sarah Wenham, our USG person, and I said, I want to do the opposite.  I want to get our English 1101 that these students are taking, but they're not getting AP credit for it because it's not aligned.

And that's what these admissions houses look at on that transcript.  If you see an AP course, in the mind it is weighed more than a dual-enrollment course.

So that's what I did.  I took several of our core classes at VSU, English 1101, Math 1111, History 2111, 2112, and worked with the College Board and got those aligned so that we would not be competing with those AP classes in the high schools, that it would just give them another option to either get the AP credit distinction and the dual enrollment distinction on their transcript.

Q    Okay.  So would -- did you get, like, for example, the 1101 and 1102 that you were talking about, aligned so that they would be given credit for AP classes at the high school level?

A    They could do that.  Each individual

school decided how those -- and each student decided.  They couldn't get both the credits.  They could either get one or the other, and how they brought it back on their transcript was left up to the school.  I was just providing them the option to do that.

Q    All right.  So if they took 1101, they could either credit it as an AP in the high school or a college 1101 credit?

A    Correct.  Students -- some schools did not provide AP classes.

Q    Right.

A    And so some of our rural schools down here, they felt like that was keeping their student from being competitive once they went to some of these schools because, Why don't you have any AP credits?

Well, they weren't offered at my school.

So the majority of those rural students were the ones that took advantage of that.

Q    Okay.  Now, did that -- did that change at all, that process?  In other words, I understand that there's this list of courses that they say are the same, regardless of where you take them -- the 27 or whatever it is, that USG says regardless of

where you take them, they're all credited the same and treated the same; is that right?

A    Well, that's what Dr. Carvajal testified to.  And we do -- those courses on that list, if they're taken at a TCSG school, then they are given transfer credit to VSU.

Q    Okay.  And they would be given transfer credit to any school regardless of where they take it; right?

A    In the state of Georgia, is my understanding.

Q    In the state of Georgia.

A    Yes.

Q    So that's what I'm asking.  Did that change what you were doing?  Because you were -- you were getting -- if I understood you correctly, you were giving AP courses -- or you were giving 1101, 1102 credit to those AP courses?

A    Well, I didn't change the structure of the program.  All I did was just add the AP distinction legally with the College Board to allow the student to be able to say that.

Q    Okay.  But can they -- can they still do that?  Can they still say, Okay, I want -- I'm taking 1101 --

A    I don't -- well, it has to be -- each -- each time you do that, you have to register that course with the College Board.  They just can't come take English 1101 and then go back to their high school and say, Oh, I took this, and I want it to be an AP course.

For example, we went into a high school, and we taught AP Psychology/Psychology 1101.  The teacher that I had teach it was a former high school teacher that had taught AP -- I mean, AP Psychology.

So we went into the College Board, registered that class for that semester with the College Board so that they knew that this class was going on and these were the students listed in it. So at the end of the semester, those students that passed that class, they could put that AP distinction as well as the dual enrollment, but they couldn't get double credit.

Q    All right.  And, then, I guess my question was, are they still able to do that?

A    I don't -- I don't know if they are or not.  I don't know if Megan Hancock is doing that, if she's even aware what that is.

Q    Were they doing that up until the time you left in November of 2020?

A   Yes.   We were giving them the option to do that.

Q   Okay.

A   And, again, those courses are in our -- in the course directory.  So they -- they were approved by the USG and in our course directory as well.

Q   Are there other institutions that do that as well, other than VSU?

A   At the time that I started putting in with it, with the Georgia Student Finance Commission, I got a call and said, Hold on just a minute.  Nobody else has done this, but the TCSG schools were doing it.  And --

Q   Okay.

A   -- so I don't know when I first started if anybody else was doing it, but based on that phone call I determined that this was news to them.

Q   And the TSG [sic] -- you said the TSG schools were doing it.  Are you saying that the TSG schools were doing it but the USG didn't know about it?

A   No.  What I'm saying is that we weren't doing it.  I had students that let me know that -- like, we would get the transcript and I'd say, What is this AP class from some Bain- -- it was over near

Bainbridge somewhere.  What is this?

Oh, well, they have their courses aligned.

So then I went and looked online at their catalog, and they would have AP British Lit/English 1102.

Q    Yeah.

A    So I don't know if the USG knew they were doing it, didn't know they were doing it.  What I'm saying is that I didn't know that it was possible to do that.  I had not even thought about that.

Q    So the TSG was giving AP credits, and you had seen that on some students' transcripts.  So you said, We need to be doing that, trying to find courses that can satisfy the AP requirement, too, or align; is that correct?

A    That is correct.  That's just giving students another option.

Q    All right.  Were the TSG schools giving it as an either/or?

A    I don't have any idea.

Q    That's what you were doing?  You take it, and you can either have AP for high school or college credit, not both?

A    Right.  They had to determine -- they had to say, I want to go the AP track, or I'll go the

dual enrollment track.

Q    All right.  So, essentially, that was not necessarily a dual enrollment situation because they were just getting one credit?

A    I'm not sure that I'm understanding you.

Q    Okay.  Maybe I'm way off here.  That's why I'm trying to figure out for myself.

The way I understand it, with dual enrollment, if you take a dual-enrollment course and I come in and I say, I need an English for high school, I want to go ahead and get my core English out of the way.

And if I take 1101, English 1101, I'm going to get dual credit.  I'm going to get high school credit, and then I'm going to get credit for three, five, whatever the hours is for the college?

A    Uh-huh (affirmative).

Q    But for AP, it's one or the other.  In other words, I'm either going to take the class here and get credit for AP in high school or take the class and get credit for --

A    Well, a large majority of these students did that.  They just wanted to have that AP distinction on their transcript.  A lot of these students would not even sit for the AP exam.  They

weren't even interested in that.

Q    Okay.  They just wanted it on their transcript to look better when they --

A    To make them more competitive.  Correct.

Q    Okay.  And it was -- and if I heard you correct earlier, there are schools in the area that don't necessarily have AP offered at the high school?

A    That is correct.

Q    But it wasn't necessarily a dual-enrollment situation, whereas you would get dual credit?  It was being paid for by the State, but you wouldn't get -- you couldn't get college credit and high school credit?

A    Sure, you did.  You got dual credit.

Q    Well, that was the part I was trying to figure out.

A    Yes.  You got your -- they were a dual-enrollment student.

Q    Okay.

A    And, basically, the course was still the same.

Q    Right.

A    But since I had it aligned with the AP --

Q    You can get AP credit.

A  -- they were able to put the AP credit on there.  And, again, that's all they were trying to do.  But, no, they got their dual credits.

**Q  So they would get the credit in high school and for college?**

A  Correct.

**Q  Okay.  That was the part that was confusing.**

MS. MAESTAS:  I'm sorry.  So AP credit on their high school transcript, same class, AP -- or dual-enrollment credit on their college transcript?

THE WITNESS:  College -- I'm talking about the high school transcript.

MR. CARTER:  That's what I'm trying to figure out.

BY MR. CARTER:

**Q  Did you get -- in other words, did you -- with the AP credit, is that all they got?  They just get an AP credit on their high school transcript and not the three hours credit for college?**

A  No.  They would get their credits for college, yes, and it would come in as English 1101 on their college transcript.  But on their high school transcript -- and each high school was

different -- they could choose to put the AP
distinc- -- they could choose just to put the
wording down there.

Q   But the classes were the same; the 1101s were the same whether you got AP or just normal credit?

A   That is correct.

Q   Okay.

All right.  And I'm just -- I thought you said earlier that you couldn't get both?

A   I'm sorry.  I may have -- I meant --

MS. MAESTAS:  Yeah.  So I'm feeling the same.  I have individual schools could get -- I'm sorry.  Individual high school students could get AP credit at the high school but could not get both.

MR. CARTER:  Right.

A   Well, meaning they couldn't get three hours for the AP and then another three hours.  They couldn't get dual credits, meaning they couldn't get three hours for the AP and then again three hours for the English 1101, meaning six hours.  They just got three hours credit.

BY MR. CARTER:

Q   So it had to be either high school or

college, whichever they wanted, for the credit?

A    I'm sorry.

MS. MAESTAS:  There's still some confusion.

BY MR. CARTER:

Q    Yeah, let me just --

A    Well, really in --

Q    In the moment, the purpose -- again, I'm trying to wrap my head around it.

The purpose of dual enrollment is, okay, I'm in high school and I want to finish high school but I want to get a jump start on college.  I'm motivated.  So if I go to Valdosta State and take English 1101, it's going to give me three hours of credit toward my college core, and I'll get high school credit towards graduation.

Do I understand that correctly?

A    The only -- I think this will clear it up. The only way they get AP credit is if they sit for the exam.

Q    Well, okay, but still, if you take 1101 with these you've got aligned, they're getting an AP on their transcript but they don't sit for the --

A    That's simply all it was for, was just to --

Q    But you still get the college credits, too?

A    Yes.  You get the three hours credit for taking Psychology 1101, which that's what you took. But since we had it aligned with the AP class, they could put down on their transcript AP, but the only way they got AP credit for it is if they sat for that exam.

And depending on where they took that AP credit, too, depended on the score that they would get, or whether it would be accepted, because some schools accept three, some do four, some accept five.

Q    So the AP designation may not be useful if they don't sit for the exam?

A    Well, they're not going to get that AP credit, and they're not going to be an AP scholar if they don't.

Does that make sense?  Does that help make sense?

Q    Somewhat.

MS. MAESTAS:  But what I don't understand is if you've got -- what's the difference between taking the AP class and getting the credit in college versus that same course, if

they just take it as a dual-enrollment course?

THE WITNESS:  There really is no difference between the two.

MS. MAESTAS:  I mean, I don't know if we're getting to the bottom line of where --

THE WITNESS:  I don't know where we're ...

BY MR. CARTER:

Q    **Well, it's muddy, but we'll leave it at that.  I don't want to beat a dead horse.  I was just trying to get a picture.**

A    Well, let me say this.  The reason that we did this was because students were saying, I'm not getting in Georgia Tech and I'm not getting in such and such class because I just had DE English 1101. My friend went to so and so technical school, and she got the AP distinction on her transcript because they have it aligned with the College Board to be able to do that.

Q    **Okay.**

A    And so, the courses are the same courses. If you look at -- when I went to get those approved, the standards and the learning objectives of both of those classes were exactly the same, because that's how AP classes were developed a long, long time ago. So by getting them aligned, all it did was allow

that student to be able to put that AP word on their transcript.

Q    Okay.  And you made a distinction between the AP designation and AP credits.  Maybe if you could explain that, that would help.  In other words, they have it on their transcript as AP, but if they don't sit for the exam, they don't get the AP credits for college.  Is that what you're saying?  Because --

A    Okay.  That's -- in order to get credit for an AP exam, you have to take --

Q    A test.

A    -- the test.

Q    And --

A    Now, you can still list it and put it -- down your grade and if your grade's a 99, but you're not going to get that course exempted from the college that you're trying to go to because you didn't sit for the exam.

Q    And that's the part, I guess, that's confusing.  The purpose of an AP exam is so that you get college credits; is that correct?

A    If you sit for the exam, uh-huh.

Q    Right.  So if you -- if you're a dual-enrollment student and you're getting the

credits, you couldn't get them anyway if you sat for the exam, could you, because you've already got them as a dual-enrollment student?

A    This is true.  It was simply to be able to allow them to put AP on their transcript.

Q    All right.  So it was a workaround for -- it was just, like, a fake AP, is what it was, because you don't sit for the exam?

A    Well, the thing was they didn't get -- they didn't get --

Q    AP credits?

A    They didn't get -- they didn't get credit for the course at the college level because then they're going to have to take whatever it was that they were going to get credit for at the college level.

Q    But they would be getting credit for the class they took at college as a dual-enrollment student?

A    That is correct.

Q    Which you've already given them credit for as a dual-enrollment student?

A    That is correct.

Q    So there's no need to sit for the exam?

A    That is correct.

Q    All right.  So it's just a workaround.  I won't call it a fake AP.  It's just a workaround within the system, but the TSG was doing it and you said, I'm going to do it, too?

A    Well, I was asked to investigate and look into it and see how we can grow this.

Q    Who was it that asked you to --

A    It was -- I believe it was Dr. Scheffler at the time.

Q    That was pre-Dr. Carr?

A    Uh-huh (affirmative).

Q    Was that yes?

A    Yes, it was.

Q    That's fine.

You said Dr. Carr came in 2017; is that right?

A    I believe so.

Q    And Dr. Carvajal, when did he come?

A    He came in January of 2017, I believe is the year.

Q    As president?

A    Pretty sure, yes, sir.

Q    And what month did Dr. Carr come?

A    June, end of May.

Q    June of 2017?

A    Uh-huh (affirmative).

Q    Okay.

MR. CARTER:  All right.  I'm going to take about a five-minute break.  We've been going for a little while.

(Recess 11:10 a.m. until 11:18 a.m.)

BY MR. CARTER:

Q    Ms. Bird, let's talk about the incident that occurred on February 20th of 2019.  Did you consider the hug that Dr. Carr gave you that day sexual in nature?

A    I don't know what you mean by the word sexual.  I found it very inappropriate, very too close, and I would probably lean more towards the word it was too intimate for my well-being.

Q    All right.  Now, my understanding is that there was a dual-enrollment student who had committed suicide; is that correct?

A    Yes.

Q    And was that the day before that day or that day?

A    That morning.

Q    Okay.

A    Well, I received a call that morning at 6:30.  I believe it happened during the night.  So

it could have been the day before.

Q    Got you.

All right.  And, obviously, that was upsetting on the campus to everyone who knew him?

A    Yes.

Q    Okay.  Were there other people that you hugged that day?

A    No, sir.

Q    None?

A    No, sir.

Q    All right.  Are you not a hugger?  I mean, people hug, obviously?

A    Uh-huh.

Q    Correct?

A    Yes, sir.

Q    Okay.  And you're telling me that there was no one else that you hugged while discussing the suicide?

A    And the reason that I can tell you that is because I've thought about it, because I believe in something that he has said, he said that he hugged me to console me.  And I started thinking back, even the ladies, we didn't hug.

When my husband -- when I woke up and he -- I went downstairs that morning, I didn't hug

him.  I am a hugger.  I don't have a problem with an appropriate hug.  But, no, sir.

Q    Have you ever hugged anyone here at Valdosta State?

A    That's a pretty broad question.  I honestly cannot recall hugging anybody for any reason.  I think maybe at a football game years ago when we won something or a student -- he took off running.  I think we all were jumping up and down and doing that kinds of things.

But as far as hugging someone, especially of the opposite sex, no.  I believe when Mr. Tee Mitchell, we had his going-away party, as we were all walking out the door, everybody hugged him and his wife, including my husband.  I mean, we were -- you know.

Q    Okay.

A    But that -- I can't -- anybody that I work with, I honestly -- I have never hugged them.

Q    Other than Mr. Mitchell when he was leaving?

A    I do believe that night at his dinner, when we were all telling them goodbye, we gave he and his wife and his children a little hug.

Q    Okay.  Well, you must not be a hugger if

you've never hugged anyone here in 20-something years?

A    Well, I honestly can't -- I mean, maybe a student when a student -- honestly, I can't -- I can't think of a time that I did.

Q    That's fine.

But, obviously a hug is not necessarily something inappropriate.  You'd agree with that?

A    I'm sorry.  State that again.

Q    I said, obviously, a hug is not necessarily something that's inappropriate; correct?

A    Not all hugs are --

Q    Okay.

A    -- intimate in nature.

Q    All right.

A    And not all hugs are done behind a closed door.  Correct.

Q    Okay.  Well, did he touch you anywhere, other than just a hug?  In other words, his arms were around the top of your body; correct?

A    I was behind my desk.  And my desk was only room enough, basically, for one person to be back there.  He came behind my desk and hugged me, not like this, but like this.

Q    Were you still seated?

A     No, sir.  I -- when I received the phone call that morning from the superintendent of schools and told me about the student, I called Mr. Mitchell because I had a meeting at 8:00 in another town with a high school.  He told me he would go to that meeting with me, and I said, Well, the school is going to be calling back before 9:00 to make a communications plan.  They don't want us to discuss this until we do that jointly.

He said, Well, I'm going to call Dr. Carr, because that was his superior, and he said, I'm going to tell him of this because I feel certain he will want to be a part of this meeting to determine what VSU says.

And I said okay.

Q     All right.

A     So that morning, around approximately 8:40-ish when he walked into my office, I heard him say --

MS. MAESTAS:  Who's he?

THE WITNESS:  Dr. Carr.

A     I heard him say, Is she in?  And I heard Mrs. Long say, Yes.

I turned around from my desk, and I saw him closing the door.

BY MR. CARTER:

Q    Dr. Carr?

A    Correct.

Q    Okay.

A    And thinking he was there to discuss the communications plan.  I had -- my office was probably this large, and my desk was back here.

Q    Okay.

A    And I had a round table in the front. I -- that is where I meet parents, students, anybody that comes to my office.  So I got up to go meet him there.  And that's when he walks in and says, I'm going to do something -- you look upset.  I'm going to do something that I don't typically do in the office.  And he was behind my desk before I could hardly even get up and moved one, two steps, and that's where the hug occurred.

Q    Okay.  And you were facing him when he hugged you?

A    Yes.

Q    Did you say, No, back away, push away?

A    I immediately pushed away and stepped beside him, and said, I need to open my door.

He then becomes very angry.  His face is red.  He says, Why did you do that, or, Why did you

need to do that?

And I'm opening the door.  I said, Because when I meet, I always have my door open, plus this office gets hot.  I turned around.  I came back, and I said, I have work to do.  I came back behind my desk, sat down.

He maybe stayed three, four seconds and was -- I don't even really remember.  All I heard was, The suicide is not your fault.  And he walked out of the door.  When he walked out of the door, I heard the front door close.  I walked out of my office to make sure the door was closed, which it was not.  Our office had an automatic lock on it, and sometimes that door would not engage all the way.

So I pushed the door shut.  I turned around.  I came back down my hall.  Mrs. Long is standing in her -- in her doorway.  She says, Are you okay?

I looked out of her window.  I could see him walking up the sidewalk, and I said, Don't ever let him back in my office again.  She testified that I said jackass, and I'll go with that.  Maybe I did. And I went back to my office and sat down.

Q    Now, at this point in time, Dr. Carr had

been there about -- over a year and a half; right?

A    Correct.

Q    He had never done anything inappropriate before to you, had he?

A    No, sir.

Q    All right.  And this was an incident where you had had a student commit suicide, and, obviously, you were upset?

A    I was.  I was not, as he has said, I believe it was in the HR report, that I was distraught and crying when he -- I was not.

Q    Okay.

A    I had been working.  The dean of students had sent over some things for me to do when a student passes away, and I was doing that when he walked in.

Q    Did you go to the service for the student?

A    Yes, sir.

Q    I think Dr. Carvajal testified that that was one of the hardest things he's ever had to do. Did you feel that way as well?

A    This student was a pretty bright student, and she had shared with me while she was at VSU.

Q    Okay.  What was that?

A    She was being bullied at her school.

Q    All right.

A    And that was pretty much all she ever said about it.  She was very quiet.  She had her act together.  I mean, she met with me right on time every time.  She knew what she wanted to do.  She wanted to be some type of creator for video games and things like that, and she was just a real neat kid.

Q    Okay.  But you took Dr. Carr's hug as intimate, I believe were your words?

A    Well, you asked me, was it sexual.  I -- it was too close.  The placement of the hands pulled me closer than is appropriate, and he would not have done that to me had I been a man.

Q    Do you know whether he's hugged men before?

A    I have no idea.

Q    All right.  So how do you know what he'd have done if you were a man?

A    Because of the nature of the hug.  The way that it felt to me was inappropriate.

Q    So you think he took the opportunity where a child -- a student had committed suicide to make an advance towards you?

A    He took what he perceived as a vulnerable

time, and what he did was wrong.

Q    Okay.  And he's done nothing inappropriate as far as approaching you intimately or anything since, has he?

A    Since?  I've not seen him since.

Q    And he hasn't done anything like that before?

A    With regard to a hug like that?  No.

Q    Okay.

A    Prior to the hug, he would visit our office about once, twice a week.  He would go from office to office, just chatting.  A lot of times it would be about VSU employees.  He wouldn't necessarily name them, but he would give you enough you knew what it was.  This one's on a professional improvement plan, just things that a vice president might not should be talking about.

And then afterwards -- you've asked me about afterwards -- he started parking his truck in our parking lot.  I didn't notice it.  Mr. Hogan was the one that noticed it and brought it to my attention, and it was -- it was quite daily.  And, yes, that is an overflow.  I understand that.  But there were approximately two times that I got in my car myself and drove over to the main parking lot to

see if he could, in fact, have parked there, and there was plenty of parking.

But a lot of people -- he could have been parking his truck up here.  There was plenty of places, but instead, he would park it right by my window.  And I found that very intimidating.

Q    That he would park in the parking lot that was an overflow lot that could be used by anyone?

A    When there was plenty other places right across the street, when he had done what he had done, when he came back into my office after my boss had left and had gone, not even four days later, and referenced the 2019 incident, when he had moved me from another office, all of these things had happened, yes, sir, I did find that odd that he was parking his car there.

Q    Okay.

A    May we go back to the -- you asked me if I'd ever hugged anybody.  Did you say at VSU or in my whole teaching career if I've ever hugged anybody?

Q    I think my question was at VSU.

A    Okay.

Q    Is it different if I ask you --

A    Well --

(Unreportable simultaneous speaking.)

A   Well, it took me 13 years to have kids. And my principal at W.G. Nunn and our maintenance guy, who's also in my church and had been in prayer groups, the day that I found out I was pregnant after 13 years, they came down to my room. We were all standing out in the hall, and we -- we hugged.

Q   Okay.

A   But, you know. So you said, Well, so you must not like hugs. No, I don't have a problem with that. But a hug in this nature, yes, I do. But I don't make a habit of hugging in a professional workplace. So I just want to make sure that I'm clear on that.

Q   I understand.

A   Okay.

Q   Is the hug the only thing that you're alluding to in your complaint when you talk about that you were subjected to sexual harassment?

A   Yes. That is sexual harassment. Absolutely.

Q   I just want to make sure that is the only incident that you're referring to, because Dr. Carr didn't do anything before or after that you considered --

A    He didn't come back to my office for a whole year.

Q    That's fine.  Got you.

All right.  And you didn't tell anyone about that.  I believe Ms. Long testified that you told her a couple weeks later or something to that effect; is that correct?

A    That night I went home and told my husband, and he asked me if I needed him to help me, if he needed to come up, and I said, Nope.  I drew a boundary line that needed to be drawn.  He got the picture.

Q    Okay.

A    And he said, Well, you let me know --

MS. MAESTAS:  When you say "he," you meant --

THE WITNESS:  Carr.

MS. MAESTAS:  Okay.  'Cause you're talking about two males.

THE WITNESS:  I'm sorry.

A    Carr got the picture that I pushed away, and that was -- I was -- that was not acceptable to me.  So I tell my husband, and my husband says that, You let me know if I need to do anything.  You let me know if Carr comes back to your office.

I said, Okay.

So then the reprimand happened, and --

BY MR. CARTER:

Q    Okay.  Let's --

A    Okay.

Q    And the reprimand, you're talking about for the email?

A    Yes, sir.

Q    Okay.  Well, we'll get there in a minute. I'm going to let you tell the whole story of --

A    You were just asking me --

Q    Right.  I just wanted to make sure --

(Unreportable simultaneous speaking.)

A    -- what your question was, but there's more to the answer.  But anyway, okay.

Q    Yeah.  I got you.  I got you.

But you told your husband that night, and essentially you said, I've taken care of the problem?

A    Uh-huh (affirmative).

Q    Is that yes?

A    Yes, sir.

Q    And he said, If not, let me know. Something along those lines?

A    Correct.

Q    Okay.  And did you tell anyone else other than your husband about the incident?  Let me just ask it that way.

A    I did tell HR, and I told my immediate supervisor.

Q    And when did you tell them?  After the incident regarding the email?

A    When they kept on going on and on about the reprimand.

Q    Right.  Okay.

A    And then on the March 6th meeting, when I met with Carvajal -- Carr, not Carvajal -- Carr to explain the intent of the email, he kept referring to the stupid thing that I did.  "That was a stupid thing that you did.  You did something stupid."

And he kept on and on saying that.  And it became quite clear to me that he was not necessarily referencing the email.  He's -- he's letting me know what he's talking about.

Q    You're talking about a 3/6/2019 meeting about the email; is that right?

A    Yes, sir.

Q    Okay.

A    I had asked -- after the email went out, I had asked, let me take care of it.  I had even

attempted to do it.  If people are upset, they certainly did not -- they've misinterpreted my intent.  The email was sent to people that were not -- that I did not send it to.

I said, Please allow me to take care of it.

And I was told, You've done enough.  What you did was stupid.  Do not do anything.

So it took me that long to get a meeting. So the March 6th meeting, I went in with Mr. Mitchell to Mr. Carr's office and explained everything.  And Mr. Mitchell and I had said -- which I knew once he hears everything, he's going to understand that what you were doing was trying to keep this university within compliance.

And instead, he kept telling me what I had done was stupid and that he was going to -- that the president wanted to suspend me for two weeks and that I should be thankful to Carr that he got the president to just give me a written reprimand.

And Mr. Mitchell said, Well, how about a verbal reprimand?  As her supervisor, that's what she needs, and that's what I am willing to do.

And he said, No.  What she's done is stupid.

I asked him three times, Who's going to write me up?

He said he is.

Q    He ...

A    Mr. Carr said that he was going to write me up, and I said, What do you hope to gain by doing that?

And he said, So that if you do anything stupid again, I can pull it out of my desk drawer. And he points and says, And protect this university.

And I said, Is this going to have any impact on future evaluations, performance evaluations, merit pay, future promotions?  Is it going to involve HR?

No, I don't know anything about HR.

Q    Okay.

All right.  And we're kind of jumping ahead, but I'll go ahead.  You said the email was designed to keep VSU in compliance.

What are you referring to?  Compliance with what?

A    Well, we had a lot of students that were not being served successfully in this program. Carvajal testified that none of the students were involved in the SAP report.  We had over 140

students that were on suspension, and some of them were not even being allowed to come back, you know, first year -- first promotion.

And we had counselors that were just sending students in any- and everywhere.  Students would come to me with blank SPAs, Student Participation Agreements.  And so we were having a lot of issues in the program.  The state -- two -- it's already beginning -- House bill's already beginning to be formulated.  The State's running out of money because the program is being abused.

And counselors were not -- not all of them but a large majority of them were not doing their due diligence in meeting with the students, deciding where they were going to go, and better yet, what they were supposed to be taking.

**Q    Okay.  I'm going to show you the first page of what's been marked as Plaintiff's Exhibit 41 previously.  Is that the email that you're referring to?**

(Marked for identification is Defendant's Exhibit 41)

A    The email, yes, it is.

BY MR. CARTER:

**Q    All right.  Now, how is it that you said**

that email is trying to keep Valdosta State in compliance?  It -- I don't -- you know, the email says what it says, obviously, but I don't see anything in there about compliance.

A    Well, it was our job at Valdosta State University, as the post-secondary institution, to counsel our stakeholders, our school partners, one being the -- the counselors.  This program, when it was developed, it's a wonderful program, but it was given to each institution, and we were given the autonomy to develop and structure it however we wanted.

Q    Right.

A    That means with regard to requirements, however we wanted to structure our program.  So what was happening is these counselors had students going to all different institutions.  All of these different institutions had different admissions requirements.  They had different rules and regulations with regard to their own programs.

Our counselors didn't understand that. The counselors had been asking, Help us to understand how this works at VSU and how it's different from these other institutions in our area.

One counselor even told me, This program

has just gotten dumped in our laps.  We have over 500 students, and we get to dual enrollment when we get to it.

So how they're out of compliance is that they're not following the rules and the program regulations in that they need to meet with their students first.  The high school counselor needs to determine what courses to take, not me.

So these high school counselors were just letting their students -- I called it running willy-nilly all around the state, all around the area, taking as many courses as they could, whether it worked for them or not, whether it helped them graduate high school or whether it helped them become whatever it was that they needed to be.

Q    Well -- let me have that back for a minute.

You don't supervise these counselors, do you?  You can't tell them what to do?

A    It was my job as -- it was our job as the post-secondary institution to make sure -- the State says that -- to make sure that they knew how to work with their students.  These counselors were asking me.

Q    But you're -- you understand that the part

of the email that was troubling was the part where -- the sentence which you have highlighted here, or arrow to it:

"For students who participate in any dual enrollment program in our state, it is critical for those students wanting to attend a four-year institution after they graduate high school, get their DE credits from the same type of institution. The curriculum course rigor needs to be the same in order for them to be successful once they graduate and move forward into college."

You understood that that was the part that upset a TSG employee, who then called Dr. Carvajal? Is that your understanding, first?  And then you can explain.

A    That's my understanding.  They were upset.

Q    Okay.

A    The letter that I received stated that we were not -- they were upset because VSU was not honoring the articulation agreement because the articulation agreement is a guarantee to these students.

I don't even reference the articulation agreement, but I'm glad this lady did because those courses aren't guaranteed.  They aren't guaranteed

unless the student can get into the school.  And while that may seem elementary --

Q    Well, that is elementary.

A    Well, you'd be amazed at the parents that didn't get that.  You'd be amazed at the students that would come in and say, Ms. So-and-so just told me that these classes -- that I'm guaranteed.  Why can I not get in?

Perfect example are the two nursing students that Carr testified he didn't know anything about.  Well, he sent them to me.

Q    Well, the point is and the deal is, you don't dispute that there was a TSG president that called Dr. Carvajal very upset about this email?

A    I don't know that that happened.

Q    But you can't dispute that it happened?

A    And I can't say for certain that it did.

Q    I understand that.  All right.

But that's -- that was what you were told, and that was your understanding of what Dr. Carvajal and Dr. Carr said?

A    I was told many called him, and I was told many counselors called him.

Q    Okay.  Who told you that?

A    That's just what Carr said.

Q    All right.  And -- but you were here for Dr. Carvajal's testimony?

A    I sure was.

Q    All right.  And do you believe Dr. Carvajal to be an honest, upstanding person?

A    Up until all of this started, yes.  Now, I have reservations about that.

Q    But up until -- up until this started, you thought Dr. Carvajal was an honest, straightforward fellow?

A    I really have no dealings with him to suggest otherwise.

Q    Okay.

A    But I have said from the beginning, if this caused this much damage, show me where.  As you've seen, I've lived here all my life.  I know an awful lot of people.  And two weeks after this incident, I was at a TCSG dual enrollment/concurrent enrollment workshop for three days.  Nobody said one word to me.  We went to eat dinner.  Everything was just like it had always been.

I know the email was sent to people that I had not sent it to.  I don't believe that you're supposed to forward emails, for that very reason, is because they don't have the context by which to

understand.  And there were some issues that were occurring that I really think would have been helpful to them.  I would have called Dr. Anderson myself.  I know her.

Q    Well --

A    So -- and I will tell you this, Mr. Carter.  That -- that email was in no way meant -- it was meant to help.  I thought I was being extremely conscientious, and that language about a four-year institution, while that may seem like it was a blanket, nothing is ever a blanket statement that everybody has to do this.

That language, I got from a 2015 concurrent enrollment session that said, For you USG schools -- because it was for all the states, and people were having trouble advising their students on the best path forward.  And at that conversation in there, they said, Georgia, you've got it easy. You're a USG school; right?  All you've got to do is say, The people that are going to a four-year institution, come to us.

And that is exactly what Carvajal was trying to do with Tina Anderson when he went to meet with her.  I was a part of some of the meetings on our own little group.  He was wanting -- he was

wanting VSU to do the academic courses and TCSG to do the technical courses.  That's what all that was about, but it didn't come to fruition.  Why? Because they would have lost a ton of enrollment.

MS. MAESTAS:  Who's they?

THE WITNESS:  TCSG.

BY MR. CARTER:

Q    Okay.  I understand what you're saying and that that's your position, but do you at least agree that you -- you can see how this may upset some people?

A    I could see how it would, yes, sir, I could.  And that's why I wanted to handle it myself. I did not agree that it caused all this damage --

Q    I understand.

A    -- as Mrs. Jeanine Boddie-LaVan said.  She said that I understood that because it was written that I had agreed to do that.  No, I didn't agree. I've never seen evidence that it caused that much damage, but I was willing to take care of it myself.

Q    All right.  Were you -- were you online for Dr. Singer's deposition, his Zoom deposition?

A    Yes, sir.

Q    All right.  And you heard what he said?

A    With regard to what part?

Q   About how this --

A   He wouldn't make that blanket statement?

Q   Yes.

A   Well, the reason that I wanted, I guess, both of you to hear from Dr. Singer is because -- Mr. Singer -- he has one of the greatest dual enrollment programs in the state.  He's been doing it an awfully long time.

However, Mr. Carter, his population of student was completely different than mine.  He also made the statement, we -- I have -- our parents and our students, I have them go out into the institutions in our area and make their own decisions.

I did that, too.  However, my parents would come back and my counselors would come back more confused than ever, because they were getting told you don't -- if you don't do well, you don't have to include these classes on your transcript.  They were being told all kinds of things that were not true.

So while I do appreciate Mr. Singer's opinion of that, I did speak with him when all of this happened, and he says, every -- which he did not tell y'all that the other day.  But every now

and then I have that issue, Jamie, but you -- and he was the one that brought it up.  He said, You've got a different population of student than I do.

So he wasn't down here in the VSU program. The people that approved of that email and saw nothing wrong with that email were the boots-on-the-ground people, me, Ms. Bessenger, Mr. Mitchell, and Ms. Lisa Long.

All three of them will tell you that there was nothing wrong with that email, that it was extremely factual.  Why?  Because they were the ones working with me in the program, seeing the problems that we were having daily.  Carvajal and Carr made a big to-do about it but they both have testified they didn't know what I did on a daily basis and they both have testified that we were having no problems in the dual enrollment program.  Carr knew we were having problems and he chose to ignore it.

**Q    It's the high school's responsibility to provide the counseling services to the students and parents before they enroll in the program, isn't it?**

A    Uh-huh (affirmative), and that wasn't happening.

**Q    Okay.  But still their responsibility?**

A    And it's typically supposed to happen in

the 8th grade.

Q    Okay.  And then the high school was supposed to make sure that the students and parents sign an advisement form; correct?

A    Uh-huh (affirmative), and that wasn't happening.

Q    And that's the high school's responsibility?

A    Well, it is our responsibility, too.

Q    How is it your responsibility?

A    Well, we were supposed to make sure that we made sure that that was happening at the high school, and when it wasn't happening at the high school, then it was being left to the post-secondary institution to explain their program.  And we had -- we developed a contract that they had to sign indicating that they had been advised and counseled and knew all of the ins and outs of the program at VSU.

Q    Was there a rule, regulation, or statute that required that contract, or was that something you came up with on your own?

A    No.  I believe it was in direct relation to keeping in compliance.

Q    How so?

A    Making sure that these parents and these students that weren't receiving the information that they were supposed to be receiving, then it fell to us to do that.

Q    But was there a written rule, policy, or guideline or statute --

A    I believe it's in -- I believe it's in all that information that we've been -- that we've given.

Q    Sitting here today, can you tell me whether it was a law of the State of Georgia, a --

A    It was a --

Q    -- rule of the State?

A    It was a -- the post-secondary institutions were supposed to be making sure -- I had compliance reviews.  And --

Q    I understand --

    (Unreportable simultaneous speaking.)

A    -- we had to make sure -- well, that's how I interpreted that rule.  That's how we at VSU interpreted that.  And when it wasn't happening, then it fell to us, as program providers, to make sure that that was being done --

Q    So the rule you have in the complaint, Section 1605.1 of the dual enrollment program's

regulations: "Prior to participating in the dual enrollment program, the student and the student's parent or guardian shall sign an advisement form provided by the eligible high school or home study program acknowledging complete understanding of the responsibilities assumed by the student while participating in the dual enrollment program."

You think that places some burden on -- or requirement on Valdosta State?

A    Absolutely.  We were the program provider. And especially when you've got students that aren't doing well as a result, and are getting GPAs that are being tanked and being put on, first, suspension and then being denied admission, and when you've got students that are potentially losing hope, and when you've got students that are working extremely hard and not being able to gain admission to Valdosta State because of shoddy advising, it certainly does.

It is our responsibility because once those students get to us, they are VSU students, and we are providing a program for them as well.  We are partners in this program.

Q    But there is nothing in the rule that confers to the post-secondary institution, is there?

A    I'm not going to say -- again, I don't

have my information in front of me, but there's more than just that one.  There's a whole bunch.  If my memory serves me, I've highlighted certain things, and that is -- and it wasn't just me making these decisions.

Again, with Mr. Mitchell, I was on the leadership committee, the leadership team, and we met about once a month.  And we would talk about these very things.  We would -- financial aid was in there.  The bursar was in there.  The admissions was in there.  We would talk about all of these issues that we were having, and how can we assist, how can we circumvent this, how can we keep our students off of this SAP list?

I even had counselors tell me, Oh, no, they don't have to be -- they're -- that doesn't go on their record.

Yes, it most certainly does.  So I think, Mr. Carter, that I would have been negligent by not addressing those issues.

**Q    But that's your opinion; correct?**

A    Well, it wasn't just mine.  I mean, as I said, as a group of directors at our university, we deemed issues that we saw, and we had counselors asking us to provide workshops, counselor retreats.

Can you all please do something to help us understand this program better and to make sure that our students are successful?

In Rodney Carr's damage email that he sent out the next day, he addresses that joint counselor retreat.  You're going to be hearing from me soon, he says.

But he didn't do one thing.  He didn't follow-up with them because I had been telling them we need to get a handle on all of this.

Q    And the joint counselor retreat, is that something that had been done before?

A    Not -- I believe VSU has, from time to time, had counselors on our campus for certain things.  I believe maybe Mrs. Long mentioned a probe -- I'm not quite sure.  But what Mr. Hogan and Mr. Mitchell and I and Mrs. Long had talked about was having a joint counselor retreat that was nothing but dual enrollment at Valdosta State.

Q    Okay.  Did y'all ever have that?

A    No, we did not.

Q    And that's not something that's required.  That's just something you thought would be helpful?

A    Well, a lot of programs -- you know, again, the State didn't give us this program with a

lesson plan book.  They said, Here's the program.
Structure it, run it however you deem necessary.

And that's how we were deeming it necessary.

Q    Got you.

MS. MAESTAS:  You want to take a break?

MR. CARTER:  Sure.  That's fine.

MS. MAESTAS:  Or are you about to ...

MR. CARTER:  What?

MS. MAESTAS:  Are you about to -- I don't want to interrupt you if you --

MR. CARTER:  No.  I was just looking for that exhibit about the conference.

THE WITNESS:  Summit.  It's got Summit written at the top.

MR. CARTER:  Yeah.

I know it's in here.  I just can't get my hands on it.

We can take a break.

(Recess 12:03 p.m. until 12:13 p.m.)

BY MR. CARTER:

Q    Ms. Bird, you said that outside of your -- and correct me if I'm wrong -- but you told your husband, and did you tell Lisa Long about the hug a couple weeks later?

A    I did.

Q    Okay.  And outside of those two, did you tell anyone else prior to the meeting about the email that we talked about earlier?

A    All right.  Say that again.  Prior -- I'm sorry.

Q    Yes, ma'am.

After -- you told your husband the night of the hug; correct?

A    Uh-huh (affirmative).

Q    And then you said you told Lisa Long a couple weeks later about the -- or you gave more detail about the hug?

A    Uh-huh (affirmative).

Q    Let's just start there.  What did you tell Ms. Long a couple weeks later?

A    I just -- she was -- her office was right across the hall from mine, and Mr. Mitchell had been coming into my office quite a bit.  She knew that we had gone over to meet with Mr. Carr.  And to be honest with you, I cannot remember the specific conversation like I can with my husband, because it was a -- she said something like, Is there something going on?

And I didn't -- she was one of the ones

that had helped me compose the email.  She approved it and said, Absolutely, you need to send this out.  Because, again, she was across the hall and saw everything.  So she knew that I had gotten in trouble about the email, and she felt bad about it.  And she says, Are you going to be written up?

I didn't even tell her that I had been written up because, quite frankly, I was embarrassed.  And I said -- and she kept going on and on about how sorry she was.  She felt responsible.

And I said, Lisa, this really and truly has nothing to do with the email.  And that's when I told her, and I just called it an inappropriate hug.

She said, Well, I knew something was wrong that day.

I didn't go into specifics with her.  But, you know, I described the hug to you and to my husband and to my attorney exactly how it happened.  His right hand is up here behind my neck.  That's when I had short hair, and his other hand was down here on the back.  And that's what made it not right.

Q    Okay.  All right.

A    And that -- I did not share all of that

with her, but I just told her that it was an
inappropriate hug.

Q    Got you.

Okay.  And so those were the two you told.
And then the first time after that that you told
anyone else was at this March 6th meeting about
the email?

A    I told Mr. Mitchell on the March 6th
meeting, and then it was after that that I told
Mrs. Long.  I told Mr. Mitchell.

Q    At the March 6th meeting.  Okay.

A    Well, I don't know that it was at that,
Mr. Carter.  I think it was maybe that afternoon, he
came to my office.

Q    After the meeting?

A    I believe so.  And I told him because we
were talking about it.  He says, Jamie, he said, I'm
sorry.  He said, I don't agree with this, and I know
what you were trying to say here.

And it's been written somewhere that it
was a template email that I changed on my own.  No,
sir, it was not.  I was never made to follow or have
my emails approved by anybody.  I was trusted.  And
so I was apologizing to him, you know, if this has
caused you any harm or, you know, and whatever, I'm

sorry.

And he said, Well, I'm sorry, too, because I thought this was going to be a verbal and that was going to be it.

And that's when I told him, I said, Well, there is something that I do need to share with you, and I told him then what had happened.

**Q   All right.  And you think that was after the March 6th meeting?**

A   Yes, sir.  I know it was.

**Q   Same day or some time later?**

A   I'm not a hundred percent sure, but that meeting was that morning.  When we left the meeting, he went to his office; I went to mine.

And I believe that was the next day, because -- it was the next day because I said to him -- I said, It will be okay.  I'm a big girl.  He can write me up if he wants to.  He's going to keep it in his desk drawer.  It's not going to impact anything, so it's okay.  And I said, But that doesn't make sense to me.

And he says, No, it doesn't.

So -- and I said, And then here is something else that I need to share with you, and I told him about the hug.  I did not describe the hug

to him, as I've done with you, Ms. Maestas, and my husband.  But I just told him the same thing, that it was an inappropriate hug.

Q    Okay.

A    Because I went home that night and told my husband what had happened at the March 6th meeting.  And he says, Jamie, that doesn't make sense.  You need to go talk to HR tomorrow.

That's why I -- and you have where I requested the meeting with Jeanine Boddie-LaVan.  I requested the meeting with her for March the 8th to discuss with her that this vice president is writing me up and keeping it in his desk drawer.  That did not make sense to me.

So when I went to that March 8th meeting was when she gave me the reprimand.  She testified that that was not true, but she is wrong.  She gave me the reprimand on March the 8th in her office.  I'm sorry, March the 7th in her office, the day after the meeting.

Q    Let me just ask you -- I just want to be clear here.

In the complaint it says:  "On or about March 13th, Jeanine Boddie-LaVan summoned Ms. Bird to her office."

You think it was March 8th and it was in response to your request?

A   I'm -- I don't know what report that you're looking at, but if it's in the HR report that --

Q   No.  It's your complaint.  It's not a big deal.  I'm just trying to make sure my dates are straight.

A   No, that is right.  That's because --

Q   On or about March 13th, VSU, Jeanine Boddie-LaVan, and then it says, gave you a reprimand dated March 5th.

A   Uh-huh (affirmative).  My recollection was it was the next day because the -- the actual reprimand is signed -- I believe it's the -- signed on the 7th.  Now, I did go back down there and speak with Ms. Boddie-LaVan after that again.

Q   So you spoke with her twice?

A   Approximately twice.  And if you want to include the CVIOG meeting where I, again, referenced this and I told her on all three times, approximately three times, that this had nothing to do with this email.  And at the final meeting she said to me, "Do you want to discuss that?"  And I said, "Absolutely not."  I -- I said, "I can't."  I

said, "I'm getting in this much trouble for this. If I go and tell you more, then I'm going to be in more trouble. I will be -- I will lose my job."

Q    All right. And she was asking if you wanted to discuss what you thought --

A    What I --

Q    -- was behind it?

A    Uh-huh (affirmative).

Q    So you didn't talk it her about --

A    I did not give her specifics --

Q    All right.

A    -- no, but I told her that I was scared to talk with her.

Q    Okay. I got you.

A    And at no time did she tell me that it was fine to do so.

Q    At no time did she tell you what? That it was fine --

A    That it was fine for me to discuss that incident with her and that I would be protected from retaliation.

Q    Okay. Well, you understand they have policies? I mean, the --

A    Well, certainly but --

Q    Okay.

A    -- yeah.

Q    Well, I'm -- I'm just being clear that the school --

MS. MAESTAS:  I'm going to object to the form of the question.  You said, "You understand there's policies?"  And she says, "I do."  I don't understand where you're going with that, and so I -- I don't think she understands --

MR. CARTER:  Well, she seemed to.

BY MR. CARTER:

Q    You understand that they have policies against harassment and retaliation -- right? -- both Valdosta State and the --

A    Well, to be perfectly honest with you, I've never even had to go down that road before.

Q    I understand.

A    So I wasn't sure what the protocol was for something like that.  I told --

Q    Well, you undergo -- you've obviously undergone training about Title VII and --

(Unreportable simultaneous speaking.)

A    -- ethics, yes.

Q    Yes.  And you have a policy, it's probably in the handbook, about harassment and retaliation;

correct?

A    I would image so.  I --

Q    All right.  And the board policies are published on their website.  You know where the Board of Regents website is?

A    I'm sure that I've been to it at --

Q    Okay.

A    -- some point in time.

Q    All right.  But you understood that it was -- that --

A    Yeah.

Q    -- retaliation and harassment is -- is protected by Title VII?

MS. MAESTAS:  Wait for him to complete the question.  You're agreeing to something, and you don't even know what he's --

MR. CARTER:  She trusts --

MS. MAESTAS:  -- asking.

MR. CARTER:  -- me.  She trusts --

MS. MAESTAS:  Yeah.

MR. CARTER:  -- me.  She knows what I'm saying, but --

MS. MAESTAS:  Yeah.  I can see where that's going.

BY MR. CARTER:

Q    You understand -- and I -- I know what you said earlier, but you understand that there are laws that protect people from harassment, discrimination, and retaliation; right?

A    There are laws that is --

Q    Okay.

A    -- that supposedly do that --

Q    Right.

A    -- yes.

Q    I understand.

     Okay.  And that -- that's just what I was trying to establish.

A    But my point is this was the vice president of the university --

Q    I understand.

A    -- and I wasn't about -- I had -- I wasn't about to have to lose my job because I liked my job and I needed my job financially.

Q    Did the written reprimand cause you any loss of pay or benefits or anything?  I mean, did it result in deduction in pay?

A    No.  I felt that it cost me my job, too.

Q    The reprimand?

A    I'm sure.  I'm sure it was looked at.

Q    Okay.  I'm -- I'm just trying to get your --

A    Uh-huh (affirmative).

Q    -- understanding.  But when they gave you the reprimand, they didn't say this is going to result in a salary --

A    No.

Q    -- decrease or anything?

And before I forget, and it's kind of skipping over, but after you were subject to the RIF, weren't you allowed to stay employed for a certain time to get increased retirement benefits?

A    In the meeting -- in the meeting I look at the piece of paper and it tells me that -- this was in July, and it tells me that my last day is going to be in September.  I don't turn 60 until October.  I don't -- I have to go a whole nother month before I can get retirement, insurance, those types of things.

And Jeanine was not there but Michelle Jordan was there, who, of course, is no longer here.  Rob Freidhoff was there, and I said, "So y'all are letting me go one month before I turn 60?"  And she said something to the effect of, "I didn't know that."  I don't know.  They both had on masks.  I

couldn't -- you know. Something to the effect she wasn't aware of that. And Freidhoff says, "Oh, yeah. That's right. Congratulations. You get to retire."

So I said, "Well, it doesn't really work like that." I said, you know -- so he testified that he left the two of us. That's not true. I got up because I knew this was coming. I knew this was coming from that January, I believe it was, 22nd meeting in my office when Rodney Carr came back to my office almost a year later from that first event.

Tee Mitchell's been gone four days. He comes back into my office alone again and sarcastically says, "Long time no see." So I knew this was coming. So I left that RIF meeting. I didn't even go back to work. I went home. I was devastated.

**Q    This was the January 2020 meeting, a year later, that you're referring to?**

A    January the 22nd.

**Q    Okay.**

A    And I went the next -- I came home, of course, had the conversation with my husband, and he said again, "We're calling HR in the morning." I called HR, and I am the one that got -- brought this

to their attention.  Carr knew I was -- he knew.  He had already asked Ryan Hogan, "Oh, well, what" -- talking about the RIF, "What about Bird?  She's retiring.  Couldn't you do without her?"

"No.  I -- I've got two admissions, unfilled positions that have been vacant for a year.  I'll give those up instead."

So Carr knew that I was turning -- was -- was supposedly eligible for retirement.  My RIF paperwork, when we got that paperwork back, it states up there that I -- on the RIF paperwork that they had to give to everybody to approve, it has my age already listed at 60, and I was not 60.  I was 59.

Q    Okay.

All right.  So -- but you were allowed to remain employed until you turned 60 so that you were eligible for retirement?

A    I was giving, like, three more due dates that they -- HR allowed.

Q    Three more what?

A    Well, first my -- my -- I say due date.  My end date.  First, my end date was going to be September.  Then they told me it would be October.  So I'm like, "Well, y'all that" -- I -- you need

to -- then the HR person -- the retirement person gets with them and says, "Ms. Bird really needs till November because then she will be eligible to actually pull retirement."

Q    Okay.

A    So --

Q    All right.  And so --

A    But, yes, I was allowed to continue to work.

Q    Okay.

A    Because I went down there and brought it to their attention.

Q    That you wouldn't be eligible for retirement until November?

A    Correct.

Q    Okay.  And ultimately was it someone in HR that approved it, or who had to approve it?

A    I believe they did, but in all of my HR paperwork they said that I had to put down there the reason that I was separating from the university was because of retirement, but I put a notation down there that wasn't why I was separating.  I was separating because I had been fired.

Q    Okay.

A    So ...

Q    How many people were subject on the RIF at the --

A    I believe --

Q    -- university?

A    -- there were six or seven.

Q    Through the whole college --

A    Uh-huh (affirmative).

Q    -- or university?

What departments are they in, if you know? And if you don't, that's fine.

A    Well, I'll tell you this, I think there were seven.  Five of them, Carr had problems with, and I was one of them.

Q    Seven that were --

A    And that's --

Q    -- subject to the RIF, and you say five of them Carr had problems with?

A    I -- let's say approximately five, maybe four, but --

Q    Who were they?  You, I assume you're including yourself --

A    Yes, I am.

Q    -- since you filed a lawsuit?

Who else?

A    Kevin -- no, Keith Warburg.  I don't know,

Mr. Carter.  They're on that piece of paper.

Q    Okay.

A    Niki, she was our dean of students, but then they brought her in to do something else.

There was a young guy -- not a young guy, but, like, 40s.  So that's young to me.  I -- their number -- their names are escaping me right now.

Q    How many females, and how many males?  Don't know?

A    I really don't know.  I would be --

Q    That's okay.

A    -- guessing.  I don't need to do that.

Q    That's fine.

Do you know who made the final decisions on the reduction in force?  Do you know how that worked?

A    Only from what Dr. Carr and Dr. Carvajal testified, and Rob Freidhoff.  With regard to my position, I believe he testified that he and Dr. Carr had that conversation about me and that the reason that my position was eliminated is because we only had 200 students -- that maybe could try to enter performance to me.  And then since I made more than Sarah, these are my wordings, but he used since my pay was more that I was the one that was chosen.

And please understand that I was moved on that January 22nd meeting when Carr came back in there and referenced that hug again and referenced sarcastically closing my door again, know that he also told me on that day that he was moving my office to Mr. Freidhoff's office.  Mr. Freidhoff testified he didn't know any -- I knew absolutely more than he did.  Mr. Freidhoff was an advising guy.

So, now, you've got Mr. Freidhoff, who's only worked with me for two months, did not know really what I did on a daily basis, had no knowledge of dual enrollment, he's the one making the decision that my job, that this position can be disbursed among recruiters.

Q    Okay.

A    So he moved me to someone with no knowledge and allowed that person to weigh in on the rest of my life.

Q    Okay.  Were other people moved at that time?

A    He sent out -- Carr sent out an email saying that Mrs. Brenda Beasley with orientation -- but she'd already been working over there.  I'm not -- they -- and that's -- that's what Rob was

alluding to.  There was a bunch of -- everybody wants to keep everything because that's how they're paid.  Nobody wants to give up orientation or dual enrollment or this or that.

Everybody else wants it because the more things you have, the more they get paid.  So I don't know when orientation went, but then another -- the first-year expenses -- experiences, I believe her name was Bev.  The three of us -- he sent out an email the day after he came back to my office again, third time by himself, that the three of us would be moving.

Q    From admissions to --

A    I don't know where Bev was.

Q    Okay.

A    Bev was -- I don't know where she was.

Q    But you were moved into what department?  Was it at the --

A    It was --

Q    -- transition --

A    It was called the office of transitions, which --

Q    And Rob --

A    -- I --

Q    -- Freidhoff was over that?

A   They had now -- now that Mr. Mitchell has left, Carr slid the advising director, executive director of advising, Mr. Freidhoff, who's been here about two and a half years, he moved him into a similar position and made him second to Carr.  So made him right under Carr, and as a result of that, he was going to take on this new office of transitions --

Q   All right.

A   -- which is advising, first-year experiences, and dual enrollment.

Q   Okay.  Did your job -- were your job responsibilities going to change at all, or was it just the reporting --

A   He told --

Q   -- that --

A   -- me that my job responsibilities would not change, "It's just who you're going to be reporting to."

Q   Okay.

A   "You're going to stay in this office until we find room for you elsewhere."

Q   And that was in January of 2020?

A   That is correct.  And on in -- again, in -- another time when he came to my office in

February.

Q   Okay.  First of 2020 is when this process was taking --

A   That's the --

Q   -- place?

A   -- first I heard of it, yes.

Q   All right.  And do you contend that that was retaliation?

A   Absolutely.  He's moved me to a person that knows nothing about dual enrollment and basically tied my hand behind my back.  In order to -- and -- and look at this.  This is February.  This is right when our enrollment season starts.  You've got House Bill 444 on the docket again.  You've got me being moved to a supervisor -- the very first thing that we have to do is to get these students tested.

Rob is a -- Rob is a very nice guy.  Rob never -- he was always very cordial with me.  He was always very -- "Please explain to me how this works, Jamie."  He was very willing to learn, but it took me three weeks to get students tested because he had no idea.  He would go back and work with the testing office and, "Let's do this.  Well, maybe we can try this."

Well, and then the testing office calls, "Who's funding it?"  Well, Mr. Hogan used to fund it.  Now, Mr. Hogan says he's not funding it.  "Mr. Freidhoff, who's going to fund the program?  I've got 30 kids right here that need to test."  We can't get them tested because nobody -- he doesn't know how to get it done.

Q    Was the -- was the reorganization done as a result of Tee Mitchell leaving?

A    That is my understanding.

Q    Okay.  Did you -- do you contend that the email reprimand was retaliation?

A    Absolutely, I do.

Q    Do you contend that Dr. Carvajal retaliated?

A    All I can tell you is what Dr. Carr told me.  I asked -- and I asked again on that March the 6th meeting -- "Let me go talk to Dr. Carvajal.  Will you please set that up?"

"No, no, no.  He is too angry to talk with you.  His wife is too angry to talk with you.  His wife wants you dealt with."  Now, those are cards -- Carr's words.  I don't know whether to believe Carr or not.

Q    All right.  Well, you were here when

Dr. Carvajal testified about --

A    Uh-huh (affirmative).

Q    -- being angry?

A    Uh-huh (affirmative).  And I also heard him say he didn't know anything about the dual-enrollment program and he didn't know anything about students doing poorly.

Q    But at that point, March -- well, it would have been after February 26th, when the email was done.  I believe that's the date on the email?

A    That's correct.

Q    Dr. Carvajal knew nothing about your situation with Carr, the hug, did he?

A    I didn't tell him.

Q    All right.  And you have no reason to believe he knew about it?

A    I would -- I -- knowing what I know now, that this gentlemen has had a past history, how could he not have known?

Q    No.  I'm not talking about the past history.  I'm talking about the hug.  You have no -- you have no reason to believe that Dr. Carvajal had any idea of the hug that Dr. Carr gave you in -- after the suicide?

A    I believe -- I -- I believe -- I have -- I

believe that Carr probably went back and told him what had happened.

Q    What do you base that belief on?

A    Because then they all blew up about that email and had yet to be able to share with me the irreparable damage that it had done.

Q    But you understood that Tina Anderson had called Dr. Carvajal angry about --

A    That is what Dr. Carvajal says, but I know Ms. -- Dr. Anderson as well.

Q    And have you talked to her about it?

A    I was told that I could not.

Q    By who?

A    Dr. Carr.  I've told them that I would -- the lady that sent me the email, Mrs. Dodd, I -- Mr. Mitchell told me right as it happened, he said, "You call Mrs. Dodd back right now."  I said, "I just tried."  I tried her again, left her a voice message to please call me back, that there had been a misunderstanding.

My USG dual-enrollment person, executive director, Sarah Wenham, called me.  I explained to her.  I sent her the email.  She said, "Take care of it.  Just explain everything the best you can."  On my -- I had then sent the email to Mr. Mitchell.

Mr. Mitchell told me to do exactly what Ms. Wenham told me to do.  I am driving home, and Mr. Mitchell calls me on my cell phone and tells me that Dr. Carr has called him and that Dr. Carvajal and his wife are furious.

Q     Okay.

A     And I was told from that point on until March the 6th -- I had asked Mr. Mitchell, "Please have Mr. Carr call me -- Dr. Carr call me, and I will -- I will explain all of this to him."

"Okay.  He said he would call you."

He never called me for two weeks.  And I kept asking and I kept being told, "He says he's too angry to speak with you."  When I even went to the March 6th meeting, I told him, I said, "Well, I've been trying to speak with you for almost two weeks now."  And he said, "We've been too angry to talk to you for fear of what we might say."

Q     All right.  So you you think -- you think that Dr. Carvajal knew of the hug and that this somehow caused him to inflate the email issue?

A     I'm not going to say a hundred percent that Dr. Carvajal knew, but after I have learned of all that has happened and Dr. Carr's past and how Dr. Carvajal has covered up from him and has

continued to enable this man --

Q    How has he --

A    -- to act --

Q    -- covered up --

A    -- this way --

Q    -- for him?

A    He brought him to Valdosta State University, did not tell anybody that this has happened.  He claims he changed 180 degrees the day he got the reprimand.  No, he did not.  His -- Dr. Carvajal's personal notes from October the 28th, I do believe -- so what's that?  Six, seven months after the reprimand?  His personal notes, Carvajal's personal notes state, "He still cannot -- he's still up to the -- Carr is still doing this.  There's more allegations.  I cannot take this risk." So he still -- and moving him to be the vice president of those two units that he talked about.

He still, six months later, is saying, "I can't take the risk with this guy."  But what does he do less than three years later?  He brings him to Valdosta State University, puts that man on our campus, and that is what I mean by enabling him.  He has some -- Dr. Carvajal has a responsibility to this, and I see it as negligent on his part for

allowing Dr. Carr to come to our campus when he knew good and well that he continued to have these issues.

Q    And by "issues," what are you talking about?

A    Every bit of what Dr. Kirkland wrote in that email.  Vulgar language, treating -- getting in women's -- too close to their space, talking intimately to them, all of that.

Q    And you're the only person that's reported anything -- or didn't report it actually until the email incident, but the only person that's had an issue with Dr. Carr at Valdosta State as far as intimate contact?

A    Well, as far as we know.  There's a --

Q    Okay.

A    -- lot of people that have had troubles with him and that they say that they've reported and then the next thing you know, they're no longer on campus anymore.  They've been let go.  So, no, I don't know that a hundred percent, but a lot of people have issues with Dr. Carr.

Q    And you think Dr. Carvajal's covering up for him?

A    Why else?  I said enabling.  Why else

would he allow him and still be a staunch supporter of him, as he is?  He testified that he changed 180. I did not see that, and there's plenty people on our campus that did not see that either.

Q    Okay.  In your complaint you've alleged that in November of 2019 you received notice that she was -- that you were being demoted via an HR job reclassification.  Is that the SVIOP?

A    The CVIOG.

Q    Well, I'm not --

A    Yes, it is.

Q    -- accurate.  CVIOG?

A    Yes.

Q    Okay.

All right.  And that's where you went from whatever your title was to manager?

A    That is correct.

Q    That you -- your -- your job responsibilities didn't change.  Your salary and benefits didn't change; correct?

A    Well, my job duties were so much more than what was written down for dual enrollment.  My job duties extended into orientation.  It extended into open houses.  I did recruitment trips within our local area not only talking about dual enrollment,

but I went on specific recruitment trips and just talked about VSU regular enrollment in general.  I was used as a recruiter many times.

I went to V-State Experiences.  Mr. Hogan says a few.  I'd claim it to be a lot more than a few.  I went to -- I met with the Office of Admissions every week for their weekly meetings.  I gave campus tours not only to just dual-enrollment students but whenever a student -- or whenever they needed help.  I found that to be the most underemployed place I'd ever seen.

So I offered to help and would be called upon.  So when you say were my duties changed, there was so much more added and when -- if you remember earlier this morning, I told you that when I spoke with Mrs. Jeanine Boddie-LaVan about my CVIOG, she gave me some suggestions.

Q    All right.

A    Well, I told her exactly what all I was doing and she got up and she went and printed out a assistant director, associate director, and director positions.  She printed out the job descriptions of all three of those.  And she says, "Jamie, I certainly understand, but please know this is really nothing that I can do to change what happened before

I got here."

Q    Okay.

A    She said, "Take this back and show" -- because Mr. Mitchell knew that I was going and Mr. Hogan knew that I was going.  So when I got back with them, I said the only way they can rectify it is if possibly my position is now reclassified based on these additional duties that I am doing.

And so that's when, later on, Mr. Mitchell and Mr. Hogan came to me and asked me if I would assume the responsibility -- because Mrs. Long was going to retire about two and a half years ago, but then her CVIOG report came out.  She's like, "Oh, I think I'll stay."

Q    Okay.

A    So -- but prior to that, they had asked me if I would assume additional duties, which included exactly what I was doing but we were going to add the scholarship committee, I was going to teach in the honors college, I was going to do a lot of others things to assist Mr. Hogan and Mr. Mitchell.

And so when I say that I was demoted and all that, when I was -- when -- so I was asked to do those things.  The only way that can happen is if Rodney Carr signs off on it and approves it.  He

wouldn't do it.  So instead of approving me to be essentially promoted to associate director, he moved me to Rob Freidhoff.  And in doing so, he also stated to me, in the -- I don't remember, maybe it was the end of that January 22nd meeting, that he could do more for my CVIOG if I moved over to this office.  And I said, "What do you mean?"  He said, "Well, they don't have a director over there."  I said, "Oh, so you want me to go over there and be the director?"  I said, "I'd rather stay right here and be the associate director.  Dual enrollment needs to stay right here."

So he moved me and then didn't do anything.

Q    Do you contend that the CVIOG was retaliatory?

A    I contend that Mr. -- Dr. Carr did not do anything to help me rectify the problem.  Dr. Gerber had tried to meet with him to try to explain exactly what happened and got nothing from Dr. Carr.  So Dr. Carr would not help me correct the issue, and I do know of others that got some of their CVIOG -- I can't remember exactly what positions they were, but I did hear that some got theirs kind of changed.

Q    Who did you hear?  What was --

A    I -- I don't recall their names.  It --

Q    By Dr. Carr?

A    I don't know.  They just went down to HR
and ...

Q    Like you --

A    I -- well, it would have to be their
super- -- your -- your immediate -- the supervisor
of your division, which I was in Carr's division.
So it could have been Dr. Miller or somebody else,
whoever the VP of that division is the one that has
to --

Q    All right.

A    -- sign off on it.

Q    You were not a direct report to Dr. Carr,
were you?

A    No.

Q    You were a direct report to Tee Mitchell?

A    Correct.

Q    Until you were a direct report to Rob
Freidhoff?

A    Correct.

Q    Okay.  Were you a direct -- before Tee
Mitchell, who did you --

A    Okay.  So --

Q    -- were you a direct report to?

A    -- when I was moved over, Tee Mitchell was the admissions director.  Lisa and Ryan were the associate directors, if I remember correctly.  So I reported to Mr. Mitchell.

Q    And what year was that?

A    2015.

Q    That was before Carr came?

A    Correct.

Q    Okay.

A    So I don't know -- it was before Carr came.  So prior to Carvajal's arrival, Dr. Kelli Brown was our interim --

Q    VP?

A    -- president.

Q    President.

A    And she made Mr. Mitchell -- we had -- somebody left, and she made Mr. Mitchell executive vice president of enrollment services.  And they appointed Ryan -- 'cause Lisa says, "I don't want to have anything to do with this director's position."  They appointed Ryan the director.  At that time, I moved under Tee, and I went to the leadership meetings along with the director of housing, the director of testing, the director of financial aid, and the registrar and myself.  And the reason being

is because I thought I was a director of dual enrollment.

So it made sense for me to go there, and Mr. Mitchell has told me the same thing.  And I would meet with that leadership team in addition to meeting with the admissions committee -- I mean the admissions office, weekly.  I would meet monthly with the leadership team of all of those departments that we utilize, and that's where these issues and these concerns of these other departments would be brought up.

Q    **Why did Tee Mitchell resign?  Do you know?**

A    I don't know specifics.  Mr. Mitchell -- Mr. Mitchell was very professional, never spoke about anybody or what was happening with him, but you could tell -- and it was -- it was known around campus that Carr doesn't like Mitchell.

Q    **Why?  Do you know why?**

A    I have no idea.  Probably because of the type of guy he was.  Mr. Mitchell was salt of the earth, member of the Baptist church, three young kids, not a part of the old boy -- good old boy system.  Just -- and I have -- that's -- just was my take on the whole situation.  There would be times when -- if you remember I told you that Dr. Carr

would frequent our office quite a bit going from office to office chatting with people?  On two occasions, he told me --

MS. MAESTAS:  Who's "he"?

THE WITNESS:  Mr. -- Dr. Carr.

A    Dr. Carr told me, "Hey, you need to get your boss man to dress down on Fridays."

BY MR. CARTER:

Q    **Oh, okay.**

A    And I'd say, "Well, I can't really do anything about that."  One day he was to the point of, "This is ridiculous.  Why does he have to wear a suit every -- every day?  He's supposed to wear red," when he has on a red tie.  So it was just little things like that, but in meetings, I witnessed some pushback on just about anything that Mitchell was trying to do or did do.  Carr would push back on it.

The final straw came, I believe, when Carr made Mr. Mitchell, who's your executive vice president of enrollment services, he made him over learning support, which is academics.  And Mr. Mitchell was like, "I don't know any -- I don't do academics."

"Well, you're going to do it.  It's a

noncompliance.  You need to get it worked out."

Q    Okay.

A    So there was just things like that, but I know Mr. Mitchell told me in December -- before he resigned, so that would have been in December of 2019, he said that he and his wife were going to talk about it over the holidays.  He says, "But I just want you to know what I'm thinking."  And I begged him not to do it because we needed him on this campus.  And he says, "Jamie, I can't -- I can't keep working like this."

He was just being -- he was just a bully and being mean and vindictive.

Q    Talking about Carr?

A    Uh-huh (affirmative).  Yes, sir.

Q    That a yes?  Towards Tee?

A    Absolutely.

And -- and, Mr. Carter, to many other people, too.  And the only reason that I tell you this here is because I have nothing to lose.  I've already lost my job.

Q    Okay.

Okay.  Have you talked with Mr. Mitchell since he left?

A    Yes.

Q   Where is he now?

A   He now lives in Gainesville, Georgia, I believe.  He lives -- because he works at Riverside Academy --

Q   Okay.

A   -- and Ms. Bessenger, that used to work with me, that's where she lives as well.

Q   Have you talked with Mr. Mitchell about this case?

A   Absolutely.

Q   What did he say?

A   He's always been very supportive.  He feels responsibility that he didn't report this himself.  He's told me that, but he says, "At that time, I knew some things that you didn't know, and I didn't need to lose my job either."  He said, "I knew he was trying to get rid of me."

Q   You?

A   No.

Q   Mitchell?

A   Carr -- Mitchell said that he knew that Dr. Carr was trying to get rid of him.

Q   Okay.  Has Mr. Mitchell provided any paperwork to you, written paperwork about --

A   We have an affidavit from him, yes.

Q    Okay.  When did you get that?  Don't know?

A    I couldn't tell you exactly.

MR. CARTER:  Did y'all produce that to me?

MS. MAESTAS:  (Nodding head affirmatively.)

MR. CARTER:  Okay.

MS. MAESTAS:  On that, there is a --

THE WITNESS:  A typo.

MS. MAESTAS:  -- date typo in the affidavit.

THE WITNESS:  It says February the 2nd was when the event -- the --

MS. MAESTAS:  The email --

THE WITNESS:  -- incident --

MS. MAESTAS:  And it's --

THE WITNESS:  Yeah.

MS. MAESTAS:  -- February, 20th.

MR. CARTER:  Okay.

THE WITNESS:  Oh, yeah --

(Unreportable simultaneous speaking)

THE COURT REPORTER:  There was some overtalking.  I didn't hear what you guys just said.

MR. CARTER:  You said February 2nd is on the affidavit, but it's the 26th 'cause --

MS. MAESTAS:  Correct.  And so --

MR. CARTER:  -- it's the email?

MS. MAESTAS:  Yeah.  And we --

MR. CARTER:  Okay.

MS. MAESTAS:  -- are -- we were in the process of trying to get that corrected, and we just haven't yet.

MR. CARTER:  That's fine.

MS. MAESTAS:  We'll probably follow-up if we need to --

MR. CARTER:  Got you.

MS. MAESTAS:  -- or use him as a witness.

MR. CARTER:  I'm going to try to get done here fairly soon.

BY MR. CARTER:

Q    I know I asked you about this ... what you've marked -- or your attorney marked as Plaintiff's Exhibit 24, and that's the dual-enrollment summit, which you were in attendance at; right?

A    Yes, sir.

(Marked for identification is Defendant's Exhibit 24)

BY MR. CARTER:

Q    Do you remember which table you were at as

far as topics go?

A    No, I do not.

Q    All right.  You heard Dr. Singer's testimony about that, that these seven or eight, however many there are, topics resulted from different tables that were just discussing these issues.  So, like, Table 1 may be the -- what is the --

A    Well, I can tell you exactly -- he's a little bit -- that's confusing.  I mean, he's not correct on that but --

Q    All right.  Tell me what you remember.

A    Well, it was -- each table, there were jars, and each table had a bunch of questions.  So each table didn't just get one question.

Q    Right.

A    Each table had all of the questions.  And so the idea was to answer as many of the questions as you could.

Q    Okay.  And who typed that up?  Do you know?

A    I believe either Ms. Bessenger did or Dr. Williams did.

See I was on the -- there were -- there are about six of us that put this together --

Q    Right.

A    -- and the reason that we did that was because of the issues that we were seeing and the state is now getting ready -- rumors were they were going to cut the program altogether or they were going to make these significant reductions to it.

So, again, it was those issues that we were seeing that we were trying to be proactive. And this was what we came up with.  Well, let's get a bunch of DE coordinators around the state, directors around the state, bring them together and see -- evidently these -- these issues must not be just specific to VSU since it's a state thing that the money is running out.  Let's get them -- everybody together.  So that's how this came about.

Q    All right.  Now, if -- you said there were jars, and did the jars have the topic headings on them so that if you pulled that out of the jar, it would say, "What is the meaning of" --

A    Misconception, yes.

Q    And then the table would discuss it?

A    And there was -- each table had a recorder --

Q    Okay.

A    -- and it was those recordings that --

it's my understanding, that's what you see here.

Q    And would each table pull out more than one topic and discuss --

A    Some did better than others, but the majority of them pulled all of them out, yes.

Q    Okay.  And it was just, I guess, time --

(Unreportable simultaneous speaking)

A    -- a roundtable.  Absolutely.

Q    All right.  Do you remember -- are any of those bullet points on that sparking conversation yours?  In other words, when someone pulled out the question, do you see any of the bullet points that represented what you discussed at the time?

A    This one is mine, All classes transfer and --

Q    Just --

A    -- apply --

Q    -- check out to the side of each one.

A    I mean, this is going to be very difficult for me to remember, but I do -- I do remember the transfer because that's the problem that we were seeing the majority of.

Q    All right.  And I'm not -- again, there's no -- I just wanted to know if you recognized any of those being yours.

A    It certainly wasn't curve parent involvement.  I don't know why -- I mean --

Q    **You'd think you would want more parents --**

A    Well, I don't know, but as I remember -- I remember later on hearing people talk about this. Parents were having -- and I -- I did have that -- homeschool students did not have a counselor.  So their parents served --

Q    **Oh.**

A    -- and it would -- it would get really heavy with parents.  So I understand why they put that there.

Q    **Okay.**

A    There was a funding app somewhere in here.

I believe this one right here might have been mine.  I'm not really sure about the funding app process because that's what we were having a hard, hard time doing.

See, Mr. Hogan testified that his office processes the students.  I don't know where he's been because when we first started, we allowed them to do that, but then when we got so far into it, Sarah and I -- we learned how to process the paperwork.  We learned how to vet the students, and then we even met with the financial aid and said,

"How can we help y'all?"  So we would even award and waive our own students.

Q    Okay.

A    So that was a huge help to our partners within the university.  So that one right there may have been the one that I put.  And this one was definitely mine:  "Clearly define the goal of the program."

Yeah, because a lot of people -- and when I say "a lot," I don't -- there were many people with the belief that this program, they should be able to get their high school diploma from this program.  So that's -- and that was not how we interpreted the program to be.  So define the -- we wanted the State to tell us exactly what is the goal of this.  And then I believe ... since I was one of the ones that was helping to put this on --

Q    Yes.

A    -- I really didn't -- I don't even remember sitting down at a table.  I kind of floated.

Q    I got you.

A    And like I said, the reason that I'm having a hard time is because I did float.  And so I -- I didn't -- I never wrote down anything.  I

think some of these, when I'm standing there talking, whoever the recorder is must have written that down because the grades -- I remember being asked about the grades.  The grades were something that were not required by the State for us to do.  All we were required to do was to send one final transcript, official final transcript, back to the high school.

Well, when we met with our stakeholders and our partners when creating the dual-enrollment honors academy, it was the school systems that we worked with in this area said, "We have to have grades, and we want monthly grades."  And so I remember having this conversation because it was -- it was a process for me to do.  A, to get the professors to give me grades.  And, B, to make sure that they reported back accurately, and I worked with our IT department to do that.

And a lot of the high schools -- Donald Singer was one that was not doing it.  The reason he wasn't doing it is because his -- his schools didn't ask for it.  But the reason we were doing it is because our high school says, "We have to have the grade," because in sending back that high school transcript, it just has a letter grade on it; right?

A, B, C, D, whatever.

Well, those high school students, the majority of the students that we were working with, they're trying to be val and sal, honor students.  I mean, they're the ones way up here.  So tenths of points, miniscule points meant a lot to them.

So when we would send back -- the reason they told me that they wanted grades, which I later found out to be true, when you send back the high school transcript, that registrar of that school -- now, it varied from schools, also.  Like, if I wrote back, "Todd Carter, 98," that high school would only take the midpoint grade of a 95.  So Todd -- Student Todd would lose three points; okay?

So for some of these kids, that didn't -- that was not acceptable.  They would come work hard.  They wanted the actual grade.  So that -- that could have been mine also is why I'm telling you that.

Q    Okay.

A    And, also, now, Dr. Carr told them that we no longer give them grades.  So that's something -- there's a lot of things that we did that are not being done.

Q    Okay.

A    We do talk about rigor because there is

differences of rigor.  Nobody will ever get me to say that there's -- that English 1101 is 1101 is 1101, which is what Dr. Carvajal testified to.  He's referring to the -- the objectives and the learning outcomes.  Yes, those are probably all the same.  But the academic rigor of that class -- which, to me, rigor is the educational expectations that you have for that class.  And it's a judgment call on the person who's teaching the class, and we have rigor -- on our campus, there's different rigor from classroom to classroom.  And I saw different rigor from TSC [sic] and I saw it from -- from TCSG and I saw it from GMC, but I also saw it on our campus, too; okay?

So some -- for example, English 1101, one professor may try to meet those standards by two, two assignments.  Another English professor across the campus may choose his judgment to discern rigor as to whether this child has met this goal or not is seven, seven assignments.

So we talked about these students coming to VSU and coming into the dual-enrollment programs that the -- they were having exposure to college rigorous classrooms versus high school.  So that could have been one of mine, too.  I'm not really

sure because, to be honest, I probably could say all of these because we're -- we were -- what we found out from this is it was very beneficial.  We all found out that we were pretty much all on the same page.  We were all seeing the same things, and we were all seeing the things that we were doing well and the things that we needed to work on.

There was a book thing because -- yes, this "unfunded mandate regarding books," that was -- that was -- and when I say "mine," it really wasn't mine.  It was Shannon McGee's, who is our -- I don't know if she's a VP.  I don't know what she does, but, see, at the very beginning, the State paid for the books and the resources, which was very hefty on those institutions.

Q    Okay.

A    But when the first round of House Bill 444, when it was tabled, they said but we're not -- we're going to try to cut back -- get back some of our money.  The schools now have to pay for the students' books, and so that was Shannon's thing, was, "Wait a minute.  What?"  I mean, because it was forty, fifty-something thousand dollars.  I mean, because we gave them -- we had to give them calculators.  We had to give them -- we could not

charge them for one thing.

And see that was another thing.  When I was moved, Dr. Carr is saying, "Oh, well y'all can't -- you just have to charge the kids for this. You have to charge the kids for that."  Well, I'm sitting here looking at the regulations, and it's saying I can't charge them a dime.  So that may have been one of mine.  I -- I just don't -- I don't know.

Oh, and this was one that was definitely mine right here, ACCUPLACER for DE.  In 2018 Dr. Carvajal got permission for VSU dual enrollment to accept ACCUPLACER as a means of acceptance.

Q    Uh-huh (affirmative).

A    Just like Donald Singer told you the other day, that is -- that is a placement exam.  I wasn't consulted about it.  No one from DE was consulted about it.  So what he did -- our dual-enrollment requirements at that time were the state minimal for dual enrollment, which just happened to be higher than our regular admission to VSU --

Q    Okay.

A    -- okay?  Both of which were basic minimal scores.  We had the lowest of the low.  Now, he has gone and said, "You have to accept ACCUPLACER."

Why?  Because he wants me to get my numbers up.

So we lowered the standards, and we allowed students to come in on ACCUPLACER.  The problem with that is then the next year, A, we can't retain them because now we have to have an SAT and an ACT to get into VSU.  So we can't retain them. We can't just move them right on in because they don't have the test, SAT or ACT, and that was hurting a lot of students.  And that was the nursing students that I keep referencing, and if the truth be known, that was the final straw that made Lisa Long and I go, "Enough is enough."

When you sit there and you look at three students and only two of them can get in and they've got over 30 credit hours and they've got a 3.8, a 3.9, and a 3.6 GPA and they've worked their buns off at a technical school and now all they want to do is to come into VSU to take Nursing 2700, which is pathophysiology, I believe, and they take the ACCUPLACER test four times and they can't get in, there's a problem.

And that's how students -- that's what I meant by that statement in that email.  We're seeing students trying to come from other institutions, and can't -- they can't get in.  Those students, you

know what they had to do the next year?  They had to wait a whole year because the nursing program only accepts you once a year.  That -- that mother and that grandmother looked at me and said, and those girls were right there, "What are we going to do?  They -- these ladies told me these courses are guaranteed that y'all are going to take them."

Q    If they get in.

A    That's right, but they didn't get in.

Q    **Because they didn't have the SAT or the ACT.**

A    They -- we tried to let them come in on ACCUPLACER.  By then, we're taking ACCUPLACER.  They couldn't even come in on ACCUPLACER.  So how did they get in the other institution that they were in is my question.  It was my concern.

So, you know, now, VSU accepts ACCUPLACER.

Q    **As do other institutions.**

A    Now, because of COVID --

Q    **Sure.**

A    -- but at the very beginning, Mr. Carter, I think we were maybe one of three that did.  And --

Q    **But you --**

A    But then again, I was penalized because of my retention numbers were so low.  Well, that's a

whole nother thing, but here's your problem right here as to why we can't retain some of these students that were coming in on ACCUPLACER only.

Q    The ACCUPLACER, if I understood, was initially allowed for dual-enrollment students?

A    Uh-uh.

Q    No?

A    Uh-uh.

Q    Okay.  What was it allowed -- you said Dr. Carvajal --

A    Oh, oh.  Okay.  I thought you were going way back --

Q    No.

A    -- as to why that -- no.  Yes, sir.  He -- he went to whomever and said, "We want to let our students come in on ACCUPLACER.  We don't want our dual-enrollment students to only be held to SAT/ACT."

Q    Okay.

A    "We want to broaden the scope and give more students the ability to come in."

Some that came in probably did very well. I'm not saying that, but I'm just saying I know of a lot of our students at our early college that really struggled trying to get in VSU because they could

not -- they could not pass the SAT or ACT.

Q   But that's -- I mean, they know that if they want to get into VSU that they have to meet these minimal requirements; right?

A   You would be surprised at what students and parents don't know.  I'm an educator, and I under- -- I would think we, as educators, understand the college process pretty much better than most people because we're kind of in that business.  But I'm going to tell you from my standpoint, where I saw -- parents didn't -- didn't know or -- or maybe they -- they saw and they thought, "Well they're in the dual enrollment program.  It's guaranteed.  Maybe they just slide on in."  I'm just telling you what I saw.

Q   I got you.

Is -- Valdosta if you have a minimum required SAT score, did you have a minimum GPA, too?

A   (Nodding head affirmatively.)

Q   As long as you meet those two standards, you're automatically in; right?

A   Now, we're talking back in 2019 --

Q   Yeah.

A   -- when I was there?

Q   Yeah.

A     This is prior to COVID?

Q     **Yeah.**

A     Say that again, please.

Q     **If you have a -- like, if Valdosta State's minimum SAT is whatever number and the minimum GPA is whatever number.  If you meet those two requirements, you're in?**

A     And there were some other requirements such as verification of (inaudible) --

THE COURT REPORTER:  Verification of?

THE WITNESS:  Lawful presence.

A     They had to just provide that, but they had to be here legally.  They had to be on track for graduation.

BY MR. CARTER:

Q     **Right.**

A     But, yes, as long as they met those GPA and those tests requirements, they were allowed. Now, whether I think that's right or wrong, it --

Q     **Sure.**

A     -- doesn't matter, but that's how admission houses work.

Q     **Okay.  And, now, ACCUPLACER is accepted for regular admissions at Valdosta and other schools?**

A     I think it is now.

Q     Okay.  And Dr. Carvajal had rolled in for the dual-enrollment students.  When was that?

A     I believe it was 2018, but the reason it's accepted now is because of COVID.

Q     Right.  I understand.  And Dr. Singer testified to that, to a large --

A     But he also said that not many -- not many -- and there's an email in there from a high school counselor saying, "Wow.  Are these kids going to be able to -- to handle VSU?"

Q     Uh-huh (affirmative).  Okay.

A     So it lowered our standards and if you look at the data, VSU numbers went up, but that's the year our retention went down.  Same thing regular admission, too.

Q     You're talking about the dual-enrollment numbers went up, but retention went down because even though they were getting in, they couldn't meet the --

A     They couldn't stay with us.  That's right. Now, students -- you know, when you're talking about retention, you're talking about -- with dual enrollment, you're talking about two different types of retention.  Are you talking about staying here

for the freshman year, or are you just talking about coming back the next semester?

Q    Right.

A    Well, there's plenty reasons as to why students -- it's not a full-time program, and they can go to multiple institutions.

Q    Dual enrollment --

A    Yes.

Q    Yeah.  Okay.

A    But the justification that was provided, Mr. Carter, for my termination, that was very misleading and very unclear, and it was not accurate.

Q    Okay.  What were you -- what was your salary at the time of the RIF?  Do you remember?

A    $58,000.  I never went into teaching for the salary.

Q    I understand.

So you were making 58,000 when you were subject to the RIF?

A    I believe that's what I'm seeing that piece of paper say.

Q    And -- and your retirement from VSU, are you collecting that now, or will that be when you turn --

A    I had to.

Q    -- 65?

A    I had to.

Q    Okay.  What does that pay a month, or annually, however it's --

A    $1900 a month --

Q    1900 --

A    -- of which 800 goes for my --

Q    Insurance?

A    -- insurance.  Uh-huh (affirmative).

Q    And the 800 is through -- the insurance is through VSU?  I mean, through the retirement system or whatever --

A    Yes, sir.  Yes, sir.

Q    And you were paid through November of 2020?

A    I -- I really can't answer that.  I do not remember, to be honest.

Q    Okay.  But whatever your retirement date or whatever the date you would be subject to retirement, were you paid through that time period --

A    I -- I believe so --

Q    -- whatever that date --

A    -- yes.

Q    -- was?

A    Yes.  There wasn't a -- there wasn't a lapse, I don't believe.

Q    And you've had no job since then?

A    Correct.

Q    Have you had to seek any kind of medical treatment?  Anything like that?  Psychological treatment, or are you just dealing with it the best you can?

And I'm not doing this for any reason other than just trying to get the full picture on how this has affected you.

MS. MAESTAS:  Take a minute, and answer the question.  Just ...

BY MR. CARTER:

Q    Take your time.  We've got plenty of time.

A    Well I've always considered myself pretty strong.  And I've got two really close -- close friends who are attorneys, one male and one female, both grew up -- and everybody's like, "I'm telling you, Bird.  It's going to be rough."

And it has been.  And what I really hate the most is, you know, I found out the other day that this guy died.  Dr. Singer, right in the deposition said, "Oh, and Mr. So-and-so died."

What?  You know, I lost all my contacts with my friends.  This was a guy that we worked on for two years with this.  What really gets me though is -- and she made it very clear that, you know, I needed to kind of disassociate myself with VSU.  You know, "If you get with your -- your people, you cannot talk with anybody from the USG.  You can't talk with them about this."  And I've lost friendships because of it, but the real thing is my family.  And evidently I haven't been real pleasant to live with.  I have panic attacks -- never before.

So -- and then, you know, Holly tells me, "We need to put down your financial whatevers."  Well, I knew it was a lot, but, I mean, I'm -- you know, I'm 60.  I -- I feel like I'm very intelligent, very capable of working.  I always loved working, even at $58,000.  And now I can't even get a dadgum job.  I've applied for, what, seven, eight?  And that's not me.

So it's -- it's definitely affected how I think about myself when I know that that's not true.  So, yeah, I -- I'm not going to ever work again in the USG system.

MS. MAESTAS:  How do you know that?

THE WITNESS:  Well, I just -- well,

I've -- actually I'm suing them.  My name is a lawsuit against them, which, you know, I --

MS. MAESTAS:  I just -- I just want you to be clear on what you're saying and why because we -- because of what we've sought in the lawsuit.

THE WITNESS:  Yeah.  Well, I just --

MS. MAESTAS:  So if you're saying that, are you saying that you would no longer seek a position?

THE WITNESS:  I would -- definitely.  I -- I mean --

MS. MAESTAS:  Okay.

THE WITNESS:  I mean, they're just not going to hire me.  It's very clear.  I mean ... I just -- my days are done.  I -- you know, it's -- this has put -- this has damaged my reputation even though the people that know me know that I'm in the right and that I stand up for what is right.  I didn't want to do this, but, yeah.

You know, at first, all I wanted was my job back.  I told that Jan Lyne that, "Just give me my job back.  Give me somebody else to report to than him.  Hopefully he won't -- he's

going to self-destruct at some point.

Hopefully he'll just leave here pretty soon."

But it didn't happen.  They wouldn't give me my job back.

BY MR. CARTER:

Q    Okay.

A    And so, yeah, I've had -- I have some heart tests in a couple of weeks just to rule out some things, but I've had some incidences.  My father had a real bad heart.  So they want to check it out.  I've got some respiratory -- not respiratory, some --

Q    Gastric?

A    Thank you.  And I'm -- there's a part of me that's disappointed that -- that I've allowed this to happen to my body, you know, but yet, it has.  I mean, I had -- I had no idea.  And, you know, I told Holly early on, I said, "I don't know if I can do this anymore," when the first round of stuff came back and they're saying -- that whole report that Jeanine Boddie-LaVan said, "It's nothing but misquotes and -- and untruths."

Now, that may be what she's being told, and she may believe that, but it's not true.  And I told her, I said, "I can't do this."  And she said,

"Jamie" -- I said, "I'm not mean enough to do this." She said, "All you got to do is tell the truth," and that's all I've done.

Q   Okay.  And I'm just trying to get a handle on it.  You're -- you're getting 1900 now as benefits.  If you had worked until 65, do you know what your benefit would have been?

A   It's in all of that stuff we sent down. We worked on -- I cannot remember --

Q   Calculations?  That's fine.

A   -- every bit of it.  And we took it to our CPA to make sure -- I mean, I just didn't say arbitrarily, "Here's a number."

Q   Got you.

A   I really wanted to do my due diligence and do the right thing.

Q   All right.

A   You know, I'm not here -- again, I didn't want to do this.  I'm not here to get anything but try to help myself, and it's been very difficult.

Q   Okay.

MR. CARTER:  Holly, are you on contingency?  Is she paying -- I don't want to ask her about it if your -- I mean, fees and expenses?

MS. MAESTAS:  She did pay something down --

MR. CARTER:  But y'all don't have --

MS. MAESTAS:  -- to cover expenses.

MR. CARTER:  -- calculations that y'all --

MS. MAESTAS:  No.  I don't think we put -- did we put attorney's fees in there?

THE WITNESS:  No.

BY MR. CARTER:

**Q    Do you -- how -- do you know what you had to pay her?**

MR. CARTER:  You said it's down for expenses?

MS. MAESTAS:  Yeah.  So she's --

MR. CARTER:  Retainer?

MS. MAESTAS:  -- paid some attorney's fees up front.

THE WITNESS:  Holly's put in a whole hell of a lot more work than she's been paid for.

MS. MAESTAS:  So I do a --

MR. CARTER:  I understand.  You do a hybrid type --

MS. MAESTAS:  I do a hybrid, but the -- it's very -- once I get past, like, you know, like, the first month, it's gone basically.

MR. CARTER:  Yeah.  Okay.

BY MR. CARTER:

Q    Do you remember how much it was?  I'm just -- what you've had to pay her?

A    Uh-huh (affirmative).

Q    How much?

MS. MAESTAS:  She paid 10,000, but I think most of that was earmarked for costs.  And we've done --

MR. CARTER:  Gone through it?

MS. MAESTAS:  -- blown through all of that.  I want to say -- was half of it attorney's fee?  I -- I can't remember.

THE WITNESS:  I don't know.

MS. MAESTAS:  I'd have to look it up, but -- and then we've done -- I mean, she's paid another 6 down, another 4 down on costs because we had to pay for the court reporter and travel and everything.  So that's -- I think you've probably paid a total of 14 toward attorney's fees and costs but we'll owe -- she'll owe more.

MR. CARTER:  Okay.

MS. MAESTAS:  That sound about right?

THE WITNESS:  (Nodding head

affirmatively.)

MS. MAESTAS:  Because I think it was 10, 6, and 4 has come in, but we have the court reporter fees --

MR. CARTER:  Got you.

MS. MAESTAS:  -- which is the lion's share of the costs and the whole thing.

MR. CARTER:  Okay.

MS. MAESTAS:  And then it becomes contingency beyond that.

MR. CARTER:  When the (inaudible) is exhausted?

MS. MAESTAS:  Say what?

MR. CARTER:  It becomes contingency once that's exhausted?

MS. MAESTAS:  Exactly, uh-huh (affirmative).

BY MR. CARTER:

Q    And just to clarify, you mentioned the heart issue that you're getting tested about in a couple weeks.  Have you been -- have you sought treatment for that before this?  Is this the first time you're been treated for it, and that's coming up in a couple weeks?

A    Uh-huh (affirmative).

Q    Is that yes?

A    All of this is coming up.  I mean, every --

Q    But you haven't had to go seek counseling or anything like that?

A    I went to see my minister --

Q    Pastor?

A    -- and his wife.

Q    All right.

A    Who just happens to be an old attorney.

Q    Who is he?

A    Jimmy (inaudible).

Q    Okay.

MS. MAESTAS:  So you're not --

THE COURT REPORTER:  I'm sorry.  The name?

THE WITNESS:  Jimmy Towson, T-o-w-s-o-n.

BY MR. CARTER:

Q    Do you know Jim Elliott?

A    I do know Jim Elliott.  He's a dear friend of mine.

Q    Is he?

A    Uh-huh (affirmative), we went to high school together.

Q    He's a good fellow.  He's a Presbyterian priest, I believe?

A    Episcopal.

Q    **Episcopal.**

A    Yep, Jim and I went to elementary school, high school.  We didn't go to -- I didn't go to Davidson.

Q    **Okay.  I wasn't sure where he went. He's -- I've worked with him a lot in the past.**

**All right.  Give me a second.  I think I'm done.  I just want to check a few things and --**

MS. MAESTAS:  Okay.  I have a couple of just, like, really small clarifying --

MR. CARTER:  Go ahead --

MS. MAESTAS:  -- questions.

MR. CARTER:  -- while I'm working.

MS. MAESTAS:  Okay.

CROSS-EXAMINATION

BY MS. MAESTAS:

Q    **You were talking about, Jamie, the -- when VSU changed to allow ACCUPLACER, and we established that around 2018, Carvajal changed, for dual-enrollment admissions, from SAT/ACT to ACCUPLACER?**

A    To include ACCUPLACER.

Q    **Okay.  So you could have SAT/ACT and also ACCUPLACER?**

A    Correct.

Q    **And that was in 2018 for dual-enrollment admissions?**

A    Correct because a lot of the students were getting concurrent enrollment in their high schools, being taught by the TCSG schools.  Concurrent enrollment is a form of dual enrollment, and it's when the dual-enrollment course is taught in the high school by the high school teacher.  That high school teacher has to be credentialed in order to do that, but the -- most of the students were getting in only by using ACCUPLACER.  So then when they would then try to come to us -- I guess that was his reasoning, is that he felt that we needed to --

Q    **Because they were --**

A    -- improve that --

Q    **-- doing it at the TCSGs --**

A    Correct.

Q    **Okay.  Now, we also stated somewhere in the deposition that ACCUPLACER was now being used for admissions at VSU for regular freshman admissions; correct?**

A    Now, it is my understanding it is because of COVID.

Q    **Okay.  Was it before COVID --**

A    No, ma'am.

Q    -- that Carvajal ever made that --

A    No, ma'am.

Q    -- change?

A    No, ma'am.

Q    Okay.  So only because of COVID --

A    That's right, and that was the problem.  I could not retain the students because they would graduate high school from never ever taking an SAT or an ACT, and they would say, "Well, we've been doing dual enrollment with you guys using ACCUPLACER.  I've been a VSU student.  Why can I no longer be a VSU student?"

Q    Got it.

And before your termination, was ACCUPLACER being used for regular admission?  Like, while you were there.  Because I'm trying to -- so COVID -- COVID hit and that change happened?

A    No, because I think -- I think that one year they just started letting students get in.  Ask your question again.  I'm sorry.

Q    Okay.  So your -- your last date of employment --

A    November.

Q    -- was November of 2020?

A    Uh-huh (affirmative).

Q    Was ACCUPLACER available for regular admission before you left?

A    I do not believe so, no.

Q    Okay.  And we talked about, at one point, that you were moved to the Office of Transitions.  I think that's called the Office of First-Year Transitions in that email.  And that was in February 2020 where Carr had come to your office and talked about that; is that right?

A    January.

Q    January 2020?

A    Uh-huh (affirmative).

Q    And we had said that Beth Beasley -- or --

A    Brenda --

Q    -- Brenda Beasley, Beth, and you were going to be moved?

A    Uh-huh (affirmative).

Q    Mr. Carter asked you whether you thought that move was retaliation, and you said, "Yes." Mr. Carter also asked you, "Was that move because Mitchell was no longer there?"  And you said, "Yes."

A    It happened when he was -- it happened after he left, but when Mr. Mitchell resigned, Mr. -- Dr. Carr came over and asked him, "We need to

look at the structure of how y'all want to do this. Do you want dual enrollment to remain with Ryan now? Since you're no longer going to be here, do you want" -- and he said, "Yes, dual enrollment needs to go to Ryan now."

Q    And you said that?

A    No.  Mr. Mitchell said that.

Q    Mr. Mitchell said that?

A    Uh-huh (affirmative).  He told me that because I was -- we were all thinking, What's going to -- where are we going to go?  Financial aid and all of us, Where are we going to go?  And so he was asked, and Mr. Mitchell said she can report -- which, that's what she reported to when she was moved over here, was admissions, which was Mr. Mitchell.  So let her just stay and report to Mr. Hogan.

Q    And did Freidhoff also state that dual enrollment should stay with Admissions?

A    Okay.  So then a couple of -- well, yes, he did, but that's what I meant.  Both of them now are testifying differently.  It's because --

Q    You mean both Hogan and --

A    And --

Q    -- Freidhoff?

A    -- Freidhoff.  Because they both -- you want many things under you so it helps secure your job.  And Freidhoff originally said, Yes, let that -- according to Mr. Hogan -- let dual enrollment stay in Admissions, but Carr didn't.  He moved dual enrollment to Freidhoff.  But then what is interesting about that is when I left, guess where -- guess where dual enrollment went then.  It went back to Ryan to do until they put Megan in -- in the position.

Q    Okay.

A    They didn't let Mr. Freidhoff handle it after I have left in November because see, when I left, Ms. -- Ms. Bessenger was not comfortable.  She had already told them that when -- when they let me go, they already knew that Mrs. Bessenger had already applied for a teaching position in North Georgia.  She had not gotten it, but she had applied for it.

Q    Uh-huh (affirmative).

A    So she kept thinking that everything would work out, I would get my job back, and I was -- I kind of felt like I would, too, to be honest with you.  And so when that didn't happen, then she called me over, like, the next week, and she says,

"I'm not coming back after Thanksgiving.  Would you be very disappointed in me?"  And I said, "Absolutely not."

So she did not want to work for Carr, and she did not want to have anything had else to do with it.  So that's why she left, but -- so it's -- now the program is with Rob.  But all over Christmas and all the month of January and February that next year, Carr told Ryan Hogan to do the job.

Q    Okay.  And you had stated that when you had applied for that new job at VSU -- this was at the beginning of your deposition -- you had interviewed and that one of the reasons that you believed that you were not picked was that there was this email that you had sent to Dr. Chu, who was the head of the hiring committee.

A    That's --

Q    Then you said -- then you said that that was inaccurate, and I wanted to hear why it -- why it was inaccurate and what actually happened.

A    Okay.  That's the first that I had heard about --

Q    Okay.  So --

A    -- that --

Q    -- in the deposition --

A     That is correct.

Q     -- of --

A     Right.

Q     **Whose deposition was that?**

A     Jeanine Boddie-LaVan.

Q     **Okay.**

A     And she said that I had been inappropriate or some -- I don't know her exact words, that I had been emailing members of the committee and Dr. Chu specifically, and that is not true.  But I've had time to reflect on that, and now I think I know exactly what she's referring to.  And I -- I hope that I'm wrong because this is ridiculous.

When I went to apply for the position, I was doing it online.  It called for my transcript -- my undergraduate transcript.  So I said -- so I left my laptop.  I went to my computer in the back.  I went to the registrar.  I went to order my transcript that will be sent electronically right then.  I'm going to take that -- that transcript, and I'm going to come attach it to my application.

Well, the time frame that I put in there, being as it had -- it was now archived due to the -- my age, I guess --

Q     **Uh-huh (affirmative).**

A     -- I have to have it between seven and ten days.

I go back.  I look at the portal, and the -- the thing is closing, like, in two.  So I don't have time.

Q     In two?

A     Two days.

Q     Okay.

A     So I call the registrar's office, and I -- I tell them my plight, what my problem was.  I asked to speak to Stanley Jones, the registrar.  He was not there.  I asked to speak to Karen Shepard.  She was not there -- thinking that they may could just go in and pull it and send it to me and then I'd be fine.

Q     Uh-huh (affirmative).

A     They tell me that she's -- that they're not there.  So, now, I'm -- now, I'm like, Well, what do I do?  So I call -- so then I go back to my computer and I try to just send it.  I think, Well, I'll go down there and get it somehow and then deliver it to them or whatever.  So I go back and try to send the application, and it won't go because that thing is not attached.  It won't let me send it.

Q    You're --

A    My transcript.

Q    -- transcript?

A    Right.  So I go -- now, I call HR.  I don't know who I get, but I tell them my story and they give me somebody.  And that person tells me all you have to do is just attach a blank something or nother.  Just put something in that cell, and you can put a notation at the bottom saying that your application has been ordered.

And I said, Oh.  I said, Okay.  I'm typing my cover letter right now.  And I said, Dr. Chu is the head of the -- no.  I said, Mr. Hogan -- I'll just put down -- because it was an admission's job.  I just assumed Mr. Hogan would be the chairman of the committee.  I said, In my cover letter, I will just put down at the bottom of Mr. Hogan's -- his -- I may have called it an email, but it was a cover letter.  It wasn't an email.  I said, I'll just put at the bottom that transcript is being ordered.  Okay?

The girl on the other end says, Dr. Chu is the head of that committee.  And I said, I knew that there were two positions, one was in Admissions, one was in Housing.  Chu is over Housing.  Hogan is over

Admissions.  So thinking that the girl has got them confused, I said, No I'm applying for the Admissions position, and that's Mr. Hogan.  And she says, No, it's actually Dr. Chu.  And I went, Dr. Chu is heading the Admissions Committee?  Never in my life has that ever happened.

And she says, Yes.  So I said, Well, okay.  I don't think I'm getting privileged information.  I don't think a thing.  So I take out Hogan's name and write Chu's name in my cover letter.

Q    That's it?

A    Yeah.  So there's no email.  I -- so then I order it.  So I go back.  I take -- I think it was my vitae.  I take the vitae.  I put it in the empty thing here, the empty cell, and I click send and it goes off.  I changed the name from Hogan to Chu in the cover letter.  You know how you write a cover letter, I'm applying for this position?  You know what I'm talking about?

Q    Yeah, I know --

A    Okay.  You --

(Unreportable simultaneous speaking.)

A    So that's all I did.  I wait -- couple of -- week, maybe couple of days later, Dr. Chu emails me, "Hey, Jamie would you like to come -- or

do a Zoom?"  I write him back, "Yes, that sounds great."  Only email I sent.  The day of the Zoom meeting -- it's supposed to be at 11:00 o'clock. It's now going on 11:08, and I'm like, Clearly I'm in the wrong place.  So I email him, "Dr. Chu, I am in -- I am waiting on the Zoom call."

Those are the only two emails that were ever done, only two emails.  And so I know this is continuing bullying from Carr and continued vindiction [sic].  Just, you know --

Q    And doctor -- or Jeanine Boddie-LaVan, she had said something about how Lisa Long had admitted --

A    Okay.

Q    -- to something.

A    All right.

Q    Do you have --

A    Then I read that when it came in.  It said she's trying to backtrack.

So not going to be out done, Jamie Bird is going to get her transcript.  Who's the only other person at this university that has the institutional knowledge that can get me my transcript?  Who does transcripts every day?  Lisa Long.  So I call Lisa.

I say, "Lisa, I'm applying for this

assistant admissions director's position, and I can't get my transcript." And I explained everything. I said, "Do you keep -- do you by any chance put down there -- can you get my transcript?" And she says, "Jamie, I can't do that. Have you tried Stanley?"

"Yes, I" -- so I tell her what the person at HR says. I said, "I'm just going to go ahead and send it in." And I said, "I've -- I've got a notation, but the lady down there said it was Dr. Chu. Is she right? Is Dr. Chu doing this?"

And she said, "Yeah." I said, "Okay. All right. On Dr. Chu's cover letter, at the bottom, I have written a little note down here that my application should be on its way." And that's the --

**Q Your transcript?**

A My -- that's what I mean. Yeah. I'm sorry. I'm getting tired. But my transcript will be on the way, and that was it. I mean, there was nothing else said. She didn't tell me anything.

**Q Okay.**

A So --

**Q So you told her it was Chu and she said --**

A She just confirmed that it was Chu, which

I found that very odd because never have we ever done that.  And then, of course, it's Jamie Bird applying for a position.  You've got -- and then, see, later on, we've now found out, see, Lisa Long was on the committee.  She got removed from the committee for supposedly giving me privileged information.  She did not give me privileged information.  And then in Jeanine Boddie-LaVan's testimony, she says, "But then Lisa was trying to walk it back."  Well, because then Lisa's figured out where she's going with it.  Well, I'm just surmising now, which I --

Q    Yeah.

A    -- shouldn't do, but, you know.

Q    Okay.

A    So -- but, yes, I've played this game fairly.  I've done everything that I was supposed to do and I still felt like that I would get that job.  And now to find out -- and she says it didn't have anything to do with it, no, don't tell me that.  It most certainly did have something to do with it.  They even removed -- and then they removed -- Michelle Jordan was the committee, too.  They removed her as well and put someone from Housing on it, which the girl that got it was from housing.

So ...

MS. MAESTAS:  That's all I've got.

MR. CARTER:  That's it?

MS. MAESTAS:  Yeah.

REDIRECT EXAMINATION

BY MR. CARTER:

Q    Just a couple more questions, Ms. Bird. In your complaint, it says that you received notice of the RIF in July -- July 17th of 2020.  Does that sound accurate?

A    Yes, sir, I believe it does.

Yes, the day before July the 14th.  So the 13th Freidhoff sends me an email asking me if I can meet him at HR.

Q    Okay.

A    I'm like, Oh.  So I slept really well that night.  So, yes, on the 14th.

Q    14th is when you had the meeting at HR?

A    Terminated, yes.  My termination meeting.

Q    Who was that with?

A    Michelle Jordan and Rob Freidhoff.

Q    And that's the one you were talking about earlier where they had talked about your retirement?

A    Uh-huh (affirmative).

Q    But when you say "termination," it's the

reduction in force.  I mean, it was a reduction in force regardless.  You were -- you were no longer employed.  I understand.

A    I was fired, Mr. Carter.

Q    You hadn't been fired until the reduction in force; right?

A    I know.  That worked beautifully, didn't it?

Q    I'm just -- I'm just saying you -- there were other people subject to the reduction in force, too.  Six or seven; right?

A    Uh-huh (affirmative).

Q    Okay.  So it wasn't just, You're fired.

A    I was not --

Q    I understand your position --

A    I was not told that I was fired.  You're correct.

Q    Okay.  All right.  Regardless of whether you agree or disagree, they told you that your job was being transferred or your duties were transferred to someone else because of your salary.  It could be done cheaper.  That's --

A    Because I --

Q    -- the reason --

A    -- only had 200 students.

Q   Right.  That's the reason that was given, and -- that that was a reduction in force?

A   And the justify -- the justification provided was inaccurate and was made by two people that had no idea what I did.

Q   And -- okay.  And that was July.  And then in August is when you filed your Title IX charge?  August -- looks like August 3rd, you wrote a letter to the Office of Legal Affairs.  On August 17th, you wrote a letter to the Office of Social Equity to request a review?  Does that sound right?

THE COURT REPORTER:  What was the word before affairs?

MR. CARTER:  Office of Social Equity.

THE COURT REPORTER:  Social Equity.

MR. CARTER:  Office of Legal Affairs.  I'm sorry.  That was the second part.  August 3rd to the Office of Legal Affairs.

THE COURT REPORTER:  Got you.

BY MR. CARTER:

Q   Does that sound --

A   If that's the date, then that is correct.  I don't have it in front of me, but, yes.

Q   Did you do that on your own, or had you hired Ms. Maestas at that time, if you know?

A    I'm pretty sure I hadn't had dialogue with her --

MS. MAESTAS:  I didn't --

A    I'm not -- I'd have to look and see.

BY MR. CARTER:

Q    Okay.

A    But I --

MS. MAESTAS:  I didn't draft it, but she had retained me.

MR. CARTER:  That's fine.

A    Okay.  I honestly cannot -- I ...

BY MR. CARTER:

Q    And was this August -- the August letter to the Board of Regents, Office of Legal Affairs and the August 17th email the first time you had submitted written allegations about adverse treatment by Dr. Carr?

A    Written, correct.

Q    Okay.  And we've talked about the other discussions you had had, verbal discussions already; right?

A    (Nods head affirmatively).

Q    Okay.  Is there any that we missed that you can remember sitting here, about the treatment you received from Dr. Carr, other than what we've

discussed?

A    I'm not really sure that -- I'm not -- you're saying the treatment that I received.  Are you specifically talking about the hug?

Q    The hug and -- the hug was first mentioned when you were discussing the email is my understanding, with anyone other than your husband and Lisa Long; correct?  The meeting you had about the email to the counselors is the first time you brought up the hug?

A    To anyone other than my husband.

Q    Right.

A    Yes.

Q    Okay.  And then other than that time, in the written reports, did you discuss the treatment with anyone?  We may have discussed it.  I just don't remember.

Did you discuss the hug or any of that?

A    Whatever I told you earlier is exactly how that --

Q    All right.

A    -- happened.  I apologize.  My mind is --

Q    That's fine.

A    My mind is leaving.

Q    But we haven't missed anything.

There's -- I just want to make sure that you've told me every time that you recall discussing Dr. Carr and the hug with anyone.

A    Well, I told Mr. Mitchell, and I told HR director several times, approximately three, that this was all about something else.

Q    Right, but you didn't mention the hug?

A    That's what I was referencing --

Q    Right.  But you didn't --

A    -- yes, but I didn't write it and I didn't say -- I did say I eluded to the fact that it was -- it was by Dr. Carr because I remember her saying --

Q    Now, when you say "her," you're talking about Jeanine --

A    Jeanine Boddie-LaVan.

Q    And she said you -- is there some --

A    "Was there something you would like to speak with me about?"  And I said, "I'll be fired just like some of these other people I see making complaints.  They're gone the next day."

Q    Okay.

A    And, you know, all I can tell you is that I know what happened, and as a result of that, every bit of this has happened.  And I was fearful for my job.  I was fearful for being -- because I will tell

you, I was -- this man came back to my office another -- another time and I've sent you a recorded message of that.  I was scared when I saw him coming to my office.  Because I knew that my two employees, also, Mr. Long and Ms. Croft, had just left that building.  And I saw him coming in, and I was scared because some people here have testified that they've never seen that man angry and they've never seen him do his fist and -- and all of that, I have.  And I was fearful of him coming back again to my office alone.

Q    Okay.

A    So I did not know what he would do.

**Q    All right.  Is there anything else you want to tell me, Ms. Bird?  I always give the witnesses a chance to tell me anything that they want to tell me that I haven't asked.**

A    Well, you're in the business of asking the questions, and I can sit here with you all day long and answer them if you want me to.

**Q    No.  I think I've asked you everything I needed to.  I just wanted to know if there was anything you wanted to talk about.**

MS. MAESTAS:  Since he's giving you a chance to --

THE WITNESS:  Gosh.  Okay.

My attorney has just handed me this, and I --

MS. MAESTAS:  This is off record.

THE COURT REPORTER:  We're off the record?

MS. MAESTAS:  Yeah.

THE COURT REPORTER:  Okay.

(Recess 1:58 p.m. until 2:00 p.m.)

THE COURT REPORTER:  Are we ordering this at this time?

MR. CARTER:  Yes, whatever I normally get.

THE COURT REPORTER:  Regular delivery is fine?

MR. CARTER:  Yes.

THE WITNESS:  And I do want to read mine.

THE COURT REPORTER:  Okay.

MS. MAESTAS:  And we'll do a copy.

THE COURT REPORTER:  Got it.  Off the record.

(Examination was concluded at 2:00 p.m.)

CERTIFICATE OF OATH

STATE OF GEORGIA

COUNTY OF LOWNDES

I, KAIRISA JOI MAGEE, RPR, GCCR (Georgia),

Notary Public, State of Florida, certify that

JAMIE BIRD appeared before me on March 15th,

2022, and was duly sworn.

Signed this 15th day of April, 2022.

_____
KAIRISA JOI MAGEE, GCCR, RPR
Georgia Certification No. 5962-0590-7476-4800
Notary Public, State of Florida
My Commission No. GG 968504
Expires: 03/15/2024

CERTIFICATE OF REPORTER

STATE OF GEORGIA

COUNTY OF LOWNDES

I, KAIRISA JOI MAGEE, RPR, GCCR (Georgia), Florida Notary, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of JAMIE BIRD; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 15th day of April, 2022.

_____
KAIRISA JOI MAGEE, GCCR, RPR, FLORIDA NOTARY

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES ON THIS SHEET

JAMIE T. BIRD V. VALDOSTA UNIVERSITY
Deponent:  JAMIE BIRD
Date of :  March 15th, 2022
Case No.:  7:21CV62 (WLS)

PAGE    LINE           REMARKS

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.

Signature of Witness _____

Dated this _____ day of _____,
_____.
JOB NO.: 387138

**Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.**
**Jamie T. Bird on 03/15/2022**                    **Index: $1900..24**

---
    Exhibits
---

**BirdJ-24**
  3:17
  124:18,23

**BirdJ-41**
  3:15
  71:18,22

---
       $
---

**$1900**  142:6

**$5,000**  29:15

**$58,000**
  141:16
  144:17

**$900**  30:12

---
       1
---

**1**  125:7

**10**  14:23
  15:23
  150:2

**10,000**  149:7

**101**  35:12,
  13,14

**10:03**  4:1

**10th**  33:3

**1101**  36:9
  38:6,14,22
  39:7,9
  40:17,25
  41:4,8

44:13
46:23
47:22
48:14,21
49:4 50:14
132:2,3,15

**1101s**  47:4

**1102**  36:10
  38:22
  40:18 43:5

**1111**  38:14

**11:00**  163:3

**11:08**  163:4

**11:10**  54:6

**11:18**  54:6

**11th**  33:4

**12**  13:14

**12:03**  86:20

**12:13**  86:20

**13**  20:7,11
  65:2,6

**13th**  7:22
  91:24
  92:10
  166:13

**14**  20:7,11
  149:20

**140**  70:25

**14th**
  166:12,17,
  18

**1605.1**  82:25

**16th**  16:5
  31:6,11

**17th**  166:9
  168:10
  169:15

**180**  111:9
  113:2

**18th**  5:17,
  19,20

**1900**  142:7
  147:5

**1923**  15:13

**1960**  7:22

**1985**  14:22

**1996**  6:1
  20:13

**1:58**  173:8

---
       2
---

**20-something**
  57:1

**200**  102:22
  167:25

**2000**  22:10,
  11,12

**2015**  22:24
  23:16 29:3
  31:3
  32:17,24
  33:15
  77:13
  118:6

**2017**  31:20,
  21 53:15,
  19,25

**2018**  134:11
  140:4
  152:20
  153:2

**2019**  24:23
  26:2 31:10
  54:9 64:13
  113:6
  121:6
  138:22

**2020**  16:5
  31:6,11
  41:25
  98:18
  105:23
  106:2
  142:16
  154:25
  155:9,12
  166:9

**20th**  15:20
  54:9
  123:17

**2111**  38:15

**2112**  38:15

**22nd**  98:9,
  20 103:2
  116:5

**23**  11:3

**24**  14:21
  124:18,23

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 178 of 228

Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.
Jamie T. Bird on 03/15/2022                     Index: 25..acceptable

**25** 10:21 13:3 14:21 34:17

**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** 7:24

**26th** 108:9 123:25

**27** 39:25

**2700** 135:18

**28th** 111:12

**2:00** 173:8, 20

**2nd** 123:11, 24

---
### 3
---

**3** 8:14

**3.6** 135:16

**3.8** 135:15

**3.9** 135:16

**3/6/2019** 68:20

**30** 107:5 135:15

**32053** 5:18

**34** 34:17

**3rd** 168:8, 17

---
### 4
---

**4** 149:17

150:3

**40s** 102:6

**41** 71:18,22

**435** 5:17

**444** 106:14 133:18

**4th** 20:7

---
### 5
---

**500** 73:2

**58,000** 141:19

**59** 99:14

**5th** 92:12

---
### 6
---

**6** 149:17 150:3

**60** 7:19,20 97:16,23 99:13,17 144:15

**61** 7:16,17

**62** 7:18

**65** 142:2 147:6

**6:30** 54:25

**6th** 68:11 69:10 89:6,8,11 90:9 91:6

107:18 110:8,15

---
### 7
---

**7th** 91:19 92:16

---
### 8
---

**80** 20:12

**800** 142:8, 11

**83** 20:13

**85** 15:1

**86** 14:22

**8:00** 58:4

**8:40-ish** 58:18

**8th** 81:1 91:11,15, 18 92:1

---
### 9
---

**92** 9:4

**93** 20:12

**95** 14:24 131:13

**96** 14:24,25 15:1

**98** 21:5 131:12

**99** 21:6

51:16

**9:00** 58:7

**9th** 33:3

---
### A
---

**a.m.** 4:1 54:6

**ability** 137:21

**absolutely** 28:19 36:21 65:21 83:10 88:2 92:25 103:7 106:9 107:13 121:17 122:10 127:8 158:3

**abused** 71:11

**academic** 78:1 132:6

**academics** 120:22,24

**academy** 122:4 130:11

**accept** 49:12 134:13,25

**acceptable** 66:22

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 179 of 228

**Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.**
**Jamie T. Bird on 03/15/2022      Index: acceptance..affirmative**

131:16

**acceptance**
134:13

**accepted**
34:10
49:11
139:23
140:5

**accepts**
136:3,17

**accreditation**
28:4

**ACCUPLACER**
134:11,13,
25 135:3,
20 136:13,
14,17
137:3,4,16
139:23
152:19,22,
23,25
153:12,20
154:12,16
155:2

**accurate**
113:12
141:13
166:10

**accurately**
130:17

**acknowledging**
83:5

**act**  62:3
111:3
135:6,8

136:11
138:1
154:10

**actual**  92:14
131:17

**add**  40:20
115:18

**added**  114:14

**addition**
119:5

**additional**
23:20
115:8,17

**address**  5:16
6:8

**addresses**
85:5

**addressing**
84:20

**adjunct**
20:24
21:22

**administrative**
16:10

**admission**
83:14,17
134:21
139:22
140:16
154:16
155:3

**admission's**
161:14

**admissions**
16:13
23:3,23
27:14 28:6
38:9 72:18
84:10 99:5
104:13
114:7
118:2
119:6,7
139:24
152:21
153:3,21,
22 156:15,
19 157:5
161:24
162:1,2,5
164:1

**admitted**
163:13

**advance**
62:24

**advantage**
39:20

**adverse**
169:16

**advised**
81:17

**advisement**
81:4 83:3

**advising**
77:16
83:18
103:8
105:2,3,10

**affairs**
168:9,13,
16,18
169:14

**affected**
143:12
144:20

**affidavit**
122:25
123:10,25

**affirm**  4:12

**affirmative**
5:10,20
6:19 12:9
14:2 15:18
33:11
44:17
53:11 54:1
67:20
80:22 81:5
87:10,14
92:13 93:8
97:3 101:7
108:2,4
121:15
134:14
140:12
142:10
149:5
150:17,25
151:22
155:1,13,
18 156:9
157:20
159:25
160:16
166:24

167:12

**affirmatively**
123:5
138:19
150:1
169:22

**afternoon**
89:13

**age**  4:21
99:13
159:24

**ages**  10:20

**agree**  28:24
57:8 78:9,
14,18
89:18
167:19

**agreed**  78:18

**agreeing**
95:15

**agreement**
4:4 74:20,
21,24

**Agreements**
71:7

**ahead**  36:7,8
44:11
70:18
152:12
164:8

**aid**  84:9
118:24
128:25
156:11

**airline**  6:13
7:2,4

**Alamo**  8:17

**Albany**  10:23

**align**  34:6
43:15

**aligned**  34:9
37:15
38:8,16,23
43:2 45:24
48:22 49:5
50:17,25

**allegations**
111:16
169:16

**alleged**
113:5

**allowed**  71:2
97:11
99:16,20
100:8
103:18
128:21
135:3
137:5,9
139:18
146:15

**allowing**
112:1

**alluding**
65:18
104:1

**altogether**
126:5

**amazed**  75:4,
5

**Anderson**
77:3,23
109:7,10

**angry**  59:24
107:20,21
108:3
109:8
110:14,17
172:8

**annually**
142:5

**answering**
5:5

**any-**  34:24
71:5

**anymore**
112:20
146:19

**AP**  37:1,3,
6,7,16,20,
21,22,25
38:8,10,
17,19,24
39:8,11,16
40:17,18,
20 41:6,8,
10,16
42:25
43:4,11,
14,22,25
44:18,20,
23,25
45:7,24,25

46:1,9,10,
19,20
47:1,5,15,
19,21
48:19,22
49:5,6,7,
9,14,16,
17,24
50:16,24
51:1,4,6,
8,11,21
52:5,7,11
53:2

**apologize**
170:22

**apologizing**
89:24

**app**  128:14,
17

**applicants**
19:14

**application**
16:10
159:21
160:23
161:10
164:15

**applications**
17:22,25

**applied**
16:15,21,
22,23,25
19:6,15
22:5 33:1,
3 144:18

157:17,18
158:11

apply 16:14
17:12 22:1
35:19
127:17
159:14

applying
162:2,18
163:25
165:3

appointed
118:19,21

appointment
29:1

approached
21:18,20
22:22

approaching
63:3

approve
99:12
100:17

approved
29:14 34:2
35:24,25
37:9,25
42:5 50:21
80:5 88:1
89:23
100:17

approves
115:25

approving

116:1

approximately
7:7 13:14
16:16 20:7
22:24
58:17
63:24
92:19,22
101:18
171:5

arbitrarily
147:13

archived
159:23

area 9:9
14:6 17:15
19:9 45:6
72:24
73:12
79:13
113:25
130:12

arms 57:19

arrested
19:17

ARRINGTON
10:2

arrival
118:11

arrow 74:3

articulation
74:20,21,
23

assignments

132:17,20

assist 84:12
115:21

assistant
11:8
16:11,12
114:21
164:1

assisted
8:10

associate
114:21
116:2,11
118:3

assume 23:3,
19 101:20
115:11,17

assumed
23:24 24:3
83:6
161:15

attach
159:21
161:7

attached
160:24

attacks
144:11

attempted
69:1

attend 12:19
13:11 74:6

attendance
124:19

attention
18:7 63:22
99:1
100:12

attorney
88:19
124:17
151:10
173:2

attorney's
148:7,16
149:13,21

attorneys
143:19

attractive
33:19
34:19

August
168:7,8,9,
17 169:13,
15

automatic
60:13

automatically
138:21

autonomy
72:11

Avenue
12:20,22
13:8

award 129:1

aware 8:22
41:23 98:2

awful  76:17

**B**

Bachelor
  20:20

back  6:7
  33:13 39:4
  41:4 55:22
  57:23 58:7
  59:7,21
  60:4,5,17,
  22,24
  64:11,18
  66:1,25
  71:2 73:16
  79:16
  88:22
  92:16
  98:10,13,
  16 99:10
  103:2
  104:10
  106:11,23
  109:1,17,
  19 115:3,5
  120:18
  130:7,17,
  24 131:7,
  9,12
  133:19
  137:12
  138:22
  141:2
  145:23,24
  146:4,20
  157:9,22
  158:1

159:17
160:3,19,
22 162:13
163:1
165:10
172:1,10

background
  19:25

backtrack
  163:19

bad  88:5
  146:10

Bain-  42:25

Bainbridge
  43:1

bakery  8:20

Ball  13:24
  15:10,11

bankruptcy
  19:22

Baptist
  119:21

Barry  28:1

base  109:3

based  32:1
  42:16
  115:7

basic  134:23

basically
  15:8 34:15
  45:21
  57:22
  106:11

148:25

basis  80:15
  103:12

Baxley  8:21
  9:1

Beasley
  103:23
  155:14,16

beat  50:9

beautifully
  167:7

beauty  36:14

began  4:1

begged  121:9

beginning
  34:22
  71:9,10
  76:14
  133:13
  136:21
  158:12

belief  25:20
  109:3
  129:11

believed
  158:14

beneficial
  133:3

benefit
  147:7

benefits
  96:21
  97:12

113:20
147:6

Bessenger
  80:7 122:6
  125:22
  157:14,16

Beth
  155:14,16

Bev  104:9,
  14,16

big  80:14
  90:17 92:6

Bill  106:14
  133:17

bill's  71:9

Bird  4:3,
  19,25 5:15
  7:1 10:21,
  25 11:1
  54:8 86:22
  91:24 99:3
  100:2
  143:21
  163:20
  165:2
  166:7
  172:15

birth  7:21
  15:5

bit  11:21
  87:19
  112:6
  120:1
  125:10
  147:11

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 183 of 228

**Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.**
**Jamie T. Bird on 03/15/2022**          Index: Black..calling

171:24

**Black** 27:11, 23

**blank** 71:6 161:7

**blanket** 77:11 79:2

**blew** 109:4

**blown** 149:11

**board** 5:1 27:8 33:15 37:23 38:16 40:21 41:3,11,13 50:17 95:3,5 169:14

**Boddie-lavan** 18:2 28:25 29:19 78:16 91:10,24 92:11,17 114:16 146:21 159:5 163:11 171:15

**Boddie-lavan's** 165:8

**body** 57:20 146:16

**book** 86:1

133:8

**books** 133:9, 14,21

**boots-on-the-ground** 80:7

**born** 7:17, 19 14:25

**boss** 64:11 120:7

**bottom** 50:5 161:9,17, 20 164:13

**boundary** 66:11

**boy** 119:22

**break** 54:4 86:6,19

**Brenda** 103:23 155:15,16

**Brian** 22:23

**bright** 61:22

**bring** 20:2 126:11

**brings** 111:21

**British** 43:4

**broad** 56:5

**broaden** 137:20

**brought** 18:6 39:4 63:21

80:2 98:25 100:11 102:4 111:7 119:11 170:10

**Brown** 118:12

**building** 172:6

**bullet** 127:10,12

**bullied** 61:25

**bully** 121:12

**bullying** 163:9

**bump** 30:8

**bumps** 28:13

**bunch** 84:2 104:1 125:14 126:10

**buns** 135:16

**burden** 83:8

**bursar** 84:10

**business** 138:10 172:18

———————

**C**
———————

**Cairo** 10:1

**calculations**

147:10 148:5

**calculators** 133:25

**call** 28:3 42:11,17 53:2 54:24 58:2,10 109:17,19 110:9,11 132:8 160:9,19 161:4 163:6,24

**called** 8:17 23:15 24:16,17, 19 29:1 32:25 35:12 36:10 58:3 73:10 74:13 75:14,22, 23 77:3 88:14 98:25 104:21 109:8,22 110:4,12 114:12 155:7 157:25 159:15 161:18

**calling** 58:7 98:24

**calls** 107:1 110:3

**campus** 26:1 34:6 55:4 85:14 111:23 112:1,20 113:4 114:8 119:17 121:10 132:10,13, 18

**capable** 144:16

**car** 63:25 64:16

**cards** 107:22

**care** 67:18 68:25 69:5 78:20 109:23

**career** 33:9 64:20

**Carr** 31:17 53:10,15, 23 54:10 58:10,21 59:2 60:25 65:23 66:17,21, 25 68:12 69:19 70:5 75:10,21, 25 80:13,

17 87:20 98:10 99:1,8 101:12,17 102:17,20 103:2,22 105:2,5,6 107:16,23 108:13,23 109:1,14 110:3,9 111:15 112:1,13, 22 115:25 116:17,20, 21 117:2, 14 118:7, 10 119:17, 25 120:5, 6,17,19 121:14 122:21,22 131:20 134:3 155:9,25 157:5 158:4,9 163:9 169:17,25 171:2,12

**Carr's** 62:9 69:11 85:4 107:23 110:24 117:8

**Carter** 4:2, 24 5:1

9:23,24 10:5 23:17 27:1 46:15,17 47:17,24 48:5 50:7 54:3,7 59:1 67:3 71:24 77:7 78:7 79:9 84:19 86:7,9,12, 16,21 89:13 94:10,11 95:17,19, 21 96:1 102:1 120:8 121:18 123:3,6, 18,24 124:2,4,8, 11,13,15, 24 131:12 136:21 139:15 141:11 143:15 146:5 147:22 148:3,5,9, 12,15,21 149:1,2, 10,23 150:5,8, 11,14,18 151:17

152:12,14 155:19,21 166:3,6 167:4 168:14,16, 20 169:5, 10,12 173:11,14

**Carvajal** 40:3 53:18 61:19 68:12 70:24 74:13 75:14,20 76:5,9 77:22 80:13 102:17 107:14,18 108:1,12, 22 109:8,9 110:4,20, 23,25 111:24 132:3 134:12 137:10 140:2 152:20 154:2

**Carvajal's** 76:2 111:11,14 112:23 118:11

**case** 122:9

catalog 43:4

caused 76:15
78:14,19
89:25
110:21

Cecil 22:25

cell 110:3
161:8
162:15

chairman
161:15

chance 8:21
164:4
172:16,25

change 24:13
33:12
39:21
40:15,19
105:13,18
113:19,20
114:25
154:4,18

changed
22:16,25
23:5,11
28:7,18
30:5 89:21
111:9
113:2
114:13
116:24
152:19,20
162:16

charge
134:1,4,5,

7 168:7

chatting
63:12
120:2

cheaper
167:22

check 127:18
146:10
152:9

child 9:10
20:16
62:23
132:19

Childhood
20:20

children 6:4
10:17,18
56:24

choose 47:1,
2 132:18

chose 6:14
80:18

chosen
102:25

Christmas
158:7

Chu 18:15
158:15
159:9
161:12,22,
25 162:4,
16,24
163:5
164:11,24,

25

Chu's 162:10
164:13

church 12:18
13:11
21:24 65:4
119:21

circumvent
84:13

city 16:21
20:6,8,9

civic 13:16

claim 114:5

claims 111:9

clarify
150:19

clarifying
152:11

class 35:18
41:12,13,
16 42:25
44:19,21
46:10
49:5,24
50:14
52:18
132:6,8,9

classes
37:1,3,16,
23,24,25
38:14,17,
24 39:11
47:4
50:23,24

75:7 79:19
127:14

classification
s 30:23

classified
25:22

classroom
132:11

classrooms
132:24

clear 48:18
65:14
68:17
91:22 94:2
144:4
145:4,15

click 162:15

close 54:14
60:11
62:12
112:8
143:18

closed 57:16
60:12

closer 62:13

closest
12:5,8

closing
58:25
103:4
160:4

club 13:24,
25 14:1,12
15:2,9,15,

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 186 of 228

**Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.**
Jamie T. Bird on 03/15/2022                    Index: clubs..contend

19

**clubs** 13:16

**CM** 9:13

**coded** 24:15

**collecting**
141:24

**college** 6:7
16:25
17:11,16
20:4,5,25
21:3 24:6
33:9 35:2,
15,19
36:3,11,
13,23
37:10,23
38:15 39:9
40:21
41:3,11,13
43:23
44:16
45:13
46:5,11,
13,21,23,
24 48:1,
12,15
49:1,25
50:17
51:8,18,22
52:13,15,
18 74:11
101:6
115:20
132:23
137:24
138:8

**comfortable**
28:15
157:14

**Commission**
34:9 42:10

**commit** 61:7

**commitment**
15:7

**committed**
54:18
62:23

**committee**
18:6,11,14
84:7
115:19
119:6
158:16
159:9
161:16,23
162:5
165:5,6,23

**committee's**
18:7

**communications**
58:8 59:6

**community**
14:7

**comparing**
26:6

**comparisons**
24:24

**competing**
37:21
38:17

**competitive**
39:15 45:4

**complaint**
65:18
82:24
91:23 92:6
113:5
166:8

**complaints**
171:20

**complete**
83:5 95:14

**completely**
79:10

**compliance**
69:15
70:19,20
72:2,4
73:4 81:24
82:16

**compose** 88:1

**computer**
159:17
160:20

**concern**
136:16

**concerns**
119:10

**concluded**
173:20

**concurrent**
77:14
153:5,6

**conference**
86:13

**confers**
83:24

**confirmed**
164:25

**confused**
79:17
162:2

**confusing**
46:8 51:21
125:10

**confusion**
48:4

**Congratulations** 29:13
98:3

**conscientious**
77:9

**considered**
65:25
143:17

**consistently**
26:1

**console**
55:22

**consulted**
134:17

**contact**
112:14

**contacts**
144:1

**contend**

Case 7:21-cv-00062-WLS   Document 33-4   Filed 05/02/22   Page 187 of 228

Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.
Jamie T. Bird on 03/15/2022                Index: context..court

106:7
107:11,14
116:15,17

context
  76:25

contingency
  147:23
  150:10,14

continue
  100:8

continued
  111:1
  112:2
  163:9

continuing
  163:9

contract
  81:16,21

conversation
  77:17
  87:22
  98:23
  102:20
  127:10
  130:14

coordinator
  24:18,25
  26:19

coordinators
  126:10

copy   29:10
  173:17

cordial
  106:19

core   36:2
  38:14
  44:11
  48:15

correct
  23:12
  32:18
  35:3,5,16,
  21 39:10
  43:15,16
  45:4,6,9
  46:6 47:7
  51:22
  52:20,23,
  25 54:18
  55:14
  57:11,17,
  20 59:3
  61:2 66:7
  67:25 81:4
  84:21
  86:23 87:9
  95:1
  100:15
  105:24
  108:11
  113:17,20
  116:21
  117:18,21
  118:8
  124:1
  125:11
  143:5
  153:1,4,
  18,22
  159:1
  167:17
  168:22

169:18
170:8

corrected
  124:6

correctly
  40:16
  48:17
  118:3

cost   96:23

costs   149:8,
  17,21
  150:7

Cotillion
  13:24
  14:12
  15:2,8

counsel   4:4
  72:7

counseled
  81:17

counseling
  80:20
  151:4

counselor
  72:25 73:7
  84:25
  85:5,11,18
  128:7
  140:10

counselors
  71:4,12
  72:8,16,
  21,22
  73:9,18,23

75:23
79:16
84:15,24
85:14
170:9

County  8:12
  16:23
  18:23,25

couple   20:23
  31:25 66:6
  86:25
  87:12,16
  146:8
  150:21,24
  152:10
  156:20
  162:23,24
  166:7

courses
  34:1,5,6,
  11,16,25
  35:1 36:2
  37:14
  39:23
  40:4,17,18
  42:4 43:2,
  14 50:20
  73:8,12
  74:25
  78:1,2
  136:6

court  4:9,17
  5:11
  123:21
  139:10
  149:18
  150:3

151:15
168:12,15,
19 173:5,
7,9,12,16,
18

cousin 9:13,
18,22
10:12

cousins
9:12,13,17

cover 148:4
161:12,16,
18 162:10,
17 164:13

covered
110:25
111:4

covering
112:23

COVID 136:19
139:1
140:5
153:24,25
154:6,18

CPA 147:12

creating
130:10

creator 62:6

credentialed
153:10

credit 24:17
35:3,15
36:22
37:10,15

38:8,19,23
39:8,9
40:6,8,18
41:18
43:23
44:4,14,
15,20,21
45:12,14,
15,25
46:1,4,9,
11,19,20,
21 47:6,
15,23
48:1,15,
16,19
49:3,7,10,
17,25
51:10
52:12,15,
17,21
135:15

credited
40:1

credits
35:18
36:11,13
39:2,17
43:11
46:3,22
47:20 49:1
51:4,8,22
52:1,11
74:8

critical
74:5

Croft 172:5

CROSS-
EXAMINATION
152:16

crying 61:11

current 5:16

curriculum
36:2 74:9

curve 128:1

cut 126:5
133:19

CVIOG 24:24
25:3,15
26:12
27:5,22
28:7,17,23
30:5 31:11
92:20
113:9,12
114:16
115:13
116:6,15,
22

—————————
        D
—————————

dad 8:22,23

dadgum
144:18

daily 63:22
80:13,15
103:12

damage 76:15
78:14,20
85:4 109:6

damaged
145:17

dance 15:12,
17

data 140:14

date 7:21
99:22,23
108:10
123:9
142:19,20,
24 154:22
168:22

dated 92:12

dates 17:3
21:14,15
92:7 99:19

daughter
10:12

Davidson
152:5

day 54:10,
20,21
55:1,7
65:5 79:25
85:5 88:16
90:11,15,
16 91:19
92:14
97:15
103:5
104:10
111:9
120:11,13
134:16
143:23

163:2,24
166:12
171:20
172:19

days   64:12
76:19
98:12
145:16
160:2,7
162:24

DE   50:14
74:8
126:10
134:11,17

dead   50:9

deal   75:12
92:7

dealing
143:8

dealings
76:11

dealt   107:22

dean   61:13
102:3

dear   151:19

December
121:4,5

decided
39:1,2

deciding
71:14

decision
103:13

decisions
79:14 84:5
102:14

decrease
30:13,19
31:12 97:8

decreased
24:9 31:14

decreases
30:14
31:23

deduction
96:22

deem   86:2

deemed   84:24

deeming   86:3

Defendant's
71:22
124:22

define
129:7,14

degree
20:18,21

degrees
111:9

deliver
160:22

delivery
173:12

demoted
113:7
115:22

denied   83:14

department
104:17
130:18

departments
101:9
119:8,10

depended
49:10

depending
49:9

deposition
4:2 18:3
78:22
143:25
153:20
158:12,25
159:4

depositions
5:3 16:9

describe
90:25

description
24:2

descriptions
114:22

designation
49:14 51:4

designed
33:7 70:19

desk   57:21,
23 58:24
59:7,15
60:6 70:9

90:19
91:13

detail   87:13

determine
43:24
58:13 73:8

determined
42:17

devastated
98:17

develop
72:11

developed
22:15
37:23
50:24 72:9
81:16

Dewar   20:25

dialogue
169:1

died
143:24,25

difference
49:23 50:3

differences
132:1

differently
156:22

difficult
127:19
147:20

diligence
71:14

147:15

**dime** 134:7

**dinner** 56:22
  76:20

**diploma**
  129:12

**direct** 4:23
  19:10
  81:23
  117:14,17,
  19,22,25

**director**
  16:12 19:1
  22:2,17
  23:14,25
  24:4,12,
  17,18 26:7
  27:3 30:6
  31:4 34:4
  105:2,3
  109:22
  114:21
  116:2,8,
  10,11
  118:2,21,
  23,24
  119:1
  171:5

**director's**
  118:20
  164:1

**directors**
  84:23
  118:3
  126:11

**directory**
  42:5,6

**disagree**
  167:19

**disappointed**
  146:15
  158:2

**disassociate**
  144:5

**disbursed**
  103:14

**discern**
  132:18

**discrepancy**
  25:1 28:24

**discrimination**
  96:4

**discuss**
  28:11,12
  29:1 58:8
  59:5 91:12
  92:24
  93:5,19
  126:21
  127:3
  170:15,18

**discussed**
  127:13
  170:1,16

**discussing**
  55:17
  125:6
  170:6
  171:2

**discussion**
  28:9

**discussions**
  169:20

**dispute**
  75:13,16

**distinc-**
  47:2

**distinction**
  38:19,20
  40:20
  41:17
  44:24
  50:16 51:3

**distraught**
  61:11

**division**
  117:8,10

**docket**
  106:14

**doctor**
  163:11

**documentation**
  29:2,11

**Dodd**
  109:15,17

**dollars**
  133:23

**Donald**
  130:19
  134:15

**door** 56:14
  57:17

58:25
  59:23
  60:2,3,10,
  11,12,14,
  16 103:4

**doorway**
  60:18

**double** 41:18

**Douglas** 9:14

**downstairs**
  55:25

**draft** 169:8

**drawer** 70:9
  90:19
  91:13

**drawn** 66:11

**dress** 120:7

**drew** 66:10

**driving**
  110:2

**drove** 63:25

**dual** 22:24
  23:4,13
  24:17 31:4
  32:16,19,
  21,23
  33:22
  36:25
  37:20
  38:19
  41:17
  44:1,3,8,
  14 45:12,
  15 46:3

47:20
48:10 73:2
74:4 76:18
79:6 80:17
82:25
83:1,7
85:19
103:13
104:3
105:11
106:10
113:22,25
116:11
119:1
134:12,20
138:13
140:23
141:7
153:7
154:11
156:2,4,18
157:4,6,8

**dual-
enrollment**
23:14,25
24:12,18,
25 26:18
27:2 34:3,
10 35:2
36:1 38:12
44:9
45:11,19
46:11 50:1
51:25
52:3,18,22
54:17
108:6
109:21

114:8
124:19
130:10
132:22
134:18
137:5,17
140:3,17
152:21
153:2,8

**due** 71:14
99:19,22
147:15
159:23

**duly** 4:21

**dumped** 73:1

**duties**
113:21,23
114:13
115:8,17
167:20

———————

**E**

———————

**earlier** 45:6
47:10 87:4
96:3
114:15
166:23
170:19

**early** 20:20
22:11
137:24
146:18

**earmarked**
149:8

**earth** 119:21

**easy** 77:18

**eat** 76:20

**eating** 13:5

**Ed** 24:6

**educate**
32:6,19

**education**
20:1,20,25
21:4

**educational**
19:25
132:7

**educator**
138:6

**educators**
138:7

**effect** 66:7
97:24 98:1

**either/or**
43:19

**eldest** 6:7

**electronically**
159:19

**elementary**
21:2 75:2,
3 152:3

**eligible**
83:4 99:9,
18 100:3,
13

**eliminated**

102:21

**Elliott**
151:18,19

**eluded**
171:11

**email** 67:7
68:7,13,
18,21,24
69:3 70:18
71:19,23
72:1,2
74:1 75:14
76:22 77:7
80:5,6,10
85:4 87:4
88:1,5,13
89:7,21
92:23
103:22
104:10
107:12
108:9,10
109:5,15,
23,25
110:21
112:7,12
123:13
124:2
135:23
140:9
155:8
158:15
161:18,19
162:12
163:2,5
166:13
169:15

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 192 of 228

Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.
Jamie T. Bird on 03/15/2022                Index: emailed..executive

170:6,9

**emailed**
  18:10

**emailing**
  18:5 159:9

**emails**  76:24
  89:23
  162:25
  163:7,8

**embarrassed**
  88:9

**employed**
  16:2,4
  97:11
  99:17
  167:3

**employee**
  74:13

**employees**
  27:9 63:13
  172:4

**employment**
  16:7 19:25
  154:23

**empty**
  162:14,15

**enable**  111:1

**enabling**
  111:23
  112:25

**end**  12:2
  15:1 41:15
  53:24
  99:23

116:5
161:22

**ended**  22:19

**engage**  60:14

**English**
  35:8,9,11,
  12 36:9,18
  38:6,14
  41:4
  44:10,11,
  13 46:23
  47:22
  48:14
  50:14
  132:2,15,
  17

**enroll**  80:21

**enrollment**
  22:24
  23:4,14
  31:4
  32:17,20,
  21,23
  33:22
  37:1,21
  38:20
  41:17
  44:1,3,9
  48:10 73:2
  74:5 76:19
  77:14 78:4
  79:7 80:17
  82:25
  83:2,7
  85:19
  103:13

104:4
105:11
106:10,13
113:22,25
114:2
116:11
118:18
119:2
120:21
134:12,20
138:13
140:24
141:7
153:5,7
154:11
156:2,4,19
157:5,6,8

**enrollment/
concurrent**
  76:18

**enter**  102:23

**Episcopal**
  152:1,2

**Equity**
  168:11,14,
  15

**equivalent**
  36:25

**escaping**
  102:7

**essentially**
  11:16  44:2
  67:18
  116:2

**establish**

96:13

**established**
  152:19

**ethics**  94:23

**evaluations**
  70:12,13

**event**  98:11
  123:12

**everybody's**
  143:20

**evidence**
  78:19

**evidently**
  18:5
  126:12
  144:10

**exact**  16:19
  21:14,15
  24:20
  159:8

**exam**  44:25
  48:20
  49:8,15
  51:7,11,
  19,21,23
  52:2,8,24
  134:16

**examination**
  4:23 166:5
  173:20

**executive**
  105:2
  109:21
  118:17

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 193 of 228

Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.
Jamie T. Bird on 03/15/2022        Index: exempted..financially

120:20

**exempted**
  51:17

**exhausted**
  150:12,15

**exhibit**
  71:18,22
  86:13
  124:18,23

**expand** 23:1

**expanding**
  21:25

**expectations**
  132:7

**expenses**
  104:8
  147:25
  148:4,13

**experiences**
  104:8
  105:11
  114:4

**explain**
  32:20 51:5
  68:13
  74:15
  81:15
  106:20
  109:24
  110:10
  116:19

**explained**
  69:11
  109:22

164:2

**exposure**
  132:23

**extended**
  113:23

**extremely**
  77:9 80:11
  83:16

---
**F**
---

**face** 59:24

**facing** 59:18

**fact** 19:10
  26:5 64:1
  171:11

**factual**
  80:11

**faculty**
  20:24
  21:22

**fairly**
  124:14
  165:17

**fake** 52:7
  53:2

**family** 8:4
  144:10

**father** 8:14
  9:5 146:10

**fault** 60:9

**fear** 110:18

**fearful**

171:24,25
172:10

**February**
  54:9
  106:1,12
  108:9
  123:11,17,
  24 155:9
  158:8

**fee** 149:13

**feel** 18:8
  58:12
  61:21
  144:15

**feeling**
  47:12

**feels** 122:13

**fees** 147:24
  148:7,16
  149:21
  150:4

**fell** 82:3,
  22

**fellow** 76:10
  151:24

**felt** 28:6,
  14 39:14
  62:21
  88:5,10
  96:23
  153:14
  157:23
  165:18

**female**

143:19

**females**
  102:8

**field** 22:18

**fifty-
something**
  133:23

**figure** 24:3
  44:7 45:17
  46:16

**figured**
  165:10

**file** 12:14

**filed** 4:20
  5:3 19:22
  32:11,13
  101:23
  168:7

**final** 22:19
  92:23
  102:14
  120:19
  130:6,7
  135:11

**Finance** 34:9
  42:10

**financial**
  84:9
  118:24
  128:25
  144:13
  156:11

**financially**
  34:19

96:19

**find** 32:5
37:8 43:13
64:15
105:22
165:19

**fine** 17:5
21:16 28:2
30:10
53:14 57:6
66:3 86:7
93:16,18,
19 101:10
102:13
124:8
147:10
160:15
169:10
170:23
173:13

**finish** 48:11

**finished**
20:1

**fired** 100:23
167:4,5,
13,16
171:18

**firm** 11:9,
12

**first-year**
104:8
105:10
155:7

**fist** 172:9

**five-minute**

54:4

**float** 129:24

**floated**
129:21

**Florida**
5:18,22
6:9,11,14
11:16,20,
21 12:7,
16,17

**fly** 7:4

**follow** 29:24
89:22

**follow-up**
85:9 124:9

**football**
56:7

**force** 31:8
102:15
167:1,2,6,
10 168:2

**forget** 97:9

**form** 4:5
26:8,17
81:4 83:3
94:5 153:7

**formulated**
71:10

**forty** 133:23

**forward** 20:2
74:11
76:24
77:17

**found** 54:13
64:6 65:5
114:10
131:9
133:2,4
143:23
165:1,4

**four-year**
74:6
77:10,20

**frame** 159:22

**Frank** 7:1,11
8:1 10:21

**frankly** 88:8

**free** 23:6

**Freidhoff**
97:22 98:2
102:18
103:6,8,10
104:25
105:3
107:4
116:3
117:20
156:18,25
157:1,3,6,
12 166:13,
21

**Freidhoff's**
103:6

**frequent**
120:1

**freshman**
141:1
153:21

**Fridays**
120:7

**friend** 50:15
151:19

**friends**
143:19
144:2

**friendships**
144:9

**front** 30:11
59:9 60:11
84:1
148:17
168:23

**fruition**
78:3

**fulfill** 35:9

**full** 5:14
143:11

**full-time**
21:19,21
141:5

**fund** 107:2,
4

**funded** 34:12
35:22

**funding**
107:2,3
128:14,16

**furious**
110:5

**future**
70:12,13

G

gain 16:7
  70:6 83:17

Gainesville
  17:20
  122:2

game 56:7
  165:16

games 62:6

Gastric
  146:13

gave 29:23
  54:10
  56:23
  87:12
  91:16,17
  92:11 97:4
  108:23
  114:8,17
  133:24

general
  114:2

gentlemen
  108:18

geographic
  12:10

Georgia
  6:10,15
  8:4,15,18,
  21 9:8,16
  10:8,9,23
  11:15,22
  12:14,15

17:15,17,
20 33:8
34:8 37:5
40:10,12
42:10
50:13
77:18
82:11
122:2
157:18

Gerber 22:23
  23:1,18
  24:10 29:6
  116:18

girl 90:17
  161:22
  162:1
  165:25

girls 136:5

give 4:13
  5:14 19:24
  38:18
  48:14
  63:14
  69:20
  85:25
  93:10
  99:7,12
  104:3
  130:16
  131:21
  133:24,25
  137:20
  145:24
  146:3
  152:8
  161:6

165:7
172:15

giving 21:15
  40:17 42:1
  43:11,16,
  18 99:19
  165:6
  172:24

glad 74:24

Glennville
  8:24

GMC 132:13

goal 129:7,
  15 132:19

God 4:15

going-away
  56:13

good 35:2
  112:2
  119:22
  151:24

goodbye
  56:23

Gosh 173:1

GPA 135:16
  138:18
  139:5,17

GPAS 83:12

GPS 12:2

grade 20:7
  51:16 81:1
  130:24,25
  131:13,17

grade's
  51:16

grades
  130:3,4,
  13,16
  131:8,21

graduate
  34:7 35:20
  36:12
  73:14
  74:7,10
  154:9

graduated
  20:4

graduation
  48:16
  139:14

grandmother
  136:4

great 163:2

greatest
  79:6

grew 143:20

Griffin 9:18

group 77:25
  84:23

groups 65:5

grow 53:6

guarantee
  74:21

guaranteed
  74:25 75:7
  136:7

138:14

**guardian**
83:3

**guess** 12:5
14:19
25:24
30:22
41:19
51:20 79:4
127:6
153:13
157:7,8
159:24

**guessing**
102:12

**guideline**
82:6

**guy** 65:4
102:5
103:9
106:18
111:20
119:20
143:24
144:2

**guys** 123:22
154:11

— H —

**habit** 65:12

**hair** 88:21

**half** 6:9,10
61:1 105:4
115:12

149:12

**hall** 60:17
65:7 87:18
88:3

**Hancock**
41:22

**hand** 4:11
88:20,21
106:11

**handbook**
94:25

**handed** 173:2

**handle** 78:13
85:10
140:11
147:4
157:12

**hands** 62:12
86:18

**happen** 8:19,
20 80:25
115:24
146:3,16
157:24

**happened**
28:22
29:21
54:25
64:15 67:2
75:15,16
79:24
88:19 90:7
91:6
109:2,16
110:24

111:9
114:25
116:20
134:20
154:18
155:23
158:20
162:6
170:22
171:23,24

**happening**
72:16
80:23
81:6,12,13
82:21
119:15

**harassment**
65:19,20
94:13,25
95:12 96:4

**hard** 5:11
83:16
128:18
129:24
131:16

**hardest**
61:20

**harm** 89:25

**hate** 143:22

**he'll** 146:2

**head** 18:5,
10,13 48:9
123:4
138:19
149:25

158:16
161:13,23
169:22

**heading**
162:5

**headings**
126:17

**hear** 79:5
116:24,25
123:22
158:19

**heard** 5:9
45:5
58:18,22
60:8,11
78:24
106:6
108:4
125:3
158:21

**hearing** 85:6
128:5

**hears** 69:13

**heart** 146:8,
10 150:20

**heavy** 128:11

**hefty** 133:14

**held** 137:17

**Helen** 11:1

**hell** 148:18

**helped**
73:13,14
88:1

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 197 of 228

**Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.**
**Jamie T. Bird on 03/15/2022**                    Index: helpful..HR

**helpful** 77:3
85:23

**helping**
129:17

**helps** 157:2

**heretofore**
4:20

**Hey** 120:6
162:25

**high** 28:13
34:7 35:3,
7,9,15,19
36:11,22
37:4,10
38:1,17,24
39:8 41:4,
7,9 43:22
44:10,14,
20 45:7,14
46:4,10,
14,20,24,
25 47:14,
15,25
48:11,15
58:5 73:7,
9,14 74:7
80:19
81:2,7,12,
13 83:4
129:12
130:8,19,
23,24
131:2,9,12
132:24
140:9
151:22

152:4
153:5,9
154:9

**higher** 36:18
134:20

**highlighted**
74:2 84:3

**highly** 33:7

**hire** 145:15

**hired** 18:20
168:25

**hiring** 18:6,
11,13
158:16

**history** 20:1
35:11,14
37:8 38:15
108:18,21

**hit** 154:18

**Hoffman**
11:13

**Hogan** 27:18
63:20
85:16 99:2
107:2,3
114:4
115:5,10,
21 128:19
156:17,23
157:4
158:9
161:13,15,
25 162:3,
16

**Hogan's**
161:17
162:9

**hold** 22:13
42:11

**holidays**
121:7

**Holly** 4:7
144:12
146:18
147:22

**Holly's**
148:18

**home** 6:3
12:8,12
20:23 66:8
83:4 91:5
98:16,22
110:2

**homeschool**
128:7

**honest** 76:5,
9 87:21
94:15
133:1
142:18
157:23

**honestly**
56:6,19
57:3,4
169:11

**honor** 131:4

**honoring**
74:20

**honors**
115:20
130:11

**hope** 70:6
83:15
159:12

**horse** 50:9

**hot** 60:4

**hours** 33:25
44:16
46:21
47:19,21,
22,23
48:14 49:3
135:15

**house** 6:9,17
11:16 71:9
106:14
133:17

**houses** 38:9
113:24
139:22

**housing**
118:23
161:25
165:24,25

**HR** 22:4
24:15 25:2
28:22
61:10 68:4
70:14,15
91:8 92:4
98:24,25
99:20
100:1,16,

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 198 of 228

Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.
Jamie T. Bird on 03/15/2022                    Index: hug..indicating

18 113:7
117:3
161:4
164:8
166:14,18
171:4

hug 54:10
55:12,23,
25 56:2,24
57:7,10,19
59:17
62:9,20
63:8,10
65:11,17
86:24
87:9,13
88:14,18
89:2 90:25
91:3 103:3
108:13,21,
23 110:20
170:4,5,
10,18
171:3,7

huge 129:4

hugged 55:7,
17,21
56:3,14,19
57:1,23
59:19
62:15
64:19,20
65:7

hugger 55:11
56:1,25

hugging

56:6,11
65:12

hugs 57:12,
16 65:10

hundred
30:16
31:16
90:12
110:22
112:21

hurting
135:9

husband
6:13,24
10:13
55:24
56:15
66:9,23
67:17 68:2
86:24
87:8,22
88:19
91:2,6
98:23
170:7,11

husband's
6:25

hybrid
148:22,23

─────────────
        I
─────────────

idea 19:3
27:6 32:3
43:20
62:17

106:23
108:23
119:19
125:18
146:17
168:5

identification
71:21
124:22

ignore 80:18

III 7:1

image 95:2

immediately
59:22

impact 70:12
90:19

impression
27:12,20

improperly
28:17

improve
153:16

improvement
63:16

inaccurate
18:9
158:19,20
168:4

inappropriate
54:13
57:8,11
61:3 62:21
63:2 88:14
89:2 91:3

159:7

inaudible
139:9
150:11
151:12

incidences
146:9

incident
54:8 61:6
64:13
65:23
68:2,7
76:18
93:20
112:12
123:14

include
79:19
92:20
152:23

included
19:8
115:17

including
56:15
101:21

increase
29:15
33:16

increased
24:8 97:12

increases
30:20

indicating

81:17

**individual**
38:25
47:13,14

**inflate**
110:21

**influx** 34:19

**information**
26:8,10,
13,20
82:2,8
84:1 162:8
165:7,8

**initially**
137:5

**ins** 81:18

**institution**
72:6,10
73:21
74:7,8
77:10,21
81:15
83:24
136:15

**institutional**
27:25
163:22

**institutions**
25:11,14,
23 33:24
42:7
72:17,18,
24 79:13
82:15
133:15

135:24
136:18
141:6

**insurance**
97:18
142:9,10,
11

**intelligent**
144:16

**intended**
24:11

**intent** 68:13
69:3

**interested**
45:1

**interesting**
157:7

**interim**
118:12

**interpreted**
82:20,21
129:14

**interrupt**
86:11

**interview**
17:6,9

**interviewed**
17:8
158:13

**intimate**
54:15
57:14
62:10
112:14

**intimately**
63:3 112:9

**intimidating**
64:6

**investigate**
53:5

**involve**
70:14

**involved**
28:10
70:25

**involvement**
128:2

**irreparable**
109:6

**issue** 80:1
110:21
112:13
116:21
150:20

**issues** 71:8
77:1
84:11,20,
24 112:3,
4,22 119:9
125:7
126:3,7,12

**IV** 10:21

**IX** 168:7

———————
**J**
———————

**J-E-N-N-I-N-G-
s** 5:23

**Jack** 11:2

**jackass**
60:23

**James** 10:25

**Jamie** 4:3,19
5:15 29:20
80:1 89:17
91:7
106:21
114:23
121:10
147:1
152:18
162:25
163:20
164:5
165:2

**Jan** 145:23

**January**
53:19
98:9,18,20
103:2
105:23
116:5
155:11,12
158:8

**jar** 126:18

**jars** 125:14
126:17

**Jeanine** 18:2
28:25
78:16
91:10,24
92:10
97:20

114:16
146:21
159:5
163:11
165:8
171:14,15

**Jenkins** 9:14
10:8

**Jennings**
5:17,22
6:9 11:16,
20 12:5

**Jim** 151:18,
19 152:3

**Jimmy**
151:12,16

**Joanna** 10:14

**job** 17:21
18:2,4,17,
23 22:2,13
24:2 27:17
30:22 72:5
73:20 93:3
96:18,19,
23 103:14
105:12,17
113:7,18,
21,22
114:22
121:21
122:16
143:4
144:18
145:23,24
146:4
157:3,22

158:9,11
161:14
165:18
167:19
171:25

**jobs** 16:14
18:18
19:5,15
28:6

**joint** 85:5,
11,18

**jointly** 58:9

**Jones** 160:11

**Jordan** 97:21
165:23
166:21

**judgment**
132:8,18

**Julie** 21:23

**July** 97:15
166:9,12
168:6

**jump** 33:9
48:12

**jumping** 56:9
70:17

**June** 53:24,
25

**junior** 35:7

**juniors**
33:13

**justification**
141:10

168:3

**justify**
168:3

─────────────
K
─────────────

**Karen** 160:12

**keeping**
39:14
81:24
91:13

**Keith** 101:25

**Kelli** 118:11

**Kevin** 101:25

**kid** 62:8

**kids** 65:2
107:5
119:22
131:15
134:4,5
140:10

**kin** 8:20

**kind** 5:4
13:5 18:24
70:17 97:9
116:24
129:20
138:9
143:6
144:5
157:23

**kindergarten**
20:6

**kinds** 56:10

79:20

**Kirkland**
112:6

**knew** 24:19
41:13 43:7
55:4 62:5
63:15
69:13
73:22
80:17
81:18
87:19
88:4,15
98:8,14
99:1,8
103:7
108:12,16
110:20,23
112:1
115:4,5
122:15,17,
21 144:14
157:16
161:23
172:4

**knowing**
108:17

**knowledge**
9:2 19:10
103:12,18
163:23

─────────────
L
─────────────

**ladies** 14:13
55:23
136:6

lady   74:24
  109:15
  164:10

Lake   6:15
  11:15
  12:1,23
  13:7

Langdale   8:9

language
  77:9,13
  112:7

laps   73:1

lapse   143:3

laptop
  159:17

large   44:22
  59:7 71:13
  140:7

lateral
  23:22 24:6

law   11:9
  82:11

lawful   4:21
  139:11

laws   96:3,6

lawsuit   5:2
  32:10
  101:23
  145:2,6

leadership
  84:7
  118:22
  119:5,8

League   13:24
  14:3,17,20
  15:6

lean   54:14

learn   106:21

learned
  110:23
  128:23,24

learning
  50:22
  120:22
  132:4

leave   15:4
  22:20 50:8
  146:2

leaving
  56:21
  107:9
  170:24

left   9:17
  39:4 41:25
  64:12
  81:14
  90:13
  98:7,15
  105:2
  109:18
  118:17
  121:24
  155:3,24
  157:7,13,
  14 158:6
  159:16
  172:5

legal   11:8

168:9,16,
  18 169:14

legally
  40:21
  139:13

lesson   86:1

letter   74:18
  130:25
  161:12,16,
  19 162:10,
  17,18
  164:13
  168:9,10
  169:13

letting
  68:18
  73:10
  97:23
  154:20

level   24:5
  38:24
  52:13,16

life   76:16
  103:19
  162:5

limitations
  34:23

lines   67:24

lion's   150:6

Lisa   80:8
  86:24
  87:11
  88:12
  118:2,19

135:11
  163:12,24,
  25 165:4,9
  170:8

Lisa's
  165:10

list   16:20
  39:23 40:4
  51:15
  84:14

listed   41:14
  99:13

Lit/english
  43:4

literature
  36:20

live   6:2,14
  8:8 9:19,
  23 10:1,
  13,22 13:2
  144:11

lived   5:25
  6:1 8:11,
  14 76:16

lives   6:23
  8:9 9:14,
  20 11:1,2,
  4 122:2,3,
  7

living   8:10

local   113:25

locally
  11:10

lock   60:13

long   5:6,
  12,25 7:6,
  11 12:1
  13:13
  21:11
  22:13
  34:1,16
  35:21
  37:22
  50:24
  58:23
  60:17 66:5
  69:9 79:8
  80:8
  85:15,17
  86:24
  87:11,16
  89:10
  98:14
  115:11
  135:12
  138:20
  139:17
  163:12,24
  165:4
  170:8
  172:5,19

longer   97:21
  112:19
  131:21
  145:9
  154:13
  155:22
  156:3
  167:2

looked   43:3

60:20
96:25
136:4

lose   30:20
  93:3 96:18
  121:20
  122:16
  131:14

losing   83:15

loss   96:21

lost   78:4
  121:21
  144:1,8

lot   16:15
  24:14,15
  27:14
  33:20
  44:24
  63:12,20,
  25 64:3,7,
  8 70:22
  71:8 76:17
  85:24
  112:17,21
  114:5
  115:20
  129:9,10
  130:19
  131:6,22
  135:9
  137:24
  144:14
  148:19
  152:7
  153:4

loved   144:17

low   134:24
  136:25

lower-level
  37:24

lowered
  31:13
  135:2
  140:13

lowest
  134:24

Lowndes   8:12
  16:23
  18:23,25

Lyne   145:23

———————————

M

———————————

Macon   8:15

made   29:1
  34:18 51:3
  79:11
  80:13
  81:12
  88:22
  89:22
  102:14,23
  105:5,6
  118:16,17
  119:3
  120:20,21
  135:11
  144:4
  154:2
  168:4

Madison   12:7

Maestas   4:8
  46:9 47:12
  48:3 49:22
  50:4 58:20
  66:15,18
  78:5 86:6,
  8,10 91:1
  94:4
  95:14,18,
  20,23
  120:4
  123:4,7,9,
  13,15,17
  124:1,3,5,
  9,12
  143:13
  144:24
  145:3,8,13
  148:1,4,6,
  14,16,20,
  23 149:7,
  11,15,24
  150:2,6,9,
  13,16
  151:14
  152:10,13,
  15,17
  166:2,4
  168:25
  169:3,8
  172:24
  173:4,6,17

Maggie   10:25
  11:1,4

main   63:25

maintenance
  65:3

**majority**
27:18
39:19
44:22
71:13
127:5,22
131:3

**make** 25:22,
24 30:22
35:5 45:4
49:19 58:7
60:12
62:23
65:12,13,
22 67:12
73:21,22
79:2,13
81:3,11
82:19,22
85:2 90:21
91:7,14
92:7 126:6
130:16
147:12
171:1

**making** 82:1,
15 84:4
103:13
141:19
171:19

**male** 143:19

**males** 66:19
102:8

**Mall** 14:1
15:9

**man** 62:14,

19 111:1,
22 120:7
172:1,8

**manager** 25:1
26:24 27:2
30:6 31:5
113:16

**mandate**
133:9

**March** 68:11
69:10
89:6,8,11
90:9 91:6,
11,15,18,
19,24
92:1,10,12
107:17
108:8
110:8,15

**marked**
71:18,21
124:17,22

**married**
7:12,25

**Martha** 8:7
11:1

**masks** 97:25

**master's**
20:21

**Math** 38:14

**matter**
139:21

**Mcgee's**
133:11

**meaning**
47:18,20,
22 126:19

**means** 72:14
134:13

**meant** 47:11
66:16 77:8
131:6
135:23
156:21

**medical**
143:6

**meet** 27:12
59:10,11
60:3 73:6
77:23
87:20
116:19
119:5,7
132:16
138:3,20
139:6
140:19
166:14

**meeting**
27:10,11,
19,20
29:2,19
30:25
58:4,6,13
68:11,20
69:9,10
71:14 87:3
89:6,9,11,
15 90:9,13
91:7,10,

11,15,20
92:20,23
97:13
98:10,15,
18 103:2
107:18
110:15
116:5
119:6
163:3
166:18,19
170:8

**meetings**
77:24
114:7
118:23
120:15

**Megan** 41:22
157:9

**Melanie** 9:23

**member** 11:14
13:13,15
14:15
21:23
119:21

**members** 27:8
159:9

**memory** 16:20
84:3

**men** 62:15

**mention**
171:7

**mentioned**
18:3 85:15
150:19

merit 31:13, 18,23 32:1 70:13

message 109:19 172:3

met 4:25 27:13 62:4 68:12 84:8 114:6 128:25 130:9 132:19 139:17

Methodist 12:21,22 13:8

Michael 27:11

Michelle 97:20 165:23 166:21

midpoint 131:13

military 7:9 15:25

Miller 117:9

mind 38:11 170:22,24

mine 30:8, 14 79:10 84:22

87:18 90:14 127:14 128:16 129:7 131:18 132:25 133:10,11 134:8,11 151:20 173:15

minimal 34:15 134:19,23 138:4

minimum 138:17,18 139:5

miniscule 131:6

minister 151:6

minute 42:11 67:9 73:17 133:22 143:13

minutes 13:3

misclassified 28:7

Misconception 126:20

misinterpreted 69:2

misleading

6:8 141:12

misquotes 146:22

missed 169:23 170:25

Mississippi 11:2

misunderstanding 35:4 109:20

Mitchell 29:7 56:13,20 58:3 69:11,12, 21 80:8 84:6 85:17 87:18 89:8,10 105:1 107:9 109:16,25 110:1,2,8 115:4,9,21 117:17,23 118:1,4, 16,17 119:4,12, 13,14,17, 20 120:17, 20,23 121:4,23 122:8,20, 21,23 155:22,24

156:7,8, 13,16 171:4

Mitchell's 98:12

mom's 9:4

moment 48:8

money 23:10, 20 30:20 71:11 126:14 133:20

month 53:23 84:8 97:17,23 142:4,6 148:25 158:8

monthly 119:7 130:13

months 103:11 111:13,19

morning 54:22,24 55:25 58:2,17 90:13 98:24 114:15

mother 8:5, 19 9:3,7 136:3

motivated
  33:7 48:13

move   23:2,
  23 24:6
  32:25
  74:11
  135:7
  155:20,21

moved   6:1,3,
  7,17 8:13
  59:16
  64:13
  103:1,17,
  20 104:17
  105:4
  106:9,15
  116:2,6,13
  118:1,22
  134:3
  155:6,17
  156:15
  157:6

moving   103:5
  104:12
  111:17

muddy   50:8

multiple
  141:6

Mystery
  13:24 14:1
  15:9

─────────────

         N
─────────────

named   4:20

names   10:20
  26:5,6
  102:7
  117:1

nature   54:11
  57:14
  62:20
  65:11

neat   62:7

necessarily
  24:16 44:3
  45:7,10
  57:7,11
  63:14
  68:17

neck   88:20

needed
  14:10,11
  34:7 66:9,
  10,11
  73:15
  96:19
  114:10
  121:9
  133:7
  144:5
  153:14
  172:22

negative
  5:10

negligent
  84:19
  111:25

news   42:17

nice   106:18

night   54:25
  56:22 66:8
  67:17 87:8
  91:5
  166:17

nightmare
  12:10

Niki   102:3

nodding
  123:4
  138:19
  149:25

nods   169:22

noncompliance
  121:1

normal   47:5

North   17:17
  157:17

Northwest
  5:17,19

notation
  100:21
  161:9
  164:10

note   164:14

notes
  111:11,13,
  14

nother   97:17
  137:1
  161:8

notice   4:3,
  20 26:4

29:6,8
  63:20
  113:6
  166:8

noticed   25:1
  26:5 29:16
  63:21

November
  16:5 24:23
  26:2 31:6,
  10,11
  41:25
  100:3,14
  113:6
  142:15
  154:24,25
  157:13

novice   32:20

number   7:23
  35:18
  102:7
  139:5,6
  147:13

numbers
  135:1
  136:25
  140:14,18

Nunn   65:3

nursing   75:9
  135:9,18
  136:2

─────────────

         O
─────────────

oath   4:22

object   94:4

objections
  4:4

objectives
  50:22
  132:4

occasions
  120:3

occurred
  54:9 59:17

occurring
  77:2

October   7:22
  97:16
  99:24
  111:11

odd   64:15
  165:1

offered
  17:21
  39:18 45:7
  114:12

office   22:15
  23:2,23
  28:6 58:18
  59:6,11,15
  60:4,12,
  13,22,24
  63:11,12
  64:11,14
  66:1,25
  69:11
  87:17,19
  89:14
  90:14

91:18,19,
  25 98:10,
  11,13
  103:6
  104:10,21
  105:7,21,
  25 106:24
  107:1
  114:6
  116:7
  119:7
  120:1,2
  128:19
  155:6,7,9
  160:9
  168:9,10,
  14,16,18
  169:14
  172:1,4,10

official
  130:7

officially
  18:1

old-school
  37:19

older   7:20

oldest   21:7

one's   63:15

ongoing
  34:14

online   43:3
  78:21
  159:15

open   59:23
  60:3

113:24

opening   60:2

opinion
  79:23
  84:21

opportunity
  62:22

opposite
  38:6 56:12

option   37:12
  38:18 39:5
  42:1 43:17

order   51:10
  74:10
  106:11
  153:10
  159:18
  162:13

ordered
  161:10,20

ordering
  173:9

organization
  14:5 15:17

organizations
  13:16
  15:22

orientation
  103:23
  104:3,7
  113:23

originally
  157:3

outcomes
  132:5

outs   81:18

overflow
  63:23 64:8

overtalking
  123:22

owe   149:21,
  22

Oxford   11:2

P

p.m.   86:20
  173:8,20

paid   25:25
  45:12
  104:3,6
  133:13
  142:15,21
  148:16,19
  149:7,17,
  20

panic   144:11

paper   30:9
  97:14
  102:1
  141:22

paperwork
  29:9 31:1
  99:10,11
  100:19
  122:24
  128:24

Case 7:21-cv-00062-WLS   Document 33-4   Filed 05/02/22   Page 207 of 228

**Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.**
**Jamie T. Bird on 03/15/2022**          Index: parent..phone

| | | | |
|---|---|---|---|
| **parent** 83:3 128:1 | **participating** 83:1,7 | 133:20 142:4 148:1,11 149:4,18 | **perceived** 62:25 |
| **parents** 9:25 59:10 75:4 79:11,15 80:21 81:3 82:1 128:3,6,8, 11 138:6, 11 | **Participation** 71:7 | **paying** 147:23 | **percent** 30:17 31:16 90:12 110:22 112:21 |
| | **partners** 37:14 72:7 83:22 129:4 130:10 | **penalized** 136:24 | |
| | | **people** 12:2 19:8 24:15 25:24 27:14 28:5,9,10, 12,15 30:17 55:6,12 64:3 69:1, 3 76:17,22 77:16,20 78:11 80:5,7 96:4 101:1 103:20 112:17,22 113:3 120:2 121:19 128:5 129:9,10 138:9 144:6 145:18 167:10 168:4 171:19 172:7 | **Perfect** 75:9 |
| **park** 6:15 11:15 12:1,20, 22,23 13:7,8 64:5,7 | **party** 56:13 | | **perfectly** 94:15 |
| | **pass** 138:1 | | **performance** 70:12 102:23 |
| | **passed** 9:5 41:16 | | |
| | **passes** 61:15 | | **period** 15:3 21:9 142:22 |
| **parked** 64:1 | **past** 6:15 13:21 108:18,20 110:24 148:24 152:7 | | |
| **parking** 63:19,20, 25 64:2,4, 7,16 | | | **permission** 134:12 |
| | | | **person** 12:11 18:21 38:5 57:22 76:5 100:1 103:18 106:9 109:21 112:10,12 132:9 161:6 163:22 164:7 |
| **part** 45:16 46:7 51:20 58:13 73:25 74:1,12 77:24 78:25 111:25 119:22 146:14 168:17 | **Pastor** 151:7 | | |
| | **path** 77:17 | | |
| | **pathophysiolog y** 135:19 | | |
| | **Paul** 10:8 | | |
| | **pay** 24:8,9, 20 28:9,13 29:15,18 30:8,19,20 31:13,18, 23 32:1 70:13 96:21,22 102:25 | | **personal** 111:11,13, 14 |
| **participate** 33:20,21 74:4 | | | **phone** 42:16 |

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 208 of 228

Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.
Jamie T. Bird on 03/15/2022                Index: picked..pretty

58:1 110:3

picked
  158:14

picture
  50:10
  66:12,21
  143:11

piece  30:9
  97:14
  102:1
  141:22

Piedmont
  16:25
  17:11,13,
  16

Piedmont/usair
  7:5

pilot  6:13
  7:2

place  5:17,
  20 8:9,10
  27:16
  106:5
  114:11
  163:5

placement
  62:12
  134:16

placements
  22:18

places  64:5,
  9 83:8

Plaintiff's
  71:18

124:18

plan  58:8
  59:6 63:16
  86:1

played
  165:16

pleasant
  144:10

plenty  64:2,
  4,9 113:3
  141:4
  143:16

plight
  160:10

point  27:3
  29:8 60:25
  75:12 95:8
  96:14
  108:8
  110:7
  120:11
  146:1
  155:5

points  70:10
  127:10,12
  131:6,14

policies
  93:23
  94:6,12
  95:3

policy  82:5
  94:24

poorly  108:7

population

79:9 80:3

portal  160:3

position
  16:11
  17:1,12
  18:25 21:1
  22:6,14,
  19,21
  23:15,19
  26:4 29:3
  31:5,7
  34:16 78:9
  102:19,21
  103:14
  105:5
  115:7
  118:20
  145:10
  157:10,17
  159:14
  162:3,18
  164:1
  165:3
  167:15

positions
  16:22,24
  17:7 25:25
  99:6
  114:22
  116:23
  161:24

possibly
  30:7 115:7

post-secondary
  72:6 73:21
  81:14

82:14
83:24

potentially
  35:12
  83:15

prayer  65:4

pre-dr  53:10

pregnant
  65:5

prepared
  27:5

Presbyterian
  151:24

presence
  139:11

presented
  30:18

president
  53:21
  63:16
  69:18,20
  75:13
  91:12
  96:15
  111:18
  118:14,15,
  18 120:21

pretty  28:12
  53:22 56:5
  61:22 62:2
  133:4
  138:8
  143:17
  146:2

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 209 of 228

Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.
Jamie T. Bird on 03/15/2022                Index: previously..pull

169:1

previously
  71:19

priest
  151:25

principal
  65:3

printed
  114:20,22

prior  8:14
  23:6 63:10
  83:1 87:3,
  5 115:16
  118:11
  139:1

privileged
  162:8
  165:6,7

proactive
  126:8

probe  85:16

problem  56:1
  65:10
  67:19
  116:18
  127:21
  135:4,21
  137:1
  154:7
  160:10

problems
  80:12,16,
  18 101:12,
  17

Proceedings
  4:1

process
  34:8,14
  39:22
  106:2
  124:6
  128:17,23
  130:15
  138:8

processes
  128:20

produce
  123:3

professional
  63:15
  65:12
  119:14

professor
  132:16,17

professors
  130:16

program  22:1
  23:1 33:16
  34:4,22
  36:15
  37:18,21
  40:20
  70:23
  71:8,11
  72:8,9,15,
  25 73:5
  74:5 80:4,
  12,17,21
  81:15,18

82:22
83:2,5,7,
10,21,22
85:2,25
86:1 107:4
108:6
126:5
129:8,11,
13,14
136:2
138:14
141:5
158:7

program's
  82:25

programs
  34:9,10
  72:20 79:7
  85:24
  132:22

promote
  15:12

promoted
  116:2

promotion
  71:3

promotions
  70:13

protect
  70:10 96:4

protected
  93:20
  95:13

protocol
  94:18

provide
  39:11
  80:20
  84:25
  139:12

provided
  26:20
  29:2,11
  83:4
  122:23
  141:10
  168:4

provider
  83:10

providers
  82:22

providing
  39:5 83:21

provost
  22:22

Psychological
  143:7

Psychology
  41:10 49:4

Psychology/
psychology
  41:8

public  19:1

published
  95:4

pull  70:9
  100:4
  127:2
  160:14

Case 7:21-cv-00062-WLS   Document 33-4   Filed 05/02/22   Page 210 of 228

Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.
Jamie T. Bird on 03/15/2022          Index: pulled..recruitment

**pulled** 62:12 126:18 127:5,11

**purpose** 25:21 30:21 32:22 48:8,10 51:21

**pursuant** 4:3

**pursue** 36:18

**push** 59:21 120:18

**pushback** 120:16

**pushed** 59:22 60:16 66:21

**put** 19:13 41:16 46:1 47:1,2 49:6 51:1, 15 52:5 83:13 100:19,21 125:25 128:11 129:6,17 144:13 145:17 148:6,7,18 157:9 159:22 161:8,9, 14,17,19

162:14 164:4 165:24

**puts** 111:22

**putting** 42:9

---

**Q**

**question** 4:5 5:6 41:19 56:5 64:22 67:14 94:5 95:15 125:15 127:12 136:16 143:14 154:21

**questions** 5:5 125:14,17, 18 152:13 166:7 172:19

**quiet** 62:3

---

**R**

**raise** 4:10

**read** 163:18 173:15

**ready** 4:10 6:6 32:25 126:4

**real** 62:7 144:9,10

146:10

**reason** 17:24 20:15 29:12 50:11 55:19 56:7 76:24 79:4 100:20 102:21 108:15,22 118:25 121:19 126:2 129:23 130:20,22 131:7 140:4 143:10 167:24 168:1

**reasoning** 153:14

**reasons** 141:4 158:13

**recall** 56:6 117:1 171:2

**received** 24:23 26:4 54:24 58:1 74:18 113:6 166:8 169:25 170:3

**receiving** 82:2,3

**recess** 54:6 86:20 173:8

**reclassificati on** 29:14 113:8

**reclassified** 29:3 30:6 115:7

**recognized** 127:24

**recollection** 17:18 92:13

**record** 84:17 173:4,5,19

**recorded** 172:2

**recorder** 126:23 130:2

**recordings** 126:25

**recruiter** 17:14,15 114:3

**recruiters** 103:15

**recruitment** 113:24 114:1

Case 7:21-cv-00062-WLS   Document 33-4   Filed 05/02/22   Page 211 of 228

Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.
Jamie T. Bird on 03/15/2022          Index: rectified..reported

rectified
  30:2

rectify
  29:22
  115:6
  116:18

red  59:25
  120:14

REDIRECT
  166:5

reduction
  31:8
  102:15
  167:1,5,10
  168:2

reductions
  126:6

reference
  74:23

referenced
  64:13
  92:20
  103:3

references
  19:8,13

referencing
  68:18
  135:10
  171:8

referring
  65:23
  68:13
  70:20
  71:19

98:19
132:4
159:12

Reffel  21:23

reflect
  159:11

regard  63:8
  72:14,20
  78:25
  102:18

Regents  5:2
  95:5
  169:14

register
  41:2

registered
  41:12

registrar
  118:25
  131:10
  159:18
  160:11

registrar's
  160:9

regular
  114:2
  134:21
  139:24
  140:16
  153:21
  154:16
  155:2
  173:12

regularly

12:18
13:11

regulation
  81:20

regulations
  72:20 73:6
  83:1 134:6

reimbursed
  23:11

related  8:23

relation
  81:23

relations
  19:1

relatives
  9:8 10:6

remain  24:9
  99:17
  156:2

remained
  20:23

remember
  17:19 21:7
  22:8 27:13
  60:8 87:21
  114:14
  116:4,23
  118:3
  119:25
  124:25
  125:12
  127:9,20
  128:4,5
  129:20

130:3,14
141:15
142:18
147:9
149:3,13
169:24
170:17
171:12

removed
  165:5,22,
  24

Renee  9:18

reorganization
  107:8

repeat  5:8

report  24:24
  26:12
  27:22
  28:23
  61:10
  70:25
  92:3,4
  112:11
  115:13
  117:14,17,
  19,25
  122:13
  145:25
  146:21
  156:13,16

reported
  112:10,18
  118:4
  130:17
  156:14

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 212 of 228

Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.
Jamie T. Bird on 03/15/2022        Index: reporter..reviews

**reporter**
4:9,17
5:11
123:21
139:10
149:18
150:4
151:15
168:12,15,
19 173:5,
7,9,12,16,
18

**reporting**
105:14,19

**reports**
170:15

**represent**
5:1

**represented**
127:13

**reprimand**
67:2,6
68:9
69:20,22
91:16,18
92:11,15
96:20,24
97:5
107:12
111:10,13

**reputation**
145:18

**request** 92:2
168:11

**requested**

91:10,11

**required**
81:21
85:22
130:5,6
138:18

**requirement**
36:23
43:14 83:9

**requirements**
35:10
72:14,19
134:19
138:4
139:7,8,18

**research**
27:25

**reservations**
76:7

**reserve** 4:4

**residents**
12:16,17

**resign**
119:12

**resigned**
121:5
155:24

**resources**
133:14

**respiratory**
146:11,12

**response**
92:2

**responsibiliti
es** 83:6
105:13,17
113:19

**responsibility**
23:3 34:5
80:19,24
81:8,9,10
83:19
111:24
115:11
122:13

**responsible**
88:11

**responsiveness**
4:6

**rest** 103:19

**result** 17:22
30:4 83:12
96:22 97:6
105:6
107:9
171:23

**resulted**
125:5

**retain**
135:5,6
137:2
154:8

**retained**
169:9

**Retainer**
148:15

**retaliated**
107:15

**retaliation**
93:21
94:13,25
95:12 96:5
106:8
107:12
155:20

**retaliatory**
116:16

**retention**
136:25
140:15,18,
23,25

**retire** 98:4
115:12

**retired** 7:3

**retirement**
97:12,18
99:9,18
100:1,4,
14,21
141:23
142:12,19,
21 166:23

**retiring**
99:4

**retreat**
85:6,11,18

**retreats**
84:25

**review** 25:6
168:11

**reviews**
82:16

**rid** 122:17, 22

**ridiculous** 120:12 159:13

**RIF** 31:22 97:11 98:15 99:3,9,11 101:1,16 141:15,20 166:9

**rigor** 74:9 131:25 132:1,6,7, 10,11,18

**rigorous** 132:24

**risk** 111:16,20

**Riverside** 122:3

**road** 94:16

**Rob** 97:22 102:18 103:25 104:23 106:18 116:3 117:19 158:7 166:21

**Rodney** 31:17,19 85:4 98:10

115:25

**rolled** 140:2

**room** 57:22 65:6 105:22

**rough** 143:21

**roughly** 14:20,24 15:3 22:8, 14

**round** 59:9 133:17 146:19

**roundtable** 127:8

**rule** 81:20 82:5,13, 20,24 83:23 146:8

**rules** 72:19 73:5

**rumors** 126:4

**run** 8:20 86:2

**running** 56:9 71:10 73:10 126:14

**rural** 39:13, 19

**Rutledge** 10:25

**Ryan** 99:2 118:2,19, 21 156:2,5 157:9 158:9

———————

**S**

———————

**SACS** 28:3

**sal** 131:4

**salary** 25:5 30:5 31:12,14 97:6 113:19 141:15,17 167:21

**salt** 119:20

**Sam's** 10:12

**SAP** 70:25 84:14

**Sarah** 38:5 102:24 109:22 128:23

**sarcastically** 98:14 103:4

**sat** 49:7 52:1 60:6, 24 135:5,8 136:10 138:1,18 139:5 154:9

**SAT/ACT** 137:18 152:21,24

**satisfy** 35:15 36:11,22 43:14

**scared** 93:12 172:3,6

**Scheffler** 53:8

**scholar** 49:17

**scholarship** 115:19

**school** 6:4 20:5 34:7 35:3,7,9, 13,15,20 36:11,23 37:4,10 38:24 39:1,5,8, 18 40:5,8 41:5,7,9 43:22 44:11,15, 20 45:8,14 46:5,10, 14,20,25 47:14,15, 25 48:11, 16 50:15 58:5,6 61:25 72:7 73:7,9,14

74:7 75:1 77:19 81:2,13,14 83:4 94:3 129:12 130:8,11, 23,24 131:2,10, 12 132:24 135:17 140:10 151:23 152:3,4 153:9,10 154:9

**school's**
  80:19 81:7

**schools**
  16:21,23 20:6,8,9 21:2 38:1, 17 39:10, 13,16 42:12,19, 20 43:18 45:6 47:13 49:12 58:2 77:15 130:19,21 131:11 133:20 139:25 153:5,6

**scope**  137:20

**score**  49:10 138:18

**scores**
  134:24

**Sears**  12:11

**season**
  106:13

**seated**  57:25

**seconds**  60:7

**Section**
  82:25

**secure**  157:2

**Security**
  7:23

**seek**  143:6 145:9 151:4

**selected**
  17:25 18:18 19:3

**self-destruct**
  146:1

**semester**
  41:12,15 141:2

**send**  69:4 88:2 130:6 131:7,9 160:14,20, 23,24 162:15 164:9

**sending**  71:5 130:24

**sends**  166:13

**seniors**
  33:14

**sense**  49:19, 20 90:21 91:8,14 119:3

**sentence**
  74:2

**separating**
  100:20,22, 23

**September**
  97:16 99:24

**serve**  31:6

**served**  14:22 23:13 70:23 128:8

**serves**  84:3

**service**
  13:23 14:3,6,17, 20 15:6 61:17

**services**
  80:20 118:18 120:21

**session**
  77:14

**set**  107:19

**sex**  56:12

**sexual**
  54:11,13 62:11 65:19,20

**Shannon**
  133:11

**Shannon's**
  133:21

**share**  88:25 90:6,24 109:5 150:6

**shared**  61:23

**she'd**  103:24

**she'll**
  149:22

**Shepard**
  160:12

**shoddy**  83:18

**shopping**
  13:5

**short**  88:21

**show**  71:17 76:15 115:3

**showed**  29:10

**shut**  60:16

**siblings**
  9:11

**sic**  14:1 42:18 132:12 163:10

**side** 127:18

**sidewalk**
  60:21

**sign** 81:4,
  16 83:3
  117:13

**signed** 92:15

**significant**
  126:6

**signs** 115:25

**similar**
  105:5

**simply** 48:24
  52:4

**simultaneous**
  65:1 67:13
  82:18
  94:22
  123:20
  127:7
  162:22

**Singer** 79:5,
  6 130:20
  134:15
  140:6
  143:24

**Singer's**
  78:22
  79:22
  125:3

**sir** 5:24
  7:10 8:2,
  13 9:6,18,
  25 10:16

11:6,11,25
12:7,16,20
13:7
14:14,16,
18 15:6,24
16:1,6,12,
16 17:23
18:12
19:4,16,
19,21,23
20:10
23:25
25:16 30:3
33:5 36:4,
14,24
53:22
55:8,10,15
56:2 58:1
61:5,18
64:15
67:8,22
68:22
78:12,23
89:22
90:10
121:15
124:21
137:14
142:14
166:11

**sister** 9:22

**sit** 44:25
  48:19,23
  49:15
  51:7,19,23
  52:8,24
  135:13

172:19

**sitting**
  82:10
  129:20
  134:6
  169:24

**situation**
  44:3 45:11
  108:13
  119:24

**Sixty-one**
  7:17

**skipping**
  97:10

**slept** 166:16

**slid** 105:2

**slide** 138:14

**small** 152:11

**So-and-so**
  75:6
  143:25

**social** 7:23
  15:15
  168:10,14,
  15

**socializing**
  13:5

**solemnly**
  4:12

**son** 14:25
  15:5

**sought** 145:5
  150:21

**sound** 149:24
  166:10
  168:11,21

**sounds** 12:9
  163:1

**south** 8:4
  9:8 10:8,9
  17:15

**space** 112:8

**sparking**
  127:10

**SPAS** 71:6

**speak** 19:14
  79:23
  92:17
  110:14,16
  160:11,12
  171:18

**speaking**
  32:24 65:1
  67:13
  82:18
  94:22
  123:20
  127:7
  162:22

**specific**
  14:8 87:21
  114:1
  126:13

**specifically**
  17:3 27:21
  159:10
  170:4

Case 7:21-cv-00062-WLS   Document 33-4   Filed 05/02/22   Page 216 of 228

Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.
Jamie T. Bird on 03/15/2022          Index: specifics..student

specifics
  27:17
  88:17
  93:10
  119:13

spoke  19:6,
  10,12 38:4
  92:18
  114:15
  119:14

stakeholders
  72:7 130:9

stand  25:15
  145:19

standards
  50:22
  132:16
  135:2
  138:20
  140:13

standing
  60:18 65:7
  130:1

standpoint
  138:11

Stanley
  160:11
  164:6

start  33:9
  48:12
  87:15

started  20:5
  32:24
  33:21
  34:15

37:12
42:9,15
55:22
63:19
76:6,8
128:21
154:20

starting
  20:1

starts  29:13
  106:13

state  5:2
  16:24
  17:1,11
  18:2,17
  19:6,9
  20:5,19,
  22,25
  22:25
  23:11 25:9
  33:8,16
  34:18
  40:10,12
  45:12
  48:13 56:4
  57:9 71:8
  72:1,5
  73:11,21
  74:5 79:7
  82:11,13
  83:9,18
  85:19,25
  94:14
  111:7,14,
  22 112:13
  126:4,10,
  11,13

129:15
130:5
133:13
134:19
156:18

State's
  71:10
  139:4

stated  74:18
  116:4
  153:19
  158:10

statement
  77:12
  79:2,11
  135:23

states  27:22
  77:15
  99:11

Staton  22:25

statute
  81:20 82:6

staunch
  113:1

stay  97:11
  105:21
  115:14
  116:10,12
  140:21
  156:16,19
  157:5

stayed  60:7

staying
  140:25

stepped
  59:22

steps  59:16

stopped
  20:15

story  67:10
  161:5

straight
  92:8

straightforwar
d  76:9

straw  120:19
  135:11

street  64:10

strictly
  23:22

strong
  143:18

structure
  40:19
  72:11,15
  86:2 156:1

struggled
  137:25

student
  21:3,25
  22:3,18
  23:11 34:8
  39:1,14
  40:21
  42:10
  45:19
  51:1,25
  52:3,19,22

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 217 of 228

Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.
Jamie T. Bird on 03/15/2022        Index: student's..suspension

54:17 56:8
57:4 58:3
61:7,15,
17,22
62:23 71:6
75:1 79:10
80:3 83:2,
6 114:9
131:13
154:12,13

**student's**
83:2

**students**
23:10
33:8,19,
21,23
34:7,12,
18,20,23,
24 37:15
38:7
39:10,19
41:14,15
42:23
43:17
44:22,25
47:14
50:12
59:10
61:13
70:22,24
71:1,5,14
72:16
73:2,7,10,
23 74:4,6,
22 75:5,10
77:16
79:12

80:20 81:3
82:2
83:11,15,
16,20
84:13 85:3
102:3,22
106:17,22
108:7
114:9
128:7,20,
24 129:2
131:2,3,4
132:21
135:3,9,
10,14,22,
24,25
137:3,5,
16,17,21,
24 138:5
140:3,22
141:5
153:4,11
154:8,20
167:25

**students'**
43:12
133:21

**study** 83:4

**stuff** 146:20
147:8

**stupid**
68:14,15
69:8,17,25
70:9

**subject**
31:22

97:10
101:1,16
141:20
142:20
167:10

**subjected**
65:19

**submitted**
169:16

**successful**
74:10 85:3

**successfully**
70:23

**suggest**
76:12

**suggestions**
29:22,23
114:17

**suicide**
54:18
55:18 60:9
61:7 62:23
108:24

**suing** 145:1

**suit** 32:13
120:13

**summit** 86:14
124:19

**summoned**
91:24

**super-** 117:7

**superintendent**
58:2

**superior**
58:11

**supervise**
21:3 73:18

**supervisor**
21:1 29:7
68:5 69:22
106:15
117:7

**support**
120:22

**supporter**
113:1

**supportive**
122:12

**supposed**
7:14 71:16
76:24
80:25
81:3,11
82:3,15
120:13
163:3
165:17

**supposedly**
96:8 99:9
165:6

**surmising**
165:12

**surprised**
138:5

**suspend**
69:18

**suspension**

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 218 of 228

**Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.**
**Jamie T. Bird on 03/15/2022**                    Index: SVIOP..tells

71:1 83:13

SVIOP   113:8

swear   4:12

sworn   4:22

system   30:23
  37:11 53:3
  119:23
  142:12
  144:23

system-wide
  25:8,18

systems
  130:11

---

**T**

---

T-O-O-T-L-E
  8:7

T-O-W-S-O-N
  151:16

table   59:9
  124:25
  125:7,13,
  14,15,17
  126:21,22
  127:2
  129:20

tabled
  133:18

tables   125:6

taking   34:24
  38:7 40:25
  49:4,24
  71:16

73:12
106:3
136:13
154:9

talented
  33:8

talk   54:8
  65:18
  84:8,11
  91:8 93:9,
  13 107:18,
  20,21
  110:17
  121:7
  128:5
  131:25
  144:7,8
  172:23

talked   85:17
  87:4
  109:11
  111:18
  114:2
  121:23
  122:8
  132:21
  155:5,10
  166:23
  169:19

talking
  13:18
  27:19
  28:15
  38:22
  46:13
  63:17
  66:18 67:6

68:19,20
89:17 99:3
108:20,21
112:4,8
113:25
121:14
130:2
138:22
140:17,22,
23,24,25
141:1
152:18
162:19
166:22
170:4
171:13

tanked   83:13

Tanner   10:14

taught   20:6
  37:20 38:1
  41:8,10
  153:6,8

taxes   12:14,
  15

TCSG   37:14
  40:5 42:12
  76:18
  78:1,6
  132:12
  153:6

TCSGS   153:17

teach   41:9
  115:19

teacher
  37:19

41:9,10
153:9,10

teachers
  21:3 37:19

teaching
  20:5 22:1,
  3,18 64:20
  132:9
  141:16
  157:17

team   28:22
  84:7
  119:5,8

Tech   50:13

technical
  50:15 78:2
  135:17

Tee   29:7
  56:12
  98:12
  107:9
  117:17,22
  118:1,22
  119:12
  121:16

telling
  29:20
  55:16
  56:23
  69:16 85:9
  131:18
  138:15
  143:20

tells   97:14,
  15 110:3

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 219 of 228

Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.
Jamie T. Bird on 03/15/2022                    Index: template..time

144:12
161:6

template
  89:21

ten  13:21
  160:1

ten-year
  15:7

tenths  131:5

term  15:1

terminated
  31:7
  166:19

termination
  141:11
  154:15
  166:19,25

test  51:12,
  13 107:5
  135:8,20

tested
  106:17,22
  107:6
  150:20

testified
  4:22 40:3
  60:22
  61:19 66:5
  70:24
  75:10
  80:14,16
  91:16 98:6
  102:18,19
  103:7

108:1
113:2
128:19
132:3
140:7
172:7

testifying
  156:22

testimony
  4:13 76:2
  125:4
  165:9

testing
  106:23
  107:1
  118:24

tests  139:18
  146:8

Thagard
  11:13

thankful
  69:19

Thanksgiving
  158:1

thing  13:6
  26:23
  27:21 52:9
  65:17
  68:14,15
  85:8 91:2
  106:16
  112:19
  119:4
  126:13
  133:8,21

134:1,2
137:1
140:15
144:9
147:16
150:7
160:4,24
162:9,15

things  56:10
  61:14,20
  62:7 63:16
  64:14
  79:20
  84:3,9
  85:15
  97:19
  104:6
  115:21,24
  120:15
  121:3
  122:15
  131:22
  133:5,6,7
  146:9
  152:9
  157:2

thinking
  10:7 24:10
  55:22 59:5
  121:8
  156:10
  157:21
  160:13
  162:1

Thirty-eight
  7:13

thought
  26:11
  29:17
  43:10 47:9
  55:20 76:9
  77:8 85:23
  90:3 93:5
  119:1
  137:11
  138:13
  155:19

thousand
  133:23

tie  120:14

tied  106:11

till  100:2

time  12:2
  15:3,7
  21:9 22:23
  24:14
  25:12
  29:7,8,19
  33:20,23
  37:22
  41:2,24
  42:9 50:24
  53:9 57:5
  60:25
  62:4,5
  63:1 79:8
  85:13,14
  89:5 90:11
  93:15,17
  95:8 97:12
  98:14
  103:21

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 220 of 228

Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.
Jamie T. Bird on 03/15/2022         Index: times..transferred

104:11
105:25
118:21
122:15
127:6,13
128:18
129:24
134:19
141:15
142:21
143:16
150:23
159:11,22
160:5
168:25
169:15
170:9,14
171:2
172:2
173:10

**times**  63:12,
  24 70:1
  92:21,22
  114:3
  119:24
  135:20
  171:5

**Tina**  77:23
  109:7

**tired**  164:19

**title**  24:16
  25:2
  26:13,14,
  15,16
  27:25
  28:18
  94:21

95:13
113:16
168:7

**to-do**  80:14

**today**  20:2
  82:10

**Todd**  5:1
  131:12,13,
  14

**told**  18:19
  21:24
  33:16
  58:3,5
  66:6,8
  67:17 68:4
  69:7 72:25
  75:6,19,
  22,24
  79:18,20
  86:23
  87:8,11
  88:14
  89:1,4,5,
  8,9,10,16
  90:5,7,25
  91:2,5
  92:21
  93:12
  94:19
  99:24
  103:5
  105:15
  107:16
  109:1,12,
  14,16
  110:1,2,7,
  13,15

114:15,19
119:4,25
120:3,6
121:4
122:14
131:8,20
134:15
136:6
145:23
146:18,23,
  25 156:9
157:15
158:9
164:24
167:16,19
170:19
171:1,4

**tomorrow**
  91:8

**ton**  78:4

**Tootle**  8:7
  9:18,23
  10:1

**Tootles**  8:20
  9:17

**top**  57:20
  86:15

**topic**  126:17
  127:3

**topics**
  125:1,5

**total**  149:20

**touch**  57:18

**tours**  114:8

**town**  5:21
  8:17 12:5
  58:4

**Towson**
  151:16

**track**  43:25
  44:1
  139:13

**training**
  94:21

**transcript**
  38:10,20
  39:4 42:24
  44:24 45:3
  46:10,12,
  14,20,24,
  25 48:23
  49:6 50:16
  51:2,6
  52:5 79:19
  130:7,25
  131:10
  159:15,16,
  19,20
  161:2,3,20
  163:21,23
  164:2,4,
  17,19

**transcripts**
  43:12
  163:24

**transfer**
  40:6,7
  127:14,21

**transferred**
  167:20,21

**transition**
  104:20

**transitions**
  104:21
  105:8
  155:6,8

**travel**
  149:19

**treated**  40:2
  150:23

**treating**
  112:7

**treatment**
  143:7,8
  150:22
  169:17,24
  170:3,15

**trips**  113:24
  114:1

**trouble**
  77:16 88:5
  93:1,3

**troubles**
  112:17

**troubling**
  74:1

**truck**  63:19
  64:4

**true**  29:15
  52:4 79:21
  91:17 98:7
  131:9
  144:21
  146:24

159:10

**trusted**
  89:23

**trusts**
  95:17,19

**truth**  4:14,
  15 135:10
  147:2

**truthful**
  32:4

**TSC**  132:12

**TSG**  42:18,
  19 43:11,
  18 53:3
  74:13
  75:13

**tuition**
  33:2,17

**turn**  97:16,
  23 141:25

**turned**  58:24
  60:4,16
  99:17

**turning**  99:8

**Twenty**  7:7

**twins**  11:3

**type**  62:6
  74:8
  119:20
  148:22

**typed**  125:20

**types**  97:18
  140:24

**typically**
  34:17
  37:11
  59:14
  80:25

**typing**
  161:11

**typo**  123:8,
  9

_____

U

_____

**uh-huh**  5:10,
  20 6:19
  12:9 14:2
  15:18
  33:11
  44:17
  51:23
  53:11 54:1
  55:13
  67:20
  80:22 81:5
  87:10,14
  92:13 93:8
  97:3 101:7
  108:2,4
  121:15
  134:14
  140:12
  142:10
  149:5
  150:16,25
  151:22
  155:1,13,
  18 156:9
  157:20

159:25
  160:16
  166:24
  167:12

**uh-uh**  5:10
  137:6,8

**ultimately**
  100:16

**unclear**
  141:12

**under-**  138:7

**underemployed**
  114:11

**undergo**
  94:20

**undergone**
  94:21

**undergraduate**
  159:16

**understand**
  5:7 30:21
  32:8 39:22
  44:8 48:17
  49:22
  63:23
  65:15
  69:14
  72:21,23
  73:25
  75:18 77:1
  78:8,15
  82:17 85:2
  93:22
  94:6,7,12,
  17 96:2,3,

Case 7:21-cv-00062-WLS    Document 33-4    Filed 05/02/22    Page 222 of 228

Jamie T. Bird vs Board Of Regents Of The University Of Georgia, ET AL.
Jamie T. Bird on 03/15/2022          Index: understanding..vitae

11,16
103:1
114:24
128:11
138:8
140:6
141:18
148:21
167:3,15

**understanding**
23:18
25:12,19
30:24
40:11  44:5
54:16
74:14,16
75:20  83:5
97:4
107:10
127:1
153:23
170:7

**understands**
94:9

**understood**
40:16
74:12
78:17  95:9
109:7
137:4

**unfilled**
99:6

**unfunded**
133:9

**uniform**
30:23

**United**
12:20,22
13:8

**units**  111:18

**universities**
37:24

**university**
21:1 37:5
69:15
70:10  72:6
84:23
96:15
100:20
101:4,8
111:8,22
129:5
163:22

**unofficially**
18:19

**unreportable**
65:1 67:13
82:18
94:22
123:20
127:7
162:22

**untruths**
146:22

**upset**  59:13
61:8 69:1
74:13,16,
19  75:14
78:10

**upsetting**
55:4

**upstanding**
76:5

**USG**  37:11
38:5 39:25
42:6,20
43:7
77:14,19
109:21
144:7,23

**utilize**
119:9

———————

**V**

———————

**V-STATE**
114:4

**vacant**  99:6

**val**  131:4

**Valdosta**  5:2
6:3,18
8:10,13
9:8,20,23
10:13
11:1,5
12:24,25
13:1,4,9,
23,24 14:3
16:21
17:1,11
18:2,17
19:6,9
20:4,6,9,
19,22,25
25:8 31:19
48:13 56:4
72:1,5

83:9,17
85:19
94:14
111:7,22
112:13
138:17
139:4,24

**varied**
131:11

**verbal**  69:22
90:3
169:20

**verification**
139:9,10

**versus**  49:25
132:24

**vet**  128:24

**vice**  63:16
91:12
96:14
111:17
118:18
120:20

**video**  62:6

**VII**  94:21
95:13

**vindiction**
163:10

**vindictive**
121:13

**visit**  63:10

**vitae**  21:13
162:14

voice  109:18

volunteer
  14:6,8

VP  117:10
  118:13
  133:12

VSU  22:25
  24:14 27:7
  34:6,17
  35:8 38:4,
  14 40:6
  42:8 58:14
  61:23
  63:13
  64:19,22
  70:19
  72:23
  74:19 78:1
  80:4 81:19
  82:20
  83:20
  85:13
  92:10
  114:2
  126:13
  132:22
  134:12,21
  135:6,18
  136:17
  137:25
  138:3
  140:11,14
  141:23
  142:12
  144:5
  152:19
  153:21

  154:12,13
  158:11

Vulgar  112:7

vulnerable
  62:25

—————————

————— W —————

W-A-Y-N-E
  10:3

W.G.  65:3

wait  95:14
  133:22
  136:2
  162:23

waiting
  163:6

waive  129:2

waived  33:2,
  17

walk  165:10

walked  58:18
  60:9,10,11
  61:16

walking
  56:14
  60:21

walks  59:12

wanted  23:1
  33:24,25
  34:1 36:18
  44:23 45:2
  48:1 62:5,
  6 67:12

69:18
72:12,15
78:13 79:4
93:5
127:24
129:15
131:8,17
145:22
147:15
158:19
172:22,23

wanting  74:6
  77:25 78:1

Warburg
  101:25

Wayne  10:1,2

wear
  120:12,13

website
  95:4,5

week  63:11
  114:7
  157:25
  162:24

weekly  114:7
  119:7

weeks  66:6
  69:18
  76:17
  86:25
  87:12,16
  106:22
  110:12,16
  146:8
  150:21,24

weigh  103:18

weighed
  38:11

well-being
  54:15

Wenham  38:5
  109:22
  110:1

whatevers
  144:13

whichever
  48:1

whomever
  137:15

wife  56:15,
  24 107:21,
  22 110:4
  121:6
  151:8

Williams
  125:23

willy-nilly
  73:11

window  60:20
  64:6

witnessed
  120:16

witnesses
  172:16

woke  55:24

women  7:15

women's
  112:8

won   56:8

wonderful
  72:9

word   51:1
  54:12,15
  76:20
  168:12

wording   47:3

wordings
  102:24

words   37:1
  39:22
  44:19
  46:18  51:6
  57:19
  62:10
  107:23
  127:11
  159:8

work   13:18
  14:6,8
  19:7  20:24
  21:19,21
  56:18  60:5
  73:22
  98:5,16
  100:9
  106:23
  122:6
  131:16
  133:7
  139:22
  144:22
  148:19
  157:22
  158:4

workaround
  52:6  53:1,
  2

worked   13:22
  38:15
  73:13
  102:16
  103:11
  121:1
  130:12,17
  135:16
  144:2
  147:6,9
  152:7
  167:7

working
  24:16  25:2
  61:13
  80:12
  83:16
  103:24
  121:11
  131:3
  144:16,17
  152:14

workplace
  65:13

works   14:6
  72:23
  106:20
  122:3

workshop
  76:19

workshops
  84:25

Wow   140:10

wrap   48:9

write   70:2,5
  90:18
  162:10,17
  163:1
  171:10

writing
  91:13

written   17:2
  69:20
  78:17  82:5
  86:15
  88:6,8
  89:20
  96:20
  113:22
  122:24
  130:2
  164:14
  169:16,18
  170:15

wrong   63:1
  80:6,10
  86:23
  88:15
  91:17
  139:19
  159:13
  163:5

wrote   112:6
  129:25
  131:11
  168:8,10

─────────────
        Y
─────────────

y'all   12:14
  21:13
  79:25
  85:20
  97:22
  99:25
  123:3
  129:1
  134:3
  136:7
  148:3,5
  156:1

year   15:13,
  21  22:8,16
  37:18
  53:20  61:1
  66:2  71:3
  98:11,18
  99:6  118:5
  135:4
  136:1,2,3
  140:15
  141:1
  154:20
  158:9

years   6:3,18
  7:7,13,20
  13:14,21
  14:23
  15:23
  20:7,11,
  21,23
  21:18
  22:15,17
  31:17,24,

```
25 56:7
57:2 65:2,
6 105:4
111:21
115:12
144:3
```

**young**  11:13
14:13
102:5,6
119:21

**younger**
18:20

---
**Z**
---

**Zoom**  78:22
163:1,2,6

**Sarah E Bessenger**

| | |
|---|---|
| **From:** | Jamie T. Bird |
| **Sent:** | Tuesday, February 26, 2019 12:45 PM |
| **To:** | agano@lanier.k12.ga.us; Amelia.Roberson@berrien.k12.ga.us; Barbara.bagley@coffee.k12.ga.us; Belknap.leeann@mail.fcboe.org; blaw@brooks.k12.ga.us; cburrell@southlandacademy.org; cluke@clinchcounty.com; Dana.cason@ccboe.net; danahutchinson@lowndes.k12.ga.us; darnisha.molden@clayton.k12.ga.us; debbie.hobbs@jeff-davis.k12.ga.us; Diane.hardin@benhillschools.org; egaskins@gocats.org; ericacooper@lowndes.k12.ga.us; Fredanewson@lowndes.k12.ga.us; gordonmo@lee.k12.ga.us; greid@gacyber.org; grissom@fultonschools.org; hjackson@gocats.org; jguilliams@valwood.org; Karen.Black@echols.k12.ga.us; Karla M Hull; Kathy.lovett@benhillschools.org; Kelly.schettini@cowetaschools.net; kpittman@jones.k12.ga.us; kwalker@camden.k12.ga.us; kwarren@cook.k12.ga.us; lebupchurch@lowndes.k12.ga.us; leighwalker@lowndes.k12.ga.us; Lucy_mason@gwinnett.k12.ga.us; martellis.curtis@coffee.k12.ga.us; mdukes@victorychristianvaldosta.org; mmckinney@gocats.org; mrodgers@tcjackets.net; reeses@fultonschools.org; registrar@hcavaldosta.org; Sujette.giddens@benhillschools.org; tadams@gortca.com; tcarter@camden.k12.ga.us; Teresa.garrett@berrien.k12.ga.us; terrimyers@lowndes.k12.ga.us; vgallahan@valwood.org; Yolandria_wyche@dekalbschoolsga.org |
| **Cc:** | Sarah E Bessenger |
| **Subject:** | RE: Dual Enrollment Honors Academy |
| **Attachments:** | 2019-Dual-Enrollment-Student-Participation-Agreement.docx; ACCUPLACER Link and Directions-updated February 2019.docx |

Good Afternoon Counselors,

Valdosta State University has released the course offerings for **Fall Semester 2019**. You may view these at: https://www.valdosta.edu/courses. We will begin registering DE students for fall semester on **March 25th**, so we have about a month to advise. I have attached the SPA and testing options for your reference. The SPA has not been updated from the state at this time, so just adjust the dates on your end for now.

With regard to DE institutional program placements: For students wanting to participate in any dual enrollment program in our state, it is critical for those students **wanting to attend a 4-year institution after they graduate high school**, get their DE credits from the same type of institution. The curriculum course rigor needs to be the same in order for them to be successful once they graduate and move forward into college. Around the state, universities are seeing students attempting to enter their institutions with many DE credits and yet, they cannot meet the needed admission requirements for that particular institution. Part of participating in a DE program is choosing the right institution in which to attend and not one that will just help students "check off courses." This also helps to ensure that students get the needed academic foundation that will allow them to move forward successfully wherever they go after they graduate. Your assistance in guiding your students (and their parents ☺) in this direction will certainly help them avoid this potential issue. Dual enrollment is a great program and we want to make sure students are being impacted in a positive way that will enhance their future education.

We look forward to working with your students this upcoming fall! Please let me know if you have any questions.

Jamie



*language from DE confirm in October-2015 used every orientation etc.*

KAIRISA J. MAGEE, RPR, GCCR
3/15/2022
DEFENDANT'S EXHIBIT
**BIRD - 41**

1

**PLAINTIFF'S EXHIBIT**
41

**Jamie T. Bird**
VSU Dual Enrollment Coordinator
Dual Enrollment Honors Academy
Office of Admissions
Valdosta State University
1500 North Patterson Street
Valdosta, Georgia  31602
229.249.2779 office
229.333.5482 fax
www.valdosta.edu



Good Afternoon Counselors,

As we have settled into our spring semester, our efforts now turn to **Fall Semester 2019** for planning purposes.  As you know, students may take any course in which we have approved as a dual enrollment course.  Those courses are updated frequently and may be located at https://apps.gsfc.org/SecureNextGen/dsp_accel_course_listings.cfm.  As you view this catalog specific to Valdosta State University, let me know if you see something missing and should be included.  We are always adding to our catalog, but can certainly look into something specific.

While students may take any course needed, we do have some guided cohorts built specifically for dual enrollment students as we have done in the past.  These are usually for students in close proximity to our campus.  Students may take some of these courses or make a schedule of a few courses that will work with their high school schedule.  It all depends on their needs and what will work for their high school.

**Fall Semester 2019:**

| Course | Days | Time | Notes |
|---|---|---|---|
| History 2112 | MWF | 8:00-8:50 | Jr course-time will allow them to return to the high school for second block. |
| English 1101 | MWF | 9:00-9:50 | Senior requirement for British Lit |
| Math 1111 | MWF | 10:00-10:50 | Senior requirement used for 4th Math |
| Communications 1100 | T/TR | 9:30-10:45 | Great course for any DE student.  Could pair with the ENG and Math above. |
| Economics 1500 | T/TR | 9:30-10:45 | Senior requirement- Could pair with the ENG and Math above. |
| Political Science 1101 | MWF | 10:00-10:50 | |
| | T/TR | 9:30-10:45 | Required in the core curriculum |

For those online students, we are working on providing more online full term options for our DE students vs. eCore.  If you have any specific needs, please let us know.

Have a great rest of your week!!

2

**Jamie T. Bird**
VSU Dual Enrollment Coordinator
Dual Enrollment Honors Academy
Office of Admissions
Valdosta State University
1500 North Patterson Street
Valdosta, Georgia  31602
229.249.2779 office
229.333.5482 fax
www.valdosta.edu

