IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION


CASE NO.:  7:21CV62 (WLS)


JAMIE T. BIRD,

                Plaintiff,
vs.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA
d/b/a VALDOSTA STATE UNIVERSITY,

                Defendant.
_____/


DEPOSITION OF

DR. RICHARD CARVAJAL


Thursday, January 20, 2022
8:36 a.m. – 12:37 p.m.


Valdosta State University
1500 North Patterson Street
Valdosta, Georgia 31698


Stenographically reported by:
KAIRISA J. MAGEE, RPR, GCCR (Georgia), FLORIDA
NOTARY


Job No. : 378317

APPEARANCES:


On behalf of Plaintiff:

        LAWSON, BECK, & SANDLIN, LLC
        1125 Commerce Drive
        Suite 300
        Peachtree City, Georgia 30269
        (770) 486-8949
        BY:  HOLLY MAESTAS, ESQ.
        holly@lawsonandbeck.com


On behalf of Defendant:

        BROWN, READDICK, BUMGARTNER, CARTER,
        STRICKLAND & WATKINS
        5 Glynn Avenue
        Brunswick, GA 31520
        (912) 264-8544
        BY:  G. TODD CARTER, ESQ.
        tcarter@brbcsw.com
        and
        VALDOSTA STATE UNIVERSITY
        OFFICE OF LEGAL AFFAIRS
        1500 N Patterson Street
        Valdosta, GA 31698
        (229) 333-5351
        BY:  JUSTIN ARRINGTON, ESQ.
        juarrington@valdosta.edu


ALSO PRESENT:  Ms. Jamie T. Bird, Plaintiff

I N D E X

Proceedings                                              Page

THE TESTIMONY OF DR. RICHARD CARVAJAL:

Direct Examination By Ms. Maestas                          6

E X H I B I T S

No.                                                     Page

Plaintiff's Marked Exhibits

52          Copy of Subpoena Duces Tecum                  13

53          Certified Mail Receipt Signature             15
            and Spoliation of Evidence and
            Discovery Preservation Warning
            Letter

7           USG Document Regarding RIF                    73
            Frequently Asked Questions

6           Letter to Jamie Bird Dated November           80
            11th, 2019

14          Spreadsheet of Newly Posted or Open           91
            Positions

46          August 4, 2020, Jeanine                       96
            Boddie-LaVan Letter to Office of
            Legal Affairs

11          August 13, 2020, Report of                    96
            Retention of Dual Enrollment
            Students

9           January 2, 2022, Data and Reports             98
            Printout from VSU Website

10          VSU Report of Retention Rates                 99

E X H I B I T S

Continued

No.                                                      Page
17          VSU Office of Admissions Website              105
            Printout

18          VSU Website Printout                          105

19          VSU Dual Enrollment Flip-Book                 106

47          11/16/2021, ABAC documents                    115

20          Dual Enrollment PowerPoint from the           128
            USG Website

21          Printout from USG Website Regarding           130
            Dual Enrollment Counseling

23          Email with Flyer from Sarah Wenham            136

24          Roundtable Bullet Points Discussion           136
            Document

41          February 26th, 2019, Email from               143
            Jamie Bird to High School
            Counselors

42          Email Chain                                   155

43          March 5th, 2019, Written Reprimand            161

I N D E X

Proceedings                         Page

Certificate of Oath                 173

Certificate of Reporter             174

Proceedings began at 8:36 a.m.:

THE COURT REPORTER:  Do you solemnly swear or affirm that the testimony you are about to give in this cause will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURT REPORTER:  Thank you.

MS. MAESTAS:  Good morning.  I am Holly Maestas.  I represent Jamie Bird.  She's the plaintiff in this matter.  This is the matter of Jamie T. Bird, Plaintiff, versus Board of Regents of the University System of Georgia doing business as Valdosta University, Defendant, Case Number 7:21cv62, pending in the United States District Court for Middle District of Georgia, Valdosta Division.

This is the defini- -- depo- -- sorry, deposition of Dr. Richard Carvajal, and it is being taken pursuant to notice and agreement of counsel.  This is a deposition of a nonparty and employee of the defendant.

In addition to this deposition being taken -- taken pursuant to notice and agreement, it is also being taken pursuant to a

Federal subpoena to appear at a deposition and to produce documents and things.

Thereupon:

DR. RICHARD CARVAJAL,

a witness named in the notice heretofore filed, being of lawful age and having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MS. MAESTAS:

Q    Did you receive your notice of deposition? It looks like this.

A    I just saw it this morning.

Q    Okay.  If you could speak up and vocalize --

A    Sure.

Q    -- your answers so that the court reporter can hear them.

Okay.  So you said the first time you've seen the notice of deposition and notice to produce was this morning?

A    Correct.

Q    Okay.  Did you have an opportunity to re- -- review the documents that were being requested --

A    I didn't.

Q   -- to bring?

A   I -- I don't -- I'm not sure what was requested.

Q   Okay.  I'm going to hand you a copy of your notice of deposition so that you will have an opportunity to review those records and provide those to me through your counsel.

A   Okay.

MR. CARTER:  To the extent we have them. That's what she's referring to, the -- and we've already given her some information on that, but I think she's got some others she wants and then this is the main thing.  You don't have any of that, but she will ask you about it if she needs to.  And to the extent you have it, give it to me, and we'll give it. Okay.

MS. MAESTAS:  Objections except to the form of the question and responsiveness of the answer will be reserved until the time of trial or the time of hearing.

BY MS. MAESTAS:

Q   The deposition is being taken stenographically by a court reporter.  So please vocalize all your responses and avoid gestures,

which cannot be reported.

You have the right to read a copy of your deposition transcript and then sign it after reading it, or you may waive that right today.  Please so indicate to the court reporter before you leave your option on this.

If you could state your full name for the record?

A    Richard Anthony Carvajal.

Q    Okay.  And are you known by any other names?

A    No.

Q    Okay.  And your address?

A    4552 Tillman Bluff Road, Valdosta, Georgia 31602.

Q    Thank you.

Have you ever had your deposition taken before?

A    Yes.

Q    How many times?

A    I believe twice.

Q    Okay.  And can you tell me about those times?

A    I know the first one.  I'm trying to remember the second one.

Q    How long ago?

A    It's been a number of years, over ten.

Q    Was it work-related litigation?

A    Yes, both --

Q    Okay.

A    Both were.

Q    Where were you working at the time?

A    Independence Community College in Independence, Kansas.

Q    Okay.  Were you a party to the lawsuit, like one of the people sued?

A    No.

Q    You were a witness?

A    I worked for the institution.

Q    Okay.  So the same capacity you're sitting here today?

A    Correct.

Q    Okay.  And what were those lawsuits about?

A    Again, the -- the second one, I believe, was -- I believe it was an HR-related issue, a termination grievance.  The -- the first one was a family of a student who was suing the institution after their child had been the victim of a sexual assault on campus.

Q    Okay.  Was it Title IX?

A    I'm sorry.  I don't recall.

Q    Okay.  Okay.  Fair enough.

     And then the other one?

A    Again, I think it was --

Q    You said --

A    My --

Q    -- HR?

A    My part -- my part was really short.

Q    Okay.  Okay.
A    So that one's harder for me to remember, but I think it was an HR-related issue.  But I -- I think pretty quickly they figured out I -- I had -- it had happened before I had been there and I had really nothing to -- to do with it --
Q    You were like --
A    -- so --
Q    -- Okay, good for me.
A    So they released me.  Yeah.
Q    Okay.
     All right.  And you said you were never a party to a lawsuit?
A    No.
Q    Okay.
     All right.  And did you do anything to prepare for today?

A    No.

Q    Okay.  Did you have any meetings with anybody other than what you've communicated with your lawyer?

A    Just with Counsel.

Q    Okay.  Did you meet with anybody who was a -- also a witness to this case?

A    No.

Q    Did you talk with Dr. Carr about his deposition yesterday?

A    Simply asked -- I sent him a text and asked him if -- if he was okay, and that was it.

Q    Okay.  Is he okay?

A    Yeah.

Q    Okay.  And did you speak with Ryan Hogan?

A    No.

Q    Okay.

Okay.  And do you keep a file on this case?

A    No.

Q    Okay.  Did you review any documents or prepare any documents for today?

A    No.

Q    Okay.

All right.  Are you on any medications or

drugs that would affect your memory or ability to

participate in a deposition, which is a

question-and-answer-style session?

        A    No.

        Q    Okay.  And do you have any relatives in

the state of Georgia?

        A    Immediate family.

        Q    Okay.  So wife, kids?

        A    Wife, two children.
        Q    And then everybody else is out of state?
        A    Out of state.
        Q    Are the children adults?
        A    One is 21.  The other one is 17.
        Q    And where do they live?
        A    At home with us.
        Q    Okay.  In Valdosta?
        A    Correct.
        Q    And what are their names?
        A    Crystal is our daughter.  Crystal
Carvajal, 21, and our son, 17, is Brandon.
        Q    Okay.  And what is your wife's name?
        A    Cheryl, C-h-e-r-y-l.
        Q    Okay.  And she lives with you --
        A    Correct.
        Q    -- at home?  Okay.

No cousins or anything like that?  What about inlaws?

A  No one in the state of Georgia.

**Q  Okay.  All right.**

**Okay.  I'm handing you what I've marked as Plaintiff's Exhibit 52.**

(Marked for identification is Plaintiff's Exhibit 52)

BY MS. MAESTAS:

Q  This is a copy of the subpoena duces tecum, which was supposed to have been given to you. Have you received a copy of it?

MR. CARTER:  It's on the back of that, or was, the one I gave you this morning.

THE WITNESS:  Oh.

A  Well, if I did, I got it this morning.

BY MS. MAESTAS:

Q  Okay.  So the first time you received the document was this morning?

A  Correct.  And I -- honestly, I didn't flip through it but just for half a second.

Q  Okay.

A  So this is the first time I've seen this.

Q  So this is a -- a federal subpoena to bring documents with you.  And if you could just

read -- so the list of documents is right here.  If you could just --

    A   In --

    **Q**   **I'm sorry.**

    A   Production?

    MR. CARTER:  Yeah.

    MS. MAESTAS:  Sorry.

    THE WITNESS:  Okay.

BY MS. MAESTAS:

    Q   Okay.  And did you bring any of those --
    A   I didn't.
    Q   -- documents with you today?
    A   I'm sorry.  I had not looked at it in advance; so, no.
    Q   Okay.  But now you have a copy of it --
    A   Yes.
    Q   -- and then you can provide those documents --
    A   Yes.
    Q   -- to me through your counsel?  Thank you.
    THE COURT REPORTER:  I'm sorry.  I can't take two people talking at the same time --
    THE WITNESS:  Sorry.
    THE COURT REPORTER:  -- and there's been some cross-talk.  So I just wanted to caution

y'all for the record.

MS. MAESTAS:  No problem.

BY MS. MAESTAS:

Q    You have Lisa Snipes in your office?

A    Correct.

(Marked for identification is Plaintiff's

Exhibit 53)

BY MS. MAESTAS:

Q    Okay.  This is a -- I'm handing you what I've marked as Plaintiff's Exhibit 53.  This is a signature of a receipt for certified mail, and then this is a spoliation of evidence and discovery preservation warning letter, which was received by your office on November 23rd, 2020, which is basically telling you to preserve any evidence which could be related to this lawsuit and that there would be certain ram- -- ramifications under civil federal law and state law if you did not do so.  And so I'm just marking this for the record.
Do you recall receiving this letter?
A    I -- I do not recall, but -- but I would not have taken --
Q    I'm going to hand it to you.
A    That's fine.
But I -- I know with a ongoing legal case

not to destroy --

Q    Okay.

A    -- documents.  So I wouldn't have done that anyway; so ...

Q    Okay.  Thank you.

Okay.  Under federal subpoena law I'm required to tender you $40.  I am going to hand that to you right now.

MR. CARTER:  We'll waive that.

THE WITNESS:  We'll waive that.

MS. MAESTAS:  Are you --

MR. CARTER:  He's a board employee.  I mean, he was required to be here anyway.  So --

MS. MAESTAS:  Okay.

A    I'm -- I'm here during the course of my service to the State.  So I'm --

BY MS. MAESTAS:

Q    I appreciate --

A    I work --

Q    -- that.

A    I work -- I mean, so I -- I can't take that 'cause I'm already being paid for this time.

Q    Okay.  So you're waiving the $40?

A    Correct.

Q    Okay.  I'm going to void this check.

All right.  Can you state your current title of your employment?

A    President, Valdosta State University.

Q    Do you have any other current positions of employment?

A    I do not.

Q    Okay.  What about any other involvement in any committees, clubs, volunteer groups, church, political organizations, bowling club, a bar that you go hopping with frie- -- you know, stuff like that, that I can know -- you know, you don't go directly home, you do this?

A    I'm the current cochair of the One Valdosta-Lowndes community revisioning effort. That's the only outside board or group that I'm -- like that, that I'm currently involved in. Socially, I'm a member at (indiscernible).

Q    Okay.

THE COURT REPORTER:  I'm sorry.  At?

THE WITNESS:  Stone Creek Golf Club.

BY MS. MAESTAS:

Q    Okay.  And are there -- on the community revitalization board or -- I can't remember, on that, are there any VSU employees on that board?

A    No.

Q    Okay.  What about USG employees?

A    I am the current chair of the mental-health consortium for the University System, which is a member group made up of students and administrative staff from across the system.  I'm the only VSU employee on that group.

Q    And it's for mental health?

A    Yeah.  We make recommendations to the system regarding how best to serve our students, faculty, and staff in issues related to mental health.

Q    Okay.  And you said you were the only VSU --

A    Correct.

Q    -- employee on that?  Okay.
Are there any -- what about TCSG employees?  Do you serve on any regular institutions or organizations with TCSG folks?

A    Not currently.

Q    Okay.  And in the past?

A    When I was at Bainbridge, I was -- I regularly attended president's meetings of the Technical College System of Georgia.  Since leaving Bainbridge, I was cochair of a mental-health task force for the University System of Georgia, which

predated the current mental-health consortium, and a member of the Technical College System of Georgia senior staff.  Their director of legal affairs was a -- a sometimes attendee of that group.

Q   Okay.  And what -- do you remember that person's name?

A   I apologize, not offhand.

Q   And they were out of Bainbridge?

A   No.  She worked in the system office in Atlanta.

Q   Okay.  And she was just on that while -- during the time that you were in Bainbridge?

A   Correct.

Q   Okay.

A   No, no.  During my time here.

Q   Okay.  But you're not on that anymore?

A   No.  It was --

Q   Okay.

A   It was the precursor -- the University System set up the mental-health task force that I cochaired, and it was the precursor to the now existing mental-health consortium that I chair.

Q   Okay.

A   Both groups with a similar mission of trying to look at how best to service the

mental-health needs of our students, faculty, and staff.

Q    Okay.  And are any TCSG people on the one that -- the later-date one, the consortium?

A    No.

Q    Okay.  It's just USG folks?

A    Correct, correct.  I was trying to remember if there were any state -- other state agency officials, but, no.  There were on the task force, but not on the consortium.  Every member of the consortium is either an employee of the University System or a student.

Q    Okay.  And what is your degree in, your highest degree?

A    My highest degree is a Ph.D. in higher education administration from the University of South Carolina.

Q    Okay.  What was your dissertation in?

A    I did a qualitative multiple case study assessment of what was called "Students of Surprise," a term we came up with, which were students that made unusual levels of growth and social competency during their college years and trying to figure out what factors had influenced that level of growth so we could more often

facilitate social development in other students.

Q    That's interesting.  Is that -- was that kind of what led to your mental health -- I guess you like to dabble in that area, it seems?

A    I can only guess why the chancellor asked me to serve, but I believe it was because I have a background in student affairs administration, and counseling often reports up through student affairs.

Q    Mm-hmm.  Okay.
Are you working on any publications right now?
A    Not currently.
Q    Okay.  I want to talk about your social-network group, especially currently and in the local area.  As far as family -- I know you probably hang out with your family but -- your family and your friends.  What do you -- like, is there anybody that you regularly go out to eat with, have over to your home, you go over to their home?
A    No, other than my family.
Q    Just your immediate family?
A    Right.
Q    Okay.  Not Dr. Carr and his family?
A    Not regularly, no.
Q    Okay.

A    I mean, I'm having dinner with somebody tonight.  It's the first time that my wife and I are going out with someone.  It's the first time we've been with them.  We know them from a work reason.

Q    Okay.

A    Most of my interactions tend to be either with family or folks I know through work.

Q    Okay.  What about TCSG people that you network with socially, personally, or acquaintance?

A    Socially, I would say none.  I -- I interact on a periodic basis with the president of the local technical college, Wiregrass Technical College.  Tina Anderson was their president when I got here.  I knew her from my days of attending TCSG president's meetings in Bainbridge, and we didn't interact socially.  We never went to dinner together, et cetera, but we would interact for business reasons.

DeAnnia Clements is the new president, and -- and I've certainly made attempts to help integrate her into the community by inviting her to multiple activities here at VSU, football tailgates, et cetera.

Q    Tina Anderson or --

A    DeAnnia Clements, the current president.

Q    Okay.  Did you do that with Tina Anderson?

A    I invited her to one game during her time as president.

Q    Okay.  And your wife, Cheryl, she works there --

A    That is correct.

Q    -- at Wiregrass?

A    That's correct.  She is a faculty member at Wiregrass.

Q    What does she teach?

A    She teaches humanities, speech, and English.

Q    Okay.  And is she really good friends with anybody at Wiregrass?

A    I think her -- she doesn't do things really away from work with anyone there at work. She is, I think, friend -- I would say she's friends with -- and I apologize.  I don't even remember her name, but the person who works as kind of the assistant in their faculty suite of offices.

Q    Okay.  What about Tina Anderson?

A    Were they friends?

Q    Yeah.

A    No.

Q    Okay.  Did they talk a lot?

A    Tina would stop by her office periodically, I think, just as part of making rounds as president.  She did that, I think, regularly with a lot of faculty.  Cheryl's a really good editor, my wife.  And she -- Tina would periodically say, Hey, would you look at this for me, et cetera, and -- just because she wanted a set of editing eyes on it but, again, very much work centered, not -- not social.

Q    Okay.  And is Tina Anderson, is she still working at Wire- --

A    She's retired now.  She's retired.

Q    Okay.

A    And does not live in the community. She -- she and her husband, after her retirement -- he was already retired -- they moved to North Georgia.

Q    Okay.  Thank you.

Do you still talk with anybody out of Bainbridge?

A    Yeah.  The -- Dean Whaley was our director of security.  He and I, probably once every month or two, would meet in the middle and play golf together.  He retired while we were there.  Beyond that, if I see others, it's very occasionally at --

at USG meetings that are currently still in

Bainbridge.  There's Shawn McGee, who was my vice

president for finance there, then followed me as

interim president when I went to Albany and then

followed me to Albany to be our vice president

there.  He and I are friends, and -- and we talk

over the phone probably every couple, three weeks.

Q    Okay.  What -- what was his name again?

A    Shawn McGee.

Q    Okay.

Okay.  Does your wife's position at Wiregrass -- does it have any influence over your presidency at VSU?

A    I'm not sure I understand the question.

Q    Does -- I mean, does anything that she ever say or communicate about Wiregrass affect how you run anything, make any decisions at VSU?

A    No.

Q    Okay.  And what about Tina, your friendship -- or acquaintanceship with Tina Anderson?  Does that ever -- does that ever sway any of your decisions or how you did anything at VSU?

A    She would -- she would call periodically and ask for -- for example, she wanted us to think about accepting their Spanish class.  There's a set

number of courses that, within the University System, we automatically take from TCSG institutions in transfer.  She wanted to expand that list.

And so -- we didn't end up doing it, but that ended up -- you know, I ended up having a conversation with our provost and others to say, Hey, you know, is this something we ever want to consider?  Those kind of things.

She and I would talk about weather, honestly, if one of us was considering a weather closure.  You know, we usually -- we would always at least text back and forth so that we weren't surprised if one was going to close and that went out to the media because inevitably then the other would start getting a bunch of phone calls.  That's about all I can think of honestly.

Q    Okay.  And you were talking about the Spanish class and the transfer credit?

A    Right.

Q    You're talking about students that were transferring from Wiregrass into VSU --

A    Correct.

Q    -- as upperclassmen?

A    No, no.  Students -- they don't have an associate of -- associate of arts -- an associate of

science degree; so -- at Wiregrass.  So they --

their students -- often if they're coming to

Valdosta with some kind of credits from Wiregrass,

they're coming with something less than 60 hours

completed.

   **Q     Okay.  But it's not a freshman?**

   A    Oh, it could be.

   **Q     It could be a freshman?**

   A    Sure.

   Q    Okay.  But they're not -- they've --
they've taken some courses, college courses --

   A    Correct.

   Q    -- and then those would be transferred to
VSU, and that's what she was calling about?

   A    Correct.

   Q    Okay.  And are you talking -- is that what
she was wanting, was to add that to an articulation
agreement?

   A    It's not so much that it would have had to
be on the articulation agreement, but she wanted
Valdosta State to -- in our practice, to begin
accepting credits from -- the Spanish credits
from -- from Wiregrass, which currently those
decisions are made at the academic department level.
And that department has not chosen to accept

their -- their credits.

Q    Okay.  And was there a reason given why they wouldn't accept them?

A    Not to me.

Q    Okay.  So did they give it to anybody else?

A    I mean, normally when we're -- I can only speak to what happens normally.  Normally we're looking at what are the learning outcomes of the course, how is the syllabus set up, does it match, in learning outcomes and in rigor, the course that we offer at -- at Valdosta State.
          So, again, there's a set number of courses that are automatically, by USG agreement, across the system, University System automatically accepts those courses.  Anything beyond that, it's up to the institution level to decide whether or not they wish to -- to do so.  And -- and those are usually -- that's a high -- a fairly high bar for institutions to get to before they start adding to that number of set courses.

Q    Okay.  And the number of set courses, is that -- are you referring to the articulation agreements?

A    No.  That is -- that is by policy at the

University System level.

Q    Okay.  It's not called an articulation agreement?

A    Correct.

Q    Okay.  So on the website, there's links to, like, a hundred, somewhere around that many, articulation agreements.  You click on it, and it's -- you can go to the Wiregrass website.  And there's maybe 30 of them.  And then you can go to VSU, and they've got several that you can click on.  And then you can go to USG and click on them.

Are you familiar with what I'm describing?

A    I am.

Q    Okay.  And I think on the Wiregrass website there's a photo of you and Tina Anderson sitting at a desk, and it must be a recent photo because you're representing VSU so -- and Tina Anderson.  And I believe that photo is your signing the articulation agreements.

Does that -- am I -- do you know which photo I'm talking about?

A    Well, it could be one of two.  We actually signed -- she and I -- there were quite a few done before I came to Valdosta State between the two institutions, and Valdosta State has similar

articulation agreements with technical colleges all throughout Georgia.

In my time as president, I've signed two with Wiregrass that I recall.  I know there were two signings.  One was here, at Valdosta State's campus; and one was actually at their -- their campus, Wiregrass' campus.  And those were two that we added to those -- the list that already existed.

Q    Okay.  And do you recall what courses were added under your presidency?

A    It's not so much by courses.  It's done by academic program.  And so it's -- for example, the one that we signed at her -- at Wiregrass was -- they had -- they have an associate of applied science degree in, I believe, early childhood education, if I recall, that's how it's phrased. And it -- we signed an articulation agreement that created a pathway for those students who finished that associate's degree to be able to transfer to Valdosta State in an elementary education program here.

Q    Okay. Were there any that she -- besides Spanish, that she asked for transfer credit and it was not given?

A    That's the only course she ever asked for.

Q    Okay.

A    Yeah.

Q    Okay.  Who asked for the ones that got -- ended up being signed on the articulation agreement that the photograph was taken?

A    Those are usually initiated at the academic department level between conversations of -- of faculty or department heads; and ultimately, it rises up through our academic affairs team, our provost, et cetera.

Q    Okay.  All right.

A    They tell me, Hey, we're ready to sign one.  Are you supportive?  And I say yes or no.

Q    Okay.

All right.  Prior to coming to VSU, you were the president of Bainbridge College?

A    Correct.

Q    Okay.  And in -- at Bainbridge College did you have experience in admissions and dual enrollment?

A    Define experience.

Q    That's a good question.  Did you work closely with admissions in dual enrollment at Bainbridge College?

A    I probably -- I guess I would say I worked

as closely with them as -- as I did any functional

area.  I mean, it's -- they don't report direct- --

they didn't report directly to me --

    Q    Uh-huh.

    A    -- but because they obviously had

implications on -- on the overall enrollment of the

institution, I wanted regular reports on how we were

doing.  I certainly knew who -- who staffed those

areas and what our strategic approach was.

    Q    Okay.  And I wanted to ask -- I think we
pretty much exhausted the talk about Wiregrass, Tina
Anderson, and the transfer credit; but I just wanted
to make sure.  Did you ever talk to her about
transfer credits for dual enrollment, like, anything
related to the dual enrollment program at Wiregrass
and how that would affect VSU's dual enrollment or
how you would deal with Wiregrass' dual enrollment?

    A    The only conversation that I recall having
about dual enrollment -- no, that's not true.  So I
had -- there were two.  One was we had a
conversation when a letter was sent from this
institution to school counselors about the dual
enrollment program and that she had received phone
calls from multiple counselors who were concerned
about that letter.

And the other time was we had a -- a conversation regarding was Valdosta State going to expand what we were doing in dual enrollment and what role would -- would we take.  Did we want -- did we truly want to be competitors, or could we carve out, each, a niche in the dual enrollment world?

Q    Okay.  So two conversations?

A    Those are the two that I recall.
Q    Okay.  And -- and these were phone calls?
A    One was a phone call -- the first one was a phone call.  The second one, we had an in-person meeting, myself and a few members from our team and her and a few members from her team at Wiregrass.
Q    When was that?
A    I -- I don't know exactly.
Q    Okay.  Was it, like, when you first started or, like, kind of in the middle?
A    We -- probably in my first year or two.
Q    Okay.  And then the first conversation you referred to, you're talking about Jamie Bird's email?
A    Yes.
Q    Okay.  And I want to talk about that one later, but I did not know about the in-person

meeting.  So I wanted to get more details on that.

A    Okay.

Q    So you said that was about two years, you know, plus or minus when you first started as president at VSU.  And where did you say the meeting occurred?

A    It occurred in a conference room outside of the executive suite at Wiregrass.

Q    Okay.  And who was there for that meeting?
A    I'm -- I'm fairly certain Dr. Carr was there.  I honestly don't recall who else from our team went.  And -- and I don't know that I knew the people from Tina's team that were with her, but there were at least a couple.
Q    Okay.  So you and Dr. Carr?
A    Yeah.  I'm -- I'm almost positive he was there.
Q    Okay.  Did you guys bring -- did you and Dr. Carr bring anyone else with you?
A    I believe we did, but I really don't remember.
Q    Okay.  Did you bring Jamie Bird?
A    I don't recall.
Q    Okay.  And tell me -- so Tina Anderson called the meeting?

A   We called the meeting.  We requested the

meeting.

Q   Okay.  VSU requested the meeting?

A   Correct.

Q   And was that you that requested it or --

A   Yes.

Q   Okay.  And so can you tell me how you

requested it and what you said?

A   Well, I mean, I probably just --
Q   And let me --
    (Simultaneous cross-talk.)
A   -- text.  She and I -- again, she and I
text semiregularly; but I -- I probably did it on
text and just said, Hey, can we get together and
talk about, you know, and told her what the topic
was.
BY MS. MAESTAS:
Q   Okay.  Do you still have that text?
A   No.
Q   Okay.  And when you said, "the topic was,"
what -- how did -- what did you say the topic was?
And I don't mean --
A   I --
Q   -- verbatim.
A   I don't recall.  I mean, I would have said

that I wanted to talk about dual enrollment.

Q     Okay.  And I think the first time you told me about this meeting today you said that you were going to carve out your niches in dual enrollment?

A     That's what I was suggesting.

Q     Okay.  And so at the meeting, what was -- what was said about that?

A     So we had been having some conversation at -- I had been involved in some conversation where we had talked about did we want to expand dual enrollment.  It was a pretty small program here.  Our enrollment was pretty -- pretty small, pretty low.

Q     And you're talking about at VSU?

A     At VSU.

Q     Okay.

A     And I thought there might be opportunities to grow that.  We knew that other institutions, mainly Wiregrass and Georgia Military College, had fairly large dual enrollment populations; and, you know, that was not something that VSU had seemed to go after aggressively.  And so I was thinking -- I felt like we should explore that, was there an opportunity to do that.

More we talked about it and thought about

it, I think we uncov- -- we realized there were challenges with how would we staff the courses, the classes that -- if we were going to do them kind of all over our geographic footprint area, how would we find enough faculty to be able to -- to staff those classes broadly.  And we could -- we could do it, but it was going to be a real challenge.  And that's --

Q    And when you say "we," you're talking about --

A    VSU.

Q    -- VSU?

A    VSU.

Q    Okay.  So you're not saying this to Tina like we --

A    This was all --

Q    -- Tina --

A    This was all in advance of the meeting. We --

Q    Okay.  Okay.

A    We had been having --

Q    So you're --

A    -- strategic --

Q    -- not --

A    -- conversations --

Q    All right.

A    -- about --

MR. CARTER:  Y'all are -- y'all are talking over each other.

MS. MAESTAS:  Okay.

MR. CARTER:  Let him finish.

A    We were having strategic conversations about what is dual enrollment.  One of the things -- we were looking at all sorts of things that we needed to -- that we thought we could look at as potentially ways to grow enrollment.  Dual enrollment was potentially viewed as one of them and --

BY MS. MAESTAS:

Q    And I -- I just wanted to -- when you say "We, in advance of the meeting, were talking about that," who is the "we"?

A    I would have done that -- I mean, it would have been members of the cabinet, of the president's cabinet here.

Q    Okay.

A    And so a strategy surfaced that, and it was my idea, of -- Wiregrass was sending faculty to all -- a bunch of high schools, a whole bunch of high schools to do courses.  They were also having

students come to their campus -- you know, it was

kind of move on to college when ready, the old

moniker, Move on when ready.  They had students

coming there and attending mostly full-time at

Wiregrass while they were still in high school.

And essentially what I pitched to Tina was

that we would have a cooperative arrangement.  We

would do cooperative marketing around dual

enrollment; and rather than being competitors, we would go out and market the opportunities together and that her focus, Wiregrass' focus, would be classes that were offered at the high schools.  And for those students who were looking for an on-campus experience, we would steer them to Valdosta State.

That would -- that would keep Valdosta State out of the high schools, which I knew she probably didn't want us to be a competitor in the high schools, and it would allow us to try to maximize what we could get on campus, which would keep us from sending faculty all over -- you know, all -- all over the place to different high schools but they would just take our courses here.

Q   Okay.  And what became of that pitch, and did you make that pitch in the meeting?

A   Made that --

Q    Okay.

A    -- pitch in the meeting.  Her team -- other members, I remember, of the team really liked it and were excited about it.  She was hesitant, and honestly nothing came of it.

Q    Okay.

A    There was -- there was no, ever, agreement to -- to do that together that I recall.  We moved forward still with trying to build a cohort model and to get as many students as we could to come here and take their courses at the campus.  We had some teaching that was done in high schools, particularly fairly close; but, yeah, we really never came to a full agreement as I had maybe hoped and really went out and marketed that together that I recall.

Q    Okay.  Why was Tina hesitant?

A    She had a lot of enrollment in dual enrollment.  It was a large percentage, at the time, of their institutional enrollment; and I think she was worried about any change that would cut that enrollment.

Q    Okay.  So she had a lot of both, high school dual enrollment students that were coming to Wiregrass and Wiregrass professors going to high schools to teach dual enrollment?

A     That's correct.

**Q     Okay.  And you said the "cohort model" --**

**that VSU moved forward under the "cohort model."**

**What -- what does that mean?**

A     We were trying to get students here and

get them connected with each other as best as we

could in the sense of how could we start having them

form friends, friendship bonds with others who were

dual enrollment students so that they weren't here
in isolation.

Q     Okay.
      Okay.  And so you moved forward with this
model, and then do you continue on -- so this is,
like, toward the beginning of your time at VSU?

A     Correct.

Q     Did you continue on trying to push this
idea forward?  Did you delegate it?  Did you
follow-up?

A     We actually moved off of it.  I think
there started to be some language at the state
level, in conversations we were hearing, that there
may be -- frankly, that there was concern about how
much dual enrollment was costing the state and that
there wasn't enough funding to continue to -- to
push it as much as they had been.

And so I think, honestly, I was worried about trying to put too many eggs in that basket and trying to grow something that the state funding mechanism may -- may change on it.  And so we -- I wanted to wait and see what that -- what that looked like.  And ultimately they did make changes to the dual enrollment --

Q    And you're talking about that --

A    -- law.

Q    -- House bill?

A    Uh-huh.

Q    Okay.  About what year did you have to really --

A    When the -- when were the changes made?

Q    Like, when did you start worrying about putting too many eggs in that basket?

A    Probably wasn't very long after -- I mean, within a year of that meeting --

Q    Okay.

A    -- we had started hearing language that there could be -- that there was anxiety about the cost of the program at the state level.

Q    And when you said, "We moved off of it," who is "we"?

A    I just kept -- I quit.  It's not -- I

wasn't asking about it.  I wasn't pushing it.  It wasn't something that, you know, we were making -- I was making a priority.

Q     Okay.  I just wanted to make sure you weren't, like, sitting with someone else and --

A     No.

Q     -- when you said "we."

A     No.

Q     All right.  How did you become the president of VSU?

A     Well, there's probably a book in that.  I guess the simple answer is I applied, interviewed, and was selected.

Q     Okay.  And did somebody say, Hey, Dr. Carvajal, you should apply?

A     Yes, but not anybody from the University System office.  It was a -- a consultant who does fundraising consulting who knew the landscape in -- you know, in Georgia and then in the southeast, and he encouraged me to take a look at it.

Q     Okay.  Do you know that person's name?

A     Jerry Smith.

Q     Okay.  And does he do anything with USG?

A     No.

Q     Okay.  He's -- and he does stuff for

fundraising, like what type --

    A    He helps institutions run campaigns,

fundraising campaigns; and he had worked with

Valdosta State.  I knew him because he had been --

we had hired him and his firm to help us do a

capital campaign at Bainbridge State College, and he

was also working on the campaign for Valdosta State.

I can't remember if it was at the same time; but if

it wasn't, it was shortly thereafter.

          And when -- when this job became open, he
reached out and said, "Hey, I think" -- the first
time was he gave me a phone call and -- and he said,
"I've already told them that -- who their next
president should be."  And he -- you know, he was
talking about the people that he was working with
here in the campaign, and -- and he was encouraging
me to -- he encouraged me to take a look at it.

    Q    Okay.  So --

    A    He had no role in the decision obviously.
He was just --

    Q    Right.

    A    He was just encouraging me to take a look
at it.

    Q    And who was he -- do you know who he was
working with on his campaign?

A    The fundraising -- the advancement team here, the institutional -- university advancement.

**Q    And who is on that?**

A    John Crawford is the vice president. Hilary Gibbs, who's no longer at the institution, is the associate VP, I think, in her role; and then a full staff of 20-plus individuals.  And at the time -- the president at the start of the campaign was Bill (indiscernible).  So he worked with Bill as well.

Q    Okay.

THE COURT REPORTER:  I'm sorry.  Bill?

THE WITNESS:  Bill McKinney.

BY MS. MAESTAS:

Q    All right.  So you applied, and then you ended up getting the position.  And did you tell anybody else that you worked with that you should -- they should come and work with you at VSU?

A    No.

Q    Okay.  So how did Dr. Carr, who worked under you, end up coming over to VSU?

A    So he worked for me at Bainbridge State. I hired him -- I started in January of 2011, and I think he started -- we hired him maybe in August or September of 2011, hired him as our vice president

of student affairs there.  Did not know him prior to the search, but hired him there.  He was a member of the team.

Probably three or four years into that time, he had -- we had had our vice president for academic affairs leave the institution, take another position somewhere else.  The institution was really hurting financially.

Q     Are you talking about Bainbridge College?
A     This was at Bainbridge.
Q     Okay.
A     And I think by that point we were Bainbridge State College; but, yes.
Q     Okay.
A     And -- and the chair of the (indiscernible) came into my --
THE COURT REPORTER:  I'm sorry.  The chair of?
THE WITNESS:  The chair of the faculty senate --
A     -- came into my office and recommended that I consider asking Rodney there to do both jobs, the VP of student affairs and academic affairs.  And so it took a while, but ultimately we did that.  So when I left the institution, he was in that -- that

dual role of leading both units.

I left and went to vest -- to take a leave from that job by the University System to go to Albany, Georgia, to be the interim president for Darton State College, who had just been announced to be consolidated with Albany State University to create a new institution together.

And I was there for just over a year doing that task.  The plan was for me to go back to Bainbridge, actually.  That's what I thought; but ultimately while I was in Albany, they decided -- the system decided to consolidate Bainbridge State College with ABAC.  That's what got me to apply to Valdosta State, because I needed a job.  And so I applied and -- and got it.

And so it had been a little while obviously, then, at that point, since Rodney and I had worked together.  In the new consolidated institution, quite frankly, I thought he would probably be their vice president for academic affairs; but I was not involved in that consolidation work.  That's just what I thought would happen.

And meanwhile, here, we -- I'd started in January 11.  I, even before I started, had been

trying to collect from the folks here what were the major priorities, what did we -- what did I need to focus on if I came, and then after I had come, what did I need to focus on.

One of the biggest priorities that was listed was that we needed to work on retention. We were woefully behind peer and like institutions in our ability to retain students.

BY MS. MAESTAS:

Q     Are you talking about VSU?

A     VSU.

And as I really tried to assess that and think about what were we doing on that front, what became very clear to me was that while everyone was saying it was our biggest priority, we actually had nobody whose job it was, was to focus on retention. We had a committee here that was cochaired by two faculty members, excellent faculty members, very caring people; but that's not what they were paid to do. And they were trying their best, with it not being their primary job, to help lead the institution in that endeavor. And so --

Q     Who --

A     -- it became --

Q     Who were they?

A    I apologize.  I don't remember their names right off the top of my head.  I can see their faces.

Q    Okay.

A    One of them is not here any longer.  I'm -- actually, I'm not sure either of them are still here.  I can wait.

So I started working on the idea of creating a unit that would be focused on all things retention and student success, what we call strategic enrollment management; and I had a chief of staff role.  That person was going to be retiring and leaving the institution.  It was a high salary.  And so I could -- without cost to the institution, we could create a new unit and a vice presidency for student success to provide leadership to that area.

The provost, we had a -- an interim provost when I got here.  We were in the middle of trying -- we were getting ready to start searching for that position permanently; and the interim had given me some guidance that the provost area was too large and that there were probably -- for anyone to be successful permanently in the job, we needed to take some things out of the current academic affairs group.

So I had that group of things.  I had some others that, again, across the institution were all, I thought, related to recruitment and retention of students; and so I pitched the idea to the cabinet and others of creating a student success unit, again, with the funding from the chief of staff position that was being vacated.  And -- and we did.

There was -- I felt there was tremendous buy-in to do that, and people recognized that we needed someone going to bed at night and waking up every morning thinking about retention in order to get better at it.

And so we opened up a national search at the same time we opened up the search for our provost.  And the -- there were -- I mean, it was -- we had multiple candidates obviously.  I had a screening committee like we do for all of our positions here.  He calls me, Rodney does, one day and says, "Hey, I see you got a job."

And I said, "Well, I do; but I thought you were going to be the academic affairs VP."

And he then tells me that he feels a connection to Valdosta State and would enjoy working for me again and thinks he's going to go after it.  And I said, "Well, there's a process, and there's a

committee.  By all means apply and, you know, if --

you got to get through the process, but I wish you

luck."

And it's -- that was -- so he applied.  He

went through -- we use a process here, which is the

same one we still use.  I started it when I got

here, I think; however, we -- we've shifted it a

little, I think, from how it had been done.

So there's a committee.  As part of what happens here, folks interview with the committee. They interview with people they'll be working with. We do an open forum where the campus -- anyone who wants to can attend and has an opportunity to give feedback on the finalists.

He was named one of the finalists by the committee and brought in for an interview.  The feedback -- institutional effectiveness works up the feedback responses that the campus gives.  It was clear he was the campus' number one pick.  He was the -- we asked the committee to come back with unranked finalists' strengths and weaknesses, but you can often read into that who they think is the --

Q     Right.

A     -- the better picks.

Q    Right.

A    It was very clear he was their top pick, and ultimately I offered him the position.

Q    Okay.  Was it your decision?

A    Yes.

Q    Okay.

A    I was -- I was the ultimate hiring authority.

Q    Okay.  And so Rodney comes in how many years after you've been -- well, it's within --
A    He started on --
Q    -- the same year?
A    His started on -- I think it was July 2nd.  I had been here six months.  He and the provost literally started the same day.
Q    Okay.  And then eventually -- well, I guess you said about two years later that's when you made that pitch to Tina Anderson, which was --
A    It was within the first two years, again.
Q    Okay.  And so as a part of Dr. Carr's -- his job was to look at retention?
A    And recruitment.
Q    And --
A    Everything related to our enrollment.  So the unit that got created was everything from

admissions and how we bring students in, including marketing, and -- and then once they're here, what are all of the mostly out-of-class array of services that we use to try to help somebody be retained and ultimately to get to graduation.  So that's tutoring, academic advising, disability support services, et cetera.

Q    Okay.  And you -- earlier today, you had said you noticed that your -- you wanted to have your dual enrollment numbers go up at VSU?

A    Yeah.  I'm kind -- the more I'm sitting here, I think that meeting was probably closer to the one-year mark of me being here because it was pretty quickly.  It was one of the things that I -- I had realized those numbers were --

Q    Okay.

A    -- I felt, low for --

Q    Yeah.

A    -- an institution by comparison to other institutions.

Q    Okay.  I see what you're saying.

And so did you -- you said you brought Dr. Carr with you to the meeting at Wiregrass.  Did you talk with him about that idea before going over there?

A    Oh, yeah.

Q    Okay.

Okay.  And was he in agreement with your idea?

A    Yes.

Q    Okay.  Why was Jamie Bird terminated?

A    Jamie was not terminated.  She was part of a reduction in force done, which is not -- not the same thing.

Q    Okay.  So what were all the factors that were considered in Jamie's reduction in force?

A    So this was obviously during the pandemic. The pandemic had -- had hit in late spring.  We all had ten days to completely flip what we did to online, and -- and then we had the statewide shutdown of businesses and the like, where everyone was encouraged to stay home.

Because folks were being asked to stay home, that means they're -- they're obviously not out buying things and spending money and, therefore, paying sales tax.  That's how the State collects a lot of its revenue.  And so the State was very worried, as it was explained to me by the folks we were talking with in university -- in the University System central office.  They were very worried that

revenue collections for the State would go down

dramatically and the State would have a huge

budgetary shortfall.

And so we were first asked to -- this

would have been somewhere around April, May,

probably May --

Q    2020?

A    -- of 2020.  We were first asked, again,

probably end of April beginning of May, to --
normally we have a collection of funds that are
unused during the course of the year; and we
allocate them out here for one-time expenses.  And
there's a collaborative process we use where the
campus gets to help us decide how to spend those
dollars.

We were asked wherever we could, rather
than -- and normally we -- I'll say we spend that
down close to zero.  We don't send money back to the
State.  We're trying to spend all of the funds that
are allocated to us.

In this unique situation, we were asked,
first, to send as much back as we could because the
State was trying to brace for this significant drop
in anticipated collections, tax collections; and we
did.  We sent, I don't remember exactly, but it was,

I mean, in the millions that we sent back.  And institutions across the University System and state agencies across Georgia did the same thing.

But right thereafter or about that same time, we were also -- well, no, it was by that time. We were also asked to start working on a --

scenarios for significant cuts in the next fiscal year that would start July 1st.  And we were asked to prepare -- I remem- -- I don't remember the exact percentages, but I -- we were asked to prepare multiple scenarios at different levels.

We were, locally, at VSU within my leadership team, we were just as worried about -- well, we were worried about a loss in state allocation that might come from a cut from the State.  We were also worried 'cause here we are in this time of huge upheaval.  We didn't know what that would do to enrollment, and we thought there might be a very significant drop in the -- our student head count starting in as early as summer and certainly into fall.

There was a lot of talk in the higher-ed industry, for example, that, you know, moms weren't going to want sons and daughters to go off to college.  They were going to keep them at home.  And

we're an institution that a lot of our students come from other places to come to us.  So that's one of multiple factors that had us really worried about, again, what our -- our numbers would look like come fall, enrollment numbers.

And so we prepared fairly aggressive cut scenarios, reductions of -- I mean, I remember at one time we were talking about what would happen if we had to reduce 20 percent of our operating funds.  It was -- these were big numbers that we were throwing out.  About 82 percent of our total funding here at the university goes to personnel.

So obviously when you start getting to significant cuts, you -- you can't do that without also looking at personnel.  We always talk -- I always talk about a scenario, "We're going to do everything but," i.e., what are the cuts that we can make to our travel, our -- you know, our supply budgets, our -- those other operating budgets that we have?  How much can we trim there because we want to do everything but eliminating personnel.

And even once we get to personnel lines, we talked about, first, well, do we have open lines, i.e., unfilled positions that we can eliminate those positions or hold them back or not hire them because

the last thing we want to do is to have a reduction in force of existing hired employees.

And so we were trying to communicate with the campus, particularly the heads of our governance groups, all through that process, Here's what we're hearing.  Here's the challenges.  We're going to do everything we can to avoid reductions, but understand it will depend on how big the cuts ultimately are.

So ultimately we received a -- a request to reduce our budget and if I recall, it was -- I believe it was around 6 percent from the State and we felt that we needed to plan for another 6 percent reduction.  And that's just -- I'm just going off memory on those numbers, but I think that was it.  I think it was 6 and 6, in percentages, that we needed to reduce, half of it being allocation and half of it being in anticipated tuition loss.

And so we -- we froze our travel budgets. I think everyone knows we weren't -- we felt like we wouldn't be traveling a lot anyway because of the pandemic.  People were very willing to allow us to reduce their travel budgets in that time of crisis, which is what we were in.

People were allowing -- were very willing

to allows us -- in fact, they made recommendations

out of the various units for where we could trim

other operating budgets.  And we had a significant

number of open positions that unit managers came

back to us and recommended that we not fill those

positions.

          These -- these weren't positions that

there wasn't work for them to do or there wasn't a

need, but they were -- everyone was trying to do
everything we could to get to the cut level to limit
the number of folks that we would have to actually
reduce who were current employees.  But ultimately
we got as far as we could get, and we had to then
move to a group that were active employees to
reduce.
          We -- and so ultimately, that was --
that -- and it wasn't a large number.  I don't
remember the exact number 'cause it changed several
times as we were trying to sort out the final budget
numbers, but there was a small group of people that
we had to reduce in order to -- to make our budget
whole, make it match.
          I honestly thought, and I -- I know most
on our leadership team thought, when we started that
work, that the number that we would have to reduce

would be way larger than it ended up being. We were -- I credit the work of a lot of people who worked really hard and came up with very creative ideas and were very open in trying to help us come up with solutions that got the number down to what it got down to.

**Q     Okay. So when you said "we" that whole time, who was "we"?**

A     I was working almost every day on this topic with members of the president's cabinet.

Q     And who --

A     And I was also talking with -- I had regular meetings with the heads of our faculty -- the officers of our faculty senate and our staff counsel.

Q     What about heads of departments, like, division heads?

A     So our unit -- our members of the cabinet were regularly meeting with their -- their leadership teams, which is the department heads at -- you know, at each level. So, for example, the provost, that's the dean's counsel. In -- in our administrative areas, it's often their directors or dean-type roles that report to -- directly to them.

Q     Who was the cabinet?

A     The cabinet at that time was -- it was our five vice presidents:  Vice president for academic affairs, vice president for finance and administration, vice president for university advancement, vice president for student affairs, and vice president for student success, Dr. Carr.  And our athletic director, our chief information officer.  I believe Brian was still here.  I don't think he had left yet.

Q     Ryan?

A     Brian Haugabrook.  He was our --

Q     Okay.

A     -- our chief IT officer.

THE COURT REPORTER:  I'm sorry.  Say that name again.

THE WITNESS:  Brian Haugabrook, H-a-u-g-a-b-r-o-o-k.

A     And -- and Melinda Cutchens, who was the senior director of presidential initiatives sort of my chief of staff, who -- like role, who's -- she's retired now, and Brian has -- he's working in private industry.  The others are all still here.

Q     Okay.  So from the time period that you received the request to reduce by the 6 percent from the State to the time that you made the decision

about that very small number, do you know, like, the dates?

     A    I don't remember exact, but I do remember it was very fast.  In fact, we had been telling people that we were going to get the notice late in -- in June and we would have to immediately turn around -- because we had to have a budget done and ready to go on July 1st.  And so we were asked to prepare -- again, we were asked to prepare scenarios in advance of that so that we were ready to enact based -- depending on what the cut size ended up being.

     Q    Okay.  So COVID pretty much universally hit around March 2020?

     A    Correct.

     Q    And then you started anticipating the budget cuts in April and May --

     A    Correct.

     Q    -- and got the request in June of 2020 to reduce, around --

     A    We got --

     Q    -- that time?

     A    We got the actual number in June.  We had started working on it before that, again, probably somewhere around --

Q    So April, May --

A    Yeah.  Right around the 1st of May.

Q    And then the final decisions were made before July 1st?

A    Yes.

Q    Okay.  And -- so as far as who you decided to put on this list, like, how did you -- was it left up to the division chairs to look inside their department, or did you -- or the VPs of their division?  Or were you actively meddling in the decisions?

A    I was not, but what I asked to happen was two things.  And I asked this of the members of the cabinet.  I asked that each cabinet member -- and this was as soon as we started working on this.  I asked them to start thinking about -- again, at one time, we thought we might be looking at even 20 percent or more cuts to our total budget.

So very early on, I started asking each member of the cabinet to -- to really dig into their budget and start thinking about what reductions might they be willing to bring forward to the rest of the group as potential cuts.

I also said that -- that there were no sacred cows, that anything -- that they could do

that about anything that they thought I was protective of, and I wanted them to make suggestions about things that were in my budget or things that, you know, folks thought I was passionate about.  And if we needed to cut them, that -- that anything could be on the table.  And I said that I wanted them to similarly have the freedom to ask questions about things in each other's units and that we weren't going to make it personal.

It wasn't going to be hard feelings.  We were talking about the thing, not about the person.  But we were going to try to bring as much as we could to the table as potential reductions and that I needed them not to be defensive or to protect their silo.  They had to think about what was best for the whole of the university.

Q    Okay.  And in that discussion, did you say, Please first consider unfilled positions?

A    Yeah.  So we knew -- I -- I was very open to the entire institution.  We'd had -- there were -- I mean, I talked to all of our governance groups whenever I would talk to our faculty senate or our staff council or our larger groups, et cetera, I always said the same things, which is that -- that way of trying to get to the "everything

but" that I talked about earlier.

Q    Okay.  And so that was told to Dr. Carr?

A    Oh, yes.  It was told to the entire institution.

Q    Okay.

Okay.  So after that first, Hey, this is how you're going to do it, they then, you know, say -- I'm going to focus on Dr. Carr because I know his name and --

A    Say what you just said again.  I'm sorry.

Q    I'm going to focus on Dr. Carr --

A    Okay.

Q    -- as one of the five VPs on the cabinet that's making decisions during this RIF.

A    Okay.

Q    So you give him your instructions.  And then does he then go and then he comes back and he comes up with his names and tells them to you, or do you not hear anything and then all of a sudden you just sign off?

A    Oh, no, no.  It was way -- way more complicated than that.

Q    Okay.

A    So each budget manager was first asked to -- I'm sorry.  Each cabinet member was first

asked to submit to our vice president for finance

and administration, Traycee Martin -- and there was

a template that she had created that everyone

could -- had to fill in what their cuts would be.

If I recall, we had given -- she had

given -- she had done the math on it, but she had

given each of them targets to hit in terms of

amounts of -- dollar amounts of reduction that were

based upon our different cut scenarios, you know, from we don't have to cut anything to we have to cut 20 percent.

And -- and so they each had to then come up with enough cuts that would get to each of those scenarios.  And, of course, they -- in keeping with what I just said, they usually started with -- with travel and operating supply lines, et cetera.  Then they would list the number of unfilled positions that they had and what those budget lines equaled.

And then -- and then if it was needed and it was -- I think it was, frankly, needed for all of them.  As I recall, they had to list existing personnel that would be needed to be reduced if, in fact, we got to certain cut levels.  And then -- and then we -- so everybody -- then we had a long cabinet meeting where everybody, me included, got to

see that list.  We had it up on -- you know, on a screen.

We went through them individually, and each person talked about the things that -- that they had brought forward.  They often would tell why -- how that was going to hurt, what was the -- what was the impact on the institution if we had to cut that or -- you know, or they would say something like, you know, "Because we're not going to travel during COVID, we're -- we're comfortable giving this one up."

And then others in the room could ask questions about anything that was on the list, and then they also had a time where they could ask about things that weren't on the list, "Well, did you think about."  And I had already been -- again, I'd said that before.  I'd already been encouraging them to do that.  So in some cases, those conversations had happened outside the meeting as well.

Q    Okay.  And was Traycee Martin present for both meetings that you're describing, where they present their --

A    Yes.  She was the one that was -- it was her -- it was her Excel file that, again, everybody had populated with what they had submitted.

Q    Okay.

A    She put it all in an Excel file and popped
it up, and that's what we were looking at.

Q    So that's Traycee Martin and the five VPs
in your cabinet?

A    Yeah.

Q    Was it -- I mean, was it just the cabinet
or did you have anybody --

A    Just the cabinet.
Q    Like, there wasn't, like, Ryan Hogan?
A    No.
Q    Lisa Long?
A    No.  It was --
Q    So it would be just Carr from admissions?
A    From student success.
Q    Okay.
A    The unit --
Q    And then --
A    The unit is the Division of Student
Success.
Q    Correct.
A    He is the vice president of that.  He was
the one representative in the room from the unit of
student success.
Q    Which in -- which is over admissions and

dual enrollment?

    A    Includes administrations and --

    Q    **Okay.**

    A    -- dual enrollment.

    Q    **Okay.  And do you remember what was on this Excel spreadsheet that -- I guess Traycee Martin presented what Carr put in the spreadsheet, or did Carr present what he put in the spreadsheet?**

    A    Traycee had created -- had taken what Dr. Carr had given her from student success and put it on the list.  It, in no way -- it wasn't prioritized at that point.  We started with just lists, everybody's lists.  And each cabinet member would discuss, individually, the things that were on their list; and then others would ask questions or make comments, et cetera, about the things, individually, as we went through them.

    Q    So Carr is doing the talking?

    A    For student -- for the items that were on the student success list.

    Q    Okay.  Do you remember the content of what he discussed, the substance?

    A    I do not.

    Q    Okay.  And do you --

    A    I -- all I -- what I remember is -- and

I've -- unfortunately, I've had to do this at

multiple places.  Those are hard, awful

conversations; and there -- there was nothing fun

about that day.  There never -- I mean, there was

nothing fun about that entire process.  Cuts are

hard, and what I -- what I recall is everyone going

through and talking about, you know, various things

on their list and how impactful they would be to the

institution.

Q    Was it ever suggested that any of VPs cut
their salaries to assist?

A    They actually suggested it about
themselves.  So that was one of the conversations
that -- that -- I don't remember who came in with
that, but I remember there was -- there was talk of
that happening at some places nationally.

The system -- one of the things the
University System said that we should think about is
some type of furlough option.  And we didn't end
up -- they didn't end up authorizing the furlough,
but they had us run numbers on what would happen and
they gave us some parameters on what a furlough
would look like.

But we had other conversations that were
initiated, again, by members of the cabinet about

what would happen if we -- if, you know, each member of the team took a -- you know, a temporary reduction in salary, et cetera.  I mean, there were so many things that were suggested, everyone trying to figure out ways to, again, get to what were really hard numbers.

Q     Do you recall anybody, I guess it would be Carr in this situation, saying anything about there being at least two open positions that were unfilled in admissions?

A     I don't -- I don't recall those specifics.

Q     Did anybody bring anything up about any COVID relief funding?

A     You mean federal --

Q     Uh-huh.

A     -- COVID relief funding?  No.  I don't -- I don't know that -- I don't recall that we were in -- that that conversation was -- I don't remember, but I don't really recall a lot of that conversation happening yet.  Certainly in the early stages of this, we hadn't heard that from -- from Washington yet.

And I recall even once we started to -- there started to be a conversation about that, there was real questions about, politically, would it

happen.  I remember I was on a town hall meeting with one of Georgia's U.S. senators, and I raised the issue of the challenge that we -- we were thinking we may have in a loss of state revenue and the number of -- of layoffs that that could result in and -- and that we needed help.  And this was Kelly Loeffler.  Honestly, it didn't go well.

She talked about why we probably couldn't do that.  And there were other people on that call. It was a chamber -- it was led by the Chamber of Commerce here in town.  And I remember others in the community saying, "Well, you tried," and, you know, "Keep pushing it," but we weren't thinking we were going to get that.

Q    Did you eventually get some COVID relief funding?

A    Much later, we did.

Q    Okay.  And was that regarding salaries for personnel?

A    Really, no; because the way it came in, it's one-time funding.  And so -- remember the reduction we took from the State.  At that time, there was no -- it wasn't temporary.  It was a permanent reduction in our allocation.

We were able -- we ultimately were able to

restore some funding after the fall because we didn't take the enrollment drop in -- in -- our head count didn't go down like we thought it would.  We actually did quite well.  And so we were able to fund some of the things back that we had had to take out over the course of the summer.

But the dollars that were reduced from the State, that was a permanent reduction.  When we got money from the Federal Government, it's a one-time allocation.  You can't use that for salary because obviously after the one time -- the one year is over, the dollars don't exist to pay the employee.

MR. CARTER:  When you get to a moment you can take a break, that would be good.

MS. MAESTAS:  Okay.  Okay.  This is a -- this is a good time to take a break.

MR. CARTER:  Good?

MS. MAESTAS:  Uh-huh.

MR. CARTER:  Okay.

MS. MAESTAS:  Yeah.  Off the record.

(Recess 10:02 a.m. until 10:13 a.m.)

(Marked for identification is Plaintiff's Exhibit 7)

BY MS. MAESTAS:

Q    Back on the record after a short break.

I have opened up a document in front of you, which I've previously marked as Plaintiff's Exhibit 7.  And this is a document that I pulled from the USG regarding reductions in force, frequently asked questions.  I'm going to refer back to the document but recall some of the earlier testimony today.

So we were talking about the reduction in force, how first we go after travel, then unfilled positions that are open and anything else we can cut, and then we get to existing personnel.  But then once you get there, then you have to decide who do we pick.  So --

A     Right.

Q     -- John Smith or Jane Smith or John Doe.

A     Well really looking at positions.  So we actually didn't have names on the list.  We had -- we had position titles on -- on the --

Q     Okay.

A     That's what got brought forward by the unit heads.

Q     On Traycee Martin's --

A     Correct.

Q     -- template?  Okay.

And you said you didn't remember what was

on the template for -- that Carr filled out.

Is that true, you don't remember?

A    I do not.

**Q    Okay.  And do you remember anything, like, discussing anyone's -- any of the position's performance, or duties or discipline, salaries, evaluations?**

A    Well, we -- we had gone through some guidance about what could -- what were the RIF rules; and we knew that we couldn't do that off of performance.  So that was never part of the conversation.  We did talk about salaries because we were looking -- obviously we were trying to get to a dollar value.

Q    Okay.  And in looking at Plaintiff's Exhibit 7 under Number 4, it does say that you can consider performance, length of service, job performance, personal conduct, performance evaluations.

Does that change your --

A    We did not.

Q    Okay.  Do you know what each -- each VP considered when they came up with their template?

A    I knew what they said as they went through each position when they were describing what was on

their list, and -- and that was different,

obviously, for every position.

    **Q    But you don't remember what was said by Carr when he did his presentation?**

    A    The only thing I -- like, I remember he talked about -- I feel like there were -- there were multiple positions in marketing.  And I remem- -- I think he had a conversation about, you know, where were -- where would the -- I guess where would the pain be felt the least.  Where would we still be able to do the core functions if -- if we -- because we had enough staffing in an area that if we eliminated this one, that one, et cetera, we would still be able to accomplish core functions.

    Q    And did that, then, go into performance?

    A    No.

    Q    Okay.  I guess I'm not understanding how you can look at how well somebody did to -- for the institution without looking into how they perform their job.

    A    We're looking at what -- based on their job description, what are they assigned to do and who can -- who can accomplish -- do we have enough positions in each area to accomplish the functions that are -- that we need done.

Q    Okay.  So you didn't look about -- at who did it better?

A    No.

Q    And do you know that each VP did not consider that?

A    We didn't have those conversations.

Q    Okay.  So you weren't privy to it if they -- if those conversations occurred, you just weren't privy to it?

A    I had no evidence that that had been part of -- they didn't present anything to us that gave us a reason to say, "Hey, I like this one.  I don't like this one."  It was all about positions and what could we do to accomplish the work.

Q    Okay.  And in the ability to accomplish the work, isn't that someone's ability to perform their job?

A    It's not how we looked at it.

Q    Okay.  And if you had numbers that showed one person doing better for VSU versus another person, would that be considered?  Like, on -- you said marketing, for example.  If you could show that one person was marketing better than the other, would that be considered?

A    We didn't do that.

Q    Okay.  Regarding the -- the Carl Vinson Institution of Government Report, CVIOG report, for 2019, was that ever considered at all when the RIF discussions were occurring with the cabinet?

A    No, not related to RIF.  We certainly talked about whether or not we were going to be able to continue to fund the -- the hoped-for multiple-step adjustments.  We knew we still had employees that wanted to do that.  But the very first thing, when we started talking with our governance groups, both groups, faculty senate, officers and our counsel on staff affairs officers, both asked me to consider delaying the next adjustment because they didn't feel it was right for us to take salary adjustments in a time when we were right in the middle of trying to figure out who did we have to reduce.

Q    Okay.  I don't know if I follow that.  So the CVIOG report came out for 2019.
     When did it come out?

A    It had -- I don't remember the exact date, but it has in it, built-in, Carl Vinson gave us a plan for how to get to the recommended funding levels.  Because obviously what you could do is on day one get everybody to where they're supposed to,

but we couldn't afford that and that's -- they knew that. I mean, that's -- that's how these plans tend to be done.

And so they gave us a five-year process to go through, five-step process that would be done annually, that over the course of that time, we could get everybody up to where they were supposed to be. And so I believe we, if I recall, we had already taken the first adjustment before COVID hit. I think that's right. I think we were getting read- -- we were now on the drawing board. We'd had a request in the budget process for the second adjustment and the -- in -- that would happen in the fiscal year to start July 1 and --

Q    What year?

A    Of 2020. So sometime during that fiscal year we would do that. And not necessarily, like, on July 1st, but sometime in that fiscal year we would take the second adjustment; and their recommendation was that we -- we not say we're never going to do it, but that we delay it for the year and try to get through this crisis.

Q    And the adjustments, was that mostly raises for salaries?

A    Their salary -- yeah, nobody goes down;

they always go up.  But it's not -- it's a salary

adjustment driven by trying to get somebody to the

correct salary for their -- their position as

compared with like positions at like institutions.

**Q    Okay.  So when you say, "The first**

**adjustment, we had already put in before COVID,"**

**that was an increase in the budget for salaries?**

A    Correct, for some employees, for those

employees who were deemed to be below where they
should be based on the data.
Q    Okay.  And that came out before COVID.  So
COVID hit --
A    I believe.
Q    -- about March 2020.  Let me direct your
attention to Plaintiff's Exhibit 6.
(Marked for identification is Plaintiff's
Exhibit 6)
BY MS. MAESTAS:
Q    So there's tabs.  So this is Plaintiff's
Exhibit 6.  This is a letter to Jamie Bird, dated
November 11th, 2019, regarding her CVIOG data --
A    Uh-huh.
Q    -- and I -- I'm looking at it for that
date.
A    Yeah.

Q   Now, it says her salary should go up a little bit.

Is that what you're talking about?

A   Yeah.

Q   Okay.  And so would this salary adjustment be that one first adjustment that you're talking about --

A   I believe so.

Q   -- before COVID?
A   Yeah, I believe so.
Q   Okay.  And then the second adjustment, does this letter and this date refresh your recollection on the timing, you know, getting to, like, before the RIF and then, like, a possible second salary adjustment from the CVIOG reports?
A   Could you restate that question?
Q   Yeah.  So November 11th, 2019, that's the date on Exhibit 6.  And then we said that's the first adjustment, before COVID, of salaries from the CVIOG reports; right?
A   I believe so.
Q   So then there's another adjustment that had been requested but was delayed because of --
A   So we have an annual budget process.  So Traycee Martin would have brought forward to the,

what we call, Budget Advisory Committee a request

for funding in the next fiscal year to pay for the

next adjustment.  And, again, it would -- there were

five in total.  We still haven't gotten to the

fifth, but, you know, the -- in -- five in total.

And so each year, she brings forward to that group a

request to fund the next year's adjustment.

Q    Okay.  And then it was in April/May 2020

that you said, "Let's hold off on that second
adjustment"?

A    I don't remember when I announced that we
wouldn't do that.  But I -- I started receiving
feedback from our governance group heads fairly
early in the process.  When we started talking with
them about the need to make reductions, that was --
that was advice they came back to me with.

Q    But it was after COVID hit?  Like, it
was --

A    Oh, yeah.

Q    -- after March 2020?

A    Yes.

Q    Okay.

A    Yeah.  It was only in direct response to
the knowledge that we would have to be making
reductions because of COVID, budget reductions.

Q    I'd like to turn back to 7.

And I know you said that you did not --

you personally don't have any evidence that

performance or discipline was considered in the RIF.

But does this document say that you can consider it?

MR. CARTER:  I mean, it'll speak for

itself, but he can --

A    The document -- yeah, whatever it says.

BY MS. MAESTAS:

Q    So yes?

A    Whatever it says.

Q    Okay.  So you don't -- you don't disagree
with the document?

A    I haven't studied this document.

Q    Okay.  Can you take a look at Number 4 and
just see if you disagree with --

MR. CARTER:  You can't disagree with a
document, again.  But it says what it says.
And I know you've got highlighted:  "Factors
such as competencies, skills, documented
performance, and all other factors equal -
length of service of employees in affected
positions are considered."
So the document says what it says.
MS. MAESTAS:  Well, you said you can't

disagree with a document.  You can't have an

argument with it, but you can say that what it

says is false.

A    I have no reason to say that what this

says is false.  This is --

BY MS. MAESTAS:

Q    Okay.

A    -- a document from the University System.

Q    Thank you.  Thank you very much.
Regarding meetings with Rodney Carr, what are your regular meetings with him?

A    With each of my cabinet members, I have a regularly scheduled what we call status meeting.  They happen roughly monthly.  Some employees, it's a little more often.  I believe his are monthly.
We have our full cabinet meetings, which happen about every two weeks; and then he and I meet as needed beyond that when -- if questions or issues arise.

Q    What about Rob Freidhoff?  Do you meet with him regularly?

A    There's no plan -- there's no scheduled meetings with Rob.  If I meet with Rob -- I've never had an individual meeting with Rob.  The meetings I've had with Rob have been informal, honestly,

because I've walked into Rodney's office and Rob was there.

Q    Okay.  And Freidhoff is not on your cabinet?

A    He is not.

Q    And what about physically going into admissions or dual enrollment?

A    Do I do that?

Q    Yeah.

A    Yeah.  I -- I actually don't know that I've ever -- I don't recall going -- I'm not even sure I know where the dual enrollment staff is in that area.  When I go to admissions, it tends to be into the front area of the -- the admission's house.
          I've done a -- when I first -- when I first started here, I did a walking tour of as many departments as I could get to.  And I know that day I walked into -- there's a secondary building off to the side, and I did a walk-through of that, said hi to some people.  Beyond that, I think the only times I've been in admissions have been in the front entrance area where there's a little, looks like, dining-room-type gathering spot just to the right of the front entrance.

Q    What about Jeanine Boddie-LaVan --

A    What about her?

Q    -- meetings?

A    I'm sorry.  What -- what are you asking?

Q    Regular meetings with her?

A    I do.  She wasn't always on cabinet.  That only changed last summer.  But I started having, I think they were, quarterly meetings with her and then as-needed meetings.

Q    Okay.

A    And then that changed in the summer when I brought her on to the president's cabinet.

Q    Okay.  And if there were a Title IX investigation going on, would you meet with Jeanine Boddie-LaVan about it?

A    No.  I'm usually -- I'll get a -- someone will -- sometimes they'll let me know on the front end that we've received a complaint, particularly if it comes in via the ethic hotline or something like that; and then I'll be told -- I think usually I'm told what the outcome of that is once -- once an investigation is done.

Q    Okay.  But she doesn't keep you posted in the interim?

A    No.

Q    Do you know who your Title IX team is?

A    Well, it's changed a lot.  Maggie Viverette was kind of the home base for Title IX until her retirement.  Well, she had sick leave before her retirement; but she left a little over a year ago, I think.

And -- and then when she left at the urging of Lee Davis, who was the former legal counsel for the institution that she reported to, we did a look at -- at the functions that reported to her, and ultimately decided to divvy up some of those functions.  And so depending on whether it's employees or students, we have -- we came up with a plan for how Title IX would be handled at that time, but it's -- it's now parceled out across the -- multiple areas.

Q    How many people?

A    I -- honestly, I don't -- I don't know.

Q    Okay.  At the time that Jamie was still employed at VSU, she did file a Title IX complaint.  Are you aware of who investigated it?  Did you play any part in that, choosing the investigator?

A    I was aware later that -- well, I didn't know if she did the investigation; but I knew Jeanine reported to me an outcome that nothing was

found.  And then I seem to recall there was an

appeal because I was asked to see if I could

identify -- find -- seek out help from the

University System to bring somebody in from another

institution to do a -- their own independent

investigation.

    Q    Uh-huh.

    A    And I called Shawn McGee, who I mentioned
earlier, who was my VP for finance at -- when I was
in Albany.  And I said, "Do you have anybody that
could do this?"  And he recommended, I think it was,
their chief legal officer.

    And I -- if I recall, I just -- I said,
"Okay.  Well, I'll pass" -- I can't remember if I
passed that name on or I gave -- or I asked him
to -- or that person to contact.  But anyway, I --
that ended up being the person who did the follow-up
investigation and then I found out what the outcome
of that was when it was done.

    Q    Okay.  And so the chief legal officer of?

    A    Albany State.

    Q    Okay.  And --

    A    And he was new.  He was relatively new at
Albany State.  So I had not worked with him in my
time there, but Shawn thought he was very

knowledgeable, good head, reasonable, et cetera, and would do a good job.

Q    **And so you believe that person was the one who did --**

A    I believe that person --

Q    **-- the vitals --**

A    -- did the --

Q    **-- investigation?**

A    -- follow-up investigation.  So there was an initial investigation done in-house, and then there -- there was an independent investigation done by somebody not at Valdosta State.

Q    Okay.  And you believe that was a male?

A    I'm sorry?

Q    A male, as in a man, not --

A    Yes.

Q    -- a woman?  Okay.

A    Yes.

Q    Does the name Janice Lynn [ph] ring a bell?

A    No.

Q    Okay.  That's our understanding of who the investigator was.

A    Again, I never met the person.  I thought I remembered that person being a male.

Q    Okay.  I -- I would think Janice Lynn is a woman.

A    I would agree.

Q    Okay.  All right.

A    But I never met -- I never met the person.

Q    Sure.  I got it.  You've -- that's fine. You don't know.

All right.  What about regular meetings regarding dual enrollment?  Do you do anything like that?  So, like, overseeing dual enrollment at VSU, regular meetings, other than meeting with Carr?

A    No.

Q    Okay.  What about regular meetings with any TCSG?  I know we talked about Tina before and kind of said, you know, that was it.  Anything we're leaving out related to TCSG regular meetings?

A    No.  I haven't had contact with anybody in their system office in -- in probably a couple of years.

Q    Since that meeting with Tina?

A    No.  In their system office, the last one I had contact with was the person who served on the mental-health task force, at Wiregrass.  Again, I've talked -- I talk with their president periodically. Again, the most recent --

Q    The weather stuff, I remember that.

A    Yeah.  And most recently it was DeAnnia Clements, the current president, I invited her in here to VSU to give her a tour.  She's an alum, and she hadn't seen the renovations in the West Hall.  I gave her a tour, and we talked about -- basically, I offered my help to her as a new leader and that, you know, I'd be here if she ever needed me.  And then -- and then was probably the week or two after that that I invited her to the president's tailgate and football game.

Q    And did you ever discuss academics at all?

A    No.

Q    What is the main function of VSU dual enrollment?

A    To -- in compliance with what is allowed by state law, to serve those students -- attract and serve those students that are taking classes at VSU while still in high school.

Q    Okay.

(Marked for identification is Plaintiff's Exhibit 14)

BY MS. MAESTAS:

Q    14.

A    Okay.

Q    Okay.  And you're --

A    I have no idea what that says.

Q    Your next job is to read all of those letters to me.

A    I freely admit I fail.

Q    This is a vision test.

     Okay.  So this is Plaintiff's Exhibit 14. And this is actually a document that was provided to me in discovery.  I requested all newly posted positions, and then this spreadsheet was provided to me.  And then I've gone --

A    Of newly?

Q    Posted positions, open positions at the time of the RIF or shortly thereafter.  And this document was provided to me.  And then this section that's in the blue --

A    Okay.

Q    -- those are the positions that are marked on the front and highlighted as admissions recruiters.

A    Okay.

Q    And so admissions recruiter.  And then some of them are one, some of them are two.  But basically they're all admissions recruiter.  And then those documents are that -- there's six of them

and then most of them are posted under Manager Ryan Hogan.

A    Okay.

Q    But one of them is Hilary Willis.

A    Okay.

Q    Okay?

Were you aware of any of these positions being opened up?

A    I mean, I don't know that I knew specifically; but I certainly know we've -- we have turnover in our admissions counselors, recruiters, semiregularly.  It's a position that tends to -- if you can keep somebody, for example, two, you know, three years, that's a long time.

Q    Okay.  And there were two positions that were open at the time of -- that Jamie was RIFed --

A    Uh-huh.

Q    -- two unfilled positions.

And were you aware of those two open positions that were unfilled at the time of the RIF?

A    No.  I don't know that I knew specifically what positions.  What I did know is that we had multiple positions that were open across the institution that weren't on the reduction list brought forward by unit managers.

We didn't tell -- we didn't tell cabinet members to bring every open position.  There were some positions that if they deemed that hiring that position was still critical, that we would do that. They were charged with trying to think of which open positions could they afford not to hire and still be able to -- to do -- accomplish core functions.

Q    So the one at the top of -- it's -- the date it was created was February 4th, 2020, 2/4/20.  And that would have been, also, right at the time of the RIF that -- when it started being considered?

A    On February 20th?

Q    February 4th, 2020.

A    Yeah.  So we didn't -- COVID hadn't started yet.

Q    And then it says:  "Close date, May 1st, 2020"?

A    Okay.

Q    So that would have been -- this data shows that there was an open position.

     Does that surprise you?

A    It does not.

Q    Okay.  So I'm just looking at you said to look at -- you know, you look at unfilled, open

positions before we look at Jamie?

    A    Correct.

    Q    **Okay.**

    A    But, again, we didn't -- I didn't mandate
that they bring every open position.  I asked them
to look at every open position and to think about
were there some of those that they could bring
forward with -- and we could still accomplish core
functions if we did not go ahead and fill those open
positions.
         And -- but we still had -- like, I
remember, for example, during that time we were
hiring a director of strategic communication at the
same time we were making reductions in marketing and
communication.  But it was because we needed a skill
set that was spelled out in the job description that
none of the existing positions in the organization
that were filled could do.
         So there were --
    Q    Okay.
    A    There were still several of those across
the institution.  We were still filling faculty
positions even though, for example, academic affairs
brought forward probably over 20 faculty lines to
not fill.  That didn't mean that the provost didn't

go forward with some searches.

Q    Okay.  And then you left it up to Carr?

Like, you didn't tell him how to do it?  So --

A    Correct.

Q    -- you just gave him these guidelines.

You didn't say, "You have to do it."  It was a

guideline that, "First look at the unfilled"?

A    Correct.

Q    Okay.  46.
(Marked for identification is Plaintiff's
Exhibit 46)
A    Don't have one of them.
BY MS. MAESTAS:
Q    Do you recognize this document?
A    No.
Q    Okay.
(Marked for identification is Plaintiff's
Exhibit 11)
BY MS. MAESTAS:
Q    Okay.  An attachment in the side of this
document, which we can't find right now, is also
luckily marked as Plaintiff's Exhibit 11.  So let's
flip to 11 since I can't locate it right now in the
other document.
A    Okay.

Q    Oh, I'm sorry.

A    I'm -- I'm just trying to figure out what that was.

Q    Yeah.  Okay.  So that was a letter drafted by Jeanine Boddie-LaVan regarding, I believe it was, Jamie Bird's appeal.  I have not deposed Jeanine yet --

A    Okay.

Q    -- and so I don't know for sure.  But that's what it looks to me to be, is related to Jamie's appeal.

A    Appeal of her reduction?  Which -- I'm sorry.  An appeal of what?

Q    So I'm not sure exactly why she wrote it, but that's what it looks like to me.  But I think all of the above 'cause it addresses everything that we've talked about.

MR. CARTER:  Was this the attachment you were looking for?

MS. MAESTAS:  Yeah.  I just couldn't find it in --

MR. CARTER:  Okay.

MS. MAESTAS:  -- 46.

MR. CARTER:  It's in 46.

MS. MAESTAS:  Thank you.

MR. CARTER:  In this copy.

BY MS. MAESTAS:

Q    Okay.  This was contained in Jeanine Boddie-LaVan's letter that you had never seen before that you were trying to figure out what it is.

A    Okay.

Q    Okay.  It's an attachment, and it has some charts on it.  And if you could just take a minute to take a look at it.

A    Okay.  Okay.

Q    Okay.  Have you ever seen those types of numbers generated before in that way?

A    Yes.

Q    Regarding the retention of dual enrollment students?

A    No.  I've seen it often regarding our overall retention numbers for the university.

Q    But not dual enrollment?

A    Correct.

Q    Okay.  And if you could look at Plaintiff's Exhibit 9 and 10?  It's going to be over here.

(Marked for identification is Plaintiff's Exhibit 9)

(Marked for identification is Plaintiff's

Exhibit 10)

A    Okay.

BY MS. MAESTAS:

Q    So this is just a printout of your website where you can get --

A    Okay.

Q    -- numbers that you just said that you've normally seen.  And so that plaintiff's exhibit --

or the chart inside of the Plaintiff's Exhibit 46, which is also Plaintiff's Exhibit 11, is -- I could not find it on that as a regularly generated number. And what you just said has confirmed what I said, that it's not a number normally generated.

Do you -- are you following what I'm saying?

A    No.  I don't think it confirms that.  We have a -- a data portal that managers are -- have the ability to parcel out the overall university numbers and they're act- -- they're encouraged, on a very regularly basis, to do that.  In fact, they have -- for each of them at their level, they tend to get different data sets than I get.

I look at what happens at the -- at the university level.  For example, the dean of the College of Health Sciences and Nursing would look at

numbers that were specific to that college.  So across the institution, there are a lot of reports that are done.  And, in fact, our portal allows people to then go even further and -- and look at specific.

Q    So Dr. Carr could go in and get that number if he wanted to?

A    Yes.

Q    Okay.

A    But, you know, as this report shows here, it's -- this report is -- it says at the bottom, you highlighted it, it's for internal use only.  So it's not one that -- we don't -- we don't take all of the things that could be learned and put them on the website.  It's for managers to -- to effectively -- more effectively manage their areas.

Q    Right.  Yes.  That -- that was my understanding.  I just wanted to make sure.

        MR. CARTER:  Do we need to take a break?

        MS. MAESTAS:  Would you like to?  No, I'm going to go.  I don't want to -- I don't want to waste your time.

        THE WITNESS:  Given the opportunity.

        MR. CARTER:  Yeah.  Oh, if you need to, we can take one.

THE WITNESS:  I'm fine.

MR. CARTER:  Okay.

BY MS. MAESTAS:

Q    And I'm sorry.  I may have asked you this before, but has anybody talked to you about this lawsuit?

A    Yes.  I mean, I know -- I know it's happening.

Q    Like, did people in the community come up to you and say, you know, "Hey, we heard that Jamie Bird filed a lawsuit.  Can you tell me about it"?  Or --

A    No one in the community.  The one -- I've had one contact.  A former employee said that she had -- had heard through the grapevine and asked me if it was -- if that was -- there was a real lawsuit and --

Q    Okay.

A    -- I said yes.

Q    And can you tell me who that person is?

A    Shari Noviello, who is our former dean of our College of Nursing and Health Sciences.  Works at Georgia College now in the same role.

Q    Okay.  And did you give her any information about it or --

A    I told --

Q    -- did you guys --

A    Yeah.  I told her that the lawsuit was real and it was in -- it --

Q    It does --

A    -- was in process.

Q    -- exist.

A    Yeah.

Q    Okay.  Anybody else?

A    Outside of campus, no.

Q    Okay.  And on campus, who's been talking about it to you?

A    Talked to Justin Arrington, our chief legal counsel; I've talked to Jeanine Boddie-LaVan; and I've talked to Rodney Carr; and I've talked to Melinda -- so I have two Melindas.  Melinda Cutchens, who retired, and she was ultimately sometime later replaced by another Melinda, who is now our chief officer to the president.  And she and I have talked about it.

Q    And what did you talk about with -- you can take whoever you want to start with.  What did you talk about?

MR. CARTER:  Not Mr. Arrington 'cause he's legal counsel.

MS. MAESTAS:  Yeah, that's right.

A    So with Dr. Carr, I'm trying to remember if there was a contact before this.  I don't recall one.  But I was -- oh, I had contact -- yeah, I was -- I had contact with legal counsel in the system office, too, University System office, their -- their legal affairs folks.  And I was brought in to -- by them when I was at a board meeting sometime in the fall, late fall and --

MR. CARTER:  Don't talk about what y'all said.

THE WITNESS:  Okay.

A    So anyway, in response to that, I came back and had a conversation about -- to inform him of what had been requested in discovery so that he would be aware that things from his -- his employee record were public, were out now, too, as part of this.

We, Jeanine and I --

BY MS. MAESTAS:

Q    And that was an attorney or ...

A    University System, the -- the Department of Legal Affairs in the University System office.

Q    Uh-huh.  Was that regarding the open records request --

A    Yes.

Q    -- for the Bainbridge College document?

A    Yes.

Q    Okay.

Okay.  That's Josiah Heidt --

A    Yes.

Q    -- I believe.  Okay.  That's --

A    Yes.

Q    -- who talked to you?

A    Yes.

Q    Okay.

A    I'm sorry.  And then Jeanine, I don't know if there's been any specifics with Jeanine, just that the -- it's happening and that it continues to proceed.  That's about it.  Again, others were with legal counsel.

Q    And then you said Melinda?

A    Yeah, Melinda Harbaugh, H-a-r-b-a-u-g-h, and she's the newly hired chief officer to the president.  She started this summer.  And -- and I -- I made her aware that -- that this lawsuit had been filed and was happening and that -- I said, you know, "You're going to have to be aware because there may be times that I have to do things like today."

Q    And thank you for being here today.

A    Yeah.  And, you know, so I wanted her to know that it was ongoing.

Q    Okay.  17.

(Marked for identification is Plaintiff's Exhibit 17)

BY MS. MAESTAS:

Q    This is Plaintiff's Exhibit 17.  It's a printout from the website of the Office of Admissions staff VSU website, and it's a four-page list of folks who work in admissions.  Do you know what these individuals do?  Like, would you -- I mean, I don't mean, like, speculate.  Like, actually do you know what they do?  Like, enough of micromanaging, for lack of a better word, to know what --

A    I have -- I have a pretty good sense of what is in Ryan Hogan's job description and what he does.  Beyond that, no.

Q    Okay.  And that's what I'm looking for.

(Marked for identification is Plaintiff's Exhibit 18)

BY MS. MAESTAS:

Q    And then 18, same question.  This list of individuals, it's three pages.  Their names are on

Pages 2 and 3.

Do you know what these folks do?

A    I do not.

Q    **Okay.**

(Marked for identification is Plaintiff's

Exhibit 19)

BY MS. MAESTAS:

Q    Okay.  And 19, the second page of it,

there's -- okay.  First of all, do you recognize
this document?
A    I'm -- no.  I mean, I'm assuming it's our
website?
Q    It's an excerpt from the website.  It's
the VSU dual enrollment flip-book.
A    Okay.
Q    Okay.  So the second page is -- I've
highlighted the name Megan Sutliff -- or, sorry,
her -- I think her name used to be Sutliff.  Yeah.
Her email is Sutliff, but her -- I guess she got
married.  Her name is Megan Hancock.
Do you know what she does?
A    I think she's the current dual enrollment
coordinator.  I don't know what her title is, but
currently coordinates that program.
Q    Okay.  And that's what Jamie used to do,

or do you not even --

A    I don't know her exact -- I don't know how similar their job descriptions are.

Q    Okay.  Fair enough.

And then on the first page, I've highlighted a sentence that says:  "The rigor and pace of our classes will prepare you for success anywhere."

Do you know what that's referring to?

A    Sure.  One of the -- I mean, we sell that what we're doing is -- is that some of our students will come here and be -- continue on as Valdosta State students and some students will go -- ultimately use those credits and transfer to other places.  And so we're helping them know that when they come here, they'll be in -- in programs that will prepare them.

Q    And it was talking about academics?

A    Yes.

Q    Okay.  So the academic vigor [sic] of the course is good enough to prepare them anywhere?

A    Sure.

Q    Are you aware of any changes to the managing structure of admissions and dual enrollment after Tee Mitchell left?

A    I mean, I know we changed it when Tee left.  I'm not -- I don't have a knowledge beyond that.

Q    Okay.  You just know that it changed?

A    Yes.

Q    So you don't know, like, "This is how we did things before" --

A    No.

Q    -- "Tee left.  Now we do it this way"?

A    I don't know that.

Q    Okay.  Were you aware of what Jamie Bird's Title IX complaint was about?

A    I was later.

Q    Like, after it was closed out or ...

A    When it was -- no.  So when it was filed -- again, I often get a -- in this case, it was a phone call.  I got a phone call.  I think it was from Jeanine.  I -- honestly, I'm not a hundred percent sure, but I believe it was Jeanine telling me that a complaint had been filed.  And -- and I -- my response is always the same, which is, "Thank you for letting me know."

Q    Okay.  So the allegation was related to, you know, several things, but there was a -- an incidence where Dr. Carr went into her office and

hugged her and she felt uncomfortable and then the door was shut.  Who did it is kind of up for grabs on what the truth is at this point, but -- as far as testimony from Dr. Carr versus other individuals.  But were you aware of -- does that refresh your recollection about it?

A    I'm aware that that's -- that that's what the complaint was.

Q    Okay.  Okay.
A    That a hug happened in the office after the death of a -- a suicide of a dual enrollment student.
Q    Okay.  You are aware of that?
A    Yes.
Q    Okay.
A    I went to the funeral of that student.  It was a really, really difficult time.  That funeral is something I will literally never forget.  We were all struggling.
Q    Okay.  Trying not to get --
A    My wife will never forget that day.  It was bad.
Q    Who all went to the funeral?
A    My wife and I did.
Q    I'm sorry.

A    And the time with the parents is literally something I will never forget.

**Q    Okay.  So I'm going to try to go back to being professional.**

A    Yeah.

**Q    Was -- was anybody else from VSU in attendance at the funeral that you can recall?**

A    I didn't see anyone.  Doesn't -- they -- it was a very long line of people that went through.  It was the visitation that I went to.  And it was -- again, it was a very long line of people.  It literally filled most -- it's a room that the funeral home has to do that in, and it's very large and it's pews.  And we were in there with a lot of other people.  And in line near me, I did not see any other -- that I recall, any other VSU employees.

Q    Okay.  And did you ever talk to Dr. Carr about the hug and the Title IX investigation?

A    I don't recall.

Q    Okay.  And do the rules of VSU or any institution in the USG, to your knowledge, say anything about how you can't be alone in someone's office with them?

A    I'm not aware of that specific rule.  No, I'm not.

Q     Okay.  Were you aware that Dr. Carr had a rule for that?

A     I'm not.

Q     Okay.  If you could look to -- at 46, and this is that long document that you were trying to figure out what it is, the letter from --

A     Okay.

Q     -- Jeanine Boddie-LaVan --

A     Okay.
Q     -- Boddie-LaVan.
      And I've marked with pink tabs and some highlighting on the front the number of times where -- let's see.  The first one says: "Dr. Carr's behavior of not meeting with women behind a closed door has been previously established by HR in writing."
      Then at the bottom -- sorry.  Next page -- sorry.  It's going to be Page 7, Number 13, the last sentence:  "Both Dr. Carr and Ms. Branch separately stated that Dr. Carr's practice when meeting with employees or students of the opposite gender is to have his administrative assistant, Shauna Branch, to sit in on the meeting."
      Were you aware of --
A     No, I wasn't aware of that specifics.  But

it's pretty common.  I mean, even as a young master

student, my professor, you know, encouraged us to be

careful when we were meeting really with anyone in

our office alone because we couldn't control what

the other person would then say.

        And -- and so I think kind of anybody in

an administrative role tends to try to limit how

often they'll do that.  All of us, there are times

when the nature of the conversation dictates that --
frankly, we wouldn't be human if we didn't set that
practice aside and try to care for the topic at hand
with the individual that you're meeting with.
        So there are -- while I -- you know, I
have a -- for example, I have a window cut into the
office -- the door that goes between my office and
Melinda's office because there have to be times that
I'm having a discrete conversation with someone.
Where most of the time I'd like Melinda or somebody
to be in the office with me, occasionally I just
can't do that.
        And so we have that window to create an
opportunity of -- of at least someone can see in.
But we're -- this is something that, frankly, every
administrator struggles with 'cause there are just
simply times where you've got to have a -- you've

got to respect the nature of the conversation and do

it in a private way.

    Q    I understand.  Do you put that in writing?

    A    No.

    Q    Is it different that Dr. Carr puts his in

writing?

        MR. CARTER:  Do you -- where are you

    referring to that he puts it in writing?

BY MS. MAESTAS:
    Q    "Dr. Carr's behavior of not meeting with
women behind a closed door has been previously
established by HR in writing."
    A    Well, that doesn't mean it was a written
policy.  That could simply be a -- respond to a
question.
BY MS. MAESTAS:
    Q    I mean, do you find it odd, anything odd
about that statement, that it was put in writing?  I
don't know who --
    A    I --
    Q    It doesn't say who put it in writing.
    A    Well, I certainly wouldn't find it odd if
he responded to a question.
    Q    Okay.  Have you ever heard of anyone
talking about how Dr. Carr expresses his anger with

his employees by gritting his teeth or shaking his fists?

   A    Say that again.

   Q    Okay.  So I -- I'm getting this from something.  I'm not making it up.  So there has been a statement that Dr. Carr will grit his teeth and shake his fists when he gets angry at employees.

        Have you ever heard of that or seen it?

   A    No.
   Q    Okay.  And I want to talk about the Bainbridge College investigation now.  But I don't want to lose sight -- like, were there any other complaints against him?  So I know of the one that we got in the open records request from ABAC and the USG I think that Josiah Heidt was talking.  But other than that one, were there any other complaints on Dr. Carr that you know about?
        So I've got Jamie Bird's Title IX, the allegation that was emailed to you by Michael Kirkland.
        Were there any others?
   A    Not that -- not that I recall.
   Q    Okay.
        All right.  If you could turn to 47.
        (Marked for identification is Plaintiff's

Exhibit 47)

BY MS. MAESTAS:

Q    Okay.  So -- and I don't want you to look at it yet, but just -- yeah.  So do you recall this investigation?  Like, I just want to recall -- want you to tell me your recollection and then ...

A    I do recall.

Q    Okay.  So can you tell me what happened?

A    I received a -- some type of communique -- you say it's an email.  Honestly, I don't remember.

Q    Okay.  That's fine.

A    -- from Michael Kirkland.  I don't recall exactly the nature of what he was concerned about, except he -- he had previously, in an interim capacity, been the vice president of student affairs, Michael had, before my arrival there.

He -- he was very, very close with the dean of students in the area, sort of like a mother figure to him.  And we were having issues with her performance and -- and -- and what I didn't -- and Michael was concerned about, as I recall, the way that Rodney was leading the division.  What I didn't know was -- was he just trying to be protective of, you know, this person he was close to or were there real issues.  I did not know.

Q    Who was the person he was --

A    Connie Snyder was her name --

Q    Okay.

A    -- long-time dean of students there.  She has since retired.

And so I -- I remember talking with folks in the System office.  I wanted to let them know I had gotten this.  And I asked for their advice, if I -- I think I did, if I recall.  I don't remember who I talked to, but -- and it was advised that I could bring in -- and this is what they thought I should do, is bring in somebody from the outside to do an investigation.  And -- and so we did that.

You know, I -- honestly, in retrospect, I'm not sure that was the right call, if I'm being real honest, simply because as soon as you do that, you open an investigation, too many -- a lot of people just automatically assume there's something there.  And -- but I really wanted to know if there was something there.  So I needed to get to the information.  Just -- I'm not sure, in retrospect, I would have done it exactly the way we did it, but we did it.

So we had two people come in.  One of them was the vice chancellor for student affairs.  She's

still in the position, Joyce Jones.  I -- the other

one was, I think, from HR, but I -- I don't remember

who that was.  It was a young man -- either HR or

legal.  I -- honestly, I don't recall.

          And so the two of them interviewed a whole

host of people, and then I met with the two of them

when -- and they met with Dr. Carr.  They came to

their conclusions.  I met with the two of them, and

as I recall, Joyce did most of the talking.

          And -- and Joyce's take was that there

wasn't certainly cause -- what they found in the

complaint, there wasn't significant wrongdoing, but

there were certainly things that could be a teaching

time for Rodney and that he could -- that he could

do better and that he could learn.  They certainly

said, you know, "Don't terminate him.  It's not --

it's not to that level, but he -- we think he needs

to get better in X, Y, and Z," and they listed some

things that he could get better in.

     Q    Okay.  And why wouldn't you have done it

the same way?

     A    Again, as I said, I need -- I wanted the

information.  The investigation was -- became a very

public investigation.  The whole campus knew about

it.  And so because the whole campus knew that

somebody from the outside or USG was down here

looking at a vice president and was doing an

investigation, "Oh, there must be something that's

really, really wrong."

    Q   Okay.

    A   That kind of can tend to happen on a

college campus.

    Q   So you didn't want all the publicity of

it, but you didn't have a --
    A   No, it wasn't the publicity.  It was if he
was going to be staying what I -- I came to
understand was that it was -- he was going to have
to now overcome a perception on campus that there
had -- there must have been something really wrong
or we wouldn't have done that kind of investigation.
    Q   And so do you think that there was nothing
wrong?
    A   No.  There -- again, what -- the feedback
I got from those who did the investigation was that,
"This is not cause for termination.  It certainly
doesn't rise to that level.  But there are things
that he can improve upon as your vice president,
things he needs to improve upon."
    Q   Okay.  And what were those things?
    A   I think, I mean, some of them are spoken

to here.  It was the extent to which he was

having -- Rodney is a -- we call him a woo, and

that's a -- there's a --

Q    You call him a what?

A    A woo.  There is a person --

Q    How do you spell that?

A    I don't know.  W-o-o, I think.  There's a

personality-type inventory test that is done.  It's

a strengths finder.  And it identifies what people's
biggest strengths are and -- and ideally, when you
have a team like we do, in a leadership team, you
want people with different strengths because they
bring different things to the table.
        Everybody on the cabinet jokes about
Rodney being our woo because that's the title of
this strength, and it's somebody who has the ability
to walk into any room and to make friends and to
interact with people and make -- and make them feel
comfortable.  And what I felt that Rodney wasn't
doing and what the feedback was, was that he
hadn't -- he wasn't establishing enough distance
with people, particularly as it was perceived by
others.
        He was kind of acting the same around
everyone and that we thought maybe he -- but he

needed to have more professional distance with the females under his employ and in the community, et cetera, that he was interacting with.

And so those were the conversations that he and I had, were around -- and it wasn't that those people were expressing concern because none of them did.  But others who would see his interactions with, again, other female employees or people in the community were making -- they were jumping to conclusions that, "Oh, he must be having an affair with this one," and that kind of thing.

And so the fact that that talk was going on I didn't think was helping him be as effective as he could be, and he needed more professional distance, particularly with females.

Q   Okay.  And this -- this email from Michael Kirkland to you December 4th, 2012, was that given to the -- to USG investigators?

A   Yes.

Q   Okay.  And the -- did he -- did he engage in vulgar and sexually-charged language?

A   I think he was -- I don't know.  I don't know that I'd use that language, but -- but he was -- he would tell -- I think the perception of the investigators was that he wasn't as cautious

with his language and the things he would say out in public, et cetera, as he should be.

Q    Okay.  But in your opinion, he did not engage in vulgar and sexually-charged language?

A    I didn't have -- I didn't have that evidence.

Q    Okay.  And what about Dr. Carr's actual physical contact with a female employee described by a witness as massaging and running her fingers through his hair?  Did you have any evidence of that?

A    I think they -- again, I would go to the report.  Honestly, I don't recall the specifics of it.

Q    Okay.

A    I don't -- they -- they didn't think it was serious.  Again, they thought it was something that -- and they certainly didn't think it was something that the other person was objecting to. It was the perception it was giving off to others who saw it.  That continually was the issue of any interactions he was having, was that people around that interaction would have -- would make conclusions about, "Oh, they're -- look how close they are.  They must be having an affair.  They must

be having a relationship," et cetera.

Q    And that -- would that reflect bad on the institution?

A    Sure.

Q    Okay.  And so I'm glad you brought up the report -- suggesting that I look at the report because I would love to.

A    Okay.

Q    So let's look at the written reprimand March 30th, 2013.

A    That's not the report I meant; but, okay.

Q    Okay.  So --

A    I meant the report completed by the investigators from USG.

Q    Yeah.  And that's funny.  We don't -- we don't have that.  We can't find it and so --

MR. CARTER:  This was all.  I think these are --

BY MS. MAESTAS:

Q    -- we were hoping that --

MR. CARTER:  -- their notes.

THE WITNESS:  Okay.

BY MS. MAESTAS:

Q    'Cause it's -- this is your written reprimand that you wrote to --

A    Yes.

Q    -- Carvajal on March 30th, 2013.

A    I'm Carvajal.  I wrote it --

Q    I'm --

A    -- to Carr.  It's all right.

Q    You didn't write yourself a letter --

A    I did not write myself --

Q    -- and reprimand --

A    -- a letter.

Q    -- yourself.  Okay.  That's probably a good sign.

Okay.  So let's try this again. March 30th, 2013, from Dr. Richard Carvajal to Dr. Rodney Carr, "Re:  Written reprimand."  Okay.

Do you recognize this document?

A    Yes.

Q    Okay.  Did you write it?

A    I did.

Q    Okay.  And at the top it says:  "Per the recommendation contained in the report of findings following an investigation ..."

What's the report of findings?

A    I'm sorry?  Say that again.

Q    What is the report of findings?  'Cause you said, "You should look at the report," and then

I turned to this written reprimand, and you said,

"That's not the report I'm talking about."

So I'm trying to figure out what you're

talking about.

A   Again, I don't remember everything that

they wrote for sure, but I certainly remember the

conversation I had with -- with the two

investigators.  And, again, I remember Joyce Jones

did most of the talking.  And it was, "This does not
rise to the level of termination, but there are
issues that we did find that he needs to get better
at.  And here are the suggestions we have of the
things that need to be pointed out to him, and you
need to coach him up to get better."

Q   So when you said -- when I was asking you
questions, you said, "I would look at the report."

Do you mean, like, a physical report, a
piece of paper?

A   I'm assuming.  I don't recall, but I'm
assuming the two of them filed a written report,
completed one after doing the investigation.  But
honestly, I don't -- I don't recall.  I just
remember the conversation.

Q   Yeah.  I mean, it sounds like there --
there was one.  You wrote about it and then you --

you just said it before we realized it was missing.

So --

A    Did I specifically say there is one?

MR. CARTER:  It says, "report of findings."  And we can't find one.

THE WITNESS:  Okay.

MR. CARTER:  She's asked for it from the Board.  We don't have one.  You don't have one. Rodney doesn't have one.

THE WITNESS:  "Per the recommendation contained in the report."  Yeah.  So -- okay. So they did one.

BY MS. MAESTAS:

Q    Okay.  Do you have any idea where it might be?

A    No.

Q    Wouldn't that be important to keep?

A    I -- I don't know why --

Q    Keep it, shred it, keep it, shred it?  I mean --

A    I don't know why it would not have been retained by the University System.

Q    Okay.

A    I don't --

MR. CARTER:  And maybe it is.  We just --

I mean, I've asked.

MS. MAESTAS:  Okay.

MR. CARTER:  If I had it, I'd willingly give it to you because from what he's saying anyway, you know.  But I don't have it.

BY MS. MAESTAS:

Q    Okay.

All right.  When -- when Dr. Carr was brought on to VSU, did you tell the hiring committee about this?

A    No.

Q    Why not?

A    We're actually not supposed to.  My instructions from HR, bring in what we know about the person and --

Q    Uh-huh.

A    -- and I wasn't on the hiring committee.  Again, the hiring committee delivered a report to me.  So we are supposed to, per HR guidelines, review and -- and consider candidates based upon their packet of information and what they present during interviews.

Q    But as --

A    And then -- and then we do obviously a background check.  If they are, in fact, the one who

is offered, you know, we determine if anything pops

up on the background check.

Q    So if you personally knew something, but

it didn't show up on a background check --

A    Well, I knew the whole of the story and I

knew -- I mean, as I'm looking through this letter,

even in this letter, I know where I want him to get

better and then I talk about the challenges of what

he's inherited and the progress that he's already
making and the potential I see in him.
         And then -- I mean, it's -- I don't think
it's much more than a year later that the faculty
senate president is in my office telling me to put
him in charge of academic affairs.  And so he
made -- he took this -- and I've -- I've had
employees in the past that I've said, "I need you to
get better at this, that, or the other."
Unfortunately, too often they don't.
         In a -- almost a unique way in my career,
Rodney Carr made tremendous progress.  He is one of
the most self-reflective people I have ever known.
And he took this and he said, "I'm going to be
different," and became an outstanding leader for
that institution.
         And so the whole of this -- of what I knew

about him was that he was that out- -- that kind of

outstanding leader and had a potential to make a

difference for us.  And, again, I think it's why he

was of the top pick of the search committee and in

the feedback from campus.

     **Q    Okay.  Okay.**

          MR. CARTER:  Can we take a break?  Let's

     take a break.

          MS. MAESTAS:  Okay.
          MR. CARTER:  Is that doable?
          MS. MAESTAS:  Yeah.  You have told me that
     you are only available 'til 12:30, and --
          THE WITNESS:  That's what you had
     requested --
          THE COURT REPORTER:  Are we off the
     record?
          MS. MAESTAS:  Yeah.
          (Recess 11:28 a.m. until 11:38 a.m.)
BY MS. MAESTAS:
     Q    All right.  Back on the record after a
short break.  I want to direct your attention to 20.
          (Marked for identification is Plaintiff's
          Exhibit 20)
     A    20?

BY MS. MAESTAS:

Q   20, Plaintiff's Exhibit 20.  It should be right in front of you.

A   Okay.

Q   This is a PowerPoint that I got from the USG website, and it's regarding dual enrollment.  And I've tabbed a couple of spots.  But -- and if you disagree with this, let me know.  But my understanding looking at this is that the USG has two separate pathways, one that's through the USG for four-year and one that's through the TCSG's.
        Does that --

A   Say that again.

Q   So there's -- so let me just look at the document.  So the first one has --

A   My first one is that.

Q   Okay.  So do you see how on this document you've got the TCSG and then the USG, and they're separate?

A   Okay.  For how to update what -- what are approved courses --

Q   Uh-huh.

A   -- at the System level.  That's what this is --

Q   Yeah.

A      -- about, I assume.  Yeah.  Okay.

Q      Okay.  And then the next green tab?

A      The 27 courses?

MR. CARTER:  This one?

MS. MAESTAS:  Yeah, that's fine.

BY MS. MAESTAS:

Q      The dual enrollment admissions --

A      Okay.

Q      -- requirements, that they're different for --

A      Correct.

Q      -- each level and the -- you have more options for getting in at the TCSG than you do at the USG level?

A      That is correct.  There are open-enrollment institutions.  University System of Georgia institutions have differing admissions standards by sector.

Q      Okay.  And if you could go to 21, this is also --

A      Oh -- is that -- okay.  This right here?

Q      Yeah, uh-huh.

(Marked for identification is Plaintiff's Exhibit 21)

A      Uh-huh.  Are we done with that?

BY MS. MAESTAS:

Q    Yes.

A    Okay.

Q    Uh-huh.  And so this is also from the USG website regarding dual-enrollment counseling.  Is your understanding that the state regulations require counseling for dual-enrollment students?

A    I don't know if it's required.  I think we all do it in practice.  I don't -- whether it's required or not, I don't know.

Q    Okay.  And if you could look at the -- I've highlighted a sentence at the top of the page that you're on:  "Students should pursue a challenging and rigorous high school curriculum to be best prepared for a successful college experience and should consult with their high school counselor to determine appropriate courses."
       What's the intent of that sentence in your opinion?

A    I think it speaks for itself, what it --

Q    Does that --

A    -- what it says.

Q    Okay.  And would it say that some courses may be better for some students than others?

       MR. CARTER:  Would it say?

A    That's not what it says.

BY MS. MAESTAS:

**Q    Okay.  So you don't think that this is saying, "Hey, not all courses are created equal," regarding the rigor of the curriculum?**

A    Within the high schools, we understand that there are college-level courses and that there are more workforce-training courses.  And I think when it's speaking to school curriculum about rigorous high school curriculum, they're talking about being in those courses that prepare you for college track.

Q    Okay.  And -- and would that be, like, a four-year versus a two-year?

A    I don't read that.

Q    Okay.

A    Do you?

Q    Do I read that in there?  I don't see the -- the words four-year or two-year --

A    Yeah.

Q    -- in that.

I think in some cases, yes, that -- that is what they're saying.

A    I -- I don't see that.

Q    Okay.  And then --

A    I think our board, actually, has

publicly -- particularly in approving the 27

courses, said just the opposite.  They --

Q    What board?

A    The Board of Regents for the University

System of Georgia.  When that measure was being

considered, they were very clear in saying that it's

time for us, as a state, to treat English 1101 as

English 1101 provided the learning competencies that
are outlined per SACS are be- -- our accrediting
body, are being followed.
        And so that's why they approved the
courses that they did for the entire system was they
wanted to ensure that institutions saw approved
SACS-level college courses as valid, no matter the
institution source.
    Q    And are you talking about the articulation
agreement?
    A    It's not an articulation agreement.  It's
university -- it's University System of Georgia
policy for the 27 courses I saw referenced earlier
in your packet.
    Q    Okay.  And do you -- the USG policy that
you're referencing, is it something that's published
all the time on the website?

A    Yeah.  The 27 courses is -- is available.

Everyone --

Q    okay --

A    -- knows what those --

Q    -- okay.

A    -- courses are.

Q    And you're talk -- and those are DE

courses or they're --

A    They make up the majority -- not the whole, but they make up the majority of what schools, colleges, and universities offer in dual enrollment to high schools because they're the courses that -- again, many dual-enrollment students will take dual-enrollment courses from one college but pursue full-time enrollment after high school graduation at another college.

And I think all of us want to make sure that students are taking courses that, in fact, will transfer and can be counted, and we have a guarantee that those 27 hours will do that.  Not just from TCSG to USG, but we do that also within the University System.

Q    And that -- but that doesn't guarantee that they get accepted.  That means --

A    No, it does.  If someone takes 11 --

English 1101 at Wiregrass, that will count as

English 1101 at any University System institution

because it's one of the approved hours.

Q    That -- so they take it at Wiregrass.
They're guaranteed admission over --

A    No.  They're not guaranteed --

Q    'Cause that's what I was asking.

A    They're not guaranteed admission.  If --
if they gain admission to the university --

Q    Uh-huh.

A    -- that course is guaranteed to be -- to
fulfill the English 1101 requirement that exists at
the university level.

Q    But they're not guaranteed to be admitted
as a student?

A    They have to meet admissions requirements
for each institution.

Q    Okay.  But simply by taking the course
that transfers is no guarantee of admission?

A    No.  Because the admissions
requirements -- the admission requirements in no way
speak to which course do -- where do you take your
dual-enrollment courses from.  What they speak to
are high school rank, high school GPA, SAT/ACT
score.

Q    Okay.

Okay.  23.

(Marked for identification is Plaintiff's

Exhibit 23)

BY MS. MAESTAS:

Q    This is an email with a flyer embedded in

it from Sarah Wenham at the USG.

Have you heard of the USG dual-enrollment

summit?

A    No.

Q    Okay.  24.

(Marked for identification is Plaintiff's

Exhibit 24)

BY MS. MAESTAS:

Q    This is a roundtable bullet points
discussion document about something that was brought
up at the summit that you didn't know occurred.  And
so I wanted to direct your attention to what's
listed as the last bullet point as a misconception.

It says:  "The rigor of the courses is the
same for all institutions since some of the courses
are transferable to all USG and TCSG institutions;
therefore, they are being prepared to be successful
at all institutions within the state no matter where
their DE credits come from.  (Then parents are

frustrated when they are not successful)."

Do you have an understanding of what that's talking about?

MR. CARTER: You have to read the --

BY MS. MAESTAS:

**Q So it's listed as a misconception, and then I think the parenthetical is the conclusion after the misconception is read.**

MR. CARTER: Okay. Now, what's the question to Dr. Carvajal?

BY MS. MAESTAS:

Q Do you understand what that's talking about? Does that ring any bells? Does it -- have you heard of this issue that was brought up at this roundtable?

A Yes. There are certainly nationally and -- and statewide there has been a long-time perception that -- that courses taught at what are perceived to be a more selective institution must be better than courses taught at an open-access institution. Community and technical colleges have fought that perception for some time. State colleges, even within the University System, have fought that as opposed to maybe taking a course at UGA, for example.

We have been working very hard and, again, our board has tried to be -- our Board of Regents has tried to be very clear in saying we -- there's no -- there's nothing to that.  And we need to be very clear in telling our public that 1101 is 1101 is 1101 provided, again, it's taught at a SACS-authorized institution, which means, therefore, appropriate learning outcomes are being observed.

Q    Have you heard of any stories where students went to a TCSG and then ended up at VSU or another four-year and they weren't academically prepared to survive their freshman year?

A    I think there are certainly cases where students have come in, frankly, no matter what their preparation has been, and have been deemed not to -- not to succeed here.  Is it that they went to a bad school or is it that they came here and didn't exert the effort that needed to -- and the focus that was needed to be successful?

Often, we don't -- sometimes, we don't know that.  But when we admit a student to VSU, we are -- we are deeming that they have the potential to be successful here should they put forth the effort and focus.

Q    Okay.  Have you ever heard of any

professors talking about the lack of the quality of the students coming in from any TCSG into VSU to attend as a college student?

A    About students?  No.  They don't -- they don't talk about students.  Our faculty do talk about, historically -- and, again, it goes to why this misperception was being covered -- that every institution that I have ever worked at, faculty -- there have been some members of the faculty in some disciplines who have operated under the assumption that they must teach it the best way, and anybody can't teach it the way they teach it.

When I worked at a small, private liberal art school, for example, my wife, who is a faculty member, as you mentioned, at Wiregrass, she taught at that private institution.  She also taught at the nearby community college, the same course.  And yet there were members of that faculty in her department who felt and had the perception that the course at the community college was of less rigor and wasn't a good course.  And she had to tell them, "You know I teach them both."

It is a perception, again, that exists across higher education, or has historically existed.  We have been working really hard to try to

help the public know that that's not the case.

English 1101, for example, is English 1101 is

English 1101 if it's taught from a

regionally-accredited institution.

**Q    Okay.  And you don't have any evidence of**

**any students where, like, Wiregrass failed to**

**prepare them?**

A    No.  In fact, evidence at community

colleges is that students who start at a community
or technical college and then transfer to a
baccalaureate-granting institution tend to
outperform the native students of that four-year
institution as they finish the rest of their
coursework to --
     Q    Where --
     A    -- degree.
     Q    Where did you get that data?
     A    That is national data.  It's literally all
across the country.
     Q    That people who go to --
     A    Community college, who finish at the
community college and then transfer to a four-year
institution nationally outperform the native
students of that four-year institution.
     Q    Interesting.  I'll have to look that up.

Have you ever talked to any high school counselors about taking dual-enrollment classes either at VSU or otherwise?

A   Have I ever talked to high school counselors --

Q   Yeah, uh-huh.

A   -- about taking those courses?

Q   Yeah.

A   No.

Q   Have you ever talked to a high school counselor about other stuff?

A   I'm trying to remember.  I don't know that I've had a single conversation with a high school counselor --

Q   Okay.

A   -- personally here in Georgia.  I have in other states, but I don't know --

Q   Okay.  Not here, not --

A   No, that's not true.  I did when I was at Bainbridge.  We had a -- we had an agreement with -- with a high school in Mitchell County, and that school counselor brought a busload of their students to campus every day and so we got to know that person.

Q   Did you talk about, like, curriculum or

academics, anything like that?

A     Not that I recall.

Q     Okay.  Have you ever gone and talked to any of the faculty regarding dual enrollment at VSU, VSU faculty regarding dual enrollment at VSU?

A     Not individually.  I don't recall if I did or not, but I have public comments about what we were looking at with dual enrollment in terms of trying to grow it.  But I wouldn't -- I certainly know I was talking with multiple people about my desire to look at could we grow dual enrollment.

Q     Okay.  Have you ever talked to any parents or students about dual enrollment, like, one-on-one? Like, I'm not talking about, like, you were in front of --

A     Well, my son's a dual-enrollment student. So I've talked to him.

Q     Okay.  Other than your own son, have you talked to other students?

A     I've talked to students -- yeah.  We had an SGA officer who was a current dual-enrollment student, and -- and he ran for SGA when he was still in dual enrollment.  I had one at Bainbridge, and I've had one here.  So I got to know them obviously as dual-enrollment students.

Q    Did you talk about curriculum or --

A    Not that I --

Q    -- course vigor or anything like that?

A    Not that I recall.

Q    Okay.

All right.  Do you remember the first time that you ever interacted with Jamie Bird?

A    I do not.

Q    Okay.  Do you know what Jamie Bird's job was?

A    I believe she was dual-enrollment coordinator.  Again, I don't know specific title. But that's -- I knew her to coordinate our dual-enrollment programs.

Q    Okay.  So ... 19.

Plaintiff's Exhibit 19, Page 2.

Do you believe that Megan Hancock performs the same job duties that Jamie Bird did?

A    I don't know.

Q    Okay.  41.

(Marked for identification is Plaintiff's Exhibit 41)

BY MS. MAESTAS:

Q    Okay.  This is Plaintiff's Exhibit 41. This is an email sent by Jamie Bird to high school

counselors, dated February 26th, 2019.  I think I already said that.

Do you recognize this email?

A    I'm assuming this is the one that was sent out that led to the complaint I received.

**Q    From?**

A    Again, it first came from Tina --

**Q    Okay.**

A    -- Anderson.

Q    Okay.  I just wanted to make sure we're talking about the same thing.

A    Is that -- is this what this is?

Yes.  Okay.

Q    Okay.  What were you doing when you first heard about this email?

A    I have no idea where I was.  I just remember I got a phone call.

Q    Okay.  So on your cell phone?

A    Yes.

Q    Okay.  And what did she say?

A    She was angry.  She was angry that VSU was going out and representing to school counselors that they should not go to Wiregrass or another TCSG institution because the academic rigor didn't exist and courses wouldn't be thought of as the same and

wanted to know -- she wanted to know why I was

supporting that.  She was upset.

          And I assured her I had no idea what she

was talking about.  She told me that she had been

contacted directly by multiple high school

counselors who were, themselves, as she described it

to me, really kind of aghast of what they had heard

and what they were receiving and wanted

(indiscernible) to know about it.  And --

          THE COURT REPORTER:  And wanted to -- what
     know about it?

          THE WITNESS:  Wanted Dr. Anderson to know
     about their concerns.

     A    And that the technical college system
commissioner had been made aware.

BY MS. MAESTAS:

     Q    What's his name?

     A    He's not in the seat now.  I'm sorry.  I'd
have to -- I'd have to go back in and look.  I knew
him.  We worked together during my time -- he was
the -- not the whole time I was in Bainbridge, but
toward the latter part of my time there, he came in
as the deputy commissioner.  And then in the
subsequent time, the commissioner had left to
another position and he had been elevated to the

commissioner seat, and that's -- that's who I knew

she was talking about.

Q    Okay.  Did she say any specific names of
high school counselors or specific high schools?

A    I don't recall.

Q    Okay.  Were those high schools that were
served by both VSU dual enrollment and Wiregrass
dual enrollment?

A    I believe -- I believe so.

Q    Okay.

A    Or they were at least students -- they
were schools that Wiregrass was serving and that
were in the footprint that we would be reaching out
to them.  So they had contact regularly from both
institutions.  Whether or not they had, actively,
students enrolled at both institutions, that's
school to school, but they had contact regularly
from both institutions because they were both in
what would be our geographic footprint.

Q    Okay.  And so this email was seen to
compete with the students they were trying to --

A    It was seen by -- by her clearly as
degrading their institution and TCSG period.  And
that's why -- and she said, "Richard, you've worked
with us.  I can't believe you would -- you feel this

way."  I mean, she was upset at me and felt that I had -- saw me as a traitor of having worked closely with the TCSG, and now I'm at an institution that is the one out there saying negative things about TCSG institutions.

**Q    Okay.  And did she say anything about, like, it doing irreparable harm or anything like that?**

A    I don't recall.

Q    All right.  So I want to look at the -- the -- what the email says in detail.  So I'm going to the second line -- it starts out on the first line:  "For students wanting to participate in any dual enrollment program in our state, it is critical for those students wanting to attend a four-year institution after they graduate high school get their DE credits from the same type of institution."
        Agree or disagree?

A    That's what it says.  That's --

Q    Right.  Right.  That's what it says.  I -- I'm saying do you agree with the statement?

A    No.

Q    Okay.  And second sentence --

A    Neither -- neither does the Board of Regents.

Q    Okay.  And the authority on that is?

A    The Board of Regents passed the 27 hours because they explicitly did not agree with this statement.

Q    But what about the pamphlet we were looking out -- looking at that said that they needed to pursue a rigorous curriculum and consult their counselor?

A    A rigorous high school curriculum, as I told you before, that's often reference saying whether or not they're taking college-prep courses or more of a workforce training curriculum.

Q    Okay.  So that's what you believe that that sentence is referring to?

A    Yes.

Q    Okay.  And let's see.  Second part I want to talk about is the very next sentence.  "The curriculum course rigor needs to be the same in order for them to be successful once they graduate and move forward into college."

Agree or disagree?

A    We need to have rigorous courses.  The challenge with that sentence, particularly given the sentence it follows, is that it is making an inference that the rigor will not be the same at a

non-USG institution and, therefore, they should not go to them.  That's where the concern was.

Q    Next sentence:  "Around the state, universities are seeing students attempting to enter their institutions with many credits and yet they cannot meet the needed admissions requirements for that particular institution."

Do you agree or disagree with that?

A    Again, it's making an inference that that's why they're not making admission when admission standards don't look at where your college level credits come from.  They look at SAT and ACT score, and they look at high school rank.  They look at high school GPA.

Q    What about UGA or Georgia Tech?

A    Same.  The only thing that is different is that at Georgia Tech, they put a higher value on the number of AP credits somebody has.  That, frankly, doesn't have anything to do with dual enrollment. They'd rather you not take dual enrollment anywhere.

I actually sat in a meeting with the University System president, and this very issue came up.  And the president of UGA got up and said, "Let me check."  And he called his admissions staff and said, "Yes, we take them from anywhere," came

back to the group and reported it.  "We don't treat it any different."

Q    Who was that?

A    (Indiscernible).

THE COURT REPORTER:  I'm sorry?

THE WITNESS:  Jere Morehead, the current UGA president.

BY MS. MAESTAS:

Q    Okay.  Page 2 of Plaintiff's Exhibit 21. So this is the list of the courses at the top.  And then it says:  "Course may not prepare students for admission to the U -- to the USG institutions with selective admissions such as Georgia Tech and UGA and are not appropriate for students planning to enter a STEM major."
Doesn't that contradict what you just said?

A    No.

Q    Why not?

A    They don't take any dual enrollment courses -- actually, it says exactly what I said. Taking dual enrollment courses and passing them, no matter where you take them, does not guarantee you admission to more selective institutions.  That's not what they look at.  They're looking at ACT and

SATC -- SAT and ACT score.  They're looking at class

rank, and they're looking at high school GPA.

          And when you get into a major level of any

institution that you go to, that -- that institution

may still have, for you to be -- to be accepted

and/or complete a major, they may still have

requirements that the courses you take at the

dual-enrollment level satisfy what we call the core,

essentially the first 60 hours.  But you still may
have to take institution-specific coursework that
could be even very similar in order to satisfy your
degree requirements, i.e., the second 60 hours.

Q    Okay.  So you're talking about course
credit.  This sentence is talking about preparing
the students for admissions with selective
admissions standards.

A    Which ones are highlighted?  I think I
know what it's doing now, where that --

          (Simultaneous cross-talk.)

BY MS. MAESTAS:

Q    Second page.

A    Where's the asterisk?

          MR. CARTER:  I don't see any.

A    There are some courses that are approved
that -- for example, we've learned that not every

student needs to take college algebra.  Some can

take different math courses that are -- are --

          MR. CARTER:  Here.

     A    -- more quantitative reasoning, et

cetera --

          THE WITNESS:  Where you at?

          MR. CARTER:  The asterisk.

          THE WITNESS:  Yeah.

     A    Yeah.  So this one, for example, has a
college-ready mathematics course.  That's not going
to fulfill a math requirement at -- at some
institutions.  And so certainly there are courses
that students can take that would fulfill entry
requirement to the institution, but they might
not -- at some institutions, but they certainly may
not get you into your desired major; or there are
some courses, like a math readiness course, that you
could take.  It would be funded by the state for
dual enrollment, but it wouldn't get you -- it's not
going to fulfill the math requirement for a USG
institution because it doesn't meet the core
standard for what needs to be taught in our core.
     Q    Okay.
     A    That might, in fact, be the math course
that the student tests into and is ready to take,

and the value of them taking it would be to build their skills up so that they're ready to take a college-level math course, which they could do at the same institution.  That doesn't mean it's not a good course to take.  It's the course the student needed at that time.

Q   Okay.

A   But it might not satisfy an admission requirement, or it certainly might not satisfy a completion requirement at the institution that the student transfers to.

Q   And it also may not prepare them academically for what they were trying to go to in the end?

A   Well, no.  Actually, that's what it's designed to do.  It's to try and -- it's preparing them to be able to take the courses that they'll need to take in college.

Q   Okay.  And that -- it's a prerequisite almost?

A   Depending on where they test.  If somebody tests at a lower level of math, we need to build their skills up in order to be able to do college-level math.

Q   Okay.  So I think I know the answer to

this, but I'm just going to read the next sentence

in Plaintiff's Exhibit 41.

            MR. CARTER:  Is this it?

            MS. MAESTAS:  No, the -- back to the

     email.

            MR. CARTER:  Oh, I'm sorry.

            MS. MAESTAS:  No, that's okay.  It's not

     like we don't have enough documents.

BY MS. MAESTAS:

     Q    So, "This also helps to ensure that
students gets the needed" --

     A    Where are we at?  I'm sorry.

     Q    Yeah.  I'm sorry.  Just right ...

     A    Thank you.  I got it.  Okay.

     Q    "This also -- also helps to ensure that
students get the needed academic foundation that
will allow them to move forward successfully
wherever they go after they graduate."

            And on, so the "this" is referring to, I
believe, the previous sentence.  Do you agree or
disagree with that sentence?  The, "This also helps
to ensure that students get the needed academic
foundation that will allow them to move forward
successfully" --

     A    Again, I think the inference that the

readers were having to this was that they can't go

to a TCSG institution to get that -- that

foundation.  And that is not the stance of the

University System or of Valdosta State.

Q    Okay.

A    Which is why I had to apologize for this.

Q    Okay.  And I want to continue to talk

about that and what you apologized for, too.  In

looking at -- so Plaintiff's 42.
          (Marked for identification is Plaintiff's
          Exhibit 42)
BY MS. MAESTAS:
     Q    Okay.  And so the -- the first email in
this email chain is actually listed second because
it's -- the reply is on the top of it.  This is an
email sent from Rodney Carr to the counselors that
the previous email was sent to.
          And have you seen this email before?
     A    I don't recall.  I think I did.  I know it
was sent.
     Q    Okay.  Did you help him write it?
     A    No, I don't believe so.
     Q    Okay.  And --
     A    He certainly knew I was upset, and I said
that something needed to go out.

Q    Did you talk about your wife being upset?

A    No.

Q    Okay.

A    That's not who I got the phone call from.

Q    Okay.  Did you ever tell anybody that your wife was upset about the email from Jamie to the counselors?

A    I don't recall that I did.

Q    Was she upset?
A    I told her later about it, and she was upset.
Q    Okay.  Did Tina Anderson ever treat her differently related to the email that Jamie sent?
A    No.
Q    Okay.
A    No.  I -- Tina and I were fine after I told her I had nothing to do with that, and I was just upset about it as she was and that I would make sure that we took actions to ensure that schools knew that was not -- high schools knew that was not our official position.  She -- I mean, she was upset, and it probably took her a week or two to get over it.  But when she saw that we were sending things out -- I mean, she -- I mean, she was still upset it happened, but she became less upset at me.

Q    Okay.  And so I want to look at the third line on the first paragraph.  It says:  "Please know that it is the mission and vision of VSU to collaborate with our education partners to serve your community."

Do you agree with that statement?

A    I agree that partnerships serving our community helps us fulfill our mission and vision.

Q    And what is the mission and vision of VSU?
A    (Indiscernible).
Q    Okay.
THE COURT REPORTER:  I'm sorry.  I didn't hear you.
THE WITNESS:  They're on the website.
BY MS. MAESTAS:
Q    Okay.  Is the mission and vision of VSU to educate students?
A    It's much longer than that.  It's on the website.
Q    But does it include that?
A    We are an educational institution.
Q    Okay.  And then the second paragraph, third line:  "VSU is committed to collaborating to meet the educational needs of dual-enrollment students by partnering with the TCSG."

How do you partner with the TCSG for dual enrollment?

A    Again, we -- we have talked about various ways that we've -- you know, we've pitched ideas to them of ways that we would do that together even without that.

Q    But that didn't happen?

A    Right.  That's --

Q    Okay.

A    But that shows our desire.  And then even without that, we -- we freely take their courses.

Q    Under the transfer credits?

A    Under the 27-hour USG --

Q    Okay.

A    -- policy.

Q    Other than that?

A    We have articulation agreements that again, as you noted, we have a bunch of them.  We have --

Q    Yeah.

A    -- one at every TCSG institution across the state, where we create a pathway for students who are in their workforce-oriented programs to be able to continue on should they get to the -- they finish that degree and they realize, you know what,

I'm pretty good at this school thing.  I like it.  I want to advance further than that associate of applied science will take me.  I'd like to get a bachelor's degree.

We create a pathway for them to be able to do that.

Q    And then the last paragraph, Rodney says: "I will be reaching out to you soon to discuss joint counselor events held throughout our region by VSU with our TCSG partners to demonstrate how we, as a collective group, can make dual enrollment a seemless transition for your students."
Do you have joint --

A    Remind me --

Q    -- counselor --

A    Where are we at?  Let me read it.

MR. CARTER:  Last paragraph.

THE WITNESS:  Oh ...

A    Okay.

BY MS. MAESTAS:

Q    Do you have joint counselor events with the TCSG partners?

A    I believe we do.

Q    Okay.  What would you -- but you don't know for sure if you --

A    No.  I mean, I know we have -- hang on.

No.  We have -- I'm sorry.  We have -- I misunderstood the question.  We have events that we meet with -- VSU meets with multiple high school counselors at one -- at one time.

I know it was our plan to do this and to try to do this with -- with Wiregrass and other partners, that that was our plan at the time.  That was Dr. Carr's plan.  I don't know if it -- if it happened.  I don't know if they wanted to do that.

Q    Okay.

A    Yeah.

Q    And how -- if you went over to TCSG -- or sorry.  If you went over to Wiregrass right now, what would you say that would help a VSU dual-enrollment student?

A    I'm not sure I understand the question.

Q    What could you say -- if you were going to go and partner with them -- like, right now you're going to leave for your meeting at 1:00 o'clock --

A    Uh-huh.

Q    -- and you go over there and you want to help VSU dual-enrollment students, what would you say to TCSG -- to Wiregrass?

A    Is the student enrolled at Wiregrass?

Q    No.  The student's enrolled at VSU dual enrollment.

A    I don't understand the question.  I don't know why I would talk with them about a student that is only enrolled at VSU currently.

Q    Okay.  Thank you.

All right.  43.

(Marked for identification is Plaintiff's Exhibit 43)

BY MS. MAESTAS:

Q    This is a written reprimand dated March 5th, 2019, and it states that it's from Tee Mitchell to Jamie Bird.
Do you recognize this document?

A    I don't know that I ever saw this.

Q    Were you aware of it?

A    I don't know that I knew specifically that a written reprimand had been given.  I certainly was aware that some type of reprimand would be given, whether it was written or oral.

Q    Okay.  I want to look at some of the things that it says.  So since you've never seen it before, you may want to -- do you like it better if I read it out loud, or do you like to read it? 'Cause I know it annoys me when I'm trying to

read --

     A    Go ahead and read it.

     Q    -- and someone's talking.

     A    Go ahead and read it.  As long as I know where you're reading, I'll read along with you.

     Q    Okay.  So starting at the top:  "On February 26th, 2019, Ms. Bird sent an email to high school counselors throughout Georgia, with whom she had established relationships, discussing the dual enrollment, DE, program.  Language was included that suggested that students needed to get their DE credits from the same type of institution in which they were planning to attend based on the rigor of the curriculum."
          Unbeknownst -- unbeknown -- I keep saying unbeknownst, but it actually says:  "Unknown to Ms. Bird, her email was forwarded to at least one person at a neighboring technical college and was then shared liberally by multiple institutions throughout the technical college system."
          "As a result, the message was considered offensive as it was perceived to suggest that technical colleges were ineffective in providing a good academic foundation for students who want to attend a four-year institution after they graduate."

"While this was an isolated occurrence in the almost -- in the almost eight years that Ms. Bird has worked for the university, the email was deemed inappropriate and demonstrated a lack of judgment in decision-making that is expected in the role of the dual-enrollment coordinator.  Moreover, this communication had a significant adverse impact on recently established relationships that will need to be repaired."

I want to stop right there.  That was a question that I asked you before regarding what needed to be repaired.

Do you know of any damaged relationships that needed to be repaired?

A    Again, I think multi- -- the president, who called me, was very upset with me.  She got less upset with me when she realized that I was not aware this had happened.  But she was certainly upset with Valdosta State.

Other presidents in the technical college system, as this references, who also got copies of it, were very upset with Valdosta State.  And that is why this became a topic of discussion and consideration at the level of the commissioner.

And I was so worried about our ability as

an institution to be able to partner with them, that they personally called the commissioner and issued a personal apology to him.

Q    Okay.  And when you were -- so I'm assuming you're saying you repaired the relationship by doing that?  I don't know.

A    What I --

Q    I guess that you're --

A    I apologized for what had happened.  I assured the commissioner, who, again, we knew each other.  And I felt -- I said, "This is not my position.  I think you -- and you know me well enough to know that, but it will not be Valdosta State's position."  And I assured him that we would take action of trying to send something out -- again, which is why I asked Dr. Carr to do that -- to assure our counselors that they knew that was not our position and to back away from that, from what had been sent.

Q    Okay.  And had you not issued that apology to those -- those people, how would that have hurt VSU dual-enrollment students?

A    It would have hurt the institution.  It would have hurt our ability going forward.  I mean, why would they want to work with us if that's what

we think about them?

And so, I mean, subsequent to that, as you've noted today, we've signed a couple articulation agreements with them.  That would not have happened had we not -- if this had -- if what had been sent out to them were, in fact, our position.  And it wouldn't have happened had we not backed away from that as our stance.

Q    So you're saying if you hadn't apologized, they would not have signed an articulation agreement?

A    They wouldn't have wanted to work with us.

Q    So do the articulation agreements -- do you ever have a student who transfers from Wiregrass -- or, sorry, from VSU to Wiregrass?

A    Yes.

Q    Okay.  And so they would have -- they would have not accepted that student in retaliation for that?  That's what you --

A    No, I don't know that.

Q    Okay.  Do you know of any evidence that it would have directly damaged any particular students, like they would have said, you know, "Hey, we're not -- you know, I know you meet all our requirements, but now that Jamie sent this email,

we're not going to let them in"?

A    I only know the anger that was expressed to me.

Q    To you.  Okay.

A    And that I -- I have to believe that would have soured the relationship between this institution and the system had we not corrected it.

Q    But you have any specific evidence of how --

A    Can't know because I corrected it.

Q    Okay.  So you saved -- you saved the day on it?

A    I did what needed to happen in order to correct a letter -- an email that went out that should not have gone out.

Q    Do you find that the articulation agreements, are they more frequently used for a student transferring from Wiregrass to VSU or VSU to Wiregrass?

A    The articulation agreement is -- is worded one way, but it's not -- it is only a Wiregrass to VSU articulation agreement.  It's creating a pathway, again, for students who are in a technical program to be able to continue on in -- in a baccalaureate program.  But it is not uncommon that

a student who is, for example, let's say, struggling academically.

They've had a rough semester.  They're not doing well or they're having real financial issues, could be a host of reasons, that -- that we find that maybe what's good for them is to sit out for a semester or a year and to go to their local technical college and we make a -- we make a referral.  We help them make a contact with that school.

Q    Okay.  So the articulation agreements are one way from a technical to a four-year?

A    Correct.

Q    Okay.  So you are saying that because of this email, the technical college wouldn't have signed it.

Wouldn't that agreement benefit students going from Wiregrass to VSU?

A    Say that again.

Q    Wouldn't -- wouldn't VSU be helping the TCSGs out by signing that, not the other way around?

A    It's helping Wiregrass -- and it's helping both institutions because obviously it's adding to enrollment at VSU.  But those -- those agreements happen, as they do in all sectors of work, often

happen because of relationships.  They start with a

conversation.  And we work really hard to have a

really good relationship with our TCSG partners

knowing that it will more often lead to those

conversations.

Q    What's more important, your relationship

with the TCSGs or the education of VSU students?

A    My -- what drives me is to get students to

the finish line of commencement, and so that's what
drives what I do.  What I have to think about are
all the things that it takes running this
institution in order to most often make that happen.
And there are a myriad of potential opportunities
and/or roadblocks for students on their way to
commencement.  I have to be thinking about all of
them if I'm on -- if at the end of the day my goal
is to get more of them to that finish line.
Q    Okay.  I don't know if that answered the
question, but that's okay.
        MR. CARTER:  It did.
        MS. MAESTAS:  If you could please not
    testify --
        MR. CARTER:  I'm not.
        MS. MAESTAS:  -- in the deposition that --
        MR. CARTER:  I'm just --

MS. MAESTAS:  -- we're paying for.

MR. CARTER:  -- making a comment.

MS. MAESTAS:  Thank you.

MR. CARTER:  You'll have the opportunity.

BY MS. MAESTAS:

Q    **Were you aware that this reprimand was placed in Jamie's permanent personnel file in HR?**

A    I was not.  Again, I -- I don't know that I knew that there was a written reprimand.  I just knew there was going to be a reprimand, whether it was written or oral.

Q    And did you want there to be a reprimand?

A    I felt that the actions were deserving of the reprimand.  Not termination.  I mean, that's very clear and this -- I think this -- says this in the letter was that this -- much of what had happened during Ms. Bird's time with the institution had been viewed to be good service.

My -- the interactions, although limited, that I had had with Ms. Bird before that had been good.  But this action caused damage that took action at the presidential level to fix.  It needed -- it deserved a reprimand because we don't want that to happen again.

Q    Did you ever talk to Tee Mitchell about

this?

A    Yes.

**Q    And what did he say?**

A    He understood that the -- he understood --

he talked about the extent to which the employee had

done, overall, a really good job for all these

years; and I agreed completely.  And then we talked

about this issue, and we talked about setting this

issue aside from the overall and needing to address

this issue.

Q    Okay.  Where is the Office of First-Year

Transitions at VSU?

A    It's administratively housed in Student

Success.

Q    Okay.  Who oversees it?

A    I don't know.

Q    How long has it been in existence?

A    I don't know.

Q    Do you know if it was created by somebody?

A    I don't know.

MS. MAESTAS:  I think we're about wrapped

up.  If we could just have, like, maybe two

minutes to --

MR. CARTER:  Sure.

MS. MAESTAS:  -- wrap up?

(Recess 12:32 p.m. until 12:35 p.m.)

BY MS. MAESTAS:

Q    We're back on the record after a short break.  This is -- just a couple more questions, Dr. Carvajal.

Are you aware of the term "SAP"?

A    Yes.

Q    Okay.  And what do you understand that to be?

A    I mean, it's something we use in a variety of areas.  But, for example, it's used in financial aid to determine whether or not a student continues to be eligible.

Q    Okay.  So satisfactory academic performance?

A    Sure.

Q    Okay.  And were you aware of any of those numbers at VSU for dual-enrollment students?

A    No.

Q    And after you had learned that Jamie Bird sent this email, did you ever ask to speak with Jamie personally?

A    Not that I recall.

Q    Did it ever cross your mind to give her an opportunity to explain where she was coming from?

A     I certainly wanted those conversations to happen in her chain of command.

**Q     All right.  Thank you very much for your time.**

A     You're very welcome.

MS. MAESTAS:  All right.

MR. CARTER:  You got --

MS. MAESTAS:  Don't forget your --

MR. CARTER:  -- him out on time.  Thank you.

MS. MAESTAS:  -- notice to produce.

THE COURT REPORTER:  Is the witness reading or waiving?

THE WITNESS:  I'm sorry?

THE COURT REPORTER:  Is the witness reading or waiving?

MR. CARTER:  If you want to read and sign it, you -- once she types it up, she can send it to me.  I can send it to you, and you can review it to make changes.  You can waive that if you want.

THE WITNESS:  I'll waive that.

MR. CARTER:  He'll waive it.

(Examination was concluded at 12:37 p.m.)

CERTIFICATE OF OATH

STATE OF GEORGIA

COUNTY OF LOWNDES

I, KAIRISA JOI MAGEE, RPR, GCCR, Notary Public, State of Florida, certify that DR. RICHARD CARVAJAL personally appeared before me on January 20th, 2022, and was duly sworn.

Signed this 3rd day of March, 2022.

_____
KAIRISA JOI MAGEE, RPR, GCCR
Georgia Certification No. 5962-0590-7476-480
Notary Public, State of Florida
My Commission No. GG 968304
Expires: 03/15/2024

CERTIFICATE OF REPORTER

STATE OF GEORGIA

COUNTY OF LOWNDES

I, KAIRISA JOI MAGEE, RPR, do hereby certify

that I was authorized to and did

stenographically report the foregoing deposition of DR. RICHARD CARVAJAL; that a review of the transcript was not requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 3rd day of March, 2022.

_____

KAIRISA JOI MAGEE, RPR, GCCR, Florida Notary

**Exhibits**

CarvajalR 6
 3:16 80:9
81:9

CarvajalR 7
 3:14 73:9
74:3 75:9

CarvajalR 9
 3:23 98:9

CarvajalR 10
 3:24 99:1

CarvajalR 11
 3:21 96:9
99:9

CarvajalR 14
 3:17 91:9
92:7

CarvajalR 17
 4:3 105:6,
8

CarvajalR 18
 4:5 105:9

CarvajalR 19
 4:6 106:6
143:9

CarvajalR 20
 4:8 128:9
129:2

CarvajalR 21
 4:9 130:9
150:9

CarvajalR 23
 4:11 136:4

CarvajalR 24
 4:12 136:9

CarvajalR 41
 4:13 143:9
154:2

CarvajalR 42
 4:15 155:9

CarvajalR 43
 4:16 161:9

CarvajalR 46
 3:19 96:9
99:9

CarvajalR 47
 4:7 115:1

CarvajalR 52
 3:11 13:6,
8

CarvajalR 53
 3:12 15:7,
9

**$**

$40  16:7,9

**1**

1  79:9

10  98:9
 99:1

10:02  73:9

10:13  73:9

11  47:9
 96:9 99:9

134:9

1101  133:8,
 9 135:1,2,
 9 138:5,6
 140:2,3

11:28  128:9

11:38  128:9

11th  80:9
 81:9

12:30  128:9

12:32  171:1

12:35  171:1

12:37  172:9

13  111:9

14  91:9
 92:7

17  12:9
 105:4,6,8

18  105:9

19  106:6,8
 143:9

1:00  160:9

1st  56:8
 62:8 63:2,
 4 79:9
 94:9

**2**

2  106:1
 143:9
 150:9

2/4/20  94:9

20  57:9
 63:9 66:9
 95:9 128:9
 129:2

20-plus  45:7

2011  45:9

2012  120:9

2013  122:9
 123:2,9

2019  78:3,9
 80:9 81:9
 144:1
 161:9
 162:7

2020  15:9
 55:7,8
 62:9 79:9
 80:9 82:8,
 9 94:9

20th  94:9

21  12:9
 130:9
 150:9

23  136:2,4

23rd  15:9

24  136:9

26th  144:1
 162:7

27  130:3
 133:2,9
 134:1,9
 148:2

**27-hour**
158:9

**2nd** 52:9

_____

**3**

**3** 106:1

**30** 29:9

**30th** 122:9
123:2,9

**31602** 8:15

_____

**4**

**4** 75:9 83:9

**41** 143:9
154:2

**42** 155:9

**43** 161:7,9

**4552** 8:14

**46** 96:9
97:9 99:9
111:4

**47** 114:9
115:1

**4th** 94:9
120:9

_____

**5**

**52** 13:6,8

**53** 15:7,9

**5th** 161:9

_____

**6**

**6** 58:9 61:9
80:9 81:9

**60** 27:4
151:9

_____

**7**

**7** 73:9 74:3
75:9 83:1
111:9

**7:21cv62**
5:15

_____

**8**

**82** 57:9

**8:36** 5:1

_____

**9**

**9** 98:9

_____

**A**

**a.m.** 5:1
73:9 128:9

**ABAC** 47:9
114:9

**ability** 12:1
48:8 77:9
99:9 119:9
163:9
164:9

**academic**
27:9 30:9
31:7,9
46:6,9
47:9 49:9
50:9 53:6
61:2 95:9
107:9
127:9
144:9
154:9
162:9
171:9

**academically**
138:9
153:9
167:2

**academics**
91:9 107:9
142:1

**accept** 27:9
28:3

**accepted**
134:9
151:5
165:9

**accepting**
25:9 27:9

**accepts** 28:9

**accomplish**
76:9 77:9
94:7 95:8

**accrediting**
133:9

**acquaintance**

22:9

**acquaintancesh
ip** 25:9

**ACT** 149:9
150:9
151:1

**act-** 99:9

**acting** 119:9

**action** 164:9
169:9

**actions**
156:9
169:9

**active** 59:9

**actively**
63:9 146:9

**activities**
22:9

**actual** 62:9
121:7

**add** 27:9

**added** 30:7,9

**adding** 28:9
167:9

**addition**
5:23

**address** 8:13
170:9

**addresses**
97:9

**adjustment**
78:9 79:9

80:2,6
81:5,6,9
82:3,7,9

adjustments
78:8,9
79:9

administration
20:9 21:7
61:4 66:2

administrations 69:2

administrative
18:5 60:9
111:9
112:7

administratively 170:9

administrator
112:9

admission
135:5,8,9
149:9
150:9
153:8

admission's
85:9

admissions
31:9 53:1
68:9 71:9
85:7,9
92:9 93:9
105:9
107:9
130:7,9
135:9

149:6,9
150:9
151:9

admit 92:5
138:9

admitted
135:9

adults 12:9

advance 14:9
37:9 38:9
62:9 159:2

advancement
45:1,2
61:5

adverse
163:7

advice 82:9
116:8

advised
116:9

advising
53:6

Advisory
82:1

affair 120:9
121:9

affairs 19:3
21:7,8
31:9 46:1,
6,9 47:9
49:9 50:9
61:3,5
78:9 95:9
103:7,9

115:9
116:9
127:9

affect 12:1
25:9 32:9

affected
83:9

affirm 5:3

afford 79:1
94:6

age 6:6

agencies
56:3

agency 20:9

aggressive
57:6

aggressively
36:9

aghast 145:7

agree 90:3
147:9
148:3,9
149:8
154:9
157:6,7

agreed 170:7

agreement
5:20,25
27:9 28:9
29:3 30:9
31:4 40:7,
9 54:3
133:9

141:9
165:9
166:9
167:9

agreements
28:9 29:7,
9 30:1
158:9
165:4,9
166:9
167:9

ahead 95:9
162:2,4

aid 171:9

Albany 25:4,
5 47:4,6,9
88:9

algebra
152:1

allegation
108:9
114:9

allocate
55:9

allocated
55:9

allocation
56:9 58:9
72:9 73:9

allowed 91:9

allowing
58:9

alum 91:4

amounts   66:8

and/or   151:6
  168:9

Anderson
  22:9 23:1,
  9 24:9
  25:9 29:9
  32:9 34:9
  52:9 144:9
  145:9
  156:9

anger   113:9
  166:2

angry   114:7
  144:9

announced
  47:5 82:9

annoys   161:9

annual   81:9

annually
  79:6

answers   6:16

Anthony   8:9

anticipated
  55:9 58:9

anticipating
  62:9

anxiety   42:9

anymore   19:9

anyone's
  75:5

AP   149:9

apologize
  19:7 23:9
  49:1 155:6

apologized
  155:8
  164:9
  165:9

apology
  164:3,9

appeal   88:2
  97:6,9

applied   30:9
  43:9 45:9
  47:9 51:4
  159:3

apply   43:9
  47:9 51:1

approach
  32:9

approved
  129:9
  133:9
  135:3
  151:9

approving
  133:2

April   55:5,9
  62:9 63:1

April/may
  82:8

area   21:4,9
  32:2 37:4
  49:9 76:9
  85:9 115:9

areas   32:9
  60:9 87:9
  100:9
  171:9

argument
  84:2

arise   84:9

arrangement
  39:7

array   53:3

Arrington
  102:9

arrival
  115:9

art   139:9

articulation
  27:9 28:9
  29:2,7,9
  30:1,9
  31:4 133:9
  158:9
  165:4,9
  166:9
  167:9

arts   26:9

as-needed
  86:8

assault   9:15

assess   48:9

assessment
  20:9

assigned
  76:9

assist   70:9

assistant
  23:9 111:9

associate
  26:9 30:9
  45:6 159:2

associate's
  30:9

assume   116:9
  130:1

assuming
  106:9
  124:9
  144:4
  164:5

assumption
  139:9

assure   164:9

assured
  145:3
  164:9

asterisk
  151:9
  152:7

athletic
  61:7

Atlanta   19:9

attachment
  96:9 97:9
  98:7

attempting
  149:4

attempts

Case 7:21-cv-00062-WLS    Document 33-5    Filed 05/02/22    Page 179 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022          Index: attend..Bird's

22:9

**attend** 51:9
139:3
147:9
162:9

**attendance**
110:7

**attended**
18:9

**attendee**
19:4

**attending**
22:9 39:4

**attention**
80:9 128:9
136:9

**attorney**
103:9

**attract** 91:9

**August** 45:9

**authority**
52:8 148:1

**authorizing**
70:9

**automatically**
26:2 28:9
116:9

**avoid** 7:25
58:7

**aware** 87:9
93:7,9
103:9
104:9

107:9
108:9
109:5,7,9
110:9
111:1,9
145:9
161:9
163:9
169:6
171:6,9

**awful** 70:2

─────────────

**B**

─────────────

**baccalaureate**
166:9

**baccalaureate-
granting**
140:9

**bachelor's**
159:4

**back** 13:9
26:9 47:9
51:9 55:9
56:1 57:9
59:5 65:9
73:5,9
74:5 82:9
83:1 103:9
110:3
128:9
145:9
150:1
154:4
164:9
171:3

**backed** 165:8

**background**
21:7 126:9
127:2,4

**bad** 109:9
122:2
138:9

**Bainbridge**
18:9 19:8,
9 22:9
24:9 25:2
31:9 44:6
45:9 46:9
47:9 104:2
114:9
141:9
142:9
145:9

**bar** 17:9
28:9

**base** 87:2

**based** 62:9
66:9 76:9
80:9 126:9
162:9

**basically**
15:9 91:6
92:9

**basis** 22:9
99:9

**basket** 42:2,
9

**be-** 133:9

**bed** 50:9

**began** 5:1

**begin** 27:9

**beginning**
41:9 55:9

**behavior**
111:9
113:9

**bell** 89:9

**bells** 137:9

**benefit**
167:9

**big** 57:9
58:8

**biggest**
48:5,9
119:9

**bill** 42:9
45:9

**Bird** 5:10,
12 34:9
54:6 80:9
101:9
143:7,9
161:9
162:7,9
163:3
169:9
171:9

**Bird's** 33:9
97:6 108:9
114:9
143:9
169:9

bit 81:2

blue 92:9

Bluff 8:14

board 5:12
16:9 17:9
79:9 103:8
125:8
133:1,4,5
138:2
147:9
148:2

Boddie-lavan
85:9 86:9
97:5 102:9
111:8,9

Boddie-lavan's
98:4

body 133:9

bonds 41:8

book 43:9

bottom 100:9
111:9

bowling 17:9

brace 55:9

Branch 111:9

Brandon 12:9

break 73:9
100:9
128:7,8,9
171:4

Brian 61:8,9

bring 7:1

13:9 14:9
34:9 53:1
63:9 64:9
71:9 88:4
94:2 95:5,
7 116:9
119:9
126:9

brings 82:6

broadly 37:6

brought 51:9
53:9 67:5
74:9 81:9
86:9 93:9
95:9 103:8
122:5
126:9
136:9
137:9
141:9

budget 58:9
59:9 62:7,
9 63:9
64:3 65:9
66:9 79:9
80:7 81:9
82:1,9

budgetary
55:3

budgets 57:9
58:9 59:3

build 40:9
153:1,9

building
85:9

built-in
78:9

bullet 136:9

bunch 26:9
38:9 158:9

business
5:14 22:9

businesses
54:9

busload
141:9

buy-in 50:9

buying 54:9

―――――――――

**C**

―――――――――

C-H-E-R-Y-L
12:9

cabinet 38:9
50:4 60:9
61:1 63:9
65:9 66:9
68:5,7,9
69:9 70:9
78:4 84:9
85:4 86:5,
9 94:1
119:9

call 25:9
33:9 44:9
49:9 72:9
82:1 84:9
108:9
116:9
119:2,4

144:9
151:8
156:4

called 20:9
29:2 34:9
35:1 88:8
149:9
163:9
164:2

calling 27:9

calls 26:9
32:9 33:9
50:9

campaign
44:6,7,9
45:8

campaigns
44:2,3

campus 9:15
30:5,6,7
39:1,9
40:9 51:9
55:9 58:4
102:9
117:9
118:7,9
128:5
141:9

campus' 51:9

candidates
50:9 126:9

capacity
9:15 115:9

capital 44:6

care 112:9

career 127:9

careful
112:3

caring 48:9

Carl 78:1,9

Carolina
20:9

Carr 11:9
21:9 34:9
45:9 53:9
61:6 65:2,
8,9 68:9
69:7,8,9
71:8 75:1
76:4 84:9
90:9 96:2
100:6
102:9
103:2
108:9
109:4
110:9
111:1,9
113:5,9
114:6,9
117:7
123:5,9
126:8
127:9
155:9
164:9

Carr's 52:9
111:9
113:9
121:7

160:9

CARTER 7:9
13:9 14:6
16:9 38:3,
6 73:9
83:6,9
97:9 98:1
100:9
101:2
102:9
103:9
113:7
122:9
125:4,7,9
126:3
128:7,9
130:4
131:9
137:4,9
151:9
152:3,7
154:3,6
159:9
168:9
169:2,4
170:9
172:7,9

Carvajal
5:19 6:4
8:9 12:9
43:9
123:2,3,9
137:9
171:5

carve 33:6
36:4

case 5:15
11:7,9
15:9 20:9
108:9
140:1

cases 67:9
132:9
138:9

caused 169:9

caution 14:9

cautious
120:9

cell 144:9

centered
24:8

central 54:9

certified
15:9

cetera 22:9
24:6 31:9
53:7 64:9
66:9 69:9
71:3 76:9
89:1 120:3
121:2
122:1
152:5

chain 155:9
172:2

chair 18:2
19:9 46:9

chairs 63:8

challenge

37:7 72:3
148:9

challenges
37:2 58:6
127:8

challenging
131:9

chamber 72:9

chancellor
21:5 116:9

change 40:9
42:4 75:9

changed 59:9
86:6,9
87:1
108:1,4

charge 127:9

charged 94:5

chart 99:9

charts 98:8

check 16:9
126:9
127:2,4
149:9

Cheryl 12:9
23:4

Cheryl's
24:4

chief 49:9
50:6 61:7,
9 88:9
102:9
104:9

child  9:15

childhood
  30:9

children
  12:9

choosing
  87:9

chosen  27:9

church  17:8

civil  15:9

class  25:9
  26:9 151:1

classes
  37:3,6
  39:9 91:9
  107:7
  141:2

clear  48:9
  51:9 52:2
  133:7
  138:3,5
  169:9

Clements
  22:9 91:3

click  29:7,9

close  26:9
  40:9 55:9
  94:9 115:9
  121:9

closed  108:9
  111:9
  113:9

closely  31:9

32:1 147:2

closer  53:9

closure  26:9

club  17:9

clubs  17:8

coach  124:9

cochair  17:9
  18:9

cochaired
  19:9 48:9

cohort  40:9
  41:2,3

collaborate
  157:4

collaborating
  157:9

collaborative
  55:9

collect  48:1

collection
  55:9

collections
  55:1,9

collective
  159:9

collects
  54:9

college  9:8
  18:9 19:2
  20:9 22:9
  27:9 31:9
  36:9 39:2

44:6 46:9
47:5,9
56:9 99:9
100:1
101:9
104:2
114:9
118:7
131:9
132:9
133:9
134:9
139:3,9
140:9
145:9
148:9
149:9
152:1
153:9
162:9
163:9
167:8,9

college-level
  132:7
  153:3,9

college-prep
  148:9

college-ready
  152:9

colleges
  30:1 134:9
  137:9
  140:9
  162:9

comfortable
  67:9 119:9

command
  172:2

commencement
  168:9

comment
  169:2

comments
  69:9 142:7

Commerce
  72:9

commissioner
  145:9
  146:1
  163:9
  164:2,9

committed
  157:9

committee
  48:9 50:9
  51:1,9
  82:1 126:9
  128:4

committees
  17:8

common  112:1

communicate
  25:9 58:3

communicated
  11:3

communication
  95:9 163:7

communique
  115:9

community
  9:8 17:9
  22:9 24:9
  72:9 101:9
  120:2,9
  137:9
  139:9
  140:8,9
  157:5,8

compared
  80:4

comparison
  53:9

compete
  146:9

competencies
  83:9 133:9

competency
  20:9

competitor
  39:9

competitors
  33:5 39:9

complaint
  86:9 87:9
  108:9
  109:8
  117:9
  144:5

complaints
  114:9

complete
  151:6

completed

27:5 122:9
124:9

completely
  54:9 170:7

completion
  153:9

compliance
  91:9

complicated
  65:9

concern  41:9
  120:6
  149:2

concerned
  32:9 115:9

concerns
  145:9

concluded
  172:9

conclusion
  137:7

conclusions
  117:8
  120:9
  121:9

conduct  75:9

conference
  34:7

confirmed
  99:9

confirms
  99:9

connected
  41:6

connection
  50:9

Connie  116:2

consideration
  163:9

considered
  54:9 75:9
  77:9 78:3
  83:4,9
  94:9 133:7
  162:9

consolidate
  47:9

consolidated
  47:6,9

consolidation
  47:9

consortium
  18:3 19:1,
  9 20:4,9

consult
  131:9
  148:7

consultant
  43:9

consulting
  43:9

contact  88:9
  90:9 101:9
  103:3,4,5
  121:8
  146:9

167:9

contacted
  145:5

contained
  98:3 123:9
  125:9

content  69:9

continually
  121:9

continue
  41:9 78:7
  107:9
  155:7
  158:9
  166:9

continues
  104:9
  171:9

contradict
  150:9

control
  112:4

conversation
  26:6 32:9
  33:2,9
  36:8,9
  71:9 75:9
  76:8 103:9
  112:9
  113:1
  124:7,9
  141:9
  168:2

conversations

Case 7:21-cv-00062-WLS    Document 33-5    Filed 05/02/22    Page 184 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022    Index: cooperative..created

31:7 33:8
37:9 38:7
41:9 67:9
70:3,9
77:6,8
120:4
168:5
172:1

**cooperative**
39:7,8

**coordinate**
143:9

**coordinates**
106:9

**coordinator**
106:9
143:9
163:6

**copies** 163:9

**copy** 7:4
8:2 13:9
14:9 98:1

**core** 76:9
94:7 95:8
151:8
152:9

**correct** 6:21
9:15 12:9
13:9 15:5
16:9 18:9
19:9 20:7
23:6,8
26:9 27:9
29:4 31:9
35:4 41:1,

9 62:9
68:9 74:9
80:3,8
95:2 96:4,
8 98:9
130:9
166:9
167:9

**corrected**
166:7,9

**cost** 42:9
49:9

**costing** 41:9

**council** 64:9

**counsel** 5:21
7:7 11:5
14:9 60:9
78:9 87:8
102:9
103:5
104:9

**counseling**
21:8
131:5,7

**counselor**
131:9
141:9
148:8
159:9

**counselors**
32:9 93:9
141:2,5
144:1,9
145:6
146:4

155:9
156:7
160:5
162:8
164:9

**count** 56:9
73:3 135:1

**counted**
134:9

**country**
140:9

**County** 141:9

**couple** 25:7
34:9 90:9
129:7
165:3
171:4

**courses** 26:1
27:9 28:9
30:9 37:2
38:9 39:9
40:9 129:9
130:3
131:9
132:4,7,8,
9 133:3,9
134:1,6,8,
9 135:9
136:9
137:9
141:7
144:9
148:9
150:9
151:7,9
152:2,9

153:9
158:9

**coursework**
140:9
151:9

**court** 5:2,8,
16 6:16
7:24 8:5
14:9 17:9
45:9 46:9
61:9 128:9
145:9
150:5
157:9
172:9

**cousins** 13:1

**covered**
139:7

**COVID** 62:9
67:9 71:9
72:9 79:9
80:6,9
81:9 82:9
94:9

**cows** 63:9

**Crawford**
45:4

**create** 47:7
49:9 112:9
158:9
159:5

**created** 30:9
52:9 66:3
69:9 94:9
132:4

170:9

**creating**
49:9 50:5
166:9

**creative**
60:3

**credit** 26:9
30:9 32:9
60:2 151:9

**credits**
27:3,9
28:1 32:9
107:9
136:9
147:9
149:5,9
158:9
162:9

**Creek** 17:9

**crisis** 58:9
79:9

**critical**
94:4 147:9

**cross** 171:9

**cross-talk**
14:9 35:9
151:9

**Crystal** 12:9

**current**
17:1,4,9
18:2 19:1
22:9 49:9
59:9 91:3
106:9

142:9
150:6

**curriculum**
131:9
132:5,9
141:9
143:1
148:7,9
162:9

**cut** 40:9
56:9 57:6
59:9 62:9
64:5 66:9
67:8 70:9
74:9 112:9

**Cutchens**
61:9 102:9

**cuts** 56:7
57:9 58:8
62:9 63:9
66:4,9
70:5

**CVIOG** 78:2,9
80:9 81:9

————————

**D**

————————

**dabble** 21:4

**damage** 169:9

**damaged**
163:9
165:9

**Darton** 47:5

**data** 80:9
94:9 99:9

140:9

**date** 78:9
80:9 81:9
94:9

**dated** 80:9
144:1
161:9

**dates** 62:2

**daughter**
12:9

**daughters**
56:9

**Davis** 87:7

**day** 50:9
52:9 60:9
70:4 78:9
85:9 109:9
141:9
166:9
168:9

**days** 22:9
54:9

**DE** 134:7
136:9
147:9
162:9

**deal** 32:9

**dean** 24:9
99:9 101:9
115:9
116:4

**dean's** 60:9

**dean-type**

60:9

**Deannia** 22:9
91:2

**death** 109:9

**December**
120:9

**decide** 28:9
55:9 74:9

**decided** 47:9
63:6 87:9

**decision**
44:9 52:4
61:9

**decision-
making** 163:5

**decisions**
25:9 27:9
63:3,9
65:9

**deemed** 80:9
94:3 138:9
163:4

**deeming**
138:9

**defendant**
5:15,22

**defensive**
64:9

**Define** 31:9

**defini-** 5:18

**degrading**
146:9

**degree** 20:9 27:1 30:9 140:9 151:9 158:9 159:4

**delay** 79:9

**delayed** 81:9

**delaying** 78:9

**delegate** 41:9

**delivered** 126:9

**demonstrate** 159:9

**demonstrated** 163:4

**department** 27:9 31:7, 8 60:9 63:9 103:9 139:9

**departments** 60:9 85:9

**depend** 58:8

**depending** 62:9 87:9 153:9

**depo-** 5:18

**deposed** 97:6

**deposition** 5:19,21,23

6:1,10,19 7:5,23 8:3,17 11:9 12:2 168:9

**deputy** 145:9

**describing** 29:9 67:9 75:9

**description** 76:9 95:9 105:9

**descriptions** 107:3

**deserved** 169:9

**deserving** 169:9

**designed** 153:9

**desire** 142:9 158:9

**desired** 152:9

**desk** 29:9

**destroy** 16:1

**detail** 147:9

**details** 34:1

**determine** 127:1 131:9 171:9

**development** 21:1

**dictates** 112:9

**difference** 128:3

**differently** 156:9

**differing** 130:9

**difficult** 109:9

**dig** 63:9

**dining-room-type** 85:9

**dinner** 22:1, 9

**direct** 6:8 80:9 82:9 128:9 136:9

**direct-** 32:2

**directly** 17:9 32:3 60:9 145:5 165:9

**director** 19:3 24:9 61:7,9 95:9

**directors** 60:9

**disability**

53:6

**disagree** 83:9 84:1 129:8 147:9 148:9 149:8 154:9

**discipline** 75:6 83:4

**disciplines** 139:9

**discovery** 15:9 92:9 103:9

**discrete** 112:9

**discuss** 69:9 91:9 159:8

**discussed** 69:9

**discussing** 75:5 162:9

**discussion** 64:9 136:9 163:9

**discussions** 78:4

**dissertation** 20:9

**distance** 119:9 120:1,9

Case 7:21-cv-00062-WLS   Document 33-5   Filed 05/02/22   Page 187 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022          Index: District..email

District
  5:16,17

division
  5:17 60:9
  63:8,9
  68:9 115:9

divvy  87:9

doable  128:9

document
  13:9 74:1,
  3,6 83:5,
  8,9 84:1,8
  92:8,9
  96:9 104:2
  106:9
  111:5
  123:9
  129:9
  136:9
  161:9

documented
  83:9

documents
  6:2,23
  11:9 13:9
  14:1,9
  16:3 92:9
  154:8

Doe  74:9

dollar  66:8
  75:9

dollars  55:9
  73:7,9

door  109:2

111:9
112:9
113:9

drafted  97:4

dramatically
  55:2

drawing  79:9

driven  80:2

drives
  168:8,9

drop  55:9
  56:9 73:2

drugs  12:1

dual  31:9
  32:9 33:3,
  6 36:1,4,9
  38:8,9
  39:8 40:9
  41:9 42:7
  47:1 53:9
  69:1,4
  85:7,9
  90:9 91:9
  98:9 106:9
  107:9
  109:9
  129:6
  130:7
  134:9
  142:4,5,8,
  9 146:7,8
  147:9
  149:9
  150:9
  152:9

158:1
159:9
161:1
162:9

dual-
enrollment
  131:5,7
  134:9
  135:9
  136:8
  141:2
  142:9
  143:9
  151:8
  157:9
  160:9
  163:6
  164:9
  171:9

duces  13:9

duly  6:6

duties  75:6
  143:9

───────────

E

───────────

earlier  53:8
  65:1 74:6
  88:9 133:9

early  30:9
  56:9 63:9
  71:9 82:9

eat  21:9

editing  24:7

editor  24:4

educate
  157:9

education
  20:9 30:9
  139:9
  157:4
  168:7

educational
  157:9

effective
  120:9

effectively
  100:9

effectiveness
  51:9

effort  17:9
  138:9

eggs  42:2,9

elementary
  30:9

elevated
  145:9

eligible
  171:9

eliminate
  57:9

eliminated
  76:9

eliminating
  57:9

email  33:9
  106:9
  115:9

Case 7:21-cv-00062-WLS    Document 33-5    Filed 05/02/22    Page 188 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022        Index: emailed..evidence

120:9
136:6
143:9
144:3,9
146:9
147:9
154:5
155:9
156:6,9
162:7,9
163:3
165:9
166:9
167:9
171:9

emailed
114:9

embedded
136:6

employ 120:2

employed
87:9

employee
5:22 16:9
18:6,9
20:9 73:9
101:9
103:9
121:8
170:5

employees
17:9 18:1,
9 58:2
59:9 78:9
80:8,9
83:9 84:9

87:9 110:9
111:9
114:1,7
120:8
127:9

employment
17:2,5

enact 62:9

encouraged
43:9 44:9
54:9 99:9
112:2

encouraging
44:9 67:9

end 26:4
45:9 55:9
70:9 86:9
153:9
168:9

endeavor
48:9

ended 26:5
31:4 45:9
60:1 62:9
88:9 138:9

engage 120:9
121:4

English 23:9
133:8,9
135:1,2,9
140:2,3

enjoy 50:9

enrolled
146:9

160:9
161:1,5

enrollment
31:9 32:6,
9 33:3,6
36:1,4,9
38:8,9
39:9 40:9
41:9 42:7
49:9 52:9
53:9 56:9
57:5 69:1,
4 73:2
85:7,9
90:9 91:9
98:9 106:9
107:9
109:9
129:6
130:7
134:9
142:4,5,8,
9 146:7,8
147:9
149:9
150:9
152:9
158:2
159:9
161:2
162:9
167:9

ensure 133:9
154:9
156:9

enter 149:4
150:9

entire 64:9
65:3 70:5
133:9

entrance
85:9

entry 152:9

equal 83:9
132:4

equaled 66:9

essentially
39:6 151:9

established
111:9
113:9
162:9
163:8

establishing
119:9

ethic 86:9

evaluations
75:7,9

events 159:9
160:3

eventually
52:9 72:9

everybody's
69:9

evidence
15:9 77:9
83:3
121:6,9
140:5,8
165:9

Case 7:21-cv-00062-WLS    Document 33-5    Filed 05/02/22    Page 189 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022         Index: exact..feedback

166:8

**exact**  56:9
59:9 62:3
78:9 107:2

**examination**
6:8 172:9

**Excel**  67:9
68:2 69:6

**excellent**
48:9

**excerpt**
106:9

**excited**  40:4

**executive**
34:8

**exert**  138:9

**exhausted**
32:9

**exhibit**
13:6,8
15:7,9
73:9 74:3
75:9 80:9
81:9 91:9
92:7 96:9
98:9 99:1,
8,9 105:6,
8,9 106:6
115:1
128:9
129:2
130:9
136:4,9
143:9

150:9
154:2
155:9
161:9

**exist**  73:9
102:7
144:9

**existed**  30:8
139:9

**existence**
170:9

**existing**
19:9 58:2
66:9 74:9
95:9

**exists**  135:9
139:9

**expand**  26:3
33:3 36:9

**expected**
163:5

**expenses**
55:9

**experience**
31:9 39:9
131:9

**explain**
171:9

**explained**
54:9

**explicitly**
148:3

**explore**  36:9

**expressed**
166:2

**expresses**
113:9

**expressing**
120:6

**extent**  7:9,
15 119:1
170:5

**eyes**  24:7

---

**F**

---

**faces**  49:3

**facilitate**
21:1

**fact**  59:1
62:4 66:9
99:9 100:3
120:9
126:9
134:9
140:8
152:9
165:6

**factors**  20:9
54:9 57:3
83:9

**faculty**  18:9
20:1 23:8,
9 24:4
31:8 37:5
38:9 39:9
46:9 48:9
60:9 64:9

78:9 95:9
127:9
139:5,8,9
142:4,5

**fail**  92:5

**failed**  140:6

**Fair**  10:2
107:4

**fairly**  28:9
34:9 36:9
40:9 57:6
82:9

**fall**  56:9
57:5 73:1
103:9

**false**  84:3,5

**familiar**
29:9

**family**  9:15
12:7 21:9
22:7

**fast**  62:4

**February**
94:9 144:1
162:7

**federal**  6:1
13:9 15:9
16:6 71:9
73:9

**feedback**
51:9 82:9
118:9
119:9
128:5

feel 76:6
  78:9 119:9
  146:9
feelings
  64:9
feels 50:9
felt 36:9
  50:8 53:9
  58:9 76:9
  109:1
  119:9
  139:9
  147:1
  164:9
  169:9
female 120:8
  121:8
females
  120:2,9
figure 20:9
  71:5 78:9
  97:2 98:5
  111:6
  115:9
  124:3
figured 10:9
file 11:9
  67:9 68:2
  87:9 169:7
filed 6:5
  101:9
  104:9
  108:9
  124:9

fill 59:5
  66:4 95:9
filled 75:1
  95:9 110:9
filling 95:9
final 59:9
  63:3
finalists
  51:9
finalists'
  51:9
finance 25:3
  61:3 66:1
  88:9
financial
  167:4
  171:9
financially
  46:8
find 37:5
  88:3 96:9
  97:9 99:9
  113:9
  122:9
  124:9
  125:5
  166:9
  167:5
finder 119:9
findings
  123:9
  125:5
fine 15:9
  90:6 101:1

115:9
130:5
156:9
fingers
  121:9
finish 38:6
  140:9
  158:9
  168:9
finished
  30:9
firm 44:5
First-year
  170:9
fiscal 56:7
  79:9 82:2
fists 114:2,
  7
five-step
  79:5
five-year
  79:4
fix 169:9
flip 13:9
  54:9 96:9
flip-book
  106:9
flyer 136:6
focus 39:9
  48:3,4,9
  65:8,9
  138:9

focused 49:9
folks 18:9
  20:6 22:7
  48:1 51:9
  54:9 59:9
  64:4 103:7
  105:9
  106:2
  116:6
follow 78:9
follow-up
  41:9 88:9
  89:9
football
  22:9 91:9
footprint
  37:4 146:9
force 18:9
  19:9 20:9
  54:8,9
  58:2 74:4,
  9 90:9
forget 109:9
  110:2
  172:8
form 7:19
  41:8
forum 51:9
forward 40:9
  41:3,9
  63:9 67:5
  74:9 81:9
  82:6 93:9
  95:8,9

Case 7:21-cv-00062-WLS    Document 33-5    Filed 05/02/22    Page 191 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022          Index: forwarded..glad

96:1 148:9 154:9 164:9

**forwarded** 162:9

**fought** 137:9

**found** 88:1,9 117:9

**foundation** 154:9 155:3 162:9

**four-page** 105:9

**four-year** 129:9 132:9 138:9 140:9 147:9 162:9 167:9

**frankly** 41:9 47:9 66:9 112:9 138:9 149:9

**freedom** 64:7

**freely** 92:5 158:9

**Freidhoff** 84:9 85:3

**frequently** 74:5 166:9

**freshman** 27:6,8 138:9

**frie-** 17:9

**friend** 23:9

**friends** 21:9 23:9 25:6 41:8 119:9

**friendship** 25:9 41:8

**front** 48:9 74:1 85:9 86:9 92:9 111:9 129:3 142:9

**froze** 58:9

**frustrated** 137:1

**fulfill** 135:9 152:9 157:8

**full** 8:7 40:9 45:7 84:9

**full-time** 39:4 134:9

**fun** 70:3,5

**function** 91:9

**functional** 32:1

**functions** 76:9 87:9 94:7 95:9

**fund** 73:5 78:7 82:7

**funded** 152:9

**funding** 41:9 42:3 50:6 57:9 71:9 72:9 73:1 78:9 82:2

**fundraising** 43:9 44:1, 3 45:1

**funds** 55:9 57:9

**funeral** 109:9 110:7,9

**funny** 122:9

**furlough** 70:9

_____

**G**
_____

**gain** 135:9

**game** 23:2 91:9

**gathering** 85:9

**gave** 13:9 44:9 70:9 77:9 78:9 79:4 88:9

91:6 96:5

**gender** 111:9

**generated** 98:9 99:9

**geographic** 37:4 146:9

**Georgia** 5:13,17 8:14 12:6 13:3 18:9 19:2 24:9 30:2 36:9 43:9 47:4 56:3 101:9 130:9 133:6,9 141:9 149:9 150:9 162:8

**Georgia's** 72:2

**gestures** 7:25

**Gibbs** 45:5

**give** 5:4 7:16 28:5 51:9 65:9 91:4 101:9 126:4 171:9

**giving** 67:9 121:9

**glad** 122:5

goal  168:9

God  5:6

golf  17:9
  24:9

good  5:9
  10:9 23:9
  24:4 31:9
  73:9 89:1,
  2 105:9
  107:9
  123:9
  139:9
  153:5
  159:1
  162:9
  167:6
  168:3
  169:9
  170:6

governance
  58:4 64:9
  78:9 82:9

Government
  73:9 78:2

GPA  135:9
  149:9
  151:2

grabs  109:2

graduate
  147:9
  148:9
  154:9
  162:9

graduation
  53:5 134:9

grapevine
  101:9

green  130:2

grievance
  9:15

grit  114:6

gritting
  114:1

group  17:9
  18:4,6
  19:4 21:9
  49:9 50:1
  59:9 63:9
  82:6,9
  150:1
  159:9

groups  17:8
  19:9 58:5
  64:9 78:9

grow  36:9
  38:9 42:3
  142:9

growth  20:9

guarantee
  134:9
  135:9
  150:9

guaranteed
  135:5,6,8,
  9

guess  21:3,5
  31:9 43:9
  52:9 69:6
  71:7 76:9

106:9
164:8

guidance
  49:9 75:9

guideline
  96:7

guidelines
  96:5 126:9

guys  34:9
  102:2

_____

H

_____

H-A-R-B-A-U-G-
H  104:9

H-A-U-G-A-B-R-
O-O-K  61:9

hair  121:9

half  13:9
  58:9

hall  72:1
  91:5

Hancock
  106:9
  143:9

hand  7:4
  15:9 16:7
  112:9

handing  13:5
  15:9

handled  87:9

hang  21:9
  160:1

happen  47:9
  57:8 63:9
  70:9 71:1
  72:1 79:9
  84:9 118:6
  158:7
  166:9
  167:9
  168:1,9
  169:9
  172:2

happened
  10:9 67:9
  109:9
  115:8
  156:9
  160:9
  163:9
  164:9
  165:5,7
  169:9

happening
  70:9 71:9
  101:8
  104:9

Harbaugh
  104:9

hard  60:3
  64:9 70:2,
  6 71:6
  138:1
  139:9
  168:2

harder  10:9

harm  147:7

Haugabrook
  61:9

He'll  172:9

head  49:2
  56:9  73:2
  89:1

heads  31:8
  58:4  60:9
  74:9  82:9

health  18:7,
  9  21:3
  99:9  101:9

hear  6:17
  65:9  157:9

heard  71:9
  101:9
  113:9
  114:8
  136:8
  137:9
  138:9
  144:9
  145:7

hearing  7:21
  41:9  42:9
  58:6

Heidt  104:5
  114:9

held  159:9

helping
  107:9
  120:9
  167:9

helps  44:2

154:9
157:8

heretofore
  6:5

hesitant
  40:4,9

Hey  24:5
  26:7  31:9
  35:9  43:9
  44:9  50:9
  65:6  77:9
  101:9
  132:4
  165:9

high  28:9
  38:9  39:5,
  9  40:9
  49:9  91:9
  131:9
  132:6,9
  134:9
  135:9
  141:1,4,9
  143:9
  145:5
  146:4,6
  147:9
  148:9
  149:9
  151:2
  156:9
  160:4
  162:8

higher  20:9
  139:9
  149:9

higher-ed
  56:9

highest  20:9

highlighted
  83:9  92:9
  100:9
  106:9
  107:6
  131:9
  151:9

highlighting
  111:9

Hilary  45:5
  93:4

hire  57:9
  94:6

hired  44:5
  45:9  46:2
  58:2  104:9

hiring  52:7
  94:3  95:9
  126:9

historically
  139:6,9

hit  54:9
  62:9  66:7
  79:9  80:9
  82:9

Hogan  11:9
  68:9  93:2

Hogan's
  105:9

hold  57:9
  82:9

Holly  5:9

home  12:9
  17:9  21:9
  54:9  56:9
  87:2  110:9

honest  116:9

honestly
  13:9  26:9
  34:9  40:5
  42:1  59:9
  72:7  84:9
  87:9  108:9
  115:9
  116:9
  117:4
  121:9
  124:9

hoped  40:9

hoped-for
  78:7

hoping  122:9

hopping  17:9

host  117:6
  167:5

hotline  86:9

hours  27:4
  134:9
  135:3
  148:2
  151:9

house  42:9
  85:9

housed  170:9

Case 7:21-cv-00062-WLS    Document 33-5    Filed 05/02/22    Page 194 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022          Index: HR..initiatives

HR   10:7
  111:9
  113:9
  117:2,3
  126:9
  169:7

HR-RELATED
  9:15 10:9

hug   109:9
  110:9

huge   55:2
  56:9

hugged   109:1

human   112:9

humanities
  23:9

hundred   29:6
  108:9

hurt   67:6
  164:9

hurting   46:8

husband   24:9

_____
      I
_____

i.e.   57:9
  151:9

idea   38:9
  41:9 49:8
  50:4 53:9
  54:4 92:2
  125:9
  144:9
  145:3

ideally
  119:9

ideas   60:4
  158:4

identification
  13:7 15:6
  73:9 80:9
  91:9 96:9
  98:9
  105:5,9
  106:5
  114:9
  128:9
  130:9
  136:3,9
  143:9
  155:9
  161:8

identifies
  119:9

identify
  88:3

immediately
  62:6

impact   67:7
  163:7

impactful
  70:8

implications
  32:6

important
  125:9
  168:6

improve

118:9

in-house
  89:9

in-person
  33:9

inappropriate
  163:4

incidence
  108:9

include
  157:9

included
  66:9 162:9

Includes
  69:2

including
  53:1

increase
  80:7

Independence
  9:8,9

independent
  88:5 89:9

indiscernible
  17:9 45:9
  46:9 145:9
  150:4
  157:9

individual
  84:9 112:9

individually
  67:3 69:9
  142:6

individuals
  45:7 105:9
  109:4

industry
  56:9 61:9

ineffective
  162:9

inevitably
  26:9

inference
  148:9
  149:9
  154:9

influence
  25:9

influenced
  20:9

inform   103:9

informal
  84:9

information
  7:11 61:7
  101:9
  116:9
  117:9
  126:9

inherited
  127:9

initial   89:9

initiated
  31:6 70:9

initiatives
  61:9

inlaws   13:2

inside   63:8
  99:9

institution
  9:14,15
  28:9 32:7,
  9 45:5
  46:6,7,9
  47:7,9
  48:9 49:9
  50:2 53:9
  57:1 64:9
  65:4 67:7
  70:9 76:9
  78:2 87:8
  88:5 93:9
  95:9 100:2
  110:9
  122:3
  127:9
  133:9
  135:2,9
  137:9
  138:7
  139:8,9
  140:4,9
  144:9
  146:9
  147:3,9
  149:1,7
  151:4
  152:9
  153:4,9
  155:2
  157:9
  158:9
  162:9

  164:1,9
  166:7
  168:9
  169:9

institution-
specific
  151:9

institutional
  40:9 45:2
  51:9

institutions
  18:9 26:2
  28:9 29:9
  36:9 44:2
  48:7 53:9
  56:2 80:4
  130:9
  133:9
  136:9
  146:9
  147:5
  149:5
  150:9
  152:9
  162:9
  167:9

instructions
  65:9 126:9

integrate
  22:9

intent   131:9

interact
  22:9 119:9

interacted
  143:7

interacting
  120:3

interaction
  121:9

interactions
  22:6 120:7
  121:9
  169:9

interesting
  21:2 140:9

interim   25:4
  47:4 49:9
  86:9 115:9

internal
  100:9

interview
  51:9

interviewed
  43:9 117:5

interviews
  126:9

inventory
  119:8

investigated
  87:9

investigation
  86:9 87:9
  88:6,9
  89:8,9
  110:9
  114:9
  115:5
  116:9
  117:9

interacting
  118:3,9
  123:9
  124:9

investigator
  87:9 89:9

investigators
  120:9
  122:9
  124:8

invited   23:2
  91:3,9

inviting
  22:9

involved
  17:9 36:9
  47:9

involvement
  17:7

irreparable
  147:7

isolated
  163:1

isolation
  41:9

issue   9:15
  10:9 72:3
  121:9
  137:9
  149:9
  170:8,9

issued
  164:2,9

issues   18:9
  84:9 115:9

124:9
167:4

items  69:9

IX  9:15
  86:9 87:2,
  9 108:9
110:9
114:9

---

**J**

---

Jamie  5:10,
  12 33:9
  34:9 54:6,
  7 80:9
  87:9 93:9
  95:1 97:6
101:9
106:9
108:9
114:9
143:7,9
156:6,9
161:9
165:9
171:9

Jamie's  54:9
  97:9 169:7

Jane  74:9

Janice  89:9
  90:1

January  45:9
  47:9

Jeanine  85:9
  86:9 87:9
  97:5,6

98:3 102:9
103:9
104:9
108:9
111:8

Jere  150:6

Jerry  43:9

job  44:9
  47:3,9
  48:9 49:9
  50:9 52:9
  75:9 76:9
  77:9 89:2
  92:3 95:9
105:9
107:3
143:9
170:6

jobs  46:9

John  45:4
  74:9

joint  159:8,
  9

jokes  119:9

Jones  117:1
  124:8

Josiah  104:5
  114:9

Joyce  117:1,
  9 124:8

Joyce's
  117:9

judgment
  163:5

July  52:9
  56:8 62:8
  63:4 79:9

jumping
  120:9

June  62:6,9

Justin  102:9

---

**K**

---

Kansas  9:9

keeping  66:9

Kelly  72:7

kids  12:8

kind  21:3
  23:9 26:8
  27:3 33:9
  37:3 39:2
  53:9 87:2
  90:9 109:2
  112:6
  118:6,9
  119:9
  120:9
  128:1
  145:7

Kirkland
  114:9
  115:9
  120:9

knew  22:9
  32:8 34:9
  36:9 39:9
  43:9 44:4
  64:9 75:9

78:8 79:1
87:9 93:9
117:9
127:3,5,6,
9 143:9
145:9
146:1
155:9
156:9
161:9
164:9
169:9

knowing
  168:4

knowledge
  82:9 108:2
  110:9

knowledgeable
  89:1

---

**L**

---

lack  105:9
  139:1
  163:4

landscape
  43:9

language
  41:9 42:9
  120:9
  121:1,4
  162:9

large  36:9
  40:9 49:9
  59:9 110:9

larger  60:1
  64:9

late  54:9
  62:5 103:9

later-date
  20:4

law  15:9
  16:6 42:9
  91:9

lawful  6:6

lawsuit  9:10
  10:9 15:9
  101:6,9
  102:3
  104:9

lawsuits
  9:15

lawyer  11:4

layoffs  72:5

lead  48:9
  168:4

leader  91:7
  127:9
  128:2

leadership
  49:9 56:9
  59:9 60:9
  119:9

leading  47:1
  115:9

learn  117:9

learned
  100:9

151:9
171:9

learning
  28:9 133:9
  138:8

leave  8:5
  46:6 47:2
  87:3 160:9

leaving  18:9
  49:9 90:9

led  21:3
  72:9 144:5

Lee  87:7

left  46:9
  47:2 61:9
  63:8 87:4,
  6 96:2
  107:9
  108:2,9
  145:9

legal  15:9
  19:3 87:7
  88:9 102:9
  103:5,7,9
  104:9
  117:4

length  75:9
  83:9

letter  15:9
  32:9 80:9
  81:9 97:4
  98:4 111:6
  123:6,9
  127:6,7
  166:9

169:9

letters  92:4

letting
  108:9

level  20:9
  27:9 28:9
  29:1 31:7
  41:9 42:9
  59:9 60:9
  99:9 117:9
  118:9
  124:9
  129:9
  130:9
  135:9
  149:9
  151:3,8
  153:9
  163:9
  169:9

levels  20:9
  56:9 66:9
  78:9

liberal
  139:9

liberally
  162:9

limit  59:9
  112:7

limited
  169:9

lines  57:9
  66:9 95:9

links  29:5

Lisa  15:4
  68:9

list  14:1
  26:3 30:8
  63:7 66:9
  67:1,9
  69:9 70:8
  74:9 76:1
  93:9 105:9
  150:9

listed  48:6
  117:9
  136:9
  137:6
  155:9

lists  69:9

literally
  52:9 109:9
  110:1,9
  140:9

litigation
  9:3

live  12:9
  24:9

lives  12:9

local  21:9
  22:9 167:7

locally  56:9

locate  96:9

Loeffler
  72:7

long  9:1
  42:9 66:9
  68:9 93:9

Case 7:21-cv-00062-WLS    Document 33-5    Filed 05/02/22    Page 198 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022        Index: long-time..March

110:9
111:5
162:4
170:9

long-time
116:4
137:9

longer 45:5
49:5 157:9

looked 14:9
42:5 77:9

lose 114:9

loss 56:9
58:9 72:4

lot 23:9
24:4 40:9
54:9 56:9
57:1 58:9
60:2 71:9
87:1 100:2
110:9
116:9

loud 161:9

love 122:7

low 36:9
53:9

lower 153:9

luck 51:3

luckily 96:9

Lynn 89:9
90:1

——————————
M
——————————

made 18:4
20:9 22:9
27:9 39:9
42:9 52:9
59:1 61:9
63:3 104:9
127:9
145:9

Maestas 5:9,
10 6:9
7:18,22
13:9 14:7,
9 15:2,3,8
16:9 17:9
35:9 38:5,
9 45:9
48:9 73:9
80:9 83:9
84:6 91:9
96:9 97:9
98:2 99:3
100:9
101:3
103:1,9
105:7,9
106:7
113:9
115:2
122:9
125:9
126:2,6
128:9
129:1
130:5,6
131:1

132:2
136:5,9
137:5,9
143:9
145:9
150:8
151:9
154:4,7,9
155:9
157:9
159:9
161:9
168:9
169:1,3,5
170:9
171:2
172:6,8,9

Maggie 87:1

mail 15:9

main 7:13
91:9

major 48:2
150:9
151:3,6
152:9

majority
134:9

make 18:8
25:9 32:9
39:9 42:6
43:4 57:9
59:9 64:2,
9 69:9
82:9 100:9
119:9
121:9

128:2
134:9
144:9
156:9
159:9
167:8,9
168:9
172:9

making 24:2
43:2,3
65:9 82:9
95:9 114:5
120:9
127:9
148:9
149:9
169:2

male 89:9

man 89:9
117:3

manage 100:9

management
49:9

manager 65:9
93:1

managers
59:4 93:9
99:9 100:9

managing
107:9

mandate 95:4

March 62:9
80:9 82:9
122:9

123:2,9
161:9

mark 53:9

marked 13:5,
7 15:6,9
73:9 74:2
80:9 91:9
92:9 96:9
98:9
105:5,9
106:5
111:9
114:9
128:9
130:9
136:3,9
143:9
155:9
161:8

market 39:9

marketed
40:9

marketing
39:8 53:2
76:7 77:9
95:9

marking 15:9

married
106:9

Martin 66:2
67:9 68:4
69:7 81:9

Martin's
74:9

massaging
121:9

master 112:1

match 28:9
59:9

math 66:6
152:2,9
153:3,9

mathematics
152:9

matter 5:11
133:9
136:9
138:9
150:9

maximize
39:9

Mcgee 25:2,9
88:8

Mckinney
45:9

means 51:1
54:9 134:9
138:7

meant 122:9

measure
133:6

mechanism
42:4

meddling
63:9

media 26:9

medications
11:9

meet 11:6
24:9 84:9
86:9 135:9
149:6
152:9
157:9
160:4

meet all
165:9

meeting 33:9
34:1,5,9
35:1,2,3
36:3,6
37:9 38:9
39:9 40:2
42:9 53:9
60:9 66:9
67:9 72:1
84:9 90:9
103:9
111:9
112:3,9
113:9
149:9
160:9

meetings
11:2 18:9
22:9 25:1
60:9 67:9
84:9 86:2,
4,7,8
90:8,9

meets 160:4

Megan 106:9

143:9

Melinda 61:9
102:9
104:9
112:9

Melinda's
112:9

Melindas
102:9

member 17:9
18:4 19:2
20:9 23:8
46:2 63:9
65:9 69:9
71:1 139:9

members 33:9
38:9 40:3
48:9 60:9
63:9 70:9
84:9 94:2
139:9

memory 12:1
58:9

mental 18:7,
9 21:3

mental-health
18:3,9
19:1,9
20:1 90:9

mentioned
88:8 139:9

message
162:9

met 89:9

Case 7:21-cv-00062-WLS    Document 33-5    Filed 05/02/22    Page 200 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022          Index: Michael..noted

90:5
117:6,7,8

Michael
114:9
115:9
120:9

micromanaging
105:9

middle   5:16
24:9 33:9
49:9 78:9

Military
36:9

millions
56:1

mind   171:9

minus   34:4

minute   98:8

minutes
170:9

misconception
136:9
137:6,8

misperception
139:7

missing
125:1

mission   19:9
157:3,8,9

misunderstood
160:3

Mitchell
107:9

141:9
161:9
169:9

Mm-hmm   21:9

model   40:9
41:2,3,9

moment   73:9

moms   56:9

money   54:9
55:9 73:9

moniker   39:3

month   24:9

monthly   84:9

months   52:9

Morehead
150:6

morning   5:9
6:12,20
13:9 50:9

mother   115:9

move   39:2,3
59:9 148:9
154:9

moved   24:9
40:8 41:3,
9 42:9

multi-   163:9

multiple
20:9 22:9
32:9 50:9
56:9 57:3
70:2 76:7

87:9 93:9
142:9
145:5
160:4
162:9

multiple-step
78:8

myriad   168:9

—————————

N

—————————

named   6:5
51:9

names   8:11
12:9 49:1
65:9 74:9
105:9
146:3

national
50:9 140:9

nationally
70:9 137:9
140:9

native   140:9

nature   112:9
113:1
115:9

nearby   139:9

necessarily
79:9

needed   38:9
47:9 48:6
49:9 50:9
58:9 64:5,
9 66:9

72:6 84:9
91:8 95:9
116:9
120:1,9
138:9
148:6
149:6
153:6
154:9
155:9
162:9
163:9
166:9
169:9

needing
170:9

negative
147:4

neighboring
162:9

network   22:9

newly   92:9
104:9

niche   33:6

niches   36:4

night   50:9

non-usg
149:1

nonparty
5:21

North   24:9

noted   158:9
165:3

Case 7:21-cv-00062-WLS   Document 33-5   Filed 05/02/22   Page 201 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022          Index: notes..opposite

notes 122:9

notice 5:20, 24 6:5,10, 19 7:5 62:5 172:9

noticed 53:9

November 15:9 80:9 81:9

Noviello 101:9

number 5:15 9:2 26:1 28:9 51:9 59:4,9 60:5 62:1, 9 66:9 72:5 75:9 83:9 99:9 100:7 111:9 149:9

numbers 53:9 57:4,5,9 58:9 59:9 70:9 71:6 77:9 98:9 99:7,9 100:1 171:9

Nursing 99:9 101:9

— O —

oath 6:7

objecting 121:9

Objections 7:18

observed 138:8

occasionally 24:9 112:9

occurred 34:6,7 77:8 136:9

occurrence 163:1

occurring 78:4

odd 113:9

offensive 162:9

offer 28:9 134:9

offered 39:9 52:3 91:7 127:1

offhand 19:7

office 15:4, 9 19:9 24:1 43:9 46:9 54:9 85:1 90:9 103:6,9 105:9 108:9 109:9 110:9

112:4,9 116:7 127:9 170:9

officer 61:8,9 88:9 102:9 104:9 142:9

officers 60:9 78:9

offices 23:9

official 156:9

officials 20:9

on-campus 39:9

one's 10:9

one-on-one 142:9

one-time 55:9 72:9 73:9

one-year 53:9

ongoing 15:9 105:3

online 54:9

open 44:9 51:9 57:9 59:4 60:4 64:9 71:9

74:9 92:9 93:9 94:2, 5,9 95:5, 6,9 103:9 114:9 116:9

open-access 137:9

open-enrollment 130:9

opened 50:9 74:1 93:8

operated 139:9

operating 57:9 59:3 66:9

opinion 121:3 131:9

opportunities 36:9 39:9 168:9

opportunity 6:22 7:6 36:9 51:9 100:9 112:9 169:4 171:9

opposed 137:9

opposite 111:9

133:3

option  8:6
  70:9

options
  130:9

oral  161:9
  169:9

order  50:9
  59:9 148:9
  151:9
  153:9
  166:9
  168:9

organization
  95:9

organizations
  17:9 18:9

other's  64:8

out-  128:1

out-of-class
  53:3

outcome  86:9
  87:9 88:9

outcomes
  28:9 138:8

outlined
  133:9

outperform
  140:9

outstanding
  127:9
  128:2

overcome
  118:9

overseeing
  90:9

oversees
  170:9

———————

**P**

———————

p.m.  171:1
  172:9

pace  107:7

packet  126:9
  133:9

pages  105:9
  106:1

paid  16:9
  48:9

pain  76:9

pamphlet
  148:5

pandemic
  54:9 58:9

paper  124:9

paragraph
  157:2,9
  159:7,9

parameters
  70:9

parcel  99:9

parceled
  87:9

parenthetical
  137:7

parents
  110:1
  136:9
  142:9

part  10:8
  24:2 51:9
  52:9 54:7
  75:9 77:9
  87:9 103:9
  145:9
  148:9

participate
  12:2 147:9

partner
  158:1
  160:9
  164:1

partnering
  157:9

partners
  157:4
  159:9
  160:8
  168:3

partnerships
  157:7

party  9:10
  10:9

pass  88:9

passed  88:9
  148:2

passing

150:9

passionate
  64:4

past  18:9
  127:9

pathway  30:9
  158:9
  159:5
  166:9

pathways
  129:9

pay  73:9
  82:2

paying  54:9
  169:1

peer  48:7

pending  5:15

people  9:11
  14:9 20:3
  22:8 34:9
  44:9 48:9
  50:9 51:9
  58:9 59:9
  60:2 62:5
  72:9 85:9
  87:9 100:4
  101:9
  110:9
  116:9
  117:6
  119:9
  120:6,8
  121:9
  127:9
  140:9

142:9
164:9

people's
119:9

perceived
119:9
137:9
162:9

percent   57:9
58:9  61:9
63:9  66:9
108:9

percentage
40:9

percentages
56:9  58:9

perception
118:9
120:9
121:9
137:9
139:9

perform   76:9
77:9

performance
75:6,9
76:9  83:4,
9  115:9
171:9

performs
143:9

period   61:9
146:9

periodic

22:9

periodically
24:2,5
25:9  90:9

permanent
72:9  73:8
169:7

permanently
49:9

person   23:9
49:9  64:9
67:4  77:9
88:9  89:3,
5,9  90:5,9
101:9
112:5
115:9
116:1
119:5
121:9
126:9
141:9
162:9

person's
19:6  43:9

personal
64:9  75:9
164:3

personality-
type  119:8

personally
22:9  83:3
127:3
141:9
164:2

periodic

171:9

personnel
57:9  66:9
72:9  74:9
169:7

pews   110:9

ph   89:9

Ph.d.   20:9

phone   25:7
26:9  32:9
33:9  44:9
108:9
144:9
156:4

photo   29:9

photograph
31:5

phrased   30:9

physical
121:8
124:9

physically
85:6

pick   51:9
52:2  74:9
128:4

picks   51:9

piece   124:9

pink   111:9

pitch   39:9
40:2  52:9

pitched   39:6

50:4 158:4

place   39:9

places   57:2
70:2,9
107:9

plaintiff
5:11,12

plaintiff's
13:6,7
15:6,9
73:9  74:2
75:9  80:9
91:9  92:7
96:9  98:9
99:8,9
105:5,8,9
106:5
114:9
128:9
129:2
130:9
136:3,9
143:9
150:9
154:2
155:9
161:8

plan   47:9
58:9  78:9
84:9  87:9
160:6,8,9

planning
150:9
162:9

plans   79:2

play   24:9
  87:9

point   46:9
  47:9  69:9
  109:3
  136:9

pointed
  124:9

points   136:9

policy   28:9
  113:9
  133:9
  158:9

political
  17:9

politically
  71:9

popped   68:2

pops   127:1

populated
  67:9

populations
  36:9

portal   99:9
  100:3

position
  25:9  45:9
  46:7  49:9
  50:7  52:3
  74:9  75:9
  76:2  80:3
  93:9  94:2,
  4,9  95:5,6
  117:1

  145:9
  156:9
  164:9
  165:7

position's
  75:5

positions
  17:4  50:9
  57:9  59:4,
  6,7  64:9
  66:9  71:9
  74:9  76:7,
  9  77:9
  80:4  83:9
  92:9  93:7,
  9  94:3,6
  95:1,9

positive
  34:9

posted   86:9
  92:9  93:1

potential
  63:9  64:9
  127:9
  128:2
  138:9
  168:9

potentially
  38:9

Powerpoint
  129:5

practice
  27:9  111:9
  112:9
  131:9

precursor
  19:9

predated
  19:1

preparation
  138:9

prepare   10:9
  11:9  56:9
  62:9
  107:7,9
  132:9
  140:7
  150:9
  153:9

prepared
  57:6  131:9
  136:9
  138:9

preparing
  151:9
  153:9

prerequisite
  153:9

present   67:9
  69:8  77:9
  126:9

presentation
  76:4

presented
  69:7

preservation
  15:9

preserve
  15:9

presidency
  25:9  30:9
  49:9

president
  17:3  22:9
  23:3  24:3
  25:3,4,5
  30:3  31:9
  34:5  43:9
  44:9  45:4,
  8,9  46:5
  47:4,9
  61:2,3,4,
  5,6  66:1
  68:9  90:9
  91:3  102:9
  104:9
  115:9
  118:2,9
  127:9
  149:9
  150:7
  163:9

president's
  18:9  22:9
  38:9  60:9
  86:9  91:9

presidential
  61:9  169:9

presidents
  61:2  163:9

pretty   10:9
  32:9  36:9
  53:9  62:9
  105:9
  112:1

Case 7:21-cv-00062-WLS    Document 33-5    Filed 05/02/22    Page 205 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022    Index: previous..questions

159:1

previous
154:9
155:9

previously
74:2 111:9
113:9
115:9

primary   48:9

printout
99:4 105:9

prior   31:9
46:1

priorities
48:2,5

prioritized
69:9

priority
43:3 48:9

private   61:9
113:2
139:9

privy   77:7,9

problem   15:2

proceed
104:9

Proceedings
5:1

process   50:9
51:2,5
55:9 58:5
70:5 79:4,
5,9 81:9

82:9 102:6

produce   6:2,
19 172:9

Production
14:5

professional
110:4
120:1,9

professor
112:2

professors
40:9 139:1

program   30:9
32:9 36:9
42:9 106:9
147:9
162:9
166:9

programs
107:9
143:9
158:9

progress
127:9

protect   64:9

protective
64:2 115:9

provide   7:6
14:9 49:9

provided
92:8,9
133:9
138:6

providing
162:9

provost   26:6
31:9 49:9
50:9 52:9
60:9 95:9

public   103:9
117:9
121:2
138:5
140:1
142:7

publications
21:9

publicity
118:8,9

publicly
133:2

published
133:9

pulled   74:3

pursuant
5:20,24,25

pursue   131:9
134:9
148:7

push   41:9

pushing   43:1
72:9

put   42:2
63:7 68:2
69:7,8,9
80:6 100:9
113:3,9

127:9
138:9
149:9

puts   113:5,
8

putting   42:9

─────────────

Q

─────────────

qualitative
20:9

quality
139:1

quantitative
152:4

quarterly
86:7

question
7:19 25:9
31:9 81:9
105:9
113:9
137:9
160:3,9
161:3
163:9
168:9

question-and-
answer-style
12:3

questions
64:7 67:9
69:9 71:9
74:5 84:9
124:9

171:4

**quickly** 10:9 53:9

**quit** 42:9

———————

**R**

———————

**raised** 72:2

**raises** 79:9

**ram-** 15:9

**ramifications** 15:9

**ran** 142:9

**rank** 135:9 149:9 151:2

**re-** 6:23

**reached** 44:9

**reaching** 146:9 159:8

**read** 8:2 14:1 51:9 92:3 132:9 137:4,8 154:1 159:9 161:9 162:1,2,4, 5 172:9

**read-** 79:9

**readers** 155:1

**readiness** 152:9

**reading** 8:3 162:5 172:9

**ready** 31:9 39:2,3 49:9 62:8, 9 152:9 153:2

**real** 37:7 71:9 101:9 102:4 115:9 116:9 167:4

**realize** 158:9

**realized** 37:1 53:9 125:1 163:9

**reason** 22:4 28:2 77:9 84:4

**reasonable** 89:1

**reasoning** 152:4

**reasons** 22:9 167:5

**recall** 10:1 15:9 30:4, 9 32:9

33:9 34:9 35:9 40:8, 9 58:9 66:5,9 70:6 71:7, 9 74:6 79:8 85:9 88:1,9 103:3 110:7,9 114:9 115:4,5,7, 9 116:9 117:4,9 121:9 124:9 142:2,6 143:4 146:5 147:9 155:9 156:8 171:9

**receipt** 15:9

**receive** 6:10

**received** 13:9 15:9 32:9 58:9 61:9 86:9 115:9 144:5

**receiving** 15:9 82:9 145:8

**recent** 29:9 90:9

**recently** 91:2 163:8

**recess** 73:9 128:9 171:1

**recognize** 96:9 106:9 123:9 144:3 161:9

**recognized** 50:9

**recollection** 81:9 109:6 115:6

**recommendation** 79:9 123:9 125:9

**recommendation s** 18:8 59:1

**recommended** 46:9 59:5 78:9 88:9

**record** 8:8 15:1,9 73:9 103:9 128:9 171:3

**records** 7:6 103:9 114:9

**recruiter** 92:9

**recruiters**

Case 7:21-cv-00062-WLS    Document 33-5    Filed 05/02/22    Page 207 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022    Index: recruitment..reporter

92:9 93:9

**recruitment**
50:3 52:9

**reduce**  57:9
58:9 59:9
61:9 62:9
78:9

**reduced**  66:9
73:7

**reduction**
54:8,9
58:1,9
66:8 71:3
72:9 73:8
74:8 93:9
97:9

**reductions**
57:7 58:7
63:9 64:9
74:4 82:9
95:9

**refer**  74:5

**reference**
148:9

**referenced**
133:9

**references**
163:9

**referencing**
133:9

**referral**
167:9

**referred**
33:9

**referring**
7:10 28:9
107:9
113:8
148:9
154:9

**reflect**
122:2

**refresh**  81:9
109:5

**Regents**  5:13
133:5
138:2
147:9
148:2

**region**  159:9

**regionally-
accredited**
140:4

**regular**  18:9
32:7 60:9
84:9 86:4
90:8,9

**regularly**
18:9 21:9
24:3 60:9
84:9 99:9
146:9

**regulations**
131:6

**related**  15:9
18:9 32:9
50:3 52:9
78:5 90:9
97:9 108:9

156:9

**relationship**
122:1
164:5
166:6
168:3,6

**relationships**
162:9
163:8,9
168:1

**relatives**
12:5

**released**
10:9

**relief**  71:9
72:9

**remem-**  56:9
76:7

**remember**
8:25 10:9
17:9 19:5
20:8 23:9
34:9 40:3
44:8 49:1
55:9 56:9
57:7 59:9
62:3 69:5,
9 70:9
71:9 72:1,
9 74:9
75:2,4
76:3,5
78:9 82:9
88:9 91:1
95:9 103:2

115:9
116:6,9
117:2
124:5,6,8,
9 141:9
143:6
144:9

**remembered**
89:9

**Remind**  159:9

**renovations**
91:5

**repaired**
163:9
164:5

**replaced**
102:9

**reply**  155:9

**report**  32:2,
3 60:9
78:2,9
100:9
121:9
122:6,9
123:9
124:2,9
125:4,9
126:9

**reported**  8:1
87:8,9
150:1

**reporter**
5:2,8 6:16
7:24 8:5
14:9 17:9

Case 7:21-cv-00062-WLS    Document 33-5    Filed 05/02/22    Page 208 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022    Index: reports..Rodney

45:9 46:9
61:9 128:9
145:9
150:5
157:9
172:9

reports  21:8
32:7 81:9
100:2

represent
5:10

representative
68:9

representing
29:9 144:9

reprimand
122:9
123:8,9
124:1
161:9
169:6,9

request  58:9
61:9 62:9
79:9 82:1,
7 103:9
114:9

requested
6:24 7:3
35:1,3,5,8
81:9 92:9
103:9
128:9

require
131:7

required

16:7,9
131:8,9

requirement
135:9
152:9
153:9

requirements
130:9
135:9
149:6
151:7,9
165:9

reserved
7:20

respect
113:1

respond
113:9

responded
113:9

response
82:9 103:9
108:9

responses
7:25 51:9

responsiveness
7:19

rest  63:9
140:9

restate  81:9

restore  73:1

result  72:5
162:9

retain  48:8

retained
53:4 125:9

retaliation
165:9

retention
48:6,9
49:9 50:3,
9 52:9
98:9

retired  24:9
61:9 102:9
116:5

retirement
24:9 87:3,
4

retiring
49:9

retrospect
116:9

revenue  54:9
55:1 72:4

review  6:23
7:6 11:9
126:9
172:9

revisioning
17:9

revitalization
17:9

Richard  5:19
6:4 8:9
123:9
146:9

RIF  65:9
75:9 78:3,
5 81:9
83:4 92:9
93:9 94:9

RIFED  93:9

rigor  28:9
107:6
132:5
136:9
139:9
144:9
148:9
162:9

rigorous
131:9
132:9
148:7,9

ring  89:9
137:9

rise  118:9
124:9

rises  31:9

Road  8:14

roadblocks
168:9

Rob  84:9
85:1

Rodney  46:9
47:9 50:9
52:9 84:9
102:9
115:9
117:9

Case 7:21-cv-00062-WLS    Document 33-5    Filed 05/02/22    Page 209 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022    Index: Rodney's..seemless

119:2,9
123:9
125:9
127:9
155:9
159:7

**Rodney's**
85:1

**role** 33:4
44:9 45:6
47:1 49:9
61:9 101:9
112:7
163:6

**roles** 60:9

**room** 34:7
67:9 68:9
110:9
119:9

**rough** 167:3

**roughly** 84:9

**rounds** 24:2

**roundtable**
136:9
137:9

**rule** 110:9
111:2

**rules** 75:9
110:9

**run** 25:9
44:2 70:9

**running**
121:9
168:9

**Ryan** 11:9
61:9 68:9
93:1 105:9

———————
S
———————

**sacred** 63:9

**SACS** 133:9

**SACS-
AUTHORIZED**
138:7

**SACS-LEVEL**
133:9

**salaries**
70:9 72:9
75:6,9
79:9 80:7
81:9

**salary** 49:9
71:3 73:9
78:9 79:9
80:1,3
81:1,5,9

**sales** 54:9

**SAP** 171:6

**Sarah** 136:7

**sat** 149:9
151:1

**SAT/ACT**
135:9

**SATC** 151:1

**satisfactory**
171:9

**satisfy**
151:8,9
153:8,9

**saved** 166:9

**scenario**
57:9

**scenarios**
56:7,9
57:7 62:9
66:9

**scheduled**
84:9

**school** 32:9
39:5 40:9
91:9 131:9
132:9
134:9
135:9
138:9
139:9
141:1,4,9
143:9
144:9
145:5
146:4,9
147:9
148:9
149:9
151:2
159:1
160:4
162:8
167:9

**schools** 38:9
39:9 40:9
132:6

134:9
146:4,6,9
156:9

**science** 27:1
30:9 159:3

**Sciences**
99:9 101:9

**score** 135:9
149:9
151:1

**screen** 67:2

**screening**
50:9

**search** 46:2
50:9 128:4

**searches**
96:1

**searching**
49:9

**seat** 145:9
146:1

**secondary**
85:9

**section** 92:9

**sector** 130:9

**sectors**
167:9

**security**
24:9

**seek** 88:3

**seemless**
159:9

**selected**
  43:9

**selective**
  137:9
  150:9
  151:9

**self-
reflective**
  127:9

**sell**  107:9

**semester**
  167:3,7

**semiregularly**
  35:9 93:9

**senate**  46:9
  60:9 64:9
  78:9 127:9

**senators**
  72:2

**send**  55:9
  164:9
  172:9

**sending**  38:9
  39:9 156:9

**senior**  19:3
  61:9

**sense**  41:7
  105:9

**sentence**
  107:6
  111:9
  131:9
  147:9
  148:9

149:3
151:9
154:1,9

**separate**
  129:9

**separately**
  111:9

**September**
  45:9

**serve**  18:9
  21:6 91:9
  157:4

**served**  90:9
  146:7

**service**  16:9
  19:9 75:9
  83:9 169:9

**services**
  53:3,7

**serving**
  146:9
  157:7

**session**  12:3

**set**  19:9
  24:7 25:9
  28:9 95:9
  112:9

**sets**  99:9

**setting**
  170:8

**sexual**  9:15

**sexually-
charged**

120:9
121:4

**SGA**  142:9

**shake**  114:7

**shaking**
  114:1

**shared**  162:9

**Shari**  101:9

**Shauna**  111:9

**Shawn**  25:2,9
  88:8,9

**shifted**  51:7

**short**  10:8
  73:9 128:9
  171:3

**shortfall**
  55:3

**shortly**  44:9
  92:9

**show**  77:9
  127:4

**showed**  77:9

**shows**  94:9
  100:9
  158:9

**shred**  125:9

**shut**  109:2

**shutdown**
  54:9

**sic**  107:9

**sick**  87:3

**side**  85:9
  96:9

**sight**  114:9

**sign**  8:3
  31:9 65:9
  123:9
  172:9

**signature**
  15:9

**signed**  29:9
  30:3,9
  31:4
  165:3,9
  167:9

**significant**
  55:9 56:7,
  9 57:9
  59:3 117:9
  163:7

**signing**  29:9
  167:9

**signings**
  30:5

**silo**  64:9

**similar**  19:9
  29:9 107:3
  151:9

**similarly**
  64:7

**simple**  43:9

**simply**  11:9
  112:9
  113:9
  116:9

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022     Index: simultaneous..starts

135:9

**simultaneous**
35:9 151:9

**single** 141:9

**sit** 111:9
167:6

**sitting** 9:15
29:9 43:5
53:9

**situation**
55:9 71:8

**size** 62:9

**skill** 95:9

**skills** 83:9
153:2,9

**small** 36:9
59:9 62:1
139:9

**Smith** 43:9
74:9

**Snipes** 15:4

**Snyder** 116:2

**social** 20:9
21:1 24:9

**social-network**
21:9

**socially**
17:9 22:9

**solemnly** 5:2

**solutions**
60:5

**someone's**
77:9 110:9
162:3

**son** 12:9
142:9

**son's** 142:9

**sons** 56:9

**sort** 59:9
61:9 115:9

**sorts** 38:9

**sounds** 124:9

**source** 133:9

**soured** 166:6

**South** 20:9

**southeast**
43:9

**Spanish** 25:9
26:9 27:9
30:9

**speak** 6:13
11:9 28:8
83:6 135:9
171:9

**speaking**
132:9

**speaks** 131:9

**specific**
100:1,5
110:9
143:9
146:3,4
166:8

**specifically**
93:9 125:3
161:9

**specifics**
71:9 104:9
111:9
121:9

**speculate**
105:9

**speech** 23:9

**spell** 119:6

**spelled** 95:9

**spend** 55:9

**spending**
54:9

**spoken** 118:9

**spoliation**
15:9

**spot** 85:9

**spots** 129:7

**spreadsheet**
69:6,7,8
92:9

**spring** 54:9

**staff** 18:5,9
19:3 20:2
37:2,5
45:7 49:9
50:6 60:9
61:9 64:9
78:9 85:9
105:9
149:9

**staffed** 32:8

**staffing**
76:9

**stages** 71:9

**stance** 155:3
165:8

**standard**
152:9

**standards**
130:9
149:9
151:9

**start** 26:9
28:9 41:7
42:9 45:8
49:9 56:6,
8 57:9
63:9 79:9
102:9
140:9
168:1

**started** 33:9
34:4 41:9
42:9 45:9
47:9 49:8
51:6 52:9
59:9 62:9
63:9 66:9
69:9 71:9
78:9 82:9
85:9 86:6
94:9 104:9

**starting**
56:9 162:6

**starts** 147:9

Case 7:21-cv-00062-WLS    Document 33-5    Filed 05/02/22    Page 212 of 219

**JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA**
**Dr. Richard Carvajal on 01/20/2022**          Index: state..study

| | | | |
|---|---|---|---|
| **state** 8:7 12:6,9 13:3 15:9 16:9 17:1,3 20:8 27:9 28:9 29:9 30:9 33:2 39:9 41:9 42:3,9 44:4,6,7 45:9 46:9 47:5,6,9 50:9 54:9 55:1,2,9 56:2,9 58:9 61:9 72:4,9 73:8 88:9 89:9 91:9 107:9 131:6 133:8 136:9 137:9 147:9 149:3 152:9 155:4 158:9 163:9 **State's** 30:5 164:9 **stated** 111:9 **statement** 113:9 114:6 147:9 | 148:4 157:6 **states** 5:16 141:9 161:9 **statewide** 54:9 137:9 **status** 84:9 **stay** 54:9 **staying** 118:9 **steer** 39:9 **STEM** 150:9 **stenographically** 7:24 **Stone** 17:9 **stop** 24:1 163:9 **stories** 138:9 **story** 127:5 **strategic** 32:9 37:9 38:7 49:9 95:9 **strategy** 38:9 **strength** 119:9 **strengths** 51:9 119:9 **structure** | 107:9 **struggles** 112:9 **struggling** 109:9 167:1 **student** 9:15 20:9 21:7,8 46:1,9 49:9 50:5 56:9 61:5,6 68:9 69:9 109:9 112:2 115:9 116:9 135:9 138:9 139:3 142:9 152:1,9 153:5,9 160:9 161:4 165:9 166:9 167:1 170:9 171:9 **student's** 161:1 **students** 18:4,9 20:1,9 21:1 26:9 27:2 30:9 | 39:1,3,9 40:9 41:5,9 48:8 50:4 53:1 57:1 87:9 91:9 98:9 107:9 111:9 115:9 116:4 131:7,9 134:9 138:9 139:2,4,5 140:6,9 141:9 142:9 146:9 147:9 149:4 150:9 151:9 152:9 154:9 157:9 158:9 159:9 160:9 162:9 164:9 165:9 166:9 167:9 168:7,8,9 171:9 **studied** 83:9 **study** 20:9 |

stuff  17:9 43:9 91:1 141:9

submit  66:1

submitted  67:9

subpoena  6:1 13:9 16:6

subsequent  145:9 165:2

substance  69:9

succeed  138:9

success  49:9 50:5 61:6 68:9 69:9 107:7 170:9

successful  49:9 131:9 136:9 137:1 138:9 148:9

successfully  154:9

sudden  65:9

sued  9:11

suggest  162:9

suggested

70:9 71:4 162:9

suggesting  36:5 122:6

suggestions  64:2 124:9

suicide  109:9

suing  9:15

suite  23:9 34:8

summer  56:9 73:6 86:6, 9 104:9

summit  136:9

supply  57:9 66:9

support  53:6

supporting  145:2

supportive  31:9

supposed  13:9 78:9 79:7 126:9

surfaced  38:9

surprise  20:9 94:9

surprised  26:9

survive

138:9

Sutliff  106:9

sway  25:9

swear  5:2

sworn  6:7

syllabus  28:9

system  5:13 18:3,5,9 19:2,9 20:9 26:2 28:9 29:1 43:9 47:3, 9 54:9 56:2 70:9 84:8 88:4 90:9 103:6,9 116:7 125:9 129:9 130:9 133:6,9 134:9 135:2 137:9 145:9 149:9 155:4 162:9 163:9 166:7

———————————
T
———————————

tab  130:2

tabbed  129:7

table  64:6,9 119:9

tabs  80:9 111:9

tailgate  91:9

tailgates  22:9

takes  134:9 168:9

taking  91:9 134:9 135:9 137:9 141:2,7 148:9 150:9 153:1

talk  11:9 21:9 23:9 24:9 25:6 26:9 32:9 33:9 35:9 36:1 53:9 56:9 57:9 64:9 70:9 75:9 90:9 102:9 103:9 110:9 114:9

Case 7:21-cv-00062-WLS   Document 33-5   Filed 05/02/22   Page 214 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022        Index: talked..terminated

120:9
127:8
134:7
139:5
141:9
143:1
148:9
155:7
156:1
161:4
169:9

**talked** 36:9 57:9 64:9 65:1 67:4 72:8 76:6 78:6 90:9 91:6 97:9 101:5 102:9 104:9 116:9 141:1,4,9 142:3,9 158:3 170:5,7,8

**talking** 14:9 26:9 27:9 29:9 33:9 36:9 37:9 38:4,9 42:8 44:9 46:9 48:9 54:9 57:8 60:9 64:9 69:9 70:7 74:8 78:9 81:3,6

82:9 102:9
107:9
113:9
114:9
116:6
117:9
124:2,4,9
132:9
133:9
137:3,9
139:1
142:9
144:9
145:4
146:2
151:9
162:3

**targets** 66:7

**task** 18:9 19:9 20:9 47:9 90:9

**taught** 137:9 138:6 139:9 140:3 152:9

**tax** 54:9 55:9

**TCSG** 18:9 20:3 22:8, 9 26:2 90:9 129:9 130:9 134:9 136:9 138:9

139:2
144:9
146:9
147:3,4
155:2
157:9
158:1,9
159:9
160:9
168:3

**TCSG's** 129:9

**TCSGS** 167:9 168:7

**teach** 23:9 40:9 139:9

**teaches** 23:9

**teaching** 40:9 117:9

**team** 31:9 33:9 34:9 40:2,3 45:1 46:3 56:9 59:9 71:2 86:9 119:9

**teams** 60:9

**Tech** 149:9 150:9

**technical** 18:9 19:2 22:9 30:1 137:9 140:9 145:9 162:9

163:9
166:9
167:8,9

**tecum** 13:9

**Tee** 107:9 108:1,9 161:9 169:9

**teeth** 114:1, 6

**telling** 15:9 62:4 108:9 127:9 138:5

**tells** 50:9 65:9

**template** 66:3 74:9 75:1,9

**temporary** 71:2 72:9

**ten** 9:2 54:9

**tend** 22:6 79:2 99:9 118:6 140:9

**tender** 16:7

**term** 20:9 171:6

**terminate** 117:9

**terminated**

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022    Index: termination..told

54:6,7

termination
 9:15 118:9
 124:9
 169:9

terms 66:7
 142:8

test 92:6
 119:8
 153:9

testified
 6:7

testify
 168:9

testimony
 5:3 74:7
 109:4

tests 152:9
 153:9

text 11:9
 26:9 35:9

thing 7:13
 54:9 56:3
 58:1 64:9
 76:5 78:9
 120:9
 144:9
 149:9
 159:1

things 6:2
 23:9 26:8
 38:8,9
 49:9 50:1
 53:9 54:9

63:9 64:3,
 8,9 67:4,9
 69:9 70:7,
 9 71:4
 73:5 100:9
 103:9
 104:9
 108:7,9
 117:9
 118:9
 119:9
 121:1
 124:9
 147:4
 156:9
 161:9
 168:9

thinking
 36:9 50:9
 63:9 72:4,
 9 168:9

thinks 50:9

thought 36:9
 38:9 47:9
 50:3,9
 56:9 59:9
 63:9 64:1,
 4 73:3
 88:9 89:9
 116:9
 119:9
 121:9
 144:9

throwing
 57:9

til 128:9

Tillman 8:14

time 6:18
 7:20,21
 9:7 13:9
 14:9 16:9
 19:9 22:2,
 3 23:2
 30:3 33:1
 36:2 40:9
 41:9 44:8,
 9 45:8
 46:5 50:9
 56:5,9
 57:8 58:9
 60:8 61:1,
 9 62:9
 63:9 67:9
 72:9 73:9
 78:9 79:6
 87:9 88:9
 92:9 93:9
 94:9 95:9
 100:9
 109:9
 110:1
 112:9
 117:9
 133:8,9
 137:9
 143:6
 145:9
 153:6
 160:5,8
 169:9
 172:4,9

times 8:20,
 23 59:9

85:9 104:9
 111:9
 112:8,9

timing 81:9

Tina 22:9
 23:1,9
 24:1,5,9
 25:9 29:9
 32:9 34:9
 37:9 39:6
 40:9 52:9
 90:9 144:7
 156:9

Tina's 34:9

title 9:15
 17:2 86:9
 87:2,9
 106:9
 108:9
 110:9
 114:9
 119:9
 143:9

titles 74:9

today 8:4
 9:15 10:9
 11:9 14:9
 36:3 53:8
 74:7 104:9
 105:1
 165:3

told 35:9
 36:2 44:9
 65:2,3
 86:9
 102:1,3

Case 7:21-cv-00062-WLS    Document 33-5    Filed 05/02/22    Page 216 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022   Index: tonight..understanding

128:9
145:4
148:9
156:9

tonight   22:2

top   49:2
  52:2 94:8
  123:9
  128:4
  131:9
  150:9
  155:9
  162:6

topic   35:9
  60:9 112:9
  163:9

total   57:9
  63:9 82:4,
  5

tour   85:9
  91:4,6

town   72:1,9

track   132:9

training
  148:9

traitor
  147:2

transcript
  8:3

transfer
  26:3,9
  30:9 32:9
  107:9
  134:9

140:9
158:9

transferable
  136:9

transferred
  27:9

transferring
  26:9 166:9

transfers
  135:9
  153:9
  165:9

transition
  159:9

Transitions
  170:9

travel   57:9
  58:9 66:9
  67:9 74:9

traveling
  58:9

Traycee   66:2
  67:9 68:4
  69:6,9
  74:9 81:9

treat   133:8
  150:1
  156:9

tremendous
  50:8 127:9

trial   7:20

trim   57:9
  59:2

true   32:9
  75:2 141:9

truth   5:4,5
  109:3

tuition   58:9

turn   62:6
  83:1 114:9

turned   124:1

turnover
  93:9

tutoring
  53:6

two-year
  132:9

type   44:1
  70:9 115:9
  147:9
  161:9
  162:9

types   98:9
  172:9

_____

U

_____

U.S.   72:2

UGA   137:9
  149:9
  150:7,9

uh-huh   32:4
  42:9 71:9
  73:9 80:9
  88:7 93:9
  103:9
  126:9

129:9
130:9
131:4
135:9
141:6
160:9

ultimate
  52:7

ultimately
  31:9 42:6
  46:9 47:9
  52:3 53:5
  58:9 59:9
  72:9 87:9
  102:9
  107:9

unbeknown
  162:9

unbeknownst
  162:9

uncomfortable
  109:1

uncommon
  166:9

uncov-   37:1

understand
  25:9 58:8
  113:3
  118:9
  132:6
  137:9
  160:9
  161:3
  171:8

understanding

**JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA**
**Dr. Richard Carvajal on 01/20/2022    Index: understood..vocalize**

76:9 89:9
100:9
129:9
131:6
137:2

**understood**
170:4

**unfilled**
57:9 64:9
66:9 71:9
74:9 93:9
94:9 96:7

**unique** 55:9
127:9

**unit** 49:9
50:5 52:9
59:4 60:9
68:9 74:9
93:9

**United** 5:16

**units** 47:1
59:2 64:8

**universally**
62:9

**universities**
134:9
149:4

**university**
5:13,14
17:3 18:3,
9 19:9
20:9 26:1
28:9 29:1
43:9 45:2
47:3,6

54:9 56:2
57:9 61:4
64:9 70:9
84:8 88:4
98:9 99:9
103:6,9
125:9
130:9
133:5,9
134:9
135:2,9
137:9
149:9
155:4
163:3

**Unknown**
162:9

**unranked**
51:9

**unused** 55:9

**unusual** 20:9

**update** 129:9

**upheaval**
56:9

**upperclassmen**
26:9

**upset** 145:2
147:1
155:9
156:1,6,9
163:9

**urging** 87:7

**USG** 18:1
20:6 25:1

28:9 29:9
43:9 74:4
110:9
114:9
118:1
120:9
122:9
129:6,9
130:9
131:4
133:9
134:9
136:7,8,9
150:9
152:9
158:9

─────────

**V**

─────────

**vacated** 50:7

**Valdosta**
5:14,17
8:14 12:9
17:3 27:3,
9 28:9
29:9 30:5,
9 33:2
39:9 44:4,
7 47:9
50:9 89:9
107:9
155:4
163:9
164:9

**Valdosta-
lowndes** 17:9

**valid** 133:9

**variety**
171:9

**verbatim**
35:9

**versus** 5:12
77:9 109:4
132:9

**vest** 47:2

**vice** 25:2,5
45:4,9
46:5 47:9
49:9 61:2,
3,4,5,6
66:1 68:9
115:9
116:9
118:2,9

**victim** 9:15

**viewed** 38:9
169:9

**vigor** 107:9
143:3

**Vinson** 78:1,
9

**vision** 92:6
157:3,8,9

**visitation**
110:9

**vitals** 89:6

**Viverette**
87:2

**vocalize**
6:14 7:25

Case 7:21-cv-00062-WLS   Document 33-5   Filed 05/02/22   Page 218 of 219

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GA
Dr. Richard Carvajal on 01/20/2022        Index: void..Wiregrass

void   16:9

volunteer
  17:8

VP   45:6
  46:9 50:9
  75:9 77:4
  88:9

VPS   63:9
  65:9 68:4
  70:9

VSU   17:9
  18:6,9
  22:9 25:9
  26:9 27:9
  29:9 31:9
  34:5 35:3
  36:9 37:9
  41:3,9
  43:9 45:9
  48:9 53:9
  56:9 77:9
  87:9 90:9
  91:4,9
  105:9
  106:9
  110:6,9
  126:9
  138:9
  139:2
  141:3
  142:4,5
  144:9
  146:7
  157:3,9
  159:9
  160:4,9
  161:1,5

164:9
165:9
166:9
167:9
168:7
170:9
171:9

VSU's   32:9

vulgar   120:9
  121:4

─────────

W

W-O-O   119:7

wait   42:5
  49:7

waive   8:4
  16:9 172:9

waiving   16:9
  172:9

waking   50:9

walk   119:9

walk-through
  85:9

walked   85:1,
  9

walking   85:9

wanted   14:9
  24:7 25:9
  26:3 27:9
  32:7,9
  34:1 36:1
  38:9 42:5
  43:4 53:9

64:2,6
78:9
100:7,9
105:2
116:7,9
117:9
133:9
136:9
144:9
145:1,8,9
160:9
165:9
172:1

wanting   27:9
  147:9

warning   15:9

Washington
  71:9

waste   100:9

ways   38:9
  71:5
  158:4,5

weaknesses
  51:9

weather   26:9
  91:1

website
  29:5,8,9
  99:4 100:9
  105:9
  106:9
  129:6
  131:5
  133:9
  157:9

week   91:9
  156:9

weeks   25:7
  84:9

Wenham   136:7

West   91:5

Whaley   24:9

wife   12:8,9
  22:2 23:4
  24:5 109:9
  139:9
  156:1,6

wife's   12:9
  25:9

willingly
  126:3

Willis   93:4

window   112:9

Wire-   24:9

Wiregrass
  22:9 23:7,
  9 25:9
  26:9 27:1,
  3,9 29:8,9
  30:4,9
  32:9 33:9
  34:8 36:9
  38:9 39:5
  40:9 53:9
  90:9
  135:1,4
  139:9
  140:6
  144:9

146:7,9
160:7,9
165:9
166:9
167:9

**Wiregrass'**
30:7 32:9
39:9

**woefully**
48:7

**woman** 89:9
90:2

**women** 111:9
113:9

**woo** 119:2,
5,9

**word** 105:9

**worded** 166:9

**words** 132:9

**work** 16:9
22:4,7
23:9 24:8
31:9 45:9
47:9 48:6
59:8,9
60:2 77:9
105:9
164:9
165:9
167:9
168:2

**work-related**
9:3

**worked** 9:14

19:9 31:9
44:3 45:9
47:9 60:3
88:9
139:8,9
145:9
146:9
147:2
163:3

**workforce**
148:9

**workforce-
oriented**
158:9

**workforce-
training**
132:8

**working** 9:7
21:9 24:9
44:7,9
49:8 50:9
51:9 56:6
60:9 61:9
62:9 63:9
138:1
139:9

**works** 23:4,9
51:9 101:9

**world** 33:7

**worried** 40:9
42:1 54:9
56:9 57:3
163:9

**worrying**
42:9

**wrap** 170:9

**wrapped**
170:9

**write** 123:6,
7,9 155:9

**writing**
111:9
113:3,6,8,
9

**written**
113:9
122:9
123:9
124:1,9
161:9
169:9

**wrong** 118:4,
9

**wrongdoing**
117:9

**wrote** 97:9
122:9
123:3
124:6,9

---

Y

---

**y'all** 15:1
38:3 103:9

**year** 33:9
42:9 47:8
52:9 55:9
56:8 73:9
79:9 82:2,
6 87:5

127:9
138:9
167:7

**year's** 82:7

**years** 9:2
20:9 34:3
46:4 52:9
90:9 93:9
163:2
170:7

**yesterday**
11:9

**young** 112:1
117:3