**JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA**
**Dr. Rodney Carr on 01/19/2022**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION


CASE NO.:  7:21CV62 (WLS)


JAMIE T. BIRD,

           Plaintiff,
vs.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA
d/b/a VALDOSTA STATE UNIVERSITY,

           Defendant.
_____/


DEPOSITION OF

DR. RODNEY CARR


Wednesday, January 19, 2022
12:58 p.m. - 4:45 p.m.



Valdosta State University
1500 North Patterson Street
Valdosta, Georgia 31698


Stenographically reported by:
KAIRISA J. MAGEE, RPR, GCCR (Georgia), FLORIDA
NOTARY


Job No. : 378316

APPEARANCES:


On behalf of Plaintiff:

        LAWSON, BECK, & SANDLIN, LLC
        1125 Commerce Drive
        Suite 300
        Peachtree City, Georgia 30269
        (770) 486-8949
        BY:  HOLLY MAESTAS, ESQ.
        holly@lawsonandbeck.com


On behalf of Defendant:

        BROWN, READDICK, BUMGARTNER, CARTER,
        STRICKLAND & WATKINS
        5 Glynn Avenue
        Brunswick, GA 31520
        (912) 264-8544
        BY:  G. TODD CARTER, ESQ.
        tcarter@brbcsw.com
        and
        VALDOSTA STATE UNIVERSITY
        OFFICE OF LEGAL AFFAIRS
        1500 N Patterson Street
        Valdosta, GA 31698
        (229) 333-5351
        BY:  JUSTIN ARRINGTON, ESQ.
        juarrington@valdosta.edu


ALSO PRESENT:  Ms. Jamie T. Bird, Plaintiff

I N D E X

Proceedings                                                    Page

THE TESTIMONY OF DR. RODNEY CARR:

Direct Examination By Ms. Maestas                                5

Certificate of Oath                                            162
Certificate of Reporter                                        163
Errata Sheet                                                   164
Notification Letter                                            165

E X H I B I T S

No.                                                            Page

Plaintiff's Marked Exhibits

50          Subpoena to Testify at a Deposition     8
            in a Civil Action for Dr. Carr

7           USG Reduction in Force, Frequently     31
            Asked Questions

47          11/16/2021, ABAC documents             40

51          Reduction in Force Request Form        47

27          9/23/2020, notes from Janice Lyn,      53
            Title IX investigator

26          Ms. Bird's report against Dr. Carr     55

17          Valdosta website printout of           70
            admissions staff

18          Valdosta website printout "Meet        71
            Your Counselor" page

19          Valdosta website Dual Enrollment       77
            flipbook printout

E X H I B I T S

Continued

| No. | | Page |
|---|---|---|
| 21 | University System of Georgia Freshman Admission Requirements | 78 |
| 23 | "USG Dual Enrollment Summit Evaluation - Your Feedback is Needed!" email chain | 81 |
| 24 | "Summit 2019 Goal of Working Lunch Sparking Conversations!" printout | 81 |
| 1 | Spring 2012 Identifying Best Practices for Student Success in Development Education in Georgia by Rodney B. Carr | 86 |
| 14 | Positions listing chart | 89 |
| 15 | 9/30/2020, USG Advanced Salary Increase Certification | 95 |
| 16 | Hiring Checklist | 95 |
| 8 | 7/14/2020, Letter to Ms. Bird "Subject:  Notice of Reduction of Force" | 99 |
| 46 | 8/24/2020, Letter from Ms. Boddie-LaVan to VSU Office of Legal Affairs and documentation, "Subject:  VSU Response to Jamie Bird Application for Discretionary Review" | 101 |
| 44A | 2/4/2020, Email from Dr. Carr | 119 |
| 41 | 2/26/2019, Email from Ms. Jamie T. Bird | 121 |
| 42 | 2/27/2019, Email chain from Jamie T. Bird to Sarah E Bessenger | 125 |
| 43 | 3/5/2019, Memo to File from Tee Mitchell to Jamie Bird | 145 |

Proceedings began at 12:58 p.m.:

THE COURT REPORTER:  When you're ready, will you raise your right hand, please?

Do you solemnly swear or affirm that the testimony you are about to give in this cause will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

Thereupon:

DR. RODNEY CARR, a witness named in the notice heretofore filed, being of lawful age and having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MS. MAESTAS:

Q    My name is Holly Maestas, and I represent the plaintiff, Jamie Bird.  This is in the matter of Jamie T.  Bird, plaintiff, versus Board of Regents of the University System of Georgia, doing business as Valdosta State University, the defendant.  This is Civil Action File No. 7:21-62 and pending in United States District Court for the Middle District of Georgia, Valdosta Division.

This deposition is being taken pursuant to notice and agreement of counsel.  This is a

deposition of a non-party and an employee of the defendant.

And did you --

MS. MAESTAS:  Mr. Carter, your flashlight is on, on your phone, and it's shining in my eyes.

MR. CARTER:  It does that.  I'm sorry.

BY MS. MAESTAS:  I know that was designed to trip me up, but it is not going to work.

MR. CARTER:  Not in the open.  If I was going to use it, it would be in another forum.

MS. MAESTAS:  Oh, okay.

MR. CARTER:  My kids always have to tell me how to do it.

BY MS. MAESTAS:

Q   And, Dr. Carr, did you receive your Notice of Deposition of Employee of Defendant Rodney Carr, Notice to Produce?

A   Is that what that is?

Q   Yes.

A   Yes.

THE COURT REPORTER:  I'm so sorry, but because you're wearing a mask, you're going to have to --

THE WITNESS:  I'm sorry about that.

THE COURT REPORTER: No, it's okay.

THE WITNESS: I asked her if that's what that was and she said yes. That's it.

BY MS. MAESTAS:

Q Yes. That appears to be it.

And when did you receive that?

A About 45 seconds ago.

Q Okay. And it is a notice to produce, in addition to being a notice of deposition. And the documents that I have asked that you bring today are listed at the end of your notice to produce.

Did you bring any documents with you today?

A I did not bring any documents with me.

Q Okay. If you would be so kind as to make sure you take notice of those and provide those documents to me through your counsel.

MR. CARTER: Do you really -- and the complaint, do you actually need the complaint? I mean, you've got it.

MS. MAESTAS: So I'm just asking that --

MR. CARTER: That would he would be prepared to testify --

MS. MAESTAS: Exactly.

MR. CARTER: Got you.

MS. MAESTAS:  So I don't want him to say, well, I would have been able to answer today if I would have brought the doggone, you know, whatcha muh dinkie, but too bad.  I left it in my desk drawer.  So that's the purpose of that.

The other ones are new records that I do not have.

MR. CARTER:  And I don't think -- you can ask him, but I don't think he has any documents relating to the Bainbridge ...

MS. MAESTAS:  Yeah.  I am going to ask him about that too.

MR. CARTER:  Okay.

MS. MAESTAS:  Okay.  Thank you very much.

BY MS. MAESTAS:

**Q    You have also been served with a subpoena, and I've marked it as Plaintiff's Exhibit 50.**

(Marked for identification is Plaintiff's Exhibit 50)

BY MS. MAESTAS:

**Q    Have you received the subpoena?**

MR. CARTER:  This was the same thing.

THE WITNESS:  Yes.  It was attached to the back of that document.

BY MS. MAESTAS:

Q    So when did you receive the subpoena duces tecum?

A    I was notified to keep dates open, but this is the first time I've seen this document.

Q    Okay.  So today sitting in this deposition, is the first time you've seen that subpoena?

A    Yes.

Q    Okay.  Can I see it for a second?

A    Yes.

Q    Okay.  So the documents that -- so the subpoena -- this is a United States District Court federal subpoena.  And it asks for you to bring your records, basically, on the Bain -- Bainbridge College -- Bainbridge State College investigation and any other institutions where you would have had other complaints or investigations, and I asked to you bring those with you today.

Under service of subpoena, I am required to tender you a $40 check, which I will deliver to you right now.

MR. CARTER:  You can keep that.  He don't -- he don't -- he was going to be here anyway.  You don't have to pay him 40 bucks.

MS. MAESTAS:  Are you waiving the $40?

MR. CARTER:  I'd waive it.

THE WITNESS:  I'll waive it.

MS. MAESTAS:  Okay.  I'm tendering Plaintiff's Exhibit 50 into the record.  We have some other exhibits that are already in the record.  This is a new one.

If you could please provide the documents that are under -- that are requested under that subpoena.  And I am going to void this check.

Objections except to the form of the question and responsiveness of the answer will be reserved until the time of trial or the time of hearing.

This deposition is being taken stenographically; so please vocalize all of your responses and avoid gestures, which cannot be reported.

You have a right to read a copy of your deposition transcript and then sign it after reading it, or you may waive that right today.  Please so indicate to the court reporter before your leave which option you chose.

Can you state your full name for the record?

A    Rodney Carr.

Q    And are you known by any other names?

A    My driver's license.  It says Rodney Brett
Carr.

Q    Brant?

A    Brett.

Q    Brent, B-r-e-n-t?

A    B-r-e-t-t, Brett.

Q    Brett.  Okay.  The mask is throwing off
some of the letters.

A    I'm sorry about that.

Q    And what is your address?

A    4642 Hickory Creek Circle,
Valdosta, Georgia 31602.

Q    Have you ever had your deposition taken
before?

A    For this case, no.

Q    What about any other cases?

A    Probably back in the early 1990s, when I
was in law enforcement.

Q    Okay.  And what was -- what was that for?

A    I cannot even remember.

Q    Was it in a courtroom, or was it is in,
like, a conference?

A    It was a conference room.

Q    Okay.

A    So I don't even know if it was a formal deposition or not.  I know the attorney was in there, and we went through some things.  But I truly can't remember all that was in it.  It was a long time ago.  Sorry.

Q    Okay. Fair enough.  No -- no problem.

Have you ever been a party to a lawsuit, meaning you sued or you have been sued?  So you're not a party in this case, you're a non-party employee of the party.

A    I have not ever been a party.

Q    Okay.  Thank you.  And what did you do -- other than communications with your counsel, what did you do to prepare for this deposition today?

A    I provided documentation to Counsel.  That's all I've done.

Q    Okay.  And what did you provide to Counsel?

A    I was asked to hold all emails, communications, all of the documents that were requested.  To be honest with you, I don't remember all of them.

Q    So the documents that were in the notice to produce or ...

A    That was the first time I've seen the request for those.

Q    Oh, okay.  So were you provided another form request and you provided documents?

A    No.  It was during the complaint process that some of the documents were produced.

MR. CARTER:  They would have been produced --

MS. MAESTAS:  Some of the documents were -- I'm sorry.  I didn't hear the answer.

MR. CARTER:  What did you say?  Some of the documents --

THE WITNESS:  Some of the documents were produced during the complaint process; so that's -- I didn't produce any since then.

BY MS. MAESTAS:

Q    Okay.  So about six months ago?

A    Possibly, yes.

Q    Okay.

MS. MAESTAS:  That probably was the original discovery request.

MR. CARTER:  Correct.  Yes.

BY MS. MAESTAS:

Q    Okay.  So nothing since the original discovery request?  Okay.

Do you keep a file on this case?

A    No, I do not.

Q    Okay.  And did you have any meetings with anybody to prepare for this deposition?

A    I met with Counsel yesterday.

Q    Anybody else?

A    No, ma'am.

Q    You didn't talk to any of your staff in preparation for today?

A    No.

Q    Did you talk to Brian Hogan about his deposition which was earlier today?

A    No.  I knew his deposition was earlier today.  We have not discussed it.

Q    Okay.  Are you on any medications or drugs that would affect your memory or ability to participate in this deposition which is a Q and A style?

A    I don't believe so.

Q    Okay.  So do you need to consult with anyone before you're able to answer that question?

A    No.

Q    Okay.  Do you believe that you can answer questions --

A    I do.

Q    -- with a clear memory, to the best of your ability?  And you're not, you know, you're not under any influence of drugs or alcohol, so at the end you don't say, I'm sorry, Holly.  Everything I said was -- you know, I was drunk.  I'm going to have to redo it?

A    All right.  So I want to make sure I understand your question.  I am able to answer your questions because I have a clear mind as I perceive it to be.

Q    Okay.  And you're not under the influence of any substances that would prevent you from being able to do that?

A    That is correct.

Q    Thank you very much.  Okay.  All right.
        Do you have any relatives in Georgia?

A    In-laws only.

Q    Okay.  So people you're related to by ...

A    Marriage.

Q    Marriage?

A    Yes.

Q    Okay.  Who are those people?

A    The entire list?

Q    Well, how many is that?

A    It's my wife's entire family.

Q    Okay.  And where are they from?

A    They all live in Calhoun or Dalton area, North Georgia.

Q    Oh, okay.  North Georgia.  Anybody of those -- and I am assuming your wife lives here?

A    Yes.

Q    Okay.  And your children, are they in the area?

A    One child is in the area, yes.

Q    Okay.  And what's his name or her name?

A    Caleb Carr.  It's "he."

Q    Okay.  How old is he?

A    20.  He's 20.

Q    Okay.  So he's an adult?

A    He is, yes.

Q    Okay.  And other than your wife and your son, Caleb, who else is living in, like, south Georgia, middle Georgia?

A    Okay.  Our daughter, Allison Carr.

Q    How old is she?

A    25.

Q    Okay.

A    And then the other one's in Auburn, Alabama.

Q    Okay.  And what is your current position

at VSU?

A    I'm the vice-president for student success.

Q    Okay.  Do you have any other current positions of employment?

A    Outside of the University?

Q    Uh-huh.

A    No.

Q    Okay.

A    I take that back.

Q    Okay.

A    I referee football.

Q    Excellent.  Where --

A    And I'm paid to do that.

Q    Where is that?

A    It's a local association.

Q    Okay.  And are there any people at VSU that you regularly work with, supervise, meet with, that also are on this -- that work with you at this referee ...

A    No.

Q    Okay.  So today -- or this -- over these next few days, I've got Ryan Hogan, Rodney Carr, Richard Carvajal, Rob Friedhoff, Lisa Long, and Jean Boddie-LaVan.  Are any of those involved with

referee football?

A     No, ma'am.

Q     Okay.  And are you involved in any -- besides -- let me get the name straight.  What's the name of the football -- so I get that right?

A     South Georgia Football Association.  South Georgia Football Officials Association, s-G-F-O-A.

Q     Okay.  And you're like a --

THE COURT REPORTER:  I'm sorry.  S-G-F ...

THE WITNESS:  O-A.

BY MS. MAESTAS:

Q     And you're a referee?

A     Yes.

Q     Okay.  Cool.

And any other organizations, groups, churches, bowling leagues, drinking club, just, like, whatever it is, people you hang out with in the local area?  So after work, do you guys go bowling?  Do you play cards?  Anything like that, that's what I'm looking for.

A     I'm not sure if I understand what you're asking.

Q     Okay.

MR. CARTER:  She's talking about clubs.

BY MS. MAESTAS:

Q    Clubs, organizations, any -- anything like that, a social organization that you're involved with, be it a church, like a prayer group?

A    No.  No social clubs that we're in.

Q    Okay.  So, like -- I don't know.  Like there's -- AYR, is the Atlanta Young Republicans. That's a group -- a political group.

MR. CARTER:  Rotary club, something like that.

BY MS. MAESTAS:

Q    Yeah.  Anything like that, because I kind of feel like I'm confusing you about the -- the question.

A    Well, a little bit.  But no, I'm not a member of Rotary Club.  I'm not a member of Loins Club or any of those things.

Q    Okay.  And as far as socially after work, anything that you do on a regular basis, besides go home and -- I mean, I have enough.  I don't really do anything because I have two little kids.  So I'm not saying that one -- I'm not trying to suggest an answer.  I'm just trying to figure out, do you do anything besides go directly home after work?

A    I don't always go directly home.

Q    Okay.  Well, what do you do when you get off of work?

A    Well, there are times we go to dinner with friends.

Q    Okay.  So are any of the friends that you go to dinner with, are they VSU employees?

A    Yes.

Q    Who are they?

A    The entire list?

Q    Yes.  Let's ...

A    Let's see.  That would be Herb and Linda Reinhard.  It is Vince Miller, Quinn Vallotton, John Crawford, Mary Crawford, Melinda Harbaugh, Curt Harbaugh, Richard Carvajal, Cheryl Carvajal, Brandon Carvajal, Crystal Carvajal.

I don't -- do minor children count, because that would be Quinn's children?

Q    Don't say their names, but ...

A    Okay.  Merritt Wall.

Q    Merritt Law?

A    Wall, W-a-l-l.

Q    Wall.  Okay.

A    And then there are some of my wife is colleagues that she teaches with.  To be honest with you, I am stretched to remember their names.

Q    Okay.  Where does your wife teach?

A    Valdosta Middle School.

Q    Okay.  All right.

And when you -- so -- I'm going to ask that later.  Sorry.  Withdraw that.

What about any TSCG, Technical College System of Georgia folks?

A    That I ...

Q    Affiliate with socially?

A    No.

Q    Okay.  What about Cheryl Carvajal?  Isn't she a teacher at Wiregrass?

A    Yes.  She is now, yes.

Q    Okay.  And --

A    I don't -- I don't socialize with her regularly.

Q    Okay.  But you go out to eat with the Carvajals?

A    On occasion.  With all of them, yes.

Q    Okay.  Anybody else we're forgetting that is the -- TCSG Wiregrass affiliate that you're --

A    Not that I'm aware of.

Q    -- friends with or acquaintances?

A    Not that I'm aware of.

Q    Okay.  What about people from USG?

Anybody -- like, now everybody works via Zoom remotely.  So you could technically be living in Valdosta and then work for the Board of Regents.

Anything like that?

A    Again, you lost me.  I -- I could be living in Valdosta and working for the Board of Regents?

Q    So --

A    Or do I hang out with anybody that works at the university system office?

Q    That one.  The latter question, that's what I'm asking.

A    No.

Q    Okay.  All right.

And what is your degree and your education?

A    I have a bachelor of science degree in criminal justice.  I have a master's degree in public administration and a doctorate degree in higher education administration.

Q    Okay.  Is that also sometimes called education leadership?  Is that EDD?

A    Yes.

Q    Okay.  I think at VSU they call it EDD.

A    (Shaking head)

Q    No?

A    It's a doctorate of education, which is the EDD.  And then there is specializations in --

THE COURT REPORTER:  I'm sorry.  "Which is the EDD"?

THE WITNESS:  The EDD is the doctorate of education, and that's what mine is.

BY MS. MAESTAS:

Q    Okay.  Okay.  Thank you.

And what's your dissertation in?  What was your dissertation on?

A    Mine was on a case -- it was a mixed method case study on the two most successful institutions inside the University System of Georgia for taking developmental education students and transferring them effectively into college level coursework.

Q    Okay.  And what does that "developmental education" -- What does that mean?

A    It's math 99, english 99, math 97, english 97.

Q    Okay.  Where would you take those classes?

A    Typically, at a two-year institution.

Q    Do you know of any two-year institutions in this area?

A    That are in our area?

**Q    Yeah, like --**

A    Georgia Military College is one of those.

**Q    And what about other ones?**

A    I would assume Wiregrass.

**Q    But you don't know if Wiregrass is a two year?**

A    I would assume that they're offering associate degrees.  They're accredited to do so.

**Q    And then what about developmental education?**

A    I have no idea what they offer developmental education-wise.

**Q    Okay.  Are you working on any publications right now?**

A    No.

**Q    How long have you been friends with Richard Carvajal?**

A    Dr.  Carvajal hired me in -- probably -- September of 2017.  And so we had been work colleagues and friends since then.

**Q    Hired in September of 2011 to which institution?**

A    Bainbridge State College.  It was Bainbridge College at the time.

Q    Okay.  And did you know him before that?

A    No, I did not.

Q    Okay.  And would you consider him a very close friend?  A friend, or an acquaintance?

A    Can you define those?

Q    Probably not.

A    I'd call it a friend.

Q    Okay.  Friend.  All right.

And in your work experience prior to coming to VSU, did you have experience in admissions and dual enrollment?

A    Yes.

Q    Okay.  What were you doing?

A    Bainbridge State College, I was the vice-president and also oversaw admissions and dual enrollment, as well.  And then at Middle Georgia State College, as the director of the Dublin and Eastman campuses, I oversaw dual enrollment and admission processes there, as well.

Q    Okay.  And how did you end up coming to VSU?

A    They advertised the position for vice president of student success.  I sent in my resume, and I came and I interviewed, and was offered the position.

Q    Okay.  Did Carvajal say, hey, you should apply for this.  I want to bring you with -- I want to bring you with me here?  Anything like that?

A    No.  He made it pretty clear that, that was not a guarantee, that the position was open.  If I wanted to apply for it, I could.

Q    Okay.

A    That would be -- it was up to the process.

Q    Okay.  And during that hiring process, do you know what other candidates were considered or anything like that?

A    No.

Q    Okay.  Were you required to disclose prior disciplinary history as part of your application?

A    No.

Q    Okay.  So I am going to attempt to ask this question, and I really don't want to, like -- like, sweep the whole ocean in this question, but I want to figure out what you do at VSU, kind of like a summary of it, like, an overview of who-all you supervise, what departments.

And so I was going to say, what are your duties at VSU, but you would probably say, I can't keep track of all those.  But -- so if you could give me -- of those departments that

you summarize, can you just kind of tell me what you do?

A    The departments that I oversee?

Q    Mm-hmm.  Yeah, we can start there.

A    Admissions, advising, academic support center, marketing, public relations, access office, institutional research, creative services.  And now I am also underneath -- the advising piece is financial aid, the registrar's office.  I think that's -- I think that's it.

Q    Okay.  And as far as, like, supervising all of those, what's your -- like, do you have a similar approach with all of them?  So you, like, meet regularly with all of them, or do you have different ones?  Like some of them you don't meet with, or is there, like, a plan that you have.

Like, you know, if you're going to tell me, I'm, you know, I am taking over your job, like, this is what I would suggest how you supervise these divisions.  Any -- any advice on that, or that you can describe how you do it?

A    I'm really confused by your question, because it seems to me like there's a couple in there.  Can you rephrase it for me?

Q    Okay.  So how do you go about supervising

all of those divisions?

A    There's directors that run those areas, and then those are the direct reports to me.

Q    Okay.  So you --

A    So I supervise that group.

Q    So just your direct reports from those departments?

A    Yes.

Q    Okay.  Do you talk to them and then let them -- like, it's more, like, laissez-faire or micromanaging?

A    I'd probably call it laissez-faire.  I think we all like that.

Q    Okay.  I'm -- I'm good with that.  Okay.
     As far as -- well, let's get right into it.  Why was Jamie Bird terminated?

A    Jamie Bird was not terminated.

Q    Oh.  Okay.  She's still there?  Working at VSU?

A    No, she is not.

Q    Okay.  Well, a terminated employee does not work there anymore.

A    It was a reduction in force.

Q    Okay.  What are all the factors that were considered for Jamie's reduction in force?

A    We were given a ten percent budget reduction by the governor, state-wide, for all agencies.  When that came to the University, it boiled down to -- it was over a $12 million budget cut, and so our chief business officer divided that up to a division.  So each division had their own ten percent cut.  Our total was a little over 1.2 million, somewhere between 1.2 and 1.3.

Q    And is that for the entire institution?

A    No.  It was $12 million for the entire institution.

Q    And how much for the department under which Jamie was reduced?

A    The division of student success, which is a part of that, was 1.29 million, 1.2, 1.3, something in that ballpark.

Q    Okay.  And that was a ten percent budget cut?

A    Yes.

Q    Okay.  Okay.

I'd like to direct your attention to --

A    I've got a -- the only thing I do have is a bad back going right now.  So I do have that. So --

Q    We're not laughing at you.  We're laughing

at me because I have to stand up periodically because of my back.

A    Okay.  Great.  Me too.  So before you -- we get into the next question, do you mind if we stand up for just a little bit?

Q    I do not.  You know, this is what I've been doing.  I've been doing this.

A    Well, yours --

Q    Because I sit the whole time.

A    Yours is probably in a little better shape than mine is.  So I --

Q    Right now.

A    -- may be sitting on an ice pack or something here in a little bit.  But if you don't mind, if we could take about a five-minute break, I'd appreciate it.

Q    Sure.  Yes.

A    All right.  Thank you.

(Recess 01:23 p.m. until 01:28 p.m.)

BY MS. MAESTAS:

Q    Are you feeling a little better with the -- your back?

A    For a moment, and thank you for that.

Q    Okay.  So I understand a bad back.  I

can't -- I have -- I have one.  So if you need to stand up while you're sitting there, I don't know if maybe it's so bad you can't do that, but I -- you may see me just stand up.  And it doesn't mean I'm emphasizing anything.  I'm just trying to prevent looking like an old lady for a whole week.

Okay.  So we were talking, we I asked the question, "Why was Jamie terminated."

And you said, "She wasn't terminated".

And I said, "Oh, she's still working there?"

And you said, "Oh, well, she was terminated because of a RIF."

And so we started talking about the RIF, okay?  Reduction in force, RIF; okay?  Do you understand that acronym?  RIF?

A    Yes.

Q    Okay.  So I am directing your attention to Plaintiff's Exhibit 7, which is the "USG Reduction in Force, Frequently Asked Questions."  So I pulled this from the USG as a guide to what can be considered in a RIF.

(Marked for identification is Plaintiff's
Exhibit 7)

BY MS. MAESTAS:

Q    And in looking at this, does this refresh your recollection about any of the factors that were considered in Jamie's RIF?

A    I have seen this document before because of years being in the University system; so I've seen the document before.

Q    Okay.  So can you tell me what all the factors you considered -- well, first of all, let's talk about who decided to terminate Jamie in the RIF.

A    The cabinet would make proposals to the cabinet.  Everyone would bring -- each one of us had an assigned amount to cut ten percent of your total budget.  For the division of student success, it was 1.2 million.  For academic affairs, it was whatever ten percent of their budget was.

And so we would discuss what those RIFs would be and where we were coming up with those and how to do that.  So it wasn't just a sole decision that was made.

Q    Okay.  So when was the first meeting regarding a RIF?

A    I do not remember the date.

Q    Okay.  How many meetings did you have with

this cabinet?

A    I have no idea how many.

Q    Was it, like, one meeting?  Was it, like, five?  Was it 30?  Like, give me some idea, like ...

A    It was more than one.

Q    Okay.

A    We did not have -- the reduction, when it was given, there wasn't a lot of time; so I -- it wasn't 30.

Q    Okay.  So the information that came, how did it come to you that you had to do --

A    I was notified by Traycee Martin.

Q    Traycee Martin.  Okay.

A    The chief business officer.

THE COURT REPORTER:  The chief business ...

THE WITNESS:  Officer.

THE COURT REPORTER:  Thank you.

THE WITNESS:  You're welcome.

BY MS. MAESTAS:

Q    Okay.  And how did that notification come to you?  Email?  Meeting?  Phone call?

A    I don't recall.

Q    Okay.  Did you ever -- did Traycee Martin ever meet with you about Jamie's RIF?

A    The individual?  No.

Q    Okay.

A    I don't recall that, no.

Q    Okay.  What other individuals -- so did -- yeah, let's ask that.

What other individuals did you meet with regarding Jamie's RIF?

A    There were discussions with direct supervisors of that area -- of all the areas -- that we had, because I asked my team to come up with ten percent reductions and what their ideas were.  So they came up with some of those ideas.  So I did discuss it with them.

Q    What supervisor were those?

A    Those were all of my direct reports at the time.  Would you like that list?

Q    Not all your direct reports.  The ones that had to do with where you ended up terminating Jamie.

A    Ryan Hogan was one of those. Rob Friedhoff.

Q    Okay.

A    I believe that was probably it for Jamie.

Q    Okay.  So Traycee Martin sends out some communication that says, hey, you have to cut your

budget in admissions by -- or no.  Student affairs; right?

A    Student success.

Q    Student success.

A    Student affairs had an additional cut.

Q    Okay.  And then you then go to Ryan Hogan and Rob Friedhoff and meet with them.  And then what happens next?

A    I say, "We have a ten percent budget reduction, and we need to come up with ideas of how to reduce our budget by ten percent."

Q    And who came up with the idea to include Jamie?

A    I don't remember.

Q    Okay.  So why was Jamie -- why did everybody -- or whoever came up with the decision, that you don't remember who it was, why did we come up with Jamie?

A    I think that you're a little confused by that part.  It wasn't Jamie. I looked at all the positions within the division.  And so --

Q    What division?

A    The division of student success.

Q    Okay.

A    So we did the broad scope of all of those

and looked at all of those and looked at operating budgets and wherever else we could make cuts.

Q    Okay.  And with respect to looking at everybody, what did you look at on everybody to then say, okay, this is the person and not this person? What did you consider?

A    A lot of those factors that are in there. Also, a duplication of work duties were also considered in that.  Workload was always considered in that.  Those were some of the things that we considered.

Q    Okay.  And you said a lot of the things that were in there.  You gestured down to Plaintiff's Exhibit 7?

A    I did.

Q    Okay.  So when you said a lot of the factors are in there, what factors, in particular, did you consider?

A    There are several employees performing the same type of function.  You also look at temporary employees.  We did that as well, which is in that one.  So really, mainly, it was No. 4.

Q    Mainly No. 4 on Plaintiff's Exhibit 7?

A    Yes.  That's on that sheet, yes.

Q    Okay.  So we've got documented

performance, length of service, annual performance evaluations, disciplinary action, job performance or personal conduct, and some other things.

Any of those things I read out loud, were they considered when Jamie was RIFed?  And that's the verb "R-I-F-e-d," like, reduction in force in a verb sense.

A     Okay.  Again, help me understand the question.

Q     Okay.  So --

A     Because there was -- there was a lot in that one question.

Q     Yeah.  I'm sorry.  So I'm going to rephrase.

So you said Plaintiff's Exhibit 7, No. 4?

A     Was one of the factors, yes.

Q     Was one of the factors.  Did you consider that in Jamie's RIF?  And then I specifically pointed out documented performance, annual performance evaluation, disciplinary action, lengths of service, job performance, personal conduct, documented performance, difficulties communicated to the employee.

So you could have already answered the question, but I am getting into more details on what

specifically you considered for Jamie.

A    I'm still trying to understand what you want me to answer.

Q    Okay.  So Jamie was terminated because of a reduction in force; right?  So "terminated employee" means no longer worked there.  Terminated.  Okay?

A    Well, in my mind --

Q    She's not continued.  She's terminated.

A    In my mind, termination does not mean that.  Termination is an involuntary separation due to performance, and that's just, in my head, the definition.  I apologize.

Q    Okay.  No problem.

So the way Jamie was terminated was a RIF, and then you said -- and I said how -- what did you consider -- and so it's a RIF -- then you have to decide, I'm going to terminate Jamie, not Lisa Wong.  I'm going to terminate Jamie not --

A    Correct.

Q    -- somebody else in admissions.  Okay?  So in doing that, you have to discriminate between individuals and differentiate them.  And I want to say while we look at No. 4, which you said was the most relevant factor in this Plaintiff's Exhibit 7,

what is written in here are you thinking applies to Jamie?

MR. CARTER:  You're talking about where it says, "Several employees performing the same function," which I think is what he had --

THE WITNESS:  Right.

MR. CARTER:  And now are you asking about the factors --

MS. MAESTAS:  Inside No. 4, what factors?

MR. CARTER:  What factors apply to the several employees performing the same function under 4, is what you're asking?

MS. MAESTAS:  Yes, sir.  That's it.

A    It was duplication of duties.  And truly where it came up from, where I've overseen dual enrollment prior to, at other institutions, we would have one employee that was doing several hundred students up to 450 to 500 students by themselves, along with recruiting duties and admission duties.

We had two people that were doing -- one person was primarily responsible for dual enrollment, and then one person that was assisting in that process.  We also had a local recruiter that was here that was our recruiter.

(Marked for identification is Plaintiff's
Exhibit 47)

BY MS. MAESTAS:

Q    Okay.  So did you consider her annual
performance evaluations?  Discipline?  Job
performance?  Anything like that?

A    As far as I know, she didn't have any poor
job performance issues.

Q    Okay.  All right.

I want to direct your attention to 46,
which is going to be in this other notebook right
here.

BY MS. MAESTAS:

Q    And I am looking at Page 6 and 7.
Actually, first, let's identify this document.
Sorry.

Do you recognize this document?

A    I don't recall seeing this exact document,
but it's the document of Jeanine's response to a
complaint -- our human resources office in response
to a complaint from Jamie --

Q    Okay.  Yes, it is.  And I am wondering,
have you ever seen it?  Did you help her write it?
Did she did say, Hey, can you look at this before I
send it?

A    I don't recall seeing it before now.

Q    Okay.  Do you recall meeting with her to -- before she wrote this?

A    Yes.

Q    Okay.

A    I was interviewed, yes.

Q    Okay.  Jeanine Boddie-LaVan interviewed you?

A    Among others, yes.

Q    In order to write this document?

A    I am not sure when this one was generated, but who I talked to helped generate it.

Q    Okay.  So we'll get into meetings. I am just talking about this document, and I'm -- I'm -- it's confirmed you've not seen it.  So that's fine. So I'm just going to start looking through the details of it; so I'm going to look at Page 6 right now.

And I'm looking at No. 3 and it says at the -- on the last sentence, it says, "Her duties could be reassigned to the local recruiters, and therefore, her position was able to be eliminated with the least impact to students."

Is that a fact that came from you, or did Jeanine Boddie-LaVan come up with that on her own?

Or is there another source?

A     It probably came from me.

Q     Came from you.  Okay.  So the statement, "Her duties could be reassigned to the local recruiters, and therefore, her position would be eliminated with the least impact to students."

Is that true?  Is that -- is that what happened?

A     Did we eliminate the position based on that?  Or -- I'm sorry -- what are you asking?

Q     Yeah.  So it says, "eliminated her position and then assigned her duties to the local recruiters."

Is that what happened?

A     No.

Q     Okay.  What happened?

A     The other person that was assisting Jamie in dual enrollment also left.  When that position left, it was rehired, and it did dual enrollment.

THE COURT REPORTER:  It was rehired and?

THE WITNESS:  It handled dual enrollment responsibilities.

BY MS. MAESTAS:

Q     And who was that person?

A     That was rehired?

Q   Yes.  Or hired.

A   Hired?  Megan is her first name.

Q   Is it Megan Hancock-Sutliff or Sutliff-Hancock?

A   Okay.  I don't -- I don't know her.

Q   You are not sure?

A   I don't.  I don't.

Q   Okay.  Okay.

So you're saying that the statement, "Her duties could be resigned to the local recruiters, and therefore, her position was able to be eliminated," you're saying that's not true because we hired Megan?

A   No.  The statement is still true.

Q   Oh, okay.  That's what I was asking.  Is the statement true and --

A   Yes.

Q   Okay.  But is that what happened.  And you said, no, it's not what happened.

A   Correct.

Q   Okay.  And so the difference -- the discrepancy is you hired a new person?

A   The difference was, we had a resignation inside the office too.

Q   Okay.  Who resigned?

A    I can't remember her name, to be honest with you.

Q    Okay.

A    Christy -- maybe.  There's a couple of Christy's over there.

Q    Okay.

A    It's easier to say I don't remember.

Q    Okay.

A    She resigned shortly after Jamie leaving, and then that position was turned into the dual enrollment responsibilities.

Q    Okay.  And then on Page 7, is a similar statement, right by that blue.  "Dual enrollment will be absorbed by the overall admissions recruiters, and these duties will become part of the regular caseload for the recruiter, rather than being a separate process.  A manager position is no longer necessary to oversee these processes."

Is that what happened?

MR. CARTER:  This might be relevant to read this.

THE WITNESS:  Right.  Right.

A    And then right underneath that, it says "The second person on the organization chart is an admissions employee who had been providing support

and assistance to dual enrollment. That employee will remain with admissions after the reduction in force is effective."

That's the position that also resigned, and that was the position that was rehired.

BY MS. MAESTAS:

Q Okay.

A Not the coordinator level position.

Q And then you're saying Megan came in?

A Yes.

Q All right. Any other new positions that you can remember?

A In admissions?

Q Uh-huh.

A The RIF involved more than one position over there.

Q Uh-huh.

A And then the other one was kind of a communications person and then a lower level communications person was brought over.

Q Okay. Who all was RIFed in admissions?

A Jamie Bird and Eric Keller.

Q Anyone else?

A No.

Q And then we don't ...

And is it -- Sarah Bessinger was the one that resigned?

A    Yes.

Q    Any other new positions created after the RIF?

A    No.

Q    That you know of?

A    No.

Q    Okay.  Just whoever replaced Sarah Bessinger?

A    Correct.

Q    And that was Megan.

Whose decision was it?  Whose final decision, signing off on it, like, this is going to be the person, Jamie is going to be RIFed?  Who signed off on that?

A    I -- the cabinet did.

Q    So, yeah, I --

A    And ultimately, I think the Board of Regents policy is that they're the ones that makes the final decision.

Q    Oh, okay.

A    So I mean, that's their policy, but our cabinet was the one that we looked -- overall viewed it and made sure that we were meeting our budget

reductions.

Q    Okay.  Is this the people on the cabinet that signed off on it?

A    No.

Q    No, it's not?

A    No.

Q    Okay.  Who signed off on it?  Oh, okay.

A    Davis did not.  Maggie Viverette did not.

Q    But the rest of the people on this piece of paper did?

A    Yes.  And Mr. Davis might have.  He was lead counsel.  I don't know.  To my knowledge, I don't.

Q    But everybody else on this did: Rodney Carr, Vince Miller, R. T. Smith, Jeanine Boddie-LaVan, Tracyee Martin, and Richard Carvajal.

A    Yes.

Q    Anybody else?

A    Not that I'm aware of.

Q    I am going to mark this as Plaintiff's Exhibit 51.

         (Marked for identification is Plaintiff's
         Exhibit 51)

BY MS. MAESTAS:

Q   So the people that signed off on it, did they rubber stamp your decision?

MR. CARTER:  Objection to form.  Calls for speculation.

You said 51. It only goes through 48 here.

MS. MAESTAS:  I know.  I know.  I've got to redo --

MR. CARTER:  You've got two more that is marked?

MS. MAESTAS:  Yeah, I've marked --

MR. CARTER:  Generally?

MS. MAESTAS:  Yeah, and I'm keeping a pile over here.

BY MS. MAESTAS:

Q   Okay.  So we talked about the people that signed off on the RIF.  So when I said "rubber stamp," I mean, did they make any substantive way in -- okay, it's going to be Jamie and not Sarah Bessinger or Ryan Hogan?  Or was that you?

A   I don't remember the entire conversations that we would have at the cabinet level of those. So I can't answer that.

Q   Were they -- do you recall anybody overriding you or speaking up and saying, no.  It

shouldn't be Jamie.  It should be John Smith or -- I'm making up a name because I don't know.

A    Yeah.  And I don't recall the exact conversations; so I don't remember them.

Q    Okay.  Do you recall any information regarding the CVIOG report that came out in 2019 regarding admissions?

A    The total CVIOG report, yes.

Q    Okay.  And what did it say?  I mean, was there anything related to what Jamie was doing that said anything about her doing a good job or maybe leading to the RIF -- not leading.  You know, did it point to -- did it have to do with the RIF at all?

A    The Carl Vinson Institute came in and did a salary study.

Q    Mm-hmm.

A    I don't -- what it had to do with job performance-wise and everything else, she had a lot of feedback on that whole process.  I didn't have a lot of feedback and input on that process for that position.

Q    Okay.  Did it have to do with the RIF at all?  Was it taken into consideration?

A    The CVIOG study?  No.

Q    No?  Okay.  Not -- I am trying to figure

out.  I am trying to investigate this.  So ...

All right.  "No" is a perfectly good answer, okay?

All right.  Do you recall that Jamie had filed a Title IX complaint?

A    Yes.

Q    Okay.  What do you recall that complaint was?

A    The incident or -- what?  Is that what you're asking?

Q    Yeah.

A    Okay.  What part of the complaint do you want me to -- the whole thing or ...

Q    Yeah.  Could -- if you -- what you recall the complaint to be about and what became of it.

A    Okay.  So we'll start with what the complaint was about.  Yes?

Q    That's fine.  Mm-hmm.

A    We had a dual enrollment student that had committed suicide, and Jamie interacts with students a lot and their families.  And I knew that it would probably would have impacted her; so, I walked over to the admissions office where her office was to check on her.

She was sitting at her desk.  She was

crying.  I told her it was going -- it was tough and all those kinds of things.  And then I said, "I can see that you're upset", and I said, "Jamie, I never do this, but if you want a hug today, I'll do it."

And she said "Yes."  So I gave her a hug and we left.

Q    Okay.

A    And then, as far as I know, that's what the complaint was about.

Q    Okay.  And do you recall what became of the complaint?

A    I know it was investigated by the Department of Human Resources here, and then they also had somebody from outside come in and investigate it, as well.  And then I was told that the allegations were unsubstantiated.

Q    Okay.  And do you remember who made that decision?

A    No, I don't.  I was -- I believe I was notified by HR; so I don't know who made that decision.

Q    And so you had -- did you have any meetings within HR regarding the Title IX --

A    Yes.

Q    -- complaint?  What were those meetings?

A    I was interviewed in the human resources conference room, then, I was also reviewed by the independent group that came in --

Q    Okay.

A    -- looking into it.  And that was -- I believe that it was online.  It was Teams or Zoom or something.

Q    What or Zoom?

A    It was either Teams or Zoom.

Q    Okay.  Okay.

A    I can't remember which platform that was.

Q    And who did you meet with in HR?

A    Jeanine Boddie-LaVan, and then I believe there was somebody else in the room.  I do not recall who it was.

Q    Okay.  And how did you defend against the allegations?

A    I told them exactly what I just told you.

Q    Okay.  Did you ever bring up any job performance or anything like that?

A    In the Title IX complaint?

Q    Uh-huh.

A    No.

Q    Okay.  I'd like for you to look at Defendant's -- or sorry -- Plaintiff's Exhibit 27.

(Marked for identification is Plaintiff's Exhibit 27)

BY MS. MAESTAS:

Q     This is Plaintiff's Exhibit 27.  It is the notes of the Title IX investigator, who is Janice Lynne, from September 23rd, 2020.  And on -- so big -- big, first paragraph.

And then second paragraph says, "There was a negative email sent out in response to a written reprimand."

Then the next paragraph, "There was a meeting where Dr. Carr and Mitchell regarding a write up."  And then she states "She holds grudges," and then, "Mr. Mitchell did hear this."

Does that refresh your recollection regarding a written reprimand or writeup being referenced in the Title IX investigation?

A     If the investigator asked about it, then I would have provided that background, yes.

Q     Okay.

A     I didn't recall doing that, but ...

Q     Okay.  So --

A     I was thinking more of the meeting with Jeanine.  When I sat in there, I told them the same exact thing I just told you.

Q    Okay.  And you -- did you talk about the reprimand and the write up and the email?

A    Not that I recall, no.

Q    Okay.  But now seeing this, it appears it was discussed.

A    I don't -- so I don't know if -- I don't see where she put down I said that.  The investigator also spoke with several other people.  So I don't know if I said that or if they said that.

Q    Well, this is your interview, and I've got everyone's interview separate.

A    Okay.

Q    So I've got the whole Title IX file, and then this is just your interview notes.

A    Okay.  Again, I don't recall saying it.  I don't.

Q    But do you have any reason to dispute -- now that you've seen this -- that it was raised in this interview?

A    If she asked the question, I would have answered the question.

Q    Okay.  Did Janice Lynne ever ask you about the Bainbridge college investigation?

A    I don't remember if she did or she didn't.

Q    What about Ms. Boddie-LaVan?

A    I don't remember if she asked me about that, either.

Q    Okay.  Okay.

If I could direct you to 26, it's the first one in that notebook.  No.  This black notebook.

(Marked for identification is Plaintiff's Exhibit 26)

BY MS. MAESTAS:

Q    And then Page 5 and letter K. I believe it's mentioned -- about midway down.

"When asked for examples of Dr. Carr being protected, Mr. Mitchell said that the President and Dr. Carr are best friends who were at Bainbridge together, and the President brought Dr. Carr with him to VSU."

Does that refresh your recollection about whether you were asked about that in your Title IX investigation or HR investigation?

A    I don't remember that.  I do not recall being asked about that.

Q    Okay.  And how were you told that the findings were unsubstantiated?

A    I don't remember if it was by phone call or, I do believe that I got something by email.

Q    Do you remember where you got it from?

A    I don't.

Q    All right.  So broad -- broad question. What is the main function of VSU?

A    To provide post-secondary education to -- by the Board of Regents to the 41 service county regions that we serve as a regional, comprehensive university.

Q    God bless you.

Okay.  It's not to educate students?

A    Yes.

Q    Okay.  Is that -- I mean, is that a primary function to get a good education, serve the students?

A    Yes.

Q    Yes.  It is.  Okay.  Good.  I am glad you said that so maybe I can send my kids here.  Okay? If it's to help everybody else out and I paid to send my kid to VSU, you're not serving my customer. Okay.

What does VSU's main function have to do with the TCSGs?

A    In my opinion?

Q    Okay.  We'll start there.

A    We're both in the education process to

educate -- to educate the students that we serve.

Q    Okay.  So that's how they're similar, but how does -- how does the TCSG serve VSU's function of educating students?

A    I don't think I understand exactly what you're asking.

Q    Does the TCSG help VSU educate students?

A    I'm really trying to figure out what you're trying to get me to go to; so, I am trying to figure that out.

Q    Okay.  I was hoping you'd go there, and then I could then ask you:  Okay.  So if our function is to educate students and we're doing it at VSU, how does a technical college do that?

A    How does a technical college educate the -- their students?

Q    No.  How does the Technical College System of Georgia educate students who are attending VSU?

A    That are attending VSU?

Q    Yes.

A    We have a joint program in dental hygiene.

Q    Okay.

A    We have that.  We also have transfer students that go back and forth between the two institutions.

Q    Okay.  Dental program.  Transfer students.

A    So -- and I mean, how else do they help us?  They are partners in communication all the way across the community and their service region.

THE COURT REPORTER:  And ...

THE WITNESS:  Their service region.

BY MS. MAESTAS:

Q    Okay.  Okay.  I think I got that.  All right.

So you have a partner dental program. Let's start with that.  How does that work?

A    I don't know.  I know we have it.

Q    Okay.  Who would know about that?

A    That would be Dr. Bob Smith or Dr. Sherry Gravett over in economic affairs.

Q    Okay.

A    It's an academic program.

Q    What about transfer students?  How does -- how does that work?

A    They have --

MR. CARTER:  Transfer or dual enrollment? You said transfer.

MS. MAESTAS:  Transfer students.

A    There are students that take courses there and then transfer those credits over here to us or

transfer from Wiregrass to us.  And there are students that start here and then transfer from us to them.

BY MS. MAESTAS:

Q    Okay.  And is that taken care of under the articulation agreements?

A    The transfers, some of those, yes.

Q    Okay.  What other -- what other transfer students are not benefited by the articulation agreement?

A    Which articulation agreement are you referring to?

Q    Well, there's a bunch of them.

A    Correct.

Q    I mean, you go online, and you can -- you go to USG level; you click on it; you read it; and then you fall asleep.  And then you go, you know --

A    Correct.

Q    -- you go to Wiregrass; you click on it; you read it; you fall asleep.  So I'm -- I'm looking at the applicable ones that apply to students transferring between Wiregrass and VSU and vice versa.

A    You mean the articulation agreements to it?  I don't know.

Q    No, no, no.  I'm not asking --

A    That is all housed in academic affairs.

Q    No, no.  I am not asking how many you have.  I am asking what transfer students are not benefited by the articulate- -- like who transfers under something that's not under the articulation agreements?

A    Again, you'd have to go down to the particular articulation agreement.  The University System has one with the entire Technical College System of 28 classes that are core classes, that you can take at a technical college, that are accepted at the University System of Georgia.  So if we are asking about transfer students in that regards, there's several that will take either A, B, C, D, or E courses that are underneath those 28 courses and transfer those over to us.

Q    Yeah.  Yeah.  I -- again --

A    But is it underneath a specific articulation agreement --

Q    No.

A    -- that you have between us and Wiregrass about this program articulating with that program --

Q    No, no.  I'm --

A    -- then I don't know how many of those are

in existence.

Q     This is broad.  This is more, like, vanilla question.

Like, are there any transfer students that transfer and they didn't even need to look at the articulation agreement?

A     I don't know if there's ever a student that looks at an articulation agreement.

Q     Well -- and I don't mean that.  I mean, like, if the admissions office does not need to refer to that credit transferring under the articulation agreement?

A     Are there any from -- that do that?

Q     Yeah.  Like --

A     There might be.  I don't know.

Q     Like, not -- like, it applies to all transfer students in some way.  Like, some articulation agreement applies to -- if you don't know, just say I don't know.

A     Yeah, I don't know.

Q     I mean -- okay. that's a fair answer.

A     It's a very broad statement.  I truly don't know.

Q     Okay.  I mean, my -- my understanding is, if you're a transfer student, you're operating under

an articulation agreement of some -- of some type.

A    There are so many of them.

Q    Yes.  So chances are, you're transferring, your credit is going to be found on that articulation agreement.  Can you agree or disagree?

A    I can't dis- -- it's too broad of a statement.  I can't --

Q    Okay.  Okay.

Does VSU owe a duty to the Technical College System of Georgia to recruit students to attend classes at the TCSG?

A    Do we owe a duty, or do we have a duty?

Q    Yeah.  Do you have to help them?

A    Or is that --

Q    Like, say you have a student who's admitted as a VSU dual enrollment student.  They meet the academic requirements.  They're attending there.  They're about to start, and you say, hey, why don't you go over to Wiregrass instead.

Would you ever do that?

A    Would I ever do that?

Q    Yeah.  Or would anyone that you supervise?

A    Well, you asked if I would ever do that. Yes, I would.

Q    You would do that.  Okay.  Why would you

do that?

A    If it was to the best benefit of the student, I would.

Q    Okay.  And what are the scenarios where that would be to the benefit of a student?  And again, that's a student's admitted.  They are about to go.  And then all of a sudden, you say, hey, why don't you go on over to another school?

A    That's a totally different scenario than what you asked the first time.

Q    Okay.  Why don't you go with what you were going to say?

A    To which question?  Can -- run it again, the question, for me -- or help me.  Which one do you -- why would I chose to ...

Q    Send a student who is admitted to VSU dual enrollment --

A    And about to start classes here?

Q    Yes.

A    Why would I ever send them to Wiregrass?

Q    Mm-hmm.

A    If they had an issue with coming to class on our campus.  They had transportation issues. They had family issues.  Wiregrass sends teachers -- typically, the Technical System sends teachers to

the schools.  Therefore, they could stay in that environment.

What if they had a learning disability that needed to be adhered to at the school, and they had the ability to do that better there than they do here.  That's one scenario that I can think of.

What if it's a -- again, family issues, especially with COVID.  I need to not have to travel to an institution.  I can't do online learning.  It's better if I do it face-to-face.  So then I would refer them to a different institution.

Q    Okay.  Thank you.  Any other reason?

A    Well, I am sure there are several that I'll think of tonight.

Q    Awesome.  Don't say that, 'cause then I'll have to redepose you.

A    I'll let you what -- how many come up.

Q    Okay.  So how do you supervise admissions and dual enrollment?

And I believe that dual enrollment is housed under admissions.  Is that correct?

Before you answer the question -- so I'm asking how you supervise it, and then if you don't supervise both of those together, who does?

A    Okay.  First question was ...

Q    How do you supervise admissions and dual enrollment and then --

A    But then you also said dual enrollment was under admissions.

Q    That's what my understanding is.  So I am trying to get you to clear it up for me.

A    Then let's take that question first.  Dual enrollment is not under admissions.

Q    Okay.  So who's it under?

A    It's under Rob Friedhoff.

Q    Is it under you?

A    Yes.  Rob reports to me.

Q    Okay.

A    So dual enrollment is still under me.  It is not in admissions.

Q    Who are the staff that support -- that Friedhoff supervises?

A    All of them or by department?

Q    All of them.  Okay.  I mean, do you know what their names are?

A    No.  There's no way I can run down that entire list.

Q    Is there overlap with admissions?  Is that --

A    What do you mean by "overlap"?  No.

Staff-wise?

Q    Uh-huh.

A    No.

Q    All right.  Who are the dual enrollment people that -- I mean, how many are there?

A    One.  Megan.

Q    Oh, just Megan?  Okay.

And then admissions is Ryan Hogan?

A    Yes.

Q    Okay.

THE WITNESS:  Can we do another break?

MS. MAESTAS:  Yeah, absolutely.  Absolutely.

THE WITNESS:  I would appreciate it.

(Recess 2:14 p.m. until 2:22 p.m.)

BY MS. MAESTAS:

Q    Back on the record after a short break.

So our last questions were about the breakdown of admissions and DE, and you said that DE was handled by Friedhoff.

A    Yes.

Q    And admissions handled by Hogan?

A    Yes.

Q    And that you supervise both Friedhoff and Hogan?

A    Yes.

Q    And that Megan is the sole DE person that you know of.

A    Yes.

Q    Okay.  All right.

And I want to come back to that, but how do you manage your meetings with -- we'll talk -- first talk about Friedhoff, and then -- well, let's talk about Ryan first, 'cause it's kind of like -- anyways.

Well, how do you handle supervising Ryan Hogan?

So I remember you said laissez-faire was how you did it before.  Do you just let him go, and then he reports?  Or do you -- may go in and check numbers, check status?

I feel like I'm not -- I'm getting the hazy eye look from you.

A    Well, there's a lot to what you just asked.  You asked about meetings first.

Q    Yeah.  Mm-hmm.  So --

A    I have bi-weekly meetings with the entire leadership team.  And then twice a month or once a month, I have meetings with -- one-on-one with all the direct reports.

Q    And that's Friedhoff and Ryan Hogan's direct reports?

A    Yes.  And Rebecca Taylor and the rest of them --

Q    Well, okay.  I am just talking about DE admissions.

A    Yes.

Q    Okay.  Thank you.  Sorry.  And so -- I lost my train of thought there.  As far as the meetings with Hogan -- I don't want to go there.

Do you -- do you make the final decision, or does Ryan make the final decision?

A    That depends.

Q    Okay.  And I'm trying to get, like, an idea of how you manage something on a daily basis, but, you know, I'm having a hard time formulating the questions to ask on it.

Oh.  I know what I was going to ask you.  Your leadership team meetings, who is -- who's on that, because you said you meet with a leadership team?

A    Correct.  All of my direct reports, Rob and Ryan.  Stanley Jones, the registrar, is also in there.  Doug Tanner, the director of financial aid, is in there.  Barrie Fitzgerald, institutional

research.  Rebecca Taylor that oversees the access office, testing office and creative service is also in there.  And then my assistant, Shauna Branch, is in there.

Q    Okay.  And so that's the meeting of all of your direct reports?

A    Yes.

Q    And so when you say "the leadership team," you're talking about your direct reports?

A    Yes.

Q    Okay.  And then you said about meetings directly with Friedhoff and Hogan.  How many times was that?

A    It's at least once a month.

Q    Okay.  And then with Friedhoff, what do you -- what do you talk about?  Like, what's a typical meeting agenda?

A    They set the agenda.  I don't.

Q    Okay.  So you go in and -- where does that occur?

A    My office.

Q    Okay.  So he comes to you, and what is a typical thing that you talk about in that meeting that Friedhoff sets the agenda?

A    I guess depends on where they are that

day.  What time of year it is.  We talk about scheduling, class schedules.  We talk about visual schedule builder.  We talk about implementation of software.  It just all depends.

He makes the agenda.  So when he comes in, it's typically what can I -- he either may seek my opinion on something or need support or financial support or something.

Q    Okay.  Thank you.  I want to direct your stones to Plaintiff's Exhibit 17.

(Marked for identification is Plaintiff's Exhibit 17)

BY MS. MAESTAS:

Q    And you're already there.

This is the -- this is from the website. I just printed it off.  This says:  "Office of Admissions Staff."

Do any of the people -- on this page -- handle things that Jamie Bird used to handle?

A    I don't know.

Q    Okay.  So previously, you said that Megan Hancock -- I think her name used to be Sutliff -- Megan handled all of dual enrollment.

A    As far as I'm aware, yes.

Q    Okay.  So your understanding is that the

people on this page do not handle dual enrollment?

A   Again, I -- that's -- I don't know.

Q   Okay.  Okay.  That's fair.  That's a fair enough answer.  I don't know the answer to that question.  If I say something, it would be wrong.

All right.  Plaintiff's Exhibit 19 or -- sorry -- 18.

(Marked for identification is Plaintiff's Exhibit 18)

BY MS. MAESTAS:

Q   So this might be, I don't know, but I am going to ask it again anyways.  Any of the people listed on this, handle tasks that Jamie used to handle?

A   I don't know.

Q   Okay.  And I want to flip back to 17.  I'm going to ask you the question a little bit differently.  Do any of the people on this list handle dual enrollment?

A   I don't know.

Q   Okay.  Same question for 18.  Any of the people on this list handle dual enrollment?

A   I don't know.

Q   Okay.  Do you know what DE courses a high school student can take at VSU?

A    Do I know all of them?  No.

Q    Okay.  I mean, do you know categories of them?  Do you know, like, hey, I know the english department is teaching such-and-such courses?

I mean, like, do you know anything about it, or is this just another, I don't know, Holly?

A    I know some.  You asked if I knew everything.  I don't.  I don't know all of them.

Q    Well, I said what DE courses can a high school student take at VSU?

A    I don't know.

Q    So I am not saying, please give me an exhaustive list of every course and every course number, as if you are a computer.  I'm saying, what do you know of that you can recall?

A    I know we do a lot of Area A courses english 1101, english 1102.  We do math modeling, college algebra.  I know we do communication arts. We do -- I think we still do entry level econ courses.  We probably do, possibly, psychology, sociology, entry level courses in the 1100s.  I -- I don't know.

Q    Do you know who teaches them?

A    No.

Q    For VSU?

A   No.

Q   Not -- not even one name?

A   Off the top of my head, no.

Q   Okay.  Do you know where they're taught?

A   No.

Q   Are they taught at VSU?

A   I don't know.

Q   Okay.  And do you know if any of them are taught on high school campuses?

A   I think they are.  I don't know for sure.

Q   Okay.  You just don't know, Holly?

A   I don't.

Q   Okay.  Once a student finishes DE at VSU, do they have a lot of options at that point -- or do they have fairly limited options?

A   Options of what?

Q   Of what to do with their life.  So go to -- go to VSU, go to Oregon State, Florida State, go to work at dad's flower shop, I mean?

A   So ask the question one more time.

Q   What are the options for somebody who finishes DE at VSU?

A   There's lots of them.

Q   Say that again.

A   There's lots of them.

Q    Lots of options?

A    I would assume, yes.

Q    Okay.  Me too.  I would assume that too.
For a student who wants to attend VSU for their undergrad career, what advice do -- would you give them regarding dual enrollment?

A    I can tell you the advice I gave my own children.

Q    Okay.

A    Take the dual enrollment courses, if you want to take them.  If you don't want to take them, then don't do it.

Q    That's laissez-faire parenting right there.

A    Right.

Q    Okay.

A    Some have taken it; some have not.

Q    Do you have any -- do you have any -- like, what if they wanted to go to UGA or Georgia Tech?  What would -- what advice would you give them?

A    About dual enrollment?

Q    Yeah.  Would you say go to Wiregrass or come to VSU?

A    I would say I wouldn't tell them -- if

they wanted to go to UGA or Georgia Tech --

Q    Yeah.

A    -- I'd tell them to enroll in AP courses, because those will count more, because that is what UGA is going to look at.  I wouldn't tell them -- I'd tell them to avoid dual enrollment.

Q    Okay.  Okay.

What about if they wanted to take a dual enrollment course and go to UGA or Georgia Tech?  You would say just don't take it at all?  Or, like, they -- say there's, you know, their schedule is such that they can only fit, you know, dual enrollment here for whatever reason.  Would you say go to Wiregrass, or would you say go to VSU?

A    I wouldn't tell them either one.  They get to make that decision.  I don't make it for them.

Q    Okay.  What would you tell a student who is SAP deficient at VSU in DE?

A    You're talking about satisfactory academic progress?

Q    I think so.  Whatever that means.

A    What would I tell them?

Q    Yeah.  What advice would you give them?  Say they want to be a -- a dual enrollment student.  What would you tell them?

A    And when you say "SAP deficient," what does that mean?

**Q    Satisfactory academic performance, I believe is the acronym.**

A    Right.  So if they're SAP deficient, are we talking about because of their GPA?

**Q    I don't know.  In any way, in any of the categories where they'd fall under that.**

A    It would all depend on what I was looking at, as to what advice I would give them.

**Q    Okay.  Well, the --**

A    I don't have the criteria sitting in front of me.

**Q    How about SAT?  'Cause I think that was what you said; right?**

A    What?  You lost me.

**Q    Okay.  I will withdraw the question.**

**Does the State -- do State regulations require counseling for high school students before they enter the DE program at VSU?**

A    Does the State require it?  I don't know.

**Q    Do you know of the existence of any State regulations which require counseling of high school students?**

A    I am not aware of any.  I don't know.

Q    Okay.  Exhibit 19, if you don't mind.  And I've highlighted a phrase which says -- sorry.  Let me tell you what that exhibit is.

(Marked for identification is Plaintiff's Exhibit 19)

BY MS. MAESTAS:

Q    First of all, do you recognize this?

A    If I had reading glasses.  It would appear it's part of our website.

Q    Are these your reading glasses?

A    No.  Those are for distance.

Q    Oh, okay.  So that would be a really good thing to bring to a deposition, is your reading glasses.

A    Okay.  Well, yeah.  It's really tiny print.

Q    Okay.  This is an excerpt of the VSU dual enrollment flip book that I printed off your website.  And I say "yours," and it's VSU's website.  Okay?

And so at the bottom of the page, it's highlighted:  "The rigor and pace of our classes will provide -- will prepare you for success anywhere."

What does that statement mean?

A    I don't know.  I wasn't the one that
designed it and put it in there.  I have no idea
what that means.

Q    Okay.  So you don't have any say-so over
the flip book?  Over that -- gets put out then?

A    Do I have any say-so over it?

Q    Yeah.  So --

A    I didn't --

Q    -- is this a laissez-faire moment?  Or --

A    I didn't review that.

Q    Okay.

A    I don't know who -- I don't know who put
it together and who did it.

Q    Okay.  So now that you're reading it, do
you have any idea what that means?

A    Not really.

Q    Okay.  21.

(Marked for identification is Plaintiff's
Exhibit 21)

BY MS. MAESTAS:

Q    And this is a publication that I pulled
off the USG's website regarding counseling for
dual enrollment students.  And I've highlighted a
sentence at the first paragraph that says:
"Students should pursue a challenging and rigorous

high school curriculum to be best prepared for a successful college experience and should consult with their high school counselor to determine appropriate courses."

What does that mean to you?

A    Other than exactly what it says?  I mean, I don't -- I don't know what you're asking me.

Q    Does it say -- doesn't it say that you should talk to your counselor and choose wisely based on the rigor of the curriculum?

MR. CARTER:  Again, the document will speak for itself.  It says what it says.

MS. MAESTAS:  Okay.

BY MS. MAESTAS:

Q    And do you have any other, like, understanding of it, the application of it?

A    No.

Q    Okay.  Next page.  Same question.

Any understanding or application in your -- in your role as vice-president?

The highlighted portion:  "Courses" -- "Course may not prepare students for admission to USG institutions with selective admissions, such as Georgia Tech or UGA and are not appropriate for students planning to enter a STEM major."

Any application to your position as VP of admissions or DE?

A    What do you mean by "any application"?

Q    Like, is anything ringing a bell?  How this -- how you manage your -- your department, how you discipline anybody, how you tell it to be run in your weekly meet of monthly leadership or bi-weekly meetings with your DE people?

A    Okay.  So going back to what it says.

Q    Mm-hmm.

A    What was your question about what it says?

Q    Does it impact how you manage?  Do you -- do you use it?  Do you refer to it?  Does it have any meaning to you?

A    I don't refer to this document at all.

Q    Okay. Perfect.

So I am not going to ask the question on Page 5, because you've already told me that you would have no idea what that means.  Okay?

A    I don't -- I don't look at them.  I don't look at this document.

Q    Okay.

A    The admission folks and the dual enrollment people do.

Q    Okay.  Perfect.  Thank you.

All right.  Plaintiff's Exhibit 23.

(Marked for identification is Plaintiff's Exhibit 23)

BY MS. MAESTAS:

Q    This is an email, which is forwarding from Sarah Wenham, from the USG -- the USG Dual Enrollment Summit for 2019.  Were you aware of this event?

A    I don't remember.

Q    Okay.  You don't have any recollection of the event going on?

A    No.

Q    Okay.  All right.

Plaintiff's Exhibit 24.

(Marked for identification is Plaintiff's Exhibit 24)

BY MS. MAESTAS:

Q    This is a bullet point list of talking points from a round table lunch regarding misconceptions -- and I'm looking at the last bullet point in that first section.

This says:  "The rigor of the courses is the same at all institutions, since some of the courses are transferable to all USG and TS" -- "TCSG institutions.  Therefore they are being prepared to

be successful at all institutions within the state, no matter where their DE credits come from, (then parents are frustrated when they are not successful.)"

          Agree or disagree that that's a misconception?

          MR. CARTER:  Do you have any idea?

          THE WITNESS:  No.

          MR. CARTER:  Okay.  That's an appropriate answer.

BY MS. MAESTAS:

     Q    Okay.  So do you have any idea what that's talking about?

     A    No.

          MR. CARTER:  The document speaks for itself.  It says:  "What is the one misconception you find students have regarding dual enrollment?  Parents?  Counselors?"

          And then it gives a list of possibilities. So you're asking him about one of the possibilities.  And I don't even remember what you asked him, but it's just --

BY MS. MAESTAS:

     Q    Do you agree or disagree with that, or do you not have enough --

MR. CARTER:  That that is the one misconception, you find students have regarding dual enrollment --

MS. MAESTAS:  Yes.

MR. CARTER:  -- is that the question?

MS. MAESTAS:  Yes.  Mm-hmm.

MR. CARTER:  And again, do you -- do you have any idea of whether they do or whether they don't?

A    I -- I don't.  I don't -- I don't know what all they talked about at the summit.

THE COURT REPORTER:  I'm so sorry.  I need you to raise your voice.

THE WITNESS:  Okay. I'm sorry.

THE COURT REPORTER:  It's okay.

A    I don't know what all they talked about at the summit.  I don't know where it came from.

BY MS. MAESTAS:

Q    So now that you know that they talked about it, do you have an understanding of this phenomenon?

A    What phenomenon?

Q    I mean, do you know what they're saying? Do you understand it?  Does it resonate with you, or do -- you just don't know?

A   I am still trying to understand the phenomenon.  What it --

Q   Like, do you -- do you understand --

A   I am trying to figure out where you're trying to get me to.

Q   I'm trying to see if this resonates with you in any way?  Like, do you agree with the statement?  Do you disagree with the statement?

A   I don't know the background of what the conversation was when they were bringing it up, other than there's some misconceptions.  They're standing up there talking about other stuff, and this is coming up.  I have no idea of what the background of that is.  I don't -- I don't feel comfortable answering that.

Q   Okay.  Fine.

Do you have any examples of specific situations of students who were not properly counseled and were disappointed or not served well by the DE program they ended up in?  And I don't want specific names, just ...

A   Am I aware of ...

Q   Any examples of students who were not properly counseled and were disappointed or not served well by the DE program they ended up in?

A    Not any right off the top of my head.

Q    Okay.  You don't have --

A    You're talking about here at VSU?

Q    Like, if a parent calls you and says, you know, Jane Smith is, you know, she was supposed to do well as a freshman.  And she attended DE at, you know, Wiregrass or wherever or GMC, and now she's not doing well.  Or, you know, John Smith, my student, he -- anything where you know of any specific situations?

     And again, if the answer is "no," fine. I just --

A    Complaints from parents?

Q    Yeah.

A    No.

Q    Okay.

A    Not that I remember.

Q    What about students?

A    Not that I remember.

Q    Okay.  Okay.  Let me see that.  Sorry.

     Do you understand Wiregrass to be a two-year institution?

A    Yes.

Q    Okay.  I would like to turn your attention to Plaintiff's Exhibit 1.

(Marked for identification is Plaintiff's Exhibit 1)

BY MS. MAESTAS:

Q    Do you recognize that document?

A    No, I do not.  Wait, that is my dissertation.  Is that mine?  Yeah, look at there. That is me.  I couldn't remember the title.

Q    Okay.  So do you recognize Plaintiff's Exhibit --

A    I do.

Q    Okay.  Okay.

A    It's been a long time.

Q    It has -- okay.  All right.  I am not going to say anything about long time or not, but -- okay.

I'd like to direct your attention to the abstract.  The first sentence:  "Two-year colleges have long enrolled students who are academically underprepared.  A key component of the mission of a two-year college is open-access."

Do you agree or disagree with that statement?

A    That a two-year college has an open access mission?  I agree.

Q    Okay.  And then:  "Two-year colleges have

long enrolled students who are academically under prepared."

        Do you agree with that statement?

A    Yes.

Q    Okay.  Page 16.  This paragraph right here:  "The open door admission policies of two-year colleges provide a pathway for many students at different levels of academic preparedness to have access to higher education."

        Do you agree with that statement?

A    Yes.  They can come at all different levels.

THE COURT REPORTER:  I'm sorry.  They come at all?

THE WITNESS:  At all different levels.

BY MS. MAESTAS:

Q    "Many students accepted into two-year colleges are underprepared for the rigor of course work at the higher level."

        Do you agree with that statement?

A    I do.

Q    Okay.  And then the beginning of the next paragraph:  "Two-year colleges have opened their doors to all students with any level of academic preparedness or under-preparedness."

**Do you agree with that statement?**

A    Actually, that was a statement out of a book by Levin and Calgano.

THE COURT REPORTER:  I'm so sorry.  I need you to raise your voice.

THE WITNESS:  I'm sorry.  You're going to have to keep hitting me.  My back is getting to me.

A    It was actually out of a-- it's a quote out of a book by Levin and Calgano.

BY MS. MAESTAS:

**Q    Do you disagree with their statement?**

A    I don't disagree with it, no.

**Q    Do you agree with it?**

A    In part, yes.

**Q    Okay.  What part do you not agree with?**

A    Academic preparedness is -- there's both levels.  They're -- they accept -- two-year institutions will accept academically under-prepared students.  Hence, the developmental education part of it.  But they will also accept students that excel academically and come in with a 4.0 GPA and very high SAT and ACT scores, because of the home situations that they might have or whatever it might be for the environment.

So do I agree that they come in at all academic levels of preparedness?  Some unprepared and some very prepared?  Yes, I agree with that.

Q  12.  Sorry.  14, not 12.  Okay.

(Marked for identification is Plaintiff's Exhibit 14)

BY MS. MAESTAS:

Q  **Do you need to take a break?  We've got some small print, and I don't want to --**

A  Yeah.  We'll find some reading glasses, too, while we're at it.

Q  **Okay.  Great.  Thanks.**

(Recess 2:50 p.m. until 3:01 p.m.)

MS. MAESTAS:  Back on the record after a short break.

BY MS. MAESTAS:

Q  **You're looking at Plaintiff's Exhibit 14 and your new challenge is to read me all of the writing on that.**

A  I am going to fail at the challenge. We'll just go ahead and mark that up as a failure and move to the next --

Q  **Okay.  So the good thing is, it is a summary of the pages to come.  So I am going to go in and -- and take a really close look at it and --**

because I've looked at it several times.

We've got several open positions, posted by manager Ryan Hogan. And this is in 2020 and 2021. We've got: "Admissions Recruiter I, Admissions Recruiter II, Admissions Recruiter I, Admissions Recruiter I, Admissions Recruiter I, Admissions Recruiter II."

Six positions. Were you aware that these new positions were posted in admissions?

A     Those are not new positions. Those are positions where somebody left, and then they're being filled because somebody vacated the position.

Q     Hold on one second.

(Pause)

Are you sure about that?

A     And there may be names of the person that left on here in there. I don't know.

Q     So your understanding is that --

A     None of these are -- it's my understanding none of them are new positions. These are people that are -- have left, and we are rehiring somebody to fill a vacated position.

Q     Okay. At the time where you were involved in the decision to RIF Jamie, weren't there two open positions that were unfilled?

A     In admissions?  I -- I don't remember, to be honest with you.  No.

Q     Okay.  Didn't Ryan Hogan offer to not fill those in order to keep Jamie on board?

A     I don't know which -- the positions you're talking about.

Q     Okay.  So you can't answer because you don't remember at all?

A     I don't.

Q     Okay.  And so you're saying -- well, first of all, do you recognize this document at all?  Have you ever seen it before?

A     It looks like one of our many budget reports.

Q     Okay.

A     It may have come out of PeopleSoft, maybe.

Q     Okay.  And then there's a blue section that says -- section labeled by -- with two Post-it notes.  And so those are the positions that are mentioned on the summary sheet.  And they are the "Admissions Assistant I" --

A     "Recruiter 1"?  The first one says: "Recruiter I."

MR. CARTER:  I think it goes further back.

MS. MAESTAS:  Yeah.  I think I just put

the Post-it note on the second page of the

posting.  Just one prior, right here.  Whoops.

Maybe not.

        MR. CARTER:  Are you looking at the page

right behind the summary?

        MS. MAESTAS:  No, it's not.

        MR. CARTER:  Okay.

        MS. MAESTAS:  It's several pages long.  I

thought I had it marked correctly, but that's

okay.  Let's just pull it out of this.

BY MS. MAESTAS:

    Q    So you can take a look at that, and that

is still Plaintiff's Exhibit 14.

    A    Is there a front page to that one?

    Q    Right here.  Yeah.  There's the front of

it.  Okay.

    A    Okay.

    Q    Were you aware of these postings for new

jobs?

    A    I am sure at some point in time forward.

It goes through the approval process for a

part-time.  It may have done that.

        MS. MAESTAS:  Are you -- are you able to

call up a section of a past deposition?

        THE COURT REPORTER:  Was that today?

MS. MAESTAS:  It was today.

THE COURT REPORTER:  Yes.  If we take a break, I can search.

MS. MAESTAS:  Okay.  We may want to do that.  We'll do -- we'll do that on our next break.  I'll come back to this.

BY MS. MAESTAS:

Q    Anyways, do you -- anything else ringing a bell on these postings?

A    Okay.  Administrative assistant and part-time in testing, that's not actually really in admissions, that's in the testing and access area.

Q    Would that be under Ryan Hogan?

A    No, ma'am.  That would be under Rebecca Taylor.

Q    Okay.  Well, it's listed as being posted by Ryan Hogan?

A    Testing is done under Rebecca.

Q    I under- -- I mean, I understand what you're saying, and so we're going to look back at the transcript from earlier today, because Ryan Hogan testified about this.

A    Okay.

Q    So any other positions that you recognize?

A    Yeah.  I mean, they all are -- at some

point in time -- towards the very end of it -- they come across our desk.

THE COURT REPORTER: I'm sorry. What was going on?

THE WITNESS: They all come across my desk -- well, electronically.

A    I assume that's what's associated with it. Those are all from 2021?

BY MS. MAESTAS:

Q    2020 and 2021.

Now, I didn't -- they -- these were provided to me in discovery from your institution.

A    Okay. I just saw 6/6/2021 up there at the top.

Q    Yeah. I believe that's when it was printed by the system; so it probably was the time that the discovery documents were produced to me because I had asked for them.

So the front sheet is the summary of the new postings and the manager who posted them. And all of them are Ryan Hogan, except for one, which is Hillary Willis, and I believe she's no longer with VSU.

A    Yeah, I don't see it. Well, there's a date. It looks like May of 2020, maybe.

Admissions Recruiter II and whatever that title is.

THE COURT REPORTER:  Can you please just speak up a little louder?  Can you repeat what you just said?

THE WITNESS:  It looks like one position, I don't -- I don't know what that date is.  I can't -- I can't read that date.

BY MS. MAESTAS:

Q    Okay.  Thank you.

All right.  15 and 16.

(Marked for identification is Plaintiff's Exhibit 15)

(Marked for identification is Plaintiff's Exhibit 16)

BY MS. MAESTAS:

Q    So -- so I -- I'm going to give you an opportunity to talk about this.  I guess it seems inconsistent to get a raise right in the middle of a reduction in force.

So this is Plaintiff's Exhibit 15, and then it has salary increase of 17 percent for Rodney Carr.  Can you explain that apparent inconsistency?

A    Inconsistency of what?

Q    So the reduction in force is for financial exigency, and you testified that it was a 1.29 million or 10 budget cut, yet you gave yourself a raise?

A    That is inaccurate.

Q    Which part?

A    I didn't give myself a raise.

Q    Okay.  Were -- did you receive a raise?

A    I did.

Q    Okay.  Who helped you get a raise?

MR. CARTER:  It shows the reason.

BY MS. MAESTAS:

Q    Who -- so who -- I -- why -- so tell me in your own words why you got the raise.

A    Additional duties were assigned to me, and two jobs were combined.

Q    Okay.  Can you tell me about that?

A    What the other duties were?

Q    Yeah, yeah.

A    I was assigned to start an online college for Valdosta State University.

Q    Okay.  And two jobs were combined?

A    I am still the vice-president for student success and starting on -- starting an online college for Valdosta State University.

Q    Okay.  Do you have people that work under you're, or do you do that by yourself?

A    Which part?

Q    The new -- the new job of the starting the online college?

A    It's not just me alone.  There's several people there.

Q    Were there new hires to work under you for the online college?

A    No.

Q    Who works under you?

A    For the online college piece, Shauna Branch oversees the budget aspect of it. Honey Coppage, who is in academic affairs, oversees part of the faculty assignment piece.  Marsha Dukes, who is elearning, now reports to me for that part, which is subject matter experts.

Also, the course facilitators were responsible for that part.  Billy Michelle is also a part of that.  Paying the faculty, recruiting the students, developing the marketing plan, all of those things.

Q    Did anybody else get raises for their additional duties?

A    Subject matter experts are paid by

stipend.  Course designers are also paid by stipend.
If faculty have a course overload for doing it, then
yes, they are all seeing increases.

Q    Okay.  Who's the -- are you -- do you have
a direct report that oversees the VSU online
college, or do you -- is that you?

A    That is me.

Q    So you report to you?

A    I report to the president.

Q    Okay.  You report to the president.  Okay.
Got you.  All right.

And then Plaintiff's Exhibit 16, which is
excerpts of Rob Friedhoff's file -- human resources'
file.  And then the last page of that document --
yes, sir, right there -- is a salary increase for
Rob Friedhoff, signed by you on January 9th, 2020.

So we're having a RIF, and we're giving a
salary increase.  Could you explain how that?

A    That's January 9th, 2020?  I don't
believe the budget reduction was in place until
after March.

Q    March of what year?

A    2020, when the pandemic hit.  I could be
wrong on my dates.  Please don't get me wrong, but I
could be wrong on my dates.

Q    Okay.  So you're saying it wasn't until -- you didn't know; so you gave him a raise, but you wouldn't have given him a raise had you known?

A    I have no idea what I would have done. Knowing a pandemic was coming, I have no idea.

March 13th, I think it is.

Q    If you could go to -- so we've identified that.  Let's talk about what that is.  What -- what was given in this -- what is documented in that page?

A    I had additional duties that were assigned to him and had a salary increase.

Q    Of how much?

A    It says here salary is 117,588, increase of $10,383.

Q    Okay.  Thank you.

And that was for Friedhoff, approved by you?

A    Correct.

Q    Okay.  If you could flip to Plaintiff's Exhibit 8.

(Marked for identification is Plaintiff's Exhibit 8)

BY MS. MAESTAS:

Q    This is the reduction in force letter sent

to Jamie Bird, and the date is July 14th, 2020.
So you're saying that because everything happened
after you gave him that raise, like, that doesn't --
that resolves the inconsistencies?

    A    Actually, the -- his position was moved
into a slight salary adjustment of that $10,000,
because I didn't replace the -- Mr. Mitchell, when
he left.  I did not replace his salary.  I took a
portion of his salary to give it to Mr. Friedhoff,
with additional responsibilities, and then took the
remainder of his salary and benefits as a reduction
for the budget cut.

         MS. MAESTAS:  Did you get all that?

         THE COURT REPORTER:  I was just about
    to -- make sure you weren't -- at the very end,
    what you said.

         THE WITNESS:  The overall salary for
    Mr Mitchell, only part of it was used back.
    And then the rest of it was part of the salary
    reduction or a part of the budget reduction
    that we had for the division.

BY MS. MAESTAS:

    Q    Okay.

    A    I can read that.

    Q    Does VSU or any USG institution have a

policy of not being alone with female employees, if you're a male employee?

A    Do they have a policy of it?

Q    Yeah.

A    I don't know of any that is written, no.

Q    Okay.

A    Not that I'm aware of.  They might.  I don't know.

Q    Okay.  46.

(Marked for identification is Plaintiff's Exhibit 46)

BY MS. MAESTAS:

Q    Okay.  Looking at the pink tab on -- so Page 1, Page 2, and then Page 7.  So you don't have to look at it.  I'm just kind of telling you where I'm going with this.

A    Okay.

Q    This is that letter that we were talking about that Jeanine Boddie-LaVan had written that you didn't know about but evidently you were interviewed.  Remember that from earlier today?

A    Uh-huh.

Q    Okay.  So she's -- she's stated several times in this letter -- Plaintiff's Exhibit 46 -- that you had a -- something previously established

by HR in writing of your behavior of not meeting with women behind a closed door.

A    It's a personal policy.

Q    And then that -- can you help me figure out that it -- documented in writing by HR?

A    I have no idea what that is.

Q    And then Page 7, No. 13, that last sentence:  "Both Dr. Carr and Ms. Branch stated separately that Dr. Carr's practice when meeting employees or students of the opposite gender, is to have his administrative assistant, Shauna Branch, to sit in on the meeting."

Why -- why do you have that policy?

A    It was a policy given to me by an old mentor of mine, and he said to -- it's just a better policy to have to avoid problems.  So I said okay, and that's what I've always done -- tried to do anyway.

Q    Okay.

A    That's not always the case, but it's something I try to do.

Q    And so would you say that most of the time you follow that practice?  I know you said not always the case.  So I'm trying to get, like, quantity ideas.

A    Most of the time, yes.

Q    You did follow the policy of not meeting alone?

A    Yes.

Q    Okay.  Did you -- when you would go over to the admissions office where Jamie used to be, did you meet one-on-one with females without someone else being in the office?

A    There are times.  They're all together in a close environment; so there's times I would probably sit in.  I know I've probably met with Brenda and Lisa by myself with their doors open where other people can see.

Q    And then the day the subject of the Title IX where there was the hug, did you violate your own practice?

A    I did.  Shauna was not with me.

Q    Okay.  And was Jamie -- she was -- you testified that she was crying; is that true?  She was crying when you saw her?

A    That's what I remember, yes.

Q    Okay.  Do you remember shutting the door?

A    I don't remember that, no.

Q    Okay.  Do you remember -- I mean, you asked her permission for a hug?

A    Yes.

Q    Okay.  You hesitated.  Does that mean you're trying to kind of remember?  You may not remember it?

A    I am trying to remember.  It was -- when you say I asked permission, it was, "if you" -- I don't remember my exact phrase, but I did not just go over there and hug her and say, you look like you need one.  I don't do that.

I said, "If you need one, I'm willing to do it today."

Q    Okay.  And what did Jamie do when you did that?

A    She got up from behind her desk, walked around to where I was standing, and gave me a hug.

Q    Did you -- did you see her open the door?

A    At any time during that?  No.  I don't remember the door being closed.

Q    Do you remember saying, "Why did you do that?"

A    No.  I don't remember that.

Q    Okay.  Do you remember Ryan being there at all during that?

A    In the office?

Q    Nevermind.  I'm thinking of a different

occasion.  When the following year, in January 2020, Ryan went with you and unlocked the building that Jamie was in and there was the air hug thing.

Can you tell me about that?

A    I don't remember what you're talking about.

Q    You -- you don't remember going into her office and talking to her about something after Ryan let you in the building, and then you said something like, oh, that's right.  You don't like hugs.  Let me give you an air hug --

A    I don't remember it.

Q    -- and then you went like this?

MS. MAESTAS:  I am standing up and putting my arms out like a air hug.

A    I don't remember it.

BY MS. MAESTAS:

Q    Okay.  Let's go with Exhibit 47.

This is a -- this is a cover letter because I sent an open records request to Abraham Baldwin Agricultural College -- also known as ABAC -- requesting records on an investigation. And so one, two, three, four pages in is bullet points dated October 28th, 2013.

And then a few more pages in, you get to

an email from Michael Kirkland, dated December 4th, 2012.  The email is to Dr. Carvajal.

And then at the end, there is a letter of reprimand dated March 30th, 2013 from Carvajal to you, regarding the investigation.

Do you remember this investigation?

A    Yes.

Q    Okay.  Can you tell me what happened, in your own words?

A    There was a complaint filed, and two folks from the Board of Regents, outside folks came down.  Joyce Jones was one of them.  The other gentleman -- Dwight might have been his first name, maybe -- came down, and they did their investigation.  And what came out of it was the written reprimand from Dr. Carvajal that -- that was back there.  I saw it somewhere in there.  That written reprimand came out of that.  And ...

Q    Okay.  Did -- where did you meet with the investigators?

A    At Bainbridge College.

Q    Okay.  So they came down?

A    Yes.

Q    From the Board of Regents?

A    Yes.

Q   Okay.  And they met with you in a conference room?

A   Yes.

Q   Were you by yourself?  Did you have a lawyer?  Did you have an adviser, anybody with you?  Anything like --

A   No.

Q   You were the only one in the room, two investigators?

A   Yes.

Q   Okay.  Do you remember if it was recorded?

A   No.

Q   Okay.  Did they take notes?

A   I don't know.

Q   You don't remember?

A   I don't.

Q   What do you remember being asked and what did you -- how did you respond?

A   Oh.  There was a lot of questions.  I don't know all of them of the -- verbatim.  They're -- I would assume they were running down their list of allegations, but I don't -- I don't remember the exact questions that they were requesting.

Q   Okay.  I'm just going to go back to the

beginning of it.

So that one, two, three, fourth page in, at the top.  It says:  "There was a speculation of an affair with Lindsey Barron."  And then more affairs with Regina Jones or Leslie from the Charter House.

Did you -- have you had any affairs with any of these women?

A    No.

Q    Do you know who Lindsey Barron is?

A    Yes.

Q    Okay.  Who's Lindsey Barron?

A    She was an admissions recruiter.

Q    Okay.  Was she a younger girl or ...

A    I guess.

Q    Okay.

A    I don't know -- I don't know how old she is.

Q    Was she, like, in her 20s or 30s or ...

A    I don't know.

Q    You don't remember?

A    No.

Q    What -- what about Regina Jones?  Who's that?

A    She was a faculty member in nursing,

maybe.

Q    Okay.  And what about Leslie from the Charter House?

A    She worked at the local bar that had a beer and wings night.

Q    Okay.  What relationship did you have with Lindsey Barron?

A    Professional.

Q    Did you guys ever have any type of relationship or somebody could have confused it with personal?

A    I can't speak for other people's perceptions.

Q    What about you?  Did you perceive any relationship with Lindsey Barron as personal?

A    What do you mean by "personal"?

Q    Did you have a friendship?  Did you talk to her about stuff that wasn't work?  Did you see her outside of work?

A    I wouldn't call what we had "outside of work."  Again, like a work party or something like that.  We had Christmas parties.  Those kinds of things.  That would be interacting.

I don't know if that's outside of work.  I don't know if I'd call that outside of work.  But

her and her husband was in the military, and they got deployed over to Italy.  And so I rented their house for awhile, but they were in Italy.

Q    Okay.  Did you ever kiss her?

A    No.

Q    Okay.  What about Regina Jones?  What type of relationship did you have with Regina Jones?

A    Work-related.

Q    Anything personal?

A    No.

Q    Did you ever kiss her?

A    No.

Q    What about Leslie from the Charter House?

A    It was a friendship.

Q    Okay.  Did you ever kiss her?

A    No.

Q    Okay.  That email from Carva- -- Carvajal or from Kirkland to Carvajal.  Second page.  It says:  "It has become clear that Dr. Carr's inappropriate behavior is a pattern and not an isolated incident."

Okay.  So if a USG investigator comes down -- I think we can all agree that they would be interested in that statement.  How did you defend against that, assuming that you did defend against

it and didn't admit to that?

MR. CARTER:  Make sure you understand that.

Q    Yeah.  I don't remember him asking me about it being a pattern and not an isolated incident, of which ...

BY MS. MAESTAS:

Q    Do you disagree with that statement, that you had a pattern of inappropriate behavior?

A    Do I disagree with that statement?

Q    Do you agree or disagree?

A    Disagree.

Q    Okay.  And did you ever threaten your employees with their jobs?

A    Prior to that, I don't think so.

Q    But after that you started?

A    No.

Q    Okay. So clarify the --

A    I don't -- I don't -- I don't remember doing that, no.

Q    Okay. Do you do that ever?  Like, did you do that in admissions or prior to Jamie being terminated?

A    No.

Q    You never said -- you never said, you

know, I've fired a bunch of people?

A    I don't remember if I did say that.  I have, but I don't remember if I said that.

Q    Okay.  Let's say that again.  So you said, I don't remember if I said it, but I have, but I don't -- let's re- --

MR. CARTER:  I think he was referring to he has fired a bunch of people.  I am not trying to --

BY MS. MAESTAS:

Q    Okay, okay, okay.

So you have fired a bunch of people, but you -- your -- your testimony today is that you've not gone around and talked about how many people you fired at VSU?

A    No.

Q    Okay.

A    Not that I remember.

Q    What about Bainbridge College?  Did you do it at Bainbridge College?

A    Did I talk about firing people?

Q    Yeah.  Did you brag about it?  Did you say, yeah, I've fired a lot of people; y'all better do your job right?  Anything like that?

A    Anything like that?

Q    Mm-hmm.

A    Define "like that."

Q    Like, I am going to terminate you, if you don't do your job.  I am going to fire you, if you don't do your job.  You won't be here anymore, if you don't do your job right.  I'm not afraid to fire somebody.  I'm not afraid to let you go.

There's a -- I mean, a ton of synonyms, but I'm assuming you're familiar with them.

A    Well, then I don't know if I -- how I would have phrased it, but if there's low performance and that is documented, then that person -- we would take personnel action, yes.

Q    Have you voiced that to people?

A    I am sure in some manner, yes.

Q    Okay.  The next paragraph.  It says Dr. Carr:  "Has become notorious around campus for vulgar and sexually charged language."

Did you engage in vulgar and sexually -- sexually charged language?  Did you talk like that?

A    Not that I remember.  No.

Q    Did you ever make physical contact with a female employee and massage and run your fingers through her hair?

A    That's not what that says.

Q    "And running her fingers" through your hair.

A    I don't remember that, no.

Q    Do you have any idea what this Michael Kirkland might be talking about?

A    I don't know where he's getting his information from.

Q    Okay.  Have you ever seen this email before?

A    This one?

Q    Yeah.

A    No.

Q    Okay.  Is this news to you?

A    That Michael --

Q    That this email was sent?

A    No.  Michael Kirkland's told me he did it.

Q    Oh, okay.  So do you -- when did he tell you that?

A    It was after the reprimand came out.  When that came out, it was -- Dr. Carvajal made it pretty clear that day, sitting in that meeting, that there had to be a 180 degree turnaround or that I wouldn't be there.

And so I learned a lot from that and turned it around completely and did a 180 degree

turnaround and earned the trust back of the staff and of the folks that were there, including Dr. Kirkland.  And, in fact, ended up being the vice president of student affairs and the vice president for academic affairs there, after the chair of the senate counsel asked me to take the post after the current economic affairs VP left.

Q    Okay.  So a dramatic turnaround.  Okay.
Help me resolve this apparent inconsistency.  You testified you have no idea what anybody's talking about, about vulgar language, about sexually inappropriate --

A    He read all of these things and said "aggressive and unprofessional."  So we changed to laissez-fair and professional language and behavior.

Q    "We changed."  Who changed?

A    I did.

Q    Okay.  So how do you go about changing it, if you're not even acknowledging that you did it?

A    Perception is reality.

Q    Okay.  So you still deny it, but then you changed.  How do you -- how did you?

A    If somebody perceives me being aggressive, then I've got to change how I interact to change the perception.

Q    And how did you do that?

A    Through a lot of research, studying, and mentors, changing leadership styles, listening.

Q    Is that when you developed your policy of not meeting women alone?

A    It was before that, but yes.

Q    Okay.  There's a -- in the written reprimand in this exhibit, it says at the top:  "Per the recommendation contained in the Report of Findings following an investigation into your actions conducted by the Board of Regents."

And then he goes on to talk about the reprimand.

The Report of Findings, have -- did you ever see it?

A    No.

Q    Okay.

A    This is what I saw.

Q    Okay.  Did you have any idea who would have it?

A    I don't.  I don't have it.

Q    Did Dr. Carvajal keep copies of anything?

A    I don't know.

Q    Did anybody keep copies of any of this stuff?

A    I don't know.

Q    Okay.  It's gone missing.

A    I don't know.  I do not have a copy of it.

Q    Okay.  So help me with this, okay.  If I get investigated by the Board of Regents and I don't keep a file on it, I don't record it, I don't take any notes, it almost darn near cost me my job, and I don't even have a document to go along with it. Help me -- help me understand that.

A    I don't understand what you're -- what you're asking me to explain.

Q    I subpoenaed these records.  This is a -- an important moment in your career that you seem to have gone past, but you don't keep any records of it?  I mean, I -- I just -- unbelievable.

A    I did not keep a copy of it, no.

Q    Okay.  Did -- did you talk to Dr. Carvajal?  Did he ever say, you know, I'm going to shred this 'cause, you know, you're better now? Like, what -- mind boggling.  Like, nobody has this.

A    I -- I can't explain that for you, to be able to understand that.  All I can tell you is that I don't have a copy of it.

Q    Okay.  You and Dr. Carvajal ever talk about that time at Bainbridge College where you were

under investigation and --

A   Do we ever talk about it?  Yes.

Q   **Yeah?**

A   Yes.

Q   **Okay.  And what do you say about it?**

A   Then or now?

Q   **Now.**

A   That it was a turnaround and going in the right direction.

Q   **And you -- even though you deny your prior conduct, you just go along with it and say, yeah, I am much better and thank God they caught it?**

A   I changed -- I'm not what people would perceive as aggressive.  I don't -- that's the part that -- I don't remember all of the things that they're writing down in there.  I don't.

Q   **Okay.**

A   But if that is someone's perception, then I need to make some adjustments for that.

Q   **Did you, like, take a class?  Did you look at online courses?  Like, I mean, if somebody says, Holly, you know, you've got to change, I'd be, like, okay.**

**Like, how did you -- how did you -- how did you change?  I don't -- did you use that -- I**

don't know what to say -- or -- but ...

A    I don't know what else to tell you.

Q    Okay.  Just making sure I got everything on it.

Did you ever tell Tee Mitchell that you were the subject of an investigation and that you can beat a lie detector?

A    I don't remember having that conversation, no.

Q    During a golf outing with Tee?

A    I don't remember having that conversation with him.

Q    All right.  44A.

(Marked for identification is Plaintiff's Exhibit 44A)

BY MS. MAESTAS:

Q    Plaintiff's Exhibit 44A is an email from you, dated February 4th, 2020, to, evidently, people in student success.  And right down at No. 3, it says we're going to:  "Create the Office of First Year Transitions."

What is that?

A    That is Mr. Friedhoff's area, where we've got first year programs, orientation, and dual enrollment.

Q    Is that a current program?  Do you have that now at VSU?

A    Do we have orientation?

Q    No, no, no.  This "Office of First Year Transition," does that exist now?  Like, if I said, hey, take me over to the Office of First Year Transitions, you'd be like, oh, will do.

A    It's not a space, no.

Q    Okay.  It's a name or --

A    Yes.

Q    Okay.  Okay.

And where was it before it was in the Office of First Year Transitions?

A    Where was what?

Q    The things that are in the first -- the Office of First Year Transitions?

A    Orientation was under admissions.  First year programs was -- you know, to be honest with you, I think that went over to advising when we started advising, and then dual enrollment was under admissions.

Q    Okay.  And Jamie was one of the people that were being moved under the Office of First Year Transitions?

A    As dual enrollment, yes.

Q    Okay.  Was Jamie competent to handle dual enrollment?

A    As far as I know, yes.

Q    All right.  41.

(Marked for identification is Plaintiff's Exhibit 41)

BY MS. MAESTAS:

Q    Okay.  Plaintiff's Exhibit 41 is an email that Jamie Bird wrote to high school counselors on February 26th, 2019.

Do you recognize this document?

A    Yes.

Q    Okay.  Where -- what were you doing when you first heard about this email?

A    I cannot say exactly.  I think that I was going to a V State Experience, I think, but I can't -- I'm not 100 on that; so I'd probably just rather say I don't know.

Q    Okay.  V State Experience.  Is that a --

A    It's an admissions recruiting event.

Q    Where -- where did it take place?

A    It might -- might have been the one in Macon or Perry or --

Q    Is it somewhere off campus?

A    Yes.

Q    Okay.  And who told you about it?

A    The email?

Q    Yeah.

A    I was contacted by Dr. Carvajal.

Q    Okay.  Did you get a copy of it in your inbox?

A    I don't -- I don't recall it being --

Q    Did somebody forward it to you?

A    They might have.  After Dr. Carvajal had received a phone call from Tina Anderson, the current -- the president at the time of Wiregrass.

Q    Okay.

A    And so I was just told of the email.  I did not -- I had not seen it at that time.

Q    So Dr. Carvajal calls you on your cell phone?

A    Yes.

Q    Okay.  And what does he say?

A    That Tina Anderson had reached out to him about an email that was forwarded to her from our institution.

Q    Do you know who forwarded it to Tina?

A    I have no idea.

MS. MAESTAS:  I am going to need to get those records.  I sent a open records request

over to Wiregrass a while ago.

Mr. Carter, are you taking a position that you represent them, or am I going to be able to talk to them ex parte?

MR. CARTER:  No.  This, I will have to check.  But I don't want -- I don't know.  You sent an open records request to them and haven't gotten anything?

MS. MAESTAS:  I didn't get that.

MR. CARTER:  All right.  Let me check with my contact at the board and see what they got.

MS. MAESTAS:  Okay.

BY MS. MAESTAS:

Q    Okay.  So you're at VSU Experience, off campus, and Dr. Carr -- or Dr. Carvajal calls Dr. Carr, you.  What does he say?  Does he -- does he say, hi, good afternoon, or is he angry, is he --

A    I don't know.  He told me about the email and asked me to look into it.

Q    Was he angry?

A    My perception of the conversation, no.

Q    No.  Okay.

So do you remember any other details other than check into it?

A    No.  I don't remember any other details,

other than the email's gone out.

Q    And so did Dr. Carvajal eventually forward it to you?

A    I don't remember how I got it.  I truly don't.

Q    Okay.  And what did you do after you got the call from Carvajal?

A    Spoke with Mr. Mitchell.

Q    Okay.  Tee Mitchell?

A    Yes.

Q    Okay.  And how did that go?

A    Oh, it was one of those, "I just got a call about an email that went out to guidance counselors.  I need you to look into it."

Q    And what did Tee Mitchell say?

A    I don't remember his exact response, but knowing Tee, it was probably like something along the lines of, I'll do it.

Q    And what happened after that?

A    Right then?

Q    Yeah.  I mean, did you hear from Tee? Did, you know, did you --

A    Some time later.  I don't know if it was the same night, next day, or whenever it was, but he said that we did send an email out.  And then --

Q    Meaning somebody in admissions did, in fact, send Plaintiff's Exhibit 41 out?

A    Yes.

Q    Okay.  And then -- so he -- he calls you later that night?

A    I don't know if it was that night or the next day.

(Simultaneous cross-talk.)

(Marked for identification is Plaintiff's Exhibit 42)

BY MS. MAESTAS:

Q    Okay.  So he calls you and then, what do you say?  Like, you know -- 'cause eventually, you're sending out another email on February 27th at 1:03 p.m., and that's 40 -- Exhibit 42?

So help me walk through the step-by-step from this email and then -- and then your response.

A    Okay.  What's your question again?

Q    So the sequence of events after -- so you get the call from Carvajal.  Tina Anderson is upset.  And then you talk to Tee.  He calls you back and says, oh, yeah, this email went out.

What do you do before you send this email out at 1:03 p.m. the next day?

A    This email went out because, truly, for

any institution of higher education, our lifeblood is that guidance counselor in that institution.  And these -- when that email went out, we had made several upset and angry.  And then also, with our partners across town at Wiregrass, where we're in charge of educating our community together, all I wanted to do was say, we're all in this together and we're putting this email out there to let you know we're going to work hand-in-hand to educate our community.  I think I said (indiscernible) --

THE COURT REPORTER:  I'm sorry.  "I think I said"?

THE WITNESS:  Which part did you miss?

THE COURT REPORTER:  "I think I said," and then everything you said after that.

MS. MAESTAS:  Your community --

MR. CARTER:  "I think I said your community" and whatever you said after that.

THE WITNESS:  It says -- I said our community but I wrote in there "your community."

BY MS. MAESTAS:

Q    Okay.  Thank you for explaining it.  I do want to get into the details of that email, but I want to know what led to writing that email.

Who did you talk to?  Who did you meet with?  Did you talk to Carvajal again?  Cheryl Carvajal is his wife, and she teaches at --

A    Wiregrass.

Q    -- Wiregrass.

Was she involved in it?  What -- what happened?

A    I don't know if the Mrs./Dr. Carvajal was involved in it or not, that would be a question for him.  I think you've got him coming in.

Q    So it's a question for him?

A    For him, yeah.  He's coming in.

Q    He's coming in?

A    You said he's on the schedule, earlier.

MS. MAESTAS:  Hold on, one second.

MR. CARTER:  Deposition.

MS. MAESTAS:  Oh, a deposition schedule.

I thought you were talking about what happened at this time.

BY MS. MAESTAS:

Q    Yeah.  So there were -- we -- I think Tee Mitchell had stated that Dr. Carvajal and his wife were angry.

A    I don't know what Mr. Mitchell stated.

Q    I mean, he said that he heard it from you.

A    Might have.  I don't remember that.

Q    Okay.

A    I know he apologized to Tina Anderson, and I don't know if he made any other phone calls after that.  I don't know.

Q    What high school counselors were upset, if any?

A    I don't know.

Q    Did you ever talk to any of them?

A    Personally?  No.

Q    Okay.  Other people talk to them and then tell you about it?

A    Other people did say that they had talked to them, but I can't remember if it was Dr. Carvajal that told me that or if it was from Tina or who it came from.  So I --

Q    And why were they upset?

A    Because it -- in reading the letter and the email, it makes it sound as though the classes we are offering have a better quality and academic quality to them.

Q    Okay.  And that's not true?

A    That the courses we offer have better academic quality than what Wiregrass offers?

Q    Yeah, or higher vigor.  Is that not true?

A    I don't believe so, no.

Q    Okay.  If you could turn to 19.

And so this -- this is, again, the VSU flipbook.  It says:  "The rigor and pace of our classes will prepare you for success anywhere."

Does that -- doesn't that try to set VSU apart from other institutions?

A    I don't understand what you're asking me.

Q    Very well.  Okay.

And we had previously talked about, in your dissertation, that you had stated Wiregrass is a two-year institution and you had said:  "Two-year colleges have long enrolled students who are academically underprepared.  A key component of the mission of a two-year college is open-access."

And you said you agreed with those statements.  Doesn't that -- isn't that consistent with what Jamie's saying in this email?

A    No.

Q    How is it not?

A    Open-access is completely different.  You can have a perfect 1600 SAT score and enroll at Wiregrass Institution.  It doesn't mean that only people of less academic capability go to two-year institutions.  That's not what that says at all.

They have a good academic rigor.  That is there.  So do we.  That is here.  Now, will folks tell you at Harvard that they're academic rigor is different than ours?  Our faculty would argue against that point, as well.  So I can agree with two-year institutions having open-access, but I can also agree that their academic rigor at a two-year institution is quality rigor for academic programs.

Q    Well, if that's the case, why would that publication from the USG say:  "Choose your courses carefully to prepare yourself"?

It doesn't say all institutions are the same.  It says make sure you choose the right course for the right academic vigor.

A    That would be a good question for the person that put that together.  I did not.

Q    And that was Plaintiff's 21.  Do you recall that?  Plaintiff's Exhibit 21?

A    I've looked at it here, yes.

Q    Okay.  I just wanted to make sure we're talking about the same document.

Okay.  I want to go into this February 26th, 2019, email in detail.

A    Which one was that again?

Q    Plaintiff's 41.

MR. CARTER:  Right here.

BY MS. MAESTAS:

Q    Okay.  It says -- about the second paragraph, second sentence:  "It is critical for those students wanting to attend a 4-year institution after they graduate high school, get their DR credits from the same type of institution. The curriculum course rigor needs to be the same in order for them to be successful once they graduate and move forward into college."

Agree or disagree?

A    Disagree.

Q    And again, isn't that what Plaintiff's Exhibit 21 is saying?

MR. CARTER:  You just asked him -- I mean, you just asked him that question.

MS. MAESTAS:  I want him to answer it again.

MR. CARTER:  He's asked and answered, and that's a valid objection so he doesn't need to go --

MS. MAESTAS:  I'm asking about a different source, though.

MR. CARTER:  It was the same source.  It was the email.

MS. MAESTAS:  Yeah.  I'm -- I'm looking at her email on the next line.

MR. CARTER:  And it doesn't say the same thing anyway, but go ahead and ask him.

MS. MAESTAS:  Are you testifying for him?

MR. CARTER:  I will testify on my -- on what I did at a two-year school.  And I wound up being a lawyer and, you know, just going around denigrating schools --

MS. MAESTAS:  Okay.  Can you --

MR. CARTER:  You asked me if I was testifying, and I'm telling you.

You've asked him this question and you've went over these documents five times.  He's answered it.  I'm going to let him answer it again.  Ask your question so that he knows what you said and he can answer it.

MS. MAESTAS:  You're going to have to invoke the rule of sequestration if you're going to be a witness in this case.

MR. CARTER:  I may do it.

MS. MAESTAS:  And you might have to get a new lawyer for the institution, if you have a -- a conflict ethically.

MR. CARTER:  He's answered the question,

but ask him again.  I mean --

          MS. MAESTAS:  Okay.  If he doesn't want to
answer it, that's fine.  I'll move on.

          MR. CARTER:  I didn't say that.  I am
entering the objection.  He can answer the
question.  You're asking him:  Isn't this the
same thing that Document 21 says?  Right?

          MS. MAESTAS:  Yeah.

          MR. CARTER:  Okay.  Go ahead.

    A     Does it say the same thing?  No, it does
not.

BY MS. MAESTAS:

    **Q     So I don't mean is it a verbatim
recitation of the email.  I'm asking is it talking
about choosing the right courses that have the right
academic vigor?**

    A     Well, that has nothing to do with this.
This -- this says:  "Students should pursue a
challenging and rigorous high school curriculum."

          That's what it says --

    **Q     And Jamie's not talking --**

    A     -- to be best prepared for a successful
college.  What this says here is the curriculum and
course rigor needs to be the same in order for them
to be successful once they graduate and move forward

into credits and yet they cannot meet the needed admission requirements.  That is completely different from what that says.

Q    Okay.  And you do not see any similarities between the two?

A    I -- I do not.

Q    Okay.

A    To be honest with you, I don't.

Q    Okay.  All right.

So I'm going to go onto a different sentence within the same email.  "Around the state, universities are seeing students attempting to enter their institutions with many DE credits, and yet they cannot meet the needed admission requirements for that particular institution."

Agree or disagree?

A    "Around the state, universities are seeing students attempting to enter their institutions with many DE credits, and yet they cannot meet the needed admission requirements for that particular institution."

I'm trying to think of a situation where they'd have DE credits and not meet the admissions requirement.

Q    Have you heard of anything happening with

nursing students?

A    No.  Not that I am aware of.  I -- I haven't heard of any.

Q    "Part of participating in a DE program is choosing the right institution in which to attend and not one that will just help students 'check off courses.'"

Agree or disagree?

A    Disagree.

Q    Okay.  How so?  Students should just check off courses?

A    Which sentence are you reading?

BY MR. CARTER:  This right here.

MS. MAESTAS:  It says --

MR. CARTER:  Starting with:  "Part of."

A    "Part of participating in a DE program is choosing the right institution in which to attend and not one that will just help students 'check off courses.'"

BY MS. MAESTAS:

Q    And you said that you disagree with that?

A    I do disagree with that.

Q    Okay.

A    I think the students ought to enroll in an institution that they have the best possibility of

being successful at.  If it checks off courses, it checks off courses.

Q    So you don't read that to be saying that they're going to take a course that they don't need and let's not let them do that?

A    I don't.

Q    Did you ever talk to Jamie about what this email meant?

A    Mr. Mitchell did that as her supervisor.

Q    And you did not talk to her about that?

A    She came to my office.  We didn't discuss the email that I remember.  We discussed about the email, but I don't remember discussing this email line-by-line.

Q    Okay.  So I'm not talking about line-by-line, but did you ever ask her what she intended to say by the email?

A    I don't remember.  I -- if I did or did not.

Q    Okay.  And then this says:  "This also helps to ensure that students get the needed academic foundation that will allow them to move forward successfully wherever they go to graduate."
         Agree or disagree?

A    With the statement by itself?

Q    Well, I think this is referring to the previous sentence.

A    Of checking off the boxes?

Q    Yeah.

A    I disagree.

Q    Okay.  And then -- so:  "Your assistance in guiding the students (and their parents) in the direction" -- "in this direction will certainly help them avoid this potential issue."

So this is talking about counseling them about this issue, and I'm assuming that you disagree with that too?

A    Yes.

Q    Okay.  And then 42 in your -- how -- who decided that this email dated February 27th, 2019, at 1:03 p.m. -- in Plaintiff's Exhibit 42 -- how was it decided to send this out?

A    I did that.

Q    Okay.  Did anybody help you with it or say anything like, This is what you need to say?

A    I don't remember that.

Q    Okay.  All right.  So the first paragraph you say:  "Please know that it is the mission and vision of VSU to collaborate with our education partners to serve your community."

Isn't the mission to educate students?

A   For all of us, yes, Wiregrass, Georgia Military, Paine College, LaGrange College, private colleges, all of them.

Q   So you're all a team?

A   To educate our community.

Q   Yeah.

A   We are partners.  We're not a -- we're partners together to educate our community.

Q   And then the next paragraph, it says:  "As South Georgia's Regional Comprehensive University, VSU is committed to collaborating to meet the educational needs of dual enrollment.  Students are partnering with the Technical College System of Georgia."

Is that partnership handled through the articulation agreements for transfer students?

A   Again, that would be -- I'd have to look at the articulation agreement to do that for dual enrollment.  I'm not sure what you're asking.

Q   Okay.  How do you partner with them? Like, what do you do to partner with the TSG?

A   For dual enrollment?

Q   Mm-hmm.

A   There are some institutions -- again, we

go back to the question you asked earlier.  If a student has transportation needs and they can't come to this campus and the institution is offering it in that high school, then we partner with them and then say, well, then you need to be at that -- going to that institution, not creating transportation issues for you here at this institution.

Q    Okay.  So if they can't attend VSU for whatever reason --

A    They don't want to attend VSU. Whatever -- however, we can help them get to that. The ultimate goal is to get the student a post-secondary education, educate our community.

Q    Okay.  All right.

And then we're talking about at the bottom -- you're talking about joint counselor events --

A    Yes.

Q    -- with VSU and the TCSG partners.  If you had a joint counseling event, what would be said to TCSG to assist in the partnership.

A    The global pandemic hit and all of that disappeared.  We've been surviving a pandemic.  So I don't -- I don't know what it would look like.

Q    Prior to the pandemic, what would it look

like?

A    I'd have to sit down with them and see what they wanted to do.

Q    So if you had to go over there right now and communicate with them about making a partnership with VSU's DE program, what would you say?

A    With Wiregrass?

Q    Yeah.

A    I don't know.  It would depend on how the conversation was going.  I'd tell them, they're here to partner with us.  Let's do it.  Let's figure it out.

Q    Okay.  So if a student was accepted at VSU and can go there and doesn't have a scheduling conflict, what would you need to partner with the TCSG to do?

A    With that student?

Q    Yeah.

A    I don't know.  We might need to.  I don't know.  It would depend on that student's needs.

Q    But they already have their DE needs met by VSU.

A    Well, then, would they go to Wiregrass? Probably not.  But in the next turn, if they need to go to Wiregrass and not here, we would collaborate

with Wiregrass to get the student there and get the student taken care of there.

Q    Wouldn't they -- wouldn't they just need to apply to Wiregrass and go through their admissions process?

A    They might.  They might not.  I don't know.

Q    So you could just send them over there? They wouldn't have to go through the admissions?

A    That would be up to Wiregrass.  I'd send them over there and say, hey, they need to take your dual enrollment class.  However they do their admissions process is up to Wiregrass.

Q    Okay.  And they wouldn't be able to do that on their own?  It would require a partnership with VSU?

A    Well, they can change it all on their own, if they'd like.

Q    Okay. All right.

So about an hour later, Karen Black from Echols County High School replies back to you and copies Jamie Bird.  Do you recall that email?

A    Yes.

Q    You do recall it?  Okay.

So I am looking at the second sentence.

It says:  "One of our biggest hurdles of getting DE students directly into the four-year college work is the fact that they must meet the math requirement along with the reading and writing."

What do you understand that sentence to mean?

A    That we have an admissions requirement for dual enrollment students, whether it be SAT, ACT, or a COMPASS test.

Q    And so she's saying, "Getting it directly into a four-year college work."

Isn't she differentiating the academic vigor of the four-year college work over the two-year college work?

A    That is not what I read into that.

Q    Okay.  What do you read into that?

A    That she's saying we have an admissions requirement of math.

Q    Okay.  That's the second part of that sentence, but --

A    I don't -- I don't read anywhere into that, that she's differentiating between a two-year curriculum and a four-year curriculum.

Q    So let's say I go to a four-year curriculum -- or I go to a four-year institution.

What does that -- that's not stating I'm not going to a two-year?  Like, you can't admit to that?

A    I don't understand what you're asking.

Q    So VSU is a four-year.  Wiregrass is a two -- year.  You're saying that sentence doesn't differentiate between the two.

A    You asked me if it differentiated about curriculum.

Q    No.  I said if she tells you how --

(Simultaneous cross-talk)

THE COURT REPORTER:  I'm sorry --

MR. CARTER:  Yeah.  You've got to let him answer.

THE WITNESS:  Okay.  I'm sorry.  I interrupted you.

BY MS. MAESTAS:

Q    Me too.  I'm sorry too.

So she's saying four-year.

A    Correct.

Q    And when I see four-year -- I mean, I see it's a four-year institution, not a two-year.  We don't have 1.5-year institutions or five-year institutions.  We have four-years, and we have two-years.  So I just -- it's beyond me that you just can't admit that, that's even talking about the

differentiation between four-years versus two-years.

A    Well, you added curriculum.

MR. CARTER:  Let me -- let me say one thing.  We don't need commentary.  Just ask him a question and let him answer it.  I mean, don't say, "It's beyond me."  When you say, you don't know what he's talking about --

(Simultaneous cross-talk)

MS. MAESTAS:  Well, I'm trying to give him an opportunity to resolve --

MR. CARTER:  Ask him.

MS. MAESTAS:  -- what I see as an inconsistency or --

MR. CARTER:  You see it as an inconsistency.  He's answered.  But go ahead, but don't -- don't try and testify or give it your opinion.  But go ahead.  Go ahead.

MS. MAESTAS:  Okay.

THE WITNESS:  So what was the question again?

BY MS. MAESTAS:

Q    So the question is, when she says: "Four-year college coursework," is that as opposed to two-year college coursework?

MR. CARTER:  And that requires

speculation --

A     Yeah, I don't.  Again, I don't --

      (Simultaneous cross-talk.)

BY MS. MAESTAS:

Q     Fine.

A     I'm just talking about the admissions --
I'm ready to talk about the admissions requirement.

Q     That's fine.  Okay.  Okay.

      Let's go to the reprimand, Plaintiff's
Exhibit 43.

      (Marked for identification is Plaintiff's
      Exhibit 43)

BY MS. MAESTAS:

Q     Okay.  So eventually Jamie Bird gets a
reprimand on March 5th, 2019, which is Plaintiff's
Exhibit 43.  Who drafted this?

A     I don't know.

Q     Did you -- do you believe Tee Mitchell
drafted it?

A     I don't know.

Q     Okay.  All righty then.

      Did you review it before it went to her?

A     I -- I don't recall it.  I might have, but
I don't -- I don't remember if I did or if I did
not.

Q    Do you remember what it says?

A    Do I remember what it says without reading it now?  No.  I don't remember what it says without reading it now.

Q    Okay.  That's a fair enough way to put that answer.

"Unbeknownst to Ms. Bird, her email was forwarded to at least one person in a neighboring technical college and then was then shared liberally with multiple institutions throughout the Technical College System."

Now, we talked about Tina Anderson.  Are we talking about anybody else?

A    Mr. Mitchell was the one that looked into all of that.

Q    Okay.  So you don't have direct knowledge of this?

A    I do not.

Q    And then:  "As a result, the message was considered offensive."

Who was offended?  I know Tina Anderson; right?

A    That is what I heard.  Now, I cannot -- I cannot say that I spoke to anybody that I can remember a name of that said that.  So I don't know.

Q    So the only one that you know of is Tina Anderson?

A    That's what I was told.

Q    By?

A    Dr. Carvajal.  Richard Carvajal.

Q    Okay.  And then the next paragraph: "Moreover, this communication had a significant adverse impact on recently established relationships that will need to be repaired."

Do you have any evidence to support that statement either through rumors?  Testimony? Documents?

A    I can only say of what I heard.

Q    Okay.  Tell me what you heard, that's fair.

A    That there were counselors that were upset, and so that we were going to need to repair those relationships so that's what we set out to do. Hence, the email that went out the following day.

Q    But you don't have any recollection of any of those counselors?  Their names?

A    Verbatim?  No.

Q    Okay.  And then it says it was noted on Ms. Bird's performance evaluation at the bottom of the first page.  Were you aware that it was going to

be noted on her performance evaluation?

A    Mr. Mitchell was her supervisor.

Q    So you weren't involved in that?

A    Of the performance evaluation?  Yes.  He then left, and so I was part of that.  And to be honest with you, I don't remember if I noted it on there or not.

Q    Okay.  We'll need to look at that.  Okay.

And then it says:  "A copy of this memorandum will be placed in Ms. Bird's permanent personnel file in human resources, and then, "Failure to comply with the listed strategy" -- "strategies or to maintain satisfactory performance in the future will result in further progressive discipline up to and including termination."

Were you aware of that language being told to Jamie and --

A    Now, this was drafted by Mr. Mitchell and human resources.

Q    Okay. So you -- you weren't aware of that?

A    No.  It seems like (indiscernible)

THE COURT REPORTER:  I'm sorry?  It seems like ...

THE WITNESS:  Pretty standard language.

MS. MAESTAS:  Pretty standard language.

A    I was not aware of it.

BY MS. MAESTAS:

Q    That's what you said was pretty standard language.

A    Before we get to another one, do you mind if I stand up a little bit?

Q    Mm-hmm.  Yeah.

(Recess 4:16 p.m. until 4:23 p.m.)

MS. MAESTAS:  Back on the record after a short break.

BY MS. MAESTAS:

Q    Plaintiff's Exhibit 45.

Actually, we're going to 46 because I think I've marked it better, and it's the same document inside.  Plaintiff's 46.  It's the annual evaluation.  Right here.

So this is inside Plaintiff's Exhibit 46, an attachment to Jeanine Boddie-Lavan's letter at the Board of Regents level.  It's February 12th, 2019.

And who -- who wrote this evaluation?

So the -- so some of it's form. Obviously, it's generated the lines and stuff like that, but the entries like the goals, the comments,

rating, comments, rating, who entered that information in there?

A   Mr. Mitchell was asked to do the evaluations of his folks prior to leaving.  So I can't remember if he left in February of 2019 or when he left, but -- so I don't know.  I don't know who wrote it.

Q   Did you add any of this information?

A   To be honest with you, I don't remember if I added anything to it or not.  I might have.  I don't know.  I can't remember.

Q   Okay.  So that was why we were looking at it was because I think we referred to it, regarding the reprimand.  And then you had said you didn't remember if you added anything to her --

A   Yeah.  I -- I don't know if that was me that added that in there or not.

Q   And are you aware of any of the numerical statements in here regarding her goal?

The DE goal was fairly aggressive at 20 percent and Jamie exceeded the DE goal with an increase of 30 percent for fall '18 term.  Are you aware?

I mean, like do you know any of that information, or is this in a document and you have

no idea what it --

A    Well, no.  I've -- I saw that in there, and I mean, I know admissions tracks their goals and everything else.  Again, it was -- her performance was never in question.

Q    Okay.  And so there's some commentary about:  "Jamie will focus on strengthening relationships with TCSG officials, which, in turn, can negate any negative repercussions in regard to partnerships with technical colleges and high school counselors."

How would she -- how would she do that?  I mean, if you know the answer to it.

A    I don't.  I don't know how she would do that.

Q    Okay.  And then I think it's stated again.  Pretty much the same question:  "I would like for Jamie to build relations with local TCSG students as well."

A    Back in the comments section?

Q    Yes, at the bottom, right here:  "I would like for Jamie to build."

How would she do that?

A    I don't know.

Q    Okay.  Do you ever recall -- or -- sorry.

Do you recall calling Ryan Hogan and asking him what happened to the letter of reprimand and asking him to look for it in his office, which used to be Tee Mitchell's office?

A    I might have.  I don't know.  I don't recall doing it, but I might have.

Q    Okay.  So I just -- I hope that all these times that you don't recall, that you don't all of a sudden recall at trial.  Okay.

So Ryan had testified that you had called, and he went and looked for the document, and it wasn't there.  And you -- you don't remember calling him?

A    I don't remember the exact conversation, no.

Q    But do you remember calling him and asking him for the location of the reprimand?

A    I don't.  I might have.  I don't -- I don't recall it.

Q    Okay.  Have any of the counselors or TCSG folks -- have they contacted you regarding this -- well, scratch that.

So you had said that there were not any -- you were not aware of any names of any counselors that were upset about the February 26, 2019, email,

and we only know the name Tina Anderson as a TCSG affiliated person who was upset.

Since that time, has anybody else brought up the email or any -- any damaging -- or any -- any further damages been brought to your attention or communicated to you?

A    There's a lot in that question.  Has anybody brought the email back up to me --

Q    Yeah.

A    -- since February of 2019?

Q    Sure.  Yeah.  Where it talked about, like, what Jamie said?

A    "Anybody" meaning a guidance counselor at another -- at a high school somewhere that we have had a conversation where they have brought up the email?

Q    Yeah.  Anybody done that?

A    Not that I remember.

Q    Okay.  What about anybody who talked about this lawsuit to you?

A    Like, as in who?

Q    Anybody.  Has anybody said, Hey, you know, I heard about the lawsuit.  I want to talk to you about it?

A    I mean, I've had a couple of people ask

about it.  Yeah.

Q   Okay.  So a couple.  Two people.  Who are they?

A   Some that -- after there was a release online of the initial lawsuit, some reached out and said, Hey, what is that?

I can't remember off the top of my head who that was.  And I don't know right off the top of my head exactly who-all came up to me.  I just know I've heard people ask about it.

Q   What about anybody from VSU?

A   Have they asked me about it?

Q   Mm-hmm.

A   I am sure because we've had -- there's other people named in the lawsuit.

Q   Okay.  So have the people who are mentioned in the complaint -- not named as a party -- so if you say named in the lawsuit, it sounds like they're a party -- mentioned in the facts of the lawsuit, who -- of those people, who have you talked to?

A   Some of them have said they've been -- they've got depositions that are coming, and I told them we're not allowed to talk about that or talk with Jeanine or with Justin.  I know Justin and I

have talked about it on here.

I've talked about it with human resources. That are folks on the cabinet that are aware that there is a lawsuit that is pending, and I've talked with some of them about it.

Q    What about like any donors or, like, proffered ...

A    I've heard that some have asked some questions about it.

Q    Okay.

A    But I did not talk to any specific donors myself.

Q    Have you ever said anything negative about Jamie at a retreat where other folks overheard?

A    I don't know what negative would be.

Q    Like, it doesn't make her look good or so that -- you know, none of what of she said is true.

A    I don't know.  I'd have to look at the statement and see to recall it.

Q    But you don't recall talking about the lawsuit at a retreat?

A    I might have.  I don't -- I don't remember, to be honest with you.

Q    Okay.  So you -- it's not like you have a practice of not talking about it.

A    Well, when you say I have a practice of it, I don't agree with that.

Q    Okay.  So you -- you are -- you have talked about it with people and -- you have in the past, and you've done it, but you remember exactly who or what you said?

A    Correct.

Q    Okay.  All right.  I think we're about wrapped up.  So if we could just have a few minutes to just make sure.

MR. CARTER:  Okay.

(Recess 4:33 p.m. until 4:39 p.m.)

MS. MAESTAS:  Back on the record after a short, little break.

BY MS. MAESTAS:

Q    Regarding Plaintiff's Exhibit 43, which is the reprimand from March 5th, we did not talk about the meeting that you had with Tee Mitchell and Jamie Bird to discuss the email that went out on February 26th, 2019, 'cause you had said that you didn't discuss it line-by-line but that it was discussed.  So I wanted to get what you had said at that meeting.

A    Are you talking about the one that was in Howell Hall; is that right?

Q    I think so.

A    I don't -- the date is not a --

MS. MAESTAS:  He's talking about a location.

(Simultaneous cross-talking.)

BY MS. MAESTAS:

Q    It's Howell Hall.

A    Okay.  Do I remember?  I don't remember exactly what I said, verbatim, line-by-line, no.

Q    Okay.  Well, I never want you to respond like a robot, okay, unless you have a tape recorder, which, of course, I want you to provide in discovery to your lawyer.

But can you recall what was said?

A    Verbatim?

Q    No.  Not verbatim.

A    What I don't -- what I don't feel comfortable with is saying, yes, I recall what was said, when I don't remember the entire conversation.

Q    Okay.  So thank you for saying that again and giving me the opportunity to say, like, if you remember how to paraphrase at trial and you forgot during this deposition, I am going to be objecting left and right, okay?  So I am not asking you verbatim.  I've not asked you verbatim for anything.

I want to know your recollection.  Okay?

You can paraphrase it.  You can summarize it.  You can give me bullet points.  If you happen to remember something verbatim, please tell me; okay?

A    Okay.

Q    Okay.  Thank you.

A    Summarize.

Q    Sure.  If that's all you have.

A    Jamie was upset about the written reprimand.  She came over.  She said that she had not had her opportunity to tell me her side.  She made several comments and discussed it with Mr. Mitchell sitting there.

And at the end of that we discussed the written reprimand, and I probably made a comment about, I've had reprimands before -- as you all have seen -- and you can turn it around.  Don't do anything else like it.  We're going to be fine. Again, her performance was never the question.

Q    Okay.  Anything else you remember?

A    That's the summary that I've got.

Q    Okay.  Do you remember stating to Jamie or Tee that you were going to keep the reprimand in your desk drawer and not provide it to HR or her

personnel file?

A    I don't remember saying that because HR was the one that did it.

Q    Okay.  Do you -- and you said you thought Tee drafted it?

A    I turned it all over to Tee and human resources.  Now, I don't know which one of them drafted it.  Thank you for pointing that out.  He may have drafted or human resources may have drafted it.  I just know I did not.

Q    Okay.  And after the email was sent on February 26th, 2019, to the high school counselors that Jamie drafted, did you ask Tee to get a contact list of the TCSG presidents, their phone numbers, and their emails?

A    Might have.

Q    Okay.  So that's ringing a bell?

A    I don't -- I can't -- truly, I don't remember if I did or I didn't, but I might have.

Q    Okay.  And if you had done that, what would be the purpose, and did you end up using the list?

A    I don't believe I sent an email out to the presidents of the TCSG system.

Q    What about phone calls?

A    I don't remember making a phone call to every one of them, no.

Q    Do you remember making a phone call to any of them?

A    No.

Q    Okay.  Why didn't you let Jamie do a reply to -- the way that you did on the next day, the ...

Do you know what I am talking about?  Your email that went out the next day, the 27th?

A    Yes.

Q    Why did you not let Jamie handle it?  You know, laissez-faire.

A    I don't know.

MS. BYRD:  Which one you want?

MS. MAESTAS:  The reprimand and the email.

BY MS. MAESTAS:

Q    Yeah, Plaintiff's Exhibit 42.  The email that you sent on February 22nd, that's what I am talking about.  You're saying -- I asked why didn't you let Jamie reply and you said ...

A    I don't know.

Q    I don't know.  Okay.  All right.  I just wanted to make sure I got the right exhibit.

MS. MAESTAS:  All right.  That's it for me, unless we've got redirect after

Mr. Carter --

MR. CARTER:  I don't have any questions.

THE COURT REPORTER:  Okay.  And before I'm off the record, I just need to know if the witness is reading or ...

(Simultaneous cross-talk.)

MR. CARTER:  You want to read and sign it? Dr. Carr?

THE WITNESS:  Yes.

(Examination was concluded at 4:45 p.m.)

CERTIFICATE OF OATH

STATE OF GEORGIA

COUNTY OF LOWNDES

I, KAIRISA JOI MAGEE, RPR, GCCR (Georgia), Notary Public, State of Florida, certify that DR. RODNEY CARR appeared before me on January 19th, 2022, and was duly sworn.

Signed this 19th day of February, 2022.

_____
KAIRISA JOI MAGEE, GCCR, RPR
Georgia Certification No. 5962-0590-7476-4800
Notary Public, State of Florida
My Commission No. GG 968504
Expires: 03/15/2024

CERTIFICATE OF REPORTER

STATE OF GEORGIA

COUNTY OF LOWNDES

I, KAIRISA JOI MAGEE, RPR, GCCR (Georgia), Florida Notary, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of DR. RODNEY CARR; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 19th day of February, 2022.

_____

KAIRISA JOI MAGEE, GCCR, RPR, FLORIDA NOTARY

```
                      ERRATA SHEET

             DO NOT WRITE ON THE TRANSCRIPT
             ENTER CHANGES ON THIS SHEET

JAMIE T. BIRD V. VALDOSTA STATE UNIVERSITY
Deponent:  DR. RODNEY CARR
Date of :  January 19th, 2022
Case No.:  7:21CV62 (WLS)

PAGE    LINE          REMARKS
```

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

```
Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.

Signature of Witness _____

Dated this _____ day of _____,
_____.
JOB NO.:  378316
```

**Exhibits**

**CarrR 1**  4:8
85:25 86:2

**CarrR 7**  3:14
31:19,24
36:14,23
37:15
38:25

**CarrR 8**  4:14
99:21,23

**CarrR 14**
4:11 89:6,
17 92:13

**CarrR 15**
4:12
95:13,21

**CarrR 16**
4:13 95:15
98:12

**CarrR 17**
3:20
70:10,12

**CarrR 18**
3:22 71:9

**CarrR 19**
3:23 71:6
77:1,5

**CarrR 21**  4:3
78:19
130:18
131:14

**CarrR 23**  4:5
81:1,3

**CarrR 24**  4:7
81:14,16

**CarrR 26**
3:19 55:8

**CarrR 27**
3:18 52:25
53:2,4

**CarrR 41**
4:21
121:6,8
125:2

**CarrR 42**
4:22
125:10,15
137:16
160:17

**CarrR 43**
4:24
145:10,12,
16 156:16

**CarrR 44A**
4:20
119:15,17

**CarrR 46**
4:16
101:11,24
149:18

**CarrR 47**
3:16 40:2
105:18

**CarrR 50**
3:13 8:17,
19 10:5

**CarrR 51**

3:17
47:22,24

**$**

$10,000
100:6

$10,383
99:15

$12  29:4,10

$40  9:21
10:1

**0**

01:23  30:19

01:28  30:19

**1**

1  7:1 85:25
86:2 91:22
101:14

1.2  29:8,15
32:16

1.29  29:15
96:3

1.3  29:8,15

1.5-year
143:22

10  6:10
96:3

100  121:17

1100s  72:21

1101  72:17

1102  72:17

117,588
99:14

12  6:12
7:12 89:4

12:58  5:1

12th  149:21

13  6:13
102:7

13th  99:6

14  7:14
89:4,6,17
92:13

14th  100:1

15  5:15
6:15 7:15
95:11,13,
21

16  5:16
6:16 87:5
95:11,15
98:12

1600  129:22

17  70:10,12
71:16
95:22

18  7:18
71:7,9,21
150:22

180  114:22,
25

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022                    Index: 19..51

**19** 6:19 71:6 77:1, 5 129:2

**1990s** 11:19

**1:03** 125:15,24 137:16

———————————

**2**

**2** 7:2 101:14

**20** 6:20 16:13 150:21

**2011** 24:22

**2012** 106:2

**2013** 105:24 106:4

**2017** 24:20

**2019** 49:6 81:7 121:10 130:23 137:15 145:15 149:21 150:5 152:25 153:10 156:20 159:12

**2020** 53:6 90:3 94:10,25

98:16,19, 23 100:1 105:1 119:18

**2021** 90:4 94:8,10

**20s** 108:19

**21** 6:21 78:17,19 130:17,18 131:14 133:7

**22** 6:22

**22nd** 160:18

**23** 81:1,3

**23rd** 53:6

**24** 5:24 81:14,16

**25** 6:25 16:21

**26** 55:4,8 152:25

**26th** 121:10 130:23 156:20 159:12

**27** 52:25 53:2,4

**27th** 125:14 137:15 160:9

**28** 60:11,16

**28th** 105:24

**2:14** 66:15

**2:22** 66:15

**2:50** 89:13

———————————

**3**

**3** 6:3 41:19 119:19

**30** 33:4,9 150:22

**30s** 108:19

**30th** 106:4

**31602** 11:14

**3:01** 89:13

———————————

**4**

**4** 6:4 7:4 36:22,23 37:15 38:24 39:9,12

**4-year** 131:5

**4.0** 88:22

**40** 9:25 125:15

**41** 56:6 121:4,6,8 125:2 130:25

**42** 125:10, 15 137:14, 16 160:17

**43** 145:10, 12,16 156:16

**44A** 119:13, 15,17

**45** 7:7 149:13

**450** 39:18

**46** 40:10 101:9,11, 24 149:14, 16,18

**4642** 11:13

**47** 40:2 105:18

**48** 48:6

**4:16** 149:9

**4:23** 149:9

**4:33** 156:12

**4:39** 156:12

**4:45** 161:10

**4th** 106:2 119:18

———————————

**5**

**5** 7:5 55:10 80:18

**50** 8:17,19 10:5

**500** 39:18

**51** 47:22,24

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 167 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022                Index: 5th..admissions

48:6

**5th** 145:15
156:17

---
**6**
---

**6** 7:6 40:14
41:17

**6/6/2021**
94:13

---
**7**
---

**7** 6:7 7:7
31:19,24
36:14,23
37:15
38:25
40:14
44:12
101:14
102:7

**7:21-62** 5:21

---
**8**
---

**8** 6:8 7:8
99:21,23

---
**9**
---

**97** 23:20,21

**99** 23:20

**9th** 98:16,
19

---
**A**
---

**a--** 88:9

**ABAC** 105:22

**ability**
14:16 15:2
64:5

**Abraham**
105:21

**absolutely**
66:12,13

**absorbed**
44:14

**abstract**
86:17

**academic**
27:5 32:16
58:17 60:2
62:17
75:19 76:3
87:8,24
88:17 89:2
97:14
115:5
128:20,24
129:24
130:1,3,7,
8,14
133:16
136:22
142:12

**academically**
86:18 87:1
88:19,22
129:14

**accept**
88:18,19,
21

**accepted**
60:12
87:17
140:13

**access** 27:6
69:1 86:23
87:9 93:12

**accredited**
24:9

**acknowledging**
115:19

**acquaintance**
25:4

**acquaintances**
21:23

**acronym**
31:16 76:4

**ACT** 88:23
142:8

**action** 5:21
37:2,20
113:13

**actions**
116:11

**add** 150:8

**added** 144:2
150:10,15,
17

**addition** 7:9

**additional**

35:5 96:15
97:24
99:11
100:10

**address**
11:12

**adhered** 64:4

**adjustment**
100:6

**adjustments**
118:19

**administration**
22:19,20

**administrative**
93:10
102:11

**admission**
25:19
39:20
79:22
80:23 87:6
134:2,14,
20

**admissions**
25:10,15
27:5 35:1
38:21
44:14,25
45:2,13,21
49:7 50:23
61:10
64:18,21
65:1,4,8,
15,23
66:8,19,22

68:6 70:17 79:23 80:2 90:4,5,6, 7,9 91:1, 21 93:12 95:1 103:6 108:13 111:22 120:17,21 121:20 125:1 134:23 141:5,9,13 142:7,17 145:6,7 151:3

**admit** 111:1 143:2,25

**admitted** 62:16 63:6,16

**adult** 16:14

**adverse** 147:8

**advertised** 25:22

**advice** 27:20 74:5,7,20 75:23 76:10

**adviser** 107:5

**advising** 27:5,8 120:19,20

**affair** 108:4

**affairs** 32:16 35:1,5 58:15 60:2 97:14 108:5,7 115:4,5,7

**affect** 14:16

**affiliate** 21:9,21

**affiliated** 153:2

**affirm** 5:4

**afraid** 113:6,7

**afternoon** 123:17

**age** 5:12

**agencies** 29:3

**agenda** 69:17,18, 24 70:5

**aggressive** 115:14,23 118:14 150:20

**agree** 62:5 82:5,24 84:7 86:21,24 87:3,10,20 88:1,14,16

89:1,3 110:23 111:11 130:5,7 131:11 134:16 135:8 136:24 156:2

**agreed** 129:16

**agreement** 5:25 59:10,11 60:9,20 61:6,8,12, 18 62:1,5 138:19

**agreements** 59:6,24 60:7 138:17

**Agricultural** 105:21

**ahead** 89:21 132:4 133:9 144:15,17

**aid** 27:9 68:24

**air** 105:3, 11,15

**Alabama** 16:24

**alcohol** 15:3

**algebra** 72:18

**allegations** 51:16 52:17 107:22

**Allison** 16:19

**allowed** 154:24

**amount** 32:14

**Anderson** 122:10,19 125:20 128:3 146:12,21 147:2 153:1

**angry** 123:17,20 126:4 127:23

**annual** 37:1, 20 40:4 149:16

**answering** 84:15

**anybody's** 115:11

**anymore** 28:22 113:5

**AP** 75:3

apologize
  38:13

apologized
  128:3

apparent
  95:23
  115:9

appears  7:5
  54:4

applicable
  59:21

application
  26:14
  79:16,19
  80:1,3

applies  39:1
  61:16,18

apply  26:2,6
  39:10
  59:21
  141:4

approach
  27:13

approval
  92:21

approved
  99:17

area  16:2,
  8,9 18:18
  23:25 24:1
  34:9 72:16
  93:12
  119:23

areas  28:2
  34:9

argue  130:4

arms  105:15

articulate-
  60:5

articulating
  60:23

articulation
  59:6,9,11,
  24 60:6,9,
  20 61:6,8,
  12,18
  62:1,5
  138:17,19

arts  72:18

asks  9:14

asleep
  59:17,20

aspect  97:13

assigned
  32:14
  42:12
  96:15,20
  99:11

assignment
  97:15

assist
  139:21

assistance
  45:1 137:6

assistant
  69:3 91:21

93:10
102:11

assisting
  39:24
  42:17

associate
  24:9

association
  17:16
  18:6,7

assume  24:5,
  8 74:2,3
  94:7
  107:21

assuming
  16:5
  110:25
  113:9
  137:11

Atlanta  19:7

attached
  8:23

attachment
  149:19

attempt
  26:16

attempting
  134:12,18

attend  62:11
  74:4 131:5
  135:5,17
  139:8,10

attended
  85:6

attending
  57:18,19
  62:17

attention
  29:21
  31:18
  40:10
  85:24
  86:16
  153:5

attorney
  12:3

Auburn  16:24

avoid  10:17
  75:6
  102:16
  137:9

aware  21:22,
  24 47:20
  70:24
  76:25 81:7
  84:22 90:8
  92:18
  101:7
  135:2
  147:25
  148:16,20
  149:2
  150:18,23
  152:24
  155:3

Awesome
  64:15

awhile  110:3

AYR  19:7

**B**

B-R-E-N-T
  11:7

B-R-E-T-T
  11:8

bachelor
  22:17

back  8:24
  11:19
  17:10
  29:23
  30:2,23,25
  57:24
  66:17 67:6
  71:16 80:9
  88:7 89:14
  91:24
  93:6,20
  100:18
  106:16
  107:25
  115:1
  125:21
  139:1
  141:21
  149:10
  151:20
  153:8
  156:13

background
  53:19
  84:9,14

bad  8:4
  29:23
  30:25 31:3

Bain  9:15

Bainbridge
  8:10 9:15,
  16 24:24,
  25 25:14
  54:23
  55:14
  106:21
  112:19,20
  117:25

Baldwin
  105:21

ballpark
  29:16

bar  109:4

Barrie  68:25

Barron
  108:4,10,
  12 109:7,
  15

based  42:9
  79:10

basically
  9:15

basis  19:19
  68:15

beat  119:7

beer  109:5

began  5:1

beginning
  87:22
  108:1

behavior

102:1
110:20
111:9
115:15

bell  80:4
  93:9
  159:17

benefit
  63:2,5

benefited
  59:9 60:5

benefits
  100:11

Bessinger
  46:1,10
  48:20

bi-weekly
  67:22 80:7

big  53:7

biggest
  142:1

Billy  97:19

Bird  5:17,
  18 28:16,
  17 45:22
  70:19
  100:1
  121:9
  141:22
  145:14
  146:7
  156:19

Bird's
  147:24

148:10

bit  19:15
  30:5,14
  71:17
  149:7

black  55:5
  141:20

bless  56:9

blue  44:13
  91:17

board  5:18
  22:3,6
  46:19 56:6
  91:4
  106:11,24
  116:11
  117:5
  123:11
  149:20

Bob  58:14

Boddie-lavan
  17:25
  41:7,25
  47:16
  52:13
  54:25
  101:19

Boddie-lavan's
  149:19

boggling
  117:20

boiled  29:4

book  77:18
  78:5 88:3,

10

**bottom** 77:21
  139:16
  147:24
  151:21

**bowling**
  18:16,19

**boxes** 137:3

**brag** 112:22

**Branch** 69:3
  97:13
  102:8,11

**Brandon**
  20:15

**Brant** 11:5

**break** 30:15
  66:11,17
  89:8,15
  93:3,6
  149:11
  156:14

**breakdown**
  66:19

**Brenda**
  103:12

**Brent** 11:7

**Brett** 11:3,
  6,8,9

**Brian** 14:11

**bring** 7:10,
  12,14
  9:14,19
  26:2,3

32:13
52:19
77:13

**bringing**
  84:10

**broad** 35:25
  56:3 61:2,
  22 62:6

**brought** 8:3
  45:20
  55:15
  153:3,5,8,
  15

**bucks** 9:25

**budget** 29:1,
  4,17
  32:15,17
  35:1,9,11
  46:25
  91:13 96:3
  97:13
  98:20
  100:12,20

**budgets** 36:2

**build**
  151:18,22

**builder** 70:3

**building**
  105:2,9

**bullet**
  81:18,20
  105:23
  158:3

**bunch** 59:13

112:1,8,12

**business**
  5:19 29:5
  33:14,15

**BYRD** 160:14

_____

          **C**
_____

**cabinet**
  32:12,13
  33:1
  46:17,24
  47:2 48:22
  155:3

**Caleb** 16:11,
  17

**Calgano**
  88:3,10

**Calhoun** 16:2

**call** 22:24
  25:7 28:12
  33:22
  55:24
  92:24
  109:20,25
  122:10
  124:7,13
  125:20
  160:1,3

**called** 22:21
  152:10

**calling**
  152:1,12,
  16

**calls** 48:4

85:4
122:15
123:15
125:4,12,
21 128:4
159:25

**campus** 63:23
  113:17
  121:24
  123:15
  139:3

**campuses**
  25:18 73:9

**candidates**
  26:10

**capability**
  129:24

**cards** 18:19

**care** 59:5
  141:2

**career** 74:5
  117:13

**carefully**
  130:11

**Carl** 49:14

**Carr** 5:10
  6:16,17
  11:1,4
  16:11,19
  17:23
  47:15
  53:12
  55:12,14,
  15 95:23

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 172 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022          Index: Carr's..churches

102:8
113:17
123:15,16
161:8

**Carr's** 102:9
110:19

**Carter** 6:4,
7,10,13
7:18,22,25
8:8,13,22
9:23 10:2
13:7,11,22
18:24 19:9
39:3,7,10
44:20
48:4,9,12
58:21
79:11
82:7,9,15
83:1,5,7
91:24
92:4,7
96:11
111:2
112:7
123:2,5,10
126:17
127:16
131:1,15,
19,24
132:3,6,
11,21,25
133:4,9
135:13,15
143:12
144:3,11,
14,25

156:11
161:1,2,7

**Carva-**
110:17

**Carvajal**
17:24
20:14,15
21:11
24:18,19
26:1 47:17
106:2,4,16
110:17,18
114:20
116:22
117:18,24
122:4,9,15
123:15
124:2,7
125:20
127:2,3,8,
22 128:14
147:5

**Carvajals**
21:18

**case** 11:17
12:10 14:1
23:12,13
102:20,24
130:9
132:20

**caseload**
44:16

**cases** 11:18

**categories**
72:2 76:8

**caught**
118:12

**cell** 122:15

**center** 27:6

**chair** 115:6

**challenge**
89:18,20

**challenging**
78:25
133:19

**chances** 62:3

**change**
115:24
118:22,25
141:17

**changed**
115:14,16,
22 118:13

**changing**
115:18
116:3

**charge** 126:6

**charged**
113:18,20

**chart** 44:24

**Charter**
108:5
109:3
110:13

**check** 9:21
10:10
50:24
67:15,16

123:6,10,
24 135:6,
10,18

**checking**
137:3

**checks**
136:1,2

**Cheryl** 20:15
21:11
127:2

**chief** 29:5
33:14,15

**child** 16:9

**children**
16:7
20:16,17
74:8

**choose** 79:9
130:10,13

**choosing**
133:15
135:5,17

**chose** 10:23
63:15

**Christmas**
109:22

**Christy** 44:4

**Christy's**
44:5

**church** 19:4

**churches**
18:16

Circle  11:13

Civil  5:21

clarify
  111:18

class  63:22
  70:2
  118:20
  141:12

classes
  23:22
  60:11
  62:11
  63:18
  77:22
  128:19
  129:5

clear  15:1,9
  26:4 65:6
  110:19
  114:21

click  59:16,
  19

close  25:4
  89:25
  103:10

closed  102:2
  104:18

club  18:16
  19:9,16,17

clubs  18:24
  19:2,5

collaborate
  137:24
  140:25

collaborating
  138:12

colleagues
  20:24
  24:21

college  9:16
  21:6 23:16
  24:3,24,25
  25:14,17
  54:23
  57:14,15,
  17 60:10,
  12 62:10
  72:18 79:2
  86:20,23
  96:20,25
  97:5,9,12
  98:6
  105:21
  106:21
  112:19,20
  117:25
  129:15
  131:10
  133:23
  138:3,14
  142:2,11,
  13,14
  144:23,24
  146:9,11

colleges
  86:17,25
  87:7,18,23
  129:13
  138:4
  151:10

combined
  96:16,22

comfortable
  84:15
  157:18

comment
  158:16

commentary
  144:4
  151:6

comments
  149:25
  150:1
  151:20
  158:13

committed
  50:20
  138:12

communicate
  140:5

communicated
  37:23
  153:6

communication
  34:25 58:3
  72:18
  147:7

communications
  12:14,21
  45:19,20

community
  58:4
  126:6,10,
  16,18,20,

21 137:25
  138:6,9
  139:13

COMPASS
  142:9

competent
  121:1

complaint
  7:19 13:5,
  14 40:20,
  21 50:5,7,
  12,15,17
  51:9,11,25
  52:21
  106:10
  154:17

complaints
  9:18 85:13

completely
  114:25
  129:21
  134:2

comply
  148:12

component
  86:19
  129:14

comprehensive
  56:7
  138:11

computer
  72:14

concluded
  161:10

conduct
  37:3,22
  118:11

conducted
  116:11

conference
  11:24,25
  52:2 107:2

confirmed
  41:15

conflict
  132:24
  140:15

confused
  27:22
  35:19
  109:10

confusing
  19:13

consideration
  49:23

considered
  26:10
  28:25
  31:22
  32:4,9
  36:9,11
  37:5 38:1
  146:20

consistent
  129:17

consult
  14:20 79:2

contact

113:22
123:11
159:13

contacted
  122:4
  152:21

contained
  116:9

continued
  38:9

conversation
  84:10
  119:8,11
  123:21
  140:10
  152:14
  153:15
  157:19

conversations
  48:21 49:4

Cool   18:14

coordinator
  45:8

copies
  116:22,24
  141:22

Coppage
  97:14

copy   10:19
  117:3,16,
  23 122:5
  148:9

core   60:11

correct
  13:22
  15:14
  38:20
  43:20
  46:11
  59:14,18
  64:21
  68:22
  99:19
  143:19
  156:7

correctly
  92:9

cost   117:7

counsel   5:25
  7:17
  12:14,16,
  19 14:5
  47:12
  115:6

counseled
  84:19,24

counseling
  76:19,23
  78:22
  137:10
  139:20

counselor
  79:3,9
  126:2
  139:16
  153:13

counselors
  82:18

121:9
124:14
128:6
147:16,21
151:11
152:20,24
159:12

count   20:16
  75:4

county   56:6
  141:21

couple   27:23
  44:4
  153:25
  154:2

courses
  58:24
  60:16
  71:24
  72:4,9,16,
  20,21
  74:10 75:3
  79:4,21
  81:22,24
  118:21
  128:23
  130:10
  133:15
  135:11
  136:1,2

courses.'
  135:7,19

coursework
  23:17
  144:23,24

court  5:2,22
  6:22 7:1
  9:13 10:22
  18:9 23:4
  33:15,18
  42:20 58:5
  83:12,15
  87:13 88:4
  92:25 93:2
  94:3 95:3
  100:14
  126:11,14
  143:11
  148:23
  161:3

courtroom
  11:23

cover  105:19

COVID  64:8

Crawford
  20:13

Create
  119:20

created  46:4

creating
  139:6

creative
  27:7 69:2

credit  61:11
  62:4

credits
  58:25 82:2
  131:7
  134:1,13,

19,23

Creek  11:13

criminal
  22:18

criteria
  76:12

critical
  131:4

cross-talk
  125:8
  143:10
  144:8
  145:3
  161:6

cross-talking
  157:5

crying  51:1
  103:19,20

Crystal
  20:15

current
  16:25 17:4
  115:7
  120:1
  122:11

curriculum
  79:1,10
  131:8
  133:19,23
  142:23,25
  143:8
  144:2

Curt  20:14

customer
  56:19

cut  29:5,7,
  18 32:14
  34:25 35:5
  96:3
  100:12

cuts  36:2

CVIOG  49:6,
  8,24

—————————

D

—————————

dad's  73:19

daily  68:15

Dalton  16:2

damages
  153:5

damaging
  153:4

darn  117:7

date  32:24
  94:25
  95:7,8
  100:1
  157:2

dated  105:24
  106:1,4
  119:18
  137:15

dates  9:4
  98:24,25

daughter
  16:19

Davis  47:8,
  11

day  70:1
  103:14
  114:21
  124:24
  125:7,24
  147:19
  160:7,9

days  17:23

DE  66:19
  67:2 68:5
  71:24 72:9
  73:13,22
  75:18
  76:20
  80:2,8
  82:2
  84:20,25
  85:6
  134:13,19,
  23 135:4,
  16 140:6,
  21 142:1
  150:20,21

December
  106:2

decide  38:18

decided
  32:10
  137:15,17

decision
  32:20
  35:16
  46:13,14,
  21 48:3

51:18,21
68:11,12
75:16
90:24

defend   52:16
110:24,25

defendant
5:20 6:2,
17

Defendant's
52:25

deficient
75:18
76:1,5

define   25:5
113:2

definition
38:13

degree
22:15,17,
18,19
114:22,25

degrees   24:9

deliver   9:21

denigrating
132:9

dental   57:21
58:1,10

deny   115:21
118:10

department
29:12
51:13

65:18 72:4
80:5

departments
26:21,25
27:3 28:7

depend   76:9
140:9,20

depends
68:13
69:25 70:4

deployed
110:2

deposition
5:24 6:1,
17 7:9 9:7
10:15,20
11:15
12:3,15
14:4,12,
13,17
77:13
92:24
127:16,17
157:23

depositions
154:23

describe
27:21

designed   6:8
78:2

designers
98:1

desk   8:5
50:25

94:2,6
104:14
158:25

detail
130:23

details
37:25
41:17
123:23,25
126:24

detector
119:7

determine
79:3

developed
116:4

developing
97:21

developmental
23:15,18
24:10,13
88:20

difference
43:21,23

differentiate
38:23
143:6

differentiated
143:7

differentiating
g   142:12,22

differentiation
n   144:1

differently
71:18

difficulties
37:23

dinkie   8:4

dinner   20:3,
6

direct   5:14
28:3,6
29:21
34:8,15,17
40:10 55:4
67:25
68:2,22
69:6,9
70:9 86:16
98:5
146:16

directing
31:18

direction
118:9
137:8

directly
19:24,25
69:12
142:2,10

director
25:17
68:24

directors
28:2

dis-   62:6

disability

64:3

**disagree**
62:5 82:5,
24 84:8
86:21
88:12,13
111:8,10,
11,12
131:11,12
134:16
135:8,9,
21,22
136:24
137:5,11

**disappeared**
139:23

**disappointed**
84:19,24

**disciplinary**
26:14
37:2,20

**discipline**
40:5 80:6
148:15

**disclose**
26:13

**discovery**
13:21,25
94:12,17
157:12

**discrepancy**
43:22

**discriminate**
38:22

**discuss**
32:18
34:13
136:11
156:19,21

**discussed**
14:14 54:5
136:12
156:22
158:13,15

**discussing**
136:13

**discussions**
34:8

**dispute**
54:17

**dissertation**
23:10,11
86:6
129:11

**distance**
77:11

**District**
5:22 9:13

**divided** 29:5

**division**
5:23 29:6,
14 32:15
35:21,22,
23 100:21

**divisions**
27:20 28:1

**doctorate**
22:19

23:2,6

**document**
8:24 9:5
32:5,7
40:15,17,
18,19
41:10,14
79:11
80:15,21
82:15 86:4
91:11
98:14
117:8
121:11
130:21
133:7
149:16
150:25
152:11

**documentation**
12:16

**documented**
36:25
37:19,22
99:9 102:5
113:12

**documents**
7:10,12,
14,17 8:9
9:12 10:8
12:21,24
13:4,6,9,
12,13
94:17
132:14
147:12

**doggone** 8:3

**donors**
155:6,11

**door** 87:6
102:2
103:22
104:16,18

**doors** 87:24
103:12

**Doug** 68:24

**drafted**
145:16,19
148:18
159:5,8,9,
13

**dramatic**
115:8

**drawer** 8:5
158:25

**drinking**
18:16

**driver's**
11:3

**drugs** 14:15
15:3

**drunk** 15:5

**dual** 25:11,
15,18
39:16,23
42:18,19,
21 44:10,
13 45:1
50:19
58:21

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 178 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022    Index: Dublin..emphasizing

62:16
63:17
64:19,20
65:2,3,7,
14 66:4
70:23
71:1,19,22
74:6,10,22
75:6,8,12,
24 77:18
78:23
80:23 81:6
82:18 83:3
119:25
120:20,25
121:2
138:13,20,
23 141:12
142:8

Dublin  25:17

duces  9:2

due  38:11

Dukes  97:15

duly  5:12

duplication
36:8 39:14

duties  26:23
36:8
39:14,19,
20 41:20
42:4,12
43:10
44:15
96:15,18
97:24

99:11

duty  62:9,
12

Dwight
106:13

——————————

E

——————————

earlier
14:12,13
93:21
101:21
127:14
139:1

early  11:19

earned  115:1

easier  44:7

Eastman
25:18

eat  21:17

Echols
141:21

econ  72:19

economic
58:15
115:7

EDD  22:22,
24 23:3,5,
6

educate
56:10
57:1,7,13,
15,18
126:9

138:1,6,9
139:13

educating
57:4 126:6

education
22:16,20,
22 23:2,7,
15,19
24:11
56:5,13,25
87:9 88:20
126:1
137:24
139:13

education-wise
24:13

educational
138:13

effective
45:3

effectively
23:16

elearning
97:16

electronically
94:6

eliminate
42:9

eliminated
41:22
42:6,11
43:12

email  33:22
53:9 54:2

55:25 81:5
106:1,2
110:17
114:8,15
119:17
121:8,14
122:2,13,
20 123:18
124:13,25
125:14,17,
22,23,25
126:3,8,
24,25
128:19
129:18
130:23
131:25
132:2
133:14
134:11
136:8,12,
13,17
137:15
141:22
146:7
147:19
152:25
153:4,8,16
156:19
159:11,23
160:9,15,
17

email's
124:1

emails  12:20
159:15

emphasizing

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 179 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022                    Index: employee..excel

31:5

**employee**
6:1,17
12:11
28:21
37:23 38:6
39:17
44:25 45:1
101:2
113:23

**employees**
20:6
36:19,21
39:4,11
101:1
102:10
111:14

**employment**
17:5

**end** 7:11
15:4 25:20
94:1
100:15
106:3
158:15
159:21

**ended** 34:18
84:20,25
115:3

**enforcement**
11:20

**engage**
113:19

**english**
23:20,21

72:3,17

**enroll** 75:3
129:22
135:24

**enrolled**
86:18 87:1
129:13

**enrollment**
25:11,16,
18 39:16,
23 42:18,
19,21
44:11,13
45:1 50:19
58:21
62:16
63:17
64:19,20
65:2,3,8,
14 66:4
70:23
71:1,19,22
74:6,10,22
75:6,9,13,
24 77:18
78:23
80:24 81:7
82:18 83:3
119:25
120:20,25
121:2
138:13,20,
23 141:12
142:8

**ensure**
136:21

**enter** 76:20
79:25
134:12,18

**entered**
150:1

**entering**
133:5

**entire**
15:23,25
20:9 29:9,
10 48:21
60:10
65:22
67:22
157:19

**entries**
149:25

**entry** 72:19,
21

**environment**
64:2 88:25
103:10

**Eric** 45:22

**established**
101:25
147:8

**ethically**
132:24

**evaluation**
37:20
147:24
148:1,4
149:17,22

**evaluations**

37:2 40:5
150:4

**event** 81:8,
11 121:20
139:20

**events**
125:19
139:17

**eventually**
124:2
125:13
145:14

**everyone's**
54:11

**evidence**
147:10

**evidently**
101:20
119:18

**exact** 40:18
49:3 53:25
104:7
107:23
124:16
152:14

**examination**
5:14
161:10

**examples**
55:12
84:17,23

**exceeded**
150:21

**excel** 88:22

Case 7:21-cv-00062-WLS   Document 33-6   Filed 05/02/22   Page 180 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022          Index: Excellent..figure

Excellent
  17:13

excerpt
  77:17

excerpts
  98:13

exhaustive
  72:13

exhibit
  8:17,19
  10:5
  31:19,24
  36:14,23
  37:15
  38:25 40:2
  47:22,24
  52:25
  53:2,4
  55:8
  70:10,12
  71:6,9
  77:1,3,5
  78:19
  81:1,3,14,
  16 85:25
  86:2,9
  89:6,17
  92:13
  95:13,15,
  21 98:12
  99:21,23
  101:11,24
  105:18
  116:8
  119:15,17
  121:6,8
  125:2,10,

15 130:18
131:14
137:16
145:10,12,
16 149:13,
18 156:16
160:17,23

exhibits
  10:6

exigency
  96:2

exist   120:5

existence
  61:1 76:22

experience
  25:9,10
  79:2
  121:16,19
  123:14

experts
  97:17,25

explain
  95:23
  98:18
  117:11,21

explaining
  126:23

eye   67:18

eyes   6:6

───────────
        F
───────────

face-to-face
  64:10

facilitators
  97:18

fact   41:24
  115:3
  125:2
  142:3

factor   38:25

factors
  28:24
  32:3,9
  36:7,17
  37:16,17
  39:8,9,10

facts   154:20

faculty
  97:15,20
  98:2
  108:25
  130:4

fail   89:20

failure
  89:21
  148:12

fair   12:7
  61:21 71:3
  146:5
  147:15

fairly   73:15
  150:20

fall   59:17,
  20 76:8
  150:22

familiar
  113:9

families
  50:21

family   15:25
  63:24 64:7

February
  119:18
  121:10
  125:14
  130:23
  137:15
  149:21
  150:5
  152:25
  153:10
  156:20
  159:12
  160:18

federal   9:14

feedback
  49:19,20

feel   19:13
  67:17
  84:14
  157:17

feeling
  30:22

female   101:1
  113:23

females
  103:7

figure   19:23
  26:19
  49:25
  57:8,10
  84:4 102:4

140:11

**file** 5:21
14:1 54:13
98:13,14
117:6
148:11
159:1

**filed** 5:11
50:5
106:10

**fill** 90:22
91:3

**filled** 90:12

**final** 46:13,
21 68:11,
12

**financial**
27:9 68:24
70:7 96:1

**find** 82:17
83:2 89:10

**findings**
55:23
116:10,14

**fine** 41:15
50:18
84:16
85:11
133:3
145:5,8
158:19

**fingers**
113:23
114:1

**finishes**
73:13,22

**fire** 113:4,
6

**fired** 112:1,
8,12,15,23

**firing**
112:21

**fit** 75:12

**Fitzgerald**
68:25

**five-minute**
30:15

**five-year**
143:22

**flashlight**
6:4

**flip** 71:16
77:18 78:5
99:20

**flipbook**
129:4

**Florida**
73:18

**flower** 73:19

**focus** 151:7

**folks** 21:7
80:23
106:10,11
115:2
130:2
150:4
152:21

155:3,14

**follow**
102:23
103:2

**football**
17:12
18:1,5,6,7

**force** 28:23,
25 31:15,
20 37:6
38:5 45:3
95:20 96:1
99:25

**forgetting**
21:20

**forgot**
157:22

**form** 10:11
13:4 48:4
149:23

**formal** 12:2

**formulating**
68:16

**forum** 6:11

**forward**
92:20
122:8
124:2
131:10
133:25
136:23

**forwarded**
122:20,22
146:8

**forwarding**
81:5

**found** 62:4

**foundation**
136:22

**four-year**
142:2,11,
13,23,24,
25 143:4,
18,20,21
144:23

**four-years**
143:23
144:1

**fourth** 108:2

**Frequently**
31:20

**freshman**
85:6

**Friedhoff**
17:24
34:21 35:7
65:10,17
66:20,24
67:8 68:1
69:12,15,
24 98:16
99:17
100:9

**Friedhoff's**
98:13
119:23

**friend** 25:4,
7,8

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 182 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022                Index: friends..hair

**friends**
  20:4,5
  21:23
  24:17,21
  55:14

**friendship**
  109:17
  110:14

**front** 76:12
  92:14,15
  94:19

**frustrated**
  82:3

**full** 10:24

**function**
  36:20
  39:5,11
  56:4,13,21
  57:3,13

**future**
  148:14

——————————
        **G**
——————————

**gave** 51:5
  74:7 96:3
  99:2 100:3
  104:15

**gender**
  102:10

**Generally**
  48:12

**generate**
  41:12

**generated**
  41:11
  149:24

**gentleman**
  106:12

**Georgia**
  5:19,23
  11:14
  15:16
  16:3,4,18
  18:6,7
  21:7 23:14
  24:3 25:16
  57:18
  60:13
  62:10
  74:19
  75:1,9
  79:24
  138:3,15

**Georgia's**
  138:11

**gestured**
  36:13

**gestures**
  10:17

**get all**
  100:13

**girl** 108:14

**give** 5:5
  26:25 33:4
  72:12
  74:6,20
  75:23
  76:10

  95:17 96:7
  100:9
  105:11
  144:9,16
  158:3

**giving** 98:17
  157:21

**glad** 56:16

**glasses**
  77:8,10,14
  89:10

**global**
  139:22

**GMC** 85:7

**goal** 139:12
  150:19,20,
  21

**goals** 149:25
  151:3

**God** 5:7
  56:9
  118:12

**golf** 119:10

**good** 28:14
  49:11 50:2
  56:13,16
  77:12
  89:23
  123:17
  130:1,15
  155:16

**governor**
  29:2

**GPA** 76:6
  88:22

**graduate**
  131:6,9
  133:25
  136:23

**Gravett**
  58:15

**Great** 30:3
  89:12

**group** 19:4,8
  28:5 52:3

**groups** 18:15

**grudges**
  53:13

**guarantee**
  26:5

**guess** 69:25
  95:18
  108:15

**guidance**
  124:13
  126:2
  153:13

**guide** 31:21

**guiding**
  137:7

**guys** 18:18
  109:9

——————————
        **H**
——————————

**hair** 113:24
  114:2

Hall  156:25
  157:7

Hancock
  70:22

Hancock-
sutliff  43:3

hand  5:3

hand-in-hand
  126:9

handle  67:11
  70:19
  71:1,13,
  14,19,22
  121:1
  160:11

handled
  42:21
  66:20,22
  70:23
  138:16

hang  18:17
  22:9

happen  158:3

happened
  42:8,14,16
  43:18,19
  44:19
  100:2
  106:8
  124:19
  127:7,18
  152:2

happening
  134:25

Harbaugh
  20:14

hard  68:16

Harvard
  130:3

hazy  67:18

head  22:25
  38:12 73:3
  85:1
  154:7,9

hear  13:10
  53:14
  124:21

heard  121:14
  127:25
  134:25
  135:3
  146:23
  147:13,14
  153:23
  154:10
  155:8

hearing
  10:14

helped  41:12
  96:10

helps  136:21

Herb  20:11

heretofore
  5:11

hesitated
  104:2

hey  26:1

34:25
40:24
62:18 63:7
72:3 120:6
141:11
153:22
154:6

Hickory
  11:13

high  71:24
  72:9 73:9
  76:19,23
  79:1,3
  88:23
  121:9
  128:6
  131:6
  133:19
  139:4
  141:21
  151:10
  153:14
  159:12

higher  22:20
  87:9,19
  126:1
  128:25

highlighted
  77:2,22
  78:23
  79:21

Hillary
  94:22

hired  24:19,
  22 43:1,2,
  13,22

hires  97:8

hiring  26:9

history
  26:14

hit  98:23
  139:22

hitting  88:7

Hogan  14:11
  17:23
  34:20 35:6
  48:20
  66:8,22,25
  67:12
  68:10
  69:12 90:3
  91:3
  93:13,17,
  22 94:21
  152:1

Hogan's  68:1

hold  12:20
  90:13
  127:15

holds  53:13

Holly  5:16
  15:4 72:6
  73:11
  118:22

home  19:20,
  24,25
  88:23

honest  12:22
  20:24 44:1
  91:2

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 184 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022        Index: Honey..individuals

120:18
134:8
148:6
150:9
155:23

Honey  97:14

hope  152:7

hoping  57:11

hour  141:20

house  108:6
109:3
110:3,13

housed  60:2
64:21

Howell
156:25
157:7

HR  51:20,23
52:12
55:19
102:1,5
158:25
159:2

hug  51:4,5
103:15,25
104:8,15
105:3,11,
15

hugs  105:10

human  40:20
51:13 52:1
98:13
148:11,19
155:2

159:6,9

hundred
39:18

hurdles
142:1

husband
110:1

hygiene
57:21

_____

**I**

ice  30:13

idea  24:12
33:2,4
35:12
68:15
78:2,15
80:19
82:7,12
83:8 84:13
99:4,5
102:6
114:4
115:10
116:19
122:23
151:1

ideas  34:11,
12 35:10
102:25

identification
8:18 31:23
40:1 47:23
53:1 55:7
70:11 71:8

77:4 78:18
81:2,15
86:1 89:5
95:12,14
99:22
101:10
119:14
121:5
125:9
145:11

identified
99:7

identify
40:15

II  90:5,7
95:1

impact  41:23
42:6 80:12
147:8

impacted
50:22

implementation
70:3

important
117:13

In-laws
15:17

inaccurate
96:5

inappropriate
110:20
111:9
115:12

inbox  122:6

incident
50:9
110:21
111:6

include
35:12

including
115:2
148:15

inconsistencie
s  100:4

inconsistency
95:24,25
115:10
144:13,15

inconsistent
95:19

increase
95:22
98:15,18
99:12,14
150:22

increases
98:3

independent
52:3

indiscernible
126:10
148:22

individual
34:1

individuals
34:4,6
38:23

influence
  15:3,11

information
  33:10 49:5
  114:7
  150:2,8,25

initial
  154:5

input  49:20

inside  23:14
  39:9 43:24
  149:16,18

Institute
  49:14

institution
  23:23
  24:23
  29:9,11
  64:9,11
  85:22
  94:12
  100:25
  122:21
  126:1,2
  129:12,23
  130:8
  131:6,7
  132:23
  134:15,21
  135:5,17,
  25 139:3,
  6,7 142:25
  143:21

institutional
  27:7 68:25

institutions
  9:17
  23:14,24
  39:16
  57:25
  79:23
  81:23,25
  82:1 88:19
  129:7,25
  130:6,12
  134:13,18
  138:25
  143:22,23
  146:10

intended
  136:17

interact
  115:24

interacting
  109:23

interacts
  50:20

interested
  110:24

interrupted
  143:15

interview
  54:10,11,
  14,19

interviewed
  25:24
  41:6,7
  52:1
  101:21

investigate

  50:1 51:15

investigated
  51:12
  117:5

investigation
  9:16 53:17
  54:23
  55:19
  105:22
  106:5,6,14
  116:10
  118:1
  119:6

investigations
  9:18

investigator
  53:5,18
  54:8
  110:22

investigators
  106:20
  107:9

invoke
  132:19

involuntary
  38:11

involved
  17:25 18:3
  19:3 45:15
  90:23
  127:6,9
  148:3

isolated
  110:21
  111:5

issue  63:22
  137:9,11

issues  40:8
  63:23,24
  64:7 139:6

Italy  110:2,
  3

IX  50:5
  51:23
  52:21
  53:5,17
  54:13
  55:18
  103:15

———————————

J

———————————

Jamie  5:17,
  18 28:16,
  17 29:13
  31:8 32:10
  34:19,23
  35:13,15,
  18,20 37:5
  38:1,4,15,
  18,19 39:2
  40:21
  42:17 44:9
  45:22
  46:15
  48:19
  49:1,10
  50:4,20
  51:3 70:19
  71:13
  90:24 91:4
  100:1

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 186 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022          Index: Jamie's..lead

103:6,18
104:12
105:3
111:22
120:22
121:1,9
136:7
141:22
145:14
148:17
150:21
151:7,18,
22 153:12
155:14
156:19
158:10,23
159:13
160:6,11,
20

**Jamie's**
28:25 32:4
33:25 34:7
37:18
129:18
133:21

**Jane** 85:5

**Janice** 53:6
54:22

**January**
98:16,19
105:1

**Jean** 17:25

**Jeanine**
41:7,25
47:16
52:13

53:24
101:19
149:19
154:25

**Jeanine's**
40:19

**job** 27:18
37:2,21
40:5,8
49:11,17
52:19 97:4
112:24
113:4,5,6
117:7

**jobs** 92:19
96:16,22
111:14

**John** 20:13
49:1 85:8

**joint** 57:21
139:16,20

**Jones** 68:23
106:12
108:5,23
110:6,7

**Joyce** 106:12

**July** 100:1

**justice**
22:18

**Justin**
154:25

───────────
**K**
───────────

**Karen** 141:20

**keeping**
48:13

**Keller** 45:22

**key** 86:19
129:14

**kid** 56:19

**kids** 6:13
19:21
56:17

**kind** 7:15
19:12
26:19 27:1
45:18 67:9
101:15
104:3

**kinds** 51:2
109:22

**Kirkland**
106:1
110:18
114:5
115:3

**Kirkland's**
114:16

**kiss** 110:4,
11,15

**knew** 14:13
50:21 72:7

**knowing** 99:5
124:17

**knowledge**
47:12
146:16

───────────
**L**
───────────

**labeled**
91:18

**lady** 31:6

**Lagrange**
138:3

**laissez-fair**
115:15

**laissez-faire**
28:10,12
67:13
74:13 78:9
160:12

**language**
113:18,20
115:11,15
148:16,25
149:1,5

**laughing**
29:25

**law** 11:20
20:20

**lawful** 5:12

**lawsuit** 12:8
153:20,23
154:5,15,
18,20
155:4,21

**lawyer** 107:5
132:8,23
157:13

**lead** 47:12

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 187 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022            Index: leadership..lot

leadership
 22:22
 67:23
 68:19,20
 69:8 80:7
 116:3

leading
 49:12

leagues
 18:16

learned
 114:24

learning
 64:3,9

leave 10:23

leaving 44:9
 150:4

led 126:25

left 8:4
 42:18,19
 51:6
 90:11,17,
 21 100:8
 115:7
 148:5
 150:5,6
 157:24

length 37:1

lengths
 37:21

Leslie 108:5
 109:2
 110:13

letter 55:10
 99:25
 101:18,24
 105:19
 106:3
 128:18
 149:19
 152:2

letters
 11:10

level 23:16
 45:8,19
 48:22
 59:16
 72:19,21
 87:19,24
 149:20

levels 87:8,
 12,15
 88:18 89:2

Levin 88:3,
 10

liberally
 146:9

license 11:3

lie 119:7

life 73:17

lifeblood
 126:1

limited
 73:15

Linda 20:12

Lindsey
 108:4,10,

12 109:7,
 15

line-by-line
 136:14,16
 156:21
 157:9

lines 124:18
 149:24

Lisa 17:24
 38:18
 103:12

list 15:23
 20:9 34:16
 65:22
 71:18,22
 72:13
 81:18
 82:19
 107:22
 159:14,22

listed 7:11
 71:13
 93:16
 148:12

listening
 116:3

live 16:2

lives 16:5

living 16:17
 22:2,6

local 17:16
 18:18
 39:24
 41:21

42:4,12
 43:10
 109:4
 151:18

location
 152:17
 157:4

Loins 19:17

long 12:5
 17:24
 24:17
 86:12,14,
 18 87:1
 92:8
 129:13

longer 38:6
 44:18
 94:22

looked 35:20
 36:1 46:24
 90:1
 130:19
 146:14
 152:11

lost 22:5
 68:9 76:16

lot 33:8
 36:7,12,16
 37:11
 49:18,20
 50:21
 67:19
 72:16
 73:14
 107:19
 112:23

114:24
116:2
153:7

**lots** 73:23,
25 74:1

**loud** 37:4

**louder** 95:4

**low** 113:11

**lower** 45:19

**lunch** 81:19

**Lynne** 53:6
54:22

---

**M**

---

**Macon** 121:23

**made** 26:4
32:21
46:25
51:17,20
114:20
126:3
128:4
158:13,16

**Maestas**
5:15,16
6:4,8,12,
15 7:4,21,
24 8:1,11,
14,15,20
9:1 10:1,4
13:9,16,
20,23
18:11
19:1,11

23:8 30:21
32:1 33:20
39:9,13
40:3,13
42:23 45:6
48:1,7,11,
13,15 53:3
55:9 58:7,
23 59:4
66:12,16
70:13
71:10 77:6
78:20
79:13,14
81:4,17
82:11,23
83:4,6,18
86:3 87:16
88:11
89:7,14,16
91:25
92:6,8,11,
23 93:1,4,
7 94:9
95:9,16
96:12
99:24
100:13,22
101:12
105:14,17
111:7
112:10
119:16
121:7
122:24
123:9,12,
13 125:11
126:16,22

127:15,17,
20 131:2,
17,22
132:1,5,
10,18,22
133:2,8,12
135:14,20
143:16
144:9,12,
18,21
145:4,13
149:1,3,
10,12
156:13,15
157:3,6
160:15,16,
24

**Maggie** 47:8

**main** 56:4,
21

**maintain**
148:13

**major** 79:25

**make** 7:15
15:7 32:12
36:2 48:18
68:11,12
75:16
100:15
111:2
113:22
118:19
130:13,20
155:16
156:10
160:23

**makes** 46:20
70:5
128:19

**making** 49:2
119:3
140:5
160:1,3

**male** 101:2

**manage** 67:7
68:15
80:5,12

**manager**
44:17 90:3
94:20

**manner**
113:15

**March** 98:21,
22 99:6
106:4
145:15
156:17

**mark** 47:21
89:21

**marked** 8:17,
18 31:23
40:1 47:23
48:10,11
53:1 55:7
70:11 71:8
77:4 78:18
81:2,15
86:1 89:5
92:9
95:12,14
99:22

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 189 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022        Index: marketing..minutes

101:10
119:14
121:5
125:9
145:11
149:15

marketing
27:6 97:21

Marriage
15:19,20

Marsha  97:15

Martin
33:12,13,
24 34:24
47:16

Mary  20:13

mask  6:23
11:9

massage
113:23

master's
22:18

math  23:20
72:17
142:3,18

matter  5:17
82:2
97:17,25

meaning  12:9
80:14
125:1
153:13

means  38:6
75:21

78:3,15
80:19

meant  136:8

medications
14:15

meet  17:18
27:14,15
33:25 34:6
35:7 52:12
62:17
68:20 80:7
103:7
106:19
127:1
134:1,14,
19,23
138:12
142:3

meeting
32:22
33:3,22
41:2 46:25
53:12,23
69:5,17,23
102:1,9,12
103:2
114:21
116:5
156:18,23

meetings
14:3 32:25
41:13
51:23,25
67:7,20,
22,24
68:10,19

69:11 80:8

Megan  43:2,
3,13 45:9
46:12
66:6,7
67:2
70:22,23

Melinda
20:14

member  19:16
108:25

memorandum
148:10

memory  14:16
15:1

mentioned
55:11
91:20
154:17,19

mentor
102:15

mentors
116:3

Merritt
20:19,20

message
146:19

met  14:5
103:11
107:1
140:21

method  23:13

Michael

106:1
114:5,14,
16

Michelle
97:19

micromanaging
28:11

middle  5:22
16:18 21:2
25:16
95:19

midway  55:11

military
24:3 110:1
138:3

Miller  20:12
47:15

million
29:4,8,10,
15 32:16
96:3

mind  15:9
30:4,15
38:8,10
77:1
117:20
149:6

mine  23:7,
12 30:11
86:6
102:15

minor  20:16

minutes
156:9

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 190 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022    Index: misconception..occasion

**misconception**
82:6,17
83:2

**misconceptions**
81:20
84:11

**missing**
117:2

**mission**
86:19,24
129:15
137:23
138:1

**Mitchell**
53:12,14
55:13
100:7,18
119:5
124:8,9,15
127:22,24
136:9
145:18
146:14
148:2,18
150:3
156:18
158:14

**Mitchell's**
152:4

**mixed**  23:12

**Mm-hmm**  27:4
49:16
50:18
63:21
67:21
80:10 83:6

113:1
138:24
149:8
154:13

**modeling**
72:17

**moment**  30:24
78:9
117:13

**month**  67:23,
24 69:14

**monthly**  80:7

**months**  13:17

**move**  89:22
131:10
133:3,25
136:22

**moved**  100:5
120:23

**Mrs./dr.**
127:8

**muh**  8:4

**multiple**
146:10

N

**named**  5:11
154:15,17,
18

**names**  11:2
20:18,25
65:20
84:21

90:16
147:21
152:24

**needed**  64:4
134:1,14,
19 136:21

**negate**  151:9

**negative**
53:9 151:9
155:13,15

**neighboring**
146:8

**Nevermind**
104:25

**news**  114:13

**night**  109:5
124:24
125:5,6

**non-party**
6:1 12:10

**North**  16:3,4

**note**  92:1

**notebook**
40:11
55:5,6

**noted**  147:23
148:1,6

**notes**  53:5
54:14
91:19
107:13
117:7

**notice**  5:11,

25 6:16,18
7:8,9,11,
16 12:24

**notification**
33:21

**notified**  9:4
33:12
51:20

**notorious**
113:17

**number**  72:14

**numbers**
67:16
159:14

**numerical**
150:18

**nursing**
108:25
135:1

O

**O-A**  18:10

**oath**  5:13

**objecting**
157:23

**objection**
48:4
131:20
133:5

**Objections**
10:11

**occasion**
21:19

105:1

occur  69:20

ocean  26:18

October
  105:24

offended
  146:21

offensive
  146:20

offer  24:12
  91:3
  128:23

offered
  25:24

offering
  24:8
  128:20
  139:3

offers
  128:24

office  22:10
  27:6,9
  40:20
  43:24
  50:23
  61:10
  69:2,21
  70:16
  103:6,8
  104:24
  105:8
  119:20
  120:4,6,
  13,16,23

136:11
152:3,4

officer  29:5
  33:14,17

officials
  18:7 151:8

one's  16:23

one-on-one
  67:24
  103:7

online  52:6
  59:15 64:9
  96:20,24
  97:5,9,12
  98:5
  118:21
  154:5

open  6:10
  9:4 26:5
  86:23 87:6
  90:2,24
  103:12
  104:16
  105:20
  122:25
  123:7

open-access
  86:20
  129:15,21
  130:6

opened  87:23

operating
  36:1 61:25

opinion

56:23 70:7
144:17

opportunity
  95:18
  144:10
  157:21
  158:12

opposed
  144:23

opposite
  102:10

option  10:23

options
  73:14,15,
  16,21 74:1

order  41:10
  91:4 131:9
  133:24

Oregon  73:18

organization
  19:3 44:24

organizations
  18:15 19:2

orientation
  119:24
  120:3,17

original
  13:21,24

outing
  119:10

overheard
  155:14

overlap

65:23,25

overload
  98:2

overriding
  48:25

oversaw
  25:15,18

oversee  27:3
  44:18

overseen
  39:15

oversees
  69:1
  97:13,14
  98:5

overview
  26:20

owe  62:9,12

—————

P

—————

p.m.  5:1
  30:19
  66:15
  89:13
  125:15,24
  137:16
  149:9
  156:12
  161:10

pace  77:22
  129:4

pack  30:13

pages  89:24

92:8
105:23,25

paid   17:14
56:18
97:25 98:1

Paine   138:3

pandemic
98:23 99:5
139:22,23,
25

paper   47:10

paragraph
53:7,8,11
78:24
87:5,23
113:16
131:4
137:22
138:10
147:6

paraphrase
157:22
158:2

parent   85:4

parenting
74:13

parents
82:3,18
85:13
137:7

part   26:14
29:15
35:20
44:15

50:12 77:9
88:15,16,
20 96:6
97:3,15,
16,19,20
100:18,19,
20 118:14
126:13
135:4,15,
16 142:19
148:5

part-time
92:22
93:11

parte   123:4

participate
14:17

participating
135:4,16

parties
109:22

partner
58:10
138:21,22
139:4
140:11,15

partnering
138:14

partners
58:3 126:5
137:25
138:8,9
139:19

partnership
138:16

139:21
140:5
141:15

partnerships
151:10

party   12:8,
10,11,12
109:21
154:18,19

past   92:24
117:14
156:5

pathway   87:7

pattern
110:20
111:5,9

Pause   90:14

pay   9:25

Paying   97:20

pending   5:21
155:4

people
15:18,22
17:17
18:17
21:25
39:21
47:2,9
48:2,16
54:8 66:5
70:18
71:1,12,
18,22
80:8,24

90:20
97:1,7
103:13
112:1,8,
12,14,21,
23 113:14
118:13
119:19
120:22
128:11,13
129:24
153:25
154:2,10,
15,16,20
156:4

people's
109:12

Peoplesoft
91:16

perceive
15:9
109:14
118:14

perceives
115:23

percent
29:1,7,17
32:14,17
34:11
35:9,11
95:22
150:21,22

perception
115:20,25
118:18
123:21

perceptions
  109:13

perfect
  80:16,25
  129:22

perfectly
  50:2

performance
  37:1,2,19,
  20,21,22
  38:12
  40:5,6,8
  52:20 76:3
  113:12
  147:24
  148:1,4,13
  151:4
  158:20

performance-
wise  49:18

performing
  36:19
  39:4,11

periodically
  30:1

permanent
  148:10

permission
  103:25
  104:6

Perry  121:23

person  36:5
  39:22,23
  42:17,24
  43:22

44:24
45:19,20
46:15 67:2
90:16
113:13
130:16
146:8
153:2

personal
  37:3,22
  102:3
  109:11,15,
  16 110:9

Personally
  128:10

personnel
  113:13
  148:11
  159:1

phenomenon
  83:21,22
  84:2

phone  6:5
  33:22
  55:24
  122:10,16
  128:4
  159:14,25
  160:1,3

phrase  77:2
  104:7

phrased
  113:11

physical
  113:22

piece  27:8
  47:9
  97:12,15

pile  48:13

pink  101:13

place  98:20
  121:21

plaintiff
  5:17,18

Plaintiff's
  8:17,18
  10:5
  31:19,23
  36:14,23
  37:15
  38:25 40:1
  47:22,23
  52:25
  53:1,4
  55:7
  70:10,11
  71:6,8
  77:4 78:18
  81:1,2,14,
  15 85:25
  86:1,8
  89:5,17
  92:13
  95:12,14,
  21 98:12
  99:20,22
  101:10,24
  119:14,17
  121:5,8
  125:2,9
  130:17,18,

25 131:14
137:16
145:9,11,
15 149:13,
16,18
156:16
160:17

plan  27:16
  97:21

planning
  79:25

platform
  52:11

play  18:19

point  49:13
  73:14
  81:18,21
  92:20 94:1
  130:5

pointed
  37:19

pointing
  159:8

points  81:19
  105:24
  158:3

policies
  87:6

policy
  46:20,23
  101:1,3
  102:3,13,
  14,16
  103:2

116:4

political
  19:8

poor   40:7

portion
  79:21
  100:9

position
  16:25
  25:22,25
  26:5 41:22
  42:5,9,12,
  18 43:11
  44:10,17
  45:4,5,8,
  15 49:21
  80:1
  90:12,22
  95:6 100:5
  123:2

positions
  17:5 35:21
  45:11 46:4
  90:2,8,9,
  10,11,20,
  25 91:5,19
  93:24

possibilities
  82:19,21

possibility
  135:25

possibly
  13:18
  72:20

post   115:7

Post-it
  91:18 92:1

post-secondary
  56:5
  139:13

posted   90:2,
  9 93:16
  94:20

posting   92:2

postings
  92:18 93:9
  94:20

potential
  137:9

practice
  102:9,23
  103:16
  155:25
  156:1

prayer   19:4

preparation
  14:9

prepare
  12:15 14:4
  77:23
  79:22
  129:5
  130:11

prepared
  7:23 79:1
  81:25 87:2
  89:3
  133:22

preparedness

87:8,25
88:17 89:2

president
  25:23
  55:13,15
  98:9,10
  115:4,5
  122:11

presidents
  159:14,24

pretty   26:4
  114:20
  148:25
  149:1,4
  151:17

prevent
  15:12 31:5

previous
  137:2

previously
  70:21
  101:25
  129:10

primarily
  39:22

primary
  56:13

print   77:16
  89:9

printed
  70:16
  77:18
  94:16

prior   25:9

26:13
39:16 92:2
111:15,22
118:10
139:25
150:4

private
  138:4

problem   12:7
  38:14

problems
  102:16

Proceedings
  5:1

process
  13:5,14
  26:8,9
  39:24
  44:17
  49:19,20
  56:25
  92:21
  141:5,13

processes
  25:19
  44:18

produce   6:18
  7:8,11
  12:25
  13:15

produced
  13:6,8,14
  94:17

professional
  109:8

115:15

**proffered**
155:7

**program**
57:21
58:1,10,17
60:23
76:20
84:20,25
120:1
135:4,16
140:6

**programs**
119:24
120:18
130:8

**progress**
75:20

**progressive**
148:14

**properly**
84:18,24

**proposals**
32:12

**protected**
55:13

**provide**  7:16
10:8 12:18
56:5 77:23
87:7
157:12
158:25

**provided**
12:16

13:3,4
53:19
94:12

**providing**
44:25

**psychology**
72:20

**public**  22:19
27:6

**publication**
78:21
130:10

**publications**
24:14

**pull**  92:10

**pulled**  31:20
78:21

**purpose**  8:5
159:21

**pursuant**
5:24

**pursue**  78:25
133:18

**put**  54:7
78:2,5,12
91:25
130:16
146:5

**putting**
105:14
126:8

———————

**Q**

———————

**quality**
128:20,21,
24 130:8

**quantity**
102:25

**question**
10:12
14:21 15:8
19:14
22:11
26:17,18
27:22 30:4
31:8 37:9,
12,25
54:20,21
56:3 61:3
63:13,14
64:22,25
65:7 71:5,
17,21
73:20
76:17
79:18
80:11,17
83:5
125:18
127:9,11
130:15
131:16
132:13,16,
25 133:6
139:1
144:5,19,
22 151:5,
17 153:7

158:20

**questions**
14:24 15:9
31:20
66:18
68:17
107:19,23
155:9
161:2

**Quinn**  20:13

**Quinn's**
20:17

**quote**  88:9

———————

**R**

———————

**R-I-F-E-D**
37:6

**raise**  5:3
83:13 88:5
95:19
96:4,7,8,
10,14
99:2,3
100:3

**raised**  54:18

**raises**  97:23

**rating**  150:1

**re-**  112:6

**reached**
122:19
154:5

**read**  10:19
37:4 44:21

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 196 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022            Index: reading..referee

59:16,20
89:18 95:8
100:24
115:13
136:3
142:15,16,
21 161:7

**reading**
10:21
77:8,10,13
78:14
89:10
128:18
135:12
142:4
146:2,4
161:5

**ready** 5:2
145:7

**reality**
115:20

**reason** 54:17
64:12
75:13
96:11
139:9

**reassigned**
41:21 42:4

**Rebecca** 68:3
69:1
93:15,18

**recall** 33:23
34:3 40:18
41:1,2
48:24
49:3,5

50:4,7,14
51:10
52:15
53:21
54:3,15
55:20
72:15
122:7
130:18
141:22,24
145:23
151:25
152:1,6,8,
9,19
155:19,20
157:14,18

**receive** 6:16
7:6 9:2
96:8

**received**
8:21
122:10

**recently**
147:8

**recess** 30:19
66:15
89:13
149:9
156:12

**recitation**
133:14

**recognize**
40:17 77:7
86:4,8
91:11
93:24

121:11

**recollection**
32:3 53:15
55:17
81:10
147:20
158:1

**recommendation**
116:9

**record** 10:5,
7,25 66:17
89:14
117:6
149:10
156:13
161:4

**recorded**
107:11

**recorder**
157:11

**records** 8:6
9:15
105:20,22
117:12,14
122:25
123:7

**recruit**
62:10

**recruiter**
39:25
44:16
90:4,5,6,7
91:22,23
95:1
108:13

**recruiters**
41:21
42:5,13
43:10
44:15

**recruiting**
39:19
97:20
121:20

**redepose**
64:16

**redirect**
160:25

**redo** 15:6
48:8

**reduce** 35:11

**reduced**
29:13

**reduction**
28:23,25
29:2
31:15,19
33:7 35:10
37:6 38:5
45:2 95:20
96:1 98:20
99:25
100:11,20

**reductions**
34:11 47:1

**refer** 61:11
64:11
80:13,15

**referee**

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 197 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022        Index: referenced..rephrase

17:12,20
18:1,12

**referenced**
53:17

**referred**
150:13

**referring**
59:12
112:7
137:1

**refresh**  32:2
53:15
55:17

**regard**  151:9

**Regents**  5:18
22:3,7
46:20 56:6
106:11,24
116:11
117:5
149:20

**Regina**
108:5,23
110:6,7

**region**  58:4,
6

**regional**
56:7
138:11

**regions**  56:7

**registrar**
68:23

**registrar's**
27:9

**regular**
19:19
44:16

**regularly**
17:18
21:16
27:14

**regulations**
76:18,23

**rehired**
42:19,20,
25 45:5

**rehiring**
90:21

**Reinhard**
20:12

**related**
15:18
49:10

**relating**
8:10

**relations**
27:6
151:18

**relationship**
109:6,10,
15 110:7

**relationships**
147:8,18
151:8

**relatives**
15:16

**release**
154:4

**relevant**
38:25
44:20

**remain**  45:2

**remainder**
100:11

**remember**
11:22
12:5,22
20:25
32:24
35:14,17
44:1,7
45:12
48:21 49:4
51:17
52:11
54:24
55:1,20,24
56:1 67:13
81:9 82:21
85:17,19
86:7 91:1,
8 101:21
103:21,22,
23,24
104:3,4,5,
7,18,19,
21,22
105:5,7,
12,16
106:6
107:11,15,
17,23
108:21
111:4,19
112:2,3,5,

18 113:21
114:3
118:15
119:8,11
123:23,25
124:4,16
128:1,14
136:12,13,
18 137:21
145:24
146:1,2,3,
25 148:6
150:5,9,
11,15
152:12,14,
16 153:18
154:7
155:23
156:5
157:8,19,
22 158:4,
21,23
159:2,19
160:1,3

**remotely**
22:2

**rented**  110:2

**repair**
147:17

**repaired**
147:9

**repeat**  95:4

**repercussions**
151:9

**rephrase**
27:24

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 198 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022                    Index: replace..retreat

37:14

**replace**
100:7,8

**replaced**
46:9

**replies**
141:21

**reply** 160:6,
20

**report** 49:6,
8 98:5,8,
9,10
116:9,14

**reported**
10:18

**reporter** 5:2
6:22 7:1
10:22 18:9
23:4
33:15,18
42:20 58:5
83:12,15
87:13 88:4
92:25 93:2
94:3 95:3
100:14
126:11,14
143:11
148:23
161:3

**reports**
28:3,6
34:15,17
65:12
67:15,25

68:2,22
69:6,9
91:14
97:16

**represent**
5:16 123:3

**reprimand**
53:10,16
54:2
106:4,15,
17 114:19
116:8,13
145:9,15
150:14
152:2,17
156:17
158:11,16,
24 160:15

**reprimands**
158:17

**Republicans**
19:7

**request**
13:2,4,21,
25 105:20
122:25
123:7

**requested**
10:9 12:22

**requesting**
105:22
107:24

**require**
76:19,21,
23 141:15

**required**
9:20 26:13

**requirement**
134:24
142:3,7,18
145:7

**requirements**
62:17
134:2,14,
20

**requires**
144:25

**research**
27:7 69:1
116:2

**reserved**
10:13

**resignation**
43:23

**resigned**
43:10,25
44:9 45:4
46:2

**resolve**
115:9
144:10

**resolves**
100:4

**resonate**
83:24

**resonates**
84:6

**resources**
40:20

51:13 52:1
148:11,19
155:2
159:7,9

**resources'**
98:13

**respect** 36:3

**respond**
107:18
157:10

**response**
40:19,20
53:9
124:16
125:17

**responses**
10:17

**responsibiliti
es** 42:22
44:11
100:10

**responsible**
39:22
97:19

**responsiveness**
10:12

**rest** 47:9
68:3
100:19

**result**
146:19
148:14

**resume** 25:23

**retreat**

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 199 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022                Index: review..school

155:14,21

review 78:10
145:22

reviewed
52:2

Richard
17:24
20:14
24:18
47:16
147:5

RIF 31:13,
14,15,16,
22 32:4,
11,23
33:25 34:7
37:18
38:15,17
45:15 46:5
48:17
49:12,13,
22 90:24
98:17

RIFED 37:5
45:21
46:15

RIFS 32:18

righty
145:21

rigor 77:22
79:10
81:22
87:18
129:4
130:1,3,7,

8 131:8
133:24

rigorous
78:25
133:19

ringing 80:4
93:8
159:17

Rob 17:24
34:21 35:7
65:10,12
68:22
98:13,16

robot 157:11

Rodney 5:10
6:17 11:1,
3 17:23
47:15
95:23

role 79:20

room 11:25
52:2,14
107:2,8

Rotary 19:9,
16

round 81:19

rubber 48:3,
17

rule 132:19

rumors
147:11

run 28:2
63:13

65:21 80:6
113:23

running
107:21
114:1

Ryan 17:23
34:20 35:6
48:20 66:8
67:9,12
68:1,12,23
90:3 91:3
93:13,17,
21 94:21
104:22
105:2,8
152:1,10

_____

S

_____

S-G-F 18:9

s-g-f-o-a
18:7

salary 49:15
95:22
98:15,18
99:12,14
100:6,8,9,
11,17,19

SAP 75:18
76:1,5

Sarah 46:1,
10 48:19
81:6

sat 53:24
76:14
88:23

129:22
142:8

satisfactory
75:19 76:3
148:13

say-so 78:4,
6

scenario
63:9 64:6

scenarios
63:4

schedule
70:3 75:11
127:14,17

schedules
70:2

scheduling
70:2
140:14

school 21:2
63:8 64:4
71:25
72:10 73:9
76:19,23
79:1,3
121:9
128:6
131:6
132:7
133:19
139:4
141:21
151:10
153:14
159:12

schools  64:1
  132:9

science
  22:17

scope  35:25

score  129:22

scores  88:23

scratch
  152:22

search  93:3

seconds  7:7

section
  81:21
  91:17,18
  92:24
  151:20

seek  70:6

selective
  79:23

senate  115:6

send  40:25
  56:17,19
  63:16,20
  124:25
  125:2,23
  137:17
  141:8,10

sending
  125:14

sends  34:24
  63:24,25

sense  37:7

sentence
  41:20
  78:24
  86:17
  102:8
  131:4
  134:11
  135:12
  137:2
  141:25
  142:5,20
  143:5

separate
  44:17
  54:11

separately
  102:9

separation
  38:11

September
  24:20,22
  53:6

sequence
  125:19

sequestration
  132:19

serve  56:7,
  13 57:1,3
  137:25

served  8:16
  84:19,25

service  9:20
  37:1,21
  56:6 58:4,
  6 69:2

services
  27:7

serving
  56:19

set  69:18
  129:6
  147:18

sets  69:24

sexually
  113:18,19,
  20 115:12

shaking
  22:25

shape  30:10

shared  146:9

Shauna  69:3
  97:13
  102:11
  103:17

sheet  36:24
  91:20
  94:19

Sherry  58:15

shining  6:5

shop  73:19

short  66:17
  89:15
  149:11
  156:14

shortly  44:9

shows  96:11

shred  117:19

shutting
  103:22

side  158:12

sign  10:20
  161:7

signed  46:16
  47:3,7
  48:2,17
  98:16

significant
  147:7

signing
  46:14

similar
  27:13
  44:12 57:2

similarities
  134:4

simultaneous
  125:8
  143:10
  144:8
  145:3
  157:5
  161:6

sir  39:13
  98:15

sit  30:9
  102:12
  103:11
  140:2

sitting  9:6
  30:13 31:2
  50:25

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 201 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022        Index: situation..stating

76:12
114:21
158:14

situation
134:22

situations
84:18
85:10
88:24

slight  100:6

small  89:9

Smith  47:15
49:1 58:14
85:5,8

social  19:3,
5

socialize
21:15

socially
19:18 21:9

sociology
72:21

software
70:4

sole  32:20
67:2

solemnly  5:4

someone's
118:18

son  16:17

sound  128:19

sounds

154:19

source  42:1
131:23,24

south  16:17
18:6
138:11

space  120:8

speak  79:12
95:4
109:12

speaking
48:25

speaks  82:15

specialization
s  23:3

specific
60:19
84:17,21
85:10
155:11

specifically
37:18 38:1

speculation
48:5 108:3
145:1

spoke  54:8
124:8
146:24

staff  14:8
65:16
70:17
115:1

Staff-wise

66:1

stamp  48:3,
18

stand  30:1,5
31:2,4
149:7

standard
148:25
149:1,4

standing
84:12
104:15
105:14

Stanley
68:23

start  27:4
41:16
50:16
56:24
58:11 59:2
62:18
63:18
96:20

started
31:14
111:16
120:20

starting
96:24 97:4
135:15

state  5:20
9:16 10:24
24:24
25:14,17
73:18

76:18,21,
22 82:1
96:21,25
121:16,19
134:11,17

state-wide
29:2

stated
101:23
102:8
127:22,24
129:11
151:16

statement
42:3 43:9,
14,16
44:13
61:22 62:7
77:25 84:8
86:22
87:3,10,20
88:1,2,12
110:24
111:8,10
136:25
147:11
155:19

statements
129:17
150:19

states  5:22
9:13 53:13

stating
143:1
158:23

status 67:16

stay 64:1

STEM 79:25

stenographically 10:16

step-by-step 125:16

stipend 98:1

stones 70:10

straight 18:4

strategies 148:13

strategy 148:12

strengthening 151:7

stretched 20:25

student 17:2 25:23 29:14 32:15 35:1,3,4, 5,23 50:19 61:7,25 62:15,16 63:3,5,16 71:25 72:10 73:13 74:4 75:17,24 85:9 96:23 115:4

119:19 139:2,12 140:13,17 141:1,2

student's 63:6 140:20

students 23:15 39:18 41:23 42:6 50:20 56:10,14 57:1,4,7, 13,16,18, 24 58:1, 18,23,24 59:2,9,21 60:4,14 61:4,17 62:10 76:19,24 78:23,25 79:22,25 82:17 83:2 84:18,23 85:18 86:18 87:1,7,17, 24 88:20, 21 97:21 102:10 129:13 131:5 133:18 134:12,18 135:1,6,

10,18,24 136:21 137:7 138:1,13, 17 142:2,8 151:18

study 23:13 49:15,24

studying 116:2

stuff 84:12 109:18 116:25 149:24

style 14:18

styles 116:3

subject 97:17,25 103:14 119:6

subpoena 8:16,21 9:2,8,13, 14,20 10:10

subpoenaed 117:12

substances 15:12

substantive 48:18

success 17:3 25:23 29:14

32:15 35:3,4,23 77:23 96:24 119:19 129:5

successful 23:13 79:2 82:1,4 131:9 133:22,25 136:1

successfully 136:23

such-and-such 72:4

sudden 63:7 152:9

sued 12:9

suggest 19:22 27:19

suicide 50:20

summarize 27:1 158:2,8

summary 26:20 89:24 91:20 92:5 94:19 158:22

summit 81:7

83:11,17

**supervise**
17:18
26:21
27:19 28:5
62:22
64:18,23,
24 65:1
66:24

**supervises**
65:17

**supervising**
27:11,25
67:11

**supervisor**
34:14
136:9
148:2

**supervisors**
34:9

**support** 27:5
44:25
65:16
70:7,8
147:10

**supposed**
85:5

**surviving**
139:23

**Sutliff**
70:23

**Sutliff-
hancock** 43:4

**swear** 5:4

**sweep** 26:18

**sworn** 5:13

**synonyms**
113:8

**system** 5:19
21:7 22:10
23:14 32:6
57:17
60:10,11,
13 62:10
63:25
94:16
138:14
146:11
159:24

---

**T**

---

**tab** 101:13

**table** 81:19

**taking** 23:15
27:18
123:2

**talk** 14:8,
11 28:9
32:10 54:1
67:7,8,9
69:16,23
70:1,2,3
79:9 95:18
99:8
109:17
112:21
113:20
116:12
117:17,24

118:2
123:4
125:21
127:1,2
128:9,11
136:7,10
145:7
153:23
154:24
155:11
156:17

**talked** 41:12
48:16
83:11,16,
19 112:14
128:13
129:10
146:12
153:11,19
154:21
155:1,2,4
156:4

**talking**
18:24
31:7,14
39:3 41:14
68:5 69:9
75:19 76:6
81:18
82:13
84:12 85:3
91:6
101:18
105:5,8
114:5
115:11
127:18

130:21
133:14,21
136:15
137:10
139:15,16
143:25
144:7
145:6
146:13
155:20,25
156:24
157:3
160:8,19

**Tanner** 68:24

**tape** 157:11

**tasks** 71:13

**taught** 73:4,
6,9

**Taylor** 68:3
69:1 93:15

**TCSG** 21:21
57:3,7
62:11
81:24
139:19,21
140:16
151:8,18
152:20
153:1
159:14,24

**TCSGS** 56:22

**teach** 21:1

**teacher**
21:12

teachers
 63:24,25

teaches
 20:24
 72:23
 127:3

teaching
 72:4

team  34:10
 67:23
 68:19,21
 69:8 138:5

Teams  52:6,9

Tech  74:20
 75:1,9
 79:24

technical
 21:6
 57:14,15,
 17 60:10,
 12 62:9
 63:25
 138:14
 146:9,10
 151:10

technically
 22:2

tecum  9:3

Tee  119:5,
 10 124:9,
 15,17,21
 125:21
 127:22
 145:18
 152:4

156:18
158:24
159:5,6,13

telling
 101:15
 132:12

tells  143:9

temporary
 36:20

ten  29:1,7,
 17 32:14,
 17 34:10
 35:9,11

tender  9:21

tendering
 10:4

term  150:22

terminate
 32:10
 38:18,19
 113:3

terminated
 28:16,17,
 21 31:8,9,
 13 38:4,5,
 6,9,15
 111:23

terminating
 34:18

termination
 38:10,11
 148:15

test  142:9

testified
 5:13 93:22
 96:2
 103:19
 115:10
 152:10

testify  7:23
 132:6
 144:16

testifying
 132:5,12

testimony
 5:5 112:13
 147:11

testing  69:2
 93:11,12,
 18

thing  8:22
 29:22
 50:13
 53:25
 69:23
 77:13
 89:23
 105:3
 132:4
 133:7,10
 144:4

things  12:4
 19:17
 36:10,12
 37:3,4
 51:2 70:19
 97:22
 109:23
 115:13

118:15
120:15

thinking
 39:1 53:23
 104:25

thought  68:9
 92:9
 127:18
 159:4

threaten
 111:13

throwing
 11:9

time  9:5,7
 10:13 12:6
 13:1 24:25
 30:9 33:8
 34:16
 63:10
 68:16 70:1
 73:20
 86:12,14
 90:23
 92:20
 94:1,16
 102:22
 103:1
 104:17
 117:25
 122:11,14
 124:23
 127:19
 153:3

times  20:3
 69:12 90:1
 101:24

103:9,10
132:14
152:8

**Tina**
122:10,19,
22 125:20
128:3,15
146:12,21
147:2
153:1

**tiny** 77:15

**title** 50:5
51:23
52:21
53:5,17
54:13
55:18 86:7
95:2
103:15

**today** 7:10,
13 8:2
9:6,19
10:21
12:15
14:9,12,14
17:22 51:4
92:25
93:1,21
101:21
104:11
112:13

**told** 51:1,
15 52:18
53:24,25
55:22
80:18

114:16
122:1,13
123:18
128:15
147:3
148:16
154:23

**ton** 113:8

**tonight**
64:14

**top** 73:3
85:1 94:14
108:3
116:8
154:7,8

**total** 29:7
32:14 49:8

**totally** 63:9

**tough** 51:1

**town** 126:5

**track** 26:24

**tracks** 151:3

**Tracyee**
47:16

**train** 68:9

**transcript**
10:20
93:21

**transfer**
57:23
58:1,18,
21,22,23,
25 59:1,2,

8 60:4,14,
17 61:4,5,
17,25
138:17

**transferable**
81:24

**transferring**
23:16
59:22
61:11 62:3

**transfers**
59:7 60:5

**Transition**
120:5

**Transitions**
119:21
120:7,13,
16,24

**transportation**
63:23
139:2,6

**travel** 64:8

**Traycee**
33:12,13,
24 34:24

**trial** 10:13
152:9
157:22

**trip** 6:9

**true** 42:7
43:12,14,
16 103:19
128:22,25
155:17

**trust** 115:1

**truth** 5:6,7

**TS** 81:24

**TSCG** 21:6

**TSG** 138:22

**turn** 85:24
129:2
140:24
151:8
158:18

**turnaround**
114:22
115:1,8
118:8

**turned** 44:10
114:25
159:6

**two-year**
23:23,24
85:22
86:17,20,
23,25
87:6,17,23
88:18
129:12,15,
24 130:6,7
132:7
142:14,22
143:2,21
144:24

**two-years**
143:24
144:1

**type** 36:20

62:1 109:9
110:6
131:7

**typical**
69:17,23

**typically**
23:23
63:25 70:6

---

**U**

---

**UGA** 74:19
75:1,5,9
79:24

**Uh-huh** 17:7
45:14,17
52:22 66:2
101:22

**ultimate**
139:12

**ultimately**
46:19

**Unbeknownst**
146:7

**unbelievable**
117:15

**under-** 93:19

**under-prepared**
88:19

**under-
preparedness**
87:25

**undergrad**
74:5

**underneath**
27:8 44:23
60:16,19

**underprepared**
86:19
87:18
129:14

**understand**
15:8 18:21
30:25
31:16 37:8
38:2 57:5
83:24
84:1,3
85:21
93:19
111:2
117:9,10,
22 129:8
142:5
143:3

**understanding**
61:24 65:5
70:25
79:16,19
83:20
90:18,19

**unfilled**
90:25

**United** 5:22
9:13

**universities**
134:12,17

**university**
5:19,20
17:6 22:10

23:14 29:3
32:6 56:8
60:9,13
96:21,25
138:11

**unlocked**
105:2

**unprepared**
89:2

**unprofessional**
115:14

**unsubstantiate
d** 51:16
55:23

**upset** 51:3
125:20
126:4
128:6,17
147:17
152:25
153:2
158:10

**USG** 21:25
31:19,21
59:16
79:23
81:6,24
100:25
110:22
130:10

**USG's** 78:22

---

**V**

---

**vacated**
90:12,22

**Valdosta**
5:20,23
11:14 21:2
22:3,6
96:21,25

**valid** 131:20

**Vallotton**
20:13

**vanilla** 61:3

**verb** 37:6,7

**verbatim**
107:20
133:13
147:22
157:9,15,
16,25
158:4

**versa** 59:23

**versus** 5:18
144:1

**vice** 25:22
59:22
115:4,5

**vice-president**
17:2 25:15
79:20
96:23

**viewed** 46:24

**vigor** 128:25
130:14
133:16
142:13

**Vince** 20:12
47:15

Vinson  49:14

violate
  103:15

vision
  137:24

visual  70:2

Viverette
  47:8

vocalize
  10:16

voice  83:13
  88:5

voiced
  113:14

void  10:10

VP  80:1
  115:7

VSU  17:1,17
  20:6 22:24
  25:10,21
  26:19,23
  28:19
  55:16
  56:4,19
  57:7,14,
  18,19
  59:22
  62:9,16
  63:16
  71:25
  72:10,25
  73:6,13,
  18,22
  74:4,24

75:14,18
76:20
77:17 85:3
94:23 98:5
100:25
112:15
120:2
123:14
129:3,6
137:24
138:12
139:8,10,
19 140:13,
22 141:16
143:4
154:11

VSU's  56:21
  57:3 77:19
  140:6

vulgar
  113:18,19
  115:11

─────────
    W
─────────

W-A-L-L
  20:21

Wait  86:5

waive  10:2,
  3,21

waiving  10:1

walk  125:16

walked  50:22
  104:14

Wall  20:19,

21,22

wanted  26:6
  74:19
  75:1,8
  126:7
  130:20
  140:3
  156:22
  160:23

wanting
  131:5

wearing  6:23

website
  70:15
  77:9,19
  78:22

week  31:6

weekly  80:7

Wenham  81:6

whatcha  8:4

who-all
  26:20
  154:9

Whoops  92:2

wife  16:5,
  16 20:23
  21:1
  127:3,23

wife's  15:25

Willis  94:22

wings  109:5

Wiregrass
  21:12,21

24:5,6
59:1,19,22
60:22
62:19
63:20,24
74:23
75:14
85:7,21
122:11
123:1
126:5
127:4,5
128:24
129:11,23
138:2
140:7,23,
25 141:1,
4,10,13
143:4

wisely  79:9

withdraw
  21:5 76:17

women  102:2
  108:8
  116:5

wondering
  40:22

Wong  38:18

words  96:14
  106:9

work  6:9
  17:18,19
  18:18
  19:18,24
  20:2 22:3
  24:20 25:9

Case 7:21-cv-00062-WLS    Document 33-6    Filed 05/02/22    Page 208 of 208

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Dr. Rodney Carr on 01/19/2022        Index: Work-related..Zoom

28:22 36:8
58:11,19
73:19
87:19
97:1,8
109:18,19,
21,24,25
126:9
142:2,11,
13,14

**Work-related**
110:8

**worked** 38:6
109:4

**working** 22:6
24:14
28:18
31:10

**Workload**
36:9

**works** 22:1,9
97:11

**wound** 132:7

**wrapped**
156:9

**write** 40:23
41:10
53:13 54:2

**writeup**
53:16

**writing**
89:19
102:1,5
118:16

126:25
142:4

**written** 39:1
53:9,16
101:5,19
106:15,17
116:7
158:10,16

**wrong** 71:5
98:24,25

**wrote** 41:3
121:9
126:20
149:22
150:7

——————

**Y**
——————

**y'all** 112:23

**year** 24:7
70:1 98:22
105:1
119:21,24
120:4,6,
13,16,18,
23 143:5

**years** 32:6

**yesterday**
14:5

**Young** 19:7

**younger**
108:14

——————
**Z**
——————

**Zoom** 22:1
52:6,8,9