IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION


CASE NO.:  7:21CV62 (WLS)


JAMIE T. BIRD,

          Plaintiff,

vs.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA
d/b/a VALDOSTA STATE UNIVERSITY,

          Defendant.
_____/


DEPOSITION OF

DR. MICHAEL KIRKLAND


Wednesday, March 16, 2022
10:34 a.m. - 12:28 p.m.



ABAC
2500 E. Shotwell Street
BAINBRIDGE, Georgia 39819


Stenographically reported by:
KAIRISA J. MAGEE, RPR, GCCR (Georgia), FLORIDA
NOTARY


Job No. :  387114

APPEARANCES:


On behalf of Plaintiff:

        LAWSON, BECK, & SANDLIN, LLC
        1125 Commerce Drive
        Suite 300
        Peachtree City, Georgia 30269
        (770) 486-8949
        BY:  HOLLY MAESTAS, ESQ.
        holly@lawsonandbeck.com


On behalf of Defendant:

        BROWN, READDICK, BUMGARTNER, CARTER,
        STRICKLAND & WATKINS
        5 Glynn Avenue
        Brunswick, GA 31520
        (912) 264-8544
        BY:  G. TODD CARTER, ESQ.
        tcarter@brbcsw.com


On behalf of Dr. Michael Kirkland:


        SHINGLER & McMILLAN, LLC
        226 Cherry Street
        Donalsonville, GA 39845
        (229) 524-1225
        BY:  DOUGLAS McMILLAN, ESQ.
        douglas@shinglermcmillan.com




ALSO PRESENT:  Ms. Jamie T. Bird, Plaintiff

                    I N D E X

Proceedings                                        Page

THE TESTIMONY OF DR. WILLIAM M. KIRKLAND:

Direct Examination By Ms. Maestas                    7

Certificate of Oath                                 87
Certificate of Reporter                             88
Errata Sheet                                        89

                  E X H I B I T S

No.                                                Page

Plaintiff's Marked Exhibits

46        8/4/2020, Jeanine Boddie-LaVan           23
          Letter to Office of Legal Affairs

47        11/16/2021, ABAC documents               23

48        10/28/2012, Kirkland complaint           23

Proceedings began at 10:34 a.m.:

MS. MAESTAS:  All right.  Good morning, everyone.  I'm Holly Maestas.  I represent Ms. Jamie Bird, and this is the matter of Jamie Bird versus Board of Regents of the University System of Georgia doing business as Valdosta State University.  It's pending in the United States District Court for the Middle District of Georgia, Valdosta Division under Case Number 721CV62.

And this is a deposition of Michael Kirkland -- Dr. Michael Kirkland.  It is being taken pursuant to notice and agreement of Counsel.  This is the deposition of a non-party, and the entity being sued is the defendant, Board of Regents, and the party being deposed is a current employee of the Defendant.

Objections except to the form of the question and responsiveness of the answer will be reserved until the time of trial or the time of hearing, and the deposition is being taken stenographically, so please vocalize all your answers and responses and avoid gestures, which can't be recorded when the deposition is

transcribed.

You have a right to read and sign a copy of your deposition, or you can waive that right today.  And you can decide that at the end.

So I see we have a number of people at the table ... we have obviously Mr. Carter, who represents the defendant in this matter, and I -- we have another gentleman at the table. And so -- just wanted to put that on the record.

MR. McMILLAN:  Douglas McMillan, Shingler & McMillan.

MS. MAESTAS:  And what -- what is your -- I'm sorry.

MR. McMILLAN:  I'm -- I'm private counsel for Dr. Kirkland.

MS. MAESTAS:  Oh, okay.  You're his individual counsel.

MR. McMILLAN:  Yes.

MS. MAESTAS:  Okay.  I did not realize he was going to have an attorney represent.  Okay. Has -- have you retained him to represent you for this deposition, or is he, like, your Counsel for many other things.

THE WITNESS:  I've used him for other

things as well.

MS. MAESTAS:  Okay. So he's, like, your private or family attorney, and then you asked him to be here because --

THE WITNESS:  Yes.

MS. MAESTAS:  Okay.

All right.  Great.  Nice to meet you.

MR. McMILLAN:  You as well.

MS. MAESTAS:  Say what?

MR. McMILLAN:  I said, "You as well."

MS. MAESTAS:  Oh, okay. Okay.

All right.  So we're going to go ahead and start with the questions.  If you can state your full name?

MR. CARTER:  You want him sworn?

MS. MAESTAS:  Oh, my bad. Thank you.

STENOGRAPHER:  When you're ready, will you raise your right hand, please?

Do you solemnly swear or affirm that the testimony you're about to give in this cause will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

Thereupon:

                    DR. WILLIAM M. KIRKLAND,

a witness named in the notice heretofore filed,

being of lawful age and having been first duly

sworn, testified under oath as follows:

                    DIRECT EXAMINATION

BY MS. MAESTAS:

        Q    And your name?

        A    William Michael Kirkland.

        Q    Okay.  And you're Dr. Kirkland as well?
Yes?

        A    Yes.

        Q    Okay.  So everything I'm -- I'm saying,
I'm hoping that you either answer "yes" or "no" or
offer some type of explanation.

             Okay.  So -- and your address?

        A    5919 3 Nights Road, Iron City, Georgia.

        Q    Okay.  And have you ever had your
deposition taken before?

        A    One time before.

        Q    Okay.  And what was the context of that?

        A    It was a -- a part time instructor who I
did not rehire, and he thought that I was
retaliating for another matter.  But what happened
was he was having an inappropriate relationship with

a student, and so I just didn't put him on the schedule for the next semester.

So part time instructors don't have rights to employment.  So he -- he finished the summer semester, and I just didn't rehire him for the fall.

Q    Okay.

A    He didn't cooperate with the complaint. Like, he didn't come to the hearings to try to resolve the matter.  So there was nothing really that I could do.  Anyway, that's what it was about.

Q    Like, a non-rehire?

A    Uh-huh (affirmative).

Q    Okay.  And what -- have you ever been a party to a lawsuit?

A    No.

Q    And what about in the context of USG? Have you ever participated in any legal actions this way?

A    That first deposition was related.

Q    Related to?

A    It was USG.

Q    Okay.  Okay.  Excellent.

And what did you do to prepare for today if anything?

A    Talked to Doug for probably 30 minutes.

Q    Okay.  Your counsel?

A    Uh-huh (affirmative).

Q    Okay.  And is that it?

A    Yeah.

Q    Okay.  All right.

And do you keep a file related to anything related to this lawsuit?  Did you review any material in preparation for this lawsuit?

A    I have read materials, but I don't know if it was in preparation for anything because I didn't know at the time I was going to be deposed.

Q    Okay.

A    So the -- a lot of the documents that have been filed have made their way around, so to speak. And so a lot of people have read them.

Q    Okay.  And what documents are those?

A    A lot of the legal documents that both law firms have filed.  A lot -- you know, there's a public access website where people download stuff. Basically the documents related to the lawsuit.

Q    So the pleadings that are found on Pacer?

A    Pacer, yeah.

Q    Okay.  That federal database where you can log in and sometimes you get some documents free, sometimes you have to pay --

A    Right.

Q    -- a couple cents a page or something like that?

A    Right.

Q    Okay.  And so, did you review Pacer, or did someone else provide you with those materials?

A    Both.

Q    Okay.  And what -- what materials did you review?

A    The documents that are on Pacer.

Q    So every single one of them?

A    Close to it, yeah.

Q    Okay.  So you -- you started looking at the docket and kind of clicked on certain things?  And did you --

A    Yes.

Q    Did you read the complaint?

A    Yes.

Q    Okay.  So you understand what this lawsuit is about?

A    Yes.

Q    Okay.  Did you happen to see the motion to compel that was filed seeking records related to the incidents that occurred at Bainbridge College?

A    Yes.

Q    You did?  Okay.

And -- and what is your recollection of what the motion to compel said?

A    Is that -- can I ask a question?  Is this the same thing as the -- the open records request?

MR. CARTER:  That's different.  That's different.

BY MS. MAESTAS:

Q    But it's the same -- it has to do with the same records.

A    My -- my recollection is that you -- or your party -- wanted some documents and you had not received it, and you filed something to get them.

Q    Okay, yeah.  All right.  Yeah.  That's it.

And in addition to the Pacer documents that you reviewed, how else are you receiving documents?

A    Different people will email them to each other, text them to each other, message them to each other.

Q    Okay.  And can you tell me who those people are?

A    I don't -- probably can't name all of them because this has generated some interest here.  And I -- I could say, generally, a lot of people, but

specifically, Melissa Harrell, Scott Dunn, Dave Nelson.

Q    Okay.  And are those employees of ABAC?

A    Two of them are.

Q    Okay.  And which ones?

A    Harrell and Nelson.

Q    They're employees of ABAC?  And who is Ms. Dunn?

A    Scott Dunn?  He's a former employee.

Q    And what were their positions?

A    Scott was the chief technology information officer, like the CIO, CTO.  Dave Nelson teaches history.  Melissa Harrell teaches criminal justice.

Q    Okay.  Any other specific individuals that you remember the names of that have been passing documents related to the case?

A    Not -- not really.  Now, I don't know who they passed the documents to.

Q    Right.  You just know what you know.

A    Right.

Q    Okay.  And what about, like, general rumors in town?

Anything like that related to the allegations made in this lawsuit?

A    I -- I don't think I understand what

you're asking me.

Q    So, like, if you don't -- if it's just generally been said but you don't have a name, there's -- we call it a rumor.

A    Uh-huh (affirmative).

Q    Anything like that that you could describe as a rumor?

A    People talk about it, but I don't know what they say, you know, I know that people are aware of it.

Q    So generally in Bainbridge, people are aware of this lawsuit?

A    Yeah.

Q    Okay.  And is there anything specific that people talk about, or is it just, Hey, you know, there's this lawsuit pending, and that's it?

Like, what's the discussion that comes of it?

A    I have not talked to a lot of people, like, widely about it.  I've talked to the people that I named.

Q    Okay.

A    What they say, I don't know.

Q    Okay.  And what about the people that you have talked to?  What's the -- the conversation?

A    We just talk about the two individuals, Richard Carvajal and Rodney Carr and, I mean, just generally the -- just talked about them, some stuff they did here and this, you know, situation.

Q    Okay.  And so I want to get into more of that.  And I wanted to -- couple of other introductory questions.

Are you under the influence of any drugs or medications that would affect your memory or your ability to participate in the deposition today?

A    No.

Q    Okay.  And do you have relatives in the state of Georgia?

A    Yes.

Q    About how many?

MR. McMILLAN:  She's asking you this for jury purposes.

A    50, 60, 75.  I don't know.  I have 27 first cousins.  They have children.

MR. McMILLAN:  In the Lowndes county area.

THE WITNESS:  My sister lives in Ray City.  Is that Lowndes County?

MR. McMILLAN:  No.

MR. CARTER:  That's around that area.

A    I think she lives in Berrien County.

BY MS. MAESTAS:

Q    Okay.  I think the jury pull would pull from outside of the county.  It would be that --

MR. CARTER:  Middle district.

BY MS. MAESTAS:

Q    Which would be a lot, but let -- do they all have your name, or do they all have different names?

A    My mother and father grew up here.  And so the family trees go between the all the Earnests, the Conyers, the Kirklands, some related to -- distantly the thousands of hundreds.  It's a lot of people.

MR. McMILLAN:  Widely known.  I know you are widely known.

THE WITNESS:  Yeah.

BY MS. MAESTAS:

Q    Okay.  Well I may just have to save that for voir dire.  But thank you for letting me know that.

Okay.  So I am looking at your, I guess, your bio on your website.  It says you grew up in Decatur County and attended Bainbridge College and you have a doctorate.

Can you tell me about your education and

basic employment history?

A    Okay.  I spent two years here at Bainbridge College, two years at the University of Georgia, bachelor's in history, two years at Valdosta State, master's.

Q    What was your master's in?

A    History.  I worked at Keiser College in Tallahassee, Andrew College in Cuthbert, briefly at a bank, Department of Family and Children Services, and started here in '03.  Started my doctorate in '03, finished the doctorate in '09 -- well, defended in '09.  The diploma's dated '10, 2010.  I've been here since 2010 -- 2003.

Q    And that's your Ph.D. in humanities, is the doctorate from Florida State?

A    Uh-huh (affirmative).  Yes.

Q    Okay.  And so since 2003, what positions have you held since being affiliated with USG?

A    In terms of professorial rank, instructor, assistant professor, associate professor -- professor.  Administrative jobs, I've been the interim vice president for student affairs, the dean of arts and sciences, assistant vice-president for academic affairs, interim vice-president for academic affairs, SACS liaison, accreditation

liaison, after the merger with ABAC, the executive director of the off-campus instructional sites, which are four of those, and now vice-president for enrollment management.

Q    Okay.  All right.

And you had mentioned that, related to the lawsuit, that there was discussion about Richard Carvajal and Rodney Carr.

And how did you -- how did you know Richard Carvajal?

A    Initially, I was on the presidential search committee; so I met him as a candidate for president.  And --

Q    And what year was that?

A    2010.

Q    All right.

A    And then he started here as president in January of 2011.

Q    Okay.  And what regular dealings did you have with him in your employment?

A    At the time that he started as president, I was the dean of arts and sciences.

Q    Okay.

A    So in between me and him was the vice-president for academic affairs; so I reported

to her, she reported to him.  But at a small college, we dealt regularly on accreditation issues. we were writing a SACS report at the time. I chaired the inauguration committee, so I worked with him on that.  We were together a lot at, you know, work committees and social functions.

**Q    Okay.  And so he came in -- in January of 2011.**

**Anything -- how did he get the job over someone else if you can recall?**

A    The committee narrowed it down to three candidates.  And the local committee -- all we do is just narrow -- narrow it down to three to five candidates.  We forward the names to Atlanta, and then a regents committee makes the recommendation to the chancellor.  So they recommended him officially to the chancellor. All we -- like I said, all we did was narrow it down to three.

**Q    Okay.  And then, what about Rodney Carr?**

**When did you first go about -- when did you first have an introduction with him?**

A    When he interviewed here in 2011.

**Q    Okay.  And were you in his interview?**

A    I was asked to drive him to Blakely, to his interview portion there.

Q   Okay.  And what was the interviewing for?

A   Vice-president for student affairs.

Q   Okay.  And what was your impression of him when you met him?

A   I mean, he was just a candidate.  I've -- I've served on lots of search committees.

My impression at the time?  He was just a candidate among many.

Q   Okay.  And did he end up getting selected to be VP of student affairs?

A   Yes.

Q   And how did -- how was he selected over anyone else?

A   The -- I don't -- I don't know if the search committee recommended names or just sent names to the president for the president to choose, but either way, the search committee did the interviewing and reference checking and Dr. Carvajal hired him.

Q   Okay.  How did they know each other?  How did Richard Carvajal and Rodney Carr first meet?

A   I think as a part of the interview process.

Q   Okay.  So in 2011?

A   Uh-huh (affirmative).

Q    Okay.  And do you recall when Carr came on board as VP of student affairs?

A    It was in the fall.  It was September/October of 2011.

Q    Okay.  All right.

And did you ever hear of any -- any problems with Dr. Carr as far as, like, complaints that happened?  Anything like that?

A    Yes.

Q    Okay.  And what were those?

A    How he talked to people.  Just how he interacted with people.

Q    Okay.  What were -- what were those complaints about?  Like, how did he talk and interact with people?

A    Very intimidating, aggressive, loud.  Usage of profanity.

Q    All right.  Anything -- I mean, is there -- is that it?  Intimidating aggressive?  Loud?

How else would he interact with people?

A    I mean, I think that covers it.  It's just how -- how you interact with people.

Q    Okay.  Were there any -- were there any specific words that he used that you found -- that

you observed him say that you found to be offensive or inappropriate?

A    At what point?

Q    I mean, right now I'm trying to get into what records that we did find that you were on, but I was trying to kind of lead up to if there was any -- anything before that.

A    At the point that you're asking, when he first started, I don't remember any specific words that he used toward people.  I just remember hearing of the result of the meeting.

Q    Okay.  The actual complaints that took place?

A    Right.

Q    Okay.  Was there ever any policy, rule, or practice that you were aware of at ABAC or in the USG about not meeting alone with employees of the opposite gender?

A    No.

Q    What about for Dr. Carr specifically?  Do you remember that being --

A    I don't remember there ever being a rule or policy against it.

Q    Okay.  And not with Dr. Carr either?

A    A rule or a policy, no.

Q    And what about in practice for Dr. Carr?

A    I heard him say that.

Q    Okay.  And when did you hear him say that?

A    It was -- it was probably some time in 2012 or early '13.

Q    Okay.  And this was after the complaints had been made that you sent to Dr. Carvajal in 2012 that he said that?

A    I don't know if it was before or after.

Q    Okay.  It could have been, you know, he just had that practice and just told everybody that?

A    Right.

Q    Okay.  Okay.

And did you ever see -- and this is really prior to the -- the complaint that you had initiated in 2012 regarding Dr. Carr.  Had you ever noticed him acting in anger with -- around other employees, such as gritting his teeth or shaking his fists?

A    No.

Q    Okay.  And before this complaint that you had initiated in 2012, had you ever noticed him making physical contact with female employees, touching them or him making the female employee touch him?

A    No.

Q    Okay.  All right.

So if you could look at Exhibit -- so this is 47 and 48, and the tabs are -- so that's 46. We'll come back to that.

(Marked for identification is Plaintiff's Exhibit 46)

(Marked for identification is Plaintiff's Exhibit 47)

(Marked for identification is Plaintiff's Exhibit 48)

BY MS. MAESTAS:

Q    47 and 48 I previously marked these as Plaintiff's Exhibit 47 and 48.  And these are the contents of the open record requests that I received both from the USG and sending it over to ABAC, and it was sent to President Bridges.  And so I'm going to go with 40 -- I think they're relatively the same.

But do you recognize documents in 47?

A    Yes.

Q    Okay.  So the first one is "Cover Letter from President Bridges, and the second and third pages is my open record request.

Okay.  And so this is a document at the top.  I'm looking at -- so this is going to be Page

1, 2, 3, 4 of Plaintiff's Exhibit 47.

Do you recognize this document?

A    Yes.

Q    Okay.  Do you know who wrote this document?

A    That -- Carvajal wrote it.

Q    Okay.  And what -- and I know that we can read the document, but do you -- can you -- did you assist in him preparing this document?

A    No.

Q    Do you know, like, when he wrote this document, what -- what he was reflecting on?

A    The vice-president for academic affairs was either about to leave or had just left for another position somewhere else.  And he was trying to figure out whether to hire a vice-president for academic affairs or to make Dr. Carr vice-president of both academic and student affairs.

Q    Okay.  And so it says:  "I know he wants the advancement role.  Exciting challenge, great for his resume, great for his desire to be a president.  Previously there was speculation of an affair with Lindsay Barron.  Since then, more speculation of affairs with Regina Jones and/or Leslie from the Charter House."

Do you know anything about Dr. Carr having affairs?

A    Only that there were rumors of it.

Q    And who is Lindsey Barron?

A    She was an admissions staffer.  I don't remember what role she was in, but she worked in admissions.

Q    Okay.  Was she a young girl? middle aged?

A    I -- I would guess that she was, you know, 20s -- 26, 28.

Q    Okay.  And -- but you don't have any evidence of it?  You just knew it was a rumor?

A    Yes.

Q    Which one?

A    If you'll ask again.

Q    Okay.  Do you have any evidence that that occurred?

A    No.

Q    Okay.  And then, what about with Regina Jones?  Who was she?

A    She was a nursing instructor.

Q    Young girl?  Middle aged?  Older lady?

A    10 years ago, she was probably late 40s, early 50s.

Q    Okay.  And what was the rumor with her?

A    That they were having a relationship.

Q    And did you ever observe anything with his behavior with Regina Jones?

A    No.

Q    And what about the Leslie from the Charter House?  Who's she?

A    I don't know.

Q    Okay. You've never heard of anything or observed anything related to --

A    I don't remember that one.

Q    Okay.  And then, so the bullet points, it says:  "Jokes with women like they're guys, stands too close to women, doesn't keep safe personal distance.  The way he acts around me is too intimate for my own comfort.  Intimacy is suggested by his behavior.  Not sure what he intends. Why didn't he learn that when he was younger."

So we said that this was Carvajal's document.  He seems to be quoting someone else.  Do you know who he's quoting?

MR. CARTER:  Let me object.  Speculation.

But go ahead and answer if you know or can answer.

A    I'd had a couple of conversations with Dr. Carvajal about this.  I don't know if I'm one of

the ones being quoted.

BY MS. MAESTAS:

Q    Okay.  But you -- you can speculate that it might have been you?

A    It -- possibly.

Q    Okay.

A    Maybe not all of them.

Q    Who do you think the other individuals are that he would be quoting?

A    Is that speculation too?

MR. McMILLAN:  Yeah, but you can answer.

MR. CARTER:  Yeah.  It's speculation, but you can answer.

A    It could have been anybody on campus.

BY MS. MAESTAS:

Q    Okay. "If I made him VP of both, he becomes other big public face of the college.  I can't that I can that risk."

So this is in October 2013, and the initial complaint you made was in December 2012; is that correct?

A    The first complaint that I made in writing was in December of 2012.

Q    Okay.  Let's go ahead and flip to that and make sure we get -- so I'll get the documents in an

open records request.  And I don't necessarily get them in the right order, but I try to present them in the way that I received them.

So this is going to be the email.  At the top it says:  "Re: concerned, Tuesday December 4th, 2012," from Carvajal to -- to you. And it says:  "Thank you for sending this."

And I'm not going to go and reread every single thing, but can you describe in your own words what you were -- well, first, let me ask.

Is this the first time you reported something on Dr. Carr?

A    In writing?

Q    I mean, no.  I guess I'd like to know if you had did something not in writing first, too.

A    I need you to ask me a question.

Q    Yeah, I understand.

When was the first time you reported something about Dr. Carr?

A    January 2012.

Q    Okay.  And how did you do that report?

A    Dr. Carvajal asked me to go to lunch because he heard I had concerns.  So we were at lunch.

Q    Okay.  And so, how did he know that you

had concerns?

A    I had been expressing them to my supervisor.

Q    And who was that?

A    Tonya Strickland, vice-president for academic affairs.

Q    Okay.  So I am assuming that you had reported this to Tonya; so that would be before January 2012.  I'm not trying to call you out.  I'm just trying to --

A    You know, maybe it could've been -- I could -- it could -- January could have been the first time.  It could have been before that.  It could have been December.

Q    Okay.  So some time in, maybe, December 2011 and January 2012, you told Tonya Strickland about your concerns?

A    Yes.

Q    Okay.  Why don't you tell me about what you told Tonya Strickland?

A    Specifically it was about ...

MR. McMILLAN:  She asked a question.

A    So someone had told me that he was very close to a female, like running fingers through each other's hair, and then, in addition to his -- the

way he treated people, I went to Tonya.

Q    Okay.  And so, this was the first time you reported it.  Prior to that, someone's telling you or you're observing it?

A    They are telling me.

Q    Okay.  So when did they first tell you?

A    About the same time.

Q    Okay.  And who was that person that told you that?

A    I don't remember.

Q    And do you remember the position that this female --

A    No.

Q    Okay.  And they told you this?

A    They told me.

Q    And so was that a -- like, a student or was it an employee?

A    It was an employee.

Q    Okay.  A female employee.  And were they under your direct --

A    I didn't say it was a female employee.

Q    Oh.  Was it a female employee?

A    I don't remember.

Q    Okay.

MR. CARTER:  You're talking about who told

you.

THE WITNESS:  Who told me.

BY MS. MAESTAS:

Q    Oh, okay.  Okay.  Okay.

So someone told you that they'd seen Dr. Carr running fingers through hands with a female employee?

A    Yes.

Q    Okay.  And we don't know who it is.  Do we know -- and you don't remember the name of the person who told you about it either?

A    I don't.

Q    Okay.  So the first name you remember is Tonya Strickland being the one that you are telling this, I guess, third-hand story --

A    Uh-huh.

Q    -- to?

MR. CARTER:  I'm not sure if he -- maybe he did, but I'm not sure if he said he didn't know who the female was.  He may not have, but ...

MS. MAESTAS:  Okay.

BY MS. MAESTAS:

Q    Do you know the name of the female who had -- with the hair and the fingers running through

their hair?

A    No.

Q    Okay.  Any other reports at this time, at this December 2011/January 2012 time?

A    No.  It was mainly the way he had interacted with people and how he had treated people, and then the running of the hair.

Q    So overall, the -- where -- you had talked about the intimidating, aggressive, loud?

A    Yes.

Q    And then the one specific scenario of this female employee who he's running hands through her hair and he's running her hands through his hair?

A    Something like that.

Q    Something like that.  Okay.

So you go to Tonya Strickland and you state these complaints about Dr. Carr.  Are you -- are you in her office?

A    I was in her office.

Q    Okay.  And you just knock on the door and you go in and you say, I want to talk about Dr. Carr?

A    Pretty much.

Q    Okay.  And what does she say?

A    I remember she listened.  I don't remember

her saying much.

Q    Okay.  And did you talk to anybody else before lunch with Dr. Carvajal on January 2012?

A    A couple of people on campus.  I remember Melissa Harrell.  I remember us talking about -- about it.

Q    Okay.  And did she have any observations of Carr herself?

A    She was one of the ones that had an interaction with Dr. Carr.

Q    And what was her interaction?

A    It was just the, you know, the aggressive raised voice, intimidating type approach that he used toward her, that she felt very intimidated.

Q    Okay.  But she hadn't been touched or inappropriately --

A    No.

Q    Okay.  Anybody else before -- between Tonya Strickland and Richard Carvajal lunch?

A    I remember talking to Adria Belk about it.

Q    All right.  And what did she -- did she talk to you, or did you just tell her?

A    She spoke to me.

Q    Okay.  And what did she say?

A    It was pretty much the same thing as

Melissa said.  It was a very similar interaction.

Q    Okay.  Anyone else?

A    I don't specifically remember other than those two.

Q    Adria Belk, Melissa Harrell, and then the employee who had the observation of the female employee and running fingers through hair, those three?

A    Right.

Q    Okay.  So then you -- you talked about Tonya Strickland.  She doesn't really do anything. What's the next thing that you hear?

Like, does Dr. Carvajal say, I want to invite you to lunch, or do you subsequently follow-up?

A    From what I remember, he emailed me to go to lunch.

Q    Okay?

A    'Cause -- to talk about whatever concerns I had.

Q    All right.  And so looking back at your email on Exhibit 47, this email is dated December 4th, 2012, and so this is almost a whole year later that you write this.  So your -- your first lunch meeting about Dr. Carr, can you tell me

what happened at the meeting?

A    At the lunch meeting that we had?

Q    Yeah. so this complaint in writing that's Exhibit 47 --

A    Uh-huh (affirmative).

Q    -- is an email that's totally a year later; right?  So now we're still in January 2012, you go to lunch --

A    Right.

Q    -- and what -- what was said during that lunch meeting?

A    I only remember a general conversation of, you know, I remember saying that Dr. Carr had only been here a few months, he had gotten off on the wrong foot, had done some things he shouldn't have done, treated people ways that he shouldn't have treated them, and that -- that the president should do something about it, should talk to him, put a stop to it, whatever.

Q    So Dr. Carvajal said that he would talk to Rodney Carr and put a stop to it?

A    I don't remember him saying that.

Q    Okay.  So did you say that the president should talk to -- okay.

So you're telling Dr. Carr [sic] -- and

what does -- he just says, eh, or --

A    I don't remember.  It's been a long time.

Q    Okay.

A    I remembered the conversation in a general way, but just -- just saying that Rodney -- 'cause he had only been here, like, three months, and it was not a good three months.

Q    All right.  And I hate to, you know, pick on details, but this is my only opportunity I get to talk to you.

So is there anything else that Dr. Carvajal or you said in that meeting?

A    Not that I remember.

Q    Okay.  Do you say anything, that you're going to follow-up, or does he say anything that he was gonna follow-up?  Or do you just kind of end the meeting and move on?

A    I think it was pretty much ended.

Q    All right.  All right.

And so, what about -- so the next thing that I see in my records is this December 4th, 2012, email that you send to Dr. Carvajal.

And does anything happen between that lunch meeting in January 2012 and the time that you send this email related to Dr. Carr?  Observations?

Complaints?

A    Yes.

Q    Okay.  Can you tell me about that?

A    Can -- can you ask specific questions?

MR. McMILLAN:  She can -- she's allowed to ask you about the general behavior.

MR. CARTER:  What was the question?  Can you read it back?

THE COURT REPORTER:  Sure.

MR. CARTER:  I think you just said, tell me about that.

(Record read by the court reporter.)

MR. CARTER:  Okay.  What are you referring to?

BY MS. MAESTAS:

Q    You have a meeting in January 2012 related to behavior of Dr. Carr.  Then I have in my records -- 'cause I'm not in your head and I don't -- I wasn't here; so I don't -- it's hard for me to say -- exactly pinpoint things that I can ask you.

But the next thing that I see is you sent an email dated December 4th, 2012, to Dr. Carvajal, and it's related to Rodney Carr.  And it appears to be the same or similar complaints with

more information from your January 2012 meeting.

So what I'm wanting to know is:  You said that something happened in between January 2012 and December 4th, 2012, and I want to know what that is.

MR. CARTER:  You're asking him about any specific incident that he recalls between January 2012 and December 2012 regarding Dr. Carr?

MS. MAESTAS:  Yes, sir.

MR. CARTER:  Okay.

A    I had another conversation with Dr. Carvajal in the spring.  I don't remember what month it was, but it was a similar conversation as the one in January.  There was another event in July.  I talked to Dr. Carvajal about two hours, resigned as arts and science dean four days later.

BY MS. MAESTAS:

Q    Who did?

A    I did.  And then, in -- it might have been late November, or it might have been early December. I don't remember.  There was a lot of people upset, and they -- they thought they could come to me and talk to me.  They -- I guess they trusted me.  They thought that I might try to take up for them in some

way.

What I think precipitated this email was he had had a staff meeting and had been very aggressive with the whole group, like, in a group meeting. And it was about enrollment numbers dropping, and one person in particular, I remember him coming to me upset. And so in between people being upset and then the continued, you know, some of the stuff that I reference, I decided to write the email.

Q   Okay.  So we have, let's see, one, two, three, four things that happened in between.  We've got spring 2012 conversation with Carvajal, July 2012 an event where you talked for two hours and then you resigned.  And then in November, December 2012 a lot of people talked to you and trusted you, and then a staff meeting where one individual employee makes a complaint about how he talks aggressively to that -- everybody in the meeting.  And so I want to get into the details of all those four things.

Okay.  So the spring 2012 conversation with Carvajal, can you tell me what occurred and what was said?

A   I remember talking to him and the

conversation being similar to the January conversation, and that's really all I remember. It was just another conversation.

Q    The same thing?

A    Same thing.

Q    And you didn't have any new complaints?

A    Not that I remember.

Q    Okay. And did Dr. Carvajal offer any new resolution or next step, or was it left similar to the January meeting?

A    I don't remember asking for a resolution, and I don't remember him saying what he was going to do.

Q    Okay.

A    I just thought I -- I had done my job by expressing the concern.

Q    Okay. And July 2012, you said there was an event. What was that event?

A    They were going -- they, Dr. Carvajal and Dr. Carr, were going to take a personnel action against a friend of mine.

Q    And what's the name of the friend?

A    Connie Snyder.

Q    All right. What was the personnel action that they were going to take and why?

A    They were going to suspend her because supposedly -- allegedly she had been drinking on the job.

Q    Okay.  Was she drinking on the job?

A    No.

Q    Okay.  And why did they think she was drinking on the job?

A    There was a beer can found in the bathroom, and she had been coming to work late.  And allegedly someone had smelled alcohol on her breath.

Q    Who was that person?

A    They didn't tell me.

Q    All right.  And why was she coming in late?

A    I don't know.

Q    Okay.  Okay.

And so what -- they said that they're going to suspend her.  Did they do an investigation as to whether she was drinking?  Did they talk to her?

MR. CARTER:  If you know.

A    I -- I don't see how they could have, because they never told Connie about it.

BY MS. MAESTAS:

Q    So they never told Connie about the

allegation?

A   They never did.

Q   So what did they tell her?

A   They never told her anything.

Q   Okay.  And so what did you do?  You -- you've learned about that they were going to suspend her?

A   I was asked to come here for a meeting in this building with Dr. Carvajal.  He told me the story.  He told me the allegations.  He told me what they were going to do.

Q   And you said something in her defense?

A   It was -- it was a lot -- I said a lot.

Q   Okay.  Can you tell me what you said?

A   I questioned, you know -- like, "How do you know the beer can is hers?"

The answer was she was the last one to leave the bathroom.  I asked if anyone had talked to her about showing up late for work as a performance issue, you know, like, actually talking to her.  And I asked if, you know, this person that smelled alcohol on the breath that day, did anyone talk to Connie to confirm it.  And the answers were no.

Q   Okay.  Anything else?

A   I ...

Q    If you can remember.  I mean, I --

A    It was a two hour -- it was a two-hour meeting.

Q    Okay.

A    I was very angry.  I said a lot.

Q    All right.  Do you remember what you said?

MR. CARTER:  Have you answered everything you remember?  I mean, you tell her what you know, but if you don't remember, just say you don't remember.  That's all you can do.

A    I do remember some things that I said.

BY MS. MAESTAS:

Q    Okay.  And can you --

A    I accused him of it being personal and not professional.

Q    You accused Dr. Carvajal?

A    Yes.

Q    And why did you think it was personal?

A    Because I -- I was -- I knew they did not like her.

Q    Who's "they"?

A    Richard and Rodney.

Q    Okay.  And why didn't they like her if you know?

A    I never asked them that, but she was a

very strong woman.  She was very influential.  She was very popular, very respected.  She and Rodney never got along, from the beginning.

Q    Okay.  What was her position?

A    She was the -- she was the dean of students.

Q    Okay.  And when you -- when you accused Dr. Carvajal of -- of being personal, did he ever say anything, like, about Dr. Carr having evidence on Connie Snyder?

A    No.  Those three things were the only things he told me, the late to work, the beer -- the can in the bathroom, and then the alcohol on the breath.

Q    Did he say how he knew?

A    I don't remember him specifically saying how he knew.

Q    Okay.  And did he say anything about Dr. Carr having observations about Connie Snyder?

A    I don't -- I don't remember how that got to Rodney or to Carvajal.  I just -- that's what I know.  That's what I remember, is Richard telling me the three pieces of supposed evidence.

Q    Okay.  So you said -- and you talked to them for two hours.  Anything else you recall?

You said you accused Dr. -- Dr. Carvajal of it being personal because Rodney Carr and Richard Carvajal didn't like her.

Do you remember anything else that you said?

A    I remember telling him to seek legal advice from USG because, you know --

Q    Carr and Carvajal?

A    Yeah.  He said he already had, and I told him that he'd better call them back and tell them the whole story.  I -- I remember saying that.

Q    And what did you think the whole story was that he should tell?

A    I -- I don't -- I didn't think that he told the lawyers the whole story.  Like, I -- I found it hard to believe that this action could be taken and Connie never even be told about the allegations.  Like, I don't -- to me, that seems kind of basic.  And I -- I thought that he should probably call them back.

Q    Okay.  And did he ever say, like, he would or ...

A    I don't remember that he did.

Q    Okay.  And was Dr. Carr in that meeting or just Dr. Carvajal?

A    Just Dr. Carvajal.

Q    Okay.  And what happened after that meeting was over?

A    That was a Friday.  I resigned the following Tuesday, I think, as dean of arts and sciences.

Q    So Connie was the -- the dean of students at the time.  Who was she -- who was her direct supervisor?

A    Dr. Carr.

Q    And when you were the dean of arts and sciences, who was your direct supervisor?

A    Dr. Stickland.

Q    Okay.  And so -- so Connie was the dean of students under Dr. Carr, and you said that she was a strong and respected woman.

Do you have any specific examples of interactions between them where you came up with this assessment that she's a strong and respected woman related to how she dealt with having Dr. Carr as a direct supervisor?

A    Well, my reference to her being a strong woman was not in relation to how she dealt with Dr. Carr.  It was just that she was a strong woman, a strong leader.  I mean, she was in an institution

here.  I mean, people call her Ms. Bainbridge College.  She's very widely respected.  You know, that's what I meant.

MR. McMILLAN:  She was -- she was my dean of students.

BY MS. MAESTAS::

Q   And so -- and then, so you had said she was a strong and respected woman and that was after you said that you had accused Dr. Carvajal of it being personal.  And so those two are not in a related -- like, did they not like her because of that authority that she had?

Are those somehow related, like a jealousy or something like that?

A   It could have been just a clash of two strong-willed people.

Q   And those are?

A   Dr. Carr and Connie.

Q   Okay, okay.  All right.

And you resigned.  Why did you resign?

A   I didn't want to be a part of the administration.

Q   Okay.  So you wanted to go back to being just faculty?

A   Just faculty.

Q    Okay.  And why didn't you want to be a part of the administration anymore?

A    Because of how they treated people and because of what they were about to do to Connie.

Q    Okay.  All right.

So anything else about the July 2012 event and meeting?

A    I think that's pretty much it.

Q    All right.  November and December of 2012, you stated that a lot of people were upset and had talked to you and trusted you.  Can you tell me about those?

MR. CARTER:  Are you asking about the people?

MS. MAESTAS:  Uh-huh (affirmative).

MR. CARTER:  Okay.  You -- you understand what she's asking?

THE WITNESS:  I struggle with very general questions.  What --

MR. CARTER:  Yeah.

THE WITNESS:  I don't even know where to start with a question like that.

BY MS. MAESTAS:

Q    Yeah.

MR. CARTER:  You always -- you always,

"Tell me about that."  Ask a more specific question, I think, is what he's wanting.

BY MS. MAESTAS:

Q    So give me the first person that you can remember that talked to you that I --

MS. MAESTAS:  Well, I mean, what's funny about that?

MR. CARTER:  No. I mean, you're asking him.

MS. MAESTAS:  I -- I mean -- I just -- I don't know the names of the people.  So if I knew them, then I would say --

MR. CARTER:  I would just -- are you asking for the names of the people that he talked to --

MS. MAESTAS:  Yeah.

MR. CARTER:  November, middle of December?  Okay.

A    Okay.  I've already mentioned two, Melissa Harrell and Adria Belk.

The day that kind of really reached a head, I was walking to class from one building to another.  So I was outside on the sidewalk.  And the student affairs building is this way.  And there's lot of -- a lot of windows on the -- the east side

of the building where I was walking.  And someone saw me walking to class and came out and met me on the sidewalk.  His name was Gerald Williams.  He was very upset about the -- the staff meeting that I referenced.

BY MS. MAESTAS:

Q    Okay.  Okay.

And you said that Melissa Harrell and Adria Belk were very upset about his general intimidating, aggressive, and loud nature?

A    Yes.

Q    Okay.  Is that the same information that they gave you in November and December of 2012?

A    Yeah.  I mean, because it continued.

Q    Okay.

A    I -- I remember Joy Burrell speaking to me.  I don't think she had any bad interactions with Dr. Carr.  I just -- she was concerned about the things going on in her building, and I remember her talking to me.

Q    Okay.  Other than -- what were the things that she said that went on in her building?

A    I honestly don't remember.  I just remember her coming and talking to me, but I don't remember specifics of what she said.

Q    Okay.  And was it related to Dr. Carr?

A    Yes.

Q    Okay.  So you just remember she was upset and it was about Dr. Carr and how it was in their building?

A    Right.  But hers was an ongoing situation.

Q    It was?

A    Uh-huh (affirmative).

Q    Okay.  Okay.

And Melissa Harrell, what was her position?

A    At the beginning part of where you started asking, 2000 --

Q    November or December.

A    -- '11, '12, she was my instructional coordinator in arts and sciences, so kind of like a No. 2.

Q    Okay.

A    And then when I resigned as dean, she became the interim dean of arts and sciences.

Q    And what about Adria Belk?

A    She was the dean of technical studies.

Q    And Joy Burrell?  What was her position?

A    I know she worked in enrollment management doing something, but she was part-time.  She was a

retired teacher who worked 49 percent as a part-time employee.  But I don't remember what she did in admissions.

Q    Okay.  So anybody else besides Melissa Harrell, Adria Belk, Gerald Williams, Joy Burrell?

A    That's all I can remember right now as far as specific names.

Q    Okay.  I'm looking at Page 2 of your email.  Page 1, I -- I've read through it, and it says you -- you:  "Were doing this under the auspices of the University System's Whistleblower Policies."

Seems to be an introduction to, kind of, the specifics.  Would that be correct?

A    Yeah.

Q    Okay.  And it says on the front -- or the -- at the top of the second page:

"It has become clear that Dr. Carr's inappropriate behavior is a pattern and not an isolated incident.  In the past year alone Dr. Carr has demeaned four different employees, reducing two women to tears."

I -- I'll get to a question.  I'm just ...

And then it says:  "Your strong friendship with Dr. Carr, which she mentions frequently, makes

the staff feel isolated from your help."

And then the third paragraph:  "He's become notorious around campus for vulgar and sexually charge language ... many employees feel unable to speak out about the situation because he has invoked your support in threatening his employees ... inappropriate behavior ... Dr. Carr's actual physical contact with a female employee described by a witness as massaging and running her fingers through his hair.  Subsequently, that female employee and Dr. Carr were overheard having inappropriate conversations, causing distress to everyone in the vicinity.  Dr. Carr announced that this fall he could not be alone with female employees because of accusations."

And you request for an outside investigator.  Okay.  Just want to ask for any specific evidence that you have knowledge of behind, kind of, those areas that I had highlighted.

So we talked about the specific individuals, and then we have the one female employee with the hair.  You don't know that person's name or the person who reported it.

In reading this, has it refreshed your recollection about any other specific examples?  So

for example, I see mentioning the female where the running fingers through his hair, and then the next sentence says:  "That female employee and Dr. Carr were overheard having inappropriate conversations, causing distress to everyone in the vicinity."

Do you recall how you learned of that conversation, the inappropriate conversations?

A    I think I do, but I'm not sure.

Q    Okay.  What do you think you recall?

THE WITNESS:  Do I answer, I think -- I think I remember?

MR. CARTER:  Best of your recollection.

I mean, yeah.  If you -- if you think you do, just preface it with that.

A    I -- I remember it being Joy Burrell who talked about the massaging and running the fingers through her hair.  I forgot about this, you know, that I wrote this, but now, I think I remember that it was Lindsey Barron.

BY MS. MAESTAS:

Q    Was the female with the running fingers through the hair?

A    Yeah.

Q    All right.  Okay.

So that is -- that's the name of the

individual that's mentioned in the bullet points dated 10/28/13 where it says:  "Previously, there was speculation of an affair with Lindsey Barron."

Right?

A    Yes.

Q    Okay.  And then you mentioned the strong friendship between Dr. Carr and Dr. Carvajal.  And was that something that Carr openly stated to employees?

A    Yes.

Q    What did he say?

A    Well, it was generally known that they spent a lot of time together playing golf and fantasy football, and they hung out a lot.  But that staff meeting that -- I remember Gerald telling me the staff meeting that made the enrollment management staff upset -- the -- Dr. Carr said something like, If you can't find -- if you can't recruit more students, we'll find people who can. And he said something like, And Dr. Carvajal agrees with me.  It was something like that.

Q    Okay.  And so, they -- they golfed, they did fantasy football.  Anything else that they did together?

A    I mean, that's -- they were just friends.

Q    Okay.  Did they walk around campus together, or did people see them together?

A    I don't really remember them being together, like, walking around.

Q    Okay.  And then:  "Dr. Carr announced this fall that he can not be alone with female employees because of accusations, leading employees to believe that Dr. Carr knows about complaints and yet nothing has been done."

When did -- when did that announcement happen?

A    That is something that I apparently knew when I read the email, but right now I don't remember him saying that.

Q    So -- okay.  So I think when we first started talking I asked you if you were aware of that practice.  And honestly I can't remember what you said.  I thought you said that --

MR. CARTER:  You asked if it was a USG or Bainbridge College practice, I believe.

A    Well, what you asked me was that if it was a policy, I think.

MR. CARTER:  Yeah.

BY MS. MAESTAS:

Q    Yeah.  And then I asked if it was a

practice of Dr. Carr?

A    I -- I think I said, no.  I'm not sure.

Q    Okay, okay.

Yeah.  I can't remember what you said.
But does this change your answer?

A    I don't -- I just don't remember him
saying that.

Q    Okay.  And so you asked for Dr. Carr [sic]
to send an outside investigator; is that correct?

A    I asked Dr. Carvajal to send --

Q    Dr. Carvajal.

A    -- an investigator.

Q    Okay.  And anything else that you remember
after us going through a little bit more details in
this email?

MR. CARTER:  Anything he remembers about
what?

BY MS. MAESTAS:

Q    Okay.  So the "notorious for vulgar and
sexually charged language."  Do you remember any
specific things that he said?

A    I mean, just a couple things that I heard.
It was -- it was like -- he would be describing
something, and he would say, like, you know,
So-and-so had some real steel balls.  It would be

like some type of anatomical reference instead of just saying, so-and-so is really, you know, strong-willed.  You know, it would be -- it would be something like that.  Like, he and I had a conversation one time and he said, "We rolled it out on the table," instead of something like, We cleared the air.

Q    Okay.  Anything else?

A    Not specifically.

Q    Okay.  All right.

Any other touching of females that you can remember?

A    No.

Q    Okay.  Okay.

So that was -- that email was sent on December 4th, 2012, at 8:45 a.m., and then he responds that evening ...

MR. CARTER:  I think it's at the top of that one there.

MS. MAESTAS:  When they print out the emails, it kind of goes in reverse.

BY MS. MAESTAS::

Q    Anything -- you may not remember what he sent you that email, but you may remember what occurred after this.

Can you tell me if you recall?

A    I remember this email.

Q    Okay.  And what happened after you sent this email?

A    Well, nothing happened for a while. The -- the very next thing that happened was I was asked to come over to this building.

Q    The one we're sitting in today?

A    Yes.

Q    Okay.

A    I was asked to come to this building at a certain time.  I don't remember the time.  I wasn't told why I was supposed to be here.  I was just told to be here.

When I got here, I spent a few minutes with Dr. Carvajal, and he said:  "This is about the email that you wrote.  You're not here to talk to me.  You're here to talk to two people from the University system."

And so, then I spoke to the two people from the University system.

Q    And you didn't have any other lead?

A    No.

Q    So you just think you're coming over for -- you had no idea, and then --

A    I had no idea.

Q    -- and then you're walking into a USG investigation?

A    Yes.

Q    Okay.  And so you go into a different room?

A    This room.

Q    This room that we are sitting in right now?

A    Mm-hmm.

Q    And do you remember the names of the individuals?

A    I remember George Jones.  The only reason I remember Dwight Baker is because I've read some of these documents recently, but I did not remember his name for a long time.  I remember Joyce because she's still there.

Q    And how did they introduce themselves?

A    They just said that they were here to -- to inquire as to my email, to interview people.  And I remember them asking me what I wanted.  And so, that's basically what I remember.

Q    And what did you say you wanted?

A    I said I wanted people to be heard.

Q    Okay.  And did you tell them anything that

you haven't already told me that you can remember?

A    No.

Q    Okay.

A    No.  I don't -- I don't think we had a long conversation.

Q    Okay.  It wasn't recorded?

A    I don't think so.  If it was recorded, they didn't tell me it was recorded.

Q    Okay.  Did they take notes?

A    Yeah.  I guess so, yeah.

Q    Okay.  All right.

And about how long did you meet with them?

A    Maybe 15 or 20 minutes.

Q    Did they tell you any information?

A    No.

Q    Okay.  They didn't -- they didn't say anything about, like, the next steps they would take, anything like that?

A    Well, they told me they were here to interview people.

Q    Okay.

A    So they spent the rest of the day interviewing staff members.

Q    Okay.  Do you know who all they interviewed?

A    No.  I don't know all of them.

Q    Do you recall any of the ones that they interviewed?

A    Spencer Stewart, Gerald Williams.  I think they interviewed April McNair.  They interviewed a lot of people, but those are just the names I remember.

Q    Okay.  Was one of them asking more of the questions than the other one?

A    Joyce Jones was, I would say, the lead of the two.

Q    And then Mr. Baker, he -- was he doing questioning as well?

A    Of me?

Q    Mm-hmm.

A    I remember him speaking.  I don't remember any specific questions that either of them asked me except, "What do you want?"

I do remember that specific question, but it was -- it was more Joyce.

Q    Okay.  Do you remember if one of them was the note-taker versus the other one?

A    No.

Q    Did they ever say that there would be a report done?

A    I -- I don't remember them saying that.

Q    Okay.  And if you can turn to the -- it's, like, three pages, like, further in.  There's the letter dated March 30th, 2013.  It is a written reprimand from Dr. Carr to Dr. Carvajal.

MR. CARTER:  You've got that backwards. from Dr. Carvajal to Dr. Carr.

MS. MAESTAS:  Thank you.

MR. CARTER:  You can -- that's fine.  Just wanted to clear the air.

BY MS. MAESTAS:

Q    To Dr. Carr from Dr. Carvajal -- they gotta have the same initials, too; so ...

This is a written reprimand from Dr. Carvajal to Dr. Rodney Carr.  And it is regarding this investigation and the items that you have discussed with me today.

Were you aware of this document?

A    At what point?

Q    Like, not because you looked at Pacer after we filed this lawsuit, but at any point before you started looking in the lawsuit that Jamie Byrd filed?

A    I became aware of this document in 2016.

Q    Okay.  Fair enough.

**And how did you learn of the document?**

A    When I -- I resigned from the administration in 2012, but by 2016, the institution was in trouble; so I was asked to return to administration to write a SACS report.  And I was given a flash drive with a lot of files that I needed to write the accreditation report, and this document was on the flash drive.

**Q    Okay.  Who's -- who gave you the flash drive?**

A    Dr. Carr.

**Q    What else was on the flash drive?**

A    It was a lot of -- it was a lot of files from Dr. Carvajal.  Because at that point, Carvajal had left, and I needed documents related to institutional planning.  Because when you write accreditation, you have to show that there's a cycle of planning, improvement, assessment.  Improvement, asse- -- you know, it's a circular -- and so it was a lot of his files about the foundation --

**Q    Which one are you talking about?**

A    Carvajal.  So the flash drive was Dr. Carvajal's that he left behind with all of his documents that he gave to Dr. Carr, and then Dr. Carr gave to me to use the documents for the --

the SACS report.

Q    Okay.  Okay.

And what -- I mean, is -- were any of the other investigative documents in there, or was it just this written reprimand?

A    The documents that you have read, like, the 2013 -- the notes where Dr. Carvajal's writing to himself?

Q    Uh-huh (affirmative).

A    That is from that flash drive.

Q    Okay.  Did Dr. -- or did President Bridges forward my open records request to you for a response?

A    Yes.

Q    Okay.  Did anybody else assist in the response?

A    Yeah.  Yeah.  I mean, we -- we looked all over for some of things that you asked for just to make sure that, you know, we had -- we had done our job to try.

Q    Okay.

A    So I -- I think the HR director, Richard Spancake, and our former director of the Blakely campus went to Blakely, which is about 45 miles away, and looked for -- through all the files that

we stored there to see if anything was relevant.

Q    Okay.

A    We looked all through this building, and then I asked at Southern Regional Technical College to look through their files just in case something had accidentally wound up with them during the merger.

Q    Oh, okay.  I did not know that you had -- were in charge of that?

A    In charge of what?

Q    That -- getting the open records request responded to.

A    I don't -- I don't know -- I -- I was asked to do the part for the Bainbridge side.  I was not a part of some files that had been moved to Tifton; so ...

Q    Okay.

A    They looked up there, too.

Q    Okay -- yeah.  So the thing that has gone missing -- I mean, maybe there's more things, but the thing that we know of that exists that's gone missing is that report of findings or any notes from the investigators.

Did you ever have anybody specifically look for that?

A    Yeah.  We looked for it.

Q    Okay.  'Cause I -- I think I've sent Dr. -- is it "Dr. Bridges" or just "President"?

A    Dr. Bridges.

Q    Dr. Bridges a follow-up e-mail stating that we will -- we wanted the report of the findings -- or Report of Findings, which is mentioned in the -- the first line of this written reprimand and Exhibit 47.

Were you aware that I sent that follow-up email looking for that Report of Findings?

A    I think so.

Q    Okay.  Okay.

And do you know the location of the Report of Findings?

A    What is the Report of Findings?

Q    So this -- is it says:  "Per the recommendation contained in the Report of Findings following an investigation into your actions conducted by the Board of Regents, I hereby am issuing this letter of reprimand that shall be added to your personnel record."

And then it says:  "Regarding in the -- in their investigation Dr. Dwight Baker and Dr. Joyce Jones found your management style to be aggressive

and unprofessional and likewise found incidents involving sexually charged language and cursing. Based on what I learned from their investigation, I agree with their conclusions that improvement is needed.  There are a specific list of concerns, including the following findings." and so --

A    So what was -- the Report of Findings is the report from Baker and Jones?

MR. McMILLAN:  Yes.  That is correct.

BY MS. MAESTAS:

Q    I believe so, yes.

A    Okay.  So what was your question?

Q    Do you know where it is?

A    Yes.

Q    Okay.  Do you have it?

A    Do I have it with me?  I don't know --

Q    Yeah.  Do you have it with you?  Do you know where you can get it?

A    Yeah.

Q    Can you get it today?  Is it on this campus?

A    I don't know if I can get it today because it's -- it's in a format that I don't know that I can extract.

Q    Okay.  Has anybody ever asked you to find

it?

A     Yes.

Q     Okay.  Who asked you?

A     So when you submitted the request --

Q     Yeah.

A     We looked everywhere; okay?  That's what I was saying.  We looked here, I asked Southern Regional to -- to look.  We went to Blakely, and we looked through all the boxes, which there's hundreds of boxes.  The people in Tifton looked, and it was not found.

It was when some of the documents from Pacer were -- were put on the website, and a lot of those documents -- like, I think this reprimand.  When the reprimand was put on Pacer and it -- it started getting circulated widely, our former IT guy, Scott Dunn, read through the documents and realized that he might have it.

He doesn't work here anymore.  So he doesn't work -- he's in Tallahassee.  He's at Florida State.

And so he sent me a message and said that he might have it, that he would look.  And then he subsequently gave it to me, and then I sent it to Dr. Bridges.

Q    Okay.  So the IT guy, Dunn, who's now at Florida State, he -- he says he finally found it somewhere?

A    He was never asked to look for it because it never occurred to me that he might have it.  But, like -- I guess, like, all -- a lot of IT people they had just flash drives, you know what I mean?

Q    Yeah.

A    And he -- I'm not -- I knew he was aware of this lawsuit.  I don't think he knew the details, but when the -- the documents started getting circulated and he read some of it, it caused him to go back and look for the Report of Findings.  And he found it in an old email, like an Outlook email file -- I guess it would have been Richard's old emails.  And that's why I don't know if I can -- if I -- I don't -- I don't know if I know how to open that type of file.

Q    Okay.  I think I -- sometimes, it's, like, a dot msg, and then the way it's formed it's --

A    Right, right.

Q    Okay.  So the Report of Findings, based on what it says in this letter, appears to be written by Dwight Baker and Joyce Jones, but it's been found on a flash drive that an old IT guy had of Richard

Carvajal's files?

A    Yes.

Q    Okay.

A    It was -- it was our practice when, like, somebody got a new computer that the computer would be backed up, and then -- with flash drive or -- I don't know how -- what holds all those documents. And then you would just copy it to the new computer.

And so apparently -- and I'm just guessing -- Richard at some point got a new computer; his old computer was backed up, and it wound up in one of Scott's files on a -- maybe on another flash drive.  I don't really know.

Q    Okay.  And so -- so you were in one of the interviews that these investigators did, but somehow, their report ends up on -- only available on this flash drive of Dr. Carvajal's.

Do you have any information has to why it's not available, like, through the USG?

A    No.

Q    Okay.

MR. CARTER:  Can you get it to us?  Can you get it to me?

THE WITNESS:  You know, I -- I have to find somebody who knows how to open it.

MR. McMILLAN:  Send to me.

(Unreportable simultaneous speaking.)

MR. McMILLAN:  I can get it open.

THE WITNESS:  Okay.

MR. McMILLAN:  There's a guy here in town that can open it.

BY MS. MAESTAS::

Q    Who's in possession of the flash drive now?

A    I have one.  I just don't remember where it is.  I -- I know it is either in my desk in Tifton, or maybe my dresser at home.  I ...

Q    Okay.  But it used to be in possession of Dunn?

A    He gave it to me, and then I was going to give to Dr. Bridges.  I just had never given it to Dr. Bridges.

Q    Okay.  Just forgot because --

A    Yeah.  It just hasn't come up.  You know?

Q    Okay.  I mean, I -- it's news to me; so -- filed two open records requests, followed up trying to find it.  Now we've got a pending motion to compel, so it's --

MR. CARTER:  Well, I don't have it, or you'd have it.  I mean, obviously.

MR. McMILLAN:  But you -- you -- your testimony was you forwarded it.  And so whenever Scott sent it to you to by e-mail, you went ahead and forwarded it to Dr. Bridges?

THE WITNESS:  You know what?  It is in my email somewhere.  Yeah, because I sent it to Dr. Bridges, and he asked me to Wright a memo explaining how I came into possession of it. And so I put the explanation in a memo.  I don't know if that document is attached to my memo, but it's somewhere I can get it, yeah.

MR. CARTER:  Would it be on your phone if you were to forward it to my email?

THE WITNESS:  I mean, I can look.  It'd be in my sent folder, but I don't remember when this happened.  Bridges, I e-mail him a lot. It would take me a while going through all these emails.

BY MS. MAESTAS:

Q    Yeah. And I'm -- I'm not asking you to -- you know.  I want to finish questioning.

MR. CARTER:  Just get it to -- get it to me and I'll ...

A    But no.  When -- when you submitted that request, we looked all over.  We really -- we really

looked.  I mean, I want you to know that.  And it was only this twist of -- I don't know if you can call it gossip or these documents being forwarded all over -- that Scott realized that he might -- he might have it.

And so when he did, he contacted me and -- and gave me a copy of the flash drive.  But the flash drive is, like, an email backup; so it's, like, years of emails from Richard.  You know what I mean?  It's not a simple file.

Q    No, I understand.  I -- I do discovery all the time.  I've gone through 1,700 pages of documents that have been dropped to me on -- on Dropbox; so I get it.  What I don't understand is why it's only available one place if it was a USG investigation, but I'm not asking you to answer that question.

Okay.  So one of the -- and the second page of this written reprimand from Dr. Carvajal to Dr. Carr, he goes through some steps he's supposed to take, and he says one of them is to -- is related to perception.  One of them, it says to read a book, "Communicating a Professional President -- Presence," a number of things to help him.

And so Dr. Carva- -- we took

Dr. Carvajal's deposition already back in January, and he stated that --

MR. CARTER:  Objection.  I don't -- ask him a question.  I don't think you can testify or tell him what other witnesses said.

MS. MAESTAS:  I can't tell him what someone else said?

MR. CARTER:  I don't think that's appropriate; so I'm objecting.  Just ask him a question.

BY MS. MAESTAS:

Q    Have you ever -- have you ever heard that after this written reprimand came out for Dr. Carr that Dr. Carr made a complete 180 and changed his whole demeanor, behavior and became a new person?

A    I wasn't aware of the reprimand till years later; so -- did his behavior get better after that? Yeah, it got better.

Q    Okay.  And did you observe that?

A    I didn't observe much in that period.  I completely retreated and had nothing to do with anything.  I taught my classes and went home.

Q    Did you ever have anybody else come up to or make any complaints about Dr. Carr after the date of -- or after the investigation?

A    Not that I could think of.

Q    Okay.  And I want to flip back to the notes and bullet points on the -- see, going into the document after the -- the first few cover letters, the one that says:  "10/28/13."

So the date of the written reprimand is March 30, 2013, and the date of these notes taken by Dr. Carvajal is 10/28/13.  And you -- when I first asked you about these bullet points, you said that you knew that Dr. Carvajal had written this document; correct?

A    Can you ask that again?  I want to make sure I understand.

Q    So earlier today when we first look at this page, Exhibit 48, you said that you knew Dr. Carvajal wrote this document.

A    I know that he wrote it because it was on that flash drive that Dr. Carr gave me and because the metadata says that he wrote it.

Q    Okay.  And does the metadata show that he created it on -- in October 2013?

A    That's what it says.

Q    Okay.  And did Dr. Carvajal ever discuss with you -- I think you said this earlier -- that he was -- he was being -- Dr. Carr was being considered

to take over the other VP role of academic affairs?

A    Did he say that to me?

Q    Did he ever discuss that with you?

A    We didn't speak from July of 2012 until -- I don't remember the next time we spoke to each other.  So he wouldn't -- he would not have said anything to me.

Q    Okay.  And so regarding Dr. Carr being -- being considered for that position of VP of academic affairs, how did you know about that?

A    How did I know about it?  I mean --

Q    Yeah.  How did you know he was being considered for it?

A    At the time?

Q    Uh-huh (affirmative).

A    There was speculation that -- that to save a salary that Dr. Carr would just be both because I think we were going through budget cuts at the time. But I did not know it.  We speculated that that could be a possibility.

Q    Okay.  And did he end up taking over that position?

A    Yes.

Q    He did?  Okay.

So he was the VP of student -- Dr. Carr

was the VP of student affairs and VP of academic affairs?

A    Yes.

Q    How long did he hold that position?

A    I don't -- I don't remember when he took over both.  But, I mean, he left in, what, 2017 -- or was it '16?  No.  He left in 2017.  So a couple -- couple -- three years maybe.

Q    Okay.  And the second to last sentence, it says:  "If I made him VP of both, he becomes the big public face of the college.  I can't take that risk."

       Do you know anything about that statement?

A    Just what it says.  I mean, the vice-president of academic affairs is considered the No. 2 at a college usually.

Q    Okay.  And then, do you know anything about the last sentence right there:  "If -- If he doesn't learn to change how he behaves, the perception he's creating, he'll never be successful as a president?"

A    Just what it says.  I mean, it's pretty ...

Q    Okay.  And this -- another bullet point document, it looks like the metadata is right behind

it.  It says:  "Created June 2012."

And then at the top it says:  "Rodney," and then it goes, three bullet points, "I can tell you what was on his mind when he wrote it."

Do you know anything about what that document means?

A    I -- I kind of get the No. 2, the relationship repair reference.  I guess I understand what it is.  I mean, No. 3.  But I don't know what the first bullet point means.

Q    Okay.

A    Definitely don't know what the second bullet point means.

Q    I want to ask you about -- you said that you had gotten the information from Dunn because -- that documents were circulated on a website.  Are you talking about Pacer?

A    There are documents, obviously, on Pacer, but somebody had also posted them on Reddit on the Valdosta site, the -- the Valdosta Reddit page.  And that's what really triggered, I think, a lot of the chatter.

Q    Okay.  I heard about Facebook, but I had not heard about Reddit.

A    I -- I saw a couple of posts from

Facebook, but I -- the documents were on Reddit.

Q    Okay.  And what document was that?

A    It was the -- the results of the -- your open record request.  All that was posted on Reddit.

Q    Okay.  Do you know who posted that?

A    The -- the names are -- what is it, a pseudonym?  You know how you makeup a name for -- for a social media.  And so whoever posted it didn't post -- didn't use their real name.

Q    Okay.  And then any -- so just Reddit? That's where you pulled it off of?  And then you --

A    I -- I didn't.  A -- some professor -- a professor at Valdosta State sent it to a professor here, and then the professor sent it to me.

Q    Okay.  Do you know who that professor was at VSU?

A    No, I don't remember.

Q    What about --

A    I -- I remember it was a history professor.

Q    What about ABAC?

A    Dave Nelson.

Q    And is he history?

A    He's history.

Q    Okay.  And other than forwarding it, was

there any content in his message?

A    In Dave's message?

Q    Mm-hm.  Like, when he gave it to you.
Like a -- just a blank forward, or --

A    Oh, I'm sure he said something like, Did
you know about this, or something like that.

Q    Okay.  Okay.

Not, like, anything, like, about --

A    But, you know, it was a Facebook -- I
think it was a Facebook message, and he sent it to
me and Scott.  And that's how Scott found out about
it.

Q    Which one's Scott?

A    Scott Dunn's the former IT guy.

Q    Oh, okay. Dunn.  I -- I got Dunn.  Okay.

A    Yeah.

Q    Okay, sorry. All right.

And do you regularly communicate with
anybody at VSU?

A    No.

Q    What about the USG?

A    No.

Q    What about the TCSGs?

A    TCSG, yes, because we share a campus with
them.

Q    Okay.  And what do you talk about?

A    It -- it could be, you know, our flower beds have weeds.  Our bathroom need to be cleaned, because we -- we rent space here.

Q    Right.

A    We are at meetings together frequently -- chamber meetings, civic club meetings.  It could be about anything operationally dealing with a college.

Q    Okay.  What about -- so you're the -- over missions now?

A    For ABAC.

Q    Okay.  And what about related to admissions for ABAC?  Do you ever talk to anybody at the TCSGs?

A    No.

Q    No?  Okay.

A    No.

Q    Have you had any conversations -- other than what you've told me, have ever -- have you had any conversations about Dr. Carr with anybody else, like, such as employees here at ABAC?

MR. CARTER:  During that time period are you --

BY MS. MAESTAS:

Q    Like -- so we've already talked about the

time period where the investigation happened, but, I mean, after you kind of knew the lawsuit was pending, have you had any communications related -- about Dr. Carr?

A     With someone here?

Q     Uh-huh (affirmative).

A     Yeah.

Q     Okay.  What's been said?

A     I think you asked that already.  You -- you started with that question.

Q     Yeah.  Uh-huh (affirmative).

MR. CARTER:  So he's already answered.  It's asked and answered.

A     It's just general conversation about their behavior here, their behavior there.

BY MS. MAESTAS:

Q     And did they say it was the same?

A     Yeah.

Q     Okay.  And did they say something like, I'm not surprised?

A     Similar sentiments.

Q     About how many people?

A     Two, three, couple?  You know I -- I don't -- you might find this hard to believe.  I don't talk to a lot of people here.  I am a -- over

admissions for all of ABAC, and so I come here and I go back to my car.  I work a lot.  I would go to Tifton -- went three days last week.  I haven't been in the building over here where the library and the academic space is.  I haven't -- I haven't been over there -- what is it, March?

MR. CARTER:  Uh-huh (affirmative).

A    Early January?  I mean, it's only, like, 50 yards away.

BY MS. MAESTAS:

**Q    Okay.  You're very busy.  Thank you for your time.**

A    Well, it's just that in my role, I'm -- I'm over administrations.  Right?  The people over there -- the librarian reports to the librarian.  The faculty report to chairs and deans.  All right?  I don't -- when I do deal with faculty, it's usually the Carter Series, which is our arts and lecture series, and we talk about that.  If -- if I have talked about Dr. Carr to anybody, it would have been somebody in this building or maybe Dave Nelson.

**Q    Okay.**

A    Because he and I are history colleagues, and we go back a long way.

MR. McMILLAN:  Dave Nelson at Valdosta?

THE WITNESS:  No.  Dave Nelson is here.

BY MS. MAESTAS:

Q    And what has -- has Dave said about Dr. Carr?

A    It's just the general sentiment of their behavior here and their behavior there.

Q    Is the same or different?

A    The same.

Q    Okay.

MS. MAESTAS:  Off the record for a second.

(Recess 12:21 p.m. until 12:27 p.m.)

MS. MAESTAS:  Thank you for your time, and I think that's all questions I have.

Did you have any --

MR. CARTER:  No.

MS. MAESTAS:  -- follow-up?

And so we're just -- we're looking for the -- what's on the flash.  I think that's the only remaining evidence that we've identified that's responsive to the open records request and the motion to compel.  And just need to ...

THE COURT REPORTER:  You're ordering?

MS. MAESTAS:  Yeah, I'll order.  And he probably wants a copy.  I don't know. Do you want a copy?

MR. CARTER:  Yes.

MS. MAESTAS:  And than are you going to read and sign?

MR. CARTER:  All right.  You've got the right to read and sign this before she puts it up.  Do you wanna do that?

THE WITNESS:  Yes.

MR. McMILLAN:  Yep.

(Examination was concluded at 12:28 p.m.)

CERTIFICATE OF OATH


STATE OF GEORGIA

COUNTY OF LOWNDES

I, KAIRISA JOI MAGEE, RPR, GCCR (Georgia), Notary Public, State of Florida, certify that DR. WILLIAM M. KIRKLAND appeared before me on March 16th, 2022, and was duly sworn.


Signed this 22nd day of April, 2022.

_____
KAIRISA JOI MAGEE, GCCR, RPR
Georgia Certification No. 5962-0590-7476-4800
Notary Public, State of Florida
My Commission No. GG 968504
Expires: 03/15/2024

CERTIFICATE OF REPORTER

STATE OF GEORGIA

COUNTY OF LOWNDES

I, KAIRISA JOI MAGEE, RPR, GCCR (Georgia), Florida Notary, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of DR. WILLIAM M. KIRKLAND; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 22nd day of April, 2022.

_____
KAIRISA JOI MAGEE, GCCR, RPR, FLORIDA NOTARY

```
                    ERRATA SHEET

              DO NOT WRITE ON THE TRANSCRIPT
               ENTER CHANGES ON THIS SHEET

JAMIE BIRD V VALDOSTA STATE UNIVERSITY
Deponent:  DR. WILLIAM M. KIRKLAND
Date of :  March 16th, 2022
Case No.:  7:21CV62 (WLS)

PAGE    LINE          REMARKS
```

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

```
Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.

Signature of Witness _____

Dated this _____ day of _____,
_____.
JOB NO.:  387114
```

**JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIV. SYSTEM OF GA**
Dr. Michael Kirkland on 03/16/2022                Index: 03..ABAC

---

**Exhibits**

---

**KirklandM-46**
  3:15 23:6

**KirklandM-47**
  3:16 23:8,
  13 24:1
  34:22 35:4
  67:9

**KirklandM-48**
  3:17 23:10
  76:15

---

**0**

---

**03**  16:10,11

**09**  16:11,12

---

**1**

---

**1**  24:1 52:9

**1,700**  74:12

**10**  16:12
  25:23

**10/28/13**
  55:2 76:5,
  8

**10:34**  4:1

**11**  51:15

**12**  51:15

**12:21**  85:11

**12:27**  85:11

**13**  22:5

**15**  61:13

**16**  78:7

**180**  75:14

---

**2**

---

**2**  24:1
  51:17 52:8
  78:16 79:7

**20**  61:13

**2000**  51:13

**2003**  16:13,
  17

**2010**  16:12,
  13 17:15

**2011**  17:18
  18:8,22
  19:24 20:4
  29:16

**2011/january**
  32:4

**2012**  22:5,
  7,16,21
  27:20,23
  28:6,20
  29:9,16
  32:4 33:3
  34:23 35:7
  36:22,24
  37:16,23
  38:1,3,4,8
  39:13,14,
  16,22
  40:17
  48:6,9

**50:13**
  58:16 64:3
  77:4 79:1

**2013**  27:19
  63:4 65:7
  76:7,21

**2016**  63:24
  64:3

**2017**  78:6,7

**20s**  25:10

**26**  25:10

**27**  14:18

**28**  25:10

---

**3**

---

**3**  7:17 24:1
  79:9

**30**  8:25
  76:7

**30th**  63:4

---

**4**

---

**4**  24:1

**40**  23:17

**40s**  25:23

**45**  65:24

**46**  23:3,6

**47**  23:3,8,
  12,13,19
  24:1 34:22
  35:4 67:9

**48**  23:3,10,
  12,13
  76:15

**49**  52:1

**4th**  28:6
  34:23
  36:21
  37:23 38:4
  58:16

---

**5**

---

**50**  14:18
  84:9

**50s**  25:24

**5919**  7:17

---

**6**

---

**60**  14:18

---

**7**

---

**721CV62**  4:10

**75**  14:18

---

**8**

---

**8:45**  58:16

---

**A**

---

**a.m.**  4:1
  58:16

**ABAC**  12:3,7
  17:1 21:16

---

23:15 80:21 82:11,13, 21 84:1

**ability** 14:10

**academic** 16:24,25 17:25 24:13,17, 18 29:6 77:1,9 78:1,15 84:5

**access** 9:19

**accidentally** 66:6

**accreditation** 16:25 18:2 64:7,17

**accusations** 53:15 56:7

**accused** 43:14,16 44:7 45:1 47:9

**acting** 22:17

**action** 40:20,24 45:16

**actions** 8:17 67:19

**acts** 26:14

**actual** 21:12 53:8

**added** 67:21

**addition** 11:15 29:25

**address** 7:16

**administration** 47:22 48:2 64:3,5

**administrations** 84:14

**Administrative** 16:21

**admissions** 25:5,7 52:3 82:13 84:1

**Adria** 33:20 34:5 49:20 50:9 51:21 52:5

**advancement** 24:20

**advice** 45:7

**affair** 24:22 55:3

**affairs** 16:22,24, 25 17:25 19:2,10 20:2 24:13,17, 18,24 25:2

29:6 49:24 77:1,10 78:1,2,15

**affect** 14:9

**affiliated** 16:18

**affirm** 6:19

**affirmative** 8:12 9:2 13:5 16:16 19:25 35:5 48:15 51:8 65:9 77:15 83:6,11 84:7

**age** 7:4

**aged** 25:8, 22

**aggressive** 20:16,19 32:9 33:12 39:4 50:10 67:25

**aggressively** 39:19

**agree** 68:4

**agreement** 4:13

**agrees** 55:20

**ahead** 6:12 26:22 27:24 73:4

**air** 58:7

63:10

**alcohol** 41:10 42:22 44:13

**allegation** 42:1

**allegations** 12:24 42:10 45:18

**allegedly** 41:2,10

**allowed** 37:5

**anatomical** 58:1

**and/or** 24:24

**Andrew** 16:8

**anger** 22:17

**angry** 43:5

**announced** 53:13 56:5

**announcement** 56:10

**answers** 4:24 42:23

**anymore** 48:2 69:19

**apparently** 56:12 71:9

**appears** 37:25

70:23

**approach**
33:13

**April**  62:5

**area**  14:20,
24

**areas**  53:19

**arts**  16:23
17:22
38:17
46:5,11
51:16,20
84:18

**asse-**  64:19

**assessment**
46:19
64:18

**assist**  24:9
65:15

**assistant**
16:20,23

**associate**
16:20

**assuming**
29:7

**Atlanta**
18:14

**attached**
73:10

**attended**
15:23

**attorney**
5:21  6:3

**auspices**
52:11

**authority**
47:12

**avoid**  4:24

**aware**  13:10,
12 21:16
56:16
63:18,24
67:10 70:9
75:16

---

**B**

---

**bachelor's**
16:4

**back**  23:4
34:21 37:8
45:10,20
47:23
70:13 75:1
76:2 84:2,
24

**backed**  71:6,
11

**backup**  74:8

**backwards**
63:6

**bad**  6:16
50:17

**Bainbridge**
10:24
13:11
15:23 16:3
47:1 56:20

66:14

**Baker**  60:14
62:12
67:24 68:8
70:24

**balls**  57:25

**bank**  16:9

**Barron**  24:23
25:4 54:19
55:3

**based**  68:3
70:22

**basic**  16:1
45:19

**basically**
9:20 60:22

**bathroom**
41:9 42:18
44:13 82:3

**beds**  82:3

**beer**  41:8
42:16
44:12

**began**  4:1

**beginning**
44:3 51:12

**behaves**
78:19

**behavior**
26:3,16
37:6,17
52:19 53:7
75:15,17

83:15 85:6

**Belk**  33:20
34:5 49:20
50:9 51:21
52:5

**Berrien**
14:25

**big**  27:17
78:10

**bio**  15:22

**Bird**  4:4,5

**bit**  57:14

**Blakely**
18:24
65:23,24
69:8

**blank**  81:4

**board**  4:5,16
20:2 67:20

**book**  74:22

**boxes**  69:9,
10

**breath**  41:10
42:22
44:14

**Bridges**
23:16,22
65:11
67:3,4,5
69:25
72:16,17
73:4,7,16

**briefly**  16:8

**JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIV. SYSTEM OF GA**
Dr. Michael Kirkland on 03/16/2022        Index: budget..challenge

budget  77:18

building
  42:9
  49:22,24
  50:1,19,22
  51:5 59:7,
  11 66:3
  84:4,21

bullet  26:11
  55:1 76:3,
  9 78:24
  79:3,10,13

Burrell
  50:16
  51:23 52:5
  54:15

business  4:6

busy  84:11

Byrd  63:22

────────────

C

────────────

call  13:4
  29:9
  45:10,20
  47:1 74:3

campus  27:14
  33:4 53:3
  56:1 65:24
  68:21
  81:24

candidate
  17:12
  19:5,8

candidates

18:12,14

car  84:2

Carr  14:2
  17:8 18:19
  19:21
  20:1,7
  21:20,24
  22:1,16
  24:17 25:1
  28:12,19
  31:6
  32:17,22
  33:8,10
  34:25
  35:13,21,
  25 36:25
  37:17,24
  38:9 40:20
  44:9,19
  45:2,8,24
  46:10,15,
  20,24
  47:18
  50:18
  51:1,4
  52:20,25
  53:11,13
  54:3 55:7,
  8,17 56:5,
  8 57:1,8
  63:5,7,12,
  15 64:11,
  24,25
  74:20
  75:13,14,
  24 76:18,
  25 77:8,

17,25
  82:20 83:4
  84:20 85:4

Carr's  52:18
  53:7

Carter  5:6
  6:15 11:6
  14:24 15:4
  26:21
  27:12
  30:25
  31:18
  37:7,10,13
  38:6,11
  41:21 43:7
  48:13,16,
  20,25
  49:8,13,17
  54:12
  56:19,23
  57:16
  58:18
  63:6,9
  71:22
  72:24
  73:12,22
  75:3,8
  82:22
  83:12
  84:7,18
  85:15

Carva-  74:25

Carvajal
  14:2 17:8,
  10 19:18,
  21 22:7
  24:6 26:25

28:6,22
  33:3,19
  34:13
  35:20
  36:12,22
  37:24
  38:13,16
  39:13,23
  40:8,19
  42:9 43:16
  44:8,21
  45:1,3,8,
  25 46:1
  47:9 55:7,
  20 57:10,
  11 59:16
  63:5,7,12,
  15 64:14,
  22 74:19
  76:8,10,
  16,23

Carvajal's
  26:18
  64:23 65:7
  71:1,17
  75:1

case  4:9
  12:16 66:5

caused  70:12

causing
  53:12 54:5

cents  10:2

chaired  18:3

chairs  84:16

challenge

Case 7:21-cv-00062-WLS    Document 34-4    Filed 05/12/22    Page 94 of 112

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIV. SYSTEM OF GA
Dr. Michael Kirkland on 03/16/2022    Index: chamber..continued

24:20

chamber 82:7

chancellor 18:16,17

change 57:5 78:19

changed 75:14

charge 53:4 66:9,10

charged 57:20 68:2

Charter 24:25 26:5

chatter 79:22

checking 19:18

chief 12:11

children 14:19 16:9

choose 19:16

CIO 12:12

circular 64:19

circulated 69:16 70:12 79:16

City 7:17 14:21

civic 82:7

clash 47:15

class 49:22 50:2

classes 75:22

cleaned 82:3

clear 52:18 63:10

cleared 58:6

clicked 10:14

close 10:12 26:13 29:24

club 82:7

colleagues 84:23

college 10:24 15:23 16:3,7,8 18:2 27:17 47:2 56:20 66:4 78:11,16 82:8

comfort 26:15

committee 17:12 18:4,11, 12,15 19:15,17

committees 18:6 19:6

communicate 81:18

Communicating 74:23

communications 83:3

compel 10:23 11:3 72:23 85:21

complaint 8:7 10:17 22:15,20 27:20,22 35:3 39:18

complaints 20:7,14 21:12 22:6 32:17 37:1,25 40:6 56:8 75:24

complete 75:14

completely 75:21

computer 71:5,8,11

concern 40:16

concerned 28:5 50:18

concerns 28:23 29:1,17 34:19 68:5

conclusions 68:4

conducted 67:20

confirm 42:23

Connie 40:23 41:23,25 42:23 44:10,19 45:17 46:7,14 47:18 48:4

considered 76:25 77:9,13 78:15

contact 22:22 53:8

contacted 74:6

contained 67:18

content 81:1

contents 23:14

context 7:21 8:16

continued 39:8 50:14

Case 7:21-cv-00062-WLS    Document 34-4    Filed 05/12/22    Page 95 of 112

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIV. SYSTEM OF GA
Dr. Michael Kirkland on 03/16/2022    Index: conversation..describe

conversation
  13:25
  35:12 36:4
  38:12,14
  39:13,22
  40:1,2,3
  54:7 58:5
  61:5 83:14

conversations
  26:24
  53:12
  54:4,7
  82:18,20

Conyers
  15:11

cooperate
  8:7

coordinator
  51:16

copy  5:2
  71:8 74:7
  85:24,25

correct
  27:21
  52:14 57:9
  68:9 76:11

could've
  29:11

counsel  4:14
  5:15,18,24
  9:1

county
  14:20,22,
  25 15:3,23

couple  10:2
  14:6 26:24
  33:4 57:22
  78:8 79:25
  83:23

court  4:8
  37:9,12
  85:22

cousins
  14:19

cover  23:21
  76:4

covers  20:22

created
  76:21 79:1

creating
  78:20

criminal
  12:13

CTO  12:12

current  4:17

cursing  68:2

Cuthbert
  16:8

cuts  77:18

cycle  64:17

_____

       D
_____

database
  9:23

date  75:24
  76:6,7

dated  16:12
  34:22
  37:23 55:2
  63:4

Dave  12:1,
  12 80:22
  84:21,25
  85:1,3

Dave's  81:2

day  42:22
  49:21
  61:22

days  38:17
  84:3

deal  84:17

dealing  82:8

dealings
  17:19

dealt  18:2
  46:20,23

dean  16:22
  17:22
  38:17 44:5
  46:5,7,11,
  14 47:4
  51:19,20,
  22

deans  84:16

Decatur
  15:23

December
  27:20,23
  28:6
  29:14,16

32:4 34:23
  36:21
  37:23
  38:4,8,21
  39:16 48:9
  49:17
  50:13
  51:14
  58:16

decide  5:4

decided  39:9

defendant
  4:16,18
  5:7

defended
  16:11

defense
  42:12

demeaned
  52:21

demeanor
  75:15

Department
  16:9

deposed  4:17
  9:11

deposition
  4:11,14,
  22,25 5:3,
  23 7:19
  8:19 14:10
  75:1

describe
  13:6 28:9

Case 7:21-cv-00062-WLS    Document 34-4    Filed 05/12/22    Page 96 of 112

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIV. SYSTEM OF GA
Dr. Michael Kirkland on 03/16/2022        Index: describing..emails

describing
  57:23

desire  24:21

desk  72:11

details  36:9
  39:20
  57:14
  70:10

diploma's
  16:12

dire  15:19

direct  7:6
  30:20
  46:8,12,21

director
  17:2
  65:22,23

discovery
  74:11

discuss
  76:23 77:3

discussed
  63:17

discussion
  13:17 17:7

distance
  26:14

distantly
  15:12

distress
  53:12 54:5

district  4:8
  15:4

Division  4:9

docket  10:14

doctorate
  15:24
  16:10,11,
  15

document
  23:24
  24:2,5,8,
  9,12 26:19
  63:18,24
  64:1,8
  73:10
  76:4,11,16
  78:25 79:6
  80:2

documents
  9:13,16,
  17,20,24
  10:10
  11:12,15,
  17 12:16,
  18 23:19
  27:25
  60:15
  64:15,24,
  25 65:4,6
  69:12,14,
  17 70:11
  71:7 74:3,
  13 79:16,
  18 80:1

door  32:20

dot  70:20

Doug  8:25

Douglas  5:11

download
  9:19

dresser
  72:12

drinking
  41:2,4,7,
  19

drive  18:24
  64:6,8,10,
  12,22
  65:10
  70:25
  71:6,13,17
  72:8 74:7,
  8 76:18

drives  70:7

Dropbox
  74:14

dropped
  74:13

dropping
  39:6

drugs  14:8

duly  7:4

Dunn  12:1,
  8,9 69:17
  70:1 72:14
  79:15
  81:15

Dunn's  81:14

Dwight  60:14
  67:24

70:24

_____

E
_____

e-mail  67:5
  73:3,16

earlier
  76:14,24

early  22:5
  25:24
  38:21 84:8

Earnests
  15:10

east  49:25

education
  15:25

email  11:18
  28:4 34:22
  35:6
  36:22,25
  37:23
  39:2,10
  52:9 56:13
  57:15
  58:15,24
  59:2,4,17
  60:20
  67:11
  70:14
  73:6,13
  74:8

emailed
  34:16

emails  58:21
  70:16

73:18 74:9

**employee**
4:17 12:9
22:23
30:17,18,
19,21,22
31:7 32:12
34:6,7
39:18 52:2
53:8,11,22
54:3

**employees**
12:3,7
21:17
22:17,22
52:21
53:4,7,15
55:9 56:6,
7 82:21

**employment**
8:4 16:1
17:20

**end** 5:4
19:9 36:16
77:21

**ended** 36:18

**ends** 71:16

**enrollment**
17:4 39:5
51:24
55:16

**entity** 4:15

**evening**
58:17

**event** 38:15
39:14
40:18 48:6

**evidence**
25:12,16
44:9,23
53:18
85:19

**EXAMINATION**
7:6

**examples**
46:17
53:25

**Excellent**
8:22

**Exciting**
24:20

**executive**
17:1

**Exhibit**
23:2,6,8,
10,13 24:1
34:22 35:4
67:9 76:15

**exists** 66:21

**explaining**
73:8

**explanation**
7:15 73:9

**expressing**
29:2 40:16

**extract**
68:24

———————
**F**
———————

**face** 27:17
78:11

**Facebook**
79:23 80:1
81:9,10

**faculty**
47:24,25
84:16,17

**Fair** 63:25

**fall** 8:5
20:3 53:14
56:6

**family** 6:3
15:10 16:9

**fantasy**
55:14,23

**father** 15:9

**federal** 9:23

**feel** 53:1,4

**felt** 33:14

**female**
22:22,23
29:24
30:12,19,
21,22
31:6,20,24
32:12 34:6
53:8,10,
14,21
54:1,3,21
56:6

**females**
58:11

**figure** 24:16

**file** 9:6
70:15,18
74:10

**filed** 7:3
9:14,18
10:23
11:13
63:21,23
72:21

**files** 64:6,
13,20
65:25
66:5,15
71:1,12

**finally** 70:2

**find** 21:5
55:18,19
68:25
71:25
72:22
83:24

**findings**
66:22
67:7,11,
15,16,18
68:6,7
70:13,22

**fine** 63:9

**fingers**
29:24
31:6,25
34:7 53:10

54:2,16,21

**finish** 73:21

**finished** 8:4
16:11

**firms** 9:18

**fists** 22:18

**flash** 64:6,
8,9,12,22
65:10
70:7,25
71:6,13,17
72:8 74:7,
8 76:18
85:18

**flip** 27:24
76:2

**Florida**
16:15
69:21 70:2

**flower** 82:2

**folder** 73:15

**follow-up**
34:15
36:15,16
67:5,10
85:16

**foot** 35:15

**football**
55:14,23

**forgot** 54:17
72:18

**form** 4:19

**format** 68:23

**formed** 70:20

**forward**
18:14
65:12
73:13 81:4

**forwarded**
73:2,4
74:3

**forwarding**
80:25

**found** 9:21
20:25 21:1
41:8 45:16
67:25 68:1
69:11
70:2,14,24
81:11

**foundation**
64:20

**free** 9:24

**frequently**
52:25 82:6

**Friday** 46:4

**friend**
40:21,22

**friends**
55:25

**friendship**
52:24 55:7

**front** 52:16

**full** 6:14

**functions**
18:6

**funny** 49:6

---

### G

**gave** 50:13
64:9,24,25
69:24
72:15 74:7
76:18 81:3

**gender** 21:18

**general**
12:21
35:12 36:4
37:6 48:18
50:9 83:14
85:5

**generally**
11:25
13:3,11
14:3 55:12

**generated**
11:24

**gentleman**
5:8

**George** 60:13

**Georgia** 4:6,
9 7:17
14:13 16:4

**Gerald** 50:3
52:5 55:15
62:4

**gestures**
4:24

**girl** 25:8,
22

**give** 6:20
49:4 72:16

**God** 6:22

**golf** 55:13

**golfed** 55:22

**good** 4:2
36:7

**gossip** 74:3

**gotta** 63:13

**great** 6:7
24:20,21

**grew** 15:9,
22

**gritting**
22:18

**group** 39:4

**guess** 15:21
25:9 28:14
31:15
38:24
61:10
70:6,15
79:8

**guessing**
71:10

**guy** 69:17
70:1,25
72:5 81:14

**guys** 26:12

## H

hair 29:25
31:25
32:1,7,13
34:7
53:10,22
54:2,17,22

hand 6:18

hands 31:6
32:12,13

happen 10:22
36:23
56:11

happened
7:24 20:8
35:1 38:3
39:12 46:2
59:3,5,6
73:16 83:1

hard 37:19
45:16
83:24

Harrell
12:1,6,13
33:5 34:5
49:20 50:8
51:10 52:5

hate 36:8

he'll 78:20

head 37:18
49:22

hear 20:6
22:3 34:12

heard 22:2
26:8 28:23
57:22
60:24
75:12
79:23,24

hearing 4:22
21:10

hearings 8:8

held 16:18

heretofore
7:3

Hey 13:15

highlighted
53:19

hire 24:16

hired 19:19

history
12:13
16:1,4,7
80:19,23,
24 84:23

hold 78:4

holds 71:7

Holly 4:3

home 72:12
75:22

honestly
50:23
56:17

hoping 7:14

hour 43:2

hours 38:16
39:14
44:25

House 24:25
26:6

HR 65:22

humanities
16:14

hundreds
15:12 69:9

hung 55:14

## I

idea 59:25
60:1

identification
23:5,7,9

identified
85:19

impression
19:3,7

improvement
64:18 68:4

inappropriate
7:25 21:2
52:19
53:7,12
54:4,7

inappropriatel
y 33:16

inauguration
18:4

incident
38:7 52:20

incidents
10:24 68:1

including
68:6

individual
5:18 39:18
55:1

individuals
12:14 14:1
27:8 53:21
60:12

influence
14:8

influential
44:1

information
12:11 38:1
50:12
61:14
71:18
79:15

initial
27:20

Initially
17:11

initials
63:13

initiated
22:15,21

inquire
60:20

institution
  46:25 64:3

institutional
  64:16

instructional
  17:2 51:15

instructor
  7:22 16:19
  25:21

instructors
  8:3

intends
  26:16

interact
  20:15,21,
  23

interacted
  20:12 32:6

interaction
  33:10,11
  34:1

interactions
  46:18
  50:17

interest
  11:24

interim
  16:22,24
  51:20

interview
  18:23,25
  19:22
  60:20
  61:20

interviewed
  18:22
  61:25
  62:3,5

interviewing
  19:1,18
  61:23

interviews
  71:15

Intimacy
  26:15

intimate
  26:14

intimidated
  33:14

intimidating
  20:16,19
  32:9 33:13
  50:10

introduce
  60:18

introduction
  18:21
  52:13

introductory
  14:7

investigation
  41:18 60:3
  63:16
  67:19,24
  68:3 74:16
  75:25 83:1

investigative
  65:4

investigator
  53:17
  57:9,12

investigators
  66:23
  71:15

invite  34:14

invoked  53:6

involving
  68:2

Iron  7:17

isolated
  52:20 53:1

issue  42:20

issues  18:2

issuing
  67:21

items  63:16

---

**J**

---

Jamie  4:4
  63:22

January
  17:18 18:7
  28:20
  29:9,12,16
  33:3 35:7
  36:24
  37:16
  38:1,3,8,
  15 40:1,10
  75:1 84:8

jealousy

47:13

job  18:9
  40:15
  41:3,4,7
  65:20

jobs  16:21

Jokes  26:12

Jones  24:24
  25:20 26:3
  60:13
  62:10
  67:25 68:8
  70:24

Joy  50:16
  51:23 52:5
  54:15

Joyce  60:16
  62:10,20
  67:24
  70:24

July  38:16
  39:14
  40:17 48:6
  77:4

June  79:1

jury  14:17
  15:2

justice
  12:13

---

**K**

---

Keiser  16:7

kind  10:14

21:6 36:16 45:19 49:21 51:16 52:13 53:19 58:21 79:7 83:2

**Kirkland** 4:12 5:16 7:2,9,10

**Kirklands** 15:11

**knew** 25:12 43:19 44:15,17 49:12 56:12 70:9,10 76:10,15 83:2

**knock** 32:20

**knowledge** 53:18

—— **L** ——

**lady** 25:22

**language** 53:4 57:20 68:2

**late** 25:23 38:21 41:9,14 42:19 44:12

**law** 9:17

**lawful** 7:4

**lawsuit** 8:14 9:7,8,20 10:19 12:24 13:12,16 17:7 63:21,22 70:10 83:2

**lawyers** 45:15

**lead** 21:6 59:22 62:10

**leader** 46:25

**leading** 56:7

**learn** 26:17 64:1 78:19

**learned** 42:6 54:6 68:3

**leave** 24:14 42:18

**lecture** 84:18

**left** 24:14 40:9 64:15,23 78:6,7

**legal** 8:17 9:17 45:6

**Leslie** 24:24 26:5

**letter** 23:21 63:4 67:21 70:23

**letters** 76:5

**letting** 15:19

**liaison** 16:25 17:1

**librarian** 84:15

**library** 84:4

**likewise** 68:1

**Lindsay** 24:23

**Lindsey** 25:4 54:19 55:3

**list** 68:5

**listened** 32:25

**lives** 14:21, 25

**local** 18:12

**location** 67:14

**log** 9:24

**long** 36:2 60:16 61:5,12 78:4 84:24

**looked** 63:20 65:17,25

66:3,18 67:1 69:6, 7,9,10 73:25 74:1

**lot** 9:13, 15,17,18 11:25 13:19 15:6,12 18:5 38:22 39:16 42:13 43:5 48:10 49:25 55:13,14 62:6 64:6, 13,20 69:13 70:6 73:16 79:21 83:25 84:2

**lots** 19:6

**loud** 20:16, 20 32:9 50:10

**Lowndes** 14:20,22

**lunch** 28:22, 24 33:3,19 34:14,17, 25 35:2,8, 11 36:24

—— **M** ——

**made** 9:14

12:24 22:7
27:16,20,
22 55:16
75:14
78:10

**Maestas** 4:2,
3 5:13,17,
20 6:2,6,
9,11,16
7:7 11:8
15:1,5,17
23:11
27:2,15
31:3,22,23
37:15
38:10,18
41:24
43:12 47:6
48:15,23
49:3,6,10,
16 50:6
54:20
56:24
57:18
58:20,22
63:8,11
68:10 72:7
73:19
75:6,11
82:24
83:16
84:10
85:2,10,
12,16,23

**make** 24:17
27:25
65:19

75:24
76:12

**makes** 18:15
39:18
52:25

**makeup** 80:7

**making**
22:22,23

**management**
17:4 51:24
55:17
67:25

**March** 63:4
76:7 84:6

**marked** 23:5,
7,9,12

**massaging**
53:9 54:16

**master's**
16:5,6

**material** 9:8

**materials**
9:9 10:6,8

**matter** 4:4
5:7 7:24
8:9

**Mcmillan**
5:11,12,
15,19 6:8,
10 14:16,
20,23
15:14
27:11
29:22 37:5

47:4 68:9
72:1,3,5
73:1 84:25

**Mcnair** 62:5

**means** 79:6,
10,13

**meant** 47:3

**media** 80:8

**medications**
14:9

**meet** 6:7
19:21
61:12

**meeting**
21:11,17
34:25
35:1,2,11
36:12,17,
24 37:16
38:1 39:3,
5,17,20
40:10 42:8
43:3 45:24
46:3 48:7
50:4
55:15,16

**meetings**
82:6,7

**Melissa**
12:1,13
33:5 34:1,
5 49:19
50:8 51:10
52:4

**members**
61:23

**memo** 73:7,
9,11

**memory** 14:9

**mentioned**
17:6 49:19
55:1,6
67:8

**mentioning**
54:1

**mentions**
52:25

**merger** 17:1
66:7

**message**
11:19
69:22
81:1,2,10

**met** 17:12
19:4 50:2

**metadata**
76:19,20
78:25

**Michael**
4:11,12
7:9

**middle** 4:8
15:4 25:8,
22 49:17

**miles** 65:24

**mind** 79:4

**mine** 40:21

Case 7:21-cv-00062-WLS    Document 34-4    Filed 05/12/22    Page 103 of 112

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIV. SYSTEM OF GA
Dr. Michael Kirkland on 03/16/2022     Index: minutes..opportunity

minutes   8:25
  59:15
  61:13

missing
  66:20,22

missions
  82:10

Mm-hm   81:3

Mm-hmm   60:10
  62:15

month   38:14

months   35:14
  36:6,7

morning   4:2

mother   15:9

motion   10:22
  11:3 72:22
  85:21

move   36:17

moved   66:15

msg   70:20

──────────────
        N
──────────────

named   7:3
  13:21

names   12:15
  15:8 18:14
  19:15,16
  49:11,14
  52:7 60:11
  62:6 80:6

narrow

18:13,18

narrowed
  18:11

nature   50:10

necessarily
  28:1

needed   64:7,
  15 68:5

Nelson   12:2,
  6,12 80:22
  84:21,25
  85:1

news   72:20

Nice   6:7

Nights   7:17

non-party
  4:15

non-rehire
  8:11

note-taker
  62:22

notes   61:9
  65:7 66:22
  76:3,7

notice   4:13
  7:3

noticed
  22:16,21

notorious
  53:3 57:19

November
  38:21

39:15 48:9
  49:17
  50:13
  51:14

number   4:9
  5:5 74:24

numbers   39:5

nursing
  25:21

──────────────
        O
──────────────

oath   7:5

object   26:21

objecting
  75:9

Objection
  75:3

Objections
  4:19

observation
  34:6

observations
  33:7 36:25
  44:19

observe   26:2
  75:19,20

observed
  21:1 26:9

observing
  30:4

occurred
  10:24

25:17
  39:23
  58:25 70:5

October
  27:19
  76:21

off-campus
  17:2

offensive
  21:1

offer   7:15
  40:8

office
  32:18,19

officer
  12:12

officially
  18:16

Older   25:22

one's   81:13

ongoing   51:6

open   11:5
  23:14,23
  28:1 65:12
  66:11
  70:17
  71:25
  72:3,6,21
  80:4 85:20

openly   55:8

operationally
  82:8

opportunity

Case 7:21-cv-00062-WLS    Document 34-4    Filed 05/12/22    Page 104 of 112

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIV. SYSTEM OF GA
Dr. Michael Kirkland on 03/16/2022        Index: opposite..position

36:9

**opposite**
21:18

**order** 28:2
85:23

**ordering**
85:22

**other's**
29:25

**Outlook**
70:14

**overheard**
53:11 54:4

---

**P**

---

**p.m.** 85:11

**Pacer** 9:21,
22 10:5,10
11:15
63:20
69:13,15
79:17,18

**pages** 23:23
63:3 74:12

**paragraph**
53:2

**part** 7:22
8:3 19:22
47:21 48:2
51:12
66:14,15

**part-time**
51:25 52:1

**participate**
14:10

**participated**
8:17

**party** 4:16
8:14 11:12

**passed** 12:18

**passing**
12:15

**past** 52:20

**pattern**
52:19

**pay** 9:25

**pending** 4:7
13:16
72:22 83:3

**people** 5:5
9:15,19
11:18,22,
25 13:8,9,
11,15,19,
20,24
15:13
20:11,12,
15,21,23
21:10 30:1
32:6,7
33:4 35:16
38:22
39:7,16
47:1,16
48:3,10,14
49:11,14
55:19 56:2
59:18,20

60:20,24
61:20 62:6
69:10 70:6
83:22,25
84:14

**percent** 52:1

**perception**
74:22
78:20

**performance**
42:19

**period** 75:20
82:22 83:1

**person** 30:8
31:11 39:6
41:11
42:21 49:4
53:23
75:15

**person's**
53:23

**personal**
26:13
43:14,18
44:8 45:2
47:10

**personnel**
40:20,24
67:22

**Ph.d.** 16:14

**phone** 73:12

**physical**
22:22 53:8

**pick** 36:8

**pieces** 44:23

**pinpoint**
37:20

**place** 21:13
74:15

**Plaintiff's**
23:5,7,9,
13 24:1

**planning**
64:16,18

**playing**
55:13

**pleadings**
9:21

**point** 21:3,8
63:19,21
64:14
71:10
78:24
79:10,13

**points** 26:11
55:1 76:3,
9 79:3

**Policies**
52:12

**policy**
21:15,23,
25 56:22

**popular** 44:2

**portion**
18:25

**position**

24:15
30:11 44:4
51:11,23
77:9,22
78:4

**positions**
12:10
16:17

**possession**
72:8,13
73:8

**possibility**
77:20

**possibly**
27:5

**post** 80:9

**posted** 79:19
80:4,5,8

**posts** 79:25

**practice**
21:16
22:1,11
56:17,20
57:1 71:4

**precipitated**
39:2

**preface**
54:14

**preparation**
9:8,10

**prepare** 8:23

**preparing**
24:9

**Presence**
74:24

**present** 28:2

**president**
16:22
17:13,17,
21 19:16
23:16,22
24:21
35:17,23
65:11 67:3
74:23
78:21

**presidential**
17:11

**pretty** 32:23
33:25
36:18 48:8
78:23

**previously**
23:12
24:22 55:2

**print** 58:20

**prior** 22:15
30:3

**private** 5:15
6:3

**problems**
20:7

**Proceedings**
4:1

**process**
19:23

**profanity**
20:17

**professional**
43:15
74:23

**professor**
16:20,21
80:12,13,
14,15,20

**professorial**
16:19

**provide** 10:6

**pseudonym**
80:7

**public** 9:19
27:17
78:11

**pull** 15:2

**pulled** 80:11

**purposes**
14:17

**pursuant**
4:13

**put** 5:9 8:1
35:18,21
69:13,15
73:9

_____

**Q**
_____

**question**
4:20 11:4
28:16
29:22 37:7

48:22 49:2
52:23
62:19
68:12
74:17
75:4,10
83:10

**questioned**
42:15

**questioning**
62:13
73:21

**questions**
6:13 14:7
37:4 48:19
62:9,17
85:13

**quoted** 27:1

**quoting**
26:19,20
27:9

_____

**R**
_____

**raise** 6:18

**raised** 33:13

**rank** 16:19

**Ray** 14:21

**reached**
49:21

**read** 5:2
9:9,15
10:17 24:8
37:8,12
52:9 56:13

60:14 65:6
69:17
70:12
74:22

reading
53:24

ready  6:17

real  57:25
80:9

realize  5:20

realized
69:18 74:4

reason  60:13

recall  18:10
20:1 44:25
54:6,9
59:1 62:2

recalls  38:7

received
11:13
23:14 28:3

receiving
11:16

recently
60:15

recess  85:11

recognize
23:19 24:2

recollection
11:2,11
53:25
54:12

recommendation
18:15
67:18

recommended
18:16
19:15

record  5:10
23:14,23
37:12
67:22 80:4
85:10

recorded
4:25 61:6,
7,8

records
10:23
11:5,10
21:5 28:1
36:21
37:18
65:12
66:11
72:21
85:20

recruit
55:19

Reddit
79:19,20,
24 80:1,4,
10

reducing
52:21

reference
19:18 39:9
46:22 58:1

79:8

referenced
50:5

referring
37:13

reflecting
24:12

refreshed
53:24

regents  4:5,
16 18:15
67:20

Regina  24:24
25:19 26:3

Regional
66:4 69:8

regular
17:19

regularly
18:2 81:18

rehire  7:23
8:5

related
8:19,20
9:6,7,20
10:23
12:16,23
15:11 17:6
26:9 36:25
37:16,24
46:20
47:11,13
51:1 64:15
74:21

82:12 83:3

relation
46:23

relationship
7:25 26:1
79:8

relatives
14:12

relevant
66:1

remaining
85:19

remember
12:15
21:9,10,
21,22 25:6
26:10
30:10,11,
23 31:10,
13 32:25
33:4,5,20
34:3,16
35:12,13,
22 36:2,13
38:13,22
39:6,25
40:2,7,11,
12 43:1,6,
8,9,10,11
44:16,20,
22 45:4,6,
11,23 49:5
50:16,19,
23,24,25
51:3 52:2,
6 54:11,

15,18
55:15
56:3,14,17
57:4,6,13,
20 58:12,
23,24
59:2,12
60:11,13,
14,15,16,
21,22 61:1
62:7,16,
19,21 63:1
72:10
73:15 77:5
78:5
80:17,19

remembered
36:4

remembers
57:16

rent  82:4

repair  79:8

report  18:3
28:21
62:25
64:5,7
65:1 66:22
67:6,7,11,
14,16,18
68:7,8
70:13,22
71:16
84:16

reported
17:25 18:1
28:11,18

29:8 30:3
53:23

reporter
37:9,12
85:22

reports  32:3
84:15

represent
4:3 5:21,
22

represents
5:7

reprimand
63:5,14
65:5 67:9,
21 69:14,
15 74:19
75:13,16
76:6

request  11:5
23:23 28:1
53:16
65:12
66:11 69:4
73:25 80:4
85:20

requests
23:14
72:21

reread  28:8

reserved
4:21

resign  47:20

resigned

38:17
39:15 46:4
47:20
51:19 64:2

resolution
40:9,11

resolve  8:9

respected
44:2
46:16,19
47:2,8

responded
66:12

responds
58:17

response
65:13,16

responses
4:24

responsive
85:20

responsiveness
4:20

rest  61:22

result  21:11

results  80:3

resume  24:21

retained
5:22

retaliating
7:24

retired  52:1

retreated
75:21

return  64:4

reverse
58:21

review  9:7
10:5,9

reviewed
11:16

Richard  14:2
17:7,10
19:21
33:19
43:22
44:22 45:2
65:22
70:25
71:10 74:9

Richard's
70:15

rights  8:3

risk  27:18
78:12

Road  7:17

Rodney  14:2
17:8 18:19
19:21
35:21 36:5
37:24
43:22
44:2,21
45:2 63:15
79:2

role  24:20

25:6 77:1
84:13

**rolled**  58:5

**room**  60:6,
7,8

**rule**  21:15,
22,25

**rumor**  13:4,7
25:12,25

**rumors**  12:22
25:3

**running**
29:24
31:6,25
32:7,12,13
34:7 53:9
54:2,16,21

— S —

**SACS**  16:25
18:3 64:5
65:1

**safe**  26:13

**salary**  77:17

**save**  15:18
77:16

**scenario**
32:11

**schedule**  8:2

**science**
38:17

**sciences**

16:23
17:22
46:6,12
51:16,20

**Scott**  12:1,
9,11 69:17
73:3 74:4
81:11,13,
14

**Scott's**
71:12

**search**  17:12
19:6,15,17

**seek**  45:6

**seeking**
10:23

**selected**
19:9,12

**semester**
8:2,5

**send**  36:22,
25 57:9,10
72:1

**sending**
23:15 28:7

**sentence**
54:3 78:9,
18

**sentiment**
85:5

**sentiments**
83:21

**September/
october**  20:4

**series**
84:18,19

**served**  19:6

**Services**
16:9

**sexually**
53:4 57:20
68:2

**shaking**
22:18

**share**  81:24

**Shingler**
5:12

**show**  64:17
76:20

**showing**
42:19

**sic**  35:25
57:8

**side**  49:25
66:14

**sidewalk**
49:23 50:3

**sign**  5:2

**similar**  34:1
37:25
38:14
40:1,9
83:21

**simple**  74:10

**simultaneous**
72:2

**single**  10:11
28:9

**sir**  38:10

**sister**  14:21

**site**  79:20

**sites**  17:2

**sitting**  59:8
60:8

**situation**
14:4 51:6
53:5

**small**  18:1

**smelled**
41:10
42:21

**Snyder**  40:23
44:10,19

**so-and-so**
57:25 58:2

**social**  18:6
80:8

**solemnly**
6:19

**someone's**
30:3

**Southern**
66:4 69:7

**space**  82:4
84:5

**Spancake**

65:23

**speak** 9:14
53:5 77:4

**speaking**
50:16
62:16 72:2

**specific**
12:14
13:14
20:25 21:9
32:11 37:4
38:7 46:17
49:1 52:7
53:18,20,
25 57:21
62:17,19
68:5

**specifically**
12:1 21:20
29:21 34:3
44:16 58:9
66:24

**specifics**
50:25
52:14

**speculate**
27:3

**speculated**
77:19

**speculation**
24:22,23
26:21
27:10,12
55:3 77:16

**Spencer** 62:4

**spent** 16:2
55:13
59:15
61:22

**spoke** 33:23
59:20 77:5

**spring** 38:13
39:13,22

**staff** 39:3,
17 50:4
53:1
55:15,16,
17 61:23

**staffer** 25:5

**stands** 26:12

**start** 6:13
48:22

**started**
10:13
16:10
17:17,21
21:9 51:12
56:16
63:22
69:16
70:11
83:10

**state** 4:7
6:13 14:13
16:5,15
32:17
69:21 70:2
80:13

**stated** 48:10
55:8 75:2

**statement**
78:13

**States** 4:8

**stating** 67:5

**steel** 57:25

**STENOGRAPHER**
6:17

**stenographical
ly** 4:23

**step** 40:9

**steps** 61:17
74:20

**Stewart** 62:4

**Stickland**
46:13

**stop** 35:19,
21

**stored** 66:1

**story** 31:15
42:10
45:11,12,
15

**Strickland**
29:5,17,20
31:14
32:16
33:19
34:11

**strong** 44:1
46:16,19,
22,24,25
47:8 52:24
55:6

**strong-willed**
47:16 58:3

**struggle**
48:18

**student** 8:1
16:22
19:2,10
20:2 24:18
30:16
49:24
77:25 78:1

**students**
44:6 46:7,
15 47:5
55:19

**studies**
51:22

**stuff** 9:19
14:3 39:9

**style** 67:25

**submitted**
69:4 73:24

**subsequently**
34:14
53:10
69:24

**successful**
78:20

**sued** 4:15

**suggested**
26:15

**summer** 8:4

**supervisor**

29:3 46:9,
12,21

support  53:6

supposed
44:23
59:13
74:20

supposedly
41:2

surprised
83:20

suspend
41:1,18
42:6

swear  6:19

sworn  6:15
7:5

system  4:6
59:19,21

System's
52:11

—————
T
—————

table  5:6,8
58:6

tabs  23:3

taking  77:21

talk  13:8,
15 14:1
20:14
32:21
33:2,22
34:19

35:18,20,
24 36:10
38:24
41:19
42:22
59:17,18
82:1,13
83:25
84:19

talked  8:25
13:19,20,
25 14:3
20:11 32:8
34:10
38:16
39:14,16
42:18
44:24
48:11
49:5,15
53:20
54:16
82:25
84:20

talking
30:25
33:5,20
39:25
42:20
50:20,24
56:16
64:21
79:17

talks  39:19

Tallahassee
16:8 69:20

taught  75:22

TCSG  81:24

TCSGS  81:23
82:14

teacher  52:1

teaches
12:12,13

tears  52:22

technical
51:22 66:4

technology
12:11

teeth  22:18

telling
30:3,5
31:14
35:25
44:22 45:6
55:15

terms  16:19

testified
7:5

testify  75:4

testimony
6:20 73:2

text  11:19

thing  11:5
28:9 33:25
34:12
36:20
37:22
40:4,5
59:6

66:19,21

things  5:24
6:1 10:14
35:15
37:20
39:12,21
43:11
44:11,12
50:19,21
57:21,22
65:18
66:20
74:24

third-hand
31:15

thought  7:23
38:23,25
40:15
45:19
56:18

thousands
15:12

threatening
53:6

Tifton  66:16
69:10
72:12 84:3

till  75:16

time  4:21
7:20,22
8:3 9:11
17:21 18:3
19:7 22:4
28:11,18
29:13,15

30:2,7
32:3,4
36:2,24
46:8 55:13
58:5 59:12
60:16
74:12
77:5,14,18
82:22 83:1
84:12
85:12

**today** 5:4
8:23 14:10
59:8 63:17
68:20,22
76:14

**told** 22:11
29:16,20,
23 30:8,
14,15,25
31:2,5,11
41:23,25
42:4,9,10
44:12
45:9,15,17
59:13
61:1,19
82:19

**Tonya** 29:5,
8,16,20
30:1 31:14
32:16
33:19
34:11

**top** 23:25
28:5 52:17
58:18 79:2

**totally** 35:6

**touch** 22:24

**touched**
33:15

**touching**
22:23
58:11

**town** 12:22
72:5

**transcribed**
5:1

**treated** 30:1
32:6
35:16,17
48:3

**trees** 15:10

**trial** 4:21

**triggered**
79:21

**trouble** 64:4

**trusted**
38:24
39:17
48:11

**truth** 6:21,
22

**Tuesday** 28:5
46:5

**turn** 63:2

**twist** 74:2

**two-hour**
43:2

**type** 7:15
33:13 58:1
70:18

---

**U**

---

**Uh-huh** 8:12
9:2 13:5
16:16
19:25
31:16 35:5
48:15 51:8
65:9 77:15
83:6,11
84:7

**unable** 53:5

**understand**
10:19
12:25
28:17
48:16
74:11,14
76:13 79:8

**United** 4:7

**University**
4:5,7 16:3
52:11
59:19,21

**unprofessional**
68:1

**unreportable**
72:2

**upset** 38:22
39:7,8
48:10
50:4,9

51:3 55:17

**Usage** 20:17

**USG** 8:16,21
16:18
21:17
23:15 45:7
56:19 60:2
71:19
74:15
81:21

---

**V**

---

**Valdosta**
4:6,9 16:5
79:20
80:13
84:25

**versus** 4:5
62:22

**vice** 16:22

**vice-president**
16:23,24
17:3,25
19:2
24:13,16,
17 29:5
78:15

**vicinity**
53:13 54:5

**vocalize**
4:23

**voice** 33:13

**voir** 15:19

**VP** 19:10
20:2 27:16
77:1,9,25
78:1,10

**VSU** 80:16
81:19

**vulgar** 53:3
57:19

---
**W**
---

**waive** 5:3

**walk** 56:1

**walking**
49:22
50:1,2
56:4 60:2

**wanted** 5:9
11:12 14:6
47:23
60:21,23,
24 63:10
67:6

**wanting** 38:2
49:2

**ways** 35:16

**website** 9:19
15:22
69:13
79:16

**weeds** 82:3

**week** 84:3

**Whistleblower**
52:11

**widely** 13:20
15:14,15
47:2 69:16

**William** 7:2,
9

**Williams**
50:3 52:5
62:4

**windows**
49:25

**witnesses**
75:5

**woman** 44:1
46:16,20,
23,24 47:8

**women** 26:12,
13 52:22

**words** 20:25
21:9 28:9

**work** 18:5
41:9 42:19
44:12
69:19,20
84:2

**worked** 16:7
18:4 25:6
51:24 52:1

**wound** 66:6
71:12

**Wright** 73:7

**write** 34:24
39:9 64:5,
7,16

**writing** 18:3
27:22
28:13,15
35:3 65:7

**written**
63:4,14
65:5 67:8
70:23
74:19
75:13
76:6,10

**wrong** 35:15

**wrote** 24:4,
6,11 54:18
59:17
76:16,17,
19 79:4

---
**Y**
---

**yards** 84:9

**year** 17:14
34:24 35:6
52:20

**years** 16:2,
3,4 25:23
74:9 75:16
78:8

**young** 25:8,
22

**younger**
26:17