**JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA**
**Lisa Long on 01/21/2022**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION


CASE NO.:  7:21CV62 (WLS)


JAMIE T. BIRD,

          Plaintiff,

vs.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA
d/b/a VALDOSTA STATE UNIVERSITY,

          Defendant.
_____/


DEPOSITION OF

LISA LONG


Friday, January 21, 2022
8:45 a.m. - 12:48 p.m.



Valdosta State University
1500 North Patterson Street
Valdosta, Georgia 31698


Stenographically reported by:
KAIRISA J. MAGEE, RPR, GCCR (Georgia), FLORIDA
NOTARY



Job No. : 378318

APPEARANCES:


On behalf of Plaintiff:

        LAWSON, BECK, & SANDLIN, LLC
        1125 Commerce Drive
        Suite 300
        Peachtree City, Georgia 30269
        (770) 486-8949
        BY:  HOLLY MAESTAS, ESQ.
        holly@lawsonandbeck.com


On behalf of Defendant:

        BROWN, READDICK, BUMGARTNER, CARTER,
        STRICKLAND & WATKINS
        5 Glynn Avenue
        Brunswick, GA 31520
        (912) 264-8544
        BY:  G. TODD CARTER, ESQ.
        tcarter@brbcsw.com
        and
        VALDOSTA STATE UNIVERSITY
        OFFICE OF LEGAL AFFAIRS
        1500 N Patterson Street
        Valdosta, GA 31698
        (229) 333-5351
        BY:  JUSTIN ARRINGTON, ESQ.
        juarrington@valdosta.edu


ALSO PRESENT:  Ms. Jamie T. Bird, Plaintiff

I N D E X

Proceedings                                                Page

The Testimony of Ms. Lisa Long:

Direct Examination By Ms. Maestas                            5

E X H I B I T S

No.                                                        Page

Plaintiff's Marked Exhibits

| 49 | Valdosta job posting | 14 |
| 19 | Valdosta virtual dual enrollment flipbook | 64 |
| 23 | 6/25/2019, Email from Sarah Wenham to Jamie T. Bird | 66 |
| 24 | Summit 2019, Goal of Working Lunch Sparking Conversations! | 67 |
| 17 | Valdosta website printout of admission staff | 70 |
| 18 | Valdosta website printout "Meet Your Counselor" page | 74 |
| 14 | Positions listing chart | 75 |
| 46 | 8/24/2020, Letter from Ms. Boddie-LaVan to VSU Office of Legal Affairs and documentation, "Subject:  VSU Response to Jamie Bird Application for Discetionary Review" | 86 |
| 7 | USG Reduction in Force, Frequently Asked Questions | 99 |

E X H I B I T S

Continued

No.                                                        Page

12          Faculty and Staff PAR forms            101

29          9/30/2020, notes from Janice Lyn,      105
            Title IX investigator for Lisa Long
            interview

30          9/30/2020, notes from Janice Lyn,      124
            Title IX investigator for Ryan
            Hogan interview

31          10/1/2020, notes from Janice Lyn,      129
            Title IX investigator for Mr.
            Mitchell

41          2/26/2019, Email from Jamie T. Bird    132

42          2/27/2019, Email chain from Jamie      134
            T. Bird to Sarah E Bessenger

43          3/5/2019, Memo to File from Tee        137
            Mitchell to Jamie Bird

47          11/16/2021, ABAC documents             145

54          VSU DE numbers from Fall Semester      147
            2015 - Fall Semester 2021

Certificate of Oath              157

Certificate of Reporter          158

Proceedings began at 8:45 a.m.:

THE COURT REPORTER: When you're ready, will you raise your right hand, please?

Do you solemnly swear or affirm that the testimony you are about to give in this cause will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

Thereupon:

LISA LONG,

a witness named in the notice heretofore filed, being of lawful age and having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MS. MAESTAS:

Q   Okay. Good morning.

A   Good morning.

Q   My name is Holly Maestas, and I represent Jamie Bird. This is the matter of Jamie T. Bird versus Board of Regents of the University System of Georgia, doing business as Valdosta State University. This is Civil Action File No. 721-CV-62. This is a lawsuit pending in the United States District Court for the Middle District of Georgia, Valdosta Division.

If you could state your name for the record?

A    Lisa H. Long.

Q    Okay.  And are you known by any other names?

A    No.

Q    Okay.  And your address?

A    4799 Zipperer, Z-i-p-p-e-r-e-r, Road, Valdosta, Georgia 31606.

Q    Okay.  Thank you.

This deposition is being taken pursuant to notice and agreement of counsel.  This is a deposition of a non-party and an employee of the defendant.

And did you receive a copy of your notice of deposition and notice to produce?

MR. CARTER:  I'll show you right here.

A    Yes.

BY MS. MAESTAS:

Q    Okay.  When did you receive that?

A    Just now.

Q    Okay.  There are documents that we had requested, which are also the subject of a discovery request, and those records are listed at the bottom of the document.  So not the certificate of service,

but we're looking for some records.

Did you have an opportunity to see those?

A   No.

Q   Okay.  So if you could just take that with you, and if there are any records that need to be produced through Counsel, if you could get those to him.  And you can take that with you.

A   Okay.

Q   Objections, except to the form of the question and responsiveness of the answer, will be reserved until the time of trial or the time of hearing.

The deposition is being taken stenographically, or by a court reporter.  So please vocalize all your responses and avoid gestures, which cannot be reported.  So just ...

You have the right to read a copy of your -- you have a right to read a copy of your deposition transcript and then sign it after reading it, or you may waive that right today.  Please so indicate to the court reporter your choice before you leave today.

Have you ever had your deposition taken before?

A   No.

Q    Have you ever been a party to a lawsuit?

A    No.

Q    And do you keep any files associated with this lawsuit?

A    No.

Q    Okay.  Did you review or prepare any documents in preparation for your deposition today?

A    No.

Q    Did you have any meetings to prepare for your deposition today?

A    No.

Q    Are you on any medications or drugs that would affect your memory or ability to participate in a deposition, which is a question and answer session?

A    No.

Q    Do you have relatives in the state of Georgia?

A    Yes.

Q    About how many?

A    Relatives in the state of Georgia?

Q    Uh-huh.

A    20?

Q    Okay.  About 20?

     Are they immediate family, like, brother?

Sisters?

A   Yes.

Q   Cousins?  Nieces?  Nephews?

A   Yes.

Q   Okay.  So I'm not going to go through all 20 of them.  Do they live in south Georgia or middle Georgia?

A   They live in -- in Valdosta and surrounding area.

Q   Okay.  And your children, are they all grown?

A   Yes.

Q   Okay.  What are your children's names?

A   My son's name is Travis Long.

Q   Okay.

A   My daughter's name is Carrie Miller.

Q   Is that it?

A   Oh, yeah.

Q   Okay.  And then your husband?

A   David E. Long.

Q   Okay.  And brothers and sisters?

A   I have two sisters, Laurie Wilson and Leslie McGinn.

Q   Okay.  And they're both married?

A   Yes.

Q    And they -- their spouses live in the area?

A    Yes.

Q    All right.  What is the title of your current position of employment?

A    Associate director of admissions.

Q    And is that at Valdosta State University?

A    Yes.

Q    VSU?  Okay.

Do you have any other current positions of employment?

A    No.

Q    Okay.  What about any committees or organizations or groups related to VSU?

A    No.

Q    Okay.  You don't, like, coach or serve on any hiring committees or anything like that?

A    No.

Q    Okay.  No volunteer after the day is over and go over to the cafeteria and --

A    No.

Q    Okay.  All right.

And what about, like, outside of work? Anything that you're involved in such as, like, bowling leagues?  Any place you go out to eat every

night, hang out at a bar, churches, political organizations, anything that you're a member of?

A    I do sporting events.  I go to football games.

Q    Okay.

A    We will go to an occasional happy hour.

Q    Okay.

A    But that's it.

Q    All right.  That -- that's what I'm looking for.

A    Okay.

Q    So the sporting events, are those VSU events?

A    Yes.

Q    Okay.  So is it VSU football?

A    Yes.

Q    Any other events?

A    No.

Q    And do you tailgate?

A    Yes.

Q    Okay.  Who do you hang out with when you tailgate?

A    We have some friends that are non-VSU employees that we tailgate with, and then I tailgate with one of my coworkers and her husband.

Q    Who's that?

A    Christy Croft.

Q    Okay.  And what about regular people that you see at the football games?  Anybody else besides those?

A    No.

Q    And then you said, I think, you go to a bar.  I think you said something about that?

A    (Nodding head.)

Q    Okay.  Can you tell me who you're with when you do that?

A    Typically we have -- after work on Fridays, we get off at 3:00, and we will typically go to El Cazador or another Mexican-type restaurant.

Q    Okay.  Sounds fun.

And who goes on those Fridays?

A    Me and my office mate, Christy, and Jamie and sometimes, every now and then -- well, we used to have more, but we've had some people leave.  So there was Sarah that used to work in my office that would go.

Q    Bessenger?

A    Yes.

Q    Does she still go?

A    No.  She's moved to Atlanta.

Q    Okay.  Anybody else?

A    No, we've dwindled.

Q    Okay.  What about anybody with the USG? Do you talk to anybody at USG, either a part of -- with your job or outside of work?

A    Not at Valdosta State, like, you mean, like, at the board?

Q    Yeah.  The University System of Georgia Board of Regents.

A    No.

Q    Okay.  What about technical college system employees, TCSG?

A    Yeah.  I'm trying to think.

No.  Not since our last conference, which was four or five years ago, and that was just simply, like, roundtable stuff.

Q    Okay.  So you don't go over there related to work or --

A    No.

Q    And what's your highest degree in -- in your education?

A    A bachelor's.

Q    And what's that in?

A    Bachelor's of Science in Organizational Leadership.

Q    Okay.  And is it related to education, or is it just generally organizational leadership?

A    It's -- no.

Q    Okay.  And how long have you been an employee of VSU?

A    32 years.

Q    Okay.  And how long have you been in admissions?

A    32 years.

Q    Okay.  And so in your title, you said you're assistant director of admissions?

A    Associate.

Q    Associate.

Is there an assistant director?

A    There are -- there is one and one open position in our office for assistant.

Q    Assistant director is open?

A    Yeah.  There are two positions for assistant.  One is Christy Croft, and the other is currently open.

Q    I'm handing you what's been previously marked as Plaintiff's Exhibit 49.

(Marked for identification is Plaintiff's
Exhibit 49)

BY MS. MAESTAS:

Q     Is that the assistant director position that's open that you were talking about?

A     Yeah.  That's -- yes.

Q     It hasn't been filled?

A     It has.  She has not started.

Q     Okay.

A     She has been offered the position, but she hasn't started yet.

Q     Okay.  You can hand that back to me. Thank you.

      And who's the -- what's the name of the person who's going to fill that position?

A     Katrina Crumpton, I believe.

Q     And where is she from?

A     She currently is in the housing office.

Q     To your knowledge, does she have experience in admissions?

A     She would go on the V State Experiences that our office -- that Ryan Hogan heads up as a representative for the housing division.

Q     And is that it, or does she have any other background, to your knowledge, in --

A     Not to my knowledge.

Q     Okay.  And your experience in admissions,

can you tell me, like, what -- all of the duties you have had?  And can you give me -- I know it might take a while, but --

A    Yes.

Q    So the way I understand is, in admissions, that there's lots of things that are handled by lots of different people, and I'm trying to establish, you know, what you know about what needs to be done in that office.

And I know it may take a little while, but -- so if we can do it in an organized way, that would be great.  But if we can just start, and then I can follow up.  And we'll see how it goes.

A    Okay.  I'll do it chronologically because I've done every position in that office except for the director.

So when I started out, I was an -- let's see what it -- they changed the names.  But I was a -- it was clerical, and I input source cards -- inquiry cards from students.  So that's basically what I did.

Q    Okay.

A    Then I moved up to a processer, and I processed freshman applications.  Basically entered them into decision -- the computer and made

decisions.

Then I got my degree and -- I don't know how much of this you need to know -- but I was going to teach.  Decided I couldn't teach.  My director asked me to please stay.

Q    Who was that director?

A    Walter Peacock.

Q    Okay.

A    And so once I got my degree, I stayed and I was promoted to assistant director, and that's when I moved to doing transfer credit -- no, no, no. That's when I went to -- I was doing recruitment; so I was over the recruiters.

Q    Okay.  And you said you were promoted to your assistant director of admission?

A    Yes.

Q    Okay.  Not associate director?

A    No, not yet.

Q    Okay.  Okay.

A    So I was over the recruiters, the recruit staff.

Our office is -- is kind of a two-sided office.  One side is processing.  One side is recruitment.  So that's why the two assistant directors.  You have one that's -- was over the

processers, and one that was over the recruiters.
So I was over the recruiters.

Someone retired and Ryan Hogan and I -- he became over the recruiters because he was one, and I went over the processing staff. And I believe that's when I was made associate director.

It's a long time.

MR. CARTER: Yeah. I understand.

BY MS. MAESTAS:

Q Okay. And when you were recruiter, is that the same thing as an admissions counselor?

A Now it is, yes.

Q Okay. So what did -- what do you do -- what is the job of a recruiter, also known as a admissions counselor?

A Okay. So they are assigned territories that they go into high schools or into college fairs and actually represent Valdosta State trying to recruit students to come here.

Q Okay. So they sit at a table in a room. Are there other recruiters from other institutions that same day?

A Yes.

Q And is it, like, the high school has a -- a college fair day?

A     Yes.

**Q     And then the recruiter knows about it, and then they -- they go over, and then they're -- so you see a -- you have a VSU table.  And then what are some other tables that you might see that day?**

A     So it's two-fold.  You can get -- the recruiter can contact a high school in their territory and say, hey, can I come speak to your seniors or can I come sit in your lunchroom and pass out brochures, or there's actually a Probe tour, which you pay to be a part of.

The Probe committee sets up -- it's kind of like a traveling -- traveling circus.  But all of the schools -- well, anybody that signs up and pays can go to these set events.  And Probe actually -- what's the word I'm looking for?  Probe advertises that, hey, all of these schools are coming to Lowndes High School today.  Everybody in the area come out to the gym at Lowndes High School.

And typically it's all of the schools in the surrounding area, like, all of Georgia.  You may have some come from -- from out of state, but the majority of the Probe tour are schools from Georgia, private, technical, university system.

There's a similar tour in Florida that

we're now participating in, and they have their own -- it's not called Probe.  It's called something else.  And you sign up.  And usually when you're down there, it's more -- there are more Florida schools represented, but you may have some from out of state.

     Q    Okay.  So as a recruiter, you go -- are -- are there other positions, other than recruiters or admissions recruiters or admissions counselors, that come to those?

     A    If we run out of personnel, like, if we have more programs than we have people to cover, then yes.  You may have the director go and represent VSU.  You may have -- I mean, we've had -- I think we've had Jamie and Sarah go and represent VSU.  I've gone.

          It just depends on how many things you have going on that one day.  We try to cover as many things as we can.

     Q    Would it be rare for Jamie to go to one of these?

     A    I mean, it's not her -- it would not be a daily duty.  It would be an occasional.

     Q    Occasionally?

     A    Occasionally.

Q    Okay.

A    Now, locally if there were something going on, like our local schools, Jamie or Sarah would go on behalf of dual enrollment.

Q    Would that be rare, occasional, or frequent?

A    Occasional.

Q    And who would go frequently?

A    The recruiters who were assigned that territory.

Q    Okay.  And as a recruiter, what programs do you talk about if you're going into high school?

A    All of them, all that we have to offer.

Q    Do they have, like, a checklist or a -- a --

A    They're trained when they're hired just in the basic knowledge of admission standards, programs that we have.  It's not unusual for a student to approach your setup, your exhibit, and talk to you about something we don't have, and in that case, a lot of times we point them to one of our sister schools.  Or if they come up and they want to know about cosmetology, we will send them over to a technical school.  So, I mean, we're just --

Q    It depends on what they want to do with

their life and then you appropriately guide them?

A    (Nodding head.)

MR. CARTER:  Is that a "yes"?

THE WITNESS:  That's a --

MR. CARTER:  That's a --

THE WITNESS:  -- "yes."

MR. CARTER:  -- "yes"?  Okay.

She can't pick it up when you're nodding.

THE WITNESS:  Sorry.

MR. CARTER:  That's okay.

MS. MAESTAS:  Thank you.

BY MS. MAESTAS:

Q    And who trains the recruiters?

A    Typically the assistant director who is over the recruit staff.  That's the position that's open currently.  So Christy Croft has been put over them temporarily since about August.

But typically we have a senior recruiter that we'll defer to, to take one under their wing.  Like, for instance, the most recent ones we hired we sent for a couple of weeks with one of our more senior recruiters for them to --

Q    Who's the senior recruiter right now?

A    Currently right now it's Christine Rice.

Q    Okay.

A    There's a high turnover.

Q    Okay.  And the -- the open position -- oh, sorry, the one that's not -- that's going to be filled by Katrina Crumpton, who was in that position before that?

A    Hillary Willis.

Q    Okay.  And regarding -- regarding dual enrollment, what would a recruiter say at a high school?

A    Well, they have the basic requirements for dual enrollment.  So they would -- they would say, yes, we have dual enrollment.  We offer dual enrollment.  These are the requirements.

They would encourage them to apply, assist them in applying.

Q    Can they apply at the high school?

A    Everything is electronically.

Q    So do they bring a laptop with them and then say, hey, let me do your application here?

A    No.

Q    Okay.  So they -- they can't apply while they're at -- somebody else handles the application?

A    Correct.  Yes.

Q    Not -- a recruiter does not do their application?

A    No.

Q    Okay.  So you said the basic requirements. That means the admission requirements for VSU dual enrollment?

A    The minimum SAT, GPA, college prep curriculum.

Q    For VSU?

A    Uh-huh.

Q    Okay.

A    And then the paperwork needed for -- from the high school guidance counselor, the permission. I think it's a ...

Q    And so they encourage them to apply.  So when the recruiter goes in, do they automatically talk about dual enrollment?

A    I don't know.

Q    Okay.

A    They -- they've been encouraged to, but I don't witness that.

Q    Right.

If you went to an event, would you automatically talk about dual enrollment, or would you wait for the student to bring it up?

A    I would wait for the student to bring it up.

As a matter of fact, I did a recruitment -- a Probe out at Valdosta High School this year because we were short.  And when a student approached me and had dual enrollment questions, I gave them the name and number of the current dual enrollment coordinator to get in contact with.

Q    Okay.  So how long ago was that?

A    October.

Q    October of 2021?

A    (Nodding head.)

Q    And you went to, you said, Lowndes?

A    Valdosta.  But it was a -- it was for the community.  So there were students there from Lowndes, Open Bible, Valdosta, Echols, Berrien, Cook.

Q    Were other people from VSU there, or were you the VSU rep?

A    Me -- myself and Christy Croft went.

Q    Were there any recruiters there?

A    No.  We were acting recruiters.

Q    Okay.  And so you went there.  And as an acting recruiter, you didn't bring up dual enrollment, the student brought it up, and then you said you need to talk to Megan Hancock?

A    Correct.

Q    Okay.  Okay.

So I think we got on a little tangent on recruiters, but -- but what started that long answer was:  What did you do in your position as admissions?

And you said you started as clerical with input cards, and then you processed freshman applications.  You did entry and decisions on a computer.  You got your degree.  You didn't teach, and then Director Peacock asked you to stay.  You were promoted to assistant director of admissions, and you were a recruiter at one point, and --

A    No.  Okay.  I was over -- as assistant director, I was over the recruit staff.

Q    Okay.  So you were never a recruiter?

A    Correct.

Q    Okay.  Only an acting recruiter?

A    Correct.

Q    Okay.

A    And at that time I was the one giving the campus tours.  So the recruiters go out and they drive the students to come to visit the campus, and I would give the tour of the campus.

Q    Okay.  Okay.

And then --

A    It's a long time ago.

Q    And then after that you became the assistant director over recruitment.  Then Hogan came along.  He took over that position, and you went into processing?

A    Processing transfer credit, yes, and supervising the processing team, the freshman processing team.

Q    What year did Ryan take over the position of associate director of recruitment?

A    I don't know the exact date.

Q    Probably find that in his personnel file.

Okay.  So the tours.  We talked about recruiters.  Now we need to talk about what you did as you were associate director over processing transfer credits and the freshman processing team.

Can you tell me what you did?

A    I don't know.  What do I do?

Q    Do you still do that now?

A    Yes.

Q    Okay.

A    So --

Q    You're, like, what do I do now?  Too much stuff.

A    You have no idea.

Okay.  The processing team is a very well-oiled machine.  They basically come in and know what they do.  Besides approving their time sheets, doing their annual evaluation, troubleshooting the -- the rare I-can't-find-this-code-type-of-thing, that's the extent of what I do with them.

My daily duty is office email, transfer credit evaluation and decisions, degree works adjustments.  I troubleshoot questions that come into the office.  I'm typically the one they call.  Haley said this person wants to know X, Y, Z.  I'm the one that digs in and finds out the why.

And then plug a lot of holes.  We have a lot of open positions.  So the admission -- the assistant director position that we are missing right now booked campus tours.  So now Christy and I are having to book the campus tours.

She also did the -- she had a P card, and she did the purchasing for the office.  I'm now doing the purchasing for the office.

**Q   Okay.  I have a question of clarification on the position that's to be filled by Katrina Crumpton.  That's assistant director of admissions. So is that going to be over processing or --**

A     Recruitment.

Q     -- recruitment?

      Okay.  Because Hogan is no longer in that position.  He is the --

A     Director.

Q     Okay.  So this is going to be ...

      And then so before that, it was Hilary Willis?

A     Yes.

Q     And who are all of the people that you remember who were the associate -- sorry, yeah -- associate director of processing?  So it was you.  Then?

A     Before me, it was Arlene Gaumond.  That's G-a-u-m-o-n-d.  She retired.

Q     Okay.  Then it was you.  Then?

A     When she retired, I moved to her spot, and Ryan moved to my spot over the recruitment staff.

Q     Okay.  So you were originally over the recruitment but then -- okay.  I'm getting it.  There's a lot going on here.

      All right.  After you, then it was Hogan.  Okay.  I may not be able to follow the whole history of it exactly.

      Okay.  So we, at least, have got on the

recruitment side Long, Hogan, Hilary, Crumpton?

A    Yes.

Q    Is that right?

A    Yes.

Q    Okay.

Okay.  So you're plugging in and filling in holes.  So one hole right now is the hole to be filled by Crumpton --

A    Correct.

Q    -- as assistant director of admissions over recruitment?

A    Correct.

Q    Got it right.  Okay.  All right.

And in filling in these holes, what are you filling in for that position to be filled by Crumpton?

A    Booking daily tours, P card duties, purchasing duties.  And then Christy Croft is currently supervising the recruiters until Katrina is in place and up and ready.

I'm trying to think.  She may be doing other things that I'm not aware of that I can't pull right off the top of my head.

Q    What about Megan Hancock?  Where does she fit in to that?

A    They replaced Jamie and Sarah with Megan Hancock, who was in our office until December -- physically in our office until December.

Q    2021?

A    But she was reporting to Rob Freidhoff in -- what -- what's Rob -- advising?  Advising, freshman year experience?  I don't know exactly what his position is.

MR. CARTER:  He testified about it yesterday, so ...

THE WITNESS:  Okay.

BY MS. MAESTAS:

Q    Okay.

A    She currently reports to Rob Freidhoff.

Q    And that's Sarah Bessenger?

A    Bessenger.

Q    And when did she give her notice?  Like, when did everybody know that she was going to be retiring?  Not, like, her official notice, but, like, when was it known --

A    Retiring?

Q    -- she was leaving?
Yeah.  Like, when it was imminent.

A    Okay.  She -- she didn't retire.  She just left.  I'm bad with dates.

Q    So a good benchmark is COVID.  COVID pretty much hit all employment -- places of employment around March 2020.

A    Okay.

Q    So usually everybody kind of remembers where they were when COVID hit, and then as far as Sarah Bessenger letting everybody know, hey, I'm not going to be here anymore.

A    She wasn't coming back after the holidays, and so it wasn't 2021.  So it was 2020.  She wasn't going -- but I don't remember if it was Thanksgiving or Christmas.

Q    Okay.  So December 2020?

A    I think.

Q    Was it after COVID?

MR. CARTER:  Is there anything after COVID yet?

MS. MAESTAS:  Yes, God willing.

A    I don't know a hundred percent.  I don't know.

BY MS. MAESTAS:

Q    Okay.  I mean, had she been talking about it for a while, or was it, like, abrupt?

A    I feel like it was abrupt.

Q    Okay.  But you don't know if it was before

or after COVID that she decided that?

MR. CARTER:  And I guess to -- just to be clear, when you mention "before or after COVID," you're talking March 2020 --

MS. MAESTAS:  Yes.

MR. CARTER:  -- time period of when it kind of hit?

A    Let me think about it.

BY MS. MAESTAS:

Q    Okay.

A    Let me -- let me ponder this.  Okay.  So her mother passed away.  I just don't -- the years just -- have just blurred since 2020.

Q    Well, we -- she doesn't work there anymore?

A    Correct.

Q    Okay.  So I can talk to her.  Okay.  I guess I can ask her and make sure.  But it's okay.  We'll just move on.

All right.  So I asked the question: "Where does Megan Hancock fall into all of these job duties that we've been listing?"

And you said that she took over Jamie and Sarah's duties.

A    She is the dual enrollment coordinator.

Q    Okay.  And so I want to ask about -- so the recruiters go into the high schools and the colleges to talk about VSU.  They don't have to bring up dual enrollment, but sometimes it comes up.  And it would be referred to Megan Hancock?

A    Ryan has asked the recruiters to recruit for dual enrollment, as well as our Pathways programs, which is -- which is also with the technical schools.  I don't know if they do.

Q    Do you know if the recruiters are trained to talk -- I mean, does the person who -- I think -- the senior recruiter, do you know if that person knows about dual enrollment?

A    I don't know.

Q    All right.  Can you tell me all of the things that were Jamie's job?

A    Let me start with before Jamie came, part of my duties was advising the dual enrollment students.  That became -- when -- when they changed the requirements and started letting students 9th grade on and everything was paid for and the State was promoting it, it became more than what I could handle.  There's also a component which --

Q    What -- about what year was that that you're talking about when everything changed?

A    See, y'all should have let me bring my folder.

Q    Okay.  So I just want to take a break now that you said, if y'all could have let me brought my folder.  So part of that notice to produce says if you need to bring anything with you that will allow you to answer questions related to this lawsuit.  So if there's a document that's going to, like, make you able to answer questions more efficiently, are you able to get it?

MR. CARTER:  Well, it doesn't say answer questions about -- it talks about the complaint, discipline, reprimand, retaliation, termination, or adverse employment action.  It doesn't talk about qualifications, but she's welcome to go get whatever she wants to if it will help her.

THE WITNESS:  It's just --

BY MS. MAESTAS:

Q    I mean, if you don't need it, then --

A    -- I'm terrible with years.  They just -- they just all mesh together.  If I can ask Jamie a question --

MS. MAESTAS:  Let me see.  Okay.

(Short pause.)

BY MS. MAESTAS:

Q    Jamie just told me that she came in in 2015.  So let's talk about 2015.  Okay?  And it's okay if you don't totally remember, you know --

A    Exact dates.

Q    -- exact dates, but we think it's around 2015.  Okay?

A    It would have been before that.

Q    Okay.

A    It would have been maybe 2013.

Q    So about two years before Jamie came you're talking about the dual enrollment laws changing where 9th graders started coming in and it was all paid for through the State.  I think you said something like that.

A    Correct.

And the -- the time consuming part at that point was building the articulation between the college courses and the high school courses that they would -- there -- there was a system that you went in and had to upload course descriptions and then get it pushed through and approved by the Georgia high school curriculum people.  And at -- at -- early on, that was time consuming.

Q    Okay.  So how a dual enrollment course

would be accepted as a college credit?

A    And a high school credit because it goes back and fulfills their high school requirement.

Q    Okay.  So you were doing that for two years, and then in and around 2015 you started transferring that over to Jamie because it was time consuming?

A    Yes.  She was actually brought in by the provost.

Q    Who was that?

A    Brian Gerber.

She was brought in with a GA, a current GA that she had, which was Sarah.

Q    What's a GA?

A    Graduate assistant.

Q    Okay.

A    Sorry.

Q    Sarah Bessenger?

A    Yes.

Sarah was really good at computer stuff, and she entered a lot of those equivalencies into the system.

Also, back when I was doing the dual enrollment students, I basically collected the documentation.  The high school counselor would say,

you -- this student is eligible to take English 1101.  So that student would come in.

We'd get them all accepted.  We would send them to regular freshman orientation.  They would get advice like our regular freshman, and then they were on their own to register.  That's how it was back then.

So I was more hands off.  I was more gather your documents.  It was -- it was a lot of paperwork back then.  It wasn't electronic at that time.

**Q    So what did Jamie start doing?**

A    So Jamie met one-on-one with the students throughout the entire process.  She would gather the documents, work with the processers to put them on, meet with the students, come up with a schedule, get them registered, send the schedule back to the high school to make sure it was an appropriate course or the high school knew what the student was doing.

She would follow-up, make sure the student was actually in the course because a lot of times students are savvy and they can switch out.  You know, their -- their counselor is telling them, you need english.  They're like, I want to take history. It's more interesting.  But it could affect their

graduation.  So Jamie made sure that they were in the classes they needed to graduate from high school.

Q    Okay.

A    And then there was the whole funding app that was not in place when I did it.  And that was a whole ...

Q    Okay.  So that's when Jamie started.  So how did it progress?

So that was around 2015.  What did she do -- so you're talking about developing the credits for courses to count for high school and college. And then as the program became older, did Jamie's job change?

A    It grew in that we had a new director at the time, Jamie's supervisor, Tee Mitchell, and they wanted -- we had never done this before -- to go -- to take our classes into the high schools.

Q    Who wanted that?

A    Tee Mitchell and maybe those across the street.

Q    And that means?  What does "across the street" mean?

A    Dr. Carr.

Q    Okay.  I think I knew what you meant, but

I don't think the jury will know what that means. Maybe they're from the area. Okay.

Okay. So the -- a new change was that they're going to start putting them into the classrooms. So what did Jamie do to assist in that process?

A    She had to find professors who were willing to go into a high school setting. She had to find professors who were -- what's the word I'm looking for -- sympathetic to high school students versus a college student.

Q    Okay.

A    She had to find professors that were willing to work five days a week when a normal schedule is -- for a professor would be, like, Monday, Wednesday, Friday or Tuesday, Thursday because a high school teaches Monday through Friday.

And there was the books. We did not provide books before, and then the State came and said books would be included. So she had to coordinate with the bookstore in getting all of the students that were registered for the various classes the appropriate books.

Q    Okay.

All right. So that change happened, and

she's working on that.  What -- what else -- is she doing all the other stuff that you previously described at the same time; the meeting with the student?  A one-on-one?  Like, what is that -- meeting one on one?  Doing their documents?  Processing them?  Getting the schedule?  Getting them registered?  She's still doing that?

A    Yes.

Q    And talking to the high school counselors and then following up to make sure they're in the course they need?

A    Yes.

Q    Okay.  So do you remember about what date the book funding came in?

A    Whenever they changed the whole dual enrollment process.  Whenever there was -- was it a House Bill?

Q    Okay. Yeah.  So there were -- there was a House Bill that came.

A    I know there was House Bill 444, and that changed funding.  But before House Bill 444, that's when they were allowing the 9th graders.  So it was at that point when they said -- I think when Jamie started it was actually titled "Move On When Ready," and then it changed names.  So -- because

they decided they were not all ready to move on.

Q   All right.

A   And then, of course, now it's changed back to more juniors and seniors, which is like it was. They don't target freshmen and sophomores now.

Q   Okay.  Anything else you can think that Jamie did?  Did she do chores?  Did she -- she was an acting recruiter?  Anything like that?

A   Yes.  Jamie was -- would help out with open house.  She would fill in as needed for recruitment events.

Q   Would she go into the high schools?

A   Occasionally, yes.

Q   What about talking to counselors?

A   Constantly.

Q   Constantly talking to high school counselors?

A   Yes.

Q   Okay.  And what would she talk about?

A   Students' schedules.  Students who had alerts on their record that the -- the professors, if a student is not showing up, they will put an alert out there.  Since Jamie was listed in the system as their adviser, she would get the alerts. She would reach out to the students, the parents,

the counselor.

Q   Okay.  So Jamie was listed as their adviser.  Now, advising, I'm told, is under Rob Freidhoff?

A   Correct.

Q   Okay.  So Jamie was listed as their adviser.  Did she also serve as an adviser in her position?

A   Yes.

Q   Okay.  So she has the duties as an adviser as well?

A   Yes.

Q   Okay.  What did that entail?

A   She would ask the students what their intended majors were once they graduated and then try to plan the classes that they were taking accordingly so that it wasn't a wasted class.  Yes, it's got to go back and fulfill a high school requirement, but if you are going to be a physics major, you need this level of physics, not this level of physics.

So she would advise them appropriately for their major.  Doesn't mean they're not going to change their major, but she would work with them. Now, some of them don't know their majors, and in

that case, she would advise them generically.

Q    Okay.  What about deciding where to attend dual enrollment courses?

A    What do you mean "where"?

Q    So there's VSU.  There's Wiregrass.  There's GMC.

A    Got you.  Okay.

So there are multiple options in Valdosta for dual enrollment.  If a student is planning on attending a flagship university --

Q    What does that mean?

A    A research university, a more competitive admissions requirement university.

Q    Is it a two-year?

A    No.  It would be -- like, a UGA is our flagship.

Q    A four-year?

A    Yes.

Q    Is VSU a flagship?

A    No.  We are a comprehensive.

Q    Okay.  Is VSU a four-year?

A    Yes.

If a student were planning to go out of state to a school such as, like, John Hopkins -- Johns Hopkins or Yale, what -- those types of

schools, she would encourage them to get their dual enrolled credit from a four-year school versus a technical college or a private two-year college because those schools look more favorably on those classes, the -- the classes from a four-year school than they do a technical school.

Q    Okay.  And how do you know that?

A    Because there have been students who have taken classes at the technical college and they weren't accepted when they got to the four-year school.

Q    Okay.  About how many can you think of? Like, is it a thousand?  A hundred?  Two over the years?  Many over the years?  I found three ...

A    I can't give you an exact number.

Q    I'm not -- and so I'm not asking for an exact number, and I'm not asking for verbatim on anything.  I'm asking for your recollection.

A    That I know of?

Q    Uh-huh.

A    Three.

Q    So only three or, like, you can only recall --

A    I can only recall three.

Q    And you don't think there are any more

that -- that applied to a flagship and then couldn't get in?

A    I don't know.

Q    Okay.  And do you believe that there were more, or you believe there was only three?

MR. CARTER:  She answered that.  She said that's what she remembers and she doesn't know.

BY MS. MAESTAS:

Q    Okay.  So when we're talking about three, are you saying the students who applied to flagship institutions and then didn't get accepted because they had gone to --

A    Didn't have -- didn't have the credit accepted.

Q    Okay.  I thought you said that they didn't get into it, like, they didn't get accepted into the program?

A    We had two students that didn't get accepted here that had done their work at a technical school.  The other students were the ones that the school didn't accept their dual enrolled credit.

Q    Well, did they get admitted?  Like, were they accepted into admission?

So there's what's accepted as a credit,

which is, like, a transfer of a credit, but then there's --

A    They were not initially accepted.

Q    So you mean accepted as a freshman student or the courses were not initially accepted?

A    They were initially not accepted as a freshman student.

Q    Okay.  And those courses were not transferred?

A    Once they could meet freshman standards, we would have accepted.

Q    Okay.  So I'm getting mixed up about what we're talking about.  So there were --

A    So let me give you the scenario.

Q    There were three students that were going to a flagship that you can remember, and then you're recalling two students who were not accepted to VSU?

A    Correct.

Q    Okay.  So we've got a total of five. Which one do you want to talk about first, the two or the three?

A    Well, the three are just students who took, like, computer science -- not computer science -- intro to computers, and it was not accepted.

Q    The credit?

A    Correct.

Q    And then those three, did you also say they were not accepted as freshman?

A    No, they were accepted.

Q    Okay.  They were accepted as freshman students, but the credit that they want -- they took in intro to computers did not transfer to their flagship institution?

A    Correct.

Q    Okay.  Got it.

A    The two that did not get accepted initially --

Q    To VSU?

A    -- at VSU had taken everything they could possibly take in their core from a technical college such that they were ready to start their major at VSU -- and this is to the best --

Q    And when you say start a major, you mean they're going into the field -- the field-specific classes?

A    That's correct.

Q    Okay.

A    But the technical school had admitted them on ACCUPLACER scores.

MR. CARTER:  What did you say?

THE WITNESS:  ACCUPLACER scores.

MR. CARTER:  Okay.

A    A placement exam.  And they could not meet our freshman SAT, ACT minimums.  If I recall correctly.

BY MS. MAESTAS:

Q    **And will you spell that acronym, ACCUPLACER?**

A    A-C-C-U-P-L-A-C-E-R.

Q    **Thank you.**

**Do you remember what institution they had taken their DE courses from?**

A    I believe it was Albany Tech.

Q    **Is that a TCSG?**

A    Yes.

MR. CARTER:  All right.  When you get to a point, I could use a break.

MS. MAESTAS:  Okay.  Yeah.

MR. CARTER:  Is this a good time?

MS. MAESTAS:  That's fine.

MR. CARTER:  All right.

THE COURT REPORTER:  Off the record.

(Recess 9:49 a.m. until 9:57 a.m.)

MS. MAESTAS:  Back on the record after a

short break.

BY MS. MAESTAS:

Q   Okay.  So, Ms. Long, we were -- the question I had asked that we were kind of filling in the details on was when Jamie was acting in her capacity as an adviser.  And we had said that -- and then I asked about regarding dual enrollment, what would she advise, and then you were going into the options.

And then you said -- you started with the flagship institutions, and then we were going into the scenarios.  And we just finished with the two students that you recalled that attended Albany Tech, which is a TCSG, and then could not get accepted into VSU their freshman year.

Okay.  So going into the same line of questioning regarding how Jamie advised high school students on dual enrollment, is there any other information that she advised about?

A   You know Jamie.  She's -- she's going to get their history from where you are now, where you want to go, what school do you want to go.  She would always offer VSU, but that's not an option for every student.

She would get the catalog for Georgia Tech

pulled up and tell them, okay, you don't need to take college algebra.  While it will satisfy your high school requirement, Georgia Tech is not going to take it.

So, basically, doing dual enrollment is to -- it's not just to take it just to take it. It's to take it to shorten your college career, to save money on your college career.

So the Georgia Tech student, she would say you need to take analytical geometry and calculus one.  That's going to be the first math they'll take.  So she would work with the student, with the student's schedule, with the high school guidance counselor to see if she believed a student could handle an upper level math.  She would make sure the student had the background from high school to jump into analytical geometry and calculus.

**Q    Is that called the needed academic foundation?**

A    I don't -- I -- the core.

**Q    The needed core --**

A    Yes.

**Q    -- curriculum to go on to a college setting or wherever they were going?**

A    Yes.

Q    Okay.  Continue.

So you said take DE to shorten their college career and save money.

A    Yes.

Q    Okay.  And then you were talking about the specific example of Georgia Tech.

A    Yes.

Q    Okay.  What other examples along that line of thought?

A    So a lot of high school students would do dual enrollment simply because they didn't want to be at the high school anymore, but the State is paying for these classes that they're taking.  So being a good steward of the State, Jamie would tell them this is -- this is not for fun.

A lot of the students would want to try out classes.  Like, they'd say, that sounds fun. I'll take that.  Well, the State is paying for it, and the student gets in it and doesn't like it and wants to drop it.  Well, the State just paid VSU X amount of dollars for that class and waste -- it was wasting money, which, in essence, is why they scaled back dual enrollment, because they started running out of money.

Q    Okay.  What other scenarios, besides the

student who wants to go to Georgia Tech and that they needed to take, I think you said --

A    I mean, that was daily.  That was -- that was with every student she advised.  She face to face advised every local dual enrolled student.  The ones that were on-site, basically all of those were kind of lumped together.

For instance, Lowndes High School taught a psychology 1101.  Well, that was just a mass -- mass registration.  You just put all of them in psych 1101.  Valwood taught two or three classes, I believe, a history class, and I'm not sure what else they taught out there.  But -- so that would be a mass -- this -- these 25 students are just in this section that's taught at Valwood.  But for the other ones, the ones that were on campus, she would advise.

Q    Okay.

THE COURT REPORTER:  Please forgive me. I'm a Floridian.  Did you say Valwood?

THE WITNESS:  Valwood, V-a-l-w-o-o-d. It's a private school in -- private high school.

THE COURT REPORTER:  Thank you.

BY MS. MAESTAS:

Q    Okay.  And what does Megan Hancock do?

A    Megan advises the students more -- she will do an occasional face-to-face.  She advises them more either via back and forth emails, or she will do Zoom meetings with them.

Q    Does she do all the same things Jamie used to do?

A    No.

Q    Okay.  What's different about Meagan's job duties that she fulfills versus -- what is -- what did Jamie do that Megan does not do?

A    I'm thinking.

Q    Yeah.  No problem.

A    I can't explain exactly.  It's less face-to-face and more mass emails.  She still has to coordinate the books.  She still has to occasionally get a new course approved.  She still has to work with the high school guidance counselors.  And some things changed with the funding app, but I'm not sure what that is.

Q    Okay.  And as far as handling the workload, is it -- do you have any opinion or know one way or the other if Megan is doing more work?  Being more efficient?

MR. CARTER:  Let me object.  That calls for speculation.  I don't believe she's her supervisor.

MS. MAESTAS:  She just testified that she knows that she does meet with them --

MR. CARTER:  She knows what she does, but --

MS. MAESTAS:  -- face-to-face or emails or Zoom, less face-to-face, mass emails, that she handles the books, occasionally has to get courses approved.  I think the witness is competent to answer the question.

MR. CARTER:  Well, my objection is that it's speculation and subjective.

BY MS. MAESTAS:

Q    Where is Meagan's office in relationship to your office?

A    Before Christmas she was across the hall from me.  Now she's across the street in the advising area.

Q    Could you observe Megan working on a daily basis, based on your location across the hall?

A    Yes.

Q    Okay.  Based on your proximity or close proximity to her, do you have any evidence of how --

if she was more efficient handling dual enrollment duties and admissions duties than Jamie?

MR. CARTER:  Define "efficient."  Again, it calls for speculation.  That's totally subjective.

BY MS. MAESTAS:

Q    So when he objects, if you know how to answer the question, you can.  If you're like, you know, Mr. Carter, you're right.  I -- I have no idea, then say that.

But I have to -- like, I'm not you; so I don't know what you have.  So there's a certain level of foundation that I have to develop because I wasn't there.  So if you -- if you kind of know where I'm going with the question and you can help me out, that would be great.  If you're like, I don't know what you're talking about.  Let me know that, too.

So I'm trying to get an idea is -- is Megan doing a good job in her position?  Do you have any evidence that could support if she's handling more tasks?  Less tasks?  Is it creating more workload?

So I think it's -- it's basically been stated that Megan's handling everything that Jamie

did, but you're saying that there were other duties. So I'm trying to get an idea.  If you have no idea what I'm talking about, then say so.

MR. CARTER:  Objection remains.

But go ahead and answer to whatever you think you can answer.

A    Two things.  Personally, I have a niece that's doing dual enrollment, and the emails that -- the email contact is not as efficient as face-to-face.  They get confused.  They don't know how to follow the step one, step two, step three. She is efficient in constructing the emails and sending them out.  I just don't think they are received as she intends.

The second thing is she's having -- she was having to put in some extra hours to stay caught up at times.  'Cause there are peak times and there are valley times.

BY MS. MAESTAS:

Q    Okay.

A    And if Ryan has asked her to do anything extra to help the admissions office, her response has been, I'm too busy.

Q    So who's -- who's Megan's supervisor?

A    Rob Freidhoff.

Q   So even though Megan's supervised by Rob, she still does handle some tasks in admissions?

A   No, not now.

Q   Okay.

A   Dual enrollment will always have ties to admissions because we have to admit them.  We have to actually process their file, which is why Ryan wanted it to remain under admissions.

Q   So is this system where Megan is under Rob and only handling dual enrollment, saying no to these extra tasks in admissions, is that -- is that more efficient?  Is it creating less work, or is it creating more work?

A   I do not know.

You mean less work for her?

Q   For everybody in admissions and dual enrollment.  Like, is it working out better?

MR. CARTER:  Same objection, speculation, but go ahead and answer.

A   In admissions we're always running out of bullets for the gun.  So we could always use help from other offices.

BY MS. MAESTAS:

Q   Okay.  And then -- so did Jamie -- when --

A   Yes.

Q    When Ryan asked her to do stuff, Jamie would say ...

A    Yes.

Q    And Megan says ...

A    No.

Q    Okay.  So when Ryan has something that needs to be done in admissions and Megan says no, who does it?

A    Typically Ryan, myself, or Christy.

Q    Not the admissions recruiters?

A    Sometimes, but usually the reason he would ask Megan is because the recruiters were all busy doing something else.

Q    Okay.  In advising dual enrollment students, was there any discussion about a -- the articulation agreements and transfer of credit after -- did that have to do with the articulation agreement at all?

A    Are you talking about the articulation agreement between the TCSG schools or the articulation between the high school and the college?

Q    The TCSGs and VSU.

Did DE have anything to do with that?

A    Are you referring to the email?

Q    The email.

A    Yes.

Q    I mean, not really.  I'm just asking, does the articulation agreement between --

A    Yeah.  Okay.

Q    Did it have to do with dual enrollment?

A    Yes.

Q    Okay.  How does that have to do with dual enrollment?

A    Because students could do dual enrollment at TCSGs, USGs, or private institutions.

Q    Okay.  Can you tie that together back to the --

A    So the University System of Georgia wrote an articulation agreement that all of their schools would take a set number -- at one point it was 27, it's been expanded -- 27 classes from the technical schools.

Q    27?

A    Yes.  But that goes back to if -- we would take it at VSU.  If you took English 1101 at Wiregrass, we would accept it back at VSU.

Q    Okay.

A    If you took English 1101 at Wiregrass and were trying to get into UGA, UGA has a subjective

admissions standards.  We have cookie-cutter admission standards at VSU.

So ours is if you have A, B, and C, you get accepted.  Georgia is, did you take rigorous classes?  Did you take AP?  Did you take this?  Do you have letters of rec?  Do you have internships?

So if a student took English 1101 at Wiregrass, UGA may or may not look favorably when processing that student's application for admissions.

Q    And where are you getting that from? Like, how do you know that?

A    I know what our admission standards are, and I know if you call UGA and ask them what their admission standards are, they cannot tell you because it's subjective.

Q    Okay.  So you know it because you've called up there and asked them that?

A    (Nodding head.)

Q    Okay.

A    Georgia Tech is very particular about their sciences, their maths and sciences.  They typically don't take AP credit for math and sciences.  They want to teach you math and science. They could really care less about your humanities

and social sciences, but ...

Q   So did they say anything about course rigor regarding their admissions requirements?

A   UGA?

Q   No.  Well, I thought we already talked about UGA.  You said you called their admissions office, and they said it's subjective and that was based on the review of whether the courses were rigorous that they took.  Did you say that?

A   I didn't call them.  I've talked to their representatives when we're both at college fairs.

Q   Okay.

A   And that's what they say.  They can't -- they can't give you if your SATs are this and your high school GPA is this, then we're going to accept you because they're looking to have a certain demographic.  They like to have a certain number of state students.  They like to have a certain number of Georgia students.  They like to have a certain number of Asian students.  They like to have ...

Q   And so it's subjective.  And how does that relate to course rigor of the student they're reviewing in admissions?

A   UGA feels that AP is more standard.  They can -- they consider that rigorous.  Dual enrollment

is rigorous, but they weigh it on the level of the institution you took it at.

Q    Okay.  Is that similar at Georgia Tech or --

A    Yes.

Q    Okay.  How does it go at Georgia Tech regarding that?

A    I haven't actually spoken to anyone at Tech.  The only thing I do know is from students who have taken AP scores, AP credit.  They'll send their scores to us, and we'll give them X number of hours in transfer classes.  They'll send it to Tech, and they will not.  So they may get 19 hours of credit from VSU for their AP.  They may get six at Tech.

Q    Okay.  What about DE classes at Tech?

A    I honestly don't know.

Q    And what about DE classes at UGA?

A    I think that they view it as rigor.  They -- it's subjective.

Q    Okay.  Do you know of that information with regard to any other four-year institutions?

A    I know that there was one student that was at Valwood, went to Johns Hopkins, and they would not accept her credit from Wiregrass.

Wiregrass was teaching exclusively at

Valwood until we came along with our dual enrollment taking some classes out there.

Q     What -- do you remember what class she took at Wiregrass?

A     It was either the comp- -- the computer class, intro to computers, or it was college algebra.

Q     And why didn't they accept the credit at Johns Hopkins?

A     Because it was from a TCSG.

Q     Any other four-year institutions?

A     Not that I'm aware of.

Q     Just the two that came from Albany Tech?

A     Yes.

Q     Exhibit 19 in your book.

      (Marked for identification is Plaintiff's
      Exhibit 19)

BY MS. MAESTAS:

Q     All right.  I've marked this as Plaintiff's Exhibit 19.  Do you recognize this document?

A     Yes.

Q     What is it?

A     This is a recruitment flyer that was sent to high school juniors and seniors.  I think this

was sent throughout the state.

Q    Okay.  And I've highlighted a sentence that says:  "The rigor and pace of our classes will prepare you for success anywhere."

Do you know what that's referring to?

A    Yes.  So initially when Jamie took over they were calling it the Dual Enrollment Honors Academy.  And they were wanting to sell it as -- to the top tier students at the high schools as an honors kind of cohort to prepare students for life after high school.

Q    Is that talking about academic vigor?

A    Yes.

Q    Okay.  Is it trying to differentiate VSU from other institutions?

A    Yes.

Q    In what way?  What -- who is it trying to differentiate from?  What does that mean?

A    We were in direct -- we were in direct competition for students.  They were wanting to grow -- grow the dual enrollment program, and the Technical College Systems of Georgia were scooping up the students in the fact that they did not have requirements to be accepted like a college did. They would allow the students to come in on

placement exams.  And the TCSG schools were in the high school daily.  I mean, they were there on a daily basis.

Q    What about GMC?  Were you competing with GMC?

A    Valdosta High School we competed with GMC. And that was strictly because of location, but that was -- GMC is located very near Valdosta High School.  So the students could easily zip over there and zip back to the high school.

Q    23.

(Marked for identification is Plaintiff's Exhibit 23)

BY MS. MAESTAS:

Q    This is an email which has a handout and it -- this came from Sarah Wenham, and it says: "USG Dual Enrollment Summit 2019."

Do you know what that is?

A    Yes.

Q    What is it?

A    I think USG was trying to get -- I say yes real quick.

They were working through best practices because, if I recall, there were issues in the funding app.  There issues -- were we all doing

the same thing.  Was everybody in the University System doing the same -- using the same procedures for dual enrollment?

Q    Okay.  Is that important?  I mean, like, why is it important, if it is important?

A    Not everybody's ready to skip high school and come to college.  So it's important that, again, the students aren't just trying out these classes because they're free, that they -- they are advanced students that are ready to -- they've exhausted what the high school has for them and they're ready for more rigor.

Q    Okay.  24.

(Marked for identification is Plaintiff's Exhibit 24)

BY MS. MAESTAS:

Q    This is a list of talking points from a working lunch at the -- the USG Dual Enrollment Summit 2019.  And there is a list of common misconceptions, and then the last bullet point is listed as one of those misconceptions.

And then the parenthetical at the end that says:  "Then parents are frustrated when they are not successful," if you could read that bullet point and --

A    The highlighted one?

Q    **Yes, ma'am.  Uh-huh.**

A    Okay.  I know what this means.

Q    **Okay.  Can you tell me what it means?**

A    It means if you come from a school where the rigor is not the same -- and we all know that the levels of rigor vary -- that a student takes -- I'll go with English 1101.  It's usually the first one we sign them up for at a technical school.  Then they come to -- they come to us once they graduate high school, and we register them for English 1102.  And our professors are, like, they are not ready for English 1102.

Q    **What schools are they typically coming from?**

A    Typically the technical schools, but there are some that come from GMC.

Q    **What professors are saying that?**

A    More the English professors.

Q    **Like who?**

A    Oh, I can't give you names.

Q    **Okay.  Yeah.  If you don't know, that's fine.  I just don't want to miss the opportunity.**

A    Just in general.  Just in general.  The biology professors were saying that they were not

ready for the anatomies or Anatomy 2.

Q    Okay.

     Okay.  We talked about this before, about the articulation agreements, and -- and you asked me a question:  Are you talking about high school curriculum, or are you talking about TCSG, USG?

     I wanted to ask you what you meant about the articulation agreements with regard to high school.

A    Those are the ones where we have to match one of our courses to a high school course.  So if a high school student has to have a physical science, a biology and a chemistry, we have to make sure the components they would be taught in high school, if they take a physical science, biology or chemistry, with us, are the same components needed to go back and satisfy that requirement for graduation.

Q    Is that the 27 courses?

A    No, that's -- that's the TCSG.

Q    Okay.

A    TCSG.

Q    Okay.  So this is -- does this have to do with getting approved at the high school level?

A    Yes.  It has to be approved by the DO -- DOE, Department of Education.

Q    Okay.  Okay.

MS. MAESTAS:  17.

(Marked for identification is Plaintiff's
Exhibit 17)

BY MS. MAESTAS:

Q    Okay.  I marked this as Plaintiff's
Exhibit 17.  This is the VSU website printoff of the
office of admissions staff.

And if you could review the names and
positions on this list.  And do you see anybody on
this list that covers duties that Jamie never
covered?

A    What do you mean "that Jamie never
covered"?

Q    Like, did anybody on this list help out
with something that Jamie never helped out with?

MR. CARTER:  In reference to what?  I
don't understand your question.

BY MS. MAESTAS:

Q    Okay.  So, for example, I'm going to look
at Olivia Griffin.

A    Who's no longer there.

Q    Okay.  But she was there -- right? -- at
some point?

A    'Til Christmas, yes.

Q    Okay.  So I would say, like, I know what Jamie Bird did and then I hopefully know what -- you work in admissions.  So you hopefully know what Olivia Griffin does.  And if you have a Venn diagram and you know what Jamie did, if they overlap, then you wouldn't be able to count that person.  And then --

A    So Olivia was an admissions counselor. She would have been told, when you're in the schools, to sell -- and especially Olivia because she was a local rep -- to sell dual enrollment.

Q    Okay.  So --

A    To promote dual enrollment as well as freshman -- as well as recruiting for freshman students.

Q    So the question is:  Do you see anybody in here that does things that Jamie never did?

Is that too --

A    When I -- Jamie never evaluated college transcripts, which is what I did.

Q    So I don't mean, like -- it's a little bit of a kind of backwards question, but we'll just go through it.

Did some of the things that Ryan Hogan does, did Jamie help out with?

A    Yes.

Q    Did some of the things that Lisa Long does or did, did Jamie help out with?

A    Yes.

Q    Did some of the things that Christy Croft does now or did, did Jamie help out with?

A    Yes.

Q    Alexis Smith.  Did some of the things that Alexis Smith does or did, did Jamie also do at some point?

A    So the next four are recruiters and --

Q    So we're talking Alexis Smith --

A    James.

Q    -- James Sampson --

A    Jesse, Olivia, Monica, Christine.

So they would all sell, represent, answer questions about dual enrollment.

Q    Okay.  So now we're on Mary Beth Bennett.

A    Okay.  Mary Beth, Ingrid, Marie, Tyler, and Linda are processers.  So Jamie would work with them getting documents to get the dual enrollment students accepted.  She would work with them forwarding them documents to move them from a dual enrollment student to a continuing freshman if they chose to stay with us after graduation.  So in that

aspect, yes.

Q   Okay.

A   Nancee is our receptionist.

Q   So would Jamie greet people if they came into the office?

A   When she was in that house?

Q   Uh-huh.

A   Yes.  If Nancee was tied up, yes, she would because Nancee's office is at the front, Jamie's was the next one.  If somebody came in, Jamie would come out and ...

Q   Okay.

A   Abbie is a communications specialist.  I don't know that she was there when Jamie was there. She handles our CRM, our communication resource manager.  She sends out all the emails and texts and that type of stuff.  So --

Q   So no?

A   No.

Q   Okay.

A   The rest of these are student assistants.

Q   Okay.  And so did Jamie help out with any of their tasks?

A   They typically just give campus tours. They stuff admissions letters.  She may have given

them some mass email to, like, put the labels on.

Q    **Did Jamie ever do tours?**

A    Yes.  Jamie would volunteer to do tours.

Q    **Okay.  18.**

(Marked for identification is Plaintiff's
Exhibit 18)

BY MS. MAESTAS:

Q    **Okay.  This is a "Meet your counselor" printout from the VSU web page on the admissions counselors, and this is going to be the same question.**

**If you see a person who did something that Jamie used to do.**

A    Okay.  So I'll -- that one is no longer here.  Olivia is no longer here.

Jamie and Linda work -- Linda is our part-time person and just the most pleasant person in the world.  So Linda -- Jamie would go to Linda to handle the -- the movement, a lot of the processes of the dual enroll; processing, putting them on.  Because the other processers had their own sections of the alphabet and -- but all of them can do it.  So she worked with Linda to move them from dual enrollment to freshman.

So Christine, James, Alexis, Jesse, and

Monica are basically the counselors who have been asked to also now sell dual enrollment.

Q   Okay.  And then you said Dowling and Olivia are no longer there?

A   No longer there, correct.

Q   But did they do things when they were there that Jamie also did?

A   Not that I can recall.

MS. MAESTAS:  14.

(Marked for identification is Plaintiff's Exhibit 14)

BY MS. MAESTAS:

Q   So it's not going to be a vision test.

A   Well, that's good.

Q   But this is a list of new positions.  So the dates says it's created -- the first admissions position was listed as open on -- let's see.  It goes from February 4th, 2020.  And then it looks like the last position was posted open March 24th, 2021, and these are admissions recruiter open positions.  And they're posted by Manager Ryan Hogan and one is Hilary Willis.

A   Okay.

Q   And then in the section that is kind of tabbed off in blue, those are the positions that

met -- match up to the ones that are listed on the front that are highlighted.  Does that make sense?

A     Yes.

Q     Okay.  So there's, you know, other positions that -- in this packet.  I'm looking at the admissions recruiter positions.

A     Okay.

Q     Okay?

So the first question is:  Which one of them -- of these, if you know, are new positions versus already have this position, that person quit for whatever reason, and now we're refilling it?

I'm going to ask that again.

So totally new position versus we had somebody, they're no longer there so now we've got to fill it again.

A     Okay.  I'm trying to think.

I think they were all there.  People left and we had to refill them.

Q     All six of them?

A     The recruiters, it's high turn -- it's high turnover for recruiters.  They -- it's burnout, quick burnout.

Q     Okay.

A     I'm trying to think if we have any new.

Q    So we did look at a list a few minutes ago of the admissions recruiters.

A    Uh-huh.

Q    Does that refresh your recollection about which ones may have been new versus refill?

A    All right.  Let me talk.

So the two that we have just filled, they haven't started yet.  One was to replace Dowling, and one was to replace Olivia.

Q    And that's, like, right now --

A    Right now.

Q    -- they're open?

A    Well, they're filled.  They haven't started yet.

Q    Okay.

A    Who left before them?  I'm -- had a little girl named Alley.  She wasn't here but six months. So one may be hers.  Alley and Jesse started at the same time.

So did Alexis take Alley's place?  I think Alexis took Alley's place.  I think we had a regional in Atlanta that left that we did not refill, or if we refilled it, we brought it back local and not in Atlanta.

Does that average out or does that end up

being ...

Q    So we've identified Dowling, Olivia, and Alley.

A    Uh-huh.

Q    And maybe Jesse?

A    No.  Jesse is still here.

Q    So this is postings in 2020 and 2021.  Was Jesse new --

A    Uh-huh.

Q    -- before 2020?

A    Yes.

Q    She was already there?

A    He.  Yeah.

Q    Okay.  And then Alley, she came in, in ...

A    She was military.  She didn't stay but about six months.

Q    Do you know if she came in 2020 or --

A    She came when Jesse did.  So she came in 20 -- 2021, the first of 2021.

Q    So just this past year?

A    (Nodding head.)

Q    Okay.  So we're not really getting into -- looks like 2021.

All right.  Let me ask you this way:  When Jamie was on board with admissions and dual

enrollment, how many recruiters did you have?

A    I'm telling you, they come and they go, and I don't get to know them anymore because it's just not worth it.

We had James.  We have -- still have James.  We have Luan.

Q    Say it again.

A    Luan.

Q    L-u-a ...

A    N.

Q    Is it a boy or a girl?

A    It's a girl.  She was -- she was Hispanic.

Q    Okay.

A    So we had James.  We had Luan.  We had -- oh, we had Nick Harrison.  We had -- did we have another guy?  I'd have to go back to personnel files, honestly.

Q    Okay.

All right.  Can you turn to 17 again?

So we've got -- so this is the office of admissions staff.  And so we've got -- so Regional Admissions Counselor Alexis Smith.

Is that also known as an admissions recruiter?

A    Yes.

Q    Okay.  And then James Sampson, recruiter?

A    Yes.

Q    And then same thing with Jesse Taylor?

A    Yes.

Q    Olivia Griffin?

A    Is gone.

Q    But it is a position?

A    Yes.

Q    Okay.  Monica Wolfe, recruiter?

A    Yes.

Q    Christine Rice, recruiter?

A    Yes.

Q    Mary Beth Bennett?

A    In-house processer.  The rest of these are in-house processers.

Q    And then on the last page we've got communication specialist and student assistant.  Any of those recruiters?

A    No.

Q    Okay.  So that's one, two, three, four, five, six.

A    Right.

Q    Okay.  So six recruiters.
     And then I said -- oh, let's look at the other page with the "Meet Your Counselor."  So

that's going to be Exhibit 18 right after that.

        And then I'm just looking for the same thing.  Which one of these are admissions recruiters?

    A    Dowling, Olivia, Christine, James, Alexis, Jesse, and Monica.

    Q    Okay.  So we've got repeated names.  Monica is a repeat from this page.  Jesse Taylor is a repeat.

    A    Alexis, James, and Christine are repeats.

    Q    Dowling and Olivia are the only new ones on this Exhibit 18; right?

    A    Yes.

    Q    Okay.

    A    And both are gone.

    Q    Both of them are gone.

        So we've got one, two, three, four, five, six admissions recruiters on Plaintiff's Exhibit 17 and two on Plaintiff's Exhibit 18.  So a total of eight recruiter positions?

    A    If you say so.

    Q    I mean, I -- do you disagree?  I mean, am I missing anybody?

        MR. CARTER:  You either know, don't know, or just --

A    I -- I don't know, honestly, a hundred percent.

BY MS. MAESTAS:

Q    **Okay.  So let's go back to --**

A    Let me think for a second.

Q    **Sure.**

A    There were four in-house.

Q    **Let's take a little break --**

A    And there were two --

Q    **-- and then you can think.**

A    Wait.

Q    **Oh, sorry.**

A    There were two in Florida that were regional.  So we had four in-house, two in Florida, and two in Atlanta.  So eight.

Q    **Four in-house, two in Florida, and ...**

A    Two in Atlanta.

MR. CARTER:  And what time period are you referring to?

THE WITNESS:  My lifetime.

MR. CARTER:  Okay.  The whole time you've been there?

THE WITNESS:  Within the last two years.

MR. CARTER:  Okay.

BY MS. MAESTAS:

Q    Okay.  In the last two years.  So Jamie's last day was November --

MS. BIRD:  16, 17.

MR. CARTER:  That's fine.

MS. MAESTAS:  -- 17th, 20 --

MS. BIRD:  '21.  No, 2020.

MS. MAESTAS:  Last year, the year we just had was 2021.

MS. BIRD:  Okay.  So 2020.

BY MS. MAESTAS:

Q    Okay.  So November 2020.  So now we're in January 2022.  So you said in the last two years. So that's five, six, seven -- that's eight recruiters.

Was there a time period where you had less recruiters?

A    Yeah.  Yes, but --

Q    Yeah.  You can explain.

A    But they -- they -- they leave.

Q    So -- and I don't mean, like -- so, like, your target number of recruiters, what number is that?  Is it eight, and has it been eight?

A    Okay.  Let me think.  So -- and this is -- this is more a Ryan question because -- because

these are his -- his people.  I'm not over them anymore.  When I had them, there were four.

We got extra.  We -- we actually had a president who told us he wanted regional recruiters, which is, I think, why it went from the four that we had to the four more that were regional.  They always tell admissions don't give up a position.  You don't want to give up a position.

Q    What does that mean?

A    Like, if one leaves, we just won't rehire that one.  You don't want to downsize your office.

Q    Okay.  Okay.

A    So we -- we typically rehire.

Now, sometimes we will wait -- our recruit period -- our heavy recruit period starts Labor Day, and it's the fall semester.  That's when kids are deciding where they're going to go to college.  So that's when all of the -- the Probes are going on.  That's when all of the high school counselors are asking you to come to the school.  That's the heavy.

Spring it starts to wane.  A lot of times in spring we're working on the juniors, going out and recruiting the juniors.

So if you had someone leave, there's really no sense in filling that -- we'll fill it at

the end of spring semester, get them up and running during the summer so they're ready to hit the road again in February --

Q    So when --

A    -- and August.

**Q    So when would you want to hire the recruiters if you had to fill a new -- a position that's open?**

A    If you have somebody leave in August, you got to go ahead and fill it because we need boots on the ground in August.  But if you have someone leave in end of November, December, you can wait until May.  And usually at that time you have more recent college graduates that are looking for a job.

**Q    When Jamie was working in DE in admissions, did you have eight recruiters?**

A    I don't know.

**Q    Do you remember a time when you had less than eight?**

A    Currently.

**Q    So I don't mean, like, target of eight. Like, I don't mean, like, unfilled, but, like, was there a time when you -- other than when you -- back when you were the -- like, recently.**

So you said the last two years you

remember having eight.  Before that, do you remember having less than eight?

A    We probably had six.  We -- we did not -- I don't think we jumped from four to eight.

Q    Okay.  So it was, like, a slow accumulation of up to eight recruiters?

A    Because we -- when -- when we were allowed to waive the out-of-state tuition for the surrounding counties we needed -- that's -- we increased recruiters.

Q    Okay.

A    First we got Florida and then several -- I don't know, maybe one or two years later we could waive the out of state tuition for South Carolina, Tennessee.  There's some other -- I think North Carolina.

MR. CARTER:  I don't know.  Alabama.

A    Alabama.  Yeah.

BY MS. MAESTAS:

Q    Okay.  46.

(Marked for identification is Plaintiff's Exhibit 46)

BY MS. MAESTAS:

Q    Okay.  Have you ever seen this document before?

A    I have not.

Q    Okay.  This is a letter that was written by Jeanine Boddie-LaVan to legal affairs at the Board of Regents regarding Jamie Bird's application for a discretionary review of her termination.

A    Okay.

Q    Okay?  It's dated August 24th, 2020.

I'd like for you to turn to Page 6 of the document.  And then there's a paragraph that's labeled No. 3.

And then the last sentence, it says: "Her", Jamie's, "duties could be reassigned to the local recruiters and therefore, her position was able to be eliminated with the least impact to students."

Agree or disagree?

A    I agree it could be eliminated.  I agree they could ask the recruiters to do -- to answer questions if approached.  I disagree that all of her duties could be done.

Q    By the recruiters?

A    Yes.

Q    Okay.  And you said you agree that her position could be eliminated.  That means it wasn't needed?

A   That's not what I meant.

Q   Okay.  Well, then let's rephrase that one.

A   Rephrase it.  Okay.

In theory, they could spread her duties amongst a group of people.  In reality, it's not at the same level of expertise.

Q   And was the level of expertise needed to do that job?

A   In my opinion, yes.

Q   Okay.  And then Page 7, at the bottom of the page it says No. 15, and then it says:  "Dual enrollment."

And then the second sentence -- or sorry, "Dual Enrollment:  Dual enrollment is being eliminated as a one-employee department."

Do you agree that dual enrollment can be a one-employee department?

A   Well, it wasn't a one-employee department.

Q   Is it now?

A   Yes.

Q   Under ...

A   Megan.  And I -- I can't attest to whether it's working for her.

Q   You cannot?

A   I cannot.

Q   Okay.  And then the next sentence:  "Dual enrollment will be absorbed by the overall admissions recruiters, and those duties will become a part of the regular caseload for the recruiter rather than a separate process."

Doesn't that sentence contradict the first one?

MR. CARTER:  That's -- that's speculation. I mean, that -- you can give your opinion, but ...

A   Which one?

BY MS. MAESTAS:

Q   So the first sentence says:  "Dual enrollment is being eliminated as a one-employee department."

Okay.  Never mind.  I think I'm reading it wrong.

So you're -- okay.  So it is a one-employee department under Megan, but you don't know whether it's working out.

Now, this second sentence says:  "Dual enrollment will be absorbed by the overall admissions recruiters, and these duties will become a part of the regular case load for the recruiter rather than being a separate process."

Is that what's happening?

A    I can't attest to that.

Q    Did you just say that Megan is the dual enrollment person?

A    But the recruiters are supposedly out there selling it.  Megan's facilitating it.

Q    Okay.  So dual enrollment will be absorbed by overall admissions recruiters.  It's a -- do you disagree with that?

A    I don't have firsthand knowledge that it's being done.

Q    Okay.  If you could turn to -- all right. If you could turn to -- there's a blue tab, I think, near the bottom of that same document.

And this is inside Plaintiff's Exhibit 46.

And this -- this document is entitled "Retention of Dual Enrollment Students.  Terms: Fall 2015, Fall 2016, Fall 2017, Fall 2018, Fall 2019."

These -- these numbers were used in this letter to show that dual enrollment retention was going down under Jamie.  Have you ever seen these numbers generated before regarding dual enrollment?

A    I have not.

Q    And so why -- do you have any idea --

A    Because I don't do numbers.

Q    **Okay.**

A    Number -- I mean, I do my job.  They come; they come.  Ryan's the numbers person.  We used to -- he would -- he would -- he would give us these numbers every morning in our -- every Monday in our report and --

Q    **These numbers right here?**

A    No, no, no, no.  Enrollment numbers. Enrollment numbers.

Q    **Okay.**

A    And (witness vocalizing).  I'm sorry.

Q    **So all --**

A    It would just go over my head.

Q    **All of enrollment?**

A    Yes.

Q    **Okay.  Would he ever come in and say anything about dual enrollment students?**

A    No.

Q    **Did anybody ever come in and talk about retention of dual enrollment students?**

A    I know that they wanted to retain them as freshman because they count in our freshman numbers, which is what we get funded by.  So it's important to retain them.

I know that we changed the way -- this was during Jamie's time -- the way that we coded them. We used to just let them be continuing. They were dual enrollment students. If they decided to stay at VSU after they graduated from high school, they were continuing. We then switched it to, if they decided to stay after doing dual enrollment, you're a freshman now, and we're counting you in our freshman numbers.

Q    Okay.

A    And that was ...

Q    So you never tracked them after they became freshman as to whether they -- they just became a freshman?

MR. CARTER:  Are you talking about she tracked them?  You said "you" --

BY MS. MAESTAS:

Q    I meant seen them tracked.

Like, if they came in as a freshman, had you seen it tracked that, okay, this one was formerly dual enrollment?

A    I did not track them.  They were tracked typically by the enrollment manager or the director.

Q    Okay.  And then these numbers right here, so they -- there's Fall 2015, Fall 2016, Fall 2017,

Fall 2018, Fall 2019.  What about spring?  Like, wouldn't that be important to put in there?

A    Spring what?  Spring?

MR. CARTER:  Let me object again on speculation.  You're just showing her a document and asking, would it be important to put in there.  Important for what?  I mean, she doesn't know --

MS. MAESTAS:  To be accurate.

MR. CARTER:  She doesn't even know why this document was created or the purpose other than what you've told her.  I mean, she's just -- it's sheer speculation because important for -- for what?  Again, just numbers.

MS. MAESTAS:  Yeah --

MR. CARTER:  So you can create a document of any numbers, but --

MS. MAESTAS:  Right.  I mean, you want to stipulate that it -- it doesn't matter, then that's --

MR. CARTER:  No.  You're asking her for information that is pure speculation.

A    There is someone that it matters to, and there's someone that tracks it.  It's just not me.

BY MS. MAESTAS:

Q    Okay.

MR. CARTER:  That's what I was getting at.
I mean ...

BY MS. MAESTAS:

Q    Okay.  So without looking at the document,
if somebody were to tell you just who was retained
as a dual enrollment student in the fall and didn't
count the spring, wouldn't that be odd?

A    For the same year?

Q    Yeah.

A    For the same school year?

Q    Yeah.

A    Yes.

Q    Okay.  And are those numbers on that
document that we just looked at for the --

A    No.

Q    Okay.

A    I see what you're saying now.

Q    Okay.  So now that you see what I'm
saying, can you think of anything else that
clarified it?

A    Yes.  You have dual enrollment students
that start in the fall.  They go fall, spring,
graduate.  You have dual enrollment students that

start brand new in the spring.  They go spring and graduate.

So, yes, you would want the students that started in the spri- -- started in the fall, did spring, and graduated to count.  You would want the students who started in the spring and graduated to count and stay.  And stay at VSU.

Q    Okay.

A    Yes, that -- that -- yes.

Q    **And are those numbers included on this document, which is a chart inside of Plaintiff's Exhibit 46?**

A    Looks like they were doing from fall to fall to fall.

Q    **So the answer is?**

A    No.

Q    **Thank you.**

**Okay.  If you could turn to -- let's see. I'll do that later.**

**Why was Jamie terminated?**

A    What I heard?

Q    **I mean, yes, unless you personally know why.  Rumors.**

MR. CARTER:  Wait a minute.  You're asking her -- that was confusing.

BY MS. MAESTAS:

Q   Do you know why she was terminated?

    MR. CARTER:  And you said, "That I heard."

BY MS. MAESTAS:

Q   Okay.  So what did --

A   Yes.

Q   -- you hear?  What did you hear?

A   Reduction in force.

Q   Okay.  And do you believe that's the reason she was terminated?

A   I do not.

Q   And what do you believe the reason she was terminated?

A   Retaliation.

Q   For ...

A   Conflict between her supervisor and Dr. Carr.

Q   And her supervisor being?

A   Tee Mitchell.

Q   Okay.  And what was the conflict about?

A   Personality clashes.

    MR. CARTER:  In between Tee and Dr. Carr, is that what you're saying?

    THE WITNESS:  Yes, sir.

    MR. CARTER:  Okay.

BY MS. MAESTAS:

Q    Was it about Jamie?

A    No -- yes.

Q    Okay.

A    No overall.  I just think there were personality conflicts between the two.  What brought Jamie in, I believe was my fault, was an email that we drafted and sent out that they didn't like.  And she was written up and reprimanded.  Or her supervisor was told to write her up and reprimand her.

Q    Okay.  Anything else?

And I'm going to get into the documents.  So I just kind of want to hear your -- your take in your own words, and then I'm going to get into the more specifics.

A    No.

Q    And do you recall that Jamie had filed a Title IX complaint?

A    Yes.

Q    Okay.  And do you remember what it -- what it was about?

And this -- again, I have documents.  But like, in your own words, what do you recall?

A    I don't know how to word that.

Q    Okay.

A    Can we get to the documents, and I will tell you yes or no?

Q    Yes.  Yes.  I'm getting organized.

MR. CARTER:  Well, I think -- do you know what Jamie's Title IX complaint was about was the question that she asked.  Do you or don't you?

THE WITNESS:  Yes.

MR. CARTER:  Okay.

BY MS. MAESTAS:

Q    And, like, do you remember any -- like, was it about -- do you have, like, a -- any set of facts that you recall that it was about?

A    Yes.

Q    Okay.  And can you give me, like, one or two sentences about -- I don't want to limit you but, like, is there --

A    A hug.

Q    Okay.  I didn't want to say it.  That's what I was thinking, but I wanted you to say it first.  Okay.

And do you remember if the complaint was substantiated, if it was dismissed, anything like that?

A    Tell me what you mean by "substantiated."

Q    Like, did they -- did the University find that there was a Title IX violation, or did the University find that there was not?

A    Not that I'm aware of.

MR. CARTER:  Do you know?  I mean --

THE WITNESS:  I do not know.

BY MS. MAESTAS:

Q    Okay.  You don't know what happened. Okay.

A    I know I was interviewed.

Q    Okay.  Perfect.

Okay.  And then I had asked you about Jamie Bird's termination, and we had said there was the reduction in force but that you didn't believe that that was the reason.  You believed it was retaliation.

And so I wanted to direct you to 7, Plaintiff's Exhibit 7.

(Marked for identification is Plaintiff's Exhibit 7)

BY MS. MAESTAS:

Q    Okay.  I'm not going to ask you anything specifically about this document, but I am talking about what can be -- how a reduction in force can be

done.  And it has been testified that if there are open positions that can be closed instead of terminating an existing personnel, that they will go to that first.

When Jamie was terminated under the reduction in force, do you recall any open positions that were unfilled?

A    In our office?

Q    Uh-huh.

And I mean admissions in dual enrollment because now it's kind of a question as to whether dual enrollment is actually in admissions.  So ...

A    We had two RIFs in our office.  We had Jamie's and we had Eric's, who was running our CRM at the time.

Q    What's CRM?

A    Customer relations manager.

I feel like there was a recruiter position open.  There was a recruiter position open.

Q    Okay.

A    Yes.

Q    And do you remember if there was another position open?

A    Sarah's when she decided to leave.

Q    Other than Sarah?

If you could look to Plaintiff's Exhibit 12.

(Marked for identification is Plaintiff's Exhibit 12)

BY MS. MAESTAS:

Q    So this is a document that I received from VSU in discovery in litigation, and it is the Faculty and Staff PAR forms.  "PAR" is personnel action request forms.  And then it's a chart, and it has the requestor and then the category, department.

And then on Page 2, a little bit more than halfway through, I've highlighted two positions in admissions that were posted in 2020.

Does that refresh your recollection regarding unfilled open positions at the time that Jamie Bird was RIFed?

A    Okay.  The two under my name were temporary hires.  One is still temporary with us, and one is not.

I'm assuming the two under Ryan were recruiters.

Q    Okay.

A    And the other one, I know he had talked about hiring a creative because before that time Keith Barboroug [ph] was doing our creative stuff

and he was RIFed, also.

Q    Okay.  And do you -- so I am going to reask the question.

Do you remember how many positions were open yet unfilled at the time Jamie --

A    Two.

Q    Two?  Okay.

A    Thank you.

Q    Who do you report to?

A    Ryan Hogan.

Q    Who does he report to?

A    Dr. Carr.

Q    How did Dr. Carr supervise admissions and dual enrollment?

A    He's the director of student success.

Q    Vice president of student success?

MR. CARTER:  I think.  I don't remember the exact title.

BY MS. MAESTAS:

Q    Okay.  So did he come over?  Did he have meetings?  Did he walk over every day?  Did he see you once a month?  Did you write a report and you never saw him?

That's the kind of information I'm looking for.

A    I didn't have a lot of interaction with him.

Q    Okay.

A    He had executive leadership meetings where his direct reports would meet with him, I believe, on a weekly basis, maybe a monthly basis, but I -- I didn't have -- I didn't have much.

I did reach out to him at one point about accepting more dual enrollment credit, and we discussed that, but we have very little interaction.

He may have gone over to the (indiscernible) --

(Simultaneous cross-talk.)

THE COURT REPORTER:  To the?

A    Admissions has the main office.

Q    So she -- she's just asking what you said. She's not asking -- she doesn't know what you said.

BY MS. MAESTAS:

Q    Okay.  And who were his direct reports that were in admissions or dual enrollment, Dr. Carr's?

A    At the time it was Tee Mitchell and Jamie Bird.

Q    Okay.

A    From that area.  From our area.

Q    Okay.  So Jamie Bird was a direct report to Carr?

A    She was in the executive --

Q    Meetings?

A    -- leadership group, yes.

Q    Okay.  So she would go with Tee Mitchell and join the meetings, which were the direct report to Carr?

A    Yes.

Q    Okay.  And did that stop happening at some point, or did it continue on?

A    That stopped happening after, I believe, our CVIOG went through.

Q    Which was in what year?

THE WITNESS:  Do you know?

MR. CARTER:  Huh?

THE WITNESS:  Do you know?

MR. CARTER:  You just answer -- answer with what you know.  That's all you can answer.  If you don't know, you just have to say, I don't know.

A    CVIOG.  2019.

Q    Okay.  If you can turn to Plaintiff's Exhibit 29.

(Marked for identification is Plaintiff's Exhibit 29)

BY MS. MAESTAS:

    Q    Now, this is 20 right here.

    So this is the interview notes of the Title IX investigator for Jamie Bird's Title IX complaint of your interview.  It's dated September 30th, 2020.

    And so I'd asked you, do you remember what the Title IX complaint was about, and you said, about a hug.  And so I wanted to ask you:  Can you tell me about what happened with the hug thing?

    And I think it -- I don't want to put words in your mouth; but if you could tell me what you recall, then I cannot be leading you.

    A    Okay.

    Q    Which I'm trying to avoid, is to get your side without it looking like I'm telling you what to say.

    A    Okay.

    Q    Which I'm not.

    A    We had a dual enrolled student commit suicide, and it was very shocking to all of us but especially to Jamie because she worked very closely with these students.

Typically in the morning when we come in, in our little house, we have, you know, five, ten minute coffee, good morning, how are you, how are you, how are you.  Jamie came in, and she was obviously upset.  You know, we talked about it.  Oh, my gosh, how could this happen, blah, blah, blah.

Shortly after our coffee time and we all disbursed, Dr. Carr came over to check on her. He -- in the little house we don't typically close our doors.  Our doors were always open.  We talked back and forth, questions such as, you know, hey, would this transfer; hey, can you tell me what comes over from GMC when it comes up.  But he came in and -- and went to Jamie's office, and he closed the door.

I don't know.  They were in there not long.  Five minutes.  And the door opened back up. He stood in there and talked a little bit longer, and then he left.

And basically what I said.  Jamie came out of her office.  I mean, she was still upset.  She still had red-rimmed eyes.  But basically, that was it for that day.

I mean, I know that she had to take care of things with the dean of students.  You had to

contact the dean of students.  The dean of students reaches out to the parents and to the high school and things like that.  So she was -- she was working with the dean of students at that time.

Q    Okay.  When -- when you were in the huddle that morning, was Jamie crying?

A    She had -- she wasn't boohooing.  She -- she had tears in her eyes.

Q    Okay.  And then when she went into her office after the morning huddle, was she still crying?

A    I wouldn't see -- I didn't see.

Q    Okay.  When Carr came in, did he talk to anybody before he went into Jamie's office?

A    Not that I remember.

Q    Okay.  And do you remember if -- you said he shut the door when he went in there?

A    Yes, because she was behind her desk.

Q    Okay.  And you said when Jamie came out of her -- oh, sorry.  He came out of the office with -- and the door was open and they talked.  Did you hear anything they said?

A    No.

Q    Okay.  When Dr. Carr left, did he talk to anybody before he left?

A    No.

Q    When Jamie came out, did she talk to anybody about what happened when Dr. Carr was in her office?

A    No.

Q    Okay.  Did she look like she was upset about anything that Dr. Carr had done?

A    She looked upset.

Q    Okay.  Did she look different than when she first went into her office?

A    She looked upset.  I mean --

Q    So she was upset about the suicide, so it was kind of --

A    I couldn't notice -- upset was upset.

Q    Okay.

A    It was ...

Q    And Jamie didn't talk to you about it?

A    Not at that time, no.

Q    All right.  And when did she end up -- I mean, did she ever talk to you about what occurred inside that office that morning?

A    Yes, later.

Q    Okay.  How much later?

A    Couple of weeks.

Q    Okay.  And what was said?

A    She said that he approached her and said, "You look like you need a hug," and she said he embraced her full-body hug.  And she said, "Lisa, you know when something just doesn't feel right.  It feels inappropriate."

Q    Okay.  Did she describe --

A    She said full-body hug.

Q    Okay.  And then what else did she say?

A    I don't remember anything else.  I mean ...

Q    Okay.

A    That she went back around her desk to -- and sat down.  He didn't immediately leave.  She -- she, after the hug, went back around her desk and put some distance.

Q    Do you remember who opened the door?

A    Jamie opened the door.

Q    So you saw Jamie open the door and go back to her desk -- or no.  You didn't see her go back to her desk.  You just saw her open the door.

You couldn't see from where you were at that point?

A    Correct.

Q    All right.  Did -- did you observe --

A    I, more or less, heard her open the

door --

Q    Okay.

A    -- than saw her open the door.

Q    Okay.

A    'Cause from where my desk is, my door is here, but I heard her open the door and go back and sit down.

Q    Okay.  So how do you know, though, it was Jamie that opened the door?

A    Because when she opened the door Dr. Carr made some comment and I -- and Jamie said it's hot.

Q    Okay.

A    I mean, I wasn't, you know, trying to eavesdrop or -- or commit everything to memory.  I just -- you know.

Q    Okay.

A    He said something, and then she said it's hot.

Q    Okay.  Got you.

All right.  And do you remember anything else about a hug, like, later?

A    Yeah.  So this -- this was a while later. He was over talking to Ryan --

Q    And that's Carr, Rodney Carr?

A    Dr. Carr was over talking to Ryan, and

they were discussing moving dual enrollment under Rob Freidhoff.  I think Ryan had -- had asked, requested for it to stay under admissions.  I think that Ryan and Jamie assumed it was staying under admissions when Dr. Carr came over to tell Ryan it was not, it was being moved.

And then he said he was going to go over to our house and let Jamie know.  And Ryan came with him, walked him in because our house is secure.  It's locked.  And so Ryan let him in the back door with the key.

Dr. Carr came in Jamie's office.  Ryan came in and sat down in my office, and he and I were just chatting, just ...

Dr. Carr went to shut the door again and then made a joke that, "Oh, that's right.  You don't like shut doors," and something about, "I'll just give you an air hug.  I know you don't like hugs."  Or, "I know you don't like" -- I don't know.

Q    Okay.  Was the door closed at that point, or did it remain open?

A    It remained open.

Q    Okay.  And did you hear any other conversation that they engaged in?

A    Not that I recall.

Q   How long did that conversation last?

A   Less than ten minutes.

Q   And how did that interaction end between Carr and Jamie?

A   He left and left out the front door.  So he walked out of her office and walked out the front door.

Q   And did he talk to anybody when he came out?

A   Not that I recall.

Q   And then did Jamie exit?  Stay in her office?  What happened?

A   She exited to the hallway right there between our offices.

Q   Okay.  And was there a conversation that occurred?

A   Ryan was there, and I think it was, "Did you hear that asshole?"

Q   That's what Jamie said?

A   Maybe I'm speculating, but ...

Q   But that's what Jamie said?  "Yes"?

A   (Nodding head.)

Q   Okay.  You've got to --

A   Yes.  I'm sorry.  Yes.

Q   Okay.  And --

A    And Ryan said something -- something about a air hug, question mark, and that was ...

Q    Do you remember Ryan saying anything about, like, that was creepy?

A    Yeah.  I do.

Q    Anything else that you remember being said?

A    No.

I do remember something.

Q    Yes, ma'am.

A    And I don't know if I heard this, or I don't know if Jamie told me this later.

Q    Okay.

A    But they were discussing her CVIOG, and when she was brought over, the position was a director position, and the CVIOG reclassified her to, I want to say, a manager.  I am not a hundred percent sure.  But Dr. Carr was telling her if she made the move that he was there proposing, that he would take care of her classification.

Q    Okay.  And you don't remember -- do you remember anything else about that topic?

A    I don't.

Q    Okay.

Okay.  So in the -- in Exhibit 29, your

Title IX interview notes from -- that were written by the investigator during your interview.  Let's see.  One, two, three, four, five, six, seven.

It says:  "Bird came out.  We talked.  She didn't say anything initially" -- I'm sorry.  "She didn't say anything initially, right, the -- but I could tell something was different -- unsettled."

Does that refresh your recollection about what we were talking about and I had asked you before?

A    Did she look more upset?

Q    Yes, ma'am.

A    She was unsettled, but there was a lot she had to follow-up with, with the -- with the Dean of students.

Q    Okay.

All right.  And then down toward the bottom, second paragraph from the bottom, it says: "The incident where she was written up for email."

And then it goes on:  "I did dual enrollment before.  It became bigger which is why we hired Jamie.

When she wrote the email, we had discussed how things were changing in dual enrollment.  She asked me to read the email, and I did and said it

looked good to send.

There was nothing wrong with that email. I don't know why she was written up."

And then:  "For the audience she sent it to it was very informative, nothing negative, purely factual.

I feel like she was targeted.  Mr. Hogan feels that she was targeted with the RIF, but may not say that.  He is nervous to talk to you.  She goes above and beyond with her students and her job."

How did that -- how did the email come up?

A    The email come -- come up -- the email came up --

THE WITNESS:  Please don't type me with incorrect grammar.

BY MS. MAESTAS:

Q    She's got to report it like you say it, and I -- we all misspeak, so.  I'm the worst.

A    Well, somebody mistyped because that's supposed to say "then", not "the."  Anyway.

Q    Yeah.  So she's been -- she's typing it as you say it; so there's -- there's bound to be typos. I think she wrote free -- Freehoe and it's Freidhoff or Freehall and it was Freidhoff.  So -- okay.  So

back to --

A    Okay.  So Jamie and I had been discussing for a while -- Jamie's way more conscientious than I am -- just put it out there -- about the State's money, about the students trying out the classes, the students not being ready.  It doesn't cost to me.  Free, free, free, free, free.  It's free so let's do it.

Momma and daddy would push them to just get in there and take as much as you can because that's going to be that much less we have to pay, you know once you graduate.  So Jamie was trying to be -- and she said this multiple times -- a good steward of the State's money.

So when we have the several students who were doing different things, taking classes that weren't going to help them once they graduate, taking classes and then just dropping them willy-nilly, she composed an email that was to go to the counselors, the high school guidance counselors.

Q    Okay.

A    And basically the email said, when advising your students on dual enrollment -- and I don't know exactly how it went, but basically -- have a little more discussion with them.  Where --

where -- what are your ultimate goals?  Like, where -- where do you want to go once you graduate from high school?  And guide them to the proper institution that would be beneficial for the student in the long run.

So basically, if you know your kid's going to Yale, don't send them to Wiregrass just because it's convenient.  Make sure that they go and take an honors class at VSU.  It's going to look a lot more -- not, don't send your student -- because if your student's going to come to VSU after high school, then, yeah, they can go to Wiregrass because we're going to take these classes from Wiregrass.

Just make sure that they're -- it was just making sure that the counselors had a little conversation with the student before they signed them up because, as I said before, Wiregrass is out at the high schools daily.  And they were building their enrollment on dual enrollment.  I mean, their enrollment went through the roof.

We're competing with the Wiregrasses and the GMCs locally for dual enrolled students because 99 percent of your dual enrolled students are local.  You have a few that we took the class to because we took the class to Americus and taught.  You have a

few that do online.  So they're not -- but the 99 percent of them are local.

So we got this pot of kids, and Wiregrass is scooping them up and building their enrollment.  Well, we're told to build our enrollment as well.  I mean, build it.  Build it, Jamie.  We want more.  Build it.  We want more.  And that's when they came up with the creative ideas of going into the schools.  But, I mean, it was --

Q    Who's "they" right there?

A    Tee and Rodney.

Q    Tee and Rodney Carr?

A    Yes.

Q    Okay.

A    So that -- that was why she sent it to the high schools.  That, and she had a very personal relationship with all of the high school guidance counselors in our service area.  So they respected her because they knew she was a former teacher.  I mean, she had a close -- none of them took that the wrong way.

Now, I can tell you what happened.

Q    I want to know about that.

So my original question was -- so you're talking about the -- the hug and then we get into

the email, and I'm just wondering how that came up in the Title IX interview.

A    I honestly don't know which came first, the email or the hug.

Q    Okay.

A    So --

Q    Okay.  Did -- so the investigator's name was Janice Lyn.

A    Yes.

Q    Did she bring it up?

A    I don't remember.

Q    Okay.

Okay.  And then on the second page the: "I feel like she was targeted and Mr. Hogan feels like she was targeted with the RIF, but he may not say that.  He is nervous to talk to you."

Can you explain that?  Did you say that?

A    I did say that, yes.

Q    Okay.  And what were you talking about?

A    So there was an incident with Jamie with Dr. Carr telling Tee to write Jamie up for this email incident.  I think Tee did not agree that she needed to be written up.

I know that Jamie had a meeting with Dr. Carr where he told her he would not submit that

reprimand to her HR file.  He would just keep it in her drawer in case she ever screwed up like that again.

Q    Okay.

A    So I don't know what happened to that reprimand letter.  I don't know if it stayed in his drawer.  I don't know if he submitted it.  I don't know, but that's what he told her.

Q    Okay.

A    So Jamie was clearly upset about that because she had said in her X number of years of job evaluations she had never been given a less than stellar evaluation.

Q    And then you said:  "Mr. Hogan feels that she was targeted."

Why did -- did you say that?

A    I did.

Q    And why did you say that?

A    Because he told me that.

Q    When did he tell you that?

A    Shortly after the RIFs were done.

Q    After Jamie left or while Jamie was still there?

A    Well, Jamie was RIFed, and then they allowed her to stay through November until she had a

birthday.

Q   Okay.  So we said Ryan Hogan told you that, and then I asked when, and then you said when she was RIFed.  So that's -- so we've got the time where we found out that she was going to be terminated under the RIF and then the time she left.

Where in that time frame, if it falls in that time frame, did he say that?

A   Okay.  Mr. Mitchell was already gone, and Ryan has now taken his position.  Rodney went to Ryan to ask about reduction in force, and he said, like, You're trying to decide who to do a reduction in force.  And he said, What about Jamie Bird?

Q   Who said that?

A   Dr. Carr to Ryan.

Q   Okay.

A   So I think that's why Ryan thought she was the chose- -- the chosen one to be RIFed.

Q   Did -- and Hogan, was he surprised that he picked Jamie?

A   I can't answer that.

Q   Okay.  But in him saying that, that was the reason you said to the Title IX investigator -- or that that's what Ryan told you, and that's why you told that to the Title IX investigator?

A   Yes.

Q   Okay.  And then down at the bottom it says, second from the bottom sentence:  "Mr. Hogan is scared.  He is scared of being recorded and it being used against him if he tells the truth."

Did you say that?

A   Yes.

Q   And why did you say that?

A   Because everybody is scared of being retaliated against.

Q   "Everybody," like, the whole word?  Like, everybody in admissions, or everybody in the little house?

A   Okay.  Mr. Mitchell -- again, we go back to the personality clash -- was extremely paranoid of losing his job.

Q   Okay.

A   Whether that trickled down to Ryan Hogan or the fact that Mr. Mitchell had just left put the target on Ryan -- I don't know -- but he -- he was -- he was very paranoid to speak.

Q   To what?

A   To -- to --

Q   "Speak"?

A   Speak.

Q    Okay.  I just didn't hear the word.  It sounded like "speed."

A    Not his speed.

Q    So was there anything that he told you about being scared, or did you just observe that by his demeanor?

A    No.  He would say --

Q    Ryan Hogan would say?  Is it Ryan Hogan?

A    Yes.

Q    Okay.  So -- it's okay.  I just -- we have a transcript --

A    "I have a wife and two kids and 16 years in this system.  I can't afford to lose my job."

MR. CARTER:  You're talking about Ryan or Tee --

THE WITNESS:  Yes.

MR. CARTER:  -- Ryan --

THE WITNESS:  Ryan.

MR. CARTER:  -- Hogan.

BY MS. MAESTAS:

Q    And did he say that he was worried about retaliation from anyone in particular?

A    Well, we all knew who -- no.  He did not say the name.

Q    Okay.  He didn't say the name, but we all

know.  I don't know and the jury --

A    It was Dr. Carr.

Q    -- will not know.  So you've got to say it.

THE COURT REPORTER:  Sorry.  You might want to say it again.  There was cross-talk.

THE WITNESS:  It was Dr. Carr.

BY MS. MAESTAS:

Q    Okay.  If you could turn to 30.

(Marked for identification is Plaintiff's Exhibit 30)

BY MS. MAESTAS:

Q    And then these are the -- this Plaintiff's Exhibit 30.  These are the interview notes that Janice Lyn took for Ryan Hogan in Jamie Bird's Title IX investigation September 30th, 2020.

And I'm looking at the last paragraph, and I'm going to read that and then go through until, like, a little bit on the next page.

It says:  "When Bird's position was eliminated, conversation with Carr and Hogan.  We in Admission can support Bird.  She has a subordinate here.  At that point Carr agreed and told us to figure it out, us Freidhoff and Hogan.  Rob agreed it should remain in admissions.

I ask him to move to admissions, and he said, 'Let's wait to do all of the transitions because I have people that will be moving to other supervisors.'

Last week I was working on forms because HR requires one form per person.  Carr texted me and said he is not going to sign Bird's.  That she will stay under Rob.

I replied, 'Oh.  I must have misunderstood.'

He said he wanted to wait until November. Don't know why.  I ask Rob, and Rob said to me that there are things going on that I don't know about. I never wanted to get in the middle of any of this."

Do you -- okay.  And I know you didn't say this, but this is referring to some conversation that went on.  Do you have any recollection of that conversation or discussion?

A   I have what Ryan told me.

Q   Let's go with that.

A   Okay.

Q   What did Ryan tell you?

A   He didn't know why Jamie was being moved from under admissions.

Q   Okay.

A    It didn't make sense to any of us.

Q    **What about to Freidhoff?  Did it make sense to Freidhoff?**

A    Freidhoff had no idea about dual enrollment.  When -- when it did end up going under him, he approached Jamie and he said, "I'm a quick learner.  You're going to have to teach me everything."

Q    **Okay.**

MR. CARTER:  Were you there for that conversation?  I'm just trying to speed this up because we're running out of time.

THE WITNESS:  (Indiscernible.)

THE COURT REPORTER:  I'm sorry.  I didn't hear you.

THE WITNESS:  No.

MS. MAESTAS:  So I'm going to object to that.

MR. CARTER:  What?  No, I know, but I -- you know, I'm going to have a -- a lot of cross examination questions.  So we may have to suspend hers 'til later.

MS. MAESTAS:  Okay.  So we said she was going to go until 12:30, and then we have Boddie-LaVan coming in at 1:00.

MR. CARTER:  Yeah.

MS. MAESTAS:  So are you saying you want to suspend it right now?  Are you --

MR. CARTER:  No, no, no.

MS. MAESTAS:  Okay.

MR. CARTER:  No.  You go as long as you want, and then --

MS. MAESTAS:  So I would object to you starting to ask -- so that we can speed it up so you can get to your cross.  I would -- I do object to you --

MR. CARTER:  Okay.  That's fine.  I won't do it.  I was just -- it was just there and I --

MS. MAESTAS:  So if we want to talk about scheduling, we can, but I don't want you to --

MR. CARTER:  I'm not going to limit you or interrupt.  Go ahead.

MS. MAESTAS:  Okay.  So let's see how -- how far we get.  What is the last possible time you can be in here?  Like, if we had to follow up later, could you come back?

THE WITNESS:  Today?

MS. MAESTAS:  Uh-huh.

THE WITNESS:  When I leave from here, I'm

heading to my child's in Daytona.

MS. MAESTAS:  What time is that?

THE WITNESS:  As soon as I get through.

MS. MAESTAS:  Okay.

MR. CARTER:  We can follow up another day.

BY MS. MAESTAS:

Q    Okay.  So at the bottom of the page it says:  "We in admission can support Bird."

Now, I know you didn't write that statement, but this is referring to something that -- that Ryan said to the investigator.  Do you have any recollection of that, of we in admission can --

A    Yes.

Q    What -- what is it referring to?

A    Processing the applications.  They collect them, giving them to our processers -- admissions processers, not anybody that is under Rob Freidhoff. We would support her in general admissions questions.  She would have transfer credit questions.  She would have -- like I said, we -- we had the door open.  We talked back and forth on a regular basis.

Q    Okay.

A    And he probably meant with the recruiters

as well, helping them recruit.

Q    Okay.  Plaintiff's 31.

(Marked for identification is Plaintiff's Exhibit 31)

BY MS. MAESTAS:

Q    This is the Title IX investigative interview notes of Tee Mitchell taken by Janice Lyn on October 1st, 2020, Plaintiff's Exhibit 31, and there's a couple of spots that are referred to.

Do you ever remember a -- an incident at an ACRO conference?  Do you remember hearing anything about that, where they -- there was some argument?

A    I heard about it, yes.

Q    How did you hear about it?

A    From someone whose office was in our office at the time and who was also at the conference.

Q    And who was that?

A    Brenda Beesley.

Q    Okay.  What did she say?

A    She said it was very awkward when they were at dinner that night as a group, that Rob -- an argument ensued between Rob and Tee.

Q    Okay.  And you don't know anything else

about it?

A    (Shaking head.)

Q    Okay.  And you ever hear about a lunch between Rob and Tee?

A    I did hear about that.

Q    And who told you about that?

A    Was it Tee?  I don't think it was Tee. I'm not sure who told me about it.

Q    Okay.  And then the next statement, did Carr ever come by the office and tell everybody they were incompetent?

A    Not that I heard.

Q    You didn't directly hear it?

A    No.

Q    Did you hear other people saying that he came in and said that?

A    I can't recall.

Q    Did you ever hear of anything about Dr. Carr saying that he had a previous Title IX incident where he was investigated but that he could beat it -- he could beat a lie detector test?

A    Yes.

Q    Who did you hear that from?

A    From Jamie.

Q    From Jamie?  Anybody else?

A    Not that I can recall.

Q    When did Jamie tell you about that?  While she was still employed?

A    Yes.

Q    Okay.  And who did she say she heard it from?

A    From him, from Dr. Carr.

Q    Oh, Dr. Carr told her that?

A    "There's not a lie detector test I can't beat."

Q    Okay.  Dr. Carr -- Jamie told you Dr. Carr told Jamie that?

A    That's my recollection.

Q    Okay. Okay.

Did you ever observe Dr. Carr gritting his teeth or making fists in anger?

A    Yes.

Q    Okay.  Can you tell me about those times?

A    There was one seminar-type thing we went to on campus -- and he was there in body, but the look on his face was -- he was not happy to be there.

Q    Okay.  And so the question was:  Do you remember him gritting his teeth or shaking his fists?

A    No.  But --

Q    Okay.  So what did --

A    I don't one-on-one with him.

Q    Okay.  And why not?

A    Because I have a buffer between my position and his position.

Q    Okay.  Okay.  But it's not, like, by choice?

A    Correct.

Q    Okay.  All right.  41.

(Marked for identification is Plaintiff's Exhibit 41)

BY MS. MAESTAS:

Q    Do you recognize this document?

A    Yes.

Q    Okay.  And what is this document?

A    This is a document that Jamie sent out to the counselors that she asked me to read before she sent it out.  And I did, and I said it sounds good.

Q    Okay.  And so I'm going to start reading a couple statements from it.  It says:  "It is critical for those students wanting to attend a 4-year institution after they graduate high school, get their DE credits from the same type of institution."

Agree or disagree, and why?

A    Yes, because there's a level of preparedness that they get at a four-year school versus a technical school.

Q    Okay.  And the --

A    Again, in my opinion.  There -- there could be a fantastic teacher out at Wiregrass.  This is a general -- a general.  I'm not saying every teacher out at Wiregrass doesn't teach.

Q    But you're -- you're saying in the -- in students that you saw that you were observing this?

A    I had a counselor from a technical college reach out to me and tell me her son was doing dual enrollment at said technical college.  And she was, like, they don't prepare them for english -- I've seen my son's essays.  There's no way he should have an A in english 1101.

Q    And what school was that for?

A    I cannot recall that.  It was not this local area.  So that's just a --

Q    Okay.  Any other examples?

I mean, I believe we've already talked about several, but this is, like, a new one, I think, that we didn't talk about before -- okay? -- and we talked about the curriculum rigor before.

And then we talked about not meeting the admissions requirements.  We talked about just checking off courses, and we talked about academic foundation.

42.

(Marked for identification is Plaintiff's Exhibit 42)

BY MS. MAESTAS:

Q    Okay.  So this is -- the first email atop is -- that you see is actually a reply to a response, which is behind it on Page 2.  So the first email in sequence is behind the one you're looking at.

So this is an email from Dr. Carr to that email list.  Have you ever seen this before?

A    I've not seen this before.

Q    You could take a few minutes to --

A    I was aware that he sent out a -- damage control.

Q    How did you know about that?

A    Jamie told me.

Q    Okay.

A    Okay.

Q    Okay, okay.

So this -- a couple of sentences:  "Please know it is the mission and vision of VSU to

collaborate with our education partners to serve your community."

Is that your understanding of the mission and vision of VSU?

A    I'm not aware of that.

Q    Okay.  And then in the next paragraph, in the middle:  "Valdosta State University is committed to collaborating to meet educational needs of dual enrollment students by partnering with the Technical College System of Georgia."

How -- how does a partnership with the TCSGs benefit VSU dual enrollment students?

A    Partnership with TCSGs.

Q    Well, first of all, is there a partnership with the TCSGs regarding VSU dual enrollment students?

A    Not that I'm aware of.

Q    Okay.  And in the last paragraph it says:  "I will be reaching out to you soon to discuss joint counselor events held throughout our region by VSU with our TCSG partners."

If you -- like, Megan -- or Megan Hancock is the new Jamie, the new DE coordinator.  If you could tell her what to say right now, like, if you said, Megan, you need to go over to Wiregrass, and I

want you to have a meeting that helps VSU dual enrollment students, what -- what would she say? What could Megan say to them?

A    I don't -- I'm not -- I don't know that they would allow her to do that because she's poaching their students.  We're offering the same things.

Q    Okay.  So --

A    We do have partnership agreements for bridging, like, an applied science degree to a bachelor's degree, but dual enrollment is not a bridge.  I --

Q    Okay.  And then turning back to the first page of Plaintiff's Exhibit 42, this is an email from Karen Black responding to Dr. Carr's email, and if you could just take a minute to read that.

A    Yes.  As a -- as a comprehensive university, we had higher admission standards than the technical schools and Georgia Military.

Q    So that's what you believe Karen Black is talking about?

A    (Nodding head.)

Q    Okay.  All right.  43.

(Marked for identification is Plaintiff's Exhibit 43)

BY MS. MAESTAS:

Q    Have you ever seen this document before?

A    I have not.

Q    Okay.  This -- this is a written reprimand issued to Jamie Bird on -- dated March 5th, 2019.  It states that it's from Tee Mitchell.  If you could just take a minute to familiarize yourself with the document.

A    So this was a document that Tee was forced to write.

Q    Are you asking me?

A    No, I'm telling you.

Q    Okay.

A    I'm assuming this was the document that Dr. Carr was going to hold in his drawer and not turn in.

Q    Are you asking me?

A    I'm assuming.  I don't know.

Q    Okay.

A    And the document was not sent to TCSG recipients.  The original email was not sent.

Q    Correct.  That's my understanding.  That's correct.  It just says it's forwarded.

A    I did talk to several counselors at Lowndes High School who said they didn't think a

thing about the email.

Q    Who did you talk to?

A    Dana Hutchinson.

Q    Who else?

A    Who was ...

I can't remember right now.

Q    Okay.  And did you ever find any evidence that -- hear anything, know anything about an adverse impact on recently established relationships that will need to be repaired?

A    No.

Q    Did you ever hear anything about the email being considered offensive?

A    No.

Q    And you said that this was a document that Tee was forced to sign.  Can you tell me a little bit more about that?

A    He was told she was to be written up, and he did not want to do it.  And --

Q    Who told him that?

A    -- Dr. Carr told him to write her up, and --

Q    How do you know that?  Who told you that?

A    I think Jamie told me that.

Q    Okay.

A    But I do know that Jamie told Tee he had more to lose than she did so to go ahead and write it up.  Tee was going to stand up against Dr. Carr, and that would have put him --

Q    Did Tee tell you this, or did Jamie tell you this?

A    Jamie told me this.

Q    Okay.

A    And she told me that she told Tee to just do it.  I mean, he had small kids and -- so ...

Q    Okay.  Did you ever talk to Tee about this email?

A    No.

Q    Or, sorry, reprimand.

Okay.  So counselors' names.  Did you ever talk to Lee Walker about the email that Jamie sent?

A    Not that I recall.

Q    How about Erica Cooper?

A    Not that I -- I know the -- not that I recall.  I ...

Q    Leb Upchurch?

THE COURT REPORTER:  I'm sorry.  Say that name again.

MS. MAESTAS:  Leb Upchurch.

A    Not that I recall, but I may have.  I --

not that I recall.

BY MS. MAESTAS:

Q    Okay.  What about Freida Newsome?

A    No.

Q    Okay.  Did you ever talk to anybody at Wiregrass, hear anything about the email, talk to them about it?

A    No.

Q    What about Tina Anderson?

A    No.

Q    So on the Lowndes County High School counselors, and you mentioned Dana Hutchinson.  How did that conversation happen?

Was it a phone call?  Visit?  Who initiated it?

A    Actually, it was more recently, and Dana was leaving the Valdosta High School Probe fair this past fall and --

Q    Fall 2021?

A    Yes.

And she -- I said something about the email, and she said, "I didn't think twice about it." She basically said, I knew what she was saying, what she was meaning.

Q    Did she elaborate?

A    No.  We were ready to get home.

Q    And --

A    It had been a long night.

Q    I know the feeling.

Did you ever talk to any high school counselors about the -- the academic rigor of four year versus two year?

A    Before Jamie started, Dr. Mike Savoy and I approached the counselors at Lowndes High School to try to get them into specific honors sections to enhance their high school transcripts because their classes would have been designated honors.

Q    And so is that for the purpose of looking good for college admissions?

A    Yes.

Q    Is it also for the purpose of having a higher academic vigor?

A    Yes.

Q    Did you ever talk to Tee Mitchell about this reprimand, Plaintiff's Exhibit -- or sorry. Did you ever talk to Ryan Hogan about Plaintiff's Exhibit 43, the reprimand?

A    The reprimand, yes.

Q    Okay.  And what did you say, and what did he say?

A    He said that Dr. Carr came -- this was after Tee left -- that Dr. Carr came -- okay.  Tee left.  Ryan moved into his old office.  And Dr. Carr came to Ryan's current office and wanted to see if Tee had left a memo, a HR memo.  I don't know exactly what they called it.  And I believe that Ryan text Tee asking him where it was, had he left it, had -- where it was.  And Tee said that he had turned it in.

Q    Who is "he"?

A    Tee.

Q    Tee?  Okay.

A    Tee said he had turned it in to HR.  It should be on file.

Q    And did Ryan Hogan say anything else to you about that?

A    Nothing.  No.  Sorry.

Q    No?  Okay.

And when did that -- you said that was after Tee left.  Was it -- was it in 2019?  2020?  Do you know?

So was it right after Tee left, or are you just saying --

A    Yeah.  I mean, within -- within a month to two months.

Q    Okay.

A    Maybe less.

Q    And Ryan never said anything else, like why or --

A    He said I never wanted to get in the middle of this.

Q    Did he say anything else?

A    No.

Q    Are you aware of any University or USG rules that prohibit one employee from going into the office of another employee without having another employee present?

A    No.

Q    Okay.  Are you aware that Dr. Carr had a policy and practice of not doing that, not going into an office without another person being there, like, as a witness?

A    I've heard that.

Q    Okay.  How did you hear that?

A    Just the rumor mill.

Q    Okay.  And what was -- what was the rumor?

So I've laid the foundation of the question.  I want to get it in your words.

A    That his executive secretary/whatever she is --

Q    Shauna?

A    -- Shauna Branch, goes everywhere with him.  I mean, she -- if he's there, she's there.

Q    Okay.  And did he go into office of women alone that you saw?

A    He went in Jamie's office, yes, that day. Shauna was not with him that day.

Q    What about other female employees' offices?

A    Not that I witnessed.

Q    Okay.  Were you aware of any prior Title IX complaints or investigations that were against Dr. Carr?

A    No.

Q    Okay.  Had you heard about the investigation at Bainbridge College?

A    Not until recently.

Q    Okay.  And how did you hear about it?

A    The rumor mill.

Q    Okay.  Anybody in particular?

A    Not that I recall.

Q    Okay.  And what was the rumor that you heard?

A    Inappropriate language, inappropriate behavior.

Q    All right.  47.

(Marked for identification is Plaintiff's Exhibit 47)

BY MS. MAESTAS:

Q    Okay.  So this is Plaintiff's Exhibit 47. This is a cover letter from Abraham Baldwin Agricultural College.  It's addressed to me because I sought these records under an open records request.

And if you could turn to Page 4, it starts the beginning of the records and leaves my correspondence with ABAC.  And if you could just take a few minutes to familiarize yourself with these documents.

THE WITNESS:  What is this?

What's this?

MR. CARTER:  Huh?

THE WITNESS:  What's that?

MR. CARTER:  Something in their system they just printed out, I guess, when looking for the notes or whatever when they did a search.  That's the best I can tell.

MS. MAESTAS:  I mean, my --

MR. CARTER:  I didn't prepare it.

BY MS. MAESTAS:

Q    I didn't prepare it, but my understanding is that it's -- under an open records request, that IT goes through and --

MR. CARTER:  Searches.

BY MS. MAESTAS:

Q    -- scrubs computers.  And so this is a snapshot of what --

A    This is what they put in --

Q    -- they pulled from the computer.

A    Okay.

Q    So I would -- you could probably ignore that part of it --

A    Okay.

Q    -- and then look at the substance of what's being said.

Okay.  Any of that ring a bell?  Have you ever seen it before, heard about it from anybody?

A    No.

Q    Other than what you said that -- through the rumor mill?

A    Correct.

Q    Okay.  And that was -- when did you start hearing about it through the rumor mill?

A    I don't recall.

Q    Was it after Jamie left VSU?

A    Yes.

Q    Okay.  What about, like, in the last couple months?  Anybody talk about it?

A    No.

(Marked for identification is Plaintiff's Exhibit 54)

BY MS. MAESTAS:

Q    Okay.  All right.

And I'm handing you what I've marked as Plaintiff's Exhibit 54.  I did not generate that document.  That document was given to me on Monday by the institution.  And it is a list of numbers.  I know you said numbers aren't your thing.

But -- so we had asked for numbers related to dual enrollment students being enrolled at VSU. And so it says in the middle:  "Student level, joint enrollment."

And then it has going from Fall 2015 to Fall 2021.  And then it says:  "Official headcount."

What is joint enrollment?

A    Dual enrollment has gone by a many of names.  It was -- gosh, what was it when my kids took it?  It's been dual enrollment.  It's been move on when ready.  It's been -- it was joint enrollment

first back in the day, and I think then it went to dual enrollment, then move on when ready, then -- what is it now -- dual enrollment.

There's been several codes in the system for admit type for a dual enrolled student.  I'd have to go back to my computer to look and see what the different ones were.

Q    So right now is joint enrollment different from dual enrollment?

A    I don't -- I don't know.  I don't know how they searched this.

Q    Okay.  So if you look at the bottom, it says that right now in fall -- or well, not right now, but in the Fall of 2021 joint enrollment was 306.

A    Okay.

Q    Is that a really high number?

A    Sounds pretty high to me.

Q    Is that -- I mean, do you attribute that to anything?

A    I know that we picked up Valwood, going back out to Valwood.  I don't know how many students that entailed.  I don't know if we did any other off-campus classes.

Q    Okay.  So Valwood.  And why weren't you at

Valwood before?

A    Because Wiregrass was out there.

Q    Okay.

A    And also -- I mean, we -- we have been at Valwood.  Getting our professors to teach five day a week classes, plus they would have to drive, you know -- they -- so it's a challenge.

Q    So -- so it's been said that Jamie wasn't retaining dual enrollment students.  And so we saw that printout before in Plaintiff's Exhibit 46 with the chart that had the fall --

A    Right.

Q    -- numbers.  And so is this -- does this reflect badly on Jamie's performance versus Megan's performance?

A    Not in my opinion.

Q    And why is that?

A    Twofold.  First off, you can only get who you're going to get.  Secondly, there's more one-on-one time spent with the students when Jamie had them versus what Megan has, but I'm not -- I don't know what Megan's target audience is.

Q    Uh-huh.

So if you have -- what about SAP with a large number of dual enrollment students?  Does that

come into play?

A    Would -- just like anything.  You can --
you can boost the numbers on the front end by doing
a lot of things, lowering admission standards,
upping new programs.  Retention is the end game;
so ...

Q    So we need to see what maybe spring
numbers say for 2022?

A    Or even after -- after spring.

Q    Okay.  And I'm handing you what I've
marked as Plaintiff's Exhibit 49.  And I may have
talked to you about it before.

And this is a job posting for the
assistant director of admissions.  And were you
aware that Jamie applied for that position?

A    Yes.

Q    Okay.  And were you aware that she did not
get the position?

A    Yes.

Q    Because we talked about -- was it with you
that I talked about?

A    Katrina.

Q    Okay.  I've been -- this is my sixth
deposition over three days.  So I apologize.

And do you -- like, do you have any

understanding of who was more equipped to handle the job, Jamie versus Katrina?

A    In my opinion?

Q    Yeah.

A    I read the job description.  Jamie ticked all the boxes.

Q    And did Katrina Crumpton?

A    All of them except for she had not worked in admissions before other than the recruitments she went on.  The recruitment ...

Q    Trips?

A    Trips.

Q    So who had more experience in admissions?

A    Jamie did.

Q    And the only experience Crumpton had was ...

A    Housing.

Q    Okay.

MS. MAESTAS:  I don't think I have anymore questions.

MR. CARTER:  All right.  Well, we've got another deposition in ten minutes; so we have to suspend this one until we come back.

Are you pretty much available any day?

THE WITNESS:  Yes.

MR. CARTER:  Okay.  So it won't be 5:00. We won't have you come back after the others to finish up with yours.

THE WITNESS:  Sure.

MS. MAESTAS:  So are you wanting us to get the court reporter?  Are you saying we get the court reporter, or are you going to renotice it?

MR. CARTER:  If she's available, she can just come back because -- I mean, I -- I'll be responsible for appearance fee for the -- my part that I will be doing when I bring you back.

MS. MAESTAS:  So I'm done with my deposition; so I would think that you would probably need to renotice it.

MR. CARTER:  Well, no, I get a right to cross, but we've already scheduled over.  I mean, there's no need to renotice it.  I can, but it's the same thing.

MS. MAESTAS:  Okay.  I just don't want -- so this is very expensive, obviously, so --

MR. CARTER:  I'll pay for it.  I'll pay for the next deposition.  I'm not trying -- but you're going to pay for this one anyway.

MS. MAESTAS:  Yeah.

MR. CARTER:  Right?  So I'll pay --

MS. MAESTAS:  I mean --

MR. CARTER:  I'll pay for the cross-examination portion.

MS. MAESTAS:  Okay.

MR. CARTER:  Is that --

MS. MAESTAS:  I mean, we haven't scheduled the depositions that are going to occur around that time.

MR. CARTER:  Right.

MS. MAESTAS:  So say, for example, you notice Jamie's --

MR. CARTER:  Sure.

MS. MAESTAS:  -- and then you have a court reporter for Jamie.  Then you may want to have your court reporter that you get for Jamie to do your portion.  Then if I notice it, I'm going to get my own court reporter.  I'm not going to rely on you to get my court reporter.

MR. CARTER:  I understand that.  Okay. Well --

MS. MAESTAS:  And then we also talked about doing it via Zoom; so I don't know if that's going to come into play.

MR. CARTER:  Well, I'll do the rest here.
I mean, I'll do it here.

Can't you just suspend it and then come back for her deposition at a later time?

THE COURT REPORTER:  I'm just going to mark this as adjourned --

MR. CARTER:  Yeah.

THE COURT REPORTER:  -- not concluded -- not examination concluded.

MS. MAESTAS:  But it may not be her.

THE COURT REPORTER:  It may not be me.

MR. CARTER:  Yeah, but I can get the -- whoever your firm is that's doing it can come back and finish it and then wrap it up.

Because you may have further direct after that, but I'll pay for that.

MS. MAESTAS:  Thank you.  That's very generous.

MR. CARTER:  What I'm saying is, I'll just use her firm to finish this one, and then if I need to notice anymore or you need to notice anymore, we'll use whoever we want to.  If you want to use them for other depos, that's fine.

It's just cleaner if we have one deposition and they can come back whenever that

is to finish her, and I'll pay for it.

THE COURT REPORTER:  It will be Volume 2 whenever her --

MR. CARTER:  Right.

THE COURT REPORTER:  -- continuation is. Even if it wasn't my firm, even if it's not me, it'll still be a continuation.

MS. MAESTAS:  Okay.  Perfect.

MR. CARTER:  That's fine.

MS. MAESTAS:  That probably settles it.

MR. CARTER:  Okay.  And I've got one that I --

THE COURT REPORTER:  Do you want to ask her about reading or waiving?  Just because I need to know because I might not be the one coming in.

MR. CARTER:  Yeah.  And I think we talked about that before.  Do you want to read it after it's typed up so you can go through and make any changes you want to, like, errors? You don't have to.  You can waive that. Totally up to you.

THE WITNESS:  What is your --

MR. CARTER:  I don't recommend.  I say -- I mean, court reporters are good at what they

do.  So all you -- you're not going to change substance of testimony.

THE WITNESS:  Okay.

MR. CARTER:  So she'll waive it.

(Examination was adjourned at 12:48 p.m.)

CERTIFICATE OF OATH

STATE OF GEORGIA

COUNTY OF LOWNDES

I, KAIRISA JOI MAGEE, RPR, GCCR, Notary Public, State of Florida, certify that LISA LONG personally appeared before me on February 21st, 2022, and was duly sworn.

Signed this 28th day of February, 2022.

_____
KAIRISA JOI MAGEE, RPR, GCCR
Georgia Certification No. 5962-0590-7476-480
Notary Public, State of Florida
My Commission No. GG 968304
Expires: 03/15/2024

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF LOWNDES

I, KAIRISA JOI MAGEE, RPR, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of LISA LONG; that a review of the transcript was not requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 28th day of February, 2022.

_____
KAIRISA JOI MAGEE, RPR, GCCR, Florida Notary

Exhibits

LongL-7   3:23
  99:19,21

LongL-12   4:4
  101:2,4

LongL-14
  3:18 75:11

LongL-17
  3:15 70:4,
  7 81:18

LongL-18
  3:17 74:6
  81:1,12,19

LongL-19
  3:11
  64:15,17,
  20

LongL-23
  3:12,13
  66:13

LongL-24
  3:14 67:15

LongL-29   4:5
  104:24
  105:2
  113:25

LongL-30   4:7
  124:11,14

LongL-31   4:9
  129:4,8

LongL-41
  4:11
  132:12

LongL-42
  4:12 134:6
  136:14

LongL-43
  4:13
  136:25
  141:22

LongL-46
  3:19 86:22
  90:15
  95:12
  149:10

LongL-47
  4:15
  145:3,5

LongL-49
  3:10
  14:22,24
  150:11

LongL-54
  4:16
  147:7,11

1

1101   38:2
  53:9,11
  60:21,24
  61:7 68:8
  133:17

1102   68:11,
  13

12   101:2,4

12:30   126:24

14   75:9,11

15   88:11

16   83:4
  123:12

17   70:2,4,7
  79:19
  81:18 83:4

17th   83:6

18   74:4,6
  81:1,12,19

19   63:13
  64:15,17,
  20

1:00   126:25

1st   129:8

2

2   69:1
  101:11
  134:10
  155:2

20   8:23,24
  9:6 78:19
  83:6 105:4

2013   36:10

2015   36:3,7
  37:5 39:10
  90:18
  92:25
  147:19

2016   90:18
  92:25

2017   90:18
  92:25

2018   90:18
  93:1

2019   66:17
  67:19
  90:19 93:1
  104:22
  137:5
  142:20

2020   32:3,
  10,13
  33:4,13
  75:18
  78:7,10,17
  83:7,10,12
  87:7
  101:13
  105:8
  124:16
  129:8
  142:20

2021   25:9
  31:4 32:10
  75:20
  78:7,19,23
  83:9
  140:19
  147:20
  148:14

2022   83:13
  150:8

21   83:7

23   66:11,13

24   67:13,15

24th   75:19
  87:7

**25**  53:14

**27**  60:16, 17,19 69:18

**29**  104:24 105:2 113:25

---

**3**

**3**  87:10

**30**  124:9, 11,14

**306**  148:15

**30th**  105:8 124:16

**31**  129:2,4, 8

**31606**  6:9

**32**  14:6,9

**3:00**  12:13

---

**4**

**4**  145:10

**4-year** 132:23

**41**  132:10, 12

**42**  134:4,6 136:14

**43**  136:23, 25 141:22

**444**  41:20, 21

**46**  86:20,22 90:15 95:12 149:10

**47**  145:1,3, 5

**4799**  6:8

**49**  14:22,24 150:11

**4th**  75:18

---

**5**

**54**  147:7,11

**5:00**  152:1

**5th**  137:5

---

**6**

**6**  87:8

---

**7**

**7**  88:10 99:18,19, 21

**721-CV-62** 5:23

---

**8**

**8:45**  5:1

---

**9**

**99**  117:23 118:1

**9:49**  49:24

**9:57**  49:24

**9th**  34:20 36:13 41:22

---

**A**

A-C-C-U-P-L-A-C-E-R  49:10

**a.m.**  5:1 49:24

**ABAC**  145:12

**Abbie**  73:13

**ability**  8:13

**Abraham** 145:6

**abrupt** 32:23,24

**absorbed** 89:2,22 90:7

**academic** 51:18 65:12 134:3 141:6,17

**Academy**  65:8

**accept**  46:21

60:22 62:15 63:24 64:8

**accepted** 37:1 38:3 45:10 46:11,14, 16,19,24, 25 47:3,4, 5,6,11,17, 25 48:4,5, 6,12 50:15 61:4 65:24 72:22

**accepting** 103:9

**accumulation** 86:6

**ACCUPLACER** 48:25 49:2,9

**accurate** 93:9

**ACRO**  129:11

**acronym**  49:8

**ACT**  49:5

**acting** 25:20,22 26:17 42:8 50:5

**action**  5:22 35:14 101:9

**address**  6:7

addressed
  145:7

adjourned
  154:6

adjustments
  28:10

admission
  17:15
  21:17 24:3
  28:15
  46:24
  61:2,13,15
  124:22
  128:8,12
  136:18
  150:4

admissions
  10:6 14:8,
  11 15:18,
  25 16:5
  18:11,15
  20:9 26:5,
  11 28:24
  30:10
  44:13 56:2
  57:22
  58:2,6,8,
  11,16,20
  59:7,10
  61:1,10
  62:3,6,23
  70:8 71:3,
  8 73:25
  74:9
  75:16,20
  76:6 77:2
  78:25

79:21,22,
23 81:3,18
84:7 85:16
89:3,23
90:8
100:10,12
101:13
102:13
103:15,20
111:3,5
122:12
124:25
125:1,24
128:17,19
134:1
141:14
150:14
151:9,13

admit 58:6
  148:5

admitted
  46:23
  48:24

advanced
  67:9

adverse
  35:14
  138:9

advertises
  19:16

advice 38:5

advise 43:22
  44:1 50:8
  53:17

advised

50:17,19
53:4,5

adviser
  42:24
  43:3,7,10
  50:6

advises
  54:3,4

advising
  31:6 34:18
  43:3 55:20
  59:14
  116:23

affairs 87:3

affect 8:13
  38:25

affirm 5:4

afford
  123:13

age 5:12

agree 87:16,
  17,23
  88:16
  119:22
  133:1

agreed
  124:23,24

agreement
  6:12
  59:18,20
  60:4,15

agreements
  59:16
  69:4,8

136:9

Agricultural
  145:7

ahead 57:5
  58:19
  85:10
  127:18
  139:2

air 111:18
  113:2

Alabama
  86:17,18

Albany 49:14
  50:13
  64:13

alert 42:23

alerts
  42:21,24

Alexis 72:8,
  9,12 74:25
  77:20,21
  79:22
  81:5,10

algebra 51:2
  64:7

Alley 77:17,
  18 78:3,14

Alley's
  77:20,21

allowed 86:7
  120:25

allowing
  41:22

Case 7:21-cv-00062-WLS   Document 34-5   Filed 05/12/22   Page 162 of 201

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Lisa Long on 01/21/2022     Index: alphabet..automatically

**alphabet**
  74:22

**Americus**
  117:25

**amount**  52:21

**analytical**
  51:10,17

**anatomies**
  69:1

**Anatomy**  69:1

**Anderson**
  140:9

**anger**  131:16

**annual**  28:4

**anymore**  32:8
  33:15
  52:12 79:3
  84:2
  151:19
  154:21,22

**AP**  61:5,23
  62:24
  63:10,14

**apologize**
  150:24

**app**  39:5
  54:20
  66:25

**appearance**
  152:11

**application**
  23:19,22,
  25 61:9

87:4

**applications**
  16:24 26:8
  128:16

**applied**
  46:1,10
  136:10
  150:15

**apply**  23:14,
  16,21
  24:13

**applying**
  23:15

**approach**
  21:19

**approached**
  25:4 87:19
  109:1
  126:6
  141:9

**appropriately**
  22:1 43:22

**approved**
  36:22
  54:18
  55:11
  69:23,24

**approving**
  28:3

**area**  9:9
  10:2
  19:18,21
  40:2 55:20
  103:25

118:18
  133:20

**argument**
  129:13,24

**Arlene**  29:14

**articulation**
  36:18
  59:16,17,
  19,21
  60:4,15
  69:4,8

**Asian**  62:20

**aspect**  73:1

**asshole**
  112:18

**assigned**
  18:16 21:9

**assist**  23:14
  40:5

**assistant**
  14:11,14,
  16,17,19
  15:2
  17:10,15,
  24 22:14
  26:11,13
  27:3
  28:16,24
  30:10
  37:15
  80:17
  150:14

**assistants**
  73:21

**associate**
  10:6
  14:12,13
  17:17 18:6
  27:10,15
  29:11,12

**assumed**
  111:4

**assuming**
  101:20
  137:14,18

**Atlanta**
  12:25
  77:22,24
  82:15,17

**atop**  134:8

**attend**  44:2
  132:22

**attended**
  50:13

**attending**
  44:10

**attest**  88:22
  90:2

**attribute**
  148:19

**audience**
  115:4
  149:22

**August**  22:17
  85:5,9,11
  87:7

**automatically**
  24:14,22

**average**
77:25

**avoid** 7:15
105:17

**aware** 30:22
64:12 99:5
134:17
135:5,17
143:9,14
144:11
150:15,17

**awkward**
129:22

— B —

**bachelor's**
13:22,24
136:11

**back** 15:10
32:9 37:3,
23 38:7,
10,17 42:3
43:18
49:25
52:23 54:5
60:12,20,
22 66:10
69:16
77:23
79:16 82:4
85:23
106:11,17
109:12,14,
18,19
110:6
111:10

116:1
122:14
127:22
128:22
136:13
148:1,6,22
151:23
152:2,10,
13 154:4,
14,25

**background**
15:23
51:16

**backwards**
71:22

**bad** 31:25

**badly** 149:14

**Bainbridge**
144:16

**Baldwin**
145:6

**bar** 11:1
12:8

**Barboroug**
101:25

**based** 55:22,
24 62:8

**basic** 21:17
23:10 24:2

**basically**
16:20,24
28:2 37:24
51:5 53:6
56:24 75:1

106:20,22
116:22,24
117:6
140:23

**basis** 55:22
66:3 103:6
128:23

**beat** 130:21
131:10

**Beesley**
129:20

**began** 5:1

**beginning**
145:11

**behalf** 21:4

**behavior**
144:25

**believed**
51:14
99:16

**bell** 146:17

**benchmark**
32:1

**beneficial**
117:4

**benefit**
135:12

**Bennett**
72:18
80:13

**Berrien**
25:14

**Bessenger**
12:22
31:15,16
32:7 37:18

**Beth** 72:18,
19 80:13

**Bible** 25:14

**bigger**
114:21

**Bill** 41:17,
19,20,21

**biology**
68:25
69:13,15

**Bird** 5:19
71:2 83:4,
7,10
101:16
103:23
104:1
114:4
121:13
124:22
128:8
137:5

**Bird's** 87:4
99:14
105:6
124:15,20
125:7

**birthday**
121:1

**bit** 71:21
101:11
106:18

124:19
138:17

**Black**
136:15,20

**blah** 106:6

**blue** 75:25
90:13

**blurred**
33:13

**board** 5:20
13:7,9
78:25 87:4

**Boddie-lavan**
87:3
126:25

**body** 131:20

**boohooing**
107:7

**book** 28:18
41:14
64:15

**booked** 28:17

**Booking**
30:17

**books** 40:18,
19,20,23
54:17
55:10

**bookstore**
40:21

**boost** 150:3

**boots** 85:10

**bottom** 6:24
88:10
90:14
114:18
122:2,3
128:7
148:12

**bound** 115:23

**bowling**
10:25

**boxes** 151:6

**boy** 79:11

**Branch** 144:2

**brand** 95:1

**break** 35:3
49:18 50:1
82:8

**Brenda**
129:20

**Brian** 37:11

**bridge**
136:12

**bridging**
136:10

**bring** 23:18
24:23,24
25:22 34:4
35:1,6
119:10
152:12

**brochures**
19:10

**brother** 8:25

**brothers**
9:21

**brought**
25:23 35:4
37:8,12
77:23 97:6
113:15

**buffer** 132:5

**build** 118:5,
6,7

**building**
36:18
117:18
118:4

**bullet**
67:20,24

**bullets**
58:21

**burnout**
76:22,23

**business**
5:21

**busy** 57:23
59:12

———————

C

———————

**cafeteria**
10:20

**calculus**
51:10,17

**call** 28:11
61:14
62:10

140:14

**called** 20:2
51:18
61:18 62:6
142:6

**calling** 65:7

**calls** 55:1
56:4

**campus**
26:21,22,
23 28:17,
18 53:16
73:24
131:20

**capacity**
50:6

**card** 28:19
30:17

**cards** 16:19,
20 26:7

**care** 61:25
106:24
113:20

**career** 51:7,
8 52:3

**Carolina**
86:14,16

**Carr** 39:24
96:17,22
102:12,13
104:2,8
106:8
107:13,24
108:3,7

Case 7:21-cv-00062-WLS    Document 34-5    Filed 05/12/22    Page 165 of 201

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Lisa Long on 01/21/2022    Index: Carr's..chronologically

110:10,24, 25 111:5, 12,15 112:4 113:18 118:12 119:21,25 121:15 124:2,7, 21,23 125:6 130:10,19 131:7,8, 11,15 134:13 137:15 138:21 139:3 142:1,2,3 143:14 144:13

**Carr's** 103:21 136:15

**Carrie** 9:16

**Carter** 6:17 18:8 22:3, 5,7,10 31:9 32:16 33:2,6 35:11 46:6 49:1,3,17, 20,22 55:1,6,13 56:3,9 57:4 58:18 70:17

81:24 82:18,21, 24 83:5 86:17 89:8 92:15 93:4,10, 17,22 94:3 95:24 96:3,22,25 98:5,10 99:6 102:17 104:16,18 123:14,17, 19 126:10, 19 127:1, 4,6,12,17 128:5 145:17,19, 24 146:5 151:21 152:1,9, 17,23 153:2,4,7, 11,14,21 154:1,7, 12,19 155:4,9, 11,17,24

**case** 21:20 44:1 89:24 120:2

**caseload** 89:4

**catalog** 50:25

**category** 101:10

**caught** 57:16

**Cazador** 12:14

**certificate** 6:25

**challenge** 149:7

**change** 39:14 40:3,25 43:24

**changed** 16:18 34:19,25 41:15,21, 25 42:3 54:20 92:1

**changing** 36:13 114:24

**chart** 95:11 101:9 149:11

**chatting** 111:14

**check** 106:8

**checking** 134:2

**checklist** 21:14

**chemistry** 69:13,15

**child's** 128:1

**children** 9:10

**children's** 9:13

**choice** 7:21 132:8

**chores** 42:7

**chose** 72:25

**chose-** 121:18

**chosen** 121:18

**Christine** 22:24 72:15 74:25 80:11 81:5,10

**Christmas** 32:12 55:18 70:25

**Christy** 12:2,17 14:19 22:16 25:18 28:17 30:18 59:9 72:5

**chronologicall y** 16:14

Case 7:21-cv-00062-WLS    Document 34-5    Filed 05/12/22    Page 166 of 201

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Lisa Long on 01/21/2022      Index: churches..comprehensive

**churches**
  11:1

**circus** 19:13

**Civil** 5:22

**clarification**
  28:22

**clarified**
  94:22

**clash** 122:15

**clashes**
  96:21

**class** 43:17
  52:21
  53:12
  64:3,6
  117:9,24,
  25

**classes**
  39:2,18
  40:23
  43:16
  45:5,9
  48:21
  52:13,17
  53:11
  60:17 61:5
  63:12,15,
  17 64:2
  65:3 67:8
  116:5,16,
  18 117:13
  141:12
  148:24
  149:6

**classification**

  113:20

**classrooms**
  40:5

**cleaner**
  154:24

**clear** 33:3

**clerical**
  16:19 26:6

**close** 55:24
  106:9
  118:20

**closed** 100:2
  106:14
  111:20

**closely**
  105:24

**coach** 10:16

**coded** 92:2

**codes** 148:4

**coffee**
  106:3,7

**cohort** 65:10

**collaborate**
  135:1

**collaborating**
  135:8

**collect**
  128:16

**collected**
  37:24

**college**
  13:11

  18:17,25
  24:5 36:19
  37:1 39:12
  40:11
  45:3,9
  48:16
  51:2,7,8,
  23 52:3
  59:22
  62:11 64:6
  65:22,24
  67:7 71:19
  84:17
  85:14
  133:12,14
  135:10
  141:14
  144:16
  145:7

**colleges**
  34:3

**comment**
  110:11

**commit**
  105:22
  110:14

**committed**
  135:7

**committee**
  19:12

**committees**
  10:13,17

**common** 67:19

**communication**
  73:15

  80:17

**communications**
  73:13

**community**
  25:13
  135:2

**comp-** 64:5

**competed**
  66:6

**competent**
  55:12

**competing**
  66:4
  117:21

**competition**
  65:20

**competitive**
  44:12

**complaint**
  35:13
  97:19
  98:6,23
  105:7,10

**complaints**
  144:12

**component**
  34:23

**components**
  69:14,16

**composed**
  116:19

**comprehensive**
  44:20

136:17

computer
  16:25  26:9
  37:20
  47:23  64:5
  146:10
  148:6

computers
  47:24  48:8
  64:6  146:7

concluded
  154:8,9

conference
  13:14
  129:11,18

conflict
  96:16,20

conflicts
  97:6

confused
  57:10

confusing
  95:25

conscientious
  116:3

considered
  138:13

Constantly
  42:15,16

constructing
  57:12

consuming
  36:17,24

37:7

contact  19:7
  25:6  57:9
  107:1

continuation
  155:5,7

continue
  52:1
  104:11

continuing
  72:24
  92:3,6

contradict
  89:6

control
  134:18

convenient
  117:8

conversation
  111:24
  112:1,15
  117:16
  124:21
  125:16,18
  126:11
  140:13

Cook  25:15

cookie-cutter
  61:1

Cooper
  139:18

coordinate
  40:21
  54:17

coordinator
  25:6  33:25
  135:23

copy  6:15
  7:17,18

core  48:16
  51:20,21

correct
  23:23
  25:25
  26:16,18
  30:9,12
  33:16
  36:16  43:5
  47:18
  48:2,10,22
  75:5
  109:23
  132:9
  137:22,23
  146:22

correctly
  49:6

correspondence
  145:12

cosmetology
  21:23

cost  116:6

counsel  6:12
  7:6

counselor
  18:11,15
  24:11
  37:25
  38:23  43:1

51:14  71:8
  74:8  79:22
  80:25
  133:12
  135:20

counselors
  20:9  41:9
  42:14,17
  54:19
  74:10  75:1
  84:19
  116:20
  117:15
  118:18
  132:18
  137:24
  140:12
  141:6,9

counselors'
  139:15

count  39:12
  71:6  91:23
  94:9  95:5,
  7

counties
  86:9

counting
  92:8

County
  140:11

couple  22:21
  108:24
  129:9
  132:21
  134:24
  147:4

courses
  36:19
  39:12 44:3
  47:5,8
  49:13
  55:11 62:8
  69:11,18
  134:3

court  5:2,24
  7:14,21
  49:23
  53:19,24
  103:14
  124:5
  126:14
  139:22
  152:6,7
  153:15,17,
  19,20
  154:5,8,11
  155:2,5,
  13,25

Cousins  9:3

cover  20:12,
  18 145:6

covered
  70:12,14

covers  70:11

COVID  32:1,
  6,15,16
  33:1,4

coworkers
  11:25

create  93:17

created

75:16
93:11

creating
  56:22
  58:12,13

creative
  101:24,25
  118:8

credit  17:11
  27:6 28:9
  37:1,2
  45:2
  46:13,22,
  25 47:1
  48:1,7
  59:16
  61:23
  63:10,13,
  24 64:8
  103:9
  128:20

credits
  27:16
  39:11
  132:24

creepy  113:4

critical
  132:22

CRM  73:15
  100:14,16

Croft  12:2
  14:19
  22:16
  25:18
  30:18 72:5

cross  126:20
  127:10
  152:18

cross-
examination
  153:5

cross-talk
  103:13
  124:6

Crumpton
  15:14 23:4
  28:24
  30:1,8,16
  151:7,15

crying
  107:6,11

current
  10:5,10
  25:5 37:12
  142:4

curriculum
  24:6 36:23
  51:23 69:6
  133:25

Customer
  100:17

CVIOG
  104:13,22
  113:14,16

————————
        D
————————

daddy  116:9

daily  20:23
  28:8 30:17

53:3 55:21
66:2,3
117:18

damage
  134:17

Dana  138:3
  140:12,16

date  27:11
  41:13

dated  87:7
  105:7
  137:5

dates  31:25
  36:5,6
  75:16

daughter's
  9:16

David  9:20

day  10:19
  18:22,25
  19:5 20:18
  83:3 84:15
  102:21
  106:23
  128:5
  144:6,7
  148:1
  149:5
  151:24

days  40:14
  150:24

Daytona
  128:1

DE  49:13

52:2 59:24
63:15,17
85:15
132:24
135:23

**dean** 106:25
107:1,4
114:14

**December**
31:2,3
32:13
85:12

**decide**
121:12

**decided** 17:4
33:1 42:1
92:4,7
100:24

**deciding**
44:2 84:17

**decision**
16:25

**decisions**
17:1 26:8
28:9

**defendant**
6:14

**defer** 22:19

**Define** 56:3

**degree** 13:20
17:2,9
26:9 28:9
136:10,11

**demeanor**
123:6

**demographic**
62:17

**department**
69:25
88:15,17,
18 89:15,
19 101:10

**depends**
20:17
21:25

**depos** 154:23

**deposition**
6:11,13,16
7:13,19,23
8:7,10,14
150:24
151:22
152:15,24
154:4,25

**depositions**
153:9

**describe**
109:6

**description**
151:5

**descriptions**
36:21

**designated**
141:12

**desk** 107:18
109:12,14,
19,20

110:5

**details** 50:5

**detector**
130:21
131:9

**develop**
56:13

**developing**
39:11

**diagram** 71:4

**differentiate**
65:14,18

**digs** 28:13

**dinner**
129:23

**direct** 5:14
65:19
99:18
103:5,19
104:1,7
154:15

**directly**
130:13

**director**
10:6
14:11,14,
17 15:2
16:16
17:4,6,10,
15,17 18:6
20:13
22:14
26:10,11,
14 27:3,

10,15
28:16,24
29:5,12
30:10
39:15
92:23
102:15
113:16
150:14

**directors**
17:25

**disagree**
81:22
87:16,19
90:9 133:1

**disbursed**
106:8

**discipline**
35:13

**discovery**
6:23 101:7

**discretionary**
87:5

**discuss**
135:19

**discussed**
103:10
114:23

**discussing**
111:1
113:14
116:2

**discussion**
59:15

116:25
125:18

**dismissed**
98:24

**distance**
109:15

**District**
5:24

**division**
5:25 15:21

**document**
6:25 35:8
64:21
86:24 87:9
90:14,16
93:6,11,17
94:6,16
95:11
99:24
101:6
132:14,16,
17 137:2,
8,9,14,20
138:15
147:12

**documentation**
37:25

**documents**
6:22 8:7
38:9,15
41:5
72:21,23
97:13,23
98:2
145:14

**DOE** 69:25

**dollars**
52:21

**door**
106:15,17
107:17,21
109:16,17,
18,20
110:1,3,5,
6,9,10
111:10,15,
20 112:5,7
128:22

**doors** 106:10
111:17

**Dowling** 75:3
77:8 78:2
81:5,11

**downsize**
84:11

**drafted** 97:8

**drawer**
120:2,7
137:15

**drive** 26:22
149:6

**drop** 52:20

**dropping**
116:18

**drugs** 8:12

**dual** 21:4
23:7,11,12
24:3,15,22
25:4,5,22

33:25
34:4,7,13,
18 36:12,
25 37:23
41:15
44:3,9
45:1 46:21
50:7,18
51:5
52:11,23
53:5 56:1
57:8 58:5,
10,16
59:14
60:6,8,10
62:25 64:1
65:7,21
66:17
67:3,18
71:11,13
72:17,21,
23 74:20,
24 75:2
78:25
88:11,14,
16 89:1,
13,21
90:3,7,17,
21,23
91:18,21
92:4,7,21
94:8,23,25
100:10,12
102:14
103:9,20
105:22
111:1
114:20,24

116:23
117:19,22,
23 126:4
133:13
135:8,12,
15 136:1,
11 147:16,
22,24
148:2,3,5,
9 149:9,25

**duly** 5:12

**duties** 16:1
30:17,18
33:22,24
34:18
43:10
54:11 56:2
57:1 70:11
87:12,20
88:4 89:3,
23

**duty** 20:23
28:8

**dwindled**
13:2

―――――――――
**E**
―――――――――

**early** 36:24

**easily** 66:9

**eat** 10:25

**eavesdrop**
110:14

**Echols** 25:14

**education**

Case 7:21-cv-00062-WLS Document 34-5 Filed 05/12/22 Page 171 of 201

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Lisa Long on 01/21/2022 Index: educational..enrollment

13:21 14:1
69:25
135:1

**educational**
135:8

**efficient**
54:25
56:1,3
57:9,12
58:12

**efficiently**
35:9

**El** 12:14

**elaborate**
140:25

**electronic**
38:10

**electronically**
23:17

**eligible**
38:1

**eliminated**
87:14,17,
24 88:15
89:14
124:21

**email** 28:8
57:9 59:25
60:1 66:15
74:1 97:7
114:19,23,
25 115:2,
12,13
116:19,22

119:1,4,22
134:8,11,
13,14
136:14,15
137:21
138:1,12
139:12,16
140:6,22

**emails** 54:5,
16 55:8,9
57:8,12
73:16

**embraced**
109:3

**employed**
131:3

**employee**
6:13 14:5
143:10,11,
12

**employees**
11:24
13:12

**employees'**
144:8

**employment**
10:5,11
32:2,3
35:14

**encourage**
23:14
24:13 45:1

**encouraged**
24:18

**end** 67:22
77:25
85:1,12
108:19
112:3
126:5
150:3,5

**engaged**
111:24

**english**
38:1,24
60:21,24
61:7 68:8,
11,13,19
133:15,17

**enhance**
141:11

**enroll** 74:20

**enrolled**
45:2 46:21
53:5
105:22
117:22,23
147:16
148:5

**enrollment**
21:4 23:8,
11,12,13
24:4,15,22
25:4,6,23
33:25
34:4,7,13,
18 36:12,
25 37:24
41:16
44:3,9

50:7,18
51:5
52:11,23
56:1 57:8
58:5,10,17
59:14
60:6,9,10
62:25 64:1
65:7,21
66:17
67:3,18
71:11,13
72:17,21,
24 74:24
75:2 79:1
88:12,14,
16 89:2,
14,22
90:4,7,17,
21,23
91:9,10,
15,18,21
92:4,7,21,
23 94:8,
23,25
100:10,12
102:14
103:9,20
111:1
114:21,24
116:23
117:19,20
118:4,5
126:5
133:14
135:9,12,
15 136:2,
11 147:16,

18,21,22,
24,25
148:2,3,8,
9,14
149:9,25

ensued
129:24

entail 43:13

entailed
148:23

entered
16:24
37:21

entire 38:14

entitled
90:16

entry 26:8

equipped
151:1

equivalencies
37:21

Eric's
100:14

Erica 139:18

errors
155:20

essays
133:16

essence
52:22

establish
16:7

established
138:9

evaluated
71:19

evaluation
28:4,9
120:13

evaluations
120:12

event 24:21

events 11:3,
12,13,17
19:15
42:11
135:20

everybody's
67:6

evidence
55:25
56:21
138:7

exact 27:11
36:5,6
45:15,17
102:18

exam 49:4

examination
5:14
126:21
154:9

examples
52:8
133:21

exams 66:1

exclusively
63:25

executive
103:4
104:3
143:24

exhausted
67:10

exhibit
14:22,24
21:19
64:15,17,
20 66:13
67:15
70:4,7
74:6 75:11
81:1,12,
18,19
86:22
90:15
95:12
99:19,21
101:2,4
104:24
105:2
113:25
124:11,14
129:4,8
132:12
134:6
136:14,25
141:20,22
145:3,5
147:7,11
149:10
150:11

existing
100:3

exit 112:11

exited
112:13

expanded
60:17

expensive
152:22

experience
15:18,25
31:7
151:13,15

Experiences
15:19

expertise
88:6,7

explain
54:15
83:19
119:17

extent 28:7

extra 57:16,
22 58:11
84:3

extremely
122:15

eyes 106:22
107:8

F

face 53:4,5
131:21

face-to-face
  54:4,16
  55:8,9
  57:10

facilitating
  90:6

fact  25:1
  65:23
  122:19

facts  98:14

factual
  115:6

Faculty
  101:8

fair  18:25
  140:17

fairs  18:17
  62:11

fall  33:21
  84:16
  90:18
  92:25 93:1
  94:8,24
  95:4,13,14
  140:18,19
  147:19,20
  148:13,14
  149:11

falls  121:7

familiarize
  137:7
  145:13

family  8:25

fantastic
  133:7

fault  97:7

favorably
  45:4 61:8

February
  75:18 85:3

fee  152:11

feel  32:24
  100:18
  109:4
  115:7
  119:14

feeling
  141:4

feels  62:24
  109:5
  115:8
  119:14
  120:14

female  144:8

field  48:20

field-specific
  48:20

figure
  124:24

file  5:22
  27:12 58:7
  120:1
  142:14

filed  5:11
  97:18

files  8:3

79:17

fill  15:13
  42:10
  76:16
  84:25
  85:7,10

filled  15:5
  23:4 28:23
  30:8,15
  77:7,13

filling
  30:6,14,15
  50:4 84:25

find  27:12
  40:7,9,13
  99:2,4
  138:7

finds  28:13

fine  49:21
  68:23 83:5
  127:12
  154:23
  155:9

finish  152:3
  154:14,20
  155:1

finished
  50:12

firm
  154:13,20
  155:6

firsthand
  90:10

fists

131:16,25

fit  30:25

flagship
  44:10,16,
  19 46:1,10
  47:16 48:9
  50:11

Florida
  19:25 20:4
  82:13,14,
  16 86:12

Floridian
  53:20

flyer  64:24

folder  35:2,
  5

follow  16:13
  29:23
  57:11
  127:21
  128:5

follow-up
  38:20
  114:14

football
  11:3,15
  12:4

force  96:8
  99:15,25
  100:6
  121:11,13

forced  137:9
  138:16

forgive
  53:19

form  7:9
  125:6

forms  101:8,
  9 125:5

forwarded
  137:23

forwarding
  72:23

found  45:14
  121:5

foundation
  51:19
  56:13
  134:3
  143:22

four-year
  44:17,21
  45:2,5,10
  63:21
  64:11
  133:3

frame  121:7,
  8

free  67:9
  115:24
  116:7

Freehall
  115:25

Freehoe
  115:24

Freida  140:3

Freidhoff
  31:5,14
  43:4 57:25
  111:2
  115:24,25
  124:24
  126:2,3,4
  128:18

frequent
  21:6

frequently
  21:8

freshman
  16:24 26:7
  27:7,16
  31:7 38:4,
  5 47:4,7,
  10 48:4,6
  49:5 50:15
  71:14
  72:24
  74:24
  91:23
  92:8,9,13,
  14,19

freshmen
  42:5

Friday
  40:16,17

Fridays
  12:13,16

friends
  11:23

front  73:9
  76:2

112:5,6
  150:3

frustrated
  67:23

fulfill
  43:18

fulfills
  37:3 54:11

full-body
  109:3,7

fun  12:15
  52:15,17

funded  91:24

funding  39:5
  41:14,21
  54:20
  66:25

_____

G

_____

G-A-U-M-O-N-D
  29:15

GA  37:12,14

game  150:5

games  11:4
  12:4

gather  38:9,
  14

Gaumond
  29:14

gave  25:5

general
  68:24

128:19
  133:8

generally
  14:2

generate
  147:11

generated
  90:23

generically
  44:1

generous
  154:18

geometry
  51:10,17

Georgia
  5:21,25
  6:9 8:18,
  21 9:6,7
  13:8
  19:21,23
  36:23
  50:25
  51:3,9
  52:6 53:1
  60:14
  61:4,21
  62:19
  63:3,6
  65:22
  135:10
  136:19

Gerber  37:11

gestures
  7:15

**girl** 77:17 79:11,12

**give** 5:5 16:2 26:23 31:17 45:15 47:14 62:14 63:11 68:21 73:24 84:7,8 89:9 91:5 98:16 111:18

**giving** 26:20 128:17

**GMC** 44:6 66:4,5,6,8 68:17 106:13

**GMCS** 117:22

**goals** 117:1

**God** 5:7 32:18

**good** 5:16, 17 32:1 37:20 49:20 52:14 56:20 75:14 106:3 115:1 116:13

132:19 141:14 155:25

**gosh** 106:6 147:23

**GPA** 24:5 62:15

**grade** 34:21

**graders** 36:13 41:22

**graduate** 37:15 39:2 68:10 94:25 95:2 116:12,17 117:2 132:23

**graduated** 43:15 92:5 95:5,6

**graduates** 85:14

**graduation** 39:1 69:17 72:25

**grammar** 115:16

**great** 16:12 56:16

**greet** 73:4

**grew** 39:15

**Griffin**

70:21 71:4 80:5

**gritting** 131:15,24

**ground** 85:11

**group** 88:5 104:5 129:23

**groups** 10:14

**grow** 65:21

**grown** 9:11

**guess** 33:2, 18 145:20

**guidance** 24:11 51:13 54:19 116:20 118:17

**guide** 22:1 117:3

**gun** 58:21

**guy** 79:16

**gym** 19:19

—————————

**H**

—————————

**Haley** 28:12

**halfway** 101:12

**hall** 55:18, 22

**hallway** 112:13

**Hancock** 25:24 30:24 31:2 33:21 34:5 54:2 135:22

**hand** 5:3 15:10

**handing** 14:21 147:10 150:10

**handle** 34:23 51:15 58:2 74:19 151:1

**handled** 16:6

**handles** 23:22 55:10 73:15

**handling** 54:22 56:1,21,25 58:10

**handout** 66:15

**hands** 38:8

**hang** 11:1, 21

**happen** 106:6 140:13

**happened**
40:25 99:9
105:12
108:3
112:12
118:22
120:5

**happening**
90:1
104:10,12

**happy** 11:6
131:21

**Harrison**
79:15

**head** 12:9
22:2 25:10
30:23
61:19
78:21
91:14
112:22
130:2
136:22

**headcount**
147:20

**heading**
128:1

**heads** 15:20

**hear** 96:7
97:14
107:21
111:23
112:18
123:1
126:15

129:15
130:3,5,
13,15,18,
23 138:8,
12 140:6
143:19
144:18

**heard** 95:21
96:3
109:25
110:6
113:11
129:14
130:12
131:5
143:18
144:15,23
146:18

**hearing** 7:12
129:11
146:24

**heavy** 84:15,
20

**held** 135:20

**helped** 70:16

**helping**
129:1

**helps** 136:1

**heretofore**
5:11

**hey** 19:8,17
23:19 32:7
106:11,12

**high** 18:17,

24 19:7,
18,19
21:12
23:1,8,16
24:11 25:2
34:2
36:19,23
37:2,3,25
38:17,19
39:2,12,18
40:8,10,17
41:9
42:12,16
43:18
50:17
51:3,13,16
52:10,12
53:8,22
54:19
59:21
62:15
64:25
65:9,11
66:2,6,8,
10 67:6,11
68:11
69:5,8,11,
12,14,23
76:21,22
84:19 92:5
107:2
116:20
117:3,11,
18 118:16,
17 132:23
137:25
140:11,17
141:5,9,11

148:17,18

**higher**
136:18
141:17

**highest**
13:20

**highlighted**
65:2 68:1
76:2
101:12

**Hilary** 29:7
30:1 75:22

**Hillary** 23:6

**hire** 85:6

**hired** 21:16
22:20
114:22

**hires** 101:18

**hiring** 10:17
101:24

**Hispanic**
79:12

**history**
29:23
38:24
50:21
53:12

**hit** 32:2,6
33:7 85:2

**Hogan** 15:20
18:3 27:3
29:3,22
30:1 71:24

75:21
102:10
115:7
119:14
120:14
121:2,19
122:3,18
123:8,19
124:15,21,
24 141:21
142:15

hold  137:15

hole  30:7

holes  28:14
30:7,14

holidays
32:9

Holly  5:18

home  141:1

honestly
63:16
79:17 82:1
119:3

honors  65:7,
10 117:9
141:10,12

Hopkins
44:24,25
63:23 64:9

hot  110:11,
18

hour  11:6

hours  57:16
63:11,13

house  41:17,
19,20,21
42:10 73:6
106:2,9
111:8,9
122:13

housing
15:16,21
151:17

HR  120:1
125:6
142:5,13

huddle
107:5,10

hug  98:19
105:11,12
109:2,3,7,
14 110:21
111:18
113:2
118:25
119:4

hugs  111:18

humanities
61:25

hundred
32:19
45:13 82:1
113:17

husband  9:19
11:25

Hutchinson
138:3
140:12

— — — — — — —
         I
— — — — — — —

I-CAN'T-FIND-
THIS-CODE-
TYPE-OF-THING
28:6

idea  27:25
56:10,19
57:2 90:25
126:4

ideas  118:8

identification
14:23
64:16
66:12
67:14 70:3
74:5 75:10
86:21
99:20
101:3
105:1
124:10
129:3
132:11
134:5
136:24
145:2
147:6

identified
78:2

ignore
146:12

immediately
109:13

imminent

31:23

impact  87:14
138:9

important
67:4,5,7
91:24
93:2,6,7,
14

in-house
80:14,15
82:7,14,16

inappropriate
109:5
144:24

incident
114:19
119:20,22
129:10
130:20

included
40:20
95:10

incompetent
130:11

incorrect
115:16

increased
86:10

indiscernible
103:12
126:13

information
50:19
63:20

93:23
102:24

**informative**
115:5

**Ingrid** 72:19

**initially**
47:3,5,6
48:13 65:6
114:5,6

**initiated**
140:15

**input** 16:19
26:7

**inquiry**
16:20

**inside** 90:15
95:11
108:21

**instance**
22:20 53:8

**institution**
48:9 49:12
63:2 117:4
132:23,25
147:13

**institutions**
18:21
46:11
50:11
60:11
63:21
64:11
65:15

**intended**

43:15

**intends**
57:14

**interaction**
103:1,10
112:3

**interesting**
38:25

**internships**
61:6

**interrupt**
127:18

**interview**
105:5,7
114:1,2
119:2
124:14
129:7

**interviewed**
99:11

**intro** 47:24
48:8 64:6

**investigated**
130:20

**investigation**
124:16
144:16

**investigations**
144:12

**investigative**
129:6

**investigator**
105:6

114:2
121:23,25
128:11

**investigator's**
119:7

**involved**
10:24

**issued** 137:5

**issues**
66:24,25

**IX** 97:19
98:6 99:3
105:6,10
114:1
119:2
121:23,25
124:16
129:6
130:19
144:12

_____

J

_____

**James** 72:13,
14 74:25
79:5,6,14
80:1 81:5,
10

**Jamie** 5:19
12:17
20:15,20
21:3 31:1
33:23
34:17
35:22
36:2,11

37:6
38:12,13
39:1,8
40:5 41:24
42:7,9,23
43:2,6
50:5,17,20
52:14
54:7,12
56:2,25
58:24 59:1
65:6
70:11,13,
16 71:2,5,
17,19,25
72:3,6,9,
20 73:4,
11,14,22
74:2,3,13,
16,18 75:7
78:25
85:15 87:4
90:22
95:20
97:2,7,18
99:14
100:5
101:16
102:5
103:22
104:1
105:6,24
106:4,20
107:6,19
108:2,17
109:17,18
110:9,11
111:4,8

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Lisa Long on 01/21/2022                    Index: Jamie's..lawsuit

112:4,11,
19,21
113:12
114:22
116:2,12
118:6
119:20,21,
24 120:10,
22,24
121:13,20
124:15
125:23
126:6
130:24,25
131:2,11,
12 132:17
134:20
135:23
137:5
138:24
139:1,5,7,
16 141:8
147:1
149:8,20
150:15
151:2,5,14
153:16,17

**Jamie's**
34:16
39:13,16
73:10 83:2
87:12 92:2
98:6
100:14
106:14
107:14
111:12
116:3

144:6
149:14
153:13

**Janice** 119:8
124:15
129:7

**January**
83:13

**Jeanine** 87:3

**Jesse** 72:15
74:25
77:18
78:5,6,8,
18 80:3
81:6,8

**job** 13:5
18:14
33:21
34:16
39:14
54:10
56:20
85:14 88:8
91:3
115:11
120:11
122:16
123:13
150:13
151:2,5

**John** 44:24

**Johns** 44:25
63:23 64:9

**join** 104:7

**joint** 135:19

147:17,21,
25 148:8,
14

**joke** 111:16

**jump** 51:16

**jumped** 86:4

**juniors** 42:4
64:25
84:22,23

**jury** 40:1
124:1

—————————

**K**

—————————

**Karen**
136:15,20

**Katrina**
15:14 23:4
28:23
30:19
150:22
151:2,7

**Keith** 101:25

**key** 111:11

**kid's** 117:6

**kids** 84:16
118:3
123:12
139:10
147:23

**kind** 17:22
19:12 32:5
33:7 50:4
53:7 56:14

65:10
71:22
75:24
97:14
100:11
102:24
108:13

**knew** 38:19
39:25
118:19
123:23
140:23

**knowledge**
15:17,23,
24 21:17
90:10

—————————

**L**

—————————

**L-U-A** 79:9

**labeled**
87:10

**labels** 74:1

**Labor** 84:15

**laid** 143:22

**language**
144:24

**laptop** 23:18

**large** 149:25

**Laurie** 9:22

**lawful** 5:12

**laws** 36:12

**lawsuit** 5:23

8:1,4 35:7

**leadership**
13:25 14:2
103:4
104:5

**leading**
105:15

**leagues**
10:25

**learner**
126:7

**leave** 7:22
12:19
83:20
84:24
85:9,11
100:24
109:13
127:25

**leaves** 84:10
145:11

**leaving**
31:22
140:17

**Leb** 139:21,
24

**Lee** 139:16

**left** 31:25
76:18
77:16,22
106:19
107:24,25
112:5
120:22

121:6
122:19
142:2,3,5,
7,20,22
147:1

**legal** 87:3

**Leslie** 9:23

**letter** 87:2
90:21
120:6
145:6

**letters** 61:6
73:25

**letting** 32:7
34:20

**level** 43:20,
21 51:15
56:13 63:1
69:23
88:6,7
133:2
147:17

**levels** 68:7

**lie** 130:21
131:9

**life** 22:1
65:10

**lifetime**
82:20

**limit** 98:17
127:17

**Linda** 72:20
74:16,18,
23

**Lisa** 5:10
6:3 72:2
109:3

**list** 67:17,
19 70:10,
11,15
75:15 77:1
134:14
147:13

**listed** 6:24
42:23
43:2,6
67:21
75:17 76:1

**listing**
33:22

**litigation**
101:7

**live** 9:6,8
10:1

**load** 89:24

**local** 21:3
53:5 71:11
77:24
87:13
117:23
118:2
133:20

**locally** 21:2
117:22

**located** 66:8

**location**
55:22 66:7

**locked**

111:10

**long** 5:10
6:3 9:14,
20 14:4,7
18:7 25:7
26:3 27:1
30:1 50:3
72:2
106:17
112:1
117:5
127:6
141:3

**longer** 29:3
70:22
74:14,15
75:4,5
76:15
106:18

**looked** 94:16
108:8,11
115:1

**lose** 123:13
139:2

**losing**
122:16

**lot** 21:21
28:14,15
29:21
37:21
38:9,21
52:10,16
74:19
84:21
103:1
114:13

117:9
126:20
150:4

lots  16:6

lowering
  150:4

Lowndes
  19:18,19
  25:11,14
  53:8
  137:25
  140:11
  141:9

Luan  79:6,
  8,14

lumped  53:7

lunch  67:18
  130:3

lunchroom
  19:9

Lyn  119:8
  124:15
  129:7

M

machine  28:2

made  16:25
  18:6 39:1
  110:11
  111:16
  113:19

Maestas
  5:15,18
  6:19 15:1

18:9
22:11,12
31:12
32:18,21
33:5,9
35:19,24
36:1 46:8
49:7,19,
21,25 50:2
54:1 55:4,
8,15 56:6
57:19
58:23
64:18
66:14
67:16
70:2,5,19
74:7 75:9,
12 82:3
83:1,6,8,
11 86:19,
23 89:12
92:17
93:9,16,19
94:1,5
96:1,4
97:1 98:11
99:8,22
101:5
102:19
103:18
105:3
115:17
123:20
124:8,12
126:17,23
127:2,5,8,
15,19,24

128:2,4,6
129:5
132:13
134:7
137:1
139:24
140:2
145:4,23
146:1,6
147:8
151:19
152:5,14,
21 153:1,
3,6,8,12,
15,23
154:10,17
155:8,10

main  103:15

major  43:20,
  23,24
  48:17,19

majority
  19:23

majors
  43:15,25

make  33:18
  35:8
  38:18,20
  41:10
  51:15
  69:13 76:2
  117:8,14
  126:1,2
  155:20

making
  117:15

131:16

manager
  73:16
  75:21
  92:23
  100:17
  113:17

March  32:3
  33:4 75:19
  137:5

Marie  72:19

mark  113:2
  154:6

marked
  14:22,23
  64:16,19
  66:12
  67:14
  70:3,6
  74:5 75:10
  86:21
  99:20
  101:3
  105:1
  124:10
  129:3
  132:11
  134:5
  136:24
  145:2
  147:6,10
  150:11

married  9:24

Mary  72:18,
  19 80:13

mass 53:9,
14 54:16
55:9 74:1

match 69:10
76:1

mate 12:17

math 51:11,
15 61:23,
24

maths 61:22

matter 5:19
25:1 93:20

matters
93:24

Mcginn 9:23

Meagan's
54:10
55:16

meaning
140:24

means 24:3
39:22 40:1
68:3,4,5
87:24

meant 39:25
69:7 88:1
92:18
128:25

medications
8:12

meet 38:16
47:10 49:4
55:5 74:8

80:25
103:5
135:8

meeting
41:3,5
119:24
134:1
136:1

meetings 8:9
54:6
102:21
103:4
104:4,7

Megan 25:24
30:24 31:1
33:21 34:5
54:2,3,12,
24 55:21
56:20 58:9
59:4,7,12
88:22
89:19 90:3
135:22,25
136:3
149:21

Megan's
56:25
57:24 58:1
90:6
149:14,22

member 11:2

memo 142:5

memory 8:13
110:14

mention 33:3

mentioned
140:12

mesh 35:22

met 38:13
76:1

Mexican-type
12:14

middle 5:24
9:6 125:14
135:7
143:6
147:17

Mike 141:8

military
78:15
136:19

mill 143:20
144:19
146:21,24

Miller 9:16

mind 89:16

minimum 24:5

minimums
49:5

minute 95:24
106:3
136:16
137:7

minutes 77:1
106:17
112:2
134:16
145:13

151:22

misconceptions
67:20,21

missing
28:16
81:23

mission
134:25
135:3

misspeak
115:19

mistyped
115:20

misunderstood.
' 125:10

Mitchell
39:16,20
96:19
103:22
104:6
121:9
122:14,19
129:7
137:6
141:19

mixed 47:12

Momma 116:9

Monday
40:16,17
91:6
147:12

money 51:8
52:3,22,24
116:5,14

Monica  72:15
  75:1 80:9
  81:6,8

month  102:22
  142:24

monthly
  103:6

months  77:17
  78:16
  142:25
  147:4

morning
  5:16,17
  91:6
  106:1,3
  107:6,10
  108:21

mother  33:12

mouth  105:14

move  33:19
  41:24 42:1
  72:23
  74:23
  113:19
  125:1
  147:24
  148:2

moved  12:25
  16:23
  17:11
  29:17,18
  111:6
  125:23
  142:3

movement

74:19

moving  111:1
  125:3

multiple
  44:8
  116:13

————————

N

————————

named  5:11
  77:17

names  6:5
  9:13 16:18
  41:25
  68:21 70:9
  81:7
  139:15
  147:23

Nancee  73:3,
  8

Nancee's
  73:9

needed  24:10
  39:2 42:10
  51:18,21
  53:2 69:16
  86:9 87:25
  88:7
  119:23

negative
  115:5

Nephews  9:3

nervous
  115:9
  119:16

Newsome
  140:3

Nick  79:15

niece  57:7

Nieces  9:3

night  11:1
  129:23
  141:3

nodding  12:9
  22:2,8
  25:10
  61:19
  78:21
  112:22
  136:22

non-party
  6:13

non-vsu
  11:23

normal  40:14

North  86:15

notes  105:5
  114:1
  124:14
  129:7
  145:21

notice  5:11
  6:12,15,16
  31:17,19
  35:5
  108:14
  153:13,18
  154:21

November
  83:3,12
  85:12
  120:25
  125:11

number  25:5
  45:15,17
  60:16
  62:17,18,
  20 63:11
  83:22 91:3
  120:11
  148:17
  149:25

numbers
  90:20,23
  91:1,4,6,
  8,9,10,23
  92:9,24
  93:15,18
  94:15
  95:10
  147:13,14,
  15 149:13
  150:3,8

————————

O

————————

oath  5:13

object  55:1
  93:4
  126:17
  127:8,11

objection
  55:13 57:4
  58:18

Objections
  7:9

objects   56:7

observe
  55:21
  109:24
  123:5
  131:15

observing
  133:11

occasional
  11:6 20:23
  21:5,7
  54:4

occasionally
  20:24,25
  42:13
  54:17
  55:10

occur   153:9

occurred
  108:20
  112:16

October
  25:8,9
  129:8

odd   94:9

off-campus
  148:24

offensive
  138:13

offer   21:13
  23:12
  50:23

offered   15:8

offering
  136:6

office
  12:17,20
  14:16
  15:16,20
  16:9,15
  17:22,23
  28:8,11,
  20,21
  31:2,3
  55:16,17
  57:22 62:7
  70:8 73:5,
  9 79:20
  84:11
  100:8,13
  103:15
  106:14,21
  107:10,14,
  20 108:4,
  10,21
  111:12,13
  112:6,12
  129:16,17
  130:10
  142:3,4
  143:11,16
  144:4,6

offices
  58:22
  112:14
  144:9

official
  31:19
  147:20

older   39:13

Olivia   70:21
  71:4,8,10
  72:15
  74:15 75:4
  77:9 78:2
  80:5 81:5,
  11

on-site   53:6

one-employee
  88:15,17,
  18 89:14,
  19

one-on-one
  38:13 41:4
  132:3
  149:20

online   118:1

open   14:15,
  17,20 15:3
  22:16 23:2
  25:14
  28:15
  42:10
  75:17,19,
  20 77:12
  85:8
  100:2,6,
  19,23
  101:15
  102:5
  106:10
  107:21
  109:18,20,
  25 110:3,6
  111:21,22

128:22
  145:8
  146:3

opened
  106:17
  109:16,17
  110:9,10

opinion
  54:23 88:9
  89:9 133:6
  149:16
  151:3

opportunity
  7:2 68:23

option   50:23

options   44:8
  50:9

organizational
  13:24 14:2

organizations
  10:14 11:2

organized
  16:11 98:4

orientation
  38:4

original
  118:24
  137:21

originally
  29:19

out-of-state
  86:8

overlap   71:5

**P**

pace  65:3

packet  76:5

paid  34:21 36:14 52:20

paperwork 24:10 38:10

PAR  101:8

paragraph 87:9 114:18 124:17 135:6,18

paranoid 122:15,21

parenthetical 67:22

parents 42:25 67:23 107:2

part  13:4 19:11 34:17 35:5 36:17 89:4,24 146:13 152:12

part-time 74:17

participate 8:13

participating 20:1

partnering 135:9

partners 135:1,21

partnership 135:11,13, 14 136:9

party  8:1

pass  19:9

passed  33:12

past  78:20 140:18

Pathways 34:7

pause  35:25

pay  19:11 116:11 152:23,25 153:2,4 154:16 155:1

paying 52:13,18

pays  19:14

Peacock  17:7 26:10

peak  57:17

pending  5:23

people  12:3, 19 16:7 20:12 25:16 29:10 36:23 73:4 76:18 84:1 88:5 125:3 130:15

percent 32:19 82:2 113:18 117:23 118:2

Perfect 99:12 155:8

performance 149:14,15

period  33:6 82:18 83:16 84:15

permission 24:11

person  15:13 28:12 34:11,12 71:6 74:12,17 76:11 90:4 91:4 125:6 143:16

personal 118:16

personality 96:21 97:6 122:15

personally 57:7 95:22

personnel 20:11 27:12 79:16 100:3 101:8

ph  101:25

phone  140:14

physical 69:12,15

physically 31:3

physics 43:19,20, 21

pick  22:8

picked 121:20 148:21

place  10:25 30:20 39:6 77:20,21

placement 49:4 66:1

places  32:2

Plaintiff's 14:22,23 64:16,20

66:12
67:14
70:3,6
74:5 75:10
81:18,19
86:21
90:15
95:11
99:19,20
101:1,3
104:23
105:1
124:10,13
129:2,3,8
132:11
134:5
136:14,24
141:20,21
145:2,5
147:6,11
149:10
150:11

**plan** 43:16

**planning**
44:9,23

**play** 150:1
153:25

**pleasant**
74:17

**plug** 28:14

**plugging**
30:6

**poaching**
136:6

**point** 21:21

26:12
36:18
41:23
49:18
60:16
67:20,24
70:24
72:10
103:8
104:11
109:22
111:20
124:23

**points** 67:17

**policy**
143:15

**political**
11:1

**ponder** 33:11

**portion**
153:5,18

**position**
10:5 14:16
15:2,8,13
16:15
22:15
23:2,4
26:4 27:4,
9 28:16,23
29:4 30:15
31:8 43:8
56:20
75:17,19
76:11,14
80:7 84:7,
8 85:7

87:13,24
100:18,19,
23 113:15,
16 121:10
124:20
132:6
150:15,18

**positions**
10:10
14:18 20:8
28:15
70:10
75:15,21,
25 76:5,6,
10 81:20
100:2,6
101:12,15
102:4

**possibly**
48:16

**posted**
75:19,21
101:13

**posting**
150:13

**postings**
78:7

**pot** 118:3

**practice**
143:15

**practices**
66:23

**prep** 24:5

**preparation**

8:7

**prepare** 8:6,
9 65:4,10
133:15
145:24
146:2

**preparedness**
133:3

**present**
143:12

**president**
84:4
102:16

**pretty** 32:2
148:18
151:24

**previous**
130:19

**previously**
14:21 41:2

**printed**
145:20

**printoff**
70:7

**printout**
74:9
149:10

**prior** 144:11

**private**
19:24 45:3
53:22
60:11

**Probe** 19:10,

12,15,16,
23 20:2
25:2
140:17

Probes  84:18

problem
  54:14

procedures
  67:2

Proceedings
  5:1

process
  38:14 40:6
  41:16 58:7
  89:5,25

processed
  16:24 26:7

processer
  16:23
  80:14

processers
  18:1 38:15
  72:20
  74:21
  80:15
  128:17,18

processes
  74:20

processing
  17:23 18:5
  27:5,6,7,
  8,15,16
  28:1,25
  29:12 41:6

61:9 74:20
128:16

produce  6:16
  35:5

produced  7:6

professor
  40:15

professors
  40:7,9,13
  42:21
  68:12,18,
  19,25
  149:5

program
  39:13
  46:17
  65:21

programs
  20:12
  21:11,17
  34:8 150:5

progress
  39:9

prohibit
  143:10

promote
  71:13

promoted
  17:10,14
  26:11

promoting
  34:22

proper  117:3

proposing
  113:19

provide
  40:19

provost  37:9

proximity
  55:24,25

psych  53:10

psychology
  53:9

pull  30:22

pulled  51:1
  146:10

purchasing
  28:20,21
  30:18

pure  93:23

purely  115:5

purpose
  93:11
  141:13,16

pursuant
  6:11

push  116:9

pushed  36:22

put  22:16
  38:15
  42:22
  53:10
  57:16 74:1
  93:2,7
  105:13
  109:15

116:4
122:19
139:4
146:9

putting  40:4
  74:20

_____

Q

_____

qualifications
  35:15

question
  7:10 8:14
  28:22
  33:20
  35:23 50:4
  55:12
  56:8,15
  69:5 70:18
  71:16,22
  74:11 76:9
  83:25 98:7
  100:11
  102:3
  113:2
  118:24
  131:23
  143:23

questioning
  50:17

questions
  25:4 28:10
  35:7,9,12
  72:17
  87:19
  106:11
  126:21

128:20,21
151:20

**quick** 66:22
76:23
126:6

**quit** 76:11

___

**R**

___

**raise** 5:3

**rare** 20:20
21:5 28:5

**reach** 42:25
103:8
133:13

**reaches**
107:2

**reaching**
135:19

**read** 7:17,
18 67:24
114:25
124:18
132:18
136:16
151:5
155:18

**reading** 7:19
89:16
132:20
155:14

**ready** 5:2
30:20
41:25 42:1
48:17

67:6,10,11
68:12 69:1
85:2 116:6
141:1
147:25
148:2

**real** 66:22

**reality** 88:5

**reask** 102:3

**reason** 59:11
76:12
96:10,12
99:16
121:23

**reassigned**
87:12

**rec** 61:6

**recall**
45:23,24
49:5 66:24
75:8
97:18,24
98:14
100:6
105:15
111:25
112:10
130:17
131:1
133:19
139:17,20,
25 140:1
144:21
146:25

**recalled**

50:13

**recalling**
47:17

**receive**
6:15,20

**received**
57:14
101:6

**recent** 22:20
85:13

**recently**
85:24
138:9
140:16
144:17

**receptionist**
73:3

**recess** 49:24

**recipients**
137:21

**reclassified**
113:16

**recognize**
64:20
132:14

**recollection**
45:18 77:4
101:14
114:8
125:17
128:12
131:13

**recommend**
155:24

**record** 6:2
42:21
49:23,25

**recorded**
122:4

**records** 6:24
7:1,5
145:8,11
146:3

**recruit**
17:20
18:19
22:15
26:14 34:6
84:14,15
129:1

**recruiter**
18:10,14
19:2,7
20:7 21:11
22:18,23
23:8,24
24:14
25:22
26:12,15,
17 34:12
42:8 75:20
76:6 79:24
80:1,9,11
81:20
89:4,24
100:18,19

**recruiters**
17:13,20
18:1,2,4,
21 20:8,9

21:9
22:13,22
25:19,20
26:3,21
27:14
30:19
34:2,6,10
59:10,12
72:11
76:21,22
77:2 79:1
80:18,23
81:4,18
83:15,17,
22 84:4
85:7,16
86:6,10
87:13,18,
21 89:3,23
90:5,8
101:21
128:25

recruiting
71:14
84:23

recruitment
17:12,24
25:2 27:3,
10 29:1,2,
18,20
30:1,11
42:11
64:24
151:10

recruitments
151:9

red-rimmed
106:22

reduction
96:8
99:15,25
100:6
121:11,12

reference
70:17

referred
34:5 129:9

referring
59:25 65:5
82:19
125:16
128:10,15

refill  76:19
77:5,23

refilled
77:23

refilling
76:12

reflect
149:14

refresh  77:4
101:14
114:8

regard  63:21
69:8

Regents  5:20
13:9 87:4

region
135:20

regional
77:22
79:21
82:14
84:4,6

register
38:6 68:11

registered
38:17
40:22 41:7

registration
53:10

regular  12:3
38:4,5
89:4,24
128:23

rehire
84:10,13

relate  62:22

related
10:14
13:17 14:1
35:7
147:15

relations
100:17

relationship
55:16
118:17

relationships
138:9

relatives
8:17,21

rely  153:20

remain  58:8
111:21
124:25

remained
111:22

remains  57:4

remember
29:11
32:11 36:4
41:13
47:16
49:12 64:3
85:18 86:1
97:21
98:12,23
100:22
102:4,17
105:9
107:15,16
109:9,16
110:20
113:3,6,9,
21,22
119:11
129:10,11
131:24
138:6

remembers
32:5 46:7

renotice
152:7,16,
19

rep  25:17
71:11

**repaired**
 138:10

**repeat**  81:8,
 9

**repeated**
 81:7

**repeats**
 81:10

**rephrase**
 88:2,3

**replace**
 77:8,9

**replaced**
 31:1

**replied**
 125:9

**reply**  134:9

**report**  91:7
 102:9,11,
 22 104:1,7
 115:18

**reported**
 7:16

**reporter**  5:2
 7:14,21
 49:23
 53:19,24
 103:14
 124:5
 126:14
 139:22
 152:6,7
 153:16,17,
 19,20

 154:5,8,11
 155:2,5,13

**reporters**
 155:25

**reporting**
 31:5

**reports**
 31:14
 103:5,19

**represent**
 5:18 18:18
 20:14,15
 72:16

**representative**
 15:21

**representative
s**  62:11

**represented**
 20:5

**reprimand**
 35:13
 97:10
 120:1,6
 137:4
 139:14
 141:20,22,
 23

**reprimanded**
 97:9

**request**  6:24
 101:9
 145:9
 146:3

**requested**

 6:23 111:3

**requestor**
 101:10

**requirement**
 37:3 43:19
 44:13 51:3
 69:17

**requirements**
 23:10,13
 24:2,3
 34:20 62:3
 65:24
 134:2

**requires**
 125:6

**research**
 44:12

**reserved**
 7:11

**resource**
 73:15

**respected**
 118:18

**responding**
 136:15

**response**
 57:22
 134:10

**responses**
 7:15

**responsible**
 152:11

**responsiveness**

 7:10

**rest**  73:21
 80:14
 154:1

**restaurant**
 12:14

**retain**
 91:22,25

**retained**
 94:7

**retaining**
 149:9

**retaliated**
 122:10

**retaliation**
 35:13
 96:14
 99:17
 123:22

**retention**
 90:17,21
 91:21
 150:5

**retire**  31:24

**retired**  18:3
 29:15,17

**retiring**
 31:19,21

**review**  8:6
 62:8 70:9
 87:5

**reviewing**
 62:23

Rice  22:24
  80:11

RIF  115:8
  119:15
  121:6

RIFED  101:16
  102:1
  120:24
  121:4,18

RIFS  100:13
  120:21

rigor  62:3,
  22 63:18
  65:3 67:12
  68:6,7
  133:25
  141:6

rigorous
  61:4 62:9,
  25 63:1

ring  146:17

road  6:8
  85:2

Rob  31:5,6,
  14 43:3
  57:25
  58:1,9
  111:2
  124:24
  125:8,12
  128:18
  129:23,24
  130:4

Rodney
  110:24

118:11,12
  121:10

roof  117:20

room  18:20

roundtable
  13:16

rules  143:10

rumor
  143:20,21
  144:19,22
  146:21,24

Rumors  95:23

run  20:11
  117:5

running
  52:23
  58:20 85:1
  100:14
  126:12

Ryan  15:20
  18:3 27:9
  29:18 34:6
  57:21 58:7
  59:1,6,9
  71:24
  75:21
  83:25
  101:20
  102:10
  110:23,25
  111:2,4,5,
  8,10,12
  112:17
  113:1,3
  121:2,10,

11,15,17,
  24 122:18,
  20 123:8,
  14,17,18
  124:15
  125:19,22
  128:11
  141:21
  142:3,7,15
  143:3

Ryan's  91:4
  142:4

_____

S

_____

Sampson
  72:14 80:1

SAP  149:24

Sarah  12:20
  20:15 21:3
  31:1,15
  32:7
  37:13,18,
  20 66:16
  100:25

Sarah's
  33:24
  100:24

sat  24:5
  49:5
  109:13
  111:13

satisfy  51:2
  69:17

SATS  62:14

save  51:8
  52:3

Savoy  141:8

savvy  38:22

scaled  52:22

scared
  122:4,9
  123:5

scenario
  47:14

scenarios
  50:12
  52:25

schedule
  38:16,17
  40:15 41:6
  51:13

scheduled
  152:18
  153:8

schedules
  42:20

scheduling
  127:16

school  18:24
  19:7,18,19
  21:12,24
  23:9,16
  24:11 25:2
  36:19,23
  37:2,3,25
  38:18,19
  39:3,12
  40:8,10,17

41:9 42:16
43:18
44:24
45:2,5,6,
11 46:20,
21 48:24
50:17,22
51:3,13,16
52:10,12
53:8,22,23
54:19
59:21
62:15
64:25
65:11
66:2,6,9,
10 67:6,11
68:5,9,11
69:5,9,11,
12,14,23
84:19,20
92:5 94:12
107:2
116:20
117:3,12
118:17
132:23
133:3,4,18
137:25
140:11,17
141:5,9,11

schools
18:17
19:14,17,
20,23 20:5
21:3,22
34:2,9
39:18

42:12
45:1,4
59:20
60:15,18
65:9 66:1
68:14,16
71:10
117:18
118:9,16
136:19

science
13:24
47:23,24
61:24
69:12,15
136:10

sciences
61:22,24
62:1

scooping
65:22
118:4

scores  48:25
49:2
63:10,11

screwed
120:2

scrubs  146:7

search
145:22

searched
148:11

Searches
146:5

secretary/
whatever
143:24

section
53:15
75:24

sections
74:22
141:10

secure  111:9

sell  65:8
71:10,11
72:16 75:2

selling  90:6

semester
84:16 85:1

seminar-type
131:19

send  21:23
38:3,17
63:10,12
115:1
117:7,10

sending
57:13

sends  73:16

senior
22:18,22,
23 34:12

seniors  19:9
42:4 64:25

sense  76:2
84:25

126:1,3

sentence
65:2 87:11
88:13
89:1,6,13,
21 122:3

sentences
98:17
134:24

separate
89:5,25

September
105:8
124:16

sequence
134:11

serve  10:16
43:7 135:1

service  6:25
118:18

session  8:15

set  19:15
60:16
98:13

sets  19:12

setting  40:8
51:24

settles
155:10

setup  21:19

shaking
130:2
131:24

Shauna 144:1,2,7

sheer 93:13

sheets 28:3

shocking 105:23

short 25:3 35:25 50:1

shorten 51:7 52:2

Shortly 106:7 120:21

show 6:17 90:21

showing 42:22 93:5

shut 107:17 111:15,17

side 17:23 30:1 105:18

sign 7:19 20:3 68:9 125:7 138:16

signed 117:16

signs 19:14

similar 19:25 63:3

simply 13:16 52:11

simultaneous 103:13

sir 96:24

sister 21:21

sisters 9:1, 21,22

sit 18:20 19:9 110:7

sixth 150:23

skip 67:6

slow 86:5

small 139:10

Smith 72:8, 9,12 79:22

snapshot 146:8

social 62:1

solemnly 5:4

son 133:13

son's 9:14 133:16

sophomores 42:5

sought 145:8

sounded 123:2

sounds 12:15 52:17 132:19 148:18

source 16:19

south 9:6 86:14

speak 19:8 122:21,24, 25

specialist 73:13 80:17

specific 52:6 141:10

specifically 99:24

specifics 97:16

speculating 112:20

speculation 55:2,14 56:4 58:18 89:8 93:5, 13,23

speed 123:2, 3 126:11 127:9

spell 49:8

spent 149:20

spoken 63:8

sporting 11:3,12

spot 29:17, 18

spots 129:9

spouses 10:1

spread 88:4

spri- 95:4

spring 84:21,22 85:1 93:1, 3 94:9,24 95:1,5,6 150:7,9

staff 17:21 18:5 22:15 26:14 29:18 70:8 79:21 101:8

stand 139:3

standard 62:24

standards 21:17 47:10 61:1,2,13, 15 136:18 150:4

start 16:12 34:17 38:12 40:4 48:17,19 94:24 95:1 132:20 146:23

started 15:6,9 16:17 26:3,6

34:20 36:13 37:5 39:8 41:24 50:10 52:23 77:8,14,18 95:4,6 141:8

**starting**
127:9

**starts**
84:15,21 145:10

**state** 5:21 6:1 8:17, 21 10:7 13:6 15:19 18:18 19:22 20:6 34:21 36:14 40:19 44:24 52:12,14, 18,20 62:18 65:1 86:14 135:7

**State's**
116:4,14

**stated** 56:25

**statement**
128:10 130:9

**statements**
132:21

**states** 5:24 137:6

**stay** 17:5 26:10 57:16 72:25 78:15 92:4,7 95:7 111:3 112:11 120:25 125:8

**stayed** 17:9 120:6

**staying**
111:4

**stellar**
120:13

**stenographically** 7:14

**step** 57:11

**steward**
52:14 116:14

**stipulate**
93:20

**stood** 106:18

**stop** 104:10

**stopped**
104:12

**street**
39:21,23 55:19

**strictly**
66:7

**student**
21:18 24:23,24 25:3,23 38:1,2,19, 20 40:11 41:4 42:22 44:9,23 47:4,7 50:24 51:9,12, 14,16 52:19 53:1,4,5 61:7 62:22 63:22 68:7 69:12 72:24 73:21 80:17 94:8 102:15,16 105:22 117:4,10, 16 147:17 148:5

**student's**
51:13 61:9 117:11

**students**
16:20 18:19 25:13 26:22 34:19,20 37:24

38:13,16, 22 40:10, 22 42:20, 25 43:14 45:8 46:10,18, 20 47:15, 17,22 48:7 50:13,18 52:10,16 53:14 54:3 59:15 60:10 62:18,19, 20 63:9 65:9,10, 20,23,25 66:9 67:8, 10 71:15 72:22 87:15 90:17 91:18,21 92:4 94:23,25 95:3,6 105:25 106:25 107:1,4 114:15 115:10 116:5,6, 15,23 117:22,23 132:22 133:11 135:9,12, 16 136:2,6

147:16
148:22
149:9,20,
25

**Students'**
42:20

**stuff**  13:16
27:24
37:20  41:2
59:1
73:17,25
101:25

**subject**  6:23

**subjective**
55:14  56:5
60:25
61:16
62:7,21
63:19

**submit**
119:25

**submitted**
120:7

**subordinate**
124:22

**substance**
146:15

**substantiated**
98:24  99:1

**success**  65:4
102:15,16

**successful**
67:24

**suicide**
105:23
108:12

**summer**  85:2

**Summit**  66:17
67:19

**supervise**
102:13

**supervised**
58:1

**supervising**
27:7  30:19

**supervisor**
39:16  55:3
57:24
96:16,18
97:10

**supervisors.'**
125:4

**support**
56:21
124:22
128:8,19

**supposed**
115:21

**supposedly**
90:5

**surprised**
121:19

**surrounding**
9:9  19:21
86:9

**suspend**

126:22
127:3
151:23
154:3

**swear**  5:4

**switch**  38:22

**switched**
92:6

**sworn**  5:13

**sympathetic**
40:10

**system**  5:20
13:8,11
19:24
36:20
37:22
42:24  58:9
60:14  67:2
123:13
135:10
145:19
148:4

**Systems**
65:22

---
**T**
---

**tab**  90:13

**tabbed**  75:25

**table**  18:20
19:4

**tables**  19:5

**tailgate**
11:19,22,

24

**takes**  68:7

**taking**  43:16
52:13  64:2
116:16,18

**talk**  13:4
21:12,19
24:15,22
25:24
27:14
33:17
34:3,11
35:15  36:3
42:19
47:20  77:6
91:20
107:13,24
108:2,17,
20  112:8
115:9
119:16
127:15
133:24
137:24
138:2
139:11,16
140:5,6
141:5,19,
21  147:4

**talked**  27:13
62:5,10
69:3
101:23
106:5,10,
18  107:21
114:4
128:22

133:22,25
134:1,2,3
150:12,20,
21 153:23
155:17

**talking** 15:3
32:22 33:4
34:25
36:12
39:11 41:9
42:14,16
46:9 47:13
52:5 56:17
57:3 59:19
65:12
67:17
69:5,6
72:12
92:15
99:24
110:23,25
114:9
118:25
119:19
123:14
136:21

**talks** 35:12

**tangent** 26:2

**target** 42:5
83:22
85:21
122:20
149:22

**targeted**
115:7,8
119:14,15

120:15

**tasks** 56:22
58:2,11
73:23

**taught** 53:8,
11,13,15
69:14
117:25

**Taylor** 80:3
81:8

**TCSG** 13:12
49:15
50:14
59:20
64:10 66:1
69:6,19,21
135:21
137:20

**TCSGS** 59:23
60:11
135:12,13,
15

**teach** 17:4
26:9 61:24
126:7
133:9
149:5

**teacher**
118:19
133:7,9

**teaches**
40:17

**teaching**
63:25

**team** 27:7,
8,16 28:1

**tears** 107:8

**Tech** 49:14
50:14,25
51:3,9
52:6 53:1
61:21
63:3,6,9,
12,14,15
64:13

**technical**
13:11
19:24
21:24 34:9
45:3,6,9
46:20
48:16,24
60:17
65:22
68:9,16
133:4,12,
14 135:9
136:19

**Tee** 39:16,
20 96:19,
22 103:22
104:6
118:11,12
119:21,22
123:15
129:7,24
130:4,7
137:6,9
138:16
139:1,3,5,
9,11

141:19
142:2,5,7,
8,11,12,
13,20,22

**teeth**
131:16,24

**telling**
38:23 79:2
105:18
113:18
119:21
137:12

**tells** 122:5

**temporarily**
22:17

**temporary**
101:18

**ten** 106:2
112:2
151:22

**Tennessee**
86:15

**terminated**
95:20
96:2,10,13
100:5
121:6

**terminating**
100:3

**termination**
35:14 87:5
99:14

**Terms** 90:17

**terrible**
  35:21

**territories**
  18:16

**territory**
  19:8 21:10

**test**  75:13
  130:21
  131:9

**testified**
  5:13 31:9
  55:4 100:1

**testimony**
  5:5

**text**  142:7

**texted**  125:6

**texts**  73:16

**Thanksgiving**
  32:11

**theory**  88:4

**thing**  18:11
  57:15 63:9
  67:1 80:3
  81:3
  105:12
  131:19
  138:1
  147:14
  152:20

**things**  16:6
  20:17,19
  30:22
  34:16
  54:7,20

57:7
71:17,24
72:2,5,8
75:6
106:25
107:3
114:24
116:16
125:13
136:7
150:4

**thinking**
  54:13
  98:21

**thought**
  46:15 52:9
  62:5
  121:17

**thousand**
  45:13

**Thursday**
  40:16

**ticked**  151:5

**tie**  60:12

**tied**  73:8

**tier**  65:9

**ties**  58:5

**til**  70:25
  126:22

**time**  7:11
  18:7 26:20
  27:1 28:3
  33:6
  36:17,24

37:6 38:11
39:16 41:3
49:20
77:19
82:18,21
83:16
85:13,18,
23 92:2
100:15
101:15,24
102:5
103:22
106:7
107:4
108:18
121:4,6,7,
8 126:12
127:20
128:2
129:17
149:20
153:10
154:4

**times**  21:21
  38:21
  57:17,18
  84:21
  116:13
  131:18

**Tina**  140:9

**title**  10:4
  14:10
  97:19 98:6
  99:3
  102:18
  105:6,10
  114:1

119:2
121:23,25
124:15
129:6
130:19
144:11

**titled**  41:24

**today**  7:20,
  22 8:7,10
  19:18
  127:23

**told**  36:2
  43:3 71:9
  84:4 93:12
  97:10
  113:12
  118:5
  119:25
  120:8,19
  121:2,24,
  25 123:4
  124:23
  125:19
  130:6,8
  131:8,11,
  12 134:20
  138:18,20,
  21,23,24
  139:1,7,9

**top**  30:23
  65:9

**topic**  113:22

**total**  47:19
  81:19

**totally**  36:4
  56:4 76:14

155:22

tour 19:10,
  23,25
  26:23

tours 26:21
  27:13
  28:17,18
  30:17
  73:24
  74:2,3

track 92:22

tracked
  92:12,16,
  18,20,22

tracks 93:25

trained
  21:16
  34:10

trains 22:13

transcript
  7:19
  123:11

transcripts
  71:20
  141:11

transfer
  17:11
  27:6,16
  28:8 47:1
  48:8 59:16
  63:12
  106:12
  128:20

transferred

47:9

transferring
  37:6

transitions
  125:2

traveling
  19:13

Travis 9:14

trial 7:11

trickled
  122:18

Trips
  151:11,12

troubleshoot
  28:10

troubleshootin
g 28:4

truth 5:6,7
  122:5

Tuesday
  40:16

tuition
  86:8,14

turn 76:21
  79:19 87:8
  90:12,13
  95:18
  104:23
  124:9
  137:16
  145:10

turned
  142:9,13

turning
  136:13

turnover
  23:1 76:22

two-fold
  19:6

two-sided
  17:22

two-year
  44:14 45:3

Twofold
  149:18

Tyler 72:19

type 73:17
  115:15
  132:24
  148:5

typed 155:19

types 44:25

typically
  12:12,13
  19:20
  22:14,18
  28:11 59:9
  61:23
  68:14,16
  73:24
  84:13
  92:23
  106:1,9

typing
  115:22

typos 115:23

———————

U

UGA 44:15
  60:25
  61:8,14
  62:4,6,24
  63:17

Uh-huh 8:22
  24:8 45:20
  68:2 73:7
  77:3 78:4,
  9 100:9
  127:24
  149:23

ultimate
  117:1

understand
  16:5 18:8
  70:18
  153:21

understanding
  135:3
  137:22
  146:2
  151:1

unfilled
  85:22
  100:7
  101:15
  102:5

United 5:23

university
  5:20,22
  10:7 13:8
  19:24

44:10,12,
13 60:14
67:1 99:2,
4 135:7
136:18
143:9

unsettled
114:7,13

unusual
21:18

Upchurch
139:21,24

upload  36:21

upper  51:15

upping  150:5

upset  106:5,
21 108:6,
8,11,12,14
114:11
120:10

USG  13:3,4
66:17,21
67:18 69:6
143:9

USGS  60:11

───────────
V
───────────

V-A-L-W-O-O-D
53:21

Valdosta
5:21,25
6:9 9:8
10:7 13:6
18:18

25:2,12,14
44:8 66:6,
8 135:7
140:17

valley  57:18

Valwood
53:11,15,
20,21
63:23 64:1
148:21,22,
25 149:1,5

vary  68:7

Venn  71:4

verbatim
45:17

versus  5:20
40:11 45:2
54:11
76:11,14
77:5 133:4
141:7
149:14,21
151:2

Vice  102:16

view  63:18

vigor  65:12
141:17

violation
99:3

vision  75:13
134:25
135:4

visit  26:22
140:14

vocalize
7:15

vocalizing
91:12

Volume  155:2

volunteer
10:19 74:3

VSU  10:9,14
11:12,15
14:5 19:4
20:14,16
24:3,7
25:16,17
34:3 44:5,
19,21
47:17
48:14,15,
18 50:15,
23 52:20
59:23
60:21,22
61:2 63:14
65:14 70:7
74:9 92:5
95:7 101:7
117:9,11
134:25
135:4,12,
15,20
136:1
147:1,16

───────────
W
───────────

wait  24:23,
24 82:11
84:14

85:12
95:24
125:2,11

waive  7:20
86:8,14
155:21

waiving
155:14

walk  102:21

walked  111:9
112:6

Walker
139:16

Walter  17:7

wane  84:21

wanted
39:17,19
58:8 69:7
84:4 91:22
98:21
99:18
105:11
125:11,14
142:4
143:5

wanting
65:8,20
132:22
152:5

waste  52:21

wasted  43:17

wasting
52:22

**JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA**
Lisa Long on 01/21/2022                    Index: web..yesterday

web   74:9

website   70:7

Wednesday
  40:16

week   40:14
  125:5
  149:6

weekly   103:6

weeks   22:21
  108:24

weigh   63:1

well-oiled
  28:2

Wenham   66:16

wife   123:12

Willis   23:6
  29:8  75:22

willy-nilly
  116:19

Wilson   9:22

wing   22:19

Wiregrass
  44:5
  60:22,24
  61:8
  63:24,25
  64:4
  117:7,12,
  13,17
  118:3
  133:7,9
  135:25
  140:6

149:2

Wiregrasses
  117:21

witnessed
  144:10

Wolfe   80:9

women   144:4

wondering
  119:1

word   19:16
  40:9 97:25
  122:11
  123:1

words   97:15,
  24 105:14
  143:23

work   10:23
  12:12,20
  13:5,18
  33:14
  38:15
  40:14
  43:24
  46:19
  51:12
  54:18,24
  58:12,13,
  15 71:3
  72:20,22
  74:16

worked   74:23
  105:24
  151:8

working   41:1

55:21
58:17
66:23
67:18
84:22
85:15
88:23
89:20
107:3
125:5

workload
  54:23
  56:23

works   28:9

world   74:18

worried
  123:21

worst   115:19

worth   79:4

wrap   154:14

write   97:10
  102:22
  119:21
  128:9
  137:10
  138:21
  139:2

written   87:2
  97:9
  114:1,19
  115:3
  119:23
  137:4
  138:18

wrong   89:17
  115:2
  118:21

wrote   60:14
  114:23
  115:24

———

Y
———

y'all   35:1,4

Yale   44:25
  117:7

year   25:3
  27:9 31:7
  34:24
  50:15
  78:20 83:8
  94:10,12
  104:14
  141:7

years   13:15
  14:6,9
  33:12
  35:21
  36:11 37:5
  45:14
  82:23
  83:2,13
  85:25
  86:13
  120:11
  123:12

yesterday
  31:10

**Z**

**Z-I-P-P-E-R-E-R**  6:8

**zip**  66:9,10

**Zipperer**  6:8

**Zoom**  54:6
  55:9
  153:24