**JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA**
**Ryan Hogan on 01/19/2022**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION


CASE NO.:  7:21CV62 (WLS)


JAMIE T. BIRD,

                Plaintiff,
vs.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA
d/b/a VALDOSTA STATE UNIVERSITY,

                Defendant.
_____/


DEPOSITION OF

RYAN HOGAN


Wednesday, January 19, 2022
8:32 a.m. - 12:02 p.m.




Valdosta State University
1500 North Patterson Street
Valdosta, Georgia 31698


Stenographically reported by:
KAIRISA J. MAGEE, RPR, GCCR (Georgia), FLORIDA
NOTARY



Job No. : 378316

APPEARANCES:


On behalf of Plaintiff:

    LAWSON, BECK, & SANDLIN, LLC
    1125 Commerce Drive
    Suite 300
    Peachtree City, Georgia 30269
    (770) 486-8949
    BY:  HOLLY MAESTAS, ESQ.
    holly@lawsonandbeck.com


On behalf of Defendant:

    BROWN, READDICK, BUMGARTNER, CARTER,
    STRICKLAND & WATKINS
    5 Glynn Avenue
    Brunswick, GA 31520
    (912) 264-8544
    BY:  G. TODD CARTER, ESQ.
    tcarter@brbcsw.com
    and
    VALDOSTA STATE UNIVERSITY
    OFFICE OF LEGAL AFFAIRS
    1500 N Patterson Street
    Valdosta, GA 31698
    (229) 333-5351
    BY:  JUSTIN ARRINGTON, ESQ.
    juarrington@valdosta.edu


ALSO PRESENT:  Ms. Jamie T. Bird, Plaintiff

I N D E X

Proceedings                                                    Page

TESTIMONY OF MR. RYAN HOGAN:

Direct Examination By Ms. Maestas                                6
Cross-Examination By Mr. Carter                                176


Certificate of Oath                                            179
Certificate of Reporter                                        180
Errata Sheet                                                   181
Notification Letter                                            182


E X H I B I T S

No.                                                           Page

Plaintiff's Marked Exhibits

19        Valdosta virtual dual enrollment                      70
          flipbook

20        USG System Board of Regents website                  74
          PowerPoint presentation

21        University System of Georgia                          77
          Freshman Admission Requirements

23        6/25/2019, Email from Sarah Wenham                   83
          to Jamie T. Bird

24        Summit 2019, Goal of Working Lunch                   89
          Sparking Conversations!

46        8/24/2020, Letter from Ms.                          102
          Boddie-LaVan to VSU Office of Legal
          Affairs and documentation,
          "Subject:  VSU Response to Jamie
          Bird Application for Discretionary
          Review"

17        Valdosta website printout of                        107
          admissions staff

E X H I B I T S

Continued

No.                                                             Page
18        Valdosta website printout "Meet            113
          Your Counselor" page

7         USG Reduction in Force, Frequently         119
          Asked Questions

30        9/30/2020, notes from Janice Lyn,          121
          Title IX investigator

31        10/1/2020, notes from Janice Lyn,          130
          Title IX investigator

29        9/30/2020, notes from Janice Lyn,          133
          Title IX investigator for Lisa Long
          interview

44A       2/4/2020, Email from Dr. Carr             138

44B       4/7/2020, Email chain from Robert         139
          Freidhoff to Jamie T. Bird

41        2/26/2019, Email from Jamie T. Bird       140

42        2/27/2019, Email chain from Jamie         151
          T. Bird to Sarah E Bessenger

43        3/5/2019, Memo to File from Tee           155
          Mitchell to Jamie Bird

11        Retention of Dual Enrollment              157
          Students, Fall 2015 - 2019 printout

14        Positions listing chart                   159.

47        11/16/2021, ABAC documents                166

49        Valdosta job posting                      172

Proceedings began at 8:32 a.m.:

THE COURT REPORTER:  When you're ready, will you raise your right hand, please?

Do you solemnly swear or affirm that the testimony you are about to give in this cause will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

MS. MAESTAS:  Good morning.  My name is Holly Maestas.  I represent Jaime Bird.  This is the matter of Jamie T. Bird -- Jamie T. Bird versus Board of Regents for the University System of Georgia, doing business as Valdosta State University, Case No. 7-21-CV-62 pending in the United States District Court of the Middle District of Georgia, Valdosta Division.

This is the deposition of Ryan Hogan.  It is being taken pursuant to notice and agreement of counsel.  This is a deposition of an employee of the defendant, and this party is being deposed in that capacity and also as a non-party.

Thereupon:

                    RYAN HOGAN,

a witness named in the notice heretofore filed,

being of lawful age and having been first duly

sworn, testified under oath as follows:

                    DIRECT EXAMINATION

BY MS. MAESTAS:

     Q    Did you receive a copy of your notice of

deposition through counsel?

     A    I did.

     Q    Okay.  Did you bring any documents with

you today?

     A    I did not.  There was a request for some

that I sent over to Justin through our Institutional

Research Department right before our meeting.

     Q    Okay.  And did you independently review

the notice of deposition and look for your own

records?

     A    That was the only records request in

there, in the deposition that I just got this

morning.

     Q    Oh, you received it just this morning?

     A    The request for the information was this

morning.

     Q    Okay.  So the notice of deposition -- I'm

handing you a copy of the notice of deposition, if you could just take a look at it.  And this is what has been previously provided to the court reporter, Notice of Deposition of Ryan Hogan and Notice to Produce.

A     This is the first time I've seen it.

MS. MAESTAS:  So let the record reflect that I've handed the witness a copy of the Notice of Deposition of Employee of Defendant Ryan Hogan and Notice to Produce, which has a list of items that he was requested to produce today, which includes enrollment records, dual enrollment records, and retention records from 2015 to the present broken down by year and that he is just seeing this for the first time this morning.

If you could check your records in your department and make sure that I get those, and you can give them to Mr. Carter who represents -- who's the attorney of record for the institution.

Objections, except to the form of the question and responsiveness of the answer, will be reserved until the time of trial or the time of hearing.  This deposition is being taken

stenographically.  Please vocalize all of your responses, and avoid gestures, which cannot be reported.

You have the right to read a copy of your deposition scr- -- deposition transcript, and than after signing it -- or sorry.  And then after reading it, you have the option to sign it, or you may waive that right today.  Please so indicate to the court reporter before you leave today, if you intend to read and sign.

BY MS. MAESTAS:

Q    **If you could state your name for the record.  Your full name.**

A    Ryan Michael Hogan.

Q    **Okay.  And are you known by any other names?**

A    I'm not.

Q    **And -- and what is your address?**

A    My address is 1413 William Street, Valdosta, Georgia 31602.

MS. MAESTAS:  Okay.  And before we go into your deposition, I want to put on the record, this is -- so we're just going to take a segue to -- there was a -- another notice of deposition, a notice of a 30(b)(6) deposition

of a Defendant, Board of Regents of the University System of Georgia, doing business as Valdosta State, and notice to produce.

A 30(b)(6) is an institutional deposition, and I requested employees to be designated regarding the following:  "The reduction in force alleged as the reason for termination of the plaintiff, and the Carl Vinson [ph] Institute of Government CVIOG report issued in and around 2019 at defendant, particularly related to VSU admissions and dual enrollment."

And I said, "Please have designees brought for today and days to follow."

Counsel and I discussed this, and he has indicated that -- Mr. Carter has indicated that there are no other witnesses other than the ones that we have placed on the schedule to be deposed today and the next few days, which are Ryan Hogan, Rodney Carr, Richard Carvajal, Rob Freidhoff, Donna Sewall, Lisa Long, and Jeanine Boddie-Lavan that would be designated witnesses for the 30(b)(6).  If that changes through the course of the depositions, if Mr. Carter could let me know.

MR. CARTER:  Sure will.

BY MS. MAESTAS:

Q    Okay.  Back to Mr. Hogan.  Thank you for that brief segue.

Have you ever had your deposition taken before?

A    I have not.

Q    And what did you do to prepare for today?

A    I read over the materials that I was sent.

Q    And what were those materials?

A    The Notice of Deposition, and then there was some information -- get -- sent to -- how to prepare for the deposition.

Q    Okay.  When did you receive that?

A    Yesterday.

Q    Okay.  So you said that you received a notice of deposition this morning.  So did you mean -- did you misspeak and mean last night?

A    When I indicated a notice of deposition, there was an email sent saying that I was going to be deposed on certain days, and that's what I meant by notice of deposition.

Q    Okay.  Just an email that you -- like, of the date and the time?

A    Correct.

Q    Okay.  Okay.

And did that come from Mr. Carter, or did it come from someone else?

A   It did not.  It came from our director of human resources Mrs. Boddie-LaVan.

Q   Okay.  And did you -- did you meet with anybody to prepare for your deposition?

A   I did not.

Q   Okay.  And anytime I ask questions like that, I'm not asking for anything that's privileged between you and your attorney.  I am asking for meetings that are not privileged.

A   I understand.

Q   Okay.  They wouldn't be privileged if you're having a meeting between you and HR, or president, or an employee who's not your lawyer.

MS. MAESTAS:  All right.  And little -- another brief segue -- Mr. Justin Arrington is in the room.  And he is -- what is your position?

MR. ARRINGTON:  Chief legal affairs officer.

MS. MAESTAS:  Okay.  And your current -- I think there was someone else who was interim. Or ...

MR. ARRINGTON:  Yes.  Interim at the time.

of ... at Which time?  I'm sorry.

MS. MAESTAS:  Like, right now.

MR. ARRINGTON:  Oh, right now?  Yeah.  I'm the permanent.

MS. MAESTAS:  So you're -- you are.  Is there another attorney who's the interim University counsel?

MR. ARRINGTON:  No.

MS. MAESTAS:  Okay.  Jaime, did you say that there was someone else that there might be an --

MS. BIRD:  Well, Davis was the one.  He was the attorney that has signed a lot of the information, and then I think Justin, maybe, worked along side of him.  And then Mr. Davis retired.  And then I was under the impression that --

MS. MAESTAS:  Is there a Mr. Davis?

MR. ARRINGTON:  He's retired.

MS. MAESTAS:  Okay.  And when did you -- when did you become your -- personnel at the University counsel?

MR. ARRINGTON:  2020.  August of 2020.

MS. MAESTAS:  August of 2020?  Okay.

Are you going to be a witness in any of

this at trial or any deposition?

MR. ARRINGTON:  No.

MR. CARTER:  [Indiscernible.]

THE COURT REPORTER:  I'm sorry.  I didn't hear you.

MR. CARTER:  I said no.  I talked to him. He is not going to be a witness.

MS. MAESTAS:  Okay.  In anticipation of Mr. Arrington not being a witness, I will not object to his presence under the rule of sequestration.

Thank you for that brief segue.

BY MS. MAESTAS:

Q    Back to Mr. Hogan.  Thank you.  Do you keep a file related to this lawsuit?

A    I do not.

Q    Okay.  Do you have a file on Jamie Bird or anything that you've maintained?

A    I do not.

Q    Okay.  Have you -- did you meet with any other -- so you heard a list of witnesses.  Have you met with any of those people in preparation for your deposition?

A    I've not.

Q    Okay.  Are you on any medications or drugs

that would affect your memory or ability to participate in a deposition, which is a Q-and-A style type of question and answer?

A    I am not.

Q    Okay.  And do you have relatives in the state of Georgia?

A    Yes.

Q    How many?  Sounds like that could be a lot.

A    I mean -- please define relative.

Q    So --

A    Mom?  Dad?  Brother?  Sister?  Or are we talking grandma?  Cousin?  All that stuff?

Q    About how many would that group entail? Like, 30 or 50?  20?  Less than 20?

A    I would say in -- can you define in the area?  Is that what you said?  State of Georgia?

Q    So, like, jury pool for --

A    Oh.

Q    -- the Middle District of Georgia, is kind of what I'm looking for.

A    Less than 50.

Q    Okay.  And are they related all by blood and marriage?  Is that --

A    Blood or marriage.

Q    Okay.  And I'm trying to think of how many we want to get to for the sake of time, but -- so where are they all -- are they living, like, in south Georgia or middle Georgia area?

A    Yes.

Q    Like, Macon?

A    Yes.

Q    Okay.  What about just in Valdosta?  Let's kind of --

A    Just in Valdosta alone?  10 to 15.

Q    Okay.  Who are they?

A    My wife.  I have --

Q    What's her name?

A    Micha'el Hogan.

Q    And how do you spell hat?

A    It's -- her legal name is Micha'el.  So Micha apostrophe e-l, "Michael" with an apostrophe, Hogan, H-o-g-a-n.

I have an aunt, Patricia Schiver, who's -- who is here in Valdosta.  Cousin Wade Schiver, who is in Valdosta.  Cousin Savannah Roberts, here in Valdosta.  Cousin Madison Roberts, here in Valdosta, and then Cousin Lee Roberts, who is here in Valdosta.

Q    Okay.

A     That's -- that's --

**Q     Those are the closest --**

A     Close.

**Q     -- ones?**

A     That's right.

**Q     Okay.  I'm not going to go into all 50 for the sake of time.**

**Okay.  And have you ever been a party to a lawsuit, meaning, like, you were the person sued or you were the person that sued someone else?**

A     I have not.

**Q     Okay.  All right.**

**What's your current title?**

A     My currently title is Director of Admission.

**Q     All right.  And do you have any other positions of employment with the University right now?**

A     I do not.

**Q     What about other involvements in the University?  Such as, like, you know, you coach the -- a team or, you know, volunteer.**

A     I teach spin classes at the student recreation center once a week.

**Q     Okay.  And what about other things that**

occupy your time on a regular basis?

    A    I teach spin classes at a studio up by Big Lots.

    Q    Okay.

    A    Three to four times a week.

    Q    What about at the university level?

    A    Nothing at the University.

    Q    What about --

    A    I mean, there's committees and things like that, but --

    Q    Tell me about those committees.

    A    I mean, the regular committees, that one would be on in my position, so hiring committees -- search committees, better term for that -- you know, special projects and initiative-type committees that we have to work on when we're working on different projects.  For example, the online college that was just launched last year, I'm on the committee for that.  So my position requires being on -- serving on a -- quite a number of committees.

    Q    Okay.  Do you serve on any of those committees with Carvajal, Freidhoff, Long, or Boddie-LaVan?

    A    Carr and Freidhoff, I do, just because they're within our division.  And so the online

college, especially, is one that we work closely on.

Q    Okay.

A    In a team environment too.  There's many others part of that.

Q    And does that have to do with -- like, tell me about hiring committees that you serve on.

A    So, you know, for example, one that I just -- I just chaired a search committee for a assistant -- associate director of housing and resident life.  So I chaired that search committee and was part of that.

Q    And who was on that committee?

A    Someone from our communications office.  Someone -- do you need specific names?

Q    Yeah.  Go ahead and say names.

A    Okay. Robin Spain, from our communications office.  Shannon McGee, from our finance and administration.  Allen Row, our chief of police office, was on that committee.  And then there was a graduate assistant whose name is escaping me at the moment.  And I believe that's -- that's it, but I chaired that search committee.

Q    Okay. Any other search committees you've recently served on?

A    We've recently hired an assistant director

of admissions.  I didn't serve -- I mean, I was on the search committee, but our housing residents life director, Dr. Chu, was the one who chaired that search committee.

Q    Can you spell that?

A    His name, Dr. Chu, C-h-u.

Q    Who else was on that committee?

A    There were Robert Spain, from our community casings unit, Rebecca Taylor, from our -- she's overseeing a couple areas now but most notably testing and access office, those sort of things.  We had Jaylin Smith, who is our student government president who is part of that, and then that's all I believe I can remember at this moment.

Q    What about Carr, Carvajal, Boddie-LaVan, and Michelle Jordan?

A    Michelle Jordan, yes.

Q    Okay.

A    Michelle Jordan from human resources.

Q    Okay.

A    And Carr, Carvajal, no.

Q    Okay.  Were any of those members removed from the committee in any capacity for any reason?

A    Michelle Jordan resigned from her position.

Q    Why did she resign?

A    I have no -- I'm not privy to that information.

Q    Did she resign during the position or --

A    During the search.

Q    -- sorry.  Yeah.

A    During the -- she did during the search.

Q    Okay.  So did she make any votes or anything like that?

A    Not that I'm aware of.  I didn't -- I wasn't apart of that search committee.

Q    What about Lisa Long?

A    She was on the search committee.

Q    Okay.  And did she make any decisions, or have to resign, or ...

A    I'm not -- she was removed from the search committee.

Q    Why was she removed?

A    I'm not aware of that at this time.

Q    Who would know about?

A    Our human resource department.

Q    Janene ...

A    I can't answer that.

Q    All right.  What is your degree in your -- the field that you have your degree in?

A     My degree -- my bachelor's degree is in business, and then my master's degree is in higher education leadership.

Q     Okay.  A masters.  Are in your doctorate program?

A     No, I am not.

Q     Do you have any involvement with the USG?  Officially?  Unofficially?  Like -- and I mean, not like, oh I'm -- I work at VSU.

A     Sure.

Q     But, like, officially do you have any committees that you're a part of?  Do you go up to the Board of Regents?

A     I don't go to the Board of Regents.  However, given that position, I am part of an organization called RACRA, R-A-C-R-A, which is an organization of all the admissions and registrars within the state.  And we convene typically once a month.  For meetings and things like that.

Q     Who's on those meetings with you?

A     It's not just me.  It's all the registrar and admissions people from across the state.

Q     Who's from VSU with you?

A     Typically it's me.  Maybe some members from the registrar's office, sometimes my associate

director.  Jamie's gone in the past to those as well, too, just because they're -- when dual enrollment was first coming about, there wasn't really an organization for dual enrollment.

And so, they would -- dual enrollment -- so Jamie would come to those sometimes.

Q    Okay.  And you just said there wasn't an organization for dual enrollment. What --

A    Not specifically.  So we -- in the University system, there are different, I think they're called racks, which is just organizations. So student affairs has one.  The registrar and admissions folks have one, that sort of thing.

And at the time --

Q    What year?

A    Sorry.

Q    You said at the time.

A    At the time --

Q    So what year?

A    -- 2015 to even present.  It's -- there are -- issues related to dual enrollment are brought up in some of the admissions conversations.

Q    Okay.  Who's talking about those things?

A    Who's specifically leading those?

Q    Yeah.  Like, who -- yeah.  Who is saying,

hey, let's make this change with the -- and make a DE rack?

A    Oh, I -- that would be system level --

Q    Okay.  Do you know who that person is?

A    I do not.

Q    Sarah Wenham?

A    I do not.

Q    Okay.  Anybody from VSU making that decision?

A    No.

Q    Okay.  All right.

What about the Technical College System of Georgia, TCSG?  Have you any affiliation with them?

A    No affiliation.  I mean, obviously we work together because we admit students from those schools, but no direct affiliation.

Q    Who do you admit?  Like, where are they going to?  If they're being admitted from the TCSG?  Where are they being admitted?

A    To the -- to Valdosta State.

Q    At what level?

A    Depends on the number of credits a student has.  So if the student has more than 30 hours of transfer credits, we might admit them as a transfer student.  It's a case-by-case situation when we're

evaluating the student.

Q    Okay.  What about, like, an associate's degree?  If they have that?

A    It depends.  There are certain articulation agreements with the technical schools that recognize some associate's degrees from some schools.  And those could be admitted.

We would admit those students -- let me clarify.  We will admit those students, but depending on the number of credits that student would get would determine based on the articulation agreement.

Q    Okay.  So if they're coming in from a TCSG, they're having 30-plus hours of credit or possibly an associate's degree?

A    And a GPA of at least a 2.0.  The GPA is really the most determining factor in that.

Q    Okay.  Okay.

Anybody else coming over?

A    From technical schools?  I mean, there could be students with less than 30 hours.  And that's when, you know, we would look at SAT and Act scores and things like that because we admit students, typically, one of two ways, either as a freshman or a transfer student, freshman student,

meaning they don't have at least 30 hours of transfer credits; transfer student, meaning they have at least 30 hours.

Q    Okay.  And when you say a "freshman," you mean they're coming in as their freshman undergrad year at --

A    Meaning that it's been less than five years since they graduated high school, and they have at least 30 hours -- they have less than 30 hours of transfer credit.

Q    Okay.  And then a transfer would be, like, an upper classman?

A    Someone with more than 30 hours of transfer over credits.

Q    Okay.  And if the high school graduate or less than five -- in less that five years.

A    Correct --

Q    Less than five years --

A    -- so if you -- and this sometimes happens where a student might take a gap year from high school and not attend any college whatsoever.  We would admit that student, or any student less than five years, we would admit that student as a freshman student, meaning they have to meet SAT scores, ACT scores, that sort of thing.

If it's over five years, we call that student a non-traditional student, which we require accuplacer exams and some other of that criteria.

Q    Okay.  Anybody else, besides a high school graduate and transfers of -- transfer students, coming in?

A    It's -- from TCSG it's rare, but there is a student category called transient.  So -- and this is from any school -- it's not just from a TCSG school -- is that if a student has permission from their home institution to come to our institution to take a course, we'll admit that student as a transient student, meaning that the student's not wanting to earn a degree with us.  They're just using that course to go back to their home institution to finish a degree there. So that's ...

Q    Okay.  But that would also be somebody whose graduated from high school or has 30-plus hours.

A    We do not look at that.  Essentially, the admission --

Q    But are they graduated from high school?

A    That' not something we look at.  What we're looking at is, does the student have permission from their home institution to come here.

Q    Could their home institution be a high school?

A    No.

Q    Okay.  So they're not in high school is what I'm trying to establish?

A    Well, what I am trying to clarify is:  We don't go verify that.  That would be on the TCSG or whatever school to verify that the student has met the admissions requirement for that institution.  That's not part of our process.

Q    Okay.  This is not a part of the official process, but it wouldn't be a high school student that's a transient?

A    Correct.

Q    Okay.  Anybody else coming over to VSU from a TCSG?

A    Not that I can think of.  That's all a different category --

Q    So you would never have, like, a TCSG student who's in dual enrollment at a TCSG then transferring over to VSU to dual enrollment as a high school student.

A    It's possible, but the student would have to meet our dual enrollment standard.

Q    Would that be a rare situation?

A    I wouldn't say "rare."

**Q    Okay.  Like, what would- --**

(Simultaneous cross-talk.)

A    I wouldn't say very common.  I would probably say somewhere in the middle of the road.  That is something -- it's seen.

**Q    So tell me about how that would occur.  If you would have --**

A    So if the student is -- and you know -- and we do see this.  And this is not specific to TCSG.  You know, the Georgia Military College is in town, and so sometimes when we would see a student who's still in high school, who took credits at GMC or took credits at TCSG, and then decided they wanted to come to VSU to take classes, that student will follow the same application process, whether or not they attended those schools or they did.  And they meet the same dual enrollment requirements.

**Q    Okay.  Would you ever have a student, who is enrolled at VSU dual enrollment, have them then transfer back to a TCSG for a dual enrollment?**

A    I would say that's -- that is definitely possible.  That's not something I personally saw, because when -- the admissions office, we see the students that are coming in the door.  We're not

tracking them if they stay enrolled, if that make sense.

Q    Okay.  Say that again.  You're not tracking them if they stay enrolled.  What do you mean --

A    So we're processing the new students that are coming in; right?  And so --

Q    So a new DE student --

A    Correct --

Q    -- or --

A    -- right, and whether that be --

THE COURT REPORTER:  I'm so sorry to interrupt --

THE WITNESS:  I'm sorry.

THE COURT REPORTER:  -- but I can not take two people speaking at the same time.

THE WITNESS:  I'm sorry.  Sorry.

THE COURT REPORTER:  That's okay.  Everyone forgets I'm here.

BY MS. MAESTAS:

Q    Okay.  So question was:  You said, "We're not keeping track of" -- I think it was some type of retention number.  What -- so that was what I wanted to ask you about, to continue on that.

We're about the DE student, VSU dual

enrollment students, and I said, "What happens when that dual enrollment -- or did they ever go back to a TCSG for dual enrollment when they're still in highschool?"

A   It is definitely possible.

Q   Okay. Why --

A   What I meant by "We don't track that" is that we, the office of admissions, are only focused on new students that are coming in, and -- but as I mentioned earlier, where we have students coming to us from TCSG or the private sector, it's quite possible that they've decided to come go -- leave us and go back to those schools, just because that's sort of the nature, especially for our area -- is that students would go to anyone, especially in our area, to one of the three dual enrollment programs.

Q   And what are those?

A   Georgia Military College, Valdosta State, Wiregrass.  I guess we -- since South Georgia State College is in town, that's something that could be, but I don't believe we see many dual enrollment students going there.  But that is a collage in town.

Q   So the most common institutions are VSU Dual Enrollment, Georgia Military College Dual

Enrollment, and Wiregrass?

     A     In my opinion, yes.

     Q     Okay.  And you're saying that once they're a dual enrollment student and then, for whatever reason, they leave, you don't track that number in admissions?

     A     (Shaking head.)

     Q     Okay.  And why don't you track it?

     A     That's more -- our job in admissions is to make sure that we are admitting students at the proper board standards and different things like that.  There is -- you know, we -- an advising team or retention team's obviously a dual enrollment area that we're looking toward those things of where the student goes, making sure they progress to graduation, those things.  Our role in admission is to make sure we admit the students and then make sure they transition to the proper department.

     Q     Okay.  So who's -- who's in charge of tracking retention of a dual -- like -- of tracking what happens after a dual enrollment student at VSU leaves?

     A     I mean, I would think that the dual enrollment area is lead on that, just because they're working with all the dual enrollment

students.

Q    What dual enrollment area?  That's not in your office?

A    It's not.  The dual enrollment has never reported to the office of admissions.

Q    I thought when Jamie Bird was under the office of admissions, she reported to you.

A    No to me.  She never reported to me.

Q    Okay.

A    She -- when Jaime was hired, she reported to Michelle, who was director of admissions at the time.  Sometime after he was named the director of admissions, he moved up into an enrollment management, associate vice president of enrollment management, and Jaime stayed reporting to him that way.  She and I reported to him together.

Q    Okay.  So who -- who oversees dual enrollment now?

A    Rob Freidhoff, is our advising and transitions -- or he's our --

Q    So it's totally separate from your office?

A    Correct.  Correct --

Q    Okay.

A    We --

MR. CARTER:  I was just going to tell you,

let him answer.  I mean, it seems a couple of times that he was trying to finish.

MS. MAESTAS:  Okay.

MR. CARTER:  And I don't want to you miss anything, but just --

MS. MAESTAS:  Yeah.  Sure.  Thank you.

A    And, again, when you say separate from our office, it's not separate in the sense of the function of the business.  It's separate in terms of a reporting structure, similarly to financial aid.

I don't directly oversee financial aid. However, I have to make sure that I code the student's residency status well on my side.  So when that student ends up in the financial aid area, it makes sense.

The dual enrollment is sort of the same thing.  We make sure that we admit the students in the correct way, and then once the students admitted, we let them work with the dual enrollment area to get enrolled in the classes and things like that.

Q    Okay.  So I guess we need to -- so all of the questions that we were talking about from the RACRA down to how you don't track what happens to a student after they're admitted, are --

A    May I clarify?

Q    **Yes.**

A    I didn't say that we don't track them after they're admitted.  You asked, what if they leave us.

Q    **Uh-huh --**

A    And I said that's not something we were looking at.

Q    **-- okay, okay.  Yeah.  Okay.**

**So I want to -- I wanted to clarify:  Are you also speaking for the time period that Jaime Bird worked there?**

A    Please clarify the question.

Q    **Okay.  'Cause it sounds like there was a major restructuring that happened after Tee Michelle and Jaime Bird departed?**

A    I -- there was a restructuring after Tee Mitchell --

Q    **Okay.**

A    -- left.  And some of the areas that were reported to him were restructured to other areas --

Q    **Okay.**

A    -- once he left.

Q    **Okay.  And so everything that you've been telling me this morning, that has to do with after**

Tee Mitchell's departure?  Or is it -- it applies to both?

A    I think what I'm speaking to is what -- the way dual enrollment is -- and you might have to be specific on everything that I've told you.  So, you know, some of the things that we've been talking about how dual enrollment students are admitted, that's been the process since before I got here --

Q    Okay, okay.

A    -- you know.

So there's always been rules and regulations and things like that about dual enrollment students.  Jamie was brought in, you know, that sorority of thing, and we as the admissions office helped train his or her on those things.  That's -- that's what I'm speaking to.

Q    Okay.

A    Now, I can't -- I never supervised Jamie, anything like that.  That's what your question is.

Q    Okay.  So everything that you have said applies to even before Tee Mitchell's time.  It's just that Jamie didn't report to you.

Is that kind of what you're saying?

A    I'm having trouble following.  So --

Q    Okay.  All right.  Well, let's --

MR. CARTER:  I was just going to say, if you wanted to clarify.  I mean, I think he just answers what he knows, but if you have a specific time period that you want to ask him, you know, specific questions about --

MS. MAESTAS:  Okay.

MR. CARTER:  -- it might be easier because --

BY MS. MAESTAS:

Q   So with what you are testifying to, is there a time period that it didn't apply?

A   Can you be specific on the question?

Q   Okay.  I'll have to --

A   I mean, I'd hate to go back through that --

Q   Yeah.

A   -- I just -- that's a --

Q   Yeah.  We'll have to go back and ask another way.  Okay.

All right.  So I want to talk about who you hang out with in the area, like, who are your friends?  Social group?

MR. CARTER:  That is just for jury information.

THE WITNESS:  Okay.  Okay.

BY MS. MAESTAS:

Q    So do you -- are you -- do you hang out with anybody who you work with?

A    Define "hang out."

Q    Get a beer after work, go walking, they come to your house, have parties, go to their house.

A    We typically -- I mean, I live here. Beside the stadium we'll typically have tailgates, and to be honest with you, no one from our office shows up because they usually have their own. So there will be sometimes that people from the University will come to those types of things, but that's about the extent of it.

Q    Okay. Does anybody who I've listed as going to be deposed on the next couple of days, Hog- -- you're Hogan. Carr, Carvajal, Freidhoff, Long, or Boddie-LaVon? Do they come to your tailgate parties?

A    No.

Q    What about coming over to your house? Go bowling with you?

A    No.

Q    Okay. How were you recruited to VSU? Like, who brought you on, or was it was just, like, a random application?

A    As a student or as a staff member?

Q    Staff member.

A    I was -- so I worked at the institution from 2001 to 2004 as a student orientation leader, and then when I got to my senior year, there was a position available, and I applied for it.  And Lisa Long was the associate director at the time, and she hired me for that position.

Q    Okay.  And how did you get promoted to the director of admissions?

A    Our director that was hired at the time, Tee Mitchell, was promoted into the Associate Vice-President of Enrollment Management.  And once he was put into that position, he appointed me into the director of admissions position.

Q    Okay.

A    I was an associate director before that point.  I want to clarify.

Q    Okay.  So maybe going into the -- some of the same stuff again, but -- so let's go back to the basics; so I can understand how it works in your office and how it's run.

What -- so I want to re-ask the question, but I think you've already answered it.  What is the main function of the office of admission?

A    Absolutely.  Our function is to admit students, qualified students, to the institution following the Board of Regents' policies and procedures.  The other main function is tuition classification purposes and then the transferability of credits.  So if at student is transferring from one institution to the next, we are the office that evaluates those credits and determine how those come to the institution and apply toward a student's degree.

Q    Okay.  And in answering that, you're talking not about dual enrollment students at all?

A    Dual enroll students are included in that -- any undergraduate students.  I should clarify.

Q    Okay.

A    Any undergrad students, meaning they have not earned a bachelor's degree, because our graduate school is separate.  So if you're applying for a master's, doctorate, something like that, that is with our graduate school.  We are focused on admitting all undergraduate students.

Q    All undergrad?  Okay.

A    So that includes post-bacc students -- so post-baccalaureate -- so a student has decided they

want to come back and earn a second degree -- dual enrolled students, transfer students, transient students, obviously beginning freshmen right out of high school.

Q    Okay.  So you said dual enrollment students.  Do you mean students are applying to become dual enrollment students at VSU?

A    Correct.

Q    Okay.  So the question was:  What is the function of admissions, and you said, all undergrad and dual enrollment --

A    Those are considered undergraduates because --

Q    Okay.

A    -- because they are not -- have not earned a graduate-level degree.  So we would say, any students -- and dual enrolled students, while we want them to stay here to pursue a grad- -- a undergraduate degree.  That's the category they're put in.

Q    Okay.  So earlier I got confused, because I thought you said that you do not handle dual enrollment in admissions, that that's handled by Rob Freidhoff.  So I'm confused because your saying the main function of admissions is to also handle dual

enrollment admission, but then you said Rob Freidhoff does that, not you.  So can you clarify?

A    Absolutely.  Once -- so it's sort of a joint effort at times.  So while we are not the ones always going out talking about the program and promoting it, we definitely do that.  The dual enrollment area will help with that as well too to go out and promote it, that sort of thing.

Sort of where the division of labor, if you will, is split up is -- once the student is admitted, then we hand that student over to the dual enrollment area.  And they help the student get registered for classes, different things like that.

Q    Okay.  So the dual enrollment area is under admissions?

A    The dual enrollment admissions process -- admitting a student as a dual enrollment student is a function of my department.

Q    Okay.

A    So the dual enrollment program itself of where it reports and things like that is in our advising and transition office.

Q    Okay.  And who oversees that?

A    Rob Freidhoff at this moment.

Q    Where did Jamie work?

A    At the time, Jamie was -- started with Tee.  When Tee left -- and then she moved under Rob Freidhoff.

**Q    Were those one in the same, before he left?**

THE COURT REPORTER:  I'm very sorry to interrupt.  May I silence my phone?  That might be a child.

(Short pause.)

A    May I ask to clarify the question?  When you said, were those position one in the same, between Tee Mitchell and Rob Freidhoff, is that what you're asking?

BY MS. MAESTAS:

**Q    I don't think so.  I think I was trying to figure out administratively.  So dual enrollment admissions and then dual enrollment after you were admitted?**

A    So think about it like this, if you will: So my office has many functions.  Like, one I just mentioned is the tuition classification.  The tuition classification drives every other piece of many parts of our campus, including financial aid.

So when financial aid takes -- a student calls and has a question about tuition

classification -- while it drives what funds the student qualifies for and things like that, they don't handle that function.  They point that student back to my office and say, Ryan, why did you classify this student this way?

Similarly with dual enrollment, when a student wanted to get admitted, that function lives within our office of admitting that student.  We coordinate with the dual enrollment areas similarly when we coordinate with financial aid -- this is just one example.  But we coordinate with them on those functions, but really what happens was, you know, the duel enrollment area was waiting on us in admissions to perform our function before they can do what's most important to a duel enrollment student, which is registering them for classes.

Does that help clarify?

Q    Yes, it does.  And what did Jamie handle? What was her job in that?

A    I don't know if I can speak to that, as I was not her supervisor, but I will say, as someone who worked with her on things, it was things like that, that -- you know, what are we waiting for to get this student admitted.  A student might come by and meet with Jamie at frist and say, I'm interested

in it.  Jamie might help that student pull up the application, help fill it out.  The student might turn the transcript in to Jamie, and then Jamie would turn that over to us.

Jamie never was part of the admitting part of the student.  That function lived over with us in admission, but, like, with many areas on our campus, we coordinated together to be able to perform that function because what Jamie and all dual enrollment people within the University system, they can't enroll a student until they've been accepted.  They have to meet the University system standards in order to be accepted.

Q    Okay?

MR. CARTER:  Let me get some coffee.  Five minutes.

(Recess 9:14 a.m. until 9:21 a.m.)

BY MS. MAESTAS:

Q    Okay.  Thank you.

I have a lot -- we had a little break there.  I have a lot better understanding of what you were saying about admissions, the tuition, classification, and then what happens after the student may be different than getting the student officially into the institution; okay?

A   Is there a question there?

Q   **Yeah, I mean --**

A   Sorry.

Q   **-- well, I'm going to go into it again. So I'm just kind of --**

A   Okay.

Q   **-- so if you hear me say anything that isn't correct, then by all means, speak up.**

A   Understood.

Q   **Okay.  And so befo- -- I got a little bit confused.  At the beginning we talked about -- we started talking about RACRA, and we got into how a student might transfer in to VSU dual enrollment from a TCSG.  I'm sorry.  No.**

**We just said transferring from a TCSG to VSU.  And you said that was 30-plus hours of credit as a transfer, and then you would look at the articulation agreement.  And then with -- if they had a GPA, GPA of 2.0 or higher, or if they had less than 30 hours, you would look at SAT, and -- sorry, did you say greater than 30 hours?**

A   I can clarify, 'cause there were some pieces of that that might not have been exactly ...

Q   **Okay.**

A   So students who live -- and let me break

it down this way.  This might be better.  Students typically come to us one of two ways, either as a freshman student, meaning it's been less than five years since they graduated high school or they're a recent graduate, and -- and they have less than 30 hours.  They must meet our freshman standards, which includes freshman index.  There's, you know, SAT/ACT, just to name some examples.

Q  And this is all admissions?  Not -- not -- I'm not doing enrollment admissions.  This is all admissions.

A  Correct.

Q  Okay.

A  Correct.  So -- and then there are transfer students.  Transfer students must have at least 30 hours of transferable credit, and I would clarify the transferable credit.  Just because if we are not able to -- if that school's not accredited and we're not able to have used that credit, that student would not meet the transfer standard.  So 30 hours of transferable credit and a 2.0 GPA, dually enrolled students are in their own category.

Q  Okay.  Let's talk about anybody who can transfer from a TCSG who's --

A  Yes.

Q    -- at a TCSG and then come to VSU for dual enrollment.

A    They must meet the dual enrollment standards.

Q    Okay.  And those are -- can you rattle them off quickly, or is it long?

A    No, no.  Not since the unlimited -- the SAT and ACT has been gone and changed.  Those are on our website.  It's a public record, you know.  All those requirements are listed on --

Q    Okay.

A    -- our website.

Q    They're higher standards.  Okay.  And so -- I'll -- well, I'll look those up.

Would it be -- what are the circumstances in which a student who would transfer from a TCSG, who is a dual enrolled student?  So we're talking about Wiregrass --

A    Mm-hmm.

Q    -- through GMC.  Then -- not GMC?

A    I'm sorry.  GMC is not a TCSG school. It's a private school.

Q    Right.  I don't know if it's a private --

A    It's a private school.

Q    -- it's a state agency, depending on what

case law you're looking at.

A    I'm not going to go there with -- but I know it's not a part of --

Q    If I were at TSG- -- TCSG and it's not a part of the USG.

A    Okay.  I just wanted to clarify TCSG --

Q    It's a state agency --

THE COURT REPORTER:  I'm sorry.

A    I got it.

BY MS. MAESTAS:

Q    It's a state agency, but different than a USG and the TCSG.  Okay.

A    Like, when you said TCSG like Wiregrass or GMC, that's why I just wanted to correct that.

Q    Okay.  Thank you for correcting me.

A    Sorry about that.

Q    No.  All right.

So people want to come -- I'm talking about students who are still in high school who want to come to VSU for dual enrollment and they're already at a TCSG in dual enrollment.  Why would -- what are the scenarios that you can think of that they would come over, and is that rare?  Is it common?

A    I think it's rather common, just

because -- I think it's important to point out some back story 'cause that -- the institution rate changed around the 2015 time -- please don't quote me on the exact time -- and the rate to come to a school like Valdosta State was significantly more versus --

Q    Okay.

A    -- a TCSG school.  There was some change in policy or whatever, and it leveled the playing field to where you could go to a Wiregrass or Valdosta State at the same cost.  So when you ask would a student come over, yes.  I mean, students could go back and forth because there wasn't much difference in the tuition cost, and there might be myriad of reasons on the why of that.

Maybe a class was offered at the time that worked better with the schedule, or if the school -- the Wiregrass was teaching that class in the school and the student didn't have to leave there.  Or in our case, we taught in the school system sometimes.

So there could be a myriad of reasons of why a student could come from Wiregrass over to Valdosta State or vice versa.  Does that answer your question?

Q    Yeah.

A    Okay.

Q    And if you had a student who was an active DE student at VSU, would you ever go to that student and say, you should go over to Wiregrass and do your DE there?

A    That would not be my decision, or my advice, even.  My role is to admit students that are applying to the institution.  I -- I'm not one to go to our students and tell them what school they should attend.

Q    But can you think of any scenario where you would see a student who was a DE student at VSU and say hey, you know, you're doing well here.  You know, you should go to Wiregrass instead?

A    That would not be something we in the office of admissions would say.  I would think that would be something from an advising standpoint or from the dual enrollment are.  That's not something --

Q    And in advising, what can you imagine -- what are those scenarios that they might say, hey, you know, you're a DE here at VSU you should do DE at Wiregrass?

A    I don't want to speculate because I don't work in advising.

Q    Okay.

A    I've never worked in advising.

Q    Would it -- would it be for academic failure, like they fall -- they're deficient in their SAP?

A    I don't want to speculate.  I --

Q    Do you know about -- what SAP is?

A    Yes.

Q    What is it?

A    Satisfactory Academic Progress.  It's a financial aid thing, but we don't give advice on those things.  That's an advising thing.

Q    And whose job would've -- would that have been?

A    The advising area or the dual enrollment areas, because the dual enrollment area acted sort of as advisers to the students.

Q    Can you name anybody that you know who that -- whose job it would have been to do --

A    Daniel Byrd.

Q    Okay.

A    Tara Messenger.

Q    Okay.

A    Megan Hancock at this point.

Q    What about Lisa Long?

A   She did dual enrollment at one point during her career.

Q   Okay.

A   Before -- when dual enrollment was rather small at Valdosta State, that was -- and before Lisa reported to me, that was a function of her position.

Q   Okay.

A   It was to help dual enrolled students, you know, get admitted, get registered for classes, things like that.

Q   So if somebody who was talking to a student who was dual enrolled at VSU and they said, Hey, you should you go to Wiregrass instead, wouldn't that reduce your numbers of retention at dual enrollment at VSU?

A   Obviously, yes.

Q   Okay.  Thank you.  I think it's obvious, too.  All right.

Okay.  And this is going to be first -- I'm asking this post-Tee Mitchell.  Who do you report to?

A   Rodney Carr.

Q   Okay.  What kind of regular meetings did you have?

A   We meet as a division.  So his direct

reports, every other week.  And then I meet with him every other week one-on-one.

Q    Okay.  And what do you talk about in those meetings?

A    Typically, strategies, things that we have -- we're -- we're working on, as far as efforts to, you know, get students admitted, get applications up, things like that, recruitment events.

Q    Okay.  And did -- what were the meetings like before Tee Mitchell?

A    Between --

Q    Who did you report to, and then what are the meetings before Tee Mitchell -- how did that go?

A    So let me clarify.  Are you --

Q    And were they any different also?

A    So let me clarify.  Are you asking what meetings were, like, between myself and Tee Mitchell, when I reported to him?

Q    Did you meet with Carr?  Did you meet with Carr and Mitchell, like, the -- the supervisory reporting meetings?

A    Before Tee Mitchell left, no, I never met with Dr. Carr.

Q    Okay.  What about Harbaugh?  Do you ever

meet with him?

A    I do not.

Q    Okay.

A    Let me clarify.  We might work on something.  Like, if I invite him to come speak at our open house or things like that.  I don't go to his office regularly for meetings about that sort of thing, but there might be something that we're working on where I invite him to those things.  So I don't -- I want to clarify.  It's not that I --

Q    Yeah.

A    -- don't have access or talk to him at all.  I do but not regularly whatsoever, if that answers your question.

Q    Yeah, and thank you for clarifying that.  I do mean a regular basis, not like there's a special event.

     Okay.  So I asked the question, what is the many function of admissions, and we got into admitting -- it was admitting students --

A    Mm-hmm.

Q    -- and that -- in that answer, you had also talked about DE admissions.

A    Mm-hmm.

Q    If I ask the question, what's the main

function of VSU dual enrollment, would that answer change?

          MR. CARTER:  What answer?  To --

BY MS. MAESTAS:

     Q     So again, I said, "what is the main function of VSU admissions," and you said to admit students --

     A     Mm-hmm.

     Q     -- then we broke down all the categories, and that also included dual enrollment admission.

     A     Mm-hmm.

     Q     If I ask the question, what is the main function of VSU dual enrollment --

     A     Mm-hmm.

     Q     -- would that answer change?

     A     It would not because, as I said earlier, the dual enrollment area does not admit students. That is the function of my department.

     Q     Okay.  Thank you.

          How many dual enrollment courses are available for high school students to take at VSU?

     A     I wouldn't know that.

     Q     Okay.  What grade levels can take classes --

     A     As a dual enrollment?

Q    -- at VSU?

A    So that is where there's been some clarification in the policy.  There's been some name changes with the program.  It's gone from joint enrollment to move-on-when-ready to joint enrollment to dual enrollment, that sort of thing.

So at this present moment, when we say the word "dual enrollment" we say that that -- that indicates that the student qualifies for the funding for the State of Georgia.  The policy for that is must be juniors or seniors or tenth graders could qualify for the funding that they have to meet Zelle Miller standards.  So there's specific -- specific criteria for that tenth grader to qualify for -- for the dual enrollment funding from the State of Georgia.

If a student does not qualify for that, that's when we -- at this moment, we call those students joint enrolled students.  So a ninth grader could do it.  A tenth grader could do dual joint enrollment.  And admissions criteria for both sets is the same.  The funding aspect is what changes.

So if the student is -- qualifies for the funding, we call that student dual enrollment.  That drives reports to other areas such as financial aid

and some thingies like that, but if it's joint enrollment, they're paying out of pocket and don't qualify for any of that.

Does that make sense?

Q    Uh-huh.

A    Okay.

Q    Do you know how -- who the professors are that teach VSU dual enrollment?

A    I -- I don't know.  I mean, I know the few that would call me if --

Q    Let's hear those.

A    Donna Sewell, Jay Rickman.  I can speculate on others, but I don't want to do --

Q    What about Robert Laplant?

MS. BIRD:  James.

MR. CARTER:  Would you ask her not to --

MS. BIRD:  I'm sorry.

MR. CARTER:  -- talk during the deposition, please?  And to quit with the nodding and the -- it makes my client nervous, I believe, to have her over there making gestures.  But go ahead.

BY MS. MAESTAS:

Q    Has my client made you feel nervous?

A    No.  I wouldn't say nervous.  I just think

I'm -- let's just move forward.

Q   Okay.  I've --

A   I do not know if Dr. Laplant taught in the program.  I can't answer that.

Q   Okay.  And -- and so, I just -- I wanted to ask, like, are -- are you okay with -- I don't know, it just sounds like you had a problem with my client.

A   I don't have a problem.

MR. CARTER:  I do.

MS. MAESTAS:  Okay.  He has a problem.  You're good.  All right.  I am not worried about Mr. Carter.  I'm just worried about the witness being comfortable.

MR. CARTER:  Well, she can't talk.  You know, if she wants to grimace --

MS. MAESTAS:  Yeah.

MR. CARTER:  -- I mean, it is a court proceeding we're in.

MS. BIRD:  I -- can I get clarification on what I'm doing, because I'm --

MR. CARTER:  You're nodding your head.  And I believe if we were in the courtroom, I'd ask the judge to --

MS. BIRD:  Oh --

MR. CARTER:  -- tell you to stop --

MS. BIRD:  -- I'm sorry.  I've never --

MR. CARTER:  It's all right.

MS. BIRD:  -- done this before.  I don't know.  I'm just --

MR. CARTER:  I understand.

MS. BIRD:  -- offering to him that what he's saying is correct, so ...

BY MS. MAESTAS:

Q   All right.  After you finish a dual enrollment course at VSU, what opti- -- what different options do you have?

Say you successfully complete one course.  What might happen to that student?  What are all the different ways they could go?

A   The student, obviously, could stay enrolled with us.  Once the student starts to graduate high school, we would want to hopefully encourage that student to continue on with us to earn a degree.

Q   A freshman or --

A   Correct.

Q   -- transfer?

A   As a freshman.

Q   Okay.

A    Right.  And those -- those were an example of things that Jamie and I would collaborate on --

Q    Okay.

A    -- is taking that student who is a dual enrollment student, getting the necessary final high school transcripts or whatever else we need to change them to what we call a continuing freshman, meaning, they have made the decision that they want to continue to finish their degree at Valdosta State.

Q    Okay.  What -- like, what was another common type of student who finished VSU DE and --

A    They might go to another school.

Q    So any school in the country, basically, that they qualified for admission and wanted to attend?

A    Depending on the admissions requirements, possibly.

Q    But as a -- as a category of students, basically, did they have unlimited potential to go -- I mean, based on their own background?

A    That would be up to the school that those students are applying for.  I don't think I could make a comment on that.

Q    Okay.  Would it be fair to say they have

lots of options?

            MR. CARTER:  You're talking about just a
      typical DE student?
BY MS. MAESTAS:

      Q    Yeah, any -- any student.  Any and all.

      A    I don't know if I would use the word
"lots."  You know, I mean, to me, I see they could
decide not to go to school; they continue to go to
another school; they continue to go to school with
us.  Those are the three that I can think of.

      Q    Or quit school?

      A    Yeah.  Go to another --

      Q    Get a job; work for their dad's
millionaire company.  Go to Oregon State, you know;
go to Florida State.

            You look confused.

      A    I mean, I just told you three options I
saw.

      Q    Yeah.

      A    Not continuing to go to school, go to
another school, or continue with us.

      Q    Okay.

      A    Those are the three that I see.

      Q    Okay.

      A    What they do past that, I mean, those are

the three.  If you're asking me what option do I see once the student finishes courses, those are the three that I see.

Q    Okay.  And was it Jamie's job to make sure that they stayed at VSU after they were --

A    Since I wasn't her supervisor, I don't know if I can answer what her job was.

Q    Okay.  So you don't know that?  You don't know the answer to that?

A    I would say not.

Q    Okay.  What about the person who handles Jamie's job now?  Is that their job to make sure that they come back to VSU and --

A    I wouldn't say -- I don't know if I could say what his job is.  I'm not his supervisor.

Q    Okay.  Okay.

So for a student who wants to attend VSU as a freshman --

A    Mm-hmm.

Q    -- regarding their dual enrollment path in high school, what advice would you give them?

A    So maybe you -- can you rephrase the question?

Q    A student who wants to attend VSU as a freshman and eventually graduate from VSU --

A    Okay.

Q    -- what advice would you give them for their dual enrollment education?

A    I don't know if I would give advice on dual enrollment.  We've been asked questions like, Do you take my credits from this?  But I don't know if we would be the one giving advice on what they should do with dual enrollment credits.  Our job in the admissions office is just to say will we take the credits from the school --

Q    Right.

A    -- you attended.

Q    Sorry.

So you don't take -- you don't do any advising?

A    Not -- no.  I mean, we are more or less focused on admitting students and then processing their transcripts for the schools that they've attended.

Q    Okay.  Would that have been Jamie's job to give?

A    I don't think I can comment on what Jamie's job was.

Q    Okay.  What did -- so you're saying you're not going to give any advice to anybody, you're just

admitting them.  You, like --

A    Well, I mean --

Q    -- take it and --

A    I'm sorry.

Q    -- you look at it.  You're admitted or not.  Well, what -- what -- what, I do if -- no, I can't do that.  You know, I'm only admitting you.  You don't give them any --

A    Not typically.  Not typically.  What our role in admission is, you know, to promote the programs that we offer.  So if you come to me and say, I'm interested in education.  Do you-all have an education program?  Our role in admission is to talk about the education program that we have.

We've been asked before, Well, what do you think about another school's, and we don't get into that.  We don't get into that.  We say, You go visit that school.  You go make the best decision for you.

Q    So if a student had questions about -- well, that question, you know, I want to go to VSU as a freshman undergrad.  What should I do as dual enrollment?  You say, Well, in admissions we can't, you know, we can't answer that.  Who would you send them to at VSU?

A    So I -- I don't know if we had students

saying, I'm interested in VSU.  I want to do dual enrollment.  I think my follow-up question to that is, Are you interested in our dual enrollment program?

Q    Okay.

A    And if so, we can talk about -- you know, I would send that student, you know, probably over to Jamie to let her talk about, you know, the -- the functions of her department and the different things that they do, that sort of thing.  I don't think -- if you're asking if a student came to us and said, I'm interested in the dual enrollment, I would say Don't come to us.  We wouldn't give advice on any matters like that, other than when a student shows interest in our institution it's our job to -- to give that student information about who we are.

Q    Okay.  What about students who are denied admission to VSU dual enrollment?  Any advice to them?  Anywhere you send them?

A    Yeah.  I -- we -- we'd want to point students towards a path that helps make them successful.  If a student is denied dual enrollment, typically it's because they don't meet the GPA requirements or test scores, things like that.  The advice we would give to that student is retry the

test, that sort of thing.

Q    At VSU?

A    Correct.

Q    Okay.  Would you ever send them to Wiregrass?

A    I -- I don't think so.  I mean, we might tell them if they want to explore their options, but if they're asking us questions about how to get admitted into VSU, we would give that student recommendation on how to get admitted.  And if they didn't meet our test standards, for example, we would say retake the test, those sort of things.

Q    Okay.  Do the state regulations for dual -- for dual -- sorry.

Do the state regulations the dual enrollment require counseling of high school students before they enter the DE program at VSU?

A    At this time, now, yes, they do.

Q    What do you mean "at this time"?

A    The -- when Jamie left, I got a little bit more involved with what the process was for that, and especially there was a change to the funding around that point to where the -- there's a system where the adviser has to go in and approve the course that the student's taking.  And then we, as

the institution, have to go in and approve, Yes, I registered that student for that course.  And then that's when the funding can start to take off.

Q    So you're saying only when Jamie was gone did the regulations require counseling?

A    I don't believe so.  I -- I can't answer what was done before that point, but once Jamie left, it was -- we worked closely with the counselors to make sure the funding got in place, and that's when I got involved and learning that. So I believe the counselors had to have a role in it.  How they did it, that sort of thing, I'm --

Q    Okay.

A    -- not aware.

Q    You just weren't aware of it?

A    I was not involved in the process.

Q    Okay.  So if I were to tell you the State regulations have required counseling for high school students wanting to enter DE program before Jamie was there and while she was there, you wouldn't have any evidence to dispute that?

MR. CARTER:  I think he answered that.  He said he wasn't involved with it.

MS. MAESTAS:  Okay.  I mean, I'd -- I'd ask for him to answer the questions, not

Mr. Carter.

A   I -- I will answer it.  And we -- that was not a function of our admissions office.  You know, what our function was, to admit the students, and then turn that student over to the dual enrollment area.

BY MS. MAESTAS:

Q   Okay.

A   So I -- I wouldn't have knowledge, but part of the functions of -- let me answer it this way.  This might help clarify.

Part of the functions of what we did in admissions was not get involved at the point of what a student needed to register for courses.  That was the dual enrollment area.  Once Jamie left and I got involved with that area of -- especially if there was a new system, that sort of thing, that's when I had knowledge.  Anything before that point, I do not have knowledge.

Q   Okay.  Let's talk about what you know --

A   Okay.

Q   -- because I don't think the counseling part has changed in the regs, but -- so let's talk about now what you do and what the checklist is for, that regulation requiring counseling?

A    Okay.

Q    And what are those?

A    It's my understanding that the student must meet with his or her counselor first, his or her school counselor first, to identify that they want to do dual enrollment, that sort of thing.  The counselor then advises the students who applied to the institution, go through the admissions process, hopefully get admitted.  And then once the student is admitted, the dual enrollment area will work with the counselor to understand what courses the student wants.

The counselor goes in, puts those courses into the system.  We go in and certify it, once we've -- we go and certify once we've registered the students for the courses.  And then that's when the funding process takes off.

Q    Do -- do you know if there's a counseling requirement regarding Satisfactory Academic Performance or SAP?

A    I'm not familiar with that.

Q    Okay.  All right.

I'd like to direct your attention to Tab No, 19.  I think I have it already open.

(Marked for identification is Plaintiff's Exhibit 19)

A    Okay.

BY MS. MAESTAS:

Q    The -- literally already --

A    Oh, I see it, I see it.

Q    -- you, like --

A    Sorry.

Q    -- went past it.

So Tab Number 19.  19.  Okay.

And I'd like to -- do you recognize this document?

A    Yes, I do.

Q    Okay.  And what is it?

A    I believe this was a postcard that Jamie and I worked on to help promote the dual enrollment program.

Q    Okay.  So at the top, you can see the URL, you know, the valdosta.edu/academics/dual-enrollment/flipbook.

A    Uh-huh.

Q    Do you remember it being called the flipbook?

A    I do.

Q    Okay.  Now that I've refreshed your

recollection -- okay?

So this is an excerpt from the website of the dual enrollment flipbook, and I wanted to direct your attention to the highlighted portion.  And it says: "The rigor and pace of our classes will prepare you for success anywhere."

What does that -- what does that mean to you?

A    I don't think the intention of a statement was to speak to the student's ability to be successful at our institution.

Q    During dual enrollment or after dual enrollment?

A    I would -- I would think the intention of the statement would be after the student has completed our dual enrollment program we'll prepare -- we, as an institution, are prepping that student to be successful.

Q    In their freshman year as an undergrad or overwise?

A    I -- I think to be successful.  I --

Q    After they leave -- so you attend VSU. The rigor of our courses is challenging enough once you finish it, you're going to be prepared to go other places?

A     That can be one interpretation of the statement.

Q     And what's your interpretation?

A     That it just stops -- my interpretation is that we're preparing for the student to be successful.  Period.

Q     Okay.

A     You know, whatever that path is for them, we're helping to prepare them to be successful.

Q     Okay.

A     That's my interpretation.

Q     And you're -- are you saying that your institution -- you should come here and not other places?

A     I don't think that we're saying that.  I think what we're saying is, a goal of ours -- if you attend us, we would want to prepare you to be successful.

Q     So that's not a good talking point to talk VSU up?

A     I don't -- I wouldn't say that it's not.  You asked me what my interpretation of the statement was.

Q     Okay.  Did you write that?

A     I do not -- I -- I don't have a

recollection, to be honest with you.

Q    Okay.

A    When we -- I will clarify.  When we worked on these things, just because my department designed different things and things like that, those were just -- that -- this is one example of a collaboration between Jamie and I.  And maybe -- I don't know when this was put out -- and maybe at the time Tee Mitchell -- but those were things that it's -- like, she might write the copy for it.  We go out and help work with the design staff and things like that.

Q    So "the rigor and pace of our classes," whose classes are you --

A    Valdosta State University.

Q    Okay.  Not -- not TS- -- TCSG's?

A    Well, it's a postcard from Valdosta State --

Q    Okay.

A    -- and therefore, and/or our --

Q    Okay.  I think it's obvious, too.

A    Okay.

Q    Thank you.

     All right.  If you could flip to Tab 20.

(Marked for identification is Plaintiff's
Exhibit 20)

MR. CARTER:  Are you just going to admit -- or have a joint for all of these exhibits to be attached --

MS. MAESTAS:  Yeah, I'm going --

MR. CARTER:  -- to all the depositions?

MS. MAESTAS:  Yeah, I'm going use to use them for all three days --

MR. CARTER:  That's fine.

MS. MAESTAS:  -- made it easier for me.

MR. CARTER:  That works.

BY MS. MAESTAS:

Q    And I have, actually -- this is Plaintiff's Exhibit 20.  This is a PowerPoint that I printed off from the USG system of Board of Regents website.  And I've tabbed a couple -- I think I've tabbed in places.  I might have -- yeah, a couple of places in green.

A    Okay.

Q    And I'd just like to -- there's a couple of different charts.  And it's got everything about TCSG paths and USG paths separated.

Can you see that?

A    I do -- I see "Course List Update."  So I

see a "TCSG Path," and I do see a "USG."

Q    Okay.

A    Okay.

Q    Pretty much throughout the document, they're, like, TCSG path, USG, TCSG, USG.  I think even the last page has two different contacts for both systems, Sarah Wenham with the DEU -- USG and then Diane Lassai Barker with the TCSG.

Do you see that?  On the last -- it's the very last of the --

A    Was that tabbed as well?

Q    No, sir.

A    Okay.

Q    Sorry.

A    No, no.  It's okay.  I just wanted to make sure I'm following along.  I do not see that.

Q    Okay.  And then the "Dual Enrollment Admission Requirements," I think is the last tab in green.

A    Oh, I see it.  Okay.

Q    And do you see that there's a chart for the TCSG and then a chart for the USG, and they're two different admission requirements?

A    I do.

Q    And that the one for USG is more difficult

than the TCSG?

A    I wouldn't say difficult.  I would say I see a difference.

Q    Okay.  And what's the difference that you see?

A    The minimum SAT scores or ACT scores.

Q    Are they higher than --

A    I wouldn't know, because it doesn't have any scores listed for the TCSG.

Q    Okay.  So one of them is talking about SAT scores, and then the other one is talking about COMPASS.  So there are other options for the TCSG to get in that aren't available under the USG chart?

A    Yeah.  I'm not familiar with what an ASSET test is.

Q    But are --

A    I do see a difference.

Q    Do you have more options under the TCSG column to get in than you do under the TCSG column?

A    I would possibly think yes, just because the -- the phrase S- -- ACT or SAT placement scores vary per program.  It's rather vague.  So I don't know what that means.

Q    Okay.  But at any rate, there's two different charts?

A    Yes.

Q    Okay.  All right.

I'd like you to flip to Plaintiff's Exhibit 21.

(Marked for identification is Plaintiff's Exhibit 21)

BY MS. MAESTAS:

Q    And this is also from the USG website and it says: "University System of Georgia Freshman Admission Requirements."  And I'd like to direct your attention to that highlighted statement.  It says: "Students should pursue a challenging and rigorous high school curriculum to be best prepared for a successful college experience and consult with high school" -- "with their high school counselor to determine appropriate courses."

Now, that doesn't say, you could take DE or you could take courses anywhere, it does not matter.  That's saying be careful what you pick because the level of academic rigor matters.  Isn't that what that's saying?

MR. CARTER:  Well, the document speaks for itself.

MS. MAESTAS:  I'm asking him questions about the document.

MR. CARTER:  Well, what are you asking him?  You're -- I mean, the last document --

MS. MAESTAS:  Does it --

MR. CARTER:  -- that you just asked him, doesn't it have two columns?  It says what it says.  What -- what do you want his interpretation?

MS. MAESTAS:  Sure.  Yes.

MR. CARTER:  Okay.  Well, ask for his interpretation.  You made a statement, but if you want his interpretation of what that statement means, ask him.

MS. MAESTAS:  So I guess that's an objection to form?

MR. CARTER:  Yes.

MS. MAESTAS:  Okay.

MR. CARTER:  Thank you.

BY MS. MAESTAS:

Q    Now, you -- when he objects to form, you can answer the question.  Now, if he says, I don't want you to speculate, but you know the answer, I don't want him saying don't speculate to prevent you from telling me the truth; okay?

A    I understand.

MR. CARTER:  The truth.  You've got to ask

him a question for him to be able to answer. You haven't asked a question. You read a statement.

Are you asking him for --

MS. MAESTAS: I said --

MR. CARTER: -- his --

MS. MAESTAS: -- does that -- I did ask a question. I said, "Does that say you could take dual enrollment course anywhere and it doesn't matter?"

MR. CARTER: No, but then you asked something else. And the document speaks for itself. The document says what it says. So if you want to ask him his interpretation you can do that, but you said, "Does that say," and is it says what it says. That's my point. Follow up with a question.

BY MS. MAESTAS:

**Q Okay. So you can answer the question. And to make things simple, why don't you just read the sentence and tell me what you think it means?**

A So let me clarify. Are you asking my interpretation of what the statement's --

**Q Yes.**

A -- intention is?

Q    Yeah.  Thank you.  Perfect.  That's even better.

A    So, "Students should pursue a challenging rigorous high school curriculum to be best prepared for a successful college experience and should consult with their high school counselor to determine the" -- "to determine appropriate courses."

My interpretation of that is that a high school counselor would want to be -- ensure that student is placed in the appropriate courses for them to be successful.

As an example, if a student's struggled with math and, you know, the test scores barley met our requirements and that counselor knew that that student struggled with math, they might advise that student from staying away from analytical geometry. To me, that's what "appropriate course" means.

Q    Okay.

A    And on -- based on -- and counsel -- let me -- maybe I can restate.

Based on a counselor's evaluation of a student's transcripts, things like that, that counselor would want to make sure that person -- the student -- is placed in the most appropriate course

for him or her.

Q   And would that ever entail going to a different institution?

A   I'm not a high school counselor, so I can't answer that.

Q   Okay.  So it would never say -- they would never say anything like, Well, sometimes the courses at this institution are more difficult than the courses at this other institution?

MR. CARTER:  That does call for speculation.  And, you know, I've sat here for a long time, but that -- I mean, you're asking him to speculate on a document he didn't create or whatever.  Go ahead.

A   I would say I'm not a high school counselor.  So I can't speculate on what a conversation between a high school counselor and a student ...

BY MS. MAESTAS:

Q   Okay.  And then Page 2.

A   Page -- of this same document?

Q   Yes.

A   Okay.  Got it.

Q   Another highlighted statement:  "Course may not prepare students for admission to USG

institution" -- "institutions with selective admissions (such as Georgia Tech NUGA) are not appropriate for students planning to enter a STEM major."

What -- and so I don't want to go into the whole thing we just did.

What is that -- what is your interpretation of the meaning of that?

A    My interpretation, just 17 years of working in admissions, is Georgia Tech and UGA have different requirements.  They have more of a holistic or selective process.  I would think that that student would need to speak to those schools about what courses, things like that, that school is looking for.

That's always been my advice to students, when they -- 'cause they will come to us and say, What do I need to get in Georgia Tech?

And I would always say, That's not my recommendation.  You need to go talk to Georgia Tech.  We are Valdosta Sate, if that helps answer your question.

Q    Okay.  Okay.

Page 5, Question 2, if -- this is a frequently asked questions.

A    Uh-huh.

Q    "Should I pursue a challenging and rigorous high school curriculum?"

"Yes."

And then the last sentence: "Students should consult with their high school counselor and parents to select courses suitable to their ability level in each subject area."

Without having to go through the thing we just did, what is your interpretation of the intention of that?

A    It would be the same as earlier.  For example, if the student was not strong -- and let's use the science at this point, that counselor might not recommend that student to take a higher level chemistry or different things like that.  So I think based on an evaluation, that counselor would make sure they're recommending the best course for the student to be successful.

Q    And if you could turn to Tab 23.  This is a Plaintiff's Exhibit 23.

(Marked for identification is Plaintiff's Exhibit 23)

BY MS. MAESTAS:

Q    This is an email with -- so I don't have

the original flier.  So this came from Sarah Wenham. And it is a -- the USG Dual Enrollment Summit from 2019.

Did you remember this event?

A    I believe so.  I believe that -- and this was -- at the time that there was some changes to the program.

Q    Okay.

A    That's my recollection, is that there might have been -- this might have been in response to some changes in the program.

Q    Okay.  And what -- what about counseling that was discussed?  Like, do you recall any requirement that students receive counseling?

A    Please define "counseling."

Q    Like, so counseling about appropriate courses, like we were just looking at that last exhibit with the USG, talking to your counselor about appropriate courses, whether an appropriate academic rigor.  Did that -- do you recall anything about that type of counseling coming up at this summit?

A    I do not -- I do not recall that.

Q    That's fine.

A    I do not recall that.

Q   That's fine.

And do you recall who attended this?

A   I do not.

Q   Okay.

A   I do -- what I will say is, I know I went to one at some point, because there was some changes with funding things.  And I -- I honestly can't remember, and especially without seeing -- on Page 3, because -- the discussion Jamie and Sarah had about my house, which was under water at the time. So I might not have been to this one, but I did go to a conference in Macon to learn about the new funding model, because coding students, again, as my -- one of my roles as tuition clarification officer is I make sure the codes -- students are coded correctly.  And that's why I went to a conference. I can't say if it was this one specifically.  I went to a conference to learn.

Q   Yeah.  I guess you probably had to deal with your house?

A   That's -- the way -- the way that Jamie said that, I would think so.  But, again, I do recall I went to one --

Q   Okay.

A   -- in Macon, when that was, I do not

recall.

Q   So Jamie attended this one.  I don't know if you have any evidence to dispute that, but okay.

A   Or recollection.

Q   Okay.  You could flip to Plaintiff's Exhibit 24.

A   Okay.

BY MS. MAESTAS:

Q   And this is a copy of talking points that were discussed at roundtable lunches about -- it says, at the top, "Misconceptions," and then the last point, bullet point in that first section, if you could read that --

A   Sure.

Q   -- as I read it out loud.

    "The rigor of the courses is the same at all institutions since some of the courses are transferable to all USG and TCSG institutions; therefore, they are being prepared to be successful at all institutions within the state no matter where their DE credits come from. (then parents are frustrated when they are not successful)."

    So since we don't want to go through the objection process again, what do you -- what is your interpretation of that talking point?

A   I believe it's something that's been discussed for a long time, since I've been here, because both systems are accredited under the same body.  And so if one is touting that they are better than the other, what is the evidence to prove that if the accreditation is the same?

I know that that is a talking point -- that -- not a talking point.  That's a debatable issue that others have had for quite some time, since the TCSG schools started becoming -- since we started accepting some of their credits.

**Q   You -- you're talking about the articulation agreement?**

A   There was a decision -- and I can't say when -- of -- we were -- we were -- we used to not take any credits from a TCSG school.  Then, I believe they became SACSCOC accredited, and then some of the credits transferred over.  There has been debates on whether that credit is -- is equal.

**Q   Okay.  And you -- is that talking about the articulation agreement?**

A   It is not.  The articulation agreement is when -- the -- if you think about it from sort of a timeline standpoint, my recollection from this time was the decision was made that we accepted those

credits.

Once we accepted those credits, some schools went and made articulation agreements that said if you do -- and this is just an example -- criminal justice at Wiregrass, and you wanted to do criminal justice at Valdosta State, in addition to the courses that the system office has told us, we will accept these other credits if you're making -- if you're going towards this program.  That's what I mean when I say an articulation agreement.

Q    Okay.

A    They -- I didn't mean to interrupt you, but I just wanted to clarify, those are individual agreements made between schools.

Q    Now, they're also available at the USG level online.  Like, you could pull them up.  I mean, there's, like, hundreds of them.

A    They might, I believe -- I believe -- and this is just my own knowledge.  I believe that system office maintains a website of those articulation agreements.

Q    Okay.  It -- but -- so your understanding is these credits started transferring, then the articulation agreements came into place?

A    That's correct.

(Marked for identification is Plaintiff's
Exhibit 24)

BY MS. MAESTAS:

**Q    Okay.  So this bullet point on Plaintiff's Exhibit 24 is referring to what eventually became the articulation agreement?**

A    I do not believe so.  I do not believe that that speaks towards articulation agreements.  I believe what that is speaking to is what I referred to as a debate between --

**Q    Okay.**

A    -- USG versus TSG [sic] which ones are more rigorous or not, because they're both accredited under the same body.

**Q    Okay.  So let's talk about the debate. Can you tell me a little bit more about this debate that everybody knows about?**

A    I don't know anything, other than what I've said is that there is a perception that one institution might be more rigorous than the others, but when they're accredited under the same standards, it's hard to argue that point.  And so it's -- it's a debate.

**Q    So what is your personal side of that debate?**

A    I see it from both sides, to be honest with you.  My personal view of it is it depends on the student.  Honestly, it depends on the student.  I would never want to make a blanket statement that said all students who attend at Institution A will not be successful if they didn't attend Institution B.  I don't believe in that.

**Q    So what about in particular to Wiregrass versus VSU?  What -- where do you stand on that debate?**

A    Again, I take it to individual student basis.

I never will say students -- every student that comes from Wiregrass will not be successful or any -- I don't believe in blanket statements.  I believe in looking at a student as an individual and what is best for that person.

**Q    So an example of -- what's an example of a student where you would advise them to go to VSU for DE versus Wiregrass for DE?**

A    The situation would be if the student has expressed interest in Valdosta State.  I would talk to that student about what their goals were, and then give them the information on who we are as an institution, and then let that student make a

decision once she or he has the information.

I say that to students, whether they're thinking about dual enrollment, whether -- this is a question we get asked all the time, Hey, I'm thinking about you and, insert school, West Georgia.

And I -- we -- and I've trained my staff all these years is we don't talk about another school while we're promoting ourselves.  All we do is we say, Here's who we are.  This is what we have to offer.  And then once that person has that information, let them make the best decision for themselves.

**Q   Okay.  And in regarding -- I think you mentioned Donna Sewell and Professor Rickman, that they had communicated to you at some point or another.  Can you tell me what they communicated to you?**

A   They -- I -- I think your question was, do I know professors who work in the program.  And --

**Q   Yeah.**

A   Yeah.  And I mean --

**Q   Okay.**

A    -- because I've been here a long time and those -- those would be students.  That -- that was my intention to answer that question.

Q    Okay.  And so I apologize.

So in -- did you ever hear of any of those -- any professors making any remarks about student academic success as freshman or transfer students if they had taken dual enrollment at a TCSG?

A    I did not, no.

Q    You never heard any of that?

A    I never talked -- your question was, did I hear anything from professors regarding --

Q    Rumors or directly?

A    I believe, I mean, working on this campus, you know, as I've pointed out, it's a debatable topic that people would often say, you know.  My response would always be they're accredited, because our job in admissions is to determine the transferability of courses.  My response has always been they're accredited under the same standards and that's why we have to bring those in.  Have I heard people talking?  Yes.

Q    Okay.  And what -- what have you heard?

A    I've heard the debates on both sides of whether the course from either institution is more rigorous.

Q    Okay.  And who's making the debate?  Who's

saying it, or who are you hearing say it?

A    I believe this is more on the hearsay side of things.  I really -- I don't know if I really want to directly answer this because, I can't say so-and-so said this to me on such-and-such date.  If that's --

Q    So if we were at trial, hearsay would be a proper objection, but --

A    Okay.

Q    -- we're on objections to form and I was talking to my lawyer.

A    Okay.

Q    Okay.  So answer the question from what you recall.

MR. CARTER:  What was the question again?

MS. MAESTAS:  He says that he doesn't want to answer the question because it was hearsay. And I said, well, that's not a proper objection in the deposition room.

THE WITNESS:  I wasn't objecting.  I was --

MS. MAESTAS:  He was about to.

A    Okay.  If I can go back and clarify my point and then you-all can discuss, I was saying I can't give specifics of who said what and when; so I

wouldn't want to speculate on things that I've

heard.

BY MS. MAESTAS:

Q    Well, I think it's okay to speculate in a deposition.  Now, if you want object at trial then that's fine.

MR. CARTER:  Well, if he said he can't remember names, I mean, is that what you're saying?

BY MS. MAESTAS:

Q    Well, I'm not saying tell me exactly the name and the date and the -- you know, the direct quote, you know, you know, from your recorder that you had.  I'm not saying that.  I'm saying:  What do you recall?

A    Absolutely.  And I'll -- I'll respond to it again, is that there's been debate on both sides regarding the rigor of the courses.  There -- and when both are accredited at the same --

Q    Okay.

A    -- ages --

Q    Okay.  And so can you give me -- sorry.  I didn't mean to interrupt, but I thought you were just rephrasing.

Can you recall anyone either a name, a

rumor of a name, or any date and timeframe?

A    I cannot.

Q    Okay.  Do you have any recollection -- and I am not asking for names protected by herpa -- FERPA, but -- so you could go -- like, a nursing student who was a, you know -- a, you know, a senior in high school, something like that.

A    Okay.

Q    So I don't want to get into names and get into all that objections.

A    I understand.

Q    Examples of specific students who were not properly counseled and who were disappointed and not served well by the DE program that they entered into?

MR. CARTER:  You're talking about here at Valdosta State?

MS. MAESTAS:  No, just any example.

MR. CARTER:  Any -- anybody that was.

MS. MAESTAS:  No.  That he can recall examples.

MR. CARTER:  That was -- and you're talking about any DE program anywhere?

MS. MAESTAS:  It could be, I mean, obviously he's going to know about people who

were coming into VSU.  So they could come from elsewhere and then end up around Ryan seeking to continue their education.

MR. CARTER:  You understand what she's asking you?

THE WITNESS:  I do.  I do.

A     I believe and an example I can provide especially recently is --

MR. CARTER:  No names.  No names --

THE WITNESS:  No names.  No, no, absolutely not.

A     -- is -- you know, when the pandemic hit and things shifted to online, you know, we'll sometimes have transcripts come in where the students says, you know, I didn't do well, but it was in an online environment.  I wasn't -- I don't prefer online.  If I come to your institution, I would rather do face-to-face.

That is a general sort of example of what we've encountered most recently, if that answers your question.

BY MS. MAESTAS:

Q     **What about not, like, pandemic related?**

A     Not that I can recall at this time.  I believe, you know, more of my attention, especially

one of the things that Jamie worked on -- Jamie and I worked on a lot were scholarship-eligible students. So I worked very closely with those students who, at our institution got here, did really well, and qualified for a scholarship.

My recollection is more towards the successful stories than I have recollection of negative experiences at this institution. Regarding other institutions, the only example I can come up with is, you know, recently the pandemic-related example.

Q   And what institution was that from?

A   I can't -- I don't -- it's more --

Q   Was it VSU?

A   Not that I remember, no, because we're mostly dealing with the incoming students; so it would be more of something that the student explained to us because they went to another institution.

Q   Okay. And so when we first started talking at the beginning, you said that would be VSU, Wiregrass, or GMC, typically. Do you recall, now that I've refreshed your recollection, what institutions that was?

A   No. I think it's important to clarify we

had talked about in our area where we see the most from.  Since dual enrollment, you know, especially the funding component that we talked about is available at all schools, we would see students come from all over the state.

So when I mentioned Wiregrass and Georgia Military, it was in response to where we saw the most from, or your example at that time, was students coming to us and going back to one of those schools.  It wasn't where we only see students from.

Q    But that was the most prevalent?

A    I would say.

Q    Okay.

A    Yes.

Q    Okay.  But you don't remember where that online student who had a negative experience, like, experience --

A    It would not have been at one of those two schools.

Q    Okay. Okay.

We've kind of danced around this a little bit, but I want to talk about more specifically about how you interacted with Jamie and what Jaime's job was.

A    I think I can speak towards my view as the

admissions department.  Obviously, we were admitting dual enrollment students.  There's also a recruitment function of those students.  For example, if a high school was having a junior financial aid night or something like that, Jamie would sometimes go to talking about the dual enrollment program.  I'd go to talk to the students about coming to Valdosta State in general.

As we saw work on some of the examples, too, we would sometimes work together on marketing materials because that's something my office does a lot of.  And so Jamie and I would work on those together on projects like that.

Another example is, you know, when we talked about the scholarship students.  You know, we wanted to be able to include dual enrollment students in that consideration and not just the students who are graduating high school.

Those are a few examples of -- of ways we make -- and then the last one I've mentioned, too, you know, our job -- we would work together on -- if she had materials for a student, transcripts, whatever, she would get those over to our office to get the student accepted.  And then once the student's accepted, she would help get the students

enrolled.

Does that answer your question?

Q   Yeah.  And so would she basically prepare all of the paperwork you needed to then admit the student?  'Cause you said we're admissions and she was dual enrollment.

A   Right.  I don't believe I can answer that, because sometimes I would believe -- it just depended on the timing of things.  So, again, if Jamie met with that student and the student had the transcripts on him or her, whatever, you know, Jamie would get those over to our office.

If the transcript -- you know, sometimes the student might have circumvented the process and just applied directly towards dual enrollment, and then we start getting those transcripts, that sort of thing.  So I don't want to make a blanket statement that said she always did this and we always did that.  There was sometimes a timing issue involved.

Q   Okay.  And I don't -- I don't know if this is a too broad of a question, but you --

A   Okay.

Q   -- would you be able to answer, like, what did Jamie have to do to have done a good job at her

job?  Like, is that -- or is that too, like, broad?

A    I -- in my opinion, just, you know, working with dual enrollment students and things like that, one of the things that I think would be a criteria would be, you know, number of students and then students retaining to the institution post-graduation would be two criteria.  If I was her supervisor, which I am not, those would be two criteria at a direct level that I would evaluate someone on.

Q    So they -- they graduate or they finish a dual enrollment class, and then she would then have to make sure they come back as a freshman?

A    I would say if the student graduated from high sch- -- sorry -- the dual enrollment with us, then graduated high school, and then enrolled with us, that would be a criteria, if I was her supervisor, that I would say should be evaluated.

Q    But didn't we talk about how there is basically, you know, so many different options for someone who is finished dual enrollment --

A    Right.

Q    -- at VSU?

A    There are -- there are.  And to your point, I think, again, what we all should do, or

what -- kind of what we all do is talk about what we have to offer at our institution.  And that's -- that's kind of where I bring that in, is -- now, whether that student does or doesn't, you know, that is something that is making sure we point that student to the resource, if they're interested in continuing on with us and things like that.

Q    Okay.  I'd like to direct your attention to 46 --

A    That's over here?

Q    -- which is going to be over there, yeah.

A    No, that's okay.  I got it.

(Marked for identification is Plaintiff's Exhibit 46)

BY MS. MAESTAS:

Q    Okay.  It's in that.  We're just going to move this.

A    Okay.  I got it.

Q    Okay.  And if you can turn to the blue tabs in the back.

A    Blue tabs in the back for 46?

Q    Yes.

A    Okay.  Got it.

Q    Okay.  So let's see.  It will be right here.

A     Okay.

Q     Okay.  So this is Jamie's Annual Performance Review from February 12th, 2019.  And do you see where it says: "Goals," and then "Comments:  The DE goal was failure aggressive at 20 percent. Jamie exceeded the DE goal with an increase of 30 percent for the Fall 18 term."

A     I do see that.

Q     "Rating distinguished."

A     I do see that.

Q     Wouldn't -- I mean, wouldn't that be a good report that she's --

A     I would think so.  I mean, but -- and I think the -- I think the goal, in my opinion, is vague.  Is that 20 percent of new dual enrolled students, or is that students who are deciding to continue on with the institution past their -- past their -- that -- that part is vague, to me.

Q     And then the next page with the blue tab --

A     Uh-huh.

Q     -- and then I think I've highlighted on yours:  "The DE program has increased by 363 percent since fall 2015.  I believe her tireless efforts have been a key to increasing DE as VSU."

MR. CARTER:  What was the question?

BY MS. MAESTAS:

Q    Isn't -- I mean, isn't that a good report as though that she's doing a good job?

MR. CARTER:  Well, again, the document will speak for itself, but go ahead.

A    I believe so.  I mean, I would -- I would think as an outsider looking at this, I would not say this is negative.

BY MS. MAESTAS:

Q    Okay.  But as an insider, you see it negative?

A    I said I would not see it as negative.

Q    Oh, okay.

A    No.  I'm just saying as an outsider, looking in, if I need to clarify as an insider, I would also think of this as positive as well.  I do think that there is more -- and I want to be clear. I do not want to take anything away from efforts, but -- but the change in the funding was significant, because prior to the change in funding where -- an example is, I would be at Valdosta High School and GMC says, you know, zero cost of attendance, Wiregrass says zero cost of attendance. Valdosta State, and I have to say a thousand dollars

and you have to pay for your books.

That was always a deterrent for students. And so when that was a change in the funding, that positively effected us.  Again, as someone that worked closely with Jamie, I would not say that -- that those numbers don't represent effort, but I do think there was a change in funding at the time that tell a story as well.

**Q    Okay.  So that would give her, basically, an advantage?**

A    I would say an opportunity, is my opinion.

**Q    Okay.  All right.**

**Was it ever Jamie's job, to your knowledge, to talk up the TCSG's dual enrollment program?**

A    Not to my knowledge.

**Q    And if she did that, wouldn't that have taken students away from VSU DE?**

A    I -- I -- to answer the question, yes, but I think going back to some of the statements made at the USG level, you know, making sure students are at the right -- at the right place and things like that, but I -- I would not -- I would not think talking up the TCSG would be a positive thing.  But at the same time, if that's what's best for that

student, that's what we're all in it for, in my opinion --

Q    Okay.

A    -- is to make sure students are at the place where they feel comfortable themselves, whether that's us --

Q    And do you believe that was Jamie's goal, was to find what was best for the students?

A    I'm not her supervisor; so I can't say what her goals were.  Working closely with Jamie, I would say I would see her sometimes do that.

Q    Sometimes?

A    I would say -- just in my limited interactions where, you know, she would have a student and said, you know, based on the program they wanted wasn't a program we offered, and so maybe she said there might be -- we don't have that program.

That happens to us in admissions all the time.  I'm interested in agriculture, we don't have a degree in agriculture, that sort of thing.

Q    Okay.  So when you said she sometimes did it, that means only because you only observed her sometimes.  Not, like, you saw most of the time when she gave them bad advice and wasn't helping them?

A    It was my -- it would be based on -- my interactions were not -- were very limited.

Q    Okay.  And that -- when you did observe her, you saw her looking out for that student's best interest?

A    That is correct.

Q    Okay.  And now I want to talk about the breakdown of handling tasks and admissions now.

A    Okay.

(Marked for identification is Plaintiff's Exhibit 17)

BY MS. MAESTAS:

Q    So if you could turn to Exhibit 17, which is going to be -- you may want to move --

A    That's okay.

Q    -- that pot of coffee --

A    Yeah.

Q    -- and wallet.

A    Okay.

MR. CARTER:  Can we take five minutes.

MS. MAESTAS:  Sure.

(Recess 10:28 a.m. until 10:36 a.m.)

MS. MAESTAS:  Back on the record after a short break.

BY MS. MAESTAS:

Q    We're going to, Ryan, start ask --
Mr. Hogan, start asking you about how tasks are
handled in the admissions office, and also how DE is
handled.

A    Okay.

Q    Now, maybe they're interchangeable, and
maybe they're not in some cases.  So I'm going to
take you to, this is a printout, Plaintiff's Exhibit
17, of the red page from BSU admission staff.  And
so I'd like for you to identify the individuals who
handle anything that Jamie ever handled.

A    That's sort of a broad statement of what
"Jamie ever handled" 'cause there are things that
Jamie handed that I had no idea about.  If you want
me to -- maybe just rephrase the question.  If you
would like for me to discuss the function of the
administrations office as we interacted with the
dual enrollment, I can do that, but I can't speak to
everything that she did.

Q    Okay. Yeah.  I understand what you're
saying.

      So I only want you to tell me what you
either know of or you have good reason to speculate
as to.  Okay?

A    No speculation needed.  So our office is

for the most part divided into two parts.  There's a processing side that would work with Jamie on collecting applications, transcripts, test scores, you know, different things like that.  There's been some changes.  At one point, there was a SPA Form. I couldn't tell you what SPA means, but it was an abbreviation, making sure documents get collected. That's the processing side of our office.  Jamie worked closely with them.

Again, whether the student turned the documents in to her or we got the documents first, the end goal of all of it was hopefully the student will get accepted, and then Jamie can work with the student to get enrolled in classes.  That's part number one.

Part number two, the other side of our office -- and I should say number one or number two because that indicates one's over the other, but equal parts of it -- the other side of our office is the recruitment division.  And those are our admissions counselors that you see there, and it would be difficult for Jamie, or even Sarah at the time, to go to the many different college fairs and things like that.  With the emergence of eCore and different things like that, we didn't want to be

specific and just stay in the Valdosta area, because there could a student in Atlanta who wants to do online classes, interested in Valdosta State.  They could do dual enrollment, as long as they met criteria and funding and things like that.

Does that answer your -- so let me -- for more on the recruitment side, when we are in a high school talking about who we are at Valdosta State and also what we have to offer, one of the closing things would be, and also we have dual enrollment, if you're interested in that.  Now, if that student comes in and says, I've got a question about something, that we couldn't answer, we would direct that over to Jamie, and maybe that would be a question Jamie could answer.  I cannot provide specific examples.

Q    Did Jamie's job include recruitment?

A    I can't speak to what Jamie's job was.  I can speak to that there would be times where a school would call her and invite her to something, and she would call me and say, "Do you want to go so you can talk about the institution as a whole?  I'll go and I'll talk about Valdosta State."

Q    Okay.  So when I -- I guess her job means she's required to do it.  So I'll say, I want to

talk about the people in admissions who handled stuff that Jamie handled, regardless of if it was a part of her quote/unquote job officially; okay?

A    I think -- I believe I understand the question.  And what I will say is that was something that we collaborated on, because, again, there are more high schools in the state than, you know, many of the staff members I have can cover, granted, more than Jamie and Sarah at the time could cover themselves.

Our view of it too, especially with Tee Mitchell at the time, is if we are in those schools, why aren't we -- we could be talking about the dual enrollment program to help support them.

Does that answer your question?  It's more of a supportive function of dual enrollment.

Q    Okay.

A    Similarly, it's the way that we generally know about financial aid.  You know, students are admitted.  Now, "Hey be sure you do your financial aid."  We kind of collaborate with other departments.

Q    Okay.  So I understand there --

A    Okay.

Q    -- was collaboration and shared roles, but

that wasn't every single student, but -- and sometimes the recruitment she would come and talk about dual enrollment?

A    Depending on the function, correct. Depending the function.  Again, my example -- and we did these many times -- Valdosta High School's having a Junior Night.  They would invite her.  She would say, "Do you want to go to this, so you can speak about this too."  Or I mean, if they would do a dual enrollment night we would go together, she would talk about dual enrollment and I'd talk about who we are as an institution, if that student didn't want to do dual enrollment but was thinking about attending us.  Is that --

Q    Okay.  Yeah.  So we talked about Jamie did and sometimes did.  So my question is of the current admissions staff, who on here handles things that Jamie handled?

A    I think we're still operating under that same sort of recruitment side of things.  There is Megan Hancock, who is serving as a dual enrollment, whatever the specific title is.  I can't speak to what that specific title is.  And we sort of operate similarly where we're rooted more heavier on the recruitment side of things, talking about the

programs, and the school, and different things like that.  Locally, if Megan can go to something, she will, but that's kind of how that's handled.  If that answers your question.

Q    Can you point out the people on this list --

A    Uh-huh.

Q    -- by name --

A    Uh-huh.

Q    -- that handled some duties that Jamie used to handle?  So I'm going to start reading them. Ryan Hogan, Lisa Long, Christy Croft, Alexis Smith, James --

THE COURT REPORTER:  I'm sorry.  Could you slow down a little bit?

MS. MAESTAS:  These are names listed on Plaintiff's Exhibit 17.

(Marked for identification is Plaintiff's Exhibit 18)

BY MS. MAESTAS:

Q    James Sampson, Jesse Taylor, Olivia Griffin, all the way through to Maggie Connolly. Then on Exhibit 18, we've got Dowling Gibson through Monica Wolfe.

A    Uh-huh.

Q    And then on Plaintiff's Exhibit 19, we've got Mike Sovoie, S-o-v-o-i-e, and Megan Hancock.

A    Okay.  So again, going back to -- and I want to clarify you said "who handled" --

Q    No, who handled.

A    No, you said "who handled," but you -- let me clarify.  Are you asking who handles --

Q    Yes.

A    -- the recruitment side of promoting the call program?

Q    I'm asking if somebody on this list did something that Jamie used to do.  I want to know about it.  I want you to --

MR. CARTER:  That Jamie exclusively used to do?

BY MS. MAESTAS:

Q    No.  Like Jamie did it sometimes, she did it on a volunteer basis, it wasn't her job and she helped you out, you collaborating?  I want to know that.

A    I understand the question.

Q    So if you can say everybody on this list does something Jamie used to do, great.  If you have to go through each one, great.  Let's do it.

A    I understand that.  And maybe I can

broadly answer this, and that might help.

Q    Sure.

A    Is that where Jamie -- and I can't say how much of her responsibility was the recruitment.  I don't know how much of that --

Q    That's not --

A    -- I'm just going to leave that part out. What I will say is:  My discussions, you know, with Rob and Megan is the same as it was when Jamie was here, while we're in the different school systems in Georgia, because the funding and things like that, you know, definitely apply.  We as the recruitment side, the recruitment side of my office and I -- you want me to go through and tell you names I can -- their goal has not changed from when Jamie was here or when Jamie is not.

My students assistant too, when they're talking to a family that's gone on a tour, we say "We have dual enrollment available, if you're interested in that."  So our role is to try to help promote the dual enrollment program, which was something Jamie had a part of.  If that answers.

Q    So I hear you say the name "recruiter".

A    It's our counselor, that's an antiquated term.

Q   Okay.

A   Regional counselor.

Q   So I see admissions counselor.

A   Uh-huh.

Q   Regional administrations counselor.

A   Correct.

Q   Admissions coordinator.  Is --

A   The counselor term that I mentioned are the -- are what -- and I say "recruiter" because that's what we were called back -- but there have been some change.  So I apologize for that.

Q   No, that's okay.

A   Counselor.

So our counselors are the ones who have territories, and they -- their main responsibility is to visit schools in these territories, promote Valdosta State.  One of the things that we've asked them to continue doing, which also hasn't changed from when Jamie was here or not, is to talk about the dual enrollment program.

Q   Okay.  Is there anybody on this list that did things that Jamie never did?  Is anybody on this list that does things that Jamie never did?

A   Not that I can speak to.

Q   All right.  And what about plaintiff's

Exhibit 18?

A    Okay.

Q    **Anybody on this list do things that Jamie never did?**

A    Well, I don't know if it's worth pointing out, there has been some maturation.  So some of these people don't work for me anymore, but I will say in the roles that they served -- 'cause there might have been some new people in there.

I would say their goal while they're in the schools is to talk about the dual enrollment program.  I can't say if they're doing something that Jamie never did.  I do not believe so.

Q    **Okay.  But if you have a Venn Diagram --**

A    Okay.  Yeah.

Q    **-- these people all did something or do something that Jamie used to do?**

A    That is correct.

Q    **Okay.  What about Plaintiff's Exhibit 19?**

A    19?

Q    **We've got Savoie --**

A    You're sure that's 19?  Oh --

Q    **No, I'm not sure.**

A    Oh, Page 2 of 19.  Sorry.

Q    **Yeah.**

A    Go ahead.

Q    **Megan Hancock and Mike Savoie.**

A    I can't speak to what Dr. Savoie does in terms of what Jamie does, I don't interact with that part.  I can speak to, I believe Megan has taken -- taken on a majority of the responsibilities that used to belong to Jamie.

Q    **Okay.  All right.  7 --**

A    I'm sorry.  Did you see 7 --

Q    **I'm trying to make sure before I tell you --**

A    Okay.  I'm sorry.  I didn't know if you were talking to me too.

Q    **Okay.  I don't want you to look at it yet.**

A    Okay.

Q    **Okay.  Why was Jamie terminated?**

A    That's, from my understanding it was a reduction in force due to budget cuts.

Q    **Okay.  And I'd like for you to -- are those all of the reasons she was terminated, to your knowledge?**

A    To my knowledge, yes.

Q    **Okay.**

A    Other than what I know what's going on with this.

Q   Okay.  So we're going to get into the asterisk on that in a minute.  Okay.

So I want you to look at Plaintiff's Exhibit 7.

(Marked for identification is Plaintiff's Exhibit 7)

A   7.  All right.  Okay.

BY MS. MAESTAS:

Q   This is what is "Frequently Asked Questions" for the USG on Reductions in Force, also know as RIF, R-I-F.

In looking at some of things that are frequently considered, or frequently asked in a RIF under the USG, does that change your answer or add to any factors regarding the basis for Jamie's termination?

A   I don't know if I could speak to some of these, of -- lack of word documented performance, things like that.  Observable actions from my interaction, I -- I can't speak that I thought that there -- from my point of view, I did not supervise Jamie.  I worked with Jamie on things.  I did not see that performance was an issue with Jamie, from my point of view of working with her.

Q   Okay.  Were you aware of anything related

to the CVIOG Report for admissions in 2019, which would have anything to do with Jamie's job?

A   Only the things that Jamie shared with me is my knowledge of it.  I didn't have -- in my role as director of admissions, those sort of things, I did not.

Q   Okay.  And she's talked to me plenty, so I don't -- okay.

And do you recall that Jamie filed a Title IX complaint?

A   Oh, I've heard of it, yes.

Q   Okay.  And what do you remember was the basis of the complaint and what became of the --

A   I don't want to speculate, just because I have not read specifically.  I just know the things that I've heard around, and I -- I really would not like to comment on what I've heard and that sort of situation.

Q   Were you involved in the Title IX?

A   I was -- I was -- I don't know what the word was.  I was interviewed --

Q   Okay.

A   -- at the time that there was an internal investigation.

Q   Okay.  I'd like to direct your attention

to Exhibit 30.

                (Marked for identification is Plaintiff's

                Exhibit 30)

        A    Okay.

BY MS. MAESTAS:

        Q    Okay.  In Plaintiff's -- what I've marked

as Plaintiff's Exhibit 30, is the interview notes as

typed up by the Title IX investigator, Janice Lyn,

dated September 30th, 2020.

                And does this refresh your recollection

about your interview?

        A    The highlighted parts -- just the parts

that you've highlighted?  Yes.

        Q    Okay.  And I see -- let's see one, two,

three, four -- not counting every word, several

times, at least four times that I'm counting that

you "feared retaliation" and you were "nervous."

                Can you tell me a little bit more about

that?

        A    I can.  You know, I've had some time to

reflect on that, and I'll be honest.  I did have a

conversation with my supervisor about that.

        Q    Who was that?

        A    Dr. Carr.

        Q    Okay.

A    And at the time, there were reduction in forces that had been happening.  Jamie did not work in my office.  Jamie was in the office behind my office.  So that was one, there was another one that was a person in my office.  And then a person --

Q    Who was that?

A    Eric Halloway.  Eric Halloway was my assistant director, and he was also a part of the reduction in force.  And then there was also a person that I worked with often and I consider a good fiend, Keith Warber.

Three people that I worked closely with had been eliminated, and then on top of it, we were going through pandemic-type times and numberings are always a stressor.  And so one of the things too, that kind of contributed towards that nervousness, is my previous supervisor, Tee Mitchell, would often come into the office most day saying "We're probably going to get fired.  We're probably going to get fired.  Numbers aren't coming in.  We're probably going to get fired."  That really led to a sort of nervousness or whatever, and then I put this -- and then the interview, she said that he was going to be able to read this.

She -- Jamie and I had a conversation

about it and she said, "You don't have to do this if you don't want to.  You don't have to."  And I said --

    Q    **You mean Janice?**

    A    Jamie.

    Q    **Oh, okay.**

    A    Jamie, when she first -- Jamie had asked me if this person could interview me or something like that, and I told her I would just say what I saw.  So when you ask questions of my feelings at the time regarding the nervousness, I don't know if I can say that it was in direct response to any one thing that Dr. Carr had done or said to me.  What I think it was at the time, was a culmination of many factors that were happening at the time.  The reduction in forces that had already happened, you know, you-all -- we've already mentioned my house had gone through a really bad insurance thing where the insurance company didn't want to pay for it.  I have two small kids.  And so I did fear what if me talking about something like this.

    Again, I've had a conversation with Dr. Carr at the time, and he just asked me did I have a role, did I do something?  And so we've actually moved past that.

Q    Okay.  Were you ever nervous that not reporting would be on you, like, as far as -- is that -- I'm looking at Plaintiff's Exhibit 30.  It says --

A    Wait.  Where are you?  Oh, right here.

Q    The third from the bottom.

A    Okay.

Q    You're asked -- let's see.  I did hear the statement when Carr said oh, you don't like the door closed.  And then you say.  "I heard some of it.  I'm nervous to remember specific parts."

A    Uh-huh.  If -- and I'll speak to that.  What I -- the -- what I meant in that statement, was I knew that this was going to be typed out.  I knew I would probably have to talk about it one day.  What I was alluding to, which I think the intention might have been missed, is I didn't recall the exact words.

That's what I said when I said I'm nervous -- remember the specific parts, so I said -- what I said was "something like," and again, I didn't want that to be taken as a direct quote, because I couldn't remember it as direct quote, but I did hear some of those words.  If that answers your question.

Q    Okay.  I will have more questions, but --
Okay.

I want to talk about the last paragraph --

A    Okay.

Q    -- right here.  And it kind of goes into
the next page too.  It says:  "When Bird's position
was eliminated, conversation with Carr and Hogan.
We in admission can support Bird.  She has a
subordinate here.  At that point Carr agreed and
told us to figure it out."

"Us" meaning -- so, it says "Frehall and
Hogan."  I'm assuming that's Freidhoff.

A    Freidhoff.

Q    "Rob agreed it should remain in
admission."  What does that paragraph mean?

A    So, I don't remember exactly saying "we
can support Bird."  I remember us talking about
that, since most of the functions stayed in
admissions, promoting the program, excepting the
students, that sort of thing, what we had talked
about was her subordinates, Sarah, at the time -- I
said Sarah could stay with us in admission and we
would support the program, was my intention, and was
what I believe I said.

And that we could provide support to her.

And some of the examples we did, you know, that Sarah would not be responsible for going out to the schools as much, you know, or things like that.  We would take that on.  That was the intention, if that answers your question.

Q    So it wasn't saying that she could stay in admissions and did not need to be --

A    That was not --

Q    -- reduced?

A    -- no.  No.  That was not the question that was asked of me.  The question that was asked of me was:  Where did we think -- where did -- he asked me what my opinion was of where dual enrollment should be, whether it should go -- stay with advising where it currently was or come over to us in admission, and my suggestion was admissions.

Q    Okay.  So when you said "Bird," you meant admissions?

A    I said dual enrollment.

Q    Yeah.  You meant dual enrollment?

A    Yeah.  I don't -- I don't -- I don't remember saying "we will support Bird," although, I worked with her a long time, but in this question of what I was asked, was where should dual enrollment report.

Q    Okay.  And then on the next page, I think you go into that further.

"I ask him to Admissions, and he said let's wait to do all the transitions because I have people that will be moving to other supervisors."

And then you say, "Last week I was working on forms because HR requires one form for one person.  Carr texted me and said he's not going to sign Birds.  She will stay under Rob."

"I replied, oh, I must have misunderstood. He said let's wait until November."

Now that would've been when she was terminated?

A    Correct.

Q    What's going on there with the --

A    So we were doing some restructuring at the time, and I had sort of a stack of forms that needed to be signed, because, you know, we called them, in the HR world PAR Forms, Performance --

THE WITNESS:  Help me here, Justin.

Performance Action --

MR. ARRINGTON:  Yeah, the Performance

Action --

BY MS. MAESTAS:

Q    Isn't it Professional --

A    Professional -- okay.  Yeah, Professional -- please don't quote me, I don't know the acronym.  But that's the form --

**Q    It continues in the titles of positions functions or getting new positions?**

A    Or -- or change in supervisors, in our case.  In our case it was.  So I had a stack of forms where some people were going -- used to report to me, but now were going to report to another person in the office, that sort of thing.  And based on the conversation that we had, I thought he was -- I had included a form for Jamie to report to me, and that -- where he said, Hey, it's just going to stay under Rob for right now, that's what he was saying is he didn't sign the form.

**Q    Okay.  And so you said, oh I must have misunderstood.**

A    Yeah.  I misunderstood.  I thought it was coming to admission, and he -- well, basically he was telling me -- and again, this is through text, and I can agree is hard to understand, you know, tones and things like.  But he just said, My understanding was Jamie was going to report to me based on mine and Rob's conversation.  And then when I texted him, he said, "Hey, I'm not going to sign

that one, Jamie's going to stay with Rob right now."

**Q    And then wait until November when she's gone; right?**

A    I can't speak to that, but, I mean, that's what he said.

**Q    And then:  "I ask about write up."  And then:  "I also, again, ask for protection from retaliation."**

**What's that about?**

A    So she -- the interviewer, Janice started asking me about some retaliation -- or some write up about Jamie being written up or something like that. And again, I got nervous.  I didn't know what that was about or whatever, but, I mean, I told the truth.  About the -- that I said that the University does not support or allow for retaliation.  Yeah, she said that.  Yeah, yeah, she said that.

And, you know, what she was saying is -- I was just like, if I'm about to say something, you know, is there retaliation.  She kind of clarified policy, that sort of thing.  So if that answers your question.

**Q    So the write-up, you didn't know what that was?**

A    I had -- just from talking with Jamie, I

knew that there was something regarding that, at some point.  She had told me that there was something of a write-up sort of situation, I don't remember when, but Jamie sort of alluded to that, at some point.

Q    So you never saw the write-up?

A    No.  Absolutely not.

Q    All right.  If you can turn to 31, Plaintiff's Exhibit 31.  Second from the bottom paragraph it says this is -- sorry, this is the interview notes of Tee Mitchell.

(Marked for identification is Plaintiff's Exhibit 31)

A    Okay.

BY MS. MAESTAS:

Q    And I'm standing up every once in a while 'cause my back.

A    I understand.

Q    "Another example is I was on vacation and Hogan called to tell me that Carr came by the recruiting office and proceeded to tell everyone they are incompetent."

Did that happen?

A    Well, it's hard for me to say because I don't -- I don't -- you know, I mean, if hearsay is

a good word to say.  But my assistant director at the time who --

Q    Lisa Long?

A    No, she's my associate.  At the time her name was Hillary Willis.  She's no longer with the University.

I was on the road and traveling, and she called me and said Dr. Carr came in and said that. He had stopped by and said that -- I -- I can't remember the exact words.  I mean, I don't -- I don't remember the exact words of what she told me, but again, it was sort of third-party information.

He never -- Dr. Carr never said it to me, but from what Hillary said to me -- said he came by and was questioning our performance.  And whether that was -- happened or not, I got that from her.

Q    Did Eric Halloway ever tell you anything about that?

A    I don't recall.  I do not recall.  I remember Hillary being the one calling and telling me about it.

Q    So the next page.

A    Okay.

Q    Do you ever remember --

A    Did you say the next page?

Q    Yeah.  The next page.

A    Okay.

Q    Do you ever remember Carr, Rodney Carr, just expressing anger in meetings or bragging about how he fired a lot of people?

A    I wouldn't say the word "bragging."  I would think, you know, he has talked about it.  And one of the things that he said to me is that when it happens it's -- when he's had to do it in his career, it's not been a surprise.  So he -- and this is where we sort of started to go, because the pressure, you know, the pressure of what students do and numbers and things like that, and especially as it drives University budget.  And, you know, sometimes I'll walk into meetings and people will go, And, you know, based on freshman enrollment, no problem pressure there Ryan.

Sometimes that pressure can sort of get to me, and so one of the things -- and I'm speculating on my own -- I think Tee learned -- not Tee -- Rodney learned about me is that kind of pressure does sort of weight on my shoulders sometimes.  So the conversations that he's had with me has been, "You need to worry about doing a good job, you know.  And, yes, I've had to fire people in the past or

whatever, but when I've had to do it, it was not a surprise to them."

Q    Okay.  And did you meet with Rodney Carr about this lawsuit and about the fact that you were going to be deposed?

A    No.

Q    All right.  29?  Sorry.  Yeah, 29.

(Marked for identification is Plaintiff's Exhibit 29)

A    Okay.

BY MS. MAESTAS:

Q    This is Plaintiff's Exhibit 29, interview notes of Lisa Long.  And I've highlighted, hopefully --

A    I can't see any highlights.  It's okay. You can just tell me --

Q    Okay.  So, let's see, one, two, three, four -- she's talking about an incident where Carr came over to Jamie Bird's office, shut the door, the door was opened.  Jamie Bird looked "unsettled." Then, "Nine months later," that's one, two, three, four --

A    Uh-huh.  I see that.

Q    "Nine months later," this is where -- "I was in my office with the door open and Ryan was

with me.  Dr. Carr came in and went into Jamie's office and went to shut the door.  It was overheard Carr saying, 'Oh, that's right.  You prefer the door open.'"

And that he was, like, gesturing with an air hug.  Do you remember that?

A    I don't remember hearing something.  I didn't see something.

Q    Okay.

A    I remember hearing some sort of reference to an air hug.  That's -- that's what I remember hearing about, because I was sitting in Lisa's office.

Q    Okay.  And I know you didn't record it, but can you try to remember as best as possible, like, the order of things that were said and where you were and --

A    Sure.  I can.

So Rodney had come over to my office to let me know of some other restructuring that was happening.  I believe specifically orientation was no longer going to report to me.  And then, I think -- I believe, that this was as a result of Tee Mitchell not being there.  He was coming to talk to some of us saying, you know, what the structure was

going to be like, that sort of thing.

At that point, once he and I finished talking he said, "I need to go over and talk to Jamie."  And I don't know if Lisa said this in her notes, but they are in a small house behind the big office of admissions.  And they felt more comfortable being behind closed -- locked doors.

And so I said, "Well, you're going to need a key to get over there.  Let me walk you over."  And so I unlocked the office and let him in.  And he went into Jamie's office.  I went to Lisa's office.  Lisa and I were talking about other things.

I did hear the comment of something about leaving the door open, and then towards the end I did hear something about an air-hug-type thing.

Q    Okay.

A    If that answers your question.

Q    And just to make sure, you never saw the gesture of the --

A    I did not see a -- I did not see a gesture or anything.  I -- it was what I heard.  I was sitting on a couch with you my back towards the door.

Q    Okay.  And then on the second page of Plaintiff's Exhibit 29.  Hogan, I think that's one,

two, three down:  "I feel like she was targeted.
Mr. Hogan feels like she was targeted for the RIF,
but may not say that.  He is nervous to talk to
you."

A    I don't think I can say whether or not I
felt she was targeted with the RIF, just because
there's been a lot of discussions about write-ups
and things like that, but -- but again, I -- I don't
think I can comment on what, I, you know, feel as,
you know, targeted with the RIFs or anything like
that.

Q    Okay.  So tell me about the write-ups.
You see --

A    Well, it was something that, you know, she
had said about -- she had told me about a write-up,
and I think Lisa alluded to it in those as well
about, you know, something about an email to
counselors or something like that.  It had to do
with that.  And actually, Jamie may have told me
herself about it after Tee left, I think.

Q    So -- and saying that, are you saying she
wasn't targeted?  It was because she did something
bad?

A    I don't think I can provide -- I didn't
think I'm in a place where I can provide a reason,

because I wasn't part of it.

Q    Okay.

A    She didn't report to me, you know, that sort of thing.

Q    But, like, is that what you were saying, that she was not targeted?

A    I didn't say that to the person whatsoever, I think that's Lisa implying something.

Q    Okay.  And then -- so when we read it, you said, "I don't think she was targeted because there was something about a write-up."

A    No.  I'm just saying because there's -- there's other things that I had heard about or whatever, but I don't think that -- I can't say. Since I don't have all the information, I can't say that I know definitively yes or no she was targeted or whatever for a RIF.  I don't think I have that information was -- was what I was trying to answer your question.

Q    Okay.  And so are you saying, based on what you heard, you believe it had to do with her write-up?

A    I -- no.  What I'm saying is:  I don't think I have all the information to know what was involved in it, because I wasn't part of any

conversations about it.

Q    Okay.  44A.

(Marked for identification is Plaintiff's Exhibit 44A)

A    Okay.

BY MS. MAESTAS:

Q    Plaintiff's Exhibit 44A.  This is an email from Rodney Carr to, I believe, admissions.  It's entitled "New Changes in the Division of Student Success."  And then right down on No. 3 it says: "Create the Office of First Year Transitions - This department will house Orientation, First Year Programs, and Dual Enrollment staff."

The question is -- first question is: "Orientation first year programs, and dual enrollment staff," were those things that Jamie Bird handled?

A    Obviously, dual enrollment.

Q    Dual enrollment?  Okay.

A    Uh-huh.

Q    And have you ever heard of "The Office of First Year transitions"?

A    I think it was something new that was created to house all three of those programs.

Q    And does it -- does it exist now?

A    I believe so, yes.

Q    **And who heads it up?**

A    Rob Freidhoff.

Q    **You're not sure if it exists?**

A    I believe it does.  I mean, there are people in those roles.  Obviously, Megan with dual enrollment, Brenda Beasley with orientation, and then, they're in the process of filling a first year programs role.  There has been some movement where Megan and Brenda, who represent orientation and dual enrollment, were still in the small house behind our office.  They have been moved to a more centralized location to be with that first year program person, so the three of them could be together.

So when I say I believe that there is that office, yes, I believe it exists.

Q    **Okay.**

A    But that's something Rob would need to clarify with you.

Q    **Okay.  And 44B.**

A    40- -- got it.  Yeah.

(Marked for identification is Plaintiff's Exhibit 44B)

BY MS. MAESTAS:

Q    **These are of a collection of emails from,**

let's see, 2020, between Jamie and Rob Freidhoff.

A     Okay.

Q     Where -- you can look at them, but basically you're communicating about dual enrollment.  And -- so my question is:  Didn't Jamie know more about the dual enrollment than Rob Freidhoff?

A     I don't think I can speak to what Rob's knowledge was.  I'm sorry.  I don't -- I can't speak for what Rob's knowledge was.

Q     Okay.  Okay.

A     That's a question for him.

       (Marked for identification is Plaintiff's
       Exhibit 41)

BY MS. MAESTAS:

Q     All right.  41.  This is an email that's been marked as Plaintiff's Exhibit 41.  This is an email that Jamie sent to these counselors, high school counselors on February 26th, 2019.

       Have you ever seen this email before?

A     I have not.  I've heard of its existence, but I don't believe I ever read it myself.

Q     But it does exist.  It does exist; right?

A     Right.

Q     Okay.  So if you could, I'm going -- we're

going to look at this carefully.

          If you want to read it to yourself as I read, that's fine, and then we'll kind of go ...

     A    I'm not -- I'm not understanding what that says right there.

          MR. CARTER:  Okay.  That --

          THE WITNESS:  Okay.  Okay.

          MR. CARTER:  -- she can ask you whatever she wants to.

          THE WITNESS:  Okay.

          MR. CARTER:  But don't speculate.

          THE WITNESS:  Sure.  Sure.

BY MS. MAESTAS:

     Q    Okay.  Have you had a chance to read it?

     A    I have.

     Q    Okay.  We're just going to talk about the first page.

     A    Okay.

     Q    Okay.  So this is to the high school counselors, and you can see -- and this copy you can actually see who it was sent to.  And she says: "For students wanting to participate in any dual enrollment program in our state, it is critical for those students wanting to attend a four-year institution after they graduate high school, get

their DE credits from the same type of institution. The curriculum course rigor needs to be the same in order for them to be successful once they graduate and move forward into college."

All right.  So I want to talk about that first two sentences right there first.

And do you agree or disagree?

A   To me, it goes back to my philosophy is each student's different.  And so I worry about making blanket statements sometimes, just, you know, like, all students should do this or that, just because each student has different needs.  So I'm not going to say I disagree with it.

I would see where her intention would be, you know, trying to make sure that students get to the right place, that sort of thing.  But to me, I would worry about making a blanket statement like -- like that.

Q   What's a situation where that blanket statement would not apply?

A   Well, just because, you know, I think if -- if a student -- if a student, you know, got credits -- two credits from a technical school regarding English or something like that, that they wouldn't be successful at a four-year institution.

I would see some -- some might interpret it that way.  And I would worry that we -- we would make any blanket statement like that.

Q    So what -- would it apply to the majority of the students who are in this area regarding Wiregrass versus VSU?

A    I can't speculate to that.  I don't know.

Q    And what about the statement:  "The curriculum course rigor needs to be the same in order for them to be successful once they graduate and move forward into college"?

A    To be honest, I don't understand the intention of that sentence:  "Course rigor needs to be the same in order for them to be successful."

I don't -- I -- that's not something I understand specifically.

Q    Let's go back to 21.  I don't know if you can kind of have these out at the same time.

A    Yeah, yeah.  Okay.

Q    So in 21 it says -- Plaintiff's Exhibit 21:  "Students should pursue a challenging and rigorous high school curriculum to be best prepared for a successful college experience and should consult with their high school counselor to determine appropriate courses."

Isn't that what Jamie's saying?

A   I don't see -- I mean, the piece that I think is missing and to what my opinion is, is not all students are the same.  And the piece that I see here is the consultation with the high school counselor to determine the best appropriate course.  I don't see that in the -- in the statement.  So to my point, I always believe each student's different.

Q   Uh-huh.  So what about the sentence down here, "your assistance," and she's talking to counselors?

A   "Your assistance in guiding your students and the parents in this right direction."

I don't -- if you're asking my opinion, the first part was sort of a blanket statement, and then the second part might have alluded to that.  And if she would've consulted with me, I probably would have talked about putting that part at the top maybe, just to make sure the intention was there.

Q   Okay.  I want to flip back to 29, and then we're going to come back to 41.

A   Okay.

Q   Well, it's right here.

A   Uh-huh.  Okay.

Q   Okay.  Page 2, at the top.  Lisa Long's

statement:  "There was nothing wrong with that email.  I don't know why she was written up.  For the audience she sent it to it was very informative, nothing negative, purely factual."

Do you agree or disagree?

MR. CARTER:  Really, you know, I don't know that that's a proper question.  And I'll objective, because that calls for speculation.  You're asking him to not only interpret what someone else said, but the written portion on the transcript of what someone else said, so --

MS. MAESTAS:  Okay.  Thank you.

BY MS. MAESTAS:

Q    I mean, I wasn't there, but I think I can get a pretty good idea that she's talking about, you know, that:  "When she wrote the email we had discussed how things were changing in dual enrollment.  She asked me to read the email, and I did and said it looked good.  There was nothing wrong with the email.  I don't know why she was written up."

So I guess, she was written up.  You may not know that part.  I have that too.  But -- so assuming innuendo that she -- that Lisa Long is stating that this is -- her opinion is this is:

"Very informative, nothing negative, purely factual."

Do you agree or disagree with that?

MR. CARTER:  Well, I think he's already answered to -- on what he said he saw is a problem with the email, but if you need to explain further go ahead.

A    I would like to explain further, just because, you know, I put things in writing all the time.  And, you know, I think sometimes, when we put things in writing like that, we got to make sure we understand the intentions of others.  You know, that's why I said I might have put that sentence about, you know, making sure that there's specific counseling and things like that, so there might not have been a perception, that it's, like -- and again, going back to the sort of debate that's been had for some time about, you know, the rigor of courses being better at one institution over the other, I probably would have rephrased some things.

Q    Okay.  And then back to 41.

"Around the state, universities are seeing students attempting to enter institutions with many DR credits and yet, they cannot meet the needed admissions requirement for that particular

institution."

Agree or disagree?

A   I -- and I agree, and I do see that sometimes.  And I'll give you an example.

And this is a sort of an issue that Jamie and I worked on often, was a student didn't take the SAT or ACT.  They took the test well enough to get into, let's say Okefenokee Tech, because they didn't require SAT or ACT.  So they got admitted to Okefenokee Tech.  Student's spent three years there -- or let's say less than 30 hours, just to make this clean.

Q   And are you talking about --

A   Dual enrollment credits --

Q   -- dual enrollment at Okefenokee Tech?

A   Yep.

That student got less than 30 hours, did not earn at least 30 hours of credit.  So when that student goes to apply to our institution, they're not meeting the requirements, because we require SAT and ACT.  So that was an issue that we had to start figuring out a little bit, just because students were getting more and more credits.  Where, you know, earlier in my career they might have six hours worth of credits, nine hours worth of credits, you

know, but they weren't meeting higher SAT scores.

Q   Okay.  And then part of participation -- did I read that yet?

"Part of participating in the DR program is choosing the right institution not just one that will help students check off courses."

Agree or disagree?

A   I agree.  I mean, choosing the best institution is what we've all -- that's, you know, I mean, I've trained my staff for years.  You know, choose what's best for the students.

Q   And:  "This also helps ensure students get the needed academic foundation that will allow them to move forward successfully wherever they go after they graduate."

Agree or disagree?

MR. CARTER:  Well, what are you referring to as "this"?

THE COURT REPORTER:  I'm sorry?  I didn't hear you, Counsel.

MR. CARTER:  Do you understand what the sentence, "this" is referring to?

THE WITNESS:  I believe so.

A   I think she's -- what the intention of this is, choosing the right institution --

BY MS. MAESTAS:

Q   Okay.

A   -- would -- that's -- that's what I interpret the pronoun "this" to be.  Help students -- students are getting the academic foundation needed, that sort of thing.

Q   So agree?

A   I would -- depending on the student.  I mean, that's the thing.  I mean, depending on the student and that counseling piece that I keep pointing back to.  If that's sort of the intention of that, yes, I would agree.

Q   Okay.  So that last sentence:  "Your assistance in guiding enrollment as a group program and want to ensure students are impacted in a positive way."  That --

A   I agree, yes.

Q   Okay.  All right.

When did you first hear about this email?

A   I believe it was soon after Tee left. Maybe in the January 2020-ish range.

Q   Okay.  So this was sent February 2019, you didn't hear about it until almost a year later?

A   I believe so.

Q   Okay.

A    I believe so.

Q    So you didn't hear about anybody getting upset about it or her getting reprimanded for it?

A    Oh, you said "Herb"?

Q    Jamie.

A    Okay.  I'm sorry.  You said Herb.  Herb is somebody who works here.

I have not.  Not until that point.  That is correct.

Q    Okay.  And that -- did you hear about it the day of the air hug and the overhearing the, "Oh, you don't like your door shut"?

A    I believe so, yes.

Q    Okay.  And did Carr talk to you about that email that day?

A    He did not talk about the email.  As I referenced in my interview, he -- the one thing that I was made privy to was, he had called me asking if Tee left any files behind, because I took over Tee's office, if there was any files left behind.  That was the only thing I know.  He didn't reference an email or anything, no.

Q    Okay.  And so he called you on your office phone and said, "Can you look in Tee's office?"

A    He said, "Did Tee leave any files behind?"

Specifically asking for if there was any files relating to any write-ups.

Q    For Jamie?

A    Correct.

Q    And then you went and looked in his office?

A    I had his office, and I had actually cleaned it out, I had actually cleaned it out before he left, actually while he left.  And I was helping him get his boxes and things like that.  And I knew there was nothing there, I double checked though.

Q    Okay.  And did he say anything in substance about the contents of the write-up or anything like that?

A    He did not.  He did not.

Q    Okay.  If you could flip to -- hold on 42.

     (Marked for identification is Plaintiff's
     Exhibit 42)

BY MS. MAESTAS:

Q    Okay.  So we're going to go a little bit backwards on Plaintiff's Exhibit 42.

A    Uh-huh.

Q    So the first email is the second page and then a response --

A    Yeah.

Q    -- Karen Black is on the top?

A    You got it.

Q    So -- so this is in -- this is Rodney Carr's reply to Jamie's email, which was Exhibit 41, dated February 27th, 2019, going to the counselors.  And he says -- well, do you want to read?

A    I've -- I've skimmed over --

Q    Okay.

A    -- I've skimmed over the parts of it.

Q    **Must be a faster reader than I am.**

A    No, no, no.  I can listen and --

Q    **Okay.**

A    -- I was skimming at the same time.

Q    So:  "You recently received an email from the VSU's Dual Enrollment Coordinator about the Fall course schedule for VSU and dual enrollment.  I would like to clarify and better define parts of the email.  Please know it is the mission and vision of VSU to collaborator -- collaborate with our education partners in serving your community.  We strive daily to provide environment of support for school system parters examiners and our partners in higher ed."

Let me kind of skip some.

"As South Georgia's Regional Comprehensive University, VSU is committed to collaborating to meet the educational needs of dual enrollment students by partnering with the TCSG."

How -- how did -- how does VSU partner -- I mean, assuming you agree with that statement.  Do you agree with that statement?

A    I mean, to an extendant I do.  I mean, we -- the articulation agreements that we had talked about is an example of the partnership between Valdosta State and a TCSG school.

Q    Okay.  That's the partnership?

A    I wouldn't say that is "the partnership." That is a partnership.

Q    Okay.  What are other partnerships?

A    Not others that I can think on, but I can only speak to admissions.  So admissions is, you know, one of those things, but at the same time too -- well, and let me speak to this.  So not just and articulation agreement, you know, we have to work with those institutions to know what will transfer over.

Now, the worst thing that I think could happen is, let's say you did a program that doesn't have an articulation agreement and then you would

walk into our institution thinking, I am going to --
all I've got is two years to do a business degree.

It's our role in the office of admissions at Valdosta State to work with those technical schools to know what will transfer over so they can guide students, because students sometimes don't come and talk to us until after they've earned the credits. So that's another piece of our partnership.

Q Okay. And then the next email is on top from Karen Black. And she says back to Dr. Carr: "Thank you for your email. One of our biggest hurdles of getting our DE students directly into the four year college coursework is the fact this must meet the math requirement along with the reading and writing."

Is that -- so she's saying she's got students at her school, which is Echols County High school --

A Uh-huh.

Q -- who are having trouble doing four-year college coursework.

A I don't interpret that that way. I -- the way I interpreted that is -- I don't mean to interrupt you.

Q    Yeah, yeah.

A    I'm so sorry.

The way I interpreted that is she is saying that they're having difficulty with a SAT requirement, which -- because if they got to a TCSG school, they don't have to meet a SAT requirement, they can be admitted on some other different things. What I believe her intention of that sentence was, We're having trouble with them meeting the math requirement, as in the SAT and reading and writing. Because SAT is divided into two parts, evidence based reading and writing and math.

That's what I believe she's saying.

Q    Okay.

A    They're -- they're having trouble meeting the SAT requirement.

Q    Okay.

A    With just me reading that first instance.

Q    Thank you.

And then 43.

(Marked for identification is Plaintiff's Exhibit 43)

A    Okay.

BY MS. MAESTAS:

Q    Plaintiff's Exhibit 43 a written reprimand

to Jamie Bird from Tee Mitchell dated March 5th, 2019.  Have you ever seen this before?

A    I have not.

Q    Okay.  It does exist.  Okay.

So I'm just going to go through a couple of lines.  "Language was included" -- so this is talking about her email, which is Exhibit 41.  And is it says:  "Language was included that suggested that students needed to get their DR credits from the same type of institution in which they are planning to attend based on the rigor of the curriculum.  Unbeknown to Ms. Bird, her email was forwarded to at least one person at neighboring Technical College and was then shared liberally by multiple institutions throughout the Technical College system.  As a result, the message was considered offensive as it was perceived that Technical Colleges were ineffective in providing a good academic foundation for students who want to attend a four-year institution after they graduate school."

Do you agree or disagree?

A    I disagree with that.  Because I -- from what I saw in the email, was Jamie saying it's important for them to get into the institution that

matches.  Now, whether I agree with that or not,
I've already spoken to.

          Do I agree that the intention of her email
matches this?  I don't believe that I see that.

     Q     Okay.  And then in the middle of the next
paragraph, "Moreover this communication had a
significant adverse effect on recent established
relationships that will need to be repaired."

          Agree or disagree?

     A     I --

     Q     If you -- if you know.

     A     I don't.  I can't say that I saw evidence
one way or the other on that.

     Q     Anybody ever talk to you about the
contents of this?

     A     No.  The first time it was brought up to
me was the first time I had heard about it.

     Q     Okay.

     A     But, again, there might have been other
conversation that I might have not been privy to,
but I do not have awareness of that.

     Q     If you could go to 11.

          (Marked for identification is Plaintiff's
          Exhibit 11)

     A     Okay.

BY MS. MAESTAS:

Q   Okay.  This is Plaintiff's Exhibit 11. Have you ever seen this type of data generated before?

A   I have.  I mean, Ms. Bird and I would participate in, I want to say, monthly meetings together with our supervisor, and he was very data driven.  And he would have reports like this where we would talk about --

Q   And who was that supervisor?

A   Tee Mitchell.

Q   Okay.  And so looking at these numbers, is anything strange about it, missing, or is it kind of like a standard form?  So -- and the reason, the background on this is -- this, you know, at the bottom it says:  "Note, this report is intended for intern" -- "internal use only."

And it was -- it ended up being used as a reason to terminate Jamie.  And so I'm wondering how we get from this to, okay, well, Jamie is doing a bad job and going to get terminated.

Do you see anything?

MR. CARTER:  He's already said he didn't supervise Jamie and he wasn't involved in the termination.  So that's pure speculation, and

I'm going to ask him not to answer that.  I mean, what are you asking?  This document leads to the termination?  He wasn't involved in that.

MS. MAESTAS:  Okay.

MR. CARTER:  His interpretation of that is --

MS. MAESTAS:  I'm not asking him about Jamie specifically.

BY MS. MAESTAS:

**Q    So somebody in his department who does Jamie's -- now does Jamie's job.  And these numbers show up for that person, is that -- does that reflect negatively, like, if these numbers showed up?**

A    Since dual enrollment has never reported to me, the retention numbers and things like that has never been something I've been privy to.  What I've been privy to is, you know, number of new students, different things like that.

**Q    Okay.  Well, okay.  I'm going to do Exhibit 14.**

(Marked for identification is Plaintiff's Exhibit 14)

A    Okay.  Oh, Lordy.

BY MS. MAESTAS:

Q    Yeah.  Don't --

A    Okay.

Q    -- don't worry too much about that.

A    Okay.

Q    Okay.  So we've got Plaintiff's Exhibit 14.  This is job openings.

A    Okay.

Q    And then it's listed by department -- or I'm sorry -- title in the second column.  And you've got:  "Admissions Recruiter II, Ryan Hogan."  Then we've got, "Administrations Recruiter II, Ryan Hogan."

So the manager is the person posting this job, and in back you'll see the posting.

A    Sure.

Q    And this is, like, the summary sheet. Admission -- sorry not that one.

"Admissions Recruiter I, Ryan Hogan. Admissions Recruiter I, Hillary Willis.  Admissions Recruiter I, Ryan Hogan.  Admissions Recruiter II, Ryan Hogan."  So I think six open positions.

A    Okay.

Q    And then in between the blue Post-it notes --

A    Got it.

Q    -- are the actual postings themselves. And these -- these were all postings that were produced to me in discovery that -- I mean, they're in -- let's see -- these were printed in 2021, as part of discovery, but they were posted in 2020 or 2021.

A    Okay.

Q    Were these all necessary positions to bring in?  I mean, do you -- okay.  So --

A    Absolutely.  Let me say yes.

Q    Okay.  So what -- what job duties -- are these people current -- you know, are these postings you currently have then, still?

A    I believe so.  There has been some maturation, you know, due to some different things, but the positions themselves, yes.  But the people that were in those at the time or whatever, possibly not, but positions, yes.

Q    Okay.

A    Okay.

Q    Okay.  And we already talked about, like --

A    Yes.

Q    -- all of them did at least something that

**Jamie used to do, or all of them do something that Jamie at least in part used to do?**

A    They -- I -- I'll answer your question like this:  Their responsibility is for recruitment for the University as a whole.  Part of that is dual enrollment.

**Q    Okay.  Great.**

A    And I do want to point out, just because there is maybe a little discrepancy with titles.  On our website you saw counselor, and on this you see recruiter.  Counselor is sort of a working title that they're given.  So if you see that discrepancy, that's why.

**Q    Okay.  But some of these positions include your current people regardless of the discrepancy in title?**

A    I wouldn't say discrepancy.  I would say that the working title is counselor, but for HR documentation purposes it's called recruiter.  They do the same function.

**Q    Okay.**

A    Okay.

**Q    And were any of these positions not filed that you posted in 2020/2021?**

A    No.  I believe we filled all of those.

Q    Filled all of them?

A    Yeah.

Q    Okay.  Do you -- are you aware of Dr. Carr having a rule or policy of practice of not meeting alone with women?

A    I have heard of that.

Q    Okay.  What did you hear?

A    I just hear that -- you know, that he makes it a clear standard that -- and I wouldn't say specifically women.  He doesn't meet with me one-on-one.  Shauna, his assistant, is always with us as well.

Q    Okay.  But didn't he regularly meet one-on-one with people in the admissions office?

A    Not that I'm aware of.

Q    Okay.  Were you ever aware of him, of Dr. Carr, changing his parking space during the time that Jamie was about to be terminated?

A    They -- I wouldn't say "changing his parking space."  I would say that there -- we noticed as an office that it seemed like he was parking there more often.

Q    And that was after the issues were happening with Jamie?

A    I can't identify the right timeline, but I

do remember it being brought up and us sort of saying he doesn't really park here as much, and it seemed like he was --

Q    Does he park --

A    -- more often.

Q    -- there now?

A    You know, I noticed it yesterday.  Because I -- I wondered if this would come up today, and I did notice yesterday he was parked there.

Q    Okay.  What --

A    I was looking.

Q    -- about before yesterday?  Did you notice it?

A    -- it how often -- I mean, often it does -- that he parks in our lot.  I can't say -- I mean, it seemed at the time it was a little bit more regular, but, I don't -- I mean, everybody -- I mean, the thing about our campus is there are -- I would -- I would think maybe 50 spots in our small lot in West Hall.  And if you can't get a spot there, everybody parks at the office of admissions.  But I have seen him park in our lot, as others who work in West Hall as well.

Q    Okay.  Did you think that was based on what happened to Jamie, or did you --

A    I don't want to speculate. I don't -- I don't know. I don't know. I know that some people in the office brought it up, and I -- I noticed that it was a little bit more frequent than in the past. I'm can't speculate the reason. I'm not going to speculate the reason.

Q    Okay. But did people in the office mention that the reason may have been Jamie's issues that he was involved in?

A    I -- there were some talk of that. I heard some people say that, yes.

Q    Okay. Did you ever hear about a prior complaint at Bainbridge Collage where Dr. Carr was investigated for his dealings with females regarding, like, sexually vulgar comments or inappropriate touching?

A    Not until recently, but not to the specifics that you just said. I heard that there was -- I heard -- and I can't say who, and I'm not going to speculate, but I did hear that there were some other issues at Bainbridge. I did not know what with the specifics were.

Q    Okay. If you could turn to 47. And this is Plaintiff's Exhibit 47.

(Marked for identification is Plaintiff's Exhibit 47)

A    Okay.

BY MS. MAESTAS:

Q    It's a cover letter to me because I sent it as an open records request.  And so if you could flip to, let's see, one, two, three, the fourth page in.

A    Uh-huh.

Q    There's some bullet points.

A    Okay.

Q    And it says that there was speculation that he had had an affair with Lindsey Barron, Regina Jones, and Leslie from the Charter -- Charter House.  "He stands too close to woman - doesn't keep a safe personal distance.  He's too intimate for my own comfort.  Intimacy is suggested by his behavior."

Then -- let's see, one, two, three, four, about five more pages in it's a document that says "Page 1 of 3."

A    Okay.

Q    And then there's Page -- on Page 1 at the bottom of the first paragraph:  "It's a hostile work place for college employees."

Page 2 of 3 starting at the top, the sentence:  "It has become clear that Dr. Carr's inappropriate behavior is a pattern and not an isolated incident."

Paragraph 2, second sentence:  "Threatened his employees with their jobs."

Paragraph 3, "Notorious around campus for vulgar and sexually charged language.  Many of his employees are unable to speak out about the situation," and it says, "because he has invoked your support in threatening his employees."

That is speaking to -- this email is written to Dr. Carvajal.  So they're invoking the president at Bainbridge as a reason to fear retaliation.

Have you ever heard of any of this?

A    I have not.

Q    Does -- have you ever seen this?

A    I have not.

Q    Anybody ever talked to you about it -- about Dr. Carr?

A    No.

Q    And then a few more pages in there's a document entitled "Written Reprimand," March 20th, 2013.

Still trying to track down the "Report of Findings," this has been a document that's gone missing.  We can't seem to get our hands on it.  We've subpoenaed it.  Maybe it will come.  I don't know.

Have you ever heard of a "Report of Findings," anything related to an investigation at the USG level of this individual?

A    I have not.

Q    Okay.  Were you aware of a recently open position in admissions that was posted in 2021 to which Jamie applied?

A    I am aware.

Q    Okay.  And did you sit on that committee?

A    I was on the committee, but I had appoint- -- appointed a search chair, which I've mentioned, Dr. Chu.  My charge to the search committee was to bring, you know, the top three candidates, unranked, to campus.  And they took that.  And I was not part of the interview process or anything like that.

Q    And was Jamie one of the top three candidates?

A    I do not believe so.

Q    Okay.  Do you think that Jamie would have

been a good fit for that position?

A   I don't believe that was my opinion, because, you know, what we had talked about as a search committee.  I had given them sort of a charge for them to make that determination.  And once the top three came, you know, based on the opinions of campus presentations and different things like that, that's how our -- the decision was made.

Q   Okay.  And I'm sorry, this is different from the other search committee --

A   I agree.

Q   -- that you had --

A   I understand.

Q   Okay.

A   Yeah, I know.  I'm familiar with the one that Jamie applied for.  She did not apply for the other ones that I chaired.

Q   Okay.

A   I chaired one for housing.  And then --

Q   Yes.

A   -- I -- yeah, I just wanted to clear.

Q   Okay.  Can you tell me who was Jamie's -- or not Jamie's, but what -- what's the name of this position?

A   Assistant director of admission.  And

earlier I gave you the names of the people that were on that search committee.

Q    Oh, you did?  I thought that was the housing one?

A    I believe you asked both.

Q    Okay.  Well, I can get that in the transcript.  Okay.

And who was eventually hired?

A    An individual named Katrina Crumpton.

Q    And what are her qualifications?

THE WITNESS:  Can I share those?  Seems like somebody's personal information.

MR. CARTER:  Yeah, I'm -- I'm going to ask him not to answer that.  You can --

MS. MAESTAS:  Of course.

MR. CARTER:  -- see what you can get.

BY MS. MAESTAS:

Q    Was she more qualified than Jamie?

MR. CARTER:  Again, this is a committee decision that he directed them to bring the top three candidates.  So that was what the committee did, so ...

BY MS. MAESTAS:

Q    Do you believe that Katrina Crumpton was more qualified than Jamie?

A    I --

Q    In your personal opinion, like, knowing what you know about her.  I'm not asking -- because he's objected to it, and we're going to get into a fight about whether that's privileged or whatever.

But I don't know how someone's qualified -- qualifications at a state institution are privileged, but okay.

Is she more qualified than Jamie Bird to do this job, in your professional opinion?

A    I'm not going to be able to answer that, because I don't know what the committee went through before we got to a top three.  So I am not privy to the information.  But based on the information, a top three was brought to me and Katrina was hired.

Now, would my opinion have changed if Jamie made it to that top three?  It could.  I just don't want to speculate and say, Yes, she was, or, No, she wasn't, because I made a decision based on the information I had at the time.  And those were evaluations from campus presentations and things like that.  I don't have the information to be able to say whether Jamie was or was not more qualified.

Q    All right.  I am going to hand you what I've mark as Plaintiff's Exhibit 49.

A    Okay.

(Marked for identification is Plaintiff's Exhibit 49)

BY MS. MAESTAS:

Q    Is that a copy of the job posting for the position we've been discussing?

A    I believe so, yes.

Q    Okay.  All right.  Thank you.

A    Yeah.  I mean, do you want me to look at other pages?

Q    Yeah.  I'm just asking --

A    Yeah, yeah, yeah.  I believe so, yeah.

Q    Okay.  Now, that you've reviewed it, does it appear to be a copy of that position to which Katrina Crumpton was hired?

A    Yes, it does.

Q    Okay.

MS. MAESTAS:  I think I'm about done.  If we could take just, like, a two-minute break --

MR. CARTER:  Sure.

MS. MAESTAS:  -- so I can just talk with my client.

(Recess 11:51 a.m. until 11:56 a.m.)

BY MS. MAESTAS:

Q    Just a couple more questions, Mr. Hogan.

In January of 2020, where you open the key -- you brought the key to go into the building and you said that you had not seen anything, you didn't see the gesture.  Did you not ask Jamie this question after that meeting, "What was that all about?  That was a little creepy"?

A     I said I had heard that.  And I had said I had heard that, and I do remember saying something to the effect of, "What was that about?  I heard this."

Q     Okay.  And that --

A     I don't remember the word "creepy."  I mean, it's been some time, but I do remember asking her, "Hey, I heard that.  What that was that about?"

Q     Okay.

A     Because at the time -- and I think I answered --

Q     No, no, go ahead.  I want you to finish.

A     Because -- and that's when she kind of told me some of the things from the past, those sort of things that I had no knowledge of.

Q     About the reprimand and such?

A     Yes.

Q     And the email.

A     (Nodding head.)

Q     Okay.  And then, did you not say that you, you know, redid the gesture like this?

MS. MAESTAS:  I'm standing up, and I'm putting my arms and making an air hug.

BY MS. MAESTAS:

Q     Did to you not do that, like tell Jamie, "I saw Carr go like that"?

A     I don't remember.  I remember hearing it, but I don't remember seeing it, seeing it specifically.  I remember sitting on the couch with my back to the door.  I don't remember seeing the gesture, but I remember hearing the words, if that answers your question.

Q     Okay.  And then did you follow-up with that in a phone call shortly after that interaction where you helped him go into her office and say that she was the only one being moved under Freidhoff and the rest of the people in admissions were staying under you.

A     I -- I --

Q     Under Carr?

A     -- I don't believe so.  I mean, I think the intention of us going over there was he had told me orientation was moving into this first-year program, that sort of thing.

Q    Office of first year transfer --

A    Correct.  Correct.  And that dual enrollment was going there too.  When you say, "The rest of admissions," the rest of admissions staff still report to me.

Q    Okay.  And then in November of --

MS. BIRD:  2020.

BY MS. MAESTAS:

Q    -- 2020, there was a meeting with you and Lisa Long, and there was a discussion that she would be filing a lawsuit.  And she had asked for your support.

And do you remember indicating that you would tell the truth about, like the air hug gesture and --

A    I don't remember being specific about what I would do.  I remember telling -- I remember there being discussion is if I would say what I saw and heard?  And I said "Yes, I would."

Q    Okay.

MS. MAESTAS:  Can we quit?

All right.  Thank you for your time, and I appreciate you being here for the time that we have.

MR. CARTER:  Let me ask you just a couple

questions.

CROSS-EXAMINATION

BY MR. CARTER:

Q    Ms. Bird came to you when, and told you that she was going to be filing a lawsuit?

MR. CARTER:  Don't comment.

A    I think there was some discussion --

MR. CARTER:  I will get an order to have you out of these depositions if you comment.

BY MR. CARTER:

Q    Go ahead.

A    I believe there was some indication that one was forthcoming.

Q    All right.  And she asked for your support?

A    I think it was -- I believe she asked if I would participate in saying what I saw and heard.

Q    All right.  And your response was you were going to tell the truth; correct?

A    Correct.

Q    And that's what you've done here today; correct?

A    Yes.

Q    Now, you were not Ms. Bird's supervisor, were you?

A   I never have been.

Q   Did not have authority to discipline her and never was involved in any that have, were you?

A   That's correct.

Q   All right.  And you don't know what her job requirements were?

A   That's correct.

Q   Valdosta State looks for dual enrollment students from all -- all kind of sources, don't you?

A   Correct.

Q   Just like you do regular enrollees; correct?

A   Correct.

Q   And you want to have dual enrollment students coming from technical -- from the technical system if they're qualified to come into the institution, don't you?

A   Absolutely.

Q   All right.

A   Absolutely.

Q   And you don't want to disparage those technical institutions qualifications in an email in anyway, do you?

A   No.  I think that speaks to the partnership, but we want to make sure that we're

partnering with them if there's students there that are interested in coming to us that we're working with them to provide those options.

Q   All right.

MR. CARTER:  Okay.  That's all I've got.

MS. MAESTAS:  All right.

THE WITNESS:  Have a good day.

MS. MAESTAS:  Thank you.  And don't forget the Notice to Produce document.

MR. CARTER:  Oh.  Do you want to -- you've got the right to read this before it's sealed up to be filed with the Court.  That's your option.  The court reporter will send it to you so you can read over it.  If there are any mistakes, you can correct them.

Would you like to do that?

THE WITNESS:  Yes.

MR. CARTER:  All right. He'll read and sign.

(Examination was concluded at 12:02 p.m.)

CERTIFICATE OF OATH


STATE OF GEORGIA

COUNTY OF LOWNDES

     I, KAIRISA JOI MAGEE, RPR, GCCR (Georgia),

     Notary Public, State of Florida, certify that

     RYAN HOGAN appeared before me on January 19th,

     2022, and was duly sworn.


     Signed this 19th day of February, 2022.


_____
KAIRISA JOI MAGEE, GCCR, RPR
Georgia Certification No. 5962-0590-7476-4800
Notary Public, State of Florida
My Commission No. GG 968504
Expires: 03/15/2024

CERTIFICATE OF REPORTER

STATE OF GEORGIA

COUNTY OF LOWNDES

I, KAIRISA JOI MAGEE, RPR, GCCR (Georgia), Florida Notary, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of RYAN HOGAN; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 19th day of February, 2022.

_____
KAIRISA JOI MAGEE, GCCR, RPR, FLORIDA NOTARY

```
                     ERRATA SHEET

              DO NOT WRITE ON THE TRANSCRIPT
               ENTER CHANGES ON THIS SHEET

JAMIE T. BIRD V VALDOSTA STATE UNIVERSITY
Deponent:  RYAN HOGAN
Date of :  January 19th, 2022
Case No.:  7:21CV62 (WLS)

   PAGE    LINE          REMARKS


_____


_____


_____


_____


_____


_____


_____


_____


_____


_____


_____


_____


_____


Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.

Signature of Witness _____

Dated this _____ day of _____,
_____.
JOB NO.:  378316
```

─────────────

   Exhibits
─────────────

HoganR 7   4:5
  119:4,6

HoganR 11
  4:18
  157:24
  158:2

HoganR 14
  4:19
  159:22,24
  160:7

HoganR 17
  3:25
  107:11,13
  108:8,9
  113:17

HoganR 18
  4:3
  113:19,23
  117:1

HoganR 19
  3:14 70:2
  114:1
  117:19

HoganR 20
  3:15 74:2,
  15

HoganR 21
  3:17 77:4,
  6 143:20,
  21

HoganR 23
  3:18
  83:21,23

HoganR 24
  3:20 86:6
  89:2,5

HoganR 29
  4:9 133:9,
  12 135:25

HoganR 30
  4:6 121:1,
  3,7 124:3

HoganR 31
  4:8 130:9,
  13

HoganR 41
  4:14
  140:14,17
  152:4
  156:7

HoganR 42
  4:15
  151:18,21

HoganR 43
  4:16
  155:22,25

HoganR 44A
  4:11
  138:4,7

HoganR 44B
  4:12
  139:23

HoganR 46
  3:21
  102:14

HoganR 47
  4:20

165:24
166:2

HoganR 49
  4:21
  171:25
  172:3

─────────────

      1
─────────────

1  166:21,23

10  15:10

10:28  107:22

10:36  107:22

11  157:22,
  24 158:2

11:51  172:23

11:56  172:23

12:02  178:20

12th  103:3

14  159:22,
  24 160:7

1413  8:19

15  15:10

17  82:9
  107:11,13
  108:9
  113:17

18  103:7
  113:19,23
  117:1

19  69:24
  70:2,10
  114:1

117:19,20,
22,24

─────────────

      2
─────────────

2  81:20
  82:24
  117:24
  144:25
  167:1,5

2.0  24:16
  45:19
  46:21

20  14:15
  73:24
  74:2,15
  103:6,15

2001  38:4

2004  38:4

2013  167:25

2015  7:14
  22:20 49:3
  103:24

2019  9:10
  84:3 103:3
  120:1
  140:19
  149:22
  152:5
  156:2

2020  12:23,
  24 121:9
  140:1
  161:6
  173:1

Case 7:21-cv-00062-WLS    Document 34-6    Filed 05/12/22    Page 183 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022          Index: 2020-ish..accredited

175:7,9

**2020-ish**
149:21

**2020/2021**
162:24

**2021** 161:5,
7 168:11

**20th** 167:24

**21** 77:4,6
143:17,20,
21

**23** 83:20,
21,23

**24** 86:6
89:2,5

**26th** 140:19

**27th** 152:5

**29** 133:7,9,
12 135:25
144:20

— 3 —

**3** 85:9
138:10
166:21
167:1,7

**30** 14:15
23:23
24:21
25:1,3,9,
13 45:20,
21 46:5,
16,20

103:7
121:1,3,7
124:3
147:11,17,
18

**30(b)(6)**
8:25 9:4,
22

**30-plus**
24:14
26:18
45:16

**30th** 121:9

**31** 130:8,9,
13

**31602** 8:20

**363** 103:23

— 4 —

**40-** 139:21

**41** 140:14,
16,17
144:21
146:21
152:4
156:7

**42** 151:16,
18,21

**43** 155:20,
22,25

**44A** 138:2,
4,7

**44B** 139:20,

23

**46** 102:9,
14,21

**47** 165:23,
24 166:2

**49** 171:25
172:3

— 5 —

**5** 82:24

**50** 14:15,22
16:6
164:19

**5th** 156:1

— 7 —

**7** 118:8,9
119:4,6,7

**7-21-CV-62**
5:14

— 8 —

**8:32** 5:1

— 9 —

**9:14** 44:17

**9:21** 44:17

— A —

**a.m.** 5:1
44:17

107:22
172:23

**abbreviation**
109:7

**ability** 14:1
71:10 83:7

**absolutely**
39:1 41:3
94:16
96:11
130:7
161:11
177:18,20

**academic**
51:3,10
69:19
77:20
84:20 92:4
148:13
149:5
156:19

**accept** 88:8

**accepted**
44:11,13
87:25 88:2
99:24,25
109:13

**accepting**
87:11

**access** 19:11
54:12

**accreditation**
87:6

**accredited**

Case 7:21-cv-00062-WLS   Document 34-6   Filed 05/12/22   Page 184 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022        Index: accuplacer..advise

46:18
87:3,17
89:14,21
92:15,18
94:19

**accuplacer**
26:3

**acronym**
128:3

**Act** 24:22
25:25 47:8
76:6,21
147:7,9,21

**acted** 51:16

**Action**
127:21,23

**actions**
119:19

**active** 50:2

**actual** 161:2

**add** 119:14

**addition**
88:6

**address**
8:18,19

**administration**
18:18

**administration
s** 108:17
116:5
160:12

**administrative
ly** 42:16

**admission**
16:15
26:21
31:16
38:25 41:1
44:7 55:10
60:15
64:10,13
65:18
75:18,23
77:10
81:25
108:9
125:8,15,
22 126:16
128:19
160:18
169:25

**admissions**
9:11 19:1
21:17,22
22:13,22
27:9 28:24
30:8 31:6,
9 32:5,7,
11,13
35:15
38:10,15
40:10,23,
25 41:15,
16 42:17
43:14
44:22
46:9,10,11
50:16
54:19,23
55:6 56:21
60:17 63:9

64:22
68:3,13
69:8 82:2,
10 92:16
99:1 100:5
106:19
107:8
108:3
109:21
111:1
112:17
116:3,7
120:1,5
125:19
126:7,16,
18 127:3
135:6
138:8
146:25
153:17
154:3
160:11,19,
20,21
163:14
164:21
168:11
174:18
175:4

**admit** 23:15,
17,24
24:8,9,23
25:22,23
26:12
31:17
33:17 39:1
50:7 55:6,
17 68:4
74:4 100:4

**admitted**
23:18,19
24:7
33:19,25
34:4 35:7
41:11
42:18
43:7,24
52:9 53:7
64:5 66:9,
10 69:9,10
111:20
147:9
155:7

**admitting**
31:10
39:22
41:17 43:8
44:5 54:20
63:17
64:1,7
99:1

**advantage**
105:10

**adverse**
157:7

**advice** 50:7
51:11
62:21
63:2,4,7,
25 65:13,
18,25
82:16
106:25

**advise** 80:16
90:19

adviser
  66:24

advisers
  51:17

advises  69:7

advising
  31:12
  32:19
  41:22
  50:17,20,
  25 51:2,
  12,15
  63:15
  126:15

affair
  166:13

affairs
  11:20
  22:12

affect  14:1

affiliation
  23:13,14,
  16

affirm  5:4

age  6:4

agency  47:25
  48:7,11

ages  94:21

aggressive
  103:5

agree  128:21
  142:7
  145:5

146:3
147:2,3
148:7,8,16
149:7,12,
17 153:6,7
156:22
157:1,3,9
169:11

agreed
  125:9,14

agreement
  5:18 24:12
  45:18
  87:13,21,
  22 88:10
  89:6
  153:20,25

agreements
  24:5 88:3,
  14,21,24
  89:8 153:9

agriculture
  106:20,21

ahead  18:15
  57:22
  81:14
  104:6
  118:1
  146:7
  173:18
  176:11

aid  33:10,
  11,14
  42:23,24
  43:10
  51:11

56:25 99:5
111:19,21

air  134:6,
  11 150:11
  174:4
  175:14

air-hug-type
  135:15

Alexis
  113:12

alleged  9:7

Allen  18:18

alluded
  130:4
  136:16
  144:16

alluding
  124:16

analytical
  80:17

and/or  73:20

anger  132:4

Annual  103:2

answering
  39:11

answers  36:3
  54:14
  96:20
  113:4
  115:22
  124:24
  126:5
  129:21

135:17
174:13

anticipation
  13:8

antiquated
  115:24

anymore
  117:7

anytime  11:8

apologize
  92:1
  116:11

apostrophe
  15:17

application
  28:16
  37:25 44:2

applications
  53:8 109:3

applied  38:6
  69:7
  100:15
  168:12
  169:16

applies
  35:1,21

apply  36:11
  39:9
  115:12
  142:20
  143:4
  147:19
  169:16

applying
  39:19 40:6
  50:8 60:23

appoint-
  168:16

appointed
  38:14
  168:16

approve
  66:24 67:1

area   14:17
  15:4
  30:14,16
  31:13,24
  32:2
  33:14,20
  36:21
  41:7,12,14
  43:13
  51:15,16
  55:17
  68:6,15,16
  69:10 83:8
  98:1 110:1
  143:5

areas   19:10
  34:20,21
  43:9 44:7
  51:16
  56:25

argue   89:22

arms   174:4

Arrington
  11:17,20,
  25 12:3,8,

19,23
13:2,9
127:22

articulation
  24:5,11
  45:18
  87:13,21,
  22 88:3,
  10,21,24
  89:6,8
  153:9,20,
  25

aspect   56:22

ASSET   76:14

assistance
  144:10,12
  149:14

assistant
  18:9,20,25
  115:17
  122:8
  131:1
  163:11
  169:25

associate
  18:9 21:25
  32:14
  38:7,12,17
  131:4

associate's
  24:2,6,15

assuming
  125:12
  145:24
  153:6

asterisk
  119:2

Atlanta
  110:2

attached
  74:5

attempting
  146:23

attend   25:21
  50:10
  60:16
  62:17,24
  71:22
  72:17
  90:5,6
  141:24
  156:11,20

attendance
  104:24

attended
  28:17
  63:12,19
  85:2 86:2

attending
  112:14

attention
  69:23 71:4
  77:11
  96:25
  102:8
  120:25

attorney
  7:20 11:10
  12:6,13

audience
  145:3

August
  12:23,24

aunt   15:19

authority
  177:2

avoid   8:2

aware   20:10,
  19 67:14,
  15 119:25
  163:3,15,
  16 168:10,
  13

awareness
  157:21

———————
    B
———————

bachelor's
  21:1 39:18

back   10:2
  13:14
  26:15
  28:21
  30:2,13
  36:14,18
  38:20 40:1
  43:4 49:2,
  13 62:13
  93:23 98:9
  101:13
  102:20,21
  105:20
  107:23
  114:3

116:10
130:17
135:22
142:8
143:17
144:20,21
146:17,21
149:11
154:11
160:15
174:11

**background**
60:21
158:15

**backwards**
151:21

**bad** 106:25
123:18
136:23
158:21

**Bainbridge**
165:13,21
167:14

**Barker** 75:8

**barley** 80:14

**Barron**
166:13

**based** 24:11
60:21
80:20,22
83:17
106:15
107:1
128:10,24
132:16

137:20
155:12
156:11
164:24
169:6
171:14,19

**basically**
60:14,20
100:3
101:20
105:9
128:19
140:4

**basics** 38:21

**basis** 17:1
54:16
90:12
114:18
119:15
120:13

**Beasley**
139:7

**beer** 37:5

**befo-** 45:10

**began** 5:1

**beginning**
40:3 45:11
97:21

**behavior**
166:18
167:3

**belong** 118:7

**big** 17:2
135:5

**biggest**
154:12

**Bird** 5:10,
11 12:12
13:17 32:6
34:12,16
57:15,17
58:20,25
59:2,4,7
125:8,17
126:17,22
133:20
138:16
156:1,12
158:5
171:9
175:7
176:4

**Bird's** 125:6
133:19
176:24

**Birds** 127:9

**bit** 45:10
66:20
89:16
98:22
113:15
121:18
147:22
151:20
164:16
165:4

**Black** 152:1
154:11

**blanket**
90:4,15

100:17
142:10,17,
19 143:3
144:15

**blood** 14:23,
25

**blue**
102:19,21
103:19
160:24

**board** 5:12
9:1 21:13,
14 31:11
39:3 74:16

**Boddie-lavan**
9:21 11:4
17:23
19:15

**Boddie-lavon**
37:17

**body** 87:4
89:14

**books** 105:1

**bottom** 124:6
130:9
158:16
166:24

**bowling**
37:21

**boxes** 151:10

**bragging**
132:4,6

**break** 44:20
45:25

107:24
172:19

**breakdown**
107:8

**Brenda**
139:7,10

**bring** 6:11
92:19
102:3
161:10
168:18
170:20

**broad** 100:22
101:1
108:12

**broadly**
115:1

**broke** 55:9

**broken** 7:14

**Brother**
14:12

**brought** 9:12
22:21
35:13
37:24
157:16
164:1
165:3
171:15
173:2

**BSU** 108:9

**budget**
118:18
132:14

**building**
173:2

**bullet** 86:12
89:4
166:10

**business**
5:13 9:2
21:2 33:9
154:2

**Byrd** 51:20

---

**C**

---

**C-H-U** 19:6

**call** 26:1
56:18,24
57:10 60:7
81:10
110:20,21
114:10
174:15

**called** 21:16
22:11 26:8
70:22
116:10
127:18
130:20
131:8
150:18,23
162:19

**calling**
131:20

**calls** 42:25
145:8

**campus** 42:23

44:7 92:12
164:18
167:7
168:19
169:7
171:21

**candidates**
168:19,23
170:21

**capacity**
5:21 19:23

**career** 52:2
132:10
147:24

**careful**
77:19

**carefully**
141:1

**Carl** 9:8

**Carr** 9:19
17:24
19:15,21
37:16
52:22
53:20,21,
24 121:24
123:13,23
124:9
125:7,9
127:8
130:20
131:8,13
132:3
133:3,18
134:1,3

138:8
150:14
154:11
163:3,17
165:13
167:21
174:7,21

**Carr's** 152:4
167:2

**Carter** 7:19
9:15,23,25
11:1 13:3,
6 32:25
33:4 36:1,
7,23 44:15
55:3
57:16,18
58:10,13,
15,18,22
59:1,3,6
61:2 67:22
68:1 74:3,
7,10,12
77:22
78:1,4,9,
15,17,25
79:6,11
81:10
93:15 94:7
95:16,19,
22 96:4,9
104:1,5
107:20
114:14
141:6,8,11
145:6
146:4

Case 7:21-cv-00062-WLS   Document 34-6   Filed 05/12/22   Page 189 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022       Index: Carvajal..classification

148:17,21
158:23
159:6
170:13,16,
19 172:20
175:25
176:3,6,8,
10 178:5,
10,18

**Carvajal**
9:19 17:22
19:15,21
37:16
167:13

**case** 5:14
48:1 49:20
128:7

**case-by-case**
23:25

**cases** 108:7

**casings** 19:9

**categories**
55:9

**category**
26:8 27:18
40:19
46:22
60:19

**center** 16:24

**centralized**
139:12

**certify**
69:14,15

**chair** 168:16

**chaired**
18:8,10,22
19:3
169:17,19

**challenging**
71:23
77:12 80:3
83:2
143:21

**chance**
141:14

**change** 23:1
49:8 55:2,
15 60:7
66:22
104:20,21
105:3,7
116:11
119:14
128:6

**changed** 47:8
49:3 68:23
115:15
116:18
171:16

**changing**
145:17
163:17,19

**charge** 31:19
168:17
169:4

**charged**
167:8

**chart** 75:21,
22 76:13

**Charter**
166:14

**charts** 74:22
76:25

**check** 7:17
148:6

**checked**
151:11

**checklist**
68:24

**chemistry**
83:16

**chief** 11:20
18:18

**child** 42:8

**choose**
148:11

**choosing**
148:5,8,25

**Christy**
113:12

**Chu** 19:3,6
168:17

**circumstances**
47:15

**circumvented**
100:14

**clarification**
56:3 58:20
85:14

**clarified**
129:20

**clarify** 24:9
27:6 34:1,
10,13 36:2
38:18
39:15 41:2
42:10
43:17
45:22
46:17 48:6
53:15,17
54:4,10
68:11 73:3
79:22
88:13
93:23
97:25
104:16
114:4,7
139:19
152:18

**clarifying**
54:15

**class** 49:16,
18 101:12

**classes**
16:23 17:2
28:15
33:20
41:13
43:16 52:9
55:24 71:5
73:13,14
109:14
110:3

**classification**
39:5
42:21,22

43:1 44:23

classify
 43:5

classman
 25:12

clean  147:12

cleaned
 151:8

clear  104:18
 163:9
 167:2
 169:21

client
 57:20,24
 58:8
 172:22

close  16:3
 166:15

closed
 124:10
 135:7

closely  18:1
 67:8 97:3
 105:5
 106:10
 109:9
 122:12

closest  16:2

closing
 110:9

coach  16:21

code  33:12

coded  85:15

codes  85:15

coding  85:13

coffee  44:15
 107:16

collaborate
 60:2
 111:21
 152:20

collaborated
 111:6

collaborating
 114:19
 153:2

collaboration
 73:7
 111:25

collaborator
 152:20

collage
 30:22
 165:13

collected
 109:7

collecting
 109:3

collection
 139:25

college
 17:17 18:1
 23:12
 25:21
 28:11
 30:18,20,
 25 77:14

80:5
 109:23
 142:4
 143:11,23
 154:14,22
 156:14,16
 166:25

Colleges
 156:18

column  76:19
 160:10

columns  78:5

comfort
 166:17

comfortable
 58:14
 106:5
 135:7

comment
 60:24
 63:22
 120:17
 135:13
 136:9
 176:6,9

comments
 103:5
 165:15

committed
 153:2

committee
 17:18
 18:8,10,
 12,19,22
 19:2,4,7,

23 20:11,
 13,17
 168:14,15,
 18 169:4,
 10 170:2,
 19,22
 171:12

committees
 17:9,11,
 12,13,14,
 15,20,22
 18:6,23
 21:12

common  28:4
 30:24
 48:24,25
 60:12

communicated
 91:15,16

communicating
 140:4

communication
 157:6

communications
 18:13,16

community
 19:9
 152:21

company
 61:14
 123:19

COMPASS
 76:12

complaint

Case 7:21-cv-00062-WLS   Document 34-6   Filed 05/12/22   Page 191 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022          Index: complete..counselor

120:10,13
165:13

**complete**
59:13

**completed**
71:16

**component**
98:3

**Comprehensive**
153:1

**concluded**
178:20

**conference**
85:12,16,
18

**confused**
40:21,24
45:11
61:16

**Connolly**
113:22

**consideration**
99:17

**considered**
40:12
119:13
156:17

**consult**
77:14 80:6
83:6
143:24

**consultation**
144:5

**consulted**
144:17

**contacts**
75:6

**contents**
151:13
157:15

**continue**
29:24
59:19 60:9
61:8,9,21
96:3
103:17
116:18

**continues**
128:4

**continuing**
60:7 61:20
102:7

**contributed**
122:16

**convene**
21:18

**conversation**
81:17
121:22
122:25
123:22
125:7
128:11,24
157:20

**conversations**
22:22
132:23
138:1

**coordinate**
43:9,10,11

**coordinated**
44:8

**coordinator**
116:7
152:16

**copy** 6:8
7:1,8 8:4
73:10 86:9
141:20
172:5,14

**correct**
10:24
25:17
27:14 29:9
32:22
33:18 40:8
45:8
46:12,14
48:14
59:8,22
66:3 88:25
107:6
112:4
116:6
117:18
127:14
150:9
151:4
175:2
176:19,20,
22 177:4,
7,10,12,13
178:15

**correcting**

48:15

**correctly**
85:16

**cost** 49:11,
14 104:23,
24

**couch** 135:22
174:10

**counsel** 5:19
6:9 9:14
12:7,22
80:20
148:20

**counseled**
95:13

**counseling**
66:16
67:5,18
68:22,25
69:18
84:12,14,
15,16,21
146:15
149:10

**counselor**
69:4,5,7,
11,13
77:15
80:6,10,
15,24
81:4,16,17
83:6,14,17
84:18
115:24
116:2,3,5,
8,13

Case 7:21-cv-00062-WLS    Document 34-6    Filed 05/12/22    Page 192 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022          Index: counselor's..dated

143:24
144:6
162:10,11,
18

**counselor's**
80:22

**counselors**
67:9,11
109:21
116:14
136:18
140:18,19
141:20
144:11
152:6

**counting**
121:15,16

**country**
60:14

**County**
154:18

**couple** 19:10
33:1 37:15
74:17,18,
21 156:5
172:25
175:25

**courses**
55:20 62:2
68:14
69:11,13,
16 71:23
77:16,18
80:8,11
81:7,9

82:14 83:7
84:17,19
86:16,17
88:7 92:17
94:18
143:25
146:19
148:6

**coursework**
154:14,22

**court** 5:2,15
7:3 8:9
13:4
29:12,15,
18 42:6
48:8 58:18
113:14
148:19
178:12,13

**courtroom**
58:23

**Cousin** 14:13
15:20,21,
22,23

**cover** 111:8,
9 166:5

**create** 81:13
138:11

**created**
138:24

**credit** 24:14
25:10
45:16
46:16,17,
19,21

87:19
147:18

**credits**
23:22,24
24:10
25:2,14
28:13,14
39:6,8
63:6,8,10
86:21
87:11,16,
18 88:1,2,
8,23
142:1,23
146:24
147:14,23,
25 154:8
156:9

**creepy**
173:6,12

**criminal**
88:5,6

**criteria**
26:3
56:14,21
101:5,7,9,
17 110:5

**critical**
141:23

**Croft** 113:12

**CROSS-
EXAMINATION**
176:2

**cross-talk**
28:3

**Crumpton**
170:9,24
172:15

**culmination**
123:14

**current**
11:22
16:13
112:16
161:13
162:15

**curriculum**
77:13 80:4
83:3 142:2
143:9,22
156:12

**cuts** 118:18

**CVIOG** 9:9
120:1

———————————

**D**

———————————

**Dad** 14:12

**dad's** 61:13

**daily** 152:22

**danced** 98:21

**Daniel** 51:20

**data** 158:3,
7

**date** 10:23
93:5 94:12
95:1

**dated** 121:9
152:5

Case 7:21-cv-00062-WLS   Document 34-6   Filed 05/12/22   Page 193 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022      Index: Davis..determination

156:1

**Davis** 12:12, 15,18

**day** 122:18 124:15 150:11,15 178:7

**days** 9:13, 18 10:20 37:15 74:9

**DE** 23:2 29:8,25 50:3,5,12, 22 54:23 60:12 61:3 66:17 67:19 77:17 86:21 90:20 95:14,23 103:5,6, 23,25 105:18 108:3 142:1 154:13

**deal** 85:19

**dealing** 97:16

**dealings** 165:14

**debatable** 87:8 92:13

**debate**

89:10,15, 16,23,25 90:10 92:25 94:17 146:17

**debates** 87:19 92:22

**decide** 61:8

**decided** 28:14 30:12 39:25

**deciding** 103:16

**decision** 23:9 50:6 60:8 64:18 87:14,25 91:1,11 169:8 170:20 171:19

**decisions** 20:14

**defendant** 5:20 7:9 9:1,10

**deficient** 51:4

**define** 14:10,16 37:4 84:15 152:18

**definitively** 137:16

**degree** 20:24,25 21:1,2 24:3,15 26:14,16 39:10,18 40:1,16,19 59:20 60:9 106:21 154:2

**degrees** 24:6

**denied** 65:17,22

**departed** 34:16

**department** 6:15 7:18 20:21 31:18 41:18 55:18 65:9 73:4 99:1 138:12 159:11 160:9

**departments** 111:22

**departure** 35:1

**depended** 100:9

**depending** 24:10

47:25 60:17 112:4,5 149:8,9

**depends** 23:22 24:4 90:2,3

**deposed** 5:21 9:18 10:20 37:15 133:5

**deposition** 5:17,19 6:9,17,20, 25 7:1,4, 9,25 8:5, 22,25 9:4 10:4,10, 12,16,18, 21 11:6 13:1,23 14:2 57:19 93:19 94:5

**depositions** 9:23 74:7 176:9

**design** 73:11

**designated** 9:5,21

**designed** 73:4

**designees** 9:12

**determination** 169:5

determine
  24:11 39:8
  77:16 80:7
  92:16
  143:25
  144:6

determining
  24:17

deterrent
  105:2

DEU  75:7

Diagram
  117:14

Diane  75:8

difference
  49:14
  76:3,4,17

difficult
  75:25 76:2
  81:8
  109:22

difficulty
  155:4

direct  6:6
  23:16
  52:25
  69:23 71:3
  77:10
  94:12
  101:9
  102:8
  110:13
  120:25
  123:12
  124:22,23

directed
  170:20

direction
  144:13

directly
  33:11
  92:11 93:4
  100:15
  154:13

director
  11:3 16:14
  18:9,25
  19:3 22:1
  32:11,12
  38:7,10,
  11,15,17
  120:5
  122:8
  131:1
  169:25

disagree
  142:7,13
  145:5
  146:3
  147:2
  148:7,16
  156:22,23
  157:9

disappointed
  95:13

discipline
  177:2

discovery
  161:4,6

discrepancy

162:9,12,
  15,17

discuss
  93:24
  108:16

discussed
  9:14 84:13
  86:10 87:2
  145:17

discussing
  172:6

discussion
  85:9
  175:10,18
  176:7

discussions
  115:8
  136:7

disparage
  177:21

dispute
  67:21 86:3

distance
  166:16

distinguished
  103:9

District
  5:15,16
  14:20

divided
  109:1
  155:11

division
  5:16 17:25

41:9 52:25
  109:20
  138:9

doctorate
  21:4 39:20

document
  70:12 75:4
  77:22,25
  78:2
  79:12,13
  81:13,21
  104:5
  159:2
  166:20
  167:24
  168:2
  178:9

documentation
  162:19

documented
  119:18

documents
  6:11
  109:7,11

dollars
  104:25

Donna  9:20
  57:12
  91:14

door  28:25
  124:9
  133:19,20,
  25 134:2,3
  135:14,23
  150:12

174:11

**doors** 135:7

**double**
  151:11

**Dowling**
  113:23

**driven** 158:8

**drives** 42:22
  43:1 56:25
  132:14

**drugs** 13:25

**dual** 7:12
  9:11 22:2,
  4,5,8,21
  27:20,21,
  24 28:18,
  20,21
  29:25
  30:2,3,16,
  21,25
  31:4,13,
  20,21,23,
  25 32:2,4,
  17 33:16,
  19 35:4,7,
  12 39:12,
  13 40:1,5,
  7,11,17,
  22,25
  41:6,11,
  14,16,17,
  20 42:16,
  17 43:6,9
  44:9 45:13
  47:1,3,17

48:20,21
50:18
51:15,16
52:1,4,8,
12,15
55:1,10,
13,17,20,
25 56:6,8,
15,20,24
57:8 59:10
60:4 62:20
63:3,5,8
64:21
65:1,3,12,
18,22
66:14,15
68:5,15
69:6,10
70:16
71:3,12,16
75:17 79:9
84:2 91:3
92:5 98:2
99:2,6,16
100:6,15
101:3,12,
15,21
103:15
105:14
108:18
110:4,10
111:13,16
112:3,10,
11,13,21
115:19,21
116:20
117:11
126:13,19,

20,24
138:13,15,
18,19
139:6,10
140:4,6
141:22
145:17
147:14,15
152:16,17
153:3
159:16
162:5
175:2
177:8,14

**dually** 46:21

**due** 118:18
  161:16

**duel** 43:13,
  15

**duly** 6:4

**duties**
  113:10
  161:12

———————

E

———————

**e-l** 15:17

**earlier**
  30:10
  40:21
  55:16
  83:12
  147:24
  170:1

**earn** 26:14
  40:1 59:20

147:18

**earned** 39:18
  40:15
  154:7

**easier** 36:7
  74:11

**Echols**
  154:18

**ecore** 109:24

**ed** 152:24

**education**
  21:3 63:3
  64:12,13,
  14 96:3
  152:21

**educational**
  153:3

**effect** 157:7
  173:9

**effected**
  105:4

**effort** 41:4
  105:6

**efforts** 53:6
  103:24
  104:19

**eliminated**
  122:13
  125:7

**email** 10:19,
  22 83:25
  136:17
  138:7

140:16,18,
20 145:2,
16,18,20
146:6
149:19
150:15,16,
22 151:23
152:4,15,
19 154:10,
12 156:7,
12,24
157:3
167:12
173:24
177:22

**emails**
139:25

**emergence**
109:24

**employee**
5:20 7:9
11:15

**employees**
9:5 166:25
167:6,9,11

**employment**
16:17

**encountered**
96:20

**encourage**
59:19

**end** 96:2
109:12
135:14

**ended** 158:18

**ends** 33:14

**English**
142:24

**enroll** 39:13
44:11

**enrolled**
28:20
29:1,4
33:20
40:2,17
46:22
47:17
52:8,12
56:19
59:17
100:1
101:16
103:15
109:14

**enrollees**
177:11

**enrollment**
7:12,13
9:11 22:3,
4,5,8,21
27:20,21,
24 28:18,
20,21
30:1,2,3,
16,21,25
31:1,4,13,
21,24,25
32:2,4,13,
14,18
33:16,19
35:4,7,13

38:13
39:12
40:5,7,11,
23 41:1,7,
12,14,16,
17,20
42:16,17
43:6,9,13,
15 44:9
45:13
46:10
47:2,3
48:20,21
50:18
51:15,16
52:1,4,15
55:1,10,
13,17,20,
25 56:5,6,
8,15,21,24
57:2,8
59:11 60:5
62:20
63:3,5,8
64:22
65:2,3,12,
18,22
66:16
68:5,15
69:6,10
70:16
71:3,12,
13,16
75:17 79:9
84:2 91:3
92:5 98:2
99:2,7,16
100:6,15

101:3,12,
15,21
105:14
108:18
110:4,10
111:14,16
112:3,10,
11,13,21
115:19,21
116:20
117:11
126:14,19,
20,24
132:16
138:13,16,
18,19
139:7,11
140:5,6
141:23
145:18
147:14,15
149:14
152:16,17
153:3
159:16
162:6
175:3
177:8,14

**ensure** 80:10
148:12
149:15

**entail** 14:14
81:2

**enter** 66:17
67:19 82:3
146:23

entered
  95:14

entitled
  138:9
  167:24

environment
  18:3 96:16
  152:22

equal  87:19
  109:19

Eric  122:7
  131:17

escaping
  18:20

Essentially
  26:20

establish
  27:5

established
  157:7

evaluate
  101:9

evaluated
  101:18

evaluates
  39:8

evaluating
  24:1

evaluation
  80:22
  83:17

evaluations
  171:21

event  54:17
  84:4

events  53:9

eventually
  62:25 89:5
  170:8

evidence
  67:21 86:3
  87:5
  155:11
  157:12

exact  49:4
  124:17
  131:10,11

examination
  6:6 178:20

examiners
  152:23

examples
  46:8
  95:12,21
  99:9,19
  110:16
  126:1

exams  26:3

exceeded
  103:6

excepting
  125:19

excerpt  71:2

exclusively
  114:14

exhibit  70:2

74:2,15
77:4,6
83:21,23
84:18 86:6
89:2,5
102:14
107:11,13
108:8
113:17,19,
23 114:1
117:1,19
119:4,6
121:1,3,7
124:3
130:9,13
133:9,12
135:25
138:4,7
139:23
140:14,17
143:20
151:18,21
152:4
155:22,25
156:7
157:24
158:2
159:22,24
160:7
165:24
166:2
171:25
172:3

exhibits
  74:5

exist  138:25
  140:23

156:4

existence
  140:21

exists
  139:4,16

experience
  77:14 80:5
  98:16,17
  143:23

experiences
  97:8

explain
  146:7,8

explained
  97:18

explore  66:7

expressed
  90:22

expressing
  132:4

extendant
  153:8

extent  37:13

———————

F

———————

face-to-face
  96:18

fact  133:4
  154:14

factor  24:17

factors
  119:15

123:15

factual
  145:4
  146:2

failure  51:4
  103:5

fair  60:25

fairs  109:23

fall  51:4
  103:7,24
  152:16

familiar
  69:21
  76:14
  169:15

family
  115:18

faster
  152:11

fear  123:20
  167:14

feared
  121:17

February
  103:3
  140:19
  149:22
  152:5

feel  57:24
  106:5
  136:1,9

feelings
  123:10

feels  136:2

felt  135:6
  136:6

females
  165:14

FERPA  95:5

field  20:25
  49:10

fiend  122:11

fight  171:5

figure  42:16
  125:10

figuring
  147:22

file  13:15,
  17

filed  6:3
  120:9
  162:23
  178:12

files
  150:19,20,
  25  151:1

filing
  175:11
  176:5

fill  44:2

filled
  162:25
  163:1

filling
  139:8

final  60:5

finance
  18:17

financial
  33:10,11,
  14  42:23,
  24  43:10
  51:11
  56:25  99:5
  111:19,20

find  106:8

Findings
  168:2,7

fine  74:10
  84:24  85:1
  94:6  141:3

finish  26:16
  33:2  59:10
  60:9  71:24
  101:11
  173:18

finished
  60:12
  101:21
  135:2

finishes
  62:2

fire  132:25

fired
  122:19,20,
  21  132:5

first-year
  174:24

fit  169:1

flier  84:1

flip  73:24
  77:3  86:5
  144:20
  151:16
  166:7

flipbook
  70:23  71:3

Florida
  61:15

focused  30:8
  39:21
  63:17

folks  22:13

follow  9:13
  28:16
  79:16

follow-up
  65:2
  174:14

force  9:7
  118:18
  119:10
  122:9

forces  122:2
  123:16

forget  178:8

forgets
  29:19

form  7:22
  78:14,19
  93:10

109:5
127:7
128:3,12,
15 158:14

**forms** 127:7,
17,19
128:8

**forthcoming**
176:13

**forward** 58:1
142:4
143:11
148:14

**forwarded**
156:13

**foundation**
148:13
149:6
156:19

**four-year**
141:24
142:25
154:21
156:20

**fourth** 166:7

**Frehall**
125:11

**Freidhoff**
9:20
17:22,24
32:19
37:16
40:24
41:2,24
42:3,12

125:12,13
139:3
140:1,7
174:17

**frequent**
165:4

**frequently**
82:25
119:9,13

**freshman**
24:25
25:4,5,24
46:3,6,7
59:21,24
60:7
62:18,25
64:21
71:19 77:9
92:4
101:13
132:16

**freshmen**
40:3

**friends**
36:22

**frist** 43:25

**frustrated**
86:22

**full** 8:13

**function**
33:9 38:25
39:1,4
40:10,25
41:18
43:3,7,14

44:6,9
52:6 54:19
55:1,6,13,
18 68:3,4
99:3
108:16
111:16
112:4,5
162:20

**functions**
42:20
43:12 65:9
68:10,12
125:18
128:5

**funding**
56:9,12,
15,22,24
66:22
67:3,9
69:17
85:7,13
98:3
104:20,21
105:3,7
110:5
115:11

**funds** 43:1

---

**G**

---

**gap** 25:20

**gave** 106:25
170:1

**general**
96:19 99:8

**generally**
111:18

**generated**
158:3

**geometry**
80:17

**Georgia**
5:13,16
8:20 9:2
14:6,17,20
15:4 23:13
28:11
30:18,19,
25 56:10,
16 77:9
82:2,10,
18,20 91:5
98:6
115:11

**Georgia's**
153:1

**gesture**
135:19,20
173:4
174:2,12
175:14

**gestures** 8:2
57:22

**gesturing**
134:5

**Gibson**
113:23

**give** 5:5
7:19 51:11
62:21

63:2,4,21,
25 64:8
65:13,16,
25 66:9
90:24
93:25
94:22
105:9
147:4

giving  63:7

GMC  28:13
47:20,21
48:14
97:22
104:23

goal  72:16
103:5,6,14
106:7
109:12
115:15
117:10

goals  90:23
103:4
106:10

God  5:7

good  5:9
58:12
72:19
100:25
103:12
104:3,4
108:23
122:11
131:1
132:24
145:15,19

156:19
169:1
178:7

government
9:9 19:12

GPA  24:16
45:19
46:21
65:23

grad-  40:18

grade  55:23

grader
56:14,19,
20

graders
56:11

graduate
18:20
25:15 26:5
39:18,21
46:5 59:18
62:25
101:11
141:25
142:3
143:10
148:15
156:20

graduate-level
40:16

graduated
25:8
26:18,22
46:4
101:14,16

graduating
99:18

graduation
31:16

grandma
14:13

granted
111:8

great
114:23,24
162:7

greater
45:21

green  74:19
75:19

Griffin
113:22

grimace
58:16

group  14:14
36:22
149:14

guess  30:19
33:22
78:13
85:19
110:24
145:22

guide  154:6

guiding
144:12
149:14

———————

H

H-O-G-A-N
15:18

Hall
164:20,23

Halloway
122:7
131:17

Hancock
51:24
112:21
114:2
118:2

hand  5:3
41:11
171:24

handed  7:8
108:14

handing  7:1

handle
40:22,25
43:3,18
108:11
113:11

handled
40:23
108:3,4,
11,13
111:1,2
112:18
113:3,10
114:4,5,6
138:17

**handles**
  62:11
  112:17
  114:7

**handling**
  107:8

**hands**  168:3

**hang**  36:21
  37:2,4

**happen**  59:14
  130:23
  153:24

**happened**
  34:15
  123:16
  131:16
  164:25

**happening**
  122:2
  123:15
  134:21
  163:24

**Harbaugh**
  53:25

**hard**  89:22
  128:21
  130:24

**hat**  15:15

**hate**  36:14

**He'll**  178:18

**head**  31:7
  58:22
  173:25

**heads**  139:2

**hear**  13:5
  45:7 57:11
  92:2,10
  115:23
  124:8,24
  135:13,15
  148:20
  149:19,23
  150:2,10
  163:7,8
  165:12,20

**heard**  13:21
  92:8,19,
  21,22 94:2
  120:11,16,
  17 124:10
  135:21
  137:13,21
  138:21
  140:21
  157:17
  163:6
  165:11,18,
  19 167:16
  168:6
  173:7,8,9,
  14 175:19
  176:17

**hearing**  7:25
  93:1
  134:7,10,
  12 174:8,
  12

**hearsay**
  93:2,7,17
  130:25

**heavier**
  112:24

**helped**  35:15
  114:19
  174:16

**helping**  72:9
  106:25
  151:9

**helps**  65:21
  82:21
  148:12

**Herb**  150:4,
  6

**heretofore**
  6:3

**herpa**  95:4

**hey**  23:1
  50:13,21
  52:13 91:4
  111:20
  128:13,25
  173:14

**high**  25:8,
  15,20
  26:4,18,22
  27:1,4,12,
  22 28:13
  40:4 46:4
  48:19
  55:21
  59:18 60:5
  62:21
  66:16
  67:18
  77:13,15

  80:4,6,9
  81:4,15,17
  83:3,6
  95:7 99:4,
  18 101:15,
  16 104:22
  110:7
  111:7
  112:6
  140:18
  141:19,25
  143:22,24
  144:5
  154:18

**higher**  21:2
  45:19
  47:13 76:7
  83:15
  148:1
  152:24

**highlighted**
  71:4 77:11
  81:24
  103:22
  121:12,13
  133:13

**highlights**
  133:15

**highschool**
  30:4

**Hillary**
  131:5,14,
  20 160:20

**hired**  18:25
  32:10
  38:8,11

Case 7:21-cv-00062-WLS    Document 34-6    Filed 05/12/22    Page 202 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022          Index: hiring..incompetent

170:8
171:15
172:15

**hiring** 17:13
18:6

**hit** 96:12

**Hog-** 37:16

**Hogan** 5:17
6:2 7:4,10
8:14 9:19
10:2 13:14
15:14,18
37:16
108:2
113:12
125:7,12
130:20
135:25
136:2
160:11,13,
19,21,22
172:25

**hold** 151:16

**holistic**
82:12

**Holly** 5:10

**home** 26:11,
15,25 27:1

**honest** 37:9
73:1 90:1
121:21
143:12

**honestly**
85:7 90:3

**hostile**
166:24

**hours** 23:23
24:14,21
25:1,3,9,
10,13
26:19
45:16,20,
21 46:6,
16,21
147:11,17,
18,24,25

**house** 37:6,
20 54:6
85:10,20
123:17
135:5
138:12,24
139:11
166:15

**housing** 18:9
19:2
169:19
170:4

**HR** 11:14
127:7,19
162:18

**hug** 134:6,
11 150:11
174:4
175:14

**human** 11:4
19:19
20:21

**hundreds**

88:17

**hurdles**
154:13

———————————

**I**

———————————

**idea** 108:14
145:15

**identification**
70:1 74:1
77:5 83:22
89:1
102:13
107:10
113:18
119:5
121:2
130:12
133:8
138:3
139:22
140:13
151:17
155:21
157:23
159:23
166:1
172:2

**identify**
69:5
108:10
163:25

**II** 160:11,
12,21

**imagine**
50:20

**impacted**
149:15

**implying**
137:8

**important**
43:15 49:1
97:25
156:25

**impression**
12:16

**inappropriate**
165:16
167:3

**incident**
133:18
167:4

**include**
99:16
110:17
162:14

**included**
39:13
55:10
128:12
156:6,8

**includes**
7:12 39:24
46:7

**including**
42:23

**incoming**
97:16

**incompetent**
130:22

increase
  103:7

increased
  103:23

increasing
  103:25

independently
  6:16

index   46:7

indicating
  175:13

indication
  176:12

Indiscernible
  13:3

individual
  88:13
  90:11,16
  168:8
  170:9

individuals
  108:10

ineffective
  156:18

information
  6:23 10:11
  12:14 20:3
  36:24
  65:16
  90:24
  91:1,11
  131:12
  137:15,18,
  24 170:12

171:14,20,
  22

informative
  145:3
  146:1

initiative-
type   17:15

innuendo
  145:24

insert   91:5

insider
  104:11,16

instance
  155:18

Institute
  9:9

institution
  7:21
  26:11,16,
  25 27:1,9
  38:3 39:2,
  7,9 44:25
  49:2 50:8
  65:15 67:1
  69:8
  71:11,17
  72:13
  81:3,8,9
  82:1 89:20
  90:5,6,25
  92:23
  96:17
  97:4,8,12,
  19 101:6
  102:2

103:17
  110:22
  112:12
  141:25
  142:1,25
  146:19
  147:1,19
  148:5,9,25
  154:1
  156:10,20,
  25 171:7
  177:17

institutional
  6:14 9:4

institutions
  30:24 82:1
  86:17,18,
  20 97:9,24
  146:23
  153:21
  156:15
  177:22

insurance
  123:18,19

intend   8:10

intended
  158:16

intention
  71:9,14
  79:25
  83:11
  91:25
  124:16
  125:23
  126:4
  142:14

143:13
  144:19
  148:24
  149:11
  155:8
  157:3
  174:23

intentions
  146:12

interact
  118:4

interacted
  98:23
  108:17

interaction
  119:20
  174:15

interactions
  106:14
  107:2

interchangeabl
e   108:6

interest
  65:15
  90:22
  107:5

interested
  43:25
  64:12
  65:1,3,12
  102:6
  106:20
  110:3,11
  115:20
  178:2

interim
  11:23,25
  12:6

intern
  158:17

internal
  120:23
  158:17

interpret
  143:1
  145:9
  149:4
  154:23

interpretation
  72:1,3,4,
  11,22
  78:7,10,11
  79:14,23
  80:9 82:8,
  9 83:10
  86:25
  159:6

interpreted
  154:24
  155:3

interrupt
  29:13 42:7
  88:12
  94:23
  154:25

interview
  121:7,11
  122:23
  123:8
  130:11
  133:12

150:17
168:20

interviewed
  120:21

interviewer
  129:10

Intimacy
  166:17

intimate
  166:16

investigated
  165:14

investigation
  120:24
  168:7

investigator
  121:8

invite   54:5,
  9 110:20
  112:7

invoked
  167:10

invoking
  167:13

involved
  66:21
  67:10,16,
  23 68:13,
  16 100:20
  120:19
  137:25
  158:24
  159:3
  165:9

177:3

involvement
  21:7

involvements
  16:20

isolated
  167:4

issue   87:9
  100:19
  119:23
  147:5,21

issued   9:9

issues   22:21
  163:23
  165:8,21

items   7:11

IX   120:10,
  19 121:8

———————————

J

———————————

Jaime   5:10
  12:9
  32:10,15
  34:11,16

Jaime's
  98:23

James   57:15
  113:13,21

Jamie   5:11
  13:17 22:6
  32:6
  35:13,18,
  22 41:25

42:1
43:18,25
44:1,3,5,9
60:2 65:8
66:20
67:4,7,19
68:15
70:15 73:7
85:9,21
86:2 97:1
98:23
99:5,12
100:10,11,
25 103:6
105:5
106:10
108:11,13,
14 109:2,
8,13,22
110:14,15
111:2,9
112:15,18
113:10
114:12,14,
17,23
115:3,9,
15,16,22
116:19,22,
23 117:3,
13,17
118:4,7,16
119:22,23
120:3,9
122:2,3,25
123:5,7
128:12,23
129:12,25
130:4

Case 7:21-cv-00062-WLS    Document 34-6    Filed 05/12/22    Page 205 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022          Index: Jamie's..knowledge

133:19,20
135:4
136:19
138:16
140:1,5,18
147:5
150:5
151:3
156:1,24
158:19,20,
24 159:9
162:1,2
163:18,24
164:25
168:12,22,
25 169:16
170:18,25
171:9,17,
23 173:4
174:6

Jamie's  22:1
62:4,12
63:20,23
103:2
105:13
106:7
110:17,18
119:15
120:2
129:1
134:1
135:11
144:1
152:4
159:12
165:8
169:22,23

Janene  20:22

Janice  121:8
123:4
129:10

January
149:21
173:1

Jay  57:12

Jaylin  19:12

Jeanine  9:20

Jesse  113:21

job  31:9
43:19
51:13,19
61:13
62:4,7,12,
15 63:8,
20,23
65:15
92:16
98:24
99:21
100:25
101:1
104:4
105:13
110:17,18,
24 111:3
114:18
120:2
132:24
158:21
159:12
160:7,15
161:12

171:10
172:5
177:6

jobs  167:6

joint  41:4
56:4,5,19,
20 57:1
74:4

Jones  166:14

Jordan
19:16,17,
19,24

judge  58:24

junior  99:4
112:7

juniors
56:11

jury  14:18
36:23

justice
88:5,6

Justin  6:14
11:17
12:14
127:20

_____

K
_____

Karen  152:1
154:11

Katrina
170:9,24
171:15
172:15

keeping
29:22

Keith  122:11

key  103:25
135:9
173:2

kids  123:20

kind  14:20
15:9 35:23
45:5 52:23
98:21
102:1,3
111:21
113:3
122:16
125:5
129:20
132:21
141:3
143:18
152:25
158:13
173:19
177:9

knew  80:15
124:14
130:1
151:10

knowing
171:2

knowledge
68:9,18,19
88:19
105:14,16
118:21,22
120:4

140:9,10
173:21

**L**

labor    41:9

lack    119:18

language
  156:6,8
  167:8

Laplant
  57:14 58:3

Lassai    75:8

launched
  17:18

law    48:1

lawful    6:4

lawsuit
  13:15 16:9
  133:4
  175:11
  176:5

lawyer    11:15
  93:11

lead    31:24

leader    38:4

leadership
  21:3

leading
  22:24

leads    159:2

learn    85:12,
  18

learned
  132:20,21

learning
  67:10

leave    8:10
  30:12 31:5
  34:5 49:19
  71:22
  115:7
  150:25

leaves    31:22

leaving
  135:14

led    122:21

Lee    15:23

left    34:20,
  23 42:2,5
  53:23
  66:20 67:8
  68:15
  136:20
  149:20
  150:19,20
  151:9

legal    11:20
  15:16

Leslie
  166:14

letter    166:5

level    17:6
  23:3,21
  77:20
  83:8,15
  88:16

101:9
105:21
168:8

leveled    49:9

levels    55:23

liberally
  156:14

life    18:10
  19:2

limited
  106:13
  107:2

Lindsey
  166:13

lines    156:6

Lisa    9:20
  20:12 38:6
  51:25 52:5
  113:12
  131:3
  133:13
  135:4,12
  136:16
  137:8
  144:25
  145:24
  175:10

Lisa's
  134:12
  135:11

list    7:11
  13:21
  74:25
  113:6

114:11,22
116:21,23
117:3

listed    37:14
  47:10 76:9
  113:16
  160:9

listen
  152:12

literally
  70:5

live    37:7
  45:25

lived    44:6

lives    43:7

living    15:3

Locally
  113:2

location
  139:13

locked    135:7

long    9:20
  17:22
  20:12
  37:17 38:7
  47:6 51:25
  81:12 87:2
  91:23
  110:4
  113:12
  126:23
  131:3
  133:13
  145:24

175:10

**Long's**
144:25

**longer** 131:5
134:22

**looked**
133:20
145:19
151:5

**Lordy** 159:25

**lot** 12:13
14:9
44:20,21
97:2 99:12
132:5
136:7
164:15,20,
22

**lots** 17:3
61:1,7

**loud** 86:15

**lunches**
86:10

**Lyn** 121:8

───────

**M**
───────

**Macon** 15:6
85:12,25

**made** 57:24
60:8 74:11
78:10
87:25
88:3,14
105:20

150:18
169:8
171:17,19

**Madison**
15:22

**Maestas** 5:9,
10 6:7 7:7
8:11,21
10:1
11:16,22
12:2,5,9,
18,20,24
13:8,13
29:20
33:3,6
36:6,9
37:1 42:14
44:18
48:10 55:4
57:23
58:11,17
59:9 61:4
67:24 68:7
70:4 74:6,
8,11,13
77:7,24
78:3,8,13,
16,18
79:5,7,18
81:19
83:24 86:8
89:3
93:16,22
94:3,10
95:18,20,
24 96:22
102:15

104:2,10
107:12,21,
23,25
113:16,20
114:16
119:8
121:5
127:24
130:15
133:11
138:6
139:24
140:15
141:13
145:12,13
149:1
151:19
155:24
158:1
159:5,8,10
160:1
166:4
170:15,17,
23 172:4,
18,21,24
174:3,5
175:8,21
178:6,8

**Maggie**
113:22

**main** 38:25
39:4 40:25
54:25
55:5,12
116:15

**maintained**
13:18

**maintains**
88:20

**major** 34:15
82:4

**majority**
118:6
143:4

**make** 7:18
20:8,14
23:1 29:1
31:10,17
33:12,17
57:4 60:24
62:4,12
64:18
65:21 67:9
75:15
79:20
80:24
83:17
85:15
90:4,25
91:11
99:20
100:17
101:13
106:4
118:10
135:18
142:15
143:2
144:19
146:11
147:12
169:5
177:25

makes  33:15
  57:20
  163:9

making  23:8
  31:15
  57:21 88:8
  92:3,25
  102:5
  105:21
  109:7
  142:10,17
  146:14
  174:4

management
  32:14,15
  38:13

manager
  160:14

March  156:1
  167:24

mark  171:25

marked  70:1
  74:1 77:5
  83:22 89:1
  102:13
  107:10
  113:18
  119:5
  121:2,6
  130:12
  133:8
  138:3
  139:22
  140:13,17
  151:17
  155:21

  157:23
  159:23
  166:1
  172:2

marketing
  99:10

marriage
  14:24,25

master's
  21:2 39:20

masters  21:4

matches
  157:1,4

materials
  10:8,9
  99:11,22

math  80:14,
  16 154:15
  155:9,12

matter  5:11
  77:19
  79:10
  86:20

matters
  65:14
  77:20

maturation
  117:6
  161:16

Mcgee  18:17

meaning  16:9
  25:1,2,7,
  24 26:13
  39:17 46:3

  60:8 82:8
  125:11

means  45:8
  76:23
  78:12
  79:21
  80:18
  106:23
  109:6
  110:24

meant  10:20
  30:7
  124:13
  126:17,20

medications
  13:25

meet  11:5
  13:20
  25:24
  27:24
  28:18
  43:25
  44:12
  46:6,20
  47:3 52:25
  53:1,20
  54:1 56:12
  65:23
  66:11 69:4
  133:3
  146:24
  153:3
  154:15
  155:6
  163:10,13

meeting  6:15

  11:14
  147:20
  148:1
  155:9,15
  163:4
  173:5
  175:9

meetings
  11:11
  21:19,20
  52:23
  53:4,10,
  14,18,22
  54:7
  132:4,15
  158:6

Megan  51:24
  112:21
  113:2
  114:2
  115:9
  118:2,5
  139:6,10

member  38:1,
  2

members
  19:22
  21:24
  111:8

memory  14:1

mention
  165:8

mentioned
  30:10
  42:21
  91:14 98:6

99:20
116:8
123:17
168:17

message
  156:16

Messenger
  51:22

met  13:22
  27:8 53:23
  80:14
  100:10
  110:4

Micha  15:17

Micha'el
  15:14,16

Michael  8:14
  15:17

Michelle
  19:16,17,
  19,24
  32:11
  34:15

middle  5:16
  14:20 15:4
  28:5 157:5

Mike  114:2
  118:2

Military
  28:11
  30:18,25
  98:7

Miller  56:13

millionaire
  61:14

mine  128:24

minimum  76:6

minute  119:2

minutes
  44:16
  107:20

Misconceptions
  86:11

missed
  124:17

missing
  144:3
  158:13
  168:3

mission
  152:19

misspeak
  10:17

mistakes
  178:15

misunderstood
  127:10
  128:17,18

Mitchell
  34:18
  38:12
  42:12
  52:20
  53:11,14,
  19,21,23
  73:9
  111:12

122:17
130:11
134:24
156:1
158:11

Mitchell's
  35:1,21

Mm-hmm  47:19
  54:21,24
  55:8,11,14
  62:19

model  85:13

Mom  14:12

moment  18:21
  19:14
  41:24
  56:7,18

Monica
  113:24

month  21:19

monthly
  158:6

months
  133:21,24

morning  5:9
  6:21,22,24
  7:16 10:16
  34:25

move  58:1
  102:17
  107:14
  142:4
  143:11
  148:14

move-on-when-
ready  56:5

moved  32:13
  42:2
  123:25
  139:12
  174:17

movement
  139:9

moving  127:5
  174:24

multiple
  156:15

myriad
  49:15,21

_____

N
_____

named  6:3
  32:12
  170:9

names  8:16
  18:14,15
  94:8 95:4,
  9 96:9,10
  113:16
  115:14
  170:1

nature  30:14

needed  68:14
  100:4
  108:25
  127:17
  146:24
  148:13

149:6
156:9

**negative**
97:8 98:16
104:9,12,
13 145:4
146:1

**negatively**
159:14

**neighboring**
156:13

**nervous**
57:20,24,
25 121:17
124:1,11,
20 129:13
136:3

**nervousness**
122:16,22
123:11

**night** 10:17
99:5
112:7,10

**ninth** 56:19

**nodding**
57:20
58:22
173:25

**non-party**
5:22

**non-
traditional**
26:2

**notably**

19:10

**Note** 158:16

**notes** 121:7
130:11
133:13
135:5
160:25

**notice** 5:18
6:3,8,17,
25 7:1,4,
9,10 8:24,
25 9:3
10:10,16,
18,21
164:9,12
178:9

**noticed**
163:21
164:7
165:3

**Notorious**
167:7

**November**
127:11
129:2
175:6

**NUGA** 82:2

**number** 17:20
23:22
24:10
29:23 31:5
70:10
101:5
109:15,16,
17 159:19

**numberings**
122:14

**numbers**
52:14
105:6
122:20
132:13
158:12
159:12,14,
17

**nursing** 95:5

———————————

O

———————————

**oath** 6:5

**object** 13:10
94:5

**objected**
171:4

**objecting**
93:20

**objection**
78:14
86:24
93:8,18

**objections**
7:22 93:10
95:10

**objective**
145:8

**objects**
78:19

**Observable**
119:19

**observe**
107:3

**observed**
106:23

**obvious**
52:17
73:21

**occupy** 17:1

**occur** 28:7

**offensive**
156:17

**offer** 64:11
91:10
102:2
110:9

**offered**
49:16
106:16

**offering**
59:7

**office**
18:13,17,
19 19:11
21:25
28:24 30:8
32:3,5,7,
21 33:8
35:15 37:9
38:22,25
39:7 41:22
42:20
43:4,8
50:16 54:7
63:9 68:3
88:7,20

Case 7:21-cv-00062-WLS    Document 34-6    Filed 05/12/22    Page 211 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022    Index: officer..pandemic-related

99:11,23
100:12
108:3,17,
25 109:8,
17,19
115:13
122:3,4,5,
18 128:10
130:21
133:19,25
134:2,13,
19 135:6,
10,11
138:11,21
139:12,16
150:20,23,
24 151:6,7
154:3
163:14,21
164:21
165:3,7
174:16
175:1

**officer**
11:21
85:14

**official**
27:11

**officially**
21:8,11
44:25
111:3

**Okefenokee**
147:8,10,
15

**Olivia**

113:21

**one's** 109:18

**one-on-one**
53:2
163:11,14

**online**
17:17,25
88:16
96:13,16,
17 98:16
110:3

**open** 54:6
69:24
133:25
135:14
160:22
166:6
168:10
173:1

**open.'** 134:4

**opened**
133:20

**openings**
160:7

**operate**
112:23

**operating**
112:19

**opinion** 31:2
101:2
103:14
105:11
106:2
126:13

144:3,14
145:25
169:2
171:2,10,
16

**opinions**
169:6

**opportunity**
105:11

**opti-** 59:11

**option** 8:7
62:1
178:13

**options**
59:12
61:1,17
66:7
76:12,18
101:20
178:3

**order** 44:13
134:16
142:3
143:10,14
176:8

**Oregon** 61:14

**organization**
21:16,17
22:4,8

**organizations**
22:11

**orientation**
38:4
134:21

138:12,15
139:7,10
174:24

**original**
84:1

**outsider**
104:8,15

**overheard**
134:2

**overhearing**
150:11

**oversee**
33:11

**overseeing**
19:10

**oversees**
32:17
41:23

**overwise**
71:20

———————

**P**

———————

**p.m.** 178:20

**pace** 71:5
73:13

**pages** 166:20
167:23
172:10

**pandemic**
96:12,23

**pandemic-
related**
97:10

Case 7:21-cv-00062-WLS Document 34-6 Filed 05/12/22 Page 212 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022 Index: pandemic-type..period

**pandemic-type**
122:14

**paperwork**
100:4

**PAR** 127:19

**paragraph**
125:3,15
130:10
157:6
166:24
167:5,7

**parents** 83:7
86:21
144:13

**park** 164:2,
4,22

**parked** 164:9

**parking**
163:17,20,
22

**parks**
164:15,21

**part** 18:4,
11 19:13
21:12,15
27:10,11
44:5 48:3,
5 68:10,
12,23
103:18
109:1,14,
16 111:3
115:7,22
118:5
122:8

137:1,25
144:15,16,
18 145:23
148:2,4
161:6
162:2,5
168:20

**parters**
152:23

**participate**
14:2
141:22
158:6
176:17

**participating**
148:4

**participation**
148:2

**parties**
37:6,18

**partner**
153:5

**partnering**
153:4
178:1

**partners**
152:21,23

**partnership**
153:10,12,
13,14
154:9
177:25

**partnerships**
153:15

**parts** 42:23
109:1,19
121:12
124:11,20
152:10,18
155:11

**party** 5:20
16:8

**past** 22:1
61:25 70:9
103:17
123:25
132:25
165:4
173:20

**path** 62:20
65:21 72:8
75:1,5

**paths** 74:23

**Patricia**
15:19

**pattern**
167:3

**pause** 42:9

**pay** 105:1
123:19

**paying** 57:2

**pending** 5:14

**people** 13:22
21:22
29:16
37:11
44:10
48:18

92:14,20
95:25
111:1
113:5
117:7,9,16
122:12
127:5
128:8
132:5,15,
25 139:6
161:13,17
162:15
163:14
165:2,7,11
170:1
174:18

**perceived**
156:17

**percent**
103:6,7,
15,23

**perception**
89:19
146:16

**Perfect** 80:1

**perform**
43:14 44:8

**performance**
69:20
103:3
119:18,23
127:19,21,
22 131:15

**period** 34:11
36:4,11
72:6

Case 7:21-cv-00062-WLS    Document 34-6    Filed 05/12/22    Page 213 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022          Index: permanent..position

permanent
  12:4

permission
  26:10,25

person  16:9,
  10 23:4
  62:11
  80:24
  90:17
  91:10
  122:5,10
  123:8
  127:8
  128:10
  137:7
  139:13
  156:13
  159:13
  160:14

personal
  89:24 90:2
  166:16
  170:12
  171:2

personally
  28:23

personnel
  12:21

ph  9:8

philosophy
  142:8

phone  42:7
  150:24
  174:15

phrase  76:21

pick  77:19

piece  42:22
  144:2,4
  149:10
  154:8

pieces  45:23

place  67:9
  88:24
  105:22
  106:5
  136:25
  142:16
  166:25

placement
  76:21

places  71:25
  72:14
  74:18,19

plaintiff
  9:8

plaintiff's
  70:1 74:1,
  15 77:3,5
  83:21,22
  86:5 89:1,
  4 102:13
  107:10
  108:8
  113:17,18
  114:1
  116:25
  117:19
  119:3,5
  121:2,6,7
  124:3

130:9,12
133:8,12
135:25
138:3,7
139:22
140:13,17
143:20
151:17,21
155:21,25
157:23
158:2
159:23
160:6
165:24
166:1
171:25
172:2

planning
  82:3
  156:11

playing  49:9

plenty  120:7

pocket  57:2

point  38:18
  43:3 49:1
  51:24 52:1
  65:20
  66:23 67:7
  68:13,18
  72:19
  79:16
  83:14 85:6
  86:12,25
  87:7,8
  89:4,22
  91:15

93:24
101:25
102:5
109:5
113:5
119:21,24
125:9
130:2,5
135:2
144:8
150:8
162:8

pointed
  92:13

pointing
  117:5
  149:11

points  86:9
  166:10

police  18:18

policies
  39:3

policy  49:9
  56:3,10
  129:21
  163:4

pool  14:18

portion  71:4
  145:10

position
  11:19
  17:13,19
  19:25 20:4
  21:15
  38:6,8,14,

Case 7:21-cv-00062-WLS   Document 34-6   Filed 05/12/22   Page 214 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022                    Index: positions..process

15 42:11
52:6 125:6
168:11
169:1,24
172:6,14

**positions**
16:17
128:4,5
160:22
161:9,17,
19 162:14,
23

**positive**
104:17
105:24
149:16

**positively**
105:4

**possibly**
24:15
60:18
76:20
161:18

**post-bacc**
39:24

**post-baccalaureate**
39:25

**post-graduation**
101:7

**Post-it**
160:24

**post-tee**
52:20

**postcard**
70:15
73:17

**posted** 161:6
162:24
168:11

**posting**
160:14,15
172:5

**postings**
161:2,3,13

**pot** 107:16

**potential**
60:20

**Powerpoint**
74:15

**practice**
163:4

**prefer** 96:17
134:3

**preparation**
13:22

**prepare**
10:7,12
11:6 71:6,
17 72:9,17
81:25
100:3

**prepared**
71:24
77:13 80:4
86:19
143:22

**preparing**
72:5

**prepping**
71:17

**presence**
13:10

**present** 7:14
22:20 56:7

**presentations**
169:7
171:21

**president**
11:15
19:13
32:14
167:14

**pressure**
132:12,17,
18,21

**pretty** 75:4
145:15

**prevalent**
98:11

**prevent**
78:22

**previous**
122:17

**previously**
7:3

**printed**
74:16
161:5

**printout**

108:8

**prior** 104:21
165:12

**private**
30:11
47:22,23,
24

**privileged**
11:9,11,13
171:5,8

**privy** 20:2
150:18
157:20
159:18,19
171:13

**problem**
58:7,9,11
132:17
146:6

**procedures**
39:4

**proceeded**
130:21

**proceeding**
58:19

**Proceedings**
5:1

**process**
27:10,12
28:16 35:8
41:16
66:21
67:16
69:8,17

Case 7:21-cv-00062-WLS    Document 34-6    Filed 05/12/22    Page 215 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022              Index: processing..qualify

82:12
86:24
100:14
139:8
168:20

**processing**
29:6 63:17
109:2,8

**produce** 7:5,
10,11 9:3
178:9

**produced**
161:4

**professional**
127:25
128:1,2
171:10

**Professor**
91:14

**professors**
57:7 91:19
92:3,10

**program** 21:5
41:5,20
56:4 58:4
64:13,14
65:4 66:17
67:19
70:17
71:16
76:22
84:7,11
88:9 91:19
95:14,23
99:7

103:23
105:15
106:15,16,
18 111:14
114:10
115:21
116:20
117:12
125:19,23
139:13
141:23
148:4
149:14
153:24
174:25

**programs**
30:16
64:11
113:1
138:13,15,
24 139:9

**progress**
31:15
51:10

**projects**
17:15,17
99:13

**promote** 41:8
64:10
70:16
115:21
116:16

**promoted**
38:9,12

**promoting**
41:6 91:8

114:9
125:19

**pronoun**
149:4

**proper**
31:11,18
93:8,18
145:7

**properly**
95:13

**protected**
95:4

**protection**
129:7

**prove** 87:5

**provide** 96:7
110:15
125:25
136:24,25
152:22
178:3

**provided** 7:3

**providing**
156:18

**public** 47:9

**pull** 44:1
88:16

**pure** 158:25

**purely** 145:4
146:1

**purposes**
39:5
162:19

**pursuant**
5:18

**pursue** 40:18
77:12 80:3
83:2
143:21

**put** 8:22
38:14
40:20 73:8
122:22
146:9,10,
13

**puts** 69:13

**putting**
144:18
174:4

---

**Q**

---

**Q-AND-A** 14:2

**qualifications**
170:10
171:7
177:22

**qualified**
39:2 60:15
97:5
170:18,25
171:7,9,23
177:16

**qualifies**
43:2 56:9,
23

**qualify**
56:12,14,

17 57:3

**question**
  7:23 14:3
  29:21
  34:13
  35:19
  36:12
  38:23 40:9
  42:10,25
  45:1 49:24
  54:14,18,
  25 55:12
  62:23
  64:20 65:2
  78:20
  79:1,2,8,
  17,19
  82:22,24
  91:4,18,25
  92:9
  93:13,15,
  17 96:21
  100:2,22
  104:1
  105:19
  108:15
  110:12,15
  111:5,15
  112:16
  113:4
  114:21
  124:25
  126:5,10,
  11,23
  129:22
  135:17
  137:19
  138:14

140:5,12
145:7
162:3
173:5
174:13

**questioning**
  131:15

**questions**
  11:8 33:23
  36:5 63:5
  64:19 66:8
  67:25
  77:24
  82:25
  119:10
  123:10
  125:1
  172:25
  176:1

**quickly** 47:6

**quit** 57:19
  61:11
  175:21

**quote** 49:3
  94:13
  124:22,23
  128:2

**quote/unquote**
  111:3

───────────
**R**
───────────

**R-A-C-R-A**
  21:16

**R-I-F** 119:11

**rack** 23:2

**racks** 22:11

**RACRA** 21:16
  33:24
  45:12

**raise** 5:3

**random** 37:25

**range** 149:21

**rare** 26:7
  27:25 28:1
  48:23

**rate** 49:2,4
  76:24

**Rating** 103:9

**rattle** 47:5

**re-ask** 38:23

**read** 8:4,10
  10:8 79:2,
  20 86:13,
  15 120:15
  122:24
  137:9
  140:22
  141:2,3,14
  145:18
  148:3
  152:7
  178:11,14,
  18

**reader**
  152:11

**reading** 8:7
  113:11

154:15
155:10,12,
18

**ready** 5:2

**reason** 9:7
  19:23 31:5
  108:23
  136:25
  158:14,19
  165:5,6,8
  167:14

**reasons**
  49:15,21
  118:20

**Rebecca** 19:9

**recall**
  84:13,20,
  23,25
  85:2,23
  86:1 93:14
  94:15,25
  95:20
  96:24
  97:22
  120:9
  124:17
  131:19

**receive** 6:8
  10:13
  84:14

**received**
  6:22 10:15
  152:15

**recent** 46:5
  157:7

Case 7:21-cv-00062-WLS    Document 34-6    Filed 05/12/22    Page 217 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022          Index: recently..relationships

**recently**
 18:24,25
 96:8,20
 97:10
 152:15
 165:17
 168:10

**recess**  44:17
 107:22
 172:23

**recognize**
 24:6 70:11

**recollection**
 71:1 73:1
 84:9 86:4
 87:24 95:3
 97:6,7,23
 121:10

**recommend**
 83:15

**recommendation**
 66:10
 82:20

**recommending**
 83:18

**record**  7:7,
 20 8:13,22
 47:9
 107:23
 134:14

**recorder**
 94:13

**records**
 6:18,19
 7:12,13,17

 166:6

**recreation**
 16:24

**recruited**
 37:23

**recruiter**
 115:23
 116:9
 160:11,12,
 19,20,21
 162:11,19

**recruiting**
 130:21

**recruitment**
 53:8 99:3
 109:20
 110:7,17
 112:2,20,
 25 114:9
 115:4,12,
 13 162:4

**red**  108:9

**redid**  174:2

**reduce**  52:14

**reduced**
 126:9

**reduction**
 9:6 118:18
 122:1,9
 123:16

**Reductions**
 119:10

**reference**
 134:10

 150:21

**referenced**
 150:17

**referred**
 89:9

**referring**
 89:5
 148:17,22

**reflect**  7:7
 121:21
 159:14

**refresh**
 121:10

**refreshed**
 70:25
 97:23

**Regents**  5:12
 9:1 21:13,
 14 74:16

**Regents'**
 39:3

**Regina**
 166:14

**Regional**
 116:2,5
 153:1

**register**
 68:14

**registered**
 41:13 52:9
 67:2 69:15

**registering**
 43:16

**registrar**
 21:21
 22:12

**registrar's**
 21:25

**registrars**
 21:17

**regs**  68:23

**regular**
 17:1,12
 52:23
 54:16
 164:17
 177:11

**regularly**
 54:7,13
 163:13

**regulation**
 68:25

**regulations**
 35:12
 66:13,15
 67:5,18

**related**  9:11
 13:15
 14:23
 22:21
 96:23
 119:25
 168:7

**relating**
 151:2

**relationships**
 157:8

relative
  14:10

relatives
  14:5

remain
  125:14

remarks   92:3

remember
  19:14
  70:22 84:4
  85:8 94:8
  97:15
  98:15
  120:12
  124:11,20,
  23 125:16,
  17 126:22
  130:4
  131:10,11,
  20,24
  132:3
  134:6,7,
  10,11,15
  164:1
  173:8,12,
  13 174:8,
  9,10,11,12
  175:13,16,
  17

removed
  19:22
  20:16,18

repaired
  157:8

rephrase
  62:22

108:15

rephrased
  146:20

rephrasing
  94:24

replied
  127:10

reply   152:4

report   9:9
  35:22
  52:21
  53:13
  103:12
  104:3
  120:1
  126:25
  128:8,9,
  12,23
  134:22
  137:3
  158:16
  168:1,6
  175:5

reported   8:3
  32:5,7,8,
  10,16
  34:21 52:6
  53:19
  159:16

reporter   5:2
  7:3 8:9
  13:4
  29:12,15,
  18 42:6
  48:8
  113:14

148:19
178:13

reporting
  32:15
  33:10
  53:22
  124:2

reports
  41:21 53:1
  56:25
  158:8

represent
  5:10 105:6
  139:10

represents
  7:20

reprimand
  155:25
  167:24
  173:22

reprimanded
  150:3

request
  6:13,19,23
  166:6

requested
  7:11 9:5

require   26:2
  66:16 67:5
  147:9,20

required
  67:18
  110:25

requirement

27:9 69:19
84:14
146:25
154:15
155:5,6,
10,16

requirements
  28:18
  47:10
  60:17
  65:24
  75:18,23
  77:10
  80:15
  82:11
  147:20
  177:6

requires
  17:19
  127:7

requiring
  68:25

Research
  6:15

reserved
  7:24

residency
  33:13

resident
  18:10

residents
  19:2

resign   20:1,
  4,15

resigned 19:24

resource 20:21 102:6

resources 11:4 19:19

respond 94:16

response 84:10 92:15,17 98:7 123:12 151:24 176:18

responses 8:2

responsibilities 118:6

responsibility 115:4 116:15 162:4

responsible 126:2

responsiveness 7:23

rest 174:18 175:4

restate 80:21

restructured 34:21

restructuring 34:15,17 127:16 134:20

result 134:23 156:16

retaining 101:6

retake 66:12

retaliation 121:17 129:8,11, 16,20 167:15

retention 7:13 29:23 31:13,20 52:14 159:17

retired 12:16,19

retry 65:25

review 6:16 103:3

reviewed 172:13

Richard 9:19

Rickman 57:12 91:14

RIF 119:11, 13 136:2,6 137:17

RIFS 136:10

rigor 71:5, 23 73:13 77:20 84:20 86:16 94:18 142:2 143:9,13 146:18 156:11

rigorous 77:13 80:4 83:3 89:13,20 92:24 143:22

road 28:5 131:7

Rob 9:19 32:19 40:23 41:1,24 42:2,12 115:9 125:14 127:9 128:14 129:1 139:3,18 140:1,6

Rob's 128:24 140:8,10

Robert 19:8 57:14

Roberts 15:21,22, 23

Robin 18:16

Rodney 9:19 52:22 132:3,21 133:3 134:19 138:8 152:3

role 31:16 50:7 64:10,13 67:11 115:20 120:4 123:24 139:9 154:3

roles 85:14 111:25 117:8 139:6

room 11:18 93:19

rooted 112:24

roundtable 86:10

Row 18:18

rule 13:10 163:4

rules 35:11

rumor   95:1

Rumors   92:11

run   38:22

Ryan   5:17
6:2  7:4,10
8:14  9:19
43:4  96:2
108:1
113:12
132:17
133:25
160:11,12,
19,21,22

———————

**S**

———————

s-   76:21

S-O-V-O-I-E
114:2

SACSCOC
87:17

safe   166:16

sake   15:2
16:7

Sampson
113:21

SAP   51:5,7
69:20

Sarah   23:6
75:7  84:1
85:9
109:22
111:9
125:21,22
126:2

sat   24:22
25:24
45:20  47:8
76:6,10,21
81:11
147:7,9,20
148:1
155:4,6,
10,11,16

SAT/ACT   46:8

Sate   82:21

Satisfactory
51:10
69:19

Savannah
15:21

Savoie
117:21
118:2,3

scenario
50:11

scenarios
48:22
50:21

sch-   101:15

schedule
9:17  49:17
152:17

Schiver
15:19,20

scholarship
97:5  99:15

scholarship-
eligible

97:2

school   25:8,
15,21
26:4,9,10,
18,22
27:2,4,8,
12,22
28:13
39:19,21
40:4  46:4
47:21,22,
24  48:19
49:5,8,17,
18,20  50:9
55:21
59:18
60:6,13,
14,22
61:8,9,11,
20,21
62:21
63:10
64:18
66:16
67:18  69:5
77:13,15
80:4,6,10
81:4,15,17
82:14
83:3,6
87:16
91:5,8
95:7  99:4,
18  101:16
104:23
110:8,20
113:1
115:10

140:19
141:19,25
142:23
143:22,24
144:5
152:23
153:11
154:18,19
155:6
156:21

school's
46:18
64:16
112:6

schools
23:16
24:5,7,20
28:17
30:13
63:18
82:13
87:10
88:3,14
98:4,10,19
111:7,12
116:16
117:11
126:3
154:5

science
83:14

scores   24:23
25:25
65:24
76:6,9,11,
21  80:14
109:3

Case 7:21-cv-00062-WLS    Document 34-6    Filed 05/12/22    Page 221 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022          Index: scr-..simultaneous

148:1

scr- 8:5

sealed
  178:11

search 17:14
  18:8,10,
  22,23
  19:2,4
  20:5,7,11,
  13,16
  168:16,17
  169:4,10
  170:2

section
  86:12

sector 30:11

seeking 96:2

segue 8:23
  10:3 11:17
  13:12

select 83:7

selective
  82:1,12

send 64:23
  65:7,19
  66:4
  178:13

senior 38:5
  95:6

seniors
  56:11

sense 29:2
  33:8,15

57:4

sentence
  79:21 83:5
  143:13
  144:9
  146:13
  148:22
  149:13
  155:8
  167:2,5

sentences
  142:6

separate
  32:21
  33:7,8,9
  39:19

separated
  74:23

September
  121:9

sequestration
  13:11

serve 17:21
  18:6 19:1

served 18:24
  95:14
  117:8

serving
  17:19
  112:21
  152:21

sets 56:21

Sewall 9:20

Sewell 57:12
  91:14

sexually
  165:15
  167:8

shaking 31:7

Shannon
  18:17

share 170:11

shared
  111:25
  120:3
  156:14

Shauna
  163:11

sheet 160:17

shifted
  96:13

short 42:9
  107:24

shortly
  174:15

shoulders
  132:22

show 159:13

showed
  159:14

shows 37:10
  65:14

shut 133:19
  134:2
  150:12

sic 89:12

side 12:15
  33:13
  89:24 93:2
  109:2,8,
  16,19
  110:7
  112:20,25
  114:9
  115:13

sides 90:1
  92:22
  94:17

sign 8:7,10
  127:9
  128:15,25
  178:19

signed 12:13
  127:18

significant
  104:21
  157:7

significantly
  49:5

signing 8:6

silence 42:7

similarly
  33:10
  43:6,9
  111:18
  112:24

simple 79:20

simultaneous
  28:3

Case 7:21-cv-00062-WLS    Document 34-6    Filed 05/12/22    Page 222 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022                    Index: single..specifically

single  112:1

sir  75:12

Sister  14:12

sit  168:14

sitting
  134:12
  135:22
  174:10

situation
  23:25
  27:25
  90:21
  120:18
  130:3
  142:19
  167:10

skimmed
  152:8,10

skimming
  152:14

skip  152:25

slow  113:15

small  52:5
  123:20
  135:5
  139:11
  164:19

Smith  19:12
  113:12

so-and-so
  93:5

Social  36:22

solemnly  5:4

somebody's
  170:12

someone's
  171:6

sorority
  35:14

sort  19:11
  22:13
  25:25
  30:14
  33:16
  41:3,8,9
  51:16 54:7
  56:6 65:10
  66:1,12
  67:12
  68:17 69:6
  87:23
  96:19
  100:16
  106:21
  108:12
  112:20,23
  120:5,17
  122:21
  125:20
  127:17
  128:10
  129:21
  130:3,4
  131:12
  132:11,18,
  22 134:10
  135:1
  137:4
  142:16
  144:15

146:17
147:5
149:6,11
162:11
164:1
169:4
173:20
174:25

sounds  14:8
  34:14 58:7

sources
  177:9

south  15:4
  30:19
  153:1

Sovoie  114:2

SPA  109:5,6

space
  163:17,20

Spain  18:16
  19:8

speak  43:20
  45:8 54:5
  71:10
  82:13
  98:25
  104:6
  108:18
  110:18,19
  112:9,22
  116:24
  118:3,5
  119:17,20
  124:12
  129:4

140:8,9
153:17,19
167:9

speaking
  29:16
  34:11
  35:3,16
  89:9
  167:12

speaks  77:22
  79:12 89:8
  177:24

special
  17:15
  54:17

specific
  18:14
  28:10 35:5
  36:4,5,12
  56:13
  95:12
  110:1,16
  112:22,23
  124:11,20
  146:14
  175:16

specifically
  22:9,24
  85:17
  98:22
  120:15
  134:21
  143:16
  151:1
  159:9
  163:10

174:10

**specifics**
93:25
165:18,22

**speculate**
50:24 51:6
57:13
78:21,22
81:13,16
94:1,4
108:23
120:14
141:11
143:7
165:1,5,6,
20 171:18

**speculating**
132:19

**speculation**
81:11
108:25
145:8
158:25
166:12

**spell** 15:15
19:5

**spent** 147:10

**spin** 16:23
17:2

**split** 41:10

**spoken** 157:2

**spot** 164:20

**spots** 164:19

**stack** 127:17
128:7

**stadium** 37:8

**staff** 38:1,2
73:11 91:6
108:9
111:8
112:17
138:13,16
148:10
175:4

**stand** 90:9

**standard**
27:24
46:20
158:14
163:9

**standards**
31:11
44:12 46:6
47:4,13
56:13
66:11
89:22
92:18

**standing**
130:16
174:3

**standpoint**
50:17
87:24

**stands**
166:15

**start** 67:3
100:16

108:1,2
113:11
147:21

**started** 42:1
45:12
87:10,11
88:23
97:20
129:10
132:11

**starting**
167:1

**starts** 59:17

**state** 5:14
8:12 9:3
14:6,17
21:18,22
23:20
30:18,19
47:25
48:7,11
49:5,11,23
52:5
56:10,15
60:10
61:14,15
66:13,15
67:17
73:15,18
86:20 88:6
90:22
95:17 98:5
99:8
104:25
110:3,8,23
111:7
116:17

141:23
146:22
153:11
154:4
171:7
177:8

**statement**
71:9,15
72:2,22
77:11
78:10,12
79:3 81:24
90:4
100:18
108:12
124:9,13
142:17,20
143:3,8
144:7,15
145:1
153:6,7

**statement's**
79:23

**statements**
90:15
105:20
142:10

**States** 5:15

**stating**
145:25

**status** 33:13

**stay** 29:1,4
40:18
59:16
110:1
125:22

126:6,14
127:9
128:13
129:1

**stayed** 32:15
62:5
125:18

**staying**
80:17
174:18

**STEM** 82:3

**stenographically** 8:1

**stop** 59:1

**stopped**
131:9

**stops** 72:4

**stories** 97:7

**story** 49:2
105:8

**strange**
158:13

**strategies**
53:5

**Street** 8:19

**stressor**
122:15

**strive**
152:22

**strong** 83:13

**structure**
33:10

134:25

**struggled**
80:13,16

**student**
16:23
19:12
22:12
23:22,23,
25 24:1,
10,25
25:2,20,
22,23,24
26:2,8,10,
12,13,24
27:8,12,
20,22,23
28:9,12,
15,19
29:8,25
31:4,15,21
33:14,25
38:1,4
39:6,25
41:10,11,
12,17
42:24
43:2,3,5,
7,8,16,24
44:1,2,6,
11,24
45:13
46:3,20
47:16,17
49:12,19,
22 50:2,3,
12 52:12
56:9,17,

23,24
59:14,16,
17,19
60:4,5,12
61:3,5
62:2,17,24
64:19
65:7,11,
14,16,22,
25 66:9
67:2 68:5,
14 69:3,9,
11 71:15,
18 72:5
80:11,16,
17,25
81:18
82:13
83:13,15,
19 90:3,
11,13,16,
19,21,23,
25 92:4
95:6 97:17
98:16
99:22,24
100:5,10,
14 101:14
102:4,6
106:1,15
109:10,12,
14 110:2,
11 112:1,
12 138:9
142:12,22
147:6,17,
19 149:8,
10

**student's**
26:13
33:13 39:9
66:25
71:10
80:13,23
99:25
107:4
142:9
144:8
147:10

**students**
23:15
24:8,9,21,
24 26:5
28:25 29:6
30:1,9,10,
15,22
31:10,17
32:1
33:17,18
35:7,13
39:2,12,
13,14,17,
22,24
40:2,3,6,
7,17 45:25
46:1,15,22
48:19
49:12
50:7,9
51:17 52:8
53:7 54:20
55:7,17,21
56:19
60:19,23
63:17
64:25

65:17,21
66:17
67:19 68:4
69:7,16
77:12 80:3
81:25
82:3,16
83:5 84:14
85:13,15
90:5,13
91:2,24
92:5 95:12
96:15
97:3,4,16
98:4,9,10
99:2,3,7,
15,17,18,
25 101:3,
5,6 103:16
105:2,18,
21 106:4,8
111:19
115:17
125:20
132:12
141:22,24
142:11,15
143:5,21
144:4,12
146:23
147:22
148:6,11,
12 149:5,
15 153:4
154:6,13,
18 156:9,
19 159:20
177:9,15

178:1

**studio**  17:2

**stuff**  14:13
38:20
111:2

**style**  14:3

**subject**  83:8

**subordinate**
125:9

**subordinates**
125:21

**subpoenaed**
168:4

**substance**
151:13

**success**  71:6
92:4
138:10

**successful**
65:22
71:11,18,
21 72:6,9,
18 77:14
80:5,12
83:19
86:19,22
90:6,14
97:7
142:3,25
143:10,14,
23

**successfully**
59:13
148:14

**such-and-such**
93:5

**sued**  16:9,
10

**suggested**
156:8
166:17

**suggestion**
126:16

**suitable**
83:7

**summary**
160:17

**summit**  84:2,
22

**supervise**
119:21
158:24

**supervised**
35:18

**supervisor**
43:21
62:6,15
101:8,18
106:9
121:22
122:17
158:7,10
176:24

**supervisors**
127:5
128:6

**supervisory**
53:21

**support**
111:14
125:8,17,
23,25
126:22
129:16
152:22
167:11
175:12
176:15

**supportive**
111:16

**surprise**
132:10
133:2

**swear**  5:4

**sworn**  6:5

**system**  5:13
9:2 22:10
23:3,12
44:10,12
49:20
66:23
68:17
69:14
74:16 77:9
88:7,20
152:23
156:16
177:16

**systems**  75:7
87:3
115:10

---

**T**

---

**tab**  69:23
70:10
73:24
75:18
83:20
103:20

**tabbed**
74:17,18
75:11

**tabs**
102:20,21

**tailgate**
37:18

**tailgates**
37:8

**takes**  42:24
69:17

**taking**  60:4
66:25

**talk**  36:20
46:23  53:3
54:12
57:18
58:15
64:14
65:6,8
68:20,23
72:19
82:20
89:15
90:22  91:7
98:22  99:7
101:19

102:1
105:14
107:7
110:22,23
111:1
112:2,11
116:19
117:11
124:15
125:3
134:24
135:3
136:3
141:16
142:5
150:14,16
154:7
157:14
158:9
165:10
172:21

**talked**  13:6
45:11
54:23  92:9
98:1,3
99:15
112:15
120:7
125:20
132:7
144:18
153:9
161:22
167:20
169:3

**talking**
14:13

22:23
33:23  35:6
39:12  41:5
45:12
47:17
48:18
52:11  61:2
72:19
76:10,11
84:18
86:9,25
87:7,8,12,
20  92:20
93:11
95:16,23
97:21  99:6
105:24
110:8
111:13
112:25
115:18
118:13
123:21
125:17
129:25
133:18
135:3,12
144:10
145:15
147:13
156:7

**Tara**  51:22

**targeted**
136:1,2,6,
10,22
137:6,10,
16

**tasks**  107:8
108:2

**taught**  49:20
58:3

**Taylor**  19:9
113:21

**TCSG**  23:13,
18  24:14
26:7,9
27:7,16,
19,20
28:11,14,
21  30:3,11
45:14,15
46:24
47:1,16,21
48:4,6,12,
13,21  49:8
74:23
75:1,5,8,
22  76:1,9,
12,18,19
86:18
87:10,16
92:6
105:24
153:4,11
155:5

**TCSG's**  73:16
105:14

**teach**  16:23
17:2  57:8

**teaching**
49:18

**team**  16:22
18:3  31:12

team's 31:13

Tech 82:2,
10,18,21
147:8,10,
15

technical
23:12
24:5,20
142:23
154:4
156:14,15,
18 177:15,
22

Tee 34:15,
17 35:1,21
38:12
42:2,12
53:11,14,
18,23 73:9
111:11
122:17
130:11
132:20
134:23
136:20
149:20
150:19,25
156:1
158:11

Tee's
150:19,24

telling
34:25
78:23
128:20
131:20

175:17

tenth 56:11,
14,20

term 17:14
103:7
115:25
116:8

terminate
158:19

terminated
118:16,20
127:13
158:21
163:18

termination
9:7 119:16
158:25
159:3

terms 33:9
118:4

territories
116:15,16

test 65:24
66:1,11,12
76:15
80:14
109:3
147:7

testified
6:5

testifying
36:10

testimony
5:5

testing
19:11

text 128:20

texted 127:8
128:25

That' 26:23

thing 22:13
25:25
33:17
35:14 41:8
51:11,12
54:8 56:6
65:10 66:1
67:12
68:17 69:6
82:6 83:9
100:17
105:24
106:21
123:13,18
125:20
128:10
129:21
135:1,15
137:4
142:16
149:6,9
150:17,21
153:23
164:18
174:25

thingies
57:1

things 16:25
17:9 19:11
21:19

22:23
24:23
31:11,14,
16 33:20
35:6,12,16
37:12
41:13,21
43:2,22
51:12
52:10
53:5,8
54:6,9
60:2 65:9,
24 66:12
73:4,5,9,
12 79:20
80:23
82:14
83:16 85:7
93:3 94:1
96:13 97:1
100:9
101:3,4
102:7
105:22
108:13
109:4,24,
25 110:5,
10 112:17,
20,25
113:1
115:11
116:17,22,
23 117:3
119:12,19,
22 120:3,
5,15
122:15

126:3
128:22
132:8,13,
19 134:16
135:12
136:8
137:13
138:16
145:17
146:9,11,
15,20
151:10
153:18
155:7
159:17,20
161:16
169:7
171:21
173:20,21

**thinking**
91:3,5
112:13
154:1

**third-party**
131:12

**thought** 32:6
40:22
94:23
119:20
128:11,18
170:3

**thousand**
104:25

**Threatened**
167:5

**threatening**

**time** 7:6,
15,24
10:23
11:25 12:1
15:2 16:7
17:1 20:19
22:14,17,
18 29:16
32:12
34:11
35:21
36:4,11
38:7,11
42:1 49:3,
4,16
66:18,19
73:9 81:12
84:6 85:10
87:2,9,24
91:4,23
96:24 98:8
105:7,25
106:20,24
109:23
111:9,12
120:23
121:20
122:1
123:11,14,
15,23
125:21
126:23
127:17
131:2,4
143:18
146:10,18
152:14

153:18
157:16,17
161:18
163:17
164:16
171:20
173:13,16
175:22,23

**timeframe**
95:1

**timeline**
87:24
163:25

**times** 17:5
33:2 41:4
110:19
112:6
121:16
122:14

**timing**
100:9,19

**tireless**
103:24

**title** 16:13,
14 112:22,
23 120:9,
19 121:8
160:10
162:11,16,
18

**titles** 128:4
162:9

**today** 6:12
7:12 8:8,
10 9:13,18

10:7 164:8
176:21

**told** 35:5
61:17 88:7
123:9
125:10
129:14
130:2
131:11
136:15,19
173:20
174:23
176:4

**tones** 128:22

**top** 70:18
86:11
122:13
144:18,25
152:1
154:10
167:1
168:18,22
169:6
170:20
171:13,15,
17

**topic** 92:14

**totally**
32:21

**touching**
165:16

**tour** 115:18

**touting** 87:4

**town** 28:12
30:20,23

Case 7:21-cv-00062-WLS    Document 34-6    Filed 05/12/22    Page 229 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022        Index: track..undergraduate

track  29:22
  30:7 31:5,
  8 33:24
  34:3 168:1

tracking
  29:1,4
  31:20

train  35:15

trained  91:6
  148:10

transcript
  8:5 44:3
  100:13
  145:11
  170:7

transcripts
  60:6 63:18
  80:23
  96:14
  99:22
  100:11,16
  109:3

transfer
  23:24
  24:25
  25:2,10,
  11,14 26:5
  28:21 40:2
  45:13,17
  46:15,20,
  24 47:16
  59:23 92:4
  153:22
  154:5
  175:1

transferabilit
y  39:5
  92:17

transferable
  46:16,17,
  21 86:18

transferred
  87:18

transferring
  27:21 39:6
  45:15
  88:23

transfers
  26:5

transient
  26:8,13
  27:13 40:2

transition
  31:18
  41:22

transitions
  32:20
  127:4
  138:11,22

traveling
  131:7

trial  7:24
  13:1 93:7
  94:5

trouble
  35:24
  154:21
  155:9,15

truth  5:6,7

78:23,25
  129:15
  175:14
  176:19

TS-  73:16

TSG  89:12

TSG-  48:4

tuition  39:4
  42:21,22,
  25 44:22
  49:14
  85:14

turn  44:3,4
  68:5 83:20
  102:19
  107:13
  130:8
  165:23

turned
  109:10

two-minute
  172:19

type  14:3
  29:22
  60:12
  84:21
  142:1
  156:10
  158:3

typed  121:8
  124:14

types  37:12

typical  61:3

typically
  21:18,24
  24:24
  37:7,8
  46:2 53:5
  64:9 65:23
  97:22

U

UGA  82:10

Uh-huh  34:6
  57:5 70:21
  83:1
  103:21
  113:7,9,25
  116:4
  124:12
  133:23
  138:20
  144:9,24
  151:22
  154:20
  166:9

unable  167:9

Unbeknown
  156:12

undergrad
  25:5
  39:17,23
  40:10
  64:21
  71:19

undergraduate
  39:14,22
  40:19

Case 7:21-cv-00062-WLS    Document 34-6    Filed 05/12/22    Page 230 of 232

JAMIE T. BIRD vs BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
Ryan Hogan on 01/19/2022        Index: undergraduates..VSU

undergraduates
  40:12

understand
  11:12
  38:21 59:6
  69:11
  78:24
  95:11 96:4
  108:20
  111:4,23
  114:21,25
  128:21
  130:18
  143:12,16
  146:12
  148:21
  169:13

understanding
  44:21 69:3
  88:22
  118:17
  128:23
  141:4

Understood
  45:9

unit  19:9

United  5:15

universities
  146:22

university
  5:12,14
  9:2 12:7,
  22 16:17,
  21 17:6,7
  22:10
  37:12

44:10,12
73:15 77:9
129:15
131:6
132:14
153:2
162:5

unlimited
  47:7 60:20

unlocked
  135:10

Unofficially
  21:8

unranked
  168:19

unsettled
  133:20

Update  74:25

upper  25:12

upset  150:3

URL  70:18

USG  21:7
  48:5,12
  74:16,23
  75:1,5,7,
  22,25
  76:13 77:8
  81:25
  84:2,18
  86:18
  88:15
  89:12
  105:21
  119:10,14

168:8

_____

          V
_____

vacation
  130:19

vague  76:22
  103:15,18

Valdosta
  5:13,16
  8:20 9:3
  15:8,10,
  20,21,22,
  24 23:20
  30:18
  49:5,11,23
  52:5 60:9
  73:15,17
  82:21 88:6
  90:22
  95:17 99:8
  104:22,25
  110:1,3,8,
  23 112:6
  116:17
  153:11
  154:4
  177:8

valdosta.edu/
academics/
dual-
enrollment/
flipbook.
  70:20

vary  76:22

Venn  117:14

verify  27:7,
  8

versa  49:23

versus  5:12
  49:6 89:12
  90:9,20
  143:6

vice  32:14
  49:23

Vice-president
  38:13

view  90:2
  98:25
  111:11
  119:21,24

Vinson  9:8

vision
  152:19

visit  64:17
  116:16

vocalize  8:1

volunteer
  16:22
  114:18

votes  20:8

VSU  9:11
  21:9,23
  23:8
  27:15,21
  28:15,20
  29:25
  30:24
  31:21
  37:23 40:7

45:13,16 47:1 48:20 50:3,12,22 52:12,15 55:1,6,13, 21 56:1 57:8 59:11 60:12 62:5,13, 17,24,25 64:20,24 65:1,18 66:2,9,17 71:22 72:20 90:9,19 96:1 97:14,22 101:23 103:25 105:18 143:6 152:17,20 153:2,5

VSU's 152:16

vulgar 165:15 167:8

**W**

Wade 15:20

wait 124:5 127:4,11 129:2

waiting 43:13,23

waive 8:8

walk 132:15 135:9 154:1

walking 37:5

wallet 107:18

wanted 28:15 29:23 34:10 36:2 43:7 48:6, 14 58:5 60:15 71:3 75:15 88:5,13 99:16 106:16 169:21

wanting 26:14 67:19 141:22,24

Warber 122:11

water 85:10

ways 24:24 46:2 59:15 99:19

website 47:9,12 71:2 74:17 77:8 88:20 162:10

week 16:24

17:5 53:1, 2 127:6

weight 132:22

Wenham 23:6 75:7 84:1

West 91:5 164:20,23

whatsoever 25:21 54:13 137:8

wife 15:12

William 8:19

Willis 131:5 160:20

Wiregrass 30:19 31:1 47:18 48:13 49:10,18, 22 50:4, 14,23 52:13 66:5 88:5 90:8, 14,20 97:22 98:6 104:24 143:6

witnesses 9:16,21 13:21

Wolfe 113:24

woman 166:15

women 163:5, 10

wondered 164:8

wondering 158:19

word 56:8 61:6 119:18 120:21 121:15 131:1 132:6 173:12

words 124:18,24 131:10,11 174:12

work 17:16 18:1 21:9 23:14 33:19 37:3,5 41:25 50:25 54:4 61:13 69:10 73:11 91:19 99:9,10, 12,21 109:2,13 117:7 122:2 153:21 154:4

**worked** 12:15
34:12 38:3
43:22
49:17 51:2
67:8 70:16
73:3 97:1,
2,3 105:5
109:9
119:22
122:10,12
126:23
147:6

**working**
17:16
31:25 53:6
54:9 82:10
92:12
101:3
106:10
119:24
127:6
162:11,18
178:2

**works** 38:21
74:12
150:7

**world** 127:19

**worried**
58:12,13

**worry** 132:24
142:9,17
143:2
160:4

164:23
166:24

**worst** 153:23

**worth** 117:5
147:25

**would've**
51:13
127:12
144:17

**would-** 28:2

**write** 72:24
73:10
129:6,11

**write-up**
129:23
130:3,6
136:15
137:11,22
151:13

**write-ups**
136:7,12
151:2

**writing**
146:9,11
154:16
155:10,12

**written**
129:12
145:2,10,
21,22
155:25
167:13,24

**wrong** 145:1,
20

**wrote** 145:16

— Y —

**year** 7:14
17:18
22:15,19
25:6,20
38:5 71:19
138:11,12,
15,22
139:8,13
149:23
154:14
175:1

**years** 25:8,
16,18,23
26:1 46:4
82:9 91:7
147:10
148:10
154:2

**yesterday**
10:14
164:7,9,12

**you-all**
64:12
93:24
123:17

— Z —

**Zelle** 56:12