**JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA**
**Robert Freidhoff on 01/20/2022**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

CASE NO.:  7:21CV62 (WLS)

JAMIE T. BIRD,

                    Plaintiff,

vs.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA
d/b/a VALDOSTA STATE UNIVERSITY,

                    Defendant.
_____/

DEPOSITION OF

ROBERT FREIDHOFF

Thursday, January 20, 2022
1:02 p.m. – 4:35 p.m.

Valdosta State University
1500 North Patterson Street
Valdosta, Georgia 31698

Stenographically reported by:
KAIRISA J. MAGEE, RPR, GCCR (Georgia), FLORIDA
NOTARY

Job No. : 378317

APPEARANCES:


On behalf of Plaintiff:

        LAWSON, BECK, & SANDLIN, LLC
        1125 Commerce Drive
        Suite 300
        Peachtree City, Georgia 30269
        (770) 486-8949
        BY:  HOLLY MAESTAS, ESQ.
        holly@lawsonandbeck.com


On behalf of Defendant:

        BROWN, READDICK, BUMGARTNER, CARTER,
        STRICKLAND & WATKINS
        5 Glynn Avenue
        Brunswick, GA 31520
        (912) 264-8544
        BY:  G. TODD CARTER, ESQ.
        tcarter@brbcsw.com
        and
        VALDOSTA STATE UNIVERSITY
        OFFICE OF LEGAL AFFAIRS
        1500 N Patterson Street
        Valdosta, GA 31698
        (229) 333-5351
        BY:  JUSTIN ARRINGTON, ESQ.
        juarrington@valdosta.edu


ALSO PRESENT:  Ms. Jamie T. Bird, Plaintiff

I N D E X

Proceedings                                                    Page

THE TESTIMONY OF ROBERT FREIDHOFF:

Direct Examination By Ms. Maestas                                5
Direct Examination (Continued) By Ms. Maestas                   92


E X H I B I T S

No.                                                           Page

Plaintiff's Marked Exhibits

17          VSU Office of Admissions Website        40
            Printout

18          VSU Website Printout                    41

20          USG PowerPoint Printout Regarding       62
            Dual Enrollment

21          University System of Georgia            63
            Freshman Admission Requirements

23          6/25/2019, Email from Sarah Wenham      69
            to Jamie T. Bird

24          2019 Dual Enrollment Summit             72
            Roundtable Discussion Bullet Points

14          2020 and 2021 Posted Open Job           79
            Positions

30          September 30, 2020, Investigator's      93
            Notes from Interview of Ryan Hogan

29          Investigator's Notes from Interview     96
            of Lisa Long

E X H I B I T S

Continued

No.                                                          Page

31        October 1, 2020, Investigator's          97
          Notes from Interview of Tee
          Mitchell

41        February 26, 2019, Email from Jamie     104
          Bird to High School Counselors

43        March 5, 2019, Written Reprimand         106
          from Tee Mitchell to Jamie Bird

8         July 14, 2020, Letter to Jamie Bird      109
          from Rob Freidhoff

44B       2020 Emails between Jamie Bird and       113
          Rob Freidhoff

47        November 16, 2021, Abraham Baldwin       118
          Agricultural College's Letter to
          Ms. Maestas

I N D E X

Proceedings                          Page

Certificate of Oath                  123

Certificate of Reporter              124

Proceedings began at 1:02 p.m.:

THE COURT REPORTER:  When you're ready, will you raise your right hand, please?

Do you solemnly swear or affirm that the testimony you are about to give in this cause will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

THE COURT REPORTER:  Thank you.

MS. MAESTAS:  Good afternoon.  My name is Holly Maestas, and I represent Jamie T. Bird. This is the matter of Jamie T. Bird versus Board of Regents of the University System of Georgia, doing business as Valdosta State University.  This is Civil Action File Number 7:21cv62, a case pending in the United States District Court for the Middle District of Georgia, Valdosta Division.

Thereupon:

ROBERT FREIDHOFF, a witness named in the notice heretofore filed, being of lawful age and having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MS. MAESTAS:

Q    And if you could, state your name for the record.

A    Robert Freidhoff.

Q    And do you have -- go by any other names?

A    Rob Freidhoff.

Q    Okay.  And your address?

A    3970 Kinderlou Forest, 31601.

Q    Okay.  This deposition is being taken pursuant to notice and agreement of counsel.  This is a deposition of a nonparty, also an employee of the defendant.  And objections except to the form of the question and responsiveness of the answer will be reserved until the time of trial or the time of a hearing.

This deposition is being taken stenographically by a court reporter.  So please vocalize all responses and avoid gestures, which cannot be reported.  You have a right to read a copy of your deposition transcript and then sign it after reading it, or you may waive that right today.  Please so indicate to the court reporter which you choose before you leave.

Have you ever had your deposition taken before?

A    I have not.

Q    **Have you ever been a party to a lawsuit?**

A    I have not.

Q    **Okay.  And what did you do to prepare for today?**

A    Primarily went back through old email.

Q    **Old email?**

A    Email.

Q    **Okay.  And you mean, like, not just one --**

A    Just with -- between Jamie and I to kind of remember a little bit of timeline.

Q    **Okay.  So emails?**

A    Uh-huh.

Q    **Okay.**

A    Yes.

Q    **Like "deer" is not "deers."  "Email" can be multiple --**

A    Multiple emails.

Q    **Yeah.  Okay.  So, "I saw deer in the forest," that could be multiple deer; right?**

A    I grew up in Michigan.  Yeah.  We had a lot of multiple deer sitings.

Q    **Okay.  Did you -- and in going through those emails, did you print any of them?  Keep a file?**

A    They're just all in my inbox in Outlook.

**Q    Okay.  I think those have been the subject of discovery requests.  So just make sure you get those to Mr. Carter to produce to me in discovery.**

MR. CARTER:  Can you do that?  Have you -- have you sent any of the emails before, that you're aware of?

Okay.  I'll make sure.

MS. MAESTAS:  Okay.  Thank you.

BY MS. MAESTAS:

**Q    And I want to talk about the documents that you reviewed, probably when we get to that. But why don't you go ahead and tell me what -- the emails that you saw now that we're on it?**

A    I was primarily looking at a date to try to remember when Jamie became part of my super- -- or I became her supervisor.  And then looked through when correspondence stopped just to remember timelines in terms of looking back or what year it was, what day it was, month, those kinds of things is what I was looking at.

**Q    Okay.  So the time period?**

A    Was end of January of 2020, first email out to say, "Hey, let's get together and talk about what this might look like moving forward."

And then would have been late fall.  I don't know if it was October or November, somewhere in there, late fall of 2020.  And then somewhat interesting in the supervision component, we only had about two or three meetings before we went full-on into COVID and we all left campus and so more of the conversations then became phone call conversations or --

Q    Okay.

A    -- Teams conversations.

Q    Okay.  And Teams meaning the Microsoft platform that's similar to Zoom?

A    Yeah.

Q    Okay.  Do you have any relatives in the state of Georgia?

A    I've got immediate family, a wife and five kids.

Q    Okay.  And are those children adults or minors?

A    17 down to 7.

Q    Okay.  So the name -- what's the age of the second youngest one?

A    So we've got 17, 15, 13, 11, and 7.

Q    Okay.  How about the name of the 17-year-old?

A    Brayden Freidoff.

Q    Okay.

A    B-r-a-y-d-e-n, same last name.

Q    Okay.  So you're very busy?

A    Yes, ma'am.

Q    And your wife's name?

A    Lindsay.

Q    And she lives in Valdosta?

A    Yeah, same --

Q    And all --

A    -- address.

Q    All the children live with you at your address?

A    For a few more months, yeah.  He's a high school senior.

Q    Okay.  What is your current title in your employment?

A    Current title is associate vice president for student success.

Q    Okay.  And what do you -- what departments or divisions or offices do you oversee?

A    So I'm part of the Division of Student Success.  The offices that I've got are advising, orientation, first-year programs, dual enrollment, the registrar's office, and the financial aid

office.  Trying to make sure I didn't miss anybody on that one.

Q    Okay.  So we've got advising, orientation --

A    Uh-huh.

Q    -- first-year programs --

A    Yeah.

Q    -- dual enrollment, registrar --

A    And financial --

Q    Financial --

A    -- aid.

Q    -- aid?

A    Yeah.

Q    Okay.  And other than doing that in your position as associate VP of student success, do you have any other positions of employment?

A    You mean another job somewhere else?

Q    Yeah, or within VSU.

A    No.  I'm just a VP for student success.

Q    Okay.

A    That's plenty.

Q    And you have the five kids that you say, so, yeah.  So eventually I'm going to ask you what you do outside of work, but now I know what it is. It's absolutely nothing.  I was just kidding.  I'll

probably ask you.

A    There's lots that I do.

Q    Okay.  So other affiliations with USG other than covering the job that you have just stated?  Like, do you serve on any other committees?  Do you coach the basketball team at VSU?  Do you serve on the grounds, flowers, beautification, opinions committee, anything like that?

A    No.  Well, we get asked to present every time there's some kind of a Momentum Summit, but that's from USG and that's just being good colleagues.  But that's not a committee or a board or anything like that.  That's just providing presentations when we're holding big events for the Academic Advising Summits or Momentum Summits.  So -- but that's not a committee or anything.  We just -- they like what we're doing and ask us to present pretty much at every one of them.

Q    Okay.  A Momentum Summit, does that have to do with admissions or dual enrollment?

A    Yes, because it's really any -- any component that is related to enrollment, progression, retention.

Q    Okay.  How often do you go to the Momentum Summit?

A    Too often.  Can I say that?  So I think we end up about three times a year up in a Atlanta typically doing some -- some kind of event.  And I say "event" because there is -- there are a lot of them.  The University System of Georgia is a pretty connected set of institutions, but what they bring you up for is sometimes a different title.  So it's been Momentum Summit.  It's been Academic Advising Institutes.  It's been -- just all different kinds of names.  There are about three times a year that we go up for something related to enrollment, management, retention, progression, graduation.

Q    What about dual enrollment?

A    There's a dual enrollment RAC, Regents Authority Council.  That's not one that I've gone to.  I don't know that the dual enrollment RAC has met back in person yet since COVID, and they may be doing that virtually.  I'd have to talk to Megan on whether or not she's been part of the DE RAC.  There is a LISTSERV for dual enrollment.  But I don't -- I don't recall off the top of my head whether or not RAC has met either virtually or in person in the last two years because of COVID.

Q    Okay.  And you said Megan.

Who is that?

A    Megan Hancock is the student services coordinator that is working with dual enrollment.

Q    And the DE LISTSERV, who's on that LISTSERV?

A    That would be dual enrollment.  So it would be people who are responsible for dual enrollment at institutions across the University System of Georgia.

Q    Okay.  So like any USG dual enrollment staff?

A    Yes.  And then there's also folks from USG that moderate or respond, too.  So Sarah Wenham is an individual at the USG that I think spearheads a lot of those efforts for dual enrollment through the USG office.

Q    Okay.  And what's her official position, Sarah Wenham?

A    Oh, I have no clue what her title is.

Q    Okay.

A    She's the -- the way that I know -- she's the high-up person for dual enrollment in the state, but I've never looked at what her actual title -- title is.

Q    Okay.

A    She's the one that if we have issues and

we want to know who to go to, then we go to Sarah and ask Sarah and say, "Hey, who's doing it well in the state?"  And Sarah says, "These are the people doing it well in the state," and then we work with them.

Q    Okay.  Did she ever tell you who was doing it well in the state?

A    I'd have to check with Megan on that and see if she gave specifics.  But Megan went out and used some of the folks that she knew and started some conversations when she transitioned in and then has had conversations with Sarah about programs in the state and how they performed.

Q    Do you know of any institutions that were -- you were told that were doing it right?

A    I think West Georgia is one that I recall that's got a pretty solid enrollment.  I think we're looking at over 800 at West Georgia, and they are comparable to us.  We're a comprehensive institution, so are they.  So their enrollment was up there pretty high.  I want to say it was about 800 students back in 2020 -- 2019, 2020.

Q    And what's the VSU dual enrollment number?

A    In -- in 2020, it was close to 200.  In 2021, there were over 300.  Spring 2022, current

enrollment, we're looking at about -- last number I saw was 264, which was about three days ago.

Q    Okay.

All right.  What's your degree -- your highest degree, and where you got it from?

A    Masters of Education, Adult and Higher Education, Grand Valley State University in Grand Rapids, Michigan.

Q    And do you have any involvement with the Technical College System of Georgia?

A    Nothing -- nothing official.

Q    Okay.  And what about Wiregrass?

A    Nothing official.

Q    Nothing official?  Do you have meetings with anybody at the TCSGs or Wiregrass?

A    I've presented at Wiregrass.  I've presented at Wiregrass on (indiscernible) advising. It's a --

THE COURT REPORTER:  On what advising?

THE WITNESS:  Appreciative advising.

A    It's a framework that is used in higher education.  I'm a national instructor, part of the national team, and consult on that part.  So I went over there and consulted with them, 2019.

BY MS. MAESTAS:

Q    Like one time?

A    Yeah.  Jammie -- Jammie Eubanks -- or Wilbanks I think is the last name over there --

Q    Okay.  I've never heard -- sorry.  I didn't mean to interrupt you.  I've never heard of that.  What does that mean, "appreciative advising"?

A    So it's a framework that's used, a philosophy, under you couldn't read and appreciative inquiry, positive psychology, success kind of literature.  So it's a strengths-based approach to conversations with students.  Goal being obviously that if we can have better conversations, ask better questions, then we can help them get to the -- the point of retaining and graduating so that there's power -- power in questions and that we typically approach things from a positive perspective.

If you're familiar with David Cooperrider's work, he did appreciate inquiry, which was a strengths-based model approach in organizational business development.  His case writer were late Seventies, early Eighties.  Started to look at it from a positive kind of perspective as opposed to a deficit kind of a model.

Q    So does that relate to academic advising?

A    Well, it's actually all -- it's really all education at this point.  It started over a decade ago, focused on appreciative advising, but has really spawned over into appreciative education.  So it's an -- it's that approach in relationships with students.

Q    Do you use that in your job at VSU?

A    All the time.

Q    How do you use it?

A    So it's a six-phase model:  Disarm, discover, dream, design, deliver, don't settle.  And it basically gives you some understanding on how to approach conversations and relationships to build relationship with our students to work on engaging and building trust so that we can have deeper conversations and understand where they have difficulties at to help improve the chance, again, that they're successful with retention and graduation.

Q    Okay.  Related to advising VSU dual-enrollment students, can you give me anything specific as an example of what you might say regarding their curriculum needs, academic needs?

A    So I think one of the things, if you were looking at a discover kind of an area on it, would

be, Tell me about what your interests are in doing dual enrollment, what is the goal behind doing dual enrollment, to try to figure out what it is they want to do and then figure out how we can help meet whatever that would be and then also to kind of figure out in the dream phase where do they want to go next.

So is VSU a space they want to stay and thrive and start through dual enrollment and then be here and make that transition, or do they want to use dual enrollment here and then go to University of Georgia or Georgia Tech or whatever it would be. And try to get some understanding as to where they want to go and what they want to do. And then really partner alongside of them to get to whatever it is that goal is that they have.

And they've got knowledge on themselves. So there's things we're going to need them to be able to tell us and then we've got some knowledge in the system that we connect to them and the two of us going together is what the model looks like. It's not an all you or an all me. It's us going forward in that pathway.

Q    Do you ever advise them to go to a technical college instead of VSU?

A    So I don't really advise dual enrollment students or most students on campus at this point. In the role that I'm in, I do very little advising. Most of what I see at this point is somebody getting a shout-out, did very awesome, and I just want to tell somebody or somebody didn't do very awesome and I wanted to tell you that somebody wasn't very awesome and then I'd work with that.

So I don't -- more so on ours, it's more training for our teams that work in our organizations that are doing the advising. I'm not day-to-day operationally meeting with dual enrollment students or meeting with really current students at VSU, unless it's the things that elevate up to -- to my level as a VP.

Q    Okay. What about meeting with high school counselors?

A    That's all Megan.

Q    Okay. So you said use -- you do -- you utilize appreciative advising all the time in your position, but then you said you don't do a lot of advising. So --

A    So I use a lot of leadership now, too, right? So the same --

Q    Yeah.

A    -- principles that were able to be used -- I've been in higher up for 19 years.  I was a VSU for 11.  I was at University of Michigan for four and a half and then here for, hard to believe, but this summer, fifth year.  And it's a model that has worked tremendously well for me, as a practitioner in the advising field, but it's very translatable.

The skill sets that you develop in -- in having relationship, building relationship with the students is not any different than having conversations with the folks that I supervise.  So while I may not use it as an appreciative advising tool, I would use it as appreciative education.

So we were kind of talking before.  Ten years ago, I started appreciative advising.  And what we recognize is that it's got utility in a lot of areas.  In fact, we have an appreciative administration course now that teaches administrators how to use the model to be able to do it for supervision.

**Q    Okay.  So it's just, like, a method of communicating?**

A    I'm trying to figure out the right way to say it.  It's really -- it's an approach and a philosophy and it's -- it's something that is

teachable and it is something that is repeatable.
So there's training manuals.  There's six-week
online courses.  There's three-day institutes that
all teach the model so that you can walk from there
to putting it into practice.

Q    Okay.

All right.  And your involvement socially
in the local area, what do you do?  So I'm not
talking about when you're sitting and doing your
jobs that we just talked about, but are you involved
in any clubs, organizations, sports?  Do you go to a
bar after work?

A    Porch Community Church is probably one of
the connection points for us as a family.  That's --
that's our local church that we go to.  I'm involved
in men's group.  Wife's involved in women's group.
Kids are involved in youth group.  But the majority
of the rest of the time is athletic activities or
music activities of the kids.

Q    Okay.  And do you see anybody from VSU in
your extra -- I don't want to say extracurricular,
but extra work activities?

A    Sure.  Yeah, from time to time.  I mean, I
don't -- Porch is not -- there's not a lot of folks
that are from VSU that are at The Porch, but there's

a few that are connected to VSU.  We travel all over Georgia for sports fields.  And so, yes, we do see, from time to time, folks that were affiliated with VSU at the sports fields.  Sometimes they're on the kids' teams; sometimes they're not.

Q    Okay.  Anybody -- what about Carvajal, Carr, Jeanine Boddie-LaVan, Lisa Long, Ryan Hogan, any of those people do you see socially?

A    For -- so golf outings.  We do golf outings.  So I've golfed with the president, golfed with Dr. Carr.  There's a golf league, actually, that takes place over the summer.  The president kind of sponsors, and people get to go to.  So we got those.  That doesn't happen a lot because I had back surgery unfortunately.  So, yeah, thankfully a lot better than I was.

But, yeah, those -- those occur summertime.  Every once in a while, we'll get together outside of that, summertime kind of session.  But that's -- that's a group of some folks from VSU, but then also just folks from the community that people know.

Q    And this is for golf?

A    Yeah, just to --

Q    Okay.

A    -- go out and play.

Q    So how often do you go golf with Carr and Carvajal?

A    With Carvajal, probably once a year, twice a year, maybe.  Well, it would have been more except for the back injury.  So about two times per year because of the back injury limiting it.  Rodney and I probably do two to three times a year.

Q    Okay.  And before the back injury -- when did your back injury happen?

A    It must have been 2019?  No.  We moved down here in 2018.  It was October.  Must have been -- it was either October of 2018 or October of 2019.  I can't believe I can't remember that.  October 2018 or October 2019, one of those two, that I had --

Q    Okay.

A    -- the surgery.  It would put me down for a while.

Q    It's probably all that lifting from the move.  I mean --

A    Yeah, I don't -- it's been a ongoing thing.  But, yeah, we're good.

Q    Well, I think --

A    Probably didn't help moving, but, yeah.

Q   Yeah.  Okay.  All right.  Thank you.  That answers my question.

What about besides the golf outings and the sporting events?  What other -- any, like, regu- -- like, do you go to a -- have people over?  Y'all go out to eat?  Anybody related to VSU that you hang out with?

A   Not frequently.  I mean, if there's an event that's occurring, we may get an invite and be able to go depending on what the schedule looks like.  But nothing consistently like, Hey, every Friday we're going to go to Austin steak out [sic] and hang out with X, Y, and Z.

Most of the time it's because we are not available because of activities with kids.

Q   Right.  Any TCSG folks that you hang out with?

A   (Shaking head).  Outside of Jammie, I'd -- I'd be fairly hard-pressed to get to many in TCSG.  I don't -- I don't know that I could --

Q   Outside of Jammie --

A   Wilbanks or Eubanks, the --

Q   The one that --

A   -- Wiregrass.

Q   -- you did the appreciative advising --

A    Uh-huh.

Q    -- thing in 2019?

A    Uh-huh.

Q    Have you been over there since then?

A    (Shaking head).

Q    Okay.

A    No.

Q    So nothing official, the appreciative advising in 2019, and nothing since then with TCSGs?

A    (Nodding head).

Q    Okay.

MR. CARTER:  Just remember to answer --

A    No.  Yeah.  Sorry.

MR. CARTER:  It's all right.

THE WITNESS:  I was just, like, nodding.

BY MS. MAESTAS:

Q    Okay.  How were you recruited to VSU?

A    So I was at University of Michigan as a director of their advising center for College of Engineering.  We did not have a retention problem there.  We had great enrollment there.  I had been doing the appreciative advising framework and done a lot nationally.

My first role was at a comprehensive institution at Grand Valley.  I missed the

comprehensive style of institution where you had the ability to impact more than just the college. Michigan's a R1 beast, and basically the college is a university unto itself.

So I knew that I wanted to get back to a comprehensive-style institution, which VSU is a comprehensive classification.  And I didn't want to shovel snow anymore, so I knew that we wanted to get to a warmer climate.  We looked, Carolinas, Georgia, Florida, those kinds of places.

This was something I saw, I think it was, on Inside Higher Ed.  And it was a unique opportunity at the time to lead a restructure of advising on campus to fully professionalize it, so to take it from a combination of faculty advising and professional advisers solely to a professional model.

There was a retention issue and -- and so it really took coming down here for a visit and taking a look at the campus and talking with the folks about what the vision was for the role, which was to be an executive to the director for advising and it was to reimagine what academic advising would look like on campus.

Again, at the time it was really unique.

That was -- I mean, I would have interviewed in October or November of 2017 and then started the role in January of 2018.  And it was not a common model.  Now, as we sit here in 2022, it's become a much more common model.

So it was one of those where it checked boxes of things that I was interested in, coming back to a comprehensive institution, not shoveling feet of snow, which could have contributed to the back surgery issue, and trying to find a fit for family and -- and what that would look like from a community perspective.

Q   Who was the first person that contacted you from VSU?

A   Tee Mitchell, because he was the chair of the committee.

Q   Okay.

A   Under Tee Mitchell, who was -- yeah, he chaired the search for my position that would have been in 2017.

Q   Okay.  All right.

Okay.  And so I'm going back to your list that you said that you're associate VP of student success and you said --

A   Division -- Division of Student Success.

Oh, sorry.  Associate vice president for student success in the Division of Student Success.

Q    Associate vice president of student success in the Division of Student Success?

A    Uh-huh.

Q    That's your full name --

A    Oh --

Q    -- title?

A    No.  Thankfully it stops at that point right there, the SS part.

Q    Okay.  So we have advising, orientation, first-year programs, DE --

A    Uh-huh.

Q    -- registrar's, and financial aid?

A    Uh-huh.

Q    So I see advising and DE, but not admissions.

A    Uh-uh.

Q    Okay.  So not admissions.  So we're separating DE from admissions?

A    Uh-huh.

Q    Okay.  And advising is separate from DE and admissions; correct?

A    I think it would depend on how you look at it.  When I look at it, I don't separate dual

enrollment from advising because that's all in my purview.  That's part of my entire group.  So I don't know that I would separate it.  But in our title, University Advising and Student Transitions, when it was created back in 2018, the goal of it was obviously to get academic advising stood up first, which was -- so professional advising stood up in July of 2018.  But there's always been a plan from the moment that I got here that we would build out a student transition side.

And so as we sit today, the student transition side is dual enrollment, first-year programs, and orientation.  That's what I classify in as student -- the student transitions side of the University Advising and Student Transitions.  And as of January, that office is actually all under one roof in 3200 Converse Hall.

We were able to move out College of Arts to the fine arts building, and the folks that are in those three areas will all reside in 3200 Converse.  Brenda Beasley, who runs orientation, is over there now.  Megan Hancock, who's our student service coordinator for dual enrollment, is over there now.  And we're in the search process to hire the FYP candidate.  Once that's done, that person will

reside over there.

Q   So who are the subordinates that you supervise in DE?

A   Megan Hancock.

Q   She's the only employee?

A   For DE, yep.

Q   All right.  And then -- so admissions, that's under Ryan Hogan?

A   Uh-huh.

Q   Did they handle DE at all?

A   So the way that I would look at it is it's a partnership between admissions and University Advising and Student Transitions.  The admissions team is out there talking about the opportunity to engage in dual enrollment.  I mean, they're out at schools across the state and talking with students from freshman year and beyond.

And so when they're out there recruiting for incoming students, my understanding is they're having conversations, too, that dual enrollment is an option.  So they're helping to get the interest of students to come in for dual enrollment and do that component of it.  But then once the student has made a decision to become a dual enrollment student, that's when Megan and that -- that part of the

University Advising and Student Transition takes over and does the rest of the work with the dual enrollment student.

So once they're applied and admitted, they're going DE, that person will actually help with some of the dual enrollment work.  But admissions plays a role in the -- what would you call it -- awareness of an opportunity to do that.  Not every student knows about dual enrollment.

So when they're out holding fairs and having conversations, the -- the admissions counselors will talk about that.  And then Megan is really kind of, what I would say, the way that I would look at it would be kind of the boots-on-the-ground person that once those DE students are here, helps those DE students through the process, paperwork process, funding process, registration process.

     Q    Okay.  Do you remember what Jamie's job was?  Do you remember what her job was?

     A    Dual enrollment was the -- the -- I don't know if the dual enrollment was the official title or not.  But I know that if you asked what Jamie's role was to anybody on campus, it was always dual enrollment.

Q    Okay.  And out of -- so we talked about Megan is the sole employee under dual enrollment --

A    Uh-huh.

Q    -- but then we said there's a partnership between dual enrollment, admissions, and advising -- well, I think you said first-year transitions, advising, and admissions, and then dual enrollment's under first-year transitions; right?

A    Student transitions, yeah.  So student transitions, first-year programs, dual enrollment, and orientation.

Q    Okay.  And in recalling what Jamie did, what -- who were the employees that now do something that Jamie used to do?

A    Admissions, to some extent, because I know Jamie went out and had conversations at high schools about dual enrollment, so, admissions, and then what Megan does in dual enrollment.  And there was also another individual.  Sarah Bessenger was also part of dual enrollment.

Q    Okay.

A    Would now be an okay time for me to step out and use the restroom?

Q    Sure.  Let me know if -- and before you go, I want to -- I do want to address something.  So

we have a little bit of a scheduling --

THE COURT REPORTER:  Are we off the record?

MS. MAESTAS:  This is on the record.

BY MS. MAESTAS:

Q    So we had your deposition scheduled from 1:00 to 3:00, and then we have somebody else coming in at 3:00 o'clock.

A    Okay.

Q    And so I'm -- I was hoping to get you done by 3:00, but I have to get that person in at 3:00 and I'm worried that I'm not going to finish your deposition by 3:00 o'clock.  Is there any way that you could return, like, after I'm done with the person I have to do at 3:00?

A    It would require me canceling appointments that I've got in the afternoon, which I can do if --

Q    Are they --

A    -- it's necessary.

Q    -- at VSU or are they, like, doctor's appointments or --

A    No.  They're -- they're staff appointments that I've got for staff meetings with --

Q    Okay.

A    -- two folks.

Q    So let me --

A    What time would you need me back at?

Q    I don't -- see, I think I'm only going to need, like, hour, hour and a half with that other person.  It could be really short.  So probably, like, 4:30.  So here -- let me tell -- put it to you this way so you kind of have an idea.

I get seven hours under the statute with you.  I do not intend on using that.  But two hours was not what I wanted.  And I tried -- Mr. Carter and I tried to arrange it, but this person is faculty that I'm going to be talking to.  So we're trying to work with her.

MR. CARTER:  I talked to him about it before he came in here if he can do it today, fine.  If not --

BY MS. MAESTAS:

Q    And then we can --

(Simultaneous cross-talk.)

BY MS. MAESTAS:

Q    -- on Friday.  So it's very expensive for us to come down here and do this.  So we're trying to not have to redo it.  The other opportunity would be if I need to follow up with you, we can do it via Zoom but we still have to hire a court reporter for

a sitting fee.  And so we're trying to --

A    Yeah.

Q    -- you know --

A    So you're thinking 4:30?

Q    Uh-huh.

A    And be done by -- maybe done by --

Q    5:15?  5:30?

A    I'm just wondering now on the kids' front.

Q    No, I -- I get it.  I'm down here on --

A    I mean, I --

Q    -- my vacation, so --

A    I can come back for 5:00 or I can come back for 4:30.

Q    Okay.  Perfect.  And then if you need, like, a -- an excuse, I think Mr. Carter and Mr. Arrington can provide you with that if it's work-related.

A    I need an excuse?

Q    Well, you said it was work-related.  So I --

A    Yeah, I've got -- yeah.  I'll take care of that when I step out after 3:00 o'clock or whenever it is to let Steph know I won't be able to do it, that I'll have to reschedule.

Q    Okay.  And I'm sorry about the

inconvenience.

A      That's okay.

MS. MAESTAS:  Okay.  We're off the record.

(Recess 1:37 p.m. until 1:44 p.m.)

BY MS. MAESTAS:

Q      Back on the record after a short break.

We were talking about -- I think the last question that we had answered was of the current people in admissions and dual enrollment and advising, which of those positions do things that Jamie used to do in her job.  And then you said people in admissions, Megan Hancock, and Sarah Bessenger, who's no longer there.  So she's not currently --

A      Correct.

Q      Okay.  Anybody else do stuff that Jamie used to handle?

A      Not to my knowledge.  But the campus partners that we were working to support dual enrollment are still similar campus partners.  So, I mean, dual enrollment interfaced with financial aid and the bookstore and different folks like that.  So those -- those positions still exist and still partner with.

So the DE person isn't obviously going to

do it on their own.  There's a -- there's a whole team of people that support, well, DE students and all of our students.  So --

Q    Okay.

A    -- those are in different divisions. Financial aid and -- well, financial aid is actually one of mine.  But bookstore is in auxiliary.  And I'm trying to think of who else has hands in -- the bursary office, different -- different offices support our DE students.  And those groups come together and have conversations on how to support and streamline and make more efficient, the process.

Q    Okay.  And Megan -- Megan Hancock, she was also known as Megan Sutliff, I believe, at some point.

Is that your understanding?

A    It's her maiden name, yeah.

Q    And so Megan Hancock, when did she get brought on to VSU as an employee?

A    January of '21.

Q    And has she gotten any raises since she came on?

A    No.  It would have been the initial hire offer, and we have not had a merit since.

Q    Okay.  Do you know what she makes?

A    Not off the top of my head.

Q    Okay.  And so your understanding was Megan -- it was a new position that was created for her?

A    That was a replacement for Sarah Bessenger.

Q    Okay.  And -- so when did Sarah Bessenger leave?

A    End of 2020 or fall of 2020.  Fall semester of 2020 is probably the correct way to say that.

Q    So she was no longer there as of fall of 2020?

A    Uh-uh.

Q    Did she leave before Jamie did?

A    I don't recall.  It was pretty close in timing.  I don't -- I don't remember who --

Q    When did she announce --

A    -- who left first?

Q    -- she was leaving?

A    In the fall, fall of 2020.

Q    Okay.  And then you brought Megan on to replace --

A    Sarah.

Q    -- Sarah?  Okay.

A    Uh-huh.

Q    All right.  In front of you, you're going to see some notebooks that have tabs in them with numbers, and I'm going to direct you to Tab Number 17.

MR. CARTER:  So it's in this book.

THE WITNESS:  Thank you.

MS. MAESTAS:  You can just leave it up here.  Yeah, that's fine.

(Marked for identification is Plaintiff's Exhibit 17)

BY MS. MAESTAS:

Q    Okay.  And this is -- I've labeled it Plaintiff's Exhibit 17.  This is just a printout from the VSU Office of Admissions page as to the list of staff in admissions.

And do you supervise any of these individuals?

A    I do not.

Q    Oh, paper cut?

A    Yeah.  I'm good.  I'm good.

Q    You bleeding out?

A    I'm fine.  Thank you.

Q    Okay.  So do I need to get you --

A    I'm good.

Q    -- a tissue because I don't want you to bleed on the document.

A    No.  I think we're okay.

THE COURT REPORTER:  I have Kleenex right here.

A    It's just a flesh wound.  We're good.

BY MS. MAESTAS:

Q    Okay.  That's the first time that's happened in all this paperwork here.

Okay.  So are -- and then if you could flip to 18.

MR. CARTER:  Probably in the front --

(Simultaneous cross-talk.)

(Marked for identification is Plaintiff's Exhibit 18)

BY MS. MAESTAS:

Q    And this is similarly a printout from the VSU website.  And it says "Meet your counselor," and these are the admissions counselors.

Do you supervise any of these individuals?

A    I do not.

Q    Okay.  But in looking at these two exhibits, 19 -- or, sorry, 18 and 17, your understanding, based on what you said, is that Jamie used to -- Jamie handled functions that these

individuals now handle?

A    I think there's always been a partnership with admissions and dual enrollment, and there is at every institution.  And so admissions counselors, when they go out, I think if they're doing things right, they're talking about admission for fall, but they're also talking about dual enrollment opportunities.  And I think your dual enrollment coordinator is the point of contact for the questions or the events or activities that take place that are specifically DE events.

So, like, my oldest son, Brayden, there were DE events at the campus.  Typically, if there's a DE event at the campus, then the coordinator for that campus would be there for that particular event, sometimes with an admissions counselor person.  So I think there's -- there's overlap.  I don't -- it's not like this person does just this and then that person just does this.  This kind of bleeds across in the role.

Q    Okay.  So I think that's a yes, but let me just make sure.

So of the people that are on these exhibits, 18 and 19, every single one of them has done something that Jamie used to do?

A    Define -- can you define "something" for me?  Because if it's just talking about dual enrollment to high school students, then I would say yes.  So having conversations about dual enrollment to high school students, Jamie did that, and that's part of what admissions counselors would do, too.  So I would say yes to that --

Q    Okay.  So there is overlap with every single one of them with Jamie, what Jamie used to do?

A    For a portion of the job that Jamie did.

Q    Okay.  And Jamie did other things as well?

A    Uh-huh.  That the admissions counselors didn't do, and the admissions counselors did stuff that Jamie didn't do.

Q    Okay.  And on these -- withdraw the question.

All right.  What is the main function of VSU dual enrollment?

A    To provide opportunities for high school students to engage in college-level curriculum.

Q    Okay.  What DE courses can high school students take at VSU?

A    So there is a list of courses that have been approved by the University System -- University

System of Georgia for them to be able to take, and that would be under the dual enrollment payment process.  And that's primarily core-related courses, but that -- that -- what courses they can take is dictated at the USG level.

And then if they -- they actually only have a certain amount of credits now that they're allowed to take as dual enrollment.  If they go above the credit amount, which is 30, or they go out of the approval of the University System of Georgia, they are considered joint enrolled and pay out of pocket.

THE COURT REPORTER:  You said "joint enrolled"?

THE WITNESS:  Joint enrolled.  Uh-huh.

A    And that was a -- that was a change of process in this 2020-2021.

BY MS. MAESTAS:

Q    Okay.

A    Pretty -- it's pretty straightforward what they -- I mean, it's pretty straightforward what's approved or not approved for them to be able to pay, and if we want to try to get something else approved, we have to go through a process on a quest to make it happen.

Q    Do the state regulations for DE requiring counseling of high school students before they enter in the DE program at VSU?

A    When you say "counseling," are you referring to counseling provided by the high school? Counseling provided by the university?

Q    I'm just saying "counseling."  I'm not saying who provides it.

A    Okay.  And then counseling in terms of advice about what dual enrollment would be, or, like, mental health related kind of counseling --

Q    No, no, no.  Not -- not mental health counseling.  Like, counseling on dual enrollment.

A    Is it mandated to have appointments?

Q    No, I don't know about mandated to have appointments.  Is it mandated that they receive counseling on dual enrollment?

A    I don't know if that is a state mandate or not, but our process is any new student that is going to go through dual enrollment has an appointment with the DE coordinator.

Q    And that's Megan?

A    (Nodding head.)

MR. CARTER:  Was that a "yes"?  Just remember to --

THE WITNESS:  Yes.

MR. CARTER:  -- verbalize.

A    Yes.

BY MS. MAESTAS:

Q    **And is there a checklist that Megan goes through to provide that counseling?**

A    I would have to chat with Megan on that. I don't -- I don't know.

Q    **Okay.  Are there any common pitfalls that you try to avoid with counseling when a student's entering dual enrollment?**

A    Well, a partnership I think that's between the high school guidance counselor and the dual-enrollment coordinator.  And if there's concerns -- I know sometimes the counselor at the high school will express that to the dual enrollment person.  If there's questions, the dual enrollment person can go back to the high school and talk and see what we're looking at.

I think it comes back to when we were talking kind of about the appreciative advising thing is try to figure out what the student's trying to do and then whether or not that's going to make some sense, based on whether they meet the requirements for dual enrollment.  So there -- there

are certain requirements that they have to meet to be eligible for dual enrollment.  And if they don't meet them we, can't be here.

So there's GPA requirements, and then there's either an ACCUPLACER exam or an ACT/SAT requirement.  So they can't be a DE student unless they're eligible to become a DE student.  But in terms of the counseling piece of it, I think it probably looks a little different for the person that's been in there the first -- first time coming in for DE what they're trying to do versus somebody who's been in.  'Cause the counseling appointment if -- looking at the person who has been here and taken courses, if they didn't perform well, then we're absolutely having a conversation about what happened, why didn't we have success, what is it that we want to continue to do.  And then we're having that conversation about is DE the right thing or not the right thing for you in terms of what you need to do both for meeting high school graduation requirements and getting that credit for college.

On the front side of it I know a lot of it is based on what is the expectation for a dual enrollment student?  What does that look like and what courses are they going to take and what's been

approved.  And there's a form that is there in terms of the courses that are going to be taken and signatures, I believe, from the high school side and from our side, from DE.

**Q     Okay.  And are you referring to the SAP, the satisfactory academic perform, with the students that were having difficulty?**

**In the previous statement you said, if the student's having trouble with DE you were absolutely having the discussion.  Is that referring in any way to the SAP --**

A     You're -- so you're asking if we would talk to them about the fact that the academic performance could come back and cause issues with satisfactory academic progress in the future?

**Q     Or now.  I mean ...**

A     Well, there's -- so, yes.  The financial side of is it is something that would be talked about because if somebody if not meeting requirements, then there's a chance if they don't get back into what is required that they're no longer going to have it paid for them.  So it would depend on, you know, how many courses they were enrolled in what those courses looked like grade-wise overall, but yeah, if there's -- if

there's an issue on the financial aid front, then that conversation would be had with the student.

Q    And is that HOPE eligibility?

A    No --

Q    What's --

A    -- HOPE is different.  I mean, HOPE is -- HOPE and SAP appeal are not -- SAP are not necessarily the same thing.  HOPE is an eligibility for the scholarship program, and it can -- it can play into it, depending on how they performed academically.  Satisfactory academic progress actually refers to financial aid and progression.

66 percent is required to continue to get your financial aid package.  66 percent successful completion is the SAP.  So SAP is one thing, and then HOPE and Zelle Miller are a different thing. If you're in an SAP issue, you're not making SAP, you're going to have issues on HOPE and on Zelle.

Q    In HOPE and on Zelle?

A    Yeah.  So HOPE is -- HOPE is 82 percent of tuition coverage.  Zelle is a hundred percent of tuition coverage.

Q    And just for the record Zelle is a Zelle Miller --

A    Scholarship.

Q    Okay --

A    Yeah.  So HOPE scholarship, yeah.  HOPE and Zelle are the, in my brain, the same way. There's different -- there's different qualification marks to be eligible for Zelle and a hundred percent coverage versus HOPE at 82 percent.  So ACT/SAT, your high school GPA, there's different demarcations that are required to hit it.

**Q    Okay.  What about in counseling the students when Megan meets with them or if they have questions they come to Megan or you regarding, like, the academic vigor of the course that they are about to choose?  Any discussions about that in counseling the student before they enter dual enrollment?**

A    Yeah.  So I don't -- I've not sat in on a meeting with Megan to kind of talk through what she says related to academic rigor.  I think, if you're looking at literature that's available or conversations that go on, one of the things we definitely talk about is the fact that it is a collegiate level course not a high school level course.  And so when they're being -- you're using the term "counseling."  I might use "advise."

Just -- when we do the advisement for dual enrollment, there's a lot of different talking

points.  To get a specific list we would need to chat with Megan and see, you know, exactly what she did.  I don't know that list off the top of my head or, you know, the sheet off the top of my head.

Q    Okay.

A    But I'm comfortable in knowing that both at the high school level for the guidance counselor that approves the courses, and then in the initial intake the conversation that this is a different level than what you have at the high school is -- is communicated.

Q    Okay.  And did you ever have an understanding that the academic vigor was different at different institutions for DE, like, VSU DE versus another institution's DE?

A    Can you rephrase that?

Q    The academic vigor.  Did you ever have a discussion regarding different academic vigor for the same courses that was available at VSU dual enrollment versus the academic vigor of the same course at another institution?

A    No.  I mean, to me dual enrollment is dual enrollment.  I mean, I think people talk about our institution versus our local ones in the area, but the data that I saw on it from our institutional

research guy was that students transferring from those institutions do equally well as our students who start here.  And that's tradition students and transfer students.

But, no, I -- my expectation is if it's going to get transfer approval that that course is going to be more rigorous than what they had in high school.  It's supposed to be a college level experience for -- regardless of whether they take it with us or TCSG or whatever that would look like.

Q    Okay.  And you said you got this data from a guy.

A    IR, institution research.  Looking at performance in students who had transferred in from Wiregrass, GMC versus what we would native VSU students and that there was not a GAP difference in performance, which is contrary to what a lot of people believe on campus.

Q    Did you ever have any specific examples where students were having trouble with academic vigor of a course at VSU, or they came in and the course was too challenging?  Anything like that where they weren't meeting it?  Like -- and I don't mean their names.  But describe the scenario where you met with a parent, phone call from a parent, met

with a student, phone call from a student?

A    I've not had any conversations with DE parents or students with Megan at all.  Jamie did that when she was here.  I've not had -- to my memory, I've not had an elevation of a DE student for complaint or commendation.  I know in holding one on ones in conversation with Jamie with Megan that you've got students who come in and it's more intense than they anticipated it being, and sometimes that's a conversation in saying, okay, it is.  And you're committed to that process, depending on when you're having the conversation.  So what is it that we could do to help support you and make sure you do what you need to do to -- to get through the course successfully.

And sometimes then it's -- they try it for a semester.  They complete that semester and say, No thanks.  I'm not interested in coming back.  I think we see that a decent amount in the senior year, where they do it senior year fall and then senior year spring they're, like, I'm good with the high school courses that I've got.  I don't want necessarily want to come back and take the rigor right there.  They are more intensive than what they're -- what they're traditionally getting

in the high school.

Q    Okay.  But you would never -- would you send them to another institution to take DE elsewhere?

A    Not if we had the course available here.

Q    Okay.

A    There could be -- there could be times, depending on the courses that are offered, that we're not able to accommodate a student's schedule or accommodate a student's preference of modality. So, for example, I think some people assume that all of the students who enroll in dual enrollment are here locally, but that's not true.

We actually enroll quite a few of dual enrollment students throughout the state.  Clearly, they're not going to come to campus.  So they're enrolling through an online course with us.  If we hit online capacity and they -- and we're not going to increase it or whatever it is, then they certainly could look for dual enrollment options at another institution, whether that's one in our own backyard or another one that offers it throughout the -- throughout the state.

There may also be times where somebody says, Hey, I'm at Lowndes County High School, and

I've got second block open to come take a course, and we don't have what they need in that second block time.

My expectation would be if we can't meet the need, that we would say, Hey, we don't but there might be opportunities for you to you pursue it at Wiregrass or GMC, or if they want to do it in online in -- in different formats.

Q   Okay.  And your IR guy that gave you the data on different types of students that were coming in to VSU and their level of success, did -- did that data have, like, personally identifying information in it when you received it?

A   No.  I -- and I'm trying to -- so I'm trying to think if it was just a conversation or actual, Here's a spreadsheet.  I think it was a verbal conversation of we've pulled that data and the -- the belief from some folks is that GMC and Wiregrass is -- is not as rigorous as what you get here, and so that conversation has played out in spaces.  And the institutional research guy's name is Barrie Fitzgerald.

Q   Barrie?

A   Barrie Fitzgerald --

Q   Okay.

A       -- had stated that he had pulled a report. And it's probably two years ago now at this point, but that showed that students who had transferred in from GMC and Wiregrass were performing at a same or similar level to what I would say is native VSU students, which native means started with us as opposed to transferring from GMC or Wiregrass.

**Q      And that did not have, like, students' names on it?**

A       Again, I think it was a verbal conversation, not a piece of paper that I physically saw.  So it was the IR guy that said, We've run this, and this is what we see.

**Q      And did it have information related to retention of those students?**

A       I don't remember it in relation to retention.  I remember it being in relation to GPA.

**Q      Okay.**

MS. MAESTAS:  All right.  Mr. Carter, this was dangerously similar to the information that --

MR. CARTER:  Dangerously?

MS. MAESTAS:  Yes.  Very closely, almost verbatim what we were trying to collect in that first discovery request and that you had

objected on the basis of FERPA.

MR. CARTER:  He said -- I mean, not to put words in his mouth, but you're looking for data.  You want -- a document is what you're looking for, and I think he said --

THE WITNESS:  Verbal.

MR. CARTER:  -- it was verbal.

MS. MAESTAS:  So -- but he's talking about a conversation where he talked to Barrie Fitzgerald and he, Barrie Fitzgerald, obvious- --

BY MS. MAESTAS:

Q    Is he a VSU employee?

A    Uh-huh.

MS. MAESTAS:  He is referring to data that he's obtained and printed out on a spreadsheet, and we want those numbers.  I mean, if he's going to go and testify about this at trial, then I deserve my time to cross-examine Barrie Fitzgerald.

MR. CARTER:  Well, I don't -- I don't know that any of this is relevant to your case, quite frankly, but if there is a spreadsheet that doesn't identify the students, can you put me in touch with Barrie?

THE WITNESS:  Uh-huh.

MR. CARTER:  Okay.

THE WITNESS:  I can.

MR. CARTER:  But I think -- and do you know what time period he was looking at?

THE WITNESS:  Well -- yeah.  I mean, the conversation would have happened, I think, preCOVID.  So you're talking about two years ago or so.

MR. CARTER:  If the -- if the data is there and fits with what you've requested, yeah, I'll get it and get it to you.

MS. MAESTAS:  Okay.

MR. CARTER:  But I think you had a specified parameter in your discovery request.  And it was students, and it was, like, 2015 through the present, if I recall.  But, look, I'm not trying to hold data back from you.  If we can satisfy FERPA and get that data -- it's just like what I brought in this morning -- we'll give you anything we've got.

MS. MAESTAS:  Okay.  Great.  Thank you.  I just -- I didn't want to miss the opportunity to address that.

BY MS. MAESTAS:

Q    All right.  So back to when you talked to Barrie Fitzgerald, and this was -- you're referring to this kind of conversation that -- that was that the other institutions weren't as equipped to prepare the students and so their academic success in college was lesser.

Can you tell talk about that conversation that you were referring to, give me a little bit more specifics about who was saying it, and was it, like, you know, team -- Team A and Team B or, like -- can you just tell me what you're referring to?

Is it, like, a debate and then you went over to Barrie Fitzgerald and --

A    Rock --

Q    -- Barrie --

A    -- paper, scissors to see who -- no.

So I sit on a different committee called the suspension -- you okay? -- suspension appeals committee, which is a very challenging committee to be on.  We -- we look at students who are no longer eligible to be at the institution for a semester, two semesters, maybe even three years, or potentially no longer eligible whatsoever.  And that

is typically the genesis of where that conversation comes in, is around, Boy, we sure do see a lot of students that come from institutions that end up in suspension appeal.

So my -- my recollection of a conversation related to rigor of academic coursework for -- for those institutions and that is -- is around that concept of suspension appeal. And if memory serves me right, that was where the -- Barrie started to look at, was to see was there some legitimacy to that belief or idea that more students who were starting at GMC or Wiregrass were hitting suspension appeal than the norm. And then that's -- what he said verbally was with what they had seen and run, there was not -- there was not a GPA difference between those who started at Wiregrass/GMC versus a native VSU student.

Q   Okay.  Thank you for explaining that.

A   You're welcome.

Q   On the suspension appeal committee, who -- who raised that, that it was where they went to, like --

A   I think -- I think anybody who's been on the committee has, at some point in time, gone, Wow, that seems like we have a lot of students from here

or there.  I mean, it's -- that's a really hard committee and you -- you get -- I mean, in some years you're looking at 300 petitions from students who are trying to get back in to the institution and are writing letters or different things like that.

Q    Uh-huh.

A    So I think sometimes it just -- it can feel like you're seeing the same institution over and over again, but it's because we're in June and we're doing this group of the 300, and just by happenstance you see that amount from that institution.

So I think anybody who has sat on a suspension appeals committee at any institution in the country is going to say something similar to, Hey, I wondered if they're being prepared differently at our local -- whether you call it a community college or TCSG system -- versus what we do here, university being the here.

Q    Did you ever ask that question?

A    I didn't have to because they were all, as soon as I got here, asking that question about, We think this is what we see.  And it's not any different than what I saw at University of Michigan for suspension appeals or at Grand Valley State

where that thought or concept was -- was there.

So it wasn't -- it wasn't a new concept to me.  And, you know, again, what -- what I understand or remember from the verbal conversation was that there wasn't a -- a statistical significance on the GPA front.  I don't know retention, progression, or different things like that, four-year graduation, I don't know.  But from a GPA prospective, it was stated that it was not -- not a difference in native versus transfer in from those institutions.

Q    Okay.  20 on your tabs.

(Marked for identification is Plaintiff's Exhibit 20)

BY MS. MAESTAS:

Q    Okay.  This is Plaintiff's Exhibit 20. This is a PowerPoint that I printed out from the USG regarding dual enrollment.  And in looking at it, it appears that there's two different pathways that are divided out in columns.  It's the TCSG pathway and the USG pathway, and just wanted to refer to that before I go onto something else.

And then -- oh, sorry.  Right here, it has two columns.  It's dual enrollment admissions requirements.  One column for the TCSG, and one column for the USG.

And is it your understanding that the admission requirements for the USG dual enrollment are of a higher standard?

A    I didn't know that in terms of, like, this side and that side.  I haven't really done a lot of TCSG work.  What I'm familiar with is what we require for our institution.  So I know that that right there, in USG, has also shifted recently.  I don't know if TCSG has shifted, too.  But I'm familiar with our requirements here and haven't had conversations about the difference between USG or TCSG and how they handle dual-enrollment students.

Q    Okay.

A    So I'm most comfortable in saying what we have to do for us a student or what we're eligible for them to be able to take in the USG setting, not on the TCSG setting.

        (Marked for identification is Plaintiff's
        Exhibit 21)

BY MS. MAESTAS:

Q    Okay.  And then 21 is another dual-enrollment publication that's available online with the USG.  And in reading this document, it talks about consulting with a high school counselor to determine appropriate courses.  And then it says,

before that:  "Students should pursue a challenging and vigorous high school curriculum."

Isn't that saying that some courses are of a different level of difficulty than others and you need to talk to your counselor about that?

MR. CARTER:  What -- are you talking about high school courses?

MS. MAESTAS:  Dual enrollment.

A    I would say, first, I don't know what the intention behind the writer's of the document were looking for.  How I would read this -- and I put myself a lot of times into the -- if I'm reading this with one of my kids, I would read this inclusive of what is the best pathway that's inclusive of high school courses and/or college courses if I was going to be dual enrolled.

And there absolutely is a difference in rigor in the high school in terms of what courses they can take because you can take college -- CP -- the kids could tell you this in a heartbeat -- college prep advanced.  Some systems have international baccalaureate.  So when I read that, I read that as inclusive to high school and potentially college pathways, and -- and our students do have to have a conversation with a high

school counselor before they can enroll with us in terms of what courses are approved by the high school.

So I -- the way I read it is I would expect Mr. Gay or Ms. Walker, who works with my student, to have that conversation inclusive of the courses at the high school and the dual enrollment options that are available.

Utilizing a son, I've got one that is doing dual enrollment coursework up at Georgia Tech in mathematics because he didn't have any more to take in Lowndes.  And he's also taking family and consumer sciences in -- in that interest, which is not a college prep or advanced.  And he just did it because he likes it.  I'd eat what he cooks.  He does pretty good.

But that's -- I mean, that's how I would read that statement, is that's a -- that's a statement inclusive of the high school rigor and the conversation about what would the rigor be at the college environment and what do we -- what do we know about that rigor versus what you would get at Lowndes or at Valdosta High School.  That's how I would personally read that.

BY MS. MAESTAS:

Q    All right.  And then on the second page, how do you read the intent behind that first sentence?

A    Am I reading the entire highlighted or just the Question 2?

Q    Oh, wrong page.

A    This one?

Q    Uh-huh.  So in --

(Simultaneous cross-talk.)

MR. CARTER:  There's an asterisk, and I think -- those are the two I see that have asterisks by them, that statement's referring to.  See want I'm talking about?  It's got an asterisk and then these --

THE WITNESS:  Uh-huh.

A    I'm -- can you ask me the question again, please?

BY MS. MAESTAS:

Q    Yeah.  So the point I'm trying to look at in this one is that it is stating there are institutions in the USG that have selective admissions requirements and that the sentence is telling you to be careful with certain courses because of the admissions requirements of those

selective institutions.  Do you -- I mean, do you understand --

A    What -- I'm sorry.  I don't -- I'm not following what the question part of it is.

Q    So the -- the selective admissions requirements of certain institutions and how that -- how the admissions offices look at, for the selective schools, about what that student took in dual enrollment.  Do you know anything about that?

A    So I've worked at a very selective institution before here.  College of Engineering is a top program in the country --

Q    Michigan?

A    -- one of the top five, University of Michigan in Ann Arbor.  They're Number 5 or Number 6 --

Q    Okay.

A    -- depending on the year.  Again, looking at this with experience that I've got and the asterisk point of this, I completely understand what they're saying when they asterisked a course that's called advanced mathematical decision-making.  That would make no sense for a student who's trying to get into an engineering program to take that course. It just -- it doesn't.  It's not -- it's not,

contentwise, correct.  They need to be taking the calculus-level courses.

And so if a counselor that I was working with for my second son, who's interested in civil engineering, told him to go take advanced mathematical decision-making for an engineering track, I would be upset because it was bad advice given by the counselor because his correct pathway is going to need calculus.  And because of the institution, he needs that calculus.

That does not denote that that course in advanced mathematical decision-making is not a rigorous course, in my opinion.  They're two different topics and that school has prerequisites that have to be met.  And if I take Calculus I or Calculus II, I can transfer that into the University of Michigan, their engineering program, and be just fine because the content is correct.  I can't do the asterisked ones because the content is incorrect. So to me, it has nothing to do with rigor and what is actually delivered in the course.

**Q    Okay.  Page 5.  The highlighted question: "Should I pursue a challenging rigorous high school curriculum?**

**Yes."**

And then:  "Consult with your high school counselor about selecting a course schedule suitable to your ability level in each area."

So here -- you kind of answered this already, but does this change your previous answers in any way?

A    No.  I would see that being a statement inclusive of the high school curriculum and the collegiate curriculum.  So rigor at the high school and rigor at the college.

Q    Okay.

(Marked for identification is Plaintiff's Exhibit 23)

BY MS. MAESTAS:

Q    Have you heard of the USG Dual Enrollment Summit?

A    Uh-huh.

Q    What about for 2019?

A    I believe Jamie attended that one, in 2019.

Q    Do they have one every year?

A    When it's not COVID season, my understanding is yes.

Q    Okay.  So -- but you are aware of what it is?

A    Yeah.  So this is similar to summits like the Momentum Summit or the advising summit that we talked about kind of at the earlier onset of the conversation.

**Q    Okay.  Can you tell me what it is?  Like, what --**

A    So --

**Q    Like, what do you talk about, a little bit more detail?  And I think you're the first person -- I think you're the first witness who's actually known what it is.  So ...**

A    So typically these -- these events are around -- so dual enrollment obviously is going to be around dual enrollment.  Academic advising summits typically, not always, are around academic advising.  Momentum approach is another submit that is offered, and that's around admissions, enrollment, retention, progression.

So they have all have themes that they're typically talking about.  If I'm going to the USG dual-enrollment summit, my expectation is that I would be going up and meeting with people who are responsible for dual enrollment at other institutions within the University System of Georgia.  We're sharing what we know and we're

learning from others about what they know and has been successful.

We're also typically getting updates from the University System about any changes to policy, procedures, rules related to dual enrollment.  So in -- in a lot of ways, it's akin to what I would call professional development for our folks that are in those areas.

It's a way to go and -- and learn what's coming down the pipe, what's going to be happening.  Personally, I think it's a networking opportunity for our folks when we go out to learn and have conversations and meet some people so that if it's not June 26th and I'm not sitting at the Dual Enrollment Summit and I've got an issue then I've met somebody from one of these summits and can say, Hey, I got an issue.  I'm not really sure how to handle this.  Met you there.  Can you kind of tell me what we do here at West Georgia or whatever it may be.

**Q    Okay.  Perfect.  Thanks.  Who -- who goes to it now?  I mean, assuming COVID is not preventing it from occurring.**

A    Megan would be responsible for going to the dual enrollment summits.

Q    Okay.  And then Exhibit 24.

(Marked for identification is Plaintiff's Exhibit 24)

BY MS. MAESTAS:

Q    These are bullet points that were generated at a roundtable discussion at the Dual Enrollment Summit in 2019.  And I wanted to direct your attention to the last bullet point in the first section.  And so before you -- there's a parenthetical at the end, which is kind of like a conclusion that was drawn, and then the bullet point is listed as a misconception.

And so would you just take a minute to digest what I just said and then read the last bullet point?

A    Okay.  What -- what was the question?

Q    Okay.  So the question is:  Does that ring a bell with anything that is related to dual enrollment issues that you handled?

"The rigor of the courses is the same at all institutions and some of the courses are transferable to all USG and TCSG institutions; therefore, they are being prepared to be successful at all institutions within the state no matter where their DE credits come from.  But then parents are

frustrated when they are not successful."

Have you heard about this?

A    That there's a belief that there's a difference in rigor between all institutions?

Q    Uh-huh.

A    Yes.  And I've heard that from university to university and from University System to TCSG. So there's some that may espouse, in our system, that the prep work at VSU was less rigorous than at other institutions in the University System of Georgia.  So is it something that is stated or is held as a belief?  Yes.  Is there anybody who's ever shown me definitive proof that that is the case? No.

And so a lot of it is people doing this just believing that what they deliver is better than what is down the street, but there's so much that goes in a student's academic performance.  Rigor of courses prior to college is probably a pretty small percentage of how they perform in college once they go, in my opinion.

Q    Okay.  And have you ever gone to -- and I'm sorry if I answered this question before -- or asked this question before.  I'm going on -- in the middle -- end of my second day of kind of going over

the same stuff.

But did you ever talk to any high school counselors about academic rigor?

A     The only high school counselors that I believe that I've communicated to about dual enrollment, period, in my time down here have been the team at Valdosta High School and then the team at Valwood.  Good Lord.  I haven't been sitting here for two continuous days, but -- so Valwood and Valdosta High School.  I don't recall rigor conversations with Valdosta High School.  I think with Valwood, there was some desire to return to us as a dual enrollment partner because of perceptions of schools and -- and coursework.

Q     And what were those conceptions?

A     That they will get asked from time to time why is this student at Valwood taking a course at Wiregrass or GMC when you have a comprehensive institution in your backyard.

Q     And that -- was that regarding academic vigor, the perception of the academic vigor?

A     I don't know if it was rigor based or if it was just a, Hey, you have somebody in USG.  Why would you not do USG versus TCSG?

I don't know where that was coming from,

but that was something that they had stated that they get asked is, Why are you not partnering with Valdosta State University?  Why are your students at Wiregrass or at GMC?  You know, What's -- what's the issue there?

Q    And what counselor was that?

A    I don't know.  I'd have to go back and -- we met with a group of them from Valwood.

Q    And what became of -- what did you do after that conversation, if anything?

A    Well, Valwood wanted to know if we would reengage with dual enrollment, if we would -- if we would come back out and be partners with Valwood for dual enrollment, which we -- which we have done.  We offered four courses there this fall and two courses this spring.

Q    And I -- this might be one I've already asked you, and I'm sorry if I did.  Have you ever talked to any professors, any faculty at VSU about academic vigor issues with student success in their courses?  Coming from, like, a -- I think you said not a native, but a transfer student, was the terminology.

A    So --

(Simultaneous cross-talk.)

Q    -- a faculty member coming up and saying, you know, Hey, Mr. Freidhoff, we -- you know, we're having issues with students who are transfer versus native in their ability to handle this course. Any -- any faculty members --

A    Yeah.  I mean, I've heard that in faculty conversations, whether or not the -- whether or not the rigor at an institution is as good as the rigor that you're at, and I've heard that both from we're more rigorous than them and I've also heard that from the, You're less rigorous than we are.

Q    Okay.  Who were they, and what institutions were they talking to?  Like, who was the speaker in those, and then what institutions were they referring to?

A    I've heard this over 19 years of the work, right?  So, I mean, there's -- there's always going to believe -- there's always going to be some faculty that you could bring in and talk to and say, Do you believe the rigor to be equivalent, less than, or greater than what we offer?

And somebody is always going to say, We're much more rigorous than they are when comparing to a TCSG or a -- a TCSG or, you know, the state of Michigan community colleges.

And that's a -- that's a belief I've heard.  But I've also, when I worked at University of Michigan, heard the place I used work at, Grand Valley State University was way too -- too light and not strong enough and didn't prepare and didn't have enough rigor.  But what I've not seen or had reported from faculty, I've never had a faculty member actually put data in front of me that shows that the student who was taking courses at that university or that university on a larger scale have performed more poorly.  I think it's -- I'll use the term anecdotal, or that kind of belief.

So I think that's something that is in the higher education system in general, the -- the idea of rigor of TCSG is less than, in terms of rigor from some of our faculty or community colleges or less than -- than the rigor of the university.

So I've known a lot of faculty over a lot of years.  That would be hard to give specific names for all those different institutions and different places, but I've not seen the data.  I really have not seen the data that confirms that anecdotal belief to be true.

Q    And you also haven't seen the data that --

A    No, but I trust Barrie.  If Barrie told me

that they had it, I am not going to question that. He is phenomenal at what he does.  I have immense and complete trust in Barrie Fitzgerald, and if he said, "We did the data, we pulled it," I -- he doesn't have to show me that data.  I'm going to believe him.  I trust our IR guy.

Q    And do you remember the names of any faculty that had engaged you in that conversation regarding the academic vigor?

A    I can't think of anything -- I can't think of any one person specifically.  I know that conversation has occurred on all three campuses I've been on, though.

Q    Okay.  Have you gotten any raises?

A    So when I went from executive director to interim AVP to AVP there were -- there were different salary lines.

Q    When was that promotion?

A    So I came in in 2018 as an executive director.  2020 -- early 2020, I was interim, and then early 2021, I was named AVP.

Q    Do you remember the salaries of those three?

A    Ish.  I -- I could probably ballpark, yeah.  I think the -- I think the first one was 105.

I don't have a clue on the middle one, how that was calculated.  I think 132.

Q     That's what you make now?

A     Uh-huh.

Q     Okay.

A     I couldn't follow the HR calculation for the middle one.  They had 15 different ways to do it.

Q     Okay.  14.

(Marked for identification is Plaintiff's Exhibit 14)

A     Oh, good God.  I should have brought some readers.

BY MS. MAESTAS:

Q     Now, this is your vision test.

A     Oh, I -- yeah, I really should have.  What is that?  Does anybody have a reader?

MR. CARTER:  It's one and a half, I think.

THE WITNESS:  Okay.  I might be able to do -- oh, yeah.  Here we go.  Thank you.  Appreciate you.

A     What am I looking for here?

BY MS. MAESTAS:

Q     Okay.  So these are positions that were posted as open in 2020 and 2021 in Plaintiff's

Exhibit 14.  And so I've highlighted the ones that are admissions recruiter openings.

A   Okay.

Q   So there's one at the top.  Then probably about eight more down, another one.  Then you jump about maybe ten more down, there's three more.  Then two more down, there's another one.  And they're Admissions Recruiter I or II.  And all of them are posted under manager Ryan Hogan except for one, which is posted under Hilary Willis.

A   Uh-huh.

Q   And the earliest one was created as open on February 4th, 2020, and the last one created open March 24th, 2021.  Now, we did look at the -- the page on the people who worked in admissions at some point, and you said that you're not supervising any of those?

A   Uh-huh.

Q   So I don't know how much you're going to know about these positions that were created.  But were you aware that these were created, these new -- these positions created as open?

A   I would assume they are rehire positions for somebody whose left and they're rehiring.  I don't think -- I don't believe any of them are newly

created positions.  So it would --

Q    Okay.

A    -- have been -- somebody would have been in a role and left.  And there definitely has been turnover at the university in general, admissions as well.  So I don't -- I -- I couldn't speak to whether it was a newly created position or you're refilling a position, but, I mean, in my world, with the advising side, we've had turnover.  And when somebody leaves, then we rehire in that -- in that --

Q    Okay.  But you don't know if they're newly created or --

A    No, uh-uh.

Q    -- old positions where somebody resigned or was terminated?

A    Know nothing about those --

Q    Okay.

A    -- 'cause they're outside of my purview.

Q    Do you remember -- do you know why Jamie was terminated?

A    Reduction in force.

Q    Okay.  And were you involved in that decision to pick Jamie over somebody else?

A    I don't -- not to pick Jamie over somebody

else.  In terms of what we looked at in terms of where the cuts may be able to come from.  There were conversations between Dr. Carr and myself and looking at a 1.1 million-dollar deficit and where it would be.

So there was feedback across the board.  I believe I was one of -- of a few that kind of looked at, Hey, these are the different expenditures or the places that we've got, and -- and said, Here's -- here's a space that could potentially be.

So I was aware of both of the RIFs that took place inside the division prior to --

Q    And --

A    -- prior to them, you know, going to HR. So it wasn't like they went to HR and then I found out that there was a RIF that was --

Q    **What was that last thing that you said? Is it wasn't like --**

A    So I didn't find out after an HR visit that -- so, like, somebody went and then all of a sudden came back and said, "I was just RIFed."

I knew I had a time as a second in command with Dr. Carr that there were RIFs that were going to be occurring inside of our division as his Number 2.

Q    Okay.  And what -- what steps did you take to --

A    Sorry.

Q    -- review -- no, that's my bad.

-- did you go to in eventually -- before -- before it was decided that Jamie would be reduced in force.

A    Uh-huh.

Q    What steps did you go through?

Like, so we heard from Carvajal, and he said there were certain things to consider.  Do you know what they were or did Carr just deliver them to you and then you said, Okay, or did you collaborate and then make decisions?

A    So we, internally, for -- for me and my process was -- 1.1 is a significant cut within a division in looking at are -- is there anything in the -- the places that I was supervising at the time that could be cut, operational budgets, print costs, travel costs, different things like that.  And then obviously when you're talking about it, last thing you want to do is -- is people RIFs.  But those have to come out when you've got a -- a heavy 1.1 reduction that's got to be there.

And so, you know, at points in times

there's questions of what -- what RIFs can be done that get us towards that 1.1 deficit, and -- and where do we have opportunities or places that we can -- we can make that cut with the least damage to the overall division.

And so mine was looking at operational and -- and across my divisions at the time -- or my units is probably the right term -- units at the time to see if there were spaces that we could cut out of, but that was still pretty early in the advising space, and we had just gotten approved for professional advising, like, a year or so before.

So coming behind and cutting advisers or whatever wasn't going to be -- wasn't going to be an option for -- in ours in terms of impact to the overarching division.

**Q     Okay.  Can you say that again about advising, why that wasn't a -- why those -- that --**

A     'Cause we had just invested a substantial amount of money in standing up professional advising to go towards retention and -- and each of my advisers sees a caseload of students between about 300 to 375 students.

And we had two -- two individuals in the dual enrollment space that were serving about 200

students.  So impactwise, getting rid of an adviser would have been a bigger impact to the student -- student success side of it than a RIF, reduction in force, and still having an individual that was available to do dual enrollment -- that individual was Sarah -- in that position to work with those 200 students.

Q    Okay.  And so who made the final decision that it was going to be Jamie over somebody else?

A    I don't know if that was a -- a Dr. Carr decision or an executive-level decision that was brought around leadership.  I do not know the answer to that.

Q    But it --

A    I don't know if VPs went and said, "Here's my list," and then they talked about it exec -- or how that worked.  I don't know that.

Q    So it was not your decision?

A    Oh, no.

Q    Okay.  Did you ever tell Dr. Carr, "We have two open positions that are unfilled.  Let's go ahead and close those and then we don't have to get rid of Jamie?"

A    I don't know that I had two open positions to fill.  Are you -- are you talking about the

Admissions Recruiter Is that were open?

Q    You and Ryan Hogan, I think, were -- had talked to Carr about how there were two open positions instead of -- 'cause I think that was also -- so it was, like, travel was a -- the -- travel costs 'cause COVID because nobody was traveling.  So let's start there, makes sense.  And then let's close open positions that aren't filled.  And then if we get past those things, then, of course, we're going to have to, you know, do the more difficult decision of cutting personnel.

And so there were two positions that were open --

A    Those would probably have been in admissions at the time.  I don't know that I had advising open at the time.  I can say this:  Had I had advising positions open at the time, I would have advocated for the advising positions to be filled because if we did not fill those positions, we would have had -- we would have had a very strong increase in the student advising -- adviser -- to adviser ratio.

So if I don't fill a position, if I've got an academic adviser line that's open and I choose not to fill that position, I'm asking that team to

take on the role of 300 to 350 students, and that's

not advantageous for student success.  So I don't

know that -- I don't think I had adviser positions

open at the time.  I don't recall.

But I can tell you looking at it from a

impact to students, I can understand why we said

we've got two people servicing 200 students and --

and working with 200 dual enrollment students and

doing it over there as opposed to an open position

that could then go and serve 300 and -- 300 to 350

students.  And if it's on the counselor side, my

understanding, on the admissions counselor's side,

again, Ryan's area, but I believe there's somewhere

between 250 to 300 that each counselor is kind of

responsible for as well.  So ...

**Q    But didn't you say that Jamie had a lot of**

**overlap with the people in admission?  Like, her job**

**duties overlapped with --**

A    I didn't say a lot of overlap.  I said I

think there were some duties that Jamie did that

admissions counselors also did.  I don't know if

that's a 10-percent number, a 90-percent number, but

there was that -- that component where an admissions

counselor would chat at a high school that was done

by an admissions counselor also done by a dual

enrollment coordinator.

Outside of that, how much overlap was there would be a good Ryan Hogan question.  But did a -- does an admission counselor talk about dual enrollment when they're out at a high school?  They do.  Does a dual enrollment coordinator talk about it when they're out at a high school?  They do.

But I don't know if that means that the role that Jamie was in in DE was 90 percent the same as an admission counselor.  That would be a Ryan Hogan question to answer.

**Q    Okay.  And then what about Jamie versus Sarah Bessen- -- Jamie Bird versus Sarah Bessenger?  Was there any discussion on that?**

A    I -- I think it was just simply from the salary side of it in terms of this is the salary for that individual, this is where people are in the state in terms of level for DE coordination that falls similar in line across -- across the state.

That -- that line, what -- what is the student services coordinator line, is a more appropriate salary for a dual enrollment person in a comprehensive institution.  And then, again, there's the 1.1 million-dollar budget reduction, that we've got to get to a certain amount based on cutting

expenses, whether that's operational or salary expenses.

Q    So is that a really long way to say that Sarah's -- Sarah Bessenger's salary was lower than Jamie's?

A    Uh-huh.  Sarah's salary was lower than Jamie's, and it was a 1.1 million-dollar reduction that we had to get to.

Q    Okay.  And did you -- did you offer that information to Carr, or did Carr make that information available to you and now you're regurgitating it?

A    I don't think it was ever explicitly stated.  I think it was these are -- these are options.  And there were a lot of moving options over time as to what it could look like.  My understanding, he wouldn't need to tell me why because that's the higher salary and --

Q    So you're speculating?

A    Yeah.

Q    Okay.

A    I mean, that's a --

Q    Okay.

A    I mean, that's a -- that -- it makes sense in my brain --

Q    Okay.  So you're saying, "Had I known what he had done, it probably was this"?

A    I'm saying if I had to make the decisions he had to as a VP, I understand why he made the decision that he did because of the 1.1 million-dollar reduction.

Q    Okay.  But he didn't share with you that that's why he decided that?

A    (Shaking head).

Q    Okay.  And you don't recall Ryan Hogan ever discussing two open positions in admissions being a possibility --

A    I don't --

Q    -- instead of RIFing --

A    I don't have a recollection --

Q    -- Jamie?

A    -- of that.  I don't.

Was there a --

THE COURT REPORTER:  Did you say something?

MS. MAESTAS:  I was just making sure you got all that because we were --

THE COURT REPORTER:  I got it.

MS. MAESTAS:  Okay.

All right.  We're at 2:54.  We're supposed

to get our next deponent at 3:00 o'clock.  Do we want to go ahead and break now and then have him come back or you want to check and see what's going on with the next deponent or do you want to keep -- I'm okay with -- I'm okay if we --

MR. CARTER:  How much longer you got?

MS. MAESTAS:  A little bit.

MR. CARTER:  Just -- if she's here, we'll just plug her in.

And then if it's not a problem for you to come back --

THE WITNESS:  Okay.

THE COURT REPORTER:  Are we off the record?

MR. CARTER:  But you can ask her, you know -- how long do you think you'll be with her?  Less than him?

MS. MAESTAS:  Uh-huh.

MR. CARTER:  So maybe an hour and a half?

MS. MAESTAS:  Yes.

MR. CARTER:  Okay.

THE COURT REPORTER:  Counsels, off the record?

MS. MAESTAS:  Yes.  We're off the record.

(Recess 2:55 p.m. until 3:56 p.m.)

MS. MAESTAS:  And we're back on the record for Rob Freidhoff.  We took a break.

And is he still under oath, or do we need to reswear him in?

THE COURT REPORTER:  He's still under oath --

MS. MAESTAS:  Okay.  Still under oath.

THE COURT REPORTER:  -- as long as y'all agree.

MS. MAESTAS:  All right.

DIRECT EXAMINATION (CONTINUED)

BY MS. MAESTAS:

Q    Okay.  And I think the last thing we talked about was -- we were talking about the RIF where Jamie was no longer working at VSU, and we talked about that there were two open positions in admissions that evidently was posted through Ryan Hogan.  But you were unaware of that?

A    I don't remember a conversation related to those two positions moving forward or not moving forward.  I don't -- I don't recall a conversation around that.

Q    Okay.

Okay.  I'm going to direct you to

Plaintiff's Exhibit 30.

(Marked for identification is Plaintiff's Exhibit 30)

BY MS. MAESTAS:

Q   Do you recall that there was a Title IX complaint that Jamie Bird filed?

A   A Title IX complaint?

Q   Uh-huh.  Do you know what Title IX is?

A   I do.  Did I know a Title IX was -- or what was -- what was --

Q   Do you --

A   -- the question --

Q   Yeah.

A   -- about Title IX?

Q   Do you recall that Jamie Bird had filed a Title IX complaint?

A   I -- I did not.  I do not.

Q   Okay.  Jamie Bird filed a Title IX complaint, and there was an investigation.  And Plaintiff's Exhibit 30 is the notes taken by the investigator when she interviewed Ryan Hogan.

A   Okay.

Q   Okay.  And do you ever remember anything about Dr. Carr going into Jamie Bird's office and shutting the door and giving her a hug?

A    I do not.

Q    Okay.  Do you ever remember anybody in admissions or dual enrollment referring to Dr. -- Dr. Carr saying, "You don't like hugs," and doing an air hug?

A    I don't recall --

Q    Okay.

A    -- a conversation like that.

Q    Okay.  And there's a paragraph at the bottom of the first page of Plaintiff's Exhibit 30. And it says -- these are notes taken by the investigator:  "When Bird's position was eliminated conversation with Carr and Hogan.  We in Admissions can support Bird.  She has a subordinate here.  At that point Carr agreed and told us to figure it out. Us, Frehall and Hogan.  And Rob agreed it should remain in admissions."

Okay.  So "Frehall" --

A    That's probably me.

Q    Thank you.

A    I've been called lots.  That's the first time on that spelling.

Q    Do you -- is this ringing a bell, what's stated in here?

A    I wouldn't agree that Rob agreed that it

is in admissions.  I can see Ryan saying that comment.

Q    Ryan said you said that you --

A    (Shaking head).

Q    Okay.  Ryan agreed that --

A    Dual -- dual enrollment -- in my opinion, dual enrollment made -- made sense where it was going to because it could become part of the student transitions part.  Ryan and I didn't necessarily see eye to eye on where dual enrollment should belong.  Ryan felt strongly that it should be in his area.  I'm very comfortable, and it makes sense in my area.  So I -- I'm not surprised to see that Ryan would have said that I agreed for it to be in admissions.

I -- this was back in -- after decisions had been made.  It made sense to me to have dual enrollment where it's at, and now having seen it longer term, it makes very good sense for it to be as part of the student transitions team because of a lot of the advising components that run in line with advising teams and support that can be provided between those three offices.

So I can see Ryan saying that.  I don't agree with that statement, nor did I ever say I think it should go back to admissions.

Q    Okay.  And then the next page, at the top of the page, it says:  "I ask him to move to admissions and he said let's wait 'til we do all the transitions because I have people that will be moving to other supervisors."

Do you know what that's referring to?

A    Asked who to move to admissions?  I don't -- I don't know who that -- I don't know what that's referring to.

Q    Okay.  Do you ever remember Ryan Hogan saying anything about being afraid of retaliation?

A    Not directly to me, no.

Q    Anybody else at admissions saying that?

A    No, not directly to me.

(Marked for identification is Plaintiff's Exhibit 29)

BY MS. MAESTAS:

Q    Okay.  If you could go to 29.

A    This one --

Q    Just previous to the one you're on.

All right.  This is Plaintiff's Exhibit 29.  Similarly, this is the interview notes of the investigator in the Title IX investigation, and this is the interview of Lisa Long.

A    Is -- I --

Q    Yeah, I'm going to ask you a question.
I'm just trying to, like -- I'm not -- I don't speak
as fast as you --

A    Sorry.

Q    -- so -- okay.

So -- all right.  Next -- second page of
this document, and it says on the third paragraph:
"I feel like she was targeted.  Mr. Hogan feels
like -- feels that she was targeted in the RIF, but
may not say that.  He is nervous to talk to you.
She goes above and beyond with her students and her
job."

Do you feel that Jamie was targeted with
the RIF?

A    I do not.

Q    And then 31.

(Marked for identification is Plaintiff's
Exhibit 31)

BY MS. MAESTAS:

Q    Okay.  Similar -- similar to the previous
three -- or previous two exhibits we've discussed,
this is the interview notes of the investigator for
Title IX in the interview of Tee Mitchell.

A    Uh-huh.

Q    And if you could look down to -- let's

see, like, one, two, three, four, five, six -- about six down:  "I am going to give you two examples."

A    Uh-huh.

Q    "Two years ago we (Carr, Rob, Tee) were at an ACRO conference.  We all went to dinner, and a shouting match occurred.  At the time I didn't know that Carr told Rob to start it.  It was a public -- it was in a public restaurant.  It was embarrassing. The day before I left Rob took me out to lunch and he told me that Rodney told him to start the argument over orientation about going one to two days, numbers were down parents wanted one day orientations.  When Rob, who was a nice guy did not start the argument Rodney did then Rob joined in.  I could tell Rob was nervous.  So Rob confessed to me over lunch that is why their relationship went south."

Do you know what that's referring to?

A    Yeah, a very awkward conversation at ACRO.

So I think, you know, there's elements of accuracy and inaccuracy in the statement that's in there.  I think the -- we -- Tee and I needed to have a conversation.  We weren't seeing eye to eye, and Rodney is the direct supervisor for both of us.

Q    Say that --

A    Rodney was the direct supervisor for both of us.

Q    Okay.

A    And I think that was the attempt to try to start the conversation to get us back in, and it didn't go particularly well.

Q    And so that was an attempt to see who, going back --

A    That was an attempt to get us to have some conversations that were difficult conversations that didn't -- didn't go particularly well.

Q    Okay.  And that was who attempting to do that?

A    Rodney engaging the two of us in a conversation about trying to move forward as leaders on the team --

Q    Okay.

A    -- and having a conversation about it and it not being a great conversation.  We had very different philosophies in orientation and leadership, Tee and I.

Q    Okay.  Thank you.

A    Uh-huh.

Q    And it says:  "Rob, who's a nice guy."

Do you agree with that statement?  I

have --

A    I like --

Q    -- to ask that.

A    I like to think so.

Q    Okay.  You did not start the argument.
Rodney did, and then Rob joined in?  Do you --

A    I -- I thought it was a -- I mean, I would have engaged it as an attempt at a conversation that's a difficult conversation and -- and wasn't clean.  It wasn't something where it was, like, "Oh, perfect.  I got" -- I think it was a conversation that needed to be had.  Whether it needed to be had at that restaurant or not, I don't know.

But I don't -- I don't see it as this person started that person jumps on.  I think it was a conversation between colleagues that, We have an opportunity to kind of talk this out.  Let's see if we can figure out how to move forward together collectively as a team.  And it just -- it wasn't a great conversation.  And the part about being nervous or whatever, I'm -- I'm not a huge fan of confrontation.  I don't think Tee is either.  And so those are always kind of tricky conversations.

Q    Was anybody drinking alcohol?

MR. CARTER:  What's the relevance to that?

A    I can't recall from whether we did or did not.

BY MS. MAESTAS:

Q    Okay.  And then this -- this sentence where it said:  "So Rob confessed to me over lunch that is why their relationship went south."

Was there a -- did you have a lunch with Tee?

A    Tee and I -- yeah.  Tee and I chatted before, and I said it was just a -- it was disappointing in how that -- that played out.  That was a disappointment.  We didn't -- we didn't achieve what we needed to achieve in that and -- and that bothered me, right?  I -- we're adults.  We should be able to have conversations and talk it through and figure it out.  And we just -- we didn't -- he and I -- Tee and my relationship didn't really improve, and I wish it would have.

Q    So when he says:  "That's why their relationship went south" --

A    I don't -- I --

Q    You believe he's talking about you -- his relationship -- Tee's relationship with you?

MR. CARTER:  Well, it's speculation.  So I object.

MS. MAESTAS:  I thought that's what you were saying.  So I don't -- I didn't get that from that, but, okay.  Fair enough. Speculation.

BY MS. MAESTAS:

Q    And you mentioned that you and Ryan Hogan have different philosophies?

A    Uh-huh.

MR. CARTER:  Yes?

BY MS. MAESTAS:

Q    Can you --

A    Yes.  Sorry.

MR. CARTER:  It's all right.

BY MS. MAESTAS:

Q    Can you share with me what you mean by that?

A    I think for -- my leadership style is very open, bring a lot of people to the table, converse it, kind of bring it forward.  And I think Ryan and Tee have similar styles in that -- like to make a decision and then kind of take that decision out.

Those are just two different -- two different ways to do leadership.  But I try to bring a lot of people together on a conversation and have that conversation as opposed to make a decision and

then try to push that out.  And that's in particular, I think, something that was voiced related to orientation.

Q    And the going from one to two days to one day, that wasn't about, like, what day of the week it was and scheduling for parents?

A    Can you rephrase that?

Q    Yeah.  So -- and, again, I have more information than just what this paragraph is saying. But I have reason to believe that this was related to scheduling, moving it to one to two days versus one day, and I just wondered if you had any recollection of that?

A    I think there were all kinds of conversations related to orientation.  But I think the numbers of days that it was was probably part of that conversation, whether it's a one day, a two day, an overnight, a nonovernight.  There's lots and lots and lots of conversations on (indiscernible).

THE COURT REPORTER:  Lots and lots of conversations on?

THE WITNESS:  How to run the orientation.

THE COURT REPORTER:  Thank you.

THE WITNESS:  You're welcome.

BY MS. MAESTAS:

Q    Okay.  On the next page at the top, there's a statement:  "In meetings with him he grits his teeth like we were getting ready to fight.  We could never have a normal dialogue like you and I are having now."

And do you ever remember Rodney Carr gritting his teeth during any meetings?

A    I don't.

Q    What about, like, making fists?

A    I don't.  No.  I've never seem him assume a fighting posture, like, in body language.

Q    Okay.  41.

(Marked for identification is Plaintiff's Exhibit 41)

BY MS. MAESTAS:

Q    Plaintiff's Exhibit 41 is an email that Jamie Bird sent out to high school counselors on February 26th, 2019.

Have you ever seen this email before?

A    I don't -- I don't believe so.  I don't believe I -- this particular email was one that was sent to me.  That was before the time I was doing dual enrollment, too.  It was 2020 when we started doing -- or I started doing more dual

enrollment.

Q    Okay.  So before your time?

A    Uh-huh.

Q    Okay.  And did -- were you able to read the email?

A    Most of it.  I --

Q    Okay.

A    Through here and here and stopped towards the bottom, but ...

Q    Okay.  So I'm going to go ahead and go through some of it.  In the second paragraph, it says:  "It is critical for those students wanting to attend a four-year institution after they graduate high school, get their DE credits from the same type of institution."

And agree or disagree?

A    I don't know that I can agree or disagree. I don't know that I have the answer to that.  I -- I don't do admissions at some of the top tiers in the state.  I don't know how they feel about it.  I also don't know if it's a state of Georgia thing or if it would be true for Florida or different kinds of places.

So I don't -- I don't know that I would blankly agree with it or disagree with it 'cause

there may be a school like Georgia or Georgia Tech that that is the case.  But depending on where that student wants to go, it may not matter whether it's at a university or a -- TCSG.

Q    Okay.  43.

(Marked for identification is Plaintiff's Exhibit 43)

BY MS. MAESTAS:

Q    **Have you ever seen this document before?**

A    I don't believe I have.  I don't recall seeing this.

Q    **Okay.  So it's a written reprimand dated March 5th, 2019, from Tee Mitchell to Jamie Bird.**

**Were you aware that she was reprimanded for sending that email?**

A    Not until, like, in July in the HR conversation that there were things that had happened between Ms. Bird and -- and Dr. Carr.  So not initially into it, but through the process of going through the HR and the RIF conversations, at that point.  So that would have been in July --

Q    **July --**

A    -- of 2020.

Q    **-- of 2020?**

A    Yeah.

Q    Okay.

A    So it would have been about five to six months after I started supervising Jamie.

Q    Okay.  And what was the conversation that you had with HR --

A    Well, it was between Jamie and --

MS. BIRD:  I can't talk.  I'm sorry.

A    -- Michelle Jordan.

I know I know this.  Yes.  So it was just the three of us that were in one of the corner rooms in the university center, and Jamie had made a comment that there was more to the story that I wasn't aware of.

BY MS. MAESTAS:

Q    Okay.  So you were in a meeting --

A    That was the RIF meeting, I believe.

Q    In July of 2020 regarding the RIF with Michelle Jordan and Jamie?

A    Yes.

Q    Okay.  I had not heard about this meeting before.

So can you tell me what happened at the meeting?

A    That was where the RIF notification was provided from HR to Jamie.  I was in the room

because I was the direct supervisor.

Q    Okay.  And this reprimand came up?

A    I -- I don't remember if the reprimand came up specifically, but I know there was a comment that was made that there was more to it than I was aware of.

Q    Okay.  And anything else you remember?

A    (Shakes head).

Q    Okay.

A    No.  It was -- I mean, it was the letter, and Michelle was the one who went through it.  And if I believe -- if I remember correctly, I think I actually exited and Jamie and Michelle stayed together in that space.  I thought -- that's -- I think --

Q    Okay.

A    -- that's what happened.

Q    So you -- why did you -- did you meet with them just to give her the letter?  Like, what was the meeting -- what was the purpose of the meeting?

A    To provide the RIF notification to Jamie.

Q    Okay.  Okay.

And then in this notebook, if you could turn to 8?

(Marked for identification is Plaintiff's

Exhibit 8)

BY MS. MAESTAS:

Q    Plaintiff's Exhibit 8 is a letter to Jamie, dated July 14th, 2020, and it says: "Subject:  Notice of Reduction of Force" --

A    Uh-huh.

Q    -- and it's signed by Jamie at the bottom, and -- and you're CCed on it.

Is this what you're referring to?

A    Uh-huh.

Q    Okay.

A    That was the letter that was covered by HR in that meeting.

Q    Okay.

Okay.  And then I want to go back to 43 and then -- so I don't know if you want to read it first, but I just have specific portions that I want to ask you about.

A    Okay.

Q    So do you want to read it --

A    Yeah --

Q    -- first?

A    -- real quick.  Yeah.

Q    Okay.

A    Okay.

Q    Okay.  So I wanted to ask you about the first paragraph, the last sentence:  "As a result, the message was considered offensive as it was perceived to suggest that Technical Colleges were ineffective in providing a good academic foundation for students who want to attend a four-year institution after they graduate."

So, again, we're referring to Plaintiff's Exhibit 41, which is the email.

Do you think that that email is offensive?

MR. CARTER:  The email -- objection on speculation because it says it was offensive to --

THE WITNESS:  The technical colleges.

MR. CARTER:  Yes.

BY MS. MAESTAS:

Q    Do you think it was "offensive as it was perceived to suggest that the technical colleges were ineffective in providing a good academic foundation for students who want to attend a four-year institution after they graduate high school"?

So he's objecting because I didn't read the whole sentence, I think.

MR. CARTER:  No.  I'm objecting because it

says the message was considered offensive as it was perceived and the message was sent to the high school advisers.

THE WITNESS:  Technical colleges.

MR. CARTER:  But go ahead and answer it.

A    My -- my answer would be I don't -- I've not worked in the TCSG system.  So what they would find offensive or not offensive, I don't -- I don't really know.  I could understand if you're somebody who gets that and you're in the TCSG, that it feels like a swipe.

BY MS. MAESTAS:

Q    But you don't have any evidence of that? Like, you don't --

A    I'm not part of the TCSG.  I -- so I --

Q    But you didn't hear anybody say you -- they were offended by it?  You never went over and -- I mean, you said you don't really go over to the TCSG's --

A    I don't have that -- I don't have those kinds of conversations with those folks.

Q    Okay.  And then in the second paragraph, in the second sentence, it says:  "Moreover, this communication had a significant adverse impact on recently established relationships that will need to

be repaired."

Do you see how that email could have damaged relationships that need to be repaired?

A    I don't know which relationships were being referred to, so I don't know that I can adequately comment on that.

Q    Do you have any evidence of any relationships that were damaged?

A    I don't --

Q    I mean, did anybody say, "There was a email back in 2019 that really damaged our relationship"?

A    It -- it was nine months later that DE really became part of my radar.  So I -- I didn't --

Q    So nine --

A    -- have those --

Q    -- months later, you never found anything that --

A    I'm not certain relationally who we're talking about, if we're talking about simply TCSG or USG or other folks.  So I don't -- I'm not comfortable on commenting on --

Q    So if it were TCSG's relationship with VSU, did you ever have any evidence that Jamie Bird's email damaged that relationship?

A    I never had any conversations about that topic.

Q    Okay.  Nobody ever brought it up to you?

A    (Shaking head).

Q    No?

A    No.  Sorry.

Q    And were you aware that this reprimand was placed in Jamie Bird's permanent personnel file in HR?

A    I was not.

Q    All right.  Getting toward the end.  So don't despair.

        44B.

        (Marked for identification is Plaintiff's
        Exhibit 44B)

BY MS. MAESTAS:

Q    So this is a few emails that were exchanged between you and Jamie in 2020, April 2020, May 2020, and July 2020.

A    Uh-huh.

Q    And so this is to refresh your recollection before I ask you the question.  When you -- when you first took over dual enrollment, did Jamie know more about dual enrollment than you did?

A    Yeah, absolutely.

Q   Were you aware of -- and I'm sorry if I've asked you this already.  I'm starting to kind of --

MR. CARTER:  Fade --

BY MS. MAESTAS:

Q   -- forget --

MR. CARTER:  -- away.

MS. MAESTAS:  I'm getting -- yes, I'm getting tired.  We have another day of depositions, too, and I have a lot of prep time to -- to get here.

BY MS. MAESTAS:

Q   So now I forgot what I was going to ask you.

MR. CARTER:  We've all been there.  Don't worry.

BY MS. MAESTAS:

Q   Okay.  So are you aware of any rule that prevented employees from meeting alone with other employees in their office without, like, a witness or a third person being there?

A   I have not.  A rule of -- I'm not --

Q   Like, so, you know, everybody leaves the room and it's just you -- me, Holly, and you, Mr. Freidhoff in this room and so to avoid it looking like an intimate situation so our -- you

know, our spouses don't get jealous or whatever it may be or there's an allegation of inappropriateness, that we bring -- we have the court reporter with us.

Are you aware of any rule, policy, either written or unwritten, regarding that?

A   No.  I -- not a -- not a USG or a VSU policy regarding that.  I do know some people who will hold to a policy like that, that will not stay in a space without somebody else present.  I've had people in all three institutions that that's been the case.

Q   Okay.  And --

A   That's a -- more of a personal thing than a USG/VSU thing.

Q   Do you know of anybody -- did you know of Dr. Carr having that policy?

A   Shauna is with him a lot.  I don't know if he's got a policy per se, but I know that his admin is typically with him.

Q   Okay.  Have you -- but you never heard him say anything, Oh, I can't go in -- in this room because there's no one else there, anything like that?

A   I have not heard him say that out loud.

No.

Q    Okay.  Did you ever hear about an investigation of Dr. Carr at -- while he was at Bainbridge College regarding inappropriate interactions with females or sexually --

A    I literally just saw a Facebook post on it this week.

Q    Okay.  Can you tell me about the Facebook post?  I'm stretching my -- I'm standing up because my back is hurting me.

A    It was posted on a VSU faculty member's Facebook page.

Q    Okay.  And who was that faculty member?

A    Chris Meyers.

Q    Okay.  And what was the posting?

A    It was a letter from Bainbridge of the -- of the -- like, the write-up letter or whatever we just look at.  I don't know.  We've been on a bunch of different tabs, but --

Q    A write up on --

A    Not that letter.  The other one like the one that you showed me for Julie's --

Q    The reprimand?

A    -- that Mr. Mitchell had written.  Yes.

Q    Okay.  The reprimand.  So that's going to

be --

A    43B?

Q    Are you memorizing my exhibits?

A    A?  I don't know.  I'm probably wrong.
You just -- it was a recent -- you just showed it to
me.

43.

Q    Yeah, 43.

A    So something similar to that, yeah, but
Bainbridge on it.

Q    Oh, okay.  So it wasn't 43b -- okay.

A    It's forty- --

Q    Okay.

A    Right here.

Q    So similar --

A    Yeah, some -- yeah, well, I got -- I don't
know if it was the number of the file or what it
was.  I don't -- I don't know exactly what the
verbiage or what style or what format it was, but I
did see it on the Facebook page.

Q    Okay.  And but it -- so it wasn't 43.  It
was on Abraham Baldwin Agricultural College's
letterhead?

MR. CARTER:  I think it was on Bainbridge.

A    It was on Bainbridge.

BY MS. MAESTAS:

Q    Bainbridge College letterhead.  Okay.

If you could turn to 47.

(Marked for identification is Plaintiff's Exhibit 47)

MS. MAESTAS:  Thank you, Mr. Carter.

BY MS. MAESTAS:

Q    So you're looking at Plaintiff's Exhibit 47.  And, let's see, the last three pages is a written reprimand from Dr. Carvajal to Dr. Carr, dated March 30th, 2013.

Is this what was on Facebook?

A    Uh-huh.

MR. CARTER:  Yes?

A    Yes.  Sorry.  I'm tired, too.

BY MS. MAESTAS:

Q    Okay.  What was the discussion about, or was it just a posting and then nobody commented?

A    There were comments from some faculty.

Q    Can you tell me what they were saying?

A    I would say probably mostly that they wanted to know more about what was there and what came of it and -- and what would -- what would happen, moving forward, to Dr. Carr.

Q    Okay.  And so I know you said you hadn't

heard about it until you saw it on Facebook?

A    Yeah, this part.  Yeah.  That's -- and that is what was on Facebook, too.

Q    And what did you -- so I was just confused 'cause you said, I didn't know about this part.  Was there a part that you did know about?

A    Oh, I know that he had been written up at a previous stop, but he never went into what we was written up for.

Q    Oh.

A    Yeah.

Q    Okay.  So he --

A    He just said he had been -- you know, that he had been written up before.

Q    He told you that?

A    Uh-huh.

Q    Okay.  And you just didn't know what --

A    I didn't --

Q    -- it was for?

A    -- know what it was for.

Q    Okay.

A    Uh-huh.

Q    And did you ever observe Dr. Carr engaging in any inappropriate conduct such as -- yeah, so you can look at --

A     On the second page or ...

Q     So one, two, three, four, five, six, seven -- here, let me find it.

A     Are you on 48?

Q     No.  I'm in 47.

A     It stopped after ...

Q     Okay.  So we're on -- and it's the bottom of the page.  It says Page 1 of 3, and it's an email from Michael Kirkland to Richard Carvajal, dated December 4th, 2012.  And then the next page -- give me a second.

MR. CARTER:  What are you asking?  I mean, are you asking him to read something?

MS. MAESTAS:  I thought he was reading it. So I was waiting for him to read.  I had said and then the next page and I expected him to turn, but he didn't, which is fine.  I was just giving him time to kind of digest the document.

BY MS. MAESTAS:

Q     Okay.  So on Page 2 of 3, there's a couple of places where it says -- so it says Carr had: "Become notorious around campus for vulgar and sexually charged language."

Have you ever observed Dr. Carr engage in any vulgar or sexually-charged language?

A     (Inaudible).

THE COURT REPORTER:  I'm sorry?

THE WITNESS:  I have not.

BY MS. MAESTAS:

Q     **What about physical contact with female employees?**

A     I have not.

Q     **What does Chris Meyers teach?**

A     History.

MS. MAESTAS:  I don't have any more questions.

MR. CARTER:  Okay.  Think we're good.

THE COURT REPORTER:  Is the witness reading or waiving?

MR. CARTER:  Do you want to read and sign? You get the opportunity after she types this up, if you want to.  She can email me the transcript and you go through and make any corrections, like, to -- you know, spellings, whatever, before it's sealed up for the court.

Do you want to do that, or do you want to just waive it?

THE WITNESS:  What's your recommendation?

MR. CARTER:  Huh?

THE WITNESS:  What's your recommendation?

MR. CARTER:  Well, I mean, several have said they'll do it, and a couple have said they waived it.  So it's kind of --

THE WITNESS:  I'll waive it.

MR. CARTER:  Okay.  We'll waive it.

THE COURT REPORTER:  Okay.  I am off the record.

(Examination was concluded at 4:35 p.m.)

CERTIFICATE OF OATH

STATE OF GEORGIA

COUNTY OF LOWNDES


I, KAIRISA JOI MAGEE, RPR, GCCR, Notary Public,

State of Florida, certify that ROBERT FREIDHOFF

personally appeared before me on January 20th,

2022, and was duly sworn.


Signed this 7th day of March, 2022.

_____
KAIRISA JOI MAGEE, RPR, GCCR
Georgia Certification No. 5962-0590-7476-480
Notary Public, State of Florida
My Commission No. GG 968304
Expires: 03/15/2024

CERTIFICATE OF REPORTER

STATE OF GEORGIA

COUNTY OF LOWNDES

I, KAIRISA JOI MAGEE, RPR, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of ROBERT FREIDHOFF; that a review of the transcript was not requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 7th day of March, 2022.

_____

KAIRISA JOI MAGEE, RPR, GCCR, Florida Notary

─────────────
  **Exhibits**
─────────────

**FreidhoffR 8**
  4:8 109:1,
  3

**FreidhoffR 14**
  3:18 79:11
  80:1

**FreidhoffR 17**
  3:10
  40:11,14

**FreidhoffR 18**
  3:11 41:15

**FreidhoffR 20**
  3:12
  62:13,15

**FreidhoffR 21**
  3:14 63:19

**FreidhoffR 23**
  3:15 69:13

**FreidhoffR 24**
  3:17 72:1,
  3

**FreidhoffR 29**
  3:21
  96:16,22

**FreidhoffR 30**
  3:20 93:1,
  3,20 94:10

**FreidhoffR 31**
  4:3 97:18

**FreidhoffR 41**
  4:5
  104:15,17

110:9

**FreidhoffR 43**
  4:7 106:7

**FreidhoffR 44B**
  4:10
  113:15

**FreidhoffR 47**
  4:11
  118:5,8,9

─────────────
         **1**
─────────────

**1**  120:8

**1.1**  82:4
  83:16,23
  84:2 88:24
  89:7 90:5

**10-percent**
  87:22

**105**  78:25

**11**  9:23
  21:3

**13**  9:23

**132**  79:2

**14**  79:9,11
  80:1

**14th**  109:4

**15**  9:23
  79:7

**17**  9:20,23
  40:5,11,14
  41:23

**17-year-old**

9:25

**18**  41:11,
  15,23
  42:24

**19**  21:2
  41:23
  42:24
  76:16

**1:00**  34:7

**1:02**  5:1

**1:37**  37:4

**1:44**  37:4

─────────────
         **2**
─────────────

**2**  66:6
  82:25
  120:20

**20**  62:11,
  13,15

**200**  15:24
  84:25 85:6
  87:7,8

**2012**  120:10

**2013**  118:11

**2015**  58:16

**2017**  28:2,
  20

**2018**  24:12,
  13,15 28:3
  30:5,8
  78:19

**2019**  15:22

16:24
  24:11,14,
  15 26:2,9
  69:18,20
  72:7
  104:19
  106:13
  112:11

**2020**  8:23
  9:3 15:22,
  24 39:9,
  10,13,21
  78:20
  79:25
  80:13
  104:24
  106:23,24
  107:17
  109:4
  113:18,19

**2020-2021**
  44:17

**2021**  15:25
  78:21
  79:25
  80:14

**2022**  15:25
  28:4

**21**  38:20
  63:19,21

**23**  69:13

**24**  72:1,3

**24th**  80:14

**250**  87:14

**264** 16:2

**26th** 71:14
104:19

**29** 96:16,
18,22

**2:54** 90:25

**2:55** 92:1

---

### 3

**3** 120:8,20

**30** 44:9
93:1,3,20
94:10

**300** 15:25
61:3,10
84:23
87:1,10,14

**30th** 118:11

**31** 97:16,18

**31601** 6:8

**3200** 30:17,
20

**350** 87:1,10

**375** 84:23

**3970** 6:8

**3:00** 34:7,
8,11,13,15
36:22 91:1

**3:56** 92:1

---

### 4

**41** 104:13,
15,17
110:9

**43** 106:5,7
109:15
117:7,8,21

**43b** 117:2,
11

**44B** 113:13,
15

**47** 118:3,5,
9 120:5

**48** 120:4

**4:30** 35:6
36:4,13

**4:35** 122:8

**4th** 80:13
120:10

---

### 5

**5** 67:15
68:22

**5:00** 36:12

**5:15** 36:7

**5:30** 36:7

**5th** 106:13

---

### 6

**6** 67:16

---

**66** 49:13,14

---

### 7

**7** 9:20,23

**7:21cv62**
5:16

---

### 8

**8** 108:24
109:1,3

**800** 15:18,
22

**82** 49:20
50:6

---

### 9

**90** 88:9

**90-percent**
87:22

---

### A

**ability** 27:2
69:3 76:4

**Abraham**
117:22

**absolutely**
11:25
47:15 48:9
64:17
113:25

**academic**
12:15 13:8

17:25
18:23
27:23 30:6
48:6,13,15
49:11
50:12,17
51:13,17,
18,20
52:20 59:6
60:6
70:14,15
73:18
74:3,20,21
75:20 78:9
86:24
110:5,19

**academically**
49:11

**accommodate**
54:9,10

**ACCUPLACER**
47:5

**accuracy**
98:21

**achieve**
101:13

**ACRO** 98:5,
19

**ACT/SAT** 47:5
50:6

**Action** 5:15

**activities**
22:18,19,
22 25:15
42:10

**actual** 14:22
  55:16

**address** 6:7
  10:11,13
  33:25
  58:24

**adequately**
  112:6

**admin** 115:19

**administration**
  21:18

**administrators**
  21:19

**admission**
  42:6 63:2
  87:17
  88:4,10

**admissions**
  12:20
  29:17,19,
  20,23
  31:7,12,13
  32:7,11
  33:5,7,15,
  17 37:9,12
  40:15,16
  41:19
  42:3,4,16
  43:6,13,14
  62:23
  66:23,25
  67:5,7
  70:17
  80:2,8,15
  81:5 86:1,

15 87:12,
  21,23,25
  90:11
  92:18
  94:3,13,17
  95:1,14,25
  96:3,7,13
  105:19

**admitted**
  32:4

**Adult** 16:6

**adults** 9:18
  101:14

**advanced**
  64:21
  65:14
  67:22
  68:5,12

**advantageous**
  87:2

**adverse**
  111:24

**advice** 45:10
  68:7

**advise** 19:24
  20:1 50:23

**advisement**
  50:24

**adviser** 85:1
  86:21,22,
  24 87:3

**advisers**
  27:16
  84:13,22

111:3

**advising**
  10:23 11:3
  12:15 13:8
  16:17,19,
  20 17:7,25
  18:3,20
  20:3,11,
  20,22
  21:7,12,15
  25:25
  26:9,19,22
  27:14,15,
  22,23
  29:11,16,
  22 30:1,4,
  6,7,15
  31:13 32:1
  33:5,7
  37:10
  46:21
  70:2,14,16
  81:9
  84:11,12,
  18,20
  86:16,17,
  18,21
  95:20,21

**advocated**
  86:18

**affiliated**
  23:3

**affiliations**
  12:3

**affirm** 5:4

**afraid** 96:11

**afternoon**
  5:10 34:17

**age** 5:22
  9:21

**agree** 92:10
  94:25
  95:24
  99:25
  105:16,17,
  25

**agreed**
  94:15,16,
  25 95:5,14

**agreement**
  6:10

**Agricultural**
  117:22

**ahead** 8:13
  85:22 91:2
  105:10
  111:5

**aid** 10:25
  11:11,12
  29:14
  37:21 38:6
  49:1,12,14

**air** 94:5

**akin** 71:6

**alcohol**
  100:24

**allegation**
  115:2

**allowed** 44:8

alongside
  19:15

amount  44:7,
  9 53:19
  61:11
  84:20
  88:25

and/or  64:15

anecdotal
  77:12,22

Ann  67:15

announce
  39:18

answers  25:2
  69:5

anticipated
  53:9

anymore  27:8

appeal  49:7
  60:4,8,13,
  20

appeals
  59:20
  61:14,25

appears
  62:18

applied  32:4

appointment
  45:21
  47:12

appointments
  34:16,21,
  22 45:14,

16

appreciative
  16:20
  17:7,9
  18:3,4
  20:20
  21:12,13,
  15,17
  25:25
  26:8,22
  46:21

approach
  17:11,17,
  20 18:5,13
  21:24
  70:16

approval
  44:10 52:6

approved
  43:25
  44:22,24
  48:1 65:2
  84:11

approves
  51:8

April  113:18

Arbor  67:15

area  18:25
  22:8 51:24
  69:3 87:13
  95:11,12

areas  21:17
  30:20 71:8

argument

98:11,14
  100:5

arrange
  35:11

Arrington
  36:16

arts  30:18,
  19

associate
  10:18
  11:15
  28:23
  29:1,3

assume  54:11
  80:23
  104:11

assuming
  71:22

asterisk
  66:11,15
  67:20

asterisked
  67:21
  68:19

asterisks
  66:13

athletic
  22:18

Atlanta  13:2

attempt
  99:4,7,9
  100:8

attempting

99:12

attend
  105:13
  110:6,20

attended
  69:19

attention
  72:8

Austin  25:12

Authority
  13:15

auxiliary
  38:7

avoid  6:18
  46:10
  114:24

AVP  78:16,
  21

aware  8:7
  69:24
  80:21
  82:11
  106:14
  107:13
  108:6
  113:7
  114:1,17
  115:5

awareness
  32:8

awesome
  20:5,6,8

awkward
  98:19

Case 7:21-cv-00062-WLS    Document 34-7    Filed 05/12/22    Page 129 of 162

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Robert Freidhoff on 01/20/2022    Index: B-R-A-Y-D-E-N..bring

## B

B-R-A-Y-D-E-N
10:3

baccalaureate
64:22

back  7:6
8:19 13:17
15:22
23:15
24:6,7,9,
10 27:5
28:8,10,22
30:5 35:2
36:12,13
37:6
46:18,20
48:14,21
53:18,23
58:18 59:2
61:4 75:7,
13 82:21
91:3,12
92:2
95:15,25
99:5,8
109:15
112:11
116:10

backyard
54:22
74:19

bad  68:7
83:4

Bainbridge
116:4,16

117:10,24,
25 118:2

Baldwin
117:22

ballpark
78:24

bar  22:12

Barrie
55:22,23,
24 57:9,
10,19,25
59:3,15,17
60:9 77:25
78:3

based  41:24
46:24
47:23
74:22
88:25

basically
18:12 27:3

basis  57:1

basketball
12:6

Beasley
30:21

beast  27:3

beautification
12:7

began  5:1

belief  55:18
60:11
73:3,12

77:1,12,23

believing
73:16

bell  72:18
94:23

belong  95:10

Bessen-
88:13

Bessenger
33:19
37:13
39:6,7
88:13

Bessenger's
89:4

big  12:14

bigger  85:2

Bird  5:11,
12 88:13
93:6,15,18
94:14
104:18
106:13,18
107:7

Bird's  93:24
94:12
112:25
113:8

bit  7:11
34:1 59:9
70:8 91:8

blankly
105:25

bleed  41:2

bleeding
40:22

bleeds  42:20

block  55:1,3

board  5:13
12:12 82:6

Boddie-lavan
23:7

body  104:12

book  40:6

bookstore
37:22 38:7

boots-on-the
ground  32:15

bothered
101:14

bottom  94:10
105:9
109:7
120:7

boxes  28:7

Boy  60:2

brain  50:3
89:25

Brayden  10:1
42:12

break  37:6
91:2 92:3

Brenda  30:21

bring  13:6
76:19

102:18,19,
23 115:3

**brought**
38:19
39:22
58:20
79:12
85:12
113:3

**budget** 88:24

**budgets**
83:19

**build** 18:13
30:9

**building**
18:15 21:9
30:19

**bullet** 72:5,
8,11,15

**bunch** 116:18

**bursary** 38:9

**business**
5:14 17:21

**busy** 10:4

———— C ————

**calculated**
79:2

**calculation**
79:6

**calculus**
68:9,10,
15,16

**calculus-level**
68:2

**call** 9:7
32:8 52:25
53:1 61:17
71:7

**called** 59:19
67:22
94:21

**campus** 9:6
20:2
27:14,20,
24 32:24
37:18,20
42:13,14,
15 52:18
54:16
120:22

**campuses**
78:12

**canceling**
34:16

**candidate**
30:25

**capacity**
54:18

**care** 36:21

**careful**
66:24

**Carolinas**
27:9

**carr** 23:7,
11 24:2
82:3,23

83:12
85:10,20
86:3 89:10
93:24
94:4,13,15
98:4,7
104:7
106:18
115:17
116:3
118:10,24
119:23
120:21,24

**Carter** 8:4,5
26:12,14
35:10,14
36:15 40:6
41:12
45:24 46:2
56:19,22
57:2,7,21
58:2,4,10,
14 64:6
66:11
79:18
91:7,9,16,
20,22
100:25
101:24
102:9,13
110:11,15,
25 111:5
114:3,6,14
117:24
118:6,14
120:12
121:12,15,
24 122:1,5

**Carvajal**
23:6 24:3,
4 83:10
118:10
120:9

**case** 5:16
17:21
57:22
73:13
106:2
115:12

**caseload**
84:22

**CCED** 109:8

**center** 26:19
107:11

**chair** 28:15

**chaired**
28:19

**challenging**
52:22
59:21 64:1
68:23

**chance** 18:17
48:20

**change** 44:16
69:5

**charged**
120:23

**chat** 46:7
51:2 87:24

**chatted**
101:9

Case 7:21-cv-00062-WLS   Document 34-7   Filed 05/12/22   Page 131 of 162

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Robert Freidhoff on 01/20/2022       Index: check..components

check  15:8
  91:3

checked  28:6

checklist
  46:5

children
  9:18 10:12

choose  6:23
  50:13
  86:24

Chris  116:14
  121:8

church
  22:13,15

civil  5:15
  68:4

classification
  27:7

classify
  30:13

clean  100:10

climate  27:9

close  15:24
  39:16
  85:22 86:8

closely
  56:23

clubs  22:11

clue  14:18
  79:1

coach  12:6

collaborate

83:13

colleagues
  12:12
  100:16

collect
  56:24

collectively
  100:19

college
  16:10
  19:25
  26:19
  27:2,3
  30:18
  47:21 52:8
  59:7 61:18
  64:15,19,
  21,24
  65:14,21
  67:11
  69:10
  73:19,20
  116:4
  118:2

College's
  117:22

college-level
  43:21

colleges
  76:25
  77:16
  110:4,14,
  18 111:4

collegiate
  50:21 69:9

column
  62:24,25

columns
  62:19,23

combination
  27:15

comfortable
  51:6 63:14
  95:12
  112:22

command
  82:22

commendation
  53:6

comment  95:2
  107:12
  108:4
  112:6

commented
  118:18

commenting
  112:22

comments
  118:19

committed
  53:11

committee
  12:8,12,16
  28:16
  59:19,21
  60:20,24
  61:2,14

committees
  12:5

common  28:3,
  5 46:9

communicated
  51:11 74:5

communicating
  21:22

communication
  111:24

community
  22:13
  23:22
  28:12
  61:18
  76:25
  77:16

comparable
  15:19

comparing
  76:23

complaint
  53:6 93:6,
  7,16,19

complete
  53:17 78:3

completely
  67:20

completion
  49:15

component
  9:4 12:22
  31:23
  87:23

components
  95:20

Case 7:21-cv-00062-WLS    Document 34-7    Filed 05/12/22    Page 132 of 162

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Robert Freidhoff on 01/20/2022    Index: comprehensive..correct

comprehensive
  15:19
  26:24
  27:1,7
  28:8 74:18
  88:23

comprehensive-
style   27:6

concept   60:8
  62:1,2

conceptions
  74:15

concerns
  46:15

concluded
  122:8

conclusion
  72:11

conduct
  119:24

conference
  98:5

confessed
  98:15
  101:5

confirms
  77:22

confrontation
  100:22

confused
  119:4

connect
  19:20

connected
  13:6 23:1

connection
  22:14

considered
  44:11
  110:3
  111:1

consistently
  25:11

consult
  16:23 69:1

consulted
  16:24

consulting
  63:24

consumer
  65:13

contact   42:9
  121:5

contacted
  28:13

content
  68:18,19

contentwise
  68:1

continue
  47:17
  49:13

CONTINUED
  92:12

continuous
  74:9

contrary
  52:17

contributed
  28:9

conversation
  47:15,18
  49:2 51:9
  53:7,10,12
  55:15,17,
  20 56:11
  57:9 58:7
  59:4,8
  60:1,5
  62:4 64:25
  65:6,20
  70:4 75:10
  78:8,12
  92:20,22
  94:8,13
  98:19,23
  99:5,15,
  18,19
  100:8,9,
  11,16,20
  102:24,25
  103:17
  106:17
  107:4

conversations
  9:7,8,10
  15:11,12
  17:12,13
  18:13,16
  21:11
  31:20
  32:11
  33:16

38:11 43:4
  50:19 53:2
  63:11
  71:13
  74:11 76:7
  82:3 99:10
  100:23
  101:15
  103:15,19,
  21 106:20
  111:21
  113:1

converse
  30:17,20
  102:18

cooks   65:15

Cooperrider's
  17:19

coordination
  88:18

coordinator
  14:2 30:23
  42:9,14
  45:21
  46:14
  88:1,6,21

copy   6:19

core-related
  44:3

corner
  107:10

correct
  29:23
  37:15
  39:10

68:1,8,18

**corrections**
121:19

**correctly**
108:12

**correspondence**
8:18

**costs**  83:19,
20 86:6

**Council**
13:15

**counsel**  6:10

**counseling**
45:2,4,5,
6,7,9,11,
13,17
46:6,10
47:8,12
50:9,13,23

**counselor**
41:18
42:16
46:13,15
51:7 63:24
64:5 65:1
68:3,8
69:2 75:6
87:11,14,
24,25
88:4,10

**counselor's**
87:12

**counselors**
20:17

32:12
41:19 42:4
43:6,13,14
74:3,4
87:21
104:18

**Counsels**
91:23

**country**
61:15
67:12

**County**  54:25

**couple**
120:20
122:2

**courses**  22:3
43:22,24
44:3,4
47:14,25
48:2,23,24
51:8,19
53:22 54:8
63:25
64:3,7,15,
16,18
65:2,7
66:24 68:2
72:20,21
73:19
75:15,21
77:9

**coursework**
60:6 65:10
74:14

**court**  5:2,9,

17 6:17,22
16:19 34:2
35:25 41:4
44:13
90:19,23
91:14,23
92:6,9
103:20,23
115:4
121:2,13,
20 122:6

**coverage**
49:21,22
50:6

**covered**
109:12

**covering**
12:4

**COVID**  9:6
13:17,23
69:22
71:22 86:6

**CP**  64:19

**created**  30:5
39:3
80:12,13,
20,21,22
81:1,7,13

**credit**  44:9
47:21

**credits**  44:7
72:25
105:14

**critical**
105:12

**cross-examine**
57:19

**cross-talk**
35:19
41:13
66:10
75:25

**current**
10:16,18
15:25
20:13 37:8

**curriculum**
18:23
43:21 64:2
68:24
69:8,9

**cut**  40:20
83:16,19
84:4,9

**cuts**  82:2

**cutting**
84:13
86:11
88:25

---

**D**

**damage**  84:4

**damaged**
112:3,8,
11,25

**dangerously**
56:20,22

**data**  51:25
52:11

55:10,12,
17 57:4,15
58:10,18,
19 77:8,
21,22,24
78:4,5

date  8:15

dated  106:12
109:4
118:11
120:9

David  17:18

day  8:20
73:25
98:9,12
103:5,12,
17,18
114:8

day-to-day
20:12

days  16:2
74:9 98:12
103:4,11,
16

DE  13:19
14:3
29:12,16,
20,22
31:3,6,10
32:5,15,16
37:25
38:2,10
42:11,13,
14 43:22
45:1,3,21

47:6,7,11,
18 48:4,9
51:14,15
53:2,5
54:3 72:25
88:9,18
105:14
112:13

debate  59:14

decade  18:2

December
120:10

decent  53:19

decided  83:6
90:8

decision
31:24
81:24
85:8,11,18
86:11 90:5
102:21,25

decision-
making  67:22
68:6,12

decisions
83:14 90:3
95:15

deeper  18:15

deer  7:16,
19,20,22

deers  7:16

defendant
6:12

deficit
17:24 82:4
84:2

define  43:1

definitive
73:13

degree  16:4,
5

deliver
18:11
73:16
83:12

delivered
68:21

demarcations
50:7

denote  68:11

departments
10:20

depend  29:24
48:23

depending
25:10
49:10
53:11 54:8
67:18
106:2

deponent
91:1,4

deposition
6:9,11,16,
20,24
34:6,13

depositions
114:9

describe
52:24

deserve
57:19

design  18:11

desire  74:12

despair
113:12

detail  70:9

determine
63:25

develop  21:8

development
17:21 71:7

dialogue
104:5

dictated
44:5

difference
52:16
60:15 62:9
63:11
64:17 73:4

differently
61:17

difficult
86:11
99:10
100:9

difficulties
18:17

**difficulty**
  48:7 64:4

**digest**  72:14
  120:18

**dinner**  98:5

**direct**  5:24
  40:4 72:7
  92:12,25
  98:24 99:1
  108:1

**directly**
  96:12,14

**director**
  26:19
  27:22
  78:15,20

**disagree**
  105:16,17,
  25

**disappointing**
  101:11

**disappointment**
  101:12

**Disarm**  18:10

**discover**
  18:11,25

**discovery**
  8:3,4
  56:25
  58:15

**discussed**
  97:21

**discussing**

90:11

**discussion**
  48:10
  51:18 72:6
  88:14
  118:17

**discussions**
  50:13

**District**
  5:17

**divided**
  62:19

**division**
  5:18 10:22
  28:25
  29:2,4
  82:12,24
  83:17
  84:5,16

**divisions**
  10:21 38:5
  84:7

**doctor's**
  34:20

**document**
  41:2 57:4
  63:23
  64:10 97:7
  106:9
  120:18

**documents**
  8:11

**door**  93:25

**drawn**  72:11

**dream**  18:11
  19:6

**drinking**
  100:24

**dual**  10:24
  11:8 12:20
  13:13,14,
  16,20
  14:2,5,6,
  9,14,21
  15:23
  19:2,9,11
  20:1,12
  29:25
  30:12,23
  31:15,20,
  22,24
  32:2,6,9,
  21,22,24
  33:2,5,7,
  10,17,18,
  20 37:9,
  19,21
  42:3,7,8
  43:2,4,19
  44:2,8
  45:10,13,
  17,20
  46:11,16,
  17,25
  47:2,23
  50:14,24
  51:19,22
  54:12,14,
  20 62:17,
  23 63:2
  64:8,16

65:7,10
  67:9 69:15
  70:13,14,
  23 71:5,
  14,25
  72:6,18
  74:5,13
  75:12,14
  84:25 85:5
  87:8,25
  88:4,6,22
  94:3 95:6,
  7,10,16
  104:24,25
  113:23,24

**dual-
enrollment**
  18:21
  46:14
  63:12,22
  70:21

**duly**  5:22

**duties**
  87:18,20

―――――――――
       **E**
―――――――――

**earlier**  70:3

**earliest**
  80:12

**early**  17:22
  78:20,21
  84:10

**eat**  25:6
  65:15

Ed 27:12

education
16:6,7,22
18:2,4
21:13
77:14

efficient
38:12

efforts
14:14

Eighties
17:22

elements
98:20

elevate
20:14

elevation
53:5

eligibility
49:3,8

eligible
47:2,7
50:5
59:23,25
63:15

eliminated
94:12

email 7:6,7,
8,16 8:23
104:17,20,
22 105:5
106:15
110:9,10,
11 112:2,

11,25
120:8
121:17

emails 7:12,
18,24 8:6,
14 113:17

embarrassing
98:8

employee
6:11 31:5
33:2 38:19
57:13

employees
33:13
114:18,19
121:6

employment
10:17
11:16

end 8:23
13:2 39:9
60:3 72:10
73:25
113:11

engage 31:15
43:21
120:24

engaged 78:8
100:8

engaging
18:14
99:14
119:23

engineering

26:20
67:11,24
68:5,6,17

enroll
54:12,14
65:1

enrolled
44:11,14,
15 48:24
64:16

enrolling
54:17

enrollment
10:24 11:8
12:20,22
13:11,13,
14,16,20
14:2,5,7,
9,14,21
15:17,20,
23 16:1
19:2,3,9,
11 20:1,13
26:21
30:1,12,23
31:15,20,
22,24
32:3,6,9,
21,22,25
33:2,5,10,
17,18,20
37:9,20,21
42:3,7,8
43:3,4,19
44:2,8
45:10,13,
17,20

46:11,16,
17,25
47:2,24
50:14,25
51:20,22,
23 54:12,
15,20
62:17,23
63:2 64:8
65:7,10
67:9 69:15
70:13,14,
18,23
71:5,15,25
72:7,19
74:6,13
75:12,14
84:25 85:5
87:8 88:1,
5,6,22
94:3 95:6,
7,10,17
104:24
105:1
113:23,24

enrollment's
33:7

enter 45:2
50:14

entering
46:11

entire 30:2
66:5

environment
65:21

equally 52:2

Case 7:21-cv-00062-WLS    Document 34-7    Filed 05/12/22    Page 137 of 162

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Robert Freidhoff on 01/20/2022          Index: equipped..feedback

**equipped**
59:5

**equivalent**
76:20

**espouse** 73:8

**established**
111:25

**Eubanks** 17:3
25:22

**event** 13:3,4
25:9
42:14,16

**events** 12:14
25:4
42:10,11,
13 70:12

**eventually**
11:23 83:5

**evidence**
111:13
112:7,24

**evidently**
92:18

**exam** 47:5

**examination**
5:24 92:12
122:8

**examples**
52:19 98:2

**exchanged**
113:18

**excuse**
36:15,18

**exec** 85:16

**executive**
27:22
78:15,19

**executive-
level** 85:11

**Exhibit**
40:11,14
41:15
62:13,15
63:19
69:13
72:1,3
79:11 80:1
93:1,3,20
94:10
96:16,22
97:18
104:15,17
106:7
109:1,3
110:9
113:15
118:5,8

**exhibits**
41:23
42:24
97:21
117:3

**exist** 37:23

**exited**
108:13

**expect** 65:5

**expectation**
47:23 52:5

55:4 70:21

**expected**
120:16

**expenditures**
82:8

**expenses**
89:1,2

**expensive**
35:21

**experience**
52:9 67:19

**explaining**
60:18

**explicitly**
89:13

**express**
46:16

**extent** 33:15

**extra** 22:21,
22

**extracurricula
r** 22:21

**eye** 95:10
98:23

──────────────

**F**
──────────────

**Facebook**
116:6,8,12
117:20
118:12
119:1,3

**fact** 21:17
48:13

50:20

**faculty**
27:15
35:12
75:19
76:1,5,6,
19 77:7,
16,18 78:8
116:11,13
118:19

**Fade** 114:3

**Fair** 102:3

**fairly** 25:19

**fairs** 32:10

**fall** 9:1,3
39:9,12,21
42:6 53:20
75:15

**falls** 88:19

**familiar**
17:18
63:6,10

**family** 9:16
22:14
28:11
65:12

**fan** 100:21

**fast** 97:3

**February**
80:13
104:19

**fee** 36:1

**feedback**

Case 7:21-cv-00062-WLS    Document 34-7    Filed 05/12/22    Page 138 of 162

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Robert Freidhoff on 01/20/2022                    Index: feel..frequently

82:6

**feel** 61:8
  97:8,13
  105:20

**feels** 97:8,9
  111:10

**feet** 28:9

**felt** 95:11

**female** 121:5

**females**
  116:5

**FERPA** 57:1
  58:19

**field** 21:7

**fields** 23:2,
  4

**fight** 104:4

**fighting**
  104:12

**figure** 19:3,
  4,6 21:23
  46:22
  94:15
  100:18
  101:16

**file** 5:15
  7:25 113:8
  117:17

**filed** 5:21
  93:6,15,18

**fill** 85:25
  86:19,23,
  25

**filled** 86:8,
  19

**final** 85:8

**financial**
  10:25
  11:9,10
  29:14
  37:21 38:6
  48:17
  49:1,12,14

**find** 28:10
  82:19
  111:8
  120:3

**fine** 30:19
  35:16
  40:9,23
  68:18
  120:17

**finish** 34:12

**first-year**
  10:24 11:6
  29:12
  30:12
  33:6,8,10

**fists** 104:10

**fit** 28:10

**fits** 58:11

**Fitzgerald**
  55:22,24
  57:10,20
  59:3,15
  78:3

**flesh** 41:6

**flip** 41:11

**Florida**
  27:10
  105:22

**flowers** 12:7

**focused** 18:3

**folks** 14:11
  15:10
  21:11
  22:24
  23:3,20,21
  25:16
  27:21
  30:19
  34:25
  37:22
  55:18
  71:7,12
  111:21
  112:21

**follow** 35:24
  79:6

**force** 81:22
  83:7 85:4
  109:5

**forest** 6:8
  7:20

**forget** 114:5

**forgot**
  114:12

**form** 6:12
  48:1

**format**
  117:19

**formats** 55:8

**forty-**
  117:12

**forward** 8:25
  19:22
  92:21,22
  99:15
  100:18
  102:19
  118:24

**found** 82:15
  112:17

**foundation**
  110:5,20

**four-year**
  62:7
  105:13
  110:6,21

**framework**
  16:21 17:8
  26:22

**frankly**
  57:23

**Frehall**
  94:16,18

**Freidhoff**
  5:20 6:4,6
  76:2 92:3
  114:24

**Freidoff**
  10:1

**frequently**
  25:8

Case 7:21-cv-00062-WLS    Document 34-7    Filed 05/12/22    Page 139 of 162

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Robert Freidhoff on 01/20/2022          Index: freshman..handle

**freshman** 31:17

**Friday** 25:12 35:21

**front** 36:8 40:2 41:12 47:22 49:1 62:6 77:8

**frustrated** 73:1

**full** 29:6

**full-on** 9:6

**fully** 27:14

**function** 43:18

**functions** 41:25

**funding** 32:17

**future** 48:15

**FYP** 30:24

— G —

**GAP** 52:16

**gave** 15:9 55:9

**Gay** 65:5

**general** 77:14 81:5

**generated** 72:6

**genesis** 60:1

**Georgia** 5:14,18 9:15 13:5 14:8 15:16,18 16:10 19:12 23:2 27:9 44:1, 10 65:10 70:25 71:19 73:11 105:21 106:1

**gestures** 6:18

**give** 5:5 18:21 58:21 59:9 77:19 98:2 108:19 120:11

**giving** 93:25 120:18

**GMC** 52:15 55:7,18 56:4,7 60:12 74:18 75:4

**goal** 17:12 19:2,16 30:5

**God** 5:7 79:12

**golf** 23:9, 11,23 24:2 25:3

**golfed** 23:10

**good** 5:10 12:11 24:23 40:21,25 41:6 53:21 65:16 74:8 76:8 79:12 88:3 95:18 110:5,19 121:12

**GPA** 47:4 50:7 56:17 60:15 62:6,8

**grade-wise** 48:25

**graduate** 105:13 110:7,21

**graduating** 17:15

**graduation** 13:12 18:19 47:20 62:7

**Grand** 16:7 26:25 61:25 77:3

**great** 26:21 58:22 99:19

**100:20**

**greater** 76:21

**grew** 7:21

**grits** 104:3

**gritting** 104:8

**grounds** 12:7

**group** 22:16, 17 23:20 30:2 61:10 75:8

**groups** 38:10

**guidance** 46:13 51:7

**guy** 52:1,12 55:9 56:12 78:6 98:13 99:24

**guy's** 55:21

— H —

**half** 21:4 35:4 79:18 91:20

**Hall** 30:17

**Hancock** 14:1 30:22 31:4 37:12 38:13,18

**hand** 5:3

**handle** 31:10

37:17 42:1
63:12
71:18 76:4

**handled**
41:25
72:19

**hands** 38:8

**hang** 25:7,
13,16

**happen** 23:14
24:10
44:25
118:24

**happened**
41:9 47:16
58:7
106:18
107:22
108:17

**happening**
71:10

**happenstance**
61:11

**hard** 21:4
61:1 77:19

**hard-pressed**
25:19

**head** 13:21
25:18
26:5,10
39:1 45:23
51:3,4
90:9 95:4
108:8

113:4

**health**
45:11,12

**hear** 111:16
116:2

**heard** 17:5,6
69:15
73:2,6
76:6,9,10,
16 77:2,3
83:10
107:20
115:21,25
119:1

**hearing** 6:15

**heartbeat**
64:20

**heavy** 83:23

**held** 73:12

**helping**
31:21

**helps** 32:16

**heretofore**
5:21

**Hey** 8:24
15:2 25:11
54:25 55:5
61:16
71:17
74:23 76:2
82:8

**high** 10:14
15:21
20:16

33:16
43:3,5,20,
22 45:2,5
46:13,16,
18 47:20
48:3 50:7,
21 51:7,10
52:7 53:21
54:1,25
63:24
64:2,7,15,
18,23,25
65:2,7,19,
23 68:23
69:1,8,9
74:2,4,7,
10,11
87:24
88:5,7
104:18
105:14
110:21
111:3

**high-up**
14:21

**higher** 16:6,
21 21:2
27:12 63:3
77:14
89:18

**highest** 16:5

**highlighted**
66:5 68:22
80:1

**Hilary** 80:10

**hire** 30:24

35:25
38:23

**History**
121:9

**hit** 50:8
54:18

**hitting**
60:12

**Hogan** 23:7
31:8 80:9
86:2 88:3,
11 90:10
92:19
93:21
94:13,16
96:10 97:8
102:6

**hold** 58:18
115:9

**holding**
12:14
32:10 53:6

**Holly** 5:11
114:23

**HOPE** 49:3,
6,7,8,16,
18,19,20
50:2,6

**hoping** 34:10

**hour** 35:4
91:20

**hours** 35:8,9

**HR** 79:6
82:14,15,

Case 7:21-cv-00062-WLS    Document 34-7    Filed 05/12/22    Page 141 of 162

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Robert Freidhoff on 01/20/2022          Index: hug..institutions

19 106:16,
20 107:5,
25 109:12
113:9

hug  93:25
94:5

huge  100:21

hugs  94:4

hundred
49:21 50:5

hurting
116:10

———————

I

idea  35:7
60:11
77:14

identification
40:10
41:14
62:12
63:18
69:12 72:2
79:10 93:2
96:15
97:17
104:14
106:6
108:25
113:14
118:4

identify
57:24

identifying

55:12

II  68:16
80:8

immense  78:2

impact  27:2
84:15 85:2
87:6
111:24

impactwise
85:1

improve
18:17
101:18

inaccuracy
98:21

inappropriate
116:4
119:24

inappropriaten
ess  115:3

Inaudible
121:1

inbox  8:1

inclusive
64:14,15,
23 65:6,19
69:8

incoming
31:19

inconvenience
37:1

incorrect
68:19

increase
54:19
86:21

indiscernible
16:17
103:19

individual
14:13
33:19
85:4,5
88:17

individuals
40:18
41:20 42:1
84:24

ineffective
110:5,19

information
55:13
56:14,20
89:10,11
103:9

initial
38:23 51:8

initially
106:19

injury  24:6,
7,9,10

inquiry
17:10,19

inside  27:12
82:12,24

institutes
13:9 22:3

institution
15:20
26:25
27:1,6
28:8 42:4
51:21,24
52:13
54:3,21
59:23
61:4,8,12,
14 63:7
67:11
68:10
74:19 76:8
88:23
105:13,15
110:7,21

institution's
51:15

institutional
51:25
55:21

institutions
13:6 14:7
15:14
51:14 52:2
59:5 60:3,
7 62:10
66:22
67:1,6
70:24
72:21,22,
24 73:4,10
76:13,14
77:20
115:11

Case 7:21-cv-00062-WLS   Document 34-7   Filed 05/12/22   Page 142 of 162

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Robert Freidhoff on 01/20/2022                    Index: instructor..July

instructor
16:22

intake   51:9

intend   35:9

intense   53:9

intensive
53:24

intent   66:3

intention
64:10

interactions
116:5

interest
31:21
65:13

interested
28:7 53:18
68:4

interesting
9:4

interests
19:1

interfaced
37:21

interim
78:16,20

internally
83:15

international
64:22

interrupt
17:6

interview
96:22,24
97:22,23

interviewed
28:1 93:21

intimate
114:25

invested
84:19

investigation
93:19
96:23
116:3

investigator
93:21
94:12
96:23
97:22

invite   25:9

involved
22:10,15,
16,17
81:23

involvement
16:9 22:7

IR   52:13
55:9 56:12
78:6

Ish   78:24

issue   27:18
28:10
49:1,17
71:15,17
75:5

issues   14:25
48:14
49:18
72:19
75:20 76:3

IX   93:5,7,
8,9,14,16,
18 96:23
97:23

———————————

J

———————————

Jamie   5:11,
12 7:10
8:16
33:12,14,
16 37:11,
16 39:15
41:24,25
42:25
43:5,9,11,
12,15
53:3,7
69:19
81:20,24,
25 83:6
85:9,23
87:16,20
88:9,12,13
90:16
92:16
93:6,15,
18,24
97:13
104:18
106:13
107:3,6,
11,18,25

108:13,21
109:4,7
112:24
113:8,18,
24

Jamie's
32:19,23
89:5,7

Jammie   17:3
25:18,21

January   8:23
28:3 30:16
38:20

jealous
115:1

Jeanine   23:7

job   11:17
12:4 18:7
32:19,20
37:11
43:11
87:17
97:12

jobs   22:10

joined   98:14
100:6

joint   44:11,
13,15

Jordan
107:8,18

Julie's
116:22

July   30:8
106:16,21,

22 107:17
109:4
113:19

jump  80:5

jumps  100:15

June  61:9
71:14

—————

K

—————

kidding
11:25

kids  9:17
11:22
22:17,19
25:15
64:13,20

kids'  23:5
36:8

kind  7:10
12:10 13:3
17:10,23,
24 18:25
19:5 21:14
23:13,19
32:13,14
35:7 42:19
45:11
46:21
50:16 59:4
69:4 70:3
71:18
72:10
73:25
77:12 82:7
87:14

100:17,23
102:19,21
114:2
120:18
122:3

Kinderlou
6:8

kinds  8:20
13:9 27:10
103:14
105:22
111:21

Kirkland
120:9

Kleenex  41:4

knew  15:10
27:5,8
82:22

knowing  51:6

knowledge
19:17,19
37:18

—————

L

—————

labeled
40:13

language
104:12
120:23,25

larger  77:10

late  9:1,3
17:22

lawful  5:22

lawsuit  7:2

lead  27:13

leaders
99:15

leadership
20:23
85:12
99:21
102:17,23

league  23:11

learn  71:9,
12

learning
71:1

leave  6:23
39:8,15
40:8

leaves  81:10
114:22

leaving
39:20

left  9:6
39:19
80:24 81:4
98:9

legitimacy
60:10

lesser  59:7

letter
108:10,19
109:3,12
116:16,17,
21

letterhead
117:23
118:2

letters  61:5

level  20:15
44:5 50:21
51:7,10
52:8 55:11
56:5 64:4
69:3 88:18

lifting
24:20

light  77:4

likes  65:15

limiting
24:7

Lindsay  10:7

lines  78:17

Lisa  23:7
96:24

list  28:22
40:16
43:24
51:1,3
85:16

listed  72:12

LISTSERV
13:20
14:3,4

literally
116:6

literature
17:11

live 10:12

lives 10:8

local 22:8, 15 51:24 61:17

locally 54:13

long 23:7 89:3 91:17 92:9 96:24

longer 37:13 39:12 48:22 59:22,25 91:7 92:16 95:18

looked 8:17 14:22 27:9 48:24 82:1,7

Lord 74:8

lot 7:22 13:4 14:14 20:21,23 21:16 22:24 23:14,16 26:23 47:22 50:25 52:17 60:2,25 63:5 64:12 71:6 73:15

77:18 87:16,19 89:15 95:20 102:18,24 114:9 115:18

lots 12:2 94:21 103:18,19, 20

loud 115:25

lower 89:4,6

Lowndes 54:25 65:12,23

lunch 98:9, 16 101:5,7

—————

**M**

—————

made 31:24 85:8 90:4 95:7,16 107:11 108:5

Maestas 5:10,11 6:1 8:9,10 17:1 26:16 34:4,5 35:17,20 37:3,5 40:8,12 41:7,16 44:18 46:4

56:19,23 57:8,12,15 58:13,22 59:1 62:14 63:20 64:8 66:1,19 69:14 72:4 79:14,23 90:21,24 91:8,19, 21,25 92:2,8,11, 13 93:4 96:17 97:19 101:3 102:1,5, 10,14 104:1,16 106:8 107:14 109:2 110:16 111:12 113:16 114:4,7, 11,16 118:1,6,7, 16 120:14, 19 121:4, 10

maiden 38:17

main 43:18

majority 22:17

make 8:3,8 11:1 19:10

38:12 42:22 44:25 46:23 53:13 67:23 79:3 83:14 84:4 89:10 90:3 102:20,25 121:18

makes 38:25 86:7 89:24 95:12,18

making 49:17 90:21 104:10

management 13:12

manager 80:9

mandate 45:18

mandated 45:14,15, 16

manuals 22:2

March 80:14 106:13 118:11

marked 40:10 41:14 62:12 63:18 69:12 72:2 79:10 93:2 96:15

97:17
104:14
106:6
108:25
113:14
118:4

marks  50:5

Masters  16:6

match  98:6

mathematical
67:22
68:6,12

mathematics
65:11

matter  5:12
72:24
106:3

meaning  9:11

means  56:6
88:8

meet  19:4
41:18
46:24
47:1,3
55:4 71:13
108:18

meeting
20:12,13,
16 47:20
48:19
50:16
52:23
70:22
107:15,16,

20,23
108:20
109:13
114:18

meetings  9:5
16:14
34:23
104:3,8

meets  50:10

Megan  13:18,
24 14:1
15:8,9
20:18
30:22
31:4,25
32:12
33:2,18
37:12
38:13,14,
18 39:3,22
45:22
46:5,7
50:10,11,
16 51:2
53:3,7
71:24

member  76:1
77:8
116:13

member's
116:11

members  76:5

memorizing
117:3

memory  53:5

60:8

men's  22:16

mental
45:11,12

mentioned
102:6

merit  38:24

message
110:3
111:1,2

met  13:17,
22 52:25
68:15
71:16,18
75:8

method  21:21

Meyers
116:14
121:8

Michael
120:9

Michelle
107:8,18
108:11,13

Michigan
7:21 16:8
21:3 26:18
61:24
67:13,15
68:17
76:25 77:3

Michigan's
27:3

Microsoft
9:11

middle  5:17
73:25
79:1,7

Miller
49:16,24

million-dollar
82:4 88:24
89:7 90:6

mine  38:7
84:6

minors  9:19

minute  72:13

misconception
72:12

missed  26:25

Mitchell
28:15,18
97:23
106:13
116:24

modality
54:10

model  17:20,
24 18:10
19:21
21:5,19
22:4 27:17
28:4,5

moderate
14:12

moment  30:9

Case 7:21-cv-00062-WLS    Document 34-7    Filed 05/12/22    Page 146 of 162

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Robert Freidhoff on 01/20/2022    Index: Momentum..offensive

Momentum 12:10,15, 19,24 13:8 70:2,16

money 84:20

month 8:20

months 10:14 107:3 112:13,17

morning 58:20

mouth 57:3

move 24:21 30:18 96:2,7 99:15 100:18

moved 24:11

moving 8:25 24:25 89:15 92:21 96:5 103:11 118:24

multiple 7:17,18, 20,22

music 22:19

N

named 5:21 78:21

names 6:5

13:10 52:24 56:9 77:19 78:7

national 16:22,23

nationally 26:23

native 52:15 56:5,6 60:17 62:9 75:22 76:4

necessarily 49:8 53:23 95:9

needed 98:22 100:12 101:13

nervous 97:10 98:15 100:21

networking 71:11

newly 80:25 81:7,12

nice 98:13 99:24

nodding 26:10,15 45:23

nonovernight 103:18

nonparty 6:11

norm 60:13

normal 104:5

notebook 108:23

notebooks 40:3

notes 93:20 94:11 96:22 97:22

notice 5:21 6:10 109:5

notification 107:24 108:21

notorious 120:22

November 9:2 28:2

number 5:15 15:23 16:1 40:5 67:15 82:25 87:22 117:17

numbers 40:4 57:17 98:12 103:16

O

oath 5:23 92:4,7,8

object 101:25

objected 57:1

objecting 110:23,25

objection 110:11

objections 6:12

observe 119:23

observed 120:24

obtained 57:16

obvious- 57:11

occur 23:17

occurred 78:12 98:6

occurring 25:9 71:23 82:24

October 9:2 24:12,13, 15 28:2

offended 111:17

offensive 110:3,10, 12,17 111:1,8

offer  38:24
76:21 89:9

offered  54:8
70:17
75:15

offers  54:22

office  10:25
11:1 14:15
30:16 38:9
40:15
93:24
114:19

offices
10:21,23
38:9 67:7
95:22

official
14:16
16:11,13,
14 26:8
32:22

oldest  42:12

ongoing
24:22

online  22:3
54:17,18
55:7 63:22

onset  70:3

open  55:1
79:25
80:12,14,
22 85:21,
24 86:1,3,
8,13,16,

17,24
87:4,9
90:11
92:17
102:18

openings
80:2

operational
83:19 84:6
89:1

operationally
20:12

opinion
68:13
73:21 95:6

opinions
12:8

opportunities
42:8 43:20
55:6 84:3

opportunity
27:13
31:14 32:8
35:23
58:23
71:11
100:17
121:16

opposed
17:24 56:7
87:9
102:25

option  31:21
84:15

options
54:20 65:8
89:15

organizational
17:21

organizations
20:11
22:11

orientation
10:24 11:4
29:11
30:13,21
33:11
98:11
99:20
103:3,15,
22

orientations
98:13

outings
23:9,10
25:3

Outlook  8:1

overarching
84:16

overlap
42:17 43:8
87:17,19
88:2

overlapped
87:18

overnight
103:18

oversee

10:21

———————————

P

———————————

p.m.  5:1
37:4 92:1
122:8

package
49:14

pages  118:9

paid  48:22

paper  40:20
56:11
59:18

paperwork
32:17 41:9

paragraph
94:9 97:7
103:9
105:11
110:2
111:22

parameter
58:15

parent  52:25

parenthetical
72:10

parents  53:3
72:25
98:12
103:6

part  8:16
10:22
13:19

16:22,23
29:10 30:2
31:25
33:19 43:6
67:4 95:8,
9,19
100:20
103:16
111:15
112:14
119:2,5,6

**partner**
19:15
37:24
74:13

**partnering**
75:2

**partners**
37:19,20
75:13

**partnership**
31:12 33:4
42:2 46:12

**party** 7:2

**past** 86:9

**pathway**
19:23
62:19,20
64:14 68:8

**pathways**
62:18
64:24

**pay** 44:11,
22

**payment** 44:2

**pending** 5:16

**people** 14:6
15:3 23:8,
13,22 25:5
37:9,12
38:2 42:23
51:23
52:18
54:11
70:22
71:13
73:15
80:15
83:22
87:7,17
88:17 96:4
102:18,24
115:8,11

**perceived**
110:4,18
111:2

**percent**
49:13,14,
20,21
50:5,6
88:9

**percentage**
73:20

**perception**
74:21

**perceptions**
74:13

**perfect**
36:14

71:21
100:11

**perform**
47:14 48:6
73:20

**performance**
48:14
52:14,17
73:18

**performed**
15:13
49:10
77:11

**performing**
56:4

**period** 8:22
58:5 74:6

**permanent**
113:8

**person**
13:17,22
14:21
28:13
30:25
32:5,15
34:11,15
35:5,11
37:25
42:17,18,
19 46:17,
18 47:9,13
70:9 78:11
88:22
100:15
114:20

**personal**
115:14

**personally**
55:12
65:24
71:11

**personnel**
86:11
113:8

**perspective**
17:17,23
28:12

**petitions**
61:3

**phase** 19:6

**phenomenal**
78:2

**philosophies**
99:20
102:7

**philosophy**
17:9 21:25

**phone** 9:7
52:25 53:1

**physical**
121:5

**physically**
56:11

**pick** 81:24,
25

**piece** 47:8
56:11

**pipe** 71:10

**pitfalls**
  46:9

**place**  23:12
  42:11  77:3
  82:12

**places**  27:10
  77:21  82:9
  83:18  84:3
  105:23
  120:21

**Plaintiff's**
  40:10,14
  41:14
  62:12,15
  63:18
  69:12  72:2
  79:10,25
  93:1,2,20
  94:10
  96:15,21
  97:17
  104:14,17
  106:6
  108:25
  109:3
  110:8
  113:14
  118:4,8

**plan**  30:8

**platform**
  9:12

**play**  24:1
  49:10

**played**  55:20
  101:11

**plays**  32:7

**plenty**  11:21

**plug**  91:10

**pocket**  44:12

**point**  17:15
  18:2  20:2,
  4  29:9
  38:15  42:9
  56:2  60:24
  66:20
  67:20
  72:8,11,15
  80:16
  94:15
  106:21

**points**  22:14
  51:1  72:5
  83:25

**policy**  71:4
  115:5,8,9,
  17,19

**poorly**  77:11

**Porch**  22:13,
  24,25

**portion**
  43:11

**portions**
  109:17

**position**
  11:15
  14:16
  20:21
  28:19  39:3
  81:7,8

  85:6
  86:23,25
  87:9  94:12

**positions**
  11:16
  37:10,23
  79:24
  80:20,22,
  23  81:1,15
  85:21,24
  86:4,8,12,
  17,18,19
  87:3  90:11
  92:17,21

**positive**
  17:10,17,
  23

**possibility**
  90:12

**post**  116:6,
  9

**posted**  79:25
  80:9,10
  92:18
  116:11

**posting**
  116:15
  118:18

**posture**
  104:12

**potentially**
  59:25
  64:24
  82:10

**power**  17:16

**Powerpoint**
  62:16

**practice**
  22:5

**practitioner**
  21:6

**precovid**
  58:8

**preference**
  54:10

**prep**  64:21
  65:14  73:9
  114:9

**prepare**  7:4
  59:6  77:5

**prepared**
  61:16
  72:23

**prerequisites**
  68:14

**present**
  12:9,18
  58:17
  115:10

**presentations**
  12:14

**presented**
  16:16,17

**president**
  10:18
  23:10,12
  29:1,3

**pretty**  12:18

Case 7:21-cv-00062-WLS    Document 34-7    Filed 05/12/22    Page 150 of 162

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Robert Freidhoff on 01/20/2022         Index: prevented..quick

13:5
15:17,21
39:16
44:20,21
65:16
73:19
84:10

**prevented**
114:18

**preventing**
71:22

**previous**
48:8 69:5
96:20
97:20,21
119:8

**primarily**
7:6 8:15
44:3

**principles**
21:1

**print** 7:24
83:19

**printed**
57:16
62:16

**printout**
40:14
41:17

**prior** 73:19
82:12,14

**problem**
26:20
91:11

**procedures**
71:5

**Proceedings**
5:1

**process**
30:24
32:17,18
38:12
44:3,17,24
45:19
53:11
83:16
106:19

**produce** 8:4

**professional**
27:16 30:7
71:7
84:12,20

**professionaliz**
**e** 27:14

**professors**
75:19

**program** 45:3
49:9
67:12,24
68:17

**programs**
10:24 11:6
15:12
29:12
30:13
33:10

**progress**
48:15
49:11

**progression**
12:23
13:12
49:12 62:6
70:18

**promotion**
78:18

**proof** 73:13

**prospective**
62:8

**provide**
36:16
43:20 46:6
108:21

**provided**
45:5,6
95:21
107:25

**providing**
12:13
110:5,19

**psychology**
17:10

**public** 98:7,
8

**publication**
63:22

**pulled** 55:17
56:1 78:4

**purpose**
108:20

**pursuant**
6:10

**pursue** 55:6
64:1 68:23

**purview** 30:2
81:19

**push** 103:1

**put** 24:18
35:6 57:2,
24 64:11
77:8

**putting** 22:5

---

**Q**

**qualification**
50:4

**quest** 44:24

**question**
6:13 25:2
37:8 43:17
61:20,22
66:6,17
67:4 68:22
72:16,17
73:23,24
78:1 88:3,
11 93:12
97:1
113:22

**questions**
17:14,16
42:10
46:17
50:11 84:1
121:11

**quick** 109:23

## R

**R1** 27:3

**RAC** 13:14, 16,19,22

**radar** 112:14

**raise** 5:3

**raised** 60:21

**raises** 38:21 78:14

**Rapids** 16:8

**ratio** 86:22

**read** 6:19 17:9 64:11,13, 22,23 65:4,18,24 66:3 72:14 105:4 109:16,20 110:23 120:13,15 121:15

**reader** 79:17

**readers** 79:13

**reading** 6:21 63:23 64:12 66:5 120:14 121:14

**ready** 5:2 104:4

**real** 109:23

**reason** 103:10

**recall** 13:21 15:16 39:16 58:17 74:10 87:4 90:10 92:22 93:5,15 94:6 101:1 106:10

**recalling** 33:12

**receive** 45:16

**received** 55:13

**recent** 117:5

**recently** 63:8 111:25

**recess** 37:4 92:1

**recognize** 21:16

**recollection** 60:5 90:15 103:13 113:22

**recommendation** 121:23,25

**record** 6:3 34:3,4 37:3,6 49:23 91:15,24, 25 92:2 122:7

**recruited** 26:17

**recruiter** 80:2,8 86:1

**recruiting** 31:18

**redo** 35:23

**reduced** 83:7

**reduction** 81:22 83:24 85:3 88:24 89:7 90:6 109:5

**reengage** 75:12

**refer** 62:20

**referred** 112:5

**referring** 45:5 48:5, 10 57:15 59:3,9,12 66:13 76:15 94:3 96:6,9 98:18

109:9 110:8

**refers** 49:12

**refilling** 81:8

**refresh** 113:21

**Regents** 5:13 13:14

**registrar** 11:8

**registrar's** 10:25 29:14

**registration** 32:18

**regu-** 25:5

**regulations** 45:1

**regurgitating** 89:12

**rehire** 80:23 81:10

**rehiring** 80:24

**reimagine** 27:23

**relate** 17:25

**related** 12:22 13:11 18:20 25:6 45:11

Case 7:21-cv-00062-WLS    Document 34-7    Filed 05/12/22    Page 152 of 162

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Robert Freidhoff on 01/20/2022         Index: relation..retaining

50:17
56:14 60:6
71:5 72:18
92:20
103:3,10,
15

**relation**
56:16,17

**relationally**
112:19

**relationship**
18:14 21:9
98:16
101:6,17,
20,23
112:12,23,
25

**relationships**
18:5,13
111:25
112:3,4,8

**relatives**
9:14

**relevance**
100:25

**relevant**
57:22

**remain**  94:17

**remember**
7:11 8:16,
18 24:14
26:12
32:19,20
39:17
45:25

56:16,17
62:4 78:7,
22 81:20
92:20
93:23 94:2
96:10
104:7
108:3,7,12

**repaired**
112:1,3

**repeatable**
22:1

**rephrase**
51:16
103:7

**replace**
39:23

**replacement**
39:5

**report**  56:1

**reported**
6:19 77:7

**reporter**
5:2,9
6:17,22
16:19 34:2
35:25 41:4
44:13
90:19,23
91:14,23
92:6,9
103:20,23
115:4
121:2,13
122:6

**represent**
5:11

**reprimand**
106:12
108:2,3
113:7
116:23,25
118:10

**reprimanded**
106:14

**request**
56:25
58:15

**requested**
58:11

**requests**  8:3

**require**
34:16 63:7

**required**
48:21
49:13 50:8

**requirement**
47:6

**requirements**
46:25
47:1,4,21
48:20
62:24
63:2,10
66:23,25
67:6

**requiring**
45:1

**reschedule**

36:24

**research**
52:1,13
55:21

**reserved**
6:14

**reside**  30:20
31:1

**resigned**
81:15

**respond**
14:12

**responses**
6:18

**responsible**
14:6 70:23
71:24
87:15

**responsiveness**
6:13

**rest**  22:18
32:2

**restaurant**
98:8
100:13

**restroom**
33:23

**restructure**
27:13

**result**  110:2

**reswear**  92:5

**retaining**
17:15

Case 7:21-cv-00062-WLS    Document 34-7    Filed 05/12/22    Page 153 of 162

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Robert Freidhoff on 01/20/2022    Index: retaliation..scheduling

**retaliation**
  96:11

**retention**
  12:23
  13:12
  18:18
  26:20
  27:18
  56:15,17
  62:6 70:18
  84:21

**return** 34:14
  74:12

**review** 83:4

**reviewed**
  8:12

**Richard**
  120:9

**rid** 85:1,23

**RIF** 82:16
  85:3 92:15
  97:9,14
  106:20
  107:16,17,
  24 108:21

**RIFED** 82:21

**RIFING** 90:14

**RIFS** 82:11,
  23 83:22
  84:1

**rigor** 50:17
  53:23 60:6
  64:18
  65:19,20,

22 68:20
69:9,10
72:20
73:4,18
74:3,10,22
76:8,20
77:6,15,17

**rigorous**
  52:7 55:19
  68:13,23
  73:9
  76:10,11,
  23

**ring** 72:17

**ringing**
  94:23

**Rob** 6:6
  92:3
  94:16,25
  98:4,7,9,
  13,14,15
  99:24
  100:6
  101:5

**Robert** 5:20
  6:4

**Rock** 59:16

**Rodney** 24:7
  98:10,14,
  24 99:1,14
  100:6
  104:7

**role** 20:3
  26:24
  27:21 28:3

32:7,24
42:20 81:4
87:1 88:9

**roof** 30:17

**room** 107:25
  114:23,24
  115:22

**rooms** 107:10

**roundtable**
  72:6

**rule**
  114:17,21
  115:5

**rules** 71:5

**run** 56:12
  60:14
  95:20
  103:22

**runs** 30:21

**Ryan** 23:7
  31:8 80:9
  86:2 88:3,
  10 90:10
  92:18
  93:21
  95:1,3,5,
  9,11,13,23
  96:10
  102:6,19

**Ryan's** 87:13

————————
————————
        **S**
————————

**salaries**
  78:22

**salary** 78:17
  88:16,22
  89:1,4,6,
  18

**SAP** 48:5,11
  49:7,15,17

**Sarah** 14:12,
  17 15:1,2,
  3,12 33:19
  37:12
  39:5,7,24,
  25 85:6
  88:13 89:4

**Sarah's**
  89:4,6

**sat** 50:15
  61:13

**satisfactory**
  48:6,15
  49:11

**satisfy**
  58:19

**scale** 77:10

**scenario**
  52:24

**schedule**
  25:10 54:9
  69:2

**scheduled**
  34:6

**scheduling**
  34:1
  103:6,11

**scholarship**
49:9,25
50:2

**school** 10:15
20:16
43:3,5,20,
22 45:2,5
46:13,16,
18 47:20
48:3 50:7,
21 51:7,10
52:8 53:22
54:1,25
63:24
64:2,7,15,
18,23
65:1,3,7,
19,23
68:14,23
69:1,8,9
74:2,4,7,
10,11
87:24
88:5,7
104:18
105:14
106:1
110:22
111:3

**schools**
31:16
33:16 67:8
74:14

**sciences**
65:13

**scissors**
59:18

**sealed**
121:20

**search** 28:19
30:24

**season** 69:22

**section** 72:9

**sees** 84:22

**selecting**
69:2

**selective**
66:22
67:1,5,8,
10

**semester**
39:10
53:17
59:23

**semesters**
59:24

**send** 54:3

**sending**
106:15

**senior** 10:15
53:19,20

**sense** 46:24
67:23 86:7
89:24
95:7,12,
16,18

**sentence**
66:4,23
101:4
110:2,24

111:23

**separate**
29:22,25
30:3

**separating**
29:20

**serve** 12:5,7
87:10

**serves** 60:8

**service**
30:22

**services**
14:1 88:21

**servicing**
87:7

**serving**
84:25

**session**
23:20

**set** 13:6

**sets** 21:8

**setting**
63:16,17

**settle** 18:11

**Seventies**
17:22

**sexually**
116:5
120:23

**sexually-
charged**
120:25

**shakes** 108:8

**shaking**
25:18 26:5
90:9 95:4
113:4

**share** 90:7
102:15

**sharing**
70:25

**Shauna**
115:18

**sheet** 51:4

**shifted**
63:8,9

**short** 35:5
37:6

**shout-out**
20:5

**shouting**
98:6

**shovel** 27:8

**shoveling**
28:8

**show** 78:5

**showed** 56:3
116:22
117:5

**shown** 73:13

**shows** 77:8

**shutting**
93:25

**sic** 25:12

side  30:10,
  12,14
  47:22
  48:3,4,18
  63:5 81:9
  85:3
  87:11,12
  88:16

sign  6:20
  121:15

signatures
  48:3

signed  109:7

significance
  62:5

significant
  83:16
  111:24

similar  9:12
  37:20
  56:5,20
  61:15 70:1
  88:19
  97:20
  102:20
  117:9,15

similarly
  41:17
  96:22

simply  88:15
  112:20

simultaneous
  35:19
  41:13
  66:10

75:25

single  42:24
  43:9

sit  28:4
  30:11
  59:19

sitings  7:22

sitting  22:9
  36:1 71:14
  74:8

situation
  114:25

six-phase
  18:10

six-week
  22:2

skill  21:8

small  73:19

snow  27:8
  28:9

socially
  22:7 23:8

sole  33:2

solely  27:16

solemnly  5:4

solid  15:17

son  42:12
  65:9 68:4

south  98:17
  101:6,20

space  19:8
  82:10

84:11,25
  108:14
  115:10

spaces  55:21
  84:9

spawned  18:4

speak  81:6
  97:2

speaker
  76:14

spearheads
  14:13

specific
  18:22 51:1
  52:19
  77:19
  109:17

specifically
  42:11
  78:11
  108:4

specifics
  15:9 59:10

speculating
  89:19

speculation
  101:24
  102:4
  110:12

spelling
  94:22

spellings
  121:19

sponsors
  23:13

sporting
  25:4

sports  22:11
  23:2,4

spouses
  115:1

spreadsheet
  55:16
  57:16,23

spring  15:25
  53:21
  75:16

ss  29:10

staff  14:10
  34:22,23
  40:16

standard
  63:3

standing
  84:20
  116:9

start  19:9
  52:3 86:7
  98:7,10,14
  99:5 100:5

started
  15:10
  17:22 18:2
  21:15 28:2
  56:6 60:9,
  16 100:15
  104:25

Case 7:21-cv-00062-WLS    Document 34-7    Filed 05/12/22    Page 156 of 162

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Robert Freidhoff on 01/20/2022                Index: starting..subject

107:3

**starting**
60:12
114:2

**state** 5:14
6:2 9:15
14:21
15:3,4,7,
13 16:7
31:16
45:1,18
54:15,23
61:25
72:24 75:3
76:24 77:4
88:18,19
105:20,21

**stated** 12:5
56:1 62:9
73:11 75:1
89:14
94:24

**statement**
48:8
65:18,19
69:7 95:24
98:21
99:25
104:3

**statement's**
66:13

**States** 5:16

**stating**
66:21

**statistical**

62:5

**statute** 35:8

**stay** 19:8
115:9

**stayed**
108:13

**steak** 25:12

**stenographical
ly** 6:17

**step** 33:22
36:22

**Steph** 36:23

**steps** 83:1,9

**stood** 30:6,7

**stop** 119:8

**stopped** 8:18
105:8
120:6

**stops** 29:9

**story** 107:12

**straightforwar
d** 44:20,21

**streamline**
38:12

**street** 73:17

**strengths-
based** 17:11,
20

**stretching**
116:9

**strong** 77:5
86:20

**strongly**
95:11

**student**
10:19,22
11:15,19
14:1
28:23,25
29:1,2,3,4
30:4,10,
11,14,15,
22 31:13,
23,24
32:1,3,9
33:9 45:19
47:6,7,24
49:2 50:14
53:1,5
60:17
63:15 65:6
67:8,23
74:17
75:20,22
77:9 85:2,
3 86:21
87:2 88:21
95:8,19
106:3

**student's**
46:10,22
48:9 54:9,
10 73:18

**students**
15:22
17:12
18:6,14,21
20:2,13,14
21:10

31:16,19,
22 32:16
38:2,3,10
43:3,5,21,
23 45:2
48:6 50:10
52:1,2,3,
4,14,16,20
53:3,8
54:12,15
55:10
56:3,6,15
57:24
58:16
59:6,22
60:3,11,25
61:3 63:12
64:1,25
75:3 76:3
84:22,23
85:1,7
87:1,6,7,
8,11 97:11
105:12
110:6,20

**students'**
56:8

**stuff** 37:16
43:14 74:1

**style** 27:1
102:17
117:19

**styles**
102:20

**subject** 8:2
109:5

submit  70:16

subordinate
  94:14

subordinates
  31:2

substantial
  84:19

success
  10:19,23
  11:15,19
  17:10
  28:24,25
  29:2,4
  47:16
  55:11 59:6
  75:20 85:3
  87:2

successful
  18:18
  49:14 71:2
  72:23 73:1

successfully
  53:15

sudden  82:21

suggest
  110:4,18

suitable
  69:2

summer  21:5
  23:12

summertime
  23:18,19

summit
  12:10,19,

25 13:8
69:16
70:2,21
71:15 72:7

summits
  12:15
  70:1,15
  71:16,25

super-  8:16

supervise
  21:11 31:3
  40:17
  41:20

supervising
  80:16
  83:18
  107:3

supervision
  9:4 21:20

supervisor
  8:17 98:24
  99:1 108:1

supervisors
  96:5

support
  37:19
  38:2,10,11
  53:13
  94:14
  95:21

supposed
  52:8 90:25

surgery
  23:15

24:18
28:10

surprised
  95:13

suspension
  59:20
  60:4,8,12,
  20 61:14,
  25

Sutliff
  38:14

swear  5:4

swipe  111:11

sworn  5:23

system  5:13
  13:5 14:8
  16:10
  19:20
  43:25
  44:1,10
  61:18
  70:24 71:4
  73:7,8,10
  77:14
  111:7

systems
  64:21

─────────────

T

─────────────

Tab  40:4

table  102:18

tabs  40:3
  62:11
  116:19

takes  23:12
  32:1

taking  27:20
  65:12 68:1
  74:17 77:9

talk  8:11,
  24 13:18
  32:12
  46:18
  48:13
  50:16,20
  51:23 59:8
  64:5 70:8
  74:2 76:19
  88:4,6
  97:10
  100:17
  101:15
  107:7

talked  22:10
  33:1 35:14
  48:18 57:9
  59:2 70:3
  75:19
  85:16 86:3
  92:15,17

talking
  21:14 22:9
  27:20
  31:14,16
  35:12 37:7
  42:6,7
  43:2 46:21
  50:25 57:8
  58:8 64:6
  66:14
  70:20

76:13
83:21
85:25
92:15
101:22
112:20

talks   63:24

targeted
  97:8,9,13

TCSG   25:16,
  19 52:10
  61:18
  62:19,24
  63:6,9,12,
  17 72:22
  73:7 74:24
  76:24
  77:15
  106:4
  111:7,10,
  15 112:20

TCSG's
  111:19
  112:23

TCSGS   16:15
  26:9

teach   22:4
  121:8

teachable
  22:1

teaches
  21:18

team   12:6
  16:23
  31:14 38:2

59:11 74:7
86:25
95:19
99:16
100:19

teams   9:10,
  11 20:10
  23:5 95:21

Tech   19:12
  65:10
  106:1

technical
  16:10
  19:25
  110:4,14,
  18 111:4

Tee   28:15,
  18 97:23
  98:4,22
  99:21
  100:22
  101:8,9,17
  102:20
  106:13

Tee's   101:23

teeth   104:4,
  8

telling
  66:24

ten   21:14
  80:6

term   50:23
  77:12 84:8
  95:18

terminated
  81:16,21

terminology
  75:23

terms   8:19
  45:9 47:8,
  19 48:1
  63:4 64:18
  65:2 77:15
  82:1 84:15
  88:16,18

test   79:15

testified
  5:23

testify
  57:18

testimony
  5:5

thankfully
  23:15 29:9

themes   70:19

thing   24:23
  26:2 46:22
  47:18,19
  49:8,15,16
  82:17
  83:21
  92:14
  105:21
  115:14,15

things   8:20
  17:17
  18:24
  19:18

20:14 28:7
37:10 42:5
43:12
50:19 61:5
62:7
83:11,20
86:9
106:17

thinking
  36:4

thought   62:1
  100:7
  102:1
  108:14
  120:14

three-day
  22:3

thrive   19:9

tiers   105:19

til   96:3

time   6:14
  8:22 12:10
  17:2 18:8
  20:20
  22:18,23
  23:3 25:14
  27:13,25
  33:22 35:2
  41:8 47:10
  55:3 57:19
  58:5 60:24
  74:6,16
  82:22
  83:18
  84:7,9

Case 7:21-cv-00062-WLS    Document 34-7    Filed 05/12/22    Page 159 of 162

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Robert Freidhoff on 01/20/2022        Index: timeline..Uh-huh

86:15,16,
17 87:4
89:16
94:22 98:6
104:23
105:2
114:9
120:18

**timeline**
7:11

**timelines**
8:19

**times** 13:2,
10 24:6,8
54:7,24
64:12
83:25

**timing** 39:17

**tired** 114:8
118:15

**tissue** 41:1

**title** 10:16,
18 13:7
14:18,22,
23 29:8
30:4 32:22
93:5,7,8,
9,14,16,18
96:23
97:23

**today** 6:21
7:5 30:11
35:15

**told** 15:15
68:5 77:25

94:15
98:7,10
119:15

**tool** 21:13

**top** 13:21
39:1 51:3,
4 67:12,14
80:4 96:1
104:2
105:19

**topic** 113:2

**topics** 68:14

**touch** 57:25

**track** 68:7

**tradition**
52:3

**traditionally**
53:25

**training**
20:10 22:2

**transcript**
6:20
121:18

**transfer**
52:4,6
62:10
68:16
75:22 76:3

**transferable**
72:22

**transferred**
52:14 56:3

**transferring**

52:1 56:7

**transition**
19:10
30:10,12
32:1

**transitioned**
15:11

**transitions**
30:4,14,15
31:13
33:6,8,9,
10 95:9,19
96:4

**translatable**
21:7

**travel** 23:1
83:20
86:5,6

**traveling**
86:7

**tremendously**
21:6

**trial** 6:14
57:18

**tricky**
100:23

**trouble** 48:9
52:20

**true** 54:13
77:23
105:22

**trust** 18:15
77:25
78:3,6

**truth** 5:6,7

**tuition**
49:21,22

**turn** 108:24
118:3
120:17

**turnover**
81:5,9

**type** 105:14

**types** 55:10
121:16

**typically**
13:3 17:16
42:13 60:1
70:12,15,
20 71:3
115:20

---
**U**
---

**Uh-huh** 7:13
11:5 26:1,
3 29:5,13,
15,21 31:9
33:3 36:5
40:1 43:13
44:15
57:14 58:1
61:6 66:9,
16 69:17
73:5 79:4
80:11,18
83:8 89:6
91:19 93:8
97:24 98:3
99:23

102:8
105:3
109:6,10
113:20
118:13
119:16,22

**uh-uh** 29:18
39:14
81:14

**unaware**
92:19

**understand**
18:16 62:3
67:2,20
87:6 90:4
111:9

**understanding**
18:12
19:13
31:19
38:16 39:2
41:24
51:13 63:1
69:23
87:12
89:17

**unfilled**
85:21

**unique**
27:12,25

**United** 5:16

**units** 84:8

**university**
5:13,15
13:5 14:7

16:7 19:11
21:3 26:18
27:4 30:4,
15 31:12
32:1 43:25
44:10 45:6
61:19,24
67:14
68:16
70:24 71:4
73:6,7,10
75:3 77:2,
4,10,17
81:5 106:4
107:11

**unwritten**
115:6

**updates** 71:3

**upset** 68:7

**USG** 12:3,11
14:9,11,
13,15 44:5
62:16,20,
25 63:2,8,
11,16,23
66:22
69:15
70:20
72:22
74:23,24
112:21
115:7

**USG/VSU**
115:15

**utility**
21:16

**utilize**
20:20

**Utilizing**
65:9

_____

V

_____

**vacation**
36:11

**Valdosta**
5:14,18
10:8 65:23
74:7,10,11
75:3

**Valley** 16:7
26:25
61:25 77:4

**Valwood**
74:8,9,12,
17 75:8,
11,13

**verbal** 55:17
56:10
57:6,7
62:4

**verbalize**
46:2

**verbally**
60:14

**verbatim**
56:24

**verbiage**
117:19

**versus** 5:12
47:11 50:6

51:15,20,
24 52:15
60:16
61:18
62:10
65:22
74:24 76:3
88:12,13
103:11

**vice** 10:18
29:1,3

**vigor** 50:12
51:13,17,
18,20
52:21
74:21
75:20 78:9

**vigorous**
64:2

**virtually**
13:18,22

**vision** 27:21
79:15

**visit** 27:19
82:19

**vocalize**
6:18

**voiced** 103:2

**VP** 11:15,19
20:15
28:23 90:4

**VPS** 85:15

**VSU** 11:18
12:6 15:23

18:7,20
19:8,25
20:14 21:2
22:20,25
23:1,4,21
25:6 26:17
27:6 28:14
34:20
38:19
40:15
41:18
43:19,23
45:3
51:14,19
52:15,21
55:11 56:5
57:13
60:17 73:9
75:19
92:16
112:24
115:7
116:11

**vulgar**
  120:22,25

──────────
      **W**
──────────

**wait** 96:3

**waiting**
  120:15

**waive** 6:21
  121:22
  122:4,5

**waived** 122:3

**waiving**

121:14

**walk** 22:4

**Walker** 65:5

**wanted** 20:7
  27:5,8
  35:10
  62:20 72:7
  75:11
  98:12
  110:1
  118:22

**wanting**
  105:12

**warmer** 27:9

**ways** 71:6
  79:7
  102:23

**website**
  41:18

**week** 103:5
  116:7

**Wenham**
  14:12,17

**West** 15:16,
  18 71:19

**whatsoever**
  59:25

**wife** 9:16

**wife's** 10:6
  22:16

**Wilbanks**
  17:4 25:22

**Willis** 80:10

**Wiregrass**
  16:12,15,
  16,17
  25:24
  52:15
  55:7,19
  56:4,7
  60:12
  74:18 75:4

**Wiregrass/gmc**
  60:16

**withdraw**
  43:16

**women's**
  22:16

**wondered**
  61:16
  103:12

**wondering**
  36:8

**words** 57:3

**work** 11:24
  15:4 17:19
  18:14
  20:8,10
  22:12,22
  32:2,6
  35:13 63:6
  73:9 76:16
  77:3 85:6

**work-related**
  36:17,19

**worked** 21:6

67:10 77:2
  80:15
  85:17
  111:7

**working** 14:2
  37:19 68:3
  87:8 92:16

**works** 65:5

**world** 81:8

**worried**
  34:12

**worry** 114:15

**wound** 41:6

**Wow** 60:24

**write** 116:20

**write-up**
  116:17

**writer** 17:22

**writer's**
  64:10

**writing** 61:5

**written**
  106:12
  115:6
  116:24
  118:10
  119:7,9,14

**wrong** 66:7
  117:4

──────────
      **Y**
──────────

**y'all** 25:6

92:9

**year** 8:19
13:2,10
21:5 24:4,
5,6,8
31:17
53:19,20,
21 67:18
69:21
84:12

**years** 13:23
21:2,15
56:2 58:8
59:24 61:3
76:16
77:19 98:4

**youngest**
9:22

**youth** 22:17

_____

Z

_____

**Zelle** 49:16,
18,19,21,
23 50:3,5

**Zoom** 9:12
35:25