IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION


CASE NO.:  7:21CV62 (WLS)



JAMIE T. BIRD,

                Plaintiff,

vs.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA
d/b/a VALDOSTA STATE UNIVERSITY,

                Defendant.
_____/


DEPOSITION OF

JEANNINE BODDIE-LAVAN


Friday, January 21, 2022
1:08 p.m. - 4:05 p.m.



Valdosta State University
1500 North Patterson Street
Valdosta, Georgia 31698


Stenographically reported by:
KAIRISA J. MAGEE, RPR, GCCR (Georgia), FLORIDA
NOTARY



Job No. : 378318

APPEARANCES:


On behalf of Plaintiff:

        LAWSON, BECK, & SANDLIN, LLC
        1125 Commerce Drive
        Suite 300
        Peachtree City, Georgia 30269
        (770) 486-8949
        BY:  HOLLY MAESTAS, ESQ.
        holly@lawsonandbeck.com


On behalf of Defendant:

        BROWN, READDICK, BUMGARTNER, CARTER,
        STRICKLAND & WATKINS
        5 Glynn Avenue
        Brunswick, GA 31520
        (912) 264-8544
        BY:  G. TODD CARTER, ESQ.
        tcarter@brbcsw.com
        and
        VALDOSTA STATE UNIVERSITY
        OFFICE OF LEGAL AFFAIRS
        1500 N Patterson Street
        Valdosta, GA 31698
        (229) 333-5351
        BY:  JUSTIN ARRINGTON, ESQ.
        juarrington@valdosta.edu


ALSO PRESENT:  Ms. Jamie T. Bird, Plaintiff

I N D E X

Proceedings                                              Page

The Testimony of Ms. Jeanine Boddie-LaVan:

Direct Examination By Ms. Maestas                          5


                        E X H I B I T S

No.                                                     Page

Plaintiff's Marked Exhibits

3            6/2016, Select Task Force on the          16
             Study of Harassment in the
             Workplace

4            Enforcement Guidance:  Vicarious          19
             Liability for Unlawful Harassment
             by Supervisors

5            VSU's Anti-Harassment policy              20

7            University System of Georgia              25
             Reduction in Force FAQ's

46           8/24/2020, Letter from Ms.                27
             Boddie-LaVan to VSU Office of Legal
             Affairs and documentation,
             "Subject:  VSU Response to Jamie
             Bird Application for Discretionary
             Review"

43           3/5/2019, Memo to File from Tee           38
             Mitchell to Jamie Bird

34           10/5/2020, Email from Janice Lyn to       55
             Jeanine Y Boddie-La Van, Subject:
             "for feedback please"

E X H I B I T S

Continued

No.                                                      Page

37      10/12/2020, Email from Janice Lyn       60
        to Jeanine Y Boddie-La Van,
        Subject:  please refer to letter L
        in document

36      10/6/2020, Email from Jeanine Y         67
        Boddie-La Van to Janice Lyn,
        Subject: Re: Attachments

40a     11/5/2020, Email from Jeanine Y         75
        Boddie-La Van to John D Crawford,
        Subject:  FW:  Jaime Bird

9       VSU website printout "Data and          83
        Reports"

10      VSU printout "Fall 2020 First-Time,     83
        Full-Time Freshman, Retention Rates

14      Position listing chart                  84

13      Position listing chart #2               88

12      Position listing chart #3               89

41      2/26/2019, Email from Ms. Jamie T.      90
        Bird

42      2/27/2019, Email chain from Jamie       97
        T. Bird to Sarah E Bessenger

47      11/16/2021, ABAC documents             111

49      Valdosta job posting                   118


Certificate of Oath                            129
Certificate of Reporter                        130
Errata Sheet                                   131

Proceedings began at 1:08 p.m.:

THE COURT REPORTER:  When you're ready, will you raise your right hand, please?

Do you solemnly swear or affirm that the testimony you are about to give in this cause will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURT REPORTER:  Thank you.

Thereupon:

JEANINE BODDIE-LAVAN,

a witness named in the notice heretofore filed, being of lawful age and having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MS. MAESTAS:

Q   Good afternoon.  My name is Holly Maestas, and I represent Jamie T. Bird.  This is the matter of Jamie T. Bird versus Board of Regents of the University System of Georgia, doing business as Valdosta State University.  Civil Action File No. 721CV62 pending in the United States District Court for the Middle District of Georgia, Valdosta Division.

If you could state your name for the

record.

A   Jeanine Boddie-LaVan.

Q   Okay.  And this -- and are you known by any other names?

A   Jeanine Boddie.

Q   Okay.  And your address?

A   3925 North Oak Street Extension, Apartment H816, Valdosta, Georgia 31605.

Q   Okay.

MS. MAESTAS:  And this deposition is being taken pursuant to notice and agreement of counsel.  This is a deposition of a non-party employee of the defendant.

Objections except to the form of the question and responsiveness of the answer will be reserved until the time of trial or the time of hearing.

BY MS. MAESTAS:

Q   This deposition is being taken stenographically by a court reporter.  Please vocalize all your responses and avoid gestures, which cannot be recorded.

You have a right to read a copy of your deposition transcript and then sign it after reading it, or you may waive that right today.  Please so

indicate your choice to the court reporter before you leave today.

Have you ever had your deposition taken before?

A    Yes, once.

Q    Once?

A    Uh-huh.

Q    Okay.  And then you're wearing a mask; so just make sure you speak up a little bit, too.

A    Nobody has ever asked me to speak up because my voice is so loud.  I'm liking that.

Q    Okay.  Very good.

A    I will speak up.

Q    Glad I could help you out with that.

All right.  So you had your deposition taken once before?

A    Uh-huh.

Q    And what was that for?

A    An employer I worked for.  They tried to take the company and we were doing worker's compensation.  It was a lawsuit about that.

Q    Okay.  So you were representing your --

A    Employer.

Q    -- employer --

A    Uh-huh.

Q    -- as a witness to that lawsuit and on the defense side?

A    Uh-huh.

Q    Okay.  And have you ever been a party to a lawsuit?

A    No.

Q    And did you do anything to prepare for your deposition today?

A    To prepare for it?

Q    Uh-huh.

So did you just come in here and not review anything?  Did you review any legal authorities?  Did you have any meetings?  Did you review any documents?  Did you provide any documents to your -- to counsel of record?

A    I reviewed back the system-level response that I gave.

Q    Okay. Okay.  And I do have that --

A    Uh-huh.

Q    -- today.

And any other documents?

A    No.

Q    Okay.  And do you keep a file related to this lawsuit?

A    On the computer -- a file -- a

system-level.  Yeah.  So -- so the system-level information that was given, I keep all of that. That's on my computer.

Q    Okay.  And have you provided that to Mr. Carter in discovery?

A    Yes.

Q    Okay.

All right.  Are you on any medications or drugs that would affect your memory or ability to participate in a deposition?

A    No.

Q    And do you have any relatives in Georgia?

A    Yes.

Q    Okay.  About how many?

A    Six -- five.

Q    Okay.  That's a short enough list to go through.  Some are -- like, I have --

A    They all came with me, that's why.

Q    Okay.  And I don't want to know names of minor children, but anybody who's going to be of age to be a potential witness or juror, I would need to know about.  So if you could just tell me who they are.

A    My husband, Devan LaVan; my mom, Volly Boddie; my sister, Jeanine Long; my -- how old do

you have to be to do the jury thing?

Q    I think 18.

A    My 20-year-old, he just turned 20, Jase LaVan, and my nephew, but he's underage.

Q    Okay.  How old is he?

A    Just -- he's turning 12 this week.

Q    Okay.

All right.  And did you have any meetings related to this lawsuit?

A    No.

Q    What about related to your deposition today?

A    No.

Q    Okay.  I mean, you met with Mr. Carter briefly or not even --

A    Just now.

Q    Okay.

A    Like --

Q    Okay.  Few minutes ago.  That was a long meeting.  Okay.  Just kidding.

All right.  So went over your name.

And your current title at VSU -- or sorry.  Your current position of employment, the title of it?

A    Chief human resource officer.

Q    At VSU?

A    At VSU.

Q    And do you have any other positions of employment?

A    No.

Q    Okay.  What about any other involvement such as, like, committees, sports, grounds crew, anything besides being chief legal officer?

A    No.  I'm chief human resource officer.

Q    Sorry.  I'm going to write that down. So --

A    That's his job.

Q    -- I've been walking by the sign every morning as we get here.  So -- okay.  Chief human ...

A    Resource officer.

Q    So this is our 7th deposition over three days.  So I am trying to keep everything correct, keep everything straight.

A    Okay.  Sure.

Q    What about other USG affiliations, Board of Regents -- when I say "USG," University System of Georgia -- other than your position of employment?

A    No.

Q    Okay.  So some people say I -- you know, I

run the such-and-such summit every spring, and I --

    A    (Shaking head.)

    Q    Okay.  What about affiliations with the technical colleges?

    A    No.

    Q    Okay.  And what about socially?  Do you -- are you a member of any clubs?  Organizations? Political groups?  Churches?

    Do you go to a bar every day or restaurant every day with a group?  Anything like that where I could see where you're spending a lot of your time?

    A    No.

    Q    Okay.

    A    So no, I don't drink.  So don't go to any bars.  Restaurants, I mean, I don't go anywhere every day to a restaurant.  So --

    Q    Yeah.  I don't mean, like, every day, but, like, with any type of recurrence.  Like, some people say, oh, I meet with, you know, Dr. Carr at the tailgate, you know, every time there's a game, a home game.

    A    No.

    Now, I am on cabinet, and so, therefore -- that just happened.  And I am on cabinet; so I do go to the football games, the home ones.

Q    Okay.  And who goes to the -- is it the cabinet?

A    It's a bunch of people.  Like, there's --

Q    Okay.

A    -- lots of people.

Q    And did -- did you discuss this lawsuit or this deposition at any of those --

A    No.

Q    -- occasions?

All right.  And then we said -- you said you didn't drink; so you don't go to any bars.  And then what about, like, a group from work that goes to restaurants?

A    No.

Q    All right.  And then, like, churches or anything like that, kids sports leagues?

A    I do have a church.

Q    Okay.  And any VSU people go to church there?

A    Yes.

Q    Okay.  Anybody that you regularly talk to at church?

A    No.

Q    Okay.  And who are those -- how many people go to the church that are --

A    Thousands.

Q    Thousands?  Okay.  So --

A    Yes.

Q    -- thank you for giving me the ballpark before I start cutting the grass.

Okay.  So I think I've covered all that.

A    I'm also on a board, Partnership Health Center; and so I'm on a board with them.

Q    Partnership Health Center?

A    Uh-huh.

Q    Okay.  Is that a private organization?

A    Yes.

Q    Okay.  And that -- and it's in Valdosta?

A    Yes.

Q    What do they do?

A    They care for people who don't have insurance, and so it's a medical -- like a doctor's office basically.

Q    Okay.  Any VSU people on that -- in that organization with you?

A    There's one person on the board with me on that, and he is LaGary Carter.  He is the Associate Dean of the College of Nursing.

Q    Have you --

THE COURT REPORTER:  I'm sorry.  Could you

say the name?

THE WITNESS:  LaGary Carter.

BY MS. MAESTAS:

Q    And did you and Mr. LaGary Carter ever talk about this lawsuit?

A    No.

Q    All right.  Your highest level of education and the degree?

A    Master's.

Q    In?

A    Human resources.

Q    Okay.  Okay.

And in studying HR to get your Master's, were you -- did you study EEOC laws and Title IX laws?

A    Yes.

Q    Do you feel that you're familiar with them?

A    Yes.

Q    All right.  I'd like to turn your attention to Exhibit 3.  And there are notebooks in front of you with tabs, and they're labeled according to -- the tabs correspond with their exhibit number.

(Marked for identification is Plaintiff's Exhibit 3)

A    Okay.

BY MS. MAESTAS:

Q    Okay.  And if you could flip to, let's see, Page 6 of 133.

And this is a document that I pulled from the EEOC website, which is the Equal Employment Opportunity Commission for the United States government.  And there's a section that's called, on Page 6:  "Workplace Harassment Too Often Goes Unreported".

Are you familiar with that?

A    This statement?

Q    Yeah.  The -- what it -- what it's talking about, that workplace harassment often goes unreported.  Are you familiar with that?

A    When you say familiar?

Q    Like, have you ever heard of that in your studies of --

A    No.

Q    Okay.  So you've never heard that they fear retaliation and will frequently not report due to that fear?

A    Not in my studies, no.

Q    Okay.  So your HR studies, you have not come across this?

A    Are you talking about me in school, or are you talking about me --

Q    Like, are you -- do you know about it? Have you ever heard of this?  Do you know about people not wanting to report harassment --

A    People not wanting to report, yes.

Q    -- because of retaliation?

A    Yes.

Q    And are you aware that it's common?

A    I'm aware that it occurs.

Q    But you do not believe that it's common?

A    No.  I didn't say that.  I said I'm not aware that it -- I'm aware that it occurs.  It's not about whether it's -- I believe that it's common.  I do know that it does occur, but I don't know how often it occurs or the frequency.

Q    Okay.  And, again, I'm not asking for, like, statistical analysis.

A    Okay.

Q    I'm not asking for, like, what number of people in the United States did not report harassment.  Like, I'm not -- I'm asking you:  Are you aware of this concept?

A    I am aware of the concept.

Q    Okay.  And that the least common response to harassment is to take some formal action, either to report the harassment internally or to file a formal legal complaint.

Have you ever heard of that?

A    Yes.

Q    Okay.

A    You said the least common -- and that's -- I think that's where I'm being held up because I don't know -- I've never heard that that's the least common.  Do I know that that kind of thing does occur?  Absolutely.  I do know that.

Q    Okay.

A    But whether it's the least common thing, I don't -- I don't know that I know that.

Q    Okay.  What about have you ever heard in the context of workplace harassment that they would -- the person would want to -- the person who's being harassed would want to avoid the harasser or deny or downplay the gravity of the situation?

A    Yes.  I have heard that before.

Q    Or even endure the behavior?

A    That, I haven't heard of.

Q    Okay.  What about the failure to report, that being a common response?

A    Yes.  I have heard that before.

Q    Okay.

(Marked for identification is Plaintiff's Exhibit 4)

BY MS. MAESTAS:

Q    Okay.  If you could turn to Exhibit 4.

And this is a -- another printout from the Equal Employment Opportunity Commission website regarding Vicarious Liability of Employers from harassment from supervisors, and if you could turn to Page 5 of 43.

A    Okay.

Q    And I'm going to read this, and then I'm going to ask you a question about it.

A    Okay.

Q    Well, I don't know if it's about it, but I'm going to read it, and then I'm going to ask you a question, and then you can make your own answer.

A    Okay.

Q    "The conduct must be so objectively offensive as to alter the conditions of the victim's employment.  The conditions of employment are altered only if the harassment culminated in a

tangible employment action or was sufficiently

severe or pervasive to create a hostile work

environment."

So I want to ask you a question:  If you

are terminated from your employment, does that

constitute a tangible employment action?

MR. CARTER:  Let me object --

A    Yes.

MR. CARTER:  Let me object to the extent

this calls for a legal conclusion.

You can talk about what you understand.

THE WITNESS:  Okay.

BY MS. MAESTAS:

Q    Okay.  What was the answer?

A    Yes.

Q    Okay.  Okay.

MS. MAESTAS:  5, Plaintiff's Exhibit 5.

(Marked for identification is Plaintiff's

Exhibit 5)

BY MS. MAESTAS:

Q    And do you recognize this document?

A    Yes.

Q    What is it?

A    It's our anti-harassment policy.

Q    For?

A    For Valdosta State University.  I'm sorry.

Q    Okay.  No, it's okay.

And so I'm going to read a section which is the definitions of sexual harassment and then -- sorry.  I'm going to read a part of it which is examples of sexual harassment.

A    Uh-huh.

Q    No. 4:  "A pattern of conduct, which can be subtle in nature that has sexual overtones as in -- and is intended to create or has the effect of creating discomfort and/or that humiliates another."

Are you familiar with that example of sexual harassment?

A    I have read it, yes.

Q    Okay.  And you're aware of this?

A    Yes.  Uh-huh.

Q    Okay.  How did you come to VSU?  How did you get recruited --

A    I didn't.

Q    -- learn about the job, or --

A    I didn't get recruited.  I was actually looking for a position and stumbled upon this one. I did not even know Valdosta existed, and so I never heard of it before in my life.  And so I applied for the position, and they seemed to like me.

Q      Okay.

A      So, yeah, got the offer.  I turned it down a few times and --

Q      Really?

A      Yeah.

Q      Well, wow.  I mean, I'm not surprised that you got the offer because I can see you've got -- you have a likeable personality, but so you turned it down a couple times?

A      Uh-huh.

Q      Wow.  Okay.  And I got -- can you tell me why?  I mean, or was that private information?

A      I don't think it's private information. My husband was also looking for employment here, and he could not find it immediately.

Q      Oh, okay.

A      And so -- yeah.  So we could not leave, you know, and just let him get rid of his job, so ...

Q      Okay.  And where does he work?

A      Right now he's between jobs.

Q      Okay.  So where was he working?

A      So he just left his other job December 29th.  He doesn't start his next -- his new one until next week.

Q   And is that in Valdosta area?

A   Uh-huh.

Q   All right.  And what does he do?

A   He's a truck driver.

Q   Okay.  And does he do anything related to VSU?

A   No.

Q   Or USG?

A   No.

Q   Technical colleges?

A   No.

Q   Okay.  And when did you first start at VSU?

A   July 1st, 2018.

Q   Why was Jamie Bird terminated?

A   She was a part of a reduction in force.

Q   Okay.  What all factors were considered in deciding that Jamie was going to be a part of that reduction in force?

A   So HR is not a part of the actual -- like, we get to review the paperwork, of course, but we do not -- we're not a part of that decision.  We actually -- my employee relations person worked with the cabinet members as they were making the decisions, and so I was not a part of that

conversation.

Q    And who's the employee relations person?

A    It was Michelle Jordan.

Q    Okay.  Okay.

So you didn't make any decisions regarding the RIF?

A    No.  HR does not make the decisions regarding the RIF.

Q    Okay.  And Michelle Jordan, she just communicated what that decision was going to be?

A    No.  I read the paperwork, and I sign off on it and make sure that the rationale makes sense. And so -- so I did see it and made sure, but I was not -- HR is not a part of the decisions on -- in that regard.

Q    Okay.  And so what was the rationale that you reviewed?

A    I don't remember it verbatim; so ...

Q    Okay.  And so I'm not asking anything to be verbatim.  So if I ask you something, I don't want you to, you know, give me your recorder of that day.  I want you to tell me what you recall.

A    Okay.  So it -- I think it was more about the fact that there were some positions that -- the position that Jamie had was making a certain amount

of money.  So only supporting 200 to 300 students, there were other -- it was a cost savings kind of thing in regard to the other people, other recruiter -- other recruiters who could be doing the same kind of thing for the same -- for less monies. And so it was a cost savings.

Q    Anything else?

A    No.

Q    Okay.  If you could turn to 7.

(Marked for identification is Plaintiff's Exhibit 7)

BY MS. MAESTAS:

Q    This is a University System of Georgia's Reduction in Force frequently asked questions, and I highlighted a couple things that jump out to me.

This includes different things that can be considered.  And so what I'm reading on here, documented performance, performance evaluations, disciplinary action, personal conduct, length of service, of those things that I've read, do you recall any of those things coming into play in Jamie's RIF?

A    So lack -- lack of funding.  Did you -- did you mention that one?

The one you have highlighted are the ones

I'm looking at?

Q   Well, you already said about the cost --

A   The cost savings, yes.

Q   -- savings.  I think that's the same --

A   So yes.

Q   -- as funding.

A   So of the things that you have highlighted, nothing else comes into play.  It was just a lack of fund -- it was the cost savings.

Q   Okay.  And did you -- did you meet with anybody regarding the RIF of Jamie?

A   No.  Michelle Jordan did.

Q   Just Michelle?

A   Uh-huh.

Q   And she met with Jamie?

A   She met with Jamie, yes.

Q   Okay.  And so -- and you just reviewed paperwork?

A   Yeah.  I talked to Michelle 'cause she reported back out to me about all the RIFs as she met with the different VPs.

Q   Uh-huh.

A   And so she reported out to me, and then I signed off on the paperwork.

Q   Did you ever meet with Dr. Carr?

A    No.

Q    Okay.  46, which is right here.

(Marked for identification is Plaintiff's
Exhibit 46)

BY MS. MAESTAS:

Q    Okay.  And this is -- I've labeled this
Plaintiff's Exhibit 46, and do you recognize this
document?

A    Yes.

Q    Okay.  And what is it?

A    It's my system-level response.

Q    Okay.  And what -- what was it a response
to?

A    To Jamie's application for discretionary
review.

Q    Okay.  And who asked you to write it?

A    Justin.

Q    Okay.  So can you tell me how that -- how
that occurred?

So there's email.  There's in person.
There's text message.  So Justin has a need and he
goes to you.  How does that happen?

A    So typically Justin will call me and say,
hey, we received this or the system office received
this request for a discretionary review.  I need the

information to kind of explain, you know, what occurred.

Q    Okay.

A    So ...

Q    And -- and so this is dated August 24th, 2020.

A    Uh-huh.

Q    And I'm looking at the findings from the review.  I see that:  "Dr. Carr's behavior of not meeting with women behind a closed door has been previously established by HR in writing."

Can -- so how do you know -- how do you know that when you wrote that?

A    We had finished an investigation with someone else, and that just happened to be something that was discussed in that -- in the investigation.

Q    Okay.  You had an investigation with someone else.  Who was that?

A    That was Sonja Wright Smith.

Q    Sandra?

A    Sonja.

Q    Sonja?

A    Uh-huh.

Q    S-o-n-j-a?

A    Uh-huh.

Q   Wright?

A   Uh-huh.

Q   W-r --

A   -i-g-h-t.

Q   Smith.

A   It is Smith; right?  Uh-huh.

Q   Okay.  I have not heard that name before so if you could tell me about that.

A   Tell me -- tell you?

Q   Yeah.  Tell me about this investigation that Sonja Wright Smith did.

A   She filed a complaint against Rodney Carr in regards to discrimination based on race.

Q   Okay.  Oh, okay.  So you're talking about another complainant?

A   Yes.

Q   Okay.  Got you.  I thought you were talking about an investigator.

A   No.

Q   Okay.  Okay.

So Rodney Carr -- what was the allegation that she made?

A   That he discriminated against her based on race.

Q   Okay.  Was it a termination?  Was it,

like, a reprimand?  Was it ...

A    She ended up resigning, but it was -- it was a reprimand that was given to her in a performance improvement plan and all of those things, so ...

Q    Okay.  And who did that investigation?

A    I did.

Q    Okay.  And what did you find?  Did you find that she was correct or --

A    There was not enough information to say that she was correct.

Q    Okay.  Other than Jamie Bird and Sonja Wright Smith, what -- had you done any other investigations?

A    No.

Q    Okay.  And so what brought this information out was the question of:  "Dr. Carr's behavior of not meeting with women behind a closed door has been previously established by HR in writing."

And you said you got that from the investigation of Sonja Wright Smith.

A    Uh-huh.

Q    How did -- like, how did you learn that from that investigation?  Like, who told you that?

A    All of his direct reports.  All of his --
so when we were going through the investigation, one
of the things that she had alleged was that he
wouldn't meet with her, and she was saying that it
was because she was African American or whatever.
So we found out that -- or he wouldn't meet with her
alone.  That's what it was.

And so we found out that he did not meet
with any women alone.  As a matter of fact, his
administrative person was in every meeting with him
to the -- yeah.

Q    Do -- do you have any personal knowledge
of how Dr. Carr does his meetings, like, any type of
meeting where he has to talk to one employee?  Do
you have personal knowledge of it?

A    No.

Q    Has he ever met with you one on one?

A    Yes.

Q    Has somebody else been in the room?

A    Typically, yes.

Q    Okay.  So your own personal experience --

A    Somebody --

Q    -- with meeting with Carr.

A    Uh-huh.

Q    But other than that, you don't know --

like, you haven't gone to other meetings with him, so this is -- your information is just through investigating others, and so hearsay from others, what others have said?

A    Correct.  The other -- yes, the other people who report to him directly, yes.

Q    Okay.  And it says you got it in writing.

A    Uh-huh.

Q    So they told you?  They wrote it down? Like, how is it in writing?

A    They -- they wrote it down and we -- so when we requested the information, Michelle was able to get -- you know, some people reported it back in writing from the questions we asked them.

Q    So, like, a statement?

A    Not a statement but just, like, whatever the questions were, they answered the question.  And so they said that, yes.

Q    Okay.  Do you still have that documentation?

A    I don't know.

Q    Okay.

A    But I have what I wrote in the report.

Q    For Sonja Wright Smith?

A    Yes.

Q    Okay.

A    And it should be -- the blurb of it should be in here.  It was in here somewhere.

Q    Okay.

A    Uh-huh.

Q    Okay.  So the next bullet point, it talks about -- or it's -- let's go back to the top one.  The February 19th, 2019, interaction with Jamie Bird is different from Ms. Bird's account.

Sorry.  "Dr. Carr's recollection of the February 19th, 2019, interaction with Jamie Bird is different from Ms. Bird's account."

Where did you get that?

A    I got that from his information that he provided, and then Jamie's that she provided.

Q    Was that a Title IX investigation, or was that someone else interviewing Dr. Carr for you to get that?

A    No.  That was the system-level response.

So for the system-level response, I had Jamie's document where she said -- she detailed what happened.  For Dr. Carr, when I was getting the system-level response, I called him in, and Michelle and I spoke to him.

Q    Okay.  So it was a phone call to Dr. Carr

about --

A   No.  We called him in.

Q   Okay.  You had a meeting with him?

A   Yes.

Q   Okay.  I thought you didn't have any meetings with him for some reason.

Okay.  So you met with Dr. Carr.

A   I thought you asked me earlier did I meet with him about the RIF, and I said no.

Q   Okay.

A   That's different than this.

Q   Than this.  Okay.

A   Yes.

Q   Okay.  So you called him in, and then you came up with this bullet point?

A   When I compared the two versions of the stories, yes, I came up with that bullet point.

Q   Okay.  And did you meet with Jamie?

A   No.  I had her information from the statement that she provided.

Q   Okay.

All right.  And then the next point:  "In regard to Ms. Bird's reprimand, Mr. Mitchell and Dr. Carr followed the guidance given to them by the Office of Human Resource."

How did -- how did you get that?

A    Tell me where you are.

MR. CARTER:  Right here.

A    Oh.  Yes, because I gave the guidance on what to -- whether or not it should be a written reprimand or something else.  And so ...

BY MS. MAESTAS:

Q    Okay.  And what was Jamie trying to overturn in her application for discretionary review?

A    It was sent after the RIF, so ...

Q    Okay.  So she was terminated for the RIF. She did the application for discretionary review of the RIF, and then -- then you write this?

A    Yes.

Q    Okay.  Okay.  I just want to make sure I got it right.

So -- all right.  So the -- there's a couple of points, and it says:  "At no time did either party discuss the February 2019 interaction or provide that interaction as a basis for the reprimand.  We have confirmed that Mitchell did not forward or share any of Ms. Bird's concerns to the Office of Human Resources.  And they've never received a formal or informal complaint from

Ms. Bird or Mr. Mitchell regarding the prohibited behavior."

So that's -- the way I see that is that's three statements that she did not report it -- did not report this February 2019 interaction.

A    Uh-huh.

Q    Isn't that failure to report sexual harassment that we were talking about under the EEOC?

A    I don't know if it's failure to report.  I know that she -- it wasn't reported.

Q    Okay.  And then on Page 2 there's another discussion.  It says:

"Prior to meeting with Ms. Bird on March 7th, 2019, both Mr. Mitchell and Dr. Carr were fully aware of the written reprimand Ms. Bird signed contained the statement.  A copy of this memorandum will be placed in Ms. Bird's permanent personnel file in Human Resources."

So I think what you're saying there is you looked at the written reprimand and then you saw in there that a copy would be placed in the HR file.  Is that what you're saying?

A    Yes.  And I think at that point it had -- yeah.  She had already signed it.

Q    And so you reviewed the written reprimand when you wrote that?

A    I actually -- yeah.  So I drafted the written reprimand.

Q    You're the one that drafted it?

A    Yeah.  Along with Tee Mitchell, yes.

Q    Okay.  I did not know that.  That's the first time I've heard that.

Okay.  So you reviewed the document that you and Tee Mitchell drafted when you wrote that bullet point?

You're quoting it.

A    Right.  So --

Q    We can look -- I have the document; so I --

A    Prior -- prior to meeting with Ms. Bird on March -- on March 7th, both Mr. Mitchell and Dr. Carr -- so all that's saying is that they were fully aware.  And that's just -- it's speaking to the fact that one of the things that Jamie mentioned was that Dr. Carr had said that it wasn't going to go into the file.

Q    Uh-huh.

A    But it says in the -- it says in the reprimand that it was going to -- it was going to be

placed in the file.

Q Okay. I want to come back to this in a minute, but 43 is the reprimand.

A Okay.

Q Since we're talking about it, we might as well look at it.

(Marked for identification is Plaintiff's Exhibit 43)

BY MS. MAESTAS:

Q So when you wrote that bullet point that says: "Prior to meeting with Ms. Bird on March 7th, 2019, both Mr. Mitchell and Dr. Carr were fully aware that the written reprimand Ms. Bird signed contained the statement. A copy of this memorandum will be placed in Ms. Bird's permanent personnel file in Human Resources" --

A Uh-huh.

Q -- you're referencing what I've marked as Plaintiff's Exhibit 43?

A Correct.

Q Okay. And you're stating that you wrote this and Tee Mitchell helped you?

A Yes.

Q Okay. And I want to talk more about that, but I just wanted to kind of make sure we got the

right document when we're in here.

And then the next bullet point is referring to the same thing but a different quote inside of -- sorry. We're back to 46.

MR. CARTER: 46?

MS. MAESTAS: Yeah.

MR. CARTER: You're on Page 2?

Yeah. This next statement, "Prior to meeting"?

MS. MAESTAS: Yeah.

BY MS. MAESTAS:

Q "Prior to meeting," and then you have a quote: "This incident will be noted on Ms. Bird's performance evaluation for this cycle and rated accordingly."

That's a direct quote from --

A Yes.

Q -- Plaintiff's Exhibit 43; correct?

A Yes.

Q Did you ever review any CVIOG reports from 2019 related to admissions for dual enrollment?

A Yes.

Q Okay. What did it say? I mean, what do you remember from it?

Like, I don't mean, like, read me the

report from your photographic memory, but like, do you remember anything about it?

A    There's nothing that stands out about it from anybody.  I mean, we've dealt with over a thousand employees.  There's nothing about that one that was any different --

Q    Okay.  Okay.  I just wanted to make sure.

And do you remember what Jamie -- do you remember that Jamie Bird filed a Title IX complaint?

A    Yes.

Q    Okay.  And do you remember what the allegation was?

A    Uh-huh.

Q    Okay.  Can you tell me what you remember?

A    Discrimination or harassment based on gender -- based on sex.

Q    Okay.  And do you remember anything else?

I mean, I have the documents, but I want -- I want to get your -- your recollection in your own words, and then I'm going to go into the documents.

A    Besides -- besides the fact that she filed one, that's --

Q    That's all you can recall now?

A    Yes.  Without referencing something else.

Q   Fair enough.

Do you remember what became of it?  Was it substantiated?  Was it dismissed?  Did it go to hearing?

A   It was dismissed and -- well, found that there wasn't enough information to conclude that the things that she alleged had -- had occurred, and then I think it was appealed.

Q   Okay.  Did you play a part in her Title IX process?

A   Play a part?

Q   Yeah.  Like, what did -- what did you do with it?  Like, did you do anything?

A   So Maggie Viverette, who was the director of social equity at the time, she had left the University.  And so on -- a consultant was hired to -- to work in her stead to take the Title IX cases and serve as the Title IX coordinator.

I became the liaison between her and legal, her and the system office in regard to getting her information that she needed to tell her, okay, you have a case.  Okay.  Here, here is Maxient, the platform that we use.  So any support that I could give in regard to resources and tools, I became that person.

THE COURT REPORTER:  Can you say the name of that system?  You said Max?

THE WITNESS:  Maxient, M-a-x-i-e-n-t.

THE COURT REPORTER:  Is it all capped?

THE WITNESS:  No.

BY MS. MAESTAS:

Q    And I missed that.  So what is that?  Maxient?

A    Yes.

Q    What is it?

A    It's just a tool that we utilize to put in Title IX cases and things like that so students can just go ahead and put it in, but I don't believe Jamie put hers in Maxient.  I think hers went directly to the Office of Social Equity.

Q    Okay.  And is Maxient -- is that a program specific to USG, or is that, like --

A    No.

Q    -- it's, like, a -- is it a private software?

A    I don't know.

Q    You don't know.

A    I'm not the technology.

Q    Is it -- like, is it a software program designed to handle Title IX case files?

A    It's case -- it handles student conduct. So it does student conduct.  It does Title IX.  It does any of those things.

Q    Okay.  And can you get into it as a student?

A    Yes.  Anybody can get into it to be able to put a complaint in there, yes.

Q    Okay.  And so do you remember if the Title IX complaint was investigated?

A    Yes, it was investigated.

Q    And do you remember who investigated it?

A    Yes.  Dr. Janice Lyn.

Q    Okay.  And did you help her investigate?

A    No.

Q    Did you review her documents that she created and help her edit them?

A    I gave her suggestions; so she did send it to me.  And so we were about to send it up to legal and to Natasha so I gave her suggestions based on what either Natasha said, what legal said, whoever was reviewing it, so ...

Q    Who's Natasha?

A    She was a attorney up at the system office, and she headed -- she played oversight of the Title IX.

Q   What's her last name?

A   Praither --

MR. ARRINGTON:  Webb.

A   -- Webb.

BY MS. MAESTAS:

Q   P-r-a-i-t-h-e-r, hyphen, W-e-b-b?

A   Something like that, yes.

Q   Your guess is as good as mine probably.

Okay.  And what suggestions did you make to Janice Lyn?

A   I don't remember.  It would have had to do -- I don't remember.

Q   Okay.  And what about -- what did Natasha Praither-Webb -- do you remember if she --

A   I don't remember.  She had suggestions, yes.

Q   Okay.  And who selected Janice Lyn to be the investigator?

A   She's the Title IX coordinator.  Well, she was going to be the Title IX coordinator, so ...

Q   Okay.  She was going to be the Title IX coordinator; so you made her the investigator in this case?

A   Uh-uh.

Q   So --

A    I didn't -- number one, I didn't make anybody anything.

Q    Okay.

A    I'm not entitled to do that.

Q    Okay.

A    So she came on board to take over the cases.  So she was helping not only with Title IX, she was helping with any EO because Maggie Viverette did EOC.  She did Title IX.  She did affirmative action.  She did all of those things.  So Janice Lyn was taking over all of those pieces.

Q    Okay.  And do you see part of your job to -- to be to reduce VSU's liability and personnel issues?

A    Yes.

Q    Okay.  Who's the Title IX team now?

A    Title IX, the interim is Valencia Holmes.

Q    Okay.  Anybody else?

A    I mean, you have deputies.  And so you have deputy -- Jennifer Grubbs is a deputy.

Q    Jennifer?

A    Grubbs.

Q    Okay.

A    And then you also have Michelle Jordan was a deputy.

And then the way Title IX is done now, you -- you know, there are other people that are being used as investigators and things like that, advisers.  I don't know all the names of the people.

Q    Okay.  Do you know how they pick who's going to investigate?

A    No.

Q    And do you know who decided Janice Lyn was going to investigate Jamie Bird's Title IX complaint?

A    There was no one.  So she took over Maggie's role; so that would have automatically fell in her purview.  I don't -- it's not that anybody decided.  She was hired to take on Maggie -- what Maggie Viverette would have normally done, and so that's what she did.

Q    Okay.  And is she a full-time employee?

A    No, she's a consultant.

Q    She's just a consultant?

A    Uh-huh.

Q    And I don't mean "just" like that's not enough, but to rule out --

A    I understand.

Q    Okay.  Do you know how the office of admissions was run?

A    No.

Q    What about dual enrollment?

A    No.

Q    Do you do any type of meetings over there and tell them how to run stuff or supervise it?

A    Do I?

Q    Yeah.

A    No.  I am not doing HR.

Q    How is it decided who an appeal was going to go to for Title IX?

A    I don't know.  Title IX doesn't fall under -- even though Valencia Holmes is -- we're splitting her between HR and EOD -- HR and student affairs right now, and she's the interim.  Title IX doesn't typically fall under my area; so I don't know.

Q    So Jamie Bird's appeal was appealed to John Crawford.  Do you know how that person was selected to be the -- the person handling the appeal?

A    Yes.  So when -- I don't know what Jamie and Janice Lyn talked about.  I do know that a name had to be given, and so that name was given to her, so ...

Q    To Jamie?

A    No, to -- to Janice Lyn.

Q    **Who gave her that name?**

A    I don't know.

Q    **Okay.  But it wasn't you?  Like, you didn't decide it's going to be John Crawford?**

A    No.

Q    **Okay.**

A    At least I don't think so.

My only conversation about John Crawford, if I remember correctly, was that he felt close to Jamie and there was a concern that I sent up to Natasha that he felt close to Jamie and he felt like they had this offside relationship, like they had a personal relationship other than just work.

And so -- and I did send that up to Natasha to say, hey, John is -- he's saying -- he wanted us to be aware that he is going to tell that to Janice Lyn.  And so I called Natasha and asked her about that, whether or not he should still be that person, so ...

Q    **And what did she say?**

A    She -- I don't recall exactly what she said, but it was a yes, that he could still do it.

Q    **Okay.**

A    So ...

Q   Who was the decision maker in dismissing Jamie Bird's Title IX complaint?

So we said Janice Lyn investigated it. Who was the decision maker?

A   So Jamie's -- Jamie's Title IX complaint wasn't handled directly as a Title IX complaint because it fell under both Title VII and Title IX. The guidance that we received from Natasha was that we could handle it as a Title VII case and with Title IX pieces to it.

So -- so that's the way. And I -- and I gave that information -- I received that information from Justin, and then I gave that information to Dr. Lyn, that that's the way it could be handled.

THE COURT REPORTER:  To Doctor ...

THE WITNESS:  Janice Lyn.

BY MS. MAESTAS:

Q   So Natasha says you can do it both ways, Title IX and Title VII.  How does that clear things up for you, or does it?

A   Because both of them prohibited discrimination based on gender.  So --

Q   So she --

A   -- it was a Title VII before Title IX and took on employees being it too.  It was just

primarily for students.  And so then it just recently with -- the changes came.  And so we would have handled it as a Title VII case anyway.  And so that's the reason why.

**Q    So the USG person, Natasha, says that you don't have to worry about Title IX --**

A    No.  That's not what she said.

**Q    Okay.  Did she say you had to follow Title IX regulations?**

A    She's -- I didn't speak directly to her, but the guidance that was given to me that I passed on to Jan Lyn was that it falls under Title VII and Title IX.

**Q    Okay.  So you do have to follow Title IX regulations?  Or VSU had to follow Title IX regulations for Jamie Bird's Title IX complaint?**

A    It was treated as a Title VII case.

**Q    Now, you said it was treated --**

A    But it --

**Q    -- as a Title VII and a Title IX case.**

MR. CARTER:  Wait, wait, wait.  Let her finish.  Let her finish.

A    It was treated as a Title VII case with pieces of -- and that's what I said -- with pieces of Title IX in there.  So that's the way we moved

forward or that --

BY MS. MAESTAS:

Q    So --

A    -- we moved forward.

Q    Okay.  Thank you.

How did you decide what portions of Title VII law or procedure and Title IX procedure you were going to follow?

A    I did not decide anything because I was not handling the case.

Q    Okay.

A    I gave the guidance that I received to Dr. Janice Lyn, and then she took it from there.

Q    And then do you know if she decided to follow Title IX regulations?

A    No.

Q    Do you think she did?

A    All the nuances of Title IX I'm not as familiar with, so I can't -- I can't tell you that.

If the ultimate goal of the laws are to ensure that, you know, we're supporting that people won't be discriminated against based on gender and the outcome, yes.  The nuances of Title IX, the new updates, I'm not as familiar with those.

Q    Okay.

THE WITNESS:  Can I just take a little break?

MS. MAESTAS:  Yes, ma'am.

(Recess 2:03 p.m. until 2:13 p.m.)

MS. MAESTAS:  Back on the record after a short break.  We have a fan for the witness who wanted it.

BY MS. MAESTAS:

Q    If you need to take another break, that's fine.

A    Thank you.

Q    It just -- I -- I do want to get all your questions in; so it just possibly delaying the time you get out.

A    I'm good with that.

Q    Okay.  Me too.

Okay.  So we were talking about Jamie Bird's Title IX complaint.  And you said it was treated as both a Title VII complaint and a Title IX complaint by VSU as directed by Natasha from the system-level Board of Regents.

A    So the guidance that I gave Dr. Lyn was to treat it that way, yes.

Q    Okay.  As both a Title VII complaint and a Title IX complaint?

A    Yes.  Yes.  A Title VII, but it was going to have pieces of the Title IX in there.  So that was the guidance that I gave.

Q    Okay.  What -- what pieces of Title IX were at play?

A    I don't know because I did not handle the case.

So I gave the guidance from notes that I took when I spoke to Justin, so whatever -- whatever the guidance was.  I just remember the -- you said you didn't need verbatim; so --

Q    Yeah.  No.

A    Okay.  So I'm just trying to summarize what -- what basically I told her, but whatever that guidance was that he got from Natasha Praither-Webb, that's the guidance I gave to Jan Lyn.

Q    Okay.  So Justin got the guidance -- Justin Arrington, who's sitting in the room today -- got the information from Natasha?

A    Yes.

Q    And then Justin gave that to you?

A    Correct.

Q    And then you gave it to Janice Lyn?

A    Correct.

Q    Okay.  And in telling her part -- it's

titled -- Title VII and Title IX and that parts of Title IX applied, did you tell her which parts?

A    No.

Q    Okay.  You just said generally parts of Title IX apply and then she had to figure that out?

A    Yes.  I told her whatever my notes said that -- that I got from Justin.  I don't remember exactly what was on the paper.  I just -- in my head, that's the way it -- it seemed to -- that's a summary of what I told her, so.

Q    Okay.  Do you still have those notes?

A    No.

Q    Okay.

Okay.  So I think I had asked you at one point -- so we said we knew Janice Lyn was the investigator; right?

A    Uh-huh.

Q    Who was the decision maker?

A    So I don't -- I don't -- I don't know.  I didn't -- I don't know who the decision maker was.  I don't even know if she used a decision maker.  I know that she did the investigation.

Q    Okay.  Who decided that it wasn't going to go to a hearing, like, it was just going to be dismissed as unsubstantiated?

A    If that wasn't a part of the part -- of Title IX that she -- if she didn't -- if she was treating it more like a Title VII case with different pieces of it, then it would not -- Title VII is not treated like that.  And so there's no -- there's nobody else, there's no hearing that it would go to.  And so ...

Q    **So was she able to pick and choose what parts of Title IX applied?**

A    Don't know.

Q    **All right.  34.**

(Marked for identification is Plaintiff's Exhibit 34)

BY MS. MAESTAS:

Q    **Yeah.  So the tabs --**

A    Okay.  Uh-huh.

Q    **There's two different books, and I tried to -- one is 1 through 25 and then --**

A    Okay.  Thank you.

Q    **-- 26 through 48.**

A    Okay.

Q    **Okay.  Now, I have this document open to -- for reference for me, I'm looking at the second page of the document.  The first page is an email from Janice Lyn to you dated October 5th,**

2020.

A    Uh-huh.

Q    And then there's an attachment.  At the top, the subject line is:  "For feedback please."

A    Uh-huh.

Q    And then I'm looking at the second page, which is a document that says October 5th, 2020. It says:  "Nature of allegations."  And then the concerns communicated were the following, and I've just read over 1 through 8 listed there.

A    Okay.

Q    And so the allegation was that she was hugged tightly against her desk without her consent behind closed doors by her male supervisor, Carr, alone in her office.  She pushed him away because she felt uncomfortable.  And later he fired her, disguising it as a RIF, and this was a pattern going back to Bainbridge College.

Basically, that is my understanding of the summary of what her Title IX complaint was.  Is that -- is that consistent with your understanding of what her complaint was?

MR. CARTER:  These eight is what you're referring to?

MS. MAESTAS:  Well, those are majority of

what I was referring to.  I think all of that is in there.

BY MS. MAESTAS:

Q    But I'm not asking you to be married to that bullet list.  I'm -- but that was my understanding of what her Title IX complaint -- like, a summary of it.  And I'm asking you if you disagree with that.

A    If I disagree with --

Q    With what I said.

(Simultaneous cross-talk)

Q    Yeah.  What I just said.

So she was hugged tightly against her desk without her consent behind closed doors by her male supervisor, Carr, Rodney Carr, alone in her office.  She pushed him away because she felt uncomfortable.  And later he fired her for it disguising it as a RIF, and it was a pattern going back to Bainbridge College.

A    Can I ask you where you're reading that from?

Q    I'm not -- I'm -- so I was trying to say don't -- I'm looking at this as a reference, but I've made a summary.  And I'm asking you if you disagree with my summary.

A    Okay.  I'm so sorry.  'Cause I was trying to follow along with you?

Q    **Yeah.**

A    Yeah.

Q    **Okay.  So the allegation was she was hugged by Dr. Carr tightly against her desk without her consent behind closed doors by her male supervisor, Carr, alone in her office.  She pushed him away because she felt uncomfortable.  And he later fired her for it, disguising it as a RIF, and that that -- there was a pattern of conduct going back to Bainbridge College.**

MR. CARTER:  Is -- that's your summary.  And are you asking her if that's --

MS. MAESTAS:  No.  I'm asking her if she -- no.  I'm not asking her about the document.  I'm asking her if she disagrees with what I said.

BY MS. MAESTAS:

Q    **Is that -- was that her allegation?**

A    Bainbridge -- I have never heard about Bainbridge College until I received either the discretionary -- I have never heard -- or they -- or maybe it was when you sent me the documents about what to get, what to collect.  I've never heard

about Bainbridge.

MR. CARTER:  I mean, the allegations from the investigator that were sent to Ms. LaVan are listed there.

BY MS. MAESTAS:

Q    And so in reading that, does that refresh your recollection of what the allegations were?

MR. CARTER:  They are what they are.

BY MS. MAESTAS:

Q    Do you remember them?  Do you remember what the allegations are?

MR. CARTER:  Well, don't read her a summary of yours and then ask her.  Just ask her what she recalled --

MS. MAESTAS:  I'm trying to refresh her recollection and then see if --

MR. CARTER:  With your summary?  You can't --

MS. MAESTAS:  Well, I'm getting it from -- from there, but I've already read through --

MR. CARTER:  Well, show where it mentions Bainbridge College in these concerns.

MS. MAESTAS:  It -- I don't think it's on the first page, but certainly --

MR. CARTER:  Okay.  You read Bainbridge

College.  Now, maybe --

MS. MAESTAS:  Okay.

MR. CARTER:  -- it came in somewhere else, but like she said, she didn't know anything about Bainbridge College.

BY MS. MAESTAS:

Q    Okay.  Exhibit 37.

(Marked for identification is Plaintiff's Exhibit 37)

BY MS. MAESTAS:

Q    Okay.  So Exhibit 37 is an email from you to -- sorry, from Janice Lyn to Jeanine Boddie-LaVan.  And the subject is:  "Please refer to letter L in the document," and then the attachment is "Birdinvestigationfinal10122020.docx."

A    Okay.

Q    And then if you go to Page 6, which is little letter L, there is a statement about -- it says the investigator asked him for examples regarding the statement being made about Dr. Carr being protected.  And Mr. Mitchell said that Dr. Carr shared that with him that he was angry when the President looked into an incident involving Dr. Carr at Bainbridge.

Does that refresh your recollection about

Bainbridge College being mentioned in Title IX?

          MR. CARTER:  That's not what you said.
You said her concerns and her allegations.
This is totally different.  This says
Mr. Mitchell.

          MS. MAESTAS:  Well, it's about -- it's a
part of the Title IX investigation.

          MR. CARTER:  But that's not what you
summarized.  That's why I'm objecting to you
summarizing and then asking her is that what
she understood about her allegations.  And it
didn't come from her.  It came from
Mr. Mitchell.  That's not the question you
asked.

          But ask whatever question you want, except
don't give summaries and then say, is that your
understanding, when those summaries are
relaying false information.

          MS. MAESTAS:  Okay.  Thank you,
Mr. Carter.

          MR. CARTER:  You're welcome.

BY MS. MAESTAS:

     Q    So let's address the -- 'cause you said
you don't remember Bainbridge College.  So I want to
address that, and then we can go back to what the

heck her Title IX complaint was about.  All right?

A    Uh-huh.

Q    So you said, I have never heard of Bainbridge College.

So this is an email from the Title IX investigator to you, and it says please refer to letter L in the document, and she's attached a document.  And in letter L it says -- which is on Page 6.  It says:  "About Dr. Carr being protected. Mr. Mitchell said that Dr. Carr shared that with him when he was angry when the President looked into the incident involving Dr. Carr at Bainbridge."

A    So I still did not know of an incident that occurred at Bainbridge.  That doesn't change because it was written in here, and I didn't know -- I'm not even sure that I looked at this or I forwarded it on, when she forwarded it to me, that I didn't forward it on to Natasha Praither to get her feedback.

So I'm not sure what -- because I was playing the go-between.  I was sending documents she sent to me to get feedback to Natasha and to Justin. So I don't -- I don't remember reading and focusing on a Bainbridge.  And so I definitely don't remember ever hearing about a Bainbridge incident or some

incident that occurred in a Bainbridge.

And so my answer is still the same.  Like, I -- I'm seeing it now, and it's in there.  And it's on L, but I don't know that I read L.  I don't know why she was asking me -- I don't even know why she was asking anybody to look at L.  But I could have forwarded it on to Natasha without even looking at it.

Did -- was there a response that I gave about L?

Q   No.  Not that I've seen in discovery.

A   Okay.

Q   But now I know that there are other documents that exist that I don't have.  So I don't know.

I also know that there was a conversation with Justin Arrington that I was never aware of and didn't receive documents on.  But --

MR. CARTER:  Justin's legal counsel making it privileged anyway.

BY MS. MAESTAS:

Q   And also, it was given as a document, but it's coming from the Board of Regents.

A   What was given --

Q   I don't know who --

A    What was given as a document?

Q    **You said you had notes from a meeting --**

A    When I was on the phone with him, I took notes, and I passed on the information to Dr. Lyn. There was no -- there was no document that Justin gave me.

Q    **Okay.  So when you forwarded this to the Board of Regents, did you get anything back from the Board of Regents, from Natasha?**

A    I don't know because I don't know for a fact that I -- I don't remember what -- it was so long ago.  I don't remember what I did with it.  I don't remember what the -- why she asked me to look at L or was she asking Natasha to look at L.  I don't know what came before that.  And without knowing that, I don't recall exactly what it was.

But I still -- like, reading in here that there was some kind of thing that occurred, it's still -- until -- I don't -- I don't remember anything about a Bainbridge.

Q    **Did you ever tell Janice Lyn that it would be inappropriate for you to provide her feedback on her independent investigation?**

A    No, because Janice Lyn wasn't asking me to provide her feedback and then to correct or to

change something she said.

She was asking -- if she was asking for feedback, then she was asking for feedback in regard to -- to make sure that the information that -- that either I provided was accurate or that the names were accurate, the spelling was accurate, the grammar was accurate, something along those lines. It wouldn't have been necessarily to ask me to -- to -- and I definitely did not change the --

THE COURT REPORTER:  Wouldn't have been necessarily to?

A    It wouldn't have been to ask me to make changes or to give her feedback to change anybody's story or anything like that.  So that -- that would not have been done.

BY MS. MAESTAS:

Q    **How is that even proper, though, if you're going to have an independent investigation?  Even for grammar, I mean, how is that proper?**

MR. CARTER:  In what way proper?

BY MS. MAESTAS:

Q    **In order for it to be considered an independent investigation.**

A    So I don't -- I don't understand that.

Q    **So if you're ...**

So you testified that your role as HR is to reduce liability for personnel issues at the University.

A    Yes.

Q    Title IX regulations require that the investigator not have a conflict of interest or bias.  How -- if she's asking for you for any feedback, how can that be an independent investigation?

A    I don't think -- so you asked me whether that was one of the things that is part of my role, and absolutely it is.  But another thing that's a part of my role is to protect our employees.  Another thing that's a part of my role is to serve as their advocate.  Another thing is -- like, there's a lot that goes into my role than just the what you called it.

And Jan Lyn knew that what I wanted more than anything else out of all of this is for everybody to be okay and for -- if something was there, then something was there.  I'm never afraid to find out that something occurred on our campus. Ever.  Because that way we can get in there and we can fix it and we can make it better.

And so -- and Jan Lyn knew that.  So her

asking me for any kind of, hey, is this -- you know, a grammar check, or can you pass this on to so and so I think was absolutely appropriate.

Q    If you could turn to 36.  This is an email --

A    Uh-huh.

Q    -- several emails between you and Janice Lyn on October 5th, 2020, and October 6, 2020.

A    Uh-huh.

(Marked for identification is Plaintiff's Exhibit 36)

BY MS. MAESTAS:

Q    On the one on October 5th, 2020, at 4:57 p.m. you state:

"Very thorough.  Please note that aside from the grammar corrections, the changes included are suggestions only in which to provide additional clarification -- additional clarification based on information you noted while meeting today. Therefore, please feel free to use or not use accordingly."

A    Uh-huh.

Q    What meeting?

A    I don't know exactly what meeting we're referring to, but I know that I was on calls between

her and Natasha in regard to getting updates on status updates and stuff like that or getting status updates.  So if Natasha said, hey, can you get something, or can you add something or whatever, if that came up -- I don't -- I don't know what the meeting was.  So ...

Q     Did you meet with Janice Lyn on October 5th --

A     I don't know.

Q     -- 2020?

And then it says -- you're commending her: "Very thorough," on her attachment, which is the next page, a draft of her report.

A     Uh-huh.

Q     You're saying:  "Very thorough.  Please note aside from the grammar corrections, the changes included are suggestions only."

What changes did you make?

A     I don't know.

Q     Okay.  So this -- this, to me, says it's aside from the grammar corrections there's additional changes.

A     But the rest of it says:  "Which to provide additional clarification based on the information you noted."

So it could have been -- it could have been anything.  It could have been clarification as to who are reporting -- like, it could have been anything.  I don't know what the changes are -- or what the changes were.

But I also say, Please feel free to use or not accordingly.

Q    Yeah.

A    And just to bring your attention to it, it's -- so in her answer to me, Long is the answer to your question.  So, clearly, she got a name wrong.  So that's the kind of things that we mostly were talking about.

Long is the answer to your question.  So she got a name wrong.  She -- she said the name -- she -- there was something about the name that she had to give me back because I asked a question about it, so ...

Q    I mean, I -- I don't see how that's clearly that, but if that's your recollection of that one statement that you made, that's fine.

But do you know -- do you know who Lisa Long is?

A    Of course.

Q    And you know she was a witness in the

Title IX investigation?

A    Yes, of course.

Q    Okay.  So I'm just going to show -- if you could flip through, we've got 34, 35, 36, 37, 38, 39, 40, 40a, 40b -- sorry.  There's no 40.  It's just 40a and 40b.

So everything from 34 through 40b, those are all emails between you and Janice Lyn, the Title IX investigator; correct?

A    Correct.  I haven't gone through all of them, but --

Q    Yeah.  But --

A    Yeah.

Q    But they are; right?

A    Okay.

Q    So between October 5th and October 26th you exchange -- I mean, there may have been more, but these are the ones that I have.

A    Right.

Q    You exchanged one, two, three, four, five, six, seven emails with drafts of the report attached to it; is that correct?

A    Yeah.

Q    Say that --

A    If there's a -- if there's an -- if

there's an email there that says what you call it, yes, that is correct.

Q    Okay.  Did -- who was the decision maker?

A    You asked --

Q    So --

A    -- me that.

Q    Yeah.

So in Title IX you've got to have the investigator and the decision maker.  So I already know who the decision maker is.  I'm just trying to get you to say it.

It was Janice Lyn.  She made the decision in her report, but Title IX says the decision maker, who cannot be the same person as the Title IX coordinator or investigator.  Were you aware of that regulation?

A    So, yes, I was aware of that allegation [sic].

But in 40a, when Jan Lyn is answering Jamie, she tells:  "Her, Your complaint does fall under both Title IX and Title VII.  However, the guidance given by the System Office was to investigate this under Title VII, which also has a nondiscrimination based on gender and sexual harassment piece.  Title VII regulations were

specifically enacted to address" --

THE COURT REPORTER:  I'm so sorry.

THE WITNESS:  I'm so sorry.

THE COURT REPORTER:  Everybody speeds up when they read.  I just need you to slow down.

THE WITNESS:  Okay.

A      "Title VII regulations were specifically enacted to address employee on employee cases such as this one.  "

THE COURT REPORTER:  Please slow down.

THE WITNESS:  Oh, I didn't slow down?

THE COURT REPORTER:  No.

THE WITNESS:  Oh.

A      "Title VII regulations were specifically enacted to address employee on employee cases such as this one.  My role is to ask questions and gather as much information as possible.  I fully understand your concerns, and I will be with you -- I will be there with you every step of the way through this process."

And so we do have a recording of the guidance that I -- that was given that was what you call it because that was the guidance that --

Q      **So your position is Title IX regulations do not apply?**

A    I didn't say they did not apply.  I'm telling you the guidance that was given by the system office to investigate this was under Title VII.  That's what the guidance was that --

**Q    Okay.  So the system said that you don't have to look to Title IX?**

A    I know -- I know it's just word sniffing. Nobody said you don't have to look to Title IX.  I think what it said was that we're dealing with both Title IX and Title VII.  The new -- the changes had just occurred earlier that year, and so we were trying to find the place where this really falls.

And so, therefore, the guidance that I was given that I shifted on to Dr. Lyn was that -- apparently -- was this that she gave -- she gave that information to Jamie.

**Q    So do you use the new Title IX regulations now?**

A    Yes.

**Q    Did you use them when Jamie filed her Title IX complaint?**

A    So Maggie Viverette left, and so I don't -- I wasn't using anything.  When Maggie left -- I don't know what Maggie was leaving 'cause she left right when all the changes occurred, and

everybody was being trained on the new Title IX procedures.  I think it happened around August or whatever.

And so I don't think that they were being utilized that first -- in that first moment, and I know they weren't being utilized in regard to when we first was taking on a Title IX case or when Jan Lyn was taking on the Title IX cases that year -- the end of that year, so ...

**Q   So even though they came into effect in August -- I think it's August 14th, 2020, is when they went into effect.**

A   Uh-huh.

**Q   Even though they were in effect, VSU wasn't using them until much later?**

A   We were trying to figure out where it falls in regard to employees, and so it was between Title VII and Title IX.

**Q   So --**

A   And it was muddy.  The -- it was very muddy.

THE COURT REPORTER:  I'm sorry.  It was?

THE WITNESS:  Muddy.

THE COURT REPORTER:  Muddy.

THE WITNESS:  Uh-huh.

THE COURT REPORTER:  It was muddy.  Okay.

THE WITNESS:  Yeah.  It was.

(Marked for identification is Plaintiff's Exhibit 40a)

BY MS. MAESTAS:

Q    Okay.  So this works -- on Plaintiff's Exhibit 40a it says:  "Your complaint does fall under both Title IX and Title VII."

A    Uh-huh.

Q    Doesn't that say that title -- Title IX applies?

If it falls under both of them, it doesn't say it doesn't fall under Title IX.  So I don't understand why -- how you're getting where it doesn't apply to it.

MR. CARTER:  But I think she's answered that question.  And I think you need to ask Janice Lyn that anyway because she's the one that wrote that, but that's consistent with what the witness said.  But she -- I mean, she's answered the question.

BY MS. MAESTAS:

Q    Okay.  Was Janice Lyn both the investigator and the decision maker?

A    Janice Lyn conducted the investigation and

made the final decision.

Q    So the answer is "yes"?

A    The answer is "yes."

Q    Okay.  And are you aware of the requirement under Title IX that you have to be given the opportunity to have an adviser of your choice who may but is not required to be an attorney and may not limit the choice or presence of the adviser for either the complainant or the respondent in any meeting or grievance proceeding?

A    For Title IX, yes.  Under Title VII, no. And since she was treating this as a Title VII case, the answer is no.

Q    Okay.  And then under 40a, Exhibit 40a.

A    It's right there.

Q    This is an email from you to John Crawford dated November 5th, 2020.  And it states, Title IX -- sorry.  "Title VII does not require an adviser to be present or a hearing."

A    Uh-huh.

Q    Are -- do you have Title VII regulations for investigations that are issued by the Board of Regents?

A    No.

Q    But do you have Title IX regulations that

are followed by the Board of Regents for investigations for Title IX?

A    Yes.

Q    So there -- there are no regulations under Title VII that you're following?

A    I wouldn't say that.  Title VII is a federal law.  Of course we follow the -- a federal law and we follow processes that, you know, require us to investigate and to see -- you know, to ensure that if there's something going on, we put a stop, duh, duh, duh, something to prevent a reoccurrence, all of those kind of things.

So we -- it's the same kind of thing as Title IX.  The outcomes are the same kind of thing; so -- now, the process may be different, but the outcome is still that you want to -- you want to do what you can to find out what's going on.  And you want to -- if it's harassment, you want to stop the harassment.  You want to prevent the reoccurrence, and you want to return the person to a pre-deprivation state.  It's the same thing.

Q    Okay.  46.  Okay.  Page 6.  And then No. 3, the last sentence.

A    Uh-huh.

Q    "Her duties could be re-assigned to local

recruiters, and therefore, her position was able to be eliminated with the least impact to students."

Where did you get that piece of information from?

A    The documentation in the RIF packet.

Q    And who did that come from?

A    What do you mean who did it come from?

Q    The RIF packet, the documentation in the RIF packet.

A    It's -- Michelle Jordan wrote up the documentation based on her conversations with the VPs.

Q    Carr?

A    In this case it would have been Carr, yeah.

Q    Okay.  Okay.

And then 7, Page 7.  And at the bottom it says under dual enrollment in bold, colon:  "Dual enrollment will be absorbed by the overall admissions recruiters, and these duties will become a part of the regular case load for the recruiter rather than being a separate process."

Is that same answer, came from Michelle Jordan who got it from Carr?

A    Yeah.  It's a snippet from the RIF request

regarding dual enrollment.  It says it right above there.  Right there.

Q    Okay.

Okay.  And then further back there's a blue tab kind of at the bottom marking --

MR. CARTER:  This one?

MS. MAESTAS:  Yeah.

BY MS. MAESTAS:

Q    In this document it's a chart.  It says: "Retention of Dual Enrollment Students, Fall Terms 2015, '16, '17, '18, and '19."

Where did you get that from?

A    Institutional effectiveness.

Q    You got it from institutional effectiveness?

A    I got Michelle to get it.  And it came through Dr. Carr, but it came from institutional effectiveness.

Q    Is that the official name of it, institution --

A    The department -- what's Barry's -- is it institutional effectiveness?  I'm not sure if it's institutional effectiveness.  Barry -- yeah.  It's institutional effectiveness.

Q    Barry?

MR. CARTER:  I think it's the same person that was named in --

MS. MAESTAS:  Yeah.  I just -- I can't remember.

MR. CARTER:  -- Fitzgerald.

MR. ARRINGTON:  Fitzgerald.

THE WITNESS:  Fitzgerald.  Uh-huh.

I actually sent you the raw data.

MR. CARTER:  Huh?

THE WITNESS:  The raw data.

MR. CARTER:  The one you sent the other --

THE WITNESS:  Uh-huh.

MR. CARTER:  -- the other day?

THE WITNESS:  Yes.

BY MS. MAESTAS:

Q    Okay.  So can you catch me up to what's going on with the raw data and --

A    You requested information --

Q    Uh-huh.

A    -- of the raw data --

Q    Uh-huh.

A    -- and I provided it.

Q    Okay.

MR. CARTER:  That's the one that Ryan gave you.

THE COURT REPORTER:  Who gave you?

MR. CARTER:  Ryan.

You marked it as 50-something.  54 maybe.

BY MS. MAESTAS:

Q    I'm handing you what's marked as
Plaintiff's Exhibit 54.

MR. CARTER:  Is that it, or was it
something else?

THE WITNESS:  It was a spreadsheet with
raw data on there.  I just forwarded it on.  I
didn't -- I didn't look at it.

MR. CARTER:  Okay.

BY MS. MAESTAS:

Q    Okay.

A    So ...

Q    So you're not sure --

A    No.

Q    -- what 54 is then?

A    Uh-uh.

Q    Okay.

Okay.  So going back to this chart, which
is inside Plaintiff's Exhibit 46.

A    Uh-huh.

Q    So it came from Carr, but Michelle got it
from --

A    I think it came from -- I think, upon request, it did come from Dr. Carr to Michelle, and Michelle sent it over to me.

Or it could have come directly from Barry Fitzgerald.  I don't -- I don't know.

Q    Did you request it from Barry?

A    I requested the documentation.

Q    Who did you request it to?  Who were you talking to?

A    Michelle.

Q    Okay.  So Jeanine Boddie -- Boddie --

A    Boddie.

Q    -- LaVan asked Michelle, get this data, and Michelle went to Barry or Dr. Carr --

A    Uh-huh.

Q    -- and then somehow it ends up back to you for your --

A    It came through Michelle.  She sent it to me.

Q    Okay.  And what did you request?

A    I think in a conversation we were having with Dr. Carr he mentioned retention, or Michelle was having -- she mentioned retention rates going lower.  And so I said I -- I wanted to see that.

Q    But you don't remember, like, specifically

what data you requested to be pulled?

A    It's just retention data.

Q    Just -- like, you said pull the retention data, and then -- and I know not verbatim, but anything that you were -- can recall 'cause it's a number; so the data is going to be important.

A    It was just retention.  Like, that's all I remember, just asking for the retention data.

Q    Okay.  9, Plaintiff's Exhibit 9.

(Marked for identification is Plaintiff's Exhibit 9)

BY MS. MAESTAS:

Q    Do you recognize this?  This is a printout from a VSU website.  Do you recognize that?

A    No.

Q    Okay.  What about 10?

(Marked for identification is Plaintiff's Exhibit 10)

A    Oh, sorry.  No, that's --

BY MS. MAESTAS:

Q    That's 11.

A    Oh, I'm sorry.  You're fine.

Q    A lot of paper there.

Okay.

A    Oh, absolutely not.

Q    Okay.

A    I don't do anything with numbers.  I'm HR.

Q    Okay.  That's fair enough.  I'm not a math major either.

Okay.  12.  This is Exhibit 12.

Actually, 14.

A    Thank God.

Q    No, it's worse.

(Marked for identification is Plaintiff's Exhibit 14)

BY MS. MAESTAS:

Q    Okay.  So we've kind of had this running joke over the last three days about Exhibit 14 and how it's microscopic print, but don't -- don't be mad at me.  It's -- we hit print after we got the documents from VSU.

And so I asked in discovery for open positions around the time that the RIF occurred.

A    Uh-huh.

Q    And this is -- this printout shows six open admissions recruiter positions.

A    Uh-huh.

Q    And I was just wondering if you knew anything about that.

A    Now, I do know that there were open

positions, but not all of them were slated to be filled.

So when we are about to do a RIF, the first thing we take off the plate is vacant positions.  So just because a position is open doesn't mean that there's a plan to fill that position.  We want to take it away so that we don't have to RIF somebody in a position.

So, yes, there may have been open positions, but I don't know that these positions were slated to be filled.  If there were one or two positions about to be filled, we still had a number of people that would have had to apply for those positions -- that would have been able to compete for those positions or something like that.

Q    Okay.  But you don't know -- like, specifically, those were posted by Ryan Hogan and Hilary Willis.  You don't know, like, what the need was and then compare it to who was going to be RIFed?  Like, did you get into any of the --

A    No.

Q    -- substance of that?

A    No.

Q    Okay.  And did you deal with handling the PAR forms?

A    No.

Q    **Who handles that?**

A    Different people in my office.

Q    **Okay.  Like, all of the HR people except you?**

A    No, not all the people.  So we have a class and (indiscernible) group.  And so --

THE COURT REPORTER:  Class and what group?

THE WITNESS:  Class and comp group.

A    And they handle some of the PARs.  Then we have my HR general is one that handles some of the PARs, and then we have some of the others that handle the PARs.  It depends on what position it is -- or what classification it is, not necessarily position.

BY MS. MAESTAS:

Q    **So if it says -- like, in the second column it says:  "Manager."  Does that mean that person asked for that position to be opened up?**

**So it says:  "Job opening," and there's a number.  Position -- posting title, manager, and then -- so Ryan Hogan, Ryan Hogan, Hilary Willis, Ryan Hogan --**

THE COURT REPORTER:  I can't hear the names you're saying.

BY MS. MAESTAS:

Q     Ryan Hogan, Ryan Hogan, and Hilary Willis. Either Ryan Hogan or Hilary -- Hilary Willis is on one.

Does that mean that that person asked for that job to be opened up?

A     No.  Typically it means that they're the person who is -- who is over that position.  So --

Q     Okay.

A     -- that's what I would think that it would mean.

But are you saying that all of these positions were posted?

Q     I mean, I'm reading the document and that's what I thought.  Because it says:  "Created." Then it has the date.  So -- let's see.  Nine columns in it says created, and it has the date.

And then -- so the first admissions recruiter position says February 4th, 2020.  And then there's another one in 2020, and then there are two, three, four -- four more in 2021 that were posted as open positions.

A     I wish this was bigger because it's -- I can't read it, but there's something -- there's something not right about this, this information.

But I can't read it to -- to be able to really go through it.

But to answer your question, yes, manager would typically mean that's the position -- that person is the supervisor of that position.

Q    Okay.  So in the -- in this little blued-off section, those are the actual positions that are referred to.  So, like, the number at the top refers to what's on the column on the far left column.

A    Uh-huh.

Q    And then there's six admissions recruiters positions in that section with the blue markings.

A    Okay.

Q    I don't know if that helps you refresh your recollection or identify it but --

A    It doesn't, but I don't see every position.  So that's not -- that doesn't fall under my purview, so ...

Q    Okay.  That's fair enough.

All right.  And then 13.

(Marked for identification is Plaintiff's Exhibit 13)

BY MS. MAESTAS:

Q    This is a little bit bigger.

A    Yes.

Q    And so do you know what this document is?

A    Nope.

Q    Okay.  All right.

     (Marked for identification is Plaintiff's
     Exhibit 12)

BY MS. MAESTAS:

Q    And 12.  Do you know what that document
is?

A    No.  Although, it does have PAR -- faculty
and staff PAR forms.

     Uh-huh.

Q    Okay.  So you're not familiar with this
type of chart?

A    No.  But if it comes out of HR, then it's
somebody -- somebody else is doing it.  And so --
but once again, that would not necessarily fall
under my purview.

Q    Okay.  On the second page, I think I
highlighted -- I'm not sure if I did.

     Yeah.  So there's several positions that
state new positions.  One under Lisa Long.  One
under Ryan Hogan.  Both in admissions.

     Were you aware of any of those positions
being posted?

A    No.

Q    Okay.  Were you involved in the hiring of -- so I'm starting to mix up some dates here, but Carr, Carvajal, or Freidhoff?

A    No.  That was before I got there.

Q    Before you got --

A    Uh-huh.

Q    Freidhoff though --

A    Before I got here.

Q    Before you got there.  Okay.

All right.  41.

(Marked for identification is Plaintiff's Exhibit 41)

BY MS. MAESTAS:

Q    Have you ever seen that document before?

A    Yes.

Q    Okay.  When was the first -- when was the first time you saw it, and what were you doing when you saw it or heard about it?

A    Oh, I don't know what I was doing, but Tee Mitchell sent it to me.

Q    Okay.  Did you ask him to send it to you?

A    Yes.

Q    Okay.  And how did -- how did that happen?

So you -- in order to ask him to send it

to you, you had to know about it.  So how did you first know about it?

A    Because Dr. Carr reached out to HR to tell us about a incident that occurred with some technical schools, and then he asked me to connect with Tee because he wanted to do some -- you know, he wanted me to look into it and see what needs to be done, so ...

Q    Okay.  I'm sorry.  Who asked you all that?

A    Dr. Carr.

Q    Dr. Carr.  Okay.

A    He asked me to reach out to Tee.

Q    All right.  Is that all you remember about that conversation with Dr. Carr?

A    Yes, because I reached out to Tee.

Q    Okay.  And was it a phone call?

A    Probably so.

Q    Okay.  And then you reached out to Tee and he just forwarded it to you.  Anything else?

A    Yeah.  I mean, Tee went through what happened.  And from his own perspective, he told me what happened, told me that Jamie was involved, told me that Jamie was a really good employee, and all this stuff.

And then I think at some point he asked me

whether or not I'd be willing to meet with Jamie and hear her side of the story, and I said of course.

Q    Okay.  And you met with Jamie?

A    Yeah.  Absolutely.

Q    Okay.  And can you tell me about that meeting?

A    It was a good one.  It was a long one.  We sat in there together almost two hours; her, me, and Michelle.  And so she explained everything from the beginning to the end in regard to her intent behind the -- the information that she sent and -- you know.

Q    And Michelle was there too?

A    I think Michelle was there, yes.

Q    All right.  And did you go through and read the email?

A    Oh, yeah.

Q    Okay.  And do you know anything about, like, curriculum and what it was talking about?

A    No.  Jamie tried to explain it to me, but it went over my head.

Q    Okay.  And so do you have any substantive opinions about whether she did something wrong or right with this email?

A    The -- the email does sound like we're

trying to guide people to the University -- to this -- this institution.

And so it does -- you know, it makes note -- I think this sentence right here: "The curriculum needs to be the same in order for them to be successful," and then this statement that, "Part of participating in a DE program is choosing the right institution," and then back here, "Your assistance in guiding your students and their parents in this direction."

So, yes, I did think that it gave the impression that we're trying to cut out technical schools and that this is the --

Q When you were -- you thought it was stating that she was trying to recruit students to come to VSU dual enrollment?

A No. I thought she was saying that it would be better to come here than to go to a technical school and that all of it -- so, basically, I see why they had the perception that they had.

Q Who's "they"?

A The -- the perception that Tee said that they had in regard to the technical schools believing that she was trying to -- she was trying

to say that you can't get a good education unless you come here.

Q    Okay.  So Tee Mitchell said that?

A    He said that's -- that was their perception.  He didn't say that's what he believed.

Q    Oh, okay.

A    He said that's what their perception was.

Q    Okay.

A    And I can see -- after I read it, I can see why, and I pointed that out to him.  I do see why they think that.

Q    And do you have any opinion about whether that was right or wrong --

A    No.

Q    -- information?

A    (Shaking head.)

Q    Okay.  Any other meetings about this email?

A    I mean, Jamie and I met twice about it.  Tee and I met, and then -- multiple times about it, and then Tee, me, and Dr. Carr talked about it.  So ...

Q    Okay.  And was there ever any discussion about a reprimand for it?

A    Yes.

Q    And then how was it decided that she was going to be reprimanded?

A    So Tee had told me that he had given a written reprimand -- I mean, a verbal reprimand to her.  But I went back and looked at other people -- 'cause it -- for me, it fell into the category of a lack of judgment and decision making -- and good decision making.

And so I looked at other people who we had had something similar.  And based on that -- we had -- we had put them on, like, a performance improvement plan or something like that, but she only had that one thing that I found in her file, and there was nothing else.  And Tee was -- he was just saying, you know, over and over again about the contributions and things like that.  So I said a written would be -- it would suffice to do a written.

Q    A written reprimand?

A    Uh-huh.

Q    And did Dr. Carvajal ever rain in on what should happen?

A    No.  I never spoke to Dr. Carvajal about it at all.

Q    And what was Dr. Carr's suggestion?

A    He did not make a suggestion to me.  He was comfortable with my suggestion, my recommendation.

Q    Okay.  Did you ever hear any discussion about Dr. Carvajal being upset about it, about the email?

A    Yes.  From either Tee or Dr. Carr, one of them mentioned to me that there had to be a lot of damage -- I think it was Jamie because Jamie -- I think she mentioned it when she was telling me.  She offered to go and do it herself.  So she offered to do damage control herself, and she was told that -- don't do anything.

And so Dr. Carvajal was on -- or somebody -- somebody was doing something, but I think that's how I learned that there was damage control that needed to be done.

Q    And did you ever hear about whether there -- what -- to what extent the damage was?

A    No.

Q    Okay.  And then whether it was repaired?

A    No.

Q    Okay.  And 42.

(Marked for identification is Plaintiff's Exhibit 42)

BY MS. MAESTAS:

Q    So this one is a little bit backwards. The first email comes -- the first email in the sequence of time comes second and then the reply is on the first page.

Have you ever seen this email before?

A    I don't think so.  Uh-uh.

Q    Okay.  And then what about the one from Karen Black?  Never heard about it?

A    Uh-uh.

Q    Okay.  43.

MS. MAESTAS:  Is it okay if we take a short break?

MR. CARTER:  Absolutely.  This doesn't go into my time.  I just want to make sure you're aware of that.

(Recess 3:10 p.m. until 3:21 p.m.)

BY MS. MAESTAS:

Q    Back on the record after a short break.

Okay.  So we're back on Plaintiff's Exhibit 43, the written reprimand.

Okay.  So the -- all of the logistics on how this is done is what I want to get into.  So I think you had said you had drafted it with Tee.

A    Uh-huh.

Q   It's dated March 5th.  So we know a meeting -- Jamie doesn't find out about it until March 6th at a meeting between she, Carr, and Tee; but then she signs it on the 7th.

Can you tell me -- can you walk me through -- you know, in the beginning the reprimand was created, and then go from there.  Like, did -- so it's dated March 5th.  Did you start drafting it, like, another day?

A   Oh, I don't -- I don't remember.  I mean, of course I had to draft it at earlier -- at a earlier point, and then I sent it to Tee and Dr. Carr to review.

Q   Okay.

A   And -- and so then Tee said he would, you know, handle giving it to her.  So I asked him did he want me to be a part of that conversation so -- in case she had any questions, and he said, no, he'd like to do it by himself.  So ...

Q   Tee said that?

A   Yeah.

Q   Okay.  And so when you sent it over to Tee and Carr for review.  Did they make any changes?

A   Tee did not.  Dr. Carr, I believe, made one change.

Q   Okay.  Do you remember what it was?

A   I think it was the word "offensive."  I think I had put something else, and I don't remember what it was, but I think it was the word "offensive."

Q   And then you said Tee didn't make any changes.

A   I don't recall him making any changes.

Q   But you -- so did you -- I think you told me that Tee helped you draft it.

A   Well, I just meant we worked together on it.  So we -- we worked together.  So I knew of this information, this beginning information and stuff like that.  Like, I would not have had that information.  So I got that from Tee.

I also got the information -- I looked in the file, too, to confirm that there was nothing on Jamie.  It was a isolated event.  But I also got that information from Tee.

I got the fact that -- so the -- the line about -- from -- based on what he told me.  Now, he didn't word it like this, but -- and I worded it --

Q   Are you talking about Tee?

A   Yes.

I worded it -- I worded it the way, you

know, from what I thought he meant by it, but when I say Ms. Bird's contributions to VSU and strong work ethic, it was because of information that Tee provided to me.  So -- so yeah.  He -- he -- I think that means we kind of drafted it together.

Q   **But he didn't, like, sit and type?**

A   No, but nobody -- yeah.  When you -- when you're -- yeah.  So, no, he wouldn't have sat and typed it.  Like, one person sits and types it based -- and so yeah.

Q   **Okay.**

A   But we collaborated on it.

Q   **Yeah.  And that's fine.  And when you first said it, I just kind of felt like you were saying that he helped type it, but now I understand that he did not do that now.**

A   Okay.  Yes.

Q   **Okay.  And so what -- did any -- did Dr. Carr provide the background on any portion of this?**

A   No.  I worked with Tee on -- on it.  So -- and some of the information -- 'cause I met with Jamie on -- so it was a -- it was a combination.

I met with Jamie, like, I think it was the end of February, February 28th maybe, something

like that.  I met with her.  And so I used all of that information, all of the information that Tee had given to draft this.  And then, of course, whatever the protocols.

Some of this language right here is just standard language that I -- I utilized.  So on the fact that it was a level of judgment and decision making, that's standard language that I use for anybody who has -- where it's a judgment and decision making kind of thing.  So -- so that's -- yeah.

**Q   As far as, like, why she was being written up, did you give any opinion on whether what she did was bad or good, or was that someone else?**

A   I'm sorry.  I don't understand the question.

**Q   So, like, in deciding -- so this conduct is bad; therefore, reprimand.  Did you render an opinion about whether what she did was bad or good?**

A   I looked at everything that was provided to me.

**Q   Uh-huh.**

A   After talking to Jamie, after talking to Tee, and reading that email myself, and that is what I drafted.

Q    Okay.  But I think before you said that you didn't have -- let me ask it, and I'm sorry if I asked you this before.  I'm just kind of -- depositions are starting to roll over on each other.

Do you have any opinion about whether there was a relationship that was adversely impacted and needed to be repaired?

MR. CARTER:  I think she did answer that before.  You asked her about the email and went through the email.

MS. MAESTAS:  Yeah.

MR. CARTER:  So she answered it then.

MS. MAESTAS:  I think -- I think so, but I just wanted to make sure.

BY MS. MAESTAS:

Q    So this -- this portion right here, Moreover, this communication --

MR. CARTER:  She's looking at the email right now.

I'm sorry.  Go ahead.  You're right.

BY MS. MAESTAS:

Q    So the second paragraph where it says, "Moreover," you see that?

A    Uh-huh.

Q    "This communication had a significant

adverse impact on recently established relationships that will need to be repaired."

A    Right.

Q    I don't -- that didn't come from you; right?

A    Well, it came from all of them because I remember I talked to -- and I said I talked to Jamie.  She was the one saying that she offered to repair.  So she wouldn't have offered to repair something if there was not --

Q    Uh-huh.

A    -- if there was not something that needed to be repaired.

And then Tee had already conveyed to me that, you know, things needed to be repaired.  So -- so it was a combination of what I got from different people.

But do -- are you -- if you're asking me whether or not I personally know that there was relationships that needed to be repaired personally because of somebody I spoke to as far as the technical schools, no.  I didn't speak to anybody at the technical schools to know that information.

Q    Okay.  Just the Carr, Jamie, or Tee?

A    Yes.

Q    Okay.  And then the offensive part.

A    What about it?

Q    What about that?  Do you have any personal knowledge about it being offensive to the technical colleges?

A    I do not have any personal knowledge about it being offensive.

Q    It either came --

A    Although --

Q    Sorry.

MR. CARTER:  Go ahead.

A    Although, I still say that I can see why it was.  Like, when I read it, I can see why they felt the way they felt.  I can see --

BY MS. MAESTAS:

Q    Okay.

A    -- why that was what you call it -- yes.

Q    You can see why, but you don't have any evidence that it was?

A    No.

Q    Okay.  Did Tee ever say that he disagreed with that it was offensive or that relationships needed to be repaired?

A    No.  Tee never told me that relationships did not need to be repaired.

He told -- what Tee told me was that Jamie was a really good employee, has been a really good employee for him for years, and that, you know, this was a mistake.  And he -- he told -- shared with me that he gave her a verbal, and he felt that that was -- that sufficed, was to give her the verbal. He did share that with me.

He shared with me that -- that he believed -- he gave her the verbal.  He -- he felt like she had been a really good employee and that he did not -- he admitted that he did not -- while this was, for the most part, an email that -- that they normally send out, this one this time, this year, it had been changed.  She had tweaked it and changed it this time, and he did share that with me.

**Q    Okay.  And what about the -- the decision to note it on the performance evaluation and --**

A    That's the standard practice.  If you have a written reprimand, we're going to note it on your performance evaluation.

**Q    And then include it in the permanent personnel file in HR?**

A    Yes.  But I told Jamie, you know, after a year we don't give as much -- you know, after it's been a year and there's nothing else occurring, we

don't give it as much weight.

Q    Okay.  And so it's dated March 5th.
Jamie signed it on the 7th.

A    Uh-huh.

Q    Did Jamie sign it in a meeting with you?

A    No.  I told you he said he wanted to meet
with her alone.

Q    Okay.  And did you meet with Jamie
regarding Carr saying that it was to be kept in his
desk drawer?

A    I did not meet with him.  I called --
contacted him after 'cause Jamie told me that in the
meeting that we had.  And I went back to my office
and I called him immediately and asked him about
that because I knew what the written reprimand said
and I knew he knew what the written reprimand said.
So I was kind of surprised that he would have said
something like that to her.

Q    All right.  Hold on one second.

A    Okay.

Q    All right.  If you could turn to --
actually, don't turn to anything yet.

Have you heard anything about
Dr. Carr's -- of an investigation of him that
occurred at Bainbridge College before he worked at

VSU?

A    I just heard about that this past week.

Q    **Okay.  And how did you hear about it?**

A    It was mentioned to me.  Apparently somebody put something out on Facebook.

Q    **Okay.  And who mentioned it to you?**

A    It's just an employee, not Dr. Carr --

Q    **Okay.**

A    -- or anybody else like that.  It's just an employee brought it to my attention because they saw it.

Q    **Okay.  And what employee was that?**

A    It was an employee who -- so I believe it was a former employee, but it came to me anonymously.  But I do believe it was Chris -- somebody from -- somebody who -- Karen Ruben's boyfriend.  I do believe it was him.  So --

Q    **Okay.**

A    -- yeah.

Q    **So I know --**

A    I do believe it was him.

Q    **-- you had to go through some thought process to come for that answer.**

A    Because I don't want to accuse somebody of doing something, but I -- I think it was him.

Q   And the -- the name is Chris?

A   I don't remember his last name, but I think it was him, because he -- it -- it was put on his Facebook page and I keep getting these anonymous things.  So ...

Q   Meyers?

A   Meyers, yes.

Q   Okay.

A   Yeah.

Q   I didn't want to tell you and --

A   Yeah.

Q   -- force the answer.

A   I didn't -- I didn't -- yeah.  So ...

Q   Okay.  And so is Chris Meyers the one that talked to you?

A   No.

Q   Okay.

A   Nobody talked to me about it at all.

Q   Okay.  So --

A   I just got it anonymously, but I think it was him that sent it to me.

Q   How did it come to you anonymously?  Was it, like, a voicemail?  Was it, like, an email that came from, like, anonymous@gmail.com wants to send you information?  Like, how did it come to you?

A    It came to me in a piece of -- on a piece of paper.  Like, somebody -- like, it came to me on -- on a piece of paper in my text messages.  And so -- not -- I'm sorry.  Not on a piece of paper.  It -- it was -- it was put on a piece of paper and then sent to me in my text messages.

Q    Okay.  A photograph of a piece of paper?

A    Yes.  A photograph of -- yeah.  Sorry.

Q    I was, like, I got to get that --

A    Yeah.  No.

Q    -- Harry Potter phone.

A    No, no.  Sorry.

Q    Okay.  So did it come from a number that was not --

A    Not --

Q    -- saved in your phone?

A    Correct.

Q    Okay.  And so now you're saying, I think I know whose number that was?

A    No.  It -- not that I know whose number.  I just think it was him because I keep -- I get things from time to time.  Like, there was a -- another thing that came that was anonymous, and so I think -- I think it's him.

Q    Okay.

A    I just do.

Q    Okay.

A    So ...

Q    And what was the other thing that was anonymous that he sent you?

A    There was a Title IX -- a class with Title IX.  And somebody -- a professor made a comment about Title IX and the fact that Dr. Carr had been accused of a Title IX violation and sexually assaulting someone or whatever.  And the professor made that comment in there, and that came to me as well.

Q    Was it Jamie Bird?

A    I assumed it was Jamie, but I don't -- I don't know for a fact.  They didn't say in the -- in the text message it was Jamie Bird.

Q    Okay.

A    So ...

Q    And there was a -- not Title IX, but -- the race discrimination complaint was not Title IX.

A    No, that's Title VII.

Q    Son- --

A    Sonja Wright Smith.

Q    Okay.

     Okay.  So you learn about it, and so

what -- what did you get on the -- on your text
messages?

A    Just that.  Just the --

Q    So -- but how many pages?

A    I think it was two.

Q    Two?

And do you remember what it looked like?
Did it have, like, letterhead?  No letterhead?

A    No letterhead.  It was just on a piece of
paper.

Q    Okay.

All right.  If you could turn to 47.

(Marked for identification is Plaintiff's
Exhibit 47)

BY MS. MAESTAS:

Q    Okay.  So I did an open record request to
Abraham Baldwin Agricultural College, or ABAC, and
then -- so my correspondence is the first three
pages.  Then the documents appear on the fourth
page --

A    Uh-huh.

Q    -- with the remainder.

And if you could just take a minute to
familiarize yourself with the documents.  There are
some parts that's a screenshot.  And nobody really

knows for sure what it is 'cause no one's testified to it, but it appears to be a screenshot that was taken maybe by IT to show their path while they found these documents --

A    Okay.

Q    -- in response to my request.

A    Uh-huh.

MR. CARTER:  These are the documents that were produced to her starting there and then these are -- you want her to read through all of them?

MS. MAESTAS:  I mean, she doesn't have to read every word, but if she could just --

MR. CARTER:  That page, and then that's what she was referring to.  And then looks like maybe, I don't know, another two emails and then a letter to Dr. Carr from Dr. Carvajal and another screenshot.  Okay.

BY MS. MAESTAS:

Q    Okay.  Any of that, have you ever seen before or heard of before?

A    No.

Q    Okay.  So there is an allegation that was made and then investigated by the Board of Regents. There were investigators that came down, and there

was a report of findings regarding Dr. Carr's inappropriate behavior, it not being an isolated incident.  He's notorious around campus for being vulgar and using sex --

MR. CARTER:  Wait.  That's not in front of me, is it?

MS. MAESTAS:  I said there were -- there were findings.  There's a reprimand and then there's also -- this is an email to Dr. Carvajal from an employee of -- I believe of ABAC regarding what he had observed, which then generated the request for the investigation.

MR. CARTER:  Yes.  This was the email from this gentleman who's providing information from other people to Dr. Carvajal, and then the letter from Dr. Carvajal to Dr. Carr about the investigation and the follow-up.

THE WITNESS:  Okay.

BY MS. MAESTAS:

Q    Okay.  So the question is -- I think you said you never knew about it, so.

A    No.

Q    So if an employee -- when they go to apply to an institution and then, say, they apply at VSU,

are they required to disclose previous disciplinary conduct?

A    No.  Not at this time, no.

Q    **They're not?**

A    No.  Like, they have to say whether, of course, they were arrested or something like that. I think that's on the application, but they're not -- there's no requirement that they disclose if they've been a part of an investigation or found guilty of an investigation.

Q    **Okay.  And if --**

A    But I don't know at the time when --

Q    **Right.  Like, right now --**

A    Yeah.

Q    **-- if you applied, no employees are required to --**

A    No.

Q    **-- disclose if they were a part of an investigation?**

A    No.

Q    **So if you have -- and if you're reviewing an application and you know that that person had this on their background, would you need to disclose that to the search committee, the hiring committee?**

A    Ask that one more time for me.

Q    Okay.  So if a person has this in their background, an investigation regarding Title IX inappropriate behavior -- you know that they have it -- you're reviewing their application -- or they're applying to VSU, would you be required to disclose that so that the hiring committee could consider it?

A    We -- our practice is not to disclose what you hear, especially not having all the full details of the information, because it definitely could be -- like, there are times where people will do a search on Facebook or whatever and read something about somebody and then find out later that that's not truth.  And so we don't ask that anybody go back to search committee and hear -- and talk about what they've heard or what they said about the person in any regard.

And so when we're doing reference checks and background checks, we're thinking that, you know, things are going to pop up, but if you don't know the full details, we would not want to, you know, put something out there that may not be true about the person.

Q    So if you did a background check on Carr and this came up, what would you do?  If Carr is

applying for employment, you did a background check and you found this out.

A    Depending on the recency of the event.  So we look at the job.  We look at the recency of the event.  We look at what was done and -- and, you know, it was a written reprimand.  It wasn't that he was termed.  It wasn't -- and, you know, if the behavior has corrected.  I mean, people correct behavior when they get a written reprimand.  So, you know, we look at all of those kind of things, so ...

Q    Would that be something that would need to be looked at?

A    What do you mean?

Q    Like, would you just say, oh, okay, I know it.  I'm not going to tell anybody.  I'm not going to consider it?  Or would you have to --

MR. CARTER:  Are you asking her what the policy is?  I mean, you said is that something that would need to be disclosed or discussed.

BY MS. MAESTAS:

Q    I guess the question is:  Do you, as the --

A    Chief HR officer.

Q    As the chief HR officer at VSU, if you knew about this, would you keep it to yourself or

would you tell somebody about it?

A    I would not have told a committee about that because I am HR.  And so if I was going to do something -- and I wouldn't have done -- necessarily done anything with this except to make sure that -- you know, if it got to the hiring point, to make sure that everything was taken care of about this. So I am HR.

But somebody outside of HR, I wouldn't expect them to go around and tell and, you know, to hurt somebody, to impact somebody's reputation when they don't have all the details because there's -- it wouldn't have been possible for them to have all the details of it.  And so --

Q    So -- okay.  So Dr. Carr, he's supervised by Dr. Carvajal at VSU.  Previously, same relationship at -- at Bainbridge College.

Would Dr. Carr, when he applied -- so Dr. Carvajal -- when Dr. Carr applied to VSU, would Dr. Carvajal have any obligation to document this in some way in --

A    No.

Q    -- Dr. Carr's --

A    No.

Q    -- application?

A   No, because just like I said when I said that we only put -- keep things -- we -- we would give -- give more weight -- give weight to things after a year.  If he's worked with him for all of these years -- this happened in 2013.  He's worked with him.  To his knowledge, he hasn't heard or seen of anything else, any kind of other things, then it's been corrected.  And so there would be no reason for him to have an obligation to share it with anybody.

(Marked for identification is Plaintiff's Exhibit 49)

BY MS. MAESTAS:

**Q   Okay.  I'm handing you what I've marked as Plaintiff's Exhibit 49.  This is a job posting for admissions, and Jamie Bird applied for it.  She did not get the position.**

**And do you know anything about the posting and who was on the hiring committee?  Anything about the hiring process for the person that was chosen?**

A   Yes.  So I do know that Dr. Zduy Chu -- Zduy Chu was the chair of the committee.

I know that Lisa Long was originally on the committee, but then we found out that she had passed on information to Jamie.  And so we asked --

got her to step down off the committee.

I know that Rebecca Taylor was on the committee.  And Michelle Jordan, I -- I put her on the committee.

Q    Anybody else?

A    I -- there's somebody else.  There's a couple other people, but I don't know who else they were.

Q    Okay.  And were you involved in how they decided who they hired?

A    No.

Q    Okay.  Who did they hire?

A    I actually don't know.  I actually don't know.

Q    Okay.  And do you have any opinion about who was better suited for the position?

A    No.  I haven't seen the information at all.

Q    Okay.  And Michelle Jordan, she recently resigned --

A    Uh-huh.

Q    -- correct?

Why did she resign?

A    She resigned because she broke confidentiality, and she knows that that's not

something that's tolerated in her role.

Q    Sorry.  I forgot to ask you.

So Lisa Long was on the hiring committee for this job posting, Plaintiff's Exhibit 49, and she was removed from the committee because she passed information to Jamie Bird.

A    Uh-huh.

Q    What -- can you tell me more details about that?  What was the information that was passed?

A    It -- the information that was passed was about who was on the -- on the selection committee. And Lisa admitted that she gave the information and then she walked it back and said she didn't give the information.

But she gave Jamie information about who was on the committee, and that's not information that was out there.  And if we can't even trust you not to give that information, then it -- it was a confidential process, so ...

Q    So is there a rule that says that you can't disclose who's on the committee?

A    It is a rule that the -- what's -- on the search committee, I conduct the trainings myself, along with other people in my office.  We tell them the search process is confidential.  You cannot

discuss it with anybody, and you definitely can't give somebody a unfair advantage in any kind of way, shape, or form.

Q    Okay.  Was Jamie eliminated as a candidate because of that?

A    Absolutely not.

Q    Okay.  Do you know why she was eliminated as a candidate?

A    No.

Q    And how did you learn that Lisa had -- Lisa Long had passed down this information to Jamie?

A    Ryan told me, or told Michelle.  Jamie had sent an email to the people on the committee or sent an email to Dr. Chu or some -- something like that.

And then -- then Ryan -- 'cause Ryan wrote and somebody said something.  So -- so we talked to Lisa Long, and Lisa said, yes, but it wasn't a big deal because the committee -- she just made -- what you call it.

And then we told her we were going to remove her from the committee, and then she came and she said, well, you know, I'm not saying I did anything, but I -- so ...

Q    And then Jamie sent an email that -- so that's how you knew she knew, or, like, what was the

email?  Or do you not know?

A    I don't know.

Q    Okay.  Back to Michelle Jordan breaching confidentiality.  What -- how did she breach confidentiality?

A    I gave her some information about something that was going on with UPD and --

Q    U --

A    UPD, University Police Department.

-- and one of their employees, and I asked her not to say anything because I had not -- I didn't know whether the information was as accurate as possible.  And the person she -- she gave the information, and then the person told their supervisor that she gave it.  And so -- and then she, unfortunately, lied to me about giving the information.

Q    Okay.  Was there anything --

A    But she took the high road once everything came out, and I do need to say that because she's a good person.

Q    Okay.  Did she raise any ethical concerns of her own in her exit interview about anything at VSU?

A    No.

MS. MAESTAS:  I'm about wrapped up, and so if you can just give me a few minutes to meet with my client.  We can leave, walk out or --

MR. CARTER:  No, we can walk out.  I'm sure she'll want to cool off.  I know somewhere where it's cooler.

(Recess 3:52 p.m. until 4:00 p.m.)

BY MS. MAESTAS:

Q    All right.  Back on the record after a short break.

Just a few follow-up questions regarding Jamie Bird's application to the assistant director of admissions position in Plaintiff's 49.  And you had stated that Lisa Long had been removed from the hiring committee because she passed information on to Jamie.

A    Uh-huh.

Q    And do you have any documentation that shows that?

A    We have the documentation -- we -- I have documentation from Michelle saying she spoke to Lisa and Lisa said yes.  I mean -- so I have -- I know there's nothing to document, but I have her statement that she did speak to Lisa and Lisa did say, yes, she -- she did share the information with

Jamie.

Q    And that was the people's names who were on the hiring committee?

A    Yes.  Or the -- who chaired -- yes, yes. Something to do with the hiring committee, yes.

Q    Something to do with it, but you said before the actual names.

A    Yes.

Q    So is it the names, or is it just something about the committee?

A    You did say you're not going to hold me to verbatim, and then I say something to you and then you -- you hold me verbatim.

Yes.  It has something to do with the hiring committee.  I think it was the people's names.

Q    But you don't know for sure?

A    I'm almost sure, but no.  A hundred percent?  No.

Q    Okay.  And then -- so you said you have documentation of it but that -- so is that a verbal conversation with Michelle, or is there, like, an email or something?

A    No.  It's a verbal conversation with Michelle.

Q    So no documentation?

A    No documentation.

Q    Okay.

MS. BIRD:  Of course not.  Of course not.
I'm sorry.  It's -- I got to go.  I'm
sorry.

BY MS. MAESTAS:

Q    And then --

MR. CARTER:  You can tell your story.

BY MS. MAESTAS:

Q    And then also a meeting with Ryan Hogan
where he told you this information --

A    Gave Michelle the information.  She spoke
to Ryan.

THE COURT REPORTER:  You said she spoke?

THE WITNESS:  Spoke to Ryan.

BY MS. MAESTAS:

Q    And Ryan, does he have any
documentation --

A    I don't --

Q    -- of it?

A    I don't know.

Q    So your understanding, it was a verbal
from Lisa Long to Ryan?

A    No.  It's not from Lisa Long to Ryan.

When -- when -- when Dr. Chu received the email or received the correspondence or received whatever he received, he contacted Ryan, I believe.  And Ryan contacted HR.  I asked Michelle to look into it to see what was going on.  Michelle looked into it.  Then she spoke to Lisa.  We told Ryan we're going to have to remove her from the committee, and that's the way it played out.

Q   Okay.  So it originated from an email to Dr. Chu?

A   Or some kind of correspondence to Dr. Chu, correct.

Q   Okay.  And do you know what that was?

A   I don't remember exactly what it was.

Q   Okay.  I guess we'd have to ask Dr. Chu.

And this was something that came from Jamie to Dr. Chu?

A   I think so, yes.

Q   All right.  And regarding Jamie's position in dual enrollment, she was the dual enrollment coordinator?

A   Manager.

Q   Manager.  Okay.

Was that position funded by grant money?

A   I have no -- I don't do anything with

money.  I don't know.

**Q   Okay.**

MS. BIRD:  Okay.  Here is everything I've sent.

MS. MAESTAS:  That's fine.

MS. BIRD:  They're all response to him, not me.

That interview -- I'm sorry.

MS. MAESTAS:  I don't have anything further.

MR. CARTER:  Okay.  We're done.

MS. MAESTAS:  Thank you for your time.

THE WITNESS:  Thank you so much.

THE COURT REPORTER:  I need to know if the witness is reading or waiving.

MR. CARTER:  You --

THE WITNESS:  I'm reading.

MR. CARTER:  Yeah.  Okay.

THE COURT REPORTER:  Okay.  And since this is my last day here, I need to tie back in and get your order on the record or if you're holding off for now.

MS. MAESTAS:  Let me try and calculate those costs real quick based on the page count because I'm going to go back to my email from

Huseby.

THE COURT REPORTER:  Okay.

MS. MAESTAS:  Is that okay?

THE COURT REPORTER:  Yes.

Are you wanting to say that you're ordering copies of whatever they order?

MR. CARTER:  I want a copy of all the transcripts, but it's hers --

THE COURT REPORTER:  All the copies of what they order?

MR. CARTER:  It's her responsibility to pay the appearance fee.

THE COURT REPORTER:  Oh, yes, the appearance fee, but if she's not ordering --

MR. CARTER:  If she's not ordering, I want all the transcripts.

THE COURT REPORTER:  You're okay with ordering the original?

MR. CARTER:  Sure, if she's not ordering.

THE COURT REPORTER:  Okay.  If she's not ordering, okay.

(Examination was concluded at 4:05 p.m.)

CERTIFICATE OF OATH

STATE OF GEORGIA

COUNTY OF LOWNDES

     I, KAIRISA JOI MAGEE, RPR, GCCR (Georgia),

     Notary Public, State of Florida, certify that

     JEANNINE BODDIE-LAVAN appeared before me on

     January 21st, 2022, and was duly sworn.


     Signed this 28th day of February, 2022.

_____
KAIRISA JOI MAGEE, GCCR, RPR
Georgia Certification No. 5962-0590-7476-4800
Notary Public, State of Florida
My Commission No. GG 968504
Expires: 03/15/2024

CERTIFICATE OF REPORTER

STATE OF GEORGIA

COUNTY OF LOWNDES

I, KAIRISA JOI MAGEE, RPR, GCCR (Georgia), Florida Notary, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of JEANNINE BODDIE-LAVAN; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 28th day of February, 2022.

_____
KAIRISA JOI MAGEE, GCCR, RPR, FLORIDA NOTARY

```
                    ERRATA SHEET

             DO NOT WRITE ON THE TRANSCRIPT
             ENTER CHANGES ON THIS SHEET

JAMIE T. BIRD V VALDOSTATE STATE UNIVERSITY
Deponent:  JEANNINE BODDIE-LAVAN
Date of :  January 21st, 2022
Case No.:  7:21CV62 (WLS)

   PAGE    LINE          REMARKS
```

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

```
Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.

Signature of Witness _____

Dated this _____ day of _____,
_____.
JOB NO.:  378318
```

Case 7:21-cv-00062-WLS    Document 34-8    Filed 05/12/22    Page 132 of 164

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Jeannine Boddie-Lavan on 01/21/2022          Index: -i-g-h-t..31605

## Exhibits

**BoddieLavanJ-3**
3:11 15:21
16:2

**BoddieLavanJ-4**
3:13 19:6,
8

**BoddieLavanJ-5**
3:15
20:17,19

**BoddieLavanJ-7**
3:16 25:11

**BoddieLavanJ-9**
4:10 83:9,
11

**BoddieLavanJ-10**  4:12
83:18

**BoddieLavanJ-12**  4:15
84:5 89:6

**BoddieLavanJ-13**  4:14
88:23

**BoddieLavanJ-14**  4:13
84:10,13

**BoddieLavanJ-34**  3:22
55:13

**BoddieLavanJ-36**  4:6
67:11

**BoddieLavanJ-37**  4:4
60:7,9,11

**BoddieLavanJ-40A**  4:8
75:4,7
76:14

**BoddieLavanJ-41**  4:16
90:13

**BoddieLavanJ-42**  4:18
96:25

**BoddieLavanJ-43**  3:21
38:8,19
39:18
97:21

**BoddieLavanJ-46**  3:17
27:4,7
81:22

**BoddieLavanJ-47**  4:19
111:14

**BoddieLavanJ-49**  4:20
118:12,15
120:4

---
**-**
---

**-i-g-h-t**
29:4

---
**1**
---

**1**  55:18
56:10

**10**  83:16,18

**11**  83:21

**12**  10:6
84:5 89:6,
8

**13**  88:21,23

**133**  16:6

**14**  84:6,10,
13

**14th**  74:11

**16**  79:11

**17**  79:11

**18**  10:2
79:11

**19**  79:11

**19th**  33:8,
11

**1:08**  5:1

**1st**  23:14

---
**2**
---

**2**  36:12
39:7

**20**  10:3

**20-year-old**
10:3

**200**  25:1

**2013**  118:5

**2015**  79:11

**2018**  23:14

**2019**  33:8,
11 35:20
36:5,15
38:12
39:21

**2020**  28:6
56:1,7
67:8,13
68:10
74:11
76:17
87:19,20

**2021**  87:21

**24th**  28:5

**25**  55:18

**26**  55:20

**26th**  70:17

**28th**  100:25

**29th**  22:24

**2:03**  52:4

**2:13**  52:4

---
**3**
---

**3**  15:21
16:2 77:23

**300**  25:1

**31605**  6:8

**34** 55:11,13 70:4,7

**35** 70:4

**36** 67:4,11 70:4

**37** 60:7,9, 11 70:4

**38** 70:4

**39** 70:5

**3925** 6:7

**3:10** 97:17

**3:21** 97:17

**3:52** 123:7

---

**4**

**4** 19:6,8 21:8

**40** 70:5

**40a** 70:5,6 71:19 75:4,7 76:14

**40b** 70:5,6, 7

**41** 90:11,13

**42** 96:23,25

**43** 19:13 38:3,8,19 39:18 97:11,21

**46** 27:2,4,7

**39:**4,5 77:22 81:22

**47** 111:12, 14

**48** 55:20

**49** 118:12, 15 120:4 123:13

**4:00** 123:7

**4:05** 128:22

**4:57** 67:14

**4th** 87:19

---

**5**

**5** 19:13 20:17,19

**50-something** 81:3

**54** 81:3,6, 18

**5th** 55:25 56:7 67:8, 13 68:8 70:16 76:17 98:1,8 106:2

---

**6**

**6** 16:6,11 60:17 62:9 67:8 77:22

**6th** 98:3

---

**7**

**7** 25:9,11 78:17

**721CV62** 5:22

**7th** 11:17 36:15 37:17 38:12 98:4 106:3

---

**8**

**8** 56:10

---

**9**

**9** 83:9,11

---

**A**

**ABAC** 111:17 113:11

**ability** 9:9

**Abraham** 111:17

**absolutely** 18:13 66:12 67:3 83:25 92:4 97:14 121:6

**absorbed** 78:19

**account** 33:9,12

**accurate** 65:5,6,7 122:12

**accuse** 107:24

**accused** 110:9

**action** 5:21 18:3 20:1, 6 25:19 45:10

**actual** 23:20 88:7 124:7

**add** 68:4

**additional** 67:17,18 68:22,24

**address** 6:6 61:23,25 72:1,8,15

**administrative** 31:10

**admissions** 39:21 46:25 78:20 84:21 87:18 88:12 89:23 118:16 123:13

admitted
105:11
120:12

advantage
121:2

adverse
103:1

adversely
102:6

adviser
76:6,8,18

advisers
46:4

advocate
66:15

affairs
47:14

affect 9:9

affiliations
11:21 12:3

affirm 5:4

affirmative
45:9

afraid 66:21

African 31:5

afternoon
5:17

age 5:13
9:20

agreement
6:11

Agricultural

111:17

ahead 42:13
102:20
104:11

allegation
29:21
40:12
56:12
58:5,20
71:18
112:23

allegations
56:8 59:2,
7,11 61:3,
11

alleged 31:3
41:7

alter 19:23

altered
19:25

American
31:5

amount 24:25

analysis
17:20

and/or 21:11

angry 60:22
62:11

anonymous
108:4
109:23
110:5

anonymous@
gmail.com
108:24

anonymously
107:15
108:20,22

answering
71:19

anti-
harassment
20:24

anybody's
65:13

Apartment
6:7

apparently
73:15
107:4

appeal 47:9,
17,20

appealed
41:8 47:17

appearance
128:12,14

appears
112:2

application
27:14
35:9,13
114:7,22
115:4
117:25
123:12

applied

21:24 54:2
55:9
114:15
117:18,19
118:16

applies
75:11

apply 54:5
72:25 73:1
75:15
85:13
113:24,25

applying
115:5
116:1

area 23:1
47:15

arrested
114:6

Arrington
44:3 53:18
63:17 80:6

assaulting
110:10

assistance
93:9

assistant
123:12

Associate
14:22

assumed
110:14

attached
62:7 70:21

Case 7:21-cv-00062-WLS    Document 34-8    Filed 05/12/22    Page 135 of 164

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Jeannine Boddie-Lavan on 01/21/2022      Index: attachment..Bird's

**attachment**
  56:3  60:14
  68:12

**attention**
  15:21  69:9
  107:10

**attorney**
  43:23  76:7

**August**  28:5
  74:2,11

**authorities**
  8:13

**automatically**
  46:12

**avoid**  6:21
  18:20

**aware**  17:11,
  12,15,25
  18:1  21:15
  36:16
  37:19
  38:13
  48:17
  63:17
  71:15,17
  76:4  89:24
  97:16

————————
        **B**
————————

**back**  8:16
  26:20
  32:13  33:7
  38:2  39:4
  52:5  56:18
  57:18

  58:12
  61:25  64:8
  69:17  79:4
  81:21
  82:16  93:8
  95:5
  97:19,20
  106:13
  115:14
  120:13
  122:3
  123:9
  127:20,25

**background**
  100:19
  114:23
  115:2,19,
  24  116:1

**backwards**
  97:2

**bad**  101:14,
  18,19

**Bainbridge**
  56:18
  57:18
  58:12,21,
  22  59:1,
  22,25
  60:5,24
  61:1,24
  62:4,12,
  14,24,25
  63:1  64:20
  106:25
  117:17

**Baldwin**

  111:17

**ballpark**
  14:4

**bar**  12:9

**Barry**  79:23,
  25  82:4,6,
  14

**Barry's**
  79:21

**bars**  12:15
  13:11

**based**  29:13,
  23  40:15,
  16  43:19
  49:22
  51:22
  67:18
  68:24
  71:24
  78:11
  95:10
  99:21
  100:10
  127:24

**basically**
  14:18
  53:14
  56:19
  93:20

**basis**  35:21

**began**  5:1

**beginning**
  92:10  98:6
  99:13

**behavior**
  18:24  28:9
  30:18  36:2
  113:2
  115:3
  116:8,9

**believed**
  94:5  105:9

**believing**
  93:25

**bias**  66:7

**big**  121:17

**bigger**  87:23
  88:25

**Bird**  5:18,
  19  23:15
  30:12
  33:9,11
  36:1,14,16
  37:16
  38:11,13
  40:9
  110:13,16
  118:16
  120:6
  125:4
  127:3,6

**Bird's**  33:9,
  12  34:23
  35:23
  36:18
  38:15
  39:13  46:9
  47:17  49:2
  50:16

Case 7:21-cv-00062-WLS    Document 34-8    Filed 05/12/22    Page 136 of 164

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Jeannine Boddie-Lavan on 01/21/2022        Index: Birdinvestigationfin..Carter

52:18
100:2
123:12

**Birdinvestigationfinal101220 20.docx.**
  60:15

**bit**  7:9
  88:25  97:2

**Black**  97:9

**blue**  79:5
  88:13

**blued-off**
  88:7

**blurb**  33:2

**board**  5:19
  11:21
  14:7,8,21
  45:6  52:21
  63:23
  64:8,9
  76:22  77:1
  112:24

**Boddie**  6:5
  9:25
  82:11,12

**Boddie-lavan**
  5:11  6:2
  60:13

**bold**  78:18

**books**  55:17

**bottom**  78:17
  79:5

**boyfriend**
  107:17

**breach**  122:4

**breaching**
  122:3

**break**  52:2,
  6,9  97:13,
  19  123:10

**briefly**
  10:15

**bring**  69:9

**broke**  119:24

**brought**
  30:16
  107:10

**bullet**  33:6
  34:15,17
  37:11
  38:10  39:2
  57:5

**bunch**  13:3

**business**
  5:20

———————
        **C**
———————

**cabinet**
  12:23,24
  13:2  23:24

**calculate**
  127:23

**call**  27:23
  33:25  71:1
  72:23

**called**  16:10
  33:23
  34:2,14
  48:18
  66:17
  106:11,14

**calls**  20:10
  67:25

**campus**  66:22
  113:3

**candidate**
  121:4,8

**capped**  42:4

**care**  14:16
  117:7

**Carr**  12:19
  26:25
  29:12,21
  31:13,23
  33:17,22,
  25  34:7,24
  36:15
  37:18,21
  38:12
  56:14
  57:15
  58:6,8
  60:20,22,
  24  62:9,
  10,12
  78:13,14,
  24  79:17

**91:16**
  104:17
  121:19

**81:24**
  82:2,14,22
  90:4  91:3,
  10,11,14
  94:21  96:7
  98:3,13,
  23,24
  100:19
  103:24
  106:9
  107:7
  110:8
  112:17
  113:17
  115:24,25
  117:15,18,
  19

**Carr's**  28:9
  30:17
  33:10
  95:25
  106:24
  113:1
  117:23

**Carter**  9:5
  10:14
  14:22
  15:2,4
  20:7,9
  35:3  39:5,
  7  50:21
  56:23
  58:13
  59:2,8,12,
  17,21,25
  60:3  61:2,
  8,20,21

63:19
65:20
75:16 79:6
80:1,5,9,
11,13,24
81:2,7,12
97:14
102:8,12,
18 104:11
112:8,14
113:5,14
116:17
123:4
125:9
127:11,16,
18 128:7,
11,15,19

**Carvajal**
90:4
95:21,23
96:5,14
112:17
113:10,16,
17 117:16,
19,20

**case** 41:22
42:25 43:1
44:23 49:9
50:3,17,
20,23
51:10 53:7
55:3 74:7
76:12
78:14,21
98:18

**cases** 41:18
42:12 45:7

72:8,15
74:8

**catch** 80:16

**category**
95:6

**Center** 14:8,
9

**chair** 118:22

**chaired**
124:4

**change** 62:14
65:1,9,13
98:25

**changed**
105:14

**chart** 79:9
81:21
89:14

**check** 67:2
115:24
116:1

**checks**
115:18,19

**chief** 10:25
11:8,9,14
116:23,24

**children**
9:20

**choice** 7:1
76:6,8

**choose** 55:8

**choosing**
93:7

**chosen**
118:20

**Chris** 107:15
108:1,14

**Chu** 118:21,
22 121:14
126:1,10,
11,15,17

**church**
13:17,18,
22,25

**churches**
12:8 13:15

**Civil** 5:21

**clarification**
67:18
68:24 69:2

**class** 86:7,
8,9 110:6

**classification**
86:14

**clear** 49:19

**client** 123:3

**close** 48:10,
12

**closed** 28:10
30:18
56:14
57:14 58:7

**clubs** 12:7

**collaborated**
100:12

**collect**
58:25

**College**
14:23
56:18
57:19
58:12,22
59:22
60:1,5
61:1,24
62:4
106:25
111:17
117:17

**colleges**
12:4 23:10
104:5

**colon** 78:18

**column** 86:18
88:9,10

**columns**
87:17

**combination**
100:23
103:16

**comfortable**
96:2

**commending**
68:11

**comment**
110:7,11

**Commission**
16:9 19:10

**committee**

Case 7:21-cv-00062-WLS   Document 34-8   Filed 05/12/22   Page 138 of 164

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Jeannine Boddie-Lavan on 01/21/2022 Index: committees..coordinator

114:24
115:6,15
117:2
118:19,22,
24 119:1,
3,4 120:3,
5,11,16,
21,23
121:13,18,
21 123:15
124:3,5,
10,15
126:7

**committees**
11:7

**common**
17:11,13,
16 18:2,9,
12,15 19:2

**communicated**
24:10 56:9

**communication**
102:17,25

**comp** 86:9

**company** 7:20

**compare**
85:19

**compared**
34:16

**compensation**
7:21

**compete**
85:14

**complainant**

29:15 76:9

**complaint**
18:5 29:12
35:25 40:9
43:7,9
46:10
49:2,5,6
50:16
52:18,19,
20,24,25
56:20,22
57:6 62:1
71:20
73:21 75:7
110:20

**computer**
8:25 9:3

**concept**
17:25 18:1

**concern**
48:11

**concerns**
35:23 56:9
59:22 61:3
72:18
122:22

**conclude**
41:6

**concluded**
128:22

**conclusion**
20:10

**conditions**
19:23,24

**conduct**
19:22 21:8
25:19
43:1,2
58:11
101:17
114:2
120:23

**conducted**
75:25

**confidential**
120:19,25

**confidentialit
y** 119:25
122:4,5

**confirm**
99:17

**confirmed**
35:22

**conflict**
66:6

**connect** 91:5

**consent**
56:13
57:14 58:7

**considered**
23:17
25:17
65:22

**consistent**
56:21
75:19

**constitute**
20:6

**consultant**
41:16
46:18,19

**contacted**
106:12
126:3,4

**contained**
36:17
38:14

**context**
18:18

**contributions**
95:16
100:2

**control**
96:12,17

**conversation**
24:1 48:9
63:16
82:21
91:14
98:17
124:22,24

**conversations**
78:11

**conveyed**
103:14

**cool** 123:5

**cooler** 123:6

**coordinator**
41:18
44:19,20,
22 71:15
126:21

**copies**
128:6,9

**copy** 6:23
36:17,22
38:14
128:7

**correct**
11:18
30:9,11
32:5 38:20
39:18
53:22,24
64:25
70:9,10,22
71:2
109:17
116:8
119:22
126:12

**corrected**
116:8
118:8

**corrections**
67:16
68:16,21

**correctly**
48:10

**correspond**
15:23

**correspondence**
111:18
126:2,11

**cost** 25:2,6
26:2,3,9

**costs** 127:24

**counsel** 6:12
8:15 63:19

**count** 127:24

**couple** 22:9
25:15
35:19
119:7

**court** 5:2,9,
23 6:20
7:1 14:25
42:1,4
49:15
65:10
72:2,4,10,
12 74:22,
24 75:1
81:1 86:8,
24 125:15
127:14,19
128:2,4,9,
13,17,20

**covered** 14:6

**Crawford**
47:18
48:5,9
76:16

**create** 20:2
21:10

**created**
43:16
87:15,17
98:7

**creating**
21:11

**crew** 11:7

**cross-talk**
57:11

**culminated**
19:25

**current**
10:22,23

**curriculum**
92:19 93:5

**cut** 93:12

**cutting** 14:5

**CVIOG** 39:20

**cycle** 39:14

---

**D**

---

**damage** 96:9,
12,16,19

**data** 80:8,
10,17,20
81:10
82:13
83:1,2,4,
6,8

**date** 87:16,
17

**dated** 28:5
55:25
76:17
98:1,8
106:2

**dates** 90:3

**day** 12:9,
10,16,17
24:22

80:13 98:9
127:20

**days** 11:18
84:13

**DE** 93:7

**deal** 85:24
121:18

**dealing** 73:9

**dealt** 40:4

**Dean** 14:23

**December**
22:24

**decide** 48:5
51:6,9

**decided**
46:8,14
47:9 51:14
54:23 95:1
119:10

**deciding**
23:18
101:17

**decision**
23:22
24:10
49:1,4
54:18,20,
21 71:3,9,
10,12,13
75:24 76:1
95:7,8
101:7,10
105:16

decisions
  23:25
  24:5,7,14

defendant
  6:13

defense  8:2

definitions
  21:4

degree  15:8

delaying
  52:13

deny  18:21

department
  79:21
  122:9

Depending
  116:3

depends
  86:13

deposition
  6:10,12,
  19,24 7:3,
  15 8:8
  9:10 10:11
  11:17 13:7

depositions
  102:4

deputies
  45:19

deputy
  45:20,25

designed
  42:25

desk  56:13
  57:13 58:6
  106:10

detailed
  33:21

details
  115:9,21
  117:12,14
  120:8

Devan  9:24

direct  5:15
  31:1 39:16

directed
  52:20

direction
  93:10

directly
  32:6 42:15
  49:6 50:10
  82:4

director
  41:14
  123:12

disagree
  57:8,9,25

disagreed
  104:21

disagrees
  58:17

disciplinary
  25:19
  114:1

disclose

114:1,8,
  18,23
  115:6,8
  120:21

disclosed
  116:19

discomfort
  21:11

discovery
  9:5 63:11
  84:17

discretionary
  27:14,25
  35:9,13
  58:23

discriminated
  29:23
  51:22

discrimination
  29:13
  40:15
  49:22
  110:20

discuss  13:6
  35:20
  121:1

discussed
  28:16
  116:19

discussion
  36:13
  94:23 96:4

disguising
  56:17

57:17
  58:10

dismissed
  41:3,5
  54:25

dismissing
  49:1

District
  5:22,23

Division
  5:24

Doctor  49:15

doctor's
  14:17

document
  16:7 20:21
  27:8 33:21
  37:9,14
  39:1
  55:22,24
  56:7 58:17
  60:14
  62:7,8
  63:22
  64:1,5
  79:9 87:14
  89:2,8
  90:15
  117:20
  123:23

documentation
  32:20
  78:5,8,11
  82:7
  123:18,20,

21 124:21
125:1,2,19

documented
25:18

documents
8:14,21
40:18,21
43:15
58:24
62:21
63:14,18
84:16
111:19,24
112:4,8

door 28:10
30:19

doors 56:14
57:14 58:7

downplay
18:21

draft 68:13
98:11
99:10
101:3

drafted
37:3,5,10
97:24
100:5
101:25

drafting
98:8

drafts 70:21

drawer
106:10

drink 12:14
13:11

driver 23:4

drugs 9:9

dual 39:21
47:2 78:18
79:1,10
93:16
126:20

due 16:23

duh 77:11

duly 5:13

duties 77:25
78:20

E

earlier 34:8
73:11
98:11,12

edit 43:16

education
15:8 94:1

EEOC 15:14
16:8 36:9

effect 21:10
74:10,12,
14

effectiveness
79:13,15,
18,22,23,
24

eliminated

78:2
121:4,7

email 27:20
55:25
60:11 62:5
67:5 71:1
76:16
92:16,24,
25 94:18
96:6 97:3,
6 101:24
102:9,10,
18 105:12
108:23
113:9,14
121:13,14,
24 122:1
124:23
126:1,9
127:25

emails 67:7
70:8,21
112:16

employee
6:13 23:23
24:2 31:14
46:17
72:8,15
91:23
105:2,3,10
107:7,10,
12,13,14
113:10,24

employees
40:5 49:25
66:13
74:17

114:15
122:10

employer
7:19,23,24

Employers
19:11

employment
10:23
11:4,23
16:8
19:10,24
20:1,5,6
22:14
116:1

enacted
72:1,8,15

end 74:9
92:10
100:25

ended 30:2

ends 82:16

endure 18:24

enrollment
39:21 47:2
78:18,19
79:1,10
93:16
126:20

ensure 51:21
77:9

entitled
45:4

environment
20:3

EO   45:8

EOC   45:9

EOD   47:13

Equal   16:8
  19:10

equity   41:15
  42:15

established
  28:11
  30:19
  103:1

ethic   100:3

ethical
  122:22

evaluation
  39:14
  105:17,20

evaluations
  25:18

event   99:18
  116:3,5

evidence
  104:19

examination
  5:15
  128:22

examples
  21:6 60:19

exchange
  70:17

exchanged
  70:20

exhibit
  15:21,24
  16:2 19:6,
  8 20:17,19
  25:11
  27:4,7
  38:8,19
  39:18
  55:13
  60:7,9,11
  67:11
  75:4,7
  76:14
  81:6,22
  83:9,11,18
  84:5,10,13
  88:23 89:6
  90:13
  96:25
  97:21
  111:14
  118:12,15
  120:4

exist   63:14

existed
  21:23

exit   122:23

expect
  117:10

experience
  31:21

explain   28:1
  92:20

explained
  92:9

Extension
  6:7

extent   20:9
  96:19

——————————

F

——————————

Facebook
  107:5
  108:4
  115:12

fact   24:24
  31:9 37:20
  40:22
  64:11
  99:20
  101:7
  110:8,15

factors
  23:17

faculty
  89:10

failure   19:1
  36:7,10

fair   41:1
  84:3 88:20

fall   47:11,
  15 71:20
  75:7,13
  79:10
  88:18
  89:17

falls   50:12
  73:12
  74:17

75:12

false   61:18

familiar
  15:17
  16:13,17,
  18 21:12
  51:19,24
  89:13

familiarize
  111:24

fan   52:6

fear   16:23,
  24

February
  33:8,11
  35:20 36:5
  87:19
  100:25

federal   77:7

fee   128:12,
  14

feedback
  56:4
  62:19,22
  64:22,25
  65:3,13
  66:8

feel   15:17
  67:20 69:6

fell   46:12
  49:7 95:6

felt   48:10,
  12 56:16
  57:16 58:9

Case 7:21-cv-00062-WLS   Document 34-8   Filed 05/12/22   Page 143 of 164

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Jeannine Boddie-Lavan on 01/21/2022          Index: figure..gender

100:14
104:14
105:5,9

**figure** 54:5
74:16

**file** 5:21
8:23,25
18:4
36:19,22
37:22
38:1,16
95:13
99:17
105:22

**filed** 5:12
29:12
40:9,22
73:20

**files** 42:25

**fill** 85:6

**filled** 85:2,
11,12

**final** 76:1

**find** 22:15
30:8,9
66:22
73:12
77:17 98:2
115:13

**findings**
28:8
113:1,8

**fine** 52:10
69:21

83:22
100:13
127:5

**finish** 50:22

**finished**
28:14

**fired** 56:16
57:17
58:10

**Fitzgerald**
80:5,6,7
82:5

**fix** 66:24

**flip** 16:5
70:4

**focusing**
62:23

**follow** 50:8,
14,15
51:8,15
58:2 77:7,
8

**follow-up**
113:18
123:11

**football**
12:25

**force** 23:16,
19 25:14
108:12

**forgot** 120:2

**form** 6:14
121:3

**formal** 18:3,
5 35:25

**forms** 85:25
89:11

**forward**
35:23
51:1,4
62:18

**forwarded**
62:17 63:7
64:7 81:10
91:19

**found** 31:6,8
41:5 95:13
112:4
114:9
116:2
118:24

**fourth**
111:19

**free** 67:20
69:6

**Freidhoff**
90:4,8

**frequency**
17:18

**frequently**
16:23
25:14

**front** 15:22
113:5

**full** 115:9,
21

**full-time**
46:17

**fully** 36:16
37:19
38:13
72:17

**fund** 26:9

**funded**
126:24

**funding**
25:23 26:6

---

G

---

**game** 12:20,
21

**games** 12:25

**gather** 72:16

**gave** 8:17
35:4
43:17,19
48:2
49:12,13
51:12
52:22
53:3,8,16,
21,23 63:9
64:6 73:15
80:24 81:1
93:11
105:5,9
120:12,15
122:6,13,
15 125:13

**gender** 40:16

Case 7:21-cv-00062-WLS    Document 34-8    Filed 05/12/22    Page 144 of 164

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Jeannine Boddie-Lavan on 01/21/2022        Index: general..Health

49:22
51:22
71:24

**general**
86:11

**generally**
54:4

**generated**
113:12

**gentleman**
113:15

**Georgia**
5:20,23
6:8 9:12
11:23

**Georgia's**
25:13

**gestures**
6:21

**get all**
52:12

**give** 5:5
24:21
41:24
61:16
65:13
69:17
101:13
105:6,24
106:1
118:3
120:13,18
121:2
123:2

**giving** 14:4
98:16
122:16

**Glad** 7:14

**go-between**
62:21

**goal** 51:20

**God** 5:7
84:7

**good** 5:17
7:12 44:8
52:15
91:23 92:7
94:1 95:7
101:14,19
105:2,10
122:21

**government**
16:10

**grammar**
65:7,19
67:2,16
68:16,21

**grant** 126:24

**grass** 14:5

**gravity**
18:21

**grievance**
76:10

**grounds** 11:7

**group** 12:10
13:12
86:7,8,9

**groups** 12:8

**Grubbs**
45:20,22

**guess** 44:8
116:21
126:15

**guidance**
34:24 35:4
49:8 50:11
51:12
52:22
53:3,8,10,
15,16,17
71:22
72:22,23
73:2,4,13

**guide** 93:1

**guiding** 93:9

**guilty**
114:10

---

**H**

---

**H816** 6:8

**hand** 5:3

**handing** 81:5
118:14

**handle** 42:25
49:9 53:6
86:10,13
98:16

**handled**
49:6,14
50:3

**handles** 43:1
86:2,11

**handling**
47:19
51:10
85:24

**happen** 27:22
90:24
95:22

**happened**
12:24
28:15
33:22 74:2
91:21,22
118:5

**harassed**
18:20

**harasser**
18:21

**harassment**
16:11,16
17:7,24
18:3,4,18
19:12,25
21:4,6,13
36:8 40:15
71:25
77:18,19

**Harry** 109:11

**head** 12:2
54:9 92:21
94:16

**headed** 43:24

**Health** 14:7,

9

hear  86:24
  92:2 96:4,
  18 107:3
  115:9,15

heard  16:19,
  22 17:6
  18:6,11,
  17,23,25
  19:3 21:24
  29:7 37:8
  58:21,23,
  25 62:3
  90:19 97:9
  106:23
  107:2
  112:21
  115:16
  118:6

hearing  6:17
  41:4 54:24
  55:6 62:25
  76:19

hearsay  32:3

heck  62:1

held  18:10

helped  38:22
  99:10
  100:15

helping
  45:7,8

helps  88:15

heretofore
  5:12

hey  27:24
  48:16 67:1
  68:3

high  122:19

highest  15:7

highlighted
  25:15,25
  26:8 89:20

Hilary  85:18
  86:22
  87:2,3

hire  119:12

hired  41:16
  46:14
  119:10

hiring  90:2
  114:24
  115:6
  117:6
  118:19,20
  120:3
  123:15
  124:3,5,15

hit  84:15

Hogan  85:17
  86:22,23
  87:2,3
  89:23
  125:11

hold  106:19
  124:11,13

holding
  127:22

Holly  5:17

Holmes  45:17
  47:12

home  12:21,
  25

hostile  20:2

hours  92:8

HR  15:13
  17:1 23:20
  24:7,14
  28:11
  30:19
  36:22
  47:8,13
  66:1 84:2
  86:4,11
  89:15 91:3
  105:22
  116:23,24
  117:3,8,9
  126:4

hugged  56:13
  57:13 58:6

human  10:25
  11:9,15
  15:11
  34:25
  35:24
  36:19
  38:16

humiliates
  21:11

hundred
  124:18

hurt  117:11

husband  9:24
  22:14

Huseby  128:1

hyphen  44:6

_____

I

_____

identification
  16:1 19:5
  20:18
  25:10 27:3
  38:7 55:12
  60:8 67:10
  75:3
  83:10,17
  84:9 88:22
  89:5 90:12
  96:24
  111:13
  118:11

identify
  88:16

immediately
  22:15
  106:14

impact  78:2
  103:1
  117:11

impacted
  102:6

important
  83:6

impression
  93:12

improvement
  30:4 95:12

inappropriate
  64:22
  113:2
  115:3

incident
  39:13
  60:23
  62:12,13,
  25 63:1
  91:4 113:3

include
  105:21

included
  67:16
  68:17

includes
  25:16

independent
  64:23
  65:18,23
  66:8

indiscernible
  86:7

informal
  35:25

information
  9:2 22:12,
  13 28:1
  30:10,17
  32:2,12
  33:14
  34:19
  41:6,21

49:12,13
53:19
61:18 64:4
65:4 67:19
68:25
72:17
73:16 78:4
80:18
87:25
92:11
94:15
99:13,15,
16,19
100:3,22
101:2
103:23
108:25
113:15
115:10
118:25
119:17
120:6,9,
10,12,14,
15,16,18
121:11
122:6,12,
14,17
123:15,25
125:12,13

inside  39:4
  81:22

institution
  79:20
  93:2,8
  113:25

institutional
  79:13,14,

17,22,23,
24

insurance
  14:17

intended
  21:10

intent  92:10

interaction
  33:8,11
  35:20,21
  36:5

interest
  66:6

interim
  45:17
  47:14

internally
  18:4

interview
  122:23
  127:8

interviewing
  33:17

investigate
  43:13
  46:6,9
  71:23 73:3
  77:9

investigated
  43:9,10,11
  49:3
  112:24

investigating
  32:3

investigation
  28:14,16,
  17 29:10
  30:6,22,25
  31:2 33:16
  54:22 61:7
  64:23
  65:18,23
  66:9 70:1
  75:25
  106:24
  113:13,18
  114:9,10,
  19 115:2

investigations
  30:14
  76:22 77:2

investigator
  29:18
  44:18,22
  54:16 59:3
  60:19 62:6
  66:6 70:9
  71:9,15
  75:24

investigators
  46:3
  112:25

involved
  90:2 91:22
  119:9

involvement
  11:6

involving
  60:23
  62:12

**isolated**
99:18
113:2

**issued** 76:22

**issues** 45:14
66:2

**IX** 15:14
33:16 40:9
41:9,17,18
42:12,25
43:2,9,25
44:19,20,
21 45:7,9,
16,17
46:1,9
47:10,11,
14 49:2,5,
6,7,10,19,
24 50:6,9,
13,14,15,
16,20,25
51:7,15,
18,23
52:18,19,
25 53:2,4
54:1,2,5
55:2,9
56:20 57:6
61:1,7
62:1,5
66:5 70:1,
9 71:8,13,
14,21
72:24
73:6,8,10,
17,21
74:1,7,8,

18 75:8,
10,13
76:5,11,
18,25
77:2,14
110:6,7,8,
9,19,20
115:2

—————————

**J**

—————————

**Jamie** 5:18,
19 23:15,
18 24:25
26:11,15,
16 30:12
33:8,11
34:18 35:8
37:20
40:8,9
42:14 46:9
47:17,21,
25 48:11,
12 49:2
50:16
52:17
71:20
73:16,20
91:22,23
92:1,3,20
94:19 96:9
98:2 99:18
100:23,24
101:23
103:8,24
105:1,23
106:3,5,8,
12 110:13,

14,16
118:16,25
120:6,15
121:4,11,
12,24
123:12,16
124:1
126:17

**Jamie's**
25:22
27:14
33:15,21
49:5
126:19

**Jan** 50:12
53:16
66:18,25
71:19 74:7

**Janice** 43:12
44:10,17
45:10 46:8
47:22
48:1,18
49:3,16
51:13
53:23
54:15
55:25
60:12
64:21,24
67:7 68:7
70:8 71:12
75:18,23,
25

**Jase** 10:3

**Jeanine** 5:11

6:2,5 9:25
60:12
82:11

**Jennifer**
45:20,21

**job** 11:12
21:20
22:18,23
45:12
86:20 87:6
116:4
118:15
120:4

**jobs** 22:21

**John** 47:18
48:5,9,16
76:16

**joke** 84:13

**Jordan** 24:3,
9 26:12
45:24
78:10,24
119:3,19
122:3

**judgment**
95:7
101:7,9

**July** 23:14

**jump** 25:15

**juror** 9:21

**jury** 10:1

**Justin**
27:17,21,
23 49:13

Case 7:21-cv-00062-WLS    Document 34-8    Filed 05/12/22    Page 148 of 164

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Jeannine Boddie-Lavan on 01/21/2022        Index: Justin's..long

53:9,17,
18,21 54:7
62:22
63:17 64:5

**Justin's**
63:19

―――――――――――

**K**

―――――――――――

**Karen** 97:9
107:16

**kidding**
10:20

**kids** 13:16

**kind** 18:12
25:2,5
28:1 38:25
64:18 67:1
69:12
77:12,13,
14 79:5
84:12
100:5,14
101:10
102:3
106:17
116:10
118:7
121:2
126:11

**knew** 54:15
66:18,25
84:23
99:12
106:15,16
113:22

116:25
121:25

**knowing**
64:16

**knowledge**
31:12,15
104:4,6
118:6

―――――――――――

**L**

―――――――――――

**labeled**
15:22 27:6

**lack** 25:23
26:9 95:7

**Lagary** 14:22
15:2,4

**language**
101:5,6,8

**Lavan** 9:24
10:4 59:3
82:13

**law** 51:7
77:7,8

**lawful** 5:13

**laws** 15:14,
15 51:20

**lawsuit** 7:21
8:1,5,24
10:9 13:6
15:5

**leagues**
13:16

**learn** 21:20

30:24
110:25
121:10

**learned**
96:16

**leave** 7:2
22:17
123:3

**leaving**
73:24

**left** 22:23
41:15
73:22,24,
25 88:9

**legal** 8:12
11:8 18:5
20:10
41:20
43:18,20
63:19

**length** 25:19

**letter**
60:14,18
62:7,8
112:17
113:17

**letterhead**
111:8,9

**level** 15:7
101:7

**liability**
19:11
45:13 66:2

**liaison**

41:19

**lied** 122:16

**life** 21:24

**likeable**
22:8

**liking** 7:11

**limit** 76:8

**lines** 65:7

**Lisa** 69:22
89:22
118:23
120:3,12
121:10,11,
17 123:14,
21,22,24
125:24,25
126:6

**list** 9:16
57:5

**listed** 56:10
59:4

**load** 78:21

**local** 77:25

**logistics**
97:22

**long** 9:25
10:19
64:12
69:10,14,
23 89:22
92:7
118:23
120:3

121:11,17
123:14
125:24,25

looked 36:21
60:23
62:11,16
95:5,9
99:16
101:20
111:7
116:12
126:5

lot 12:11
66:16
83:23 96:8

lots 13:5

loud 7:11

lower 82:24

Lyn 43:12
44:10,17
45:10 46:8
47:22
48:1,18
49:3,14,16
50:12
51:13
52:22
53:16,23
54:15
55:25
60:12
64:4,21,24
66:18,25
67:8 68:7
70:8
71:12,19

73:14 74:8
75:18,23,
25

—————

M

—————

M-A-X-I-E-N-T
42:3

mad 84:15

made 24:13
29:22
44:22
57:24
60:20
69:21
71:12 76:1
98:24
110:7,11
112:24
121:18

Maestas
5:16,17
6:10,18
15:3 16:4
19:7
20:13,17,
20 25:12
27:5 35:7
38:9 39:6,
10,11 42:6
44:5 49:17
51:2 52:3,
5,8 55:14
56:25 57:3
58:15,19
59:5,9,15,
19,23

60:2,6,10
61:6,19,22
63:21
65:16,21
67:12
75:5,22
79:7,8
80:3,15
81:4,13
83:12,20
84:11
86:16 87:1
88:24 89:7
90:14
97:1,12,18
102:11,13,
15,21
104:15
111:15
112:12,19
113:7,20
116:20
118:13
123:1,8
125:7,10,
17 127:5,
9,12,23
128:3

Maggie 41:14
45:8
46:14,15
73:22,23,
24

Maggie's
46:12

major 84:4

majority
56:25

make 7:9
19:20
24:5,7,12
35:16
38:25 40:7
44:9 45:1
65:4,12
66:24
68:18 96:1
97:15
98:23 99:6
102:14
117:5,6

maker 49:1,4
54:18,20,
21 71:3,9,
10,13
75:24

makes 24:12
93:3

making 23:24
24:25
63:19
95:7,8
99:8
101:8,10

male 56:14
57:14 58:7

manager
86:18,21
88:3
126:22,23

March 36:15
37:17

Case 7:21-cv-00062-WLS    Document 34-8    Filed 05/12/22    Page 150 of 164

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Jeannine Boddie-Lavan on 01/21/2022    Index: marked..Mitchell

38:12
98:1,3,8
106:2

marked  16:1
19:5 20:18
25:10 27:3
38:7,18
55:12 60:8
67:10 75:3
81:3,5
83:10,17
84:9 88:22
89:5 90:12
96:24
111:13
118:11,14

marking  79:5

markings
88:13

married  57:4

mask  7:8

Master's
15:9,13

math  84:3

matter  5:18
31:9

Max  42:2

Maxient
41:23
42:3,8,14,
16

means  87:7
100:5

meant  99:11
100:1

medical
14:17

medications
9:8

meet  12:19
26:10,25
31:4,6,8
34:8,18
68:7 92:1
106:6,8,11
123:2

meeting
10:20
28:10
30:18
31:10,14,
23 34:3
36:14
37:16
38:11
39:9,12
64:2
67:19,23,
24 68:6
76:10 92:6
98:2,3
106:5,13
125:11

meetings
8:13 10:8
31:13 32:1
34:6 47:4
94:17

member  12:7

members
23:24

memorandum
36:18
38:15

memory  9:9
40:1

mention
25:24

mentioned
37:20 61:1
82:22,23
96:8,10
107:4,6

mentions
59:21

message
27:21
110:16

messages
109:3,6
111:2

met  10:14
26:15,16,
21 31:17
34:7 92:3
94:19,20
100:22,24
101:1

Meyers
108:6,7,14

Michelle
24:3,9
26:12,13,

19 32:12
33:23
45:24
78:10,23
79:16
81:24
82:2,3,10,
13,14,18,
22 92:9,
13,14
119:3,19
121:12
122:3
123:21
124:22,25
125:13
126:4,5

microscopic
84:14

Middle  5:23

mine  44:8

minor  9:20

minute  38:3
111:23

minutes
10:19
123:2

missed  42:7

mistake
105:4

Mitchell
34:23
35:22
36:1,15
37:6,10,17

38:12,22
60:21
61:5,13
62:10
90:21 94:3

**mix** 90:3

**mom** 9:24

**moment** 74:5

**money** 25:1
126:24
127:1

**monies** 25:5

**morning**
11:14

**moved** 50:25
51:4

**muddy** 74:20,
21,23,24
75:1

**multiple**
94:20

———————

**N**

———————

**named** 5:12
80:2

**names** 6:4
9:19 46:4
65:5 86:25
124:2,7,9,
16

**Natasha**
43:19,20,
22 44:13

48:12,16,
18 49:8,18
50:5 52:20
53:15,19
62:18,22
63:7 64:9,
14 68:1,3

**nature** 21:9
56:8

**necessarily**
65:8,11
86:14
89:17
117:4

**needed** 41:21
96:17
102:7
103:12,15,
20 104:23

**nephew** 10:4

**non-party**
6:12

**nondiscriminat
ion** 71:24

**North** 6:7

**note** 67:15
68:16 93:4
105:17,19

**notebooks**
15:21

**noted** 39:13
67:19
68:25

**notes** 53:8

54:6,11
64:2,4

**notice** 5:12
6:11

**notorious**
113:3

**November**
76:17

**nuances**
51:18,23

**number** 15:24
17:22 45:1
83:6 85:12
86:21 88:8
109:13,19,
20

**numbers** 84:2

**Nursing**
14:23

———————

**O**

———————

**Oak** 6:7

**oath** 5:14

**object** 20:7,
9

**objecting**
61:9

**Objections**
6:14

**objectively**
19:22

**obligation**

117:20
118:9

**observed**
113:11

**occasions**
13:9

**occur** 17:17
18:13

**occurred**
27:19 28:2
41:7 62:14
63:1 64:18
66:22
73:11,25
84:18 91:4
106:25

**occurring**
105:25

**occurs**
17:12,15,
18

**October**
55:25 56:7
67:8,13
68:7
70:16,17

**offensive**
19:23
99:2,5
104:1,4,7,
22

**offer** 22:2,7

**offered**
96:11

103:8,9

office  14:18
27:24
34:25
35:24
41:20
42:15
43:24
46:24
56:15
57:15 58:8
71:22 73:3
86:3
106:13
120:24

officer
10:25
11:8,9,16
116:23,24

official
79:19

offside
48:13

one's  112:1

open  55:22
84:17,21,
25 85:5,9
87:22
111:16

opened  86:19
87:6

opening
86:20

opinion
94:12

101:13,19
102:5
119:15

opinions
92:23

opportunity
16:9 19:10
76:6

order  65:22
90:25 93:5
127:21
128:6,10

ordering
128:6,14,
15,18,19,
21

organization
14:11,20

Organizations
12:7

original
128:18

originally
118:23

originated
126:9

outcome
51:23
77:16

outcomes
77:14

oversight
43:24

overtones
21:9

overturn
35:9

P

P-R-A-I-T-H-E-
R  44:6

p.m.  5:1
52:4 67:14
97:17
123:7
128:22

packet  78:5,
8,9

pages  111:4,
19

paper  54:8
83:23
109:2,3,4,
5,7 111:10

paperwork
23:21
24:11
26:18,24

PAR  85:25
89:10,11

paragraph
102:22

parents
93:10

PARS  86:10,
12,13

part  21:5
23:16,18,
20,22,25
24:14
41:9,11
45:12
53:25 55:1
61:7
66:11,13,
14 78:21
93:6 98:17
104:1
105:12
114:9,18

participate
9:10

participating
93:7

Partnership
14:7,9

parts  54:1,
2,4 55:9
111:25

party  8:4
35:20

pass  67:2

passed  50:11
64:4
118:25
120:6,9,10
121:11
123:15

past  107:2

path  112:3

pattern  21:8
  56:17
  57:18
  58:11

pay  128:12

pending  5:22

people  11:25
  12:19
  13:3,5,18,
  25 14:16,
  19 17:7,8,
  23 25:3
  32:6,13
  46:2,4
  51:21
  85:13
  86:3,4,6
  93:1 95:5,
  9 103:17
  113:16
  115:11
  116:8
  119:7
  120:24
  121:13

people's
  124:2,15

percent
  124:19

perception
  93:20,23
  94:5,7

performance
  25:18 30:4
  39:14
  95:11

105:17,20

permanent
  36:18
  38:15
  105:21

person  14:21
  18:19
  23:23 24:2
  27:20
  31:10
  41:25
  47:18,19
  48:20 50:5
  71:14
  77:20 80:1
  86:19
  87:5,8
  88:5 100:9
  114:22
  115:1,16,
  23 118:20
  122:13,14,
  21

personal
  25:19
  31:12,15,
  21 48:14
  104:3,6

personality
  22:8

personally
  103:19,20

personnel
  36:19
  38:16
  45:13 66:2

105:22

perspective
  91:21

pervasive
  20:2

phone  33:25
  64:3 91:16
  109:11,16

photograph
  109:7,8

photographic
  40:1

pick  46:5
  55:8

piece  71:25
  78:3
  109:1,3,4,
  5,7 111:9

pieces  45:11
  49:10
  50:24
  53:2,4
  55:4

place  73:12

Plaintiff's
  16:1 19:5
  20:17,18
  25:10
  27:3,7
  38:7,19
  39:18
  55:12 60:8
  67:10
  75:3,6

81:6,22
83:9,10,17
84:9 88:22
89:5 90:12
96:24
97:20
111:13
118:11,15
120:4
123:13

plan  30:4
  85:6 95:12

plate  85:4

platform
  41:23

play  25:21
  26:8 41:9,
  11 53:5

played  43:24
  126:8

playing
  62:21

point  33:6
  34:15,17,
  22 36:24
  37:11
  38:10 39:2
  54:15
  91:25
  98:12
  117:6

pointed
  94:10

points  35:19

Case 7:21-cv-00062-WLS    Document 34-8    Filed 05/12/22    Page 154 of 164

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Jeannine Boddie-Lavan on 01/21/2022        Index: Police..provide

Police  122:9

policy  20:24
  116:18

Political
  12:8

pop  115:20

portion
  100:19
  102:16

portions
  51:6

position
  10:23
  11:23
  21:22,25
  24:25
  72:24 78:1
  85:5,7,8
  86:13,15,
  19,21
  87:8,19
  88:4,5,18
  118:17
  119:16
  123:13
  126:19,24

positions
  11:3 24:24
  84:18,21
  85:1,5,10,
  12,14,15
  87:13,22
  88:7,13
  89:21,22,
  24

possibly
  52:13

posted  85:17
  87:13,22
  89:25

posting
  86:21
  118:15,18
  120:4

potential
  9:21

Potter
  109:11

practice
  105:18
  115:8

Praither
  44:2 62:18

Praither-webb
  44:14
  53:15

pre-
deprivation
  77:21

prepare  8:7,
  9

presence
  76:8

present
  76:19

President
  60:23
  62:11

prevent
  77:11,19

previous
  114:1

previously
  28:11
  30:19
  117:16

primarily
  50:1

print  84:14,
  15

printout
  19:9 83:13
  84:20

prior  36:14
  37:16
  38:11
  39:8,12

private
  14:11
  22:12,13
  42:19

privileged
  63:20

procedure
  51:7

procedures
  74:2

proceeding
  76:10

Proceedings
  5:1

process
  41:10
  72:20
  77:15
  78:22
  107:23
  118:20
  120:19,25

processes
  77:8

produced
  112:9

professor
  110:7,10

program
  42:16,24
  93:7

prohibited
  36:1 49:21

proper
  65:17,19,
  20

protect
  66:13

protected
  60:21 62:9

protocols
  101:4

provide  8:14
  35:21
  64:22,25
  67:17
  68:24
  100:19

Case 7:21-cv-00062-WLS    Document 34-8    Filed 05/12/22    Page 155 of 164

**JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA**
Jeannine Boddie-Lavan on 01/21/2022 Index: provided..recommendation

provided   9:4
  33:15
  34:20  65:5
  80:22
  100:4
  101:20

providing
  113:15

pull   83:3

pulled   16:7
  83:1

pursuant
  6:11

purview
  46:13
  88:19
  89:18

pushed   56:15
  57:16  58:8

put   42:11,
  13,14  43:7
  77:10
  95:11  99:3
  107:5
  108:3
  109:5
  115:22
  118:2
  119:3

_____

        Q
_____

question
  6:15
  19:16,20
  20:4  30:17

32:17
61:13,15
69:11,14,
17  75:17,
21  88:3
101:16
113:21
116:21

questions
  25:14
  32:14,17
  52:13
  72:16
  98:18
  123:11

quick   127:24

quote   39:3,
  13,16

quoting
  37:12

_____

        R
_____

race   29:13,
  24  110:20

rain   95:21

raise   5:3
  122:22

rated   39:14

rates   82:23

rationale
  24:12,16

raw   80:8,
  10,17,20
  81:10

re-assigned
  77:25

reach   91:12

reached
  91:3,15,18

read   6:23
  19:15,19
  21:3,5,14
  24:11
  25:20
  39:25
  56:10
  59:12,20,
  25  63:4
  72:5  87:24
  88:1  92:16
  94:9
  104:13
  112:10,13
  115:12

reading   6:24
  25:17
  57:20  59:6
  62:23
  64:17
  87:14
  101:24
  127:15,17

ready   5:2

real   127:24

reason   34:6
  50:4  118:9

Rebecca
  119:2

recall   24:22

25:21
40:24
48:22
64:16  83:5
99:8

recalled
  59:14

receive
  63:18

received
  27:24
  35:25
  49:8,12
  51:12
  58:22
  126:1,2,3

recency
  116:3,4

recently
  50:2  103:1
  119:19

recess   52:4
  97:17
  123:7

recognize
  20:21  27:7
  83:13,14

recollection
  33:10
  40:19
  59:7,16
  60:25
  69:20
  88:16

recommendation

Case 7:21-cv-00062-WLS    Document 34-8    Filed 05/12/22    Page 156 of 164

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Jeannine Boddie-Lavan on 01/21/2022    Index: record..repaired

96:3

**record**  6:1
8:15 52:5
97:19
111:16
123:9
127:21

**recorded**
6:22

**recorder**
24:21

**recording**
72:21

**recruit**
93:15

**recruited**
21:18,21

**recruiter**
25:4 78:21
84:21
87:19

**recruiters**
25:4 78:1,
20 88:12

**recurrence**
12:18

**reduce**  45:13
66:2

**reduction**
23:16,19
25:14

**refer**  60:13
62:6

**reference**
55:23
57:23
115:18

**referencing**
38:18
40:25

**referred**
88:8

**referring**
39:3 56:24
57:1 67:25
112:15

**refers**  88:9

**refresh**
59:6,15
60:25
88:15

**regard**  24:15
25:3 34:23
41:20,24
65:3 68:1
74:6,17
92:10
93:24
115:17

**Regents**  5:19
11:22
52:21
63:23
64:8,9
76:23 77:1
112:24

**regular**
78:21

**regularly**
13:21

**regulation**
71:16

**regulations**
50:9,15,16
51:15 66:5
71:25
72:7,14,24
73:17
76:21,25
77:4

**related**  8:23
10:9,11
23:5 39:21

**relations**
23:23 24:2

**relationship**
48:13,14
102:6
117:17

**relationships**
103:1,20
104:22,24

**relatives**
9:12

**relaying**
61:18

**remainder**
111:22

**remember**
24:18
39:24
40:2,8,9,

11,14,17
41:2 43:8,
11 44:11,
12,14,15
48:10
53:10 54:7
59:10
61:24
62:23,24
64:11,12,
13,19 80:4
82:25 83:8
91:13
98:10
99:1,3
103:7
108:2
111:7
126:14

**remove**
121:21
126:7

**removed**
120:5
123:14

**render**
101:18

**reoccurrence**
77:11,19

**repair**  103:9

**repaired**
96:21
102:7
103:2,13,
15,20
104:23,25

reply   97:4

report   16:23
  17:7,8,23
  18:4 19:1
  32:6,23
  36:4,5,7,
  10 40:1
  68:13
  70:21
  71:13
  113:1

reported
  26:20,23
  32:13
  36:11

reporter
  5:2,9 6:20
  7:1 14:25
  42:1,4
  49:15
  65:10
  72:2,4,10,
  12 74:22,
  24 75:1
  81:1 86:8,
  24 125:15
  127:14,19
  128:2,4,9,
  13,17,20

reporting
  69:3

reports   31:1
  39:20

represent
  5:18

representing
  7:22

reprimand
  30:1,3
  34:23
  35:6,22
  36:16,21
  37:1,4,25
  38:3,13
  94:24
  95:4,19
  97:21 98:6
  101:18
  105:19
  106:15,16
  113:8
  116:6,9

reprimanded
  95:2

reputation
  117:11

request
  27:25
  78:25
  82:2,6,8,
  20 111:16
  112:6
  113:12

requested
  32:12
  80:18 82:7
  83:1

require   66:5
  76:18 77:8

required

76:7
  114:1,16
  115:5

requirement
  76:5 114:8

reserved
  6:16

resign
  119:23

resigned
  119:20,24

resigning
  30:2

resource
  10:25
  11:9,16
  34:25

resources
  15:11
  35:24
  36:19
  38:16
  41:24

respondent
  76:9

response
  8:16 18:2
  19:2
  27:11,12
  33:19,20,
  23 63:9
  112:6
  127:6

responses

6:21

responsibility
  128:11

responsiveness
  6:15

rest   68:23

restaurant
  12:9,16

restaurants
  12:15
  13:13

retaliation
  16:23 17:9

retention
  79:10
  82:22,23
  83:2,3,7,8

return   77:20

review   8:12,
  14 23:21
  27:15,25
  28:9
  35:10,13
  39:20
  43:15
  98:13,23

reviewed
  8:16 24:17
  26:17
  37:1,9

reviewing
  43:21
  114:21
  115:4

rid   22:18

RIF   24:6,8
  25:22
  26:11 34:9
  35:11,12,
  14 56:17
  57:18
  58:10
  78:5,8,9,
  25 84:18
  85:3,8

RIFED   85:20

RIFS   26:20

road   122:19

Rodney
  29:12,21
  57:15

role   46:12
  66:1,11,
  13,14,16
  72:16
  120:1

roll   102:4

room   31:19
  53:18

Ruben's
  107:16

rule   46:22
  120:20,22

run   12:1
  46:25 47:5

running
  84:12

Ryan   80:24
  81:2 85:17
  86:22,23
  87:2,3
  89:23
  121:12,15
  125:11,14,
  16,18,24,
  25 126:3,6

———————————

S

S-O-N-J-A
  28:24

Sandra   28:20

sat   92:8
  100:8

saved   109:16

savings
  25:2,6
  26:3,4,9

school   17:3
  93:19

schools   91:5
  93:13,24
  103:22,23

screenshot
  111:25
  112:2,18

search
  114:24
  115:12,15
  120:23,25

section
  16:10 21:3

88:7,13

selected
  44:17
  47:19

selection
  120:11

send   43:17,
  18 48:15
  90:22,25
  105:13
  108:24

sending
  62:21

sense   24:12

sentence
  77:23 93:4

separate
  78:22

sequence
  97:4

serve   41:18
  66:14

service
  25:20

severe   20:2

sex   40:16
  113:4

sexual   21:4,
  6,9,13
  36:7 71:24

sexually
  110:9

shaking   12:2
  94:16

shape   121:3

share   35:23
  105:7,15
  118:9
  123:25

shared   60:22
  62:10
  105:4,8

she'll   123:5

shifted
  73:14

short   9:16
  52:6
  97:13,19
  123:10

show   59:21
  70:3 112:3

shows   84:20
  123:19

sic   71:18

side   8:2
  92:2

sign   6:24
  11:13
  24:11
  106:5

signed   26:24
  36:17,25
  38:14
  106:3

significant

102:25

signs  98:4

similar
  95:10

simultaneous
  57:11

sister  9:25

sit  100:6

sits  100:9

sitting
  53:18

situation
  18:22

slated  85:1,
  11

slow  72:5,
  10,11

Smith  28:19
  29:5,6,11
  30:13,22
  32:24
  110:23

sniffing
  73:7

snippet
  78:25

social  41:15
  42:15

socially
  12:6

software
  42:20,24

solemnly  5:4

somebody's
  117:11

Son-  110:22

Sonja  28:19,
  21,22
  29:11
  30:12,22
  32:24
  110:23

sound  92:25

speak  7:9,
  10,13
  50:10
  103:22
  123:24

speaking
  37:19

specific
  42:17

specifically
  72:1,7,14
  82:25
  85:17

speeds  72:4

spelling
  65:6

spending
  12:11

splitting
  47:13

spoke  33:24
  53:9 95:23

103:21
123:21
125:13,15,
16 126:6

sports  11:7
  13:16

spreadsheet
  81:9

spring  12:1

staff  89:11

standard
  101:6,8
  105:18

stands  40:3

start  14:5
  22:24
  23:12 98:8

starting
  90:3 102:4
  112:9

state  5:21,
  25 21:1
  67:14
  77:21
  89:22

stated
  123:14

statement
  16:14
  32:15,16
  34:20
  36:17
  38:14 39:8
  60:18,20

69:21 93:6
123:24

statements
  36:4

states  5:22
  16:9 17:23
  76:17

stating
  38:21
  93:15

statistical
  17:20

status  68:2

stead  41:17

stenographical
ly  6:20

step  72:19
  119:1

stop  77:10,
  18

stories
  34:17

story  65:14
  92:2 125:9

straight
  11:19

Street  6:7

strong  100:2

student
  43:1,2,5
  47:13

students

Case 7:21-cv-00062-WLS    Document 34-8    Filed 05/12/22    Page 160 of 164

JAMIE T. BIRD vs BOARD OF REGENTS OF UNIVERSITY SYSTEM OF GEORGIA
Jeannine Boddie-Lavan on 01/21/2022    Index: studies..technology

25:1 42:12 50:1 78:2 79:10 93:9,15

**studies** 16:20,25 17:1

**study** 15:14

**studying** 15:13

**stuff** 47:5 68:2 91:24 99:13

**stumbled** 21:22

**subject** 56:4 60:13

**substance** 85:22

**substantiated** 41:3

**substantive** 92:22

**subtle** 21:9

**successful** 93:6

**such-and-such** 12:1

**suffice** 95:17

**sufficed** 105:6

**sufficiently** 20:1

**suggestion** 95:25 96:1,2

**suggestions** 43:17,19 44:9,15 67:17 68:17

**suited** 119:16

**summaries** 61:16,17

**summarize** 53:13

**summarized** 61:9

**summarizing** 61:10

**summary** 54:10 56:20 57:7,24,25 58:13 59:13,17

**summit** 12:1

**supervise** 47:5

**supervised** 117:15

**supervisor** 56:14 57:15 58:8

88:5 122:15

**supervisors** 19:12

**support** 41:23

**supporting** 25:1 51:21

**surprised** 22:6 106:17

**swear** 5:4

**sworn** 5:14

**system** 5:20 11:22 25:13 27:24 41:20 42:2 43:23 71:22 73:3,5

**system-level** 8:16 9:1 27:11 33:19,20, 23 52:21

---

**T**

---

**tab** 79:5

**tabs** 15:22, 23 55:15

**tailgate** 12:20

**taking** 45:11 74:7,8

**talk** 13:21 15:5 20:11 31:14 38:24 115:15

**talked** 26:19 47:22 94:21 103:7 108:15,18 121:16

**talking** 16:15 17:3,4 29:14,18 36:8 38:5 52:17 69:13 82:9 92:19 99:23 101:23

**talks** 33:6

**tangible** 20:1,6

**Taylor** 119:2

**team** 45:16

**technical** 12:4 23:10 91:5 93:12,19, 24 103:22, 23 104:4

**technology**

42:23

**Tee**  37:6,10
38:22
90:20
91:6,12,
15,18,20
93:23
94:3,20,21
95:3,14
96:7 97:24
98:3,12,
15,20,22,
24 99:6,
10,15,19,
23 100:3,
21 101:2,
24 103:14,
24 104:21,
24 105:1

**telling**
53:25 73:2
96:10

**tells**  71:20

**termed**  116:7

**terminated**
20:5 23:15
35:12

**termination**
29:25

**Terms**  79:10

**testified**
5:14 66:1
112:1

**testimony**
5:5

**text**  27:21
109:3,6
110:16
111:1

**thing**  10:1
18:12,15
25:3,5
39:3 64:18
66:12,14,
15 77:13,
14,21 85:4
95:13
101:10
109:23
110:4

**things**
25:15,16,
20,21 26:7
30:5 31:3
37:20 41:7
42:12 43:3
45:10 46:3
49:19
66:11
69:12
77:12
95:16
103:15
108:5
109:22
115:20
116:10
118:2,3,7

**thinking**
115:19

**thought**
29:17

34:5,8
87:15
93:14,17
100:1
107:22

**thousand**
40:5

**Thousands**
14:1,2

**tie**  127:20

**tightly**
56:13
57:13 58:6

**time**  6:16
12:11,20
35:19 37:8
41:15
52:13
84:18
90:18
97:4,15
105:13,15
109:22
114:3,12,
25 127:12

**times**  22:3,9
94:20
115:11

**title**  10:22,
23 15:14
33:16 40:9
41:9,17,18
42:12,25
43:2,8,25
44:19,20,
21 45:7,9,

16,17
46:1,9
47:10,11,
14 49:2,5,
6,7,9,10,
19,24
50:3,6,8,
12,13,14,
15,16,17,
20,23,25
51:6,7,15,
18,23
52:18,19,
24,25
53:1,2,4
54:1,2,5
55:2,3,4,9
56:20 57:6
61:1,7
62:1,5
66:5 70:1,
8 71:8,13,
14,21,23,
25 72:7,
14,24
73:3,6,8,
10,17,21
74:1,7,8,
18 75:8,
10,13
76:5,11,
12,17,18,
21,25
77:2,5,6,
14 86:21
110:6,8,9,
19,20,21
115:2

titled  54:1

today  6:25
  7:2 8:8,20
  10:12
  53:18
  67:19

told  30:25
  32:9 53:14
  54:6,10
  91:21,22
  95:3 96:12
  99:9,21
  104:24
  105:1,4,23
  106:6,12
  117:2
  121:12,20
  122:14
  125:12
  126:6

tolerated
  120:1

tool  42:11

tools  41:24

top  33:7
  56:4 88:9

totally  61:4

trained  74:1

trainings
  120:23

transcript
  6:24

transcripts
  128:8,16

treat  52:23

treated
  50:17,18,
  23 52:19
  55:5

treating
  55:3 76:12

trial  6:16

truck  23:4

true  115:22

trust  120:17

truth  5:6,7
  115:14

turn  15:20
  19:8,12
  25:9 67:4
  106:21,22
  111:12

turned  10:3
  22:2,8

turning  10:6

tweaked
  105:14

type  12:18
  31:13 47:4
  89:14
  100:6,15

typed  100:9

types  100:9

typically
  27:23
  31:20
  47:15 87:7

88:4

—————————

U

—————————

Uh-huh  7:7,
  17,25 8:3,
  10,19
  14:10
  21:7,16
  22:10 23:2
  26:14,22
  28:7,23,25
  29:2,6
  30:23
  31:24 32:8
  33:5 36:6
  37:23
  38:17
  40:13
  46:20
  54:17
  55:16
  56:2,5
  62:2 67:6,
  9,22 68:14
  74:13,25
  75:9 76:20
  77:24
  80:7,12,
  19,21
  81:23
  82:15
  84:19,22
  88:11
  89:12 90:7
  95:20
  97:25
  101:22

102:24
103:11
106:4
111:21
112:7
119:21
120:7
123:17

Uh-uh  44:24
  81:19
  97:7,10

ultimate
  51:20

uncomfortable
  56:16
  57:16 58:9

underage
  10:4

understand
  20:11
  46:23
  65:24
  72:17
  75:14
  100:15
  101:15

understanding
  56:19,21
  57:6 61:17
  125:23

understood
  61:11

unfair  121:2

United  5:22
  16:9 17:23

University
 5:20,21
 11:22 21:1
 25:13
 41:16 66:3
 93:1 122:9

unreported
 16:12,17

unsubstantiate
d  54:25

UPD  122:7,9

updates
 51:24
 68:1,2,3

upset  96:5

USG  11:21,
 22 23:8
 42:17 50:5

utilize
 42:11

utilized
 74:5,6
 101:6

— V —

vacant  85:4

Valdosta
 5:21,23
 6:8 14:13
 21:1,23
 23:1

Valencia
 45:17
 47:12

verbal  95:4
 105:5,6,9
 124:21,24
 125:23

verbatim
 24:18,20
 53:11 83:4
 124:12,13

versions
 34:16

versus  5:19

Vicarious
 19:11

victim's
 19:23

VII  49:7,9,
 19,24
 50:3,12,
 17,20,23
 51:7
 52:19,24
 53:1 54:1
 55:3,5
 71:21,23,
 25 72:7,14
 73:4,10
 74:18 75:8
 76:11,12,
 18,21
 77:5,6
 110:21

violation
 110:9

Viverette
 41:14 45:8

46:15
 73:22

vocalize
 6:21

voice  7:11

voicemail
 108:23

Volly  9:24

VPS  26:21
 78:12

VSU  10:22
 11:1,2
 13:18
 14:19
 21:17
 23:6,13
 50:15
 52:20
 74:14
 83:14
 84:16
 93:16
 100:2
 107:1
 113:25
 115:5
 116:24
 117:16,19
 122:24

VSU's  45:13

vulgar  113:4

— W —

W-E-B-B  44:6

W-R  29:3

wait  50:21
 113:5

waive  6:25

waiving
 127:15

walk  98:5
 123:3,4

walked
 120:13

walking
 11:13

wanted  38:25
 40:7 48:17
 52:7 66:18
 82:24
 91:6,7
 102:14
 106:6

wanting
 17:7,8
 128:5

ways  49:18

wearing  7:8

Webb  44:3,4

website  16:8
 19:10
 83:14

week  10:6
 22:25
 107:2

weight  106:1
 118:3

Willis  85:18
  86:22
  87:2,3

women  28:10
  30:18 31:9

wondering
  84:23

word  73:7
  99:2,4,22
  112:13

worded
  99:22,25

words  40:20

work  13:12
  20:2 22:20
  41:17
  48:14
  100:2

worked  7:19
  23:23
  99:11,12
  100:21
  106:25
  118:4,5

worker's
  7:20

working
  22:22

workplace
  16:11,16
  18:18

works  75:6

worry  50:6

worse  84:8

wow  22:6,11

wrapped
  123:1

Wright  28:19
  29:1,11
  30:13,22
  32:24
  110:23

write  11:10
  27:16
  35:14

writing
  28:11
  30:20
  32:7,10,14

written  35:5
  36:16,21
  37:1,4
  38:13
  62:15
  95:4,17,
  18,19
  97:21
  101:12
  105:19
  106:15,16
  116:6,9

wrong  69:12,
  15 92:23
  94:13

wrote  28:13
  32:9,11,23
  37:2,10
  38:10,21

75:19
78:10
121:15

_____

**Y**
_____

year  73:11
  74:8,9
  105:13,24,
  25 118:4

years  105:3
  118:5

_____

**Z**
_____

Zduy
  118:21,22