# Holly Maestas

**Sent:**            Tuesday, October 13, 2020 2:03 PM
**To:**               Janice  Lyn
**Subject:**         Bird Investigation
**Attachments:**    Birdinvestigation.docx

Please review the entire report again. I have added the parts as requested by Natasj

**From:** Janice Lyn <jlyn@valdosta.edu>
**Sent:** Monday, October 12, 2020 6:23 PM
**To:** Jeanine Y Boddie-La Van <jyboddielavan@valdosta.edu>
**Subject:** please refer to letter L in the document

PLAINTIFF'S
EXHIBIT
38

1



**VALDOSTA STATE UNIVERSITY**

October 13, 2020

**VSU Obligation:**
Valdosta State University recognizes its legal and moral obligation to provide an environment in which an opportunity for education and employment is available to all qualified individuals without discrimination on the basis of race, color, religion, age, sex, sexual orientation, gender identity, national or ethnic origin, disability, or veteran status.

**Nature of Allegation:**
On August 17, 2020 Ms. Jamie Bird emailed Dr. Maggie Viverette, Director of the Office of Social Equity to submit a request of review of wrongful termination and subsequent retaliation. Also, in a letter dated August 3, 2020 to the Office of Legal Affairs, Board of Regents for the University of System Georgia, Ms. Bird states that she was the target of adverse treatment for 17 months, and the victim of sexual assault by Dr. Rodney Carr, VP for Student Success.

**Documented Concerns from Reporting Party:**

1. February 20, 2019 Dr. Carr entered Ms. Bird's office to check on Ms. Bird and to see how she was doing after being notified one of her students committed suicide. Ms. Bird stated that upon entering her office Dr. Carr shut the door, stated to Ms. Bird that he was there to check on her, stated that he normally does not do something like this, and gave her a "tight full body hug." Ms. Bird stated that she pulled away and opened her door and said she does not like her door shut.
2. Six days after the incident, Ms. Birds stated that she was verbally reprimanded regarding an email sent out from her to high school counselors. Approximately, a week after the incident or verbal reprimand, Ms. Bird stated she was given a written reprimand "that appeared to have been written by her supervisor."
3. Ms. Bird stated that she failed to receive a promotion within the Office of Admissions in January 2020, and her merit was impacted by her 2020 evaluation.
4. Ms. Bird stated that Dual Enrollment was moved from the Office of Admissions to another department on campus which resulted in her having no support.
5. Ms. Bird stated that she was removed from the Enrollment Services Leadership Team.
6. Ms. Bird stated that Dr. Carr prevented Ms. Bird's previous supervisor, Tee Mitchell, from completing Ms. Bird's 2019 evaluation
7. Ms. Bird stated that Dr. Carr adjusted her merit pay to a rate lower than submitted by her supervisor.
8. Ms. Bird stated that Dr. Carr shared portions of her confidential personnel information with another employee at VSU under the guise of "missing" information.

**Related Laws and Policies:**
This report addresses alleged violations of Federal/State Laws, VSU policy, Board Policy, and the HRAP.

**Title VII and Title IX:**   In accordance with federal and state law including, Title IX of the Education Amendments of 1972 ("Title IX") and Title VII of the Civil Rights Act of 1964 (Title VII), the University System of Georgia (USG) prohibits discrimination on the basis of sex in any of its education programs or activities or in employment. The USG is committed to ensuring the highest ethical conduct of the members of its community by promoting a safe learning and working environment.

**VSU**: The University System of Georgia is an affirmative action/equal opportunity/equal access employer that prohibits discrimination on the basis of age, disability, gender, national origin, race, religion, or status as a Vietnam War Era veteran.

**BOR**: No person shall be excluded from employment or participation in, denied the benefits of, or subjected to discrimination, harassment, or retaliation under any program or activity conducted by the Board of Regents of the University System of Georgia (USG) or any USG institution based on any characteristic protected by law. Incidents of discrimination, unlawful harassment, and retaliation will be met with appropriate disciplinary action, up to and including dismissal from the USG.  USG Sexual Misconduct Policy can be found here: https://www.usg.edu/policymanual/section6/C2655

**HRAP**: In accordance with applicable federal and state law the University System of Georgia (USG) prohibits its faculty, staff and students from engaging in any form of prohibited discrimination or protected status harassment (including sexual harassment), and expects these individuals to refrain from committing acts of bias within the System's jurisdiction. The University System of Georgia complies with applicable State and Federal law which provides that it shall be an unlawful discriminatory practice for any employer, because of the sex (including gender and pregnancy discrimination), age, disability, national origin, race, religion, genetic information, or veteran status of any person, to discharge without cause, to refuse to hire, or otherwise discriminate against any person with respect to any matter directly or indirectly related to employment or academic standing.  HRAP Prohibits Discrimination and Harassment Policy can be found here:  https://www.usg.edu/hr/manual/prohibit_discrimination_harassment

**Process:**
Based on the information received, I, Dr. Janice Lyn, Interim Title IX Coordinator, was contacted to conduct an investigation into the allegations and led the investigation. I was charged with making an assessment based upon the "totality of the circumstances" as to whether the alleged events did in fact occur and if so, whether actions did constitute harassment based on sex.

In the course of the investigation I, 1) reviewed the USG Board of Regent policies, Human Resources Administrative Practice Manual (HRAP), VSU policies related to the allegations, 2) interviewed Dr. Rodney Carr, 3) interviewed Ms. Jamie Bird about the alleged events leading up to her allegations, 4) interviewed witnesses provided by both parties, and 4) reviewed relevant documentation related to the allegations.

2

**Witnesses**
Lisa Long, Associate Director
Ryan Hogan, Director
Tee Mitchell, previous supervisor, Associate VP to Ms. Jamie Bird
Jeanine Boddie-LaVan, Director of Human Resources

**Standard of Evidence:**
This report will determine by a preponderance of the evidence whether there has been a violation of VSU, Board, and the HRAP policies. A preponderance of the evidence means that the information shows that it is "more likely than not" that the accused violated this policy.

**Description of Events**
On February 20, 2019 Ms. Bird was contacted at 6:30am and told that one of her Dual Enrollment students had committed suicide. Ms. Bird called her supervisor, Tee Mitchell, AVP Enrollment Services, and informed him of the event. Mr. Mitchell instructed Ms. Bird to wait on communicating this information, as there needed to be a joint communication from the University and he would contact Dr. Carr, VP for Student Success and let him know what had transpired. Later that day, Dr. Carr stopped by to see how Ms. Bird was doing after hearing about the loss of her student. Dr. Carr entered Ms. Bird's office, the door was shut, and he stated to Ms. Bird that while he normally does not do this, gave Ms. Bird a hug. Ms. Bird stated she pulled away opened the door and they talked another "3-4 more minutes" about suicide and then Mr. Carr left.

January 2020, Ms. Bird stated that Dr. Carr returned to her office and stated "long time no see." She said Dr. Carr stated that he was sorry to see Mr. Mitchell is no longer here but doing well in Tennessee. She said Dr. Carr stated that he hopes they (Bird and Carr) can get back to prior the email and be friendly again. He asked Ms. Bird if she needed anything, and she mentioned the reclassification. Dr. Carr stated that he would make some calls. Ms. Bird stated that Dr. Carr asked if they were good and she said yes then he said let me give you a hug, then Dr. Carr said, "oh that's right you don't like hugs, and said here is an air hug."

On August 3, 2020, Ms. Bird sent a letter to the Office of Legal Affairs Board of Regents for the University of Georgia system alleging that she was the "target of adverse and subsequent termination by Dr. Carr due to the incident in her office on February 20, 2019 which she stated was sexual assault.

While Ms. Bird uses the term "sexual assault" to describe the incident, the new guidelines from the Department of Education were issued March 6, 2020.Given the new guidelines and definitions issued by the Department of Education, federal and state law including, Title IX of the Education Amendments of 1972 ("Title IX"), Title VII of the Civil Rights Act of 1964 (Title VII), and the University System of Georgia (USG), Sexual Assault has been retitled as Nonconsensual Sexual Contact or Nonconsensual Sexual Penetration. For the purposes of this investigation, I will be investigating this complaint under both Sexual Harassment and Nonconsensual Sexual Contact.

3

**Definitions**

**Nonconsensual Sexual Contact:** Any physical contact with another person of a sexual nature without the person's consent. It includes but is not limited to touching (or penetrating) of a person's intimate parts (such as genitalia, groin, breasts, or buttocks); touching (or penetrating) a person with one's own intimate parts; or forcing a person to touch his or her own or another person's intimate parts.

**Sexual Harassment:** Unwelcome verbal, nonverbal, or physical conduct, based on sex or on gender stereotypes, that is implicitly or explicitly a term or condition of employment or status in a course, program, or activity; is a basis for employment or educational decisions; or is sufficiently severe, persistent, or pervasive to interfere with one's work or educational performance creating an intimidating, hostile, or offensive work or learning environment, or interfering with or limiting one's ability to participate in or to benefit from an institutional program or activity.

The USG also prohibits unwelcome conduct determined by a Reasonable Person to be so severe, pervasive and objectively offensive that it effectively denies a person equal access to a USG education program or activity in violation of Title IX.

**Investigator's Response to Individual Concerns:**

1. February 20, 2019 Dr. Carr entered Ms. Bird's office to check on Ms. Bird and to see how she was doing after being notified one of her students committed suicide. Ms. Bird stated that upon entering her office Dr. Carr shut the door, stated to Ms. Bird that he was there to check on her, stated that he normally does not do something like this, and gave her a "tight full body hug." Ms. Bird stated that she pulled away and opened her door and said she does not like her door shut.
   a. Dr. Carr was informed a dual enrollment student had committed suicide.
   b. Dr. Carr went to Ms. Bird's office to check-in on her and see how she was doing.
   c. When Dr. Carr arrived, he stated Ms. Bird was visibly upset and crying.
   d. Dr. Carr stated that while he normally does not give hugs, he was going to give Ms. Bird a hug because she was visibly upset and crying.
   e. Dr. Carr told this investigator that giving a hug without anyone present is not something he normally does, as he always makes sure to have his assistant present or another employee when he is alone with anyone.
   f. Dr. Carr also stated that in reference to letter "e," he would normally ask first before giving a hug.
   g. Lisa Long stated on that day she saw Dr. Carr go to Ms. Bird's office, she saw the door shut, she saw the door open, she saw Dr. Carr and Ms. Bird "stood and talked a little more," and then Dr. Carr left. Ms. Long stated they were in Ms. Bird's office about 5 minutes.
   h. Ms. Long stated Ms. Bird came out of her office and did not say anything about what happened in her office.
   i. Ms. Long stated that "it was probably a week or so later that she may have mentioned (about the hug) to her supervisor before me, I don't know."

4

j.  Ms. Long stated that Ms. Bird told her that she came around her desk and he embraced her in a hug that didn't feel right and that is when she backed away and opened her office door then went back behind her desk.

k.  Tee Mitchell, supervisor of Ms. Bird at the time, said it was probably a week later when Ms. Bird told him about the incident. Mr. Mitchell stated to Ms. Bird, "I am going to be honest with you. He will probably fire us both if we say anything."

- Mr. Mitchell stated that when he and Ms. Bird talked about the incident we both agreed that he "will likely get rid of both of us."
- Mr. Mitchell stated that he told Ms. Bird "we could roll the dice and see what happens." That is when we both (Mr. Mitchell and Ms. Bird) decided we would leave it alone.
- Mr. Mitchell stated he felt confident Dr. Carr would be protected "like he has been protected before."
- Mr. Mitchell shared that Dr. Carr has said in numerous meetings he has 30 years and can retire whenever he wants so he can do whatever he wants.
- When asked for examples of Dr. Carr being protected, Mr. Mitchell said that the President and Dr. Carr are best friends who were at Bainbridge together and the President brought Dr. Carr with him to VSU.
- Mr. Mitchell said that Dr. Carr shared that with him that he (Dr. Carr) was angry when the President looked into the incident involving Dr. Carr at Bainbridge.
- Mr. Mitchell stated that Dr. Carr bragged about how many people he fired at Bainbridge.
- When asked if he (Mr. Mitchell) personally witnessed retaliation by Dr. Carr, Mr. Mitchell stated that he has not.
- Mr. Mitchell said the example he can give is how Dr. Carr will grit his teeth in meetings like he is about to jump over the desk and fight.
- Mr. Mitchell said as a grown man it is hard to admit because of pride that he could not sleep out of fear of losing his job and to put those things (mentioned above) is not a healthy environment.
- Mr. Mitchell's last example is how he applied to Augusta College. Mr. Mitchell stated that Mr. Hogan told him that Dr. Carr told Mr. Hogan that Mr. Mitchell had applied to Augusta College. Dr. Carr told Mr. Hogan that he told Augusta College that Mr. Mitchell is a "good guy." Mr. Mitchell stated he did not get the job "and had to wonder what was really said if Dr. Carr was ask the question would you hire him again."

l.  Mr. Mitchell, when asked about the February 20, 2019 incident told this investigator, "she (Bird) said he (Carr) came in closed the door and he gave her an unsolicited hug and it was awkward and uncomfortable."

m.  When this investigator asked Mr. Mitchell the reason Bird gave for Carr giving the hug Mr. Mitchell stated, "I don't know why he (Carr) went there, I have no detail of the conversation, maybe it was about dual enrollment of the email."

n.  Mr. Mitchell stated he did not witness either of the incidents (Feb 20, 2019 hug, January 2020 air hug).

o.  Ryan Hogan stated that Dr. Carr came to his office to let him know that Dual Enrollment will be reporting to Advising. Dr. Carr asked Mr. Hogan if he had the

5

key to that building and they proceeded to walk over together. Mr. Hogan stated that "I did hear the statement that Dr. Carr made about not liking the door closed. On January 2020, Mr. Hogan did hear the statement Dr. Carr made something like, "air hug, you don't like to be touched."

    p.  Lisa Long said (about letter "o") 9 months later she was her my office with the door open and Mr. Hogan was with me. Dr. Carr came in and it was overheard him saying "oh that's right you prefer the door open." Ms. Long could not hear their specific conversation.

2. Six days after the incident, Ms. Bird states that she was verbally reprimanded regarding an email sent out from her to high school counselors. Ms. Bird stated she was told it would not be written, and then was told by Dr. Carr it would be written but kept in his desk drawer. Approximately a week later Ms. Bird stated she was given a written reprimand "that appeared to have been written by her supervisor.

    a.  After interviewing Human Resources (HR) personnel, the investigator determined that on March 6, 2019 Dr. Carr, and Mr. Mitchell met with Ms. Bird.

    b.  At this meeting both Dr. Carr and Mr. Mitchell were fully aware of the process and policy surrounding the reprimand; meaning, the reprimand would be included in Ms. Bird's personnel file, and would be noted on her review and impact merit.

    c.  VSU made Mr. Mitchell aware that in review of the incident, the amount of damage control that needed to be completed that VSU HR would be moving forward with the written reprimand.

    d.  HR worked with Mr. Mitchell and the written reprimand was created in collaboration with HR and Mr. Mitchell.

3. Ms. Bird stated that she failed to receive a promotion within the Office of Admissions in January 2020, and her merit was impacted by her 2020 evaluation.

    a.  There was no merit allocated for FY 2020.

    b.  FY 2019 merit (determined in 2018) was based on a specific pool of money available and changes to the merit pay impacted almost all employees in Student Success.

    c.  Dr. Carr utilized guidance and training from VSU HR, and forwarded the same instruction to all supervisors.

    d.  Subsequent to Mr. Mitchell leaving, Ms. Bird underwent a "reporting structure only" change. She was moved from Mr. Mitchell to an interim AVP. Her physical location remained the same.

    e.  Dual Enrollment remained listed as a department in Admissions. At no time was Dual Enrollment listed under another department.

    f.  According to HR, no changes were made to Ms. Bird's classification, role or responsibilities that would have warranted a reclassification or promotion.

    g.  VSU completed a classification and compensation study with Carl Vincent Institute of Georgia (CVIOG). The recommendation at the conclusion of the study was that Ms. Bird was appropriately classified in the Manager classification.

4. Ms. Bird stated that Dual Enrollment was moved from the Office of Admissions to another department on campus which resulted in her having no support.

    a.  VSU HR confirmed that subsequent to Mr. Mitchell leaving, Ms. Bird underwent a "reporting structure only" change. Her department did not change and she was not moved physically to another location.

5. Ms. Bird stated that she was removed from the Enrollment Services Leadership Team.

6

    a. Prior to Mr. Mitchell leaving, Ms. Bird had been meeting with Mr. Mitchell's leadership team.

    b. When Mr. Mitchell left, Ms. Bird was moved to an Interim AVP. Dr. Carr assumed some of Mr. Mitchell's direct reports and utilized his already operational Leadership Team moving forward. When reporting structures changed, these departments (registrar, testing, admissions) were now reporting directly to Dr. Carr. Ms. Bird's representation was not needed, as the Interim AVP was now in place to participate.

6. Ms. Bird stated that Dr. Carr prevented Ms. Bird's previous supervisor, Mr. Mitchell, from completing Ms. Bird's 2019 evaluation.

    a. At the time of Mr. Mitchell's resignation, Dr. Carr did instruct Mr. Mitchell to complete annual evaluations from 2019 prior to his departure.

    b. Mr. Mitchell received several emails as the supervisor reminding him to complete the evaluations.

    c. As of the date Mr. Mitchell left VSU, his annual reviews were not completed.

    d. This left Dr. Carr as the 2nd level supervisor responsible for the annual reviews of all Mr. Mitchell's previous direct reports.

7. Ms. Bird stated that Dr. Carr adjusted her merit pay to a rate lower than submitted by her supervisor.

    a. Based on feedback from HR, Dr. Carr confirmed that neither the self-review nor the documentation left behind by Mr. Mitchell indicated performance for those under Mr. Mitchell that exceeded expectations or fell below expectations.

    b. Dr. Carr did not have information to justify higher or lower ratings, thus rating Ms. Bird in the "successful" category.

    c. As a result of calibration of all ratings, a majority of evaluations of employees reflected "decrease" in ratings 2019 evaluation year.

    d. All of Mr. Mitchell's direct reports received an overall rating of "successful."

8. Ms. Bird stated that Dr. Carr shared portions of her confidential personnel information (i.e., a written reprimand) with another employee at VSU under the guise of "missing" information.

    a. Mr. Hogan stated that Dr. Carr called him and asked if he could get in touch with Mr. Mitchell. Mr. Hogan stated, "he (Dr. Carr) didn't tell me what type of letter it was. I called Tee and Tee said he signed it and gave it to Rodney and Rodney would get it to HR."

    b. Mr. Hogan stated he knew "what kind of letter it was but not because someone told me. I had heard around here what was going on."

    c. Mr. Mitchell stated, "Ryan called because Carr ask him to call me and see if I had taken anything like personnel information. I ask Ryan why didn't he (Carr) call me he has my cell number. Ryan said I don't know he just ask me. I told him I gave HR a copy, Carr a copy, and Jamie has a copy. I don't have any of those documents."

### Findings

- The cuts to VSU's state allocation and tuition budgets alone totaled $12.1 million for the 2021 fiscal year.
- To meet that deduction, it was allocated across all units at the University while trying to preserve instruction as the core mission of our institution.
- Student Success's portion of those cuts totaled $1,290,006.

7

- Prior to making a decision regarding position eliminations multiple strategies were implemented.
- No information regarding Ms. Bird's concerns were shared with the Office of Human Resources, the Office of Social Equity, or Dr. Carr until August 2020.
- Upon guidance from Mr. Mitchell, Ms. Bird did not bring her complaint forward.
- Dr. Carr stated that he did hug Ms. Bird following the notification of the student's suicide and upon seeing her distressed.
- Dr. Carr confirmed that that he was going to do something he had never done before (hug her).
- Mr. Mitchell reported to this investigator that Ms. Bird did not mention the February 2019 incident until "probably a week later." If the timing is correct, it would have been subsequent to the write up for Ms. Bird.
- Ms. Long also concurred "it was probably a week or so later" that Ms. Bird said something to her about the incident. If the timing is correct, it would have been subsequent to the write up for Ms. Bird.
- February 26, 2019 Ms. Bird sent an email to high school counselors that resulted in a written reprimand.
- This investigator found that the written reprimand was appropriate in light of the circumstances and not adverse treatment from the February 20, 2019 report.
- Dr. Carr followed the guidance of VSU HR and worked in collaboration with HR in issuing a written reprimand to Ms. Bird.
- Upon Mr. Mitchell's departure, only Ms. Bird's reporting structure changed. Dual Enrollment remained in Admissions.
- Ms. Bird met with Dr. Carr about reclassification of her position February 2020.
- While the door was open, Ms. Long and Mr. Hogan stated they only heard parts of the conversation that referenced air hugs and open doors. Neither were able to share any other parts of the conversation.
- Ms. Bird did not receive a promotion because CVIOG completed a classification and compensation study and it was determined that Ms. Bird was appropriately classified in the Manager classification. Nothing changed in regard to classification, role and responsibilities that would warrant a promotion or reclassification.
- After Mr. Mitchell left, Dr. Carr made reporting structure changes resulting in the registrar, admissions, and testing reporting department to report to Dr. Carr. As a result, the structure of the Leadership Teams was adjusted.
- Dr. Carr instructed Mr. Mitchell to complete all his direct reports 2019 performance evaluations, prior to his departure.
- Mr. Mitchell did not complete the direct reports 2019 performance evaluations.
- Mr. Mitchell did not indicate being pressured or asked to not complete the evaluations of his direct reports.
- Dr. Carr utilized existing data to complete the 2019 performance evaluations.
- In collaboration with HR's guidance, and given data available, all of Mr. Mitchell's direct reports that were similarly situated were assigned "successful" category on their evaluations and all employees student success employees merit amount was impacted.
- Dr. Carr asked Mr. Hogan to contact Mr. Mitchell to find out if Mr. Mitchell had personnel information connected to Ms. Bird.

8

- Mr. Hogan stated that Dr. Carr did not specify what kind of document he needed from Mr. Mitchell.
- Ms. Bird stated she was terminated and was not released due to a reduction in staff.
- Dr. Carr stated that Dual Enrollment numbers were down, impacting the University budget, approximately $1.29 million reduction directly impacting personnel numbers.
- A document with numbers was provided to this investigator. Out of 205 Dual Enrolled total students for Fall 2019, only 90 have been retained.
- HR explained the process, policy, and impact of financial exigency on VSU. According to HR, Ms. Bird's removal was not based on her performance evaluations, but on budget reductions.
- In comparison to peer institutions, the Dual Enrollment process is handled by university recruiters, with a case load of approximately 338 per recruiter, with an average salary of $32.000 annually. Ms. Bird's case load is approximately 238-300 students at a salary of $58.000 annually and is a one employee department. Her duties can be assigned to the current recruiters with minimal impact to these students. Eliminating one employee units and departments is in keeping with the guidance from the Comprehensive Administrative Report.

**Conclusion:**

Nonconsensual Sexual Contact defined as any physical contact with another person of a sexual nature without the person's consent. It includes but is not limited to the touching of a person's intimate parts (for example, genitalia, groin, breasts, or buttocks); touching a person with one's own intimate parts; or forcing a person to touch his or her own or another person's intimate parts. This provision also includes "Fondling" as defined by the Clery Act.

Based on the information received from all parties, this situation does not meet the standard of this definition. This investigator found there was no touching of Ms. Bird or Dr. Carr's intimate parts (e.g., genitalia, groin, breasts, or buttocks). This investigator found there was no touching of Ms. Bird or Dr. Carr's own intimate parts; or forcing one another to touch his or her own intimate parts. This investigator found no fondling between Ms. Bird and Dr. Carr.

**Sexual Harassment:** Unwelcome verbal, nonverbal, or physical conduct, based on sex or on gender stereotypes, that is implicitly or explicitly a term or condition of employment or status in a course, program, or activity; is a basis for employment or educational decisions; or is sufficiently severe, persistent, or pervasive to interfere with one's work or educational performance creating an intimidating, hostile, or offensive work or learning environment, or interfering with or limiting one's ability to participate in or to benefit from an institutional program or activity.

This investigator has examined and considered all information gathered during the investigation. After a thorough review of the information as outlined above, this investigator has determined that based upon a preponderance of evidence there is **not** sufficient information to conclude 1) the February 2019 exchange whereby Dr. Carr hugged Ms. Bird had a romantic or sexual intent; 2) the reprimand and subsequent decisions made by Dr. Rodney Carr were a result of the 2019 interaction or retaliatory; and 3) that the actions taken by Dr. Rodney Carr constituted harassment based upon gender (nonconsensual sexual contact or sexual harassment).

9

Accordingly, the investigator found that there was not a violation of VSU Policy, BOR Policy or the HRAP.

**Recommendations:**
- Future interactions should be limited to work related discussions through the Interim AVP, unless otherwise agreed to in advance by both parties
- Communication should be sent to employees that remind them that perceived concerns of this type should be immediately brought forward to the appropriate office (Social Equity, Human Resources, Legal Affairs, etc.) to be investigated formally
- HR will continue to check in with both parties on a monthly basis until further notice
- Re-training needs to occur campus wide on the administrator's process for handling employee complaints and concerns or when allegations are made
- Both parties are encouraged to contact HR in the event that further support is needed to move forward

As a reminder, anyone who in good faith, reports what he or she believes to be misconduct associated with this complaint, or who participates or cooperates in or is otherwise associated with any investigation, shall not be subject to retaliation. Anyone who believes he or she is the target of retaliation for reporting, participating or cooperating in, or otherwise being associated with an investigation should immediately contact Michelle Jordan, Employee Relations Manager. Any person found to have engaged in retaliation is a violation of this Policy shall be subject to disciplinary action.

10

Case 7:21-cv-00062-WLS    Document 34-32    Filed 05/12/22    Page 12 of 12


**Holly Maestas**

| | |
|---|---|
| **From:** | Janice  Lyn |
| **Sent:** | Monday, October 5, 2020 4:13 PM |
| **To:** | Jeanine Y Boddie-La Van |
| **Subject:** | for feedback please |
| **Attachments:** | Birdinvestigation.docx |

1