**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

JAMIE T. BIRD,                 :
                                     :
      Plaintiff,           :
                                       :
                                       :
v.                            :     CASE NO.:  7:21-CV-00062 (WLS)
                                       :
BOARD OF REGENTS OF THE    :
UNIVERSITY SYSTEM OF       :
GEORGIA d/b/a VALDOSTA STATE :
UNIVERSITY,               :
                                       :
      Defendant.          :
_____ :

## ORDER

Before the Court is Defendants' Motion for Summary Judgment (Doc. 42). For the reasons that follow, Plaintiff's Title VII claims cannot survive summary judgment, and Plaintiff's Georgia-law claim is appropriate for dismissal under 28 U.S.C. § 1367(c)(3).

## RELEVANT PROCEDURAL HISTORY & BACKGROUND

Plaintiff Bird initially filed her lawsuit against Defendants Valdosta State University ("VSU") and the Board of Regents of the University System of Georgia in the Superior Court of Fulton County on January 20, 2021. (Doc. 1-1). Therein, Plaintiff alleges claims under Title VII for Gender Discrimination (Count One) and Retaliation Discrimination (Count Two), and under the Georgia Whistleblower Act O.C.G.A. § 45-1-4 for violations against Plaintiff related to the rules and regulations of the Georgia Dual Enrollment Program (Count Three) and for violations against Plaintiff related to Title VII and Title IX (Count Four). (*Id.*) Plaintiff alleges that she was fired from her job at VSU as the Dual Enrollment Director because Defendants VSU and its employee, Dr. Rodney Carr, retaliated against her

for "blowing the whistle" on VSU's "unlawful acts and omissions" regarding its Dual

Enrollment Program. (Doc. 1-1, at 1.)

Defendants removed the case to the Northern District of Georgia, Atlanta division,

on February 19, 2021, based on federal question jurisdiction under 28 U.S.C. §§ 1331,

1441(c). (Doc. 1-2; 1-3). About two months later, the case was transferred to Valdosta

Division of the Middle District of Georgia. (Docs. 9; 14).

In September of 2022, this Court issued an Order (Doc. 38) addressing various

motions by the Parties, including denying without prejudice Defendants' previous Motion

for Summary Judgment (Doc. 33), and Plaintiff's Motions to Compel (Docs. 22; 28).

Thereafter, Defendants filed the instant Motion for Summary Judgement (Doc. 42). Plaintiff

filed her Response (Doc. 43), and Defendants filed their Reply (Doc. 47). Defendant's

Motion for Summary Judgment (Doc. 42) is ripe for the Court's ruling.

## SUMMARY OF RELEVANT FACTS

The following facts are derived from Plaintiff's Complaint, Defendants' Motion for

Summary Judgment, Plaintiff's Response, Defendants' Statement of Undisputed Material

Facts, Plaintiff's Statement of Material Facts to Which There Exists a Genuine Issue to be

Tried, and the record in this case that have been properly cited to and supported by

evidence. Where relevant, the factual summary contains undisputed as well as disputed facts

derived from the pleadings, the discovery and disclosure materials on the record, and any

affidavits. Notably, all evidence, the record, and any inferences arising therefrom are

construed in light most favorable to Plaintiff because she is the nonmoving Party.

Plaintiff Jamie Bird previously worked at Valdosta State University as the Dual

Enrollment Manager or Director from 2015 until her separation from employment in

November 2020. (Docs. 42-2; 43-1; 43-2). Plaintiff was one of the six or seven employees at VSU who were let go from employment due to COVID-related Reduction in Force ("RIF") in 2020. (Doc. 42-4, at 167; 42-5, at 54). In particular, Plaintiff was subject to RIF because Dual Enrollment was serving "only 200 students" and because Plaintiff's "pay was more" than another Dual Enrollment employee's salary. (Doc. 42-2, at 101–02; Doc. 43-7, at 89). When the COVID Pandemic hit in March of 2020, VSU, along with other colleges across the State of Georgia, was asked to start working on a scenario for significant cuts in the next fiscal year, starting in July. (Doc. 42-5, at 56). Once VSU received a request to reduce its budget, VSU prepared for "fairly aggressive cut scenarios" and aimed to reduce the budget in travel costs, printing costs, and then moved to reducing active employees. (*Id.* at 57; Doc. 42-6, at 29; Doc. 43-7, at 83–84). VSU's total budget cut was a little over $1 million. (Doc. 42-6, at 29; Doc. 43-7, at 89).

Dr. Richard Carvajal is the current President of VSU and has assumed that position since January of 2017. (Docs. 42-2, 43-1). Dr. Rodney Carr is the current Vice President of Student Success at VSU and has assumed that position since June of 2017. (Docs. 42-2; 43-1). The two had previously worked together at Bainbridge College when Carvajal worked as its President and Carr worked as its Vice President of Student Affairs. (Doc. 42-5, at 46–52). While at Bainbridge College, Dr. Carvajal had issued a written reprimand to Dr. Carr for his "aggressive and unprofessional" behavior and incidents of "sexually charged language and cursing." (Docs. 41, 42).  A former employee of Bainbridge College, Michael Kirkland, testified that there were speculations of Dr. Carr having affairs with female employees and how his interaction with female workers often involved "aggressive raised voice" and "intimidating type approach." (Doc. 43-3, at 25–33). Subsequently, a few months after Dr.

Carvajal was hired to be the President of VSU, Dr. Carr also applied for the position of Vice President of Student Success at VSU. (*Id.* at 49–52). Dr. Carr was one of the finalists named by the hiring committee and was the committee's "number one pick." (*Id.* at 50). Dr. Carvajal had the "ultimate hiring authority," and he offered Dr. Carr the position. (*Id.* at 51–52).

Plaintiff Bird worked in the Office of Admissions as the Dual Enrollment Manager or Director, which was under the Department of Student Success, led by Dr. Carr. (Doc. 42-5, at 68). Plaintiff's direct supervisor was Tee Mitchell, who was the Director of Admissions at VSU. (Doc. 43-48, at 3). Tee Mitchell's direct supervisor was Dr. Carr. (Doc. 43-48, at 4).

When Dr. Carr arrived at VSU in June of 2017, until February 20, 2019, when Dr. Carr hugged Plaintiff, Dr. Carr had not done anything that Plaintiff considered inappropriate. (Docs. 42-2; 43-1). On February 20, 2019, a student who was enrolled at the Dual Enrollment Program committed suicide. (Docs. 42-2; 43-1; 42-4, at 54). At that time, Tee Mitchell was Plaintiff's direct supervisor, and Tee Mitchell's supervisor was Dr. Carr. (Doc. 42-4, at 58). On the morning of February 20th, Plaintiff called Tee Mitchell about a meeting that was scheduled in another town. (Doc. 42-4, at 58). Tee Mithcell told Plaintiff that the school planned to make a communication plan about the student who committed suicide, so he was going to call Dr. Carr because Dr. Carr may want to be part of that meeting set in another town "to determine what VSU says." (*Id.*) At around 8:40 AM that morning, Plaintiff heard Dr. Carr say, "Is she in?" to which Lisa Long responded, "Yes." (*Id.*) Dr. Carr entered Plaintiff's office and closed the door. (Doc. 42-4, at 58). Plaintiff thought Dr. Carr came to visit her to discuss the communication plan. (*Id.* at 59). So, Plaintiff said she got up from her desk so that she could meet him at a round table placed in

4

front of her office. (*Id.*) Then, Dr. Carr told Plaintiff that she looked "upset," although Plaintiff contends that she was not upset because she had been working on some tasks regarding the student's passing, which had been sent to Plaintiff from the dean of students. (*Id.* at 61). Dr. Carr told Plaintiff that he was "going to do something" that he does not "typically do in the office." (*Id.* at 59). Dr. Carr went behind her desk where there is "only room enough" for "one person to be there," and hugged her. (*Id.* at 57, 59). Dr. Carr hugged her before she had an opportunity to exit that area, placed one hand behind her neck, placed his other hand on her lower back, and gave her a "tight full body hug." (Doc. 43, at 9–10). She felt "threatened and uncomfortable," and "immediately" pushed him away, opened the door, and stated that she had work to do. (*Id.* at 10). Plaintiff also called the hug "inappropriate," and that Dr. Carr would not have "done that to" her if she had been a man. (Doc. 42-4, at 62). Plaintiff immediately pushed away and stepped besides Dr. Carr and said that she needed to open the door. (*Id.* at 59). Dr. Carr then became "very angry," his face turned "red," and said to Plaintiff, "Why did you do that?" (*Id.*) Plaintiff told Dr. Carr that she "always" has her door open and that the office gets hot. (*Id.*) She also told Dr. Carr that she has work to do and sat down at her desk. (*Id.*) Dr. Carr stayed for a few seconds before telling Plaintiff that the suicide was not her fault. (*Id.*) Once he left, Plaintiff told Lisa Long to not let him back in her office again. (*Id.*)

Dr. Carr "had never done anything inappropriate" to Plaintiff before the hug, and he has not done anything inappropriate as far as approaching Plaintiff intimately since that hug. (*Id.* at 61, 63). The hug is the only conduct of sexual harassment alleged by Plaintiff. (*Id.* at 65; Doc. 1-1).

On the night of the hug, Plaintiff told her husband about it. (*Id.* at 64). When the husband asked Plaintiff if she needed his help, Plaintiff told him, "Nope," and that she "drew a boundary line that needed to be drawn." (*Id.*) Plaintiff told Lisa Long about the hug a couple weeks later. (*Id.* at 86–88). Additionally, since the hug, Plaintiff noticed Dr. Carr parking his truck "right by [her] window," which she found "very intimidating." (Doc. 42-4, at 64).

On February 26, 2019, a few days after the hug, Plaintiff sent out an email to high school counselors about the Dual-Enrollment program and courses. (Doc. 42-4, at 67). The email, in part, stated:

> [f]or students wanting to participate in any dual enrollment program in our state, it is critical for those students wanting to attend a 4-year institution after they graduate high school, get their DE credits from the same type of institution. The curriculum course rigor needs to be the same in order for them to be successful once they graduate and move forward into college.

(Docs. 43-46; 42-4, at 74). Plaintiff wrote and sent the email to high school counselors in the community to explain the importance of following the Dual Enrollment programs' rules and advising the high school students in the programs in accordance with the program's rules. (Doc. 42-4, at 72–73). Plaintiff understood that her email could upset some people. (*Id.* at 74, 78). Plaintiff knew it is ultimately the high school's responsibility to provide counseling and guidance to students and their parents before students enroll in the program. (*Id.* at 80). And although there is no law or statute that places the burden or requirement on post-secondary institutions, like VSU, to ensure that students have been counseled about the Dual Enrollment program by their high school counselors, Plaintiff saw that it was still VSU's responsibility to ensure that students interested in Dual Enrollment program were receiving proper counseling. (*Id.* at 80–84).

Soon after Plaintiff sent the email, Dr. Carvajal received a phone call from then-president of Wiregrass, Tina Anderson, who was upset about the email. (*Id.* at 74–75; Doc. 42-5, at 144–170). Tina Anderson was angry because she thought the email sent by Plaintiff made it seem as if VSU was contending that Wiregrass and other Technical College System of Georgia (TCSG) institutions did not possess academic rigor. (Doc. 42-5, at 144). Tina Anderson also told Dr. Carvajal that she had been contacted directly by multiple high school counselors who were "aghast" of the email, and Tina Anderson saw the email as VSU degrading her institution and other TCSG institutions. (*Id.* at 145–46). Dr. Carvajal told her that he did not know what she was talking about. (*Id.* at 144). Other presidents of TCSG institutions also got copies of the email and were upset with VSU. (*Id.* at 163). Dr. Carvajal apologized for what happened and assured that some action would be taken. (*Id.*) Dr. Carvajal testified that if not for the apology, the email would have hurt VSU's ability to go forward with other institutions. (*Id.* at 164–66). Dr. Carvajal asked Dr. Carr to assure the counselors that Plaintiff's email was not VSU's position. (*Id.* at 164). Accordingly, Dr. Carr sent out an email on February 28, 2019, stating that it is the "mission and vision of Valdosta State University to collaborate with [its] educational partners" to serve the community, and that VSU is "committed to collaborating to meet the educational needs of dual enrollment students by partnering with" the TCSG. (Doc. 43-37, at 2). Dr. Carr's email also added that the "TCSG is able to provide core courses that are high quality and offered in" those institutions. (*Id.*)

A few days later, in early March of 2019, Plaintiff was given a written reprimand for the email. (Docs. 42-2; 43-38). Plaintiff met with Tee Mitchell and Dr. Carr to explain the intent of her email, pursuant to her request for the meeting. (Doc. 42-4, at 68–69). Dr. Carr

kept telling Plaintiff, "That was a stupid thing that you did. You did something stupid." (*Id.*) Plaintiff said it became "quite clear" to her that Dr. Carr was not necessarily referencing the email. (*Id.* at 68–69). When Plaintiff asked Dr. Carr what he was going to gain by writing her up, Dr. Carr responded that if she did "anything stupid again," he could pull the written reprimand to "protect this university." (*Id.* at 70). Dr. Carvajal found the written reprimand was "deserved" because of damage caused by the email required action at the presidential level to remedy. (Doc. 42-5, at 169).

A few days after the meeting with Dr. Carr, Plaintiff met with Ms. Jeannie Boddie-Lavan in Human Resources at VSU to discuss the written reprimand. (Doc. 42-4, at 91–92). At around this meeting, Plaintiff also told Tee Mitchell, her direct supervisor, about Dr. Carr's hug. (Doc. 42-4, at 66, 86–89). The written reprimand did not cost Plaintiff loss of pay or benefits. (Doc. 42-2, at 96).

Subsequently, at another meeting with Ms. Boddie-Lavan, Plaintiff then told Ms. Boddie-Lavan that the reprimand actually had "nothing to do" with her email. (*Id.*) When Ms. Boddie-Lavan asked Plaintiff if she wanted to "discuss that incident," Plaintiff responded, "Absolutely not," because she could get in "much trouble" for doing so and "will lose" her job. (*Id.* at 92–93). Plaintiff stated that she did not give Ms. Boddie-Lavan the "specifics" but told her that Plaintiff was "scared to talk" with Ms. Boddie-Lavan. (*Id.* at 93). The written reprimand did not cost her loss of pay or benefits. (Doc. 42-2, at 96).

Plaintiff was aware of the laws against harassment, discrimination, and retaliation; however, she said she was not aware of nor explained of VSU's policies against harassment, discrimination, and retaliation. (Doc. 43-1, at 4).

About a year later, on January 22, 2020, Dr. Carr entered Plaintiff's office to discuss her job reconstructing and to explain that Dual Enrollment would move to a different department. (Doc. 42-2; Doc. 43-2). During this encounter, Dr. Carr also condescendingly mentioned Plaintiff's discomfort from his hug back from February of 2019, and stated that Plaintiff did not like hugs, did not like being touched, did not like her door being closed when he was in the office, and that he would only be able to give her an air-hug. (Doc. 43-2). This conversation was overheard by Lisa Long and Ryan Hogan. (*Id.*)

A few months later, due to the COVID Pandemic, the Board of Regents directed all member institutions to review their budgets. (Docs. 42-2; 43-1). VSU was required to cut state allocation and tuition budgets for the 2021 fiscal year. (Docs. 42-2; 43-1). Plaintiff received a letter on July 17, 2020, which informed her that her position would be terminated later in the year due to RIF. (Docs. 42-2, at 4; 42-4, at 97). Plaintiff, however, was allowed to stay employed until November of 2020 so that she could be eligible for her retirement benefits because she turned sixty (60) years old in October. (Doc. 42-2, at 4; Doc. 42-4, at 97). Plaintiff's written reprimand was referred to during the RIF, and Plaintiff was one of the six or seven people subject to the RIF. (Docs. 43-1, at 4–5; 42-2, at 3; 42-4, at 96).

On August 3, 2020, which was about over a year after the hug and the receipt of the written reprimand for Plaintiff's email, Plaintiff filed a letter to the Office of Legal Affairs, and then wrote a letter to the Office of Social Equity to request review on August 17, 2020. (Docs. 42-2, at 4; 42-4, at 168; 43-1, at 4).

Defendants contend that Plaintiff Jamie Bird was separated from employment in November of 2020 because she was one of six or seven people who were subjected to COVID-related RIF. (Docs. 42-2, at 7; Doc. 42-4, at 101). Conversely, Plaintiff argues that

RIF is a pretext and that she was terminated because Dr. Carr retaliated against Plaintiff. (Doc. 43-1, at 3, 5).

## **LEGAL STANDARD**

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Chow v. Chak Yam Chau*, 555 F. App'x 842, 846 (11th Cir. 2014) (citing *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013)). "'A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.'" *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (citation omitted). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant—here, Defendants—bears the initial burden of showing, by citing to the record, that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet that burden by presenting evidence showing there is no dispute of material fact, or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322–24.

After the movant has met their burden, the Court must determine "whether the evidence [submitted by plaintiff] presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citation omitted). The nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. While a plaintiff can use their affidavit to meet this burden, FED. R. CIV. P. 56(c)(4), the affidavit must "designate 'specific facts showing that there is a genuine issue for trial,'" and she "may not merely rest on [her] pleadings." *Graham*, 193 F.3d at, 1282. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Vicks v. Knight*, 380 F. App'x 847, 851 (11th Cir. 2010) (citation omitted). To avoid summary judgment, the nonmovant must point to record evidence that would be admissible at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form").

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Matsushita*, 475 U.S. at 587–88; *Allen*, 121 F.3d at 646. The Court, however, must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

In addition, the Court's Local Rule 56 requires the following:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56.

## ANALYSIS

Plaintiff Bird alleges Title VII and Title IX claims against Defendants for a sexually hostile work environment and retaliation and on claims brought under Georgia Whistleblower Act. Plaintiff claims that Defendants intentionally discriminated against her because of her gender, that Plaintiff's refusal to succumb to the hug or the sexual harassment was the proximate cause of the adverse employment action taken against her, and that Defendants retaliated against Plaintiff for opposing Dr. Carr's intimate behavior towards her. (Docs. 1-1, at 26–27; 43, at 4).

Generally, claims of employment discrimination, including sexual harassment claims, such as the claims in the above-styled matter, often present fact-intensive issues. *E.g.*, *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999). Nevertheless, the Eleventh Circuit has observed that motions for summary judgment are still appropriate in such cases to "police the baseline for hostile environment claims." *Id.* (internal citation omitted).

### I.    Title IX, Title VII, and Sexually Hostile Work Environment

To begin, Title IX was passed as part of the Education Amendments of 1972. *Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*, 47 F.4th 791, 811 (11th Cir. 2022) (citing

*Cannon v. Univ. of Chi.*, 441 U.S. 677, 694–96 (1979)). It was "patterned after" the Civil Rights Act of 1964. *Id.* The statute states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . ." 20 U.S.C. § 1681(a). Its purpose is to prohibit sex discrimination in education. *Id.*; *Adams by and through Kasper*, 57 F.4th at 811.

Relatedly, Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). It also probits a sexually hostile work environment. *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1279 (11th Cir. 2003). A Title VII plaintiff bears the initial burden to establish a prima facie case of discrimination when relying on circumstantial evidence of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To establish a prima facie case of hostile-environment sexual harassment claim based on gender under Title VII, the plaintiff must prove that she: (1) belongs to a protected group; (2) employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) harassment must have been based on the sex of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of the employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *Borden, Inc.*, 195 F.3d at 1245 (internal citation omitted). If the plaintiff succeeds in proving the prima facie case, the burden then shifts to the defendant to articulate "some legitimate, nondiscriminatory reason" for its employment decision. *McDonell Douglas Corp.*, 411 U.S. at 802. Notably, the employer need not persuade the court that it was motivated by the

proffered reasons. *Tex Dep't of Cmty. Aff. v. Burdine*, 450 U.S. 248, 254 (1981). Once the defendant carries its burden, the plaintiff will be "afforded a fair opportunity to show" that the defendant's reasons were pretextual. *McDonnell Douglas Corp.*, 411 U.S. at 802. In doing so, however, a plaintiff "must meet it head on and rebut it" and "[q]uarreling with that reason is not sufficient." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004).

Notably, Title VII is not a "general civility code." *Freeman v. City of Riverdale*, 330 F. App'x 863, 865 (11th Cir. 2009) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). The Supreme Court has stated that the standards for judging hostility under Title VII are sufficiently demanding to ensure they "filter out complaints" that attack the "ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788. In particular, the fourth element, which requires "the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere general civility code." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 582–83 (11th Cir. 2000) (citation omitted). Often, the "paradigm of sexual harassment as federally prohibited employment discrimination occurs when an employee's expressed terms of employment, such as salary or continued employment, are conditioned upon compliance with the employer's sexual demands." *Mendoza*, 195 F.3d at 1245 (internal citation omitted). "In such a case, traditionally described as quid pro quo harassment, the 'discrimination with respect to terms or conditions of employment' is explicit." *Id.* (citations omitted). But here, Plaintiff testified that the reprimand did not result in a reduction of salary or benefits. (Doc. 42-4, at 96, 97).  If anything, Plaintiff was allowed to stay until after she turned 60 years old so that she can be eligible for retirement benefits. (Doc. 42-4, at 97–99). In absence of such "explicit" discrimination, an employee must make

some showing to connect allegations of sexual harassment to a violation of Title VII. *Mendoza*, 195 F.3d at 1245. In other words, an employer's harassing action toward an employee does not constitute employment discrimination under Title VII, unless the conduct is "sufficiently severe or pervasive" to alter the conditions of employee's employment and create an abusive working environment. *Id.* (citation omitted).

Moreover, establishing that a conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes both a subjective and an objective component. *Mendoza*, 195 F.3d at 1246. Thus, the employee must "subjectively" perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment. *Id.* Furthermore, this subjective perception must also be objectively reasonable; that is, the environment must be one that a reasonable person would find hostile or abusive. *Id.*

A conduct that is "not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Wilborn v. S. Union State Cmty. Coll.*, 720 F. Supp. 2d 1274, 1296 (M.D. Ala. 2010) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances. *Mendoza*, 195 F.3d at 1246. The objective component of the analysis is fact intensive. The Supreme Court and the Eleventh Circuit have identified four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4)

whether the conduct unreasonably interferes with the employee's job performance. *Id.* (internal citations omitted). In directing the courts to determine whether an environment is sufficiently hostile or abusive by assessing the four factors, the Supreme Court has explained that Title VII does not generally prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and the opposite sex." *Faragher*, 524 U.S. at 788 (internal citation omitted). "A recurring point in these opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal quotations omitted); *see also Freeman*, 330 F. App'x at 865–66 (The Eleventh Circuit explaining that, in evaluating the objective severity of the harassment, the frequency factor weighs in favor of a plaintiff's hostile work environment claim and that offensive language or conduct alone cannot show such language or conduct is objectively severe or pervasive if "too sporadic and isolated.")

Importantly, the courts must examine the conduct in context, not as isolated acts, thus determine, under the totality of the circumstances, whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the employee's employment and create a hostile or abusive working environment. *Mendoza*, 195 F.3d at 1246 (internal citations omitted).

Here, Plaintiff Bird alleges that her refusal to succumb to Dr. Carr's hug was the proximate cause of the adverse employment action taken against her. (Doc. 1-1, at 26). The hug is the only conduct that Plaintiff contends is sexual harassment. (Doc. 42-4, at 65). Dr. Carr had not done anything inappropriate to Plaintiff neither before the hug nor after the

hug. (*Id.* at 61, 63).[1]  On the other hand, Defendants contend that Plaintiff failed to show that the hug was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment. (Doc. 42-1, at 4–7).

Even construing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff cannot establish the fourth element[2] of a prima facie case of her hostile work environment by Dr. Carr's hug in February of 2019 or his comments about how Plaintiff does not like hugs or his air-hug gesture on January 22, 2020. As Defendants correctly contend, Plaintiff "complains only of the one hug," and it is undisputed that Dr. Carr "never touched her either before or after" the hug. (Doc. 42-1, at 5). It is also undisputed that the hug was for a "very brief time period." (*Id.*) The Court finds that evidence and facts do not establish that either conduct was severe or pervasive—Plaintiff cannot show that the brief, one-time hug in a context where Dr. Carr perceived Plaintiff to be upset or distressed was

---

[1]  **Question:**  Okay, and [Dr. Carr has] not done anything inappropriate as far as
approaching you intimately or anything since [the hug], has he?
  **Plaintiff:**  Since? I've not seen him since.
  **Question:**  And he hasn't done anything like that before?
  **Plaintiff:**  With regard to a hug like that? No.

(Doc. 42-4, Deposition of Plaintiff, at 63).

[2]  The Court notes that Plaintiff does not provide any arguments as to the fourth element, which focuses on severity and pervasiveness of harassment. (*See generally* Doc. 43). Plaintiff cites to the Eleventh Circuit's *Sparks v. Pilot Freight Carries, Inc.*, to argue that she met her burden of proof to survive summary judgment as to her Title VII claims because she belonged to the statutorily protected group, was qualified to do her job, was discharged, and was replaced by a person outside the protected group. (Doc. 43, at 6); *Sparks*, 830 F.2d 1557, 1562 (11th Cir. 1987). But a full reading of *Sparks* shows that the analysis does not end there. In fact, the Eleventh Circuit in *Sparks* discusses the burden-shifting framework and provides that a plaintiff asserting a hostile working environment sexual harassment by an employer must establish a prima facie case, which includes the fourth element of whether the harassment was sufficiently severe or pervasive. *Sparks*, 830 F.2d at 1561.

frequent or severe, and the comments by Dr. Carr appear to be, at worse, "mere offensive utterance." *Mendoza*, 195 F.3d at 1246. In sum, Plaintiff fails to sufficiently plead a prima facie case of gender discrimination based on hostile work environment and fails to demonstrate that there is a genuine dispute of material fact that the hug was severe or pervasive to alter the terms and conditions of Plaintiff's employment.  Thus, Defendant's Motion for Summary Judgment as to Plaintiff's Title VII claim for sexually hostile work environment is **GRANTED**. Because Plaintiff failed to establish a prima facie case of gender discrimination, the Court need not proceed to assess the rest of the burden-shifting *McDonnell Douglas* framework. *See Faragher*, 524 U.S. at 788.

## II.     Title VII Retaliation Claims

Plaintiff contends that Defendants retaliated against her by giving her a written reprimand for the email that she sent out in February of 2019, and by subjecting her to the COVID-related RIF. (Doc. 43, at 1–2).

Title VII prohibits employer from retaliating against an employee for engaging in protected activity. *See* 42 U.S.C. § 2000e-3(a). Under Title VII, it "shall be an unlawful employment practice for an employer to discriminate against any of his employes . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter. . . ." *Id.*

Here, Plaintiff's retaliation claims are based upon circumstantial evidence. Thus, Plaintiff must use the burden-shifting *McDonnell Douglas* framework and make out a prima facie case of retaliation by establishing that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) there exists a causal link between the two. *E.g.*, *Barnett v. Athens Reg'l Med. Ctr. Inc.*, 550 F. App'x 711, 714 (11th Cir. 2013). As discussed

18

above in the previous section, *supra*, if Plaintiff can establish a prima facie case of her retaliation case, the burden shifts to Defendants to rebut the presumption by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). Once Defendants carry its burden, the burden shifts back to Plaintiff to show that Defendants' proffered legitimate reasons for taking the adverse action was a pretext for retaliation and that Plaintiff's protected activity was the but-for cause for the adverse action. *Mealing v. Ga. Dep't of Juv. Just.*, 564 F. App'x. 421, 427 (11th Cir. 2014). A plaintiff can demonstrate pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's proffered reason. *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007). But a reason is not pretext for retaliation under Title VII unless it is shown "<u>both</u> that the reason was false and that discrimination was the real reason." *Id.* (citations omitted) (emphasis in original); *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020).

Here, Defendants argue that Plaintiff cannot prove the second and third elements of her prima facie case for retaliation. (Doc. 42-1, at 7–12). Plaintiff argues that VSU retaliated against Plaintiff by issuing a written reprimand for sending out an email to high school counselors because her email "revealed the past pitfalls suffered by students who were not properly counseled as to the appropriate academic rigor of the dual enrollment courses" (Doc. 43, at 14–15) and by terminating her "in the convenient and happenstance RIF of the COVID-19 pandemic" (*Id.* at 16–18).

A. <u>**Second Element: Materially Adverse Action**</u>

Under the second element, a materially adverse action, an "adverse employment action" in the retaliation context does not carry the restrictive definition that it does in the discrimination context. *Barnett*, 550 F. App'x at 714. It is not limited to discriminatory actions that affect the terms and conditions of employment. *Id.* (citing to *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)). Instead, "materially adverse" in the retaliation context means "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* The significance of "any given act of retaliation will often depend upon the particular circumstances." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69. Moreover, the antiretaliation provision of Title VII protects an individual not from all retaliation, but from retaliation that produces an injury or harm. *Id.* at 67. The Supreme Court stated that "material adversity" is distinguishable from "trivial harms." *Id.* at 68.

Additionally, the Eleventh Circuit has held that generally a "memoranda of reprimand or counseling that amount to no more than a mere scolding, without any following disciplinary action, do not rise to the level of adverse employment actions sufficient to satisfy the requirements of Title VII." *Barnett*, 550 F. App'x at 713. Still, the courts must look to see whether a memorandum of reprimand could amount to an adverse employment action because context matters when analyzing what constitutes an adverse employment action. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69.

Here, the relevant record and evidence show that the written reprimand did not cost Plaintiff loss of pay or benefits. (Doc. 42-2, at 96). Under the Eleventh Circuit, where there is no "tangible consequence from the memo, in the form of a loss of pay or benefits or

20

further discipline . . . or a material impact on the terms and conditions of employment" or "even a negative annual performance evaluation" as a result of the reprimand or memo, then such written reprimand is not actionable under Title VII. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1240–41 (11 Cir. 2001) (rejecting an employee's argument that the employer's maintenance of the employee's memo of counseling or reprimand in the employee's personnel file, which could jeopardize employee's chance of obtaining a different position in the future, because that memo did not "trigger any more tangible form of adverse action such as loss in benefits"). Moreover, it is undisputed that Plaintiff was permitted to stay employed until November, instead of the original, earlier "end date," so that Plaintiff could be eligible for retirement benefits once she turned sixty (60) years old in October of 2020. (Doc. 42-2, at 99–100). Therefore, the Court agrees with Defendants and finds that Plaintiff failed to establish the second element.

### B. <u>Third Element: Causal Connection</u>

Assuming arguendo that the written reprimand was an adverse action, the Court finds that Plaintiff fails to establish the third element of her prima facie case of retaliation.

Under the third element, a causal connection between protected activity and materially adverse action, "at a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action." *Clover v. Total Sys. Servs. Inc.*, 176 F. 3d 1346, 1354 (11th Cir. 1999). Furthermore, "for purposes of a prima facie case, close temporal proximity may be sufficient to show that the protected activity and adverse action were not wholly unrelated." *Wallace v. Ga. Dep't of Transp.*, 212 F. App'x 799, 802 (11th Cir. 2006). The Eleventh Circuit stated that "if there is a substantial delay between the protected expression and the adverse action <u>in the</u>

absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (emphasis added).

Here, Plaintiff contends that Defendants retaliated against her by giving her a written reprimand for the email that she sent out in February of 2019, and by subjecting her to the COVID-related RIF. (Doc. 43, at 1–2). The Court finds Plaintiff fails to sufficiently show that either of these incidents are retaliatory.

First, as to the written reprimand, Plaintiff was issued the written reprimand in early March of 2019, a few days after she sent the email to high school counselors on February 26, 2019. More than a year after the issuance of the written reprimand, Plaintiff received a notice of COVID-related RIF in July of 2020. About a month after, in August of 2020, Plaintiff filed a complaint about Dr. Carr's hug. Based on the record and evidence, the Court does not find that Plaintiff has sufficiently demonstrated that subjecting Plaintiff to RIF was retaliation for her complaints filed in August 2020, because the RIF notice was handed to her before she filed her complaints. The Court further finds that Plaintiff fails to show that Defendants' decision to subject her to RIF for the hug that occurred in February of 2019 is retaliatory because more than a year had passed between that hug and the issuance of the RIF notice in July of 2020. The Eleventh Circuit has found three (3) to four (4) months disparity, without further evidence showing causation, to be insufficient to show causal connection. *Higdon*, 393 F.3d at 1220. Hence, because there was a "substantial delay" between the hug and the written reprimand and the RIF notice, Plaintiff is required to present further evidence to establish that the protected expression and the adverse action were causally related; otherwise, the "complaint of retaliation fails as a matter of law." *Higdon*, 393 F.3d at 1220. Upon careful consideration of the Parties' briefs, depositions,

evidence, and relevant records, the Court ultimately finds that Plaintiff has not provided such evidence. Because Plaintiff fails to establish a prima facie case of her retaliation claim, the Court's assessment ends here. *See Faragher*, 524 U.S. at 788. Plaintiff ultimately fails to demonstrate that there is a genuine dispute of material fact as to the second and third elements, and thus, Defendant's Motion for Summary Judgment for Plaintiff's Title VII retaliation claim is **GRANTED**.

### III.   Plaintiff's Georgia Claim

Plaintiff's remaining claims are Georgia-law claims. The Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims as the Court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Thus, the state law claim is **DISMISSED without prejudice**.

### CONCLUSION

For aforementioned reasons, Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiff's claims of gender discrimination and retaliation discrimination under Title VII. Plaintiff's claim of Georgia Whistleblower Act is **DISMISSED without prejudice**.

**SO ORDERED**, this ___26th___ day of September 2023.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**